PAUL SAVAD, ESQ. (5358)
SUSAN COOPER, ESQ. (5433)
Paul Savad & Associates
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
Phone: (845) 624-3820
Email: paul@savadlaw.com

ROMAN P. STORZER, ESQ.
ROBERT L. GREENE, ESQ. (5430)
Storzer & Greene, P.L.L.C.
1025 Connecticut Avenue, NW #1000
Washington, D.C. 20036
Phone: (202) 857-9766
Email: storzer@storzerandgreene.com

JOHN G. STEPANOVICH, ESQ. (8876)
Lentz Stepanovich & Bergethon, P.L.C.
448 Viking Drive, Suite 370
Virginia Beach VA 23452
Phone: (757) 498-7035
Email: jgs@lawlsb.com



Parties Added
2cnd Amended Sum.
Issued



U.S. DISTRICT COURT
FILED
NOV 15 2007
S.D. OF N.Y.
W.P.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------X

CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., RABBI MORDECHAI BABAD, RABBI
WOLF BRIEF, RABBI HERMEN KAHANA, RABBI MEIR
MARGULIS, RABBI GERGELY NEUMAN, RABBI
MEILECH MENCZER, RABBI JACOB HERSHKOWITZ, RABBI
CHAIM ROSENBERG, RABBI DAVID A. MENCZER,
RABBI ARYEH ROYDE, and KOLEL BELZ OF MONSEY,

                                   Plaintiffs,

         -against-

VILLAGE OF POMONA, NY; BOARD OF TRUSTEES OF
THE VILLAGE OF POMONA, NY; NICHOLAS SANDERSON,
AS MAYOR; IAN BANKS, ALMA SANDERS ROMAN,
RITA LOUIE and BRETT YAGEL, AS TRUSTEES
AND IN THEIR OFFICIAL CAPACITIES,

                                   Defendants.

-----------------------------------------------------------------------------X

07cv6304

**SECOND
AMENDED
COMPLAINT**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Congregation Rabbinical College of Tartikov (the "Congregation"), Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi David A. Menczer, Rabbi Aryeh Royde and Kolel Belz of Monsey, by their attorneys, Paul Savad & Associates, Storzer & Greene, P.L.L.C., and Lentz, Stepanovich and Bergethon, P.L.C., as for their Complaint against the Defendants, allege as follows:

## NATURE OF ACTION

1.      This action is commenced by Plaintiffs to redress violations of the their civil rights—as protected by the United States and New York Constitutions, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), and the Fair Housing Act, 42 U.S.C. § 3601 *et seq*—caused by the Defendants' burdensome, discriminatory and unreasonable land use regulations and intentional conduct which have prohibited and continue to prohibit the Congregation from owning, holding, building and operating a Rabbinical College that will include places of worship, religious educational facilities, religious courts, libraries of Jewish texts, and student housing solely dedicated for the religious use by the Plaintiff Congregation's full-time rabbinical students, lecturers and their families (the "Rabbinical College") on a 30-acre portion of the Congregation's large 100-acre property in Pomona ("the Subject Property").

2.      The Rabbinical College will be a religious institution for ordained rabbis.

(the majority of whom will be drawn from Rockland County) to engage in advanced rabbinical studies to train as judges for rabbinical courts.   All Plaintiffs have a sincere religious belief that they must teach and study certain Jewish texts and conduct their lives in such a manner to act as religious leaders within their community.  Furthermore, there is a severe shortage of such religious leaders in the Orthodox Jewish community, the members of which believe that—as a religious matter—disputes must be resolved by courts composed of rabbis, and not the civil courts.   The Village's laws preventing the existence of such an institution therefore substantially burdens Plaintiffs' religious exercise.

    3.    The Village's Zoning Code forbids the Rabbinical College's use throughout its entire jurisdiction.  In addition, the Village has enacted several new ordinances designed specifically to prevent the Plaintiffs' use.  The Congregation has no administrative means of using its property legally as a Rabbinical College.

    4.    In addition to burdening Plaintiffs' religious exercise, the Village has targeted Hasidic or Orthodox Jewish land uses (including Plaintiffs' use) for years. Defendant Village has repeatedly used legislative and administrative means to prevent the Jewish community from utilizing the Subject Property.  Specifically, each and every time the previous three owners of the Subject Property attempted to develop it for a Jewish-affiliated institution (including a Jewish camp, a yeshiva, and now the Rabbinical College), the Village has responded by targeting such use and amending its zoning code to prevent, impair or delay development and housing for such use.  This targeting is the direct result of fierce anti-Hasidic animus in the local community.  Upon information and belief, the current administration of the Village was elected on a

3

platform of preventing the Congregation from locating in the Village, and appeasing local resident's intent on excluding this Jewish community from the Village.

