Exhibit "20"

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALBANIAN ASSOCIATED FUND and IMAM POLOZANI, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:06-cv-3217 |
| THE TOWNSHIP OF WAYNE and THE TOWNSHIP OF WAYNE PLANNING BOARD, | ) ) ) ) | |
| Defendants. | ) ) ) | |

---

BRIEF OF THE UNITED STATES AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

CHRISTOPHER J. CHRISTIE
  United States Attorney

SUSAN STEELE
  Assistant United States Attorney
  Peter Rodino Federal Building
  970 Broad Street, Suite 700
  Newark, NJ  07102
  (973) 645-2920

WAN J. KIM
  Assistant Attorney General

STEVEN H. ROSENBAUM
  Chief
MICHAEL S. MAURER
  Deputy Chief
RYAN G. LEE
  Trial Attorney
  Department of Justice
  Civil Rights Division
  Housing & Civil Enforcement Section
  950 Pennsylvania Avenue, NW – G Street
  Washington, DC  20530
  (202) 305-3109

## TABLE OF CONTENTS                                            PAGE

INTEREST OF THE UNITED STATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.    *Albanian Associated Fund, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.    *The Township of Wayne, NJ* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    3.    *Conditional Use Permit Process* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    4.    *The Mosque's Efforts to Obtain a CUP* . . . . . . . . . . . . . . . . . . . . . 6

    5.    *Open Space Committee* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    6.    *The Township Commences Eminent Domain*
        *Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO
    WHETHER THE TOWNSHIP'S USE OF EMINENT DOMAIN
    PROCEEDINGS TO FRUSTRATE THE MOSQUE'S EFFORTS TO
    OBTAIN A CONDITIONAL USE PERMIT CONSTITUTES THE
    IMPOSITION OR IMPLEMENTATION OF A LAND USE
    REGULATION UNDER RLUIPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    *The Are Genuine Questions As To Whether*
        *The Township "Discriminat[ed]" Against The*
        *Mosque "On The Basis Of Religion"*
        *Within The Meaning Of RLUIPA 2(b)(2).* . . . . . . . . . . . . . . . . . . . . 16

**TABLE OF CONTENTS (continued):**                    **PAGE**

1.    *Full Inquiry Into The Township's
Intent Is Appropriate To Prove
Discrimination In Violation Of
Section 2(b)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

2.    *Evidence Showing Discrimination
In Violation Of RLUIPA 2(b)(2)* . . . . . . . . . . . . . . . . . . . . . . 18

    a.    *The Township's Actions Have
The Classic Trademarks Of
Discrimination Under
Arlington Heights* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    b.    *There Is Evidence That Hostility
To The Mosque By Local
Residents Motivated The Township
To Thwart The CUP Application* . . . . . . . . . . . . . . . . . .20

    c.    *There Are Genuine Questions
As To Whether The Township's
Non-Discriminatory
Reasons For Commencing
Eminent Domain Are Pretextual* . . . . . . . . . . . . . . . . . 23

B.    *There Is Evidence Supporting The Conclusion
That The Commencement Of Eminent Domain
In This Case Constitutes The "Implement[ation]"
Of A "Land Use Regulation" Within The
Meaning Of RLUIPA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    1.    *A Conclusion That The Township's
Eminent Domain Action "Implement[ed]"
A Zoning Law Is Supported By The Evidence* . . . . . . . . . . . . 28

ii

**TABLE OF CONTENTS (continued):**                                    **PAGE**

2.    *A Conclusion That RLUIPA Encompasses
      The Implementation Of Zoning Law Governing
      CUPs In This Case Is Consistent With
      Its Goals And Purposes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3.    *Other Federal Courts Have Recognized That
      Eminent Domain Proceedings May Fall Within
      The Scope Of RLUIPA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**TABLE OF AUTHORITIES**                                        **PAGE**

**CASES:**

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) . . . . . . . . . . . . . . . 22

*Cottonwood Christian Ctr.* v. *Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2005) . . . . . . . . . *passim*

*Elliot & Frantz, Inc.* v. *Ingersoll-Rand Co.*, 457 F.3d 312 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Faith Temple Church* v. *Town of Brighton*, 405 F. Supp. 2d 250 (W.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Faith Temple Church* v. *Town of Brighton*, No. 06-0354 (2d Cir. dismissed April 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 30, 34

*Harris* v. *Pernsley*, 820 F.2d 592 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . .1

*Islamic Ctr. of Miss., Inc.* v. *City of Starkville*, 840 F.2d 293 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lauren W.* v. *DeFlaminis*, 840 F.3d 259 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . .16

*Lighthouse Inst. for Evangelism, Inc.* v. *City of Long Branch*, No. 06-1319 (3d Cir. filed Feb. 6, 2006) . . . . . . . . . . . . . . . . . . . . . .15

*Living Water Church of God* v. *Charter Twp. of Meridian*, 384 F. Supp. 2d 1123 (W.D. Mich. 2005) . . . . . . . . . . . . . . . . . . . .17, 18

*Marks* v. *City of Chesapeake*, 883 F.2d 308 (4th Cir. 1989) . . . . . . . . . . .20, 21, 22

*Palmore* v. *Sidoti*, 466 U.S. 429 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv

**TABLE OF AUTHORITIES (Continued):**                    **PAGE**

**CASES (Continued):**

*St. John's United Church of Christ* v. *City of Chicago*, 401 F. Supp. 2d 887 (N.D. Ill. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sts. Constantine & Helen Greek Orthodox Church, Inc.* v. *City of New Berlin*, 396 F.3d 900 (7th Cir. 2005) . . . . . . . . . . . . . . . 16, 17, 31, 32

