**EXHIBIT A**

PAUL SAVAD, ESQ. (5358)
SUSAN COOPER, ESQ. (5433)
Paul Savad & Associates
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
Phone: (845) 624-3820
Email: paul@savadlaw.com

ROMAN P. STORZER, ESQ.
ROBERT L. GREENE, ESQ. (5430)
Storzer & Greene, P.L.L.C.
1025 Connecticut Avenue, NW #1000
Washington, D.C. 20036
Phone: (202) 857-9766
Email: storzer@storzerandgreene.com

JOHN G. STEPANOVICH, ESQ. (8876)
Lentz Stepanovich & Bergethon, P.L.C.
448 Viking Drive, Suite 370
Virginia Beach VA 23452
Phone: (757) 498-7035
Email: jgs@lawlsb.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————X

CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., RABBI MORDECHAI BABAD, RABBI
WOLF BRIEF, RABBI HERMEN KAHANA, RABBI MEIR
MARGULIS, RABBI GERGELY NEUMAN, RABBI
MEILECH MENCZER, RABBI JACOB HERSHKOWITZ, RABBI
CHAIM ROSENBERG, RABBI DAVID A. MENCZER,
RABBI ARYEH ROYDE, and KOLEL BELZ OF MONSEY,

**SECOND
AMENDED
COMPLAINT**

                              Plaintiffs,

          -against-

VILLAGE OF POMONA, NY; BOARD OF TRUSTEES OF
THE VILLAGE OF POMONA, NY; NICHOLAS SANDERSON,
AS MAYOR; IAN BANKS, ALMA SANDERS ROMAN,
RITA LOUIE and BRETT YAGEL, AS TRUSTEES
AND IN THEIR OFFICIAL CAPACITIES,

                              Defendants.

———————————————————————————————X

ROBINSON & COLE LLP
RECD 15 NOV '07 AM 10:55

Congregation Rabbinical College of Tartikov (the "Congregation"), Rabbi

Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis,

Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi

Chaim Rosenberg, Rabbi David A. Menczer, Rabbi Aryeh Royde and Kolel Belz of

Monsey, by their attorneys, Paul Savad & Associates, Storzer & Greene, P.L.L.C., and

Lentz, Stepanovich and Bergethon, P.L.C., as for their Complaint against the

Defendants, allege as follows:

## NATURE OF ACTION

1.     This action is commenced by Plaintiffs to redress violations of the their civil

rights—as protected by the United States and New York Constitutions, the Religious

Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.*

("RLUIPA"), and the Fair Housing Act, 42 U.S.C. § 3601 *et seq*—caused by the

Defendants' burdensome, discriminatory and unreasonable land use regulations and

intentional conduct which have prohibited and continue to prohibit the Congregation

from owning, holding, building and operating a Rabbinical College that will include

places of worship, religious educational facilities, religious courts, libraries of Jewish

texts, and student housing solely dedicated for the religious use by the Plaintiff

Congregation's full-time rabbinical students, lecturers and their families (the "Rabbinical

College") on a 30-acre portion of the Congregation's large 100-acre property in Pomona

("the Subject Property").

2.     The Rabbinical College will be a religious institution for ordained rabbis.

(the majority of whom will be drawn from Rockland County) to engage in advanced rabbinical studies to train as judges for rabbinical courts. All Plaintiffs have a sincere religious belief that they must teach and study certain Jewish texts and conduct their lives in such a manner to act as religious leaders within their community. Furthermore, there is a severe shortage of such religious leaders in the Orthodox Jewish community, the members of which believe that—as a religious matter—disputes must be resolved by courts composed of rabbis, and not the civil courts. The Village's laws preventing the existence of such an institution therefore substantially burdens Plaintiffs' religious exercise.

3.      The Village's Zoning Code forbids the Rabbinical College's use throughout its entire jurisdiction. In addition, the Village has enacted several new ordinances designed specifically to prevent the Plaintiffs' use. The Congregation has no administrative means of using its property legally as a Rabbinical College.

4.      In addition to burdening Plaintiffs' religious exercise, the Village has targeted Hasidic or Orthodox Jewish land uses (including Plaintiffs' use) for years. Defendant Village has repeatedly used legislative and administrative means to prevent the Jewish community from utilizing the Subject Property. Specifically, each and every time the previous three owners of the Subject Property attempted to develop it for a Jewish-affiliated institution (including a Jewish camp, a yeshiva, and now the Rabbinical College), the Village has responded by targeting such use and amending its zoning code to prevent, impair or delay development and housing for such use. This targeting is the direct result of fierce anti-Hasidic animus in the local community. Upon information and belief, the current administration of the Village was elected on a

3

platform of preventing the Congregation from locating in the Village, and appeasing local resident's intent on excluding this Jewish community from the Village.

5.      In preventing the Congregation from using the Subject Property for its protected religious and expressive activity along with its housing availability, the Village and its officials are continuing to violate both federal and state law, including the First and Fourteenth Amendments of the Constitution of the United States; 42 U.S.C. §§ 2000cc *et seq.* (the Religious Land Use and Institutionalized Persons Act of 2000, hereinafter "RLUIPA"); 42 U.S.C. § 3601 *et seq.* (the Fair Housing Act); Article I §§ 3, 8, 9 and 11 of the Constitution of the State of New York; New York Civil Rights Law § 40-C(1) and (2); and New York Village Law § 7-700 by:

A.      Substantially burdening its religious exercise and expression without a compelling governmental interest, or without using the least restrictive means of achieving any compelling governmental interest;

B.      Preferring nonreligious educational institutions over religious educational institutions;

C.      Preferring other religious institutions over the Plaintiffs' proposed religious institution;

D.      Excluding the Congregation's use entirely from its jurisdiction;

E.      Applying unreasonable laws against the Congregation;

F.      Discriminating against the Hasidic Jewish community in general and the Congregation in particular;

G.      Denying or otherwise making residential housing/dwellings

4

unavailable for the individual Plaintiffs and other Hasidic or Orthodox Jews;

H.    Interfering with the right of the individual Plaintiffs and other Hasidic or Orthodox Jews to available housing/dwelling; and

I.    Enacting zoning provisions that not only ignore a regional and Village shortage of affordable housing and the needs of the locality and the region, but intentionally and/or effectively excluding such housing.

6.    The Defendants' actions, all of which took place under color of state law, are and should be declared unlawful, and should be permanently enjoined.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), 42 U.S.C. § 2000cc *et seq.*, 42 U.S.C. § 3613(a), *et seq.*, and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States, particularly the First and Fourteenth Amendments to the Constitution of the United States, and the Religious Land Use and Institutionalized Persons Act of 2000 and the Fair Housing Act.

8.    This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because

5

the acts and transactions complained of occurred, and continue to occur in this District.

## THE PARTIES

10.   Plaintiff Congregation Rabbinical College of Tartikov Inc. is a religious corporation formed in 2004 under New York's Religious Corporations Law, and owns the Subject Property within the Village of Pomona upon which it is attempting to construct a Rabbinical College and related facilities.

11.   Plaintiff Rabbi Meir Margulis is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College, due to laws and actions of the Village.

12.   Plaintiff Rabbi Gergely Neuman is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College, due to laws and actions of the Village.

13.   Plaintiff Rabbi Wolf Brief is a natural person who resides in Rockland County, New York and who, for the purposes of religious exercise, speech, assembly, and instruction, seeks to lecture scholars in advanced studies of the Jewish religious laws, including the Talmud and other rabbinic texts.  He is prevented from doing so, due to the laws and actions of the Village.

14.   Plaintiff Rabbi Hermen Kahana is a natural person who resides in

6

Rockland County, New York and who, for the purposes of religious exercise, speech, assembly, and instruction, seeks to lecture scholars in advanced studies of the Jewish religious laws, including the Talmud and other rabbinic texts. He is prevented from doing so, due to the laws and actions of the Village.

15.    Plaintiff Rabbi Meilech Menczer is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

16.    Plaintiff Rabbi Jacob Hershkowitz is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

17.    Plaintiff Rabbi Chaim Rosenberg is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

18.    Plaintiff Rabbi David A. Menczer is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the

7

laws and actions of the Village.

19.    Plaintiff Rabbi Aryeh Royde is a natural person who resides in Rockland County, New York and wishes to attend the Congregation's Rabbinical College for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from attending the Rabbinical College due to the laws and actions of the Village.

20.    Plaintiff Rabbi Mordechai Babad will be the academic head (Dean) of the proposed Rabbinical College.

21.    Plaintiff Kolel Belz of Monsey is a religious corporation formed under New York's Religious Corporations Law, with its principal office at 12 Maple Terrace, Monsey, New York 10952.

22.    Defendant Village of Pomona is a municipal corporation duly formed and existing pursuant to the laws of the State of New York.  The Village is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

23.    Defendant Board of Trustees of the Village of Pomona is the municipal legislative body authorized by New York Village Law § 7-700 to adopt zoning and land use regulations for the Village of Pomona.  The Board of Trustees is a branch, department, agency or instrumentality of a government within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

## BACKGROUND

### The Congregation's Need for a Rabbinical College

24.    Plaintiff, Congregation Rabbinical College of Tartikov, Inc., is a religious

institution dedicated to the instruction of advanced rabbinical studies for previously ordained Rabbis. Plaintiff Mordechai Babad leads a group of rabbinical students that currently meet, worship and study at another religious institution's facilities in Rockland County.

25. A fundamental purpose of the Congregation is to meet the severe need of Orthodox Jewish communities for rabbinical judges (*dayanim*) to serve in religious courts in order to resolve disputes between and among Orthodox Jews, and to provide religious guidance to members of the Orthodox/Hassidic community for the frequent religious issues that arise concerning the proper application of the laws that govern every aspect of the daily activities and lives of Orthodox Jews. All rabbinical judges are *dayanim*. However, not all *dayanim* are rabbinical judges, since *dayanim* refers to a broader category of learned Rabbis who may give opinions on certain aspects of Jewish Law, but who cannot rule on all of them.

26. The Orthodox Jewish community includes the Hassidic community, which contains various sects. This community is distinguished by a particular method of dress, certain religious customs and practices and their use of the Yiddish language and lifestyle. The Hassidic community has been the target of official and unofficial discriminatory animus, statements and actions in Rockland County, by the Defendants.

27. The individual Plaintiffs are members of the Orthodox/Hassidic Jewish religion and are prospective students and teachers of the educational component and residents of the housing component of the Rabbinical College. These Plaintiffs have been and continue to be denied the opportunity to obtain housing within the community

9

of Pomona by the conduct and action of the Defendants.

