UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONGREGATION RABBINICAL COLLEGE
OF TARTIKOV, INC., RABBI MORDECHAI
BABAD, RABBI WOLF BRIEF, RABBI HERMEN
KAHANA, RABBI MEIR MARGULIS, RABBI
GERGELY NEUMAN, RABBI MEILECH
MENCZER, RABBI JACOB HERSHKOWITZ,
RABBI CHAIM ROSENBERG, RABBI DAVID A.
MENCZER, RABBI ARYEH ROYDE, and KOLEL
BELZ OF MONSEY,

       Plaintiffs,

  v.

VILLAGE OF POMONA, BOARD OF TRUSTEES
OF THE VILLAGE OF POMONA, NICHOLAS
SANDERSON, as mayor, IAN BANKS, as Trustee
and in his official capacity, ALMA SANDERS
ROMAN, as Trustee and in her official capacity,
RITA LOUIE, as Trustee and in her official capacity,
and BRETT YAGEL, as Trustee and in his official
capacity,

       Defendants.

Case No. 07-CV-6304 (KMK)

<u>OPINION AND ORDER</u>

---

<u>Appearances</u>:

Paul Savad, Esq.
Susan E. Cooper, Esq.
Laura M. Feigenbaum, Esq.
Savad Churgin, Attorneys at Law
Nanuet, New York
*Counsel for Plaintiffs*

Roman P. Storzer, Esq.
Robert L. Greene, Esq.
Storzer & Greene, P.L.L.C.
Washington, D.C.
*Counsel for Plaintiffs*

John G. Stepanovich, Esq.
Lentz, Stepanovich & Bergethon, P.L.C.
Virginia Beach, Virginia
*Counsel for Plaintiffs*

Joseph L. Clasen, Esq.
William J. Kelleher, III, Esq.
Samantha L.H. Cassetta, Esq.
Robinson & Cole LLP
New York, New York
*Counsel for Defendants*

Marci A. Hamilton, Esq.
The Law Office of Marci Hamilton
Washington Crossing, Pennsylvania
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

"This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 295 (3d Cir. 2007). Plaintiffs challenge certain zoning and environmental ordinances enacted by Defendant Village of Pomona, asserting that the ordinances are unlawful under the First and Fourteenth Amendments of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, the New York Civil Rights Law § 40-c(1), (2), Article I, Sections 3, 8, 9, and 11 of the New York State Constitution, and New York common law. Specifically, Plaintiffs challenge the enactment and enforcement of the Village of Pomona, New York Code Sections 130-4 (defining educational institutions and dormitories), 130-10(F)(12) (limiting the size of dormitories pursuant to an educational use), and 126 (establishing wetlands protections) (together, the "challenged

ordinances").[1]  Defendants move to dismiss Plaintiffs' Second Amended Complaint under

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the reasons discussed below,

Defendants' Motion is granted in part and denied in part.

## I.  Background

The Court assumes the following facts, largely drawn from Plaintiffs' Second Amended

Complaint, as true for purposes of the instant Motion.  Plaintiffs have brought this action to

challenge the aforementioned zoning ordinances adopted by Defendant Village of Pomona (the

"Village"); Plaintiffs claim that the ordinances unlawfully prohibit Plaintiff Congregation

Rabbinical College of Tartikov (the "Congregation") from owning, holding, building, and

operating a rabbinical college on a 100-acre tract (the "Subject Property") located in the Village

and owned by the Congregation.  (Second Am. Compl. ("SAC") ¶ 1 (Dkt. No. 28).)

### A.  The Parties

Plaintiffs are corporations and individuals affiliated with the Orthodox Jewish

community, including various sects of the Hasidic community, all of whom allege an interest in

the construction of a rabbinical college on the Subject Property.  (*Id.* ¶¶ 24-27.)  The

Congregation, the owner of the Subject Property, is a religious corporation that was formed in

2004 with the aim of constructing a rabbinical college and related facilities on the Subject

Property.  (*Id.* ¶ 10.)  Plaintiff Kolel Belz of Monsey ("Kolel Belz") is a religious corporation

that serves more than 200 families and purports to "represent[] the interests of itself and the

broader Orthodox community in actively seeking trained" rabbinical judges ("*dayanim*") to

---

[1] The challenged ordinances can be found in the Declaration accompanying Plaintiffs'
Memorandum of Law in Opposition to Defendants' Motion To Dismiss.  They can also be found
online at http://www.ecode360.com/12718511 and http://www.ecode360.com/12718574.

"conduct the activities of rabbinical courts."  (*Id.* ¶¶ 34-35.)  Plaintiffs Rabbi Mordechai Babad

("M. Babad"), Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis, Rabbi Gergely

Neuman, Rabbi Meilech Menczer ("M. Menczer"), Rabbi Jacob Hershkowitz, Rabbi Chaim

Rosenberg, Rabbi David A. Menczer ("D. Menczer"), and Rabbi Aryeh Royde (collectively, the

"Individual Plaintiffs") are trained Rabbis who seek to live and to teach and/or to study at the

Congregation's proposed rabbinical college.  (*Id.* ¶¶ 11-20.)  Defendants consist of the Village,

its Mayor, Nicholas Sanderson, and the members of its Board of Trustees, Ian Banks, Alma

Sanders Roman, Rita Louie, and Brett Yagel.  (*Id.* ¶¶ 22-23.)

     B.  The Religious Significance of a Rabbinical College

     According to Orthodox Jewish belief, Orthodox Jews are not permitted to resolve

conflicts in the secular court system.  (*Id.* ¶ 54.)  Rather, the Orthodox Jewish religion requires

that Orthodox Jews resolve conflicts in rabbinical courts before rabbinical judges applying

Jewish law.  (*Id.*)  The Orthodox Jewish community therefore is obligated by religious belief to

create rabbinical courts in every locale where Orthodox Jews live.  (*Id.* ¶¶ 54-55.)  Currently,

however, because there are very few trained rabbinical judges in the United States, "there are

only a very few [r]abbinical [c]ourts . . . serving Orthodox Jews in the entire United States," and

those courts are "extremely overburdened."  (*Id.* ¶ 49.)

     Plaintiffs allege that by building the rabbinical college, the Congregation seeks to

ameliorate the "severe" shortage of trained rabbinical judges in the Orthodox Jewish community.

(*Id.* ¶¶ 25, 33.)  While several other rabbinical colleges exist in the United States, "[t]he existing

[institutions] are insufficient to meet the need of students" who wish to become rabbinical judges

and to train the number of "[r]abbinical [j]udges needed to serve the Orthodox Jewish

community."  (*Id.* ¶ 82.)  Moreover, not all of the rabbinical colleges in the United States offer

the "full course of study or religious environment" that the Congregation's planned rabbinical

college will offer.  (*Id.*)  Although Plaintiffs acknowledge that one rabbinical college already

offers the same type of program that the Congregation's rabbinical college plans to offer—Kollel

Beth Yechiel Mechil of Tartikov, located in Brooklyn, New York—that "facility is extremely

overcrowded and . . . [i]ts doors have been shut for several years to new rabbis because

of . . . dire space limitations."  (*Id.* ¶ 48.)

C.  The Congregation's Planned Rabbinical College

The Congregation's planned rabbinical college will be "devoted solely to religious

training of [rabbinical judges] who will be tested and certified by rabbinical authorities . . . after

many years of intense religious study."  (*Id.* ¶ 53.)  Rabbinical students, all of whom must be

ordained Rabbis, "will normally begin these specialized religious studies between the ages of 20

and 30."  (*Id.* ¶ 59.)  Training to become a certified rabbinical judge may take "up to (or beyond)

fifteen years."  (*Id.*)  During that time, rabbinical students will study the religious laws of the

Orthodox Jewish tradition, as well as "the wise and just application of the religious laws," and

they will learn how "to counsel members of the Orthodox Jewish community on the day-to-day

questions that arise in applying Jewish Law to every aspect of their daily lives."  (*Id.* ¶ 58.)

The academic format of the planned rabbinical college "is based upon strenuous religious

study and prayer during the hours of 5:00 a.m. to 10:30 p.m., with meal breaks."  (*Id.* ¶ 60.)

Plaintiffs believe that "it is essential for these students to live, study and pray in the same place

in order to minimize outside influences and to intensify the religious learning experience."

(*Id.* ¶ 65.)  In accord with Plaintiffs' belief that "[r]esidential housing is essential to the training

provided by" a rabbinical college, the Congregation's rabbinical college will include housing for

the rabbinical students.  (*Id.* ¶ 64.)  Such housing must accommodate families, as many students "will be married, some with young children."  (*Id.* ¶¶ 59, 66.)

Additionally, because "Orthodox Jews must pray three times per day, in morning, afternoon and evening services," (*id.* ¶ 63), Plaintiffs allege that it is essential to their religious beliefs that the rabbinical college and the residential housing be close in proximity to synagogues ("*shuls*"), (*id.*).  Accordingly, the planned rabbinical college will include up to ten *shuls* to accommodate Orthodox Jews of all sects and traditions, including Ashkenazic, Sephardic, and other Hasidic and Orthodox sects.  (*Id.* ¶ 68.)

The Congregation's rabbinical college will also include four rabbinical courtrooms on campus, "which will be used to litigate and settle disputes, and as teaching facilities for students to become certified [r]abbinical [j]udges."  (*Id.* ¶ 69.)  The campus will further house "multiple libraries, which will contain the books necessary for the educational program."  (*Id.* ¶ 70.)

While the Orthodox Jewish religion prescribes a rigorous program for the certification of rabbinical judges, Plaintiffs allege that no formal accreditation process exists for the program that will be offered by the rabbinical college.  (*Id.* ¶¶ 105-06.)

D.  The Subject Property

The Subject Property consists of a 100-acre tract of land located within the Village and also within the larger Town of Ramapo.  (*Id.* ¶¶ 1, 73, 75.)  The Congregation purchased the Subject Property in August 2004 with the intention of building thereon its rabbinical college and related facilities.  (*Id.* ¶¶ 10, 73.)  Around the same time, an "additional contiguous 30 acres was [sic] purchased by an affiliate of the Congregation to serve as a buffer between the [r]abbinical [c]ollege and the neighboring community."  (*Id.* ¶ 74.)  Plaintiffs allege that "[t]he Subject

Property is uniquely suited to meet the needs of the Congregation" in building the rabbinical college.  (*Id.* ¶ 76.)

According to Plaintiffs, "the Subject Property is the only available parcel of land" that is both appropriately sized and situated in close proximity to the "religious infrastructure and population," as required for a rabbinical college.  (*Id.* ¶ 83.)  Plaintiffs further allege that the Subject Property also is an appropriate location for the planned rabbinical college because of its proximity to both the Village and the other villages located within the Town of Ramapo, which are also home to a large Orthodox Jewish community.  (*Id.* ¶ 77.)  Importantly, these villages are equipped with "the infrastructures necessary to maintain the practices prescribed by [the Orthodox Jewish] beliefs, including synagogues, yeshivas, elementary and high schools for boys and girls, ritual baths, and kosher food stores and restaurants."  (*Id.*)  Moreover, it is the Orthodox Jewish community in these villages, as well as other villages within the greater area of Rockland County, that the Congregation's rabbinical college is intended to serve.  (*Id.* ¶ 80.)  Plaintiffs allege that "[n]o alternative properties exist in [the Village] or in surrounding communities which can legally or practicably accommodate the" planned rabbinical college.  (*Id.* ¶ 84.)

E.  The Village's Land Use Ordinances

Plaintiffs claim that the Village's land use ordinances prohibit the Congregation from building its rabbinical college on the Subject Property.  (*Id.* ¶¶ 92-95.)  First, Plaintiffs allege that the Village's zoning laws generally prohibit the Congregation from building the rabbinical college itself.  The entire Village, including the Subject Property, is designated as an "R-40 District," which "requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of one-family homes," (*id.* ¶ 88).  *See also* Vill. of Pomona, N.Y. Code § 130-5.

The Village's Zoning Code permits a limited number of uses on land within the Village's boundaries—e.g., one-family residences, houses of worship, libraries and museums, public parks and playgrounds. *See* Vill. of Pomona, N.Y. Code § 130-9(A). According to Plaintiffs, a rabbinical college could not qualify under any of the uses permitted by the Village. While the Village does grant, upon approval by either the Village Board of Trustees or the Village Board of Zoning Appeals, certain special use permits, Plaintiffs allege that a rabbinical college could not qualify as a special use under the other provisions of the Village's zoning Code. (SAC ¶ 91.) Specifically, although Sections 130-4 and 130-10 of the Village Zoning Code empower the Board of Trustees to issue a special use permit for "educational institutions," Plaintiffs allege that Section 130-4's restricted definition of "educational institution" as "[a]ny private or religious . . . school conducting a full-time curriculum of instruction a minimum of five days per week for seven months per year *and accredited by the New York State Education Department or similar recognized accrediting agency*," Vill. of Pomona, N.Y. Code § 130-4 (emphasis added), prevents the rabbinical college from being permitted as a special use. (SAC ¶ 93.) Plaintiffs allege that no formal accreditation process exists for the rabbinical college, (*id.* ¶¶ 105-06), and thus claim that the rabbinical college cannot qualify under the Village's land use ordinances as either a permitted use or a special use under Sections 130-9 and 130-10, (*id.* ¶ 95.)

Plaintiffs further allege that the Village's land use ordinances prohibit the Congregation from building residential facilities requisite to its rabbinical college. Although the Subject Property consists of a 100-acre tract of land, it is considered a single "lot" under the Village's zoning law. (*Id.* ¶ 89.)[2] Pursuant to Section 130-9 of the Village's Zoning Code, unless the

---

[2] Currently, the Subject Property contains "12-13 structures, including bungalows and other buildings used as an Orthodox Jewish summer camp." (SAC ¶ 89.)

Subject Property is subdivided, the entire 100-acre tract may house only a single one-family residence; multiple dwellings are explicitly prohibited.  *See* Vill. of Pomona, N.Y. Code § 130-9(A)(1).  Allegedly, it is "impracticable" for the Congregation to comply with this restriction given the alleged need to house students, teachers, and their families on the rabbinical college campus.  (SAC ¶ 92.)  While the land use ordinances permit dormitories as an "accessory use to an" educational institution "on the same lot as the educational use," Vill. of Pomona, N.Y. Code § 130-10(F)(12), Plaintiffs allege that a rabbinical college cannot meet the Village's definition of an educational institution.  Moreover, Section 130-4 of the Village Code defines "dormitory" as exempting rooms that "contain separate cooking, dining or housekeeping facilities," *id.*, § 130-4, which Plaintiffs allege are required to house families adequately.  (SAC ¶ 107.)  Additionally, Plaintiffs allege that the land use ordinances unreasonably prohibit the construction of more than one dormitory building per lot and limit the size of a dormitory to twenty percent of the "total square footage of all buildings on the lot," *see* Vill. of Pomona, N.Y. Code § 130-10(F)(12).  (SAC ¶¶ 108-09.)  According to Plaintiffs, "applying generally accepted architectural standards and guidelines for school building square footage per student and dormitory square footage per student, such a restriction results in permitted school dormitories which could house a maximum of only approximately three (3%) of any student body."  (*Id.* ¶ 163.)  Therefore, the "twenty percent restriction effectively eliminates all dormitories."  (*Id.*)

Based on these provisions of the Village's Zoning Code, Plaintiffs argue that "there is no question that the College's proposed use is forbidden within the Village."  (*Id.* ¶ 111.)

F.  The Village's Environmental Regulations

In April 2007, the Village adopted a wetlands protection ordinance, which requires a 100-foot buffer around wetlands of 2,000 square feet or more.  *See* Vill. of Pomona, N.Y. Code §

126-3(A). Plaintiffs contend that the Village enacted this law "specifically to prevent the Hasidic Jewish community from locating and obtaining housing within the Village." (SAC ¶ 174.) Plaintiffs further allege that "the . . . wetlands law . . . exempts nearly every lot in the entire Village, except for the [Subject Property] (and perhaps a very few other uses, if any)." (*Id.* ¶ 169.) Accordingly, Plaintiffs challenge the law as "intended to restrict development of the [Subject Property], which contains 37 acres of wetlands." (*Id.* ¶ 171.)

G. Discriminatory Purpose

Plaintiffs allege that the Village adopted the challenged ordinances with the deliberate purpose of precluding construction of the rabbinical college. (*Id.* ¶¶ 156-159.) Specifically, Plaintiffs contend that the timing of the enactment of some of these zoning laws suggests discriminatory animus. For example, the Village's definition of "educational institution" was amended one month after the Congregation's August 2004 purchase of the Subject Property to require that a qualifying institution be "accredited by the New York State Department of Education or a similar recognized accrediting agency," Vill. of Pomona, N.Y. Code § 130-4. (SAC ¶ 156.) Just a few months thereafter, in late 2004, the Village further amended its Zoning Code to exclude from its definition of "dormitory" any single-family, two-family and multifamily dwelling units, *see* Vill. of Pomona, N.Y. Code § 130-4, and to limit the number of dormitories per lot. (SAC ¶¶ 157-58.) In January 2007, the Village again amended its Zoning Code to limit the size of dormitory buildings—relative to the total square footage of all buildings on the lot—to be used as accessories to educational institutions. (*Id.* ¶ 162.)

Plaintiffs further allege that the "'Dormitory' legislation [passed in 2007] was . . . designed and enacted specifically to prevent the Hasidic Jewish community from residing and obtaining housing within the Village," as evidenced in part by "[c]ommunity

opposition . . . through public comment at the hearing on the dormitory legislation." (*Id.* ¶¶ 164-65.)  Plaintiffs highlight the following comments, made by the Village's then-Mayor, Herbert Marshall, in response to the community's opposition as further evidence of the discriminatory motive behind the dormitory legislation:

> Ladies and gentleman, let me say something.  We sitting at this table have limitations that are placed on us as to what we can say, and what we can't say, because our attorney tells us what we can say and what we can't say.  I can't say what I feel – I can't – if I agree with you, I don't agree with you, I don't have that luxury of being able to say that here.  All that I can say is that every member of this board works very, very hard to do what is best for this community.  You have your issues.  Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that we don't agree.

(*Id.* ¶ 166.)

Plaintiffs further allege that Mayor Sanderson and Trustees Yagel and Louie were elected to office based on campaign promises to "fight this plan" and "stand up to this threat," ostensibly referring to the Congregation's plan to build the rabbinical college.  (*Id.* ¶ 178.)  Plaintiffs also cite an article published in a local newspaper, the Journal-News, which stated that Mayor Sanderson defeated former Mayor Marshall "in a contest defined by land-use concerns sparked by plans for a rabbinical college."  (*Id.* ¶ 198.)  Plaintiffs also allege that Trustees Yagel and Louie "expressly warned a civic association to be careful not to allow discriminatory statements to slip out."  (*Id.* ¶ 183.)  Mayor Sanderson allegedly stated publicly in 2007 that "[t]he single most important issue facing the village at this time is the as yet un-proposed, but leaked, [r]abbinical [c]ollege development," and that the Village should "maintain[] its cultural and religious diversity."  (*Id.* ¶ 180 (fourth alteration in original).)  It is further alleged that, prior to his election, Mayor Sanderson "appeared in a campaign video [in which] he said that the

[r]abbinical [c]ollege could not only 'change the village,' but could change 'the makeup of the village,'" suggesting, in Plaintiffs' view, his intention of "controlling the influx of Hasidic Jews into the Village." (*Id.* ¶ 179.) Once Mayor Sanderson was elected, he allegedly stated "if they use RLUIPA to get us, we will fight," further noting that "it would cost $1,000,000 to fight a RLUIPA challenge, and . . . the funds could be raised over '3-5 years' before a lawsuit would be filed." (*Id.* ¶ 181, 184.)

In addition to these and other specific allegations concerning animus toward the rabbinical college, Plaintiffs also generally allege that there has been "[c]ommunity [h]ostility to Hasidic Jews" in the Village, which "played a significant role in the discriminatory actions undertaken by the Defendants and led directly to targeting of various Jewish uses of the Subject Property." (*Id.* ¶ 186.) In support of this allegation, Plaintiffs cite various slurs and other offensive statements about Hasidic Jews made by members of the Village's community. (*Id.* ¶¶ 188-95.) The various statements include an alleged statement by Doris Ulman, the Village's Attorney, at a seminar on RLUIPA that "residents should not 'cave into them and sell our houses,' referring," in Plaintiffs' view, "to the Hasidic population." (*Id.* ¶ 192.)

### H. The Congregation Contacts the Village Regarding the Project

The Congregation does not allege that it submitted a formal application for the planned rabbinical college to the Village. Rather, the Village first became aware of the Congregation's plan for the rabbinical college when a "hypothetical sketch plat . . . was apparently leaked to the 'Preserve Ramapo' group," a "local private organization that has" expressed concerns about "population growth in Ramapo's Hasidic communities." (*Id.* ¶¶ 175-76.) Plaintiffs allege that the Village amended its zoning laws in a discriminatory manner in 2004 and later in 2007 based on its knowledge from this leak of the Congregation's plan to build the rabbinical college.

The Congregation reached out to the Village Board of Trustees and other Village representatives in March and April 2007 to discuss the project and whether it could "be accommodated by the Village." (*Id.* ¶¶ 208-09.) After apparently receiving no response from the Village, counsel for the Congregation telephoned Ulman on May 9, 2007 to discuss the project. (*Id.* ¶ 210.) Counsel subsequently followed up on May 10, 2007 with two letters requesting a "[p]ublic [m]eeting, for an informal design and technical review of a proposed project," (*id.*), as is encouraged under the Village's Zoning Code. *See* Vill. of Pomona, N.Y. Code § 130-28(E)(3) ("Applicants are encouraged to submit a preliminary, informal application and to discuss it with the appropriate permitting Board prior to formal submission of a complete and detailed special permit application."). Ulman responded by letter on May 14, 2007, stating

> I do not understand why you would request any meeting to discuss the design of a project that is illegal until you have applied for the required zone change. At no time did your letters or discussions with me suggest that a public meeting was requested to discuss the project. In my opinion, any meeting, public or private, would be premature.

