UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

CONGREGATION RABBINICAL COLLEGE OF          Case No. 07-CV6304(KMK)
TARTIKOV, INC., RABBI MORDECHAI BABAD,
RABBI WOLF BRIEF, RABBI HERMEN KAHANA,
RABBI MEIR MARGULIS, RABBI GERGELY
NEUMAN, RABBI MEILECH MENCZER,
RABBI JACOB HERSHKOWITZ, RABBI
CHAIM ROSENBERG, RABBI DAVID A.
MENCZER, and RABBI ARYEH ROYDE,

Plaintiffs,

-against-

VILLAGE OF POMONA, NY; BOARD OF TRUSTEES OF
THE VILLAGE OF POMONA, NY; NICHOLAS SANDERSON,
AS MAYOR; IAN BANKS as Trustee and in his official capacity,
ALMA SANDERS ROMAN as Trustee and in her official capacity,
RITA LOUIE as Trustee and in her official capacity,
and BRETT YAGEL, as Trustee and in his official capacity,
Defendants.
--------------------------------------------------------------------X

**RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

Paul Savad
Donna Sobel
Savad|Churgin
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954

Roman P. Storzer (admitted *pro hac vice*)
Storzer & Greene, P.L.L.C.
1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20036

John G. Stepanovich (JS 8876)
Stepanovich Law, PLC
516 Baylor Court
Chesapeake, Virginia 23320
*Attorneys for Plaintiffs*

Plaintiffs Congregation Rabbinical College of Tartikov, Inc. ("Tartikov" or the "Rabbinical College"), Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis,, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, Rabbi David A. Menczer, (collectively, the "Plaintiffs") submit this Rule 56.1 Statement of Material Facts as to which there is no genuine issue to be tried in support of Plaintiffs' Motion for Summary Judgment.

<u>PRELIMINARY FACTS</u>

<u>TARTIKOV</u>

1.      The Rabbinical College of Tartikov, Inc. ("Tartikov" or the "Rabbinical College") is a New York religious corporation incorporated on August 1, 2004.  It was formed to establish a rabbinical college with a Torah Community in Rockland County, New York. Defendants' Responses to Plaintiffs' Requests for Admission No. 27, attached to the Declaration of Paul Savad submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Savad Decl.") as Exhibit ("Ex.") as **Exhibit 310**; Transcript of 30(b)(6) Deposition of Congregation Rabbinical College of Tartikov, Inc. ("Tartikov 30(b)(6) Tr.") attached to Savad Decl. as **Exhibit 27** pages 9:11-16;  148:18-149:16; Transcript of Deposition of Michael Tauber dated May 7, 2014 ("Tauber Tr.") attached to Savad Decl. as **Exhibit 28** pages 133:10-21; Transcript of Deposition of Chaim Babad, dated May 19, 2014 ("C. Babad Tr.") attached to Savad Decl. as **Exhibit 31** pages 152:16-23; Savad Decl. **Ex. 290**.

<u>THE VILLAGE</u>

2.      Land use in the Village of Pomona (the "Village") is governed by various provisions of the Village Code, including the Zoning, Wetlands, Subdivision, Site Plan, and Stormwater chapters.  Village of Pomona Code ("Code"), attached to the Declaration of Paul Savad submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Savad Decl.") as **Exhibit ("Ex.") 314** chapters, 114, 118, 119, 126, 130.

3.      The Village regulates its own land use, subject to New York State requirements. Transcript of 30(b)(6) Deposition of Village of Pomona ("Village" or "Pomona") and Board of Trustees of the Village of Pomona ("Board"), Day 2, July 16, 2014 ("Defendants' 30(b)(6) Tr. Day 2"), attached as to Savad Decl. as **Exhibit 13**; pages 282:15-282:18.

4.      The entire area of the Village is designated as a residential district, known as the "R-40 District," with a minimum of 40,000 square feet per lot.  Savad Decl. Ex. 314 Code Sec. 130-5.

2

5.      Permitted land uses within the R-40 District are one-family residences, houses of worship, public utilities rights-of-way, libraries and museums, public parks and playgrounds, and agricultural pursuits.  Savad Decl. **Ex. 314** Code Sec. 130-9.

6.      Special permit uses within the R-40 District are recreational facilities; playgrounds, swimming clubs, tennis courts and recreational buildings; reservoirs, water towers and water tanks; telephone exchanges and public utility substations, communications centers for emergency and other purposes, and any and all other public utility facilities which are or support the primary function of the public utility company; camps; wireless telecommunication services facility; educational institutions; and houses of worship.  **Savad Decl. Ex. 314** Code Sec. 130-10.

7.      On January 22, 2001, the Village enacted Local Law No. 1 of 2001, which regulates school land uses within the Village ("LL1 of 2001").  Savad Decl. **Ex. 152.**

8.      Local Law No. 1 of 2001 adopted a 10% maximum building coverage requirement for schools.  Savad Decl. **Ex. 152;** Savad Decl. **Ex. 314** Code Sec. 130-10(F)(2)(a).

9.      Local Law No. 1 of 2001 adopted a 20% floor area ratio for schools.  Savad Decl. **Ex.152;** Savad Decl. **Ex. 314** Code Sec. 130-10(F)(2)(b).

10.      Local Law No. 1 of 2001 adopted a 25% maximum impervious surface limitation for schools.  Savad Decl. **Ex. 152; 314**  Code Sec. 130-10(F)(2)(c).

11.      On September 27, 2004, the Village enacted Local Law No. 5 of 2004, which regulates Educational Institution land uses within the Village ("LL5 of 2004").  Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 399:8-400:7.

12.      Local Law No. 5 of 2004 eliminated the definition of the word "School" and amended the definition of the words "Educational Institution" to include a requirement that any Educational Institution must be "accredited by the New York State Education Department or similar recognized accrediting agency."  Savad Decl. **Ex. 314**  Code Sec. 130-4.

13.      Local Law No. 5 of 2004 adopted a "Dormitory" provision that read: "DORMITORY - A building that is operated by a school located on the same lot and which contains private or semi-private rooms which open to a common hallway, which rooms are sleeping quarters for administrative staff, faculty or students.  Communal dining, cooking, laundry, lounge and recreation facilities may be provided.  Dormitory rooms shall not contain separate cooking, dining or housekeeping facilities except that one dwelling unit with complete housekeeping facilities may be provided for use of a Superintendent or supervisory staff for every fifty dormitory rooms.  Not more than one communal dining room shall be provided in any building used for dormitory purposes.  Single family, two-family and/or multi-family dwelling units other than as described above shall not be considered to be dormitories or part of dormitories."  Savad Decl. **Ex. 314**  Code Sec. 130-4.

14.     Local Law No. 5 of 2004 added the following requirement for Educational Institutions: "The minimum lot area for an educational institution shall be 10 acres." Savad Decl. **Ex. 314** Code Sec. 130-10(F)(1)(a).

15.     Local Law No. 5 of 2004 added the following language to the "Educational Institution" special permit regulations: "A dormitory is permitted as an accessory use to an educational use and there shall be not more than one dormitory building on a lot." Savad Decl. **Ex. 314** Code Sec. 130-10(F)(12).

16.     Local Law No. 5 of 2004 added the following language to the "Educational Institution" special permit regulations: "The maximum height of a dormitory shall be two stories or 25 feet, whichever is less." Savad Decl. **Ex. 314** Code Sec. 130-10(F)(12)(c).

17.     On January 22, 2007, the Village enacted Local Law No. 1 of 2007, which regulates Educational Institution land uses within the Village ("LL1 of 2007"). Savad Decl. **Ex. 315.**

18.     Local Law No. 1 of 2007 added the following requirement for Educational Institutions: "(a) The minimum lot area for an educational institution shall be a net lot area of 10 acres. (b) No portion of any land under water shall be counted toward the net lot area. Not more than one-fourth of any land which is defined as wetland by the U.S. Army Corp of Engineers, the New York State Department of Environmental Conservation and/or Chapter 126 of this Code or which is within a one hundred year frequency floodplain or within access, utility or drainage easements or rights-of-way shall be counted toward the net lot area. (c) No portion of any land with unexcavated slopes over 35% shall be counted toward net lot area. Not more than 25% of any land with unexcavated slopes greater than 15% but less than 35% shall be counted toward the net lot area." Savad Decl. **Ex. 314** Code Sec. 130-10(F)(1)(a).

19.     Local Law No. 1 of 2007 added the following language to the "Educational Institution" special permit regulations: "A dormitory building is permitted as an accessory use to an educational use provided it is located on the same lot as the educational use and there shall be not more than one dormitory building on the lot.  A dormitory building shall not occupy more than twenty (20) percent of the total square footage of all buildings on the lot." Savad Decl. **Ex. 314** Code Sec. 130-10(F)(12).

20.     On April 23, 2007, the Village enacted Local Law No. 5 of 2007, which regulates wetlands within the Village ("LL5 of 2007").  Savad Decl. **Ex. 155.**

21.     Local Law No. 5 of 2007, titled the Wetlands Protection Law, prohibited various forms of development activity from occurring within 100 feet of the boundary of any wetland, water body or watercourse, unless a permit is issued by the Board of Trustees or Planning Board, which can be granted only if the regulation results in a deprivation of "the reasonable use of a property so as to constitute a de facto taking of such property." Savad Decl. **Ex. 314**  Code Sec. 126-5.

22.    Local Law No. 5 of 2007 exempted "lots that are improved with single-family residences" from the application of its "one-hundred-foot-buffer" provision. Savad Decl. Ex. 314 Code Sec. 126-3(D).

23.    Pomona is a typical suburban community, with many single family houses with garages. It is densely built out, with existing single family residential structures in the area are a mix of styles reflecting a suburban development pattern with limited aesthetic cohesion. Declaration of Susannah Drake submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Drake Decl.") ¶¶ 25-26; Beall Dec. ¶ 213.

24.    Six percent of the Village is currently occupied with rental homes and the Village has low vacancy rates. Transcript of the Deposition of Charles Voorhis, dated August 1, 2014 attached to Savad Decl. as Exhibit 18 ("Voorhis Tr."), pages 141:16-142:20.

25.    The average rental rate for a house in the Village is $2000-$3000 per month. Savad Decl. Ex. 18 (Voorhis Tr.) pages 143:2-144:13; Savad Decl. Ex. 248. Tauber Decl. ¶ 49. Defendants' expert witness was unaware as to the cost of rental units in the area. Savad Decl. Ex. 18 (Voorhis Dep. at 140:6-8).

26.    There is a need in the Village for affordable, multi-family housing as identified in its 1997 Master Plan. Transcript of 30(b)(6) Deposition of Village and Board, Day 1, July 15, 2014 ("Defendants' 30(b)(6) Tr. Day 1"), attached as to Savad Decl. as Exhibit 12 pages 180:17-181:6; Transcript of Deposition of Mark Healey, taken on September 11, 2014 ("Healey Tr."), attached to Savad Decl as Exhibit 24 pages 33:12-35:4; Savad Decl. Ex. 151.

## OVERVIEW OF JEWISH LAW

27.    Plaintiffs believe that Jewish law (or "Halakhah") is a religiously based system, and the religious beliefs of its adherents require them to obey its tenets. Declaration of Steven Resnicoff submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Resnicoff Decl.") ¶ 21; Declaration of Meleich Menczer submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Menczer Decl.") ¶ 6; Declaration of Jacob Hershkowitz submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Hershkowitz Decl.") ¶ 6; Declaration of Chaim Rosenberg submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Rosenberg Decl.") ¶ 7; Declaration of Steven H. Resnicoff submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Resnicoff Decl.") ¶ 21.

28.    Plaintiffs believe that the principal body of Jewish law (known as Biblical law) was communicated in non-written form from G-d to the Jewish people through Moses. This communication had two parts. One part was intended to be, and was, committed to writing. This part is known as the "Written Torah" or the "Five Books of Moses." Resnicoff Decl. ¶22; Menczer Decl. ¶ 7; Hershkowitz Decl. ¶ 7; Rosenberg Decl. ¶ 8.

29.     Plaintiffs believe that the second part of the communication from G-d was intended not to be written, but, instead, to be taught orally directly from teacher to student. This portion is known as the "Oral Torah." Together, the Written Torah and Oral Torah constitute the Torah. Resnicoff Decl. ¶23;  Menczer Decl. ¶ 8; Hershkowitz Decl. ¶ 8; Rosenberg Decl. ¶ 9.

30.     Plaintiffs believe that Orthodox Jews fundamentally agree that the Torah embodies the word and will of God and that it is authoritative.  Therefore, one is religiously and morally obligated to follow its rules. Resnicoff Decl. ¶24;  Menczer Decl. ¶ 9; Hershkowitz Decl. ¶ 9; Rosenberg Decl. ¶ 10.

31.     Plaintiffs believe that early Jewish law authorities feared that the Torah, or parts of it, might be forgotten.  Consequently, they decided that it was necessary - and permitted by Jewish law - to commit the Oral Torah to writing. Resnicoff Decl. ¶25;  Menczer Decl. ¶ 10; Hershkowitz Decl. ¶ 10; Rosenberg Decl. ¶ 8.

32.     Plaintiffs believe that the first major publication that contained parts of both the Written Torah and the Oral Torah was the Mishnah, which was redacted around the year 180.  It is divided into 63 subject areas. Resnicoff Decl. ¶26;  Menczer Decl. ¶ 11; Hershkowitz Decl. ¶ 11; Rosenberg Decl. ¶ 12.

33.     Plaintiffs believe that the Babylonian Talmud (the "Talmud") is the central literary source from which much of Jewish law/Halakhah is derived.  The Talmud addresses 37 of the 63 subject areas of the Mishnah.  As to each of these 37 subject areas, the Talmud consists of two parts.  The first is the relevant Mishnah, and the second is known as the "Gemara."  The Gemara is the legal analysis and elaboration of the teaching of the Mishnah, along with a discussion of additional legal issues that arise in connection with the Mishnah. Resnicoff Decl. ¶27;  Menczer Decl. ¶ 12; Hershkowitz Decl. ¶ 12; Rosenberg Decl. ¶ 13.

34.     Plaintiffs believe that there are many post-Talmudic written Jewish law treatises that are regarded as especially authoritative. One, known as the Mishneh Torah, was written by Maimonides.  This treatise comprehensively addressed all areas of Jewish law and was meticulously organized by topics. Resnicoff Decl. ¶28;  Menczer Decl. ¶ 13; Hershkowitz Decl. ¶ 13; Rosenberg Decl. ¶ 14.

35.     Plaintiffs believe that the Jewish Law code known as the Arba' ah Turim ("Tur"), written by Yaakov ben Asher (Rabbi Jacob) (1270-1340), was the first to organize Jewish Law law into a four-part structure/division.  It is limited to those issues of Jewish Law that are applicable in the current era, i.e., in the period after the destruction of the holy Temple in Jerusalem. The foremost commentary on the Arba'ah Turim is known as the "Beit Yosef," which was written in the sixteenth century by Rabbi Joseph Karo. Resnicoff Decl. ¶29;  Menczer Decl. ¶ 14; Hershkowitz Decl. ¶ 14; Rosenberg Decl. ¶ 15.

36.     Plaintiffs believe that The Shulchan Aruch (literally  meaning, "the Set Table", but known by most Jewish communities as the "Code of Jewish Law") was authored by Joseph Karo and is  based on the four-part structure of the Arba' ah Turim.  Rabbi Karo lived in the

Middle East and wrote the Shulchan Aruch according to the perspectives of Middle Eastern (Sephardic) Jewish authorities.   Soon after publication of the Shulchan Aruch, Rabbi Moses Isserles ("Rema"), who lived among Europe's Ashkenazic Jews, added his glosses to the Shulchan Aruch.  These glosses are known as the "mappah" or tablecloth that enhances Rabbi Karo's Set Table. Resnicoff Decl. ¶30;  Menczer Decl. ¶ 15; Hershkowitz Decl. ¶ 15; Rosenberg Decl. ¶ 16.

37.    The Talmud is the source for the Shulchan Aruch. Affidavit of Meilech Menczer previously submitted in Opposition of Plaintiffs' Motion to Dismiss, dated January 10, 2008 ("Menczer MTD Dec."), attached to Savad Decl. as Exhibit 307 ¶ 9.

## JEWISH LAW, CUSTOMS AND TRADITIONS

38.    Plaintiffs believe that Jewish men are religiously obligated to marry at a young age and have large families. Transcript from the deposition of Leonard Jackson August 13, 2014 ("Jackson Tr.") attached to Savad Decl. as Exhibit 38, page 36:11-19; Resnicoff Decl. ¶86-99; Menczer Decl. ¶ 16; Hershkowitz Decl. ¶ 16; Rosenberg Decl. ¶18; .Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 23:22-24:15; Declaration of Michael Tauber submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Tauber Decl.") ¶ 8,38.

39.    Plaintiffs believe that the religious basis for having a large family is rooted in Genesis: G-d told Adam and Eve,  representing all humankind to "be fruitful and multiply." Genesis 1:28; and again after the flood that  consumed almost all of humankind, G-d repeated this command to Noah and his sons on the Ark, Genesis 9: 1, 7, and to Jacob when he entered the land of Israel, G-d said to him: " I am the Almighty G-d; be fruitful and multiply." Genesis 35:11. Resnicoff Decl. ¶87;  Menczer Decl. ¶ 17; Hershkowitz Decl. ¶ 17; Rosenberg Decl. ¶ 18; Tauber Decl.¶38.

40.    Plaintiffs believe that the Talmud also emphasizes this command by citing that when a Jewish male dies and appears before the Heavenly Tribunal to be judged, one of the six questions he is asked is "Were you busy with being fruitful and multiplying." Resnicoff Decl. ¶90;  Menczer Decl. ¶ 18; Hershkowitz Decl. ¶ 18; Rosenberg Decl. ¶ 18; Tauber Decl.¶38.

41.    Plaintiffs believe that rabbinic law continues this biblical commandment: "Although a man has fulfilled the mitzvah to be fruitful and multiply--he is commanded by the rabbis not to desist from procreation while he yet has strength, for whoever adds even one Jewish soul is considered as having created an entire world." See Moses Maimonides (1135-1204), MISHNAH TORAH, *Hilkot Ishut* 15:16, as cited in Resnicoff Decl. ¶91;  Menczer Decl. ¶ 19; Hershkowitz Decl. ¶ 19; and Rosenberg Decl. ¶ 19; Tauber Decl.¶38.

42.    Plaintiffs believe that in order to meet this religious obligation, Jewish law imposes conjugal duties upon a husband and wife while forbidding them to engage in family planning and forbidding them from using birth control. Tartikov 30(b)(6) Tr. pages 24:22-25:8; Resnicoff Decl. ¶99;  Menczer Decl. ¶ 20; Hershkowitz Decl. ¶ 20; Rosenberg Decl. ¶ 20.

43.     Plaintiffs believe Jewish families meet this religious obligation in part because the Talmud teaches that "this will  hasten the arrival of the Messiah because there are a certain, but unknown number of souls stored in heaven, and the Messiah will only come after all of those souls have been born." Resnicoff Decl. ¶93;  Menczer Decl. ¶ 21; Hershkowitz Decl. ¶ 21; Rosenberg Decl. ¶ 21;Tauber Decl.¶38.

44.     Judaism teaches that a person is significantly influenced by his environment and directs him to dwell among a community that is directed to the Torah. Resnicoff Decl. ¶107-122; Menczer Decl. ¶ 22; Hershkowitz Decl. ¶ 22; Rosenberg Decl. ¶ 22;Tauber Decl.¶38.

45.     Every Jewish male is biblically commanded to engage in rabbinic study, study of Torah.  Resnicoff Decl. ¶44-70;  Menczer Decl. ¶ 23; Hershkowitz Decl. ¶ 23; Rosenberg Decl. ¶ 23.

46.     Plaintiffs believe that the Torah commands Jewish males to learn the Torah day and night, or to "speak of them [the Torah's precepts] while you sit in your home, while you walk on the way, when you retire and when you arise." Deuteronomy 6:5-9.  Resnicoff Decl. ¶44;  Menczer Decl. ¶ 24; Hershkowitz Decl. ¶ 24; Rosenberg Decl. ¶ 24.

47.     Plaintiffs believe that this biblical command has been reinforced by the rabbis by declaring that "the study of the Torah is Judaism's highest ideal..." and not only a "sacramental act" but the greatest of all *mizvots* [commandments]. Resnicoff Decl. ¶45;  Menczer Decl. ¶ 25; Hershkowitz Decl. ¶ 25; Rosenberg Decl. ¶ 25.

48.     Plaintiffs believe that because the study of the Torah should be constant, any time one unjustifiably detracts from Torah study, he commits the sin of bitul Torah (waste of the Torah). Resnicoff Decl. ¶61;  Menczer Decl. ¶ 26; Hershkowitz Decl. ¶ 26; Rosenberg Decl. ¶ 26.

## RELIGIOUS JUDGES/ DAYANIM

49.     Plaintiffs believe, as a matter of religious faith, that Orthodox/Hasidic[1] Jews are prohibited from resolving their disputes in secular courts, so there is a need for rabbinical judges. Resnicoff Decl. ¶31-43;  Menczer Decl. ¶ 27; Rosenberg Decl. ¶ 27; Hershkowitz Decl. ¶ 27; Transcript of Deposition of Jacob Hershkowitz, dated May 13, 2014 ("Hershkowitz Tr.") attached to Savad Decl. as **Exhibit 30** pages 86:4-17; Savad Decl. Ex. 27 (Tartikov 30(b)(6) Tr.) 81:6-14 ; Transcript of Deposition of Professor Preston Green, dated July 30, 2014 ("Green Tr.") attached to Savad Decl. as **Exhibit 16** pages 40:25-41:17. Resnicoff Decl. ¶33;  Menczer Decl. ¶ 27; Hershkowitz Decl. ¶ 27.

---

[1] Throughout their moving papers, Plaintiffs will refer to Orthodox/ Hasidic Jews without distinction. Although a distinction does exist, it is irrelevant for purposes of this motion.

50.     A backlog of cases often forces Orthodox Jews involved in disputes to go to secular courts. Savad Decl. **Ex. 31** (C. Babad Tr.) 96:22-97:8.

51.     Plaintiffs believe that there is a great need for rabbinical judges, so Orthodox Jews are not forced to go to secular courts, and the demand for rabbinical judges is growing. Savad Decl. **Ex. 31** (C. Babad Tr.) 96:21-97:8; Transcript of Deposition of Meilech Menczer dated April 2, 2014 ("Menczer Tr.") attached as **Exhibit 26** to Savad Decl. pages 85:22-86:2; Tauber Decl. ¶14; Rosenberg Decl.¶41; Hershkowitz ¶39.

52.     Plaintiffs believe that only qualified Jewish religious judges shall hear and decide disputes between and among Jews. Resnicoff Decl. ¶¶33-39;  Menczer Decl. ¶ 35; Hershkowitz Decl. ¶ 35; Rosenberg Decl. ¶ 37.

53.     Plaintiffs believe that this is a very serious command and that by going to civil courts, the Orthodox/Hasidic Jew ignores the holy laws and legal system that God made just for the Jewish people and instead chose the laws and rules made by man. Resnicoff Decl. ¶38; Menczer Decl. ¶ 36; Hershkowitz Decl. ¶ 36; Rosenberg Decl. ¶ 38.

54.     The religious courts are called bais din and the judges who sit on these religious courts are called *dayanim* (plural) and *dayan* (singular).  Resnicoff Decl. ¶18;  Menczer Decl. ¶ 37; Hershkowitz Decl. ¶ 37; Rosenberg Decl. ¶ 39.

55.     Plaintiffs believe that Orthodox/Hasidic Jews also look for help on a daily basis from the *dayanim* on the many religious issues that come up because our religious laws direct every part of their lives.  Menczer Decl. ¶38; Hershkowitz Decl. ¶38; Rosenberg Decl. ¶40.

56.     Plaintiffs believe that to serve as a *dayan*, and judge cases according to the true intent of our religious law, the judge "becomes a partner with G-d." By doing justice and settling disputes, the *dayan* helps keep the world according to G-d's Will.  Resnicoff Decl. ¶69; Menczer Decl. ¶28; Hershkowitz Decl. ¶ 28; Rosenberg Decl. ¶ 28.

57.     The Code of Jewish Law that will be studied at the Congregation Rabbinical College of Tartikov will include all aspects of Jewish life, personal and business, because we are guided by our religious laws in these ways.  Menczer Decl. ¶ 44; Hershkowitz Decl. ¶ 51; Rosenberg Decl. ¶53; Tauber ¶15; Tauber Decl.¶15.

58.     The Code of Jewish Law sets out the religious rules of how Orthodox/Hasidic Jews  are to live their lives and they are to strictly follow these religious laws in their daily lives, which these Plaintiffs do follow these beliefs.  Menczer Decl. ¶ 45; Hershkowitz Decl. ¶ 52; Rosenberg Decl. ¶ 54; Tauber ¶15.

59.     Even in the nearby Monsey community, there is a backlog of cases and not enough qualified religious judges to handle all of the cases. Savad **Ex. 26** (Menczer Tr.) 83:19-85:19; Hershkowitz Decl. ¶ 39; Rosenberg Decl. ¶ 41;Tauber Decl.¶14.

60.     Because there is a shortage of sufficiently trained rabbinic judges, capable of handling all of the cases, currently, rabbis that are not really capable are handling cases now. Savad **Ex. 26** (Menczer Tr.) 83:9-13.

61.     The need for qualified rabbinical judges is so great that the demand will be double or triple in 15 years from now.  Savad **Ex. 26** (Menczer Tr.) 85:20-86:4.

62.     Plaintiffs believe that Jewish religious sources explain that by serving as a judge and resolving disputes between people according to the true intent of the law, the rabbinical judge is credited with being a partner with G-d. Resnicoff Decl. ¶69;  Menczer Decl. ¶ 28; Hershkowitz Decl. ¶ 28; Rosenberg Decl. ¶ 28.

63.     Plaintiffs believe that, by settling disputes between people, *dayanim* (religious judges) enable the world to continue to exist, because without courts and due process of law, anarchy would ensue. Resnicoff Decl. ¶69;  Menczer Decl. ¶ 29; Hershkowitz Decl. ¶ 29; Rosenberg Decl. ¶ 29.

64.     Plaintiffs believe that, by sitting in judgment, the rabbinical judge  "basks in the presence of G-d" because the Holy One, blessed be He, leaves the highermost heavens and causes His Shekhinah [Divine Presence] to rest at the judge's side" thus, serving as a religious judge is a spiritually fulfilling act. Resnicoff Decl. ¶69;  Menczer Decl. ¶ 30; Hershkowitz Decl. ¶ 30; Rosenberg Decl. ¶ 30.

## THE SHULCHAN ARUCH

65.     Tartikov's rabbinical college program will focus on Jewish Law or, *"Halacha"* which is based on the four books of Shulchan Aruch, which includes everything that pertains to all facets of daily Orthodox Jewish life.  Transcript of Deposition of Rabbi Mordechai Babad dated May 9, 2014 ("M. Babad Tr.") attached to Savad Decl. as **Exhibit 29** pages 57:18-58:2; Transcript of Deposition of Professor Steven Resnicoff dated August 3, 2014 ("Resnicoff Tr.") pages 43:17-47:12; Savad **Ex. 27** (Tartikov 30(b)(6) Tr.) 54:21-24; Savad **Ex. 16** (Green Tr.) 91:19-21; Savad **Ex. 26** (Menczer Tr.) 24:24-25:15; 56:11-16; Transcript of Deposition of Chaim Rosenberg dated May 2, 2014 ("Rosenberg Tr.") attached to Savad Decl. as **Exhibit 25** pages 24:14-15.

66.     The Shulchan Aruch is not actually 4 books. There are four major divisions in Jewish law.  It is a massive amount of literature that the rabbinical students will have to master. Savad Decl. **Ex. 34** (Resnicoff Tr.)  43:17-47:12.

67.     To master this study, there are thousands of religious commentaries that must be read and understood in order to be fully knowledgeable in the Code of Jewish Law and to become a qualified rabbinical judge.  This is a long and difficult process that will require a total commitment from the plaintiff students, for which they are prepared. M. Menczer Decl ¶47; Hershkowitz Decl. ¶ 54; Rosenberg Decl. ¶ 56.

68.     The four divisions of the Shulchan Aruch are:

a.      Chosen Mishpat--are the laws of finance, interest and financial responsibility; law of personal and financial damages; legal procedure, including the rules of the Bes Din and rules of witnesses.

b.      Yoreh De'ah --are laws related to kashrut (Jewish religious dietary laws, "kosher"); religious conversion laws; laws regarding mourning;  laws of family purity; and laws related to Israel.

c.      Orach Chayim-- are laws related to prayers, synagogue, Sabbath and holidays)

d.      Even Ha'ezer-- are laws related to marriage and divorce.

Savad Decl. **Ex. 24** (Resnicoff Tr.) 44: 7-48:21; Savad Decl. **Ex. 31** (C. Babad Tr.) 13:14-14:13; Tauber Decl. ¶16;  Resnicoff Decl. ¶30, 76;  Menczer Decl. ¶ 46; Hershkowitz Decl. ¶ 53; Rosenberg Decl. ¶55.

## TARTIKOV'S MISSION AND PURPOSE

69.     The Rabbinical College of Tartikov, Inc. is a New York religious corporation incorporated on August 1, 2004.  It was formed to establish a rabbinical college in Rockland County, New York.  Defendants' Responses to Plaintiffs' Requests for Admission No. 27, attached to Savad Decl as **Exhibit 310;** Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 9:11-16; 148:18-149:16; Savad Decl. **Exhibit 28** (Tauber Tr.) 133:10-21; Savad Decl. **Ex. 31** (Chaim Babad Tr.) 152:16-23; Savad Decl. **Ex. 290.**

70.     Tartikov's religious purpose is to develop and operate a rabbinical college that will be a Torah Community to educate students to become rabbinic judges.  Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 11:17-12:8; Savad Decl. **Ex. 28** (Tauber Tr.) 104:25-105:4; Tauber Decl. ¶6.

71.     A Torah community is a living and learning religious campus which includes total dedication to religious obligations of mastering the Code of Jewish Law in order to become a full-time rabbinical judge while at the same time meeting the students' religious obligations to his family (including teaching them the Torah) and to worshipping God in the proper way. Tauber Decl. ¶ 21;  M. Menczer Dec. ¶ 52; Hershkowitz Decl. ¶ 59; Rosenberg Decl. ¶ 61;Resnicoff Decl.¶107-122.

72.     The Torah Community involves intensive learning interaction, day and night among the students, teachers and lecturers.  Tauber Decl. ¶ 21; M.Menczer Dec. ¶ 53; Hershkowitz Decl. ¶ 60; Rosenberg Decl. ¶62;Resnicoff Decl.¶107-122.

73.     The Torah Community will allow the rabbinical college's students to have the opportunity to constantly gain knowledge from the teachers and students by interacting with the

teachers and discussing the issues with their fellow students. Tauber Decl. ¶ 28; M.Menczer Dec. ¶ 54; Hershkowitz Decl. ¶ 61; Rosenberg Decl. ¶63;Resnicoff Decl.¶107-122.

74.      As part of the Torah Community, the students will be able to have access to teachers and fellow students day and night, in the study halls, courtrooms, *shuls,* or in the living quarters, and this will allow for constant communication and learning opportunities. Tauber Decl. ¶ 29; M.Menczer Dec. ¶ 55; Hershkowitz Decl. ¶ 62; Rosenberg Decl. ¶64;Resnicoff Decl.¶107-122.

75.      There is a need for a Torah community.  Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 9:23-12:8.

76.      The proposed schedule at Tartikov is a full-time course of study for approximately 15 years.  Savad Decl. **Ex. 31** (Chaim Babad Tr.) 97:13-22; 99:22-100:2; Resnicoff Decl **Ex. 2.**

77.      The religious study method that will be used at Tartikov is called *chevrusa,* where students study with a partner. Savad Decl. **Ex. 25**  (Rosenberg Tr.) 23:13-15.

## THE TARTIKOV VISION

78.      Michael Tauber and Chaim Babad are trustees of Congregation Rabbinical College of Tartikov, Inc. Savad Decl. **Ex. 28** (Tauber Tr.) 101:21-24; Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 13:17-23; Savad Decl. **Ex. 31** (C. Babad Tr.) 154:16-22; 155:18-21.

79.      Michael Tauber and Chaim Babad discussed their religious commitment and vision for the rabbinical school for years. Savad Decl. **Ex. 28** (Tauber Tr.) 134:3-135:3; Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 9:17-11:19.

80.      The religious commitment of Michael Tauber and Chaim Babad to this rabbinical school is based on each of their family's long histories with rabbinical courts. Savad Decl. **Ex. 31** (C. Babad Tr.) 100:9-101:6; 155:22-157:20; 157:22-159:18; Savad Decl. **Ex. 272** (Tauber 30(b)(6)**Ex. 710**); Savad Decl. **Ex. 29** (M. Babad Tr.) 52:5-11.

81.      The Babad family name is rooted in the name *Bais din,* or son of Bais din, and the first Babad family judge goes back over 500 years in Krakow, Poland. Before World War II, the Babad family had rabbis that served in 40 cities and towns, but the war wiped them out. Savad Decl. **Ex. 31** (C. Babad Tr.) 89:1-21-90:6.

82.      Chaim Babad's father told him to support rabbinical colleges in order to replenish the rabbinical judges who had been killed during the Holocaust. Savad Decl. **Ex. 31** (C. Babad Tr.) 17:25-19:3; 188:16-189:3.

83.      It is customary for Orthodox Jews to donate 10% of their earnings to charitable causes. Savad Decl. **Ex. 31** (Chaim Babad Tr.) 95:3-96:11; 105:11-109:25. Every business venture of Chaim Babad is designed to ensure that 10% of its earnings are contributed to Kahal

Minchas Chinuch. Savad Decl. **Ex. 31** (Chaim Babad Tr.) 51:11-52:21; 95:5-17. Kahal Minchas Chinuch purchased the Property and transferred it to Tartikov. Savad Decl. **Ex. 28** (Tauber Tr.) 128:23-129:6.

84.     For many years, Michael Tauber and his family have donated an enormous amount of time and millions of dollars to Mechon L'Hoyroa. Savad Decl. **Ex. 28** (Tauber Tr.) 95:16-97:17. Chaim Babad has also donated a lot of charity to Mechon L'Hoyroa over the years. Savad Decl. **Ex. 28** (Tauber Tr.) 97:18-98:3.

85.     When news of the intended college reached the community, Michael Tauber received many calls from many potential students. Savad Decl. **Ex. 27** (Tauber 30(b)(6) Tr.) 159:2-20.

86.     Tartikov will be self funding; it is not seeking any infrastructure from Pomona. Savad Decl. **Ex. 31** (Chaim Babad Tr.) 103:3-12.

87.     The Rabbinical College of Tartikov, Inc. pays money in the form of stipends to its students. Savad Decl. **Ex. 28** (Tauber Tr.) 105:6-106:3; 114:3-12; Savad Decl. **Ex. 31** (C. Babad Tr.) 164:17-165:17.

## THE INDIVIDUAL PLAINTIFFS

### Students

88.     Jacob Hershkowitz is 27 years old. Hershkowitz Tr. 11:3-4. He is married and has 5 children. Transcript of Deposition of Jacob Hershkowitz dated May 13, 2014 ("Hershkowitz Tr." attached as **Exhibit 30** to Savad Decl. pages 9:6-10. He speaks Yiddish and is a member of the Orthodox/Hasidic Community and according to his religious beliefs, he has strict dress codes which emphasizes modest dress. Hershkowitz Decl.¶3,4. He is known as a "Rabbi" in his community because of his full-time religious study. Hershkowitz Decl.¶40. He studies at Kollel Belz. Savad Decl. **Ex. 30** (Hershkowitz Tr.) 11:18-13:2; Savad Decl. **Ex. 306** Affirmation of Jacob Hershkowitz previously submitted in Opposition of Plaintiffs' Motion to Dismiss, dated January 10, 2008 (Hershkowitz MTD Aff) ¶ 2 . Based upon his religious belief, he intends to become a rabbinical judge. Savad Decl. **Ex. 30** (Hershkowitz Tr.) 23:14-24:6. He plans to get a *smicha* in all 4 books. *Id.* 19:9-20:19; Savad Decl. **Ex. 306** ¶ 3. He has been admitted to Tartikov and will attend upon its opening. Hershkowitz Decl.¶49. His wife works as a secretary at Pines Homes. Savad Decl. **Ex. 30** (Hershkowitz Tr.) 7:23-9:4.

89.     The Village has no knowledge that Jacob Hershkowitz does not intend to study at a rabbinical college as described in the Second Amended Complaint. Savad Decl. **Ex. 312**; Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 280:2-8.

