UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONGREGATION RABBINICAL COLLEGE  :
OF TARTIKOV, INC., et. al.,     :
              :
              :  CIVIL NO. 07:CV 6304 (KMK)
    Plaintiffs,      :
V.             :
              :
VILLAGE OF POMONA, NY, et. al.,   :
              :
              :  JANUARY 22, 2015
    Defendants.     :

**DEFENDANTS' LOCAL RULE 56.1(a) STATEMENT
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

   In support of their motion for summary judgment, Defendants respectfully submit the

following statement of material facts not in dispute pursuant to Local Civil Rule 56.1(a).

## I.  THE PARTIES AND THEIR ACTORS

  1. Defendant, The Village of Pomona ("Village") is a municipal corporation that was

incorporated in 1967 in compliance with New York law, and is comprised of roughly 2.4 square

miles of land, half in the Town of Ramapo and half in the neighboring Town of Haverstraw, in

Rockland County, New York. (*See Village of Pomona Website Home Page* (accessed January 21,

2015), available at http://www.pomonavillage.com/ ("Village Home Page"); The Village of

Pomona Master Plan Update (1997)). [Amanda E. Gordon Affidavit ¶ 30, Exhibit 25] ("Gordon

Aff."); [Doris Ulman Affidavit ¶ 23, Exhibit 17] ("Ulman Aff.").

2. The Village has a population of approximately 3,000 persons.  (*See* United States Census Bureau/American FactFinder, *2010 Census*, (accessed January 20, 2015), available at http://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml; *see also* (Village Home Page.) [Gordon Aff. ¶ 30-31, Exhibit 25-26].

3. Defendant Board of Trustees of the Village of Pomona ("Board of Trustees") is the Village's legislative body.  At the time suit was filed, the Board of Trustees was comprised of 5 Trustees (Ian Banks, Nicholas Sanderson, Alma Sanders Roman, Rita Louie, and Brett Yagel), one of whom (Sanderson) was, at the time suit was filed, the elected Mayor of the Village.  *See* New York State Village Law Section, § 3-301(1); (*See generally*, Second Amended Complaint (November 15, 2007) ("SAC")). [Ulman Aff. ¶ 20, Exhibit 14].

4. Defendants Banks, Sanderson, Roman, Louie and Yagel have been named as defendants in their official capacities as Trustees.  (*See generally*, SAC).

5. Plaintiff Congregation Rabbinical College of Tartikov ("Tartikov" or "Plaintiff") is a religious corporation formed under the laws of the State of New York on August 1, 2004. (Certificate of Incorporation of Congregation Rabbinical College of Tartikov, Inc., August 1, 2004) ("Certificate of Incorporation"); (Deposition of Congregation Rabbinical College of Tartikov pursuant to FRCP 30(b)(6) ("Tartikov 30(b)(6) Dep."), 148:15-149:3, May 5, 2014). [Gordon Aff. ¶¶ 15, 23, Exhibit 10, 18].

6. At the time of incorporation, Tartikov's officers included Chaim Babad, Abraham Halberstam, Naftali Babad, Samuel Chimmel, Michael Tauber and Asher Mandel. (Certificate of Incorporation, RC_00002811). (Tartikov 30(b)(6) Dep., 148:15-149:3, May 5, 2014). [Gordon Aff. ¶¶ 15, 23, Exhibit 10, 18].

7. Michael Tauber ("Tauber") is a real estate developer in Rockland County with 30 years of experience in development.  He has developed numerous projects in Rockland County, including multi-family housing, synagogues and schools.  (Tauber, Michael, 33:21-36:8, 80:20-81:4, 148:1-148:5, May 7, 2014). [Gordon Aff. ¶ 14, Exhibit 9].

8. Tauber manages the Tartikov corporate entity, which management includes locating and purchasing the land, hiring professionals needed, and running the day-to-day business of the corporation.  He was elected as Trustee of Tartikov for purposes including the "related litigation of the Pomona Property." (Tartikov 30(b)(6) Dep., 15:5-15:15, May 5, 2014); (Resolution of Board of Trustees and Members of Congregation Rabbinical College of Tartikov, Incorporated, August 6, 2004); (Tauber, Michael., 124:10-126:4, May 7, 2014). [Gordon Aff. ¶¶ 14, 25, Exhibit 9, 20].

9. Chaim Babad is involved in real estate investment, with a management company based out of New York City.  He currently owns, though his various corporate entities, approximately 40 properties, located primarily in New York City.  (Babad, Chaim, 24:3-25:15, 27:6-27:11, May 19, 2014). [Gordon Aff. ¶ 6, Exhibit 1].

10. Chaim Babad provides the funding for Tartikov.  (Tartikov 30(b)(6) Dep., 15:18-15:20, 66:5-66:15, 67:3-67:11, 81:15-81:17, May 5, 2014); (Babad, Chaim, 159:19-160:14, May 19, 2014). [Gordon Aff. ¶¶ 6, 15, Exhibit 1, 10].

11. Tartikov claims that it was formed to establish a rabbinical college in Rockland County.  (Tartikov 30(b)(6) Dep., 9:14-9:16, May 5, 2014).  [Gordon Aff. ¶ 15, Exhibit 10].

12. The Certificate of Incorporation does not indicate that Tartikov was formed to operate a rabbinical college. (Certificate of Incorporation, RC_00002807-RC_00002808); (Tartikov 30(b)(6) Dep.), 148:15-149:3, May 5, 2014). [Gordon Aff. ¶¶ 15, 23, Exhibit 10, 18].

13. Instead, the stated purposes are "(a) To promote the religious, intellectual, moral and social welfare among its members and families, (b) To provide a suitable place of divine worship for the members of the corporation, their families and others of the Jewish Orthodox faith, (c) To promote and increase interest in the teaching and ideals of the worlds renowned scholars of the Jewish Orthodox faith, (d) To establish, maintain and conduct a school for the of [sic] the holy Torah and to maintain classes for the teachings of the customs, traditions and mode of worship of the Jewish Orthodox faith, (e) To aid and assist worthy indigent members of the corporation with loans and housing, (f) To do all things necessary to the accomplishment of the foregoing purposes and if the Trustees shall so decide, to associate itself with persons and organizations desiring to assist on the effectuation of the purposes hereinabove set forth. . . ." (Certificate of Incorporation, RC_00002807-RC_00002808); (Tartikov 30(b)(6) Dep.), 148:15-149:3, May 5, 2014). [Gordon Aff. ¶¶ 15, 23, Exhibit 10, 18].

14. Plaintiffs Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, and Rabbi David A. Menczer (collectively the "Individual Plaintiffs") are rabbis who seek to live, teach, and/or study at Tartikov's proposed rabbinical college. (SAC ¶¶ 11-20)

15. The Individual Plaintiffs receive stipends from Tartikov because they have committed to teach or attend the proposed rabbinical college in the event it is built. (Tartikov 30(b)(6) Dep.,

19:1-20:5, May 5, 2014); (Hershkowitz, Jacob, 67:13-67:16, May 13, 2014); (Rosenberg, Chaim, 9:3-9:17, May 2, 2014). [Gordon Aff. ¶¶ 10, 13, 15, Exhibit 5, 8, 10].

## II.      THE HYPOTHETICAL NATURE OF THE PROPOSED RABBINICAL COLLEGE

16. Tartikov owns an approximately 100 acre tract of land in the Village between Routes 202 and Route 306 (the "Subject Property").  (Bargain and Sale Deed with Covenant Against Grantor's Acts—Individual or Corporation, August 17, 2004, RC_00002024-RC_00002028); (SAC ¶¶ 50, 89); (Tauber, Michael., 124:10-126:4, May 7, 2014). [Gordon Aff. ¶¶ 14, 24, Exhibit 9, 19].

