**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------

CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., *et al.,*

                                        Plaintiffs,

            -against-                                        **07 Civ. 6304 (KMK) (GAY)**

VILLAGE OF POMONA, NY; *et al.*,

                                        Defendants.
--------------------------------------------------------------------

**DECLARATION OF ALAN C. WEINSTEIN**

Alan C. Weinstein declares as follows, pursuant to 28 U.S.C. § 1746:

1.      I make this declaration on behalf of the Plaintiff Congregation Rabbinical College of
Tartikov, Inc. to support my opinion that the zoning provisions of the Village of Pomona's
Code regulating educational institutions described below (1) prohibit the Plaintiff's use;
(2) are unreasonable and not justified from a land planning perspective; and (3) do not
promote the interests asserted by the Village.  Additionally, (4) the challenged restrictions
treat educational institutions in general, and specific types of educational institutions in
particular, differently and worse than other institutional land uses without justification.
Finally, (5) a Rabbinical College as proposed by the Plaintiff can be developed in the
Village without creating unacceptable impacts to the Village's community character.

2.      I hold degrees in city planning (M.C.P. from the Massachusetts Institute of Technology)
and law (J.D. from the University of California, Berkeley) and am a Full Professor, with
tenure, in both the College of Urban Affairs and the College of Law at Cleveland State
University.

1

3.      I have taught graduate level courses in Land Use Planning and Land Use Planning Law for over 30 years in city planning Masters degree programs accredited by the Planning Accreditation Board, and taught Land Use Planning Law for over 30 years in law schools accredited by the Association of American Law Schools and/or the American Bar Association.

4.      I have substantial experience in local planning and zoning issues. I have worked as a consultant to government and private entities on planning, zoning and development issues for over 30 years, including, but not limited to: the formulation of general plans, zoning ordinances, subdivision regulations and unified development ordinances; the formulation of specific district plans and implementing ordinances; the formulation of specific policy plans and implementing legislation; and the application of planning and zoning legislation and regulations both to existing and proposed land uses.

5.      I have conducted research and published articles and treatise chapters dealing with these issues and have spoken regularly as an expert on these issues at legal and planning conferences.

6.      I have provided expert witness consultation and expert witness reports in RLUIPA litigation brought against local governments by private parties, the United States Department of Justice and the United States Attorney for the Southern District of New York.

7.      Attached as **Exhibit A** is a true and correct copy of my curriculum vitae.

I.      <u>**THE CHALLENGED CODE PROVISIONS PROHIBIT THE RABBINICAL COLLEGE USE.**</u>

8.      The use of the term "Rabbinical College" herein refers to that land use proposed to be developed by the Plaintiff Congregation Rabbinical College of Tartikov, Inc., on its

property within the Village of Pomona, but which is prohibited by the Village's land use regulations for the various reasons described below.  While no specific site plan or special permit application has been filed for such use (as it is prohibited), any such use will have certain characteristics, namely that it will be an unaccredited educational institution, and that it will seek to provide family housing with housekeeping facilities for its student body.

<u>Accreditation provision</u>

9. Reviewing Chapter 130 – Zoning of the Village of Pomona Code, it is clear that the proposed Rabbinical College, which I understand from the Plaintiffs in this litigation cannot be accredited, is totally excluded from the Village of Pomona's jurisdiction.

10. Section § 130-9 A of the Code states: "All uses listed hereunder are permitted in the R-40 District; <u>all others not listed are prohibited</u>, except as provided in §§ 130-10 and 130-11." Educational institutions are not among the uses "listed hereunder" in § 130-9 A, but § 130-10 F states that "Educational institutions as defined in § 130-4" are allowed "subject to special permit approval by the Village Board of Trustees and site plan approval by the Planning Board." "Educational Institution" is defined in § 130-4 as "Any private or religious elementary, junior high or high school, college, graduate or post-graduate school . . . accredited by the New York State Education Department or similar recognized accrediting agency." Because an unaccredited Rabbinical College does not meet the definition of Educational Institution in §130-4, it cannot qualify to be permitted under § 130-10 as an exception to the prohibition on uses not "listed hereunder" in § 130-9 A. Accordingly, an unaccredited Rabbinical College is totally excluded from the Village of Pomona's jurisdiction.

<u>Definition of dormitory to exclude family housing</u>

11.     It is also clear that the proposed Rabbinical College, which would include housing for students and their families, is totally excluded from the Village of Pomona's jurisdiction for this separate reason as well.

12.     The definition of "Dormitory" in § 130-4, when construed with other definitions in § 130-4, would result in the proposed Rabbinical College being totally excluded from the Village of Pomona's jurisdiction.  Section 130-4 ("Dormitory") provides that "Dormitory rooms shall not contain separate cooking, dining or housekeeping facilities except that one dwelling unit with completed housekeeping facilities may be provided for use of a superintendent or supervisory staff for every 50 dormitory rooms." It also provides: "Single-family, two-family and/or multifamily dwelling units other than as described above shall not be considered to be dormitories or part of dormitories."

13.     When these provisions are construed with § 130-4 ("Dwelling Unit"), which provides: "A building or portion thereof providing complete housekeeping facilities for one family, including independent cooking, sanitary and sleeping facilities, and physically separate from any other dwelling unit whether or not in the same building," and § 130-4 ("Family"), which provides: "Any number of individuals related by blood, marriage or adoption, or not more than four persons who are not so related, living together as a single housekeeping unit, using rooms and housekeeping facilities in common and having such meals as they may eat at home generally prepared and eaten together)," neither a "family," as defined by the Village of Pomona, nor "Single-family, two-family and/or multifamily dwelling units," as defined by the Village, is permitted in a "dormitory," as defined by the Village.