5.     In preventing the Congregation from using the Subject Property for its protected religious and expressive activity along with its housing availability, the Village and its officials are continuing to violate both federal and state law, including the First and Fourteenth Amendments of the Constitution of the United States; 42 U.S.C. §§ 2000cc *et seq.* (the Religious Land Use and Institutionalized Persons Act of 2000, hereinafter "RLUIPA"); 42 U.S.C. § 3601 *et seq.* (the Fair Housing Act); Article I §§ 3, 8, 9 and 11 of the Constitution of the State of New York; New York Civil Rights Law § 40-C(1) and (2); and New York Village Law § 7-700 by:

A.     Substantially burdening its religious exercise and expression without a compelling governmental interest, or without using the least restrictive means of achieving any compelling governmental interest;

B.     Preferring nonreligious educational institutions over religious educational institutions;

C.     Preferring other religious institutions over the Plaintiffs' proposed religious institution;

D.     Excluding the Congregation's use entirely from its jurisdiction;

E.     Applying unreasonable laws against the Congregation;

F.     Discriminating against the Hasidic Jewish community in general and the Congregation in particular;

G.     Denying or otherwise making residential housing/dwellings

4

unavailable for the individual Plaintiffs and other Hasidic or Orthodox Jews;

H.   Interfering with the right of the individual Plaintiffs and other Hasidic or Orthodox Jews to available housing/dwelling; and

I.   Enacting zoning provisions that not only ignore a regional and Village shortage of affordable housing and the needs of the locality and the region, but intentionally and/or effectively excluding such housing.

6.   The Defendants' actions, all of which took place under color of state law, are and should be declared unlawful, and should be permanently enjoined.

## JURISDICTION AND VENUE

7.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), 42 U.S.C. § 2000cc *et seq.*, 42 U.S.C. § 3613(a), *et seq.*, and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States, particularly the First and Fourteenth Amendments to the Constitution of the United States, and the Religious Land Use and Institutionalized Persons Act of 2000 and the Fair Housing Act.

8.   This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

9.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because

the acts and transactions complained of occurred, and continue to occur in this District.

## THE PARTIES

10.    Plaintiff Congregation Rabbinical College of Tartikov Inc. is a religious corporation formed in 2004 under New York's Religious Corporations Law, and owns the Subject Property within the Village of Pomona upon which it is attempting to construct a Rabbinical College and related facilities.

11.    Plaintiff Rabbi Meir Margulis is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College, due to laws and actions of the Village.

12.    Plaintiff Rabbi Gergely Neuman is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College, due to laws and actions of the Village.

13.    Plaintiff Rabbi Wolf Brief is a natural person who resides in Rockland County, New York and who, for the purposes of religious exercise, speech, assembly, and instruction, seeks to lecture scholars in advanced studies of the Jewish religious laws, including the Talmud and other rabbinic texts. He is prevented from doing so, due to the laws and actions of the Village.

14.    Plaintiff Rabbi Hermen Kahana is a natural person who resides in

6

Rockland County, New York and who, for the purposes of religious exercise, speech, assembly, and instruction, seeks to lecture scholars in advanced studies of the Jewish religious laws, including the Talmud and other rabbinic texts. He is prevented from doing so, due to the laws and actions of the Village.

15.    Plaintiff Rabbi Meilech Menczer is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

16.    Plaintiff Rabbi Jacob Hershkowitz is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

17.    Plaintiff Rabbi Chaim Rosenberg is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

18.    Plaintiff Rabbi David A. Menczer is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the

7

laws and actions of the Village.

19.    Plaintiff Rabbi Aryeh Royde is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

20.    Plaintiff Rabbi Mordechai Babad will be the academic head (Dean) of the proposed Rabbinical College.

21.    Plaintiff Kolel Belz of Monsey is a religious corporation formed under New York's Religious Corporations Law, with its principal office at 12 Maple Terrace, Monsey, New York 10952.

22.    Defendant Village of Pomona is a municipal corporation duly formed and existing pursuant to the laws of the State of New York.  The Village is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

23.    Defendant Board of Trustees of the Village of Pomona is the municipal legislative body authorized by New York Village Law § 7-700 to adopt zoning and land use regulations for the Village of Pomona.  The Board of Trustees is a branch, department, agency or instrumentality of a government within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

## BACKGROUND

### The Congregation's Need for a Rabbinical College

24.    Plaintiff, Congregation Rabbinical College of Tartikov, Inc., is a religious

institution dedicated to the instruction of advanced rabbinical studies for previously ordained Rabbis.  Plaintiff Mordechai Babad leads a group of rabbinical students that currently meet, worship and study at another religious institution's facilities in Rockland County.

25.    A fundamental purpose of the Congregation is to meet the severe need of Orthodox Jewish communities for rabbinical judges (*dayanim*) to serve in religious courts in order to resolve disputes between and among Orthodox Jews, and to provide religious guidance to members of the Orthodox/Hassidic community for the frequent religious issues that arise concerning the proper application of the laws that govern every aspect of the daily activities and lives of Orthodox Jews.  All rabbinical judges are *dayanim*.  However, not all *dayanim* are rabbinical judges, since *dayanim* refers to a broader category of learned Rabbis who may give opinions on certain aspects of Jewish Law, but who cannot rule on all of them.

26.    The Orthodox Jewish community includes the Hassidic community, which contains various sects.  This community is distinguished by a particular method of dress, certain religious customs and practices and their use of the Yiddish language and lifestyle.   The Hassidic community has been the target of official and unofficial discriminatory animus, statements and actions in Rockland County, by the Defendants.

27.    The individual Plaintiffs are members of the Orthodox/Hassidic Jewish religion and are prospective students and teachers of the educational component and residents of the housing component of the Rabbinical College.  These Plaintiffs have been and continue to be denied the opportunity to obtain housing within the community

9

of Pomona by the conduct and action of the Defendants.