*The Church of the Hills of the Twp. of Bedminster* v. *Twp. of Bedminster*, No. 05-CV-3332, 2006 U.S. Dist. LEXIS 9488, at *21 (D.N.J. Feb. 24, 2006) . . . . . . . . . . . . . . 30

*Universal Oil Prods. Co.* v. *Root Ref. Co.*, 328 U.S. 575 (1946) . . . . . . . . . . . . . 1

*Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**STATUTES:**

Religious Land Use and Institutionalized Persons Act of 2000

     42 U.S.C. 2000cc *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
     42 U.S.C. 2000cc(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
     42 U.S.C. 20000cc-2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     42 U.S.C. 20000cc-3(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 32
     42 U.S.C. 2000cc-5(4)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     42 U.S.C. 2000cc-5(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

New Jersey Statutes Annotated 20:3-1 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . 4
New Jersey Statutes Annotated 40:55D-25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Township of Wayne Code 4-14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Township of Wayne Code 4-39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Township of Wayne Code 129-42(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Township of Wayne Code 129-42(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

**TABLE OF AUTHORITIES (Continued):**                    **PAGE**

**STATUTES (Continued):**

Township of Wayne Code 129-42(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 19
Township of Wayne Code 134-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Township of Wayne Code 134-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Township of Wayne Code 134-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
Township of Wayne Code 134-65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Township of Wayne Code 134-69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Township of Wayne Code 134-70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Township of Wayne Code 211-114(A)(1)(h). . . . . . . . . . . . . . . . . . . . . . . . . . 6

**RULES:**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**LEGISLATIVE HISTORY:**

146 Cong. Rec. 16,698 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**MISCELLANEOUS:**

Webster's Third New International Dictionary (1993). . . . . . . . . . . . . . . . . . . . .28

vi

## INTEREST OF THE UNITED STATES

This case concerns the appropriate interpretation of the prohibitions in the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. 2000cc *et seq.* The Department of Justice is charged with enforcing RLUIPA, see 42 U.S.C. 2000cc-2(f), and therefore has an interest in how courts construe the statute's protections. An *amicus* filing from an agency charged with enforcement of the statute at issue can be particularly useful, see *Universal Oil Prods. Co.* v. *Root Ref. Co.*, 328 U.S. 575, 581 (1946) ("a federal court can always call on law officers of the United States to serve as *amici*"), and it "can contribute to [a] court's understanding" of the issues involved in a particular lawsuit. *Harris* v. *Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987).

## STATEMENT OF THE ISSUE

The United States will address the following question: Whether the requirement that governmental actions challenged under RLUIPA involve the "impos[ition] or implement[ation]" of "a land use regulation" is satisfied by a municipality's commencement of eminent domain proceedings to thwart a conditional use permit ("CUP") application pending before the municipality's planning board.

-2-

## INTRODUCTION

Albanian Associated Fund, Inc. (the "Mosque") alleges that the Township violated RLUIPA Section 2(b)(2) when it commenced eminent domain proceedings to take the Mosque's land.  Dkt. 1 ¶¶2, 78, 79.[1]  In its brief in support of its motion for summary judgment, Dkt. 85, the Township argues that the Mosque's RLUIPA claim fails as a matter of law because "RLUIPA does not apply to 'takings.'" Dkt. 85, at 19.

The Court should deny the Township's motion for summary judgment with respect to the Mosque's RLUIPA claim under Section 2(b)(2), which prohibits municipalities from "discriminat[ing] against any assembly or institution on the basis of religion or religious denomination" by "impos[ing] or implement[ing]" a "land use regulation." 42 U.S.C. 2000cc(b)(2).  Here, zoning law governs the Mosque's application for a CUP and therefore satisfies RLUIPA's definition of a "land use regulation."  After more than three years of considering the CUP application, the Township used its eminent domain power, which had the effect of thwarting the Mosque's CUP.

---

[1] The abbreviation "Dkt." refers to briefs, exhibits, affidavits, and transcripts on file with this Court.

-3-

Because there are genuine issues of material fact concerning the Township's motivations to take the Mosque's land while the Mosque's CUP application was pending, and because there is evidence to support the conclusion that the challenged discrimination arises from the implementation or imposition of a land use regulation triggering RLUIPA, this Court should deny summary judgment.

## STATEMENT OF FACTS[2]

1.    *Albanian Associated Fund, Inc.*

Plaintiff Albanian Associated Fund, Inc. (the "Mosque") is a religious community of Moslems of Albanian ancestry with approximately 200 member families. Dkt. 1 ¶3. It currently operates a mosque in Paterson, New Jersey. Dkt. 1 ¶13. Over recent decades, a substantial number of Albanian Moslems have located in Wayne, New Jersey and the surrounding area. Dkt. 1 ¶14. The Mosque sought to relocate to Wayne because there is no Albanian Mosque in the area, and its current facility was inadequate. Dkt. 1 ¶¶13, 14. It intends to construct a religious facility consisting of two buildings for the purposes of Moslem religious events and youth and recreational activities. Dkt. 1 ¶¶29, 30.

---

[2] The parties' briefs in support of and opposition to the Township's motion for summary judgment do not contain statements of undisputed facts.

-4-

2.    *The Township of Wayne, NJ*

The Township of Wayne (the "Township") is a corporate body politic of the State of New Jersey, and is empowered by the State to act through its governing body, its officials, employees, and official bodies.  The Township is empowered by the State of New Jersey to regulate and restrict the use of land and structures within the Township's borders and is empowered to take property through eminent domain.  See N.J.S.A. 20:3-1 *et seq.*  The Township's Code specifies that the Mayor is charged with "supervis[ing] all the departments of the township government . . . ."  Township of Wayne Code 4-14.  One such department is the Department of Planning.  The head of the Department of Planning is the Township Planner, "appointed by the Mayor with the advice and consent of the Council." Wayne Code 4-39.