28.     This discrimination—demonstrated by the specific facts described below—
has occurred before in Rockland County as evidenced by the federal Second Circuit
Court of Appeals' ruling in *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995),
which upheld a finding of discrimination by the nearby Village of Airmont as "amply
support[ed by] a finding that the impetus was not a legitimate nondiscriminatory reason
but rather an animosity toward Orthodox Jews as a group."

### Historical Background

29.     Prior to World War II, *dayanim* came from and were trained in Europe.
Rabbinical colleges existed throughout Europe, and each large Jewish community had
its own rabbinical court (*bais din*) to handle disputes between Orthodox Jews.   At that
time, there were no formal institutions in America for such training.

30.     These *dayanim* were nearly completely eliminated in WWII. Thousands
were exterminated by the Nazis.  Most middle-aged Orthodox Jews who would have
been eligible to become *dayanim* were murdered by the Nazis, leaving mainly the very
young and the elderly members of the community.

31.     Because of the systematic slaughter of the Jews, only a small fraction of
the rabbis survived in Europe after the war, and very few rabbinical courts continued to
exist.

32.     At the conclusion of World War II, approximately 10,000 Orthodox/Hasidic
Jews immigrated to the United States, bringing with them this shortage of *dayanim*
because most surviving Orthodox Jews were either too young or too old to be trained.

10

Today, in the third generation since the Holocaust, the Orthodox Jewish population in America is approximately 600,000, and consequently, the need for *dayanim* has become acute.

33.    As the Orthodox population regenerates itself throughout the world (including Rockland County, New York), the religious need for *dayanim* is becoming severe and cannot be met.

34.    Plaintiff Kolel Belz of Monsey is a religious corporation that has need for *dayanim* to serve their Hassidic congregants. Currently, Kolel Belz of Monsey has more than 200 families, and has only one *dayan* who has not been certified as a rabbinical judge.

35.    Kolel Belz represents the interests of itself and the broader Orthodox community in actively seeking trained *dayanim* to conduct the activities of rabbinical courts, which are necessary religious institutions under Jewish law.

36.    Kolel Belz utilizes no government or private accreditation agency to determine the suitability of *dayanim* who preside over its rabbinical courts.

37.    Congregation Kolel Belz of Monsey is currently experiencing significant growth, and its need for *dayanim* will become even greater over the coming years. They are in desperate need of a *bais din*.

38.    Plaintiffs Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi David A. Menczer and Rabbi Aryeh Royde are engaged in certain rabbinical studies at Kolel Belz. As a continuation of these studies, a course of education similar to that which will be offered at the Rabbinical College, which is

11

necessary for them to become rabbinical judges. Each of these individuals is compelled by their religious beliefs to pursue such studies; however, there is no existing rabbinical college that can accommodate their pursuits due to the dearth of such institutions generally, and specifically to accommodate the local Hasidic Jewish population.

39.    Plaintiff Congregation Rabbinical College of Tartikov will, upon its opening, admit Rabbis Menczer, Hershkowitz, Rosenberg, Menczer and Royde to its course of instruction in order to provide the religious education necessary for them to become certified rabbinical judges.

40.    Plaintiffs Margulis and Neuman are currently engaged in certain rabbinical studies at Mechon L'Hoyroa, located in Monsey, New York. However, that institution is very limited in terms of curriculum, student size, and ability to offer the religious environment that can be provided by the Rabbinical College.

41.    Plaintiffs Brief and Kahana are compelled by their religious beliefs to teach rabbinical scholars. They sincerely believe that there is a significant religious need for *dayanim* in the Orthodox Jewish community that is currently unsatisfied. They are currently being prevented from doing so because of the laws and actions of the Village.

42.    The Village's laws and actions, if upheld, will directly coerce the Plaintiffs who are natural persons into abandoning their plans to become rabbinical judges or teaching such individuals.

43.    The Village's laws and actions, if upheld, will necessarily place substantial pressure on the Plaintiff Congregation to alter its behavior, by completely preventing it from operating the Rabbinical College. Under the Village's current code, the Plaintiff

12

Congregation has no opportunity to engage in religious education, expression and worship motivated by its sincere religious beliefs within the Village. The effect of the Village's code is to completely prohibit the Plaintiff Congregation's use.

44.    The Plaintiff Congregation is also precluded from using any other site within the Village. There is no viable alternative for the Plaintiff Congregation to reach its religious objectives other than on the Subject Property.

45.    All Plaintiffs who are natural persons will reside at the Rabbinical College with their families.

46.    Rabbi Yehiel Babad and Rabbi Naftali Babad, the *rosh yeshiva* (academic head) and the Chief Judge of the *bais din*, respectively, of Kollel Beth Yechiel Mechil of Tartikov in Brooklyn, together with Plaintiff Rabbi Mordechai Babad who presently resides in the Town of Ramapo and is the planned *rosh yeshiva,* of the Rabbinical College, are the sons of Rabbi Usher Babad, an esteemed rabbinical judge, who was able to flee the atrocities of Europe and moved to New York in the early 1950's. Usher Babad came from a long line of rabbis, including Joseph Babad, who authored a famous book approximately 150 years ago titled the *Minchas Chinuch*, a respected work on the 613 *Mitzvot* (commandments) that guide the way of life with the rules and practices of the daily lives of Orthodox Jews and sets forth part of the rules sought to be enforced by the *dayanim*.

47.    Prior to his escape from Europe, Rabbi Usher Babad was a prisoner in a concentration camp during the War. Most of his family members in the Ukraine were exterminated, including his wife and children. Upon relocating to New York, he formed

13

a small *bais din*, the Central Rabbinical Congress in Brooklyn, along with the first

Tartikov *shul* (synagogue), named after the Eastern European village of the Babad

family's heritage.

48.    The Plaintiff Congregation is affiliated with Kollel Beth Yechiel Mechil of

Tartikov, located in Brooklyn, New York at 1452 55th Street.  Kollel Beth Yechiel Mechil

is also a rabbinical college that provides the same type of program that Plaintiff

Congregation will provide.  That facility is extremely overcrowded and cannot begin to

satisfy the need for rabbinical judges. Its doors have been shut for several years to new

rabbis because of such dire space limitations.  It serves mainly the Jewish community in

Brooklyn.

49.    Currently, there are only a very few Rabbinical Courts (*bais dins*) serving

Orthodox Jews in the entire United States.  These courts are extremely overburdened,

causing religious adherents to violate their sincerely held religious laws and beliefs by

resorting to the secular court system.

### The Rabbinical College – Its History, Purpose and Operation

50.    The Congregation purchased the Subject Property on August 17, 2004, for

the sole purpose of building and operating a Rabbinical College with residential housing

on the site.  In furtherance of this goal, an affiliate of the Congregation subsequently

purchased ten additional adjacent lots totaling approximately 30 additional acres,

improved with 13 single-family homes, located contiguous to the Subject Property, to

serve as a buffer between the Rabbinical College and the surrounding community.

51.    Upon information and belief, the Village learned of the potential use as a

14

Rabbinical College immediately after the deed was recorded in the Rockland County clerk's office on August 31, 2004.

52.    The planned Rabbinical College will be a specialized *kollel* (a term that derives from the Hebrew "klal", which mean group or community.), an institute organized solely for the advanced religious studies of the Talmud and of rabbinic literature for post-graduate Jewish adults. Every student at the Rabbinical College will already be an ordained rabbi before entering the religious college.

53.    The College will be devoted solely to religious training of *dayanim* who will be tested and certified by rabbinical authorities (*semicha*) after many years of intense religious study. *Semicha* is the "transmission" of rabbinic authority to give advice or judgment in Jewish law. These judges will comprise the *bais din* necessary to apply *halakha* (Jewish law, translated literally as "the way of walking"). The *dayanim* must be thoroughly educated in order to resolve the various controversies subject to Jewish law.

54.    The religious tradition of *bais din* is central to Orthodox Jewish religious belief. When Orthodox Jews have a conflict, they are not permitted, according to the *Chumash* (the five books of Moses, known as the Torah or the "Old Testament") to resolve the dispute in the secular courts. This tenet is based upon the Torah, Deuteronomy 16:17, which says, "Judges and court officers shall you place unto yourself in all your gates." This sincerely held religious belief of the Plaintiffs establishes an obligation to institute ecclesiastic courts, or *bais din*, in every locale (*Sefer ha-Mizvot, mizvot aseh*, no. 176; *Sefer Mizvot Gadol, esin*, no. 87; *Sefer ha-Hinnukh*, no. 491). These sources identify the religious obligation to establish *bais din*

15

and set rigorous academic and personal standards for judges. The specific religious admonition against those who do not use such courts is found in the *Shulchan Aruch, Hashen Mishpat* 26:1 declaring: "And whosoever comes before [gentile courts] for judgment is a wicked person and it is as if he has blasphemed and lifted a hand against the Torah of our teacher Moses."

55.     This command has formed the basis for the institution of the religious or "ecclesiastic" courts everywhere that Orthodox Jews live.

56.     The sources of authority and principal texts that will be studied at the Rabbinical College are the laws and commentaries written in the Bible (*Torah*), the *Talmud*, and the *Shulchan Aruch* (a comprehensive code of *halakha* compiled by Rabbi Yosef Karo in the 16th century). The *Shulchan Aruch* is comprised of four books: (1) *Orach Chayim* - laws of daily life, including prayer, blessings, meals, synagogue, Sabbath, holidays, family codes, etc.; (2) *Yoreh De'ah* - laws of *shechita* (the religious and humane method of slaughter of animals for food), *kashrut* (keeping kosher), family purity, circumcision, burials, religious conversion, etc.; (3) *Even Ha'ezer* - laws of marriage, divorce and related issues; and (4) *Choshen Mishpat* – other civil controversies and the rules of the *bais din*.

57.     The religious tradition of *bais din*, and the training of rabbis as *dayanim*, is central to Orthodox Jewish religious belief.

58.     The purpose of the Rabbinical College is to educate rabbis on these religious laws, and on the wise and just application of the religious laws, to serve on *bais dins* and to counsel members of the Orthodox Jewish community on the day-to-day

questions that arise in applying Jewish Law to every aspect of their daily lives.

59.    Plaintiffs believe such training to become a certified *dayanim* for *bais din* is necessary and may take up to (or beyond) fifteen years.  Students, all ordained Rabbis, will normally begin these specialized religious studies between the ages of 20 and 30, and who will be married, some with young children. Plaintiff students and other students will attend the religious college without any tuition costs and without any housing costs. To meet their other financial needs, Plaintiff students and their families will be subsidized by the College.

60.    The format of the daily activities at the Rabbinical College is based upon strenuous religious study and prayer during the hours of 5:00 a.m. to 10:30 p.m., with meal breaks.  The communal living structure—where students are with their families, prayer and learning groups, lecturers and fellow students—contributes to the necessary religious environment that the Congregation must provide at its Rabbinical College.