(Defs.' Ex. R; SAC ¶ 211.) On June 22, 2007, the Congregation contacted Mayor Sanderson, the Village Board of Trustees, and Ulman by letter, again suggesting a meeting to discuss the Congregation's proposed project. (SAC ¶ 212.) The letter requested "that the Village of Pomona Board of Trustees exercise its authority under federal law to grant an exemption to a religious institution to allow for the construction of" the rabbinical college. (Defs.' Ex. S at 1; SAC ¶ 213.) On July 3, 2007, Mayor Sanderson responded to the Congregation by letter, stating that the Village "cannot grant your request to have the Board of Trustees exempt [the project] from the provisions of the Pomona Zoning Law " and that "the only remedy available for the [r]abbinical [c]ollege were [sic] legislative ones [sic]." (SAC ¶¶ 214-15.)

## II. Discussion

### A. Standard of Review

#### 1. Rule 12(b)(1)

"[A] federal court has subject-matter jurisdiction over a cause of action only when it 'has authority to adjudicate the cause' pressed in the complaint." *Singer v. Xipto, Inc.*, 852 F. Supp. 2d 416, 422 (S.D.N.Y. 2012) (quoting *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007)). "Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted). "A plaintiff asserting jurisdiction has the burden of proving by a preponderance of evidence that it exists." *Id.* (internal quotation marks omitted). "[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (alteration in original) (citations and internal quotation marks omitted).

#### 2. Rule 12(b)(6)

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). "In

adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted). Instead, the Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

"A court presented with a motion to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6)

motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 404 (E.D.N.Y. 2008) (internal quotation marks omitted); *see also Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

B.  Justiciability

Defendants move to dismiss on the grounds that Plaintiffs lack standing to bring this case and that Plaintiffs' claims are not ripe.

1.  Standing

The Court begins, as it must, with the question of Plaintiffs' standing.  *See Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009) ("[S]tanding . . . is intended to be a threshold issue at least tentatively decided at the outset of the litigation."); *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 387-88 (2d Cir. 1997) ("Whether a claimant has standing is 'the threshold question in every federal case, determining the power of the court to entertain the suit.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975))).  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)); *see also W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (same); *Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA*, No. 12-CV-2865, 2012 WL 6062544, at *5

(S.D.N.Y. Dec. 7, 2012) (same).[3]  It is the burden of the party invoking federal jurisdiction to establish standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  However, "at the pleading stage, standing allegations need not be crafted with precise detail."  *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan*, 504 U.S. at 561); *see also Nat'l Council of La Raza v. Mukasey*, 283 Fed. App'x 848, 850 (2d Cir. 2008) (same); *Heghmann v. Sebelius*, No. 09-CV-5880, 2010 WL 2643301, at *2 (S.D.N.Y. May 13, 2010) (same).

Generally, "the 'injury-in-fact' requirement means that a plaintiff must have personally suffered an injury."  *Huff*, 549 F.3d at 107; *see also Lujan*, 504 U.S. at 560 n.1 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) ("[Article] III requires the party who invokes the court's authority to show that he [or she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." (internal quotation marks omitted)).  A plaintiff must allege a personal stake in the outcome of the case and a "distinct and palpable" injury.  *See*

_____

[3] In addition to these constitutional requirements, courts also apply "prudential principles" to determine whether a plaintiff has standing.  *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979).  These prudential limits on standing allow courts "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim."  *Id.* at 99-100.  Not all claims are subject to prudential limits, however, as Congress is permitted to "expand standing to the full extent permitted by [Article] III."  *Id.* at 100.  In fact, plaintiffs pursuing claims under the FHA are not subject to prudential limits on standing.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (holding that Congress intended standing under the FHA to extend to the full limits of Article III).  As the Court finds that Plaintiffs' standing can be determined based solely on the constitutional analysis, the Court does not engage in a separate standing analysis for Plaintiffs' FHA claims.  Rather, the Court uses the same analysis to determine Plaintiffs' standing with respect to all of its claims.  *See ACORN v. County of Nassau*, No. 05-CV-2301, 2006 WL 2053732, at *7 n.1 (E.D.N.Y. July 21, 2006) (employing the same analysis to determine the plaintiffs' standing under the Equal Protection Clause and the FHA).

*Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks omitted); *see also Duke Power Co. v. Carolina Envtl. Study Grp., Inc*., 438 U.S. 59, 72 (1978); *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 358 (S.D.N.Y. 2000).

As for causation, a plaintiff "satisf[ies] the causation requirement if the complaint 'aver[s] the existence of [an] intermediate link between the . . . [challenged] regulations and the injury.'" *Pac. Capital Bank*, 542 F.3d at 350 (second and third alterations in original) (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992)); *see also In re Currency Conversion Fee Antitrust Litig.*, Nos. M 21-95, 05-CV-7116, 2009 WL 151168, at *2 (S.D.N.Y. Jan. 21, 2009) (same). Causation is lacking if the claimed injury is "th[e] result [of] the independent action of some third party not before the court" rather than the challenged conduct. *Lujan*, 504 U.S. at 560 (alterations in original) (internal quotation marks omitted); *see also M.J. Entm't Enters., Inc. v. City of Mount Vernon*, 234 F. Supp. 2d 306, 311-13 (S.D.N.Y. 2002) (holding that plaintiff lacked standing to bring a facial challenge to a zoning ordinance that did not apply to plaintiff's property). But a plaintiff need not claim that a defendant's challenged actions were the very last step in a chain of events leading to an injury adequately to allege causation. *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (noting that the "'fairly traceable'" requirement does not demand that "the defendant's actions [be] the very last step in the chain of causation"); *Ctr. for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 192 (2d Cir. 2002) (same).

Finally, the redressability requirement demands that there is a "'non-speculative likelihood that the injury can be remedied by the requested relief.'" *Coalition of Watershed Towns v. EPA*, 552 F.3d 216, 218 (2d Cir. 2008) (per curiam) (quoting *Huff*, 549 F.3d at 106-07); *see also M.J. Entm't*, 234 F. Supp. 2d at 311 (determining that redressability requirement was not met because "a ruling by this Court invalidating the 'special permit use'

18

provisions of the Zoning Code would not redress plaintiff's injury," as plaintiff's proposed use was barred by another ordinance). To meet this standard, the plaintiff must allege facts that show it is "'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Watershed Towns*, 552 F.3d at 218 (quoting *Lujan*, 504 U.S. at 561); *see also Allen v. Wright*, 468 U.S. 737, 758 (1984) (holding that there was no standing where it was "entirely speculative" whether withdrawal of the challenged tax exemption would lead "any particular school . . . to change [the] policies" that had caused the plaintiffs' injuries); *Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 374 (2d Cir. 2004) (finding injury redressable, because, "[w]ere [plaintiff] to succeed on the merits of its claims, it likely would be able to erect at least some of the signs it has asserted an intent to build").

### a. The Congregation

The Congregation has shown that it has standing to challenge the ordinances at issue because, accepting as true the allegations in the Second Amended Complaint, the Congregation has alleged a particularized injury that would be redressed if the Court granted the requested relief. The Congregation alleges, inter alia, the following in support of its standing: (1) the Congregation owns the Subject Property; (2) it purchased the Subject Property with the intention of building a rabbinical college thereon; (3) it already has begun to develop plans to build the rabbinical college; (4) the Subject Property is subject to Sections 130-4, 130-9, and 130-10 of the Village Zoning Code, as well as Section 126 (the Village's wetlands ordinance), which on their face prohibit unaccredited educational institutions and some of the Congregation's planned accessory uses; and (5) those provisions were enacted unlawfully to prevent the Congregation from building its rabbinical college. (Pls.' Mem. 23.) Under these circumstances, the Congregation has sufficiently alleged an "injury in fact" that gives it a personal stake in the

outcome of the litigation, as the Congregation's intended use of the Subject Property is allegedly prohibited by the challenged ordinances.  *See Lamar*, 356 F.3d at 373-75 (finding that standing requirements were satisfied, where an ordinance prevented plaintiff from building certain signs); *Chabad Lubavitch v. Borough of Litchfield*, 796 F. Supp. 2d 333, 338 (D. Conn. 2011) (holding that religious corporation which owned property had standing to challenge zoning ordinance); *M.J. Entm't*, 234 F. Supp. 2d at 310 (determining that plaintiff had established standing with respect to one claim, where the challenged ordinance kept the plaintiff from "offer[ing] topless dancing as entertainment at its business establishment").

The Congregation also has met the other elements of Article III standing.  The Congregation's alleged injury is fairly traceable to Defendants, because the Congregation allegedly cannot build the rabbinical college or its accessory uses as a result of the challenged ordinances.  *See Pac. Capital Bank*, 542 F.3d at 350 (noting that an allegation of an "intermediate link between" an injury and a challenged regulation is sufficient to demonstrate traceability (internal quotation marks omitted)); *M.J. Entm't*, 234 F. Supp. 2d at 310 (holding that the plaintiff's "injury is traceable to the challenged action of [Defendant because Plaintiff] cannot [engage in its desired use] at its current location or relocate to another location . . . because of the municipality's Zoning Code").

Further, the alleged injury is redressable through the requested relief, because invalidation of the challenged ordinances allegedly could allow the Congregation to build the rabbinical college and its accessory uses.  Taking the allegations in the Second Amended Complaint as true, "the Subject Property is the only available parcel of land" that is both appropriately sized and appropriately situated in close proximity to the "religious infrastructure and population," as required for a rabbinical college.  (SAC ¶ 83.)  Based on these allegations,

there is a "non-speculative likelihood" that if the challenged ordinances were invalidated, the

Congregation could build the rabbinical college on the property. *See Watershed Towns*, 552

F.3d at 218 (internal quotation marks omitted). As the Second Amended Complaint does not

clarify whether a complete plan for the rabbinical college, including financing commitments, yet

exists, the Court is aware that there is a chance that even if the requested relief is granted, the

Congregation might not build the rabbinical college on the Subject Property. But "these types of

uncertainties always exist in housing development cases," and they "should not be used as a

means to defeat standing." *ACORN*, 2006 WL 2053732, at *10; *see also Village of Arlington

Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261-62 (1977) ("[A]ll housing developments

are subject to some extent to . . . uncertainties . . . . [A] court is not required to engage in undue

speculation as a predicate for finding that the plaintiff has the requisite personal stake in the

controversy."); *Huntington Branch, NAACP v. Town of Huntington*, 689 F.2d 391, 394 (2d Cir.

1982) ("[T]he requirement that the relief requested be likely to redress the injuries alleged by a

plaintiff is not a demand for complete certainty.").[4]

---

[4] Defendants argue that the Congregation cannot meet the injury-in-fact requirement, because it has not submitted an application to the Village. (Defs.' Mem. 26.) However, there is authority that land use plaintiffs who have identified, and spent resources to develop, a specific project that is barred by local laws may, without more, still have standing to challenge those laws. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424-25 (2d Cir. 1995) (holding that plaintiff had standing to bring FHA claim challenging an ordinance, even before the government entity had applied the ordinance against plaintiff); *ACORN*, 2006 WL 2053732, at *9 (noting that plaintiff alleged "that it took substantial steps, and expended resources in preparing a plan, but did not formally submit it to defendants because it did not comply with the allegedly discriminatory RFP"). In any event, as discussed at length below, this failure renders Plaintiffs' as-applied challenges unripe. But, in the context of a facial challenge, a party "need not have first sought and been denied [a] permit prior to filing" suit to suffer an injury-in-fact. *Lamar*, 356 F.3d at 374. Thus, Congregation has standing to pursue its facial challenges to the zoning ordinances.

<u>b. The Individual Plaintiffs</u>

The Individual Plaintiffs are trained Rabbis who seek to live and to teach and/or to study at the Congregation's planned rabbinical college. (SAC ¶¶ 11-20.) Defendants contend that the Individual Plaintiffs cannot meet the injury-in-fact requirement because they are "yet-to-be admitted or enrolled students," a yet-to-be hired Dean, and yet-to-be-hired lecturers who have "no basis to claim injury now," before the school has been "approved or constructed—let alone opened its doors." (Defs.' Mem. 30.) Defendants' argument is unavailing.

The Individual Plaintiffs assert that they have been prevented from studying, teaching, worshipping, and living at the rabbinical college by the challenged ordinances, which they allege discriminate against them based on their religion. (Pls.' Mem. 23-24; SAC ¶¶ 156-159.) Contrary to Defendants' argument that the Individual Plaintiffs are "yet-to-be admitted" or "yet-to-be-hired," the Individual Plaintiffs have submitted affidavits that, taken as true, demonstrate that each has been either offered a position at the rabbinical college or offered enrollment as a student at the rabbinical college once it opens.[5] (M. Babad Aff. ¶¶ 1, 12; Brief Aff. ¶¶ 5-6; Kahana Aff. ¶¶ 5-6.) The Individual Plaintiffs, therefore, have a personal and concrete stake in seeing the rabbinical college built. *See Ross*, 524 F.3d at 222 (holding that a plaintiff must allege a personal stake in the outcome of the case and a "distinct and palpable" injury (internal quotation marks omitted)); *see also Arlington Heights*, 429 U.S. at 264 (holding that an individual who sought to live in planned housing community had standing to challenge

---

[5] It is proper for the Court to consider these affidavits in deciding the instant Motion. *See J.S. ex rel. N.S. v. Atica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) (explaining that in resolving a 12(b)(1) motion to dismiss, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits").

discriminatory zoning laws preventing development of that housing community); *ACORN*, 2006 WL 2053732, at *11 (allowing individual plaintiffs who sought to live in affordable housing project in defendant city to challenge zoning ordinances preventing construction of the affordable housing project). The fact that the rabbinical college is not yet built or has not yet opened does not prevent the Individual Plaintiffs from asserting an injury now, as Defendants contend. (Defs.' Mem. 30.) Indeed, the Individual Plaintiffs' alleged injury-in-fact stems from the very fact that the rabbinical college cannot yet be built or opened.

Further, the Individual Plaintiffs' alleged injury is both fairly traceable to Defendants and redressable by the Court. First, the Individual Plaintiffs' inability to live and teach at the rabbinical college is caused by the challenged ordinances, which allegedly prevent the construction and operation of the rabbinical college and some of its accessory uses on the Subject Property. Second, taking the allegations in the Second Amended Complaint as true, there is at least a non-speculative likelihood that if the challenged ordinances were invalidated, the Congregation's planned rabbinical college could be built, and the Individual Plaintiffs could study, work, and live on the Subject Property. *Cf. Arlington Heights*, 429 U.S. at 264 (finding that the individual plaintiff's injury—inability to obtain affordable housing in defendant village —was redressable by the requested relief, because it was likely that the housing development would materialize absent the challenged discriminatory ordinance); *ACORN*, 2006 WL 2053732, at *11 (same).

### c. Kolel Belz

Plaintiff Kolel Belz is a religious corporation that serves more than 200 families of congregants and purports to "represent[] the interests of itself and the broader Orthodox community in actively seeking trained" rabbinical judges to "conduct the activities of rabbinical

courts." (SAC ¶¶ 34-35.) In support of its standing argument, Kolel Belz argues that it "will benefit from this litigation because it will have access to the services of rabbinical judges trained at the [r]abbinical [c]ollege." (Pls.' Mem. 24-25.) Defendants argue that Kolel Belz lacks standing to raise any of its claims on its own behalf or on behalf of the local Orthodox community. (Defs.' Mem. 26-29.) For the following reasons, the Court agrees that Kolel Belz lacks standing to pursue this action.

Kolel Belz, "as an organization, is fully able to bring suit on its own behalf 'for injuries it has sustained,'" *Int'l Action Ctr. v. City of New York*, 522 F. Supp. 2d 679, 693 (S.D.N.Y. 2007) (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp*., 418 F.3d 168, 174 (2d Cir. 2005)), "so long as those injuries—or threats of injury—are 'both "real and immediate," [and] not "conjectural or hypothetical,"'" *id.* (alteration in original) (quoting *Bordell v. Gen. Electric Co.*, 922 F.2d 1057, 1060 (2d Cir. 1991)). Kolel Belz, however, fails to allege that it has personally suffered any injury based on the Village's zoning ordinances. Instead, it alleges that the challenged ordinances will deprive the local Orthodox community of trained rabbinical judges. Even assuming that this alleged injury is cognizable as an injury-in-fact, Kolel Belz does not allege that *it* suffers any personal injury separate and apart from the interests of the local Orthodox community. *See Huff*, 549 F.3d at 109 (holding that an investment advisor lacked standing to sue based on injuries suffered by its clients); *Int'l Action Ctr.*, 522 F. Supp. at 693 (finding that plaintiff organization failed to allege an injury to itself that was not merely speculative). Accordingly, the Court finds that Kolel Belz lacks standing to pursue this action on its own behalf.

As Kolel Belz has not alleged that it is a membership organization, it cannot assert (and, indeed, it has not asserted) associational standing.[6]  Therefore, "[t]o the extent that [Kolel Belz] seeks to sue on behalf of" the local Orthodox community, "it may pursue its claim only on a theory of third-party standing."  *Mid-Hudson*, 418 F.3d at 174; *see also Huff*, 549 F.3d at 109.  A plaintiff may assert "third-party standing where [it] can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests."  *Huff*, 549 F.3d at 109; *see also Miller v. Albright*, 523 U.S. 420, 447 (1998) (O'Connor, J., concurring in the judgment) (explaining that a plaintiff asserting third-party standing must have "a close relation to the third party," and "some hindrance to the third party's ability to protect his or her own interests [must exist]" (internal quotation marks omitted)); *Mid-Hudson*, 418 F.3d at 174 ("[A] plaintiff seeking third-party standing in federal court must . . . demonstrat[e] a close relation to the injured third party and a hindrance to that party's ability to protect its own interests.").  "In this vein, courts historically have permitted '[t]rustees [to] bring suits to benefit their trusts; guardians ad litem [to] bring suits to benefit their wards; receivers [to] bring suit to benefit their receiverships; assignees in bankruptcy [to] bring suit to benefit bankrupt estates; [and] executors [to] bring suit to benefit testator estates.'"  *Huff*, 549 F.3d at 109 (alterations in

_____

[6] "'Under New York and federal law, an organization may sue as a representative of its members only if the members have standing to sue in their own right.'"  *Int'l Action Ctr.*, 522 F. Supp. 2d at 694 (quoting *Mid-Hudson*, 418 F.3d at 173); *see also Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 539 (S.D.N.Y. 2008).  Here, however, Kolel Belz has neither alleged, nor provided the Court with any basis to infer, that it is a membership organization.  While some of the Individual Plaintiffs allegedly engage in rabbinical studies at Kolel Belz (SAC ¶ 38), there is no specific allegation that these specific Individual Plaintiffs, or any others, are members of Kolel Belz.  Therefore, the Court finds that Kolel Belz would have no basis to assert associational standing.  *See Int'l Action Ctr.*, 522 F. Supp. 2d at 694 (holding that an organization was not entitled to sue as a representative of its members, where the organization was not a membership organization).

original) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 287-88 (2008)). Here, however, Kolel Belz has failed to allege what type of relationship it has to the members of the local Orthodox community. The Second Amended Complaint alleges merely that Kolel Belz is a religious corporation and that some of the Individual Plaintiffs engage in rabbinical studies there. (SAC ¶¶ 21, 38.) These allegations do not provide the Court with a basis to conclude that Kolel Belz has a sufficiently close relationship to the members of the local Orthodox community to warrant recognition of third-party standing.

Nor has Kolel Belz provided the Court with any allegations from which the Court could conclude that members of the community cannot vindicate their own interests. To do so, Kolel Belz would need to establish that "some barrier or practical obstacle (*e.g.*, third party is unidentifiable, lacks sufficient interest, or will suffer some sanction) prevents or deters the third party from asserting his or her own interest." *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 106 (1st Cir. 1995). Kolel Belz offers nothing by way of an allegation, let alone proof, of any such barriers preventing third parties from challenging the Defendants' conduct. Indeed, the participation of the Individual Plaintiffs—some of whom are connected to Kolel Belz (SAC ¶ 38)—suggests otherwise. *See Hodak v. City of St. Peters*, 535 F.3d 899, 905 (8th Cir. 2008) (noting that circuit courts agree that "if a third party actually asserts his [or her] own rights, no hindrance exists and third-party standing is improper").

For these reasons, the Court finds that Plaintiff Kolel Belz lacks standing to bring this suit. Accordingly, its claims are dismissed without prejudice.

2.  Ripeness

a.  Facial Challenges

Plaintiffs have raised facial challenges to the legality of certain portions of the Village's

Zoning Code under the Equal Protection Clauses of both the Federal Constitution and the New

York Constitution, as well as the Free Speech, Free Exercise, and Free Association Clauses of

the First Amendment of the Federal Constitution and corollary protections in the New York

Constitution, and under RLUIPA.  Defendants summarily assert that Plaintiffs "facial

challenge[s] fail[] to meet the jurisdictional requirement[] of ripeness," (Defs.' Mem. 13),

arguing that Plaintiffs should be required to participate "in the normal land use process," (*id.*).

Contrary to Defendants' assertion, however, "'facial' challenges to regulation[s] are generally

ripe the moment the challenged regulation or ordinance is passed."  *Suitum v. Tahoe Reg'l*

*Planning Agency*, 520 U.S. 725, 736 n.10 (1997); *see also Cnty. Concrete Corp. v. Township of*

*Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006) (noting that the finality requirement "does not

apply . . . to *facial* attacks on a zoning ordinance, i.e., a claim that the mere enactment of a

regulation either constitutes a taking without just compensation, or a substantive violation of due

process or equal protection." (emphasis in original)); *Lamar*, 356 F.3d at 374 (holding that a

party "need not have first sought and been denied *any* permit prior to filing a facial challenge"

(emphasis in original)); *MacDonald v. Safir*, 206 F.3d 183, 189 (2d Cir. 2000) ("[T]here is no

need for a party actually to apply or to request a permit in order to bring a facial challenge to an

ordinance (or parts of it) . . . ."); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 757 (2d Cir.