90.     Meilech Menczer is 37 years old. He has 8 children ages 2-16. Savad Decl. **Ex. 26** (Menczer Tr.) 6:9-13. He speaks Yiddish and is a member of the Orthodox/Hasidic Community and according to his religious beliefs, he has strict dress codes which emphasizes modest dress. M.Menczer Decl. ¶3. He is known as a "Rabbi" in his community because of his

full-time religious study. M.Menczer Decl. ¶40. Based on his religious beliefs, he intends to study all 4 books of the Shulchan Aruch. Savad Decl. **Ex. 26** (Menczer Tr.) 12:17-13:23. He has been approved for admission into the rabbinical school campus proposed to be built by Tartikov and intends and is committed to study all four volumes of the Shulchan Aruch at Tartikov to become a rabbinical judge. Savad Decl. **Ex. 26** (Menczer Tr.) 13:24-14:7; 19:4-11; Savad Decl. **Ex. 307** ¶ 17. It has been his aspiration since his youth to be a rabbinical judge. Savad Decl. **Ex. 26** (Menczer Tr.) 13:12-23; Savad Decl. **Ex. 307** ¶ 2. He is currently studying the *Chosen Mishpat* at Kollel Belz. Savad Decl. **Ex. 26** (Menczer Tr.) 51:3-16. He is currently employed as a tutor at the Yeshiva Shaar Ephriam in Monsey, NY, tutoring students 13-16 in the Talmud. Menczer Decl. ¶32. He has been admitted to Tartikov and will attend upon its opening. Menczer Decl. ¶42.

91.     The Village has no knowledge that Meilech Menczer does not intend to study at a rabbinical college as described in the Second Amended Complaint. Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 280:2-8.

92.     Chaim Rosenberg is 29. He is married and has five children ages 3 months to 8 Savad Decl. **Ex. 25** (Rosenberg Tr.) 5:8-12. His religious belief has been that he should become a rabbinical judge for as long as he can remember because he has the ability and believes that someone who has the ability must do so. Savad Decl. **Ex. 25** (Rosenberg Tr.) 11:12-12:5. He is committed to Tartikov and is currently studying to be ready when Tartikov opens Savad Decl. **Ex. 25** (Rosenberg Tr.) 9:3-22. He has been admitted to Tartikov and will attend upon its opening. Rosenberg Decl.¶51. His wife works as a math tutor at a girls school, Bnos Esther Pupa. Savad Decl. **Ex. 25** (Rosenberg Tr.) 5:21-6:14.

93.     The Village has no knowledge that Chaim Rosenberg does not intend to study at a rabbinical college as described in the Second Amended Complaint. Savad Decl. **Ex. 312**; Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 280:2-8.

<u>Teachers</u>

94.     Mordechai Babad, Tartikov's intended dean, is trained in and is qualified to rule on matters within all four books of the Shulchan Aruch. Savad Decl. **Ex. 29** (M. Babad. Tr.) 30:15-32:24; 41:3-14. He became a rabbinical judge in the 1980's. *Id.* at 33:18-34:8 He is married and has 16 children. *Id.* at 9:13-17.

95.     Mordechai Babad is one of the only people trained in all four books of the Shulchan Aruch. Savad Decl. **Ex. 26** (M. Menczer Tr.) 86:5-13. He is considered to be one of the most respected scholars in Monsey, New York. Savad Decl. **Ex. 25** (Rosenberg Tr.) 44:19-45:10.

96.     The Village has no knowledge that Mordechai Babad does not intend to teach at a rabbinical college as described in the Second Amended Complaint. Savad Decl. **Ex. 312**; Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 281:4-14.

97.     Wolf Brief, one of Tartikov's intended teachers, is trained in all 4 books of the Shulchan Aruch. Affidavit of Wolf Brief previously submitted in Opposition of Plaintiffs' Motion to Dismiss, dated January 10, 2008 Savad Decl. **Ex. 329** ¶ 2.  His religious beliefs requires him to pass on this knowledge. *Id.* at ¶ 3.  He plans to reside at Tartikov so that he can be available to students day and night. *Id.* at ¶ 7.

98.     The Village has no knowledge that the plaintiff teachers do not intend to teach at the rabbinical college as described in the Second Amended Complaint. Savad Decl. **Ex. 312**; Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 280:21-281:3.

## THE PROPERTY

99.     The subject property is situated on an approximately 100-acre parcel located at the intersection of US Route 202 and NY Route 306 in the Village of Pomona, Rockland County. Declaration of William Fitzpatrick submitted herewith in support of Plaintiffs' Motion for Summary Judgment ("Fitzpatrick Decl.") ¶ 11.

100.    Tartikov's property is located in the southeast quadrant of the Route 202 and Route 306 intersection.  Fitzpatrick Decl. ¶ 41.

101.    Tartikov purchased the Property on August 4, 2004.  Savad Decl. **Ex. 28** (Tauber Tr.) 128:23-129:6; Savad Decl. **Ex. 291**.

102.    Tartikov purchased the Property for the express purpose of building and operating a religious educational institution, specifically a rabbinical college.  Tauber Decl. ¶3.

103.    Prior to the purchase, Michael Tauber was looking for a location that would accommodate the rabbinical college for years.  Savad Decl. **Ex. 28** (Tauber Tr.) 135:4-136:7.

104.    The Subject Property can accommodate the needs of Tartikov as a site for its rabbinical college. Tauber Declaration ¶3-5; It will accommodate the needs of the rabbinical students/teachers and their families to be near necessary Jewish services. Resnicoff Decl.  ¶100-106.

105.    Chaim Babad provided the funds for the purchase of the subject property; and there is no mortgage on the property.  Savad Decl. **Ex. 27** (Tartikov 30(b)(6) Tr.) 81:15-23.

106.    The only parcel of property owned by The Rabbinical College of Tartikov, Inc. is the Subject Property. Savad Decl. **Ex. 31** (C. Babad Tr.) 76:20-78:4.

## THE VILLAGE'S TARGETING OF ORTHODOX/ HASIDIC JEWS AND THEIR PROPERTY

### Village officials were Aware that Orthodox/ Hasidic Jews lived in the Neighboring Community Prior to Passage of the Challenged Laws

107.    Village officials and employees are aware that Orthodox/Hasidic families have large families.  Transcript of Deposition of Nicholas Sanderson dated July 31, 2014, attached to Savad Declaration as **Exhibit 17** ("N. Sanderson Tr.") pages 151:20-25; Transcript of Deposition of Brett Yagel dated May 8, 2014, attached to Savad Declaration as **Exhibit 4** ("B. Yagel Tr.") pages 22:15-21; 201:11-21; Transcript of Deposition of Alma Sanders Roman dated May 16, 2014, attached to Savad Declaration as **Exhibit 7** ("Roman Tr.") pages 24:18-21; Transcript of Deposition of Rita Louie dated June 16, 2014, attached to Savad Declaration as **Exhibit 9** ("Louie Tr.") 183:23-184:2; Transcript of Deposition of Melvin Cook dated April 8, 2014, attached to Savad Declaration as **Exhibit 1** ("Cook Tr.") pages 160:8-14; Transcript of Deposition of Robert Prol dated April 9, 2014, attached to Savad Declaration as **Exhibit 2** ("Prol Tr.") pages 72:6-15; 73:11-74:17; Transcript of Deposition of Lynn Yagel dated May 22, 2014, attached to Savad Declaration as **Exhibit 8** ("L. Yagel Tr.") 38:21-39:5; Transcript of Deposition of Leslie Sanderson dated July 7, 2014, attached to Savad Declaration as **Exhibit 11** ("Leslie Sanderson Tr. ") pages 237:4-13.

108.    Village officials and employees can recognize Orthodox/ Hasidic Jews by the manner in which they dress.   Savad Decl. **Ex. 11** (L. Sanderson Tr.) 56:22-25; 57:7-10; Savad Decl. **Ex. 9** (Louie Tr.) 49:20-50:2; Savad Decl. **Ex. 8** (L. Yagel Tr.) 38:2-20; 124:4-9; Savad Decl. **Ex. 4** (B. Yagel Tr. ) 96:11-22; 244:25-245:6;  Transcript of Deposition of Doris Ulman dated August 15, 2014, attached to Savad Declaration as **Exhibit 23** ("Ulman Tr.") pages 22:23-23:12; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 19:15-25; Transcript of Deposition of Robert Rhodes, Day 1, dated August 11, 2014, attached to Savad Declaration as **Exhibit 19** ("Rhodes Day 1 Tr.") pages 55:4-56:16; Transcript of Deposition of Alan Lamer dated May 12, 2014, attached to Savad Declaration as **Exhibit 5** ("Lamer Tr.") pages 57:19-58:8; Transcript of Deposition of Herbert Marshall dated April 30, 2014, attached to Savad Declaration as **Exhibit 3** ("Marshall Tr.") pages 26:3-13

109.    Village officials and employees are aware that Hasidic/ Orthodox Jews strictly follow the Torah and have particular customs and laws. Savad Decl. **Ex. 2** (Prol Tr.) 96:16-25; Savad Decl. **Ex. 11** (L. Sanderson Tr.) 56:25-57:4;  209:8-20; Savad Decl. **Ex. 5** (Lamer Tr.) 57:2-12

110.    Village officials and employees have knowledge that the New Square area of Monsey, New York is predominantly occupied by Hasidic/ Orthodox residents.   Savad Decl. **Ex. 11** (L. Sanderson Tr.) 156:23-157:3 ; Savad Decl. Ex. 9 (Louie Tr.) 227:17-20; Savad Decl. **Ex. 7** (Roman Tr.) 33:16-22; 67:23-25; Savad Decl. **Ex. 23** (Ulman Tr.) 23:13-24; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 16:9-17:3; Savad Decl. **Ex. 5** (Lamer Tr.) 58:16-59:5; 100:18-21; Savad Decl. **Ex. 8** (L. Yagel Tr.) 26:17-27:20 ; Savad Decl. **Ex. 11** (L. Sanderson Tr.) 156:23-157:6.

111.    Former Planning Board Member Mel Cook called New Square a "tribal ghetto", totally ultra-orthodox Jewish people.  Savad Decl. **Ex. 1** (Cook Tr.) 89:16-90:21.

112.    Village officials have knowledge that Monsey is predominantly occupied by Hasidic/ Orthodox residents. Savad Decl. **Ex. 3** (Marshall Tr.) 145:21-146:2; Savad Decl. **Ex. 9** (Louie Tr.) 227:5-16; Savad Decl. **Ex. 23** (Ulman Tr.) 23:13-24; Savad Decl. **Ex. 17** (N.

Sanderson Tr.) 16:9-17:3; Lamer Tr. 58:16-59:5. Former Mayor Marshall accused former Deputy Mayor Appel that "Monsey grew up under your watch" when he was chairman of the Ramapo zoning board. Savad Decl. **Ex. 3** (Marshall Tr.) 145:5-145:20; Savad Decl. **Ex. 71**.

113.     Village officials and employees have knowledge that the term "voting bloc" is sometimes used as another way to say Orthodox/ Hasidic Jews. Savad Decl. **Ex. 3** (Marshall Tr.) 22:2-21; 152:4-10; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 17:13-16; Savad Decl. **Ex. 4** (B. Yagel Tr.) 167:19-21; Savad Decl. Ex. 9 (Louie Tr.) 48:11-14; Savad Decl. **Ex. 11** (L. Sanderson Tr.) 123:17-125:3; 156:19-22; Savad Decl. **Ex. 8** (L. Yagel Tr.) 26:17-27:20; Savad Decl. **Ex. 2** (Prol Tr.) 23:18-24:14; 59:15-61:4; 63:14-64:8; 163:14-164:23; Savad Decl. **Ex. 1** (Cook Tr.) 81:22-83:10; Savad Decl. **Ex. 19** (Rhodes Tr.) 132:20-133:14; Transcript of Deposition of Michael Castelluccio dated August 12, 2014, attached to Savad Declaration as **Exhibit 21** ("Castelluccio Tr.") 26:2-6.

114.     When speaking about adult student housing, Brett Yagel has stated "how convenient for the voting bloc". Savad Decl. **Ex. 4** (B. Yagel Tr.) 158:12-159:22; Savad Decl. **Ex. 101**.

115.     Village officials and employees have knowledge that Rockland's Hasidic Jewish population has "exploded" or increased. Savad Decl. **Ex. 11** (L. Sanderson Tr.) 57:57:17-20; 163:24-164:23; Savad Decl. **Ex. 165**; Savad Decl. **Ex. 9** (Louie Tr.) 42:24-43:23; 50:3-7; Savad Decl. **Ex. 7** (Roman Tr.) 33:12-16; Savad Decl. **Ex. 23** (Ulman Tr.) 23:13-24; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 16:9-17:3; Savad Decl. **Ex. 5** (Lamer Tr.) 58:9-12; Transcript of Deposition of Ian Banks dated May 15, 2014, attached to Savad Declaration as **Exhibit 6** ("Banks Tr.") pages 36:13-17; Savad Decl. **Ex. 1** (Cook Tr.) 78:21-79:13.

116.     Brett Yagel has stated that he agrees with Preserve Ramapo leader Robert Rhodes' statement that "examination of the population growth in Ramapo's Hasidic communities should be the central focus of any land use plan in Ramapo." Savad **Decl. Ex. 4** (B Yagel Tr.) 202:19-203:8

117.     The Village has knowledge of the Orthodox Jewish population in and around the Town of Ramapo and its villages. Defendants Answer, attached to Savad Declaration as **Exhibit 309 ¶ 78**.

### Village Officials, Employees and Residents Voiced their Opposition to the Orthodox/ Hasidic Community in General and the Specific Orthodox/ Hasidic Owners of the Property prior to the Passage of the Challenged Laws

### Local Law No. 1 of 2001 Was Passed in Response to Yeshiva Spring Valley

118.     In January, 2001, the Village enacted Local Law No. 1 of 2001, which regulates school land uses within the Village. The law adopted a 10% maximum building coverage requirement for schools, a 20% floor area ratio for schools and a 25% maximum impervious

surface limitation for schools.  Savad Decl. **Ex. 314** Code Sec. 130-10(F)(2)(a); 130-10(F)(2)(b) and 130-10(F)(2)(c).

119.    The law was considered from December 1999 through its passage in January of 2001.  Savad Decl. **Ex. 24** (Healey Tr.) 74:7-75:18; Savad Decl. **Ex. 153.**

120.    In 1997, Mayor Marshall and Trustee Banks stated that they had concerns with the Orthodox as it related to the school district. Savad Decl. **Ex. 6** (Banks Tr.) 30:22-32:19; Savad Decl. **Ex. 119.**

121.    The law was created in response to a proposal by Yeshiva Spring Valley to build a yeshiva on the Property.  Following a December, 1999 informal appearance before the Planning Board at which Yeshiva Spring Valley laid out its plans, the Village planner commented that the zoning for schools "really stinks" and warned that based on the fact that the property is 100 acres, Yeshiva Spring Valley could build over 800,000 square feet of school development as of right.  The Village planner recommended that a law be drafted in response to that fact.  Savad Decl. **Ex. 24** (Healey Tr.) 74:7-75:18; Savad Decl. **Ex. 153** at pages 41 and 42; Savad Decl. **Ex. 12** (Defendants' 30(b)(6) Day 1 Tr.) 121:23-122:4; Transcript of Deposition of Rabbi Fromowitz, dated June 25, 2014 attached to the Savad Declaration as **Exhibit 33** ("Fromowitz Tr.") 45:2-19.

122.    At the December, 1999 informal appearance, by Yeshiva Spring Valley before the Village there was an undercurrent that the Village did not want Yeshiva Spring Valley to come into the Village.  Savad Decl. **Ex. 33** (Fromowitz Tr.) 45:20-47:10.

123.    In January, 2000, the Village Planner provided memos to the Village Board and Planning Board entitled "Proposed Primary School and Pre-School (YSV Pomona) and the Village Zoning Regulations Regarding Schools."  The memos indicated that Village regulations on schools are "scant" and recommended that the Village amend the zoning laws for schools. Savad Decl. **Ex. 17** ("N. Sanderson Tr.) 47:21-49:4;  Savad Decl. **Ex. 196**; Savad Decl. **Ex. 5** (Lamer Tr.) 40:22-41:16; Savad Decl. **Ex. 115**; Savad Decl. **Ex. 24** (Healey Tr.) 41:10-24; 43:9-44:23; 48:9-49:2; Savad Decl. **Ex. 152.**

124.    The Village Planner in conjunction with Village Attorney then drafted a new law regarding schools which eventually became Local Law No. 1 of 2001 and included many of the recommendations from the January, 2000 memos by the Village Planner.  Savad Decl. **Ex. 1** (Cook Tr.) 349:18-350:10; Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 349:18-350:2; Savad Decl. **Ex. 115**; Savad Decl. **Ex. 152.**

125.    During the time-frame between the December, 1999 informal appearance and the passage of Local Law No. 1 of 2001 in January, 2001, the Village delayed and obstructed Yeshiva Spring Valley's application's until the new law could be passed.  Savad Decl. **Ex. 33** (Fromowitz Tr.) 49:23-50:18; 56:8-21; 112:2-115:10.

126.    When discussing proposed Local Law No. 1 of 2001, Mayor Marshall said "This thing's going to come in.  They're going to come in and we're going to be caught with our pants

down if we don't move. That's why I want to make sure that we're moving ahead. If you miss a meeting, no problem, you're going to be involved in the discussion anyway." Savad Decl. **Ex. 3** (Marshall Tr.) 96:17-98:9; Savad Decl. **Ex. 64.**

127.    The Village has produced no evidence showing that it conducted a SEQRA review in conjunction with Local Law No. 1 of 2001. Transcript of 30(b)(6) Deposition of Village and Board, Day 4, July 18, 2014 ("Defendants' 30(b)(6) Tr. Day 4") attached as **Exhibit 15** to the Savad Decl pages 877:16-878:3

128.    Local Law No. 1 of 2001 was passed in January, 2001 and it prevented Yeshiva Spring Valley from being able to build its yeshiva as envisioned. Savad Decl. **Ex. 33** (Fromowitz Tr.) 59:21-60:16; 61:22-62:8; 62:9-25; Savad Decl. **Ex. 152.**

129.    There were no schools in the Village at the time of the passage of Local Law No. 1 of 2001. Savad Decl. **Ex. 310** (Request to Admit Response) Nos. 94 and 98.

130.    Following the passage of Local Law No. 1 of 2001, and the sale of the property by Yeshiva Spring Valley in 2004 (to Tartikov) and its move to another location, Nicholas Sanderson commented that due to Local Law No. 1 of 2001 that perhaps Yeshiva Spring Valley was advised to go to a "friendlier place such as Ramapo". Savad Decl. **Ex. 17** (N. Sanderson Tr.) 63:24-64:9; Savad Decl. **Ex. 198.**

<u>Local Law No. 5 of 2004 Was Passed in Direct Response to Residents' Objections to the Possibility that Orthodox/ Hasidic Owners of the Property Would Build Dormitories for Adult Students and their Families</u>

131.    On September 27, 2004, the Village enacted Local Law No. 5 of 2004, which regulates Educational Institution land uses within the Village. The law eliminated the definition of the word "School" and amended the definition of the words "Educational Institution" to include a requirement that any Educational Institution must be "accredited by the New York State Education Department or similar recognized accrediting agency." Savad Decl. **Ex. 314** Code Sec. 130-4.

132.    Local Law No. 5 of 2004 also adopted a "Dormitory" provision that read: "DORMITORY - A building that is operated by a school located on the same lot and which contains private or semi-private rooms which open to a common hallway, which rooms are sleeping quarters for administrative staff, faculty or students. Communal dining, cooking, laundry, lounge and recreation facilities may be provided. Dormitory rooms shall not contain separate cooking, dining or housekeeping facilities except that one dwelling unit with complete housekeeping facilities may be provided for use of a Superintendent or supervisory staff for every fifty dormitory rooms. Not more than one communal dining room shall be provided in any building used for dormitory purposes. Single family, two-family and/or multi-family dwelling units other than as described above shall not be considered to be dormitories or part of dormitories." Savad Decl. **Ex. 314** Code Sec. 130-4. Although the Village Code did not

explicitly state that dormitories were permitted prior to the passage of Local Law No. 5 of 2004, the Village Attorney has admitted that New York caselaw required the Village to allow dormitories. Savad Decl. Ex. 314 Code Sec. 130-4.

133.    Local Law No. 5 of 2004 also added the following requirement for Educational Institutions: "The minimum lot area for an educational institution shall be 10 acres." and stated that "A dormitory is permitted as an accessory use to an educational use and there shall be not more than one dormitory building on a lot." and that "The maximum height of a dormitory shall be two stories or 25 feet, whichever is less." Savad Decl. Ex. 314   Code Sec. 130-10(F)(1)(a); Code Sec. 130-10(F)(12); Code Sec. 130-10(F)(12)(c); Savad Decl. Ex. 175.

134.    Local Law No. 5 of 2004 was passed on September 27, 2004.  Savad Decl. Ex. 13 (Defendants' 30(b)(6) Day 2 Tr.) 399:8-14

135.    The Village knew that dormitory housing for Hasidic/ Orthodox adult students and their families was a concern in the surrounding area because as early as 1999, during the Yeshiva Spring Valley informal appearance, Village Planning Board members asked its representatives multiple times if the yeshiva would include dormitories.  Savad Decl. Ex. 33 (Fromowitz Tr.) 45:20-47:10; Savad Decl. Ex.153.

136.    From December 2002, through 2004, the Village, as well as Village officials and employees opposed Ramapo's proposed master plan which allowed dormitories for adult students and their families; and at the same time, the Village, as well as Village officials and employees supported efforts to form a proposed village called "Ladentown" which was designed to prohibit the building of adult student at neighboring Patrick Farm.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 114:20-116:3;  118:19-23; 125:17-126:20; 131:21-132:2; 132:3-6; Savad Decl. Ex.156; Savad Decl. Ex. 157; Savad Decl. Ex.158; Savad Decl. Ex. 3 (Marshall Tr.) 130:3-131:2; 154:4-11; 155:21-156:16; Savad Decl. Ex. 70 ; Savad Decl. Ex. 4 (B. Yagel Tr.) 163:22-166:17; Savad Decl. Ex. 101.

137.    In March, 2004 the Village promoted its "Good Neighbor" policy in its newsletter, the Village Green.  The policy was aimed at issues that are "oppositional to the character and nature of the Village." Savad Decl. Savad Dec;. Ex. 297.

138.    In 2004, the Village filed a lawsuit in New York State Court to challenge Ramapo's Adult Student Housing laws passed in 2004 which permitted family dormitories in the neighboring Town of Ramapo. Savad Decl. Ex. 310 (Request to Admit) Response No. 86.

139.    In 2004, Yeshiva Spring Valley was still in talks with the Village to try to get permission to build its yeshiva as envisioned.  In one of its submissions to the Village, Yeshiva Spring Valley's engineer accidently mislabeled a building which was an educational center as a dormitory.  It clarified the mistake almost immediately.  Savad Decl. Ex. 33 ("Fromowitz Tr.) 73:4-14.

140.    The Village rushed Local Law No. 5 through the legislative process and failed to comply with many required formalities.  The resolution passing Local Law No. 5 of 2004 did not

20

contain a SEQRA resolution. Savad Decl. 12 (Defendants' 30(b)(6) Day 1 Tr.) 61:16; Savad Decl. **Ex. 278**. There were no studies for Local Law No. 5 of 2004. Savad Decl. **Ex. 310** (Request to Admit) Response Nos. 54; 58. The Village does not have any records to suggest that there was a New York General Municipal Law review of Local Law No. 5 of 2004. Savad Decl. 12 (Defendants' 30(b)(6) Day 1 Tr.) 135:23; Savad Decl. 278.

141.     The Village limited dormitories to one building in response to Ramapo's Adult Student Housing laws which "in its wisdom determined that a dormitory use could be 90% of use" Savad Decl. 13 (Defendants' 30(b)(6) Day 2 Tr.) 456:8-457:14.

142.     The Village's zoning restrictions only apply to educational institutions, and to no other land uses. Savad Decl. **Ex. 310** (Request to Admit) Response No. 93.

143.     There were no educational institutions in the Village at the time of the passage of Local Law No. 5 of 2004 (and still are none). Savad Decl. 310 (Request to Admit) Response Nos. 94 and 95.

144.     The Village admitted that Village Attorney Doris Ulman stated at the meeting where law was passed, that the purpose of the law was to **strengthen** the Village's control over schools. (emphasis added). Savad Decl. **Ex. 118**.

## Local Law No.1 of 2007 Was Passed in Response to Tartikov

145.     On January 22, 2007, the Village enacted Local Law No. 1 of 2007, which regulates Educational Institution land uses within the Village. The law added the following requirement for Educational Institutions: "(a) The minimum lot area for an educational institution shall be a net lot area of 10 acres. (b) No portion of any land under water shall be counted toward the net lot area. Not more than one-fourth of any land which is defined as wetland by the U.S. Army Corp of Engineers, the New York State Department of Environmental Conservation and/or Chapter 126 of this Code or which is within a one hundred year frequency floodplain or within access, utility or drainage easements or rights-of-way shall be counted toward the net lot area. (c) No portion of any land with unexcavated slopes over 35% shall be counted toward net lot area. Not more than 25% of any land with unexcavated slopes greater than 15% but less than 35% shall be counted toward the net lot area." Savad Decl. 314 Code Sec. 130-10(F)(1)(a).

146.     Local Law No. 1 of 2007 also added the following language to the "Educational Institution" special permit regulations: "A dormitory building is permitted as an accessory use to an educational use provided it is located on the same lot as the educational use and there shall be not more than one dormitory building on the lot. A dormitory building shall not occupy more than twenty (20) percent of the total square footage of all buildings on the lot." Savad Decl. **Ex. 314** Code Sec. 130-10(F)(12); Savad Decl. **Ex. 315**; Savad Decl. **Ex. 309** (Answer) ¶162.

147.     Local Law No. 1 of 2007 was proposed in November, 2006 and was passed on January 22, 2007. Savad Decl. **Ex. 316**.

148.     The Village has admitted that it was made aware of Tartikov's purchase of the Property at least as early as November, 2004.  Savad Decl. **Ex. 309** (Answer) ¶¶ 51, 143; Savad Decl. 12 (Defendants' 30(b)(6) Day 1 Tr.) 89:21-90:19; Savad Decl. **Ex. 311** (Interrogatory) Response No. 20.

149.     Village Attorney Doris Ulman knew that the Property was going to be used as a rabbinical college from the time she learned of the purchase because of the name, The Congregational Rabbinical College of Tartikov, Inc.  Savad Decl. 23 (Ulman Tr.) 17:8-18:2.

150.     In February, 2005, the Village trustees and employees knew that the "Rabbinical College" owned the Property. Savad Decl. 17 (N. Sanderson Tr.) 70:4-72:12; 73:24-74:3; Savad Decl. **Ex. 317**, Savad Decl. **Ex. 200**; Savad Decl. 15 (Defendants' 30(b)(6) Day 4 Tr.) 964:22-965:20; Savad Decl. 177; Savad Decl. 15 (Defendants' 30(b)(6) Day 4 Tr.) 966:3-967:20; Savad Decl. **Ex. 178**; Savad Decl. 3 (Marshall Tr.) 109:21-110:9; Savad Decl. **Ex. 66**; Savad Decl. 6 (Banks Tr.) 65:2-12; Savad Decl. **Ex. 120**; Savad Decl. **Ex. 39**; Savad Decl. **Ex. 65**; Savad Decl. 66; Savad Decl. 177; Savad Decl. **Ex. 178**; Savad Decl. 200.

151.     In June of 2005 at a joint meeting of the Village Board and the Village Planning Board, Mayor Marshall comments that "nothing has come into the Village yet regarding the use of the Property (referring to Tartikov). Savad Decl. **Ex. 299.**

152.     In late 2005, the Village became aware of rumors regarding Tartikov's intended use of the Property. Savad Decl. **Ex. 309** (Answer) ¶ 51; Savad Decl. 12 (Defendants' 30(b)(6) Day 1 Tr.) 92:4-15; Savad Decl. **Ex. 311** (Interrogatory) Response No. 20.

153.     Tartikov's attorney, Paul Savad, told Village Attorney Doris Ulman about Tartikov's intended use of the Property in 2005 or 2006. Savad Decl. **Ex. 311** (Interrogatory) No. 20

154.     In May, 2006, Village Clerk Leslie Sanderson sent an email to Mayor Marshall and her husband, Trustee Nick Sanderson entitled "Here we go."  The email informed them that a resident came in to Village Hall to report that surveyors were on the Camp Dora property.[2] Savad Decl. 11 (L. Sanderson Tr.) 210:15-213:17; Savad Decl. **Ex. 168**; Savad Decl. 17 (N. Sanderson Tr.) 74:8-75:18; Savad Decl. **Ex. 318**; Savad Decl. 3 (Marshall Tr.) 110:12-112:24; Savad Decl. **Ex. 67.**

155.     In November, 2006, when anti-downzoning signs were placed near Tartikov's Property, Trustee Sanderson commented that the Property was "at last . . . being used for something really useful." Savad Decl. 17 (N. Sanderson Tr.) 97:18-98:17; Savad Decl. **Ex. 208.**

---

[2] Camp Dora ( an Orthodox Summer Day Camp) was the name of the camp  prior to Yeshiva Spring Valley and that name was how many residents refer to the Property to this day, even when it was owned by Yeshiva Spring Valley and Tartikov.  Savad Decl. Ex. 3 (Marshall Tr.) 29:10-15.

156.    On November 27, 2006  Doris Ulman distributed proposed local laws amending the zoning code regarding dormitory buildings, which would become Local Law No. 1 of 2007 and a houses of worship to Village trustees.  Savad Decl. **Ex. 316**; Savad Decl. **Ex. 332**.

157.    On December 18, 2006, the  Village held a Public Hearing at its Board meeting regarding "Amending the Zoning Law of the Village of Pomona in relation to Dormitory Buildings" and Houses of Worship Law.  Tartikov's attorney, Paul Savad spoke at the meeting and asked if this dormitory law was being passed "because of the intended use of the Tartikov property."  Mayor Marshall stated "these are rules that are necessary to maintain **control** over development within a community to protect its integrity." (emphasis added)  Savad Decl. **Ex. 296**; Savad Decl. **Ex. 304**; Savad Decl. **Ex. 331.**

158.    In early January, 2007, Preserve Ramapo emailed a site layout that it had received regarding Tartikov's proposed rabbinical college.  The email was received by Village board members and trustees.  Following that email blast, there was much local press regarding Tartikov's plans. Savad Decl. 11 (L. Sanderson Tr.) 90:25-93:3; Savad Decl. 154; Savad Decl. 4 (B. Yagel Tr.) 29:17-30:11; 122:20-123:11; Savad Decl. **Ex. 320.**

159.    On January 22, 2007, the Village held a public hearing on the dormitory law where people spoke out against Tartikov.  The Village Attorney reported that the meeting was the most packed that she had ever seen the meeting room, well more than the 49 person room capacity.  Savad Decl. 23 (Ulman Tr.) 48:6-50:25; 48:6-49:5; Savad Decl. 13 (Defendants' 30(b)(6) Day 2 Tr.) 453:7-454:9; Savad Decl. **Ex. 310** (Request to Admit) Response No. 102; Savad Decl. 3 (Marshall Tr.) 186:7-15.  Mayor Marshall stated that there were "a lot of people there- too many" *Id.* at 177:17-178:4; Brett Yagel reported that it was a "packed house" with a lot of public speakers. Savad Decl. 4 (B. Yagel Tr.) 181:23-182:13.  Trustee Sanderson reported that there were 150 residents packed into a room with a legal occupancy of 49. Savad Decl. 17 (N. Sanderson Tr.) 194:17-196:10; Savad Decl. **Ex. 245.**  Trustee Lamer stated that there were a large number of residents at the meeting. Savad Decl. **Ex. 5** (Lamer Tr.) 90:18-91:8; Savad Decl. **Ex. 116.**

160.    Village Attorney Doris Ulman was not surprised by the turnout because people came to speak out against Tartikov due to article two weeks before. Savad Decl. **Ex. 23** (Ulman Tr.) 49:6-50:25

161.    Mayor Marshall reported that at the January 22, 2007 meeting "[t]here was a hostility engendered from the article in the Journal News regarding the Tartikov project"; "there was a general degree of ill will".  Savad Decl. **Ex.3** (Marshall Tr.) 176:16-176:17

162.    The Village was considering changing the height limitation for dormitories from 25 feet to 35 feet to be the same as other uses in the Village in light of Village Attorney Doris Ulman's admission that dormitories were treated differently than other Village uses; therefore she proposed a change to 35 feet to be consistent with other height requirements in the Village's laws.  Savad Decl. **Ex. 123** at RC 1093, lines 15-23; *Id.* at RC 1108, line 22- 1109, line 7; *Id.* at RC 1137, line 16- RC 1138, line 5.  However, after receiving feedback from the public at the

January 22, 2007 meeting expressing opinions that the height should be the lowest amount possible in order to keep Tartikov out of the Village, the Village Board decided to keep the height limitation at 25 feet. Savad Decl. **Ex. 123** at RC 1141, line 22- RC 1144, line 19.

163.    When Mayor Marshall explained that the Village was considering changing the height limitation from 25 feet to 35 feet, members of the public shouted in opposition. Savad Decl. **Ex. 123** at RC 1092, line 19- RC 1093, line 14. One public speaker stated "Just say the old law, and new law proposed, so we know the difference. I didn't know it used to be 25. It got right past me. So if you could just say, you know, it used to be 25 and now it's going to be 35. We would like it to go to 15 really. Get it in our favor. Let's change the law in our favor as opposed to accommodating, going up to 25 or 35. I think we can go 25 to 15 and everybody here will be real happy." Savad Decl. 6 (Banks Tr.) 101:11-20; Savad Decl. **Ex. 123** at RC 1093, lines 5-13

164.    After hearing the public's input at the January 22, 2007 meeting regarding the height limitation, Trustees Sanderson, Lamer and Banks all stated that they wanted to maintain the 25 foot limitation, rather than increase it to 35 feet. Savad Decl. **Ex. 123** at RC 1140, line 12- RC 1141, line 19. Trustee Sanderson specifically stated that the Village should keep the 25 foot limit because "based on the input from the public this evening, I think it's very clear that there is a great deal of concern." *Id.* at RC 1141, lines 8-19

165.    The law was passed without making the change increasing the height limitation from 25 feet to 35 feet. Savad Decl. **Ex. 123** at RC 1141, line 22- RC 1144, line 19.

166.    The Village also considered changing the law to increase the number of dining halls to two dining halls per building from only one dining hall per building based on a suggestion from Rockland County. Savad Decl. **Ex. 123** at RC 1092, lines 15-19; *Id.* at RC 1109, lines 11-16;   When Mayor Marshall explained that the Village was considering this increase from one dining hall to two, members of the public shouted in opposition *Id.* at RC 1104, line 20- 1106, line 21. The law was passed without increasing the number from one dining hall to two, thus, the Village overrode Rockland County's recommendation. *Id.* at RC 1141, line 22- RC 1144, line 19; Savad Decl. **Ex. 278** at 13.

167.    When a public speaker asked what could be done to protect the Village from the Tartikov proposal, Mayor Marshall stated that requiring that a dormitory be an accessory use accomplishes that. Savad Decl. **Ex. 123** at RC 1134, line 20- RC 1135, line 11.

168.    Speakers at the January, 22, 2007 meeting said the following:

a.    "We are going to be another Kiryas Joel (a Hasidic community). That's why we are emotional. You can get into the environmental impact and all of that. That's all I have to say." Savad Decl. 3 (Marshall Tr.) 179:17-180:5; 180:19-181:7; Savad Decl. **Ex. 78** at RC 1120. Mayor Marshall responded to this comment by stating "[l]adies and gentlemen, there isn't anyone sitting up here who doesn't know how you feel." Savad Decl. 3 (Marshall Tr.) 180:6-13; Savad Decl. **Ex. 78** at RC 1120.

b.      "The frustration that we have is that you knew of the press that had come out, whether it be true or not. You knew that it was out there, and you know we were very, very upset. I think what would have helped us is if at the beginning of this meeting you had said, this is what is going on, we know that you've read this, we are here to protect your interests and the amendments to this law, this project, this alleged project, with the alleged attorney who is allegedly sitting here, produces it, that these amendments will defend us. If you had said that in the beginning, I don't think as many people would be as upset as they are, because we don't know where you stand." Savad Decl. **Ex. 3** (Marshall Tr.) 181:8-182:6; Savad Decl. **Ex. 78** at RC 1122.

c.      Mayor Marshall responded to this comment by stating "[l]adies and gentlemen, let me say something. We sitting at this table have limitations that are placed on us as to what we can say and what we can't say, because our attorney tells us what we can say and what we can't say. I can't say what I feel, I can't. If I agree with you, I don't agree with you, I don't have that luxury of being able to say that here. All that I can say is that every member of this board works very, very hard to do what is best for this community. You have your issues. Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that that we don't agree. We may or may not, but please give us the benefit of the doubt. We have all been doing this. We work very hard at what we do. We try and do what is best for the community but it's our home. There are limitations under the law that restrict what we can say and when we can say it." Savad Decl. 3 (Marshall Tr.) 182:7-183:16; Savad Decl. **Ex. 78** at RC 1122.

d.      Tartikov "would entirely change the character of the village. It would entirely change the politics of the village. And I think there has to be a solution through the zoning laws and through the amendments to the zoning laws that prohibits such a large number of people being within one property, and one institution. Thank you very much." Savad Decl. 6 (Banks Tr.) 99:24-100:8; Savad Decl. **Ex.123** at RC 1073

169.    Alma Roman took public opinion into her decision to vote in favor of the law. Savad Decl. 7 (Roman Tr.) 74:22-75:19. Brett Yagel supported the law as private citizen and candidate. Savad Decl. 4 (B Yagel Tr.) 176:21-179:7.