17. Tartikov purchased the Subject Property on August 17,  2004 and recorded the deed with Rockland County on August 31, 2004.  The Village was not aware of the sale of the Subject Property until November 2004. Bargain and Sale Deed with Covenant Against Grantor's Acts—Individual or Corporation, August 17, 2004, RC_00002024-RC_00002028); (Tauber, Michael., 124:10-126:4, May 7, 2014); (Rockland County Recording Certificate of Transfer of Deed, August 31, 2014, RC_00002023); (SAC ¶¶ 50-51); (Deposition of Village of Pomona and Village of Pomona Board of Trustees pursuant to FRCP 30(b)(6) ("Village 30(b)(6) Dep."), 89:21-90:7, July 15, 2014). [Gordon Aff. ¶¶ 14, 16, 24, Exhibit 9, 11, 19].

18. In its Second Amended Complaint, Tartikov has alleged that it intends to construct a rabbinical college on this piece of property. (SAC ¶ 1).

19. Tartikov has never filed any application with the Village seeking to construct a rabbinical college.  (Tartikov 30(b)(6) Dep., 120:3-120:5, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

20. As a result, prior to discovery in this action, the Village did not know any details regarding the proposed rabbinical college because no information had been communicated to the Village or its officials.  (Village 30(b)(6) Dep., 69:4-69:9, July 15, 2014). [Gordon Aff. ¶ 16, Exhibit 11].

21. All facts regarding the proposed facilities, proposed number of students and proposed academic requirements were learned through discovery. [Ulman Aff. ¶ 40].

22. Those facts learned through discovery include conceptual site plans prepared in 2004 by Leonard Jackson ("Mr. Jackson") of Leonard Jackson Associates, engineer hired by Tartikov, and Saccardi & Schiff, Incorporated, planner hired by Tartikov.  Mr. Jackson testified that, a preliminary concept plan is "[w]hatever the engineer can come up with to suit the needs of the client . . . . it's "the beginning of the process."  Mr. Jackson also testified that eight buildings on the conceptual site plan were dormitory buildings.  (Leonard, Jackson, 22:25-23:10, 29:17-30:18, 56:7-58:2, 59:25-62:9, August 13, 2004); (Saccardi & Schiff, Inc., Site Location-Rabbinical College of Tartikov at RC_0004129); (Saccardi & Schiff, Inc., Site Layout Plan-Rabbinical College of Tartikov at RC_0004130). [Gordon Aff. ¶¶ 11, 28, Exhibit 6, 23].

### 1.    The Definition of a Specialized Kollel

23. Plaintiffs have alleged that the proposed rabbinical college is a "specialized kollel." (SAC ¶ 52).

24. Tartikov cannot articulate what a "specialized kollel" is.  (Tartikov 30(b)(6) Dep., 20:22-21:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

25. The only document that Tartikov is aware of that explains what constitutes a "specialized kollel" is a single page proposed Curriculum that outlines the full rabbinical judge training

program for all fifteen years.  (Tartikov 30(b)(6) Dep., 22:3-23:2, May 5, 2014); *see* <u>Proposed Rabbinical College of Tartikov Program Schedule</u> ("<u>Curriculum</u>"). [Gordon Aff. ¶¶ 15, 26, Exhibit 10, 21].

### 2.    **Tartikov's Proposed Curriculum and Course of Study**

26.  The proposed Curriculum was prepared by one of the individual plaintiffs, Meilech Menczer ("Rabbi Menczer"), a putative student. (Tartikov 30(b)(6) Dep., 19:14-19:21, 23:3-23:5, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

27.  The proposed Curriculum was prepared a few months prior to the deposition of Tartikov, pursuant to FRCP 30(b)(6), which occurred in May 2014. (Tartikov 30(b)(6) Dep., 23:9-23:13, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

28.  Mr. Tauber asked Rabbi Menczer to prepare it "knowing my counsel wanted to see it in writing, not just verbally." (Tartikov 30(b)(6) Dep., 23:14-23:16, May 5, 2014); *see also* (Babad, Mordechai 75:13-76:4, May 9, 2014)("[S]o I guess [Resnicoff], as part of his expert witness, did feel that it must be put into an exhibit . . ."). [Gordon Aff. ¶¶ 7, 15, Exhibit 2, 10].

29.  The Curriculum does not provide any information concerning what constitutes a "specialized kollel." *See* <u>Curriculum</u>; (Tartikov 30(b)(6) Dep., 22:12-23:2, May 5, 2014). [Gordon Aff. ¶¶ 15, 26, Exhibit 10, 21].

30.  The Curriculum does not provide any details concerning what, exactly, the proposed rabbinical college scholars would do. *See* <u>Curriculum</u>; (Tartikov 30(b)(6) Dep., 22:12-23:2, May 5, 2014). [Gordon Aff. ¶¶ 15, 26, Exhibit 10, 21].

31. Rather, the Curriculum simply identifies subject areas for study.  *See* <u>Curriculum</u>; (Tartikov 30(b)(6) Dep., 22:12-23:2, May 5, 2014); (Babad, Mordechai, 69:3-73:25, May 9, 2014). [Gordon Aff. ¶¶ 7, 15, 26 Exhibit 2, 10, 21].

32. Mordechai Babad ("Rabbi Babad"), the putative dean of the proposed rabbinical college, "[g]lanced through" the Curriculum but did not do anything more with the document.  (Babad, Mordechai, 68:3-68:8, May 9, 2014.) [Gordon Aff. ¶ 7, Exhibit 2].

33. In his capacity as putative dean, Rabbi Babad has neither prepared nor asked anyone to prepare any documents that would reflect the course of study at the proposed rabbinical college. (Babad, Mordechai, 74:25-75:7, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

34. In his capacity as putative dean, Rabbi Babad has not hired any teachers.  (Babad, Mordechai, 83:16-83:18, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

35. In fact, Rabbi Babad testified that he has done "[n]othing" as the prospective dean and that he thought hte job was "premature."  (Babad, Mordechai, 83:12-83:15, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

### 3.      The Dearth of Written Standard for Admission or Performance

36. The Curriculum is the only written document pertaining to the proposed rabbinical college's intended program of study. (Tartikov 30(b)(6) Dep., 31:23-32:9, May 5, 2014); (Babad, Mordechai, 94:24-95:14, May 9, 2014). [Gordon Aff. ¶¶ 7, 15, Exhibit 2, 10].

37. Specifically, the proposed rabbinical college does not have any written criteria for admission.  (Tartikov 30(b)(6) Dep., 31:23-32:9, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

38. All that is required for admission is a meeting with Rabbi Babad.  Once Rabbi Babad feels that an individual is "for real and ready for this program, he will give them the go-ahead to

get into it.  So once they get the go-ahead from Rabbi Babad, he can go ahead and start and will be able to live in there and get into the program."  (Tartikov 30(b)(6) Dep., 30:19-30:24, 31:17-31:22, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

39. The proposed rabbinical college does not have any written application. (Tartikov 30(b)(6) Dep., 32:8-32:9 May 5, 2014); (Babad, Mordechai, 94:24-95:10, May 9, 2014). [Gordon Aff. ¶¶ 7, 15, Exhibit 2, 10].

40. The proposed rabbinical college will have no entrance examination.  (Tartikov 30(b)(6) Dep., 32:6-32:7, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

41. The proposed rabbinical college will not require entering students to have any degree as a prerequisite to admission.  (Tartikov 30(b)(6) Dep., 32:15-32:18, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

### 4.     The Proposed Rabbinical College's Facilities and Student Housing

42. The proposed rabbinical college is composed primarily of housing, with accessory religious uses that include synagogues, study halls, and courtrooms.  (Tartikov 30(b)(6) Dep., 34:23-36:17, 42:1-43:14, May 5, 2014); (Religious School with 4500 Residents Planned for Pomona, January 9, 2007); (Castelluccio, Michael, 33:10-33:25, 44:3-44:8, August 12, 2014) ("Website Plans"); (Leonard, Jackson, 56:7-58:2, August 13, 2004); (Saccardi & Schiff, Inc., Site Location-Rabbinical College of Tartikov at RC_0004129); (Saccardi & Schiff, Inc., Site Layout Plan-Rabbinical College of Tartikov at RC_0004130). [Gordon Aff. ¶¶ 8, 11, 15, 28, 29, Exhibit 3, 6, 10, 23, 24].