14. Moreover, the definition of "Dormitory" also states that it is "[a] building that is operated by an educational institution . . . which contains private or semiprivate rooms which open

to a common hallway, which rooms are sleeping quarters for <u>administrative staff, faculty or students</u>."  Code § 130-4.  Family members are thus not permitted.

15.  In neither my professional planning practice nor my planning-related teaching and research have I previously seen such an outright prohibition on the provision of dormitory housing for families.

<u>Definition of dormitory to exclude housekeeping facilities</u>

16.  Providing only for "common dining" facilities would also preclude family student housing opportunities, and thus prohibit Tartikov's proposed Rabbinical College.

17.  Designing and building student housing to include cooking and housekeeping facilities is not merely appropriate, but necessary to meet the requirements of married students with families who will be in-residence for a number of years.

18.  Common dining facilities would make longer-term residence at an educational institution impractical because it would preclude an essential element of familial life: taking meals together in private as a family so that the family is free to make its own choices as to timing of meals, diet, disciplining children, etc.

19.  It is extremely common for educational institutions offering post-baccalaureate degree programs to provide housing options for married students, and particularly for married students with children, that include separate cooking, dining and housekeeping facilities. An example of such apartment-like housing can be seen in the attached floor plans (see below) from the educational institution where I am a faculty member, Cleveland State University.



## Three Bedrooms Three Bathrooms

Renderings are an artist's conception and are intended only as a general reference.
Features, materials, finishes, and layout may vary by individual apartment home.



20.     In neither my professional planning practice nor my planning-related teaching and research

have I previously seen such an outright prohibition on the provision of housing for married

6

students and married students with children.

<u>20% restriction on dormitories</u>

21.   Under § 130-10 F-12 of the Pomona Code, "[a] dormitory building is permitted as an accessory use to an educational institution," but "shall not occupy more than 20% of the total square footage of all buildings on the lot."

22.   In neither my professional planning practice nor my planning-related teaching and research have I previously seen any numerically expressed limitation on the extent to which dormitory buildings could be associated with an educational institution.  More specifically, I have never seen a limitation on dormitory buildings associated with an educational institution expressed as a percentage of the total square footage of all buildings.

23.   As a general matter, such a percentage limitation on student housing can be expected to have varying effects on the total number of students who could be enrolled in an educational institution depending on the location and type of the educational institution.

24.   As regards to the <u>location</u> of the educational institution as a variable, a percentage limitation on student housing will have far greater effect on the total number of students who could be enrolled in an educational institution located where there are not ample opportunities for affordable student housing near the campus (such as Pomona) or where a significant number of students prefer not commute because the campus is distant from areas where housing is available.  In such educational institutions, more or all students require on-campus housing and therefore the effect of a percentage limitation of student housing on the total number of students who could be enrolled in an educational institution is heightened.

25.   As regards to the <u>type</u> of educational institution as a variable, a percentage limitation on

7

student housing will have far greater effect on the total number of students who could be enrolled in an educational institution that offers instruction in a single discipline which requires only limited instructional facilities (*i.e.,* less square footage) as compared to an educational institution that offers a broad range of disciplines which require extensive instructional facilities (*i.e.,* more square footage).

26.    The general effect of such a percentage limitation on religious college housing will be to limit the total number of students who could be enrolled in the religious college.

27.    The 20% limitation in the Village of Pomona Code §130-10(F)(12) will effectively preclude Tartikov's ability to construct and operate the Rabbinical College with housing for students anywhere within the Village.

28.    The 20% limitation on dormitories has this preclusive effect because the Rabbinical College will differ from most secular institutions of higher education in two aspects that, combined, make the 20% dormitory restriction uniquely limiting.

29.    First, the Rabbinical College's focused curriculum and mode of instruction would require far fewer instructional and auxiliary buildings, and thus far less square footage, than is typically found on the campuses of secular institutions of higher education.  Based on information I received from Michael Tauber, an Officer of Congregation Rabbinical College of Tartikov, Inc., the Rabbinical College will require facilities to support its instructional program totaling approximately 30,000 square feet. This figure would include space for a main "study-room," classrooms, libraries, Rabbinical Beth-Din courtrooms, and a Mikveh (ritual bath).

30.    As opposed to secular educational institutions, the Rabbinical College would have no plans or need for facilities to accommodate: laboratories for the physical, biological or social

8

sciences; studios for the creative and performing arts; multiple libraries, media centers and computer centers to serve a broad range of subject-matters; theater-like venues for educational or entertainment events; athletic facilities to accommodate students' recreational needs as well as intra-collegiate and intercollegiate sports (*e.g*., swimming pools, tennis and basketball courts, baseball and softball fields, track and field-facilities, gymnasia, arenas and stadia); and offices to accommodate faculty, administrators, and support staff across a broad range of disciplines.

31.     Because the square footage of the instructional and associated facilities required to support the Rabbinical College's educational program (*e.g.,* 30,000 s.f.) would be so limited, the "square foot denominator" of the fraction that defines the 20% limitation on dormitories is much lower than for secular institutions of higher education. This means that the "square foot numerator" will also be much lower than for secular institutions of higher education and thus the limiting effect of the 20% dormitory restriction will be far more severe for the Rabbinical College than for secular institutions of higher education.

32.     Second, the length of the Rabbinical College's program of instruction, combined with the mode of instruction and the familial status of its student body, would create a need for significantly more residential living space than would be needed for most, if not all, secular institutions of higher education with a comparable enrollment.