28.    This discrimination—demonstrated by the specific facts described below—has occurred before in Rockland County as evidenced by the federal Second Circuit Court of Appeals' ruling in *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412 (2d Cir. 1995), which upheld a finding of discrimination by the nearby Village of Airmont as "amply support[ed by] a finding that the impetus was not a legitimate nondiscriminatory reason but rather an animosity toward Orthodox Jews as a group."

**Historical Background**

29.    Prior to World War II, *dayanim* came from and were trained in Europe. Rabbinical colleges existed throughout Europe, and each large Jewish community had its own rabbinical court (*bais din*) to handle disputes between Orthodox Jews.   At that time, there were no formal institutions in America for such training.

30.    These *dayanim* were nearly completely eliminated in WWII. Thousands were exterminated by the Nazis.  Most middle-aged Orthodox Jews who would have been eligible to become *dayanim* were murdered by the Nazis, leaving mainly the very young and the elderly members of the community.

31.    Because of the systematic slaughter of the Jews, only a small fraction of the rabbis survived in Europe after the war, and very few rabbinical courts continued to exist.

32.    At the conclusion of World War II, approximately 10,000 Orthodox/Hasidic Jews immigrated to the United States, bringing with them this shortage of *dayanim* because most surviving Orthodox Jews were either too young or too old to be trained.

Today, in the third generation since the Holocaust, the Orthodox Jewish population in America is approximately 600,000, and consequently, the need for *dayanim* has become acute.

33.    As the Orthodox population regenerates itself throughout the world (including Rockland County, New York), the religious need for *dayanim* is becoming severe and cannot be met.

34.    Plaintiff Kolel Belz of Monsey is a religious corporation that has need for *dayanim* to serve their Hassidic congregants.  Currently, Kolel Belz of Monsey has more than 200 families, and has only one *dayan* who has not been certified as a rabbinical judge.

35.    Kolel Belz represents the interests of itself and the broader Orthodox community in actively seeking trained *dayanim* to conduct the activities of rabbinical courts, which are necessary religious institutions under Jewish law.

36.    Kolel Belz utilizes no government or private accreditation agency to determine the suitability of *dayanim* who preside over its rabbinical courts.

37.    Congregation Kolel Belz of Monsey is currently experiencing significant growth, and its need for *dayanim* will become even greater over the coming years. They are in desperate need of a *bais din*.

38.    Plaintiffs Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi David A. Menczer and Rabbi Aryeh Royde are engaged in certain rabbinical studies at Kolel Belz.  As a continuation of these studies, a course of education similar to that which will be offered at the Rabbinical College, which is

11

necessary for them to become rabbinical judges. Each of these individuals is compelled by their religious beliefs to pursue such studies; however, there is no existing rabbinical college that can accommodate their pursuits due to the dearth of such institutions generally, and specifically to accommodate the local Hasidic Jewish population.

39.    Plaintiff Congregation Rabbinical College of Tartikov will, upon its opening, admit Rabbis Menczer, Hershkowitz, Rosenberg, Menczer and Royde to its course of instruction in order to provide the religious education necessary for them to become certified rabbinical judges.

40.    Plaintiffs Margulis and Neuman are currently engaged in certain rabbinical studies at Mechon L'Hoyroa, located in Monsey, New York. However, that institution is very limited in terms of curriculum, student size, and ability to offer the religious environment that can be provided by the Rabbinical College.

41.    Plaintiffs Brief and Kahana are compelled by their religious beliefs to teach rabbinical scholars. They sincerely believe that there is a significant religious need for *dayanim* in the Orthodox Jewish community that is currently unsatisfied. They are currently being prevented from doing so because of the laws and actions of the Village.

42.    The Village's laws and actions, if upheld  will directly coerce the Plaintiffs who are natural persons into abandoning their plans to become rabbinical judges or teaching such individuals.

43.    The Village's laws and actions, if upheld, will necessarily place substantial pressure on the Plaintiff Congregation to alter its behavior, by completely preventing it from operating the Rabbinical College. Under the Village's current code, the Plaintiff

Congregation has no opportunity to engage in religious education, expression and worship motivated by its sincere religious beliefs within the Village. The effect of the Village's code is to completely prohibit the Plaintiff Congregation's use.

44.    The Plaintiff Congregation is also precluded from using any other site within the Village. There is no viable alternative for the Plaintiff Congregation to reach its religious objectives other than on the Subject Property.

45.    All Plaintiffs who are natural persons will reside at the Rabbinical College with their families.

46.    Rabbi Yehiel Babad and Rabbi Naftali Babad, the *rosh yeshiva* (academic head) and the Chief Judge of the *bais din*, respectively, of Kollel Beth Yechiel Mechil of Tartikov in Brooklyn, together with Plaintiff Rabbi Mordechai Babad who presently resides in the Town of Ramapo and is the planned *rosh yeshiva,* of the Rabbinical College, are the sons of Rabbi Usher Babad, an esteemed rabbinical judge, who was able to flee the atrocities of Europe and moved to New York in the early 1950's. Usher Babad came from a long line of rabbis, including Joseph Babad, who authored a famous book approximately 150 years ago titled the *Minchas Chinuch*, a respected work on the 613 *Mitzvot* (commandments) that guide the way of life with the rules and practices of the daily lives of Orthodox Jews and sets forth part of the rules sought to be enforced by the *dayanim*.