The Township Planning Board is empowered by the State of New Jersey to regulate land use within Wayne.  N.J.S.A. 40:55D-25.  The Township Planning Board consists of nine members, including the Mayor, a municipal official appointed by the Mayor, a member of the Municipal Council, and six other municipal citizens appointed by the Mayor.  Wayne Code 134-6.  The Board's duties include "exercis[ing] subdivision control and site plan review."  Wayne Code 134-12.  The Code specifies that the Board has the power to review

-5-

applications for and direct issuance of CUPs. Wayne Code 134-12. The Board has

exclusive jurisdiction over conditional uses. Wayne Code 134-65.

3.    *Conditional Use Permit Process*

A conditional use is a "use permitted in a particular zoning district * * *

upon a showing that such use in a specified location will comply with the

conditions and standards for the location or operation of such use as contained in

the zoning regulations." Wayne Code 134-2. The Planning Board may issue a

CUP for a place of worship in a district zoned R-A under the following conditions:

- minimum lot area of one and one-half acres, which shall be increased in relationship to the scale of the development;
- height not in excess of permitted limit in zoning district;
- building floor area not in excess of 0.25 of lot area;
- building located at least 50 feet from a side property line and 50 feet from rear property line;
- property shall front on arterial or collector street and shall have a minimum lot width of 200 feet;
- parking areas and driveways shall be located at least 50 feet from a residential district property line, at least 25 feet from any other property line or street and at least 10 feet from a building;
- no parking within the front yard setback;
- one parking space per three seats; one parking space per six lineal feet of pew; or one space per 25 square feet of assembly area if there are no fixed seats, based on maximum seating capacity, whichever is greater;
- parking lots screened by fence no higher than six feet or landscaped buffer of not less than 50 feet in width when adjacent to a residence or residential zoned property;
- adherence to specific requirements when accessory use is part of the application.

-6-

Wayne Code 211-114(A)(1)(h). "Unless the developer agrees to an extension, a Board must grant or deny approval of . . . a conditional use permit [within] 95 days" of "submission of a complete application." Wayne Code 134-70. If the Planning Board does not issue a decision within 95 days and the applicant does not agree to a time extension, "the application is deemed approved by default." Wayne Code 134-70. An application for a CUP requires a public hearing before it can be approved or denied. Wayne Code 134-69.

4.    *The Mosque's Efforts to Obtain a CUP*

On October 5, 2001, the Mosque purchased land known as Block 3517, Lot 40 on the Tax Map of the Township (the "Mosque's land"). Dkt. 1 ¶22. The land is in a district zoned R-A, and a place of worship is permitted as a conditional use. Dkt. 1 ¶32. The land is currently vacant, and it is located near a church, preschool facility, office building, service station, and residences. Dkt. 1 ¶23; Dkt. 1-4 ¶16. In 1987, the Township Planning Board approved a variance to build a residential subdivision on the Mosque's land, but nothing was built. Dkt. 35-4. In 1994, the Township Board of Adjustments considered but ultimately denied an application for a variance to build a nursing home on the Mosque's land. Dkt. 85-11, at 3-5. In denying the application, the Township noted that the saturation of the area with nursing homes raised serious questions about the need for the facility:

-7-

> There are presently more than thirteen hundred nursing home beds within Wayne Township nearly twenty-seven hundred beds within five miles of the proposed site and more than forty-six hundred beds within ten miles of the proposed site, constituting approximately (10%) of the total number of such beds in the entire state of New Jersey raising serious questions regarding the actual need for the proposed facility and confirming an absence of a compelling need.

Dkt. 85-11, at 3-4. The Township mentioned the environmental characteristics of the property along with the nineteen other findings for why the variance should be denied. Dkt. 85-11, at 3-5.

On October 17, 2002, the Mosque submitted an application for a CUP and site plan to the Township Planning Board to build a religious facility, Dkt. 1 ¶29, and it compiled a team of architects and other experts to assist with the application process. Dkt. 1-4 ¶11. At the outset of the process, the Planning Board abandoned its established practice of permitting applicants to resolve outstanding technical issues with Township engineers subsequent to final approval of an application. Dkt. 1 ¶36. Instead, the Planning Board announced that "for once" it would withhold final approval until all outstanding issues, technical and otherwise, were resolved. Dkt. 1 ¶36. This decision prolonged the application process. Dkt. 1 ¶36.

The Township Planner's report, dated October 21, 2003, stated, "A review of the revised site and architectural plans indicate compliance with conditional use requirements of the code." Dkt. 13-7, at 15. Nonetheless, the Board held more

-12-

6.    *The Township Commences Eminent Domain Proceedings*

On January 18, 2006, the Township Council decided to acquire the Mosque's land. Dkt. 93-4, at 116:9-119:8; 120:4-14; Dkt. 82-4, at 10. The Mayor testified in deposition that he thought of the idea of taking the Mosque's property after reading a New Jersey appellate court decision. Dkt. 93-4, at 111:6-114:5. The Mayor also testified that he thought the Mosque's land was a "poster child" for the kind of land that should be taken for open space preservation because it was "full of rock, full of steep slopes." Dkt. 93-4, at 83:13-84:2. The Mayor deemed the Mosque's land environmentally sensitive for that reason. Dkt. 93-4, at 95:18-96:16. The Mayor testified that there is nothing in the Township Code that defines "environmental sensitivity." Dkt. 93-4, at 93:17-94:9. The Mayor testified that he took RLUIPA into consideration when he considered using eminent domain to take the Mosque's land. Dkt. 93-4, at 135:4-12.