61.    Other rabbis will serve as lecturers and remain daily in the study halls (*Bais Medrash*) to interact and advise the students during their studies.

62.    The rabbinical students studying at the Rabbinical College will be provided with tuition, housing and accommodations and educational books and computers free of charge, and, based on need, will receive a regular monthly stipend from $1200 to $2400 from the Congregation for the sole purpose of facilitating their advanced rabbinical studies.

63.    Prayer will be a fundamental element of the students' life at the Rabbinical College.  Orthodox Jews must pray three times per day, in morning, afternoon and evening services. Each prayer service (in the eleventh section of a prayer known as the

17

*Shemoneh Esrei*, in which God's help is requested), includes a request that God "Restore Our Judges" and again let us have Judges of the caliber which Jews once possessed (*Shimon Schwab*); and that God help the Judges rule wisely and justly (*Yaaros D'Vash*). Proximity of the *shuls* to the housing units is essential for this religious need.

64.    Residential housing is essential to the training provided by the Rabbinical College because it permits the students to live in close proximity, allowing them to immerse themselves in the studies and discussion required to learn the Torah. It also allows the students to spend their spare time together, discussing their religious studies amongst themselves as this is part of the religious learning process. The Rabbinical College is a specialized *kollel*, where community is essential.

65.    It is the Congregation's and individual Plaintiffs' religious practice and belief that it is essential for these students to live, study and pray in the same place in order to minimize outside influences and to intensify the religious learning experience.

66.    Moreover, since the course of religious study prohibits students from being employed (with an 8-12 hour daily academic schedule), and their wives generally are not employed, residential housing at the Rabbinical College is necessary to enable the Rabbis to concentrate on their studies for a 15-year period.

67.    The proposed residential components of the Rabbinical College are "dwellings" as that term is defined by the Fair Housing Act, 42 U.S.C. § 3602.

68.    In addition to the religious educational buildings on the proposed site, the Congregation plans to include up to ten *shuls* (synagogues). These *shuls* will be located in multiple housing units, and integrated in the daily lives of the students and

their families. Because of the sincerely held religious beliefs of the Plaintiffs, religious activities cannot be separated from any part of the students' daily activities. These multiple *shuls* are necessary, since students may come from many different Jewish sects and traditions, including Ashkenazic, Sephardic, and other Hassidic and Orthodox sects.

69.   The Rabbinical College will also include four *bais din* courtrooms throughout the campus, which will be used to litigate and settle disputes, and as teaching facilities for students to become certified Rabbinical Judges and engaged in "shimush" (internship).

70.   The Rabbinical College will also house multiple libraries, which will contain the books necessary for the educational program.

71.   There is no secular purpose to the Rabbinical College, which will be organized and developed as a purely nonprofit religious institution.

72.   The Rabbinical College's plan to use its property to build a religious school is "religious exercise" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(&)(a) & (b).

## DEFENDANTS' PROHIBITION ON THE CONGREGATION'S RELIGIOUS EXERCISE

### The Selection of the Subject Property

73.   On August 17, 2004, the Congregation purchased the Subject Property in the Village of Pomona.

74.   An additional contiguous 30 acres was purchased by an affiliate of the Congregation to serve as a buffer between the Rabbinical College and the neighboring community.

19

75.   The Subject Property is located at the intersection of Routes 202 and 306, which are state highways in the Village in the Town of Ramapo.

76.   The Subject Property is uniquely suited to meet the needs of the Congregation.

77.   Locally, the Orthodox Jewish community within the Town of Ramapo and adjacent Villages, including Pomona, has grown over the last 80 years with the development of the infrastructures necessary to maintain the practices prescribed by their religious beliefs, including synagogues, yeshivas, elementary and high schools for boys and girls, ritual baths, and kosher food stores and restaurants.

78.   Over these years, the Orthodox Jewish community has spread from its center in Monsey (an unincorporated hamlet in the Town of Ramapo) to numerous villages within the Town of Ramapo, including the Villages of Kaser and New Square (villages created to support the Hassidic Jewish community), Wesley Hills (a village created to preserve a neighborhood of luxury homes on large lots, but which has a sizeable shopping center with a Kosher food market ), Airmont (a village which was declared by the Federal courts to have been created to prevent the spread of the Orthodox Jewish community, see *Leblanc-Sternberg v. Fletcher*, 104 F.3d 355 (2d Cir. 1996)), New Hempstead, Spring Valley, Suffern, Montebello, Chestnut Ridge and Pomona.

79.   Upon information and belief, in 2000, there were approximately 90,000 Jews living in Rockland County, out of a total population of 287,000, with those numbers having increased in the last seven years.

80.   The Rabbinical College will predominantly serve the Orthodox/Hassidic

20

Jewish community in Rockland County, its towns and its local incorporated Villages.

81.     Plaintiff Kolel Belz of Monsey, located in the nearby hamlet of Monsey, currently has multiple potential rabbinical students ready to study at the Rabbinical College when it is built.

82.     Although several other *kollelim* exist in the United States, including in Lakewood, New Jersey, Seattle, and Atlanta, upon information and belief, none offer the full course of study or religious environment planned for the Congregation's institution. The existing *kollelim* are insufficient to meet the need of students wishing to study in such a manner, and insufficient to provide the *dayanim* with the Rabbinical Judges needed to serve the Orthodox Jewish community.

83.     Even putting aside local zoning regulations, the Subject Property is the only available parcel of land that can accommodate the Rabbinical College, because of its size and proximity to the necessary religious infrastructure and population.

84.     No alternative properties exist in Pomona or in surrounding communities which can legally or practicably accommodate the Plaintiffs' use.

85.     Neither Pomona nor any nearby Village or Town permits the Rabbinical College's use, either by right or by special exception.

### The Village of Pomona's Zoning Code

86.     The Village of Pomona is located within the Town of Ramapo, New York, in Rockland County, New York.

87.     Pomona was incorporated in 1967.

88.     The entire area of the Village of Pomona falls within its "R-40 District",

21

which requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of one-family homes, according to the Village of Pomona Zoning Code, Article III (General Provisions), § 130-5 (District Classification). The subject property is located in the R-40 district.

89.    The Subject Property is a single lot of approximately 100 acres, and is bordered by U.S. Route 202 on the north and New York State Route 306 on the west. The 100-acre lot is currently developed and contains 12-13 structures including bungalows and other buildings used as an Orthodox Jewish summer camp.

90.    Residentially, only one single-family home can be built on the Congregation's 100-acre property, without subdividing the Property, under the restrictions of the Village's Zoning Code.

91.    The Village Code does not permit the Rabbinical College (along with its residential component to exist anywhere in the Village of Pomona, either as a "matter of right" or by special use permit.

92.    It is impracticable for the Rabbinical College to legally exist anywhere in Pomona, given the single-family residence zoning provided for in its Code.

93.    The Village Code does not permit an unaccredited religious educational institution such as the Rabbinical College to operate anywhere within the Village of Pomona.

94.    The Village Code does not permit, as a "matter of right" or by special use, any religious educational facilities with a residential component for the religious education students and their families.

95.    The Village Code explicitly states that "All uses listed hereunder are

22

permitted in the R-40 District; all others not listed are prohibited, except as provided in §§ 130-10 and 130-11." Village of Pomona Zoning Code, Article IV (Use Regulations), § 130-9 (Permitted Uses), paragraph A.

96.     Plaintiffs' religious education program contains both pure expression and expressive conduct. The Village's zoning code prohibits this expressive activity throughout its jurisdiction.

97.     No property in the Village may be principally used for a Rabbinical College or any similar "unaccredited" religious education facility, as described herein.

98.     No property in the Village may be principally used for an educational facility that incorporates a communal family environment, necessary for the purposes of Plaintiffs' religious expression and exercise, as described herein.

99.     The Village's zoning code significantly limits the Plaintiffs' communicative activity within its jurisdiction.

100.    The Village possesses no compelling or sufficiently substantial government interest to prohibit the Plaintiffs' use outright within its jurisdiction.

101.    In enacting certain ordinances restricting the use of the Subject Property, the Village has presented no evidence that Plaintiffs' use would threaten any Village interest generally, or would threaten any Village interest more than various permitted uses.

102.    The Village cannot demonstrate that there exists any less intrusive means of achieving any government interest other than prohibiting the Plaintiffs' use outright within its jurisdiction, or that it has narrowly drawn its regulations to serve its interests.

103.    The laws and actions of the Defendants that prevent the application,

construction and utilization of the Subject Property as a Rabbinical College imposes onerous and unreasonable conditions upon the Plaintiffs, which conditions are unrelated to the health, safety and welfare of the residents of the Village of Pomona.

104.  The Village permits certain "Educational Institutions"; however, such institutions are limited by definition to "[a]ny private or religious elementary, junior high or high school, college, graduate or post-graduate school conducting a full-time curriculum of instruction a minimum of five days per week for seven months per year *and accredited by the New York State Education Department or similar recognized accrediting agency*." Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

105.  The Rabbinical College is not accredited by the New York State Education Department, nor can it be.

106.  Upon information and belief, there is no public or private "similar recognized accrediting agency" for the program offered by the Rabbinical College.

107.  The Village permits dormitories, but defines "Dormitory" in such a manner as to exclude the Rabbi students and their families. Pomona Zoning Code, Article II (Definitions) §130-4 (Terms Defined). The student housing required by the Rabbinical College would be excluded from the definition of "dormitory," since the Village Code expressly forbids "Dormitory rooms [from] contain[ing] separate cooking, dining or housekeeping facilities . . .". Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

108.  The Village's Code also contains a patently unreasonable prohibition against more than one dormitory building being permitted on a lot, *regardless of the*

24

*size of the lot.* Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

109. The Village's Code contains a patently unreasonable prohibition limiting the size of a dormitory to "twenty (20) percent of the total square footage of all buildings on the lot." Pomona Zoning Code, Article IV (Use Regulations), §130-10 (Special Permit Uses), Paragraph F (Educational Institutions).

110. The Village Code does permit "libraries and museums" in the R-40 District. Pomona Zoning Code, Article IV (Use Regulations), § 130-9 (Permitted Uses), paragraph A(5).

111. For these several reasons, the Rabbinical College proposed by the plaintiff Congregation is therefore expressly excluded from the Village under the text of its ordinance. Based upon the exclusion by the Village of the use of the property as a non-accredited Rabbinical College, and the actions and statements of the Village officials as alleged herein, there is no question that the College's proposed use is forbidden within the Village.