1998) ("[Making] no effort to apply for a permit . . . does not, of course, deprive [plaintiff] of

standing to assert that the [zoning ordinance] is facially invalid . . . ."); *S. Lyme Prop. Owners*

*Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524, 536 (D. Conn. 2008) ("[F]acial challenges

are generally ripe the moment the challenged regulation or ordinance is passed." (internal

quotation marks omitted)); *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 155 (W.D.N.Y.

2006) ("[F]acial challenges to legislative acts are ripe by their very nature." (internal quotation

marks omitted)); *City of New Rochelle*, 111 F. Supp. 2d at 360 (holding that facial challenge to

land use law was ripe as it presented "pure questions of law").[7]  Accordingly, Plaintiffs' facial

challenges to the Village's zoning ordinances are ripe for review.

### b.  As-Applied Challenges

Defendants further contend that Plaintiffs' as-applied challenges to the Village's zoning

laws are not ripe for adjudication, because the Congregation failed "formally [to] present[] [its]

actual plans for the proposed [r]abbinical [c]ollege to the Village," or to "ma[k]e any application

for a special use permit, use variance, zoning amendment or zone change as required by the

Village zoning laws."  (Defs.' Mem. 12.)  The Court agrees that Plaintiffs' as-applied challenges

under the Free Speech, Free Exercise, and Free Association Clauses of the First Amendment, the

Equal Protection Clause of the Fourteenth Amendment, the FHA, and RLUIPA, as well as

Plaintiffs' as-applied claims under New York state law, are unripe, and thus, the Court lacks

subject matter jurisdiction over these claims.

---

[7] Given the general rule that facial challenges become ripe at the inception of the regulation or ordinance, *see Suitum*, 520 U.S. at 736 n.10, there is no reason to believe that facial challenges under RLUIPA would be treated differently.  *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287-88 (5th Cir 2012) (noting that plaintiff's "facial challenges" under RLUIPA were "easily ripe"); *Sisters of St. Francis Health Servs., Inc. v. Morgan County*, 397 F. Supp. 2d 1032, 1048-49 (S.D. Ind. 2005) (holding that ripeness requirements for as-applied challenge under RLUIPA did not apply in the context of a facial challenge under RLUIPA and deeming the case ripe for review).

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005). The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) ("Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." (internal quotation marks omitted)); *Authors Guild, Inc. v. HathiTrust*, No. 11-CV-6351, 2012 WL 4808939, at *7 (S.D.N.Y. Oct. 10, 2012) ("Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies of sufficient immediacy and reality and not hypothetical or abstract disputes." (internal quotation marks omitted)). At its core, ripeness is "peculiarly a question of timing," meaning that a case can become ripe for adjudication even if initially premature. *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974). Thus, for example, an action is not ripe if it involves contingent future events that may or may not occur. *See Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580-81 (1985).

"Determining whether a case is ripe generally requires [courts] to 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Murphy*, 402 F.3d at 347 (quoting *Abbott Labs.*, 387 U.S. at 149); *see also Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003) (same); *New York v. U.S. Army Corps of*

29

*Eng'rs*, Nos. 11-CV-2599, 11-CV-3857, 11-CV-3780, 2012 WL 4336701, at * 13 (E.D.N.Y.

Sept. 24, 2012) (same). "The 'fitness of the issues for judicial decision' prong . . . requires a

weighing of the sensitivity of the issues presented and whether there exists a need for further

factual development." *Murphy*, 402 F.3d at 347 (quoting *Abbott Labs.*, 387 U.S. at 149); *see

also E. End Eruv Ass'n, Inc. v. Village of Westhampton Beach*, 828 F. Supp. 2d 526, 536

(E.D.N.Y. 2011) (same). The "'hardship to the parties' prong . . . injects prudential

considerations into the mix requiring [courts] to gauge the risk and severity of injury to a party

that will result if the exercise of jurisdiction is declined." *Murphy*, 402 F.3d at 347 (quoting

*Abbott Labs.*, 387 U.S. at 149); *see also E. End Eruv Ass'n*, 828 F. Supp. 2d at 536 (same).

<u>i. The Final Decision Requirement</u>

"Building on the foregoing, the Supreme Court has developed specific ripeness

requirements applicable to land use disputes." *Murphy*, 402 F.3d at 347. In *Williamson County

Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court

formulated a two-pronged approach to evaluate the ripeness of a Fifth Amendment Takings

Clause claim. The first prong requires the land developer to obtain a final, definitive position as

to the application of the relevant zoning laws to the property from the municipal entity

responsible for those laws. *Id.* at 186. Under this prong, the plaintiff cannot seek federal court

review of a zoning ordinance or provision until it has submitted at least one meaningful

application for a variance. *Id.* at 190. Under the second prong, the property owner must seek

compensation for an alleged taking before initiating a federal lawsuit. *Id.* at 194. This second

prong derives from the "Fifth Amendment's proviso that only takings without 'just

compensation' infringe that Amendment." *Suitum*, 520 U.S. at 734; *see also Murphy*, 402 F.3d

at 348-5 (discussing *Williamson*'s two-prong ripeness analysis in Takings Clause cases).

Although this ripeness paradigm was originally developed by the Supreme Court in the context of a regulatory takings challenge, *see Williamson*, 473 U.S. at 186, the Second Circuit has applied prong one of the *Williamson* analysis to land use disputes involving more than just takings claims. *See Murphy*, 402 F.3d at 349-50. Indeed, the Second Circuit has applied this test to as-applied challenges to land use laws under RLUIPA, the First Amendment, the Equal Protection Clause, and the Due Process Clause. *See id.* at 348-51 (applying final decision test for ripeness to as-applied RLUIPA claims and as-applied First Amendment free exercise claims); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88-89 (2d Cir. 2002) (noting that *Williamson*'s finality test had been extended to Equal Protection claims and Due Process claims); *Southview Assocs., Ltd. v. Bongartz*, 980 F. 2d 84, 96-97 (2d Cir. 1992) (noting that plaintiff's substantive due process claim was subject "to only the final decision prong of the *Williamson* ripeness test"); *accord Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 979 (9th Cir. 2011) ("All of the circuits to address this issue have applied the final decision requirement to RLUIPA claims, as well as to related First Amendment–based § 1983 claims . . . ."); *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533, 537 (6th Cir. 2010) (noting that the Sixth Circuit has applied the finality requirement to Equal Protection and First Amendment challenges to land use requirements); *Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1291-92 (3d Cir. 1993) (applying *Williamson* final decision rule to substantive Due Process, procedural Due Process, and Equal Protection as-applied challenges to zoning determination); *Unity Ventures v. County of Lake*, 841 F.2d 770, 774-76 (7th Cir. 1988) (applying final decision rule to Equal Protection and Due Process claims); *Roman Catholic Diocese of Rockville Ctr. v. Inc. Village of Old Westbury*, No. 09-CV-5195,

2012 WL 1392365, at *6 (E.D.N.Y. Apr. 23, 2012) (noting that in the Second Circuit the final

decision rule applies to First Amendment and RLUIPA challenges to land use laws).[8]

The final decision requirement also applies to land use disputes arising under New York

law. *See Church of St. Paul & St. Andrew v. Barwick*, 496 N.E.2d 183, 189-90 (N.Y. 1986)

(finding that as-applied claims under the First Amendment of the New York State and Federal

Constitutions unripe based on plaintiff's failure to obtain a final decision, where the plaintiff had

yet to seek administrative approval of its "rebuilding program"); *Waterways Dev. Corp. v.*

---

[8] Plaintiffs claim that the Second Circuit has "squarely decided the question of whether a pre-enforcement challenge to a facially neutral zoning ordinance under the First Amendment and the Fair Housing Act is ripe." (Pls.' Mem. 13.) For this proposition, Plaintiffs cite the Second Circuit's decision in *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995). However, in the portion of *LeBlanc-Sternberg* quoted by Plaintiffs, the Second Circuit merely held that the plaintiffs in that case had *standing* to challenge facially neutral zoning ordinances under the FHA and the First Amendment. *See id.* at 424-26. The court did not address, because it was not asked to address, the analytically distinct question of whether the plaintiffs' claims were ripe under *Williamson*. *See Bronx Household of Faith v. Bd. of Educ. of New York*, 492 F.3d 89, 111 (2d Cir. 2007) (noting that while ripeness "overlaps in some respects with standing," the "central concerns of ripeness doctrine are somewhat distinct from standing"). In fact, for example, after *LeBlanc-Sternberg*, the Second Circuit held that "in certain circumstances a First Amendment claim emanating from a land use dispute may be subject to the *Williamson County* prong-one ripeness test." *Murphy*, 402 F.3d at 350; *see also id.* ("[W]e do not believe it necessary to distinguish the RLUIPA claim from the First Amendment Free Exercise claim when it comes to our ripeness inquiry."); *accord Grossi v. City of New York*, No. 08-CV-1083, 2009 WL 4456307, at *5 (E.D.N.Y. Nov. 30, 2009) ("It is well settled that the final decision requirement is applicable to . . . First Amendment claims."); *Shenkel United Church of Christ v. North Coventry Township*, No. 09-CV-1823, 2009 WL 3806769, at *3 (E.D. Pa. Nov. 13, 2009) ("[I]n as-applied First Amendment and RLUIPA claims arising from land use disputes, *Williamson*'s prong-one ripeness standard governs."); *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 349 n.5 (S.D.N.Y. 2000) (applying *Williamson* to First Amendment claim). Indeed, the Second Circuit has found *Williamson* to be inapplicable to a First Amendment claim only in limited specific circumstances—such as where there already was an adequate factual record and where the plaintiff had experienced an "immediate injury." *Murphy*, 402 F.3d at 350 n.5. As noted below, however, Plaintiffs do not fit within this exception, as they have not submitted a single, formal proposal to the Village providing the details regarding the rabbinical college they will build—which omission renders the factual record incomplete.

*Lavalle*, 813 N.Y.S.2d 485, 486 (App. Div. 2006) (holding that under New York law, a claim is not ripe if a governmental body has yet to render a "final determination as to the validity" of a proposed project); *cf. Koultukis v. N.Y.C. Dep't of Bldgs.*, Index No. 103643/01, 2001 WL 1722885, at *1 (N.Y. Sup. Ct. Oct. 4, 2001) ("[A] controversy cannot be ripe for judicial review if the claimed harm may be prevented or significantly ameliorated by further administrative action." (citation omitted)).

"A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." *S&R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008); *see also Ecogen*, 438 F. Supp. 2d at 155 (holding that the final decision rule generally requires "that the plaintiff . . . have submitted at least one application for, and been denied, permission for the proposed structure or use of the subject property."); *Goldfine v. Kelly*, 80 F. Supp. 2d 153, 159 (S.D.N.Y. 2000) ("In order to have a final decision, a 'development plan must be submitted, considered, and rejected by the governmental entity.'" (quoting *Unity Ventures*, 841 at 774)); *Barwick*, 496 N.E.2d at 189-90 (holding that decision was not final "until plaintiff has sought and the Commission has granted or denied a certificate of appropriateness or other approval . . . ." (citation omitted)); *Waterways*, 813 N.Y.S.2d at 486 (holding that case was not ripe, because "[t]he plaintiff ha[d] not applied for a building permit for the residential units involving the variance at issue" and "[t]herefore, there [had] been no final determination as to the validity thereof"). Furthermore, generally, even if a plan has been submitted and rejected, a claim is not ripe until the "property owner submit[s] at least one meaningful application for a variance." *Murphy*, 402 F.3d at 348; *see also id.* at 353 ("[F]ailure to pursue a variance prevents a federal challenge to a local land use decision from becoming ripe." (citing *Williamson*, 473 U.S. at 190)); *Bikur Cholim, Inc. v.*

33

*Village of Suffern*, 664 F. Supp. 2d 267, 275 (S.D.N.Y. 2009) ("In general, . . . failure to seek a variance prevents a zoning decision from becoming ripe."); *S&R Dev. Estates*, 588 F. Supp. 2d at 461-64 (dismissing claims on ripeness grounds, where the plaintiff had not applied for a variance); *Goldfine*, 80 F. Supp. 2d at 159 (same); *Korcz v. Elhage*, 767 N.Y.S.2d 737, 738-39 (App. Div. 2003) (same); *Dick's Quarry, Inc. v. Town of Warwick*, 739 N.Y.S.2d 464, 464-65 (App. Div. 2002) (same). In the end, "[a] case is ripe when the court 'can look to a final, definitive position from a local authority to assess precisely how [a property owner] can use [his or her] property.'" *Bikur Cholim*, 664 F. Supp. 2d at 275 (quoting *Murphy*, 402 F.3d at 347).

The Second Circuit has held that the final decision rule: (1) "aids in the development of a full record"; (2) ensures that a court "will . . . know precisely how a regulation will be applied to a particular parcel"; (3) recognizes the possibility that, by granting a variance, the administrative body "might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes"; and (4) "evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Murphy*, 402 F.3d at 348; *accord Spence v. Zimmerman*, 873 F.2d 256, 262 (11th Cir. 1989) ("We stress that federal courts do not sit as zoning boards of review and should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions."); *Hoehne v. County of San Benito*, 870 F.2d 529, 532 (9th Cir. 1989) (noting that in *Williamson* and other decisions, the Supreme Court "has erected imposing barriers . . . to guard against the federal courts becoming the Grand Mufti of local zoning boards."); *Barwick*, 496 N.E.2d at 189 ("[T]he controversy cannot be ripe if the claimed harm may be prevented or significantly ameliorated by further administrative action or by steps available to the complaining party."); *Koultukis*, 2001 WL 1722885, at *1 ("The purpose of this doctrine is to

avoid litigation which may become academic and [to] prevent the premature review or adjudication of administrative actions." (citation omitted)).

In this case, there has been no final decision, as the Congregation has yet to submit a single formal application to the Village Board of Trustees for approval of the rabbinical college. This failure by Plaintiffs to file (or their decision not to file) any formal application for use of the Subject Property leaves Plaintiffs outside the boundaries of the final decision rule. *See Guatay Christian Fellowship*, 670 F.3d at 980 (holding that "the Church's failure to complete even *one* full Use Permit application leaves us unable to discern whether there is a true case or controversy, and any resulting injury" (emphasis in original)); *Loesel v. City of Frankenmuth*, No. 08-CV-11131, 2009 WL 817402, at *13 (E.D. Mich. Mar. 27, 2009) (finding plaintiff failed to satisfy final decision rule, even if "the evidence showed that each individual city official opposed the building of a Wal-Mart," because the plaintiff "never even completed an initial application"); *Wal-Mart Stores, Inc. v. City of Turlock*, 483 F. Supp. 2d 987, 998-99 (E.D. Cal. 2006) (noting that for an as-applied challenge to land use regulations to be ripe, a "final decision by the government agency that inflicts a concrete harm on the landowner is required," but that before "a decision is final the landowner must have submitted one formal development plan and sought a variance from any regulations barring development in the proposed plan [both of which] have been denied"). Although Plaintiffs were allegedly rebuffed by the Village attorney and by Mayor Sanderson in their *informal* efforts to present their plan to the Village officials, such "[i]nformal efforts to gain approval for land development are insufficient, by themselves, to constitute final government action." *Goldfine*, 80 F. Supp. 2d at 160; *see also Unity Ventures*, 841 F.2d at 775 (dismissing claim on ripeness grounds, because the plaintiffs had not made a "formal application" that was rejected); *Grossi*, 2009 WL 4456307, at *5 (noting that plaintiffs

had not satisfied the final decision requirement, because they had "failed to complete the paperwork and file the application with the appropriate offices"); *Celentano v. City of West Haven*, 815 F. Supp. 561, 569 (D. Conn. 1993) ("An unsuccessful effort to negotiate an informal resolution of a zoning dispute with a local agency . . . does not, by itself, constitute final government action."); *Waterways*, 813 N.Y.S.2d at 486 (dismissing claim on ripeness grounds, where "[t]he only challenged actions [were] conversations with, and letters from, various Town of Brookhaven officials," which the court concluded did not "have any final effect on the validity of the variance at issue and/or the issuance of a building permit allowing the construction of the units").

Plaintiffs suggest that, by adopting the challenged ordinances, Defendants have made a final decision to bar Plaintiffs from building the rabbinical college on the Subject Property. (Pls.' Mem. 13-14.) Yet, Plaintiffs do not allege that Defendants have rejected any particular development plan that Plaintiffs have formally submitted to Defendants. Rather, Plaintiffs broadly charge that Defendants have been hostile to the *idea* of a rabbinical college ever since some information about the putative college leaked. Indeed, Plaintiffs assert that "Defendants' conduct . . . has been made in a total vacuum of any information about the plans for the [r]abbinical [c]ollege and without seeing any of the studies performed . . . ." (SAC ¶ 185.) But, that void is the direct result of Plaintiffs' decision not to make a formal application to the Village (complete with the necessary details about the use of the Subject Property). Instead of identifying a final decision by Defendants to reject a particular land development plan, Plaintiffs have cited only the zoning ordinances that they believe would bar them from building a rabbinical college—which ordinances they seek to invalidate, based on how they *might be* applied to the would-be college. Thus, it is Plaintiffs who are attempting "to address important

36

and potentially complex constitutional and regulatory issues in a vacuum." *Kittay*, 112 F. Supp. 2d at 349; *see also S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 504 (9th Cir. 1990) ("Since no meaningful application has been made, there has been no final determination regarding allowable development of these properties and the district court properly concluded appellants' as-applied claim is not ripe for federal adjudication.").

### ii.  The Futility Exception

The Second Circuit has recognized a futility exception to the final decision requirement, cautioning that "the finality requirement [should not be] mechanically applied." *Murphy*, 402 F.3d at 349.  While "[t]he Second Circuit has not yet determined what the precise contours of the futility exception are," *Homefront*, 570 F. Supp. 2d at 407 (internal quotation marks omitted); *see also Osborne v. Fernandez*, No. 06-CV-4127, 2009 WL 884697, at *5 (S.D.N.Y. Mar. 31, 2009) (noting that the contours of the futility exception have "not yet [been] definitively delineated by the Second Circuit"), the consensus among courts appears to be that to invoke the futility exception, a plaintiff must demonstrate:  (1) "that plaintiff has filed 'at least one meaningful application,'" and (2) "the inevitability of refusal of the[] application, taking into consideration factors such as 'the defendants' hostility, delay and obstruction,'" *Osborne*, 2009 WL 884697, at *5 (quoting *Dix v. City of New York*, No. 01-CV-6186, 2002 WL 31175251, at *6-7 (S.D.N.Y. Sept. 30, 2002)); *see also S&R Dev. Estates*, 588 F. Supp. 2d at 463-64.[9]

---

[9] Courts have described the futility exception as being "narrow."  *See Gilbert v. City of Cambridge*, 932 F.2d 51, 60-61 (1st Cir. 1991) (noting that courts have recognized a "narrow" "futility exception" to the final decision requirement); *Roman Catholic Bishop of Springfield v. City of Springfield*, 760 F. Supp. 172, 182-83 (D. Mass. 2011) (same); *Goldfine*, 80 F. Supp. 2d at 159 (same).

Plaintiffs contend that the futility exception is met here, because the Village officials "lack discretion to grant any administrative relief and have 'dug in their heels' against the Congregation." (Pls.' Mem. 16.) In particular, Plaintiffs claim that there is no way for them to obtain a land use permit to build a rabbinical college, because the re-written zoning laws bar any administrative relief, including zoning variances, special use permits, and administrative appeals. As such, Plaintiffs claim that the only way they can develop the Subject Property to construct a rabbinical college is through a legislative fix—for example, a text amendment to change the zoning laws.[10] And, even if they were required to do this under *Williamson* (which Plaintiffs

[10] The process to obtain a text amendment in the Village appears to be the following: (1) The applicant files a petition for amendment describing the proposed changes with the Village Clerk—the Board of Trustees has discretion to decide whether to consider formally the proposed amendment; (2) if the proposed amendment is to be considered, the Board of Trustees must refer it to the appropriate Village entities and/or individuals for a review and report; (3) the Village Planning Board shall confer with the applicant and assist the applicant in revising its petition and resubmitting it to the Board of Trustees (and to the board, agency, or official to which it was referred by the Board of Trustees); (4) within 45 days of the referral or the re-submission, the Village Planning Board and the board, agency, or official to which the proposed amendment was referred shall report to the Board of Trustees regarding the advisability of the proposed amendment—failure to report within 45 days shall be construed as approval of the amendment; (5) the Village Attorney shall report to the Board of Trustees regarding the form of the amendment; and (6) the Board of Trustees shall give notice of a public hearing and hold such public hearing upon receipt of the reports and any revised amendment. *See* Vill. of Pomona, N.Y. Code §§ 130-35–130-41.

The process to obtain a special use permit appears to entail the following: (1) An applicant must submit a formal application describing, inter alia, the proposed use—the application will be considered by the Board of Trustees or the Zoning Board (depending on the proposed use); (2) the relevant board refers the application to the appropriate Village board, agency, or official for a review and report, due within 30 days of the referral; (3) within 62 days after the receipt of the completed application, a public hearing must be held after appropriate notice has been given; and (4) within 62 days of the public hearing, the Board of Trustees or the Zoning Board must decide the application. *See* Vill. of Pomona, N.Y. Code § 130-28(E).

Defendants argue that the process of seeking a text amendment is akin to an administrative remedy that Plaintiffs could have, but have not, pursued. The Court need not resolve the question of whether seeking a text amendment is legislative as opposed to an administrative act, because, in either case, Plaintiffs' failure to submit one meaningful application thwarts their attempt to invoke the futility exception to the final decision rule.

claim they are not), Plaintiffs allege that Defendants' discriminatory animus towards Plaintiffs is so entrenched that it would be hopeless to change the zoning laws.