170.    The Village overrode the recommendations from Rockland County regarding the law. Transcript of the Redirect 30(b)(6) Deposition of the Village and Board dated August 15, 2014, attached as Exhibit 22 to the Savad Declaration ("30(b)(6) Redirect Tr.") pages 1093:18-1095:10; Savad Decl. **Ex. 278** at page 13.

171.    The Village had no studies to support that there was a need for the law. Savad Decl. **Ex. 310** (Request to Admit) Response Nos. 55, 59, 63 and 64.

172.     There were no educational institutions in the Village at the time of the passage of Local Law No. 1 of 2007 (and still are none). Savad Decl. **Ex. 310** (Request to Admit) Response Nos. 94 and 97.

## Local Law No. 5 of 2007 was in Response to Tartikov

173.     On April 23, 2007, the Village enacted Local Law No. 5 of 2007, which regulates wetlands within the Village. Savad Decl. **Ex. 155.**

174.     Local Law No. 5 of 2007, titled the Wetlands Protection Law, prohibited various forms of development activity from occurring within 100 feet of the boundary of any wetland, water body or watercourse, unless a permit is issued by the Board of Trustees or Planning Board, which can be granted only if the regulation results in a deprivation of "the reasonable use of a property so as to constitute a de facto taking of such property." Savad Decl. **Ex. 314** Code Sec. 126-5.

175.     Local Law No. 5 of 2007 exempted "lots that are improved with single-family residences" from the application of its "one-hundred-foot-buffer" provision.  Savad Decl. **Ex. 314** Code Sec. 126-3(D)

176.     Local Law No. 5 of 2007 was passed in April, 2007.  Savad Decl. **155.**

177.     In the 1990's, the Village  considered a Model Wetlands law, but decided it was not necessary.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Day 3 Tr.) 562:19-563:20.

178.     Village Attorney Doris Ulman did not discuss drafting the Wetlands law with the Board when she became Village attorney in 2003.  Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 464:25-465:4

179.     Village Attorney Doris Ulman drafted and worked on less stringent, more general Wetlands laws in her jobs in Chestnut Ridge, New Hempstead and South Nyack. Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr. ) 473:3-10

180.     Before the Village passed the Wetlands law, it had prior knowledge that the Property had wetlands.  Mayor Marshall knew from the days that Camp Dora owned the Property that there were Wetlands on the Property. Savad Decl. **Ex. 3** (Marshall Tr.) 79:22-80:7.

181.     Mel Cook knew that there were Wetlands on the Property. Savad Decl. **Ex. 1** (Cook Tr.) 35:23-25; Savad Decl. **Ex. 108.**

182.     On September 25, 2006 Doris Ulman stated at the Village Board meeting that she  was working on the local law revision for wetlands and would try to have it for the next workshop meeting.  At the same meeting a Village resident asked for the Village Green newsletter to include updates on issues such as Camp Dora and Patrick Farm.  Savad Decl. **Ex. 321.**

26

183.    On December 11, 2006 Village Attorney Doris Ulman distributed a memo to Mayor Marshall regarding proposed Wetlands law, enclosing a draft of the law.  She stated that "the purpose of the proposed law is to prohibit as much disturbance of wetlands as possible while at the same time protecting property rights and not effecting a taking."  Savad Decl. **Ex. 298;** Savad Decl. **Ex. 302;** Savad Decl. **Ex. 300.**

184.    At the January 22, 2007 meeting, (in addition to consideration of the dormitory law), the Village also accepted public comment about the Wetlands law.  In response, at least one public speaker at the hearing addressed Tartikov and at least one speaker directed their comments to Hasidic Jews.  Savad Decl. **Ex. 310** (Request to Admit) Response Nos. 101 and 103.

185.    At the April 4, 2007 Pomona Civic Association Meeting,  just prior to passing the Wetlands Law, Trustee Sanderson stated that there are things that the Village has to do to prepare for the Tartikov "looming crisis."   Savad Decl. **Ex. 239** ¶5; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 173:16-174:3; 174:12-16.

186.    The Subject Property is subject to and not exempt from Local Law No. 5 of 2007 and its 100' buffer requirement.  Savad Decl. **Ex. 310**  (Request for Admissions) Response No. 14.

187.    Even Defendants' proffered land use expert does not know of any other municipalities where the Wetlands law exempts single family residences.  Savad Decl. **Ex. 18** (Voorhis Tr.) 157:11-16.

188.    Defendants' proffered land use expert admits that wetlands do in fact exist on lots improved with single family residences within the Village and are not less important than other wetlands.  Savad Decl. **Ex. 18** (Voorhis Tr.) 159:14-160:5.

189.    The Village states that "every single wetland is vital to the health and safety of every single person," yet most property in the Village is exempt from the Wetlands law.  Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2) Tr 485:14-486:2

190.    The Village did not conduct any studies before passing Local Law 5 of 2007. Savad Decl. **Ex. 310**  (Request for Admissions) Response Nos. 56, 60 and 64.

191.    The Village has not had any applications under Local Law 5 since it was passed in 2007.  Savad Decl. **Ex. 13**  (Defendants' 30(b)(6) Day 2 Tr.) 481:13-19.

## Tartikov's Proposal Prompted the Village to Seek Amendments to RLUIPA

192.    Mayor Marshall was concerned about RLUIPA beginning in 2004, when he solicited and received an RLUIPA packet of information from an attorney on June 11, 2004, Savad Decl. **Ex. 75.**

193.    Alan Lamer spoke to a representative of Congressman Engel's office regarding his RLUIPA concerns in 2004. Savad Decl. **Ex. 5** (Lamer Tr.) 92:2-98:3;  Savad Decl. **Ex. 117.**

194.    Lynn Yagel e-mailed Village Clerk Leslie Sanderson about RLUIPA counsel in 2005. Savad Decl. Ex. 8 (L. Yagel Tr.) 107:3-111:23; Savad Decl. **Ex. 322;** Savad Decl. **Ex. 11** (L. Sanderson Tr.) 135:5-139:10; Savad Decl. **Ex. 160.**

195.    Village Clerk Leslie Sanderson e-mailed Trustees Sanderson and Lamer reminding trustees about a "RLUIPA Sword or Shield" seminar being held by the Village of Montebello on November 6, 2006 . Savad Decl. **Ex. 17** (N. Sanderson Tr.) 164:23-166:18; Savad Decl. **Ex. 234.**

196.    Leslie Sanderson admitted that there were no RLUIPA issues in the Village in 2006. Savad Decl. **Ex. 11** (L. Sanderson Tr.) 143:14-145:8; Savad Decl. **Ex. 162.**

197.    On September 26, 2006, Village Clerk Leslie Sanderson, at the direction of her husband, Trustee Sanderson e-mailed Village Attorney Doris Ulman about an RLUIPA lawsuit by the federal government against the Village of Suffern. Savad **Decl. Ex. 11** (L. Sanderson Tr.) 141:2-143:9; Savad **Decl. Ex. 161;** Savad Decl. **Ex. 23** (Ulman Tr.) 35:15-38:16; Savad Decl. **Ex. 281.**

198.    Despite knowledge of the federal statute, RLUIPA, since at least 2004, the Village passed a resolution in February, 2007 seeking "amendments to the act and to obtain testimony from towns and villages that are burdened with the improper use of the act." This action was proposed by the Village Board one month after Tartikov was first mentioned RLUIPA at January, 2007 meeting. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 152:21-153:23; Savad Decl. **Ex. 5** (Lamer Tr.) 83:23-87:20; Savad Decl. **Ex. 228;** Savad Decl. **Ex. 3** (Marshall Tr.) 171:12-174:19; Savad Decl. **Ex.77;** Savad Decl. **Ex. 7** (Roman Tr.) 63:13-65:5; Savad Decl. **Ex. 334;** Savad Decl. **Ex. 309** (Answer ¶ 207); Savad Decl. **Ex. 310** (Request for Admissions) Response ¶ 122.

199.    The Village never sought to have RLUIPA reviewed prior to January 22, 2007. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 155:15-157:13.

200.    In 2007, there were no active RLUIPA applications in the Village, only in areas surrounding Village. Savad Decl. **Ex. 5** (Lamer Tr.) 68:16-23; Savad Decl. **Ex. 3** (Marshall Tr.) 173:5-11.

## The Village Was Aware That Tartikov's Proposal Was for an Orthodox/ Hasidic School

201.    Trustee Rita Louie knew that a "rabbinical college" was associated with Jews and that Tartikov was going to train rabbis to be judges in rabbinical courts. Savad Decl. **Ex. 9** (Louie Tr.) 56:19-57:15; 112:2-15; 241:24-242:4.

202.    Village Attorney Doris Ulman knew that the Property was intended to be used as a rabbinical college based on the name rabbinical college. Savad Decl. **Ex. 23** (Ulman Tr.) 17:8-18:2.

203.    Village Clerk Leslie Sanderson knew from the time that she was working at Village that Tartikov was going to train rabbinical students to be judges. Savad Decl. **Ex. 11** (L. Sanderson Tr.) 63:18-65:4.

204.    In January, 2007 Village Clerk Leslie Sanderson also knew that the residents would be Orthodox/ Hasidic Jews. Savad Decl. **Ex. 11** (L. Sanderson Tr. 95:8-13).

205.    Trustee Nicholas Sanderson knew that Tartikov was going to be a rabbinical college which would teach rabbis. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 22:17-23:19

206.    Trustee Alan Lamer knew that Tartikov was going to prepare rabbis to sit on rabbinical courts and that it would involve adult student housing. Savad Decl. **Ex. 5** (Lamer Tr.) 51:19-52:12; and he knew this in March, 2007. *Id.* 69:4-17.

207.    Trustee Brett Yagel knew that Tartikov was owned by Jews and would potentially be used for a religious purpose. Savad Decl. **Ex. 4** (B Yagel Tr.) 243:24-244:20.

208.    The Village had knowledge that the rabbinical college is going to train rabbis to become rabbinical judges. Savad Decl. **Ex. 12** (Defendants' 30(b)(6) Day 1 Tr.) 244:3-8.

209.    Doris Ulman was told by Tartikov's attorney that Tartikov would be a rabbinical college to train judges for rabbinical courts. Savad Decl. **Ex. 12** (Defendants' 30(b)(6) Day 1 Tr.) 75:23-76:9.

## Village Residents, Trustees and Employees Voiced Their Opposition to Tartikov

210.    Trustee Nicholas Sanderson publicly stated that the Village should "maintain[] its cultural and religious diversity" Savad Decl. **Ex. 310** (Request for Admission) Response No. 106.

211.    Village Planning Board Chairperson Cook was opposed to Tartikov. He stated "[s]ome of us see the Rabbinical College as the beginnings of another restricted religious community similar to New Square." Savad Decl. **Ex. 1** (Cook Tr.) 102:18-104:2; Savad Decl. **Ex. 42.**

212.    Also regarding Tartikov, Village Planning Board Chairperson Cook stated that secular Jews and non-Jews hope that the end result will be to the benefit of Village residents. Savad Decl. **Ex. 1** (Cook Tr.) 104:4-11; Savad Decl. **Ex. 42.**

213.     Village Clerk Leslie Sanderson stated that The Village would not be diverse if the ratio of people coming in is much greater than the people already there. Savad Decl. **Ex. 11** (L. Sanderson Tr.) 200:9-25.

214.     Village Clerk Leslie Sanderson also stated that Tartikov would "usurp the Village, perhaps the Village Board." Savad Decl. **Ex. 11** (L Sanderson Tr.) 200:15-16.

215.     In a February, 2000 letter to the editor signed by Lynn Yagel, but authored by Trustees (then candidates for the Board of Trustees) Leslie Sanderson and Brett Yagel, the writers refer to "homogenous individuals." This is a reference to Orthodox/Hasidic Jews. The term was used in the context that the potential influx of Orthodox/Hasidic Jews into Pomona would not be natural progression for the Village.  Savad Decl. **Ex. 9** (Louie Tr.) 258:22-259:13; Savad Decl. **Ex. 149**, Savad Decl. **Ex. 150**; Savad Decl. Ex. 8 (L. Yagel Tr.) 146:24-147:12; 147:19-148:4; Savad Decl. **Ex. 174**.

216.     Trustee Rita Louie admits that she made judgments against the rabbinical college even though she did not know any specifics of the proposal Savad Decl. Ex. 9 (Louie Tr.) 119:24-121:9; 121:17-25; Savad Decl. Ex. 133.

217.     The Village residents were interested in finding out about Tartikov from Village officials; and they came to Village Hall to express their opinions on the topic of Tartikov.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 66:4-67:9; 213:22-214:24; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 188:15-189:7; Savad Decl. **Ex. 241**; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 191:20-192:16; Savad Decl. **Ex. 243**; Savad Decl. Ex. 3 (Marshall Tr.) 66:10-14; 66:23-67:7.

218.     The Village received many calls regarding Tartikov, and their reaction to Tartikov was all negative; the Village received no positive reaction regarding Tartikov.  Savad Decl. **Ex. 17** (N. Sanderson Tr.) 85:20-86:13.

219.     Village residents were concerned about maintaining the status quo and having the Village carry on more or less the way it exists. Savad Decl. **Ex. 6** (Banks Tr.) 76:12-77:6.

220.     The Defendants are aware that private citizens within the Village have expressed opposition to the development of a Rabbinical College. Savad Decl. Ex.310 (Request for Admissions) Response No. 117.

221.     Defendants are aware that private citizens have expressed opposition through on-line comments to the development plans of the Plaintiffs within the Village.  Savad Decl. Ex. 310 (Request for Admissions) Response No. 118.

222.     Defendants are aware that private citizens have expressed opposition through print media comments to the development plans of the Plaintiffs within the Village.  Savad Decl. Ex.310 (Request for Admissions) Response No. 119.

223.   Defendants are aware that private citizens have expressed opposition to development in the Village by the Plaintiffs. Savad Decl. Ex. 310 (Request for Admissions) Response Nos. 120 and 121.

## Village Officials Responded to the Opposition of Pomona Residents to Tartikov

224.   Preserve Ramapo was opposed to Tartikov as it understood its plans in January, 2007. Transcript of the Deposition of Robert Rhodes dated August 12, 2014 ("Rhodes Tr. Day 2") attached as Exhibit 20 to the Savad Declaration pages 207:14-208:9.

225.   At the time of Preserve Ramapo's opposition to Tartikov in January, 2007, its leader (at the time) Robert Rhodes, knew that Tartikov was planning an Orthodox rabbinical college along with family housing. Savad Decl. **Ex. 20** (Rhodes Tr. Day 2) 213:10-18

226.   Brett Yagel, village resident and candidate for trustee corresponded with Preserve Ramapo's Michael Castelluccio following Preserve Ramapo's January, 2007 e-mail regarding Tartikov's plans. Yagel stated that Preserve Ramapo's posting of the Tartikov information was "nice work" and that "a lot" of individuals have been speaking up about this. He also spoke about the owners of the Property attempting to garner support for the project from the "religious" community. Savad Decl. Ex. 4 (B. Yagel Tr.) 223:10-224:25; Savad Decl. Ex. 108.

227.   The Preserve Ramapo website "detonated" with stories following the release of the information regarding Tartikov. Web site visits "spiked" from a couple of hundred per day to more than 1000 per day. Savad Decl. **Ex. 21** (Castelluccio Tr.) 82:2-25; Savad Decl. **Ex. 258.**

228.   Village Clerk Leslie Sanderson found the Tartikov plans to be "concerning." She knew that the new residents would be Orthodox/ Hasidic Jews. Savad Decl. Ex. 11 (L. Sanderson Tr.) 94:6-95:13; Savad Decl. Ex. 11 (L. Sanderson Ex. 326); and she discussed these concerns with Village Trustees. Savad Decl. Ex. 11 (L. Sanderson Tr.) 99:15-23.

229.   People told Village Clerk Leslie Sanderson that they wanted to be kept informed about Tartikov as well as the proposed religious adult student housing at neighboring Patrick Farm. Savad Decl. Ex. 11 (L Sanderson Tr.) 171:18-172:15.

230.   Village residents would come in to Village Hall and ask Village Clerk Leslie Sanderson about the Property. Savad Decl. Ex. 11 (L. Sanderson Tr.) 213:23-214:24; 215:12-216:10.

231.   Village resident Lynn Yagel stated that there is no hope for Rockland County due to RLUIPA development. Savad Decl. Ex. 11 (L Yagel Tr.) 125:8-127:15; Savad Decl. Ex. **128.**

232.    Planning Board Chairman Cook wanted his views opposing Tartikov heard. Savad Decl. Ex. 1 (Cook Tr.) 109:24-110:18. He wrote to the Rockland County Journal News multiple times. Savad Decl. Ex. 42; Savad Decl. Ex. 43); Savad Decl. Ex.44. He wrote Mayor N. Sanderson in June, 2007 regarding the Tartikov website. Savad Decl. Ex. 1 (Cook Tr.) 121:25- 123:7; Savad Decl. Ex. 46; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 188:3-10; Savad Decl. Ex. 324. He also wrote to Mayor Sanderson regarding accreditation issues for Tartikov. Savad Decl. Ex. 1 (Cook Tr.) 125:6-126:5; Savad Decl. Ex.47. He also wrote to the Village Assessor stating that "some of us have serious doubts about how forthright the rabbinical college is being in these legal proceedings." Savad Decl. Ex. 1 (Cook Tr.) 155:21-156:13. "Tartikov is and was a big deal to him." *Id.* Cook Tr. 124:5-10

233.    Village resident Robert Prol wanted his opinions to be heard by Village officials. Savad Decl. Ex. 2 (Prol Tr.) 78:5-79:2. In February, 2007 he sent a letter to Mayor Marshall and Trustee Sanderson stating that as a Village resident he supported the Board opposing Tartikov. *Id.* at 31:11-32:5; 80:21-81:7; Savad Decl. Ex. 51.

234.    Robert Prol sent another letter in July, 2007 to Mayor Sanderson and Trustees Brett Yagel, Ian Banks and Rita Louie stating "There is only one outcome acceptable to the community, and that is to maintain our fair zoning laws and the way of life we have all invested in." Savad Decl. Ex. 2 (Prol Tr.) 123:2-124:12; 127:5-19; Savad Decl. Ex. 57; Savad Decl. **Ex. 17** (N Sanderson Tr.) 191:6-15; Savad Decl. **Ex. 242**. He was referring to comments that he had heard from other Village residents. Savad Decl. Ex. 2 (Prol Tr.) 127:5-128:5.

235.    Less than a year after Robert Prol sent this letter, Mayor Sanderson appointed Prol to the Village Planning Board. Savad Decl. Ex. 2 (Prol Tr.) 13:2-18;27:15-22.

236.    Trustee Louie responded to Robert Prol's July, 2007 letter by stating that "[i]t's a little unsettling what's going on, but we are sure we can maintain our zoning laws in Pomona and keep our neighborhood rural and diverse." Savad Decl. Ex. 9 (Louie Tr.) 221:4-226:12; Savad Decl. **Ex. 145**.

237.    Village Clerk Leslie Sanderson stated that "[p]retty much everybody" was "talking about it" and the Village residents' reactions to the project were all negative. She did not speak to anyone who had a positive reaction to Tartikov's plans. Savad Decl. Ex. 11 (L. Sanderson Tr.) 95:18-96:4; 99:4-8; 99:24-100:17.

238.    Leslie Sanderson told another Village resident that "[e]veryone I talk to is concerned about the Rabbinical College." Savad Decl. Ex. 11 (L. Sanderson Tr.) 224:11-19; Savad Decl. **Ex. 170**.

239.    Village residents told Leslie Sanderson that they wanted to know what was going on with Tartikov. Savad Decl. Ex. 11 (L Sanderson Tr.) 171:18-172:15.

240.    Trustee Rita Louie said about Tartikov "follow the money and the truth will be revealed." Savad Decl. Ex. 9 (Louie Tr.) 241:11-18; Savad Decl. **Ex. 146**.

241.    Village resident Lynn Yagel does not believe that Tartikov is a pious endeavor. She believes that it is about money; she doesn't have any facts to support that conclusion. She publicized this opinion. Savad Decl. Ex. 8 (L. Yagel Tr.) 149:15-153:14; 157:5-9.

242.    Private citizens made statements in opposition to the Rabbinical College. Savad Decl. Ex. 310 (Request for Admissions) Response No. 116.

243.    Private citizens posted on-line comments in opposition to the Rabbinical College. Savad Decl. Ex. 310 (Request for Admissions Response) No. 114.

244.    Robert Prol believed Tartikov would be a "slum" and posted on LoHud.com that all of the Village residents he knows want Village officials to oppose the project . Savad Decl. Ex. 2 (Prol Tr.) 86:4-18; 89:16-91:9; 92:11-124; 107:16-108:11; 123:2-124:12; 167:25-170:17; Savad Decl. Ex. 53; Savad Decl. Ex. 54; Savad Decl. Ex. 55; Savad Decl. Ex. 56; Savad Decl. Ex. 57; Savad Decl. Ex. 61; Savad Decl. Ex. 62.

245.    Village residents also sent correspondence to the Village and made statements in the press regarding Tartikov, which was all negative.  Savad Decl. **Ex. 23** (Ulman Tr.) 34:13-35:8; Savad Decl. Ex. 311 (Interrogatory) Response Nos. 23 and 24; Savad Decl. Ex. 310 (Request for Admissions) Response No. 115.

246.    In January, 2007, Brett Yagel, then a resident and Trustee candidate was quoted in a New York Times article regarding Tartikov that it is "disgusting" that "[t]hey're trying to create this mini city in our village." Savad Decl. Ex. 4 (B. Yagel Tr.) 245:17-246:18; Savad Decl. Ex. 112.

247.    The trustees corresponded among themselves regarding Tartikov.  Savad Decl. Ex. 9 (Louie Tr.) 184:8-185:18; Savad Decl. **Ex. 141**; Savad Decl. Ex. 4 (B. Yagel Tr.) 229:8-230:18; Savad Decl. Ex.110.

248.    Trustee (then later, Mayor) Nicholas Sanderson took village residents' concerns into account when voting on laws. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 12:20-25.

249.    While running for office while still a trustee, Sanderson met with hundreds of Village residents who stated their concerns and opposition to Tartikov. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 124:11-20.

250.    The opinions of Village residents informed Sanderson's decision that he believed that there were problems with the Tartikov project.  Savad Decl. **Ex. 17** (N. Sanderson Tr.) 132:7-21.

251.    Trustee Rita Louie stated that she receives feedback on issues from the public at hearings and around the Village; and that she weighs these opinions when deciding on a law. Savad Decl. Ex. 9 (Louie Tr.) 34:15-18; 36:7-12; 37:9-20.

252.     Trustee Brett Yagel receives opinions from Village residents through e-mails, website comments, phone calls, newspapers, blogs and takes the positions of Village residents into account when deciding about legislation. Savad Decl. Ex. 4 (B. Yagel Tr.) 30:12-31:15.

253.     Trustee Brett Yagel stated that the articles and on-line postings regarding Tartikov were more negative than positive.  Savad Decl. Ex. 4 (B. Yagel Tr.) 32:10-16.

254.     Trustee Alma Roman talks to constituents about issues and takes those opinions into account when voting on laws.  Savad Decl. Ex. 7 (Roman Tr.) 19:7-20:5.

255.     Trustee Alma Roman specifically listened to residents regarding Local Law No. 1 of 2007 and took those comments into consideration when voting in support of Local Law No. 1 of 2007.  Savad Decl. Ex. 7 (Roman Tr.) 74:22-75:19.

256.     Trustee Banks takes constituents' opinions into account when voting on laws. Savad Decl. Ex. 6 (Banks Tr.) 25:19-23.

257.     Mayor Marshall stated that people who spoke to him were concerned with maintaining their quality of life. Savad Decl. Ex. 3 (Marshall Tr.) 16:10-20.

258.     Trustee Lamer listened to opinions from the public that were stated in Village meetings. Savad Decl. Ex. 9 (Lamer Tr.) 91:19-92:19.

259.     Village Clerk Leslie Sanderson was required to address the concerns of residents regarding Tartikov as soon as possible. Savad Decl. Ex. 11 (L Sanderson Tr.) 18:19-21.

260.     After the election in 2007, Trustee Louie told Village resident Judy Fleischer, who had expressed Tartikov concerns during the election, to give her feedback because it was important to hear from her constituents regarding what was going on in the Village.  Savad Decl. Ex. 9 (Louie Tr.) 153:19-155:13; Savad Decl. Ex. 135.

261.     Village Trustees and employees read The Rockland County Journal News and its on-line version, LoHud.  Savad Decl. Ex. 4 (B. Yagel Tr.) 23:3-15; Savad Decl. **Ex. 12** (Defendants' 30(b)(6) Day 1 Tr.) 67:13-68:19; Savad Decl. Ex. 3 (Marshall Tr.) 26:14-18; 27:16-19; Savad Decl. Ex. 11 (Leslie Sanderson Tr.) 58:16-24; 76:9-12; Savad Decl. **Ex. 23** (Ulman Tr.) 25:22-24; Savad Decl. Ex. 5 (Lamer Tr.) 58:6-8; Savad Decl. Ex. 7 (Roman Tr.) 34:12-24; Savad Decl. Ex. 9 Louie Tr. 37:21-38:6; Savad Decl. Ex. 6 (Banks Tr.) 25:24-26:13; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 20:2-21:13.

262.     Village Trustees and employees heard "rumors" regarding Tartikov. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 78:18-79:14; 131:9-132:6;  Savad Decl. **Ex. 12** (Defendants' 30(b)(6) Day 1 Tr.) 67:13-68:19; Savad Decl. Ex. 7 (Roman Tr.) 38:5-39:3; Savad Decl. **Ex. 23** (Ulman Tr.) 49:12-51:22; Savad Decl. Ex. 3 (Marshall Tr. 28:19-29:9); Savad Decl. Ex. 9 (Louie Tr.) 101:10-16.

263.    Village Clerk Leslie Sanderson stated that everyone was talking about the "rumors" regarding Tartikov and she discussed those rumors with one or more officials. Savad Decl. Ex. 11 (L. Sanderson Tr.) 95:18-96:4; 99:4-23.

## Discrimination Against Dense Housing Is Discrimination Against Orthodox/ Hasidic Jews

264.    Village officials and employees knew that the Property was to be used by Orthodox/ Hasidic Jewish entities and individuals.  See Paragraphs 149-150, above.

265.    Village officials and employees are aware that Orthodox/Hasidic families have large families. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 151:20-25; Savad Decl. Ex. 4 (B. Yagel Tr.) 22:15-21; 201:11-21; Savad Decl. Ex. 7 (Roman Tr.) 24:18-21; Savad Decl. Ex. 9 (Louie Tr.) 183:23-184:2; Savad Decl. Ex. 1 (Cook Tr.) 160:8-14; Savad Decl. Ex. 2 (Prol Tr.) 72:6-15; 73:11-74:17; Savad Decl. Ex. 8 (L. Yagel Tr.) 38:21-39:5; Savad Decl. Ex. 11 L. Sanderson Tr.) 237:4-13.

266.    Village officials and employees have knowledge that Rockland's Hasidic Jewish population has "exploded" or increased. Savad Decl. Ex. 11 (L. Sanderson Tr.) 57:57:17-20; 163:24-164:23; Savad Decl. **Ex. 165**; Savad Decl. Ex. 9 (Louie Tr.) 42:24-43:23; 50:3-7; Savad Decl. Ex. 7 (Roman Tr.) 33:12-16; Savad Decl. **Ex. 23** (Ulman Tr.) 23:13-24; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 16:9-17:3; Savad Decl. Ex. 5 (Lamer Tr.) 58:9-12; Savad Decl. Ex. 6 (Banks Tr.) 36:13-17; Savad Decl. Ex. 1 (Cook Tr.) 78:21-79:13.

267.    Leslie Sanderson was aware that the Orthodox/ Hasidic community expanding in area. Savad Decl. Ex. 11 (L. Sanderson Tr.) 164:13-23.

268.    The Village claims that Tartikov is primarily a housing development without any evidence to support this.  Savad Decl. **Ex. 12** (Defendants' 30(b)(6) Day 1 Tr.) 236:24-237:20.

## Tartikov Was "The Single Most Important Issue" in the March 2007 Village Election

269.    The campaign for Village Board of Trustees ran from January, 2007 through March, 2007.  Herbert Marshall ran for re-election as mayor on a slate with Alan Lamer who ran for re-election as a trustee.  Nicholas Sanderson ran for election as mayor on a slate with Brett Yagel and Rita Louie.

270.    During the time of the campaign, Herbert Marshall was serving as the Village mayor and Nicholas Sanderson and Alan Lamer were serving as Village trustees.  Savad Decl. Ex. 5 (Lamer Tr.) 60:15-25; Savad Decl. Ex. 3 (Marshall Tr.) 35:11-37:1.

271.    During the campaign Marshall, Sanderson and Lamer voted in favor of Local Law No. 1 of 2007 and in favor of the resolution to ask Congress to revisit RLUIPA. Savad Decl. Ex. 315; Savad Decl. Ex.  17 (N. Sanderson Tr.) 152:21-153:23; Savad Decl. Ex. 5 (Lamer

Tr.) 83:23-87:20; Savad Decl. **Ex. 228**; Savad Decl. **Ex. 229**; Savad Decl. Ex. 3 (Marshall Tr.) 171:12-174:19; Savad Decl. Ex. 77; Savad Decl. Ex. 7 (Roman Tr.) 63:13-65:5; Savad Decl. Ex. 334; Savad Decl. Ex. 309 (Answer) ¶ 207; Savad Decl. Ex. 310 (Request for Admissions) Response ¶ 122.

272.    During the campaign Marshall, Sanderson and Lamer held hearings regarding Local Law No. 5 of 2007 and in the month following the election, Sanderson, Yagel and Louie voted in favor of Local Law No. 5 of 2007.  Savad Decl. **Ex. 155**.

273.    Tartikov was a significant issue for Village residents during the campaign time from January, 2007 through March, 2007. Savad Decl. Ex. 4 (B. Yagel Tr.) 34:3-11; 138:6-13; Savad Decl. Ex. 94; Savad Decl. Ex. 9 (Louie Tr.) 54:20-55:9; 76:19-22 ; 100:17-103:3.

274.    Sanderson, Yagel and Louie's campaign materials stated that "the single most important issue facing the Village is clearly the Tartikov development.  We will vigorously defend our land use codes and regulations." Savad Decl. Ex. 4 (B. Yagel Tr.) 105:2-106:14; Savad Decl. Ex. 88; Savad Decl. Ex. 9 (Louie Tr.) 127:18-128:10; 235:16-21;  Savad Decl. Ex. 133.

275.    Sanderson, Yagel and Louie's campaign materials mention Tartikov by name and promise to "stand up to the threat." Savad Decl. **Ex. 17** (N. Sanderson Tr.) 125:12-19; 133:2-134:5; 138:23-139:15;  Savad Decl. **Ex. 215**; Savad Decl. **Ex. 218**; Savad Decl. **Ex. 220**.

276.    Sanderson, Yagel and Louie's campaign message to constituents was that they would fight the rabbinical college.  Savad Decl. **Ex. 17** (N. Sanderson Tr.) 133:7-15.

277.    While running for office, Trustee Sanderson met with hundreds of Village residents who stated their concerns and opposition to Tartikov. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 124:11-20; Savad Decl. Ex. 4 (B. Yagel Tr.) 144:13-21.

278.    Nicholas Sanderson believes that he, Yagel and Louie won the election because they seemed to satisfy the village residents regarding Tartikov.  Savad Decl. **Ex. 221**.

279.    Trustee Sanderson submitted a campaign video to the Journal News which stated "[g]ood morning.  My name is Nick Sanderson.  I'm currently deputy mayor of the village and I'm running for election as mayor. I've been trustee for nine years and before that I spent two years on the village planning board.  This election is critical for the village.  We are facing a huge proposed, or as yet unproposed, development that has been leaked, but could completely change the village and the make-up of the village. We need a strong leader as mayor and chief executive officer of the village.  I believe that my passion for the village, my experience in village government, my experience in running my own company for the last 30 years will help this village and allow this village to fight this proposed development.  Thank you." Savad Decl. **Ex. 17** (N. Sanderson Tr.) 125:24-128:25; Savad Decl. **Ex. 216**.

280.    Brett Yagel submitted an election video submitted to the Journal News which stated "[m]ost importantly I want to unite the Village residents so that we can stand  together and

legally fight the development that is being planned." Savad Decl. Ex. 4 (B. Yagel Tr.) 111:19-113:5; 134:22-135:15; Savad Decl. Ex. 89; Savad Decl. Ex. 93.

281.    Candidate Louie sent an e-mail to Sanderson and Yagel on March 17, 2007 proposing language for an e-mail blast stating that they will be able to "defeat any developers who plan to take over our village and our area" and they "have the plan, the experience, the knowledge, the legal counsel and the guts." Savad Decl. Ex. 9 (Louie Tr.) 114:15-115:17; Savad Decl. Ex. 132.

282.    Sanderson, Yagel and Louie publicized to the community that they had hired Marci Hamilton to help them fight RLUIPA. Savad Decl. Ex. 17 (N. Sanderson Tr.) 96:22-97:13; Savad Decl. Ex. 207.

283.    Sanderson, Yagel and Louie believed that it was important to tell the public that they hired counsel to educate them on RLUIPA so the public would know that they shared their concerns. Savad Decl. Ex. 17 (N. Sanderson Tr.) 175:19-177:16; Savad Decl. Ex. 4 (B. Yagel Tr.) 78:12-79:5; 79:24-80:3.

284.    Trustee Sanderson publicly stated that the Village should "maintain[] its cultural and religious diversity" Savad Decl. Ex. 310 (Request for Admission) Response No. 106.

285.    Sanderson, Yagel and Louie's campaign Placards promised to "fight" for Pomona. Savad Decl. Ex. 4 (B. Yagel Tr.) 141:18-142:11; Savad Decl. Ex. 95.

286.    Nicholas Sanderson has no disagreement with Preserve Ramapo's election endorsement that he, Yagel and Louie  will "fight" Tartikov. Savad Decl. Ex. 17 (N. Sanderson Tr.) 96:11-21.

287.    Sanderson, Yagel and Louie promised to create a legal defense fund that would grow over time in order to fight Tartikov ("this development"). Savad Decl. Ex. 4 (B. Yagel Tr.) 130:7-12; Savad Decl. Ex. 91.

288.    Sanderson, Louie and Yagel ran on platform opposed to the development of Tartikov; but they admit they had no knowledge regarding its plans and their opposition was just conjecture that Tartikov would be bad for the environment;  Louie admitted that she made judgments against the rabbinical college even though she did not know any specifics of its proposal other than what she heard from the rumor mill which formed the basis of her belief that they should campaign in opposition to the project.  Savad Decl. Ex. 9 (Louie Tr.) 119:24-121:9; 121:17-25; 123:18-124:25; Savad Decl. Ex.133.  B. Yagel admits that he did not know that there were real environmental problems with Tartikov's proposed use as stated in Sanderson, Yagel and Louie's campaign literature.  Savad Decl. Ex. 4 (B Yagel Tr.) 121:20-22; Savad Decl. Ex. 90. Sanderson admits that the campaign statement that Tartikov would have "real environmental and safety concerns" was based on rumors, the sketches disseminated in January, 2007 by Preserve Ramapo and talking to hundreds of Village residents.  Savad Decl. Ex. 17 (N Sanderson Tr.) 129:15-130:3; 132:7-21; Savad Decl. Ex. 217.

37

<u>More Comments Against Tartikov or Hasidic/ Orthodox Jews by Village Trustees and</u>
<u>Employees</u>

289.    Brett Yagel and Rita Louie spoke about "homogenous individuals." They were referring to Hasidic/ Orthodox Jews and that it would not be a natural progression for such "homogenous individuals" to move to Pomona.  Savad Decl. Ex. 9 (Louie Tr.) 258:22-259:13; Savad Decl. **Ex. 149** Savad Decl. **Ex. 150**; Savad Decl. Ex. 8 (L. Yagel Tr.) 146:24-147:12; 147:19-148:4; Savad Decl. **Ex. 174.**

290.    Trustee Nicholas Sanderson said that it sounded "ominous" to him that Yeshiva Spring Valley withdrew its application when the Patrick Farm property changed hands. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 62:11-63:7; Savad Decl. Ex.198.

291.    Trustee Nicholas Sanderson referred to triangle of 306/ 202 (the Tartikov Property) as being used for something useful when signs were posted on the property opposing down zoning.  Savad Decl. **Ex. 17** (N. Sanderson Tr.) 97:18-98:17; Savad Decl. **Ex. 208.**

292.    Village Clerk Leslie Sanderson "prefer[s] Pomona to stay the way it is." Savad Decl. Ex. 11 (L. Sanderson Tr.) 159:11-15.

293.    Village Clerk Leslie Sanderson believes that there are "so many threats around us." Savad Decl. Ex. 11 (L. Sanderson Tr.) 238:19-239:19.

294.    Sanderson, Yagel and Louie campaigned to "keep Pomona Pomona"meaning "keep Pomona the village that it is and not change it."  Savad Decl. Ex. 9 (Louie Tr.) 156:2-18; Savad Decl. Ex. 136.