43. According to Plaintiffs, the housing and the other buildings would be located on the campus of the Subject Property.  (SAC ¶ 68-70); (Tartikov 30(b)(6) Dep., 39:7-43:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

44. Plaintiffs contemplate initially building somewhere between 50 and 250 units of housing, which will be apartments that have 3 or 4 bedrooms, ranging in size from 1800-2000 square feet. (Tauber, Michael, 165:24-166:10, May 7, 2014); (Babad, Chaim, 102:6-102:11, 177:24-178:8, May 19, 2014). [Gordon Aff. ¶¶ 6, 14, Exhibit 1, 9].

45. The purpose of the housing included in the plans for the proposed rabbinical college is to house the families of students.  It is not contemplated that any rabbinical training will occur in the housing.  (Tartikov 30(b)(6) Dep., 26:7-26:25, 34:23-35:24, 159:23-160:6, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

46. Plaintiffs can point to no authority that it is necessary that all facilities of the proposed rabbinical college be on campus apart from vague, unspecified references to the requirements contained in the Torah.  *See generally* (Tartikov 30(b)(6) Dep., 27:2-43:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

47.  The proposed rabbinical college will require its students to be married and to live on campus, in the multi-family homes, with their families. (Tartikov 30(b)(6) Dep., 24:16-26:25, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

48. The Plaintiffs claim that this requirement is found in the Torah but failed to identify any specific sections in the Torah specifying this requirement.  *See generally* (Tartikov 30(b)(6) Dep., 25:9-30:10, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

- 10 -

49. Plaintiffs claim that living on campus is necessary so the student will have the full support of his friends, neighbors, families, wife and children in order to commit himself to the fifteen year program. (Tartikov 30(b)(6) Dep., 28:6-28:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

50. Chaim Babad testified: "Because you got to understand, the only way they can keep it is they need—it's like a two-stage thing.  I mean, the husband studies, but the wife has to agree that he should study.  Because if the wife doesn't agree, and she needs money, and she needs to go to parties, she needs to go and he has to babysit at night or whatever it is, then automatically he doesn't have the capability for the—it will take him forever.   And by the time he'll finish one, he'll forget the second one.  He'll finish the second one, he'll forget the third one.  And in order that he should be able to study and work it, his wife has to be that he doesn't have no problem with the –where to live and doesn't have no problem with –to go and to see that the neighbor's wife got a new dress and I have to match a new dress. So they'll all be like over here, and they'll have to live in this kind of a style in the next 15 years.  And this way, hopefully it will work." He continued "[s]o we came to the figure that the reason how its gonna work is that if we make a separate, complete isolated thing over there with housing, with everything.  Perhaps [in Pomona] its gonna work." (Babad, Chaim, 99:2-99:25, 125:22-126:8, May 19, 2014); *see also* (Neubeger, Sheftel, 79:1-79:19, July 23, 2014)(comparing the benefit of students living together at Princeton to the benefits of rabbinical college students living together on campus). [Gordon Aff. ¶¶ 6, 12, Exhibit 1, 7].

51. The proposed rabbinical college will pay for all tuition and housing expenses for its students. (Tartikov 30(b)(6) Dep., 65:24-67:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

52. Funding for the proposed rabbinical college will be provided by Chaim Babad.  (Tartikov 30(b)(6) Dep., 66:3-67:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

53. There are no written documents evidencing this arrangement.  (Tartikov 30(b)(6) Dep., 67:12-67:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

54. Although the sponsors of the proposed rabbinical college allege that there is a dire need for rabbinical judges within the Orthodox community, they admit that students will not study at the proposed rabbinical college unless the college commits to pay full tuition, all of their housing and other living costs, and provide education for their children. (Tartikov 30(b)(6) Dep., 61:23-61:25, May 5, 2014); (Babad, Chaim, 168:7-169:25, May 19, 2014). [Gordon Aff. ¶¶ 6, 15, Exhibit 1, 10].

### 5.   Other Rabbinical Colleges

55. Two similar rabbinical colleges exist in the immediate area, one in Monsey, Mechon L'Hoyroa, and one in Brooklyn, Kollel Beis Yechiel Mechel of Tartikov ("Tartikov of Brooklyn").  (Tartikov 30(b)(6) Dep., 43:15-44:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

56.  Both Mechon L'Horoya and Tartikov of Brooklyn train students in the four books of Shulchan Aruch, which are the same as those intended to be studied at the proposed rabbinical college. (Tartikov 30(b)(6) Dep., 43:15-46:9, 63:15-63:17, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

57. Despite the Plaintiffs' claim that there is a great need for rabbinical judges, there are only a handful of rabbinical judge students at Mechon L'Horoya, and no students currently studying

to be rabbinical judges at Tartikov of Brooklyn. (Tartikov 30(b)(6) Dep., 43:15-44:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

58. Neither Mechon L'Horoya nor Tartikov of Brooklyn offer on-campus housing for their students. (Tartikov 30(b)(6) Dep., 46:10-46:17, 62:23-63:3, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

59. Rabbinical judge students enrolled at Tartikov of Brooklyn are all married and live with their families off campus.  (Tartikov 30(b)(6) Dep., 47:2-47:13, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

60. Rabbinical judge students enrolled at Mechon L'Hoyroa are currently studying to become rabbinical judges despite the fact that they do not live on campus. (Tartikov 30(b)(6) Dep., 64:19-64:21, May 5, 2014); (Babad, Chaim, 175:6-175:12, May 19, 2014). [Gordon Aff. ¶¶ 6, 15, Exhibit 1, 10].

61. Mechon L'Horoya's facilities are housed in a single building, containing synagogues, a library and a mikveh. (Tartikov 30(b)(6) Dep., 63:4-63:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

62. Tartikov of Brooklyn does not have a synagogue on campus.  (Tartikov 30(b)(6) Dep., 46:18-46:19, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

63. Tartikov of Brooklyn does not have libraries on campus.  (Tartikov 30(b)(6) Dep., 46:20-46:21, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

64. Tartikov of Brooklyn does not have a mikveh on campus. (Tartikov 30(b)(6) Dep., 46:22-46:23, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

65. Although the proposed rabbinical college expects to start with 250 students, Plaintiffs hope that it will grow over the years and "[p]robably in the next ten years we'll probably have several thousand of them over there." (Babad, Chaim, 102:6-102:11, May 19, 2014); *see* (Tartikov 30(b)(6) Dep., 60:15-60:21, May 5, 2014). [Gordon Aff. ¶ 6, 15, Exhibit 1, 10].

66. Currently, Tartikov does not know how many students will attend the proposed rabbinical college if it constructed.  (Tartikov 30(b)(6) Dep., 62:16-62:22, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

67. Rabbi Babad, the putative dean of the proposed rabbinical college, is not aware whether any students have yet been admitted. (Babad, Mordechai, 93:24-94:11, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

## III.    LAND USE REGULATION IN THE VILLAGE OF POMONA

### 1.    History of the Village's Land Use and Development

68. The Village was formed in 1967 "[t]o fulfill the vision of a close-knit community vested in [its] rural roots." *Village of Pomona Website Home Page* (accessed January 20, 2015), available at http://www.pomonavillage.com/ ("Village Home Page"). [Gordon Aff. ¶ 30, Exhibit 25].