33.     Even students at mainstream universities usually spend no more than one or two years in a "traditional" dormitory room[1] before moving on to larger accommodations in a

---

[1] For a guide to "traditional" dormitory design, *see*: "College and University Residence Hall Guidelines, 5th ed." (2009), published by Dormitory Authority, State of New York. Available at. http://www.dasny.org/construc/College%20and%20University%20Residence%20Hall%20Design%20Guidelines.pdf.

fraternity/sorority house, apartment-like university housing[2] (some of which is designated for graduate students or students with families) or off-campus housing. Except for the fraternity/sorority house, such housing will usually have cooking facilities in the individual units. In short, even in mainstream universities, graduate students – let alone married graduate students, many with children – do not live in traditional small dormitory rooms.

34.     In the case of the Rabbinical College's students, this is even more true because of the length of the program of instruction, which I understand to be up to approximately 15 years.

35.     Because of the mode of instruction planned at the Rabbinical College, which would feature extremely long hours and an emphasis on student-to-student intellectual interaction outside of formal classes, off-campus housing would not be a reasonable option for the students.

36.     Because larger housing accommodations—rather than "traditional" dormitory rooms— would be the only reasonable option for the students of the Rabbinical College (because they would be married with children), the number of units that would comprise the "square footage numerator" of the fraction that would determine the effect of the 20% limitation will be lower than for secular institutions of higher education. This means that the limiting effect of the 20% dormitory restriction would be far more severe for the Rabbinical College than for secular institutions of higher education.

37.     For the reasons stated above, the "square foot denominator" for the 20% limitation will be much lower than for secular institutions of higher education, while the number of units that

---

[2] Numerous publications document the demand for, and educational institutions' construction of, such apartment-like on-campus housing facilities. *See, e.g.*, Paul Abramson, "There's No Place Like Home: Residence Halls are Evolving from Sleeping Spaces to Fully Furnished Homes Away from Home for Students," College Planning & Management, (June 2012) pp. 2-8. Available at: http://collegeplanning.epubxp.com/i/74667/23; Herman Miller, Inc., "Room and Board Redefined: Trends in Residence Halls" (2007). Available at: http://www.hermanmiller.com/content/dam/hermanmiller/documents/research_summaries/wp_Room_and_Board.pdf.

comprise the "square foot numerator" for the 20% limitation will also be much lower than for secular institutions of higher education. Thus, the limiting effect of the 20% dormitory restriction on the Rabbinical College would be extremely severe.

38.  As an illustration, the following numerical analysis uses data provided to me by Michael Tauber.

39.  Mr. Tauber informed me that the non-residential instructional facilities at the Rabbinical College would occupy approximately 30,000 s.f.

40.  Applying the 20% limit to this denominator means that the maximum square footage for residential facilities would be 6,000 s.f.

41.  Mr. Tauber also informed me that the anticipated average age of students entering the Rabbinical College would be 25-27, all or almost all such students would be married, and all or almost all of these married students would have children.

42.  To provide residential units that would do no more than meet the minimum occupancy standards required by the Property Maintenance Code of New York, a three-bedroom residential unit with a living-room, dining room and kitchen would require 460 s.f. merely to accommodate the dwelling-area for these rooms exclusive of entryways, hallways, bathrooms, and storage space; the actual square footage for such a unit would, at absolute minimum, require approximately 700 s.f.[3]

43.  Similarly, a four-bedroom residential unit with a living-room, dining-room and kitchen would require 590 s.f. merely to accommodate the dwelling-area for these rooms exclusive of entryways, hallways, bathrooms, and storage space; the actual square footage for such a

_____

[3] The square footage requirements in the Property Maintenance Code are very small. For example, 70 s.f. is the minimum acceptable size for a single-occupant bedroom (*e.g.*, 7' x 10').

unit would, at absolute minimum, require 900 s.f.

44.    Based on these figures, no more than six to eight in-residence students could enroll in the Rabbinical College developed on a lot of at least ten acres that was restricted by the limitation on dormitory space in the Pomona Village Code.

45.    Furthermore, educational institutions in more urban areas will generally not seek to provide as much on-campus housing as educational institutions in suburban or rural areas since urban areas typically provide an ample array of off-campus housing in relative proximity to the campus.

46.    For educational institutions in suburban or rural areas, off-campus housing in relative proximity to the campus is far less available and often restricted to single-family housing.

47.    Students normally cannot afford to rent single-family homes. Communities often seek to discourage or prohibit such arrangements because they want single-family residential neighborhoods to be predominantly owner-occupied residences rather than absentee-owner rentals to students.

## II.    STUDENT HOUSING DOES NOT CONVERT THE PRINCIPAL USE OF AN EDUCATIONAL INSTITUTION.

48.    The Village justifies its restriction on dormitories to just 20% of the square footage of an educational institution by stating that such restriction is necessary to prevent the accessory student housing use from becoming the "principal use."

49.    While there is a significant zoning and land planning interest in ensuring that an accessory use does not become a principal use, there is no such threat with respect to dormitories that justifies the 20% restriction on dormitory square footage required by the Village's Code.

50.    Characterizing student residential facilities as somehow a separate accessory use and other

facilities as the principal educational use is incorrect.  An accessory use is one that is subordinate and incidental to the primary use. Code § 130-4 ("Use, Accessory").

51.    In the case of an institution of higher education, however, the residential experience itself can be central to the educational enterprise, rather than subordinate and incidental.

52.    Students being resident on-campus helps to effectively integrate learning and social development by providing students the opportunity to form an identity or a sense of community with the institution.