47.    Prior to his escape from Europe, Rabbi Usher Babad was a prisoner in a concentration camp during the War. Most of his family members in the Ukraine were exterminated, including his wife and children. Upon relocating to New York, he formed

a small *bais din*, the Central Rabbinical Congress in Brooklyn, along with the first

Tartikov *shul* (synagogue), named after the Eastern European village of the Babad

family's heritage.

48.    The Plaintiff Congregation is affiliated with Kollel Beth Yechiel Mechil of

Tartikov, located in Brooklyn, New York at 1452 55th Street.  Kollel Beth Yechiel Mechil

is also a rabbinical college that provides the same type of program that Plaintiff

Congregation will provide.  That facility is extremely overcrowded and cannot begin to

satisfy the need for rabbinical judges. Its doors have been shut for several years to new

rabbis because of such dire space limitations.  It serves mainly the Jewish community in

Brooklyn.

49.    Currently, there are only a very few Rabbinical Courts (*bais dins*) serving

Orthodox Jews in the entire United States.  These courts are extremely overburdened,

causing religious adherents to violate their sincerely held religious laws and beliefs by

resorting to the secular court system.

### The Rabbinical College – Its History, Purpose and Operation

50.    The Congregation purchased the Subject Property on August 17, 2004, for

the sole purpose of building and operating a Rabbinical College with residential housing

on the site.  In furtherance of this goal, an affiliate of the Congregation subsequently

purchased ten additional adjacent lots totaling approximately 30 additional acres,

improved with 13 single-family homes, located contiguous to the Subject Property, to

serve as a buffer between the Rabbinical College and the surrounding community.

51.    Upon information and belief, the Village learned of the potential use as a

Rabbinical College immediately after the deed was recorded in the Rockland County clerk's office on August 31, 2004.

52.     The planned Rabbinical College will be a specialized *kollel* (a term that derives from the Hebrew "klal", which mean group or community.), an institute organized solely for the advanced religious studies of the Talmud and of rabbinic literature for post-graduate Jewish adults.  Every student at the Rabbinical College will already be an ordained rabbi before entering the religious college.

53.     The College will be devoted solely to religious training of *dayanim* who will be tested and certified by rabbinical authorities (*semicha*) after many years of intense religious study.  *Semicha* is the "transmission" of rabbinic authority to give advice or judgment in Jewish law.  These judges will comprise the *bais din* necessary to apply *halakha* (Jewish law, translated literally as "the way of walking").  The *dayanim* must be thoroughly educated in order to resolve the various controversies subject to Jewish law.

54.     The religious tradition of *bais din* is central to Orthodox Jewish religious belief.  When Orthodox Jews have a conflict, they are not permitted, according to the *Chumash* (the five books of Moses, known as the Torah or the "Old Testament") to resolve the dispute in the secular courts. This tenet is based upon the Torah, Deuteronomy 16:17, which says, "Judges and court officers shall you place unto yourself in all your gates."  This sincerely held religious belief of the Plaintiffs establishes an obligation to institute ecclesiastic courts, or *bais din*, in every locale (*Sefer ha-Mizvot, mizvot aseh*, no. 176; *Sefer Mizvot Gadol, esin*, no. 87; *Sefer ha-Hinnukh*, no. 491).  These sources identify the religious obligation to establish *bais din*

15

and set rigorous academic and personal standards for judges.  The specific religious admonition against those who do not use such courts is found in the *Shulchan Aruch, Hashen Mishpat* 26:1 declaring: "And whosoever comes before [gentile courts] for judgment is a wicked person and it is as if he has blasphemed and lifted a hand against the Torah of our teacher Moses."

55.    This command has formed the basis for the institution of the religious or "ecclesiastic" courts everywhere that Orthodox Jews live.

56.    The sources of authority and principal texts that will be studied at the Rabbinical College are the laws and commentaries written in the Bible (*Torah*), the *Talmud*, and the *Shulchan Aruch* (a comprehensive code of *halakha* compiled by Rabbi Yosef Karo in the 16th century).  The *Shulchan Aruch* is comprised of four books: (1) *Orach Chayim* - laws of daily life, including prayer, blessings, meals, synagogue, Sabbath, holidays, family codes, etc.; (2) *Yoreh De'ah* - laws of *shechita* (the religious and humane method of slaughter of animals for food), *kashrut* (keeping kosher), family purity, circumcision, burials, religious conversion, etc ;  (3) *Even Ha'ezer* - laws of marriage, divorce and related issues; and (4) *Choshen Mishpat* – other civil controversies and the rules of the *bais din*.

57.    The religious tradition of *bais din*, and the training of rabbis as *dayanim,* is central to Orthodox Jewish religious belief.

58.    The purpose of the Rabbinical College is to educate rabbis on these religious laws, and on the wise and just application of the religious laws, to serve on *bais dins* and to counsel members of the Orthodox Jewish community on the day-to-day

questions that arise in applying Jewish Law to every aspect of their daily lives.