In February 2006, the Township offered to purchase the Mosque's property, but the Mosque refused to sell the land. Dkt. 1 ¶¶27, 28. On March 8, 2006, while the Mosque's conditional use application was still pending before the Planning Board, the Township notified the Mosque that the application process was being discontinued because the Township was planning to institute condemnation proceedings against the Mosque to take the land. Dkt. 1-5, at 8-9.

-13-

On April 5, 2006, the Township unanimously passed Resolution No. 139,

which sought to condemn the Mosque's land. Dkt. 85-26. The Resolution stated:

> Authorizing the preparation of a [sic] appraisal report for use in any
> condemnation proceedings regarding Block 3517, Lot 40 and further
> authorizing the commencement of negotiations with the property
> owner regarding a sale of Block 3517, Lot 40.

Dkt. 85-26.

The Township has stated, in an attempt to justify the condemnation, that the

Township adopted a "Master Plan, which has incorporated into it an 'Open Space

and Recreation Plan'" and that the Mosque's parcel was "identified as one property

for preservation that matches the criteria for those properties the Township wishes

to preserve." Dkt. 1-5, at 7. The Township admitted that the condemnation "was

not previously necessary" prior to the Mosque's application. Dkt. 1-5, at 8. The

Township cannot point to another instance where it has attempted to condemn

property to stop a land development, Dkt. 1-5, at 8, and it has never before

condemned property for open space preservation. Dkt. 93-4, at 98:6-18.

Furthermore, the Township never sought to acquire land for open space

preservation simply to leave it undeveloped is it appears to have done when it

sought to acquire the Mosque's land. Dkt. 93-4, at 40:12-22; 73:4-6; 85:18-86:19;

88:7-89:8; 99:12-99:21; 134:9-16. The other three properties the Township

acquired through purchase for open space preservation purposes were for park and

-14-

recreation purposes.  Dkt. 93-4, at 40:12-22; 73:4-6; 134:9-16.

The Township has granted permission to develop land that was deemed environmentally sensitive by granting waivers to its environmental protection ordinance 32 times since the Mosque submitted its application; it has refused to grant waivers only twice.  Dkt. 94-3.  One property received a waiver despite the presence of steep slopes, Dkt. 94-4, at 2-3.  Another property was given approval to construct a subdivision despite "significant environmental conditions,"  Dkt. 94-5, at 2-6, and another applicant was permitted to construct an office building on a parcel that not only had steep slopes like the Mosque's land but that also had wetlands.  Dkt. 93-4, at 44:2-4; 129:10-22.  The Open Space and Recreation Plan notes, "[t]he few remaining tracts of land available for development within the Township are generally impacted by the presence of flood plains, steep slopes or wetlands and often by combinations of each." Dkt. 85-24, at 3.

-15-

## ARGUMENT

**THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO
WHETHER TOWNSHIP'S USE OF EMINENT DOMAIN PROCEEDINGS
TO FRUSTRATE THE MOSQUE'S EFFORTS TO
OBTAIN A CONDITIONAL USE PERMIT CONSTITUTES
THE IMPOSITION OR IMPLEMENTATION OF A
LAND USE REGULATION UNDER RLUIPA**

Section 2(b)(2) of RLUIPA contains three elements: (1) "discriminat[ion]

against any assembly or institution on the basis of religion or religious

denomination"; (2) by a "government"; (3) through the "impos[ition] or

implent[ation]" of a "land use regulation." 42 U.S.C. 2000cc(b)(2). RLUIPA

defines "government" as "a State, county, municipality, or other governmental

entity created under the authority of a State." 42 U.S.C. 2000cc-5(4)(A)(i).

RLUIPA defines "land use regulation" as "a zoning or landmarking law, or the

application of such a law, that limits or restricts a claimant's use or development of

land." 42 U.S.C. 2000cc-5(5). By its terms, RLUIPA must "be construed in favor

of a broad protection of religious exercise, to the maximum extent permitted by the

terms of [the statute] and the Constitution." 42 U.S.C. 2000cc-3(g).[3]

---

[3] The United States has taken the position in its *amicus curiae* brief to the
Third Circuit filed on June 7, 2006, in *Lighthouse Inst. for Evangelism, Inc.* v. *City
of Long Branch*, No. 06-1319 (3d Cir. filed Feb. 6, 2006), that RLUIPA Sections
2(a) and 2(b) operate independently and that a plaintiff need not show a substantial
burden to prove the requirements for a violation of Section 2(b). Moreover, the
United States submits that, at the very least, there are disputed facts in this case as

-16-

Summary judgment is not warranted unless a review of the record "reveals that 'there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Elliot & Frantz, Inc.* v. *Ingersoll-Rand Co.*, 457 F.3d 312, 318 (3d Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). "In determining whether summary judgment is warranted," this Court should "review the facts in the light most favorable to the non-moving parties * * * and draw all reasonable factual inferences in their favor." *Lauren W.* v. *DeFlaminis*, 840 F.3d 259, 266 (3d Cir. 2007).

A.    *There Are Genuine Questions As To Whether The Township "Discriminat[ed]" Against The Mosque "On The Basis Of Religion" Within The Meaning Of RLUIPA 2(b)(2)*

    1.    *Full Inquiry Into The Township's Intent Is Appropriate To Prove Discrimination In Violation Of Section 2(b)(2)*

Courts have recognized the "vulnerability of religious institutions – especially those that are not affiliated with the mainstream Protestant sects or the Roman Catholic Church – to subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards." *Sts. Constantine & Helen Greek Orthodox Church, Inc.* v. *City of New Berlin*, 396 F.3d

---

to whether the Mosque would be substantially burdened by the Township's commencement of eminent domain proceedings.