### The Village Lacks Justification to Exclude the Congregation

112. No compelling, important or legitimate reason exists to prohibit the Congregation's intended use on its property or to prohibit the Congregation's intended use completely from the Village.

113. Immediately upon purchase of the property, the Congregation retained professionals in the fields of planning, traffic, environmental, engineering, architectural, and archaeology to develop a site plan with architectural drawings and to perform thorough studies of traffic, environment, and all other health, welfare and safety issues.

114. The Congregation commissioned an extensive examination of traffic

25

patterns for the proposed educational institution and the accessory uses reasonably associated with and necessary to further its religious educational purpose, and examined the surrounding areas to ensure that no compelling governmental interest exists regarding the health and safety of the traveling public.

115.   The site plan was repeatedly modified by the professionals to ensure that it met applicable engineering, environmental, traffic and other standards, demonstrating that the Rabbinical College could be built with no negative effect on public health and safety.

116.   The Congregation also caused a professional engineering analysis to be made with regard to other development issues, including drainage, sewer, water supply, parking and all other environmental issues.

117.   The Congregation also conducted archaeological, air quality and noise studies in order to mitigate all significant adverse impacts from the project.

118.   The Congregation's plan for its educational religious facility is a beneficial use under New York law under *Cornell University v. Bagnardi*, 68 N.Y.2d 583 (1986), and the exclusion of the Rabbinical College by the Village is contrary to New York State Law.

119.   Many other colleges of similar size with student housing exist throughout the New York State, in urban, suburban and rural areas. For example, the Dominican College recently constructed a 200-student residence hall, including apartment units with kitchens, on a 10-acre parcel of land in Orangeburg, Rockland County about 11 miles away from Pomona. St. Thomas Aquinas College in Sparkill, Rockland County has 5 dormitory buildings housing more than 350 students on its 48-acre campus

26

(about 13 miles away from the Subject Property). Nyack College offers on-campus housing for 80% of its students in several residence halls, including on-campus married-student housing on its 63-acre campus in Nyack in Rockland County (about 10 miles away from Pomona). Iona College, located on 35 acres in Westchester County offers housing for over 900 students, including multiple-bedroom student housing with kitchens.

## DISCRIMINATION AGAINST THE CONGREGATION AND OTHER JEWISH ENTITIES

120. The Village of Pomona has engaged in a targeted and deliberate decades-long effort to prevent various Jewish individuals and institutions from developing the subject property and other nearby properties, while permitting other development within the Village, including a large Hindu temple. Each time that the past three owners of the subject property attempted to develop the subject property for a Jewish-affiliated purpose the Village enacted new ordinances to prevent such development, constituting a pattern of religious discrimination directed at the Jewish individuals and organizations during their successive periods of ownership of the subject property. Upon information and belief, this targeting has been based in large part on anti-Hasidic animus.

### Targeting of Camp Dora Golding

121. Since 1920, the subject property had been operated as a recreation camp. The Federation of Jewish Properties purchased the property in 1982 and operated a sleep-away camp for underprivileged children. In 1990, there were between 125 and 190 campers, and the Federation applied for approvals to build a bungalow to house an

additional 24 campers.  Upon information and belief, in response, the Village took steps

to prevent its housing expansion.

122.  At a public hearing on the Camp's application held on December 17, 1990,

the Village Trustees proposed adopting a zoning code amendment, ostensibly to

govern camps generally, which were not then included in the zoning code, and upon

information and belief, with the specific intention of restricting this application and this

property.

123.  The Village then proceeded to enact targeted legislation aimed at the

Camp and to engage in significant delaying tactics, resulting in circumstances that

made further development of the Camp facilities effectively impracticable.

124.  Sometime after 1991, the Federation decided to sell the property and

relocate its camp in Pennsylvania, due to the Village's obstacles to any expansion of

the camp.

### Targeting of Yeshiva Spring Valley

125.  On January 6, 1999, the property was sold to Yeshiva of Spring Valley,

which had intended to build a religious boys' school for approximately 800 Orthodox

Jewish students, a Synagogue, and eventually a preschool.

126.  On February 24, 1999, Yeshiva of Spring Valley applied for a Real

Property Tax Exemption, and included in their application the intention to build a

religious boys' school.  Yeshiva of Spring Valley continued the use of the property as a

religious summer camp and used the buildings in the winter to store its supplies and

educational materials for its other educational facilities.

28

127. On December 15, 1999, Yeshiva of Spring Valley made an informal presentation to the Village Planning Board of their plans for a 100,000 square-foot private primary school building and synagogue, and to later build a 20,000 to 30,000 square-foot pre-school, all to be built on less than ten acres of the hundred-acre property.

128. During the presentation, members of the Village Planning Board discussed their desire to change the zoning code governing schools, because the zoning for schools "really stinks", requiring "only" five acres to build a school, and noting that Yeshiva of Spring Valley could construct an approximately 800,000 square foot building as of right under the then-existing code on the 100-acre property.

129. In response to Yeshiva of Spring Valley's proposed use, the Village planners recommended that the zoning code be amended. All consideration of Yeshiva Spring Valley's plans to construct the school were suspended by the Village for almost one year while the zoning amendment was under consideration.

130. Then, approximately two years from the time Yeshiva Spring Valley announced its intentions to build a religious day school, the Village finally took action and on January 22, 2001, the Village Trustees adopted Local Law No.1 of 2001, containing new restrictions for schools that made it impossible for it to build the project it proposed.

131. The Village's Local Law No.1 of 2001 removed schools as a permitted use and re-classified schools and educational institutions as a "special permit" use. Pomona Zoning Code, Article IV (Use Regulations), §130-10 (Special Permit Use), paragraph F. The new special permit provision increased the minimum lot requirement

from 5 acres to 10 acres plus .05 acre per enrolled pupil, added more deduction for slopes and wetlands than was previously required, reduced the percentage of allowable building coverage, floor space and impervious surfaces.

132. These new laws made it effectively impracticable for Yeshiva Spring Valley to build a school as then proposed.

133. Upon information and belief, the code provision was intentionally drafted to prevent reasonable construction by the Yeshiva of Spring Valley of a school for 800 Orthodox Jewish students on the property.

134. Thereafter, in June of 2001, Yeshiva of Spring Valley submitted plans to use over 60 acres for a religious school for 850 students (kindergarten through 12th grade), with a synagogue and adult education center, and using the remaining acreage for 25 single-family homes on 40,000 square-foot lots.

135. Public hearings and environmental reviews continued through 2001 and 2002, without resolution.

136. Because of the significant delay, Yeshiva of Spring Valley did not withdraw its application, but began looking for other properties for their school, since, upon information and belief, it became clear that the Village was not proceeding in good faith and would not allow reasonable development of the property for an Orthodox Jewish yeshiva.

137. In January of 2004, Yeshiva Spring Valley submitted its annual request for a tax exemption for religious use, which it had routinely received each year for the five years it had owned the property.

138. In February of 2004, the Village, for the first time, challenged the tax

exemption, even though neither the ownership nor the use of the property had changed.

139.  On March 22, 2004, without good cause and in contravention of law, the Village Trustees voted to deny the religious tax exemption for Yeshiva Spring Valley's property.

140.  On June 28, 2004, without good cause and in contravention of law, the Village Board of Assessment Review also denied the religious tax exemption.

141.  Upon information and belief, in the Summer of 2004, Village Attorney Doris Ulman told Rabbi Metzger, a representative of Yeshiva Spring Valley, that if he would withdraw their application for a Jewish school and remove all of the related files from the Village office, that the Village would grant the tax exemption.

142.  The Village then passed further zoning amendments concerning educational institutions and dormitories, further restricting the use of the Subject Property.

143.  Yeshiva Spring Valley abandoned its efforts to develop the property as a school and sold the property to the Congregation in August of 2004.

### Targeting of Adult Student Housing in the Town of Ramapo

144.  In 2004, the Town of Ramapo, in which Pomona is located, adopted a new Comprehensive Plan that zoned four locations within its jurisdiction for the development of adult student housing, needed by the Jewish Hasidic community in connection with certain religious schools (but which cannot accommodate the Congregation's use). One of these four locations, known as the Patrick Farms, is located directly across the

street from the Congregation's property in Pomona.

145. In response, the Village of Pomona sued the Town of Ramapo to challenge its adoption of "adult student housing" zones in New York Supreme Court.

146. On or about June 17, 2005, the Village's claims against the Town were dismissed for lack of standing by acting New York Supreme Court Justice Francis Nicolai.

147. The Village appealed this decision, and on August 14, 2007, the Appellate Division ruled that those villages neighboring the Town's new zones for adult student housing have an interest in the potential environmental impacts of the new Town law sufficient to give them standing under SEQRA.

148. In July of 2004, the Village circulated its Village Green Newsletter (written, published by the Village at Village expense) supporting the creation of a new village outside of its jurisdiction to be formed and to include the Patrick Farms property, to be known as the Village of "Ladentown," and to remove the property from the Town of Ramapo's zoning reach.

149. Upon information and belief, the Village's purpose in promoting the proposed Village of Ladentown was to prevent the Patrick Farms property from being lawfully developed with 12 acres of adult student housing for adult Hasidic students, or with any other type of multi-family or other affordable housing that the Town might permit.

150. In a letter to the editor of the Journal News, Ms. Lynn Yagel, wife of Defendant Brett Yagel, stated: "After listening to all of this, I realized that once the Patrick Farm property is developed, I would not be welcome there. My children will not

be welcome there. Eventually public roads will be blocked on Saturdays, as they are in New Square. . . . Merchants at the local Stop and Shop in Pacesetter Park in Mt. Ivy are being warned that they will not be able to open for business on Saturdays."

151.  Upon information and belief, Pomona Village Attorney Doris Ulman volunteers her time to the Ladentown incorporation effort.

152.  Upon information and belief, in official proceedings before the Town of Ramapo, Ms. Leslie Sanderson, wife of Defendant Sanderson and former Clerk of the Defendant Village, stated that she also supported the formation of the Village of Ladentown as a method of gaining control over development.

153.  An October 23, 2005 New York Times column reported another local resident quoted as saying: "'You say Patrick Farm, and I want to throw up, I literally get nauseous,' said Holly Castle, who lives about a mile or so away. 'You wonder, how can someone drop their own little planet on us?'"

154.  Defendant Brett Yagel's campaign materials stated that "he has been assisting his 'Ladentown' neighbors in their fight for village incorporation."

155.  Upon information and belief, the drive to create the Village of Ladentown, supported by the Village, was based on a motivation to prevent Hasidic Jews from residing there.