As an initial matter, Plaintiffs' position conflates the finality requirement with the exhaustion requirement. As the Supreme Court explained in *Williamson*:

> The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable. While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

473 U.S. at 192-93 (citations omitted). The final decision rule, as noted above, requires a land use plaintiff to establish that it obtained "a final, definitive position as to how it could use the property from the entity charged with implementing the zoning regulations." *Murphy*, 402 F.3d at 348. This "jurisdictional prerequisite conditions federal review on a property owner submitting at least one meaningful application for a variance." *Id.*; *see also City of Turlock*, 483 F. Supp. 2d at 999 ("Before a decision is final the landowner must have submitted one formal development plan and sought a variance from any regulations barring development in the proposed plan[, both of which] have been denied."). A landowner plaintiff may avoid dismissal on ripeness grounds, however, by establishing the futility of pursuing administrative remedies, such as variances, re-applications, or appeals to zoning boards. *See Murphy*, 402 F.2d at 349 ("A property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile."); *S. Pac.*, 922 F.2d at 504 ("While it is true that something called a 'futility exception' exists, this exception serves

only to protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.").  What the futility exception does not discharge, however, is "an owner's obligation to file one meaningful development proposal."  *S. Pac.*, 922 F.2d at 504.  Indeed, courts have explicitly and consistently held, a "[property owner] cannot rely upon the futility exception" until he or she makes "at least one 'meaningful application.'"  *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1455 (9th Cir. 1987); *see also Guatay Christian Fellowship*, 670 F.3d at 982 (holding that property owner could not invoke the futility exception, because it had not submitted a meaningful permit application); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 525 (6th Cir. 2004) ("[While] a plaintiff need not seek a variance from a regulation where it would be an idle and futile act[,] the exception only applies where a landowner has submitted at least one meaningful application for a variance." (internal quotation marks omitted)); *Gilbert*, 932 F.2d at 61 ("[T]he filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception."); *Herrington v. County of Sonoma*, 857 F.2d 567, 569 (9th Cir. 1988) (per curiam) ("A property owner cannot rely on the futility exception until he or she makes at least one meaningful application."); *Unity Ventures*, 841 F.2d at 775-76 (holding that at least one formal application must be filed before a court can determine whether futility is met); *S&R Dev. Estates*, 588 F. Supp. 2d at 463-64 (same); *Osborne*, 2009 WL 884697, at *5 (same); *City of Turlock*, 483 F. Supp. 2d at 999 (same); *Westhab, Inc. v. City of New Rochelle*, No. 03-CV-8377, 2004 WL 1171400, at *11 (S.D.N.Y. May 3, 2004) (same); *Kittay*, 112 F. Supp. 2d at 349-50 (same).  Put another way, there is no such thing as a futility exception to the requirement that a landowner make at least one formal application before bringing the type of as-applied challenges brought by Plaintiffs here.

Requiring one meaningful application ensures that local zoning authorities have at least one opportunity to consider how local regulations apply to a proposed use before the regulations are subject to judicial review. *See Church v. City of Medina*, No. 11-CV-0275, 2012 WL 2395195, at *5 (D. Minn. June 25, 2012) ("A decision on the merits of any of the courts would require the decisionmaker to know how the City would have responded to the Church's withdrawn permit application."). Relatedly, the meaningful application requirement enables a court to consider the applicability of the challenged regulations to a formal plan, the precise details of which might well dictate the outcome of the litigation. As one court has explained in terms that apply to this case:

> Although [plaintiffs] opposed the rezoning of the subject properties between 1983 and 1985, they gave no indication at that time of how they might intend to develop the property if permitted to do so. They filed no meaningful applications for development of the property, for variances, or for any other form of relief before filing this federal complaint. To address this claim in this posture, federal courts would be required to guess what possible proposals [plaintiffs] might have filed with the City, and how the City might have responded to these imaginary applications.

*S. Pac.*, 922 F.2d at 504 (footnote omitted).

Here, in the absence of a formal application, the particulars of the Congregation's planned use remain abstract. For example, the Amended Complaint does not allege the size of the dormitories that Plaintiffs propose to build, and Plaintiffs have provided inconsistent representations on this point. (SAC ¶ 212 (alleging that Plaintiffs' counsel "stated [in a letter to the Village's Counsel] that [Plaintiffs would] seek a development for only 250 students"); Tr. of Oral Argument ("Tr.") 63-64 (stating that the dormitories would house 250 students in the "first phase," but that "there conceivably could be one-thousand units").) Thus, the Court cannot know whether Plaintiffs may pursue development plans that could comport with some, even if

41

not all, of the Village's Zoning Code.  *See Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1551 (11th Cir. 1991) (holding a claim unripe, where the plaintiffs had not sought variances or attempted to pursue "less ambitious development plans").  Moreover, the Village has not had the opportunity to review any plans, to hold a public hearing, or to decide whether any part of the Congregation's plan complies with the Village's Zoning Code (including ordinances other than those attacked facially by Plaintiffs).  Under such circumstances, the Court cannot "know precisely how [the ordinances] will be applied to [this] particular parcel."  *Murphy*, 402 F.3d at 348; *see also City of Medina*, 2012 WL 2395195, at *5 ("The City's decision [on a withdrawn permit application] would . . . allow the Court to know how the zoning ordinance would be applied to the Church's property, so that it could apply the appropriate statutory or constitutional analysis to the City's treatment of the Church.").  In other words, the question of how the Village's zoning ordinances would be applied is purely speculative, because the rabbinical college, while a genuine and real aspiration of Plaintiffs, is, at this point, still merely an undefined plan.

Plaintiffs contend that, notwithstanding their failure to submit a single application, rejection of their application is certain, because no Village official or entity has discretion to approve Plaintiffs' proposed use of the Subject Property as a rabbinical college under the Village's Zoning Code.  (Pls.' Mem. 17.)  The Second Circuit has indeed noted that a plaintiff may be excused from pursuing all available administrative remedies if "a zoning agency lacks discretion to grant variances."  *Murphy*, 402 F.3d at 349.  Here, for example, it is undisputed that the Village's zoning authorities would not have the discretion to issue a special use permit for an unaccredited institution or to issue certain variances under the Village's Zoning Code.  (Defs.'

Mem. 10.)[11] In other words, Plaintiffs argue that the futility exception should apply here, because they have no option of persuading the Village to change its Zoning Code or of seeking a variance or special use exception of any kind. But, again, for Plaintiffs to invoke the futility exception on the claim that they could not seek a special use permit or a variance of any kind, because they are not entitled to either under the Village's Zoning Code, they nonetheless had to have submitted at least one formal application for development of the Subject Property before bringing their as-applied claims.

To be sure, courts have regularly found that the futility exception applies in instances where landowners could not, by law, obtain a variance under local zoning ordinances, but only where the landowner had submitted a formal application. For example, in *Hoehne*, the landowners purchased a sixty-acre parcel of land and then subsequently submitted a subdivision application to the county planning commission, proposing to divide the property into four lots with an average of fifteen acres per lot. 870 F.2d at 530. At the time of the formal proposal, the

---

[11] The Parties agree that the rabbinical college would not qualify for a special use permit if, as Plaintiffs allege, there exists no formal accreditation process for the rabbinical college, because the Village's Zoning Code allows special use permits to issue only to an *accredited* "educational institution," *see* Vill. of Pomona, N.Y. Code § 130-4. (SAC ¶¶ 93, 95, 105-06.) Defendants have also accepted Plaintiffs' representation that the rabbinical college could not meet the Village's criteria for granting a use variance, because Plaintiffs cannot show at least three of the six mandatory requirements for granting a variance, in particular (a) that "the property in question cannot yield a reasonable return if used only for a purpose allowed in that district[,] (b) [t]hat the plight of the owner is due to unique circumstances affecting the property which is the subject of the application and not to general conditions in the neighborhood[,]" and "(e) [t]hat the unnecessary hardship claimed as a ground for the variance has not been created by the owner." (Pls.' Mem. 18 n.30 (quoting Vill. of Pomona, N.Y. Code § 130-28(D)(1)).) *See United States v. Airmont*, No. 05-CV-5520, slip op. at 8 n.3 (S.D.N.Y. Nov. 12, 2008) (noting that a property owner's failure to apply for a variance after its formal application was rejected was excused as futile where the property owner "would almost certainly be unable to establish the factors that it would be required to show to obtain a use variance"); *cf. Bikur Cholim*, 664 F. Supp. 2d at 286 (noting that it would have been futile for plaintiffs to appeal the denial of their variance application, where the property plainly did not meet the criteria required for a variance).

43

property was zoned to permit single-family residences with a five-acre minimum.  *Id.*  The

planning commission voted to deny the request, which recommendation was adopted by the

board of supervisors.  *Id.* at 531.  "Subsequent to the Board's decision, the County amended its

General Plan land-use designation" to change the designation of the subject parcel to

"Agricultural Rangeland," thereby imposing a forty-acre minimum lot size and legally barring

the plaintiffs' proposed subdivision plan.  *Id.*  Plaintiffs brought an action challenging the

county's actions.  The Ninth Circuit held that it "would have been futile for the [land owners] to

seek a zoning variance *to accommodate their application* because the supervisors, by legislative

act, changed the zoning designation from a minimum lot size of five acres to one of forty acres,"

and because a "variance [was] not available for exceptions to the requirements of the General

Plan."  *Id.* at 534-35 (emphasis added).[12]

    However, just five years later, the Ninth Circuit confronted a challenge to a

municipality's general plan and water moratorium.  *See Kawaoka v. City of Arroyo Grande*, 17

F.3d 1227 (9th Cir. 1994).  The district court dismissed the action, concluding that plaintiffs'

failure to submit a formal development plan doomed the as-applied challenges as unripe.  *See id.*

---

[12] Other courts have reached similar conclusions—i.e., that a land owner may claim futility if he or she has submitted a formal application to municipal officials, and if the applicable zoning laws bar any variances or other administrative remedies.  *See, e.g.*, *Herrington*, 857 F.2d at 570 (holding that plaintiffs who had submitted a "32-unit subdivision proposal" were not required to seek a variance where the municipal board had rezoned the property to bar the proposal, and where the zoning ordinance did not permit any variances); *Roman Catholic Diocese*, 2012 WL 1392365, at *1, *6 (holding that plaintiff had satisfied ripeness requirements when, after plaintiffs filed a formal development plan, municipality adopted a law barring the proposed use and prohibited plaintiffs from appealing to the municipality's zoning board of appeals); *City of Turlock*, 483 F. Supp. 2d at 999-1001 (finding landowner's claim was ripe, where landowner had filed an application and revised application to open a "discount superstore," and where the local zoning law barred such stores and did not allow for variances).

at 1232.  On appeal, plaintiffs cited *Hoehne* "for the proposition that they [were] not required to seek a legislative amendment to undo that which ha[d] just been done by the legislature." *Id.* at 1233.  In rejecting this claim, the Ninth Circuit concluded that *Hoehne* was "unhelpful" to the plaintiffs, because "even in *Hoehne*, the [plaintiffs] had applied to the City to develop their property and been rejected," whereas "in the present case, the Kawaokas have filed no such application." *Id.* (citing *S. Pac.*, 922 F.2d at 503).  And so it is here.  While Plaintiffs may well be right that they could not have sought a variance or special use permit, that alone does not make their as-applied challenges ripe, because they did not submit a formal application to develop the Subject Property.

Furthermore, in the absence of even one meaningful application, the Court cannot conclude that the Village's rejection of Plaintiffs' application is virtually certain, as required to demonstrate futility.  *See Murphy*, 402 F.3d at 349 (noting that the futility exception might apply if the zoning agency has "made clear that all such applications will be denied"); *Gilbert*, 932 F.2d at 61 ("To come within the exception, a sort of inevitability is required:  the prospect of refusal must be certain (or nearly so)."); *Osborne*, 2009 WL 884697, at *5 (explaining that a plaintiff must show, inter alia, "the inevitability of refusal of their application" to demonstrate futility); *Tri-State Video Corp. v. Town of Stephentown*, No. 97-CV-0965, 1998 WL 72331, at *4 (N.D.N.Y. Feb. 13, 1998) (deciding not to apply the futility exception despite open hostility of the town and its officials toward the plan, because the Zoning Board of Appeals "ha[d] yet to issue any ruling on . . . [the p]laintiffs' proposed use of the property").  Plaintiffs contend that the futility exception should apply here, because the Village has exhibited such hostility toward the notion of a rabbinical college that it would almost certainly reject any application by Plaintiffs.  In support of this claim, Plaintiffs highlight their allegations that the ordinances were

45

enacted specifically to prevent the construction of a rabbinical college and that Village officials and members of the community have expressed discriminatory animus toward Plaintiffs' plans.

Plaintiffs' claims about the letters written by the Village attorney and Mayor Sanderson and the comments allegedly made by other Village officials, if true, are indeed troubling. But these individuals are not the only Village officials who would consider a formal application, if it were ever made. The fate of any formal proposal therefore remains an unanswered question. This conclusion finds support in the case law. For example, in *Homefront*, the court refused to excuse the plaintiff's failure to submit a single formal application based on the futility exception despite statements by the Mayor of the defendant Village that the "proposed project was 'not happening in our town'" and that the defendants "would not permit plaintiffs to build anything on the [subject] property." 570 F. Supp. 2d at 401, 402. In rejecting the plaintiffs' claim of futility, the court emphasized that "[the Mayor] could change his mind regarding the proposal or, regardless of [his] negative views, the Planning Board or the [Board of Zoning Appeals] could approve the proposal." *Id.* at 409. Other courts faced with only the public statements of some municipal officials and a failure by the landowner plaintiff to submit a formal application have similarly declined to apply the futility exception. *See Roman Catholic Bishop*, 760 F. Supp. 2d at 183 ("[T]he City's decision to pass the Ordinance in no way predetermines the outcome of an application for an exemption. . . . It would be perfectly consistent for the City to enact this Ordinance in an effort to stave off the possibility of demolition and later provide an exemption for Plaintiff to remove features of the Church's facade."); *Loesel*, 2009 WL 817402, at *13 ("[T]he City Council and Planning Commission consist of several members and absent any definitive action taken by them as a group, evidence of the strength of a single person's point of

view . . . does not adequately show that Defendant would have rejected Wal-Mart's proposal or request for a variance.").[13]

Thus, the Court declines to speculate about the likelihood that the Village Board of Trustees would reject the Congregation's plans (whatever they may be). Instead, the Village Board of Trustees "should be given an opportunity to reach a final decision as to how it will apply the [Village's zoning laws] to the property at issue." *Congregation Anshei Roosevelt v. Planning & Zoning Bd. of Roosevelt*, No. 07-CV-4109, 2008 WL 4003483, at *13 (D.N.J. Aug. 21, 2008); *see also id.* (dismissing claims on ripeness grounds, because plaintiffs had yet to apply for a variance, which would not have been futile), *aff'd*, 338 Fed. App'x 214 (3d Cir. 2009). Accordingly, Plaintiffs' claims under New York Civil Rights Law § 40-c, as well as Plaintiffs' as-applied challenges to the Village's zoning regulations under the First Amendment, the Fourteenth Amendment, the New York Constitution, and RLUIPA are not ripe for adjudication, and these claims are dismissed without prejudice.

### iii. Ripeness of FHA Claims

Defendants do not appear specifically to challenge the ripeness of Plaintiffs' claims under the FHA.[14] Nevertheless, as ripeness is a jurisdictional matter, the Court separately

---

[13] Plaintiffs' allegations about the cool reaction to their *informal* overtures to Village officials about the rabbinical college do not alter the analysis. *See Loesel*, 2009 WL 817402, at *13 ("To determine that Defendant would have rejected an application that was never completed, based on the result of only a preliminary meeting, would be entirely speculative. Thus, Plaintiffs' claims do not meet the finality requirement, and they may not advance their challenge to the ordinance as applied to their property.").

[14] Three theories of discrimination are available to a plaintiff alleging a violation of the FHA or Title II of the Americans with Disability Act ("ADA"): (1) intentional discrimination; (2) disparate impact; and (3) refusal to make a reasonable accommodation. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003); *Lapid Ventures, LLC v. Township of Piscataway*, No. 10-CV-6219, 2011 WL 2429314, at *5 (D.N.J. June 13, 2011). Plaintiffs

addresses the question of whether Plaintiffs' as-applied FHA claims are ripe for adjudication. The Second Circuit has not explicitly decided whether the final decision requirement applies to FHA claims.  As noted above, Plaintiffs understandably point to *LeBlanc-Sternberg*, in which the Second Circuit allowed the plaintiffs to recover under the FHA for a municipality's discriminatory enactment of a zoning code.  In that case, the Second Circuit observed that the FHA explicitly grants standing to "anyone who believes he [or she] '*will* be injured by a discriminatory housing practice *that is about to occur*.'"  67 F.3d at 425 (quoting 42 U.S.C. § 3602(I) (emphasis in original).  The *LeBlanc-Sternberg* court further noted that "where it has been established that a zoning ordinance will likely be applied in a discriminatory manner, it is unnecessary that the municipality actually so apply it before the ordinance may properly be

_____

appear to be relying on the first two theories.

challenged." *Id.*[15] It is this statement on which Plaintiffs rely in asserting that their FHA claims are ripe.

However, notwithstanding Plaintiffs' view of *LeBlanc-Sternberg*, the lower courts within the Second Circuit have, since that decision, regularly held that the ripeness analysis derived

---

[15] In support of this proposition, the *LeBlanc-Sternberg* panel cited the Eighth Circuit's decision in *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208 (8th Cir. 1972). In *Park View Heights*, the plaintiffs included two non-profit groups that sought to build a multi-family housing development and eight individuals suing as a class. The developers submitted an application to build the apartments to the Department of Housing and Urban Development ("HUD"), after securing a mortgage and completing all architectural, legal, and organizational planning. *Id.* at 1210-11. As a result of this planning, HUD issued a "feasibility letter," which was "tantamount to a contractual obligation" to support the project. *Id.* at 1211 (internal quotation marks omitted). In response to the feasibility letter, area residents organized an effort to incorporate the area that included the proposed housing development (and to call it, of all things, "the City of Black Jack"). Subsequently, the city council adopted a zoning ordinance that "effectively prevent[ed] the construction of new multi-family dwelling units within" the newly incorporated city. *Id.* Plaintiffs brought an action challenging the zoning ordinance as, inter alia, an unlawful taking, and as violating the Thirteenth and Fourteenth Amendments, as well as the FHA. *Id.* The district court dismissed, concluding that the claims were not ripe, because no building permit had been denied, and no variance had been sought. *Id.* at 1212. In reversing, the Eighth Circuit held that the case was ripe, because it "kn[e]w the conduct intended by the plaintiffs, as well as the actions which [had] been taken by the defendants." *Id.* at 1215.

To the extent Plaintiffs might suggest that *Park View Heights* stands for the proposition that a land use plaintiff can show that its FHA claims are ripe even without formalizing the land use development plan, they would be overreaching. First, *Park View Heights* was decided well before *Williamson County*, which has been interpreted to apply to a wide variety of land use claims, including the FHA. Indeed, the Eighth Circuit, notwithstanding its own holding in *Park View Heights*, has held that a plaintiff bringing a reasonable accommodation claim under the FHA must permit the municipality an opportunity to consider a formal application. *See Oxford House-C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir. 1996) ("Congress . . . did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance."). Second, this case is distinguishable from *Park View Heights*, because, in that case, the development plans were concrete, finalized, and publicly known, whereas here they are far from developed or publicly known. Indeed, the Eighth Circuit itself has declined to apply *Park View Heights* when the development at issue is filled with uncertainties. *See Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 960 (8th Cir. 2001) ("In *Park View*, we considered an attack on a zoning ordinance that prohibited the construction of multiracial housing. We noted the architectural and engineering plans for the building were complete, and the City could do nothing further to exclude the plaintiffs from the community. In our case, however, there are many unresolved uncertainties." (citation omitted)).

from *Williamson* applies to as-applied FHA claims.  *See Jenkins v. Eaton*, No. 08-CV-0713, 2009 WL 811592, at *3 (E.D.N.Y. Mar. 27, 2009) (noting that the ripeness doctrine under *Williamson* "extends both to equal protection and due process challenges, as well as to related claims under the FHA" (citation omitted)); *S&R Dev. Estates*, 588 F. Supp. 2d at 461 ("Courts in this Circuit have also applied the [*Williamson*] ripeness doctrine to FHA claims."); *Town & Country Adult Living, Inc. v. Village/Town of Mount Kisco*, No. 02-CV-0444, 2003 WL 21219794, at *2 (S.D.N.Y. May 21, 2003) (recognizing applicability of final decision requirement to FHA claims and concluding that it had been satisfied); *Tsombanidis v. City of West Haven*, 129 F. Supp. 2d 136, 160-61 (D. Conn. 2001) (holding that FHA reasonable accommodation claim was not ripe, because the city had not been given an opportunity to consider plaintiff's land use request); *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 770-71 (E.D.N.Y. 1999) (applying *Williamson* to FHA claim, but holding that plaintiff had received final denial of special use permit).  *But see Advocacy & Res. Ctr. v. Town of Chazy*, 62 F. Supp. 2d 686, 688-89 (N.D.N.Y. 1999) (determining that FHA claim was ripe despite the plaintiffs' failure to apply for a variance).  And, since *LeBlanc-Sternberg*, the Second Circuit has held that a plaintiff must provide a government entity an opportunity to accommodate the plaintiff's intended use, so that the government entity can "know what a plaintiff seeks prior to incurring liability" for violating the FHA.  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 579 (2d Cir. 2003).