295.    Village Clerk Leslie Sanderson is opposed to the Orthodox/ Hasidic "bloc vote." Savad Decl. Ex. 11 (L. Sanderson Tr.) 124:13-125:3; 155:22-156:22; Savad Decl. **Ex. 158.**

296.    Planning Board Chair Melvin Cook has stated that the increased number of Orthodox/ Hasidic Jews has hurt the community.  Savad Decl. Ex. 1 (Cook Tr.) 79:14-80:6.

<u>Village Officials and Employees Voiced Their Desire for Pomona to Maintain its</u>
<u>Diversity</u>

297.    Sanderson, Yagel and Louie campaigned on a platform of maintaining Pomona's diversity.  Savad Decl. Ex. 4 (B. Yagel Tr.) 132:8-133;21; Savad Decl. Ex. 92.

298.    Regarding Tartikov, R. Louie stated that "[i]t's a little unsettling what's going on, but we are sure we can maintain our zoning laws in Pomona and keep our neighborhood rural and diverse." Savad Decl. Ex. 9 (Louie Tr.) 221:4-226:12; Savad Decl. **Ex. 145.**

299.    N. Sanderson publicly stated that the Village should "maintain[] its cultural and religious diversity."  Savad Decl. Ex. 310 Response No. 106.

300.    In her campaign material, Rita Louie claimed that "the Village of Pomona is a cultural, ethnic and religious model of diversity." Savad Decl. Ex. 9 (Louie Tr.) 136:17-137:19; Savad Decl. Ex.134.

301.    However, Rita Louie has admitted that there are no Hasidic Jews in the Village of Pomona, that she knows of.  Savad Decl. Ex. 9 (Louie Tr.) 137:20-25; 228:17-21.

302.    There are some Orthodox Jews in the Village, but Village officials and employees are not aware of any Hasidic Jews who live in the Village.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 201:5-202:17; 227:3-5; Savad Decl. Ex. 23 (Ulman Tr.) 25:9-21; Savad Decl. Ex. 12 (Defendants' 30(b)(6) Day 1 Tr.) 111:5-115:17.

303.    Leslie Sanderson says that the Village is diverse, but admits that there are no Hasidic Jews who live in the Village.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 226:16-227:5.

304.    Village resident Lynn Yagel believes that the Village is diverse, but does not believe that there are any Hasidic residents of the Village.  Savad Decl. Ex. 8 (L. Yagel Tr.) 69:21-70:15; 122:17-123:17; 124:4-125:7; 153:15-154:7.

305.    Village Clerk Leslie Sanderson believes that the Village would not be diverse if the ratio of people coming in is much greater than the people already living in the village.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 200:9-25.

306.    Village Clerk Leslie Sanderson believes that Tartikov would "usurp the Village, perhaps the Village Board." Savad Decl. Ex. 11 (L Sanderson Tr.) 200:15-16.

307.    Rita Louie sent an e-mail to a Village resident stating that she wanted to keep the Village diverse because she wanted to "maintain[] the demographic makeup of the village the way it is." Savad Decl. Ex. 9 (Louie Tr.) 226:13-227:4; Savad Decl. Ex. 145.

308.    There are no Jewish culture events at the Village Cultural Center, but there are other cultures that sponsor events there.  Savad Decl. Ex. 9 (Louie Tr.) 139:12-140:4.

## The Village "Good Neighbor" Policies Favored Village Residents

309.    The Village published its "Good Neighbor" policy in the Village Green in March 2004, stating that it was aimed at things that are "oppositional to the character and nature of the Village." Savad Decl. Ex. 297.

310.    Local Law No. 1 of 2001 was designed to protect the surrounding neighborhoods from non-residential use.  Savad Decl. Ex. 13 (Defendants' 30(b)(6) Day 2 Tr.) 375:18-376:3; 377:23-25; 440:2-14.

311.    The Village exempted those homes already built at the time Local Law No.5 of 2007 was passed from portions of the Wetlands Law. Transcript of the 30(b)(6) Deposition of the

Village and Board ("Defendants' 30(b)(6) Day 3 Tr.") attached as Exhibit 14 to the Savad Declaration pages 564:21-565:4.

312.    In 2004, the Village adopted a resolution chiding public officials who place politics of special interest groups above others; Village Attorney Doris Ulman stated that the special interest group could refer to the Orthodox/ Hasidic Jewish bloc vote. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Day 4 Tr.) 976:13-979:20; Savad Decl. **Ex. 179.**

## General Anti- Orthodox/Hasidic Sentiment in the Surrounding Community

313.    A community activist who was trying to form a new village ("called Ladentown") in order to prevent Patrick Farm from becoming adult student family housing for Hasidic/ Orthodox Jews, described the area near Patrick Farm as "like a snake pit";   Village resident Lynn Yagel has heard similar sentiments from others.  Savad Decl. **Ex. 8** (L Yagel Tr.) 72:23-73:21; Savad Decl. **Ex. 12**5.

314.    There is distrust between the Orthodox/ Hasidic community and non-Orthodox/ Hasidic community.   Savad Decl. **Ex. 21** (Castelluccio Tr.) 64:10-67:22.

## Village Officials and Employees Publicly Declared Their Intention to Thwart Tartikov's Attempt to Have Its Plan Approved

315.    Trustee Sanderson told the Rockland County Journal News just before the March, 2007 election: "I have a vision for the Village of Pomona.  The year is 2011, during the last village board meeting before the village election.  Mayor Sanderson addresses the 50 or 60 attendees.  During the open period, a resident thanks the board for opening Village Hall for the drivers education course.  He not only saved 10 percent on his insurance, but did not have to go to Nyack to take it.  Next is a report on Tartikov development.  The State Environmental Quality Review Act process is almost finished.  The village board will soon receive the application to make a decision on granting a special permit for the huge development, or deny it.  The board knows that if it is denied, a Religious Land Use and Institutional Persons Act lawsuit will follow.  Fortunately, the board has had a strong legal team in place for the last four years and is well prepared to fight for the village.  Then comes the village treasurer's reports that is expenditures and receipts are in line with the village plan, with no items over budget.  A resident asks if taxes will be going up this year.  She replies that the legal defense fund created four years ago is almost $1 million, ahead of target, so no tax increase is foreseen.  There is a murmur (sic) from the appreciative audience.  My vision does not include a gavel.  Please vote for me on Tuesday so that my vision, and much more that I have planned for the village, can come true." Savad Decl. **Ex. 17** (N. Sanderson Tr.) 198:4-200:03; Savad Decl. **Ex. 247.**

316.    Mayor Sanderson stated at an April 4, 2007 Pomona Civic Association Meeting which was also attended by Trustees Louie and Yagel that with respect to Tartikov, the Village

has the "gift of time" and he will recommend that the Village start putting away money for future legal fees. Savad Decl. **Ex. 239** ¶6; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 174:17-175:4.

317.    Yeshiva Spring Valley experienced a delay from the Village during its presentations regarding its intention to build a yeshiva within the Village.  Savad Decl. Ex. 33 (Fromowitz Tr.) 112:2-23.

## The Village Acted in Opposition to Yeshiva Spring Valley.

318.    Yeshiva Spring Valley wanted to build a yeshiva on the Property.  However, the Village caused delay while it amended its laws regarding schools.    Savad Decl. Ex. 33 (Fromowitz Tr.) 62:9-15.

319.    Village residents opposed the Yeshiva Spring Valley project.  Savad Decl. Ex. 33 (Fromowitz Tr.) 84:15-85:5; 86:3-87:2; Savad Decl. Ex. 69.

320.    Rabbi Fromowitz, Yeshiva Spring Valley's executive director, had the feeling that the Village was challenging the project. Savad Decl. Ex. 33 (Fromowitz Tr.) 87:3-89:7.

321.    It was evident to Rabbi Fromowitz that Yeshiva Spring Valley would have to wait until Local Law No. 1 of 2007 was passed before his project could go forward in the Village. Savad Decl. Ex. 33 (Fromowitz Tr.) 43:11-44:3.

## Upon Discovery of Tartikov's Plans, the Village Acted in Opposition to Its Request for Tax Exemptions

322.    The Village approved Tartikov's tax exemption applications in 2005 and 2006. Savad Decl. Ex. 310 (Request to Admit) Response No. 92.

323.    Then in 2007, the Village denied Tartikov's tax exemption after Paul Savad spoke about Tartikov's plans at the Village Board meeting in January, 2007.   Nothing changed on the property in between these times.  Savad Decl. Ex. 310 (Request to Admit) Response No. 91.

324.    The Village employed the same pattern with Yeshiva Spring Valley.  The Village approved Yeshiva Spring Valley's applications for exemption from 1999 through 2003. However, in 2004, when Yeshiva Spring Valley was complaining that it was unable to get approval on its application to build the yeshiva, the Village denied Yeshiva Spring Valley's tax exempt application.  Savad Decl. Ex. 310 (Request to Admit) Response Nos. 81-82.

325.    In July 2007, Robert Prol conducted an investigation and posted on-line that there are too many tax exempt properties, and most are of the Jewish faith.  Savad Decl. Ex. 2 (Prol Tr.) 145:3-147:7; Savad Decl. Ex. 60.

326.     Melvin Cook met with the Village assessor in order to oppose Tartikov's tax exemption application. Savad Decl. Ex. 1 (Cook Tr.) 72:6-73:20; 128:20-129:4; 154:4-22; Savad Decl. Ex. 49; Savad Decl. Ex. 50. This was the only time he went to the assessor regarding a property. Savad Decl. Ex. 1 (Cook Tr.) 74:11-21.

327.     Melvin Cook also wrote to the Department of Treasury about Tartikov's tax exemption request.  Savad Decl. Ex. 1 (Cook Tr.) 126:21-127:13.

328.     Melvin Cook also wrote to the Rockland County Journal News opposing the tax exemption. Savad Decl. Ex. 1 (Cook Tr.) 93:3-94:10; Savad Decl. Ex. 41; Savad Decl. Ex. 44.

329.     Melvin Cook reported about his investigation, opposition, and assessor meetings regarding Tartikov to Mayor Sanderson.  Savad Decl. Ex. 1 (Cook Tr.) 85:20; 87:21-88:16; 116:21-119:15; 127:14-128:2; Savad Decl. Ex. 40; Savad Decl. Ex. 45; Savad Decl. Ex. 48

330.     Mayor Sanderson "applauded" Cook's investigation and stated that it was "good news" that Ramapo denied the tax exemption for Tartikov. Savad Decl. Ex. 17 (N. Sanderson Tr.) 81:18-82:11; 104:10-105:14; Savad Decl. Ex. 202; Savad Decl. Ex. 210.

### Village Officials and Employees Worked with Preserve Ramapo to Oppose Tartikov and Other Orthodox/ Hasidic Projects

331.     Preserve Ramapo was opposed to Tartikov as it understood its mission and plan in January, 2007. Savad Decl. Ex. 20 (Rhodes Tr.) 207:14-208:9 213:10-18.

332.     Preserve Ramapo leader Bob Rhodes spoke out against Tartikov at the Comfort Inn meeting in May, 2007 where Tartikov invited the community to hear its plans for the project. Savad Decl. Ex. 20 (Rhodes Tr.) 273:19-274:9; Savad Decl. Ex. 254.

333.     Preserve Ramapo widely disseminated Michael Tauber's purported political contributions because it believed that Tartikov was a controversial issue. Savad Decl. Ex. 20 (Rhodes Tr.) 223:15-224:21; Savad Decl. Ex. 250; Savad Decl. Ex. 17 (N Sanderson Tr.) 86:18-87:21; Savad Decl. Ex. 204.

334.     Preserve Ramapo published a hypothetical concept plan on its website showing Tartikov and Patrick Farm.  Savad Decl. Ex. 20 (Rhodes Tr.) 258:3-259:4; Savad Decl. Ex. 252.

335.     Village officials supported Preserve Ramapo.  Savad Decl. Ex. 4 (B. Yagel Tr.) 84:25-85:16; 140:8-23; 197:11-198:7.

336.     The Sandersons and Yagels hosted Preserve Ramapo fundraisers.  Savad Decl. Ex. 4 (B. Yagel Tr.) 86:3-5; Savad Decl. Ex. 8 (L. Yagel Tr.) 103:8-104:11; Savad Decl. Ex.127; Savad Decl. Ex. 17 (N. Sanderson Tr.) 89:22-91:2; Savad Decl. Ex. 206.

337.     Brett Yagel disseminated accusations made by Preserve Ramapo against Tartikov officer Michael Tauber.  Savad Decl. Ex. 4 (B. Yagel Tr.) 42:14-46:5; Savad Decl. Ex. 86.

338.     Just after Preserve Ramapo published the hypothetical concept plan, Trustees Sanderson and Brett Yagel along with Preserve Ramapo leader Robert Rhodes discussed hiring a demographer to conduct a population study of Ramapo and Rockland, broken down by each Village. Savad Decl. Ex. 4 (B Yagel Tr.) 240:12-242:23; Savad Decl. Ex.111; Savad Decl. **Ex. 20** (Rhodes Tr.) 252:21-255:16; Savad Decl. **Ex. 251**; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 196:15-197:7; Savad Decl. **Ex. 246** .

339.     Preserve Ramapo leader, Robert Rhodes stated that the data would be useful in Court when Pomona argues "that there is a compelling government interest in restricting large scale 'religious' housing." Savad Decl. **Ex. 246.**

340.     Brett Yagel admitted that the timing of the suggestion by Preserve Ramapo to hire a demographer was related to Tartikov and the perceived plan to have large scale Jewish housing on its property.  Savad Decl. Ex. 4 (B Yagel Tr.) 242:15-244:20.

341.     Mayor Nicholas Sanderson, Trustees Rita Louie and Brett Yagel and Village resident Robert Prol corresponded with Preserve Ramapo leader Robert Rhodes regarding Tartikov in July of 2007.

342.     Rita Louie, Nick Sanderson, Savad Decl. Ex. 59; Savad Decl. **Ex. 17** (N Sanderson Tr.) 99:13-100:24; Savad Decl. **Ex. 209**; Savad Decl. **Ex. 20** (Rhodes Tr.) 216:14-217:18; Savad Decl. **Ex. 249.**

343.     Brett Yagel and Robert Prol corresponded regarding Preserve Ramapo; Rita Louie asked Bob Prol to send information onto Preserve Ramapo,  because she was unable to do so because of her position.  Savad Decl. Ex. 9 (Louie Tr.) 250:2-253:19; Savad Decl. **Ex. 148.**

344.     Mayor Sanderson, and Trustees Louie and Yagel corresponded with Preserve Ramapo leader Robert Rhodes and Robert Prol regarding an inquiry that Prol made on Tartikov's website.  Savad Decl. Ex. 4 (B Yagel Tr.) 62:10-65:13; Savad Decl. Ex. 87.

345.     Brett Yagel corresponded with Trustees Sanderson and Louie about working with Preserve Ramapo to draft a letter for Pomona residents to send to their elected officials in opposition to RLUIPA.   Savad Decl. Ex. 9 (Louie Tr.) 210:13-211:14; Savad Decl. **Ex. 143**; Savad Decl. Ex. 4 (B Yagel Tr.) 211:9-212:25; 213:14-216:6;  Savad Decl. Ex.106; Savad Decl. Ex. 325; Savad Decl. **Ex. 21** (Castelluccio Tr.) 72:17-73:16; 87:3-22; Savad Decl. **Ex. 256**; Savad Decl. **Ex. 261.**

346.     When Melvin Cook told Trustee Sanderson that he had concerns regarding Tartikov, Sanderson responded that "we must be much more proactive in fighting this urbanization of our Village" and assured him that his "slate has very close ties with Preserve Ramapo." Savad Decl. **Ex. 17** (N Sanderson Tr.) 105:15-108:14; Savad Decl. **Ex. 210.**

347.    Just after he was elected, Mayor-Elect Sanderson reported that Brett Yagel would obtain information from Preserve Ramapo "all the time" and that information was given to Preserve Ramapo from Yagel.  Savad Decl. **Ex. 17** (N Sanderson Tr.) 106:19-108:14.

348.    Melvin Cook corresponded with Preserve Ramapo regarding Tartikov.  Savad Decl. **Ex. 20** (Rhodes Tr.) 268:23-269:19; Savad Decl. **Ex. 253**.

349.    Preserve Ramapo endorsed Sanderson, Yagel and Louie's candidacy for Village trustee.  Savad Decl. **Ex. 17** (N Sanderson Tr.) 42:8-22; Savad Decl. Ex. 9 (Louie Tr.) 86:17-20; Savad Decl. Ex. 131.

350.    Brett Yagel wrote an article with Preserve Ramapo leader Michael Castelluccio opposing Patrick Farm.  The article was posted on Preserve Ramapo's website.  Savad Decl. Ex. 4 (B Yagel Tr.) 16:13-219:22; Savad Decl. Ex. 107.

351.    Preserve Ramapo leader Robert Rhodes regularly speaks to Brett Yagel for updates on Tartikov.  Savad Decl. **Ex. 19** (Rhodes Tr.) 50:2-9.

352.    The March, 2003 Village Green Newsletter states that Leslie Sanderson is the Liaison with Preserve Ramapo and lists the Village phone number to reach her for any inquires.  Savad Decl. Ex. 11 (L Sanderson Tr.) 102:9-104:8; Savad Decl. Ex. 324; Savad Decl. Ex. 3 (Marshall Tr.) 116:9-118:25; Savad Decl. Ex. 68.

353.    The October, 2005 Village Green newsletter had a favorable article about Preserve Ramapo. Savad Decl. Ex. 11 (L Sanderson Tr.) 106:8-109:14; Savad Decl. **Ex. 155**.

354.    Preserve Ramapo leader Michael Castelluccio believes that Ramapo's Adult Student Housing law is a bypass to avoid RLUIPA conflicts. Savad Decl. **Ex. 21** (Castelluccio Tr.) 45:13-46:2; 46:25-48:15.

355.    Preserve Ramapo leader Michael Castelluccio believes that RLUIPA  is an aberration of the law and that it is unfair because it increases the number of tax exempt properties; but he does not know if FHA or ADA has the same effect.  Savad Decl. **Ex. 21** (Castelluccio Tr.) 59:6-62:25. He made an anti-RLUIPA call to action. *Id.* 73:23-75:6; Savad Decl. **Ex. 257**.

356.    Preserve Ramapo leader Robert Rhodes believes that RLUIPA is a terrible, terrible law.  Savad Decl. **Ex. 19** (Rhodes Tr.) 56:16-57:12.

357.    Preserve Ramapo leader Michael Castelluccio opposes the Orthodox/ Hasidic bloc vote.  Savad Decl. **Ex. 21** (Castelluccio Tr.) 26:2-27:14.

358.    Preserve Ramapo supported efforts to incorporate Ladentown to stop Patrick Farm from becoming religious, adult student family housing.  Savad Decl. **Ex. 20** (Rhodes Tr.) 283:16-284:9; Savad Decl. **Ex. 255**.

359.    Preserve Ramapo leader Robert Rhodes has spoken out about the Orthodox/ Hasidic Jewish community, stating that an "examination of the population growth in Ramapo's Hasidic communities should be the central focus of any land use plan in Ramapo;" and that survival of the community depends on maintaining single family residences who pay the bulk of the taxes. Savad Decl. **Ex. 20** (Rhodes Tr.) 205:7-19; Savad Decl. Ex. 4 (B Yagel Tr.) 202:19- 203:8.

## The Village has Only Opposed Orthodox/ Hasidic Land Uses Beyond its Jurisdiction

360.    The Village challenged Ramapo's law authorizing Adult Student Housing in June, 2004, just 3 months before passing Local Law No. 5 of 2004 (dormitory law). Savad Decl. Ex. 310 (Request to Admit) Response No. 86; Savad Decl. Ex. 11 (L. Sanderson Tr.) 173:4-11; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 66:9-68:12; Savad Decl. **Ex. 199**; Savad Decl. Ex. 102; Savad Decl. **Ex. 122**; Savad Decl. Ex.124; Savad Decl. **Ex. 227**; Savad Decl. Ex. 309 (Answer) ¶145-147.

361.    The Village opposed the development of Patrick Farm as adult student housing for Orthodox/Hasidic Jewish students and their families as authorized by Ramapo's Adult Student Housing laws. Savad Decl. **Ex. 15** (Village 30(b)(6) Day 4 Tr.) 953:16- 987:15; Savad Decl. **Ex. 182**; Savad Decl. **Ex. 23** (Ulman Tr.) 20:2-18; Savad Decl. **Ex. 280**; Savad Decl. Ex. 6 (Banks Tr.) 42:3-45:7.

362.    Village officials, employees and residents knew that Patrick Farm was meant to be for Orthodox/ Hasidic Jewish (religious) students. Savad Decl. Ex. 11 (L. Sanderson Tr.) 79:25-80:7; 95:8-13; 192:11-195:9; Savad Decl. **Ex. 154**; Savad Decl. **Ex. 167**; Savad Decl. Ex. 9 (Louie Tr.) 43:25-44:6; 92:7-15; 188:3-10; 243:16-245:4; 245::11-246:23; Savad Decl. Ex.147; Savad Decl. Ex. 8 (L. Yagel Tr.) 52:5-8; 84:14-20; Savad Decl. Ex. 9 (Louie Tr.) 92:7-15; Savad Decl. Ex. 4 (B. Yagel Tr.) 58:21-24.

363.    The Village initiated lawsuits against Ramapo regarding the Adult Student Housing laws and the developers of Patrick Farm. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Day 4 Tr.) 981:8-983:8; Savad Decl. **Ex. 181**; Savad Decl. Ex. 9 (Louie Tr.) 95:19-98:11-20; Savad Decl. Ex. 7 (Roman Tr.) 42:3-44:25.

364.    People were concerned that Patrick Farm would become like New Square. Savad Decl. Ex. 11 (L. Sanderson Tr.) 154:21-25.

365.    Trustee Louie was opposed to a zone change for Patrick Farm to "accommodate the development of a segregated community." Savad Decl. Ex. 9 (Louie Tr.) 245:5-246:23; Savad Decl. **Ex. 147**; Savad Decl. Ex. 9 (Louie Tr.) 247:17-249:20.

366.    Trustee Louie agrees with Preserve Ramapo's endorsement of her, that the floodgates were opened when Ramapo passed the Adult Student Housing laws. Savad Decl. Ex. 9 (Louie Tr.) 88:16-89:3; Savad Decl. Ex. 131.

367.     Brett Yagel worked to prevent Patrick Farm from being developed.  Savad Decl. Ex. 4 (B. Yagel Tr.) 225:6-227:9; Savad Decl. Ex. 109.

368.     The Village and its Trustees and employees supported efforts to form the village of Ladentown, which would encompass Patrick Farm and prevent it from being developed as adult student housing for Orthodox and Hasidic students and their families.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 125:17-126:20; Savad Decl. **Ex. 158**; Savad Decl. Ex. 3 (Marshall Tr.) 154:4-11; 155:21-156:16; Savad Decl. Ex. 11 (L. Sanderson Tr.) 131:21-132:2; 132:3-6; Savad Decl. Ex. 4 (B. Yagel Tr.) 163:22-166:17; Savad Decl. Ex. 101; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 95:22-96:10.

369.     In December, 2002, the Village sent a postcard to all Village residents inviting them to a community rally in support of the proposed village of Ladentown; Mayor Marshall spoke at that rally.  Savad Decl. Ex. 3 (Marshall Tr.) 130:3-131:2; Savad Decl. Ex. 70; Savad Decl. Ex. 11 (L. Sanderson Tr. )114:20-116:3;  Savad Decl. **Ex. 156**; Savad Decl. **Ex. 157**.

370.     Mayor Marshall regularly updated Village residents about Ladentown and Patrick Farms.  Savad Decl. Ex. 3 (Marshall Tr.) 131:13-135:17.

371.     Brett Yagel and Nicholas Sanderson held a fundraiser for the Ladentown efforts. Savad Decl. Ex. 8 (L. Yagel Tr.) 58:3-11; 90:25-92:11; Savad Decl. **Ex. 126**.

372.     Mayor Marshall, Trustees Sanderson and Yagel personally endorsed or supported Ladentown.  Savad Decl. Ex. 3 (Marshall Tr.) 140:21-142:12; Savad Decl. Ex. 8 (L. Yagel Tr.) 54:13-57:11; Savad Decl. Ex. 4 (B. Yagel Tr.); 170:17-171:20; Savad Decl. **Ex. 17** (N. Sanderson Tr.) 95:22-96:10; Savad Decl. **Ex. 207**.

373.     Village attorney and Village resident Doris Ulman performed free legal work for the appeal regarding the efforts to incorporate Ladentown.  Savad Decl. **Ex. 23** (Ulman Tr.) 18:3-19:11.

374.     The Village did not oppose the neighboring Anna Mann Property proposal to become an assisted living facility in 1999.  The Village did not pass laws regarding assisted living.  This was the same time-frame as Village began drafting Local Law No. 1 of 2001 in response to Yeshiva Spring Valley's 1999 informal meeting. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Day 4 Tr.) 1022:9-1023:23; Savad Decl. **Ex. 189**.

375.     However, when it was later proposed that the Anna Mann property become a Yeshiva, Leslie Sanderson opposed the sale of the property to the Orthodox for a middle school (Yeshiva); She said "that does not sound good" and "we must all go to the public hearings when they announce them." Savad Decl. Ex. 11 (L. Sanderson Tr.) 224:20-226:3; Savad Decl. Ex.170.

376.     In 1996, Bais Yaakov, a Yeshiva, was applying for expansion in Ramapo.  The Village wrote to Ramapo opposing it, went to a Ramapo meeting to read statement from Mayor Klingher in opposition, challenged the plans in Court, and The Village Attorney advised residents to contact Ramapo to object to the planned expansion. Savad Decl. **Ex. 187**.

## The Village Failed to Oppose Non- Orthodox/ Hasidic Development

377.    The Village did not oppose legalizing an agricultural operation in Wesley Hills, despite many environmental concerns because the Village did not want to "get involved" in other Village's issues.  Savad Decl. Ex. 15 (Defendants' 30(b)(6) Day 4 Tr.) 1015:4-1017:13; 1017:20-1019:8; Savad Decl. Ex. 185; Savad Decl. Ex. 186.

378.    The Village did not take a position in 2003 on an open space item in New Hempstead because the Village did not want to get involved in other Village's issues.  Savad Decl. Ex. 15 (Defendants' 30(b)(6) Day 4 Tr.) 1021:4-25; Savad Decl. Ex. 188.

## The Village has Only Opposed Orthodox/ Hasidic Land Uses Inside of the Village.

379.    In addition to the actions described above with regard to Tartikov and Yeshiva Spring Valley, the Village sought to enforce day care law in 2005 against a Rabbi. Savad Decl. Ex. 15 (Defendants' 30(b)(6) Day 4 Tr.) 1034:8-1036:4; Savad Decl. Ex. 191.

380.    The Village also denied Yeshiva Spring Valley's tax exemption in 2004, but voted in favor of the Humane Society's tax exemption on the same day, even though the Humane Society had not timely filed its application for exemption.  Savad Decl. Ex. 17 (N. Sanderson Tr.) 54:12-58:22; Savad Decl. Ex. 197.

381.    Every Village Trustee but one was in favor of the concept of Barr Laboratories purchasing property in 2002 to build an office building with parking, which was not a permitted use. Defendants' 30(b)(6) Tr. 940:24-944:5.  The Board informed the Haverstraw supervisor of this position.  Savad Decl. Ex. 15 (Defendants' 30(b)(6) Day 4 Tr.) 940:24-944:5; Savad Decl. Ex. 176; Savad Decl. Ex. 278.

382.    The Village applied for funds for a senior citizen center in the Village.  Savad Decl. Ex. 15 (Defendants' 30(b)(6) Day 4  Tr.) 1024:7-10255:25; Savad Decl. Ex.190.

383.    The Village treated the animal hospital/ humane society favorably.  The Village did not pursue violations by the Humane Society despite receiving a letter from an attorney for the mortgagee of the Property demanding that the Village issue violations. Savad Decl. Ex. 278 pages 24-27.

## The Village, Its Officials, Employees and Residents  Believe that They Should Not Have to Comply with RLUIPA.

384.    The Village passed a resolution in February, 2007 regarding RLUIPA, seeking "amendments to the act and to obtain testimony from towns and villages that are burdened with the improper use of the act." This was done despite the Village's knowledge of RLUIPA, since at least 2004 and was proposed by the Village Board one month after Tartikov was first mentioned RLUIPA at January, 2007 meeting. Savad Decl. Ex. 17 (N. Sanderson Tr.) 152:21-153:23; Savad Decl. Ex. 5 (Lamer Tr.) 83:23-87:20; Savad Decl. Ex. 228; Savad Decl. Ex. 229; Savad Decl. Ex. 3 (Marshall Tr.) 171:12-174:19; Savad Decl. Ex. 77; Savad Decl. Ex. 7 (Roman Tr.) 63:13-65:5; Savad Decl. Ex. 334; Savad Decl. Ex. 309 (Answer) ¶ 207; Savad Decl. Ex. 310 (Request for Admissions) Response ¶ 122.

385.    Mayor Marshall wants RLUIPA to be amended because he believes it is misused.  Savad Decl. Ex. 3 (Marshall Tr.) 165:6-11; 167:17-168:8; Savad Decl. Ex. 76.

386.    Village resident Lynn Yagel does not believe that religious organizations have the right to build something that has a negative impact on their neighbors.  She defines negative as anything that affects neighbor's quality of life. Savad Decl. Ex. 8 (L. Yagel Tr.) 155:11-157:4.

387.    Village resident Robert Prol created a Defeat RLUIPA group.  He felt that the Village was under attack because Tartikov wanted to seek protection based upon RLUIPA and build a rabbinical college.  Savad Decl. Ex. 2 (Prol Tr.) 35:25-36:8; 37:18-38:18; 42:21-43:15; 61:12-62:3.  Trustee Sanderson joined the group.  Savad Decl. Ex. 17 (N. Sanderson Tr.) 141:17-142:19; 161:12-162:20; Savad Decl. Ex. 222; Savad Decl. Ex. 2 (Prol Tr.) 38:19-20.

388.    Robert Prol went to a Village Board meeting as part of his Defeat RLUIPA initiative to thank them for passing the resolution seeking review and amendments to RLUIPA and to get as many people as possible to contact their representatives to revisit RLUIPA.  Savad Decl. Ex. 2 (Prol Tr.) 65:17-22.  He was seeking to minimize religious use in Pomona. Id. 66:14-23.  Shortly thereafter, Mayor Sanderson appointed Prol to the Planning Board.  Id. 13:2-18;27:15-22.

389.    Trustee Sanderson, Brett Yagel and Rita Louie wanted the public to know that as candidates they hired counsel knowledgeable about RLUIPA to demonstrate that they were "concerned about the things they [the citizens] were concerned about." Savad Decl. Ex. 17 (N. Sanderson Tr.) 177:10-16; Savad Decl. Ex. 9 (Louie Tr.) 133:11-134:6; 141:13-142:22; 146:22-147:20; 157:11-159:4; Savad Decl. Ex. 4 (B Yagel Tr.) 145:8:146:2; Savad Decl. Ex. 96; Savad Decl. Ex. 4 (B Yagel Tr.) 146:15-147:5; Savad Decl. Ex. 97; Savad Decl. Ex. 4 (B Yagel Tr.) 147:11-148:8; Savad Decl. Ex. 98.

390.    Rita Louie campaigned on a promise that "no developer was going to come under a fundamentally flawed statute to try and build some mega development in the middle of our little simple village" Savad Decl. Ex. 9 (Louie Tr.) 126:18-127:7 ; 148:9-13

391.    Trustee Louie thinks that RLUIPA is flawed, but cannot identify the flaw.  She does not like the end result-- that the federal law impacts local zoning. Savad Decl. Ex. 9 (Louie Tr.) 127:8-17; 148:14-21; 149:15-23; 165:5-23.

392.     Trustee Yagel believes that RLUIPA is "flawed" because it relegates everyone but religious regarding land use.  Savad Decl. Ex. 4 (B. Yagel Tr.) 65:14-67:35.

393.     In April, 2007,  at Trustee Yagel's urging, Mayor Sanderson sought to meet with Congressman John Hall to review RLUIPA.  Savad Decl. **Ex. 17** (N. Sanderson Tr.) 157:18-158:20; 158:25-160:16; Savad Decl. **Ex. 231**, 232; Savad Decl. Ex. 4 (B. Yagel Tr.) 153:14-25; 154:19-155:4; Savad Decl. Ex. 100.

394.     Trustee Yagel had informal conversations with federal representatives to try to cure RLUIPA.  Savad Decl. Ex. 4 (B. Yagel Tr.) 69:7-70:19

395.     L. Sanderson thinks RLUIPA is an unfair law; that the people who are already there [on the land] have rights; and RLUIPA helps religious institutions build what they want to build.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 132:10-133:23

396.     Doris Ulman delivered a speech regarding RLUIPA on  May 1, 2007.   D Ulman Tr 60:20-63:25; Savad Decl. Ex. 86; Answer ¶ 192.  Ulman admits that she told the audience not to "cave in" to people asking people to sell their houses. Savad Decl. **Ex. 23** (Ulman Tr.) 62:21-63:25.

397.     Mayor Sanderson encouraged trustees to attend Doris Ulman's  speech on RLUIPA.  Savad Decl. **Ex. 17** (N. Sanderson Tr.) 166:24-167:15;  Savad Decl. **Ex. 235.**  However, when the Village officials were invited to a public informational presentation by Tartikov, they did not attend because it was not a Village meeting.  Savad Decl. Ex. 11 (L. Sanderson Tr.) 145:14-150:2; Savad Decl. **Ex. 163**, 164.

### The Village Only Sought to Change Laws Related to Issues that Impacted Orthodox/ Hasidic Development

398.     As set forth above, Paragraphs 118-191, the Village passed laws in response to Orthodox/Hasidic Jewish schools, adult student housing for Hasidic/ Orthodox students in neighboring areas and in opposition to Tartikov and Yeshiva Spring Valley.

399.     However, the Village did not act to pass laws in response to issues that were not related to Orthodox/ Hasidic development.  Mayor Marshall encouraged residents in 2001, just after passing Local Law No. 1 of 2001, to accept group homes because the federal Fair Housing Act permits them.  The Village did not seek to have the Fair Housing Act reviewed, amended or repealed.  Savad Decl. Ex. 15 (Defendants' 30(b)(6) Day 4 Tr.) 1003:5-1005:5; Savad Decl. **Ex. 184**; Savad Decl. Ex. 3 (Marshall Tr.) 203:5-205:4; Savad Decl. **Ex. 180**; Savad Decl. **Ex. 189.**

400.     Village Residents believe there are too many tax exempt properties in Rockland, but Pomona did not seek to review, amend or repeal tax exemption laws.  Savad Decl. Ex. 11 (L. Sanderson Tr.). 55:3-8; Prol Tr. 34:14-35:5; 66:14-68:3  L. Yagel Tr. 30:17-34:6; 35:13-37:25;.

401.    When the Mann  property just outside Village was considered to become an assisted living facility in 1999, the Village did not  pass laws regarding assisted living. (This was the same time-frame as Village began drafting Local Law No. 1 of 2001 in response to Yeshiva Spring Valley's 1999 informal meeting.)  Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Day 4  Tr.) 1022:9-1023:23; Savad Decl. **Ex. 189**.

402.    The Village did not pass laws tightening zoning laws regarding office building parking when Barr Laboratories was interested in purchasing property in the Village in 2002, despite the fact that this office building use was not a permitted use. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Tr. 940:24-944:5); Savad Decl. Ex 176.

403.    In fact, every trustee but one was in favor of the concept of Barr purchasing the property for commercial use; and the Village Board informed the Haverstraw supervisor of this position. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Tr. 940:24-944:5); Savad Decl. **Ex. 176**; Savad Decl. **Ex. 278**.

404.    The Village is preempted by state law regarding laws that regulate daycare; the Village never passed a resolution seeking to repeal or amend these New York state laws. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Tr. 1007:15-1009:10).

405.    The Village did not change its laws regarding post partum facilities when a post partum facility was proposed to open in the Village. Savad Decl. **Ex. 15** (Defendants' 30(b)(6) Tr. 1002:4-23;) Savad Decl. Ex. 131.

## The Village treated Tartikov's Request for an Informal Meeting Differently than Other Developers

406.    At the same time the Village refused to meet with Tartikov, on May 7, 2007, Mayor  Sanderson e-mailed with developer Joyce telling him that the Village meets with developers who are or who wish to be involved with the Village "as a courtesy." But this courtesy was not provided to Tartikov, despite its repeated requests to meet with the  Village. Sanderson Tr 112:6-113:26; 115:4-20;Savad Decl. **Ex. 214**.

407.    Mayor Sanderson stated that he corresponded with developer Joyce because he wanted to make sure that he was satisfied that his issues were being addressed by the Village. Sanderson Tr 123:5-10; Savad Decl. **Ex. 214**.

408.    A "developer that wishes to develop property in the Village can write to the Planning Board and ask to be-- ask to make an informal presentation to the board during a planning meeting or he can request to have a Technical Advisory Committee (TAC)  meeting. There are procedures for both." Sanderson Tr 114:2-16. "An applicant can ask to meet with TAC and not submit an application to the Planning Board, just submit a letter with a proposal and a plan." Savad Decl. **Ex. 23** (Ulman Tr 31:12-24).  A TAC meeting is an aid to the developer.  Savad Decl. **Ex. 23** (Ulman Tr 29:13-31:11).