69. Ever since its formation almost 50 years ago, the Village has limited land use to single-family residences on one-acre zoned property, commonly known as R-40.  VILLAGE OF POMONA CODE BOOK ("VILLAGE CODE") § 130-5; Village of Pomona Master Plan Update (1997), and the Village of Pomona Development Policies Plan (1974)(cited therein) ("Village Master Plan"). [Ulman Aff. ¶¶ 14, 23, Exhibit 8, 17].

70. The Village first adopted its zoning laws, contained in Chapter 130 of the Village Code, in 1968, shortly after the Village was created, to preserve and enhance the rural residential character of the area.  VILLAGE CODE § 130-2. [Ulman Aff. ¶ 12, Exhibit 6].

71. The zoning laws reflect the Village's long-time concerted purpose and its history as a low-density residential community, providing "[w]hereas areas of commercial, industrial and high-and medium-density residential development are to be found elsewhere in Rockland County, and whereas the area embraced by the Village of Pomona conforms to the low-density concept of the outlying areas of the existing Town of Ramapo Master Plan and the Zoning Ordinances of the Towns of Haverstraw and Ramapo, therefore this chapter is intended to provide for the orderly and desirable development of the Village of Pomona and to regulate and restrict the use of land and the construction and use of buildings and accessory land improvements in the following manners:

> To preserve and enhance the rural residential character of the Village and to encourage the orderly and beneficial development of the entire Village.
>
> To prevent the overcrowding of land with persons and structures in relation to open spaces, circulation and neighboring land uses and to require adequate provision for off-street parking.
>
> To prevent the contamination of streams and ponds, to safeguard the water table and to encourage the wise use and sound management of the natural resources throughout the Village in order to preserve the integrity, stability and beauty of the community and the value of the land.
>
> To provide adequate light, air and privacy for residents, to secure safety from fire, flood and other danger and to discourage uses inimical to public health.
>
> To encourage any construction which will tend to enhance the natural, rural beauty of the area.
>
> To discourage auxiliary construction which detracts from the rural aesthetic beauty of the community.

> To facilitate such services as utilities, sewerage, parks and other public requirements.

VILLAGE CODE § 130-2. [Ulman Aff. ¶ 12, Exhibit 6].

72. This stated purpose is in keeping with the plans and resolutions of the Towns of Ramapo and Haverstraw, in which the Village is located. VILLAGE CODE § 130-2 (Purpose and Intent: "the area embraced by the Village . . . conforms to the low-density concept of the outlying areas of the existing Town of Ramapo Master Plan and the Zoning Ordinances of the Towns of Haverstraw and Ramapo . . . ."); *See also* (Rockland County Department of Planning General Municipal Law Review of the Town of Ramapo Comprehensive Plan). [Ulman Aff. ¶¶ 12, 36, Exhibit 6, 30].

73.  In 1974, a comprehensive plan for the Village of Pomona, entitled "Development Policies Plan" (otherwise known as the "The Village of Pomona Master Plan" or "1974 Plan") was prepared.  Village Master Plan, at POM0004828. [Ulman Aff. ¶ 23, Exhibit 17].

74. In 1997, an addendum to the Development Policies Plan, entitled "Village of Pomona Master Plan Update" was prepared.  Village Master Plan. [Ulman Aff. ¶ 23, Exhibit 17].

75. From 1974 to 1997, the population of the Village grew by at least 46%, and the amount of developed area in the Village increased by 42%.  Village Master Plan, at POM0004828. [Ulman Aff. ¶ 23, Exhibit 17].

76. When the Village updated its Master Plan in 1997, it called for a "policy to maintain the low-density residential character of the Village should remain unchanged. . . . Care should be taken that future development is designed so as to preserve open space and important natural features." Village Master Plan, at POM0004852. [Ulman Aff. ¶ 23, Exhibit 17].

- 16 -

2.     The Village's Current Land Use and Development

77. The entire Village, including the Subject Property, is designated as an R-40 District, which requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of single-family residences.  (SAC ¶ 88); See VILLAGE CODE § 130-5. [Ulman Aff. ¶ 14, Exhibit 8].

78. Single-family residences, public utilities rights-of-way, libraries and museums, public parks and playgrounds, and agricultural pursuits are all permitted uses as-of-right in the Village. VILLAGE CODE, § 130-9; (Village Master Plan). [Ulman Aff. ¶¶ 15, 23, Exhibit 9, 17].

79. The construction of educational institutions (with attendant dormitories), houses of worship[1] and other stated uses are permitted by special use permit, some of which are under the jurisdiction of the Board of Trustees and others under the jurisdiction of the Zoning Board of Appeals.  See VILLAGE CODE §§ 130-10, 130-11. [Ulman Aff. ¶¶ 16-17, Exhibit 10-11].

80. The Zoning Board of Appeals has authority to grant use or area variances to a property owner.  See VILLAGE CODE § 130-28(D);  New York State Village Law Section, § 7-712(b), et seq. [Ulman Aff. ¶¶ 18, 21, Exhibit 12, 15].

81. A property owner may also petition to amend the zoning law or apply for a zone change should its use not be encompassed by a special use permit or be suitable for a variance.  VILLAGE CODE §§ 130-35 - 130-45. [Ulman Aff. ¶ 19, Exhibit 13].

82. Houses of worship have been approved by the Village as special permit uses after review to minimize the adverse effects of non-residential uses on the adjacent single family residential

---

[1] Further inaccuracy and need for clarification in Village law was discovered during discovery.  Village Code § 130-9 states:  A.  All uses listed hereunder are permitted in the R-40 District, all others not listed are prohibited, except as provided in §§ 130-10 and 130-11 . . . . (2) Houses of worship, subject to the requirements of Subsection C below (Subsection C repealed).  However, Village Code § 130-10(G) lists houses of worship as a special permit use. [Ulman Aff. ¶ 43].

neighborhoods. VILLAGE CODE § 130-10(G); (Village 30(b)(6) Dep., 939:8-940:23, July 18, 2014). [Ulman Aff. ¶ 16 Exhibit 10], [Gordon Aff. ¶ 19, Exhibit 14].

83. The Ladentown Church, Hindu Temple, and Zoroastrian Temple are uses of property in Pomona that have a principally religious use. (Village 30(b)(6) Dep., 30:22-33:25, July 15, 2014). [Gordon Aff. ¶ 16, Exhibit 11].

84. The Village has opposed other high-intensity development. *Village of Pomona v. Zoning Board of Appeals of Town Haverstraw et. al*, Index No. 904/2013 (Alfieri, J.); *Village of Pomona v. Town of Haverstraw et. al*, Index No. 2205/2012) (Alfieri, J.). [Ulman Aff. ¶ 39].

### 3.   The Specific Local Laws at Issue

#### a.      Local Law 1 of 2001

85.  Local Law Number 1 of 2001, which relates to the definition, permitting and requirements for Educational Institutions, was adopted by the Board of Trustees on January 22, 2001. Village of Pomona, Board of Trustees Meeting Minutes, (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

86.  Prior to 2001, educational institutions were permitted as-of-right throughout the Village. (Village 30(b)(6) Dep., 374:18-374:21, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

87. New York case law permits and encourages educational use of land to be governed by special permit rather than as-of-right so the impact of high intensity use may be addressed by local governments.  (Village 30(b)(6) Dep., 395:21-396:6, 397:20-398:6, July 16, 2014); *Cornell University v. Bagnardi*, 510 N.Y.S 2d 861 (N.Y. 1986). [Gordon Aff. ¶ 17, Exhibit 12].

88. Local Law 1 of 2001 amended § 130-4 of the Village Code by adding the definition of "Educational Institution," which was defined as "any school or other organization or institution

conducting a regularly scheduled comprehensive curriculum of academic and/or alternative

vocational instruction similar to that furnished by kindergartens, primary or secondary schools

and operating under the Education Law of New York State, and licensed by the State of New

York." Local Law 1 of 2001, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 7, 13, Exhibit

1, 7].