53.    Specifically as regard to Tartikov's Rabbinical College, characterizing residential facilities as an accessory use would be even more questionable in light of the educational goals served by having students resident on campus because the residential use is an integral part of the religious instructional program.

54.    The Zoning Code defines  "use," "accessory use," and "principal use" as follows: "USE: The specific purpose for which land, water, a building or a structure is designed, arranged, intended or for which it is or may be occupied or maintained.  USE, ACCESSORY: A use which is customarily incidental and subordinate to the principal permitted use on the lot and located on the same lot therewith, except that where specifically provided, accessory off-street parking need not be located on the same lot. An 'accessory use' may not be accessory to another 'accessory use.'  USE, PRINCIPAL: The main use of a structure or lot."  Code § 130-4.

55.    Even if a dormitory is viewed as an accessory use to an educational institution, there is no risk that it will effectively become the principal use if the 20% limitation would not apply. Dormitories of any size that house students enrolled in a legitimate program of educational instruction would still be <u>subordinate</u> and <u>incidental</u> to the principal use of the property as

an educational institution.  In fact, Mr. Voorhis, the Village's own planning expert, has acknowledged that an educational institution could have more than 20% of its total floor area devoted to dormitories and would still be an educational institution.

56.   Additionally, no such requirement is necessary to ensure that the principal use does not change.  To ensure that "Educational Institution" remains the primary use, the Village Code could require that educational institutions are not permitted to have persons occupying dormitories other than bona fide students engaged in a program of study offered by the educational institution, along with their spouses, and their children under the age of maturity.

57.   In neither my professional planning practice nor my planning-related teaching and research have I previously seen any code provision limiting student housing to 20% or any other percentage of square footage of an educational institution.

58.   The 20% limitation is a wholly arbitrary limit that fails to differentiate among types of educational institutions and thus, in an effort to exclude "housing," can actually exclude educational institutions.

59.   Even where more than 50% of total area is devoted to an accessory use, that accessory use does not by definition become the principal use. For example, the fact that more than 50% of the total area of a shopping center, or a mass-transit facility, or a sports/entertainment facility is devoted to parking facilities does not mean that the principal use has become a parking lot rather than a shopping center, mass-transit facility, or sports/entertainment facility. Similarly, even if more than 50% of a residential lot is devoted to various accessory uses the principal use remains a single-family home. For example, the Village of Pomona Zoning Code would permit, as accessory uses to a single-family home, a tennis court, a

swimming-pool, and a home occupation that comprises 25% of a residential structure. In combination, these accessory uses could easily constitute more than 50% of the total buildable area of a residential lot.

60.     In the example described above, I have no doubt that the Village of Pomona would still consider the principal use of the lot to be a single-family home.

### III.     THE CHALLENGED ZONING CODE PROVISIONS ARE NOT NECESSARY TO PROTECT THE VILLAGE'S INTEREST IN ITS "COMMUNITY CHARACTER"

#### A.     "Community Character" is not an issue of public health and safety.

61.     "Community character" normally refers to the various attributes and assets that make a community unique, and that establish a sense of place for its residents. It does not have a direct association with the public health and safety. For example, a given community might seek to maintain a rural community character by prohibiting sidewalks and street-lighting. Such prohibitions could not be justified on the basis of public health and safety (and in fact could be contrary to it).

62.     The Village, prior to passing the laws regulating educational institutions in 2001, 2004 and 2007, did not conduct any studies or prepare any reports that evaluated the possible effect of an educational institution on maintaining community character.

63.     The Village has previously addressed concerns about maintaining community character by using its site plan review process. For example, this occurred in 2004 when granting a use variance permitting the establishment of an animal hospital despite the fact that it was a commercial use prohibited by the Zoning Code and thus clearly in conflict with maintaining the non-commercial character of the community.

B.    <u>The challenged regulations do not "directly" address the asserted interest of protecting the Village's community character.</u>

*Accreditation requirement*

64.    The requirement that educational institutions be accredited is not directly related to protecting the issue of community character.

65.    From a planning perspective, an accredited educational institution would, as a general matter, have just as much of an effect on community character as a comparable unaccredited educational institution.  Thus, for example, there would be no difference between an accredited Rabbinical College and an unaccredited Rabbinical College as regards effect on community character.

66.    In my experience, relatively few jurisdictions' local zoning ordinances discuss accreditation at all with respect to educational institutions, and none do so to the complete exclusion of unaccredited, trade or vocational schools from the jurisdiction.

67.    Such a requirement does not appear in the leading publication providing model definitions for zoning.  In "A Planners Dictionary," Michael Davidson & Fay Dolnick, eds., American Planning Association PAS Report Number 521/522 (2004), of the four examples defining "educational facilities, college/university," none contains an "accreditation" requirement and only one – for Champaign, Illinois – refers to "An educational institution authorized by the state to award . . . degrees."

68.    I also examined codified ordinances in the 530 local governments on the New York eCode360 Library website,[4] which showed that in addition to the Village of Pomona, only

---

[4] http://www.generalcode.com/ecode360/NY.

five other jurisdictions (0.94%) had an accreditation provision.  These jurisdictions are : Town of Colonie, Albany County; Town of Dickinson, Broome County; Town of Haverstraw, Rockland County; Village of Newark, Wayne County; and Town of Plattekill, Ulster County.

69.    However, none of these completely exclude non-accredited education activity from its jurisdiction.

70.    The Plattekill Code § 110-6 provides:  "Elementary and secondary schools and institutions of higher learning duly licensed by the State of New York, attendance at which fulfills the compulsory education requirements of the state or leads to the granting of diplomas from accredited educational institutions recognized by the State of New York."