59.    Plaintiffs believe such training to become a certified *dayanim* for *bais din* is necessary and may take up to (or beyond) fifteen years.  Students, all ordained Rabbis, will normally begin these specialized religious studies between the ages of 20 and 30, and who will be married, some with young children. Plaintiff students and other students will attend the religious college without any tuition costs and without any housing costs.  To meet their other financial needs, Plaintiff students and their families will be subsidized by the College.

60.    The format of the daily activities at the Rabbinical College is based upon strenuous religious study and prayer during the hours of 5:00 a.m. to 10:30 p.m., with meal breaks.  The communal living structure—where students are with their families, prayer and learning groups, lecturers and fellow students—contributes to the necessary religious environment that the Congregation must provide at its Rabbinical College.

61.    Other rabbis will serve as lecturers and remain daily in the study halls (*Bais Medrash*) to interact and advise the students during their studies.

62.    The rabbinical students studying at the Rabbinical College will be provided with tuition, housing and accommodations and educational books and computers free of charge, and, based on need, will receive a regular monthly stipend from $1200 to $2400 from the Congregation for the sole purpose of facilitating their advanced rabbinical studies.

63.    Prayer will be a fundamental element of the students' life at the Rabbinical College.  Orthodox Jews must pray three times per day, in morning, afternoon and evening services. Each prayer service (in the eleventh section of a prayer known as the

17

*Shemoneh Esrei*, in which God's help is requested), includes a request that God "Restore Our Judges" and again let us have Judges of the caliber which Jews once possessed (*Shimon Schwab*); and that God help the Judges rule wisely and justly (*Yaaros D'Vash*).  Proximity of the *shuls* to the housing units is essential for this religious need.

64.    Residential housing is essential to the training provided by the Rabbinical College because it permits the students to live in close proximity, allowing them to immerse themselves in the studies and discussion required to learn the Torah. It also allows the students to spend their spare time together, discussing their religious studies amongst themselves as this is part of the religious learning process. The Rabbinical College is a specialized *kollel*, where community is essential.

65.    It is the Congregation's and individual Plaintiffs' religious practice and belief that it is essential for these students to live, study and pray in the same place in order to minimize outside influences and to intensify the religious learning experience.

66.    Moreover, since the course of religious study prohibits students from being employed (with an 8-12 hour daily academic schedule), and their wives generally are not employed, residential housing at the Rabbinical College is necessary to enable the Rabbis to concentrate on their studies for a 15-year period.

67.    The proposed residential components of the Rabbinical College are "dwellings" as that term is defined by the Fair Housing Act, 42 U.S.C. § 3602.

68.    In addition to the religious educational buildings on the proposed site, the Congregation plans to include up to ten *shuls* (synagogues).  These *shuls* will be located in multiple housing units, and integrated in the daily lives of the students and

18

their families. Because of the sincerely held religious beliefs of the Plaintiffs, religious activities cannot be separated from any part of the students' daily activities. These multiple *shuls* are necessary, since students may come from many different Jewish sects and traditions, including Ashkenazic, Sephardic, and other Hassidic and Orthodox sects.

69.    The Rabbinical College will also include four *bais din* courtrooms throughout the campus, which will be used to litigate and settle disputes, and as teaching facilities for students to become certified Rabbinical Judges and engaged in "shimush" (internship).

70.    The Rabbinical College will also house multiple libraries, which will contain the books necessary for the educational program.

71.    There is no secular purpose to the Rabbinical College, which will be organized and developed as a purely nonprofit religious institution.

72.    The Rabbinical College's plan to use its property to build a religious school is "religious exercise" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(&)(a) & (b).

## DEFENDANTS' PROHIBITION ON THE CONGREGATION'S RELIGIOUS EXERCISE

### The Selection of the Subject Property

73.    On August 17, 2004, the Congregation purchased the Subject Property in the Village of Pomona.

74.    An additional contiguous 30 acres was purchased by an affiliate of the Congregation to serve as a buffer between the Rabbinical College and the neighboring community.

75.    The Subject Property is located at the intersection of Routes 202 and 306, which are state highways in the Village in the Town of Ramapo.

76.    The Subject Property is uniquely suited to meet the needs of the Congregation.

77.    Locally, the Orthodox Jewish community within the Town of Ramapo and adjacent Villages, including Pomona, has grown over the last 80 years with the development of the infrastructures necessary to maintain the practices prescribed by their religious beliefs, including synagogues, yeshivas, elementary and high schools for boys and girls, ritual baths, and kosher food stores and restaurants.

78.    Over these years, the Orthodox Jewish community has spread from its center in Monsey (an unincorporated hamlet in the Town of Ramapo) to numerous villages within the Town of Ramapo, including the Villages of Kaser and New Square (villages created to support the Hassidic Jewish community), Wesley Hills (a village created to preserve a neighborhood of luxury homes on large lots, but which has a sizeable shopping center with a Kosher food market ), Airmont (a village which was declared by the Federal courts to have been created to prevent the spread of the Orthodox Jewish community, see *Leblanc-Sternberg v. Fletcher*, 104 F.3d 355 (2d Cir. 1996)), New Hempstead, Spring Valley, Suffern, Montebello, Chestnut Ridge and Pomona.