-17-

895, 900 (7th Cir. 2005). In *Village of Arlington Heights* v. *Metro. Hous. Dev.
Corp.*, 429 U.S. 252 (1977), the Supreme Court identified a variety of categories of
evidence that may support a finding of discriminatory purpose in the context of a
challenge to a zoning decision. Noting that "[d]etermining whether invidious
discriminatory purpose [is] a motivating factor demands a sensitive inquiry into
such circumstantial and direct evidence of intent as may be available," *id.* at 266,
the Court in *Arlington Heights* examined the historical background of the decision
at issue, the specific events leading up to the decision, any departures from
procedural norms, and the legislative or administrative history of the decision,
including statements by members of the decisionmaking body. *Id.* at 266-268. A
sensitive inquiry into discriminatory intent is fully consistent with the principle of
free-exercise jurisprudence that "subtle departures from neutrality and covert
suppression of particular religious beliefs" are prohibited. *Church of the Lukumi
Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 534, 540 (1993) (internal
citations omitted) (citing the *Arlington Heights* factors and noting that in cases
under both the Free Exercise and Equal Protection Clauses, a city council's intent
may be determined "from both direct and circumstantial evidence"); see also
*Living Water Church of God* v. *Charter Twp. of Meridian*, 384 F. Supp. 2d 1123,
1134 (W.D. Mich. 2005) (a court must view a township's actions "in the context of

-18-

[the] history" between the municipality and the religious institution).

2.    *Evidence Showing Discrimination In Violation of RLUIPA 2(b)(2)*

a.    *The Township's Actions Have The Classic Trademarks of Discrimination Under* Arlington Heights

When viewed in their entirety, the Township's actions raise genuine questions of whether it acted with discriminatory purpose in an effort to stall and ultimately thwart the Mosque's application for a CUP. There is evidence that the Planning Board proceedings did not "progress[] according to the usual procedures." *Arlington Heights*, 429 U.S. at 269. There is evidence to support the finding that at the outset of the Mosque's application process, the Township Planning Board prolonged the process by departing from its established practice of approving applications before all outstanding technical issues were resolved with the Township's engineers. Indeed, while the Township's planner stated that the Mosque's application met the requirements for the permit in October 2003, the process continued for more than two years without a decision on the merits. *Id.* at 267 ("Departures from the normal procedural sequence * * * might afford evidence that improper purposes are playing a role"). Also, the Open Space Committee targeted the Mosque's property when it departed from its duty under the Open Space Ordinance to formulate a prioritized list of properties to be acquired by the Township Council "as prioritized," Wayne Code 129-42(C), and instead identified

-19-

properties for acquisition on an *ad hoc* basis by considering factors such as

whether a property was "under development pressure" and was "environmentally

sensitive." Dkt. 93-4, at 128:24-128:5; *Id.* at 267 (noting that "substantive

departures * * * may be relevant, particularly if the factors usually considered

important" are disregarded). Finally, the Township Council took the extraordinary

step of taking the Mosque's land while its CUP application was pending and made

the unprecedented decision to leave the Mosque's land undeveloped after the

taking. *Id.* ("historical background of the [municipality's] decision is [an]

evidentiary source" for determining motivation). These actions have the classic

trademarks of discriminatory purpose under the framework set forth in *Arlington

Heights*, and they afford circumstantial evidence that "shed * * * light" on and

"spark suspicion" about the Township's motivations. *Arlington Heights*, 429 U.S.

267, 269 (noting the "specific sequence of events leading up to the challenged

decision may also shed some light on the decisionmaker's purpose").

-20-

b.    *There Is Evidence That Hostility To The Mosque By Local Residents Motivated The Township To Thwart The CUP Application*

The evidence in the record also raises genuine questions of whether the Township was motivated to commence eminent domain proceedings against the Mosque's land to appease residents hostile to the Mosque. When the Township commenced eminent domain proceedings against the Mosque in April 2006, it was clear that delay and expense were not going to deter the Mosque from seeking a CUP from the Planning Board. By that time, the CUP process had been ongoing for three years without a decision on the merits, even though the Township's planner stated in October 2003 that a review of the Mosque's site plan and architectural plan indicated compliance with the requirements for the permit. During that time period, the Mosque abided by the Board's requests by revising its site and architectural plans, supplementing its reports, and hiring testifying experts.

Against this backdrop, the finder of fact could reasonably conclude that the Township was motivated to condemn the Mosque's land in April 2006 to ensure that the Mosque did not ultimately prevail in its effort to obtain the CUP and to appease the hostile local residents that attended every Planning Board meeting that related to the Mosque's application. In *Marks* v. *City of Chesapeake*, 883 F.2d 308 (4th Cir. 1989), the court considered whether local officials "purposeful[ly]

-21-

discriminat[ed]" against a permit applicant. *Id.* at 311 (internal citations omitted).

The appellant sought to obtain a zoning change and CUP to operate a house for a

fortune telling business. *Id.* at 309. The City's Planning Commission and City

Council unanimously approved the zoning change, and the City's Planning

Commission approved the request for a CUP by a 6-3 vote. *Id.* However, local

residents voiced opposition to the CUP request when the matter was before the

City Council. *Id.* The court in *Marks* characterized the opposition in the following

manner:

> Then, during a 'public comment' session, several local residents for
> the first time voiced their opposition to the proposed operation of a
> palmistry inside the city limits. Most apparently considered palmistry
> and fortune telling 'unwholesome and immoral.' More significantly,
> seven of the eight city residents speaking against [the appellant's]
> application expressed 'religious' reasons for their opposition to final
> approval of his proposed use of the property.