**Targeting the Congregation through Dormitory Regulation**

156.  On September 27, 2004, one month after Tartikov purchased the property, and while the Town of Ramapo's adult student housing zones were under attack by Pomona and other villages, the Village amended its zoning code's definition of

33

educational institution to allow for colleges, graduate and post-graduate schools that are "accredited by the New York State Department of Education or similar recognized accrediting agency." Pomona Zoning Code, Article I (Authority and Purpose), § 130-4 (Terms Defined).

157.  Also in late 2004, the Village amended its zoning code to permit dormitories as an accessory use to a school, but explicitly prohibited housing that would accommodate students with families:  "Single-family, two-family and/or multifamily dwelling units other than as described above shall not be considered to be dormitories or part of dormitories." Pomona Zoning Code, Article I (Authority and Purpose), § 130-4 (Terms Defined).

158.  Further amendments in 2004, passed subsequent to the Congregation's purchase of the Subject Property, required dormitories to be on the same lot as the primary educational use, and there could be no more than one dormitory building on the lot. Village of Pomona Code, Article IV (Use Regulations), § 130-10 (Special Permit Uses), paragraph F (Educational Institutions), subparagraph 12.

159.  Upon information and belief, these provisions were enacted to prevent Jewish rabbinical scholars, who generally are married with children, from obtaining housing in Pomona.

160.  There was no rational basis for this action.  Many other jurisdictions throughout the country permit student family housing, and such use is in fact commonly provided at educational institutions, especially for graduate and post-graduate students.

161.  In September 2004, the Village again targeted the Subject Property in amending its zoning code by implementing a number of restrictions concerning building

34

coverage, impervious surface coverage, calculation of net lot area and road access, which are not imposed on other institutional and nonresidential land uses.

162.  On January 22, 2007, the Village again amended its code provision for educational institutions, adding a provision limiting the size of a dormitory building to twenty percent of the total square footage of all buildings on the lot.  Pomona Zoning Code, Article IV (Use Regulations), § 130-10 (Special Permit Uses), paragraph F (Educational Institutions), subparagraph 12.

163.  This twenty percent restriction effectively eliminates all dormitories since, applying generally accepted architectural standards and guidelines for school building square footage per student and dormitory square footage per student, such a restriction results in permitted school dormitories which could house a maximum of only approximately three percent (3%) of any student body.

164.  Upon information and belief, this "Dormitory" legislation was also designed and enacted specifically to prevent the Hasidic Jewish community from residing and obtaining housing within the Village.

165.  Community opposition was displayed through public comment at the hearing on the dormitory legislation and was mostly targeted at Hasidic Jews in general and at the Rabbinical College in particular.

166.  At a public Village hearing (which occurred shortly after news of the proposed Rabbinical College was made public), Mayor Marshall of Defendant Village stated:

Ladies and gentlemen, let me say something.  We sitting at this table have limitations that are placed on us as to what we can say, and what we

35

can't say, because our attorney tells us what we can say and what we

can't say. I can't say what I feel – I can't – if I agree with you, I don't

agree with you, I don't have that luxury of being able to say that here. All

that I can say is that every member of this board works very, very hard to

do what is best for this community. You have your issues. Don't assume

because no one has gotten up and said, wow, I agree with you, oh boy;

don't assume that because we didn't do that that we don't agree.

167. The Journal-News reported on January 23, 2007 that "The [Village of

Pomona] board voted unanimously after a long and heated public hearing to make

some changes to the law in order to be able to block a planned rabbinical college.

Amendments include allowing no more than one communal dining room in a dormitory

building, and specifying the size of said buildings and the space they can occupy."

### Targeting the Congregation through Environmental Regulation

168. In December of 2006, at the same time the Village proposed to amend the

dormitory law, the Village proposed a new Wetlands Protection law (Village Code

§ 126) to require a 100-foot buffer around wetlands of two thousand square feet or

more. This provision governs wetlands that are currently subject to the jurisdiction of

the United States Army Corps of Engineers and/or New York State's Department of

Environmental Control.

169. In particular, the proposed wetlands law by its very terms exempts nearly

every lot in the entire Village, except for the Congregation's property (and perhaps a

very few other uses, if any).

36

170. On April 23, 2007, the Village adopted the Wetlands Protection law, which included the following provision: "All single-family residences are exempted from the 100-foot buffer requirement."

171. Upon information and belief, this proposed wetlands code section was intended to restrict development of the Congregation's property, which contains 37 acres of wetlands under the jurisdiction of both the US Army Corps of Engineers and the NYSDEC. The Village's 100-foot buffer encumbers an additional 10 acres of the Congregation's property.

172. Since the entire area of the Village falls within its "R-40 District" for residential homes, and since the Village is almost completely built with single-family homes, the wetlands code is targeted at the Congregation's property, and upon information and belief, applies to very few (if any) other wetlands in the Village.

173. The Wetlands Protection code of the Village has no reasonable basis and is irrational, in that it is use-based, exempting most of property in the Village (single-family homes) by use, and not based on any environmental factors.

174. Upon information and belief, this "Wetlands" legislation was designed and enacted specifically to prevent the Hasidic Jewish community from locating and obtaining housing within the Village.

### Targeting of the Rabbinical College:  Opposition to the Congregation's Use by Elected Officials and Village

175. Upon information and belief, the news of the Congregation's hypothetical sketch plat to build a Rabbinical College was apparently leaked to the "Preserve

Ramapo" group by one of the agencies that received a preliminary sketch plat showing potential maximum use of the property in connection with the Congregation's completion of its draft Environmental Impact Statement.

176.  Preserve Ramapo is a local private organization that has made public statements such as an "examination of population growth in Ramapo's Hassidic communities" should be "the central focus of any land use plan in Ramapo."

177.  Upon information and belief, based solely on this copy of a leaked preliminary drawing, with no further information, elected officials in the Village determined that such a use is illegal, and would delay through the environmental review process any such development for a sufficient time to raise funds to defend any court challenge.

178.  This position was voiced by the newly elected team of new Mayor Nicholas Sanderson (formerly the deputy mayor) and new Trustees Brett Yagel and Rita Louie when, prior to their election, they published and circulated campaign literature that stated that the Village will "fight this plan", and the "team . . . is prepared to stand up to this threat . . . ." This "team" also hired a well-known anti-RLUIPA legal expert, Professor Marci Hamilton.

179.  Mayor Sanderson appeared in a campaign video where he said that the Rabbinical College could not only "change the village", but could change "the makeup of the village." Upon information and belief, this "makeup of the village" statement referred to controlling the influx of Hasidic Jews into the Village.

180.  Upon information and belief, in early 2007, Defendant Sanderson publicly stated that "The single most important issue facing the village at this time is the as yet

un-proposed, but leaked, Rabbinical College development on Rt 306 in the village," and

stated that the Village should "maintain[] its cultural and religious diversity." Upon

information and belief, this statement referred to Mayor Sanderson's interest in

controlling the influx of Hasidic Jews into the Village.

181.   After his election, newly elected Mayor Sanderson said: "if they use

RLUIPA to get us, we will fight," referring to the College's intended use of the Property.

182.   Upon information and belief, Defendant Sanderson was elected on a

platform that consisted mainly of preventing the Congregation from locating in Pomona.

183.   Defendants Yagel and Louie expressly warned a civic association to be

careful not to allow discriminatory statements to slip out.  Other public statements by

community residents include "We need to strategize as a community in private rather

than use the public forums such as this site and the Village Hall.... Thanks, I know it is

very hard to hold back, but we have to and do it right.... We have to play the game and

do it right. If we have to be tricky fine, that's the legal system."

184.   Defendant Sanderson said that it would cost $1,000,000 to fight a RLUIPA

challenge, and that the funds could be raised over the "3-5 years" before a lawsuit

would be filed.

185.   Upon information and belief, the Defendants' conduct described herein has

been made in a total vacuum of any information about the plans for the Rabbinical

College and without seeing any of the studies performed, despite the Congregation's

repeated pre-election and post-election offers to meet with the Board or other Village

representatives to present the concept and the studies to the Village to begin a dialog

on meeting any legitimate health, safety and welfare concerns.

**Targeting of the Rabbinical College: Community Hostility to Hasidic Jews**

186. Discriminatory animus exists in Pomona and elsewhere in the Town of Ramapo against Orthodox and/or Hasidic Jews. Upon information and belief, this animus played a significant role in the discriminatory actions undertaken by the Defendants and led directly to targeting of various Jewish uses of the Subject Property (including the Plaintiffs' proposed use), the legislation targeting the Plaintiffs' use, and the election of Mayor Sanderson and other members of the current Village Board.

187. Many letters to the Editor of the Journal-News describe the community's opposition to the Congregation's use, which has been described in the newspaper as a "tribal ghetto."

188. In local publications, the Hasidic population has been referred to as a "cult," "fake people," "Dark Hatted Orthodox Men prancing around Pomona" and "Hasidic schemers" by community residents.

189. Other communications to the Journal-News by local residents state: "Just what the (orthodox) doctor ordered: another rabbinical college in Rockland, in this tiny village of Pomona . . . and will the last non-Israelite leaving Rockland County besides Jerry Seinfeld please turn out the lights?", "Just what Rockland needs. More rabbis," ""Lord, though i walk through the Ramapo Valley overrun by Hasidic tax-exemptions causing the death of non-Hasids throughout the Ramapo Valley," and "the Hasidim give all 'Jews' a bad name and start to see this cult for what it is. A bunch of blood sucking self centered leeches . . . ."

190. Other public statements include "paul savad [undersigned counsel] should

40

be hung by his balls in new square" (New Square is a nearby Hasidic community), "this 'college' is essentailly [sic] an indoctination [sic] center for medieval superstitions," and the proposed Rabbinical College is "a huge cult compound similar to 'JonesTown' ... Unless of course that the Grand Rebbe in charge of this waste of land and community resources will be providing his followers with the free spiked kool aid ... kosher of course."

191.  Local residents have publicly opined "is it fair that Rockland County will become mostly hasidic/orthodox? . . . . Just look at Wesley Hills where 15 years ago was predominantly non-orthodox and today it is completely Orthodox. Is this fair??" and "If the Monsey/Ramapo Hasidics, like their libidinal breathren in New Square, Kiryas Joel and Williamsburgh, cannot contain the deep love of sex (and consequently, the children sired from their libidinal inclinations) or their propensity to religiously propagate like rabbits, perhaps they might learn about Condoms. they were invented for this reason. and some Condoms are Kosher in helping warring/disputing Hasidic tribes from invading neighboring non-Hasidic tribes' communities throughout Rockland, Orange and Sullivan Counties."