Illustrative of these decisions is *Woodfield Equities, L.L.C. v. Inc. Village of Patchogue*, 357 F. Supp. 2d 622 (E.D.N.Y. 2005).  In that case, the plaintiffs challenged a village's condemnation of their property on the grounds that the condemnation violated the FHA, the ADA, and the Rehabilitation Act.  *Id.* at 630.  In rejecting the plaintiffs' application for a

preliminary injunction, the court found that the FHA, ADA, and Rehabilitation Act claims were not ripe, because the plaintiffs had not made any proper application to the village for the right to operate the property as they wished (to run a residential recovery center).  *Id.* at 631-32. Although the *Woodfield Equities* court acknowledged the broad standing afforded under statutes like the FHA and ADA, and, in fact, cited *LeBlanc-Sternberg*, it nonetheless concluded that the claims were not ripe, because the condemnation was not a final decision.  *Id.* at 632 ("Ideally, the submission of at least one purposeful application that is subsequently denied, meets the finality requirement. . . .  Plaintiffs never submitted an application to the Village for a use variance or special permit.").[16]

The consensus view among the lower courts within the Second Circuit—that as-applied challenges under the FHA are not ripe unless the plaintiff has submitted at least one formal application for relief—is shared by courts outside our circuit.  *See, e.g.*, *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Scotch Plains*, 284 F.3d 442, 451 n.5 (3d Cir. 2002) (noting that requiring local land use entities to have an opportunity to comply with an FHA reasonable accommodation request before an FHA claim can be considered ripe is consistent with holdings from other circuits); *Oxford House-A v. City of University City*, 87 F.3d 1022, 1024-25 (8th Cir. 1996) ("The Oxford Houses must give the City a chance to accommodate them through the City's established procedures for adjusting the zoning code."); *United States v. Village of Palatine*, 37 F.3d 1230, 1233 (7th Cir. 1994) (citing *Williamson* in holding that plaintiffs' FHA

----

[16] The Second Circuit affirmed the denial of the preliminary injunction.  *See* 156 Fed. App'x. 389 (2d Cir. 2005).  In affirming, the Second Circuit noted that the plaintiff had filed an action in state court challenging the village's condemnation and that the state court had issued a stay, freezing the condemnation.  *Id.* at 391.  Thus, the Second Circuit did not need to reach the question of the ripeness of the action.

reasonable accommodation claims were not ripe, because plaintiffs had not sought a reasonable accommodation of the village); *Marriott Senior Living Servs., Inc. v. Springfield Township*, 78 F. Supp. 2d 376, 385-86 (E.D. Pa. 1999) (noting that "it is undisputed that Marriott never submitted a Preliminary Plan and Final Plan pursuant to the Township's . . . Ordinance[,]" and accordingly finding plaintiff's FHA claim unripe); *Oxford House, Inc. v. City of Virginia Beach*, 825 F. Supp. 1251, 1261-62 (E.D. Va. 1993) ("[T]he zoning process is not remedial in nature because, unless and until plaintiffs are denied a conditional use permit or the required conditions are established, the City has not fully applied its zoning scheme to them and, consequently, plaintiffs' claims of discrimination . . . are not ripe for adjudication . . . .").

Plaintiffs correctly note that a landowner asserting an as-applied FHA claim need not always "first pursue remedies under local zoning laws." (Pls.' Mem. 21.) Indeed, the Second Circuit has held that, by its terms, the FHA does not require a plaintiff to exhaust all local remedies before bringing an action in federal court. *See Huntington*, 689 F.2d at 393 n.3 (2d Cir. 1982); *see also Tsombanidis*, 352 F.3d at 579 ("It may be that once the governmental entity denies [a reasonable] accommodation, neither the FHA nor the ADA require a plaintiff *to exhaust* the state or local administrative procedures." (emphasis in original)). This is the view of other courts as well. *See, e.g.*, *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000) (holding that FHA reasonable accommodation claim was ripe when the accommodation was denied, and that plaintiff did not need to pursue remedies in subsequent proceedings); *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir. 2000) (same). But none of these courts has permitted an as-applied challenge to a zoning ordinance, asserted under the FHA, to proceed until the plaintiff has made at least one formal application detailing the proposed use of the property at issue, thus allowing the government entity to make

a decision regarding the plaintiff's request. *See Lapid-Laurel*, 284 F.3d at 451 n.5 (suggesting agreement with decisions in other circuits that as-applied challenges under the FHA "must first be presented to local land use boards" before being ripe (citing *Village of Palatine*, 37 F.3d 1230)); *Bryant Woods*, 124 F.3d at 602 (noting that the county "must be afforded an opportunity to make a final decision," even if plaintiff is not required to pursue "post-decisional procedures," as would be required in a takings case (citing *Williamson*, 473 U.S. at 195)); *Marriott Senior Living Servs.*, 78 F. Supp. 2d at 385-86 ("While strict compliance with every local ordinance or regulation is not required, before the denial of a reasonable accommodation claim may be deemed final, the applicant must show that under the circumstances it has afforded the appropriate local authority a reasonable opportunity to consider the project in some final form . . . ."). In other words, even if a plaintiff may satisfy the final decision rule without exhausting his or her administrative remedies, there is no authority for the proposition that a plaintiff can satisfy the final decision rule without making at least one formal application to the relevant governmental entity. *See Marriott Senior Living Servs.*, 78 F. Supp. 2d at 385 ("Marriott clearly did not progress beyond preliminary discussions with Township officials and submission of the Sketch Plan under the Township's informal procedure."). Thus, Plaintiffs' as-applied challenges under the FHA are not yet ripe and are dismissed without prejudice.

However, as is true with Plaintiffs' constitutional challenges to the zoning ordinances, the ripeness of Plaintiffs' facial FHA challenges presents a different question. To the extent that Plaintiffs allege under the FHA that the Village adopted the challenged ordinances with a discriminatory purpose, those claims may proceed. *See Jackson v. Okaloosa County*, 21 F.3d 1531, 1541 n.16 (11th Cir. 1994) (finding that FHA claims were ripe, where plaintiffs alleged that "the adoption of the Policy itself violated the Fair Housing Act because the Policy was

adopted with discriminatory purpose and/or with disparate impact"); *Caron Found. of Fla, Inc. v. City of Delray Beach*, --- F. Supp. 2d ---, No. 12-CV-80215, 2012 WL 2249263, at *6-8 (S.D. Fla. May 4, 2012) (holding that plaintiff's as-applied, reasonable accommodation claim was not ripe, but that plaintiff's facial challenge, based on a claim of disparate treatment, was ripe); *Lapid Ventures*, 2011 WL 2429314, at *6 (noting that plaintiffs' reasonable accommodation claim was not ripe, but that plaintiffs' disparate treatment and disparate impact claims were ripe, because plaintiffs alleged that the zoning ordinances at issue were adopted for "a discriminatory purpose").

Thus, Plaintiffs' facial challenges under the FHA to the Village's zoning ordinances are ripe for review.[17]

### C.  Plaintiffs' Facial Challenges

Plaintiffs contend that the challenged ordinances facially violate the Equal Protection Clauses of both the Federal Constitution and the New York Constitution, the Free Exercise, Free Speech, and Free Association Clauses of the First Amendment and corollary protections in the New York Constitution, the FHA, and RLUIPA.  Defendants argue that Plaintiffs' allegations fail to state a valid facial challenge to the Village's zoning ordinances.  (Defs.' Mem. 18-24.)  A facial challenge is one that "address[es] not the application of [an ordinance] to a particular set of plaintiffs . . ., but the [legality] of the [ordinance]" itself.  *Washington v. Glucksberg*, 521 U.S. 702, 739-40 (1997) (Stevens, J., concurring); *see also Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006) ("Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications;

---

[17] Moreover, because Defendants have not challenged Plaintiffs' FHA claims as failing to state a claim under Rule 12(b)(6), those claims may proceed.

as-applied, in a personal application)." (emphasis in original)), *overruled on other grounds*, *Bond v. United States*, 131 S. Ct. 2355 (2011).

"A plaintiff making a facial claim faces an 'uphill battle' because 'it is difficult to demonstrate that the mere enactment of a piece of legislation' violates the plaintiff's constitutional rights." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) (quoting *Suitum*, 520 U.S. at 736 n.10). Indeed, facial challenges are "generally disfavored," because facial invalidation is "strong medicine" that "has been employed by the [Supreme] Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). The Supreme Court has explained that "[f]acial challenges are disfavored for several reasons." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). First, "[c]laims of facial invalidity often rest on speculation. As a consequence, they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). Second, "[f]acial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotation marks omitted). Finally, courts must be mindful that "'a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Id.* at 451 (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006)) (brackets omitted). With these considerations in mind, the Court now turns to Plaintiffs' facial attacks.

1.  Relevance of Discriminatory Motive to Plaintiffs' Facial Challenges

As a threshold matter, the Court considers Plaintiffs' argument that the motive behind the enactment of the challenged ordinances is relevant to their facial challenges. Plaintiffs contend that in addition to examining the text of the challenged ordinances, the Court must also consider whether the ordinances were "enacted with a discriminatory *purpose*" to determine their facial validity. (Pls.' Mem. 10 (emphasis in original).) In particular, Plaintiffs argue that the motivation behind the ordinances is relevant to their facial claims under the Equal Protection Clause, the Free Exercise Clause, and the Free Speech Clause. Defendants argue that the "subjective motivation" of those who enacted the challenged ordinances is irrelevant to the Court's determination of the challenged ordinances' facial validity. (Defs.' Mem. 19 (internal quotation marks omitted).)

Normally, courts treat "the actual intent or motive of the government decisionmakers [as] irrelevant to their inquiry." Alan E. Brownstein, *Illicit Legislative Motive in the Municipal Land Use Regulation Process*, 57 U. Cin. L. Rev. 1, 1 (1988); *see also Arlington Heights*, 429 U.S. at 268 n.18 (noting that questioning legislative motivation represents "substantial [judicial] intrusion into the workings of other branches of government"); *United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); *McCray v. United States*, 195 U.S. 27, 56 (1904) ("The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130 (1810) ("It may well be doubted how far the validity of a law depends upon the motives of its framers . . . ."); *Field Day,*

*LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (noting that a court evaluating "[a] 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual"); *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1292-93 (7th Cir. 1996) (explaining that legislative motive is relevant to only certain constitutional claims); *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1547 (11th Cir. 1994) ("The district court erred . . . in searching for the actual motivation of the legislation . . . [because] the proper inquiry is concerned with the *existence* of a conceivable rational basis, not whether that basis was actually considered by the legislative body." (emphasis in original)).

The difficulty of ascertaining legislative motivation is often cited as a reason why such inquiries normally are to be avoided. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 558 (1993) (Scalia, J., concurring in part and concurring in the judgment) ("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body . . . ."); *Michael M. v. Superior Court of Sonoma Cnty.*, 450 U.S. 464, 470 (1981) (noting that "individual legislators may have voted for the statute for a variety of reasons"); *O'Brien*, 391 U.S. at 383 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). *See generally* John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1212-23 (1970) (discussing arguments against consideration of motive, including difficulty of ascertaining motive). Relatedly, courts question the utility of inquiring into legislative motive. In *O'Brien*, the Supreme Court emphasized the futility of evaluating legislative motive, noting that it makes little sense to void a law that could "be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it."

391 U.S. at 384; *see also Grossbaum*, 100 F.3d at 1293 ("Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution.").

Nevertheless, the Supreme Court recognized in *O'Brien* that there is "a very limited and well-defined class of cases where the very nature of the constitutional question requires an inquiry into legislative purpose." *O'Brien*, 391 U.S. at 383 n.30. For example, courts inquire into the motives of government decisionmakers in deciding both claims of discrimination against a suspect class in violation of the Equal Protection Clause, *see, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (noting that to succeed on an Equal Protection challenge to a redistricting plan, the burden is on the plaintiff to prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (invalidating on its face a law disenfranchising felons, because "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect"); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216-17 (2d Cir. 1987) (explaining that Equal Protection claim alleging racial discrimination require a reviewing court to consider whether government action was motivated by race), and claims of discrimination against religion or religious conduct in violation of the Free Exercise Clause, *see, e.g.*, *Iqbal*, 556 U.S. at 676 ("Where the claim is invidious discrimination in contravention of the First . . . Amendment[], . . . the plaintiff must plead and prove that the defendant acted with discriminatory purpose."); *Lukumi*, 508 U.S. at 533 (explaining that to substantiate a free exercise claim, the plaintiff must show that "the object or purpose of a law is the suppression of

58

religion or religious conduct"); *id.* at 540 (considering events preceding enactment of an ordinance to determine whether it was motivated by religious animus).[18]

---

[18] Defendants contend that the above-mentioned principles, while applicable in the context of as-applied challenges, do not apply in the context of facial challenges. Specifically, Defendants argue that examining the actual motive behind the ordinances' enactment is at odds with the standard by which facial challenges are judged, namely whether the plaintiff has "establish[ed] that no set of circumstances exists under which the [statute] would be valid." *Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008) (second alteration in original) (quoting *Cranley*, 318 F.3d at 110); *see also Bach v. Pataki*, 408 F.3d 75, 89 (2d Cir. 2005) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). There is a debate among the Justices of the Supreme Court as to the validity of the no-set-of-circumstances standard, which was originally announced by the Supreme Court in *Salerno*, 481 U.S. at 745. *See Wash. State Grange*, 552 U.S. at 449 (acknowledging that "some Members of the Court have criticized the *Salerno* formulation"); *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (Opinion of Stevens, J.) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself . . . ."); *id.* at 77-83 (Scalia, J., dissenting) (arguing in favor of the *Salerno* standard). Nevertheless, in the Second Circuit, the *Salerno* standard remains the basis for evaluating most facial constitutional challenges. *See Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 58 n.2 (2d Cir. 2010) (applying *Salerno* to facial challenge to zoning law); *Diaz*, 547 F.3d at 101 (applying *Salerno* standard to facial Due Process challenge). The *Salerno* standard is inapplicable, however, to certain claims, including certain Free Speech and Free Exercise claims. *See Virginia v. Hicks*, 539 U.S. 113, 118 (2003) ("The First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges.").

Under the *Salerno* standard, Defendants argue, regardless of the actual bases for the ordinances' enactment, the ordinances may be upheld if they are justified by some conceivable constitutional basis. (Defs.' Mem. 19.) There is some support in the Second Circuit for the broad outlines of Defendants' argument. In *Giusto v. INS*, 9 F.3d 8 (2d Cir. 1993) (per curiam), the Second Circuit rejected a facial Equal Protection challenge to a congressional amendment to the Immigration and Nationality Act, which distinguished on its face "between aliens who have served at least five years in prison and those who have served shorter terms." *Id.* at 9. The Second Circuit held that the legislative enactment would "not be set aside as the denial of equal protection of the laws if any state of facts reasonably *may be conceived* to justify it." *Id.* at 10 (emphasis added) (internal quotation marks omitted). Similarly, in *Ecogen*, the court explained that a "defendants' subjective motivation in enacting [an ordinance] is irrelevant" to a facial Equal Protection claim, because the "*existence* of a conceivably rational basis" is all that is required to survive a facial challenge. 438 F. Supp. 2d at 157-58 (emphasis in original); *accord S. Lyme Prop. Owners Ass'n*, 539 F. Supp. 2d at 540-41 (rejecting argument that plaintiffs could establish facial Equal Protection claim by showing improper motive).

Nonetheless, these cases are distinguishable from the instant case, because none involved allegations of discriminatory animus grounded in race or religion. *See Giusto*, 9 F.3d at 9-10

Motive also can be relevant to Free Speech claims.  For example, where government restricts speech based on its content, a reviewing court may consider the government's motive to determine whether the government has impermissibly restricted speech merely because public officials disapprove the speakers' views.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 812 (1985) (noting that government may not restrict speech "to suppress a particular point of view"); *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 n.8 (4th Cir. 1989) (explaining that legislative motive "may be relevant when the challenged legislation has on its face some content-based, *direct* inhibiting effect on freedom of speech or some other expressive activity or enterprise" (emphasis in original)).  Nevertheless, while motive is a factor that may be considered, a court may not find a First Amendment violation solely on the basis that a government decisionmaker acted with an improper motive.  *See City of Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 47-48 (1986) (explaining that *O'Brien* had rejected the view that

---

(reviewing governmental classification based on number of years in prison); *S. Lyme Prop. Owners Ass'n*, 539 F. Supp. 2d at 541 (reviewing Equal Protection class of one claim); *Ecogen*, 438 F. Supp. 2d at 157-58 (reviewing a claim based on defendant's aesthetic hostility toward the plaintiffs' project).  Where the alleged motivation behind the enactment of a law is discriminatory animus based on race or religion, courts may look beyond the law's facially neutral text and conceivably rational basis to determine whether the law is on its face invalid. *See Lukumi*, 508 U.S. at 534 ("[An] action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."); *Hunter*, 471 U.S. at 231-32 (invalidating law on its face notwithstanding the law's conceivably legitimate basis, because it was enacted with the purpose of discriminating based on race and had that effect).  This is not inconsistent with the general standard of *Salerno*, which demands that "no set of circumstances exists under which the Act would be valid," because a law that violates the Equal Protection Clause or the Free Exercise Clause will be invalid when applied under any conceivable circumstance, even if it can be justified by a conceivably benign motive.  *See Hunter*, 471 U.S. at 231-33 (invalidating law on its face on Equal Protection grounds based on its discriminatory purpose and effect, and noting that even if the same law could be validly enacted under the Tenth Amendment, "the enactment of [the law] violated the Fourteenth Amendment, and the Tenth Amendment cannot save legislation prohibited by the subsequently enacted Fourteenth Amendment").

improper motive of stifling expression, without more, invalidates a law or government action); *O'Brien*, 391 U.S. at 383 (declining to strike down a law on First Amendment grounds solely on the basis of illicit motive); *M.J.M. Exhibitors, Inc. v. Stern* (*In re G. & A. Books, Inc.*), 770 F.2d 288, 297 (2d Cir. 1985) ("[S]ubjective motivation . . . to suppress [speech] does not [by itself] render [the challenged action] unconstitutional, provided [it] is justified by substantial government interests independent of such motive.").

### 2. Equal Protection Claims

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same).[19] "To prove an equal protection violation, claimants must prove purposeful discrimination" by a government actor, *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)), directed at a suspect class, *id.* (citing *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457-58 (1988)), such as a racial group, *Pyke v. Cuomo*, 567 F.3d 74, 77 (2d Cir. 2009) (per curiam), or a religion, *see Pederson v. Office of Personnel Mgmt.*, No. 10-CV-1750, 2012 WL 3113883, at *12 (D. Conn. July 31, 2012) ("[C]ourts apply the most searching constitutional scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national origin, sex or religion." (alteration in original)

---

[19] Because the equal protection provisions of the New York Constitution are interpreted consistently with the corollary provisions in the Federal Constitution, *see People v. Kern*, 554 N.E.2d 1235, 1240-41 (N.Y. 1990) (holding that the guarantee of Equal Protection under the New York Constitution is co-extensive with that of the Federal Constitution); *People v. McCray*, 443 N.E.2d 915, 918 (N.Y. 1982) ("[O]ur State constitutional equal protection clause is no more broad in coverage than its Federal prototype." (citation omitted)), the Court addresses both challenges here.

(internal quotation marks omitted)).  If the claimants can show purposeful discrimination directed at a suspect class, the government action is "subject to strict judicial scrutiny," and may be upheld only if the government action "further[s] a compelling state interest and [is] narrowly tailored to accomplish the purpose."  *Pyke*, 567 F.3d at 77.

The Second Circuit has identified "three common methods" of "establish[ing] a violation of equal protection by intentional discrimination":  (1) identifying "a law that expressly classifies on the basis of race," (2) identifying "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (3) identifying "a facially neutral [law or] policy that has an adverse effect and that was motivated by discriminatory animus."  *Id.* (internal quotation marks omitted).  Here, Plaintiffs cannot rely on the first method of proving discrimination, because the challenged ordinances are facially neutral with respect to religion (and race).  Nor can Plaintiffs rely on the second method, because Plaintiffs' as-applied challenges to the ordinances are not yet ripe for reasons already explained.  Thus, to establish a claim for discrimination in violation of the Equal Protection Clause, Plaintiffs rely on the third method by claiming that the challenged ordinances, although facially neutral, "ha[ve] an adverse effect and . . . [were] motivated by discriminatory animus."  *Id.* (internal quotation marks omitted); *see also Washington v. Davis*, 426 U.S. 229, 240-41 (1976) (explaining that a facially neutral law or policy violates the Equal Protection Clause if it has both a discriminatory purpose and discriminatory effect).

a.  Discriminatory Purpose

Plaintiffs claim that the challenged ordinances were enacted with a discriminatory purpose.  "Discriminatory purpose 'implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse

effects upon an identifiable group.'" *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir.

1999) (alteration in original) (emphasis omitted) (quoting *Personnel Adm'r v. Feeney*, 442 U.S.

256, 279 (1979)). "Discriminatory intent or purpose typically refers to those instances when a

government actor seeks to disadvantage or negatively impact a group of persons." *Id.*

"'Determining whether invidious discriminatory purpose was a motivating factor demands a

sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"

*Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242).

Here, Plaintiffs' allegations are sufficient to allege discriminatory purpose. First,

Plaintiffs pled that the timing of the enactment of one of the challenged ordinances demonstrates

Defendants' discriminatory animus. Indeed, Plaintiffs allege that one of the three challenged

ordinances, Section 130-4 (defining educational institutions and dormitories), was enacted

within months of the Congregation's purchase of the Subject Property, (SAC ¶¶ 156-57). *See*

*Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988) (noting that plaintiffs had

established triable Equal Protection case based on government conduct that post-dated plaintiffs

entering into a lease to use certain property); *Yonkers*, 837 F.2d at 1221 (noting that

discriminatory intent may be inferred from, among other facts, "'the specific sequence of events

leading up to the challenged decision'" (brackets omitted) (quoting *Arlington Heights*, 429 U.S.

at 267)).

Second, Plaintiffs' allegations of racially charged public comments preceding the

enactment of Sections 130-10 (limiting the size of dormitories pursuant to an educational use)

and 126 (establishing wetland protections) suggests the existence of discriminatory motivation.

For example, in response to racially charged public comments, the Village's then-Mayor

allegedly alluded to the discriminatory purpose behind the enactment of these ordinances by stating that:

> We sitting at this table have limitations that are placed on us as to what we can say, and what we can't say, because our attorney tells us what we can say and what we can't say. I can't say what I feel—I can't—if I agree with you, I don't agree with you, I don't have that luxury of being able to say that here. All that I can say is that every member of this board works very, very hard to do what is best for this community. You have your issues. Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that[,] that we don't agree.