409.    Tartikov wrote to the Village, spoke at Village meetings and called the Village Attorney requesting an informal meeting to discuss its plans on multiple occasions: on March 28, 2007, April 12, 2007, April 25, 2007, and June 22, 2007. Savad Decl. Ex. 287; Savad Decl. Ex. 23 (Ulman Tr. 69:3-7); Savad Decl. Ex. 17 (N. Sanderson Tr. 146:14-24); Savad Decl. Ex. 225; Savad Decl. Ex. 211; Savad Decl. Ex. 17 (N. Sanderson Tr. 108:19-109:2; 117:21-120:2;) Savad Decl. Ex. 309 (Answer ¶ 210);  Savad Decl. Ex. 212; Savad Decl. Ex. 17 (N. Sanderson Tr.). 109:7-14; Savad Decl. Ex 309 (Answer ¶¶ 212-215).

410.    The letters from Tartikov did not ask for an exemption from the Village of its zoning laws, but asked the Village for consideration under RLUIPA.  Savad Decl. Ex. 15 (Defendants' 30(b)(6) Tr. 1038:12-1039:12).

411.    Tartikov was not offered a TAC meeting or any type of informal meeting with the Planning Board in response to any of its requests; nor was it told that it could simply submit a letter with a proposal and a plan (as available to others, see 406-408 above). Savad Decl. Ex. 27 (M. Tauber 30(b)(6) Tr. 116:6-118:10; 120:3-16; 127:24-130:21; 131:22-132:6); Savad Decl. Ex. 27 (Defendants' 30(b)(6) Tr. 178:7-18); Savad Decl. Ex. 309 (Answer ¶¶ 208, 209); Savad Decl. Ex. 17 (N. Sanderson Tr. 117:7-20); Savad Decl. Ex. 213.

412.    Mayor Sanderson claims that Tartikov should have known how to apply for the TAC meeting, even though he, as mayor and trustee for 15 years, had no idea how to apply for the TAC meeting Savad Decl. Ex. 17 (Sanderson Tr. 115:21-117:6).

413.    When Barr Laboratories was interested in purchasing property in 2002 in the Village to build an office building with parking, (a non-permitted use), the Board discussed whether they would approve of this potential use at a Village Board meeting.  This discussion occurred before the property was even purchased by the potential purchaser.  All but one trustee was in favor of the concept and the Village informed the Haverstraw supervisor of this position. Savad Decl. Ex. 15 (Defendants' 30(b)(6) Tr. 940:24-944:5); Savad Decl. Ex. 176; Savad Decl. Ex. 278.

## The Village Has a History of Reacting to Issues with Jewish religious Practices by Passing Laws.

414.    Former Mayor Marshall admitted that the Village passed a law prohibiting overnight parking because residents complained that Orthodox Jews, who are prohibited from using their cars on the Sabbath, from sundown Friday to sundown Saturday, were parking their cars on the street overnight.  Savad Decl. Ex. 3 (Marshall Dep Tr. 160:3-162:4);  Savad Decl. Ex. 73; Savad Decl. Ex. 74.

## Village Officials and Employees Tried to Mask Their Real Intentions on Tartikov

## The January 22, 2007 Village Board Meeting

415.    As set forth above, Paragraphs 159-168, the January 22, 2007 meeting was a "hostile" one in which many Village residents came out to oppose Tartikov and to demand the

Village Board to pass laws to thwart Tartikov's attempts to build a rabbinical college with family housing in the Village.

416.    During the meeting, Mayor Marshall was accused of not listening to residents' opposition to Tartikov. He responded by stating "[l]adies and gentlemen, let me say something. We sitting at this table have limitations that are placed on us as to what we can say and what we can't say, because our attorney tells us what we can say and what we can't say. I can't say what I feel, I can't. If I agree with you, I don't agree with you, I don't have that luxury of being able to say that here. All that I can say is that every member of this board works very, very hard to do what is best for this community. You have your issues. Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that that we don't agree. We may or may not, but please give us the benefit of the doubt. We have all been doing this. We work very hard at what we do. We try and do what is best for the community but it's our home. There are limitations under the law that restrict what we can say and when we can say it." Savad Decl. Ex. 3 (Marshall Tr. 182:7-183:16); Savad Decl. Ex. 78 at RC 1122.

417.    Mayor Marshall also stated "[l]adies and gentlemen, there isn't anyone sitting up here who doesn't know how you feel." Savad Decl. Ex. 3 (Marshall Tr. 180:6-13); Savad Decl. Ex. 78 at RC 1120.

418.    After the meeting, contrary to regular Village procedure of summarizing all public comments in the Meeting Minutes, Mayor Marshall directed the secretary who transcribed the minutes to remove all of the comments made by the public from the minutes, instead only leaving their names and addresses; this reduced the 29 page draft of the minutes to 13 pages. Savad Decl. Ex. 3 (Marshall Tr. 216:2-15); Savad Decl. **Ex. 23** (D Ulman Tr 42:12-44:16; 604:17-24); Savad Decl. **Ex. 283**; Savad Decl. Ex. 3 (Marshall Tr. 217:4-218:6); Savad Decl. Ex. 3 ( Marshall Tr. 219:4-220:12; 223:20-224:7);Savad Decl. Ex. 84; Savad Decl. Ex.23 (D Ulman Tr 46:11-47:2; 54:22-55:5); Savad Decl. **Ex. 283** ; Savad Decl. **Ex. 284**).

The February, 2007 Village Board Meeting

419.    Prior to the February, 2007 Village Board meeting, Mayor Marshall sent an e-mail to the trustees warning them that Tartikov's attorney might be at the meeting. Savad Decl. Ex. 3 (Marshall Tr. 191:5-193:6); Savad Decl. Ex.79.


Village Trustee Candidates Rita Louie and Brett Yagel Authored a Letter to the Editor of the Rockland County Journal News Which Expressed their Opposition to Tartikov, but it was Signed and Submitted by Lynn Yagel

420.    In February, 2007, Village Board candidates Rita Louie and Brett Yagel drafted a letter to the Rockland County Journal News editor entitled "Pomona Rabbinical College Not a 'Natural Progression.'  The letter referred to the proposed Orthodox/ Hasidic residents of

Tartikov as "homogenous individuals" and disputed Tartikov Lawyer's suggestion that the moving of Orthodox/Hasidic Jews into Pomona was a natural progression. Savad Decl. Ex. 114.

421.    Rather than submit the letter to the Rockland County Journal News in their own names, Village Trustee candidates, Rita Louie and Brett Yagel asked his wife, Lynn Yagel, to submit the letter to the editor in her name; and she did.  Savad Decl. Ex. 113 (letter as it appeared in the Journal News); Savad Decl. Ex. 114 (draft authored by Rita Louie and Brett Yagel); Savad Decl. Ex. 8 (L. Yagel Tr. 144:8-145:4);Savad Decl. Ex. 130.

## Mayor Sanderson and Trustees Yagel and Louie Warned People to Watch What They Say about Tartikov in Public

422.    Mayor Sanderson, Brett Yagel and Rita Louie decided to attend a meeting of the Pomona Civic Association in April 2007.  In advance of the meeting, Trustee Yagel warned Mayor Sanderson and Trustee Louie that they "Must be very careful about what we say. Don't know who's in the audience. Savad might show up again." Savad Decl. Ex. 4 (B. Yagel Tr. 192:4-192:22); Savad Decl. Ex. 105; Savad Decl. Ex. 9 (Louie Tr. 173:18-175:4);Savad Decl. Ex. 139.

423.    When discussing Tartikov at the meeting, Trustee Louie warned people that there is a person with a video camera at the Village meetings who will use everything they say against them, so everyone should be careful about what they say.  Savad Decl. Ex. 9 (Louie Tr. 204:12-18); Savad Decl. Ex. 142 ¶ 12.

424.    When discussing Tartikov at the meeting, Mayor Sanderson stated that he did not want to make the mistakes that the developers want him to make.  Savad Decl. Ex. 17 (N. Sanderson Tr. 175:5-18); Savad Decl. Ex. 239 ¶8.

425.    When discussing Tartikov at the meeting, Trustee Yagel stated that the residents should make sure that when they speak in public they do not speak in a discriminatory manner because that could be construed as being discriminatory.  Savad Decl. Ex. 4 (B. Yagel Tr.). 189:15-190:24; Savad Decl. Ex. 173 ¶ 10.

## Other Actions Where Village Trustees and Employees Watched What they Said

426.    Trustee Louie reported to Mayor Sanderson that a person from Tartikov's law firm had been at the Planning Meeting.  Louie asked Sanderson to have Village Attorney Doris Ulman give the village planning board the "ground rules" for such situations. Savad Decl. Ex. 9 (Louie Tr.). 178:12-179:24; Savad Decl. Ex. 140.

427.    When corresponding with Village resident Robert Prol regarding organizing a spin-off of Preserve Ramapo to oppose Tartikov,  Trustee Louie asked Prol to send the information to Preserve Ramapo because she could not do it because of her position with the Village.  Savad Decl. Ex. 9 (Louie Tr.). 250:2-253:19; Savad Decl. Ex. 149; Savad Decl. Ex. 2 (Prol Tr.) 121:2-122:7; Savad Decl. Ex. 58.

428.    Village Clerk Leslie Sanderson spoke "in code" when corresponding about Tartikov. She said "it may sound as if I am talking in code, but I hope you understand what I am talking about" and she admitted that she was referring to Tartikov.  Savad Decl. **Ex. 26** (L. Sanderson Tr.) 220:5-221:7

## Village Officials and Employees Refused to Attend a Public Meeting Held by Tartikov and Tried to Encourage Others Not to Go.

429.    Tartikov held a meeting in May, 2007 to present information to the public about the proposed rabbinical college.  Savad Decl. Ex. 15 (Defendants' 30 (b)(6) Day 4 Tr.) 1036:5-24; Savad Decl. Ex. 17 (Sanderson Tr.) 82:12-17; Tr. 82:82:22-83:4; 83:8-23; Savad Decl. Ex. 4 (B. Yagel Tr.) 32:17-33:8 ; Savad Decl. **Ex. 23** (Ulman Tr.) 57:6-58:25; 59:2-7; Savad Decl. **Ex. 286.**

430.    While corresponding with a Village resident suggesting that the resident not go to the meeting held by Tartikov, Leslie Sanderson said: "consider this next piece of information from me NOT advice from the Village of Pomona". Savad Decl. **Ex. 170**; Savad Decl. Ex. 11 (L. Sanderson Tr.). 223:6-232:22.

431.    Mayor Sanderson told people that he was not going to the Tartikov meeting. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 85:8-23.

432.    A Village resident called the Village and was encouraged not to attend Tartikov's meeting and was told that if they did attend, they might incriminate the village.  Savad Decl. **Ex. 17** (N. Sanderson Tr.). 168:7-169:17; Savad Decl. **Ex. 236.**

433.    A Village employee was admonished for telling the Village resident not to attend the meeting in order to avoid incriminating the Village.  She was told instead by Leslie Sanderson to repeat the words that Mayor Sanderson told them to say, which was "personally, I don't think it's a good idea to go to the meeting."   Savad Decl. **Ex. 17** (N. Sanderson Tr.). 169:22-172:5; Savad Decl. **Ex. 237**

434.    Mayor Sanderson replied to an e-mail from another Village resident regarding the Tartikov meeting by asking the resident to call Sanderson before he considers going to the meeting.  Savad Decl. **Ex. 238**; Savad Decl. **Ex. 17** (N. Sanderson Tr.). 172:19-173:3

435.    Leslie Sanderson decided not to go the meeting, even though she knew that the purpose of the Tartikov meeting was to disclose information to the public about Tartikov's plans. Savad Decl. Ex. 11 (L. Sanderson Tr.) 233:8-19.

## Village Residents, Officials and Employees Made it Clear that they Would Rather Pay to Oppose Tartikov than Allow it to be Built in the Village

436.   Many Village residents would attend a "coffee" with Mayor Sanderson to tell him that whatever the cost, they would like the Village to protect its zoning laws. Savad Decl. Ex. 11 (L. Sanderson Tr.). 218:16-219:2; Savad Decl. **Ex. 169.**

437.   Mayor Sanderson wanted to create a legal fund for an anticipated lawsuit with Tartikov. Savad Decl. **Ex. 17** (N. Sanderson Tr.). 184:2-185:20. In fact, during their election campaign, Mayor Sanderson and Trustees Yagel and Louie promised  to create a legal defense fund in order to "fight" RLUIPA challenges. Savad Decl. **Ex. 17** (N. Sanderson Tr.)  135:24-136:20; Savad Decl. **Ex. 219.**

438.   During the time-frame when Tartikov was attempting to meet with the Village to discuss its proposed rabbinical college, the Village was making arrangements to set up a fund for litigation against Tartikov. This occurred months before this lawsuit was filed, and even before the last of the challenged laws was passed. Savad Decl. **Ex. 17** (N. Sanderson Tr.) 174:4-16; 174:17-175:4; Savad Decl. **Ex. 239** ¶¶5-6, 13-14.

439.   Lynn Yagel attempted to organize fundraisers to support the Village's lawsuit with Tartikov. Savad Decl. **Ex. 8** (L. Yagel Tr.) 117:2-120:13; Savad Decl. **Ex. 128.**

440.   Village residents showed great support for an almost 70% tax hike to cover a "tax stabilization fund" to pay for the Tartikov litigation. Savad Decl. **Ex. 17** (N. Sanderson Tr.). 135:24-137:10; 139:20-141:12; 145:5-146:13; Savad Decl. **Ex. 221;** Savad Decl. **Ex. 225;** Savad Decl. **Ex. 240;** Savad Decl. Ex. 4 (B. Yagel Tr.). 36:16-40:10; Savad Decl. Ex. 85 Savad Decl. Ex. 2 (Cook Tr.) 100:18-101:13; Savad Decl. Ex. 44.

441.   N. Sanderson writes in an email to Rita Louie just after the tax hike was approved that if the reporter writing about the tax hike could figure out that the tax hike had to do with "the Tartikov thing", then other people could figure it out as well. Savad Decl. **Ex. 17** (N. Sanderson Tr.). 193:23-194:12; Savad Decl. **Ex. 244**

442.   Leslie Sanderson said that it would be impossible for the Village to purchase available open land that was offered to it because, based on statements by Village residents, money needed to be used to fight Tartikov.  Savad Decl. **Ex. 17** (L. Sanderson Tr.) 216:15-222:4 Savad Decl. **Ex. 169.**

443.   Mayor Marshall made comments on January 9, 2007 about being Trustee Sanderson "slick" about putting proposed local dormitory and wetlands laws on website "in case availability is challenged by others." Savad Decl. **Ex. 3** (Marshall Tr.) 212:23-215:20; Savad Decl. Ex. 82, Savad Decl. Ex. 83.

## TOTAL EXCLUSION

444.   Tartikov is a religious assembly.  Tauber Decl. ¶22.

445.   Tartikov is a religious institution.  Tauber Decl. ¶ 2.

446. Tartikov's planned facility is a religious structure. Tauber Decl. ¶ 23-27.

447. Tartikov's educational institution will be purely religious in nature. Tauber Decl. ¶ 15-21

## Housing is Religious Use

448. The Plaintiffs sincerely believe as a religious matter that one must exile (with a sense of urgency) himself to a Torah Community in order to live and study there. Savad Decl. **Ex. 26** (Menczer Tr.) 35:21-36:18; 40:3-41:11; Savad Decl. **Ex. 27** Tauber 30(b)(6) Tr. 27:2-28:22;  Savad Decl. **Ex. 29**, M. Babad 96:16-25; Savad Decl. Ex. 36 (Neuberger Tr.) 85:16-86:22; Neuberger Rep. page 3; Resnicoff Rep. page 27-29; M Menczer MTD Aff ¶ 14, 16; Menczer Decl.¶24,57; Hershkowitz Decl. ¶59,64; Rosenberg Decl.¶61, 66; Resnicoff Decl. ¶116,117.

449. Without on-campus housing, the plaintiffs cannot accomplish their religious goal. Hershkowitz MTD Aff dated January 10, 2008 ¶ 7; M. Menczer MTD Aff ¶ 6; Resnicoff Decl. ¶107-109, 110-112, 113-117117.

450. On-campus housing allows students to study at various times of day and night and interact with other rabbinical students and teachers on a continuing basis. Margulis MTD Aff dated January 10, 2008 ¶ 8; M. Menczer MTD Aff ¶ 6; Menczer Decl.¶55; Hershkowitz Decl. ¶62; Rosenberg Decl.¶63; Resnicoff Decl. ¶112, 116,122; Tauber Decl.¶29.

451. A Torah community is one where all of the people's minds are on the Torah. Savad Decl. Ex. 30 (Hershkowitz Tr.) 24:25-25:5; M. Menczer MTD Aff ¶ 6; Resnicoff Decl. ¶107, 110,111.

452. To achieve their goals as a Torah scholar as defined by the religious books, the Plaintiffs have to dedicate themselves to a certain kind of study program, studying day and night while being surrounded by other Torah students to the exclusion of all worldly pleasures and distractions. Savad Decl. **Ex. 26** (Menczer Tr.) 88:18-89:13.Menczer Decl.¶55; Hershkowitz Decl. ¶62; Rosenberg Decl.¶64; Resnicoff Decl. ¶107-122.

453. Orthodox/ Hasidic Jews believe that a Torah community is a completely religious atmosphere where people live according to Halachic standards. Savad Decl. Ex. 36 (Neuberger Tr.) 45:2-46:12; Tauber Decl.¶21; Resnicoff Decl. ¶110,111.

454. In a Torah Community, the whole mind of the rabbinical student is in the Torah. To be a rabbinical judge, a student's whole mind has to be in the Torah. Everyone is living together, of the same mind, with no outside influences to distract them. Savad Decl. Ex. 30 (Hershkowitz, Tr.) 26:16-24; 27:13-28:3;Resnicoff Decl. ¶116,117; Tauber Decl. ¶16-29;Tauber Decl.¶16-33.

455. To study the Torah according to religious beliefs, one is required to exile himself into a Torah Community. Savad Decl. **Ex. 27** (Tauber 30(b)(6) Tr. 27:2-20); Savad Decl. **Ex. 25**

(Rosenberg Tr.) 36:19-36:17; 37:9-38:2; Def. Ex. 3; Savad Decl. **Ex. 27** (Tauber 30(b)(6) Tr. 42:2-24); Savad Decl. **Ex. 288**; Savad Decl. **Ex. 29** (Mordechai Babad Tr.) 96:19-25; Savad Decl. Ex. 30 (Hershkowitz Tr.) 33:11-34:12; Resnicoff Decl. ¶116,117.

456.    It is a religious requirement to live in a Torah community in order to become a Torah scholar; and one must become a Torah scholar before he can become a rabbinical judge. Savad Decl. **Ex. 26** (Menczer Tr.) 86:16-87:12; Savad Decl. Ex. 30 (Hershkowitz Tr.) 79:21-80:13; 92:25-93:20; Savad Decl. Ex. 36 (Neuberger Tr.) 85:16-86:21;Resnicoff Decl. ¶110,111; Tauber Decl.¶19, 22

457.    There is a need for all of the rabbinical scholars to live together in a Torah community in order for program to succeed. M. Menczer MTD Aff ¶ 12. Without living in Torah community, one cannot accomplish his religious goal. Hershkowitz MTD Aff ¶ 7; M. Menczer MTD Aff ¶ 18; Resnicoff Decl. ¶107,108.

458.    The Rabbinical College of Tartikov, Inc. was formed for the purpose of developing and operating a rabbinical college as a Torah community, as described by Orthodox/Hasidic religious sages. Tauber 30(b)(6) 11:20-12:8; Tauber Decl ¶3,6,7.

459.    The Rabbinical College of Tartikov, Inc. cannot offer its religious program to train rabbis to become full-time rabbinical judges (*dayanim*) if it cannot build a Torah Community with on-campus housing. Savad Decl. **Ex. 26** (Meleich Menczer Tr.) 43:13-43:9; 66:23-67:21; Savad Decl. **Ex. 27** (64:19-65:3); Savad Decl. **Ex. 25** (Rosenberg Tr.) 39:2-15.

460.    The Plaintiff students believe as a religious matter that they need to live together and study together in a community committed to Torah. Savad Decl. **Ex. 26** (Melech Menczer Tr.) 35:21-36:18; 36:19-37:5; 39:14-41:11; Savad Decl. Ex. 30 (Hershkowitz Tr.) 24:13-24; 27:5-16; 28:9-29:10; 30:14-31:14; 81:13-85:17; Savad Decl. **Ex. 29** (Mordechai Babad Tr.) 97:2-5 ; M. Menczer MTD Aff ¶ 6; Tauber Decl.¶19-29

461.    Plaintiffs believe that living in a Torah Community is essential to the success of the rabbinic program of the Congregation Rabbinical College of Tartikov, Inc. Resnicoff Decl.¶107;Tauber Decl. ¶ 31-37. Tauber Decl.¶16-39.

462.    Tartikov's officers believe, based on their religious background and what is required in their religious books, that students will only be able to complete the rabbinical judge program in all four books of the Shulchan Aruch if they live in the Torah community. Savad Decl. **Ex. 27** (42:11-24).

463.    A Torah community is necessary because rabbinical students can devote themselves completely to their studies; it creates a situation where they can devote themselves fully to their task at hand without having to deal with other difficulties; it is a rarified atmosphere and is especially important in response to contemporary society because we are trying to live according to Jewish law and the world outside of the Torah community is not in tune with that. Savad Decl. Ex. 36 (Neuberger Tr.) 43:23-44:24; Resnicoff Decl.¶108, 110;Savad Decl. **Ex. 26** Savad Decl. Ex. 34 (Resnicoff Tr.) 9:10-10:13; 16:11-18:19.

464.    The Torah community has to encompass the entire community within the campus so no that there are no non-Torah influences or distractions. Savad Decl. **Ex. 26** Savad Decl. Ex. 34 (Resnicoff Tr.) 9:10-10:13; 16:11-18:19; Savad Decl. Ex. 30 (Hershkowitz Tr.) 27:17-28:4; Savad Decl. **Ex. 26** (Menczer Tr.) 36:19-37:5.

465.    Rabbinical students must live on campus to learn all 4 volumes of the Shulchan Aruch. Savad Decl. **Ex. 25** (Rosenberg Tr.) 33:19-34:15; 37:2-8; Resnicoff Decl.¶107.

466.    Rabbinical students will not be able to achieve the maximum depth of learning the Torah if they do not live on the campus of the Torah Community.  They will have to downgrade their level of learning Torah.  Savad Decl. **Ex. 26** (Meilech Menczer Tr.) 68:15-69:3; Savad Decl. **Ex. 25** (Rosenberg Tr.) 39:16-41:15.

467.    Rabbinical students will be immersed in their studies and study more if they live on campus. Savad Decl. Ex. 36 (Neuberger Tr.) 59:16-61:5; Resnicoff Decl.¶112,113,115,116.

468.    In a Torah Community, rabbinical students can study at various times of the day or night with other rabbinical students on a continuous basis.  Hershkowitz MTD Aff ¶ 6;Resnicoff Decl.¶112,122; Tauber Decl.28, Rosenberg Decl ¶64; Menczer Decl¶55

469.    There is currently no Torah community in which the students can live.  Savad Decl. Ex. 30 (Hershkowitz Tr.) 94:2-7;  Menczer Decl.¶60; Hershkowitz Decl. ¶67; Rosenberg Decl.¶69;

470.    There is no opportunity to study the complete Shulchan Aruch in America and in specifically around the Town of Ramapo, N.Y. in the manner that the Plaintiffs believe is necessary because of the need for a Torah community to accommodate such religious study.  M Menczer MTD Aff ¶ 5;Menczer Decl.¶60; Hershkowitz Decl. ¶67; Rosenberg Decl.¶69;

471.    The  Rabbinical College cannot adequately function without housing its students. Savad Decl. **Ex. 26** (Meleich Menczer Tr.) 35:6-11; Resnicoff Decl.¶107;  Savad Decl. **Ex. 25** (Rosenberg Tr.) 55:9-56:16 .  A student could not study all 4 books of the Shulchan Aruch at a school such as Kollel Belz because it is a much shorter studying day. Savad Decl. **Ex. 27** (27:21-28:22);Hershkowitz Decl. ¶41-47; Rosenberg Decl.¶43-49;

472.    There is a high dropout rate at other programs which do not provide the rabbinical students with housing in a Torah Community. Savad Decl. **Ex. 27** (27:21-28:19).

473.    Other programs that do not provide housing as part of the Torah Community are unable to complete all four books of the Shulchan Aruch.  Savad Decl. **Ex. 27** ( 63:18-64:9).Menczer Decl.¶60; Hershkowitz Decl. ¶67; Rosenberg Decl.¶69;

474.    Kollel Belz is not a Torah community.  It is a general *kollel* where all different types of students come to learn; they get married and then they leave to go to work.  Even though they learn, learning is not their goal in life.  Savad Decl. Ex. 30 (Hershkowitz. Tr.) 25:6-20; 26:7-27:10.

475.    Kollel Beth Yechiel Mechil of Tartikov of Brooklyn is not a Torah community. Savad Decl. Ex. 30 (Hershkowitz Tr.)  59:15-61:17.

476.    Congregation Rabbinical College of Tartikov, Inc. intends to provide housing, synagogue, shul, library, and courtrooms as part if its use of the subject property as a Rabbinical College.  Tauber Decl. ¶23-27.

477.    The rabbinical college will provide a large study hall capable of holding all of the full-time rabbinical students together in one room so they can learn in the proper way according to our religion in this Torah Community.  Tauber Decl.¶ 23.

478.    The rabbinical college will provide facilities where the students can take their lunches together during the day, which will allow them to stay at the school and continue religious learning without interruption.  Tauber Decl. ¶ 25.

479.    The Village believes that Tartikov wants to build a rabbinical college. Defendants' 30(b)(6) Tr 240:24-25.

480.    The Village has no facts to indicate that Plaintiffs' intended use of the subject property is not motivated by their religious beliefs. Savad Decl. **Ex. 12** 279:15-18;280:12-16.

481.    The Village has no facts to indicate that Plaintiffs' religious beliefs are not sincere. Savad Decl. **Ex. 12** 279:19-25; 280:17-20.

482.    The Village admits that housing could be a religious use. Defendants' 30(b)(6) 16:21-17:19; 24:6-25:7; 30:4-21; 50:10-53:8.

483.    The Village is a "jurisdiction," and both the Village and the Board of Trustees are "governments" under RLUIPA.  Request for Admission Response Nos. 16, 38, 39.

484.    The Village has admitted that both the Zoning and Wetlands Protection chapters of its Code are "land use regulations." Request for Admission Response Nos. 17, 18.

485.    The challenged zoning provisions and the WPL has been imposed upon the Plaintiff Congregation Rabbinical College of Tartikov, Inc.  Request for Admission Response No. 29.

486.    The housing component of the rabbinical college is only for students (and teachers) who are committed to the full-time religious training  program along with their families, as well as one or two caretakers of the subject property.  Savad Decl. **Ex. 27** (12:9-13:3; 156:6-15); Savad Decl. Ex. 36 (Neuberger Tr.) 52:8-53:2; Savad Decl. Ex. 30 (Hershkowitz Tr.) 83:16-85:17; Savad Decl. **Ex. 18** (Voorhis Tr.) 175:19-22 (above).

487.    Students who drop out of the full-time religious training program will have to move out of the housing at the rabbinical college.  Savad Decl. **Ex. 26** Savad Decl. Ex. 31 (Chaim Babad Tr.) 183:13-25

488.    The Congregation Rabbinical College of Tartikov, Inc. will require students to live on the campus of the rabbinical college and the housing will be provided by the Congregation Rabbinical College of Tartikov, Inc. at no cost to them. Savad Decl. **Ex. 27** (28:20-22); Savad Decl. Ex.30 (Hershkowitz Tr.) 72:12-21.

489.    Housing is required for the rabbinical college use.  Savad Decl. **Ex. 26** Savad Decl. Ex. 35 (Weinstein Tr.) 22:18-23:8; 23:12-24:15; Weinstein Decl.¶¶ 11-47; Resnicoff Decl. ¶107.

490.    There is more need for more housing at theological schools and schools of religious studies than for secular schools.  Savad Decl. Ex. 35 (Weinstein Tr.) 28:14-29:5; Weinstein Decl. ¶¶ 135-142.

491.    The on-campus residential experience can be essential to the educational experience. Savad Decl. Ex. 35 (Weinstein Tr.) 62:10-63:6; 63:13-64:5; Weinstein Decl. ¶ 51; Resnicoff Decl. ¶107-122.

492.    Providing housing on campus is critical to the success of the proposed rabbinical college program. Resnicoff Decl. ¶107-122.

### The Students are Required to Live with Their Families With Cooking, Dining and Housekeeping Facilities

493.    It is the students' religious belief that they must live with their families in order to raise their family in a religious environment. Savad Decl. **Ex. 27** 26: 7-26; 84:4-24; 106:24-107:9; Savad Decl. Ex. 30 (Hershkowitz Tr.)  92:25-93:20; Savad Decl. **Ex. 26** (Menczer Tr.) 45:16-46:8; Savad Decl. **Ex. 25** (Rosenberg Tr.) 34:16-24; Resnicoff Decl. ¶112.

494.    The rabbinical students need a separate area where they can study and live with their families. Savad Decl. Ex. 31 (Chaim Babad Tr.) 98:19-25; M. Menczer MTD Aff ¶ 15;Tauber Decl. ¶ 30,32.

495.    The Torah Community is like a monastery, but unlike Catholic seminarians or Buddhist monks, Plaintiffs' religious beliefs require them to be married and have children. M. Menczer MTD Aff ¶ 15.

496.    When The Congregational Rabbinical College of Tartikov, Inc. was formed, the understanding was that the planned rabbinical college would be only for students (and teachers) committed to the full-time program, along with their families. Savad Decl. **Ex. 27** (12:12-13:3); Savad Decl. Ex. 38 (Jackson Tr.) 34:6-17

497.    Every day that the project remains unbuilt, the Village is "intruding" on the Plaintiff students' rights to study and live with their family in Torah Community.  Savad Decl. **Ex. 27** 126:16-127:17.

498.    Most colleges have family housing for students.  Weinstein Decl. ¶¶ 15, 19-20; Savad Decl. Ex. 37 (Fitzpatrick Tr.) 59:14-60:10; Savad Decl. Ex. 32 (Drake Tr.) 87:14-88:5; Drake Decl. ¶8.

499.    Because Plaintiffs' religious belief is that the students at the rabbinical college must live with their families, the rabbinical college students required their own housing unit with separate cooking facilities.  Savad Decl. **Ex. 27** 84:4-24; Tauber Decl.¶ 32.

500.    The Village has no facts to indicate that Plaintiffs' need to live with their family, and therefore to have housekeeping facilities, is not motivated by their religious beliefs.  Savad Decl. **Ex. 12** ( 279:15-18); 280:12-16.

501.    The Village has no facts to indicate that Plaintiffs' religious beliefs concerning the need to live with their families are not sincere.  Savad Decl. **Ex. 12** (279:19-25; 280:17-20).

## Courtroom on campus

502.    Plaintiffs intend for the rabbinical college to provide the opportunity for the rabbinical students to observe how rabbinical judges fulfill their duties.  This experience is necessary for everyone who wants to become a judge, and is called Shimush (rabbinic apprenticeship).  Savad Decl. **Ex. 25** (Rosenberg Tr.) 26:21-27:14; Savad Decl. **Ex. 26** (Menczer Tr.) 96:19-97:2; Tauber Decl.¶27; Resnicoff Decl ¶121.

503.    *Shimush Talmidei Chachamim* describes the rabbinical students' observation of judges hearing cases. Savad Decl. **Ex. 26** (Menczer Tr.) 96:9-97:17;Resnicoff Decl ¶121.

504.    The Congregation Rabbinical College of Tartikov, Inc. intends to provide at least four courtrooms on the campus as part of the educational institution.  Savad Decl. **Ex. 28** (Tauber Tr.) 160:7-161:2; Tauber Decl.¶27.

505.    The religious basis for courtrooms being on the campus is rooted in the same religious sources which requires the training of rabbinical judges, because Plaintiffs need courtrooms to do the training.  Savad Decl. **Ex. 27** ( 38:19-40:11); Savad Decl. **Ex. 25** (Rosenberg Tr.) 34:25-35:18;Resnicoff Decl ¶121.

506.    Courtrooms are needed on the rabbinical college's campus in order for its students to be able to observe senior rabbinical judges hearing actual disputes.  The students will be learning in the upstairs of the building while real cases are being heard downstairs. Savad Decl. **Ex. 27** (34:17-36:24);Resnicoff Decl ¶121;Tauber ¶30.

507.    Having courtrooms on the campus is essential to the religious learning, so the students and the judges can be together.  Savad Decl. **Ex. 27** (37:23-38:17); Savad Decl. **Ex. 26** (Menczer Tr.) 96:9-18;Resnicoff Decl ¶121.

508.    It is a religious requirement for the rabbinical students to observe court proceedings. Savad Decl. **Ex. 26** (Menczer Tr.) 97:12-17.  The authority comes from the Torah in general. Savad Decl. **Ex. 27** (38:18-39:22; 39:23-40:11; 40:12-41:25);Resnicoff Decl. ¶121.

509.    The rabbinical students need to be in close proximity to senior judges while studying for as well as providing research assistance to the judges for use in their cases.   Savad Decl. **Ex. 27** (36:25-37:21);Resnicoff Decl ¶121.

510.    The Village has no facts to indicate that Plaintiffs' need to include courtroom facilities is not motivated by their religious beliefs.   Savad Decl. **Ex. 12** (279:15-18; 280:12-16).

511.    The Village has no facts to indicate that Plaintiffs' religious beliefs concerning the need to include courtroom facilities are not sincere. Savad Decl. **Ex. 12** (279:19-25; 280:17-20).

<u>Library on Campus</u>

512.    The religious basis for a library on campus is rooted in the same religious sources which requires them to train rabbinical judges because students need to have access to religious books for their studies.  Savad Decl. **Ex. 27** (42:25-43:9); Savad Decl. **Ex. 26** (Menczer Tr.) 98:4-18; M. Babad 97:15-98:6.

513.    The rabbinical college will provide libraries that will contain all of the books necessary for the students to learn according to our religion and to become proficient in the Code of Jewish Law in this Torah Community. Tauber Decl. ¶24.

514.    Going off campus to a library is a disruption of studies. Savad Decl. **Ex. 26** (Menczer Tr.) 98:19-99:9.

515.    A college campus typically includes libraries.  Savad Decl. Ex. 32 (Drake Tr.) 61:9-62:5.

516.    The Village has no facts to indicate that Plaintiffs' need to include libraries is not motivated by religious beliefs. Savad Decl. **Ex. 12** (279:15-18; 280:12-16).

517.    The Village has no facts to indicate that Plaintiffs' religious beliefs concerning the need to include libraries are not sincere.   Savad Decl. **Ex. 12** (279:19-25; 280:17-20).

<u>Mikvah on campus</u>

518.    Tartikov intends to provide *mikvahs* (ritual baths) on its rabbinical college campus. Savad Decl. Ex. 34 (Resnicoff Tr.) 5:23-6:14; Savad Decl. **Ex. 25** (Rosenberg Tr.) 33:7-18; Savad Decl. Ex. 36 (Neuberger Tr.) 24:2-23; Tauber Decl. ¶26.

519.    The religious need for *mikvah* is based in the Talmud and many other places. Tauber 30(b)(6) Tr. 43:10-14; Resnicoff Decl. ¶¶ 100-106.

520.    The rabbinical college has to have a ritual bath (*mikvah*).  Savad Decl. Ex. 34 (Resnicoff Tr.) 7:16-8:16.

521.    The Village has no facts to indicate that Plaintiffs' need to include *mikvahs* is not motivated by religious beliefs.  Savad Decl. **Ex. 12** (279:15-18; 280:12-16).

522.    The Village has no facts to indicate that Plaintiffs' religious beliefs concerning its need to include *mikvahs* are not sincere. Savad Decl. **Ex. 12** (279:19-25; 280:17-20).

<u>Shul on campus</u>

523.    Tartikov has to have *shuls* (synagogues) on campus so that everyone at the campus prays together. Savad Decl. **Ex. 26** (Menczer Tr.) 34:5-35:11; Savad Decl. Ex. 30 (Hershkowitz Tr.) 72:2-7; Savad Decl. **Ex. 25** (Rosenberg Tr.) 33:7-16; Savad Decl. Ex. 35 (Weinstein Tr.) 20:20-22:17 (not offering expert opinion on this); Savad Decl. Ex. 36 (Neuberger Tr.) 24:2-23;Tauber Decl. ¶22.

524.    A *shul* is a physical indicator of a Torah Community.  Savad Decl. Ex. 30 (Hershkowitz Tr.) 31:15-32:2.

525.    Tartikov may need different shuls for Ashkenazi and Sephardic sects.  Savad Decl. **Ex. 29** (M. Babad Tr.) 99:19-10.