89. Local Law 1 of 2001 further amended § 130-10 of the Village Code by adding provisions

to make Educational Institutions subject to special permit approval by the Board of Trustees and

site plan approval by the planning board. Local Law 1 of 2001 at § 4, *codified as* VILLAGE CODE

§ 130-10(F). [Ulman Aff. ¶¶ 7, 16, Exhibit 1, 10].

90. Local Law 1 of 2001 also added requirements and standards for granting a special use

permit for an educational institution, including minimum net lot area, maximum development

intensity, road frontage and access, setbacks and screening, parking, noise and exterior lightning,

and public water and sewer. Local Law 1 of 2001 at § 4, *codified as* VILLAGE CODE § 130-

10(F). [Ulman Aff. ¶¶ 7, 16, Exhibit 1, 10].

91. The need for Local Law 1 of 2001 was first identified by the Village's planning

consultant, Mark A. Healey, AICP ("Mr. Healey" or "the Village planning consultant") of

Frederick P. Clark Associates Inc. (Village 30(b)(6) Dep., 355:2-355:11, July 16, 2014). [Gordon

Aff. ¶ 17, Exhibit 12].

92. In December 1999, Mr. Healey reviewed the zoning provisions of the Village Code in

conjunction with an informal presentation by Yeshiva Spring Valley to the Village Planning

Board regarding its plans to build a school in the Village on the Subject Property. Memorandum,

Frederick P. Clark Associates, Inc. (January 14, 2000); <u>Memorandum</u>, Frederick P. Clark Associates, Inc. (January 24, 2000). [Ulman Aff. ¶¶ 33-34, Exhibit 27-28].

93. As a result of this review, Mr. Healey noted that the Village's standards for the development of educational institutions were inadequate and out of date.  (Village 30(b)(6) Dep., 358:15-358:17; 374:12-374:17, July 16, 2014); <u>Memorandum</u>, Frederick P. Clark Associates, Inc. (January 14, 2000). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 33, Exhibit 27].

94. On January 24, 2000, Mr. Healey issued a memorandum to the Village's then mayor and Board of Trustees, in which he stated that the standards for the development of educational institutions were inadequate and out of date. (Village 30(b)(6) Dep., 358:15-358:17; 374:12-374:17, July 16, 2014); <u>Memorandum</u>, Frederick P. Clark Associates, Inc. (January 24, 2000). [Gordon Aff. ¶ 17 Exhibit 12]; [Ulman Aff. ¶ 34, Exhibit 28].

95. The Healey memoranda to the Planning Board, Mayor, and Board of Trustees proposed a series of comprehensive and coordinated zoning amendments aimed at addressing the following issues: Modification of the lot area requirement for educational institutions; Restrictions on the maximum building coverage and maximum impervious surface coverage; Modification to the Village's off-street parking requirements for educational institutions; Modification of the zoning regulations to include signage requirements; and Amendment of the Village zoning to make educational institutions a special permit use, rather than as-of-right.
<u>Memorandum</u>, Frederick P. Clark Associates, Inc. (January 14, 2000); <u>Memorandum</u>, Frederick P. Clark Associates, Inc. (January 24, 2000). [Ulman Aff. ¶¶ 33-34, Exhibit 27-28].

96. On January 22, 2001, the Board of Trustees held a public hearing regarding proposed Local Law 1 of 2001. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

97. No one from the public spoke at the January 22, 2001 public hearing regarding proposed Local Law 1 of 2001. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

98. On January 22, 2001, the Board of Trustees adopted Local Law 1 of 2001. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

99. The law was enacted because (1) the Board of Trustees wanted to have educational institutions as special permit uses rather than as of right, and (2) to set standards to reduce the impact of non-residential use on adjacent residential neighborhoods and properties. (Village 30(b)(6) Dep., 350:14-351:2, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

100. The impact on adjacent residential neighborhoods and properties that the law sought to reduce included traffic, water runoff, water quality, noise, air pollution, destruction of wildlife and plant life, water usage, the sanitary sewer system, and community character. (Village 30(b)(6) Dep., 389:16-397:19, July 16, 2104); (Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories at ¶ 4, December 11, 2013). [Gordon Aff. ¶¶ 17, 21, Exhibit 12, 16].

101. The inadequate standards the law sought to clarify included:

  a. The five acre gross area minimum lot size was not enough to protect adjacent neighborhood and properties;

  b. The minimum setback of 125 feet gave more space between the development property and property lines;

c. Minimum frontage of 250 feet was necessary for sufficient area, particularly at the front of the property, when developing non-residential use; and

d. Clarified whether or not educational uses were to be permitted on small subdivision streets as opposed to state or county roads.

(Village 30(b)(6) Dep., 375:20-382:21, July 16, 2014).  [Gordon Aff. ¶ 17, Exhibit 12].

102.    Although Mr. Healey's suggestion to amend the Village Code with regard to the standards for schools was first voiced during a discussion related to Yeshiva Spring Valley, Yeshiva Spring Valley was never told that they would have to wait to file their application pending the adoption of a new law.  Memorandum, Frederick P. Clark Associates, Inc. (January 14, 2000); Memorandum, Frederick P. Clark Associates, Inc. (January 24, 2000); (Village 30(b)(6) Dep., 125:4-128:20, July 15, 2014). [Ulman Aff. ¶¶ 33-34, Exhibit 27-28]; [Gordon Aff. ¶ 16, Exhibit 11].

103.    The Village testified through its counsel that, had Yeshiva Spring Valley filed an application and had site plan been approved prior to January 22, 2001, the previous law, not Local Law 1 of 2001, would have applied to it.  (Village 30(b)(6), 363:14-363:23, July 16, 2014); (Fromowitz, Nathan, 49:23-56:21, June 25, 2014). [Gordon Aff. ¶¶ 9, 17, Exhibit 4, 12].

104.  However, Yeshiva Spring Valley did not file an application until sometime around June 2001, then subsequently did not submit the environmental studies required for New York State Environmental Quality Review Act ("SEQRA") determination.  The application filed in June 2001 was for a 25-lot single-family residential development and a Yeshiva, rather than the primary school and preschool Yeshiva Spring Valley had previously considered.  (Village 30(b)(6), 133:23-139:5, July 15, 2014); (Village 30(b)(6), 366:22-367:2, July 16, 2014);

Memorandum, Frederick P. Clark Associates, Inc. (January 24, 2000). [Gordon Aff. ¶ 16-17 Exhibit 11-12]; [Ulman Aff. ¶ 34, Exhibit 28].

### b.    Local Law 5 of 2004

105. Local Law Number 5 of 2004, which amended the definition of educational institutions, added provisions for dormitories, and amended minimum lot areas, frontage and access requirements and set backs, was adopted on September 27, 2004.  Village of Pomona, Board of Trustees Meeting Minutes (September 27, 2004). [Ulman Aff. ¶ 27 Exhibit 21].

106. Current Village Counsel, Doris Ulman ("Ms. Ulman" or "Village Counsel"), was appointed in July 2003. (Village 30(b)(6) Dep., 303:20-303:21, July 16, 2014).[2] [Gordon Aff. ¶ 17, Exhibit 12].

107. As newly-appointed Village Counsel, in 2003 Ms. Ulman began to review the Village laws.  She noted pre-existing laws that could be improved, or where there were deficiencies or inaccuracies in the laws and recommended amendments to the Board of Trustees.  This review resulted in the adoption of 9 local laws in 2003, 8 local laws in 2004, and 5 local laws in 2005. (Village 30(b)(6) Dep., 399:23-400:7, July 16, 2014); (Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories at ¶ 7, December 11, 2013). [Gordon Aff. ¶¶ 17, 21, Exhibit 12, 16].