71.    However, the Plattekill Code in § 110-6 also defines "Instructional Use" as "An institution or organization not necessarily licensed or accredited as a school by the State of New York, which provides for the teaching of any skill or body of knowledge independent of a general curriculum of studies" and allows an "Instructional Use" as a permitted Special Use in the RR-1.5 Rural Residential District, BD-40 Business District, and BD-60 Light Business District. Plattekill Code § 110 – Attachment 1 Schedule of District Regulations.

72.    The Village of Newark Code explicitly exempts "commercially operated schools of beauty culture, dancing, driving, music and similar establishments" from any accreditation requirement (Newark Code § 170-3) and permits such schools in both the B-1 Neighborhood Business District and the B-2 General Business District.  Newark Code §§ 170-18 (1) and 170-20 (1).

73.    The Town of Dickinson Code recently adopted new "legislation . . . establishing a reasonably drawn special permit requirement for applications seeking to establish or

expand religious or educational uses in the Town, to be implemented by the Town Zoning Board of Appeals." It specifically recognizes that "that systematic exclusion of religious or educational institutions from a zoning district is beyond the power of any municipality," and permits religious and educational uses through a special permit scheme that recognizes that although "appropriate restrictions may be imposed in the form of conditions to be attached to the grant of a special exception permit limiting either the extent of the religious or educational use itself or the nature and/or extent of its proposed accessory uses, . . . such conditions shall be reasonably drawn to counteract the deleterious effects on the public's welfare, but not, by their cost, magnitude or volume, to operate indirectly to <u>exclude the religious or educational use altogether</u>." Dickerson Code § 600-15(I) (emphasis added). Additionally, Dickerson requires that an "Educational Use" be accredited if it is a principal use, but does not appear to impose an accreditation requirement on educational uses that are accessory uses. Dickinson Code § 600-2B.

74. The Town of Colonie permits other land uses for educational activity, including "Cultural Venue," which is a "building or space used for cultural education . . . ." and "Community Center," which, *inter alia*, is a "facility for . . . educational . . . activities, not operated for profit, . . . ." Colonie Code § 190-6. Neither of these land uses are required to be accredited.

75. The Town of Haverstraw permits "training schools" as a "permitted accessory use" to certain other uses. Haverstraw Code 167 Attachment 12.

76. No New York jurisdiction (with a zoning code available on eCode360) other than Pomona excluded non-accredited educational land uses completely from their jurisdiction.

77. This is strong evidence that neither professional planners nor local government officials in the State of New York view accreditation of educational institutions as necessary to protect

an interest in "community character." Further, based on my experience both in professional planning practice and in planning education and research, accreditation of educational institutions is normally not raised as a zoning issue generally and specifically not raised as necessary to protect an interest in "community character."

78.  To the extent that preventing "noise" impacts is part of the community character analysis (as suggested by the Village Rule 30(b)(6) designee), addressing concerns about noise by prohibiting all non-accredited educational institutions is unnecessary in light of the fact that the Village Trustees adopted an ordinance regulating noise directly in 1973. Code ch. 96.

79.  If further regulation of noise were deemed necessary, doing so by prohibiting all non-accredited educational institutions is poor planning practice.

80.  First, an accredited educational institution could raise exactly the same concerns about noise as an unaccredited educational institution. That would be the case for an accredited technical college that offers programs in truck driving or operation of construction equipment; for example, Fox Valley Technical College.

81.  Second, prohibiting an entire category of uses because of concerns that a sub-category of those uses might produce excessive noise is not good planning practice because more-focused approaches are readily available. These include not only the existing Chapter 96 that regulates "noise" directly but also includes prohibiting only those categories of educational uses, whether accredited or not, that raise significant concerns about noise.  For example, the Village could have prohibited "educational institutions involving use of equipment that produces excessive noise and vibrations or conducts classes or instruction out of doors that generates excessive noise."

82.     The connection between requiring in all instances accreditation of educational institutions and traditional land use concerns is too attenuated to qualify as paramount or even reasonable zoning or land planning interest.

*No Family Housing or Housekeeping Facilities*

83.     The requirement that dormitories not contain separate cooking, dining or housekeeping facilities is not directly related to protecting the issue of community character.

84.     As a general matter, zoning and planning to maintain community character is primarily concerned with the type, height and bulk, density and layout of uses rather than micro-management of the operational characteristics of uses.

85.     Aesthetic concerns about the interior of a room are wholly irrelevant to land-use regulation. While land-use regulation may legitimately be concerned with aesthetic issues when regulating the exterior of buildings, there are no legitimate "community character" concerns with the aesthetics of the interiors of privately-owned buildings.

86.     The testimony of the Village's expert Voorhis about separate housekeeping facilities focused on his concern about safety risks posed by the use of small kitchen appliances. This concern is misplaced because students and their families are likely to use such small kitchen appliances more intensely in dormitory units that have no other option for food preparation and less likely to use such small appliances in a dormitory unit that has separate housekeeping facilities that provide a typical residential stove with burners and an oven. Further, a dormitory unit with separate housekeeping facilities will be required by building, safety, and electrical codes to provide electrical, ventilation and fire-safety equipment appropriate for a space where meals are prepared.