79.    Upon information and belief, in 2000, there were approximately 90,000 Jews living in Rockland County, out of a total population of 287,000, with those numbers having increased in the last seven years.

80.    The Rabbinical College will predominantly serve the Orthodox/Hassidic

20

Jewish community in Rockland County, its towns and its local incorporated Villages.

81.    Plaintiff Kolel Belz of Monsey, located in the nearby hamlet of Monsey, currently has multiple potential rabbinical students ready to study at the Rabbinical College when it is built.

82.    Although several other *kollelim* exist in the United States, including in Lakewood, New Jersey, Seattle, and Atlanta, upon information and belief, none offer the full course of study or religious environment planned for the Congregation's institution.  The existing *kollelim* are insufficient to meet the need of students wishing to study in such a manner, and insufficient to provide the *dayanim* with the Rabbinical Judges needed to serve the Orthodox Jewish community.

83.    Even putting aside local zoning regulations, the Subject Property is the only available parcel of land that can accommodate the Rabbinical College, because of its size and proximity to the necessary religious infrastructure and population.

84.    No alternative properties exist in Pomona or in surrounding communities which can legally or practicably accommodate the Plaintiffs' use.

85.    Neither Pomona nor any nearby Village or Town permits the Rabbinical College's use, either by right or by special exception.

### The Village of Pomona's Zoning Code

86.    The Village of Pomona is located within the Town of Ramapo, New York, in Rockland County, New York.

87.    Pomona was incorporated in 1967.

88.    The entire area of the Village of Pomona falls within its "R-40 District",

which requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of one-family homes, according to the Village of Pomona Zoning Code, Article III (General Provisions), § 130-5 (District Classification). The subject property is located in the R-40 district.

89.    The Subject Property is a single lot of approximately 100 acres, and is bordered by U.S. Route 202 on the north and New York State Route 306 on the west. The 100-acre lot is currently developed and contains 12-13 structures including bungalows and other buildings used as an Orthodox Jewish summer camp.

90.    Residentially, only one single-family home can be built on the Congregation's 100-acre property, without subdividing the Property, under the restrictions of the Village's Zoning Code.

91.    The Village Code does not permit the Rabbinical College (along with its residential component to exist anywhere in the Village of Pomona, either as a "matter of right" or by special use permit.

92.    It is impracticable for the Rabbinical College to legally exist anywhere in Pomona, given the single-family residence zoning provided for in its Code.

93.    The Village Code does not permit an unaccredited religious educational institution such as the Rabbinical College to operate anywhere within the Village of Pomona.

94.    The Village Code does not permit, as a 'matter of right" or by special use, any religious educational facilities with a residential component for the religious education students and their families.

95.    The Village Code explicitly states that "All uses listed hereunder are

22

permitted in the R-40 District; all others not listed are prohibited, except as provided in §§ 130-10 and 130-11." Village of Pomona Zoning Code, Article IV (Use Regulations), § 130-9 (Permitted Uses), paragraph A.

96.    Plaintiffs' religious education program contains both pure expression and expressive conduct.  The Village's zoning code prohibits this expressive activity throughout its jurisdiction.

97.    No property in the Village may be principally used for a Rabbinical College or any similar "unaccredited" religious education facility, as described herein.

98.    No property in the Village may be principally used for an educational facility that incorporates a communal family environment, necessary for the purposes of Plaintiffs' religious expression and exercise, as described herein.

99.    The Village's zoning code significantly limits the Plaintiffs' communicative activity within its jurisdiction.

100.    The Village possesses no compelling or sufficiently substantial government interest to prohibit the Plaintiffs' use outright within its jurisdiction.

101.    In enacting certain ordinances restricting the use of the Subject Property, the Village has presented no evidence that Plaintiffs' use would threaten any Village interest generally, or would threaten any Village interest more than various permitted uses.

102.    The Village cannot demonstrate that there exists any less intrusive means of achieving any government interest other than prohibiting the Plaintiffs' use outright within its jurisdiction, or that it has narrowly drawn its regulations to serve its interests.

103.    The laws and actions of the Defendants that prevent the application,

23

construction and utilization of the Subject Property as a Rabbinical College imposes onerous and unreasonable conditions upon the Plaintiffs, which conditions are unrelated to the health, safety and welfare of the residents of the Village of Pomona.

104.   The Village permits certain "Educational Institutions"; however, such institutions are limited by definition to "[a]ny private or religious elementary, junior high or high school, college, graduate or post-graduate school conducting a full-time curriculum of instruction a minimum of five days per week for seven months per year _and accredited by the New York State Education Department or similar recognized accrediting agency_." Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

105.   The Rabbinical College is not accredited by the New York State Education Department, nor can it be.

106.   Upon information and belief, there is no public or private "similar recognized accrediting agency" for the program offered by the Rabbinical College.

107.   The Village permits dormitories, but defines "Dormitory" in such a manner as to exclude the Rabbi students and their families. Pomona Zoning Code, Article II (Definitions) §130-4 (Terms Defined). The student housing required by the Rabbinical College would be excluded from the definition of "dormitory," since the Village Code expressly forbids "Dormitory rooms [from] contain[ing] separate cooking, dining or housekeeping facilities . . .". Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

108.   The Village's Code also contains a patently unreasonable prohibition against more than one dormitory building being permitted on a lot, _regardless of the_

24

*size of the lot.* Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

109.  The Village's Code contains a patently unreasonable prohibition limiting the size of a dormitory to "twenty (20) percent of the total square footage of all buildings on the lot." Pomona Zoning Code, Article IV (Use Regulations), §130-10 (Special Permit Uses), Paragraph F (Educational Institutions).