*Id.* At the conclusion of the hearing, the City Council unanimously denied the

CUP application. *Id.* at 310. The court held that under the circumstances, the

city's "true 'motivation * * * obviously required the court to resolve a factual

question." *Id.* 312 (internal citations omitted) (explaining that "[a]s a general

matter, * * * the public's 'negative attitudes, or fear, unsubstantiated by factors

which are properly cognizable in a zoning proceeding, are not permissible bases'

for local officials' land use decisions." *Id.* at 311 (quoting *Cleburne* v. *Cleburne*

-22-

*Living Ctr., Inc.*, 473 U.S. 432, 448 (1985)).

Like *Marks*, the circumstances in this case raise genuine questions about the true motivations of the Township to commence eminent domain proceedings against the Mosque's land while its application for a CUP was pending before the Planning Board. The Property Protection Group formed by neighbors attended every Planning Board hearing relating to the Mosque's application and made known its hostility to the Mosque and to Moslem prayer rituals and religious practices. The Mayor sat on the Planning Board while the Mosque's application was pending, and he admits that he came up with the idea to take the Mosque's property. In addition, the Township Council President's district representative was the unofficial leader of the Property Protection Group. This evidence, coupled with the historical background recounted above, permits the reasonable inference that the Township was motivated, at least in part, by the hostility of the Township's residents when it commenced eminent domain proceedings against the Mosque. See *Islamic Ctr. of Miss., Inc.* v. *City of Starkville*, 840 F.2d 293, 302 (5th Cir. 1988) ("'Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.'") (quoting *Palmore* v. *Sidoti*, 466 U.S. 429, 433 (1984)).

-23-

c.    *There Are Genuine Questions As To Whether The Township's*
      *Non-Discriminatory Reasons For Commencing Eminent*
      *Domain Are Pretextual*

The Township asserts non-discriminatory reasons for attempting to take the

Mosque's land, but there are genuine questions as to whether these assertions are a

pretext for discrimination. The Township asserts that the timing of its decision to

commence eminent domain proceedings coincided with a recommendation to

acquire the property from the Open Space Committee. However, this assertion is

not supported by the record. The minutes of the Open Space Committee contain

nothing to indicate that it recommended that the Township Council take the

Mosque's land. The only mention of the Mosque's property in the records of the

Committee prior to the taking occurred twenty months before the Township

decided to acquire the Mosque's land:

> Discussion ensued regarding the application to construct a mosque on
> property located on the Hamburg Turnpike and Colfax Road. This
> site is environmentally sensitive due to the presence of steep slopes.

There is no other reference in the Committee minutes until after the decision to

acquire the property was made by the Township Council on January 18, 2006. The

Committee minutes of January 26, 2006 indicate that the Mayor, who is the

chairman of the Committee, informed Committee members that the Township had

decided to acquire the Mosque's property. Thus, the record simply does not

-24-

support the assertion that the Township acquired the Mosque's land under the Open Space Program.

However, even if the finder of fact were to accept the Township's assertion that the Township Council's decision to take the Mosque's land was pursuant to a recommendation from the Open Space Committee, the finder of fact could well conclude that any such recommendation was the result of an illegitimate process that targeted the Mosque's land. Once the Committee was in operation, it disregarded its duties under the ordinance to generate a prioritized list of properties and instead chose to operate under a general rule of thumb to have the Township acquire properties that were environmentally sensitive and under development pressure. During that time, the Mosque's land was under development pressure because its CUP application was pending before the Planning Board, and the Mayor testified that he considered the Mosque's land environmentally sensitive due to its steep slopes and rock. Thus, to the extent that the Township Council relied on the recommendation of the Committee to acquire the Mosque's property, that evidence in the record permits the inference that the Committee's departure from its duties under the ordinance so that it could target the Mosque is additional evidence of discriminatory purpose. See *Arlington Heights*, 429 U.S. at 267 (the "specific sequence of events leading up to the challenged decision * * * [and]

-25-

substantive departures * * * may be relevant" to the question of invidious

discriminatory purpose).

The Township also asserts that it was motivated to commence eminent

domain proceedings against the Mosque's land because the land was

environmentally sensitive. However, nothing in the record adequately explains the

Township's sudden interest in keeping this particular parcel undeveloped due to its

environmental characteristics. The Township did not take the position that the

Mosque's land was too environmentally sensitive to develop before the Mosque

submitted its CUP application. Rather, the Township granted an application to

build a residential subdivision on the Parcel in 1987, and the Township's 1994

denial of an application for a variance for a nursing home did not ground its

decision on environmental sensitivity.

In addition, the Township has not been as zealous about the development on

other properties in the Township that it has deemed environmentally sensitive. The

evidence in the record shows that the Township has granted permission to develop

land that was deemed environmentally sensitive 32 times since the Mosque

submitted its application for a CUP and has denied permission only twice. And in

one instance, the Township permitted the construction of an office building on land

that not only had steep slopes like the Mosque's land but also had wetlands.

-26-

Moreover, the Township has permitted development of the land surrounding the

Mosque's property.

Like the court in *Cottonwood Christian Ctr.* v. *Cypress Redevelopment*

*Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002), this Court should find that there

are genuine questions concerning whether the Township's contention that it

attempted to take the Mosque's land for open space is pretext. In *Cottonwood*, the

court was not impressed with the City's rationale for its efforts to condemn the

church's land:

> For nearly a decade, the Cottonwood Property sat vacant. Despite
> having been declared a blight, having been the subject of [various
> redevelopment plans], and being under the authority of the
> Redevelopment Agency, no improvements were made. * * * Once
> Cottonwood purchased the land, however, the City became a bundle
> of activity and developed [specific plans].