192.  The Village Attorney for the Village of Pomona, Doris Ulman, while at a May 1, 2007 public seminar on the subject of RLUIPA which was held at a local library, stated to those in attendance that residents should not "cave into them and sell our houses," referring, upon information and belief, to the Hasidic population.  Much anti-Hasidic sentiment was expressed at the seminar.  For example, another individual was observed pointing to an individual dressed in traditional Hasidic Jewish garb (who was simply borrowing a book from the library) and described him as the "devil."

41

193. An influential member of the local community, Mr. Robert Rhodes, chairman of the Preserve Ramapo organization, and an active voice in limiting the population of Hasidic Jews in Rockland County, has engaged in a systematic effort to prevent an increase in the Hasidic Jewish population, making statements such as: "[A]n examination of population growth in Ramapo's Hassidic communities should be the central focus of any land use plan in Ramapo," "this is a very poor community," "How fast can the expansion of housing for a Hassidic sect take place?," "I estimate that the non-Hassidic population is [sic] Rockland is growing about ten per cent (10%) a decade, and the Hassidic population is growing about one hundred per cent (100%) a decade," and "Child poverty is now growing more rapidly in Rockland County than in any other county in New York State . . . due primarily to increasing size of the Hassidic community in Monsey."

194. Mr. Robert Rhodes has written, in a "Community View" column published in the Journal-News:

A serious analyst would also look at rates of family formation, fertility and so forth for each separate ethnic and/or religious group in Ramapo.

This statement was made in a context of discussing the Hasidic community in Ramapo.

195. Mr. Rhodes has attacked the Hasidic community's existence in Ramapo with unfounded condemnation and stereotypes and unsupported facts and incited the public and local politicians, including named Defendants, with his actions. He stated:

"Members of the Hassidic community do not come to Rockland as the result of simply individual or family decisions. They come as members of congregations that move as a group. Thus, it is quite possible that a

42

major new supply of legal housing in Monsey will have a perverse effect.

It may encourage the movement of more Hassidic sects to Ramapo,

creating an even worse housing crisis in the near future."

196.   Upon information and belief, there is a direct connection between this

community hostility against the Hasidic Jewish population generally and the Village

Administration's hostility to the Congregation's proposed Rabbinical College.

197.   Regarding Defendant Sanderson's election (which was described by the

press as an "upset") as Mayor of Pomona, the Journal-News reported on March 22,

2007: "In Rockland, Pomona's deputy mayor, Nicholas Sanderson, challenged Mayor

Herbert Marshall and won; his two running mates took trustee posts. A plan for a

rabbinical college in Pomona that could easily double the village population put

residents on alert."

198.   The Journal-News also reported on March 21, 2007: "POMONA - Mayor

Herbert Marshall was defeated last night by his deputy, Nicholas Sanderson, in a

contest defined by land-use concerns sparked by plans for a rabbinical college."

199.   A Journal-News editorial published on March 19, 2007 stated: "But the

campaign to watch is in Pomona.  There, development is certainly at the heart of the

village contest. A rabbinical college that would serve up to 1,000 students and their

families could be placed on 100 acres in the village."

200.   The Preserve Ramapo organization "strongly endorse[d]" Defendants

Sanderson, Yagel and Louie.

201.   Defendant Brett Yagel is a member of Preserve Ramapo.

202.   The Journal News published a letter by Lynn Yagel (wife of Defendant

43

Yagel) on February 1, 2007 describing the Rabbinical College as a project "that will house thousands of homogenous individuals who can control village elections . . . ."

203.   As described below, significant animus towards Hasidic Jews exists elsewhere in the Town of Ramapo and its Villages.

204.   A mayor of another Village in the Town of Ramapo stated: "What do you want should happen here?  Do you want synagogues all over the place?"

205.   A flyer distributed in the nearby Village of Wesley Hills reads in part: "LET YOUR VOICE BE HEARD!!!  WEDNESDAY AT 8:15 P.M. AT VILLAGE HALL.  Come one, come all !!!  First Frankl passed legislation for prayer halls.  On Wednesday night he is going to approve another synagogue.  If we don't put a stop to Frankl, they'll soon be growing like mushrooms.  This legislation now makes it possible to HAVE A SYNAGOGUE ON EVERY STREET AND ON EVERY BLOCK.  THAT INCLUDES NEXT DOOR TO YOUR HOME!!!  PROTEST NOW!!!"

206.   In response to this community sentiment, Defendant Mayor Sanderson ran for election and said in a letter to the editor of the Journal-News, :

"I have a vision for the Village of Pomona.  The year is 2011, during the last village board meeting before the village election. . . .  Next is a report about the Tartikov development.  The State Environmental Quality Review Act process is almost finished.  The Village Board will soon receive the application to make a decision on granting a special permit for the huge development, or deny it.  The Board knows that if it is denied, a Religious Land Use and Institutionalized Persons Act lawsuit will follow.  Fortunately, the Board has had a strong legal team in place for the last four years and is well prepared to fight for the Village. .

44

. . A resident asks if taxes will be going up this year. She (the Village treasurer) replies that the legal defense fund created four years ago is almost $1 million ahead of target, so no tax increase is foreseen. There is a murmur from the appreciative audience."

207. On February 12, 2007, the Village of Pomona adopted a resolution to ask the United State Congress to hold hearings to amend RLUIPA, ostensibly because the provisions of the law were "costly to municipalities in legal fees and other court-related expenses."

### Targeting of the Rabbinical College:
### The Village's Refusal to Meet with Rabbinical College Representatives

208. Prior to the submission of any professional plans, at public hearings of the Village Board on March 26, 2007 and April 12, 2007, a representative of the College requested a meeting with the Village representatives to discuss the proposed College project. As the proposed use is not a permitted land use within the Village, the Rabbinical College sought to discuss how its religious exercise may be accommodated by the Village.

209. By letters dated March 26, 2007 and April 25, 2007, representatives of the College requested a meeting with Village representatives to discuss the proposed College project.

210. On May 9, 2007, the Rabbinical College's attorney, Paul Savad, telephoned the Village Attorney, Doris Ulman, to discuss the Plaintiffs' proposed use. Mr. Savad followed up on this conversation with two letters dated May 10, 2007, stating that the Rabbinical College requested a "Public Meeting, for an informal design and

technical review of a proposed project."

211.  Ms. Ulman responded to this telephone call and correspondence in a letter dated May 14, 2007, stating in part that "In my opinion, any meeting, public or private, would be premature."  Upon information and belief, this comment by the Village Attorney was in furtherance of the Village's orchestrated plan to keep any zoning application by the Rabbinical College "tied up" in the administrative process for many years at the cost of millions to the Plaintiff Congregation, as promised by the newly elected mayor.

212.  On June 22, 2007, the Rabbinical College contacted the Mayor, Village Board, and Village Attorney by letter, again attempting to meet representatives of the Village to discuss its proposed use.  That letter specifically stated that the Rabbinical College was willing to seek a development for only 250 students.

213.  In that June 22, 2007 letter, the Rabbinical College informed the Village of its authority under 42 U.S.C. § 2000cc-3(e) to "avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden."

214.  On July 3, 2007, Defendant Sanderson responded to the Rabbinical College's June 22, 2007 letter, stating that it "cannot grant your request to have the Board of Trustees exempt [the Rabbinical College] from the provisions of the Pomona Zoning Law."

46

215.  Defendant Sanderson stated in his July 3, 2007 letter that the only remedy available for the Rabbinical College were legislative ones.  Defendant Sanderson also adopted the previous statements of the Village Attorney by stating that "[t]he Village Attorney has informed me that she has discussed Village procedures with you on more than one occasion."

216.  Upon information and belief, it is customary that various municipality bodies or commissions informally meet with proponents of new projects; however, the Village failed to do so with the Plaintiffs.

217.  In the past, the Village officials and Planning Board have met with landowners informally to discuss proposed uses of land.

218.  The Village has refused to meet with the Rabbinical College concerning its proposed use of land, treating it differently and worse than similarly situated landowners.

219.  The history described above, including the targeted laws, actions and conduct, and the statements made by public officials including the newly elected Mayor Sanderson, demonstrate the entrenched hostility to the Plaintiffs' use of the Subject Property as a Rabbinical College.

220.  The Defendants have therefore "dug in their heels" and have made it clear to the Congregation that any application for its use of the Subject Property as a Rabbinical College, even if such administrative relief existed, would be denied.

221.  Further, under New York law and the Village's Zoning Code, the Village's Zoning Board of Appeals lacks any authority to issue a variance for the Congregation's use of the Subject Property as a Rabbinical College.

47

222. Defendants lack any authority to grant a special use permit, because such a permit can only be issued to "accredited" institutions by the New York State Education Department or "similar accrediting agency". There is no accrediting agency that can accredit the Congregation's use of the Subject Property. There is also no special use permit provision for the necessary housing component of the Rabbinical College.

### Facial Discrimination of Zoning Ordinance

223. The Village's Zoning Code expressly permits "Educational Institutions" in its R-40 Zoning District, if they are "accredited by the New York State Education Department or similar recognized accrediting agency." Pomona Zoning Code, Article II (Definitions), § 130-4 (Terms Defined).

224. The proposed Rabbinical College is not accredited by the State of New York, nor can it be.

225. There is no "similar recognized accrediting agency" for the Rabbinical College's proposed use.

226. As such, this religious institution is being treated on "less than equal terms" as a nonreligious institution, such as a secular college or an accredited religious college.

### EXCLUSIONARY ZONING WITHOUT REGARD TO REGIONAL NEEDS

227. The Village of Pomona was incorporated in 1967.

228. The Zoning Code of the Village of Pomona establishes only one residential district encompassing the entire Village, the R-40 District, with a minimum lot of 40,000

square feet (one acre).  Pomona Zoning Code, Article III, § 130-5.

229.  The Village Code permits only the following residential uses: "one-family residences with one dwelling per lot (no commercial; no trailers; no multiple dwellings)", houses of worship, public utilities rights-of-way, libraries, museums, public parks, playgrounds and agricultural pursuits.  Pomona Zoning Code, Article IV, § 130-9(A).

230.  Upon information and belief, the principal reason for the incorporation of the Village of Pomona was to preserve a one-family residence lot pattern of development.

231.  Multi-family dwellings are specifically excluded.

232.  The Village has been designated by the New York State Department of Environmental Conservation as an "urbanized area."

233.  The Congregation's property is bordered by State Highways 202 and 306.

234.  The property, by virtue of its location, is reasonably adaptable for multi-family dwellings.

235.  Since its incorporation, the Village has amended its Zoning Code multiple times, but has not included any classification for multi-family residential housing, despite the fact that Pomona and the surrounding region, which includes all of Rockland County, New York, all or part of Orange County, New York, and all or part of Bergen County, New Jersey ("the Region"), has a burgeoning need for multi-family housing due to all of the following reasons:

A.    The cost of single-family houses has increased and has become unaffordable.

B.    Moderate and middle income households whose housing needs

49

cannot be met by the existing supply of multi-family housing has

grown.