(SAC ¶ 166.) And before the challenged ordinances were enacted, officials in the Village made numerous statements that raise an inference of discriminatory animus:

- Defendants Yagel and Louie "expressly warned a civic association to be careful not to allow discriminatory statements to slip out," (*id.* ¶ 183);

- Defendant Sanderson stated publicly that "[t]he single most important issue facing the village at this time is the as yet un-proposed, but leaked, [r]abbinical [c]ollege development," that the Village should "maintain[] its cultural and religious diversity" and that "the [r]abbinical [c]ollege could not only 'change the village,' but could change 'the makeup of the village,'" (*id.* ¶¶ 179-80 (fourth alteration in original)); and

- Defendants Yagel, Louie, and Sanderson were elected to Village Office based on campaign promises to "fight this plan" and "stand up to this threat," ostensibly referring to the Congregation's plan to build the rabbinical college, (*id.* ¶ 177 (internal quotation marks omitted)).

At this stage in the litigation, these allegations are sufficient to establish Plaintiffs' claim that the challenged ordinances were enacted with the purpose of discriminating against members of Orthodox and Hasidic Jewish communities. *See LeBlanc-Sternberg*, 67 F.3d at 425 (noting that a "plaintiff can establish a *prima facie* case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive" (internal quotation marks

omitted)); *Yonkers*, 837 F.2d at 1221 (noting that discriminatory intent may be established by "contemporary statements by members of the decisionmaking body" (quoting *Arlington Heights*, 429 U.S. at 267) (internal quotation marks omitted)).

b.  Discriminatory Effect

In addition to plausibly alleging discriminatory intent, Plaintiffs must allege that the challenged ordinances have had an adverse effect to make out their Equal Protection claim.  *See Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) (noting that a plaintiff could "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus").  However, in seeking to satisfy this burden, Plaintiffs are not "obligated to show a better treated, similarly situated group of individuals."  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001); *see also id.* (holding that a plaintiff who "alleges that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus[] is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection"); *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 546 (S.D.N.Y. 2006) ("The *Pyke* analysis implicitly recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose.").

Here, Plaintiffs' core claim is that the challenged ordinances have had the foreseeable and adverse effect of prohibiting Plaintiffs from building a rabbinical college in the Village. (SAC ¶ 111.)  For example, Plaintiffs allege that over the years, the Village has adopted a series of legal impediments to prevent "Jewish individuals and institutions from developing the [S]ubject [P]roperty and other nearby properties, while permitting other development within the Village, including a large Hindu temple." (*Id.* ¶ 120.)  According to Plaintiffs, as their plans for

65

the Subject Property evolved, the Village's zoning ordinances also evolved to box out the possibility of a rabbinical college being built. For example, Plaintiffs allege that the Village adopted the dormitory ordinance (Section 130-4) precisely to "prevent Jewish rabbinical scholars, who generally are married with children, from obtaining housing in Pomona." (*Id.* ¶ 159; *id.* ¶ 164 ("[T]his 'Dormitory' legislation was also designed and enacted specifically to prevent the Hasidic Jewish community from residing and obtaining housing within the Village.").) According to Plaintiffs, this type of zoning restriction has resulted in a "disparate impact" on them by limiting their opportunity "to obtain housing." (*Id.* ¶ 246.) While this ordinance might conceivably be applied to other dormitories, Plaintiffs' claim is that no other educational institutions would require a significant number of dormitories to accommodate families, thus proving, in Plaintiffs' view, Defendants' discriminatory effect.

Similarly, Plaintiffs allege that the zoning ordinance that requires educational institutions be "accredited by the New York State Education Department or similar recognized accrediting agency" has the intended effect of barring only a rabbinical college, because there is no "recognized accrediting agency" for such an institution. (*Id.* ¶ 225.) At the same time, this provision likely would not affect other educational institutions, which presumably are capable of receiving state accreditation. The result of this ordinance, according to Plaintiffs, is thus to bar only their efforts to build a rabbinical college. The same is true of the wetlands protection ordinance (Section 126), because, according to Plaintiffs, the exemptions in this provision have the effect of singling out the Plaintiffs' property and preventing Plaintiffs from building the structures needed to support a rabbinical college. (*Id.* ¶¶ 169-171.)

While Defendants may dispute the assertion that Plaintiffs (or those in their subject class) have been adversely affected by the challenged zoning ordinances, and may otherwise argue that these restrictions serve compelling interests or are otherwise lawful, this is not the time to test those defenses. *Bikur Cholim*, 664 F. Supp. 2d at 276-77 (noting that whether zoning regulations were neutral was fact question not properly resolved at motion to dismiss stage). Instead, taking Plaintiffs' allegations as true for purposes of deciding this motion, the Court concludes that Plaintiffs have substantiated their facial Equal Protection claim.

### 3. Free Exercise Claims

Plaintiffs argue that they have stated a claim for violation of their right to Free Exercise of religion, because they have alleged that the challenged ordinances were enacted with the purpose of discriminating against Plaintiffs' religious exercise. The First Amendment to the Federal Constitution, applicable to the states through the Fourteenth Amendment, "prohibits the enactment of any law 'prohibiting the free exercise' of religion." *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 215 (2d Cir. 1997).[20] "At a minimum, the protections of

---

[20] The free exercise provision of the New York Constitution, though not identical to the Free Exercise Clause of the Federal Constitution, likewise guarantees the right to free exercise of religion: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind . . . ." N.Y. Const. Art. I, § 3. The New York Court of Appeals has not decided whether the New York constitutional free exercise protection is to be interpreted coextensively with the Federal Free Exercise Clause. *See New Creation Fellowship of Buffalo v. Town of Cheektowaga*, No. 99-CV-0460, 2004 WL 1498190, at *79 (W.D.N.Y. July 2, 2004) ("[T]he issue of identicality between federal and New York State constitutional protection [is] an open one.").

However, the New York Court of Appeals has not adopted the rule of the United States Supreme Court (in *Employment Division v. Smith*), that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. 872, 879 (1990) (internal quotation marks omitted). Instead, the New York Court of Appeals has held, in analyzing a state free exercise claim, that "when the State imposes an incidental burden on the right to free exercise of religion," the courts

the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. Indeed, as the Supreme Court has observed, it was "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (Opinion of Burger, C.J.); *see also McGowan v. Maryland*, 366 U.S. 420, 464 (1961) (Opinion of Frankfurter, J.) ("In assuring the free exercise of religion, the Framers of the First Amendment were sensitive to the then recent history of those persecutions and impositions of civil disability with which sectarian majorities in virtually all of the Colonies had visited deviation in the matter of conscience."); *Douglas v. City of Jeannette*, 319 U.S. 157, 179 (1943) (Jackson, J., concurring in result) ("The First Amendment grew out of an experience which taught that society cannot trust the conscience of a majority to keep its religious zeal within the limits that a free society can tolerate.").

It is not a violation of the Free Exercise Clause, however, to enforce a generally applicable rule, policy, or statute that incidentally burdens a religious practice, as long as the government can "demonstrate a rational basis for [the] enforcement" of the rule, policy, or statute, and the burden is only an incidental effect, rather than the object, of the law. *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002); *see also Smith*, 494 U.S. at 878-79 (explaining that enforcement of a neutral law of general applicability does not

---

are to consider the "interest advanced by the legislation that imposes the burden," and then "the respective interests must be balanced to determine whether the incidental burdening is justified." *Catholic Charities of the Diocese of Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006) (internal quotation marks omitted). The difference in the state and federal tests is immaterial here, because the Court finds that Plaintiffs have stated a free exercise clause claim under the First Amendment. *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 n.9 (2d Cir. 2012) (finding that municipality's interference with a church's land project violated Federal and state Free Exercise Clauses, but noting difference in tests in Federal and New York courts).

offend the Free Exercise Clause). Thus, to state a free exercise claim, a plaintiff generally must establish that "the object of [the challenged] law is to infringe upon or restrict practices because of their religious motivation," or that the law's "purpose . . . is the suppression of religion or religious conduct." *Lukumi*, 508 U.S. at 533. Such a law is subject to strict scrutiny review, and it "will survive strict scrutiny only in rare cases." *Id.* at 546.

"To determine the object of a law, [the Court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* at 533. But, even if neutral on its face, a law may still run afoul of the Free Exercise Clause if it "targets religious conduct for distinctive treatment." *Id.* at 534; *see also id.* ("Facial neutrality is not determinative"). As the Supreme Court has cautioned, the Free Exercise Clause "forbids subtle departures from neutrality," *Gillette v. United States*, 401 U.S. 437, 452 (1971), and "covert suppression of particular religious beliefs," *Bowen*, 476 U.S. at 703 (Opinion of Burger, C.J.). *See also Lukumi*, 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."). In this regard, the courts may find "guidance" in Equal Protection jurisprudence, which, among other things, requires consideration of direct and circumstantial evidence regarding the objects of those who enacted the law in question. *Lukumi*, 508 U.S. at 540; *see also* Note, *Coded Codes: Discriminatory Intent, Modern Political Modernization, and Local Immigration Ordinances*, 85 N.Y.U. L. Rev. 2099, 2102 (2010) (discussing the use of "[q]uality of life" zoning ordinances that can serve as "'coded codes'—facially neutral ordinances enacted to address immigration concerns and target specific communities").

Here, Plaintiffs have plausibly alleged that the challenged ordinances were enacted to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. For example, as noted above, Plaintiffs claim that the enactment of Section 130-4 (defining educational institutions and dormitories) occurred within months of the Congregation's purchase of the Subject Property, (SAC ¶¶ 156-57), suggesting that the object of the ordinance was the prohibition of a rabbinical college. Until rumors of the rabbinical college surfaced, Plaintiffs contend, the Village exhibited no interest in imposing the accreditation requirement, which is a state requirement, after all. Thus, argue Plaintiffs, Defendants' claims about the interests supposedly protected by Section 130-4 not only are irrational (or at least not compelling), but in fact are evidence of the pretextual means used by Defendants to single out Plaintiffs from using their property based on the exercise of their religion. *See Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1225 (C.D. Cal. 2002) ("At first blush, the City's concern about blighting rings hollow. Why had the City, so complacent before Cottonwood purchased the Cottonwood Property, suddenly burst into action? . . . [T]he activity suggests that the City was simply trying to keep Cottonwood out of the City, or at least from the use of its own land.").

Moreover, Plaintiffs allege that public comments preceding the enactment of the other two challenged ordinances, Sections 130-10 (limiting the size of dormitories pursuant to an educational use) and 126 (establishing rules for protections of wetlands), strongly suggest animosity toward the Orthodox and Hasidic Jewish sects of the Jewish religion. (SAC ¶ 166.) As discussed above, the then-Mayor's response to these public comments tacitly recognized that discriminatory motives could be discerned in connection with enactment of the challenged ordinances. (*Id.*) Similarly, as noted above, Plaintiffs allege that members of the Village's

Board of Trustees, Defendants Yagel and Louie, "expressly warned a civic association to be careful not to allow discriminatory statements to slip out," (*id.* ¶ 183), and the Village's mayor, Defendant Sanderson, stated publicly before the enactment of these ordinances that "[t]he single most important issue facing the village at this time is the as yet un-proposed, but leaked, [r]abbinical [c]ollege development," that the Village should "maintain[] its cultural and religious diversity," and that "the [r]abbinical [c]ollege could not only 'change the village,' but could change 'the makeup of the village,'" (*id.* ¶¶ 179-80 (fourth alteration in original).).

While it is of course debatable that the above-mentioned animosity to the rabbinical college stemmed from "legitimate concern[s] . . . for reasons quite apart from discrimination," *Lukumi*, 508 U.S. at 535, at this early stage in the litigation, Plaintiffs' allegations are sufficient to suggest an improper purpose of discrimination against Plaintiffs' religious exercise, *cf. id.* at 540 ("Relevant evidence [of improper purpose] includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.").

Plaintiffs' claim is fortified when the separate zoning ordinances are viewed together, rather than in isolation, as the Supreme Court has said is appropriate in this context. *See id.* at 539-40 (noting that four ordinances at issue could "be treated as a group for neutrality purposes"). Thus, even if any of these ordinances might survive constitutional scrutiny, based solely on its apparent neutrality, their cumulative effect on Plaintiffs is relevant to the analysis. Indeed, each ordinance, while facially neutral, has the effect of limiting Plaintiffs' use of the Subject Property. For example, as noted, Plaintiffs claim that Defendants barred the construction of non-accredited educational institutions and barred dormitories with separate

cooking facilities, precisely because they expect that a rabbinical college cannot be accredited, and because many who would study at a rabbinical college (and many more than might study at other colleges) would be adults with families in need of kitchen facilities. (SAC ¶¶ 104-106, 107-09, 111, 156-59, and 162-64.) And, Plaintiffs allege that the wetlands ordinance, while facially innocuous, can plausibly be viewed as specifically targeting Plaintiffs, given that the exceptions provided in that ordinance effectively will bar Plaintiffs from using the Subject Property to build a rabbinical college, without affecting many, if any, other property owners in Pomona. (*Id.* ¶¶ 169, 172, 173, and 174.)

To be sure, these ordinances on their face do not distinguish between religious and secular facilities (let alone between Orthodox/Hasidic and non-Orthodox/Hasidic facilities)—for example, both religious and secular educational institutions require state accreditation and are barred from having dormitories with separate kitchens. But, according to Plaintiffs, these other institutions are merely theoretical and consequently could not have been the real or even possible object of the ordinances. Thus, the only effect of these ordinances, and the only effect allegedly intended by Defendants, was to prevent Plaintiffs from building a rabbinical college. In particular, Plaintiffs claim that the Village adopted these ordinances to regulate characteristics unique to an Orthodox/Hasidic rabbinical college, in effect imposing a "religious gerrymander." *Lukumi*, 508 U.S. at 535 ("[T]he ordinances when considered together disclose an object remote from these legitimate concerns. The design of these laws accomplishes instead a 'religious gerrymander,' an impermissible attempt to target petitioners and their religious practices." (citation omitted) (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)). According to Plaintiffs, the alleged statements by some of the

Defendants demonstrate that they knew the Village could not adopt a zoning ordinance expressly prohibiting the construction of a rabbinical college. So, Plaintiffs claim, as an alternative, Defendants have tried subtly to achieve the same result through the cumulative impact of these facially neutral ordinances, which Defendants adopted only after Plaintiffs purchased the Subject Property. *Cf. Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1310 (11th Cir. 2006) (noting that "all of the zoning ordinances at issue were enacted before [plaintiff] purchased the Property, further undermining any suggestion that the zoning code 'target[ed] [plaintiff's] lesser known religious sect'" (second alteration in original) (internal quotation marks omitted)).

The Court recognizes fully that Defendants dispute many of Plaintiffs' factual assertions regarding the rationale for adopting these ordinances, and that they may tender evidence explaining the compelling (or rational) health, safety, and other public interest reasons for them. But these are fact-driven questions that will have to be addressed at another time. *See Roman Catholic Diocese of Rockville Ctr.*, 2012 WL 1392365, at *7 (noting that "an analysis of whether the government has shown a compelling government interest or the use of least restrictive means is more appropriately addressed in connection with summary judgment"). And, even if Plaintiffs ultimately prevail in striking down these ordinances on their face, this outcome would not necessarily entitle Plaintiffs to build their rabbinical college. Indeed, the Free Exercise Clause by itself does not give religious institutions the constitutional right to build whatever structures they might like, wherever they might wish. *See Fortress Bible*, 694 F.3d at 221 (collecting authority for proposition that "religious institutions do not have a constitutional right to build wherever they like"). Put simply: The Court is not here concluding that the ordinances do, in fact, violate the Free Exercise Clause, let alone that Plaintiffs should prevail in their quest to

build a rabbinical college on the Subject Property. Instead, the Court concludes merely that Plaintiffs have adequately stated a plausible claim that the challenged ordinances facially violate their free exercise rights.

### 4. Free Speech and Free Association Claims

Plaintiffs also claim that the challenged ordinances facially violate the Free Speech and Free Association Clauses of the First Amendment.[21] For example, Plaintiffs argue that the challenged ordinances prevent Plaintiffs from engaging in "expressive activity" and "expressive and intimate association" by prohibiting the construction and operation of a rabbinical college on the Subject Property.[22] (Pls.' Mem. 38-39.) Defendants counter that Plaintiffs' planned rabbinical college, even if barred by the challenged ordinances, does not involve speech, (Defs.' Mem. 33-34), and that nothing in the ordinances prevents Plaintiffs from associating or worshipping together, let alone associating with or raising their families, (*id.* at 34).

---

[21] The corollary provisions to the First Amendment's Free Speech and Free Association Clauses in the New York Constitution are interpreted consistently with the Federal Constitution. *See Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 351-52 (S.D.N.Y. 2007) (explaining that "[w]hile the New York Constitution generally affords greater protection than the federal constitution with regard to speech," the federal and New York constitutional provisions protecting free speech and free association from retaliation are governed by the same principles, and dismissing state Free Speech claims on the same basis as federal claims (alteration in original)). Therefore, the Court addresses both Plaintiffs' state and federal challenges here.

[22] With respect to their Free Speech claim, Plaintiffs assert that Defendants' actions have excluded Plaintiffs' protected expressive activity "completely from the Village's jurisdiction," that Defendants have treated religious expressive activity on less than equal terms with nonreligious expressive activity, that Defendants have regulated expression "on the basis of the character of the speaker," and that Defendants' regulation of speech has not been "content[]neutral." (SAC ¶ 253.)

With respect to their Free Association claim, Plaintiffs allege that Defendants have intruded "upon the Plaintiffs' right to marriage, childbirth, the raising and education of children," and that Defendants have intruded "upon the Plaintiffs' right to associate for purposes of protected expressive activity." (*Id.* ¶ 257.)

There are many layers to Plaintiffs' Free Speech claim, very few of which were addressed by the Parties in the two pages they collectively included in their memoranda of law. For example, the Parties have devoted little to the critical questions of: (1) what "expressive conduct" Plaintiffs are engaging in, or might engage in, through the construction of a rabbinical college; (2) how the challenged ordinances regulate such expressive conduct; and (3) what standard of review should be applied to these regulations.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Constitutionally protected speech includes, among other things, certain symbolic speech and expressive conduct. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66-69 (2006); *Texas v. Johnson*, 491 U.S. 397, 407 (1989); *Spence v. Washington*, 418 U.S. 405, 409-10 (1974). "[T]he scope of protection for speech generally depends on whether the restriction is imposed because of the content of the speech." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 450 (2d Cir. 2001). Thus, a restriction on speech should be viewed as content based if the claimed reason for the restriction is itself content based. *See Boos v. Barry*, 485 U.S. 312, 320-21 (1988) (holding that regulations "that focus on the direct impact of speech on its audience" are viewed as content-based restrictions); *Renton*, 475 U.S. at 48 (holding that regulation justified by the secondary effects of adult theatres have on the surrounding community was content neutral). In other words, "[g]overnment regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis in original) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Content-neutral regulations may limit the time, place, or manner of

protected expression, even in a public forum. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

The question of whether a regulation is content based is critical, because it informs the level of scrutiny the regulation should receive. Content-based restrictions are viewed as presumptively invalid and are subject to strict scrutiny. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *accord Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006). Under the strict scrutiny test, a content-based regulation may be upheld only if it serves a "compelling" government interest, "is *necessary* to serve the asserted [compelling] interest," *R.A.V.*, 505 U.S. at 395 (alteration and emphasis in original) (internal quotation marks omitted), is precisely tailored to serve that interest, and is the least restrictive means available for that purpose. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004); *Boos*, 485 U.S. at 321.[23] Content-neutral restrictions, on the other hand, invite intermediate scrutiny. *Mastrovincenzo*, 435 F.3d at 98. Under this less stringent test, a content-neutral regulation will be upheld if it is narrowly tailored to serve a significant government interest and allows for alternative channels for communication. *See Ward*, 491 U.S. at 791; *Clark*, 468 U.S. at 293; *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006). To be narrowly tailored, a content-neutral regulation need not be the least restrictive or least intrusive means of achieving the asserted government

---

[23] Strict scrutiny of content-based restrictions derives from the concern "that if the government were able 'to impose content-based burdens on speech,' it could 'effectively drive certain ideas or viewpoints from the marketplace.'" *Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (quoting *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

interest. *See Ward*, 491 U.S. at 798 n.6 (noting that the least-restrictive-means test is "wholly out of place" in reviewing a content-neutral regulation).

With these principles in mind, the Court turns to the question of whether Plaintiffs have substantiated their claim that the challenged ordinances facially violate their freedom of speech. The only issue addressed (and disputed) by the Parties is the extent to which Plaintiffs have sufficiently alleged that the challenged ordinances regulate protected speech. Defendants argue that the only possible effect of the ordinances is to limit Plaintiffs' construction of a rabbinical college, which Defendants assert is conduct that is not expressive. (Defs.' Mem. 34.). In support of this position, Defendants cite two cases: *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004) and *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002). Both cases are distinguishable and therefore not dispositive.

In *San Jose Christian*, the Ninth Circuit held that the zoning ordinance at issue in that case did "not at all prohibit the establishment of religiously-affiliated educational institutions." 360 F.3d at 1032. In fact, the ordinance at issue permitted such institutions to exist, subject to certain requirements. As such, the Ninth Circuit concluded that the zoning restriction was a content-neutral, "time, place and manner restriction," which "long [has] been held to be permissible." *Id.* at 1033 (internal quotation marks omitted). Critical to the Ninth Circuit's ruling was that the record "reflect[ed] *no* indication that the City's action was motivated by the City's disdain of [the] College's religious orientation, or by the message to be communicated to the students/parishioners at the Property." *Id.* at 1032 (emphasis in original). Taking Plaintiffs' allegations (described in detail above) as true, the same cannot be said here.