526.    *Shuls*, libraries, courtrooms, and classrooms constitute religious exercise and religious land use.  Request for Admission Response Nos. 20, 21, 22, 23, 24.

527.    The Village has no evidence that the housing component of the rabbinical college is not religious exercise and religious land use.  Interrogatory Response No. 37.

<u>Curriculum/ Program</u>

528.    Rabbinical students will study the Four Books of the Shulchan Aruch. Savad Decl. **Ex. 25** (Rosenberg Tr.) 14:6-20; 32:8-33:6; Savad Decl. **Ex. 26** (M. Menczer Tr.) 17:11-21; 21:13-23:24; 23:21-24:11; Savad Decl. Ex. 30 (Hershkowitz Tr.) 55:4-11; 65:4-11; Savad Decl. Ex. 36 (Neuberger Tr.) 23:14-25;Resnicoff Decl. Ex. 34; Tauber 30(b)(6) 21:15-22:11; Savad Decl. **Ex. 29** (M. Babad Tr.) 71:23-73:25; 74:12-76:4; Savad Decl. **Ex. 25** (Rosenberg Tr.) 30:18-31:8; 32:8-33:6; Savad Decl. Ex. 34 (Resnicoff Tr.) 47:13-48:21;Menczer Decl.¶46; Hershkowitz Decl. ¶53; Rosenberg Decl.¶55;

529.    Every Orthodox Jew learns some part of four books of the Shulchan Aruch; but the students at Tartikov will learn all of the volumes of the Shulchan Aruch.  Savad Decl. **Ex. 29** (M. Babad Tr.) 22:3-24:23.

530.    Living in a Torah Community supports this intensive study. Savad Decl. **Ex. 27** (42:2-21).Resnicoff Decl.¶107-122.

531.    The students require approximately thirteen to fifteen years of study for completion of all four books of the Shulchan Aruch.  Savad Decl. **Ex. 26** (M. Menczer Tr.) 80:19-23; Savad Decl. **Ex. 25** (Rosenberg Tr.) 14:6-20; Savad Decl. **Ex. 29** (M. Babad Tr.) 66:17-69:9; 69:10-71:3; Savad Decl. **Ex. 26** (M. Menczer Tr.) 78:25-79:11; M. Menczer MTD Aff ¶ 6; Savad Decl. Ex. 30 (Hershkowitz Tr.) 44:3-18; Hershkowitz 44:19-47:9 ; Savad Decl. **Ex. 29** (M. Babad Tr.) 65:8-66:16; Savad Decl. Ex. 34 (Resnicoff Tr.) 51:2-52:15; 53:11-54:14; Tauber Decl. ¶18.

532.    This lengthy period of study is necessary because of the complexity of the third and fourth volume of the Shulchan Aruch.  M. Menczer MTD Aff ¶ 4; Resnicoff Decl.¶71-73.

533.    The proposed course of study is longer than other rabbinic programs because it is designed for full-time religious law judges.  Most rabbinic programs are to train pulpit rabbis, not Jewish law scholars.  Resnicoff Decl.¶73

534.    Tartikov has an excellent curriculum because it covers all four topics of Shulchan Aruch.  Savad Decl. Ex. 34 (Resnicoff Tr.)  42:6-43:16; Menczer Decl.¶46,47; Hershkowitz Decl. ¶53,54; Rosenberg Decl.¶55,56;

535.    Tartikov's program is comprehensive and well structured.  Savad Decl. Ex. 36 (Neuberger Tr.) 74:12-75:7; Resnicoff Decl.¶71-85.

536.    After studying portions of the curriculum, students will be given oral and/or written tests. Savad Decl. **Ex. 29** (M. Babad Tr.) 76:5-79:16; Savad Decl. **Ex. 27** (156:16-158:7); Savad Decl. Ex. 30 (Hershkowitz Tr.) 21:13-16;Tauber Decl. ¶9-10.

Full-time study

537.    The students at the rabbinical college will study from 6:00am-10:30pm Sunday through Thursday, with relatively short intervals for meals, prayers, time with family and perhaps a little rest.  Menczer Decl.¶50; Hershkowitz Decl. ¶57; Rosenberg Decl.¶59;

538.    The students will also have study sessions on Friday morning and on the Sabbath. Resnicoff Decl. ¶85.

539.    It is Tartikov's religious belief that students at its rabbinical college should study full-time. Savad Decl. **Ex. 28** (Tauber Tr.) 7:5-12

540.    Without housing and the stipend provided to them by Congregation Rabbinical College of Tartikov, Inc., the rabbinical college students would have to be employed to support their families and would be unable to study full-time. Savad Decl. **Ex. 26** (Menczer Tr.) 11:2-7.

## Receive smicha

541.    Students at the rabbinical college will obtain a *smicha* at the end of their studies if successful in their studies.  Tauber Decl. ¶10.

542.    A *smicha* is a certification that a student has studied and been tested to be proficient in an area of Jewish law.  Tauber Decl. ¶10; Savad Decl. **Ex. 29** (M. Babad Tr.) 18:16-23.

543.    A *smicha* is not a degree or certification recognized by the New York State Board of Regents.  Kinser Decl. ¶ 16; Savad Decl. **Ex. 16** (Green Tr.) 43:14-44:13; 81:16-82:21; 83:17-84:3; Savad Decl. **Ex. 193**; Savad Decl. **Ex. 194**.

544.    A *smicha* is not a test; and one who gives *smicha* can give it orally.  The student goes to a senior rabbi who tests the student's knowledge.  M. Babad 18:16-22:2; 24:22-25:25; Savad Decl. **Ex. 26** (Menczer Tr.) 17:22-18:21.

545.    It is not necessary to have a *smicha* or degree to be a rabbinical judge.  One must have the necessary knowledge.  Savad Decl. **Ex. 29** (M. Babad Tr.) 57:6-17; Savad Decl. Ex. 34 (Resnicoff Tr.) 56:21-58:8.

546.    A *smicha* is given by rabbi, not a school.  M. Babad 23:8-24:7.

547.    The Congregation Rabbinical College of Tartikov, Inc. will not award *smicha* to students.  Tauber Decl. ¶10; Kinser Dec. ¶ 17.

## Admission requirements

548.    Tartikov will admit qualified students.  Savad Decl. **Ex. 29** (M. Babad Tr.) 79:15-81:25.

549.    Requirements to be admitted into Tartikov are a determination that the students are capable of learning all four books of the Shulchan Aruch.  Savad Decl. **Ex. 29** (M. Babad Tr.) 94:23-95:4.

550.    Prospective students will need to complete a high school level program in the Talmud and meet with M. Babad in order to be considered for Tartikov.  Savad Decl. **Ex. 26** (M. Menczer Tr.) 90:21-92:6.

551.    Tartikov will have no written tests or application for admission.  Savad Decl. Ex. 30 (Hershkowitz Tr.) 68:20-25.

552.    Anyone interested in Tartikov's program must set up meeting with M. Babad.  He will verbally test the prospective student, and determine he is qualified.  There is no written document that serves as an admission application.  Savad Decl. **Ex. 27** (30:19-32:9).

<u>Students already admitted</u>

553.    In 2007, Chaim Babad offered to support the studies of ten students under Mordechai Babad (one of the few judges fully trained in all four books of the Shulchan Aruch).  Those ten students were therefore able to commit to full-time studies in the Talmud to prepare to enter Tartikov .M. Menczer MTD Aff ¶ 10.

554.    All of the student Plaintiffs are qualified to be admitted into Tartikov. Savad Decl. **Ex. 29** (M. Babad Tr.) 134:4-135:9.

555.    Jacob Hershkowitz, Meilech Menczer, Chaim Rosenberg, Meir Margulis and David Menczer have been admitted to Tartikov.  Savad Decl. Ex. 306 ("Hershkowitz MTD") Aff ¶ 4; Savad Decl. Ex. 30 (Hershkowitz Tr.) 67:24-68:19; Savad Decl. Ex. 307 ("M. Menczer MTD") Aff ¶ 11;  Savad Decl. Ex. 308 ("Margulis MTD Aff") ¶ 6; Menczer Decl.¶41; Hershkowitz Decl. ¶48; Rosenberg Decl.¶50;

556.    The accepted students are qualified to be in Tartikov's program, but cannot begin studies because the school is not allowed.  Savad Decl. **Ex. 29** (M. Babad Tr.) 93:10-19.

557.    All of the Plaintiff Students will begin studies at Tartikov when the college is built.  Savad Decl. **Ex. 29** (M. Babad Tr.) 131:8-25.6; Menczer Decl.¶42; Hershkowitz Decl. ¶449; Rosenberg Decl.¶51;

<u>Free tuition, Stipends and Housing</u>

558.    The rabbinical students' tuition and housing will be paid by the Congregation Rabbinical College of Tartikov, Inc.  Savad Decl. **Ex. 27** (65:24-66:4) Savad Decl. **Ex. 26** (Menczer Tr.) 46:9-22; Savad Decl. **Ex. 28** (M. Tauber Tr.) 102:20-15; Tauber Decl.¶ 31.

559.    The rabbinical students would be unable to commit to the program for fifteen years without financial assistance in the form of a stipend.  Savad Decl. Ex. 31 (C. Babad Tr.) 168:7-170:17; Savad Decl. Ex. 34 (Resnicoff Tr.) 54:15-56:18.

560.    Without a stipend or free housing, the students of Tartikov would have be employed and would be unable to engage in such intensive study. Savad Decl. **Ex. 26** (Menczer Tr.) 9:12-10:25; Savad Decl. Ex. 30 (Hershkowitz Tr.) 63:8-12; Savad Decl. Ex. 31 (C. Babad Tr.) 164:17-164:17; Savad Decl. **Ex. 27** (19:22-10:5); Savad Decl. **Ex. 25** (Rosenberg Tr.) 9:3-22.

561.    The stipend and free housing allow students to study at various times of day and night and interact with other rabbinical students on a continuing basis.  Margulis MTD Aff ¶ 8.

562.    Without the stipend, students cannot engage in their religious exercise of studying to become a rabbinical judge. Hershkowitz MTD Aff ¶ 7.

## Plaintiffs Cannot Currently Practice Their Religious Beliefs

563.    There is no institution that offers the type of religious education that the Plaintiffs seek to offer and engage in. Savad Decl. Ex. 34 (Resnicoff Tr.) 18:20-19:17;Menczer Decl.¶60; Hershkowitz Decl. ¶67; Rosenberg Decl.¶69;

564.    Tartikov's proposed curriculum is going to be unique and different from what any other school offers. Savad Decl. **Ex. 26** (Menczer Tr.) 26:4-9 ; 61:2-8; Savad Decl. **Ex. 27** (44:15-21); Savad Decl. Ex. 34 (Resnicoff Tr.) 34:20-35:8.

565.    Other kollels exist where students study Jewish law, but do not have as their mission or ambition the goal to train them to become full-time rabbinical judges.  Savad Decl. Ex. 34 (Resnicoff Tr.) 19:21-22:7.

566.    Tartikov can be described as a specialized kollel because it is a guided curriculum towards a specific goal, becoming a rabbinical judge, and not just studying a more general curriculum. Savad Decl. **Ex. 25** (C. Babad Tr.) 96:16-21.

567.    In the way that Tartikov proposes to train its students, there are no other schools that can train its students to become rabbinical judges. Hershkowitz MTD Aff ¶ 8;Menczer Decl.¶60; Hershkowitz Decl. ¶67; Rosenberg Decl.¶69;

568.    Kollels in the Monsey area include Kollel Belz and Mechon L'Horoya.  They only teach certain sections of the Shulchan Aruch, as opposed to Tartikov which will teach all four books.  Savad Decl. **Ex. 25** (Rosenberg Tr.) 14:6-20; Savad Decl. Ex. 30 (Rosenberg Tr.) 16:5-8; 28:14-24; Savad Decl. **Ex. 26** (M. Menczer Tr.)  51:20-23; Savad Decl. **Ex. 26** (M. Menczer Tr.) 82:18-83:13.

569.    Kollel Belz is not a specialized kollel; it is a general kollel.  Savad Decl. **Ex. 25** (Rosenberg Tr.) 48:20-49:24.  Kollel Belz does not provide a Torah Community because students must live off campus and they must work part-time to support their families.  Because of this, the students are deprived of a round-the-clock Torah study environment. M. Menczer MTD Aff. ¶ 8;  Savad Decl. Ex. 30 (Hershkowitz Tr.) 25:6-13; 26:7-27:10. The students do not live on campus. Savad Decl. **Ex. 26** (Menczer Tr.) 42:8-12. There is no campus at Kollel Belz. Savad Decl. **Ex. 26** (Menczer Tr.) 54:16-19; Savad Decl. **Ex. 26** (Menczer Tr.)  55:20-56:102260:22-61:9; Savad Decl. Ex. 30 (Hershkowitz Tr.) 20:18-21:12; Savad Decl. **Ex. 26**

(Menczer Tr.) 57:2-5; 82:10-17; Savad Decl. **Ex. 25** (Rosenberg Tr.) 18:22-24;  Savad Decl. **Ex. 25** (Rosenberg Tr.) 55:9-56:16.

570.    Mechon L'Hoyroa does not teach the same program as Tartikov.  Savad Decl. **Ex. 26** (Menczer Tr.)  60:22-61:9;Savad Decl. **Ex. 27** (44:22-45:14).  It teaches only monetary issues, not family disputes or other legal issues.  Savad Decl. **Ex. 26** (Menczer Tr.) 81:18-82:9. There is no campus at Mechon L'Hoyroa and no on campus housing.  Savad Decl. **Ex. 27** (62:23-25; 63:10-11); Savad Decl. **Ex. 27** (63:2-3; 63:12-13; 84:25-85:6); Savad Decl. **Ex. 26** (Menczer Tr.) 41:24-42:7.

571.    Kollel Beth Yechiel Mechil of Tartikov of Brooklyn does not have the same program as Tartikov. Savad Decl. **Ex. 25** (Menczer Tr.)  60:22-61:9; Savad Decl. **Ex. 27** (45:16-46:9). It is not a Torah community. Savad Decl. Ex. 30 (Hershkowitz Tr.) 59:24-60:15.  Students do not live on campus. Savad Decl. **Ex. 27** (46:16-17); 84:25-85:6; Savad Decl. **Ex. 26** (Menczer Tr.) 41:12-23. Kollel Beth Yechiel Mechil of Tartikov of Brooklyn has no on-campus housing for the students. Savad Decl. **Ex. 27** (46:9-15).

### There is a High Drop out Rate at the other kollels which do not provide a Torah Community or Free Housing and Tuition.

572.    The dropout rate at other kollels is higher because the students are not part of an insular Torah Community.  Savad Decl. Ex. 31 (C. Babad Tr.) 125:7-126:8 ; Savad Decl. **Ex. 26** (Menczer Tr.) 43:24-45:15; M. Menczer MTD Aff ¶ 13.

573.    The pressure for students at kollels to be employed gets stronger as their families grow larger, unless they have free housing and tuition.  Savad Decl. Ex. 31 (C. Babad Tr.) 92:20-93:8.

574.    70% of students who formed a study group in 2001 to study the Shulchan Aruch dropped out by 2008 because it is very difficult to study 15 hours per day outside of a dedicated Torah community. M. Menczer MTD Aff ¶ 7.

575.    Intended Tartikov students and former Plaintiffs Gergley Neuman and Aryeh Royde have already dropped out because could not wait for Tartikov's program. Savad Decl. **Ex. 27** (59:7-60:5); Savad Decl. **Ex. 26** (Menczer Tr.) 52:16-53:25; Tauber Decl.¶48.

### The Challenged Code Provisions Prohibit the Use Outright

576.    The Village Code does not permit Educational Institutions within its jurisdiction anywhere by right.  CODE § 130-9 (Permitted Uses).

577.    Educational Institutions may be permitted with a Special Permit, however only those Educational Institutions that meet the Code's definitions of such use and its "accessory" use (housing) are permitted.  Code §§ 130-4 (Definitions), 130-10(F) (Special Use Permits, Educational Institutions).

578.    Any use not listed under section 130-9 of the Village Code is prohibited, unless it is permitted by special use permit.  Code § 130-9 (Permitted Uses).

579.    Educational Institutions are only permitted under the Village Code as a special use.  Code sec. 130-10(F).

----

<u>Accreditation</u>

580.    The Village prohibits Plaintiffs' religious land use, and any unaccredited Rabbinical College, by right or by special permit within its jurisdiction.  Code sec. 130-4; Request for Admission Response Nos. 1, 2, 3, 4; Weinstein Decl. ¶¶ 9-10.

581.    The Village's definition of an "Educational Institution" prohibits an unaccredited entity, as any Educational Institution must be "accredited by the New York State Education Department or similar recognized accrediting agency." Code sec. 130-4.

582.    The Village's Code is unlike other jurisdictions in prohibiting outright all unaccredited educational institutions.  Weinstein Dec. ¶¶ 66-76.

583.    Plaintiff cannot be accredited by any New York State body.  Kinser Dec. ¶¶ 6-37;Tauber Decl. ¶ 13.

584.    The Village has no knowledge of whether or not Tartikov can be accredited. Savad Decl. **Ex. 13** (at 293:12-294:12); Savad Decl. **Ex. 311** (Interrogatory) Response No. 25.

585.    Defendants' purported expert admits that Tartikov is not eligible for accreditation by NYS. Savad Decl. **Ex. 16** (Green Tr.) 123:22-124:7.

586.    The Village Code requires accreditation by New York State or a similar accrediting agency.  Code sec. 130-4; Savad Decl. **Ex. 16** (Green Tr.) 56:7-12; Savad Decl. **Ex. 16** (Green Tr.) 37:18-21; 38:5-15; 65:4-7 ; Savad Decl. **Ex. 16** (Green Tr.) 67:5-69:5; 70:2-8; 71:22-73:14; 76:21-77:17; Green Rep. page 18.

587.    Tartikov cannot be accredited because it does not grant degrees.   Kinser Decl. ¶ 15-19; Savad Decl. **Ex. 16** (Green Tr.) 79:20-80:15.

588.    Such "degrees" are listed in the Rules of the Board of Regents, and Tartikov will not grant any of these.  A *smichah* is not a degree recognized by the Board of Regents. Kinser Dec. ¶ 14-16.

589. An educational institution would have to offer degrees or a certificate in which credits count toward a degree in order to be accredited; all religious institutions which are accredited in New York are degree granting institutions. Savad Decl. **Ex. 16** (Green Tr.) 67:5-69:5; 70:2-8; 71:22-73:14; 76:21-77:17; 80:23-81:11; Green Rep. page 18.

590. To be accredited, an educational institution would have to be in existence and fully operational. It must submit a self-study reviewing its facilities, curriculum and faculty, including a site visit. Savad Decl. **Ex. 16** (Green Tr.) 58:6-59:17; 65:8-66:22; Kinser Dec. ¶23-34.

591. Tartikov is not operational yet and therefore cannot be accredited or submit a self-study. Savad Decl. **Ex. 27** (50:7-11); Kinser Dec. ¶ 23-34.

592. An institution would have to have entrance exams in order to be accredited. Savad Decl. **Ex. 16** (Green Tr.) 91:7-14.

593. Tartikov does not give entrance exams. Savad Decl. **Ex. 27**, Tauber 30(b)(6) Tr. 50:4-5.

594. The Association of Advanced Rabbinical and Talmudic Schools ("AARTS") would be the appropriate private accrediting body to accredit Tartikov. Savad Decl. **Ex. 16** (Green Tr.) 55:24-56:6; 56:14-21; 60:14-61:7; 61:10-64:17; 66:23-67:4; 73:15-22; Green Rep. page 10; Tauber Decl. ¶11, 12.

595. Tartikov cannot be accredited by AARTS. Savad Decl. **Ex. 27** , Tauber 30(b)(6) Tr. 50:18-51:4; 52:12-55:2; D. Ex. 4; Savad Decl. Ex. 36 (Neuberger Tr.) 79:20-81:20; Savad Decl. **Ex. 16** (Green Tr.) 89:18-21; Tauber Decl ¶ 11.

596. Tartikov was informed that it cannot be accredited by AARTS. Tauber Decl. ¶11.

597. Bernard Fryshman, executive vice president of AARTS, informed Tartikov that AARTS could not accredit Tartikov's program. Tauber Decl. ¶11.

598. An institution would have to have entrance exams in order to be accredited by AARTS. Savad Decl. **Ex. 16** (Green Tr.) 91:7-18.

599. Tartikov does not give entrance exams. Savad Decl. **Ex. 27** (Tauber 30(b)(6),50:4-5); Savad Decl. **Ex. 16** (GREEN?? Tr.) 91:15-18.

600. In order to be accredited by AARTS, an institution would have to be operational. Savad Decl. **Ex. 16** (Green Tr.) 86:9-89:12; 89:22-90:18; Savad Decl. **Ex. 27** (50:7-11).

601. An institution would have to have broader curriculum than Tartikov to be accredited by AARTS; their planned curriculum which focuses on the four books of Halacha would not be approved by AARTS. Savad Decl. **Ex. 16** (Green Tr.) 89:18-21; 90:19-22; 91:7-

14; 91:19-2 Savad Decl. **Ex. 27** (158:8-25); Savad Decl. **Ex. 193**, Savad Decl. **Ex. 194**, Savad Decl. **Ex. 195**.

602.    Tartikov only studies the 4 books of the Shulchan Aruch. Savad Decl. **Ex. 27** (50:3-5).  Meilech Menczer does not know of any Shulchan Aruch program that is accredited. Savad Decl. **Ex. 26** (Menczer Tr.) 58:11-59:9.

## Family Housing Prohibition

603.    The Village Code states in part: "Single-family, two-family and/or multifamily dwelling units . . . shall not be considered to be dormitories or part of dormitories." Savad Decl. Ex. 314, Code Sec. 130-4.

604.    The Village Code defines Dormitories in part as: "A building that is operated by an educational institution . . . and which contains private or semiprivate rooms which open to a common hallway, which rooms are sleeping quarters for administrative staff, faculty or students." Savad Decl. Ex. 314, Code Sec. 130-4.

605.    The Village Code's definition of Dormitories does not permit their use as sleeping quarters for family members of students. Savad Decl. Ex. 314, Code Sec. 130-4.

606.    Wives and children of students cannot live in Dormitories as they are defined in the Village Code. Savad Decl. Ex. 314, Code Sec. 130-4.

607.    No Educational Institution with family housing, other than one unit for a superintendent for every 50 dormitory rooms, is permitted either by right or by special permit within the Village. Savad Decl. Ex. 310 , Request for Admission Response No. 49.

608.    Multi-family dwellings are prohibited anywhere within the Village either by right or by special permit. Savad Decl. Ex. 310, Request for Admission Responses Nos. 131, 132. This prohibition is highly unusual. Weinstein Decl. ¶ 15.

609.    This prohibition on family housing prohibits Tartikov's intended Educational Institution use, or any similar religious institutional use, as it eliminates any housing for its students, who have families and a religious obligation to live with their families. Tauber Decl.¶ 33;  Savad Decl. **Ex. 27** (126:3-127:7); Weinstein Decl. ¶¶ 11-14.

## Housekeeping Prohibition

610.    The Village Code states in part: "Dormitory rooms shall not contain separate cooking, dining or housekeeping facilities . . . ."  Savad Decl. Ex. 314, Code Sec. 130-4.

611.    This prohibition effectively eliminates any housing for its students.  Savad Decl. Ex. 314, Code sec. 130-4; Tauber Decl.¶ 33; Weinstein Dec. ¶¶ 16-18; Savad Decl. **Ex. 27** (126:3-127:7).

612.    The Village has admitted that no Educational Institution with "separate cooking, dining or housekeeping facilities," other than one unit for a superintendent for every 50 dormitory rooms, is permitted either by right or by special permit within the Village.  Savad Decl. Ex. 310,  Request for Admission Response No. 48.

613.    The Village's prohibition of separate cooking, dining and housekeeping facilities at part of student housing is highly unusual.  Weinstein Dec. ¶ 20;  Voorhees Tr. 121:25-122:10.

614.    This prohibition on housekeeping facilities prohibits Tartikov's intended Educational Institution use, or any similar religious institutional use, as it eliminates any housing for its students, who have families and a religious obligation to live with their families.  Tauber Decl. ¶33;  Savad Decl. **Ex. 27** (126:3-127:7); Weinstein Dec. ¶¶ 16-18.

<u>Wetlands Protection Law</u>

615.    An Educational Institution is required to be located on a parcel with a net lot area of greater than ten acres within the  Savad Decl. Ex. 314, Village.  Code Sec. 130-10(f)(1)(a).

616.    The subject Property is the only non-government owned property within the Village that meets the Village's requirement of ten acres of net lot area for an Educational Institution.  Beall Dec. ¶¶ 15-19.

617.    The WPL applies to the subject Property.   Savad Decl. Ex. 310, Request for Admission Response No. 14.

618.    Because of the existence of wetlands on the west side of the property adjacent to Route 306, access to the property would be limited to an area between such wetlands.  Beall Decl. ¶ 280 & Exh. T; Tauber Decl. ¶ 28.

619.    The Wetlands Protection Law states: "it shall be unlawful to conduct, directly or indirectly, any of the following activities . . . within 100 feet of the boundary of any wetland . . . Erecting any . . . roads, driveways, . . . ."  Savad Decl. Ex. 314, Code Sec. 126-3(A).

620.    This area where driveway access could be located falls within the 100 foot "buffer" created by the Wetlands Protection Law, where no development is permitted for lots that are not improved with single family residences.  Savad Decl. Ex. 314, Code Sec. 126-3(a); Tauber Decl. ¶28 ; Beall Decl. ¶ 280 & Exh. T.

621.    Access from the Property to Route 202 is impracticable because of the existence of steep slopes, wetlands and wetland buffers.  Tauber Decl. ¶ 28.

622.    A permit procedure is available for permits to "conduct or cause to be conducted a regulated activity specific in sec. 126-3 of this chapter"; however, such permits are only available if "regulation of wetlands pursuant to this chapter results in a deprivation of the

reasonable use of a property so as to constitute a de facto taking of such property . . . ."  Savad Decl. Ex. 314, Code Sec. 126-5.

623.    The WPL's permit scheme is highly flawed, unusual and unprecedented.  Beall Dec. ¶¶ 21-33; Savad Decl. **Ex. 18** (Voorhis Dep. at 157:11-159:5).

624.    The WPL's permit scheme does not take into account the purposes of wetlands protection by creating any standards regarding impacts, mitigation, or the public interest.  Beall Dec. ¶¶ 71-73.

625.    The Property could be used for single family residential purposes.  Savad Decl. Ex. 314, Code 130-9(A)(1).

## Tartikov Cannot Obtain a Variance or Text Amendment

626.    The Congregation Rabbinical College of Tartikov, Inc. cannot obtain a variance from the accreditation provision, the family housing prohibition, and the housekeeping facilities prohibition.  When Tartikov was seeking to meet with the Village to discuss the rabbinical college, Village Attorney Ulman told Tartikov's attorney that Tartikov could not obtain  a variance.  Ms. Ulman repeated that representation to this Court in May, 2009.  Savad Decl. Ex. 313, pages 18:20-19:8.

627.    A "text amendment," "zone change" or "rezoning" would constitute legislative action by the Village.   Savad Decl. Ex. 314, Code Sec. 16-5(A).

## SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGIOUS EXERCISE

628.    Elimination of the burden created by the Village's zoning and wetlands protection laws on Plaintiffs' religious exercise will affect interstate commerce.  Tauber Decl. ¶40.

## Burden on Tartikov

629.    The Congregation Rabbinical College of Tartikov, Inc.'s religious exercise of developing and using its Property as a rabbinical college, which is motivated by its religious beliefs because of the need for more rabbinical judges, is burdened by the Village's prohibition and regulation of Educational Institutions.  Savad Decl. Ex. 30 (Hershkowitz Tr.) 86:4-21; Savad Decl. **Ex. 27** ( 81:6-14) ; Savad Decl. **Ex. 16** (Green Tr.) 40:25-41:17; Savad Decl. Ex. 305  Brief MTD Aff dated January 10, 2008 ¶ 3-5.

630.    The Torah Community's living, learning and worshipping as proposed by the Congregation Rabbinical College of Tartikov is necessary for the exercise of its religious beliefs. Tauber Decl.¶ 37.

631.    The backlog in religious courts forces Orthodox and Hasidic Jews to go to secular courts. C. Babad 96:22-97:8; Savad Decl. **Ex. 26** (Menczer Tr.) 83:19-85:19.

632.    There are not enough sufficiently trained rabbinic judges, so rabbis that are not sufficiently capable are currently handling cases.  Savad Decl. **Ex. 26** (Menczer Tr.) 83:9-13.

633.    Currently, most rabbinical judges are trained in only the first two books of the Shulchan Aruch, which govern the relationships between man and God; rabbinical judges are needed to decide controversies between people (the third and fourth volumes of the Shulchan Aruch) and to rule on issues of Jewish law on which people seek advice in advance to ensure that they don't break Jewish law.  Savad Decl. Ex. 34 (Resnicoff Tr.) 66:25-68:17; M. Menczer MTD Aff ¶ 3-4.

634.    Most rabbinical judges were killed in the Holocaust.  Savad Decl. Ex. 31 (C. Babad Tr.) 97:9-17.

635.    There are very few rabbis sufficiently trained as rabbinical judges now.  Most of those who are live in Israel. M. Menczer MTD Aff ¶  5.

636.    Most rabbinic courts in existence will only agree to hear a case if the parties explicitly relieve the judges of the responsibility for rendering a decision that it in strict accord with Jewish law.  Resnicoff Decl. ¶ 74.

637.    Tartikov will prepare its students to make a decision in strict accordance with Jewish law.  Resnicoff Decl. ¶ 74; Tauber Decl. ¶ 6.

638.    It is Tartikov's religious belief to build and operate the rabbinical college's Torah Community for the purpose of training rabbis to become full-time rabbinical judges who are fully qualified in the Code of Jewish Law, or *Shulchan Aruch*; and to create the religious experience of having the students live in the Torah Community with their families allowing them to interact with fellow rabbinical students and learn from trained rabbis.  Tauber Decl.¶ 6.

639.    Tartikov is burdened because cannot teach the rabbinical students.  Savad Decl. **Ex. 27** (Tauber 30(b)(6) Tr. 127:8-24)

<u>Burden on Individual Plaintiffs</u>

640.    Every student who will attend the Rabbinical College is compelled by his religious beliefs to pursue this study.  Tauber Decl.¶ 7.

641. The individual student plaintiffs currently are prevented from pursuing their studies because they are deprived of the course of study that their religious beliefs motivate them to engage in. Savad Decl. **Ex. 25** (Rosenberg Tr.) 39:16-40:5; 54:11-55:8 ) good quotes re: serving God); 55:15-56:16 (would take 50 years currently); 61:5-14 (don't live forever).

642. The individual student plaintiffs cannot live or study in a Torah community. Savad Decl. Ex. 30 (Hershkowitz Tr.) 24:13-24; 94:2-7;  Savad Decl. **Ex. 26** (Menczer Tr.) 66:23-67:21.

643. Meilech Menczer has had to downgrade studies by learning less in the Torah. Savad Decl. **Ex. 26** (Menczer Tr.) 68:15-69:3.

644. The individual student plaintiffs cannot practice their religion in the manner they believe they should, according to their beliefs  Savad Decl. **Ex. 25** (Rosenberg Tr.) 57:7-19; Savad Decl. **Ex. 25** (Rosenberg Tr.) 39:16-40:5;  Savad Decl. **Ex. 26** (Menczer Tr.) 64:10-18

645. The individual student plaintiffs cannot have the quality of study they believe that they should have. Savad Decl. **Ex. 25** (Rosenberg Tr.) 61:15-62:3

646. The individual plaintiffs are not able to study to become a rabbinical judge. Savad Decl. **Ex. 26** (Menczer Tr.) 32:10-22.

647. The individual plaintiffs cannot achieve greatness in the Torah without learning all four books of The Shulchan Aruch and currently they cannot learn these four books.  Savad Decl. **Ex. 26** (Menczer Tr.) 66:8-22.

648. The individual student plaintiffs cannot live on campus with their families. Savad Decl. **Ex. 27**, Tauber 30(b)(6) Tr. 126:3-127:7.

649. If Tartikov does not open, there is no place for Margulis and M. Menczer to receive the training to become a rabbinical judge.  Margulis MTD Aff ¶ 6, 8.

650. The individual plaintiffs are prevented from lecturing and passing on knowledge Brief MTD Aff ¶ 6.

651. The Village has no knowledge that the individual plaintiffs do not intend to study to become rabbinical judges Defendants' 30(b)(6) Tr 280:2-8.

## 20% Dormitories

652. The specific needs of a Rabbinical College are minimal in terms of classroom space, as the actual space needed for education programs, which involve a study method called *chavrusa* (pairs of students analyzing, discussing and debating shared texts)  are minimal and do

not include athletic facilities, laboratories, theaters, etc.  Tauber Decl. ¶ 34; Weinstein Dec. ¶¶ 27-32.

653.    A Rabbinical College, where students will be married with children, also requires greater living space. Tauber Decl. ¶ 8, 35.

654.    The number of students that could be housed are estimated at six to eight. Weinstein Decl. ¶¶ 37-44.

655.    The 20% dormitory limitation effectively means that no Rabbinical College can be developed, as housing no more than a nominal number of student rabbis does not permit Tartikov to operate its Torah Community that is so essential to its religious exercise.  Tauber Decl. ¶33; Drake Dec. ¶¶ 63-67;  Savad Decl. **Ex. 18** (Voorhis Dep.) 168:3-11.

656.    If not permitted to have housing on campus, students will learn much less and will downgrade their level of learning the Torah. Savad Decl. **Ex. 26** (Menczer Tr.) 68:15-69:3

Significant Delay, Expense and Uncertainty

657.    The decision whether or not to consider a requested zoning amendment is an entirely discretionary decision by a municipal legislative body, such as a board of trustees. Unlike other land use applications, a board of trustees may simply decide not to entertain a request to amend a zoning law. Tauber Decl. ¶ 41.

658.    Zoning Law requires that any such requested amendment shall be referred to various agencies, individuals and boards for their review. Tauber Decl. ¶ 41.

659.    Any proposed zoning amendment would be subject to the full SEQRA review process. Tauber Decl. ¶ 41.

660.    Given the fact that any amendment to eliminate the accreditation requirement would affect all land in the Village, the impact on all potentially impacted parcels would be required to be considered.    Tauber Decl. ¶ 41

661.    The process for a zone/text amendment or variance (which the Village has informed Plaintiffs is unavailable for Plaintiffs' use) is a long and discretionary process that is highly uncertain as it is subject to approval of various boards and agencies in the Village, such as the Planning Board, Village Attorney, Village Engineer, Code Enforcement Officer, and other boards and bodies of the Village.  Tauber Decl. ¶41.

662.    Any proposed zoning amendment does not even have to be considered by the Board of Trustees and if it does consider the amendment, it is subject to the SEQRA process, and

any proposal to change the current code would affect all of the land in the Village and therefore the impact of this upon all potential parcels would have to be considered. Tauber Decl. ¶41.

663.    The SEQRA process would require a detailed environmental impacts statement that would be time-consuming and expensive, if the amendment is considered by the Board of Trustees. Tauber Decl. ¶ 41.

664.    This entire process is very extensive, expensive and time-consuming. It would also be uncertain in the best of circumstances and even more so given the hostility of Village residents to Tartikov and its use. Tauber Decl. ¶ 41. Tartikov will pursue any fair and impartial regulatory process which is not discriminatory or unduly burdensome under applicable law and ensure that any legitimate land use impacts are mitigated, and will abide by fair and reasonable conditions imposed on the property. Tauber Decl. ¶ 47.

## Reasonable Expectation to Build

665.    Tartikov did not expect that its educational institution would be subject to an "accreditation" requirement; that its Rabbinical College would not be allowed to have family housing (with housekeeping facilities), or that it would be limited to only 20% of the total square footage limitation for its housing, as these laws were not enacted until 2004 and 2007, after it purchased the property. Tauber Decl. ¶3, 4; Savad Decl. Ex. 310 (Request for Admissions) Response No. 10.

666.    Tartikov did not expect that it would lose access to its Property, as established by the Wetlands Protection Law, enacted in 2007. Tauber Decl. ¶5.

667.    Tartikov believed that it would be permitted to build the rabbinical college with student housing when it purchased the subject property in 2004. Tauber Decl. ¶ 4.

668.    Zoning ordinances that prohibited institutions of higher learning and student housing for such institutions were unconstitutional under New York law. Savad Decl. Ex. 13 (Defendants' 30(b)(6) Day 2 Tr.) 432:10-23.

669.    The zoning code in place prior to the passage of Local Law No. 5 of 2004 "did not specifically address dormitories." Savad Decl. Ex. 310 (Request for Admission) Response No. 9.

670.    The Village's Code prior to the passage of Local Law 5 of 2004 was unconstitutional. Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Day 2 Tr.) 432:10-23.

## FREE SPEECH / EXPRESSIVE CONDUCT / ASSOCIATION

671.    The Court has correctly noted that the stated purpose of the Rabbinical College is "to foster the expression of certain ideas among and between faculty members and students." 915 F. Supp. 2d at 625.