108. Prior to 2004, dormitories were not permitted as accessory uses to educational institutions in the Village. (Village 30(b)(6), 404:15-404:18, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

---

[2] Ms. Ulman testified as Village of Pomona representative pursuant to FRCP 30(b)(6), Village of Pomona Board of Trustees representative pursuant to FRCP 30(b)(6), and in her personal capacity over a period of 5 days. (Village 30(b)(6) Dep., July 15, 2014, July 16, 2014, July 17, 2014, July 18, 2014, August 15, 2014). [Ulman Aff. ¶ 42].

109. Ms. Ulman examined the existing law and recommended amendments to the law that would enhance the ability of an applicant to build a school.  (Village 30(b)(6) Dep., 401:12-401:20, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

110. The amendments recommended by Ms. Ulman were aimed at addressing the following issues:

     a.     Removal of the half-acre requirement for each student so that the minimum lot area required for an educational institution is substantially reduced to 10 acres net lot area;

     b.     Addition of the provision allowing dormitories, as prior to 2004 dormitories were not permitted as accessory uses to schools in the Village of Pomona;

     c.     Clarification of the definition of "educational institution" and removal of the definition of school so that there was only one definition relating to the same use;

     d.     Removal of the requirement that an educational institution be located on a state or county road; and

     e.     Tightening and clarifying language in general.

(Village 30(b)(6) Dep., 401:21-406:9, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

111. These amendments, as well as potential revisions to the Village fence and sign law, were discussed by the Board of Trustees in the summer of 2004.  Village of Pomona, Board of Trustees Meeting Minutes (August 23, 2004). [Ulman Aff. ¶ 25, Exhibit 19].

112. On September 7, 2004, Ms. Ulman presented the Board of Trustees with a

memorandum regarding the proposed amendments to the zoning law in relation to schools.
<u>Memorandum Proposed Amendment to Zoning Law in Relation to Schools</u> (September 7, 2004);
<u>Village of Pomona, Board of Trustees Meeting Minutes</u> (September 7, 2004). [Ulman Aff. ¶¶ 26,
35, Exhibit 20, 29].

113. The memorandum proposed a series of amendments to the zoning law in relation to
schools and dormitories aimed at addressing the issues noted in Paragraph 110 (a)-107(e).
<u>Memorandum Proposed Amendment to Zoning Law in Relation to Schools</u> (September 7, 2004).
[Ulman Aff. ¶ 35, Exhibit 29].

114. On September 27, 2004, the Board of Trustees held a public hearing regarding proposed
Local Law 5 of 2004.  <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (September 27,
2004). [Ulman Aff. ¶ 27, Exhibit 21].

115. Only one Village resident spoke at the September 27, 2004 public hearing regarding
proposed Local Law 5 of 2004.  <u>Village of Pomona, Board of Trustees Meeting Minutes</u>
(September 27, 2004). [Ulman Aff. ¶ 27, Exhibit 21].

116. On September 27, 2004, the Board of Trustees adopted Local Law 5 of 2004. <u>Village of
Pomona, Board of Trustees Meeting Minutes</u> (September 27, 2004). [Ulman Aff. ¶ 27, Exhibit
21].

117. Local Law 5 of 2004 states in relevant part:  "A dormitory building is permitted as an
accessory use to an educational use provided it is located on the same lot as the educational use
and there shall be not more than one dormitory building on the lot."  Local Law 5 of 2004,
*codified as* VILLAGE CODE § 130-4(F). [Ulman Aff. ¶¶ 8, 13, Exhibit 2, 7].

118. The definition of dormitory included the provision: "Single-family, two-family and/or

multifamily dwelling units other than as described above shall not be considered to be dormitories or part of dormitories." Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 8, 13, Exhibit 2, 7].

119. Dormitories were also required to be on the same lot as the primary educational use and there could be no more than one dormitory building on the lot. Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-10. [Ulman Aff. ¶¶ 8, 16, Exhibit 2, 10].

120. The definition of dormitory contained in Local Law 5 of 2004 was modeled after the Town of Ramapo's definition and is nearly identical. (Village 30(b)(6) Dep., 301:13-301:17, 303:5-303:8, July 16, 2014); (Revised Code of the Town of Ramapo, Ch. 376). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 38, Exhibit 32].

121. It was also similar to the definition of dormitory used by the Village of Chestnut Ridge, as testified to by Village Counsel. (Village 30(b)(6) Dep., 301:19-301:20, July 16, 2014); (Chestnut Ridge Definition of Dormitory, pg. XVIII-10). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 37, Exhibit 31].

122. The definition of educational institution was also amended to require that educational institutions be "accredited by the New York State Education Department or similar recognized accrediting agency." Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 8, 13, Exhibit 2, 7].

123. The Law was enacted in part to reduce the impact of non-residential use on adjacent residential neighborhood and properties. The impact on adjacent residential neighborhood and properties that the law sought to reduce included traffic, water runoff, water quality, noise, air pollution, destruction of wildlife and plant life, water usage, the sanitary sewer system, and

community character.  Village Counsel testified "[w]e don't distinguish between one resident

and another.  The protection of all of these facilities, of all of these elements are for everybody."

(Village 30(b)(6) Dep., 389:9-397:19, July 16, 2014); (Defendants' Amended Responses to

Certain of Plaintiffs' Second Set of Interrogatories at ¶ 6, December 11, 2013). [Gordon Aff. ¶¶

17, 21, Exhibit 12, 16].

124. The dormitory portion of Local Law 5 of 2004 was enacted in response to requirements

in case law, including but not limited to *Congregation Mischknois Lavier Yakov Inc. v. Board of

Trustees of Village of Airmont*, *Diocese of Rochester v. Planning Board of the Village of

Brighton*, and *Cornell University v. Bagnardi*.  In Village Counsel's opinion, the *Village of

Airmont* case, which was filed in 2002, indicated that dormitories could not be prohibited in

relation to an educational use.  Additionally, *Bagnardi* discussed the special status afforded to

educational institutions in land use cases and set forth the factors to be considered by local

governments when reviewing applications for such uses.  (Village 30(b)(6) Dep., 430:14-435:18,

July 16, 2014); *Congregation Mischknois Lavier Yakov Inc. v. Board of Trustees of Village of

Airmont*, *7:*02-cv-05642-SCR (S.D.N.Y. filed July 19, 2002); *Cornell University v. Bagnardi*,

510 N.Y.S 2d 861 (N.Y. 1986); *Diocese of Rochester v. Planning Board of the Village of

Brighton*, 154 N.Y.S 2d 849 (N.Y. 1956). [Gordon Aff. ¶ 17, Exhibit 12].

125. Ms. Ulman's review of the aforementioned cases brought to light an issue with the pre-

existing Village Code, which required an educational institution to have a minimum net lot area

of ten acres plus a half-acre per student.  Village Counsel was of the opinion that the "per

student" requirement in the then-existing Code provision would not be permitted under *Bagnardi*

because student population is not considered to be a zoning or land use issue.  Thus, the law was

changed to comply with these case requirements. This change was important to the Village because it prevented the entire educational institution requirement from being declared unconstitutional. (Village 30(b)(6) Dep., 434:22-435:18, July 16, 2014); *Cornell University v. Bagnardi*, 510 N.Y.S 2d 861 (N.Y. 1986). [Gordon Aff. ¶ 17, Exhibit 12].

126. The accreditation portion of Local Law 5 of 2004 was added to create a distinction between an educational institution bearing the special status, required by the New York State Court of Appeals, and a commercial-type educational use, such as an automotive school which is not protected by the special status standard. Due to its residential character, the Village preferred to avoid commercial-type educational land use in Pomona. (Village 30(b)(6) Dep., 418:8-421:25, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

127. Twenty eight other municipalities in the state of New York have similar accreditation requirements. Seven municipalities specifically require that institutions of higher education be accredited. Sixteen municipalities limit education use to public and/or private accredited schools. Five zoning ordinance provisions limit such education use to accredited elementary and/or secondary schools. (*See* Green, Preston, Expert Witness Report in Congregation Rabbinical College of Tartikov, Inc. et al. v. Village of Pomona, pp. 12-16 (May 14, 2014)). [Gordon Aff. ¶ 20, Exhibit 15].