87.     Additionally, zoning codes should strive to make accommodation for the changing nature

of land uses while imposing appropriate regulations to protect the public health, safety or welfare. Regarding dormitories, based on my knowledge of the relevant literature and my personal observations of recent student housing construction at my own institution (Cleveland State University), that there is a strong trend away from traditional dormitory rooms and towards dormitory suites and apartments.  Numerous publications document the demand for, and educational institutions' construction of, apartment-like on-campus housing facilities rather than traditional "dormitories." *See, e.g.*, Paul Abramson, "There's No Place Like Home: Residence Halls are Evolving from Sleeping Spaces to Fully Furnished Homes Away from Home for Students," COLLEGE PLANNING & MANAGEMENT at 2-8 (June 2012) (available at: http://collegeplanning.epubxp.com/i/74667/23); Herman Miller, Inc., "Room and Board Redefined: Trends in Residence Halls" (2007) (available at:

http://www.hermanmiller.com/content/dam/hermanmiller/documents/research_summaries/wp_Room_and_Board.pdf).

88.     This trend results in student housing facilities that are less "institutional" in appearance and more closely resemble non-student residential housing forms. As a result, this trend would result in student housing facilities that would negatively impact community character, if they impact it at all, far less than more institutional-appearing student housing facilities.

89.     The subject Village requirement runs directly counter to this trend, which, in my professional opinion, is unwise, unduly restrictive and fails either to protect or to advance community character.

90.     Since the Village of Pomona is developed primarily with single-family homes, allowing— rather than prohibiting—single-family, two-family and/or multifamily dwelling units as

"dormitories or part of dormitories" would be more likely "to minimize the impact of a non-residential use in a single-family residential district" and "maintain community character."

91. If the governmental interest to be served is "to minimize the impact of a non-residential use in a single-family residential district" and "maintain community character," then a total prohibition on housing types that are more similar to the character of the surrounding community than the permitted type of dormitory cannot be directly related to that interest. From a professional planning perspective, structures, such as a single large dormitory building, that less closely resemble in form and size the surrounding single-family homes are in greater conflict with the governmental interest to maintain community character than are structures that more closely resemble the form and size of the surrounding single-family homes.

92. It is a generally recognized planning principle to prefer types of development at a given location that are closer in use and form to surrounding types of development. This preference can be seen quite clearly in the treatment of legal non-conforming uses and/or structures. For example, many zoning codes relax the prohibition on the expansion of a non-conforming use or structure where the expansion has the effect of bringing the non-conforming use or structure closer to being in conformity with the regulations for the district.

93. The Village's designee also testified that the prohibition on single-family, two-family and multi-family housing would indirectly address community character issues such as noise because "[i]n a dormitory as defined in our law, you would have fewer people living -- you would have a person or two persons the traditional dormitory room as opposed to those

two persons or more living in a single family house because then you would have additional persons. . . . And your multi family use by its nature is going to generate more people than a room will in a dormitory or even a suite of rooms."

94.     It is difficult to make sense of these assertions since the Village's designee seems to suggest that that there would be fewer residents in a "traditional dormitory" than in other housing types, which is counter-intuitive, but at the same time asserts that multi-family housing would "generate more people" than a suite of dormitory rooms.  One cannot state that "multi-family" housing would necessarily produce more people than dormitory housing where both housing types are subject to the same height and bulk restrictions.

95.     Further, as the Village's designee acknowledges, much of the Village's concern about noise produced by residents at an educational institution is effectively addressed by the required setbacks in the Village Code:  "Where your setbacks are also going to help control noise because particularly with school if your play areas are setback 125 feet with landscaping in between from the next door neighbor, they're not going to hear the children playing as if you were right on 10 feet from the property line."

96.     Any remaining concerns could be addressed through the site plan review process, and, most importantly from a professional planning perspective, the noise issue can be addressed directly through an ordinance regulating noise itself.

        C.     <u>The same interest is implicated and threatened by uses that remain permitted (accredited educational institutions, permitted dormitories, libraries, museums)</u>

97.     To the extent that the Village of Pomona allows non-residential assembly and institutional uses other than non-accredited educational institutions, it threatens its asserted interest in maintaining community character that is the claimed basis for prohibiting unaccredited

educational institutions. In fact, the Pomona Zoning Code permits libraries and museums as-of-right and also allows, subject to special permit approval, the following non-residential uses: accredited educational institutions and associated dormitory facilities, recreational facilities, camps, and houses of worship.

98.  Although, as discussed above, the accreditation requirement is not directly related to the stated governmental interest in protecting "community character," even if it was, the Village does leaves other appreciable harm to that interest unregulated.

99.  There are accreditation organizations for land uses with characteristics similar to educational institutions, such as Camps (the American Camp Association) and Museums (the American Alliance of Museums). The Village Code does not impose on either Camps or Museums the accreditation requirement it imposes on educational institutions.

100.  There is no difference between the potential impact of accredited educational institutions on community character and the potential impact of unaccredited educational institutions on community character. The only feature distinguishing the two types of institution is their accreditation status which has no relevance to planning and land use regulatory concerns.

       D.     <u>Maintaining community character could be achieved through less restrictive means than a total prohibition.  (Site plan, special permit process, architectural review)</u>

101.  None of the laws addressed above are narrowly tailoreded to achieve the interest of preserving community character.  Many other means of achieving such goal are available to the Village without banning or rendering impracticable Tartikov's proposed use.

102.  As a matter of general planning practice, conditions to address concerns about maintaining community character are regularly imposed on property development through the site plan review and approval process, the special or conditional use permit approval process and,

where available, through the architectural or design review process.

103. The Village's interest in maintaining its community character can be accomplished through the site plan review and special permit approval processes provided for in the Pomona Code.