110.  The Village Code does permit "libraries and museums" in the R-40 District. Pomona Zoning Code, Article IV (Use Regulations), § 130-9 (Permitted Uses), paragraph A(5).

111.  For these several reasons, the Rabbinical College proposed by the plaintiff Congregation is therefore expressly excluded from the Village under the text of its ordinance.  Based upon the exclusion by the Village of the use of the property as a non-accredited Rabbinical College, and the actions and statements of the Village officials as alleged herein, there is no question that the College's proposed use is forbidden within the Village.

### The Village Lacks Justification to Exclude the Congregation

112.  No compelling, important or legitimate reason exists to prohibit the Congregation's intended use on its property or to prohibit the Congregation's intended use completely from the Village.

113.  Immediately upon purchase of the property, the Congregation retained professionals in the fields of planning, traffic, environmental, engineering, architectural, and archaeology to develop a site plan with architectural drawings and to perform thorough studies of traffic, environment, and all other health, welfare and safety issues.

114.  The Congregation commissioned an extensive examination of traffic

patterns for the proposed educational institution and the accessory uses reasonably associated with and necessary to further its religious educational purpose, and examined the surrounding areas to ensure that no compelling governmental interest exists regarding the health and safety of the traveling public.

115.   The site plan was repeatedly modified by the professionals to ensure that it met applicable engineering, environmental, traffic and other standards, demonstrating that the Rabbinical College could be built with no negative effect on public health and safety.

116.   The Congregation also caused a professional engineering analysis to be made with regard to other development issues, including drainage, sewer, water supply, parking and all other environmental issues.

117.   The Congregation also conducted archaeological, air quality and noise studies in order to mitigate all significant adverse impacts from the project.

118.   The Congregation's plan for its educational religious facility is a beneficial use under New York law under *Cornell University v. Bagnardi,* 68 N.Y.2d 583 (1986), and the exclusion of the Rabbinical College by the Village is contrary to New York State Law.

119.   Many other colleges of similar size with student housing exist throughout the New York State, in urban, suburban and rural areas.  For example, the Dominican College recently constructed a 200-student residence hall, including apartment units with kitchens, on a 10-acre parcel of land in Orangeburg, Rockland County about 11 miles away from Pomona.  St. Thomas Aquinas College in Sparkill, Rockland County has 5 dormitory buildings housing more than 350 students on its 48-acre campus

(about 13 miles away from the Subject Property).  Nyack College offers on-campus housing for 80% of its students in several residence halls, including on-campus married-student housing on its 63-acre campus in Nyack in Rockland County (about 10 miles away from Pomona).  Iona College, located on 35 acres in Westchester County offers housing for over 900 students, including multiple-bedroom student housing with kitchens.

## DISCRIMINATION AGAINST THE CONGREGATION AND OTHER JEWISH ENTITIES

120.  The Village of Pomona has engaged in a targeted and deliberate decades-long effort to prevent various Jewish individuals and institutions from developing the subject property and other nearby properties, while permitting other development within the Village, including a large Hindu temple.  Each time that the past three owners of the subject property attempted to develop the subject property for a Jewish-affiliated purpose the Village enacted new ordinances to prevent such development, constituting a pattern of religious discrimination directed at the Jewish individuals and organizations during their successive periods of ownership of the subject property.  Upon information and belief, this targeting has been based in large part on anti-Hasidic animus.

### Targeting of Camp Dora Golding

121.  Since 1920, the subject property had been operated as a recreation camp. The Federation of Jewish Properties purchased the property in 1982 and operated a sleep-away camp for underprivileged children.  In 1990, there were between 125 and 190 campers, and the Federation applied for approvals to build a bungalow to house an

27

additional 24 campers.  Upon information and belief, in response, the Village took steps to prevent its housing expansion.

122.  At a public hearing on the Camp's application held on December 17, 1990, the Village Trustees proposed adopting a zoning code amendment, ostensibly to govern camps generally, which were not then included in the zoning code, and upon information and belief, with the specific intention of restricting this application and this property.

123.  The Village then proceeded to enact targeted legislation aimed at the Camp and to engage in significant delaying tactics, resulting in circumstances that made further development of the Camp facilities effectively impracticable.

124.  Sometime after 1991, the Federation decided to sell the property and relocate its camp in Pennsylvania, due to the Village's obstacles to any expansion of the camp.

### Targeting of Yeshiva Spring Valley

125.  On January 6, 1999, the property was sold to Yeshiva of Spring Valley, which had intended to build a religious boys' school for approximately 800 Orthodox Jewish students, a Synagogue, and eventually a preschool.

126.  On February 24, 1999, Yeshiva of Spring Valley applied for a Real Property Tax Exemption, and included in their application the intention to build a religious boys' school.  Yeshiva of Spring Valley continued the use of the property as a religious summer camp and used the buildings in the winter to store its supplies and educational materials for its other educational facilities.