*Id.* at 1225. As in *Cottonwood*, the environmental nature of Mosque's land was of

no specific concern to the Township until *after* the Mosque filed its CUP

application. As mentioned above, the Township did not deem the Mosque's land

too environmentally sensitive to be developed in 1987 or 1994. However, once the

Mosque submitted a CUP application, the Township "became a bundle of activity."

*Id.* There is evidence that shows the Planning Board departed from its usual

practice and decided to withhold approval of the CUP until all outstanding matters

were resolved, and twenty hearings and three years were not sufficient to permit it

-27-

to render a resolution on the merits.  The Township enacted an Open Space

Ordinance and formed an Open Space Committee that, contrary to the directive of

the Ordinance, operated under a rule of thumb that targeted the Mosque's land for

acquisition.  The Township Council subsequently commenced eminent domain

proceedings to take the Mosque's land for open space, even though it has never

before condemned property for this reason.  Like the court in *Cottonwood*, the

finder of fact could conclude that the Township's claim that it commenced eminent

domain proceedings to preserve the Mosque's land for open space "rings hollow"

and that in reality the Township was "simply trying to keep [the Mosque] out of

the [Township], or at least from the use of its own land."  *Id.*

In short, the record affords evidence of discriminatory purpose under the

*Arlington Heights* framework, contains evidence that the Township commenced

eminent domain proceedings against the Mosque to appease hostile residents, and

supports a conclusion that the Township's actions are "unexplainable on [non-

discriminatory] grounds," *Arlington Heights*, 429 U.S. at 266.  Under the

circumstances, the finder of fact could reasonably conclude that the Township

commenced eminent domain proceedings against the Mosque to thwart the

Mosque's application for a CUP and thereby appease residents hostile to the

-28-

Mosque.  The record supports the conclusion that, at the very least, there are genuine issues of material fact that warrant denial of the summary judgment motion.

B.    *There Is Evidence Supporting The Conclusion That The Commencement Of Eminent Domain In This Case Constitutes The "Implement[ation]" Of A "Land Use Regulation" Within The Meaning Of RLUIPA*

1.    *A Conclusion That The Township's Eminent Domain Action "Implement[ed]" A Zoning Law Is Supported By The Evidence*

RLUIPA's plain language prohibits the "implement[ation]" of land use rules in a way that discriminates on the basis of religion.  See 42 U.S.C. 2000cc(b)(2). The plain meaning of the verb "implement" is "to carry out," or "to give practical effect and ensure of actual fulfillment by concrete measures."  Webster's Third International Dictionary 1134 (1993).

Simply stated, the record supports the conclusion that the Township used eminent domain to make a zoning decision.  Without a doubt, a township "implement[s]" zoning law within the meaning of RLUIPA when it grants or denies a CUP.  In this case, the Township used eminent domain in an attempt to issue a *de facto* denial of the permit.  The Township clearly intended for the condemnation to operate as a denial.  In March 2006, while the Mosque's application was still pending before the Planning Board, the Township notified the Mosque that the application process was being discontinued because the Township

-29-

was instituting condemnation proceedings.  In addition, this Court has recognized

that the condemnation would be tantamount to a denial.  Dkt. 66 (recognizing that

if the condemnation were to proceed, the Mosque's CUP application "would be

moot so there would be no way to have a resolution of that application on its

merits").  Thus, the facts support a reasonable inference that the Township used

eminent domain to carry out, or "implement," the zoning scheme governing the

Mosque's CUP application.  Stated another way, the record supports a finding that

the Township acted in an arbitrary and *ad hoc* fashion in its exercise and

implementation of the powers given to it by the State to regulate land use within

the Township.  In addition to delay and other measures used to thwart the

construction of the Mosque's religious facility, the Township drew on its power of

eminent domain to accomplish its goals of barring construction.  In this context,

the use of eminent domain may properly be viewed as the implementation of the

-30-

Township's land use regulations.[4]  The elements of an RLUIPA violation are

therefore all properly presented in this case.[5]

_____

[4] Because the eminent domain power was used here to implement the denial of the CUP, this Court need not reach the issue of whether the Open Space and Recreation Plan, Dkt. 85-24, was a zoning law that was implemented by the exercise of eminent domain.  The United States argued to the Second Circuit in *Faith Temple* v. *Town of Brighton*, No. 06-0354 (2d Cir. dismissed April 9, 2007), which was settled on appeal after briefing, that a "comprehensive plan" in that case was a zoning law that was implemented by the exercise of eminent domain in furtherance of its goals, thus triggering RLUIPA.  Dkts. 27-2, 27-3, 27-4.  Here, too, the Open Space and Recreation Plan might be a "zoning law" that could be implemented through the exercise of eminent domain.  However, based on the record it is questionable whether the Open Space and Recreation Plan was applied at all; rather it appears the Open Space and Recreation Plan was invoked in an irregular manner as a pretext for stopping construction of the Mosque's religious facility.  Thus, the United States believes the better approach for analyzing what occurred here is that the exercise of the eminent domain power was an implementation of the CUP process, rather than of the Open Space and Recreation Plan.

[5] The Township argues that RLUIPA only applies to individualized government assessments.  Dkt. 85, at 23.  However, the plain language of Section 2(b)(2) does not require a showing of an individualized assessment.  In any event, the record plainly establishes that the Township made an individualized assessment.  It specifically targeted the Mosque's land for eminent domain proceedings.  See *The Church of the Hills of the Twp. of Bedminster* v. *Twp. of Bedminster*, No. 05-CV-3332, 2006 U.S. Dist. LEXIS 9488, at *21 (D.N.J. Feb. 24, 2006) (recognizing that a "case-by-case evaluation" is an individualized assessment within the meaning of RLUIPA).