C.     Young families, including large numbers of Orthodox Jews, are

moving into the region to avail themselves of the existing

infrastructure of synagogues, housing for large families, yeshivas

for boys, yeshivas for girls, high schools for boys, ritual baths,

Kosher food stores, and Kosher restaurants.

D.     The growing Orthodox Jewish community is in need of additional

affordable housing in proximity to the aforesaid infrastructure.

E.     The need for adult student housing for the Orthodox Jewish

community has grown.

F.     The economy of the region has grown exponentially since the

original passage of the Village Zoning Code, with more jobs and

businesses in the region, requiring more housing.

236.  Robert Rhodes, the founder of Preserve Ramapo, has himself admitted

that "There really is a desperate shortage of housing in the Hassidic community . . . ."

237.  The Village Master Plan Update in 1997 identified the then-apparent lack

of affordable housing in the region, but failed to provide for multi-family housing in any

form, even ignoring the recommendation of the Village planning consultant to include

provisions for accessory use apartments.

238.  The Zoning Code of the Village of Pomona is unconstitutional under the

New York Constitution in that it does not consider and fails to address the housing

needs of the Village and of the region, and has the exclusionary effect of preventing

50

moderate income families from moving into the Village, and of preventing all but the wealthy from living there, and effectively preventing proportionate numbers of Hasidic Jews from living in the Village.

239.  The restrictions in the Village code are expressly framed for the purpose of excluding multi-family dwellings in order to preserve the Village as a gentrified community of one-family houses on large lots and to discourage the influx of the Hasidic Jewish community.

240.  Pomona's Zoning Code is illegal and invalid in that, inter alia, it was not enacted in accordance with a well considered plan, but instead was enacted to preclude a variety of densities and housing types within the Village.

241.  The exclusion of multi-family dwellings is unreasonable, discriminatory, exclusionary, arbitrary and oppressive, and unnecessary for the health, safety, morals or general welfare of the Village, and is not authorized by Article 7 of the Village Law of the State of New York, pursuant to which Pomona's Zoning Code was enacted.

242.  No legal or factual basis exists for the exclusion of multi-family dwellings within the Village.

243.  The zoning code of the Town of Ramapo, in which Pomona is located, and multiple other villages provide for affordable housing as do other towns and villages in Rockland County.

244.  The restriction of the Zoning Code of the Village of Pomona banning the erection of multi-family dwellings is unreasonable, oppressive and arbitrary in that it deprives the residents of Pomona and the Region of affordable housing.

245.  The restriction of the Zoning Code of the Village of Pomona banning the

51

erection of multi-family dwellings is unreasonable, oppressive and arbitrary and confiscatory in that it deprives the Congregation of the reasonable use of its land.

246.   The actions and conduct of the Village of Pomona, particularly through the restrictions of its Zoning Code and other targeted legislation have resulted in and continue to result in a disparate impact and/or disparate treatment upon these Plaintiffs and their opportunity to obtain housing because of the Village's anti-Hasidic animus and motive toward them.

247.   Through these actions and their conduct, the Defendants have intentionally interfered with the Plaintiffs' exercise or enjoyment of their rights to obtain available housing as granted or protected by law.

### AS A FIRST CAUSE OF ACTION
### Free Exercise Clause
### United States Constitution,
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

248.   Plaintiffs repeat and reallege paragraphs "1" through "247" as if fully set forth herein.

249.   Defendants' laws and actions deprived and continue to deprive all Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, (1) by substantially burdening the Plaintiffs' religious exercise without a compelling governmental interest; (2) by discriminating against and targeting the Plaintiffs for disfavor; (3) by prohibiting the Plaintiffs' use completely from the Village's

52

jurisdiction; and (4) by treating religious assemblies and institutions on less than equal

terms as nonreligious assemblies and institutions.

250.  The Plaintiffs have no adequate remedy at law for the harm and damage

caused by Defendants' violation of its constitutional rights.

251.  Defendants have caused the Plaintiffs to suffer, and to continue to suffer,

irreparable harm, damage and injury. The Plaintiffs will continue to suffer such

damages unless the Village's acts and conduct complained of are permanently

enjoined.

**AS A SECOND CAUSE OF ACTION**
**Free Speech Clause**
**United States Constitution,**
**First and Fourteenth Amendments**
**42 U.S.C. § 1983**

252.  Plaintiffs repeat and reallege paragraphs "1" through "251" as if fully set

forth herein.

253.  Defendants' laws and actions deprived and continue to deprive all Plaintiffs

of their right to free speech and freedom of association, as secured by the First

Amendment to the United States Constitution and made applicable to the States by the

Fourteenth Amendment, by (1) prohibiting the Plaintiffs' protected expressive activity

completely from the Village's jurisdiction; (2) by treating religious expressive activity on

less than equal terms as nonreligious expressive activity; (3) by regulating expression

and expressive conduct on the basis of the character of the speaker; (4) by failing to be

content-neutral; (5) by failing to leave open any alternative channels of communication;

53

and (6) by enforcing regulations against expressive activity that are not narrowly tailored to serve a legitimated governmental objective.

254.  The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of its constitutional rights.

255.  Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury. The Plaintiffs will continue to suffer such damages unless the Village's acts and conduct complained of are permanently enjoined.

### AS A THIRD CAUSE OF ACTION
#### Freedom of Association
#### United States Constitution,
#### First and Fourteenth Amendments
#### 42 U.S.C. § 1983

256.  Plaintiffs repeat and reallege paragraphs "1" through "255" as if fully set forth herein.

257.  Defendants' laws and actions deprived and continue to deprive Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechi Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh Royde and Rabbi David A. Menczer of their right to freedom of intimate association and freedom of expressive association, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by intruding unduly upon the Plaintiffs' right to marriage, childbirth, the raising and

54

irreparable harm, damage and injury. The Plaintiffs will continue to suffer such damages unless the Village's acts and conduct complained of are permanently enjoined.

### AS A FIFTH CAUSE OF ACTION
#### "Substantial Burdens"
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(2)(a)**

264.    Plaintiffs repeat and reallege paragraphs "1" through "263" as if fully set forth herein.

265.    Defendants' laws and actions deprived and continue to deprive Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing a land use regulation in a manner that places a substantial burden on the Plaintiffs' religious exercise without any compelling interest, and without using the least restrictive means of furthering any compelling interest.

## AS A SIXTH CAUSE OF ACTION
### "Nondiscrimination"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(2)(b)(2)

266.    Plaintiffs repeat and reallege paragraphs "1" through "265" as if fully set forth herein.

267.    Defendants' laws and actions deprived and continue to deprive Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing a land use regulation that discriminates against the Plaintiffs on the basis of religion.

## AS A SEVENTH CAUSE OF ACTION
### "Equal Terms"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(2)(b)(1)

268.    Plaintiffs repeat and reallege paragraphs "1" through "267" as if fully set forth herein.

269.    Defendants' laws and actions deprived and continue to deprive Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf

Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi

Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh

Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as

secured by the Religious Land Use and Institutionalized Persons Act, by imposing and

implementing a land use regulation that treats religious assemblies and institutions on

less than equal terms as nonreligious assemblies and institutions.


### AS AN EIGHTH CAUSE OF ACTION
#### "Exclusions and Limits"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(2)(b)(3)(A)

270.    Plaintiffs repeat and reallege paragraphs "1" through "269" as if fully set

forth herein.

271.    Defendants' laws and actions deprived and continue to deprive Plaintiffs

Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf

Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi

Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh

Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as

secured by the Religious Land Use and Institutionalized Persons Act, by imposing and

implementing land use regulations that totally excludes the Congregation's use from its

jurisdiction.

58

## AS A NINTH CAUSE OF ACTION
### "Exclusions and Limits"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(2)(b)(3)(B)

272.   Plaintiffs repeat and reallege paragraphs "1" through "271" as if fully set forth herein.

273.   Defendants' laws and actions deprived and continue to deprive Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by unreasonably limiting religious institutions within its jurisdiction.

## AS A TENTH CAUSE OF ACTION
### New York State Constitution - Article 1, §§ 3, 8, 9 and 11

274.   Plaintiffs repeat and reallege paragraphs "1" through "273" as if fully set forth herein.

275.   The Defendants, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of the rights of all Plaintiffs to protect their interests under the law in violation of Article I, § 3 (freedom of worship; religious liberty), Article 1 § 8 (freedom of speech), Article I, § 9 (right to assemble) and Article 1 § 11 (equal protection of laws; discrimination in civil rights prohibited) of the New York State Constitution.

Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi

Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh

Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as

secured by the Religious Land Use and Institutionalized Persons Act, by imposing and

implementing a land use regulation that treats religious assemblies and institutions on

less than equal terms as nonreligious assemblies and institutions.


### AS AN EIGHTH CAUSE OF ACTION
#### "Exclusions and Limits"
#### Religious Land Use and Institutionalized Persons Act of 2000
#### 42 U.S.C. § 2000cc(2)(b)(3)(A)

270.    Plaintiffs repeat and reallege paragraphs "1" through "269" as if fully set

forth herein.

271.  Defendants' laws and actions deprived and continue to deprive Plaintiffs

Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf

Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi

Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh

Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as

secured by the Religious Land Use and Institutionalized Persons Act, by imposing and

implementing land use regulations that totally excludes the Congregation's use from its

jurisdiction.

## AS A NINTH CAUSE OF ACTION
### "Exclusions and Limits"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(2)(b)(3)(B)

272.   Plaintiffs repeat and reallege paragraphs "1" through "271" as if fully set forth herein.

273.   Defendants' laws and actions deprived and continue to deprive Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Rabbi Meir Margulis, Rabbi Gergely Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh Royde and Rabbi David A. Menczer of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by unreasonably limiting religious institutions within its jurisdiction.

## AS A TENTH CAUSE OF ACTION
### New York State Constitution - Article 1, §§ 3, 8, 9 and 11

274.   Plaintiffs repeat and reallege paragraphs "1" through "273" as if fully set forth herein.

275.   The Defendants, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of the rights of all Plaintiffs to protect their interests under the law in violation of Article I, § 3 (freedom of worship; religious liberty), Article 1 § 8 (freedom of speech), Article I, § 9 (right to assemble) and Article 1 § 11 (equal protection of laws; discrimination in civil rights prohibited) of the New York State Constitution.

construction and utilization of the Subject Property as a Rabbinical College, as enacted and as applied, have had the effect and continue to have the effect, whether intended or not, of excluding Plaintiffs from obtaining student housing anywhere in the Village of Pomona by discriminating against the Plaintiffs based on religion, in violation of 42 U.S.C. § 3604(a).