In *Tenafly*, plaintiffs were Orthodox Jewish residents who, consistent with religious convention, wanted to use *eruvs* to mark the outer boundaries of the home, which use would

allow them to engage in certain activities on the Sabbath (e.g., pushing baby strollers). 309 F.3d at 152. An *eruv* can be constructed by attaching *lechis* (thin black strips made out of the same type of hard plastic used for the coverings of utility lines) vertically along utility poles. *Id.* The plaintiffs challenged a town ordinance that barred the placement of any sign or the like on, among other objects, poles and trees. In rejecting the plaintiffs' Free Speech claim, the Third Circuit held that the *eruv* "simply demarcates the space within which certain activities otherwise forbidden on the Sabbath are allowed." *Id.* at 162. As such, the court concluded that the mere placement of an *eruv* did not communicate any idea or message; rather, it served only a "purely functional purpose." *Id.* at 164. Accordingly, the ordinance survived scrutiny under the Free Speech Clause.[24]

In the end, the Court finds that Plaintiffs have plausibly (if barely) pled enough facts to establish that the rabbinical college would engage in and foster expressive conduct. In particular, Plaintiffs have alleged that they wish to construct and operate a rabbinical college to foster the expression of certain ideas among and between faculty members and students. As such, the communicative conduct will be more than just congregants' worshipping. *See Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (discussing the distinct "First Amendment right to 'receive information and ideas'"). Moreover, Plaintiffs allege that the expressive conduct will, of necessity, involve Orthodox teachings and principles. Thus, to the extent Plaintiffs have alleged—as the Court finds they have—that Defendants were motivated by a discriminatory animus against Plaintiffs because of Plaintiffs' affiliation with the Orthodox/Hasidic community, Plaintiffs also have alleged that the ordinances restrict protected

---

[24] However, the Third Circuit held that the plaintiffs had established that the selective enforcement of the ordinance violated the Free Exercise Clause. 309 F.3d at 165-78.

expressive conduct because of its message. *See Chabad Lubavitch*, 796 F. Supp. 2d at 345 (denying motion to dismiss Free Speech challenge to zoning ordinance regulating size of houses of worship, because plaintiff had alleged that defendants "acted with the *intent* to interfere with [plaintiff's] religious speech and expressive association" (emphasis in original)); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 981 (N.D. Ill. 2003) (holding that plaintiff religious organization had adequately pled Free Speech claim in challenge to zoning ordinance, where "the dispositive factor triggering the zoning ordinance in question was ultimately the content of the congregation's speech in its property"); *cf. Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 657 (10th Cir. 2006) (affirming dismissal of Free Speech and Free Association claims, where "no evidence was presented indicating that the ordinance was passed for the purpose of curtailing or controlling the content of expression"); *San Jose Christian*, 360 F.3d at 1032 (noting that the record "reflects *no* indication that the City's action was motivated by the City's disdain of College's religious orientation" (emphasis in original)).

The Court recognizes that there is authority suggesting that zoning ordinances that restrict the locations of religious institutions do not necessarily regulate expressive conduct. *See Merrimack Congregation of Jehovah's Witnesses v. Town of Merrimack*, No. 10-CV-581, 2011 WL 1236133, at *4 (D.N.H. Mar. 31, 2011) ("Courts have held that, absent other expressive conduct, limitations on the geographical location of a religious institution do not implicate the right to free expression under the First Amendment."); *Grace Church of Roaring Fork Valley v. Bd. of Cnty. Comm'rs of Pitkin Cnty.*, 742 F. Supp. 2d 1156, 1167 (D. Colo. 2010) (noting that "denial of the Church's proposal to build a worship facility at a particular location did not improperly regulate the Church's dissemination of its religious message"). Here, however, the

challenged ordinances do not just limit the possible locations for Plaintiffs' rabbinical college; rather, taking Plaintiffs' allegations as true, these ordinances ban such an institution from being built anywhere in Pomona.

The Court also recognizes that there is authority suggesting that even if such zoning regulations could be viewed as regulating speech, they are content-neutral time, place, and manner restrictions that are subject to intermediate scrutiny. *See Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 468-69 (8th Cir. 1991) (considering zoning restrictions on location of church as a time, place, and manner regulation). It may be that after the record is filled with evidence, or the lack of it becomes glaring, Plaintiffs will not be able to substantiate their pleadings. Indeed, the Court, in merely denying Defendants' Motion as to this claim, is not holding that the challenged ordinances here do violate the Free Speech Clause of the First Amendment, let alone suggesting what level of scrutiny should be applied in evaluating Plaintiffs' Free Speech challenge to these ordinances. Those are topics for another day (and after more briefing). For now, it suffices to say that Plaintiffs have adequately stated a Free Speech claim for the reasons discussed above. Therefore, Defendants' Motion to Dismiss this claim is denied.[25]

---

[25] In their opposition to Defendants' Motion, Plaintiffs also contend that they have raised a "facial overbreadth challenge" to the challenged ordinances. (Pls.' Mem. 11.) "Under the First Amendment doctrine of overbreadth, a statute is invalid when it brings within its scope—and thus threatens to chill—conduct protected by the First Amendment." *United States v. Sattar*, 314 F. Supp. 2d 279, 304 (S.D.N.Y. 2004), *aff'd*, 590 F.3d 93 (2d Cir. 2009); *see also Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("We have provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions."). The Supreme Court has cautioned that the overbreadth doctrine is "strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), to be used "sparingly and only as a last resort" *id.*, and only when the overbreadth is not only real, but "substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615. Stated differently, an overbreadth claim requires "a law's

80

The First Amendment also protects the Freedom of Association. *See Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). The Supreme Court has "identified two types of 'freedom of association' that merit constitutional protection: (i) 'choices to enter into and maintain certain intimate human relationships' and (ii) association 'for the purpose of engaging in those activities protected by the First Amendment.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12-13 (1st Cir. 2011) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984)); *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995-96 (2d Cir. 1997) (same); *AK Tournament Play, Inc. v. Town of Wallkill*, No. 09-CV-10579, 2011 WL 197216, at *2 (S.D.N.Y. Jan. 19, 2011) (same). Here, the Court already has found that Plaintiffs have alleged that the challenged ordinances were adopted out of discriminatory animus, and that these ordinances also implicate Plaintiffs' Free Speech rights. Given this conclusion—the ultimate resolution of which, again, will have to await further development and subsequent motion practice—the Court finds that Plaintiffs have adequately stated a Freedom of Association claim,

---

application to protected [activity] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications.'" *Hicks*, 539 U.S. at 119-20; *see also United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999) ("Particularly when conduct and not speech is involved, to void the statute the overbreadth must be 'real [and] substantial . . . judged in relation to the statute's plainly legitimate sweep.'" (alterations in original) (quoting *Broadrick*, 413 U.S. at 613)).

Plaintiffs did not include any overbreadth claim in their Second Amended Complaint. Nor did they include any allegations that would support such a claim. For example, Plaintiffs have not made any specific allegations about the application of the challenged ordinances to protected activity that is beyond the scope of the regulation of the Subject Property. Indeed, rather than "chilling" Plaintiffs' expressive conduct, the challenged ordinances allegedly prohibit such activity directly, by barring Plaintiffs from constructing a rabbinical college at all. Therefore, Defendants' Motion is granted, without prejudice to Plaintiffs to amend, as to any overbreadth claim Plaintiffs might be deemed to have included in their Second Amended Complaint. *See Calvary Christian Ctr. v. City of Fredericksburg*, 832 F. Supp. 2d 635, 645 (E.D. Va. 2011) (dismissing overbreadth challenge to zoning ordinance, where plaintiff "failed to explain how the overbreadth doctrine applies in this case").

because Plaintiffs have alleged that the ordinances bar Plaintiffs from associating in their rabbinical studies—conduct that is otherwise constitutionally protected. *See Chabad Lubavitch*, 796 F. Supp. 2d at 345 (denying motion to dismiss Free Speech and Freedom of Association claims, because plaintiffs had adequately alleged defendants' intent to interfere with plaintiffs' "religious speech and expressive association"); *Vineyard Christian*, 250 F. Supp. 2d at 984 (same). However, Defendants' Motion is denied only as it relates to the second type of freedom identified above—engaging in those activities protected by the First Amendment. Plaintiffs' bare-bones, conclusory allegations about the deprivation of their rights to familial association are inadequate to state a Freedom of Association claim. Simply put, there is nothing about Defendants' alleged actions, or even their alleged motives, that establishes that they seek or have sought to disrupt Plaintiffs' familial association rights. To the extent Plaintiffs might believe (even though they did not argue this point) that the dormitory provision could limit the ability of students with families to live on the rabbinical college campus, such a result would not separate students or faculty from their families, but merely require those students or faculty to make a choice about how best to manage their desire to study or teach at the rabbinical college while meeting their family obligations. Plaintiffs have not cited any authority suggesting that this would-be conundrum is tantamount to a violation of the Freedom of Association. Therefore, Defendants' Motion to Dismiss this component of the Freedom of Association claim is granted.

### 5. RLUIPA Claims

Plaintiffs further raise a facial challenge to Sections 130-4 (defining educational institutions and dormitories), 130-10 (limiting the size of dormitories pursuant to an educational use), and 126 (establishing wetlands protections) of the Village's Code under RLUIPA.

"RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [Supreme Court] precedents." *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 261 (3d Cir. 2007) (same). "The path to the enactment of RLUIPA is well documented." *Lighthouse*, 510 F.3d at 261. In 1993, Congress enacted the Religious Freedom Restoration Act ("RFRA") in response to the Supreme Court's decision in *Smith*, 494 U.S. 872 (1990), which (as noted earlier) held that the Free Exercise Clause of the Constitution does not invalidate neutral and generally applicable laws, even if they incidentally burden the exercise of religion. *See Lighthouse*, 50 F.3d at 261 (noting that "Congress initially enacted [RFRA] in 1993 to counter the Supreme Court's decision in [*Smith*]"); *see also* Note, *Religious Land Use in the Federal Courts Under RLUIPA*, 120 Harv. L. Rev. 2178, 2180 (2007) [hereinafter "*Religious Land Use*"] (noting that RFRA "purported to overrule *Smith*"). "RFRA provided that any legislation imposing a substantial burden on religion would be invalid unless it was the least restrictive means of furthering a compelling state interest." *Lighthouse*, 510 F.3d at 261.

"But in 1997, in *City of Boerne v. Flores*[, 521 U.S. 507 (1997)], the Supreme Court invalidated RFRA as applied to state and local governments, holding that RFRA exceeded Congress's power under Section 5 of the Fourteenth Amendment to enforce the Free Exercise Clause against the states." *Religious Land Use* at 2180; *see also Lighthouse*, 510 F.3d at 261 ("[T]he Supreme Court in [*City of Boerne*] struck down RFRA as it applied to the States because it exceeded Congress's remedial power under Section 5 of the Fourteenth Amendment."). RLUIPA was Congress's reaction to *City of Boerne*. *See Opulent Life Church*, 697 F.3d at 289.

"More limited in reach than RFRA, RLUIPA addresses only land use regulations, and the religious rights of institutional persons." *Lighthouse*, 510 F.3d at 261 (citation omitted).

RLUIPA provides certain protections for land use for religious exercise. *See* 42 U.S.C. § 2000cc. In particular, RLUIPA contains separate provisions (1) to protect religious persons, including religious assemblies or institutions, from land use regulations that substantially burden their free exercise of religion, *see id.* § 2000cc(a), and (2) to protect religious persons, including religious assemblies or institutions, from land use regulations that discriminate against them or exclude them on the basis of religion or religious denomination, *see* § 2000cc(b). Plaintiffs facially attack the challenged ordinances under both of these provisions. (Pls.' Mem. 12.) Defendants argue that Plaintiffs' facial challenges under RLUIPA should be dismissed as meritless. (Defs.' Mem. 22.)

### a. Substantial Burden

The Substantial Burden provision of RLUIPA

> prohibits a governmental entity from applying a land use regulation "in a manner that imposes a substantial burden on the religious exercise of a person . . . or institution, unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and . . . [the burden imposed] is the least restrictive means of furthering that compelling governmental interest."

*Westchester Day Sch. v. Village of Mamaroneck* ("*Westchester I*"), 386 F.3d 183, 189 (2d Cir. 2004) (alterations in original) (quoting § 2000cc(a)(1)); *see also Fortress Bible*, 694 F.3d at 218-19. This provision "backstops the explicit prohibition of religious discrimination in the later section of [RLUIPA], much as the disparate-impact theory of employment discrimination backstops the prohibition of intentional discrimination." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005). Thus, for

example, if a "land use decision . . . imposes a substantial burden on religious exercise . . . and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision." *Id.*

Plaintiffs posit that the challenged ordinances, because they have the intended effect of barring a rabbinical college, substantially burden their ability to engage in "religious study and prayer throughout the day and night, [and to live] in a communal facility that allows them to be fully immersed in their religious studies with their families, praying and learning groups, lecturers and fellow students—all contributing to the necessary religious environment." (Pls.' Mem. 29; SAC ¶¶ 60, 63, 68.) Defendants contend, in the first instance, that building a rabbinical college is not religious exercise under RLUIPA. (Defs.' Mem. 36.) The Court is unpersuaded by Defendants' claim, and concludes that Plaintiffs have sufficiently alleged that the rabbinical college and its accessory uses constitute "religious exercise" within the meaning of RLUIPA.

"The statute defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' and provides further that '[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered . . . religious exercise.'" *Westchester I*, 386 F.3d at 186 (alterations in original) (quoting 42 U.S.C. § 2000cc-5(7)(A), (B)); *see also Sts. Constantine & Helen*, 396 F.3d at 900 (same). "Religious exercise" under RLUIPA is to be defined broadly and "'to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Westchester Day Sch. v. Village of Mamaroneck* ("*Westchester II*"), 504 F.3d 338, 347 (2d Cir. 2007) (quoting 42 U.S.C. § 2000cc-3(g)); *see also Bikur Cholim*, 664 F. Supp. 2d at 275, 288 (same). It is clear that the building of

a rabbinical college, with the alleged purpose of training rabbinical judges for religious courts, falls squarely within this definition of "religious exercise."  Additionally, while the Second Circuit has expressed doubt over whether "secular . . . accessory facilities" to a religious school are protected as "religious exercise" under RLUIPA, *see Westchester I*, 386 F.3d at 189 (questioning, in particular, whether enlargement of a gymnasium at a religious school would constitute religious exercise), Plaintiffs have sufficiently alleged that the multi-family dormitories that they seek to build are intended to facilitate religious exercise, thus bringing this accessory use within RLUIPA's protections.  *See Westchester II*, 504 F.3d at 348 (noting that the correct inquiry to determine whether an educational facility is covered as "religious exercise" by RLUIPA is whether it "would be used at least in part for religious education and practice"); *see also Bikur Cholim*, 664 F. Supp. 2d at 276 (holding that operation "of facility to enable observant individuals to visit the sick on the Sabbath and holidays as well as the other individual plaintiff's [sic] obligations to observe the Sabbath while being able to visit their family members at [a nearby hospital] implicate their religious exercise"); *Mintz v. Roman Catholic Bishop of Springfield*, 424 F. Supp. 2d 309, 319 (D. Mass. 2006) (holding that a church's proposed development of a "parish center" that would "house an office for religious education[,] and . . . serve as a meeting place for the parish council . . . [and as] the locus of small gatherings related to church services" constituted "religious exercise" under RLUIPA).

As a second line of attack on this cause of action, Defendants argue that the ordinances do not, on their face, impose a substantial burden on Plaintiffs' exercise of religion.  According to Defendants, a substantial burden requires "something more than an incidental effect on religious exercise."  (Defs.' Mem. 37 (internal quotation marks omitted).)  Thus, say Defendants, the mere denial of a religious institution's application to build a religious facility is not a

substantial burden, where a second application could be filed. (*Id.* at 38.) And, where such an application is denied based on regulations that are facially neutral (and which serve valid public interests), there is no substantial burden on the exercise of religion, because the location of a religious facility is "not itself religiously significant." (*Id.*) Applying these precepts to this case, Defendants assert that Plaintiffs have not been burdened by Defendants' actions, including the adoption of the facially neutral zoning ordinances. At most, these ordinances might limit Plaintiffs' ability to build a rabbinical college on the Subject Property, but that is not the type of burden that is cognizable under RLUIPA. Moreover, argue Defendants, because Plaintiffs have not even filed an application (let alone a second application) to build their rabbinical college, it is too early for Plaintiffs' to claim they have been burdened by anything Defendants have done. (*Id.*)

RLUIPA does not itself define the phrase "substantial burden." *See Roman Catholic Bishop*, 760 F. Supp. 2d at 186. However, the Second Circuit has held that a land use regulation constitutes a "substantial burden" within the meaning of RLUIPA if it "directly *coerces* the religious institution to change its behavior." *Westchester II*, 504 F.3d at 349 (emphasis in original); *see also Fortress Bible*, 694 F.3d at 218-19. "The burden must have more than a minimal impact on religious exercise, and there must be a close nexus between the two." *Fortress Bible*, 694 F.3d at 219.[26] Among the types of burdens the courts have found to be

---

[26] Other circuit courts have adopted a similar definition. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("[A] 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."); *San Jose Christian*, 360 F.3d at 1034 (noting that a substantial burden is one that "impose[s] a significantly great restriction or onus upon [religious] exercise"); *Civil Liberties for Urban Believers v. City of Chicago* ("*CLUB*"), 342 F.3d 752, 761 (7th Cir. 2003) (holding that substantial burden is one that renders religious exercise "effectively impracticable").

minimal, and hence not protected by RLUIPA, are facially neutral permit and variance requirements. Thus, courts have regularly found that zoning ordinances that merely require religious institutions to go through a routine permit or variance application process do not run afoul of RLUIPA. *See, e.g., id.* ("A denial of a religious institution's building application is likely not a substantial burden if it leaves open the possibility of modification and resubmission."); *Konikov v. Orange County*, 410 F.3d 1317, 1323 (11th Cir. 2005) ("[R]equiring applications for variances, special permits, or other relief provisions [does] not offend RLUIPA's goals."); *San Jose Christian*, 360 F.3d at 1035-36 (holding that a city's requirement that plaintiff refile a "*complete*" permit application did not constitute a substantial burden); *CLUB*, 342 F.3d at 761-62 (finding that "the scarcity of affordable land available for development in R zones, along with the costs, procedural requirements, and inherent political aspects of the Special Use, Map Amendment, and Planned Development approval processes" did not impose substantial burden on religious institutions); *Roman Catholic Bishop*, 760 F. Supp. 2d at 187 (finding that a routine application process did not violate RLUIPA); *Hale O Kaula Church v. Maui Planning Comm'n*, 229 F. Supp. 2d 1056, 1071 (D. Haw. 2002) (holding that laws requiring special use permits did not impose a substantial burden on religious institution). Indeed, to exempt religious institutions from the normal permit/variance process would result in favoring these institutions, something which RLUIPA (or the Free Exercise Clause) does not require (and which the Establishment Clause might prohibit). *See CLUB*, 342 F.3d at 762 ("Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations. . . . [N]o such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious

88

exercise."); *see also Westchester I*, 386 F.3d at 189 ("As a legislative accommodation of religion, RLUIPA occupies a treacherous narrow zone between the Free Exercise Clause, which seeks to assure that government does not interfere with the exercise of religion, and the Establishment Clause, which prohibits the government from becoming entwined with religion in a manner that would express preference for one religion over another, or religion over irreligion.").

While RLUIPA does not exempt religious institutions from complying with facially neutral permit and variance applications procedures, it does protect such institutions from land use regulations that substantially affect their ability to use their property in the exercise of their religion.  For example, courts have held that zoning ordinances, or zoning decisions, that significantly lessen the prospect of a religious institution's being able to use the property to further its religious mission contravenes RLUIPA.  *See Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 992 (9th Cir. 2006) (holding that the defendant county's two denials of variance permits, under the circumstances, had "to a significantly great extent lessened the prospect of [the religious institution] being able to construct a temple in the future," thus imposing a "substantial burden" on the religious institution); *Roman Catholic Diocese*, 2012 WL 1392365, at *8 (upholding plaintiff's facial challenge to zoning law, because plaintiff had adequately alleged that the "conditions imposed by the [law] would significantly restrict the [plaintiff's] use of their Property for religious burial purposes"); *Grace Church of N. Cnty. v. City of San Diego*, 555 F. Supp. 2d 1126, 1138 (S.D. Cal. 2008) (holding that "based on the undisputed facts in this case, . . . Defendants [have] implemented a land use regulation in a manner that imposed a 'significantly great restriction or onus' on Plaintiff's religious exercise").

Such burdens can come in many forms.  For example, courts have held that zoning

schemes which impose conditions on the use of the property, such as limitations on the size of

the facilities to be used by the religious institution, can impose a substantial burden.  *See Roman*

*Catholic Diocese*, 2012 WL 1392365, at *8 (holding that defendant's zoning conditions,

including its set-back requirement, imposed a substantial burden, because they, inter alia, limited

the amount of the land available for religious burial purposes); *Chabad Lubavitch*, 796 F. Supp.