672.    Daily life at the Rabbinical College's Torah Community will include prayer, multiple *shuls*, and "*shimush*" (internships) in *bais din* courtrooms throughout the campus, which will be used to resolve disputes, where they will learn from experienced rabbinical judges. M. Tauber Decl ¶19-29. Resnicoff ¶121.

673.    The Torah Community (which includes all aspects of the proposed use, including housing) involves intensive religious learning interaction, day and night, among the students, teachers and lecturers. Menczer Decl.¶50-60; Hershkowitz Decl. ¶57-67; Rosenberg Decl.¶59-69; Tauber Decl. ¶ 42-46; Resnicoff ¶ 110-122.

674.    Religious learning in this way as an integral part of the Torah Community will allow the students to communicate and associate with their teachers and fellow students, and interact with them as part of the religious learning process to gain knowledge. Tauber Decl. ¶ 42-46; M. Menczer Dec ¶53-60; Hershkowitz Decl.¶ 60-67; Rosenberg Decl.¶62-69; Tauber Decl. ¶28,29.

675.    Because the students will live within the Torah Community, they will communicate with their teachers and fellow students day and night, in the study halls, courtrooms, *shuls,* or in the living quarters, and this will allow for constant communication, expression and religious learning opportunities. M. Menczer Dec ¶51-60; Hershkowitz Decl.¶ 60-67; Rosenberg Decl.¶61-69; Tauber Decl. ¶28,29.

676.    This communication between the students, teachers and judges involves Orthodox teachings and principles as the material is all based on the Shulchan Aruch,or Code of Jewish Law. Michael Tauber Decl ¶16,17,20-29; M.Menczer Decl ¶52;Hershkowitz Decl.¶ 59; Rosenberg Decl.¶61.

677.    The Torah Community aspect of Plaintiff's expressive conduct that constitutes the Rabbinical College is inseparable from and necessary for the other aspects of that expression and expressive conduct.  M. Tauber Decl ¶19-29;

678.    The Torah Community provided by Tartikov will allow the students to meet their religious obligations to their families by having the opportunity to teach their family the Torah. Rosenberg Decl. ¶35,61,66;Hershkowitz Decl.¶59,64; Menczer Decl.¶52,57.

679.    The challenged ordinances restrict the communication and expression among and between Tartikov, the rabbinical students, teachers and judges by preventing or greatly restricting the Torah Community from existing. Tauber Decl. ¶¶ 42-46.

680.    The accreditation requirement specifically restricts Tartikov and the plaintiff student and teacher's expression on the basis of its program content.  Savad Decl. Ex. 314 Code Sec. 130-4.

681.    The accreditation process for an "Educational Institution" requires evaluation of and distinctions based on the content of Tartikov's speech.  Savad Decl. Ex. 314 Code Sec. 130-4.

## GOVERNMENTAL INTERESTS

683.    Plaintiffs' proposed land use is a religious assembly and institution.  Tauber Decl.

684.    Accredited educational institutions, which are a permitted special use in the Village, include nonreligious "institutions."  Weinstein Dec. ¶ 135.

685.    Libraries , which are a permitted use in the Village, include nonreligious "institutions."  Weinstein Dec. ¶ 126.

686.    Museums , which are a permitted special use in the Village, include nonreligious "institutions."  Weinstein Dec. ¶ 126.

687.    The Village's accreditation requirement treats the proposed Rabbinical College on less than equal terms as accredited nonreligious educational institutions.  Weinstein Dec. ¶¶ 121-124.

688.    The Village has described non-accredited Educational Institutions as not "legitimate."  Savad Decl. Ex. 13 (Defendants' 30(b)(6) Tr. 418:8-24).

689.    The Village states that the reason for the differential treatment between accredited and non-accredited Educational Institutions is that "if a school is unaccredited, there is no way of knowing what impacts on the wetlands or anything else it is going to have because the you know the number of different schools that can apply for approval are different types of schools is limitless and so it's impossible to determine what impact and unaccredited school is going to have on a on a piece of land until you know what the unaccredited school is proposing and what type of work it does.  Using my example before the automotive school is going to have a tremendous impact on wetlands."  Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 761:9-22.

690.    The Village's expert witness is unaware of any land use basis for excluding non-accredited educational institutions from a jurisdiction.  Savad Decl. Ex. 18 (Voorhis Dep. at 107-08).  He has never worked on any zoning code revisions dealing with educational institutions.  Savad Decl. Ex. 18 (Voorhis Dep. at 127:10-13).

691.    The Village's distinction between accredited and non-accredited Educational Institutions was intended to distinguish between commercial and non-commercial Educational Institutions. Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Tr. 419:4-11).

692.    Automotive schools, driving schools and carpentry schools can be accredited. Weinstein Dec. ¶ 123; Fitzpatrick Dec. ¶ 63; Beall Dec. ¶ 231.

693.    There is no difference in impacts generally on the stated governmental interests between accredited and non-accredited educational institutions.  Beall Dec. ¶ 229-232, 246-247, 250-252, 260-261, 269-271, 276, 305; Fitzpatrick Dec. ¶ 61-70; Weinstein Dec. ¶ 121-124.

694.    The maximum building coverage for Educational Institutions, which would include the proposed Rabbinical College if it met the requirements for an Educational Institution, is 10% of the net lot area. Savad Decl. Ex. 314, Code § 130-10(F)(2)(a).

695.    The maximum total floor area for Educational Institutions, which would include the proposed Rabbinical College if it met the requirements for an Educational Institution, is 20% of the net lot area. Savad Decl. Ex. 314, Code § 130-10(F)(2)(b).

696.    The total coverage of impervious surfaces for Educational Institutions (which includes all buildings and structures, parking areas, driveways, sidewalks and other areas covered in concrete, asphalt or packed stone) cannot exceed 25% of the net lot area.  Savad Decl. Ex. 314, Code § 130-10(F)(2)(c).

697.    The maximum height for a dormitory building is two stories or 25 feet, whichever is less, under the Village Code.  Code § 130-10(F)(12)(c).

698.    The maximum impervious surface coverage requirement for libraries and museums is 15%. Savad Decl. Ex. 314, Code § 130-12(I).

699.    There is no maximum building coverage for libraries and museums under the Village Code's bulk regulations.  Savad Decl. Ex. 314, Code § 130-12; RFA Resp. No. 93.

700.    There is no maximum floor area for libraries and museums under the Village Code's bulk regulations.  Savad Decl. Ex. 314, Code § 130-12; RFA Resp. No. 93.

701.    The maximum height for a Library or Museum within the Village is 35 feet. Savad Decl. Ex. 314, Code § 130-12(H).

702.    There is no maximum number of stories for a Library or Museum within the Village under the Village Code's bulk regulations. Savad Decl. Ex. 314, Code § 130-12.

703.    A Library or Museum would effectively be permitted a three-story building in the Village. Weinstein Dec. ¶ 132.

704.    The square footage of a Library or Museums could be approximately twice as large as the proposed Rabbinical College. Beall Dec. ¶¶ 306-315.

705.    The Village treats Libraries and Museums on more favorable terms than the proposed Rabbinical College. Weinstein Dec. ¶¶ 125-134.

706.    Libraries are permitted uses within the Village of Pomona, and are not required to obtain a special permit. Savad Decl. Ex. 314, Code § 130-9(5).

707.    Museums are permitted uses within the Village of Pomona, and are not required to obtain a special permit. Savad Decl. Ex. 314, Code § 130-9(5).

708.    The purpose of building coverage and floor area limitations is to limit the "size" of development. Savad Decl. Ex. 18 (Voorhis Dep. at 56-58).

709.    The Village's concern with impacts to environmental resources, including wetlands, is the size and intensity of development. Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 749:24-750:12. The Village testified as follows: "Q  Is it the case that any zoning law that would reduce building development would advance all of the governmental interests that we've discussed? . . . . A Yes." Defendants' 30(b)(6) Tr. 1044:15-24.

710.    The Village's concern with impacts to floodplains is the size of impervious surface created by development. Savad Decl. Ex. 15, Defendants' 30(b)(6) Tr. 7/18 at 825:22-826:7, 836:4-11, 838:4-11.

711.    The Village's concern with impacts to plant life and wildlife is the size of development. Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 553 at 550:18-553:9.

712.    The Village's concern with impacts to air quality is the size of development. Ulman Savad Decl. Ex. 13, Defendants' 30(b)(6) Tr. 391:18-392:6, 396:2-11, 439:13-25.

713.    The Village's concern with impacts to its water supply and sanitary sewer system is the size of development. Savad Decl. Ex. 13,  Defendants' 30(b)(6) Tr. 389:24-390:20, 572:22-575:23.

714.    The Village's concern with impacts to its stormwater systems is the size of development. Savad Decl. Ex. 13,  Defendants' 30(b)(6) Tr., 389:24-390:12.

715.    Libraries, museums and an accredited educational institution would in general have just as much of an effect on community character as a comparable unaccredited educational institution. Weinstein Dec. ¶¶ 97-100.

716.    The Village's stated purpose for the building coverage and floor area limitations is to limit development generally, which would (according to the Village) reduce impacts to floodplains, reduce air, water and noise pollution, prevent impacts to wetlands, water, sanitary

and stormwater sewer systems and traffic, and maintain community character.  Defendants' 30(b)(6) Tr. 570:13-571:13, 590:6-591, 678:3-21, 698:2-14, 723:21-724:10, 749:10-750:12, 827:13-828:9, 853:25-854:11.

717.   The Village's stated interests justifying the building coverage, floor area and height limitations are equally affected by library or museum uses.  Beall Dec. ¶¶ 306-315; Weinstein Dec. ¶ 125-134; Drake Dec. ¶¶ 91-94; Fitzpatrick Dec. ¶¶ 174-179.

718.   The Village of Poquott, New York, is the "most similar" in terms of community character to Pomona in Defendants' expert witness' experience.  Voorhis Dep. at 19-20.

719.   The Village of Poquott's maximum lot coverage, which is defined as "[t]hat percentage of the lot area covered by the building area," ranges from 20% to 25%.  Savad Decl. Ex. 314; Village of Poquott Zoning Code sec. 183-6{8}, 183-13(D) (available at http://ecode360.com/10907031).

720.   Colleges and universities with enrollments under 2,500 students that are religiously affiliated overwhelmingly provide housing for a very high percentage of their students.  Weinstein Dec. ¶¶ 136-138.

721.   Many theological schools offer 100% housing for their students.  Weinstein Decl. ¶ 136.

722.   Smaller (less than 2,500 students) theological schools in New York State and in the Northeast region generally provide housing for most or all of their students, and at all geographical levels, theological colleges with enrollments under 2,500 overwhelmingly provide housing for a very significant percentage of their students.  Weinstein Decl. ¶¶ 137-142.

723.   No educational institutions existed within the Village in 2001, in 2004, in 2007, or presently.  Interrogatory Resp. No. 35; Savad Decl. **Ex. 15**, Defendants' 30(b)(6) Tr. 1043:8-1044:14.

724.   Educational Institutions are subject to the "special permit" review process in the Village of Pomona, described in section Village Site Plan review process. Savad Decl. Ex. 314 Code Sec. 130-10(F).

725.   Educational Institutions are "subject to special permit approval by the Village Board of Trustees and site plan approval by the Planning Board." Savad Decl. Ex. 314, Code § 130-10(F).

726.   Educational Institutions are subject to the general "requirements of this Code for special permit and site plan approval," and are also subject to the specific "standards and requirements" described in Village Code § 130-10(F).  Savad Decl. Ex. 314, Code § 130-10(F).

727.    The size of Educational Institutions are limited by the following code provisions: 10% maximum building coverage; 20% maximum floor area; 25% maximum impervious surface; 25 foot maximum height for dormitories; 35 foot maximum height for other buildings. Savad Decl. Ex. 314, Code §§ 130-10(F), 130-12(H); Weinstein Dec. ¶¶ 132-133.

728.    All buildings, recreation areas, parking areas and other property uses and structures for an Educational Institution must be set back a minimum of 125 feet from each property line. Such setback must include a buffer area of a minimum of 35 feet in width consisting of trees, shrubs, plants, fencing and/or other materials as determined by the Planning Board to be sufficient to screen the educational use from adjoining uses and streets.  Savad Decl. Ex. 314, Code § 130-10(F)(4).

729.    With respect to Educational Institutions, "[t]he Board of Trustees may impose such restrictions and regulations which would avoid or minimize traffic hazards, impairment of the use, enjoyment or value of property in the surrounding area, or generally protect the health, safety and welfare of the neighborhood and to otherwise implement the purpose and intent of this chapter." Savad Decl. Ex. 314, Code § 130-10(F)(9).  This authority is "in additional to all other requirements of this Code for special permit and site plan approval." Code § 130-10(F).

730.    Educational Institutions are subject to a minimum net lot area of 10 acres.  No portion of any land under water shall be counted toward the net lot area.  In calculating net lot area, "[n]ot more than 1/4 of any land which is defined as wetland by the U.S. Army Corps of Engineers, the New York State Department of Environmental Conservation and/or Chapter 126 of this Code or which is within a one-hundred-year-frequency floodplain or within access, utility or drainage easements or rights-of-way shall be counted toward the net lot area. No portion of any land with unexcavated slopes over 35% shall be counted toward net lot area. Not more than 25% of any land with unexcavated slopes greater than 15% but less than 35% shall be counted toward the net lot area." Savad Decl. Ex. 314, Code § 130-10(F)(1)(a).

731.    The Board of Trustees may impose such reasonable conditions and restrictions as are directly related to and incidental to a special use permit. Savad Decl. Ex. 314, Code § 130-28(E)(4)(c)(2); Voorhis Dep. at 93.  "[E]ach specific permit shall be considered as an individual case, . . . ." Code § 130-28(E)(1).

732.    All special permit uses must meet the following standards: "All special permit uses shall comply with the following standards, in addition to the site plan standards of this chapter. The permitting Board shall attach such additional conditions and safeguards to any special permit as are, in its opinion, necessary to ensure initial and continual conformance to all applicable standards and requirements.  The location and size of the special permit use, nature and intensity of the operations involved in it or conducted in connection with it, the size of the site in relation to it and the location of the site with respect to streets giving access to it are such that it will be in harmony with the appropriate and orderly development of the area in which it is

located. The location, nature and height of buildings, walls and fences and the nature and extent of existing or proposed plantings on the site are such that the special permit use will not hinder or discourage the appropriate development and use of adjacent land and buildings. Operations in connection with any special permit use will not be more objectionable to nearby properties by reason of noise, traffic, fumes, vibration or other characteristics than would be the operations of permitted uses not requiring a special permit. Parking and loading areas will be of adequate size for the particular special permit use, properly located and suitably screened from adjoining residential uses, and the entrance and exit drives shall be laid out so as to achieve maximum convenience and safety. The special permit use will not result in diminution of the value of property in the neighborhood or a change in the character of the neighborhood in which the use would be situated." Savad Decl. Ex. 314, Code § 130-28(E)(6).

733. The Board of Trustees may attach such additional conditions and safeguards to any Educational Institution special permit as are, in its opinion, necessary to ensure initial and continual conformance to all applicable standards and requirements. Savad Decl. Ex. 314, Code § 130-28(E)(6).

734. The special permit process allows the Village to mitigate impacts created by the special permit use. Savad Decl. **Ex. 18**, Voorhis Dep. at 96.

735. Site plan approval under § 118-32 of the Village Code is required for all special permit uses. Savad Decl. Ex. 314, Code § 130-28(E)(5).

736. In order to receive site plan approval, an Educational Institution must demonstrate: "That the proposed activity and the manner in which it is to be accomplished are in accordance with the purpose and findings set forth in this chapter. That the proposed activity and the manner in which it is to be accomplished can be completed without increasing the possibility of creep or sudden slope failure and will minimize additional erosion to the maximum extent practicable. That the proposed activity and the manner in which it is to be accomplished will not adversely affect the preservation and protection of existing wetlands, water bodies, watercourses and floodplains. That the proposed activity and the manner in which it is to be accomplished can be completed in such a way so as not to adversely affect existing, proposed or potential future wells or sewage disposal systems or any endangered species of flora or fauna. That the proposed activity and the manner in which it is to be accomplished are consistent with the principles and recommendation of the adopted Village Master Plan." Savad Decl. Ex. 314, Code § 119-3(A).

737. In granting site plan approval, the Village's Planning Board has the authority to impose such reasonable conditions and restrictions as are directly related to and incidental to a proposed site plan. Savad Decl. Ex. 314, Code § 119-3(B).

738. The Village's Planning Board cannot approve a site plan unless it takes into consideration the "public health, safety and general welfare and sets appropriate conditions and

safeguards which are in harmony with the general purpose and intent of this chapter," including with respect to traffic, parking, landscaping and buffering, lighting, drainage, water and sewage, and building design, among other criteria. Savad Decl. Ex. 314, Code § 119-5(D).

739.    Educational Institutions are subject to review under New York's SEQRA. Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 784:18-787:19; Code § 119-7(G).

740.    The Village believes that it cannot control the size of Educational Institution development other than through the adoption of the challenged zoning code provisions. Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 711:20-713:20.

741.    The governmental interests that were asserted by the Village in support of the challenged zoning provisions apply equally to any land development within the Village. Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 570:16-18, 749:24-750:2, 1044:15-24.

742.    The Village sought the advice of no experts or consultants regarding the challenged zoning provisions, other than its own planning firm. Savad Decl. Ex. 311, Interrogatory Resp. No. 30.

743.    The only reports, studies, memoranda or other documents identified by the Village that supported the passage of the challenged zoning code provisions were: "(1) two memoranda written by their own planning firm, Frederick P. Clarke, commissioned in response to the predecessor Orthodox owner of the Property, Yeshiva Spring Valley. Neither of these were supported by any evidence demonstrating a need for the challenged provisions; (2) the New York Court of Appeals' decision in *Cornell University v. Bagnardi*, 68 N.Y.2d 583, 510 N.Y.S.2d 861 (1986), and related cases; (3) the County of Westchester Model Ordinance, a Survey of Municipal Ordinances in Westchester County, and the Village's draft 1998 local law addressing wetlands; and (4) sec. 401 of the federal Clean Water Act, Article 24 of the NYS Environmental Conservation Law, and MS4 Permitting requirements and manuals. *Id.* The Village has failed to explain how any of these demonstrate a need for the challenged ordinances." Savad Decl. Ex. 311, Interrogatory Resp. Nos. 3, 13, 15.

<u>Community Character</u>

744.    The Village states that all of the challenged zoning code provisions are necessary to protect the "community character" of the Village. Savad Decl. Ex. 311, Interrogatory Resp. Nos. 4, 6.

745.    The Village Code requires that, with respect to Educational Institutions, the location and height of its buildings, the location, nature and height of walls and fences and the nature and extent of landscaping on the site shall be such that the use will not hinder or discourage the development and use of adjacent land and buildings. Savad Decl. Ex. 314, Code § 130-10(F)(11).

746.    The Village defines "community character" as follows: "Q  So when you talk about character of the community, are you talking about the visual character of the community? A   Partially but mostly I'm talking about the zoning character, the usage within the community. Q   So the interests listed here maintaining community character is protecting the uses within the community?  A        It's protecting the type of community character that has been determined by the Board of Trustees to be the policy of the community." Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 394:7-18.

747.    The Village states that the elements of "community character" are "No streetlights," "no sidewalks," "maintaining as much of the land original landscaping as possible," "no commercial activity," "larger lot sizes," "trees," "landscaping between properties," "Protection of the water supply, protection of air pollution against air pollution, noise, protection of your wetlands," and maintaining "[s]emi-rural single family neighborhoods." Savad Decl. **Ex. 12**, Defendants' 30(b)(6) Tr. 99:18-100:14, 393:20-395:10, 634:8-635:14.

748.    The Village's expert witness defines "community character" as "[D]emography, economic trends, land use, zoning are, in my mind and in my field, parts of what we typically call human resources of a community and that's part of that baseline." Voorhis Dep. at 40-41.

749.    The Village has no evidence that community character was threatened by educational institutions.  RFA Resp. Nos. 11, 12; Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 586:7-15.

750.    The Village had no studies, reports or documentation regarding community character prior to the passage of Local Law Numbers 1 of 2001, 5 of 2004, and 1 of 2007. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 583:2-586:2.

751.    The Village only relied on their own knowledge of the community character conditions within the Village prior to the passage of the challenged code provisions.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 586:2, 593:23-594:2.

752.    Community character is not mentioned in the text of Local Laws No. 1 of 2001, Local Law No. 5 of 2004, Local Law No. 1 of 2007, and Local Law No. 5 of 2007.  Local Law No. 1 of 2001, Local Law No. 5 of 2004, Local Law No. 1 of 2007; Local Law No. 5 of 2007.

753.    The Village did not consider any alternatives to achieve its goals of protecting community character when it passed Local Law No. 1 of 2001.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 594:6-600:4.

754.    The Village Board of Trustees did not consider community character when enacting Local Law No. 1 of 2007.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 625:2-13.

755.    Local Law No. 1 of 2007 was not meant to address the issue of community character, as the Village testified that it "was primarily a correction of Local Law 5 of 2004." Savad Decl. **Ex. 14**, Ulman 30(b)(6) Tr. 625:7-8.

756.    The only "community character" interests alleged by the Village to be advanced by Local Law No. 5 of 2007 are the protection of environmental resources. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 641:20-24.

757.    The Village testified that the accreditation requirement "was imposed as a restriction on the use of organizations that might call themselves schools but are not subject to the special status of the state case law. That was all it was intended to do." Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 610:6-10.

758.    The Village's justification for the accreditation requirement as necessary to protect community character was that schools such as "driving education school," "automotive school" and "carpenter's union" might locate in Pomona. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 622:3-12.

759.    Driving education schools, automotive schools and carpenter's schools are educational institutions that can be accredited. Weinstein Dec. ¶ 132; Fitzpatrick Dec. ¶ 63.

760.    Non-accredited educational institutions do not, as a class, impact community character more than accredited educational institutions. Weinstein Dec. ¶¶ 64-82, 97-100.

761.    Libraries, museums and camps do not need to be accredited in the Village of Pomona. Savad Decl. Ex. 314, Code §§ 130-9(A)(5), 130-10(D); 30(b)(6) at 610:11-16.

762.    Accreditation is irrelevant in terms of architecture. Drake Dec. ¶¶ 40-46, 88.

763.    The no "separate cooking, dining or housekeeping facilities" rule does not directly relate to the issue of community character, as such rule relates solely to the interior of buildings. Weinstein Dec. ¶¶ 83-86; Drake Dec. ¶¶ 55-59.

764.    There is no risk associated with small kitchen appliances in dormitory rooms where students would be housed in student family housing with normal residential kitchens. Weinstein Dec. ¶ 86; Savad Decl. **Ex. 18**, Voorhis Dep. at 120.

765.    The safety concerns of the Village concerning the use of hot plates and other small cooking appliances primarily relate to traditional dormitory room, not family housing unit living. Savad Decl. **Ex. 18** (Voorhis Tr.) 119:10-120:14.

766.    Defendants' expert has never seen a prohibition that restricts separate cooking, dining or housekeeping facilities. Savad Decl. **Ex. 18** (Voorhis Tr.) 121:25-122:10.

767.    Defendants' expert testified that an educational institution with housekeeping facilities would not necessarily impact community character more than an educational institution without such facilities. Savad Decl. **Ex. 18** (Voorhis Tr.) 176:21-177:9.

768.    Defendants' expert did not investigate any other jurisdictions to find a similar provision that restricts separate cooking, dining or housekeeping facilities. Savad Decl. **Ex. 26** (Voorhis Tr.) 120:25-121:4.

769.    Defendants' expert does not do work for jurisdictions that have this provision that restricts separate cooking, dining or housekeeping facilities. Savad Decl. **Ex. 26** (Voorhis Tr.) 125:5-13.

770.    The majority of dorms at Cleveland State University have housekeeping facilities. Savad Decl. Ex. 35 (Weinstein Tr.) 57:11-20.

771.    Prohibiting non-accredited educational institutions is not a practice generally accepted in the planning field, nor do other jurisdictions completely prohibit non-accredited educational institutions. Weinstein Dec. ¶¶ 64-82.

772.    The permitted dormitories described in the Village Code would create greater negative impacts on community character than student family housing, which is prohibited in the Village Code. Weinstein Dec. ¶¶ 88-93; Drake Dec. ¶¶ 60-61, 87.

773.    Student family housing would be more similar to the character of the surrounding community than permitted dormitories. Weinstein Dec. ¶ 90; Drake Dec. ¶ 61.

774.    The prohibition on non-traditional student housing runs counter to the trend of establishing family housing options for post-secondary students. Weinstein Dec. ¶ 89.

775.    The dormitory restrictions are justified by the Village on the basis of limiting size and intensity of use. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 610:17-611:4, 612:4-12, 623:12-23, 636:22-637:20, 708:15-709:7.

776.    None of the challenged zoning code provisions regarding dormitories limit the size of an Educational Institution, as such use is limited by the 10% maximum building coverage, 20% maximum floor area, 25% maximum impervious surface, and 25'/35' building height limitations. Beall Dec. ¶¶ 241, 254-255, 263-264, 300-301, 304; Weinstein Dec. ¶ 94.

777.    The Village claims that the "one dormitory building" limitation advances its interest in maintaining community character by limiting the "intensity" of the use. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 637:14-640:25. However, "smaller buildings are often easier to place on a site while avoiding wetlands." Beall Dec. ¶ 297. The one dormitory rule is antithetical to the goal of maintaining residential character. Drake Dec. ¶ 52-53. The one dormitory building rule prevents any flexibility in design and ensures that sure building would

have the greatest possible bulk, thus in conflict with surrounding homes.  Weinstein Dec. ¶¶ 115-120.

778.    The Village claims that the "20% limitation" for dormitories advances its interest in maintaining community character by limiting the "intensity" of the use. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 623:12-24.

779.    Libraries and museums could threaten the asserted interest in maintaining community character as much as the prohibited educational institution uses, and the proposed Rabbinical College could be designed in a manner that would not have a greater impact than other institutional and residential uses such as museums, libraries, dormitory buildings for accredited schools, or single family housing based on existing average density requirements. Drake Dec. ¶ 96; Weinstein ¶¶ 97-100.

780.    A Rabbinical College could be developed in Pomona in a manner consistent with the Village's interest in preserving its community character.  Drake Dec. ¶¶ 15-17, 21-39; Weinstein Dec. ¶¶ 101-114; Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 616:19-617:11; Savad Decl. **Ex. 18** (Voorhis Dep. at 174:2-9). "[I]t is a fairly simple design issue to introduce new dormitory and campus buildings into a community and retain the current community character." Drake Dec. ¶ 36.

781.    Student housing can be built to resemble residential housing.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 616:19-21.

782.    The impacts on the Village's community character that could have potentially occurred with respect to a Hindu temple use in Pomona were all addressed in the application process.  Savad Decl. **Ex. 15**, Defendants' 30(b)(6) Tr. 939:24-940:23.

783.    The impacts on the Village's community character that could have potentially occurred with respect to an animal hospital use in Pomona were all addressed in the application process.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 586:16-588:8.

784.    The challenged zoning code provisions are not necessary to protect the Village's interest in maintaining its community character because there are other, less restrictive means of achieving that interest, including the special permit and site planning process, and submission before the Village's Board of Architectural Review.  Weinstein Dec. 101-114; Drake Dec. 80-86; Savad Decl. Ex. 314, Code §§ 3-1(A), 3-4(A), 119, 130-10(F), 130-28.

785.    The special permit process can address impacts on community character.  Savad Decl. **Ex. 18**, Voorhis Dep. at 97.

786.    Any site plan approved by the Village Planning Board must be consistent with the principles and recommendation of the adopted Village Master Plan.  Savad Decl. Ex. 314, Code § 119-3(A)(5).  Because the Village Code requires a 10-acre minimum area and maximum 10%

lot coverage for an educational institution, there would be ample room for significant buffering and screening of any educational institution from the surrounding single-family residential district. Weinstein Dec. ¶ 107.

787.   Any site plan approved by the Village Planning Board must ensure that all buildings and other structures shall harmoniously relate to each other, the site and neighboring properties. Savad Decl. Ex. 314, Code § 119-5(D)(9). The Architectural Review Board will not approve any application for a use that would "be detrimental to the character of the neighborhood," among other standards. Code § 3-5(C).

788.   The WPL 100' buffer does not protect community character, and allows other significant impacts to community character, as it does not prevent any development outside of such buffer, and does not apply to properties improved with single family residences. Savad Decl. Ex. 314, Code § 126-3.

789.   The WPL 100' buffer is not necessary to protect community character because there are other means of achieving that interest, including the special permit and site planning process, and submission before the Village's Board of Architectural Review. Weinstein Dec. 101-114; Savad Decl. Ex. 314, Code §§ 3-1(A), 3-4(A), 119, 130-10(F), 130-28.


Traffic

790.   The Village has stated that all of the challenged code provisions, other than the "no housekeeping facilities" and "one dormitory building" provisions, are meant to advance its interests in traffic regulation. Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Tr.) 389:24-390:20, 439:21-25, 678:3-686:17.

791.   The basis for the Village's contention that the challenged code provisions, other than the "no housekeeping facilities" and "one dormitory building" provisions, advance its interest in traffic regulation is that: "All dwelling units, by their nature, generate traffic." Savad Decl. **Ex. 312** (Interrogatory) Resp. No. 26.

792.   The Village's traffic justification is wholly unreasonable and insufficient for the purpose of measuring potential infrastructure impact. Fitzpatrick Dec. ¶ 58.

793.   The Village had no studies or reports demonstrating a need for laws regulating educational institutions in order to protect its traffic interests. Savad Decl. **Ex. 312** (RFA) Resp. Nos. 53, 54, 55, 56.

794.   The Village had no knowledge of the traffic that would be generated by an Educational Institution when it adopted the challenged zoning code provisions. Savad Decl. **Ex. 14**, (Defendants' 30(b)(6) Tr.) 674:4-15, 675:8-17.

795.   The two main thoroughfares in the Village are Routes 202 and 306. Fitzpatrick Dec. ¶ 13.

796.   The Village has no evidence demonstrating problems with traffic capacity on Routes 202 and 306 in the Village.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 669:9-675:7.

797.   Existing levels of service on Routes 202 and 306 are excellent and excess capacity is extraordinarily high.  Fitzpatrick Dec. ¶¶ 17-26.

798.   The Village has no evidence of any unusual safety issues on Routes 202 and 306 in the Village.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 675:18-676:3.

799.   The Village had not taken any steps to address traffic safety on Routes 202 and 306.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 677:2-4.

800.   The Village "has no way of knowing" whether an Educational Institution with 250 students would create an unacceptable traffic safety risk.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 677:5-10.

801.   There is no traffic interest justifying the adoption of the challenged code provisions.  Fitzpatrick Dec. ¶¶ 47-53, 58-59, 66-68, 77-80, 86-92.

802.   The Village's only explanation for why non-accredited Educational Institutions will generate more traffic than accredited institutions is that an "automotive school is going to generate a tremendous amount of traffic because the cars are going to be coming in and out of there on a -- quite often to be tested and used for training purposes, and buses, not only passenger vehicles but all kinds of vehicles."  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 683:8-13.  The Village's statement that non-accredited Educational Institutions will generate more traffic than accredited institutions is unsupported and false.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 683:4-19; Fitzpatrick Dec. ¶¶ 63-65.

803.   The Village's prohibition on student family housing as necessary to prevent traffic impacts is unsupported.  Fitzpatrick Dec. ¶¶ 76-80.  To the extent that the Rabbinical College may generate more traffic based on the fact that its students will generally be married and have children (for instance, if the Rabbinical College was double-counted as both a college <u>and</u> an apartment building), traffic analysis demonstrates that there will still be no more than a *de minimis* impact on traffic within the Village.  Fitzpatrick Dec. ¶¶ 127-133.

804.   The Village stated that the 20% dormitory limitation was justified with respect to traffic impacts because "[a] smaller living facility that houses fewer people is going to generate less traffic than one that is larger and houses a larger number of people." Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 686:22-25.

805.    The 20% dormitory limitation runs contrary to the Village's stated interest in regulating traffic, as a campus that students must drive to creates more traffic than a residential campus. Fitzpatrick Dec. ¶¶ 82-89.

806.    The Village has no evidence that permitting more housing on campus would increase traffic impacts.  Savad Decl. Ex. 14 (Defendants' 30(b)(6) Tr.) 689:9-20.

807.    Traffic impact caused by any development "depends on use and on a specific project." Savad Decl. Ex. 14 (Defendants' 30(b)(6) Tr.) 683:21-22; Savad Decl. Ex. 18 (Voorhis Dep. at 172:20-173:13).

808.    The Village stated: "mitigation of traffic is considered during the review process and is dependent upon the traffic that is generated by the particular project that's being proposed and so I cannot answer whether or not it can be mitigated because I don't know what the project is." Savad Decl. Ex. 14 (Defendants' 30(b)(6) Tr.) 685:19-24.

809.    The proposed Rabbinical College will not negatively impact the Village's traffic interests. Fitzpatrick Dec. ¶¶ 114-173.

810.    The effect of a Rabbinical College on the local traffic infrastructure, even accounting for the fact that most students will be married and have children, will be negligible. Fitzpatrick Dec. ¶¶ 158-63. "[T]the existing infrastructure has excess capacity and is devoid of any unusual safety issues that could be exacerbated by added traffic," and "the Rabbinical College use, even with the addition of more family trips, be they trips for school, work, entertainment, shopping, would not even begin to stress the excess traffic capacity of the adjacent infrastructure with 250 students or, for that matter, 2500 students. The infrastructure could handle the generation." Fitzpatrick Dec. ¶¶ 115, 133.

811.    There are no safety issues in the local traffic infrastructure that would justify exclusion of the Rabbinical College's proposed use. Fitzpatrick Dec. ¶¶ 168-73.

812.    The permitted uses within the Village, including accredited educational institutions (including community colleges), single family residential, libraries and museums, would have greater impacts on the local traffic infrastructure than the proposed Rabbinical College use. Fitzpatrick Dec. ¶¶ 174-79.

813.    The Village has means of achieving its traffic interests that are less restrictive than the challenged code provisions. Fitzpatrick Dec. ¶¶ 93-113.

814.    Traffic impacts may be considered under SEQRA evaluation, and the Village's site plan and special permit application processes. Savad Decl. Ex. 14 (Defendants' 30(b)(6) Tr.) 661:12-14, 691:12-19; Savad Decl. Ex. 18 (Voorhis Dep.) at 97; Fitzpatrick Dec. ¶¶ 93-97.

815.   The special permit process can address impacts on traffic.  Savad Decl. **Ex. 14** (Voorhis Dep.) at 97.

816.   The Village Code requires that "[t]he location and size of the [Educational Institution] use, the nature and intensity of operations involved in or conducted in connection therewith, its site layout and its relation to access streets shall be such that both pedestrian and vehicular traffic to and from the use and the assembly of persons in connection therewith shall not be hazardous."  Savad Decl. **Ex. 314** Code § 130-10(F)(19).

817.   With respect to any special permit use, including Educational Institutions, the Village may impose conditions to ensure that "[o]perations in connection with any special permit use will not be more objectionable to nearby properties by reason of . . . traffic, . . . than would be the operations of permitted uses not requiring a special permit."  Savad Decl. **Ex. 314** Code § 130-28(6)(c).

818.   The Village also regulates traffic impacts through its site planning process, where the Planning Board must review and set appropriate conditions to ensure that "maximum safety will be achieved and function properly provided for."  Savad Decl. **Ex. 314** Code § 119-5(D)(1).

<u>Noise</u>

819.   The Village has stated that all of the challenged code provisions, other than the "no housekeeping facilities" provision and the Wetlands Protection Law, are meant to advance its interests in regulating noise impacts.  Savad Decl. **Ex. 311** (Interrogatory) Resp. Nos. 4, 6; Savad Decl. **Ex. 13** (Defendants' 30(b)(6) Tr.) 395:5-10, 396:19-397:19, 439:21-25, 723:16-742:3.

820.   The Village possessed no reports, studies or other documents demonstrating that its noise interest was threatened by educational institutions.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 726:6-7, 730:15-731:10, 737:17-25.

821.   The Village's sole basis for justifying the challenged code provisions based on noise impacts is that Board members "had knowledge that if the building is limited in size, it will accommodate fewer people and create less noise."  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 726:11-17, 732:14-16, 737:6-11.  However, the Village also stated that the noise referred to as justifying the educational institution restrictions was "[m]ostly from traffic."  Savad Decl. **Ex. 13** (Defendants' 30(b)(6)) Tr. 397:3-5.

822.   Noise was not mentioned in the text of Local Law No. 1 of 2001, nor was it discussed by the Board of Trustees as a basis for passing Local Law No. 1 of 2001.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 724:13-15, 725:6-13.

823.    Noise was not mentioned in the text of Local Law No. 5 of 2004, nor was it discussed by the Board of Trustees as a basis for passing Local Law No. 5 of 2004.  Savad Decl. **Ex. 14** (Defendants' 30(b)(6) Tr.) 730:7-14.

824.    Noise was not mentioned in the text of Local Law No. 1 of 2007, nor was it discussed by the Board of Trustees as a basis for passing Local Law No. 1 of 2007. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 736:16-25.

825.    The Village's claim that family housing generates more noise than traditional dormitory housing is unsupported by any evidence. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 732:8-733:12.