128. There were also, in the opinion of Village Counsel, inconsistencies and vagueness issues in the pre-existing Zoning Code that the Local Law sought to clarify. Village Counsel testified that the old definition of "school" required that an educational land use be approved by the New York State Board of Regents or the New York State Education Department. Conversely, the definition of "educational institution" required that it be duly licensed by the

State of New York.  The accreditation requirement replaced the previous licensing requirement and the requirement for approval by the New York State Board of Regents or New York State Education Department in an effort to make it easier and clear for applicants, as well as Village officials, to understand Zoning requirements. (Village 30(b)(6) Dep., 416:25-418:24, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

### c.      Local Law 1 of 2007

129. Local Law Number 1 of 2007, addressing errors, inconsistencies and vagueness issues in relation to previously enacted educational institution and dormitory laws, was adopted on January 22, 2007.  Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-4, 130-10; Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2007). [Ulman Aff. ¶¶ 9, 13, 16, 29, Exhibit 3, 7, 10, 23].

130. As Village Counsel, Ms. Ulman continued on a regular basis to review the Village laws and made recommendations to the Board of Trustees on amendments where she believed the laws could be improved, or where there were deficiencies or inaccuracies in pre-existing laws. (Village 30(b)(6) Dep., 399:23-400:7, July 16, 2014); Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, 4:14-4:21 (January 22, 2007). [Gordon Aff. ¶¶ 17, 22, Exhibit 12, 17].

131. With regard to Local Law 1 of 2007, Ms. Ulman examined the existing law and recommended amendments to the law. (Village 30(b)(6) Dep., 446:17-446:19, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

132. Ms. Ulman believed there were errors, as well as inconsistencies and vagueness issues, in the pre-existing Zoning Code, including:

a.  Clarification that dormitory use is an accessory use to a principal educational use;

b.  The 2001 law referenced "net lot area" requirements that had been incorrectly carried forward during the 2004 amendment as "lot area," inadvertently omitting the word "net"; and

c.  The definition of dormitory contained the language "a building that is operated by a school," whereas the definition of school had been previously deleted and replaced with "educational institution."

(Village 30(b)(6) Dep., 442:23-443:6, 444:8-445:4, 448:5-449:25, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

133.  On December 18, 2006, the Board of Trustees held a public hearing regarding proposed Local Law 1 of 2007.  Village of Pomona, Board of Trustees Meeting Minutes (December 18, 2006). [Ulman Aff. ¶ 28, Exhibit 22].

134.  At the hearing, an attorney for Tartikov, Paul Savad ("Attorney Savad"), was present and asked the Board to continue the hearing to the next Board meeting, alleging that the proposed local law had not been properly posted on the Village website.  The Board of Trustees granted Attorney Savad's request and adjourned the public hearing to the next Board meeting, to be held on January 22, 2007.  Village of Pomona, Board of Trustees Meeting Minutes (December 18, 2006). [Ulman Aff. ¶ 28, Exhibit 22].

135.  On January 9, 2007, plans for the proposed rabbinical college were leaked to the public and disseminated by a political action group, Preserve Ramapo, via its website and email distribution list.  Tartikov claims that these plans were "leaked" by "agencies" who were provided the plans by Tartikov.  The plans depicted a large housing component of the proposed rabbinical college. Religious School with 4500 Residents Planned for Pomona, January 9, 2007;

(Castelluccio, Michael, 33:10-33:25, 44:3-44:8, August 12, 2014)("Website Plans"); (Tartikov

30(b)(6) Dep., 111:1-112:25, May 5, 2014). [Gordon Aff. ¶¶ 8, 15, 29, Exhibit 3, 10, 24].

136. The leaked plans the same conceptual site plans prepared by Tartikov's engineer and

planner, Leonard Jackson Associates, in 2004 but were reduced in size and with the buildings

colored in. *Supra* ¶ 22; (Leonard, Jackson, 56:7-58:2, 74:10-74:25, August 13, 2004); (Saccardi

& Schiff, Inc., Site Location-Rabbinical College of Tartikov at RC_0004129); (Saccardi &

Schiff, Inc., Site Layout Plan-Rabbinical College of Tartikov at RC_0004130); (Website Plans).

[Gordon Aff. ¶¶ 11, 28-29, Exhibit 6, 23-24].

137. On January 14, 2007, an article appeared in the local newspaper, the Rockland Journal

News, stating that the property would bring 4,500 or more people to Pomona.  In the article,

Attorney Savad stated, among other things, that  "nothing they do will stop our project."  (Walsh,

James, Rural Setting Could Change in Pomona, (Rockland Journal News January 14, 2007)).

[Gordon Aff. ¶ 27, Exhibit 22].

138. On January 22, 2007, the Board of Trustees continued the public hearing regarding

proposed Local Law 1 of 2007.  Transcript on Public Hearings on Local Law Amendment:

Dormitories (Continued), Local Law Amendment: Wetlands, (January 22, 2007). [Gordon Aff. ¶

22, Exhibit 17].

139. The January 22, 2007 public hearing regarding proposed Local Law 1 of 2007 was

attended by many members of the public, whose comments addressed the high density housing

reported in the Journal News article of January 12, 2007, rather than addressing the proposed

local law that was being considered by the Board of Trustees.  At the public hearing, the then-

mayor urged the attendees not to discuss the housing project reported by the Journal News, since

it was not before the Board, and to limit their remarks to the proposed local law that was at issue. Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, 2:5-3:22, 10:16-10:20, 13:10-14:2, 19:16-19:5, 24:3-24:12, 24:20-25:12, 30:18-31:1, 70:17-71:4 (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

140.   Despite the admonition by the then-mayor stated in Paragraph 139, most of the comments from the public were aimed at the plans for the proposed rabbinical college, which had been leaked to the public just thirteen days prior.  *See generally* Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, (January 22, 2007); *see also* (Walsh, James, Rural Setting Could Change in Pomona, (Rockland Journal News January 14, 2007)); (Website Plans). [Gordon Aff. ¶¶ 22, 27, 29, Exhibit 17, 22, 24].

141.   Although they had never previously done so, Tartikov or its representatives had a videographer videotape and a court reporter transcribe this Village public hearing.  Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17]; [Ulman Aff. ¶ 41].

142.   On January 22, 2007, the Board of Trustees adopted Local Law 1 of 2007.  Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

143.   Local Law 1 of 2007 states in relevant part:  "A dormitory building shall not occupy more than 20% of the total square footage of all buildings on the lot."  Local Law 1 of 2007, *codified as* Village Code § 130-10(F). [Ulman Aff. ¶¶ 9, 16, Exhibit 3, 10].

144. The word "net" was also added as to the minimum net lot area standards required of an educational institution. Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-10(F). [Ulman Aff. ¶¶ 9, 16, Exhibit 3, 10].

145. Additionally, the definition of dormitory was also readopted with the words "educational institution" replacing the word "school" and adding "as accessory to a principal use." Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 9, 13, Exhibit 3, 7].

146. Local Law 1 of 2007 was enacted to fix errors and clarify inconsistencies and vagueness in the pre-existing laws. (Village 30(b)(6) Dep., 459:5-459:24, July 16, 2014); Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, 4:11-4:25, 13:25-14:2, 24:20-25:3, 27:23-28:11, 31:21-32:1, 53:8-53:9 (January 22, 2007). [Gordon Aff. ¶¶ 17, 22, Exhibit 12, 17].

### d.   Local Law 5 of 2007

147. Local Law Number 5 of 2007, enacting a wetlands protection law for the Village, was adopted on April 23, 2007.  Local Law 5 of 2007, *codified as* VILLAGE CODE § 126-3; Village of Pomona, Board of Trustees Meeting Minutes (April 23, 2007). [Ulman Aff. ¶¶ 10-11, Exhibit 4-5].