104. The "accreditation" requirement is not narrowly tailored because it fails to distinguish between unaccredited educational institutions for which accreditation is a possibility and unaccredited educational institutions for which accreditation is not even a possibility.

105. The Village's interest in community character could still be protected if it allowed dormitories with housekeeping facilities, in other words family housing, because the Village could impose appropriate conditions through the site plan approval and special use approval processes to address any possible concerns in that regard.

106. Permitting, rather than prohibiting, single family, two-family and/or multifamily dwelling units as "dormitories or part of dormitories" would be more likely to "maintain community character" and thus would be an alternative, and more effective, way of achieving that governmental interest.

107. Additionally, because the Village Code requires a 10-acre minimum area and maximum 10% lot coverage for an educational institution, there would be ample room for significant buffering and screening of any educational institution from the surrounding single-family residential district. Further, the "shielding" effect of such buffering and screening would be greater as the size of the area for the educational institution increases.

108. Perhaps most importantly, the Pomona Zoning Code § 130-10(F) requires that an Educational Institution would be subject to special permit approval by the Village Board of Trustees and site plan approval by the Planning Board. This requirement would impose

various site development requirements on the Rabbinical College.

109. Regarding the governmental interest to "maintain community character," the most relevant requirements are §§ 130-10(F)(4) & (11). Section 130-10(F)(4) would require a minimum 125-foot setback requirement from each property line of the Rabbinical College and a minimum buffer area of 35 feet with plantings and/or fencing "as determined by the Planning Board to be sufficient to screen the educational use from adjoining uses and streets."

110. Section 130-10(F)(11) provides that "[t]he location and height of buildings, the location, nature and height of walls and fences and the nature and extent of landscaping on the site shall be such that the use will not hinder or discourage the development and use of adjacent land and buildings."

111. An alternative means to achieve the stated governmental interest of protecting community character would be for the Board of Trustees and the Planning Board Code to exercise their discretionary authority under §§ 130-10(F)(4)&(11) to impose various reasonable siting, buffering and screening requirements that would ensure that the development of the Rabbinical College would not conflict with the stated governmental interest.

112. There is also an alternative means of ensuring that the principal use of an Educational Institution is not converted to a "housing complex." The Village could require that educational institutions are not permitted to have persons occupying dormitories other than bona fide students engaged in a program of study offered by the educational institution, their spouses, and their children under the age of maturity. This requirement could be incorporated into the special use process as a condition for approval of the project and could also be a separate section of the Village Code to ensure compliance through code

enforcement.   This requirement would allow the Village to differentiate between educational institutions for which on-campus residence is an integral part of the instructional program and which ensure that only bona-fide students and their families are occupying dormitories versus educational institutions that are merely trying to develop and operate housing under the guise of being an educational institution.

113.    The proposed Rabbinical College would not necessarily impact "community character" negatively because any development plan ultimately presented for the proposed 100-acre site could locate buildings, parking and internal streets, and provide for ample screening, in a manner to ensure that there would be minimal, if any, impact on the community character of the surrounding area.

114.    The Village's own expert, Charles Voorhis, admits that the proposed Rabbinical College could be built so that it is visually in harmony with the surrounding community.


**IV.     REASONABLENESS OF THE "ONE DORMITORY BUILDING LIMITATION"**

115.    The prohibition on more than one dormitory building for an Educational Institution does not promote any zoning or land planning interest.

116.    For any educational institution, the prohibition effectively prohibits all flexibility in site design that could be achieved by the use of multiple buildings for dormitory use.

117.    The prohibition ensures that any dormitory building constructed would have the maximum bulk permitted by the other provisions governing dormitories, principally 20% of the total square footage limit. The resulting maximum-sized building will be more in conflict with the character of the surrounding community than a number of smaller dormitory buildings.

118.    By effectively requiring that any dormitory building constructed would have the greatest

possible bulk, the prohibition precludes dormitory designs using a number of smaller buildings that would be more likely to "maintain community character" because they would be more in character with the surrounding single-family development.

119.   Moreover, the Village Code does not prohibit more than one building for temporary residential use for Camps. Village Code §130-10(D)(4) specifically provides that Camps may include multiple residential buildings: "The facility may include bungalows, cottages and tents . . . ."

120.   Further, as noted previously, the Board of Trustees and the Planning Board Code may exercise their discretionary authority under Village Code §§ 130-10(F)(4)&(11) to impose various reasonable siting, buffering and screening requirements that would ensure that the development of the Rabbinical College would not conflict with any stated governmental interest.

## V.   DIFFERENTIAL TREATMENT BETWEEN THE PROPOSED USE AND PERMITTED LAND USES.

### A.   Accreditation

121.   The accreditation requirement treats the Rabbinical College on less than equal terms compared with secular institutions of higher education because, while the vast majority of secular institutions of higher education will either be – or could be – accredited, I have been informed by agents of Tartikov that the Rabbinical College would not be able to receive accreditation.

122.   The land use justifications offered by the Village for the accreditation requirement do not justify such differential treatment because they are concerned primarily with aspects of the operation of an educational institution that have little to do with its status as accredited or

non-accredited. These include concerns about noise and environmental harm that would result from unaccredited schools that were essentially commercial in nature.

123. As a matter of professional planning practice, concerns about commercial schools related to the nature of their operations – for example, instruction in truck driving or operating heavy construction machinery that could cause noise or environmental harm – are addressed much more directly by a prohibition on those specific uses rather than an outright prohibition on all unaccredited schools. Moreover, such institutions can be accredited. For example, the Bronx Community College's Automotive Program is accredited by the National Automotive Technicians Education Foundation ("NATEF").[5] Thus, the justification to prevent uses that are in fact permitted in the Village is wholly unreasonable.