28

127.   On December 15, 1999, Yeshiva of Spring Valley made an informal presentation to the Village Planning Board of their plans for a 100,000 square-foot private primary school building and synagogue, and to later build a 20,000 to 30,000 square-foot pre-school, all to be built on less than ten acres of the hundred-acre property.

128.   During the presentation, members of the Village Planning Board discussed their desire to change the zoning code governing schools, because the zoning for schools "really stinks", requiring "only" five acres to build a school, and noting that Yeshiva of Spring Valley could construct an approximately 800,000 square foot building as of right under the then-existing code on the 100-acre property.

129.   In response to Yeshiva of Spring Valley's proposed use, the Village planners recommended that the zoning code be amended.  All consideration of Yeshiva Spring Valley's plans to construct the school were suspended by the Village for almost one year while the zoning amendment was under consideration.

130.   Then, approximately two years from the time Yeshiva Spring Valley announced its intentions to build a religious day school, the Village finally took action and on January 22, 2001, the Village Trustees adopted Local Law No.1 of 2001, containing new restrictions for schools that made it impossible for it to build the project it proposed.

131.   The Village's Local Law No.1 of 2001 removed schools as a permitted use and re-classified schools and educational institutions as a "special permit" use. Pomona Zoning Code, Article IV (Use Regulations), §130-10 (Special Permit Use), paragraph F. The new special permit provision increased the minimum lot requirement

from 5 acres to 10 acres plus .05 acre per enrolled pupil, added more deduction for slopes and wetlands than was previously required, reduced the percentage of allowable building coverage, floor space and impervious surfaces.

132.   These new laws made it effectively impracticable for Yeshiva Spring Valley to build a school as then proposed.

133.   Upon information and belief, the code provision was intentionally drafted to prevent reasonable construction by the Yeshiva of Spring Valley of a school for 800 Orthodox Jewish students on the property.

134.   Thereafter, in June of 2001, Yeshiva of Spring Valley submitted plans to use over 60 acres for a religious school for 850 students (kindergarten through 12th grade), with a synagogue and adult education center. and using the remaining acreage for 25 single-family homes on 40,000 square-foot lots.

135.   Public hearings and environmental reviews continued through 2001 and 2002, without resolution.

136.   Because of the significant delay, Yeshiva of Spring Valley did not withdraw its application, but began looking for other properties for their school, since, upon information and belief, it became clear that the Village was not proceeding in good faith and would not allow reasonable development of the property for an Orthodox Jewish yeshiva.

137.   In January of 2004, Yeshiva Spring Valley submitted its annual request for a tax exemption for religious use, which it had routinely received each year for the five years it had owned the property.

138.   In February of 2004, the Village, for the first time, challenged the tax

exemption, even though neither the ownership nor the use of the property had changed.

139. On March 22, 2004, without good cause and in contravention of law, the Village Trustees voted to deny the religious tax exemption for Yeshiva Spring Valley's property.

140. On June 28, 2004, without good cause and in contravention of law, the Village Board of Assessment Review also denied the religious tax exemption.

141. Upon information and belief, in the Summer of 2004, Village Attorney Doris Ulman told Rabbi Metzger, a representative of Yeshiva Spring Valley, that if he would withdraw their application for a Jewish school and remove all of the related files from the Village office, that the Village would grant the tax exemption.

142. The Village then passed further zoning amendments concerning educational institutions and dormitories, further restricting the use of the Subject Property.

143. Yeshiva Spring Valley abandoned its efforts to develop the property as a school and sold the property to the Congregation in August of 2004.

### Targeting of Adult Student Housing in the Town of Ramapo

144. In 2004, the Town of Ramapo, in which Pomona is located, adopted a new Comprehensive Plan that zoned four locations within its jurisdiction for the development of adult student housing, needed by the Jewish Hasidic community in connection with certain religious schools (but which cannot accommodate the Congregation's use). One of these four locations, known as the Patrick Farms, is located directly across the

31

street from the Congregation's property in Pomona.

145.  In response, the Village of Pomona sued the Town of Ramapo to challenge its adoption of "adult student housing" zones in New York Supreme Court.

146.  On or about June 17, 2005, the Village's claims against the Town were dismissed for lack of standing by acting New York Supreme Court Justice Francis Nicolai.

147.  The Village appealed this decision, and on August 14, 2007, the Appellate Division ruled that those villages neighboring the Town's new zones for adult student housing have an interest in the potential environmental impacts of the new Town law sufficient to give them standing under SEQRA.

148.  In July of 2004, the Village circulated its Village Green Newsletter (written, published by the Village at Village expense) supporting the creation of a new village outside of its jurisdiction to be formed and to include the Patrick Farms property, to be known as the Village of "Ladentown," and to remove the property from the Town of Ramapo's zoning reach.

149.  Upon information and belief, the Village's purpose in promoting the proposed Village of Ladentown was to prevent the Patrick Farms property from being lawfully developed with 12 acres of adult student housing for adult Hasidic students, or with any other type of multi-family or other affordable housing that the Town might permit.

150.  In a letter to the editor of the Journal News, Ms. Lynn Yagel, wife of Defendant Brett Yagel, stated: "After listening to all of this, I realized that once the Patrick Farm property is developed, I would not be welcome there. My children will not

32