-31-

2.    *A Conclusion That RLUIPA Encompasses The Implementation Of Zoning Law Governing CUPs In This Case Is Consistent With Its Goals And Purposes*

While a plain reading of RLUIPA can lead to a conclusion that the commencement of eminent domain proceedings in this case constitutes the implementation of zoning law, such a conclusion is also supported by its legislative history. Congress was concerned by municipalities' creative use of zoning laws to deprive religious institutions of the use of their property in favor of other, non-religious uses that may be preferred by the municipality. See, *e.g.*, 146 Cong. Rec. 16,698 (2000) (joint statement of Sens. Hatch & Kennedy) ("Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and in the highly individualized and discretionary process of land use regulation."). This concern of Congress has born out in practice. As the Seventh Circuit has recognized,

> [R]eligious institutions – especially those that are not affiliated with the mainstream Protestant sects or the Roman Catholic Church – [are vulnerable] to subtle forms of discrimination when, as in this case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards.

*Sts. Constantine*, 396 F.3d at 900; see also *Cottonwood*, 218 F. Supp. 2d at 1222 n.9 (city used zoning and eminent domain power to try to ensure that its preferred use, a Costco, was sited on the land rather than a church).

-32-

Congress therefore painted with a broad brush in allowing *any* method of implementation of a land use regulation to satisfy the requirements of RLUIPA. And it further reinforced this notion by expressly instructing that RLUIPA be construed broadly.  See 42 U.S.C. 2000cc-3(g).  To permit a township's exercise of eminent domain to discriminate against a religious institution by controlling the outcome of a zoning proceeding would be to permit an outcome that cannot be squared with the operative language of RLUIPA or RLUIPA's broad purpose of curtailing discriminatory abuse of local land use authority.

    3.     *Other Federal Courts Have Recognized That Eminent Domain Proceedings May Fall Within The Scope Of RLUIPA*

Federal district courts that have addressed similar issues have recognized that there may be situations in which the commencement of eminent domain proceedings could satisfy the requirements of RLUIPA.  *Cottonwood Christian Center* is instructive.  In that case, a town used its eminent domain power, pursuant to a zoning plan to take a church's land to sell to Costco.  The court rejected the argument that eminent domain is not a "land use regulation" under RLUIPA, stressing that "the Redevelopment Agency's authority to exercise eminent domain to contravene blight * * * is based on a zoning system developed by the City."  218 F. Supp. 2d at 1222 n.9.

-33-

Subsequently, the plaintiff in *St. John's United Church of Christ* v. *City of Chicago*, 401 F. Supp. 2d 887 (N.D. Ill. 2005), advocated a broad reading of *Cottonwood*, arguing that *Cottonwood* "stands for the proposition that all exercises of eminent domain authority are subject to RLUIPA." *St. John's*, 401 F. Supp. 2d at 899-900. The *St. John's* court rejected this argument but noted that *Cottonwood* "can be read to suggest that RLUIPA is applicable to the specific eminent domain actions where the condemnation proceeding is intertwined with other actions by the city involving zoning regulations." *Id.* at 900.

The *St. John's* court concluded that the condemnation proceedings at issue were not sufficiently linked to zoning regulations, holding that it was not "persuaded that it should construe the concept of zoning so broadly that any acquisition of land by the City pursuant to eminent domain proceedings is an act of zoning." *Id.* However, the *St. John's* court was careful to state that there could be instances in which the exercise of eminent domain would satisfy the requirements of RLUIPA. See *id.* ("It is important to note that this Court's holding that the City does not act pursuant to a zoning or landmarking law should not be taken to mean that all condemnation proceedings necessarily are outside the scope of RLUIPA. This Court expresses no opinion with respect to that conclusion.").

-34-

In *Faith Temple Church* v. *Town of Brighton*, 405 F. Supp. 2d 250

(W.D.N.Y. 2005), *appeal dismissed after settlement*, No. 06-0354 (2d Cir. April 9,

2007), the district court ruled that eminent domain proceedings are categorically

excluded from the scope of RLUIPA.  However, the district court in *Faith Temple*

failed to recognize that while eminent domain proceedings themselves may not

qualify as "land use regulations" under RLUIPA, eminent domain proceedings

may fall within the scope of RLUIPA when they are intertwined with the operation

of a zoning scheme.[6]  The ruling in *Faith Temple* therefore conflicts with

*Cottonwood* and is at odds with the discussion in *St. John's*.  Both of these cases

properly recognize that in some cases eminent domain proceedings may well fall

within the scope of RLUIPA.  And as demonstrated above, the use of the eminent

domain to discriminate against a religious institution by thwarting a CUP

application pending before a Planning Board presents such a case.

---

[6] In fact, the United States' brief to the Second Circuit in *Faith Temple*, see *supra*, n.4, argued that the actions of the Township in that case were covered by RLUIPA.  See Dkts. 27-2, 27-3, 27-4 (containing United States' brief in *Faith Temple*).

-35-

## CONCLUSION

For the foregoing reasons, this Court should deny the Township's motion for summary judgment with respect to the Mosque's RLUIPA claims.

Respectfully Submitted,

CHRISTOPHER J. CHRISTIE
  United States Attorney

WAN J. KIM
  Assistant Attorney General


/s/ Ryan G. Lee

SUSAN STEELE
  Assistant United States Attorney
  Peter Rodino Federal Building
  970 Broad Street, Suite 700
  Newark, NJ  07102
  (973) 645-2920

STEVEN H. ROSENBAUM
  Chief
MICHAEL S. MAURER
  Deputy Chief
RYAN G. LEE
  Trial Attorney
  Department of Justice
  Civil Rights Division
  Housing & Civil Enforcement Section
  950 Pennsylvania Avenue, NW – G Street
  Washington, DC  20530
  (202) 305-3109