282.   Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

283.   Plaintiffs have no adequate remedy at law for such harm, damage and injury caused by Defendants' conduct.

284.   Defendants have caused the Plaintiffs to suffer, and continue to suffer irreparable harm, damage and injury, and the Plaintiffs will continue to suffer such harm unless the Defendants' acts and conduct complained of are permanently enjoined.

### AS A THIRTEENTH CAUSE OF ACTION
#### Fair Housing Act
#### 42 U.S.C. § 3617

285.   Plaintiffs repeat and reallege paragraphs "1" through "284" as if fully set forth herein.

286.   The Defendants, by their continuing conduct, acts and legislative enactments that prevent the application for, and construction and utilization of the Subject Property as a Rabbinical College, have intentionally discriminated against the Plaintiffs by interfering with the Plaintiffs' on account of their having exercised rights, or

61.

having aided or encouraged other persons in the exercise or enjoyment of rights that are granted or protected by 42 U.S.C. § 3604 (a) in violation of 42 U.S.C. § 3617.

287.  Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

288.  Plaintiffs have no adequate remedy at law for such harm, damage and injury caused by Defendants' conduct.

289.  Defendants have caused the Plaintiffs to suffer, and continue to suffer irreparable harm, damage and injury, and the Plaintiffs will continue to suffer such harm unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS A FOURTEENTH CAUSE OF ACTION
### *Berenson* Doctrine
### Exclusionary Zoning

290.  Plaintiffs repeat and reallege paragraphs "1" through "289" as if fully set forth herein.

291.  The exclusion of multi-family housing by the Village of Pomona is not a valid exercise of the zoning authority delegated to the Village by Village Law § 7-700, and does not promote the health, safety or general welfare of the residents of the Village of Pomona.

292.  The Zoning Code of the Village of Pomona violates the standards set out by the New York Court of Appeals in *Berenson v. the Town of New Castle*, 38 N.Y.2d 102 (1975) and *Continental Building Company v. Town of North Salem*, 211 A.D.2d 88

(3d Dep't. 1995), *app. dism'd., lv. den.*, 86 N.Y.2d 818 (1995), and other cases, in that it does not consider the present regional housing needs of the region in which the Village is located, and such regional housing needs are not otherwise adequately provided for.

293.   The Village Zoning Code ignores the regional housing needs which has had an unjustifiably exclusionary effect and does not by its implementations provide to the Plaintiffs their rights to have adequate housing, which action violates Plaintiffs' rights as secured by the Constitution of the State of New York (Article 1, § 11, equal protection) and decisional law in New York State.

294.   The Village Zoning Code does not consider the housing needs of those in need of adult student housing or those who can only afford low or moderate income housing in the Village and in the region in which the Village is located, including the individual plaintiffs.

295.   By passing a Zoning Code that completely omits any provision for the construction of multi-family dwellings as of right, the Village has either acted for an exclusionary purpose, or the Zoning Code has brought about an exclusionary effect under *Berenson*, and has thwarted the fulfillment of the regional need for multi-family, adult student housing and moderate income housing.

296.   Defendants have caused the Congregation Rabbinical College of Tartikov, Inc. to suffer, and continue to suffer, irreparable harm, damage and injury.

297.   The Congregation will continue to suffer such damages unless the Village Zoning Code is declared unconstitutional and this Court directs Defendant Village to provide a comprehensive zoning plan to meet the regional needs and the requirements of the Jewish community seeking religious education, and to provide for multi-family

housing that can provide affordable housing to Plaintiffs and others who seek religious educational opportunities within the Village.

298. The Congregation has no adequate remedy at law for the harm and damage caused by Defendants' violation of its constitutional rights

## RELIEF SOUGHT

WHEREFORE, Plaintiffs demand Judgment as follows:

**On the First through Fourth, Tenth and Eleventh Causes of Action:**

A.    Declaratory judgment holding the laws and actions of the Defendants that prevent the application for, and construction and utilization of the Subject Property as a Rabbinical College to be unconstitutional and illegal under the United States and New York Constitutions, and the New York Civil Rights Law;

B.    Annulment of those provisions of the Village Zoning Code that violate the Rabbinical College's civil rights and permanent injunctive relief enjoining all Defendants from unconstitutionally and illegally applying the laws and codes of the Village that prevent the application for, and construction and utilization of the Subject Property as a Rabbinical College;

C.    Declaratory judgment declaring that the Plaintiffs' use of the Subject Property as a Rabbinical College is permitted, subject to limitations designed to meet the Defendants' compelling public health and safety interests, and directing the Defendants to use the means of achieving

64

those interests that are least restrictive on the Plaintiffs' religious exercise;

D.     Appointment of a federal monitor to ensure that the Village complies with all orders of this Court by overseeing the actions of the Village so as to entitle the Plaintiffs to the relief awarded by the Court and to report to the Court as needed;

E.     An award to Plaintiffs of full costs, disbursements and attorneys' fees, to the extent permitted by law, arising out of Defendants' actions and land use decisions and out of this litigation; and

F.     Granting such other, further and different relief as to this court seems just, proper and equitable.


**On the Fifth through Ninth Causes of Action:**

A.     Declaratory judgment declaring that the Defendants have violated Plaintiffs Congregation Rabbinical College of Tartikov, Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman, Kahana, Rabbi Meir Margulis, Rabbi Gergerly Neuman, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi Aryeh Royde and Rabbi David A. Menczer's rights under RLUIPA;

B.     Annulment of those provisions of the Village Zoning Code that violate the Rabbinical College's statutory rights under RLUIPA and permanent injunctive relief enjoining all Defendants from illegally applying the laws and codes of the Village that prevent the application for, and construction and utilization of, the Subject Property as a Rabbinical College;

C.    Declaratory judgment declaring that the Plaintiffs' use of the Subject

Property as a Rabbinical College is permitted, subject to limitations

designed to meet the Defendants' compelling public health and safety

interests, and directing the Defendants to use the means of achieving

those interests that are least restrictive on the Plaintiffs' religious exercise;

D.    Appointment of a federal monitor to ensure that the Village complies with

all orders of this Court by overseeing the actions of the Village so as to

entitle the Plaintiffs to the relief awarded by the Court and to report to the

Court as needed;

E.    An award to Plaintiffs of full costs, disbursements and attorneys' fees, to

the extent permitted by law, arising out of Defendants' actions and land

use decisions and out of this litigation; and

G.    Such other, further and different relief as to this Court seems just, proper

and equitable.


**On the Twelfth and Thirteenth Causes of Action:**

A.    Declaratory judgment holding the laws and actions of the Defendants that

prevent the application for, and construction and utilization of the Subject

Property as a Rabbinical College deprive Plaintiffs of their statutory rights

under the Fair Housing Act, as amended, and declaring that such action

constitutes an illegal official act under color of law;

B.    Declaratory judgment declaring the laws and actions of the Defendants

that prevent the application for, and construction and utilization of the

66

Subject Property as a Rabbinical College are facially invalid because such laws were adopted with the intent to discriminate and/or have a discriminatory effect upon Plaintiffs based upon religion, all in violation of the Fair Housing Act, as amended;

C.    Declaratory judgment declaring the laws and actions of the Defendants that prevent the application for, and construction and utilization of the Subject Property as a Rabbinical College are invalid as applied because such laws were adopted with the intent to discriminate and/or have a discriminatory effect upon Plaintiffs based upon religion , all in violation of the Fair Housing Act, as amended;

D.    Declaratory judgment declaring that portion of the Subject Property of the Rabbinical College used for dwelling purposes is a permitted use under the Fair Housing Act, as amended;

E.    Enjoinder of the Defendants their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Fair Housing Act, as amended, or undertaking any and all action in furtherance of these discriminatory and disparate acts;

D.    Appointment of a federal monitor to ensure that the Village complies with all orders of this Court by overseeing the actions of the Village so as to entitle the Plaintiffs to the relief awarded by the Court and to report to the Court as needed;

E.    An award to Plaintiffs of full costs, disbursements and attorneys' fees, to

67

the extent permitted by law, arising out of Defendants' actions and land
use decisions and out of this litigation; and

F.     Granting such other, further and different relief as to this Court seems
just, proper and equitable.

**On the Fourteenth Cause of Action:**

A.     Declaratory judgment holding the Village Zoning Code to be
unconstitutional under the New York Constitution, insofar as it excludes
multi-family housing, affordable housing and adult student housing and
otherwise fails to provide for an array of housing to meet the needs of the
Village and the region;

B.     Annulment of those provisions of the Village Zoning Code that prevent the
construction of appropriate affordable housing to meet the regional needs
of the region and the specific needs of the Plaintiffs' for housing for a
Rabbinical College;

C.     Directing that the Defendant Village provide a comprehensive zoning
plan to meet regional needs for housing and the needs of the religious
educational community and further directing the Village to provide multi-
family residential development in the zoning code to allow affordable
housing to Plaintiffs on the property of the Rabbinical College;

D.     Declaratory judgment declaring that the Village Code permit, accept and
process an as-of-right application for Plaintiffs' phased site plan and
granting said site plan final approval for a Rabbinical College and directing

68

the Building Inspector to issue a building permit for up to 250 residential

units;

E.     Appointment of a federal monitor to ensure that the Village complies with

all orders of this Court by overseeing the actions of the Village so as to

entitle the Plaintiffs to the relief awarded by the Court and to report to the

Court as needed;

F.     An award to Plaintiffs of full costs, disbursements and attorneys' fees, to

the extent permitted by law, arising out of Defendants' actions and land

use decisions and out of this litigation; and

G.     Granting such other, further and different relief as to this Court seems

just, equitable and proper.

The Plaintiffs demand a trial by jury of all issues for which the Plaintiffs are

entitled such a jury trial.


Dated:          Nanuet, New York
                November 14, 2007


                                        PAUL SAVAD, ESQ.  (5358)
                                        SUSAN COOPER, ESQ. (5433)
                                        Paul Savad & Associates
                                        Attorneys for Plaintiffs
                                        55 Old Turnpike Road – Suite 209
                                        Nanuet, New York 10954
                                        (845) 624-3820


69

ROMAN P. STORZER, ESQ.
ROBERT L. GREENE, ESQ. (5430)
Storzer & Greene, P.L.L.C.
1025 Connecticut Avenue, N.W.
Suite One Thousand
Washington, DC 20036
(202) 857-9766

JOHN G. STEPANOVICH, ESQ.(8876)
Lenz Stepanovich & Bergethon, PLC
448 Viking Drive, Suite 370
Virginia Beach VA 23452
(757) 498-7035

70