2d at 343 (finding substantial burden allegations sufficient based on claims that municipality

limited plaintiff's expansion to an area 17,000 square feet smaller than plaintiff proposed, and

describing that "if [plaintiff] conformed its plans to the [municipality's] specification, it would

need to sacrifice a good potion of the spaces that it believes is necessary to the exercise of its

religion"); *Cathedral Church of the Intercessor v. Inc. Village of Malverne*, No. 02-CV-2989,

2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006) (finding plaintiff adequately alleged substantial

burden, where space limits imposed by defendants "constrained" the ability of the church's

parishioners to "observe or participate" in religious services).  Courts also have found religious

institutions have satisfied the substantial burden requirement by alleging or proving that a

municipality's zoning scheme imposes significant "delay, uncertainty, and expense."  *Sts.*

*Constantine & Helen*, 396 F.3d at 901; *see also Westchester II*, 504 F.3d at 349 (noting that a

complete denial of a religious institution's zoning application which results in substantial "delay,

uncertainty, and expense" can be a substantial burden); *Grace Church*, 555 F. Supp. 2d at 1137-

39 (finding plaintiff had established substantial burden from uncertainty and expense resulting

from municipality's zoning regulations and from municipal officials' consistent hostility toward

plaintiff in their review of plaintiff's land use applications).  In other words, contrary to

Defendants' suggestion, "a complete denial" of a religious institution's intended or applied-for

use of its property "is not necessary for the Court to find that the government regulation . . . impose[s] a substantial burden on religious exercise." *Cathedral Church*, 2006 WL 572855, at *8; *see also Sts. Constantine & Helen*, 396 F.3d at 899-900 (finding that to establish substantial burden, a religious group need not "show that there was no other parcel of land on which it could build its church"); *Westchester Day Sch. v. Village of Mamaroneck*, 379 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2005) (same). Thus, for example, the Second Circuit has held recently that when a municipality's "willingness to consider [a] proposal is disingenuous, a conditional denial may rise to the level of a substantial burden." *Fortress Bible*, 694 F.3d at 219. "Moreover, when the town's actions are arbitrary, capricious, unlawful, or taken in bad faith, a substantial burden may be imposed because it appears that the [religious institution] may have been discriminated against on the basis of its status as a religious institution." *Id.*

Taking Plaintiffs' allegations as true, the Court finds that Plaintiffs have plausibly made a case that Defendants' actions impose a substantial burden on Plaintiffs' religious exercise. First, while the challenged ordinances may be facially neutral, in the sense that they do not expressly single out the Subject Property or otherwise expressly ban the construction of a rabbinical college, for reasons described above in connection with Plaintiffs' Free Exercise Clause claim, Plaintiffs have alleged that the combined effect (even a subtle one) of the challenged ordinances is to bar the construction of a rabbinical college, and *only* to do that. Indeed, based on the timing of the ordinances' adoption and amendment, as well as the statements made by some of the Defendants regarding the rabbinical college, Plaintiffs have plausibly alleged that this was the purpose of these ordinances. The ordinances allegedly do not just restrict where a rabbinical college can be built, or the size and number of the structures that can make up the college, but in fact completely prevent Plaintiffs from building and running a rabbinical college at all in

Pomona.  If these allegations are true, then Plaintiffs have established a substantial burden.  *See Cottonwood*, 218 F. Supp. 2d at 1226 ("Preventing a church from building a worship site fundamentally inhibits its ability to practice its religion.").

Second, while it is true that Plaintiffs have not yet filed a variance or special use application to build a rabbinical college on the Subject Property, Plaintiffs have alleged (again, as described above) that the challenged ordinances do not allow for any special use certificates or variances.  (SAC ¶¶ 91, 221-22.)  Thus, under the zoning scheme as it currently exists, Plaintiffs' only option is to seek a text amendment to the Zoning Code—a legislative process that Plaintiffs allege would be cumbersome and, given the hostility of Defendants, fraught with indefinite delay and uncertainty.  Indeed, according to Plaintiffs, Defendants have erected a number of barriers to the construction of the rabbinical college precisely to delay the process long enough to deter Plaintiffs from completing the college.  (SAC ¶¶ 206-20.)  Thus, Plaintiffs have established that Defendants' alleged actions impose a substantial burden on Plaintiffs' religious exercise.  Accordingly, the Motion to Dismiss this claim is denied.  *See Roman Catholic Diocese*, 2012 WL 1392365, at *8 (granting motion to amend facial challenge to zoning ordinance, based on the conclusion that plaintiff had adequately alleged the ordinance imposed a substantial burden by, among other things, reducing the portion of the property that could be used for religious purposes and requiring plaintiff to meet certain groundwater testing and landscaping requirements); *Grace Church*, 555 F. Supp. at 1138 (granting summary judgment to plaintiff on a Substantial Burden claim, based on evidence that plaintiff had no "reasonable expectation that any application for an extension" to use its property would be granted); *Cathedral Church*, 2006 WL 572855, at *8 (denying motion to dismiss, where plaintiff had

adequately alleged a substantial burden based on claims that the space limitations imposed by municipality would limit the number of congregants who could participate in religious services).[27]

### b.  Discrimination and Exclusion

Plaintiffs also raise a facial challenge to the Village's zoning ordinances under each of the three subsections of the Discrimination and Exclusion provision of RLUIPA.

### i.  Equal Terms

The Equal Terms provision of RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).  This "statutory command 'requires equal treatment of secular and religious assemblies and allows courts to determine whether a particular system of classifications adopted by a city *subtly or covertly departs from requirements of neutrality and general applicability*.'"  *Primera*, 450 F.3d at 1307 (brackets omitted) (emphasis in original) (quoting *Midrash*, 366 F.3d at 1232).  As with the Substantial Burden component of RLUIPA, the meaning of the Equal Terms section is far from clear, *see Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140, 1154 (E.D. Cal. 2003) (asserting that this section "is even less clear" than the "substantial burden" section), but the courts have determined that the "substantial burden and nondiscrimination provisions are operatively independent of one another," *CLUB*, 342 F.3d at

---

[27] It again bears repeating that the Court is not finding that Defendants have violated the Substantial Burden component of RLUIPA, merely that Plaintiffs have adequately pled this claim.  Of course, it remains to be seen if Plaintiffs will be able to substantiate this cause of action.  *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214 (D. Conn. 2012) (granting summary judgment to defendants after having denied their motion to dismiss free exercise and RLUIPA claims).

762.  Moreover, some courts have concluded that the Nondiscrimination provisions of RLUIPA, which include the Equal Terms provision, "codify existing Equal Protection Clause and Free Exercise Clause jurisprudence."  *Petra Presbyterian Church v. Village of Northbrook*, No. 03-CV-1936, 2003 WL 22048089, at *11 (N.D. Ill. Aug. 29, 2003); *accord Guru Nanak*, 326 F. Supp. 2d at 1155 (same); *Freedom Baptist Church of Del. Cnty. v. Township of Middletown*, 204 F. Supp. 2d 857, 869 (E.D. Pa. 2002) (same).[28]

There are four elements of an Equal Terms violation: (1) the plaintiff must be a religious institution; (2) subject to a land use regulation; that (3) treats the religious institution on less than equal terms; with (4) a nonreligious institution.  *See Primera*, 450 F.3d at 1307-08.[29]  The consensus among courts is that there are three distinct kinds of Equal Terms violations: (i) a statute that facially differentiates between religious and secular assemblies or institutions; (ii) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to secular, assemblies or institutions; or (iii) a truly neutral statute that is selectively enforced against religious, as opposed to secular, assemblies or institutions.  *See*

---

[28] The one exception is the precise application of the "similarly situated" requirement found in Equal Protection jurisprudence.  *See Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 617 F. Supp. 2d 201, 209 (S.D.N.Y. 2008) (noting that the "key point of diversion among the [c]ourts is the metric of comparison they employ to determine whether particular religious and non-religious institutions or assemblies are properly measured against one another under the statute," and, further describing that, "'while [the equal terms provision] has the "feel" of an equal protection law, it lacks the "similarly situated" requirement usually found in equal protection analysis'" (quoting *Midrash*, 366 F.3d at 1229)), *aff'd*, 626 F.3d 667 (2d Cir. 2010).

[29] A plaintiff bringing an Equal Terms claim need not establish that the challenged land use regulation imposed a substantial burden.  *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1172 (9th Cir. 2011) (noting that a RLUIPA plaintiff asserting an Equal Terms claim has no obligation to establish a substantial burden); *Lighthouse*, 510 F.3d at 262 (explaining that the Equal Terms provision contains no language suggesting a plaintiff must establish substantial burden).

*Primera*, 450 F.3d at 1308; *accord Vision Church v. Village of Long Grove*, 468 F.3d 975, 1003

(7th Cir. 2006) (following same analysis); *Church of Scientology of Ga., Inc. v. City of Sandy*

*Springs*, 843 F. Supp. 2d 1328, 1361 (N.D. Ga. 2012) (same); *Covenant Christian Ministries,*

*Inc. v. City of Marietta*, No. 06-CV-1994, 2008 WL 8866408, at *13 (N.D. Ga. Mar. 31, 2008)

(same); *Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978, 989 (N.D. Ill. 2008) (same).

The Second Circuit has not yet identified the precise standard to analyze whether a

plaintiff has adequately alleged an Equal Terms violation. *See Third Church of Christ*, 626 F.3d

at 670 (noting different approaches in other circuits but declining to adopt or reject any of them);

*Roman Catholic Diocese*, 2012 WL 1392365, at *10 (noting that the Second Circuit has "yet to

decide the precise outlines of what it takes to be a valid comparator under RLUIPA's equal-

terms provision" (internal quotation marks omitted)).  The other circuit courts to have considered

the analysis to be used under this provision—the Third, Fifth, Seventh, Ninth, and Eleventh

Circuits—have adopted different approaches. *See Third Church of Christ*, 626 F.3d at 669-70

(reviewing the approaches from the Eleventh, Third, and Seventh Circuits).  As the Fifth Circuit

very recently described:

> The approaches of [the] . . . circuits to facial Equal Terms Clause
> challenges fall roughly into two camps.  In one camp is the
> Eleventh Circuit, which treats all land use regulations that facially
> differentiate between religious and nonreligious institutions as
> violations of the Clause, but will nonetheless uphold such a
> regulation if it survives strict scrutiny review.  The other camp
> includes the Third, Seventh, and Ninth Circuits.  Those circuits
> hold that a violation of the Equal Terms Clause occurs only if a
> religious institution is treated less well than a similarly situated
> nonreligious comparator.  The Third Circuit requires the
> comparator to be similarly situated *as to the regulatory purpose*.
> The Seventh and Ninth Circuits require a comparator that is
> similarly situated with respect to accepted zoning criteria.

*Opulent Life*, 697 F.3d at 291-92 (footnote, citations, and internal quotation marks omitted) (emphasis in original); *see also id.* (adopting a variation of the comparator analysis used by the Third and Seventh Circuits); *Centro Familiar Cristiano*, 651 F.3d at 1172-73 (adopting Third Circuit's "similarly situated" requirement and, where necessary, Seventh Circuit's test that comparator be similarly situated with respect to accepted zoning criteria); *River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010) (en banc) (modifying the Third Circuit's test to focus on the regulatory criteria used to enact the law, rather than municipality's purpose in enacting the law); *Lighthouse*, 510 F.3d at 272-73 (holding that the proper inquiry focuses on the "impact of the allowed and forbidden [uses] . . . in light of the purpose of the regulation"); *Konikov*, 410 F.3d at 1327-28 (explaining that a secular comparator in an as-applied challenge should be selected by looking at "the evidence considered by" the municipality applying the zoning code to determine the criteria used in making its decision regarding a religious institution, and then comparing it to a secular institution or assembly under those same criteria). *See generally* Note, *RLUIPA's Equal-Terms Provision's Troubling Definition of Equal*, 60 U. Kan. L. Rev. 193 (2011) (noting the circuit split and criticizing the Eleventh Circuit's approach); Comment, *Freedom From Religion: RLUIPA, Religious Freedom, and Representative Democracy on Trial*, 158 U. Pa. L. Rev. 571 (2010) (canvassing split among circuit courts and endorsing the Eleventh Circuit's analysis); Note, *Restoring RLUIPA's Equal Terms Provision*, 58 Duke L.J. 1071 (2009) (acknowledging the circuit split and criticizing the use of any similarly situated analysis in applying the Equal Terms provision). Despite the differing approaches, however, each of the circuit courts that has considered such claims agrees that to show an Equal Terms violation, a religious institution must be treated differently from a nonreligious comparator. *See Third Church*, 626 F.3d at 669 ("Determining whether a

municipality has treated a religious entity 'on less than equal terms' requires a comparison between the religious entity and a secular one.").[30]

The Court here need not weigh in on the thorny question of what a RLUIPA plaintiff must specifically plead by way of secular comparators to make out a prima facie Equal Terms claim. As noted, there are three categories of Equal Terms violations—facially non-neutral regulations, facially neutral regulations which "gerrymander" burdens on religious institutions, and facially neutral regulations which are differentially applied. The first and third categories likely require Plaintiffs to plead some facts regarding some particular secular comparators. *See Elijah Grp., Inc.*, 643 F.3d at 422-23 (explaining that in analyzing whether a land use regulation facially differentiates, any nonreligious institution or assembly can be a comparator; in analyzing a discriminatory application claim, a plaintiff must identify a "similarly situated" nonreligious comparator; and in analyzing a "gerrymander" claim, a plaintiff need establish only that the facially neutral regulation separates uses of land in a way that "burdens almost only religious uses,"—such that treatment of the religious plaintiff is assessed relative to nonreligious (or other

---

[30] It bears noting that the Fifth Circuit does not buy the Second Circuit's professed agnosticism. In *Elijah Group, Inc. v. City of Leon Valley*, the Fifth Circuit commented that while the Second Circuit, in *Third Church*, "attempted to avoid choosing among the other . . . circuits' tests, it concluded that the hotel was a valid comparator to the church because 'the Church's and the hotels' catering activities [are] *similarly situated with regard to their legality* under [the City's] law.'" 643 F.3d 419, 423 (5th Cir. 2011) (alterations and emphasis in original) (quoting *Third Church of Christ*, 626 F.3d at 670). By making such a comparison, the Fifth Circuit concluded that the Second Circuit, "[e]ven if unintentionally," "created a fourth test— somewhat combining the Third and Seventh Circuits' tests—which identifies a comparator that is similarly situated for 'all functional intents and purposes' of the regulation." *Id.*

This Court is not as adept at reading between the lines as others, but defers to our Circuit when it states that is not adopting (or rejecting) any other court's standard or test. And, in any event, the difference in the approaches of the various circuits is not dispositive here, as discussed below.

religious institutions') land use); *Church of Scientology*, 843 F. Supp. 2d at 1361-62 (holding

that to successfully claim that zoning ordinances were selectively enforced in violation of Equal

Terms provision, religious institution would need to show "that the two projects were similarly

situated" with "some specificity"). But, in any event, Plaintiffs have not established that the

challenged ordinances here are facially non-neutral. As noted above, each provision standing

alone makes no distinction between religious and secular assemblies or institutions, let alone

makes a distinction between Orthodox/Hasidic and non-Orthodox/Hasidic assemblies or

institutions. Nor have Plaintiffs made out a claim that the challenged ordinances have been

differentially applied to them, as the Court already has concluded that Plaintiffs' as-applied

challenges are not yet ripe.

But for the reasons provided in not dismissing Plaintiffs' Equal Protection and Free

Exercise claims, the Court concludes that Plaintiffs have pled facts sufficient to make out a

"gerrymander" claim, which itself can also support an Equal Terms claim. *See Primera*, 450

F.3d at 1309 (holding that a religious "gerrymander" would support an Equal Terms violation);

*Church of Scientology*, 843 F. Supp. 2d at 1361 ("A religious gerrymander that departs from

basic principles of neutrality may support a RLUIPA violation."). As discussed above, Plaintiffs

have alleged sufficient facts regarding the timing and impact of, and the motives behind, the

challenged ordinances to suggest that they were adopted solely to bar Plaintiffs from

constructing a rabbinical college on the Subject Property. *Cf. Primera*, 450 F.3d at 1310

(holding that plaintiff failed to identify evidence that the challenged zoning ordinances operated

to "gerrymander" plaintiff's use of its property, citing, inter alia, that the challenged zoning

provisions were adopted before plaintiff purchased the property at issue); *Church of Scientology*,

843 F. Supp. 2d at 1361 (same). Again, crucial to the Court's conclusion is the compelled

assumption as to the truth of Plaintiffs' allegations; the Court is not reaching the conclusion that the challenged ordinances do, in fact, violate RLUIPA on their face, or that, even if they do contravene the Equal Terms provision, they would not survive strict scrutiny (or any other standard of review). Therefore, the Court denies Defendants' Motion to Dismiss as to Plaintiffs' Equal Terms claim.

ii. Nondiscrimination

Plaintiffs assert a facial challenge to the Village's ordinances under RLUIPA's Nondiscrimination provision, which provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2).

Very few courts have considered claims based on the Nondiscrimination provision of RLUIPA. However, based on the language of the two provisions and the caselaw applying them, the elements of a Nondiscrimination claim differ little, if at all, from an Equal Terms claim. *See Church of Scientology*, 843 F. Supp. 2d at 1360-61 (noting that both the Equal Terms and Nondiscrimination provisions of RLUIPA cover the same three types of violations); *Covenant Christian Ministries*, 2008 WL 8866408, at *15-16 (treating Equal Terms and Nondiscrimination as identical claims); *New Life Ministries v. Charter Township of Mt. Morris*, No. 05-CV-74339, 2006 WL 2583254, at *3-5 (E.D. Mich. 2006) (same). Thus, the Court concludes that Plaintiffs' Nondiscrimination claim survives Defendants' Motion for the same reasons Plaintiffs' Equal Protection, Free Exercise, and Equal Terms claims survive. Accordingly, Defendants' Motion to Dismiss with respect to this claim is denied.

### iii.  Exclusions and Limits

Finally, Plaintiffs allege that the Village's zoning ordinances on their face violate RLUIPA's Exclusions and Limits provision by totally excluding a rabbinical college from the Village.  This provision provides that "[n]o government shall impose or implement a land use regulation that . . . (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction."  42 U.S.C. § 2000cc(b)(3).  The purpose of this provision "is not to examine the restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate."  *Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v Township of West Pikeland*, 721 F. Supp. 2d 361, 387 (E.D. Pa. 2010); *accord Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs*, 613 F.3d 1229, 1238 (10th Cir. 2010) (noting that district court's jury instruction properly required plaintiff to establish that the county's "regulation, as applied or implemented, has the effect of depriving both [plaintiff] and other religious institutions or assemblies of reasonable opportunities to practice their religion, including the use and construction of structures, within Boulder County" (internal quotation marks omitted)).

The Court concludes that Plaintiffs have stated a claim based on their facial challenge under the Exclusions and Limits Provision.  As noted, Plaintiffs have pled that the challenged ordinances prevent them, as a matter of law, from building the rabbinical college (indeed, any rabbinical college) on the Subject Property or anywhere in Pomona.  The Court recognizes Defendants' point that Plaintiffs could seek to change the ordinances, via a text amendment, but this does not change the analysis.  Plaintiffs have alleged facts plausibly establishing that any efforts to change the law will be time consuming and likely unsuccessful.  And in any event,

100

Plaintiffs have alleged that as now written, the challenged ordinances prevent Plaintiffs (or any Orthodox/Hasidic group) from building a viable rabbinical college in Pomona, and that this was the intended objective of Defendants. This is sufficient to make out a plausible Exclusions and Limits claim. *See Rocky Mountain*, 613 F.3d at 1238 (upholding jury's verdict for RLUIPA plaintiff based, in part, on evidence that county official stated that it would allow only a 100-seat synagogue because "there will never be another mega church . . . in Boulder County," and on testimony that another congregation ran out of money going through the County's special use application process (alteration in original) (internal quotation marks omitted)). Accordingly, Defendants' Motion to Dismiss this claim is denied.

*         *         *

At oral argument, counsel for Defendants expressed concern that Plaintiffs were intending to build "Wake Forest University in Pomona." (Tr. 5).[31] For a residential community such as Pomona, the idea of a large college being built might be of profound and genuine concern for local residents and public officials, and it may be why Defendants and village residents want to block the construction of Plaintiffs' college. However, in this lawsuit Plaintiffs allege that Defendants are blocking their college not because of its physical size or the number of students and faculty that may reside, study, and work there, but because it is an Orthodox/Hasidic rabbinical college that would employ, educate, and house members of the Orthodox/Hasidic community. At this stage, these allegations are untested, but in the Court's view, they are sufficient to merit testing. This ruling is not tantamount to saying that Plaintiffs

---

[31] Wake Forest University has just under 5,000 undergraduate students and a campus size of approximately 340 acres. *See* Wake Forest University, http://en.wikipedia-org/wiki/Wake-Forest-University.

will be able to build a rabbinical college, let alone one that is of a size or structure to their liking. Rather, this ruling only means that the case can proceed to the next phase.

### III. Conclusion

For the reasons discussed above, Defendants' Motion is granted in part and denied in part. Plaintiff Kolel Belz is dismissed as a Plaintiff in this action without prejudice. The remaining Plaintiffs' as-applied challenges under the Free Speech, Free Exercise, and Free Association Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and RLUIPA, as well as their as-applied claims under the New York Constitution and New York state law, are dismissed without prejudice as unripe. The Motion To Dismiss is denied as to the remaining claims. The Clerk of Court is respectfully directed to terminate the pending motion. (Dkt. No. 36.)

SO ORDERED.

Dated:        January 4, 2013
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:
Paul Savad, Esq.
Susan M. Cooper, Esq.
Laura M. Feigenbaum, Esq.
Savad Churgin, Attorneys at Law
55 Old Turnpike Road, Suite 209
Nanuet, NY 10954
(845)-624-3820
mail@savadchurgin.com
*Counsel for Plaintiffs*

Roman P. Storzer, Esq.
Robert L. Greene, Esq.
Storzer & Greene, P.L.L.C.
1025 Connecticut Ave. NW, Suite 1000
Washington, DC 20036
(202) 857-9766
storzer@storzerandgreene.com
*Counsel for Plaintiffs*

John G. Stepanovich, Esq.
Lentz, Stepanovich & Bergethon, P.L.C.
448 Viking Ave., Suite 370
Virginia Beach, VA 10019
(757)-498-7035
jgs@lawlsb.com
*Counsel for Plaintiffs*

Joseph L. Clasen, Esq.
William J. Kelleher, III, Esq.
Samantha L.H. Cassetta, Esq.
Robinson & Cole LLP - NYC
885 Third Avenue, St. 2800
New York, NY 10022
203-462-7514
wkelleher@rc.com
*Counsel for Defendants*

Marci A. Hamilton, Esq.
The Law Office of Marci Hamilton
36 Timber Knoll Drive
Washington Crossing, PA 18977
(212) 353-8984
*Counsel for Defendants*