826.    The Village's claim that student housing by its very nature generates more noise than non-housing Educational Institution facilities is unsupported by any evidence.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 738:2-739:17.

827.    The Village has stated that it cannot mitigate noise impacts caused by an Educational Institution.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 735:10-12.

828.    The Village can regulate noise impacts through the "Noise" chapter of its Code, which states that "[i]t shall be unlawful for any person to make, continue or cause to be made or continued any loud, unnecessary or unusual noise or any noise which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others within the limits of the village." Savad Decl. **Ex. 314** Code § 96-2; Weinstein ¶ 78.  Penalties can include fines, imprisonment and "other remedies . . . as are now or may hereafter be provided by law."  Savad Decl. **Ex. 314** Code ¶¶ 1-12, 96-4.

829.    The special permit process can address noise impacts.  Savad Decl. **Ex. 18**, Voorhis Dep. at 97.

830.    A 125 foot setback with landscaping can prevent neighbors from hearing noise generated by a school. Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 397:5-15.

831.    The Village can impose conditions on any special permit to ensure that such use "will not be more objectionable to nearby properties by reason of noise, . . . than would be the operations of permitted uses not requiring a special permit."  Savad Decl. **Ex. 314**, Code § 130-28(6)(c); Weinstein Dec. ¶ 78, 81, 95-96; Savad Decl. **Ex. 18**, Voorhis Dep. at 97.

## Compliance with New York State Zoning Law Regarding Educational Institutions

832.    The Village has stated that the accreditation requirement, the "one dormitory" limitation, the "no housekeeping facilities" provision, and the "no family housing" rule were adopted in order for the Village to comply with the requirements of New York State law.  Savad

Decl. 311 (Interrogatory) Resp. Nos. 2, 6, 8; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 429:24-437:25.

833.    The Village has admitted that its zoning code related to Educational Institutions was unconstitutional prior to 2004.  Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 432:10-23.

834.    Student housing must be permitted with respect to Educational Institutions. Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 430:6-432:8.

835.    New York State law does not prohibit the Village from permitting non-accredited educational institutions to locate in its jurisdiction.  Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 416:9-14.

## Compliance with Federal and State Environmental Law

836.    The Village has stated that it was required to adopt the Wetlands Protection Law in order to comply with federal and state environmental protection law.  Savad Decl. **Ex. 311**, Interrogatory Resp. Nos. 15, 17; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 329:9-337:2.

837.    The Village could not state which provisions of federal or state environmental protection laws required the passage of the Wetlands Protection Law.  Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 330:2-9.

838.    Neither state nor federal environmental protection law required the Village to adopt the Wetlands Protection Law. Savad Decl. **Ex. 13**,  Defendants' 30(b)(6) Tr. , 333:13-15, 334:9-10; Beall Dec. ¶¶ 113-122.

## Achieving Clarity and Consistency of Laws

839.    The Village has stated the purpose of the accreditation requirement, the 20% dormitory limitation, and the one dormitory building rule was to "address vagueness and inconsistencies in the pre-existing definitions."  Interrogatory Resp. Nos. 2, 7.

840.    The Village has stated that the "one dormitory building" and "20% dormitory" limitations are necessary to "clarify that the dormitory use is an accessory to the principal educational use and does not become a principal use." Savad Decl. **Ex. 311**,  Interrogatory Resp. Nos. 11, 12; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 459:19-24, 618:22-619:25.

841.    The provisions of the Educational Institution zoning laws that were described as vague and inconsistent were (1) the separate and potentially inconsistent definitions for "school" and "educational institution," (2) whether the prior definition applied to post-secondary institutions, (3) whether dormitories were included or excluded, and (4) whether the net lot areas included NY DEC wetlands.  Savad Decl. **Ex. 311**, Interrogatory Resp. Nos. 2, 7, 9.

842.    The "20% dormitory" limitation is highly unusual, and does not exist in any other municipal code. Weinstein Dec. ¶¶ 22, 57. Defendants' expert witness is unfamiliar with a requirement similar to the 20% dormitory restriction in any other jurisdiction. Savad Decl. **Ex. 18** (Voorhis Dep. at 130:6-8).

843.    The zoning code defines "use, principal" as "The main use of a structure or lot." Savad Decl. **Ex. 314**, Code sec. 130-4.

844.    The Village's zoning code defines "use, accessory" as "A use which is customarily incidental and subordinate to the principal permitted use on the lot and located on the same lot therewith, except that where specifically provided, accessory off-street parking need not be located on the same lot." Savad Decl. **Ex. 314**, Code 130-4.

845.    Student housing is part of an Educational Institution's principal use. Weinstein Dec. ¶ 51-53.

846.    If viewed as an accessory use, student housing facilities at an Educational Institution are subordinate and incidental to the principal Educational Institution use. Savad Decl. **Ex. 314** Code 130-4; Weinstein Dec. ¶¶ 54-56.

847.    The "one dormitory building" and "20% dormitory" limitations are not necessary to ensure that the principal use of an Educational Institution does not become another use. Weinstein Dec. ¶¶ 48-60. An educational institution can retain its principal use with much more than 20% of its building area devoted to housing space. Savad Decl. **Ex. 18** Voorhees Dep. at 132-135.

848.    The Village had no specific basis for using the 20% figure as a dormitory limitation, and such figure is wholly arbitrary. Weinstein Dec. ¶ 58; Savad Decl. **Ex. 18**, Voorhis Dep. at 132-35; Savad Decl. **Ex. 12**, Defendants' 30(b)(6) Tr. 27:21-28:19, 457:15-25.

849.    The Village did not rely on any zoning handbooks or manuals in using the 20% figure for dormitories. Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 458:2-5. Defendants' witness was unaware of any studies examining the issue of space permitted for housing at educational institutions. Savad Decl. **Ex. 18** (Voorhis Dep. at 134:4-135:6).

850.    The Village did not rely on the advice of any planning professional in using the 20% figure for dormitories. Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 458:6-12.

851.    The Village did not review other colleges in using the 20% figure for dormitories. Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 457:24-459:3.

852.    The only written guideline for determining whether a use is a principal use is the zoning code definitions, which do not contain a 20% figure. Savad Decl. **Ex. 12**, Defendants' 30(b)(6) Tr. 22:7-21; Code 130-4.

853.     Devoting more than 50% of the area of a lot used for a shopping center, mass-transit facility or stadium to parking does not convert the principal use of those facilities to a "parking lot." Weinstein Dec. ¶ 59; Savad Decl. **Ex. 18** (Voorhis Dep. at 171:8-22).  When reviewing another educational institution with greater than 20% of building space devoted to housing, Defendants' expert stated that this did not convert the use to something other than an educational institution.  Savad Decl. **Ex. 18** (Voorhis Dep. at 133:12-134:4).

854.     The Village could ensure that the principal use of an Educational Institution does not change to a different principal use by placing conditions of approval requiring that anyone living on campus could be a student or family member of a student of the Educational Institution. Weinstein Dec. ¶¶ 56, 112.


Environmental Generally

855.     The Village has stated that the elements of the Educational Institution laws that are necessary to control environmental impacts are: "Setbacks, buffers, landscaping and height restrictions," Savad Decl. **Ex. 311**, Interrogatory Resp. No. 27, and that the Village infrastructure (sanitary sewer system, stormwater system and roads) cannot accommodate "high density housing."  *Id.* Interrogatory Resp. No. 28.

856.     No reports, documents, experts or consultants provided any environmental justification for the challenged Code provisions in 2001, 2004 or 2007.  Savad Decl. **Ex. 310** RFA Resp. Nos. 57, 58, 59, 60.

857.     There is no direct relationship between the challenged zoning code provisions and the Village's interest in protecting environmental resources.  Beall Dec. ¶¶ 223.

858.     The Wetlands Protection Law excludes most of the Village from the application of its 100' buffer.  Savad Decl. **Ex. 314**, Code § 126-3(D).

859.     Permitted uses, including accredited Educational Institutions, permitted dormitories, libraries and museums, could have equal or greater impacts on environmental resources.  Beall Dec. ¶ 246.

860.     The Village has the authority to prevent environmental impacts from development in its jurisdiction through the application of the SEQRA requirements, its site plan and special permit processes, and its Flooding and Stormwater code provisions.  Savad Decl. **Ex. 314** Code chs. 79, 114, 119 (especially 119-7(G)), 130 (especially 130-10(F), 130-28); Savad **Decl. Ex. 18**, Voorhis Dep. at 97.

861.     The Village's Planning Board and the Zoning Board of Appeals are authorized to set more stringent requirements than are set forth in the Village's Code in those cases where such

are deemed necessary for the preservation of natural features they consider desirable, the elimination or control of natural features considered undesirable or, in general, to meet the stated purposes of this chapter. Savad Decl. **Ex. 314**, Code § 130-7(A).

862.    The Village was able to address all environmental impacts caused by the development of a Hindu Temple within its jurisdiction. Savad Decl. **Ex. 15**, Defendants' 30(b)(6) Tr. 940:5-23.

863.    The Rabbinical College's proposed use could be developed in some form, with student family housing (greater than 20% of the total square footage) in more than one building and with housekeeping facilities, and with access through the 100' wetland buffer, without harming the Village's interests in protecting environmental resources and infrastructure. Beall Dec. ¶¶ 278-296.

864.    An Educational Institution can be appropriately integrated into an environmental sensitive area with a proper degree of analysis and site-specific assessment.  Savad Decl. **Ex. 18**, Voorhis Dep. at 52-54.

<u>Protecting wetlands and water pollution</u>

865.    The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the 20% dormitory limitation, the family housing prohibition, the one dormitory building limitation and the Wetlands Protection Law was to protect wetlands and water quality.  Savad Decl. **Ex. 311**, Interrogatory 3, 4, 6, 15, 16, 27, 28; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 389:24-390:20, 752:13-772:7. The Wetlands Protection Law's statement that the protection of all wetlands is vital to the health, safety and welfare of all persons is unreasonable, and unsupported by science.  Savad Decl. **Ex. 314**, Code Sec. 126-1; Beall Dec. ¶¶ 37-46.

866.    The Village has no evidence that wetlands were threatened by educational institutions. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 744:8-15.

867.    There are numerous flaws with the Wetlands Protection Law, including: (1) The Village is not aware of the locations, extent and types of aquatic resources in its jurisdiction and did not conduct an assessment or inventory of such resources, which is necessary to reasonably regulate wetlands and watercourses, Beall Dec. ¶¶ 24, 37, 40-41, 43-44, 83;  (2) it does not provide scientifically sound definitions of wetlands, but uses an unreasonable and outdated method of wetland delineation used in the 1970s, Beall Dec. ¶¶ 47-54; (3) it does not define boundaries of watercourses or waterbodies, Beall Dec. 55-60; and (4) it does not provide authority for the Village to review wetlands delineations but rather relies on professionals "authorized" by the NYSDEC--which does not authorize such professionals. Beall Dec. ¶¶ 61-68.

868.   The only basis for the Wetlands Protection Law is the Board of Trustees' general knowledge.  The WPL is ill-conceived, poorly written and illogical.  Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 7/16 at 486:9-15, 746:6-747:7; 758:2-7.

869.   There are no "impaired waters" in the Village.  Beall Dec. ¶¶ 42; Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 745:3-7.

870.   Within the Village, 99% of mapped aquatic resources are currently regulated by the Corps of Engineers, and 80% are regulated by the NYSDEC.  Beall Dec. ¶¶ 100-101; Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 783:10-19.

871.   The Wetlands Protection Law is a duplicate or triplicate layer of regulation of wetlands.  Beall Dec. ¶¶ 29, 86-111.

872.   The Village suggests that there are "isolated wetlands," although not "a tremendous amount," that need protection yet cannot identify any of them, and admits that it has no mapped wetlands.  Beall Dec. ¶ 82-85; Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 745:8-746:5.

873.   The Village's knowledge of its wetlands comes from "[m]embers of the board [who] drive around."  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 746:6-10.

874.   "Driving around" is an unreasonable and adequate methodology for making legislative determinations regarding wetlands.  Beall Dec. ¶ 84.

875.   There is no "regulatory void" with respect to the regulation of wetlands within the Village.  Beall Dec. ¶¶ 81-112.

876.   The texts of Local Law No. 1 of 2001, Local Law No. 5 of 2004 and Local Law No. 7 of 2007 do not refer to protection of wetlands.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 750:21-751:4, 757:11-14, 767:21-23.

877.   Wetlands was not discussed by the Board of Trustees as a reason for enacting Local Law No. 1 of 2001, Local Law No. 5 of 2004 and Local Law No. 7 of 2007.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 751:5-8, 757:15-18, 767:24-768:9.

878.   The Village's justification for the accreditation provision with respect to its interest in wetlands is that "[w]ith an unaccredited school since you don't know what type of use is going to be proposed, there is no way of knowing if the wetlands will be affected or not," providing an example of an "automotive school."  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 756:5-10, 761:9-762:5.

879.   There are no facts that support the contention that non-accredited Educational Institutions would have different impacts on wetlands than accredited Educational Institutions.  Beall Dec. ¶¶ 229-232.

880.    The Village's justification for the "family housing" prohibition with respect to its interest in wetlands is that family housing "take[s] up more land space" than traditional dormitories. Savad Decl. **Ex. 14**,  Defendants' 30(b)(6) Tr. 762:6-14.

881.    The contention that "family housing" "take[s] up more land space" than traditional dormitories is unsupported and false. Beall Dec. ¶¶ 235-238.

882.    All housing, whether "family housing" or traditional dormitories, would be equally limited by the Village's building coverage, floor area, and impervious surface limitations. Beall Dec. ¶ 237.

883.    The prohibition on housekeeping facilities is unrelated to protection of wetlands. Beall Dec. ¶¶ 233-234.

884.    The Village's justification for the "20% dormitory" limitation with respect to its interest in wetlands is that "a limitation on the size of the building has a direct relationship to the protection of wetlands."  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 769:20-770:6.

885.    All facilities in an Educational Institution, whether housing or non-housing facilities, would be equally limited by the Village's building coverage, floor area, and impervious surface limitations.  Beall Dec. ¶¶ 240-242.

886.    Devoting more space to non-housing facilities in an Educational Institution, such as laboratories or gymnasia, cannot reduce the impact to wetlands. Savad Decl. . 14,Ex Defendants' 30(b)(6) Tr. 770:7-771:7.

887.    The Village's justification for the "one dormitory" limitation with respect to its interest in wetlands is that multiple buildings would necessarily have more of an impact than one building. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 763:2-17.

888.    The contention that multiple dormitory buildings would necessarily have more of an impact on wetlands than one dormitory building is untrue. Beall Dec. ¶¶ 297.

889.    The Village states that every single wetland is vital to the health and safety of every single person. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 485:14-23; Savad Decl. Ex. 314, Code sec. 126-1.

890.    The 100' buffer provision of the Wetlands Protection law does not effectively protect wetlands within the Village, as it exempts the majority of the Village. Beall Dec. ¶¶ 146-158, 220; Drake Dec. ¶ 70.  The Wetlands Protection Law states in part: "The aforesaid one-hundred-foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences." Savad Decl. Ex. 314, Code sec. 126-3(D).  The Village has justified this exemption by claiming that it desired prior single family construction to be "grandfathered."  Savad Decl. Ex. 311 (Interrogatory) Response No. 18.

Concerns regarding the protection of wetlands would be the same for vacant lots that are developed with single family homes in the future. Savad Decl. **Ex. 18** (Voorhis Dep. at 161:10-162:2).

891.    285 of 1,156 parcels of land in the Village are located within 100' of a mapped or unmapped wetland or watercourse. Beall Dec. ¶ 151.

892.    240 of the 285 parcels of land within 100' of a mapped or unmapped wetland or watercourse in the Village are improved with single family residences and are thus exempt from the Wetlands Protection Law's 100' buffer restrictions. Beall Dec. ¶ 151.

893.    Of the 45 parcels of land within 100' of a mapped or unmapped wetland or watercourse in the Village, twenty are vacant, and six are associated with local parks or open space. Beall Dec. ¶ 152.

894.    The 20 vacant lots within 100' of a mapped or unmapped wetland or watercourse in the Village will be exempt from the Wetlands Protection Law's 100' buffer restrictions if they become improved with a single family residence. Beall Dec. ¶ 153.

895.    Only 19 out of 1,156 parcels of land are effectively limited by the Wetlands Protection Law's 100' buffer restrictions. Beall Dec. ¶ 152.

896.    Single family residential uses have created recent impacts to wetlands in the Village, including excavation and construction of structures and impervious surface within the 100' wetlands buffer. Beall Dec. ¶¶ 148-150, 156-158. Concerns regarding protection of wetlands exist for wetlands that are located on single family residential lots. Savad Decl. **Ex. 18** (Voorhis Dep. at 159:21-160:5).

897.    The Village claims that "it cannot mitigate the effect of unaccredited educational institutions," multiple dormitory buildings, or "family housing" on wetlands without banning such development. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 764:7-765:19.

898.    The Village admits that "The entire site plan and special permit process require the Village to address the issue of wetlands on any property that comes into the Village for site plan or special permit approval and that is by State Law." Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 748:11-18.

899.    SEQRA requires a lead agency on a development project to take a "hard look" at potential environmental impacts, including impacts on wetlands. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 784:18-787:19.

900.    A municipality determines whether a development will have potential environmental impacts, and assess whether the mitigation for addressing such impacts are adequate. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 785:15-8-787:19.

901. Existing regulations protect wetlands within the Village more efficiently and effectively than the Wetlands Protection Law and the challenged zoning code provisions, including NYSDEC Articles 15 & 24, SEQRA, the Village Code Chapters 114 (Stormwater) and 79 (Flooding), and the federal Clean Water Act. Beall Dec. ¶¶ 159-196; Savad Decl. **Ex. 18** (Voorhis Dep. at 163:21-165:3).

902. The Village's site plan and special permit approval processes require the Village to "address the issue of wetlands on any property" for such approvals, and such requirement is mandated by state law. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 748:8-15; Beall Dec. ¶¶ 142, 161, 191-192, 245-247.

903. The special permit process can address impacts on wetlands and water pollution. Savad Decl. **Ex. 18**, Voorhis Dep. at 97.

904. Under the Village Code, no site plan for a special permit use can be granted unless the Planning Board determines "[t]hat the proposed activity and the manner in which it is to be accomplished will not adversely affect the preservation and protection of existing wetlands, water bodies, watercourses . . . ." Savad Decl. Ex. 314, Code § 119-3(A)(3).

905. In order to approve a site plan for development, the Village Planning Board must establish "conditions of approval" to ensure the "[p]rotection of all wetlands in accordance with the requirements of Chapter 126 of this Code, the New York State DEC and the U.S. Army Corps of Engineers." Savad Decl. Ex. 314, Code § 119-7(C)(6)(w).

906. Finally, development near the wetlands on the subject Property would be regulated by the NYSDEC. Beall Dec. ¶¶ 282-285.

907. Given the existing regulatory means of controlling development to prevent environmental impacts, any development by Tartikov should improve the wetland environmental conditions. Beall Dec. ¶¶ 293, 296.

908. Wetlands are protected by properly locating and designing buildings relative to site constraints. Beall Dec. ¶¶ 286-289.

### Preventing flooding

909. The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the 20% dormitory limitation, the family housing prohibition, the one dormitory building limitation and the Wetlands Protection Law was to prevent flood damage and protect floodplains. Savad Decl. Ex. 311, Interrogatory 3, 4, 6, 15, 16, 27, 28; FPC Memo POM 14125, 14128, 13137; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 389:24-390:20, 439:21-25, 827:13-847:10; Code § 126-1.

910. The Village's sole justification for the challenged code provisions with respect to preventing floodplain impacts is that more development creates more impact. Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 389:24-390:12, 391:18-25, 825:10-826:11.

911. The Village had no evidence of impacts from any nonresidential land uses on floodplains. Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 1043:8-1044:14.

912. The Village had no studies or reports concerning floodplains in Pomona were conducted or reviewed supporting this reason. Savad Decl. **Ex. 18**, Defendants' 30(b)(6) Tr. 832:23-833:4, 845:13-18.

913. The texts of the Local Law No. 1 of 2001, Local Law No. 5 of 2004, and Local Law No. 1 of 2007 do not refer to flooding. Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 828:10-13, 832:14-17, 844:23-845:2; Local Law No. 1 of 2001; Local Law No. 5 of 2005; Local Law No. 1 of 2007.

914. Flooding was not discussed by the Board of Trustees as a reason for enacting any of the challenged code provisions. Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 828:15-20, 832:18-22, 845:3-5, 847:19-848:2.

915. The Village states that the justification for the accreditation requirement with respect to floodplain regulation is: "some types of schools that have much more of an impact on wetlands and floodplains than other uses which are more stationary, if you will do not have as much outdoor equipment that may be connected with it outdoor use and so on." Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 834:15-23.

916. The Village states that the justification for the student family housing prohibition, the one dormitory building and 20% dormitory limitations with respect to floodplain regulation is that such development constitutes more intensive use. Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 835:21-846:11.

917. The Village's floodplain justifications for the challenged zoning code provisions are irrational. The Village's use of educational institutions law to prevent flooding or protect floodplains when the Village has § 79 Flood Damage Prevention, § 114 Stormwater Management, and § 119 Site Development Review and SEQRA "is like using a hammer to drill a screw when it already has more than one screwdriver in its tool belt." Beall Dec. ¶¶ 248-257.

918. Buildings devoted to housing have no greater effect on floodplains than buildings devoted to classroom space. Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 846:2-11; Beall Dec. ¶ 255.

919. The Village states that the justification for the Wetlands Protection Law with respect to floodplain regulation is that "if you fill the wetlands or destroy them in some way, the water is going to flow over the land." Savad Decl. **Ex. 16**, Defendants' 30(b)(6) Tr. 848:3-15.

920.   The Wetlands Protection Law's 100' buffer does not prevent the filling in or destroying of wetlands.  Code § 126-3.

921.   The Wetlands Protection Law will not reduce existing flooding within the Village. Beall Dec. ¶¶ 123-127.

922.   The Village states that it cannot mitigate flooding impacts from Educational Institutions without the challenged zoning provisions. Savad Decl. Ex. 16,  Savad Decl. Ex. 15, Defendants' 30(b)(6) Tr. 841:25-844:5.

923.   The challenged zoning code provisions are unnecessary to prevent floodplain impacts. Beall Dec. ¶¶ 205-213, 248-257.

924.   Existing regulations adequately protect the Village's interest in protecting floodplains, including the Village's Floodplain regulations (chapter 79), SEQRA, NYSDEC's Stormwater Regulations and Design Manual, reviewing and approving Stormwater Pollution Prevention Plans. Beall Dec. ¶¶ 126-127, 205-212, 248-257.

925.   No site plan for a special permit use in the Village can be granted unless the Planning Board determines "[t]hat the proposed activity and the manner in which it is to be accomplished will not adversely affect the preservation and protection of existing . . . floodplains." Savad Decl. Ex. 314, Code § 119-3(A)(3).

926.   The special permit process can address impacts on floodplains.  Savad Decl. Ex. 18 (Voorhis Dep. at 97).

927.   The Village Code contains a "Flood Damage Prevention" chapter that regulates development in terms of preventing flood damage and protecting floodplains. Savad Decl. Ex. 34,, Code ch. 79.

928.   The Village's interest in preventing flood damage and protecting floodplains is met through the application of the Flood Damage Prevention chapter of its Code. Savad Decl. Ex. 314, Code § 79-3; Beall Dec. ¶¶ 248-257.

929.   Any application for a floodplain development permit must demonstrate that a nonresidential structure will be floodproofed, and that there will be no negative effect on any watercourse, among other technical requirements. Savad Decl. Ex. 314, Code §§ 79-13; 79-16.

930.   No development in the Village is permitted within a flood hazard area without being in compliance with Chapter 79 of the Code. Savad Decl. Ex. 314 Code § 79-9.

931.   State law, including NYSDEC's Article 15 regulations, protects floodplains. Beall Dec. ¶ 126.

932.    The Wetland Protection Law is not an effective tool to accomplish the Village's goal of preventing flood damage and protecting floodplains.  Beall Dec. ¶¶ 123-127.

933.    Development of the proposed Rabbinical College would have to comply with Savad Decl. Ex. 314, Code sec. 79, and such development would create no direct impacts to any regulated floodplains.  Beall Dec. ¶¶ 292, 294.

<u>Protecting plant life and wildlife</u>

934.    The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the family housing and housekeeping facilities prohibitions, the one dormitory building limitation and the Wetlands Protection Law was to protect plant life and wildlife.  Interrogatory 3, 4, 6, 15, 16, 27, 28; FPC Memo POM14125, 14128, 13137; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 392:2-25, 439:21-25, 544:21-562:18; Savad Decl. Ex. 314, Code § 126-1.

935.    The Village has no evidence that plant life and wildlife is threatened or impacted by educational institutions or by any non-residential land use.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 545:17-546:18.

936.    The Village possesses no reports or studies demonstrating that plant and wildlife was threatened by educational institutions. Savad Decl. **Ex. 14**,  Defendants' 30(b)(6) Tr. 561:2-6, 562:19-563:20.

937.    The Village's stated evidence justifying the challenged zoning code provisions with respect to protecting plant life and wildlife is a reference to the New York DEC and "general local concerns" and "general knowledge."  Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 392:7-18, 552:6-7.

938.    The text of the challenged zoning code provisions do not refer to plant life and wildlife, and plant life and wildlife was not discussed by the Board as a reason for passing the challenged zoning laws. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 547:7-10, 547:22-548:3, 560:14-19.

939.    Protecting plant life and wildlife was not discussed by the Board of Trustees as a reason for enacting any of the challenged zoning code provisions.  Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 547:7-10, 547:22-548:3, 560:20-25.

940.    The Village states that the justification for the accreditation requirement with respect to plant life and wildlife is that "automotive schools" will harm plant life and wildlife. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 549:3-21, 554:25-555:6.

941.    The Village states that the justification for the challenged dormitory provisions with respect to plant life and wildlife is that the prohibited housing will "us[e] a greater amount

of the land . . . . You're using more -- that would be the primary, the primary difference." Savad
Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 551:5-14, 552:16-19

942.    The prohibited housing will not use a greater amount of land than permitted
student housing, as maximum development for both is limited by building, floor area and
impervious surface coverage regulations. Beall Dec. ¶¶ 241, 254-255, 263-264, 300-301, 304;
Weinstein Dec. ¶ 94.

943.    The permitted uses of accredited schools, non-housing elements of a college,
permitted dormitories and museums and libraries would equally affect plant life and wildlife.
Beall Dec. ¶¶ 276, 305.

944.    The Village stated that impacts on plant life and wildlife caused by Educational
Institutions can be mitigated through the land development process. Savad Decl. **Ex. 14**,
Defendants' 30(b)(6) Tr. 555:19-557:5.

945.    The Wetlands Protection Law is unnecessary to protect animal and plant life.
Beall Dec. ¶¶ 137-145, 472.

946.    Existing Village, state and federal regulations sufficiently protect animal and
plant life. Beall Dec. ¶¶ 222, 245-267.

947.    The Village Code states that no site plan may be granted unless there is a
determination that "the proposed activity and the manner in which it is to be accomplished can
be completed in such a way so as not to adversely affect . . . any endangered species of flora or
fauna." Savad Decl. Ex. 314, Code § 119-3(A)(4).

948.    The special permit process can address impacts on plant life and wildlife. Savad
Decl. **Ex. 18**, Voorhis Dep. at 97.

949.    The Village Planning Board must establish conditions of site plan approval for
"[t]he protection of existing trees and other vegetation where feasible." Savad Decl. Ex. 314,
Code § 119-7(C)(6)(t).

950.    The Village must address plant life and wildlife when it conducts the SEQRA
review. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 554:6-17; Beall Dec. ¶ 222, 277.

951.    Any development on the subject Property can be clustered to avoid environmental
impacts. Beall Dec. ¶¶ 285-289.

952.    Existing regulations and the site planning process would protect habitat if the
subject Property were developed as a Rabbinical College. Beall Dec. ¶ 296.

## Protecting air quality

953.    The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the family housing prohibition, the one dormitory building and 20% dormitory limitations, and the Wetlands Protection Law was to protect air quality. Savad Decl. Ex. 311, Interrogatory 3, 4, 6, 15, 16, 27, 28; FPC Memo POM14125, 14128, 13137; Savad Decl. **Ex. 13**,  Defendants' 30(b)(6) Tr. 391:18-392:6, 395:17-396:18, 697:11-723:15; Savad Decl. Ex. 314, Code § 126-1.

954.    The Village states that the justification for the challenged code provisions with respect to air quality is that there would be "fumes" from traffic and that such development would involve "cutting too many trees." Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 395:21-396:18, 700:15-701:6.

955.    The Village possesses no specific reports or studies demonstrating that air quality was threatened by educational institutions. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 699:2-6, 703:3-20, 715:7-12, 723:5-15.

956.    The text of the challenged zoning code provisions do not refer to air quality. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 700:7-9, 702:9-11, 714:20-22.

957.    Air quality was not stated by the Board of Trustees as a basis for passage of the Educational Institution laws. Savad Decl. **Ex. 14**,  Defendants' 30(b)(6) Tr. 702:12-18, 715:3-6.

958.    The Village has the authority to impose conditions on any special permit use to ensure that such use "will not be more objectionable to nearby properties by reason of . . . fumes, . . . than would be the operations of permitted uses not requiring a special permit." Savad Decl. Ex. 314, Code § 130-28(6)(c).

959.    The special permit process can address impacts on air quality.  Savad Decl. Ex. **18**, Voorhis Dep. at 97.

960.    Trees are also protected under the Code in the site plan application process. Savad Decl. Ex. 314, Code § 119-7(C)(6)(t)-(u).

## Water Supply & Sanitary Sewers

961.    The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the family housing and housekeeping prohibitions, the one dormitory building and 20% dormitory limitations, and the Wetlands Protection Law was to protect the local water supply and sanitary sewer system. Savad Decl. Ex. 311,  Interrogatory 3,

4, 6, 15, 16, 27, 28; FPC Memo POM14125, 14128, 13137; Savad Decl. **Ex. 13**, Defendants' 30(b)(6) Tr. 389:24-390:20, 439:21-25, 566:12-580:11, 858:17-870:20; Code § 126-1.

962.    The only basis for the Village's position that the challenged code provisions are intended to protect the Village's water supply and sanitary sewer system is a "general awareness" of water use issues from newspaper reports and discussions, and "general knowledge" of the water usage of Educational Institutions. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 567:23-25, 574:20-23.

963.    The Village does not regulate its water supply. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 567:5-9.

964.    The Village had no studies or reports establishing any lack of sufficient infrastructure, which includes water supply and sanitary sewers when it adopted the challenged code provisions in 2001, 2004 and 2007. RFA Resp. 61, 62, 63, 64;Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 567:10-569:7, 574:20-23, 858:25-859:11.

965.    Protecting its water supply and sanitary sewers was not stated as a basis for passage of the Educational Institution laws. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 572:11-13, 855:21-25.

966.    The Village has no evidence of negative impacts on the water supply and sanitary sewer systems caused by Educational Institutions, or by any nonresidential land use. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 569:23-570:11.

967.    The Village states that the justification for the accreditation requirement with respect to sanitary sewers is that "automotive schools" would damage sanitary sewers if motor oils were poured into the sewer system. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 861:15-862:14.

968.    The Village has provided no evidence supporting its statement that non-accredited Educational Institutions "use[] more water" than accredited Educational Institutions. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 577:13-578:7.

969.    The Village states that the justification for the challenged dormitory provisions with respect to water usage and sanitary sewers is only related to the size of such housing. Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 574:11-575:23, 854:6-11, 858:17-24, 862:23-864:4, 866:21-867:7.

970.    The Village's statement that individuals residing in family housing would "encourage[] the use of additional water," as compared to individuals residing in a communal facility is unsupported by any evidence. Defendants' 30(b)(6) Tr. 575:14-17.

971.   The Village stated that the Wetlands Protection Law is "not going to [a]ffect the sanitary system as much . . . ." Savad Decl. **Ex. 14**, Defendants' 30(b)(6) Tr. 870:16-20.

972.   Existing Village regulations sufficiently protect the Village's interest in the water supply. Savad Decl. Ex. 314, Code §§ 119-5, 110-5, 110-22 – 110-29.

973.   In granting site plan approval, the Village Planning Board must determine that "[t]he proposed systems for water supply . . . on the site shall be adequate, and facilities shall be sufficient to handle the increase in service." Savad Decl. Ex. 314, Code § 119-5(D)(7).

974.   In granting site plan approval, the Village Planning Board must determine that "[t]he proposed systems for sewage collection and disposal on the site shall be adequate, and facilities shall be sufficient to handle the increase in service." Savad Decl. Ex. 314, Code § 119-5(D)(7).

975.   The special permit process can address impacts on water supply and sanitary sewers. Savad Decl. **Ex. 18**, Voorhis Dep. at 98.

976.   The Village Code contains a chapter devoted to regulating its sanitary sewer systems. Savad Decl. Ex. 314, Code ch. 110.

977.   The Village's "Board of Sewer Commissioners shall also have authority to determine the manner and conditions under which said building sewers shall be installed and maintained . . . ." Savad Decl. Ex. 314,  Code § 110-5(D).

978.   Standards for the Village's sewer systems are set forth in the Code.  Savad Decl. Ex. 314, Code §§ 110-22 -- 110-29.

979.   The Village Code also regulates "prohibited discharges" in the sanitary sewer system. Savad Decl. Ex. 314, Code § 110-32 -- 110-41.

Stormwater System

980.   The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the family housing prohibition, the one dormitory building and 20% dormitory limitations, and the Wetlands Protection Law was to prevent impacts to its stormwater sewer system. Savad Decl. **Ex. 15** , Defendants' 30(b)(6) Tr. 856:18-870:20.

981.   The Village states that the justification for the accreditation requirement with respect to water usage and stormwater sewers is that "automotive schools" would generate pollutants. Savad Decl. **Ex. 15**, Defendants' 30(b)(6) Tr. 862:5-14.

982.   There is no basis to support the Village's contention that non-accredited Educational Institutions would general pollutants that would contaminate the Village's stormwater system.  Beall Dec. ¶¶ 260-261.

983.   Family housing would not have greater impacts on the Village's stormwater system than traditional dormitory housing.  Beall Dec. ¶¶ 262-263.

984.   The Village states that the justification for the challenged dormitory provisions with respect to the stormwater system is only related to the size of such housing.  Savad Decl. **Ex. 15**,Defendants' 30(b)(6) Tr. 862:23-864:4, 864:21-867:7.

985.   The challenged dormitory provisions do not affect the total size of an Educational Institution, but only affect the layout of such institution.  Beall Dec. ¶¶ 263-264.

986.   The Village's statement that the Wetlands Protection Law protects the stormwater system is not based on any facts or evidence. Savad Decl. **Ex. 14**,  Defendants' 869 30(b)(6) Tr. 869:17-870:16.

987.   The Wetlands Protection Law does not protect stormwater systems.  Beall Dec. ¶¶ 128-132.

988.   The Village's stormwater system is adequately protected by other existing regulations.  Beall Dec. ¶¶ 132, 258-266.

989.   Stormwater management is regulated through the Village's "stormwater management" chapter.  Code ch. 114; Beall Dec. ¶¶ 214-221.

990.   The Village Code's stormwater management chapter "provide[s] for the health, safety, and general welfare of the citizens of the Village of Pomona through the regulation of nonstormwater discharges to the municipal separate storm sewer system . . . ." Savad Decl. Ex. 314, Code § 114-1.

991.   No application for approval of a land development activity shall be reviewed by the Village until the Pomona Planning Board or the Building Inspector, as the case may be, has received a stormwater pollution prevention plan prepared in accordance with the requirements of chapter 114.  Savad Decl. Ex. 314, Code § 114-25.

992.   All land development activities must meet the standards of the New York State Stormwater Design Manual, the New York Standards and Specifications for Erosion and Sediment Control, or the technical equivalent.  Savad Decl. Ex. 314, Code § 114-27(A),(B).

993.   Within the Village, any approved site plan for a special permit use must include a stormwater pollution prevention plan in accordance with Chapter 114 of the Village Code. Savad Decl. Ex. 314, Code § 119-5(B)(2)(j); Beall Dec. ¶¶ 202, 266.

994.   The special permit process can address impacts on stormwater systems.  Savad Decl. **Ex. 18**, Voorhis Dep. at 97.

995.   No site plan can be approved by the Planning Board unless "[t]he proposed stormwater drainage system [is] adequate to prevent any increase in the rate of surface runoff or otherwise contribute to downstream flooding during a storm of any magnitude up to and including a one-hundred-year-frequency storm."  Savad Decl. Ex. 314, Code § 119-5(D)(6).

996.   A stormwater plan generally must mimic or improve the pre-existing site stormwater runoff conditions.  Beall Dec. ¶ 203.

997.   As the Rabbinical College would be required to comply with Code sec. 114 and 119 and SEQRA, the development "would likely be an improvement over existing site conditions." Beall Dec. ¶ 295.

998.   The Village is not "rural," but rather suburban in nature.  Beall Dec. ¶¶ 316-323, Drake Dec. ¶¶ 25-26.


Dated:  Nanuet, New York
        January 22, 2015


PAUL SAVAD (PS 5358)

Savad Churgin
Attorneys for Plaintiffs
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
(845) 624-3820