148. Since the 1990s, the Village had discussed enacting a wetlands protection law. (Village 30(b)(6) Dep., 463:23-464:24, July 16, 2014).  [Gordon Aff. ¶ 17, Exhibit 12].

149. Events of the 21st century underscored the critical need to control and protect wetlands. Hurricanes Floyd and Irene and Super Storm Sandy both particularly affected the Village of

Pomona, including flooding conditions and resulting damage. (Village 30(b)(6) Dep., 464:5-464:24, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

150. Through various discussions, the Board of Trustees proposed a series of comprehensive and coordinated environmental amendments aimed at addressing the following issues:

        a.      Protection of plant life and wildlife;

        b.      Protection against flooding;

        c.      Protection of a natural filtration system to reduce pollutants into streams and rivers, and ultimately into the water supply; and

        d.      Protection of wetlands to ensure they are not destroyed.

(Village 30(b)(6) Dep., 565:9-565:18; 579:12-579:18, July 17, 2014); (Village 30(b)(6) Dep., 847:3-847:10, July 18, 2014). [Gordon Aff. ¶¶ 18-19, Exhibit 13-14].

151. Before drafting the wetlands protection law, Ms. Ulman reviewed the wetlands laws of the villages of Chestnut Ridge, New Hempstead, and South Nyack. Ms. Ulman also reviewed the New York State Environmental Conservation Law. (Village 30(b)(6) Dep., 470:16-472:13, July 16, 2014); (New York State Environmental Conservation Law §§ 24-0103, 24-0105, 24-0107, 24-0701). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 22, Exhibit 16].

152. On January 22, 2007, the Board of Trustees held a public hearing regarding proposed Local Law 5 of 2007. Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

153. At the hearing, it was noted that the Board of Trustees had not yet received a response from Rockland County Planning Department on proposed Local Law 5 of 2007. Thus, the Board of Trustees voted to extend the public hearing to February 26, 2007. Transcript on Public

<u>Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment:</u>
<u>Wetlands</u> (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

154. On February 26, 2007, the Board of Trustees continued the public hearing regarding proposed Local Law 5 of 2007. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (February 26, 2007). [Ulman Aff. ¶ 30, Exhibit 24].

155. The February 26, 2007 public hearing regarding proposed Local Law 5 of 2007 was attended by Attorney Susan Cooper ("Attorney Cooper"), counsel for Tartikov. Attorney Cooper requested that the public have further opportunity to later comment on any new proposals put forth as to Local Law 5 of 2007. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (February 26, 2007). [Ulman Aff. ¶ 30, Exhibit 24].

156. In response to Attorney Cooper's request, and on advice of Village Counsel, the Board of Trustees voted to extend the public hearing to March 26, 2007. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (February 26, 2007). [Ulman Aff. ¶ 30, Exhibit 24].

157. On March 26, 2007, the Board of Trustees continued the public hearing regarding proposed Local Law 5 of 2007. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (March 26, 2007). [Ulman Aff. ¶ 31, Exhibit 25].

158. On April 23, 2007, the Board of Trustees adopted Local Law 5 of 2007. <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (April 23, 2007). [Ulman Aff. ¶ 32, Exhibit 26].

159. Local Law 5 of 2007 states, in pertinent part, that: "(A) Except as provided in § 126-4 below, it shall be unlawful to conduct, directly or indirectly, any of the following activities upon any wetland, water body or watercourse or within 100 feet of the boundary of any wetland, water

body or watercourse unless a permit is issued therefor by the Board of Trustees or the Planning Board, as the case may be.

> (1) Any form of draining, dredging, excavation or removal of material, except removal of debris or refuse.
>
> (2) Any form of depositing of any material such as but not limited to soil, rock, debris, concrete, garbage, chemicals, etc.
>
> (3) Erecting any building or structure of any kind, roads, driveways, the driving of pilings or placing of any other obstructions, whether or not they change the ebb and flow of water. The definitions of the words "building" and "structure" shall be defined in the Zoning Law of the Village of Pomona.
>
> (4) Installing a septic tank, running a sewer outfall, discharging sewage treatment effluent or other liquid waste into or so as to drain into any wetland, water body or watercourse.
>
> (5) Any other activity which substantially impairs any of the several functions served by wetlands, water bodies and watercourses or the benefits derived therefrom as set forth herein."

Local Law 5 of 2007, *codified as* VILLAGE CODE § 126-3. [Ulman Aff. ¶¶ 10-11, Exhibit 4-5].

160. Local Law 5 of 2007 further provided that "The aforesaid one-hundred-foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences." Local Law 5 of 2007, *codified as* VILLAGE CODE § 126-3. [Ulman Aff. ¶¶ 10-11, Exhibit 4-5].

161. The law was enacted because the Board of Trustees was concerned about wetlands in the Village that were not regulated by the state or the federal government.  The 100 foot buffer requirement in the Village Wetlands Law was taken from the New York State Environmental Conservation Law, which requires a permit from the New York State Department of Environmental Conservation ("DEC"), for any proposed disturbance of land within 100 feet of any DEC-regulated wetlands. (Village 30(b)(6) Dep., 461:2-461:17, July 16, 2014); (New York State Environmental Conservation Law §§ 24-0103, 24-0105, 24-0107, 24-0701). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶¶ 22, Exhibit 16].

162. The law was also enacted because the Board of Trustees sought to protect the health, safety, and welfare of all of the residents of the Village. (Village 30(b)(6) Dep., 565:9-565:18; 579:9-579:18; 581:5-582:8, July 17, 2014). [Gordon Aff. ¶ 18, Exhibit 13].

163. The health, safety, and welfare of the residents of the Village was protected through the law by preserving plant life and wildlife, reducing pollution, protecting the wetlands as a natural filtration system and thus the Village water supply, and preserving community character and quality of life. (Village 30(b)(6) Dep., 565:9-565:18; 579:7-579:18; 581:5-582:7, July 17, 2014); (Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories at ¶ 16, December 11, 2013). [Gordon Aff. ¶¶ 18, 21, Exhibit 13, 16].

164. The Plaintiffs filed the instant lawsuit approximately three months after enactment of Local Law 5 of 2007.  Chaim Babad testified:  "Make sure you win the case.  If not, you're gonna pay a lot."  (Babad, Chaim, 153:5-153:7 May 19, 2014); (*See* Complaint, July 10, 2007). [Gordon Aff. ¶ 6, Exhibit 1].

Dated: January 22, 2015

DEFENDANTS

VILLAGE OF POMONA, NY; BOARD
OF TRUSTEES OF THE VILLAGE OF
POMONA, NY; NICHOLAS
SANDERSON AS MAYOR; IAN
BANKS AS TRUSTEE AND IN HIS
OFFICIAL CAPACITY; ALMA
SANDERS ROMAN AS TRUSTEE
AND IN HER OFFICIAL CAPACITY,
RITA LOUIE AS TRUSTEE AND IN
HER OFFICIAL CAPACITY; AND
BRETT YAGEL AS TRUSTEE IN HIS
OFFICIAL CAPACITY

By____*/s/ Marci A. Hamilton*_____
    Marci A. Hamilton (*pro hac vice*)
    36 Timber Knoll Drive
    Washington Crossing, PA 18977
    Tel. No.: (215) 353-8984
    Fax No.: (215) 493-1094
    hamilton.marci@gmail.com

    John F. X. Peloso, Jr. (JP6110)
    Andrea Donovan Napp (AN1978)
    Amanda E. Gordon (*pro hac vice*)
    Robinson & Cole LLP
    1055 Washington Blvd.
    Stamford, CT 06901
    Tel. No.  (203) 462-7503
    Fax. No.  (203 462-7599
    jpeloso@rc.com
    anapp@rc.com
    agordon@rc.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing though the Court's CM/ECF System.

*/s/ Andrea Donovan Napp*
Andrea Donovan Napp