124. Again, the land use justifications offered by the Village for the accreditation requirement, focusing primarily on concerns about noise, community character, and environmental issues associated only with certain types of commercial for-profit schools do not justify such differential treatment of all non-accredited schools.

B.    The 10% building coverage limitation

125. The 10% total building coverage limitation for Educational Institutions treats the Rabbinical College on less than equal terms than other nonreligious assembly and institutional uses.

126. While the 10% limitation applies to the Rabbinical College, it does not apply to two other assembly and institutional uses, "Libraries" and "Museums," within the Village.

127. Libraries are only subject to the 15% lot coverage limitation in Village Code § 130-12 I.

128. Museums are only subject to the 15% lot coverage limitation in Village Code § 130-12 I.

---

[5] "Introducing Bronx Community College," at 2 (located at http://www.bcc.cuny.edu/College-Catalog/2014-2015/introducing_bcc.pdf).

129.   Again, the land use justifications offered by the Village for the building coverage limitation, namely community character, noise, and environmental concerns, do not justify such differential treatment because there are no differences related to building coverage between any given educational institution and a comparably sized library or museum as regards land use impacts associated with percentage of building coverage.

C.   The 20% FAR limitation

130.   The 20% floor area limitation for Educational Institutions also treats the Rabbinical College on less than equal terms than other nonreligious assembly and institutional uses.

131.   While the 20% limitation applies to the Rabbinical College, it does not apply to two other assembly and institutional uses, "Libraries" and "Museums," within the Village.

132.   The Pomona Village Code does not impose any explicit floor coverage limitation on Libraries. As a practical matter, the 35-foot height limitation for all structures in the Village contained in Village Code § 130-12 H would result in an effective floor coverage limitation of at least 30%. For example, the 35-foot height limit would allow construction of a three-floor Library with a first floor-height of 15 feet and floor-heights of 10 feet for both the second and third floors.

133.   The Pomona Village Code does not impose any explicit floor coverage limitation on Museums. As a practical matter, the 35-foot height limitation for all structures in the Village contained in Village Code § 130-12 H would result in an effective floor coverage limitation of at least 30%. For example, the 35-foot height limit would allow construction of a three-floor Museum with a first floor-height of 15 feet and floor-heights of 10 feet for both the second and third floors.

134.   Again, the land use justifications offered by the Village for the floor area limitation do not

justify such differential treatment because there are no differences related to floor area between an educational institution and a comparably sized library or museum as regards land use impacts associated with floor area limitation.

        D.      The 20% Square Footage Restriction for Dormitories

135.    The 20% housing restriction for Educational Institutions also treats religious educational institutions on less than equal terms than nonreligious educational institutions.

136.    Religious educational institutions overwhelmingly have greater need for more on-campus housing.  Attached as **Exhibit B** is a study of the proportion of dormitory rooms to enrolled students, published online by CityTownInfo.com,[6] with data procured from the Integrated Postsecondary Education Data System,[7] shows that the category of schools that have at least one dormitory opening available per student is dominated by theological seminaries.

137.    Attached as **Exhibit C** is a listing of all non-Orthodox Jewish colleges/universities in New York State that offer courses in theology or religious studies with undergraduate enrollment under 2,500[8] showing percentage of students living in "college housing" using data obtained from Collegedata at http://www.collegedata.com.

138.    Attached as **Exhibit D** is a listing of all non-Orthodox Jewish colleges/universities in the Northeast Region[9] that offer courses in theology or religious studies with undergraduate enrollment under 2,500 showing percentage of students living in "college housing" using

---

[6]    http://www.citytowninfo.com/cti/test/highest-dorm-room-coverage-all-colleges-and-universities.shtml

[7] The website for the Integrated Postsecondary Education Data System is http://nces.ed.gov/ipeds/.

[8] Less than 2,500 students is the smallest enrollment that is searchable on the Collegedata website. This figure was chosen as being closest to the projected enrollment of any proposed Rabbinical College.

[9] Collegedata defines the Northeast Region as the states of:  Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island and Vermont.

data obtained from Collegedata at http://www.collegedata.com.

139. In New York State:  (a) the two non-Orthodox Jewish seminaries with enrollment under 2,500 on the Collegedata website each have 100% of their students living in "college housing" and (b) the three additional non-Orthodox Jewish seminaries with enrollment under 2,500 listed on the CityTownInfo.com website each provide at least one dorm room per enrolled student.

140. In the Northeast Region, the seven non-Orthodox Jewish seminaries with enrollment under 2,500 listed on the CityTownInfo.com website each provide at least one dorm room per enrolled student.

141. At the national level, excluding seminaries already identified above, the eleven non-Orthodox Jewish seminaries with enrollment less than 2,500 listed on the CityTownInfo.com website each provide at least one dorm room per enrolled student.

142. At all geographical levels, colleges/universities with enrollments under 2,500 students are overwhelmingly religiously affiliated and provide housing for a very significant percentage of their students.

## VI.     CONCLUSION.

143. For the foregoing reasons, the challenged provisions of the Village's zoning code regulating educational institutions do not reasonably advance the Village's stated interests in preventing impacts to its community character.  They also permit other development that would have equal or greater impacts to this goal. Finally, it is clear that a Rabbinical College as proposed by the Plaintiff can be developed in the Village without creating unacceptable impacts to community character.

144.    I declare under penalty of perjury, that the foregoing is true and correct.


Executed on:   January 16, 2015

*Alan Weinstein*

Alan Weinstein