# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., *et al.*,

                                   Plaintiffs,

        -against-                           **07 Civ. 6304 (KMK) (GAY)**

VILLAGE OF POMONA, NY; *et al.*,

                                   Defendants.

------------------------------------------------------------------

## DECLARATION OF STEVEN H. RESNICOFF

Steven H. Resnicoff declares as follows, pursuant to 28 U.S.C. § 1746:

1. I make this declaration on behalf of the Plaintiff Congregation Rabbinical College of Tartikov, Inc. to support my opinion that there is a religious obligation to create a system of Jewish courts in which Jews can have their disputes adjudicated; that every Jewish male is biblically commanded to engage in rabbinic study—the study of the Torah; that Tartikov's proposed curriculum is an excellent program that reflects a sincere and legitimate course of religious study; that Jewish law strongly encourages young men to marry early and raise large families; and that there is a religious basis for Tartikov's students to live in a Torah Community, as proposed by Tartikov.

2. In preparing this Declaration, I have generally relied upon my years of experience in the fields of Jewish law, secular law and education. I have also relied on my February 3, 2014, visit to Mechon L'Hoyroa, 168 Maple Avenue, Monsey, New York 10952. During that visit, I met with the individual plaintiffs (except for Rabbi Margulies), Rabbi Mordechai Babad (the proposed dean), other proposed teachers, and plaintiffs' attorneys. I have also relied on a conversation I had by phone with Rabbi Menczer on March 4, 2014. In addition, I have relied on the various texts and commentaries which I cite in this report. I have also reviewed a document prepared by the plaintiffs, and attached hereto as Attachment #1, that sets forth some of the plaintiffs' religious beliefs. Some of the sources cited by that document are also cited by me in this report. I have also reviewed the Second Amended Complaint in this lawsuit, Congregation Rabbinical College of Tartikov, Inc., et al. v. Village of Pomona, N.Y., et al. I also reviewed a document attached hereto as Attachment #2 that is the Proposed Rabbinical College of Tartikov Program Schedule that I understand was prepared by some of the Plaintiffs, including Rabbi Menczer.

1

3. I earned my B.A. at Princeton University, which I received in 1974 as a participant in the special undergraduate program of the Princeton's Woodrow Wilson School of Public and International Affairs. In my senior year, I was selected as a "Scholar of the Woodrow Wilson School." As such, I was relieved of all ordinary academic requirements and was able to pursue a course of study of my own design. I was elected to Princeton's Chapter of Phi Beta Kappa.

4. I earned my J.D. degree at Yale Law School in 1978. While at Yale, I served as a member of the board of directors of its Moot Court Board.

5. I took a leave of absence from Yale for the 1976-1977 academic year and pursued a course of Jewish studies in Israel. During my fall 1977 semester at Yale, I resided    in New York City and pursued a specially designed intensive semester in Jewish law. My Yale advisor for this special program was the late Professor Robert Cover.

6. After graduation from Yale, I again pursued rabbinic studies in Israel. In fall 1979, I entered the Rabbi Aaron Kotler Institute for Advanced Learning, also known as Beth Medrash Govoha ("BMG"), a rabbinic studies program in Lakewood, New Jersey. BMG is one of the world's premiere institutions for the study of Jewish law. I was awarded a rabbinic degree from BMG in 1982. I also separately received an advanced rabbinic ordination, known as *yoreh yoreh, yadin yadin*, from the late Rabbi Moses Feinstein, of blessed memory, who was one of the world's greatest Jewish law authorities. This advanced ordination indicates that the rabbinic authority issuing it believes that the recipient is qualified to serve as a judge in a civil dispute.

7. I began teaching at the DePaul University College of Law in fall 1988 as an Assistant Professor. I was promoted to Associate Professor in 1992, received tenure in 1994, and became a Full Professor in 1995. I have taught courses in bankruptcy, contracts, commercial paper, legal profession and secured transactions. I have authored or co-authored five books and over forty articles and chapters. In addition, I have authored or co-authored many annual supplements or updates. I have also served in many administrative committees, at both the College of Law and University levels. For example, during many years I served as a member of the DePaul College of Law's Curriculum Committee. At the University level I have served, for example, on the University's Board on Promotion and Tenure. In addition, I have received various awards for my teaching and scholarship. In summer 2002, I served as a visiting professor at Brooklyn Law School, located in Brooklyn, New York.

8. I have published numerous Jewish law articles and chapters in a variety of venues, from rabbinic journals to books published by the Oxford University Press. These have addressed diverse topics, such as anti-terrorism measures, bankruptcy, bioethics, business ethics, estate planning, and legal ethics.

9. I authored the book, *Understanding Jewish Law*, that was published in 2012 by LexisNexis, a major law school book publisher.

2

10. A number of my presentations and writings have focused specifically on the operation of Jewish courts and the enforcement of Jewish court awards in secular courts.

11. The American Association of Law Schools (AALS) has sections on specific areas of law. The AALS has an annual conference at which all, or most, of these sections (either separately or in conjunction with one or more other sections) sponsors an academic program. The AALS created a section on Jewish Law which had its inaugural program at the AALS convention in 1992. I was invited to deliver the inaugural presentation based on an article that I had published in the Seton Hall Law Review article. I served as the Chair of the AALS Section on Jewish Law in 1998-1999. In various years, I have also served as the Section's Chair-elect, Secretary, Treasurer, and as a member of its Executive Committee.

12. Throughout my years teaching at DePaul, I have made presentations regarding Jewish law and the various interrelationships between Jewish law and secular law at many programs at which Continuing Legal Education has been awarded. I have also addressed these subjects at programs at a number of law schools and at international scholarly conferences.

13. For a number of years, I have been an active member of the Jewish Law Association ("JLA"), an international organization that promotes the study of Jewish Law, especially in English. I was the Chair of the JLA's Executive Board from 2002 to 2004. At other times, I have served as the chair of its Publication Committee, a member of its Executive Committee, and as editor of its eNewsletter.

14. I have taught many different Jewish law topics in various forums. In addition to teaching Jewish law to law students at DePaul, I have taught a variety of Jewish law courses at Spertus College of Jewish Law, now known as the Spertus Institute for Jewish Learning and Leadership. Some of these courses were part of a master's program, and others were part of a doctoral program. In addition, I was one of two thesis advisors for one of Spertus' successful doctoral candidates. In summer 2012, I was a faculty member in a Graduate Certificate Program in Jewish Community Leadership, co-sponsored by Northwestern University and Spertus. I taught the module on leadership ethics.

15. I am the Chair of the DePaul University College of Law's Center for Jewish Law & Judaic Studies (JLJS). Between Fall 2007 and Fall 2014, I served as one of two Co-Chairpersons of JLJS. In connection with my activities with JLJS, I have given various presentations regarding Jewish law, often in programs involving CLE credit. I have also been intimately involved in planning the programming of many additional JLJS programs.

16. Over the years, I have reviewed a number of Jewish law articles and one Jewish law book for various publishers. In addition, at the request of several law schools and universities in the United States and Israel, I have written reviews of the work of candidates being considered for promotion and/or tenure.

17. As to my experience as a legal practitioner, I was a principal in Gerszberg & Resnicoff, a law firm in Lakewood, New Jersey from 1987 to 1988. Previously, from 1984 to 1987, I served as an associate in the Lakewood, New Jersey, office of Selesky, Kolsky & Gerszberg from 1984-1987. In 1983-1984, I worked as an associate at the Baltimore, Maryland, office of the firm then known as Venable, Baetjer & Howard.and now known as Ven able LLP.

18. A list of my publications since 2004. These include the following:

   i.   Sole Author, UNDERSTANDING JEWISH LAW (LexisNexis, 2012);
   ii.  Co-Author (with Professor Donna Litman), *Jewish and American Inheritance Law: Commonalities, Clashes and Estate Planning Consequences,* in L. Moscovits (ed.), JEWISH LAW ASSOCIATION STUDIES XXII (2012);
   iii. Author, *Jewish Law and the Tragedy of Sexual Abuse of Children – The Dilemma Within the Orthodox Jewish Community,* 13:2 RUTGERS JOURNAL OF LAW & RELIGION (2012);
   iv.  Author, *Jewish and American Bankruptcy Law: Their Similarities, Differences and Interactions,* 19:2 AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW (Winter 2011);
   v.   Author, *Shooting Down Suicide Airplanes - What's Law Got to Do With It?,* 10 ISSUES IN AVIATION LAW & POLICY 281 (Spring 2011);
   vi.  Author, *Da'at Torah & Censorship,* in L. Moscovits (ed.), JEWISH LAW ASSOCIATION STUDIES XX (2010);
   vii. Author, *Autonomy in Jewish Law – in Theory and in Practice,* 24 JOURNAL OF LAW AND RELIGION 507 (2008-09);
   viii. Author, *May Plaintiffs Enjoy a Double Recovery? The "Collateral Source Rule" and Jewish Law,* in J. Fleishman (ed.), JEWISH LAW ASSOCIATION STUDIES XVIII (2008);
   ix.  Author, *Keeping One=s Word in Commercial & Non-Commercial Contexts,* in E. Dorff (ed.), JEWISH LAW ASSOCIATION STUDIES XVI (2007);
   x.   Author, *Supplying Human Body Parts - a Jewish Law Perspective,* 55 DEPAUL LAW REVIEW 851 (2006);
   xi.  Author, *Jewish Law and Socially Responsible Corporate Conduct,* 11 FORDHAM JOURNAL OF CORPORATE & FINANCIAL LAW 681 (2006);
   xii. Author, *Contemporary halakhic problems,* chapter 29 in Nicholas de Lange and Miri Freud-Kandel (eds.), MODERN JUDAISM: AN OXFORD GUIDE (Oxford: Oxford University Press, 2005);
   xiii. Author, *The Legal and Halachic Ramifications of Brain Death,* in Fred Rosner and Robert Schulman (eds.), MEDICINE AND JEWISH LAW III (Brooklyn, NY: Yashar Books, Inc., 2005);
   xiv. Author, *Ends and Means in Jewish Law: Lying to Achieve Economic Justice,* JEWISH LAW ANNUAL XV (London: Taylor & Francis, 2004);
   xv.  I published several brief reviews of Jewish law books during this time;
   xvi. For a number of years during this period, I served as the editor of the e-newsletter of the Jewish Law Association, an international organization dedicated to the

promotion of the study of Jewish Law, especially in English.  In serving as editor, I wrote a number of items on Jewish law topics, including case law regarding the enforceability of rabbinic court judgments;

xvii.   In addition, a number of my older articles were "published" on the internet, including at jlaw.com;

19. I was also the author or co-author of the following secular law scholarship that was published or republished:

xviii.   Author, *Illinois' New Legal Ethics Rules:  A Disappointing Travail*, 9 DEPAUL JOURNAL OF BUSINESS AND COMMERCIAL LAW 29 (FALL 2010);

xix.   Author, *Fraudulent Transfer Law in Illinois*, in Robert M. Fishman et al. (eds.), SECURED TRANSACTIONS 2007 EDITION (Illinois Institute for Continuing Legal Education, 2007).  I had authored a chapter on the same topic in the 2001 edition of this book prior to enactment in 2005 of major changes to the Bankruptcy Code;

xx.   Author, *Lying and Lawyering:  An Honest Perspective* in Keith W. Krasemann and Patricia H. Werhane, (eds.), CONTEMPORARY ISSUES IN BUSINESS ETHICS: THE CALLISTA WICKLANDER LECTURES (University Press, 2006).  This chapter was essentially reprinted from an earlier edition of the DEPAUL UNIVERSITY ACADEMIC AFFAIRS QUARTERLY;

xxi.   Co-Author (with Prof. Wayne Lewis), NEGOTIABLE INSTRUMENTS AND OTHER PAYMENT SYSTEMS: PROBLEMS AND MATERIALS (LexisNexis Co., 2004);

xxii.   Co-Author (with Prof. Wayne Lewis), TEACHER'S MANUAL TO NEGOTIABLE INSTRUMENTS AND OTHER PAYMENT SYSTEMS: PROBLEMS   AND MATERIALS (LexisNexis Co., 2004);

xxiii.   Co-Author (with Prof. Wayne Lewis), 2004 Cumulative Supplement to Wayne K. Lewis and Steven H. Resnicoff, THE NEW LAW OF NEGOTIABLE INSTRUMENTS (Michie Company, 1996);

20. Jewish Law Presentations: The Jewish law presentations I have made since 2004, include those set forth below.  I have not included presentations that solely concerned secular law.

xxiv.   Presenter, *The Causes and Cures of Unethical Business Practices – A Jewish Perspective*, at The Henry Kaufman Conference on Religious Traditions and Business Behavior (2013), sponsored by the University of Maryland's Robert H. Smith School of Business, October 31, 2013;

xxv.   Panel Member, Conference on "Tikkun Olam" sponsored by the DePaul University College of Law Center for Jewish Law & Judaic Studies (JLJS), October 24, 2013;

xxvi.   Panel Member, *The Circumcision Debate: Medical and Legal Implications*, at Judaism, Health and Healing:  A Chicago Community Resource Conference, April 14, 2013 (conference co-sponsored by the DePaul University College of Law Center for Jewish Law & Judaic Studies, the Spertus Institute for Jewish Learning and Leadership and the University of Illinois at Chicago College of Medicine);

xxvii.  Presenter, Congregation Yehuda Moshe's Night of Knowledge," November 10, 2012;

xxviii.  Sole Speaker, Program sponsored by JLJS at DePaul University on September 12, 2012, entitled, *Understanding Jewish Law.*

xxix.  Keynote Speaker, Regional Yom Iyun –*The Many Faces of Abuse: Jewish and Clinical Perspectives*, sponsored by the Chicago/Midwest Jewish Chaplains Group, in partnership with the Jewish Healing Network of Chicago, the National Association of Jewish Chaplains and the Chicago Board of Rabbis, August 29, 2012;

xxx.  Presenter, Jewish Law Association Conference, Yale University, August 2, 2012. Topic: *May One Kill Some Innocents to Save Others*;

xxxi.  Presenter, CLE Program sponsored by JLJS at DePaul University entitled, "A Comparative Analysis of Law through the Examination of Biblical, Talmudic and Scholarly Texts." Topic: *Jewish Ethics and Legal Ethics: Comparisons and Contrasts,* May 30, 2012;

xxxii.  Presenter, CLE Program sponsored by JLJS at DePaul University entitled, "A Comparative Analysis of Law through the Examination of Biblical, Talmudic and Scholarly Texts." Topic: *Reporting Child Sexual Abuse to Secular Authorities - Jewish law Perspectives,"* May 30, 2012;

xxxiii.  Sole Presenter, Professionalism CLE Program sponsored by JLJS at Congregation KINS, West Rogers Park, Chicago, on December 18, 2011. Topic: *Is Law a Suitable Career for a Good Jewish Boy or Girl?*;

xxxiv.  Presenter at Third Session of Program entitled, *Judaism in Professional Life*, November 17, 2011, at the Illinois Holocaust Museum and Education Center, and sponsored by Spertus Institute for Jewish Studies. Topic: *Financial & Business Ethics: What's Judaism Got to Do With It?*;

xxxv.  Panel Member at Symposium entitled, *Religion and Bankruptcy: Perspectives Thereon and Treatment Therein*, sponsored by the St. John's University School of Law's Centers for Bankruptcy Studies and for Law and Religion, held at the St. John's University School of Law, September 16, 2011. Topic: *Jewish and American Bankruptcy Law: Their Similarities, Differences and Interactions*;

xxxvi.  Presenter, International Conference entitled, *Intellectual Property in Jewish Law*, sponsored by the Yad HaRav Herzog Institution and JMB, Factor & Co., in Jerusalem, Israel, June 26, 2011. Topic: *Halakhic Issues involved in Embryonic Stem Cell Research;*

xxxvii.  Commencement Speaker, Hebrew Theological College, June 20, 2011;

xxxviii.  Panel member, Northwestern University College of Law, *Economics of Biotechnology: The Human Gene Patenting Debate*, sponsored by Northwestern University College of Law Journal of Technology and Intellectual Property as part of its Sixth Annual Symposium, March 4, 2011;

xxxix.  One of two speakers, January 20, 2011, CLE program sponsored by DePaul College of Law Center for Jewish Law & Judaic Studies (JLJS). Topic: *Common Problems in the Representation of Jewish Clients*;

xl.  One of two speakers, December 8, 2010, CLE program sponsored by JLJS in Deerfield, IL. Topic: *Jewish Estate Planning and the Estate of Feinberg*;

xli.  One of two speakers, Keynote Program for Conference entitled, *Founding A Nation/Constituting A People: American and Judaic Perspectives*, May 15, 2010, sponsored by JLJS and funded by the Jack Miller Center;

xlii.  Sole Presenter, February 17, 2010, CLE program sponsored by JLJS, at DePaul. Topic: *Double Dipping: A Comparison of American and Jewish Approaches*;

xliii.  Sole Presenter, program at the Northwestern University Law School sponsored by the Jewish Law Students Association, March 8, 2010. Topic: *Jewish Law and Legal Ethics*;

xliv.  Presenter, February 7, 2010, program entitled, *Jewish Family Law, the Agunah and General Issues in Jewish Law*, sponsored by the Fordham University School of Law Conference. Topic: *Responding to Sexual Abuse of Children – Jewish Law Issues*;

xlv.  Presenter (one of two presenters), January 27, 2010, CLE program co-sponsored by JLJS and DePaul College of Law Health Law Institute, January 27, 2010. Topic: *Issues in Genetic Engineering: Jewish and American Legal Perspectives*;

xlvi.  Sole Presenter, November 4, 2009, CLE program sponsored by JLJS, at DePaul. Topic: *Debtor Collection and Bankruptcy – A Comparison of Jewish and American Law*;

xlvii.  Presenter (one of two), March 24, 2009, CLE program sponsored by JLJS. Topic: *Ethical Issues in Jewish and American Jurisprudence*;

xlviii.  Panel member, November 13, 2008, Conference sponsored by the Jewish Students Association of John Marshall Law School, Chicago, November 13, 2008. Topic: *Estate of Feinberg: The Enforceability of "the Jewish Clause" in Wills*;

xlix.  Panel Chair, October 26, 2008, Twelfth Annual Conference of the Midwest Jewish Studies Association, co-sponsored by the DePaul Center for Jewish Law & Judaic Studies. Panel topic: *New Approaches to Jewish Law*;

l.  Speaker, October 26, 2008, Twelfth Annual Conference of the Midwest Jewish Studies Association, co-sponsored by the DePaul Center for Jewish Law & Judaic Studies. Topic: *Killing People to Save Lives – Does Jewish Law Allow it?*;

li.  Speaker, October 23-25, entitled, *Speaking of Law and Religion*, sponsored by Hamline University School of Law Journal of Law and Religion. Topic: *Autonomy in Jewish Law – in Theory and in Practice*;

lii.  Speaker, *Judaica Fest 2008*, July 2008, Joint Conference of the Jewish Law Association and the British Jewish Studies Association, at the University of Manchester, UK. Topic: *Da'at Torah (Rabbinic Authority) and Censorship*;

liii.  Speaker, July 2006, Jewish Law Association's 2006 Conference, Bar-Ilan University. Topic: *May Plaintiffs Enjoy a Double Recovery? The "Collateral Source Rule" and Jewish Law*;

liv.  Speaker, December 6, 2005, at a CLE program in Seattle, Washington sponsored by the Kollel of Seattle. Topics: (1) *Bankruptcy Law - American, Israeli and Jewish Law: Perspectives on Bankruptcy Law's "Fresh Start" Policy*; and (2) *Whistleblowing versus Confidentiality: The Responsibilities of Lawyers under Jewish and Secular Law*;

lv.  Presenter, March 4, 2005, DePaul University Law Review Symposium entitled, *Precious Commodities: The Supply and Demand of Body Parts.* Topic: *Supplying Human Body Parts - a Jewish Law Perspective;*

lvi.　Speaker, November 16, 2004, CLE program at the law offices of Vinson & Elkins, Houston, Texas.    Topic: *Bankruptcy Law - American, Israeli and Jewish Law Perspectives on Bankruptcy Laws, A Fresh Start Policy*;

lvii.　Speaker, November 16, 2004, CLE entitled, *Halachic Estate Planning Seminar* at the Jewish Community Center, Houston, Texas. Topic: *Where There's a Will, There's a Halacha Way*;

lviii.　Speaker, August 4, 2004, Jewish Law Association's 2004 Boston Conference, at Boston University.  Topic: *Keeping One's Word in Commercial & Non-Commercial Contexts*;

lix.　Speaker, June 9, 2004, CLE program, in St. Louis, Missouri. Topic: *Jewish Law and the Corporate Paradigm*;

lx.　Panel Member, Sanctuary May 23, 2004 Television Telecast WLS ABC7.  Topic: *Jewish Law and the Modern World*;

lxi.　Speaker, May 3, 2004, Conference sponsored by the Kollel of Ottawa Choshen Mishpat Conference, Ottawa, Canada.  Topic: *Jewish Business Ethics*;

lxii.　Speaker, February 23, 2004, Fordham School of Law Conference entitled, *Religious Values and Corporate Decision Making.* Topic: *Does Corporate Decision Making Allow Room for Religious Values?*).

## INTRODUCTION TO JEWISH LAW

21. Jewish law (or "Halakhah") is a religiously based system, and the religious beliefs of its adherents require them to obey its tenets.

22. The principal body of Jewish law (known as Biblical law) was communicated in non-written form from G-d to the Jewish people through Moses.   This communication had two parts.   One part was intended to be, and was, committed to writing. This part is known as the "Written Torah" or the "Five Books of Moses."

23. The second part of the communication from G-d was intended not to be written, but, instead, to be taught orally directly from teacher to student. This portion is known as the "Oral Torah."  Together, the Written Torah and Oral Torah constitute the Torah.

24. Orthodox Jews fundamentally agree that the Torah embodies the word and will of God and that it is authoritative.  Therefore, one is religiously and morally obligated to follow its rules.

25. Because of the persecution of Jews and the imposition of capital punishment upon those who taught Jewish law, early Jewish law authorities feared that the Torah, or parts of it, might be forgotten.  Consequently, they decided that it was necessary - and permitted by Jewish law - to commit the Oral Torah to writing.

26. The first major publication that contained parts of both the Written Torah and the Oral Torah was the Mishnah, which was redacted around the year 180.  It is divided into 63 subject areas.

27. The Babylonian Talmud (the "Talmud") is the central literary source from which much of Jewish law/Halakhah is derived. The Talmud addresses 37 of the 63 subject areas of the Mishnah. As to each of these 37 subject areas, the Talmud consists of two parts. The first is the relevant Mishnah, and the second is known as the "Gemara." The Gemara is the legal analysis and elaboration of the teaching of the Mishnah, along with a discussion of additional legal issues that arise in connection with the Mishnah.

28. There are many post-Talmudic written Jewish law treatises that are regarded as especially authoritative. One, known as the Mishneh Torah, was written by Maimonides between 1170 and 1180. This treatise comprehensively addressed all areas of Jewish law and was meticulously organized by topics.

29. The Jewish Law code known as the Arba' ah Turim ("Tur"), written by Yaakov ben Asher (Rabbi Jacob) (1270-1340), was the first to organize Jewish Law into a four-part structure/division. It is limited to those issues of Jewish Law that are applicable in the current era, i.e., in the period after the destruction of the holy Temple in Jerusalem. The foremost commentary on the Arba'ah Turim is known as the "Beit Yosef," which was written in the sixteenth century by Rabbi Joseph Karo.

30. The Shulchan Aruch (literally meaning, "the Set Table", but known by most Jewish communities as the "Code of Jewish Law") was authored by Joseph Karo and is based on the four-part structure of the Arba' ah Turim. Rabbi Karo lived in the Middle East and wrote the Shulchan Aruch according to the perspectives of Middle Eastern (Sephardic) Jewish authorities. Soon after publication of the Shulchan Aruch,. Rabbi Moses Isserles ("Rema"), who lived among Europe's Ashkenazic Jews, added his glosses to the Shulchan Aruch. These glosses are known as the "mappah" or tablecloth that enhances Rabbi Karo's Set Table.

## THE RELIGIOUS SIGNIFICANCE OF SYSTEM OF JEWISH COURTS

31. In my opinion, there is a religious obligation to create a system of religious Jewish courts in which Jews can have their disputes adjudicated. The original source is the biblical verse, "Judges and court officers shall you place unto yourself in all your gates." (Deuteronomy 16:17). See J. David Bleich, CONTEMPORARY HALAKHIC PROBLEMS IV (New York: Yeshiva University Press, 1995) 3-4 (hereafter "BLEICH IV")(citing a number of early Jewish law authorities who rely on this verse).

32. Because of certain tragic historical events, it is possible that the obligation in contemporary times is rabbinic. See, e.g., Eliyahu ben Yehuda Yitzhakov, OTSAR HAMISHPAT I, simon 1, sif 1, at 2 (citing some sources who say that the obligation is still biblical while others say it is currently rabbinic). But, whether biblical or rabbinic, the obligation to create a system of religious Jewish courts is an extremely important religious duty. *Id.*, at 4, n.1. If there remains a biblical duty to appoint judges, there is also a biblical prohibition against appointing judges who lack adequate Torah knowledge. *Id.* This prohibition applies even if the person appointed possesses many fine personal attributes. See Maimonides, MISHNEH TORAH, *Laws of Judges* 3:8. See

also BABYLONIAN TALMUD, *Sanhedrin* 7b (one who appoints an unqualified judge is as if he planted in Israel a tree used for idolatry).

33. Moreover, there is a biblical prohibition that forbids a Jewish plaintiff to file suit against another Jew other than in a religious Jewish court. This arises from the verse, "And these are the ordinances which you shall set before them." (Exodus 21:1) In context, the word "them" is understood to refer to capable Jewish religious judges, and the implied message is that you should put these disputes before "them" and not before others, such as Gentile judges. See, e.g., BABYLONIAN TALMUD, *Gittin* 88b; Rabbi Shlomo Ben Yitzchaki (known as *Rashi*; 1040-1105), COMMENTARY ON THE TORAH, Exodus 21:1; SHULHAN ARUKH, *Hoshen Mishpat* 26:1; Maimonides (1135-1204), MISHNEH TORAH, *Laws of Court* 26:7.

34. These sources use the acronym "Akum," which is derived from the Hebrew words for "star worshippers." This term, "Akum," is generally used to refer to all idolaters. Nevertheless, virtually all Jewish law authorities explain that in this context the term is intended to apply to all non-rabbinic courts. See, e.g., R. Shimon Duran (1361-1444), TASHBATS IV:6 (applies to Muslim courts even though Muslims are neither star worshippers nor idolaters). R. Simcha Krauss (contemporary), *Litigation in Secular Courts*, JOURNAL OF HALACHA AND CONTEMPORARY SOCIETY III (1982) 35, 37-38, n. 6; R. Mordecai Biser (contemporary), *Can An Observant Jew Practice Law? A Look at Some Halakhic Problems*, THE JEWISH LAW ANNUAL XI 103, n. Indeed, many Jewish law authorities simply translate the word "Akum" as "Gentile." See, e.g., Yaacov Ariel (contemporary), *Secular Courts in the State of Israel*, http://www.jlaw.com/Articles/SecularCourts.html; BLEICH IV, at 3.

35. According to many authorities, the prohibition applies to any secular courts – even to the secular courts of the State of Israel and even if all of the judges are Jewish. The late Rabbi Ovadia Yosef (1920-2013), the late Sephardic Chief Rabbi of Israel, for example, stated that the prohibition applied *a fortiori* to the submission of disputes to Jewish judges who, although religiously obligated to apply Jewish law, apply secular Israeli law instead. See Ovadia Yosef, YEHAVE DA'AT IV, no. 64. See also Moshe Sternbuch (contemporary), TESHUVOT VEHANHAGOT III, no. 441; R. Krauss, *supra*, at 49-52.

36. The prohibition applies even if the law that the court would apply contained the same rules as Jewish law. See, e.g., SHULHAN ARUKH, *supra*; Maimonides, *supra*; Yaakov ben Yaakov Moshe Lorberbaum of Lissa (1760-1832), NESIVOS HAMISHPAT HIDUSHIM 26:1.

37. Moreover, the prohibition applies even if both parties voluntarily agree with each other to have their dispute adjudicated in the secular court. SHULHAN ARUKH, *supra*. These rules apply even if the court applies the same legal rules as applicable under Jewish law and even if the same result is reached. SHULHAN ARUKH, *supra*; Maimonides, *supra*. Indeed, if as a result of the litigation, the plaintiff collects more money than would have been awarded by a religious Jewish court, the extra money is considered to have been stolen. Joseph Caro, BEIT YOSEF, *Hoshen Mishpat* 26 (citing the view of Shlomo ben

Aderet (1235-1310)); Menashe Klein (1924-2011), MISHNEH HALACHOS IV, no. 213; BLEICH IV, at 7; Ari Marburger, *Arkaos*, "Civil Litigation, and Halachah," at am@maysharim.org, at 3.

38. Transgressing this law is a grave offense. A violator appears to have actively abandoned the holy laws and legal system that G-d specifically prescribed for the Jewish people, preferring, instead, rules and procedures made by man.

39. Jewish law authorities categorically condemn anyone who would violate this rule. Rabbi Shlomo Ben Yitzchaki (1040-1105), in his commentary on the Bible (Exodus 21:1) calls him an "Evildoer" who has "desecrated G-d's name." SHULHAN ARUKH, *Hoshen Mishpat* 26:1 states that one who violates this rule is an Evildoer and a blasphemer. The Tanhuma, at Mishpatim 3, states: "For whoever abjures Jewish judges and goes before gentile [judges] has first denied the Holy One, blessed be He, and thereafter denied the Torah." See BLEICH IV, *supra* at 3.

40. Certain portions of the Jewish prayer service may only be said in the presence of ten or more adult Jewish men. Some authorities expressly rule a Jew who files suit against another Jew in a secular or non-Jewish court rather than in a religious Jewish court cannot be counted towards this minimum number of ten. See Marburger, *supra* at 3, n. 5 (citing the commentator Abraham David ben Asher Anshel Wahrman (1740-1840), known as the Keseph Ha-Kedoshim, on Shulhan Arukh, Hoshen Mishpat 26:1).

41. In some religious Jewish communities, Jewish courts operate much as they did in ancient times. In other such communities, there are important differences. The differences may depend on, among other things, the particular religious beliefs held by most people in the community and the heterogeneity of the community.

42. Throughout most of Jewish history in the Diaspora, Jews lived in insular communities some degree of juridical and governmental autonomy. In such a setting, each city had an official rabbinic court where disputes were adjudicated. In the contemporary United States, some Jewish groups, usually but not always Hasidic groups, have official rabbinic courts, and members of those communities litigate their disputes in these courts. These courts may also accept cases involving Jews who are unaffiliated with their groups. Other rabbinic courts, including some that are not affiliated with any Hasidic group, hear cases involving all sorts of Jewish litigants.

43. Many secular law statutes provide for secular court enforcement of arbitration awards. Many rabbinic courts comply with the requirements of those statutes and, therefore, the rabbinic court awards are enforceable in secular court. If the losing party in a rabbinic court proceeding fails to comply with the court's decision, the court can, as a matter of Jewish law, authorize the prevailing party to enforce the rabbinic court decision in secular court. Under Jewish law, once a rabbinic court authorizes the prevailing party to go to secular court, it is permissible for that party to do so.

11

## THE RELIGIOUS SIGNIFICANCE OF RABBINICAL STUDY AND TEACHING
## AND BECOMING AND SERVING AS A RABBINICAL JUDGE

44. Every Jewish male is biblically commanded to engage in rabbinic study - the study of Torah. The Torah commands him to "speak of them [the Torah's precepts] while you sit in your home, while you   walk on the way, when you retire and when you arise." Deuteronomy 6:5-9.   Moreover, it is of the utmost religious importance.  The Babylonian Talmud, Sabbath 127a, states:

> These are the precepts whose fruits a person enjoys in This World but whose principal remains intact for him in the World to Come. They are:  the honor due to father and mother, acts of kindness, early attendance at the house of study morning and evening, hospitality to guests, visiting the sick, providing for a bride, escorting the dead, absorption in prayer, bringing peace between man and his fellow – *and the study of Torah is equivalent to them all.* (Emphasis added).

45. Similarly, Rabbi Maurice Lamm writes, "The study of Torah is Judaism's highest ideal. The rabbis gave it such a high priority that they declared, 'A Torah scholar of illegitimate birth takes precedence over a high priest ignoramus.'" See, e.g., Maurice Lamm, *The Jewish Way in Love & Marriage* (New York: Harper & Row, 1980) 101.  In fact studying Torah is itself an intrinsically religious act. As Rabbi J. David Bleich writes, "[Torah] study is not merely a means but an end, and not merely an end among ends, but the highest and   noblest of human aspirations.  Study of Torah for its own sake is a sacramental act, the greatest of all *mizvot* [commandments]." See J. David Bleich, CONTEMPORARY HALAKHIC PROBLEMS   (Ktav Publishing House, Inc.: New York, 1977) (hereafter "BLEICH I") xiii.

46. Rabbi Moshe Chaim Luzzatto (1707-1746) explains that "God granted us one particular means which can bring man close to God more than anything else.  This is the study of His revealed Torah." See Moshe Chaim Luzzatto, THE WAY OF GOD (Aryeh Kaplan, translator; New York: Feldheim Publishers, 1981) 71.

47. Furthermore, Judaism teaches that the G-d and His Will are one and that every law in the Torah is G-d's Will:

> . . . Torah study itself . . . is a manifestation of complete attachment to Hashem and His Torah.  Rav Chaim of Volozhin states in *Nefesh Hachaim* (Gate 4, ch. 6): "For [Hashem] and his will are one, as is written in the *Zohar*, and every law or halachah in the holy Torah is His will." See DORASH DOVID, SERIES 1, SHUFRA D'MOADAH 147

48. The Hassidic Master known as the Sfas Emes writes:

> Even during periods of exile, when the Divine Presence is not overtly revealed, Hashem can be 'found' through Torah study.  When Hashem commanded Moshe to write the Torah. . . . [Deuteronomy 31:19], He in effect was telling him to subsume the light of His Presence in the Torah. By immersing himself in Torah study, the Jew

can 'find' the Shechinah [the Holy Presence].   Thus, the Torah is called . . . testimony, because it is the greatest evidence of Hashem's Presence. " See, e.g., Sfas Emes, PIRKEI AVOS (Yosef Stern, translator and adaptor)(hereafter "STERN") 482.

49. The Tanna d.b. Eliezer 148 states: "Even though Israel be in exile among the nations, if they occupy themselves with Torah, it is as though they were not in exile." See C. G. Montefiore and H. Loewe, A RABBINIC ANTHOLOGY (Philadelphia: Jewish Publication Society of America, 5720-1960) )(hereafter "MONTEFIORE")132.

50. As J. David Bleich writes:

The Jew has always perceived God speaking to him through the leaves of the Gemara [i.e., the Talmud], from the paragraphs of the *Shulhan Arukh* and the words of the verses of the Bible.  The Sages long ago taught, "*kudsha berikh hu ve-oraita had*," God and the Torah are one; the Torah is the manifestation of divine wisdom.  God reveals Himself to anyone who immerses himself in the depths of Torah; the intensity of the revelation is directly proportionate to the depth of penetration and perceptive understanding.  To the scholar, a novel, illuminating insight affords a more convincing demonstration of the Divine Presence than a multitude of philosophic arguments.  It is a form of divine confrontation which must be experienced in order to be understood.  See BLEICH I, at xiii.

51. The study of Jewish law is especially important.  According to Rabbi Judah Lowe (c. 1513-1609), known as the Maharal of Prague:

The] Gemara [Babylonian Talmud, Niddah 73a] conveys the exalted character of the Torah and, particularly the advantage obtained by one who reviews *halachos* [Jewish laws]. . . . . The Gemara's lesson is that fundamental success in learning is dependent on the study of Halachah [Jewish law], that, to elaborate, *halachah* is the Torah's unswerving truth, veering neither to the left nor to the right."

See MAHARAL OF PRAGUE, NESIVOS OLAM – NESIV HATORAH: AN APPRECIATION OF TORAH STUDy (Eliakim Willner, trans. and adaptor; Brooklyn, N.Y.:  Mesorah Publications, Ltd., 1994) (hereafter, "Maharal") 87.

52. The Babylonian Talmud, Berakhot, p. 8a, states that, "From the day the Beis HaMikdash [i.e., the Holy Temple] was destroyed, HaShem [G-d] has nothing in His universe but the 4 amos [cubits] of halacha [Jewish law]."  In addition, the study of Jewish law brings great religious rewards.  For example, the Babylonian Talmud, tractate Megillah 28b states: "The Academy of Elijah taught: 'He who studies Torah laws every day, has the assurance that he will be in the World to Come, as it is said, "The ways of the world are His" - do not read [הליכות] "ways," but [הלכות] "laws.'"" The mastery of Halakhah, Jewish law, is the essence of Torah study.

53. The Jewish authorities compare studying Jewish law with the offering of sacrifices in the Temple.  Tanhuma B, Ahare Mot 35a, states:

The Law acts as a surrogate for the temple. Where sacrifices would have atoned for certain classes of sins, now that the Temple has gone, the Law, if    Israelites occupy themselves with its study, serves as an equivalent. God foresaw that the Temple would be destroyed, and He said, "while the temple exists, and you bring sacrifices, the temple atones for you; when the temple is not there, what shall atone for you? Busy yourselves with the words of the Law, for they are equivalent to sacrifices, and they will atone for you." See MONTEFIORE, at 188-119.

54. In fact, studying Torah is even said to be greater than offering sacrifices. Avot de-Rabbi    Natan states:

> The study of Torah is more beloved by God than burnt offerings. For if a man studies Torah he comes to know the will of God, as it is said, *then shalt thou understand the fear of the Lord, and find the will of God* (Proverbs 2:5) Hence, when a sage sits and interprets Holy writ to the congregation, scripture accounts it to him as though he had offered up fat and blood on the altar. See Judah Goldin, THE LIVING TALMUD (New York: New American Library, 1957), at 46.

55. In addition, through the religious experience of studying Torah, a person is protected from sin. The Midrash on Psalms 119:10 states: "The evil *yetzer* [i.e., the evil inclination] has no power over against the Law [i.e., the Torah], and he who has the Law in his heart, over him the *yetzer* has no power." See MONTEFIORE, AT 125. Similarly, the Babylonian Talmud, Berakhot 5a states:

> R. Levi b. Hama said in the name of R. Simeon b. Lakish: A man should always oppose the good impulse to the evil impulse, as it is said, "stir up (A.V. Stand in awe) and sin not" (Ps.IV,4). If he conquer it, well and good; but if not, let him occupy himself with Torah, as it goes on to say, "Commune with your heart." . . . . See MONTEFIORE AT 125.

56. Furthermore, the Sifre on Deuteronomy, Parshat Ekev, section 45, states:

> The words of the Law are likened to a medicine of life. Like a king, who inflicted a big wound upon his son, and he put a plaster upon his wound. He said, "My son, so long as this plaster is on your wound, eat and drink what you like, and wash in cold or warm water, and you will suffer no harm. But if you remove it, you will get a bad boil." So God says to the Israelites, "I created within you the evil *yetzer* [i.e., the evil inclination], but I created the Law as a medicine. As long as you occupy yourselves with the Law, the *yetzer* will not rule over you. But if you do not occupy yourselves with the Torah, then you will be delivered into the power of the *yetzer*, and all its activity will be against you."

> *Id.* See also Shmuel ben Yitzhak Di Uzeda (1540-1605), MIDRASH SHMUEL ON PIRKEI AVOT 4:18 (hereafter, MIDRASH SHMUEL) 181.

57. There is no limit to the biblical obligation to learn Torah. One must learn Torah day and night. As Joshua 1:8 states, "This book of Torah shall not leave your mouth, and you shall meditate in it day and night." The Mishnah, an ancient Jewish law text redacted circa 188, declares: "These are the commandments that have no prescribed measure: the corner of a field which must be left for the poor], the first-fruit offering, the pilgrimage, acts of kindness, and Torah study." MISHNAH, *Peah* 1:1, translated in SIDDUR at 17.

58. One is supposed to learn Torah instead of seeking materialistic enjoyment. Pirkei Avot 6:4 states: "This is the way of Torah: Eat bread with salt, drink water in small measure, sleep on the ground, live a life of deprivation - but toil in the Torah!" Rabbinic literature is replete with statements that in order to learn Torah deeply, a person must minimize his business activity, his sleep, and all of his physical pleasures and be happy with his lot. As one commentator puts it:

> Our Rabbis taught: "This is the Torah, a man who dies in a tent" – the Torah is only acquired by one who sacrifices in the tent of Torah [Babylonian Talmud] (Berachot 43b). In other words, one only acquires Torah if he devotes himself completely and absolutely to the Torah." See Rav Zalman Baruch Melamed, *Producing Torah Leadership*, in CROSSROADS IV (Elan Shevut, Gush Etzion, Israel: Zomet) 68.

59. Furthermore, one is supposed to learn Torah constantly. Its serious study is complex and demanding. If a person's chain of thought were interrupted, he might have to waste a great deal of time to get back to the same point in his analysis as he was before. As Meir Meiseles points out:

> The least neglect is followed by serious results. Resh Lakish said [Jerusalem Talmud, Berakhot 9): I found the following exposition written in Megillat Hassidim ("the scroll of the righteous"): "If you leave me one day – I shall leave you two days." Now the Torah is like two men who were travelling in opposite directions. They met at the same inn; but when they parted, and each one had travelled only one mile, the distance between them grew to *two* miles."

> See Meir Meiseles (contemporary), JUDAISM – THOUGHT AND LEGEND (Jerusalem, Israel: Feldheim Publishers, Ltd., 1964) 160-161.

60. Rav Chaim Veloshin (174-1821), in Nefesh HaChaim 4:33 makes the following comment on Proverbs 3:18:

> *The Torah is a tree of life to those who cling to it.* A person has to fix his heart and picture clearly in his mind the following image. A man drowning in a swiftly flowing river coming close to a strong tree would definitely grab hold of it with all his strength and wouldn't loosen his grip for an instant. He would be intensely aware that his life is totally dependent upon his attachment to that tree and no one is so foolish not to understand that if he is lax for even a second and relaxes his attachment that he

will immediately be torn away from the tree by the river and drown.  That is the way it is with our holy Torah which is described as the Tree of Life. Only when a person holds on to Torah with love and involves himself and his thought constantly in it does he have genuine elevated life and is he attached to G-d.  Because in fact G-d and the Torah are a unity.  If he deserts his learning and distances himself from fixed involvement with Torah for the nonsense of the world and its pleasures, he cuts himself off from the exalted life and deliberately drowns himself – G-d forbid.

See Daniel Eidensohn, DAAS TORAH: A JEWISH SOURCEBOOK (Jerusalem: Emunah Press, 2005) 152

61. In addition, there is a concept of "bitul Torah" [the waste of Torah], which refers to any time in which one unjustifiably detracts from his Torah study.  The sin of bitul Torah is very great. The Jerusalem Talmud, Hagigah 1:7 explains that it was because of bitul Torah that    the First Holy Temple in Jerusalem was destroyed.  It states: "The Holy One Blessed be He pardoned the sin of illicit relations and of the spilling of blood, but not that of the neglect of Torah study."  See Rabbenu Jonah, GATES OF REPENTENCE (Jerusalem: Feldheim, 5736)(hereafter "GATES")    83.

62. Moreover, there are many rabbinic statements that emphasize the severe punishments for bitul Torah.  The Sifrei, Deuteronomy, Ekev, states: "Just as the reward for Torah study is greater than that for all the mitzvoth [i.e., commandments], so is punishment for its neglect greater than that for all the transgressions."  GATES, *supra*, at 141. See, Pirkei Avot,  chapter 3, Mishnah 5; Yosef Hayyim ben Eliyahu, OTSAROS HAYYIM, 372-384; MIDRASH SHMUEL, *supra*, at 152, 235, 287, and 456.

63. The sages indicate that even slight interruptions can are punishable.  The Babylonian Talmud, Avodah Zarah 3b, states: "Anyone who interrupts his Torah study and engages in    idle talk is fed burning coals."  See also MIDRASH SHMUEL, *supra*, at 189.  Some rabbis write that this even applies to someone who interrupts his study to listen to idle talk even though he himself does not say anything.  See Jacob Meir Rosenbaum, EVEN BOHAN II, at 35 (citing authorities).

64. In addition, the Babylonian Talmud, Berakhot 5a, states that if sufferings afflict a person, he should examine his deeds.  If he does not find any other explanation for his plight, he should assume that it is because of bitul Torah.

65. A Jewish male is biblically obligated to teach Torah to his male children.  Deuteronomy 6:5-9 states:

You shall love HASHEM, your G-d, with all your heart, with all your soul and with all your resources.  Let these matters that I command you today be upon your heart. Teach them thoroughly to your children and speak of them while you sit in your home, while you walk on the way, when you retire and when you arise.  Bind them as a sign upon your arm and let them be tefillin between your eyes.  And write them on the doorposts of your house and upon your gates.

See THE COMPLETE ARTSCROLL SIDDUR (Nosson Scherman, commentator, Brooklyn, N.Y: Mesorah Publications, Ltd., 1999) (hereafter "SIDDUR") 93

66. Similarly, Deuteronomy, 11:18-21 states:

> Place these words of Mine upon your heart and upon your soul; bind them for a sign upon your arm and let them be tefillin between your eyes. Teach them to your children, to discuss them, while you sit in your home, while you walk on the way, when you retire and when you arise. And write them on the doorposts of your house and upon your gates. In order to prolong your days and the days of your children upon the ground that HASHEM has sworn to your ancestors to give them, like the days of the heaven on the earth. See SIDDUR, at 93.

67. Indeed, male children are supposed to start learning Scripture when they are only five years    old. See Pirkei Avot (The Ethics of the Fathers) chapter 5, Mishnah 25, in SIDDUR at 579. Jewish sources say that learning done while one is young is much more effective than    learning when one is older:

> Elisha ben Avuya said: One who studies Torah as a child, to what can he be likened? - to ink written on fresh paper. And one who studies Torah as an old man, to what can be he likened? - to ink written on smudged paper. See SIDDUR, at 569. See also MIDRASH SHMUEL, *supra*, at 320 (what the young learns is successfully internalized and remains part of one's fiber).

68. In addition, Judaism considers the teaching of Torah to others as an extremely important religious act. The Babylonian Talmud, Sanhedrin 19b, states that whoever teaches someone Torah is considered as if he gave birth to him. Rabbi Eliyahu Dessler says even more:

> There can be no greater _hessed_ [act of kindness] than teaching Torah. A person who looks after the physical needs of his fellow stands very high in the scale of Torah achievement. He has given life to a person in this world and "saving a life is equivalent to saving a whole world." But a person who teaches other people Torah has given them life in this world and in the next, and there can be no greater _hesed_ than this. See Eliyahu E. Dessler, STRIVE FOR TRUTH V(Aryeh Carmell, trans.; New York: Feldheim Publishers, 2002) 2012.

69. Serving as a religious judge is a spiritually fulfilling act. Jewish sources explain that by serving as a judge and resolving disputes between people, a person is credited with becoming a partner with G-d in Creation itself. The Teaching of the Fathers quotes Rabban Shimon ben Gamliel, who teaches that the world stands on three things: justice, truth and peace. Pirkei Avot 1:18. Rabbenu Yona (c. 1180-1263) explains that these are the three things that enable the world to endure:

By settling disputes between people, Dayanim (Jewish religious judges) enable the world to continue to exist, because if not courts and due process of law, anarchy      would ensue. . . . This is what our sages meant when they declared: "Anyone who judges a case and reaches the correct conclusion according to the true intent of the law, is as if he becomes a partner to the Holy One in the creation of the world." The Holy One created the world intending that it continue to exist. Wicked people, when they steal, cheat and commit other evil, serve only to destroy the world, as we are taught with respect to the generation of the flood in the days of Noah. It was decreed that they should die because of the sin of theft, as it is written (Genesis 6:13): "for the land is full of robbery because of them." Immediately afterwards we read, "Behold I am going to destroy them."

Therefore, when a judge breaks the arrogant arms of the wicked, and forces them to restore to the owners all that they robbed from them, the judge preserves the world. The Creator's Will is that the world that He made continue and not be destroyed, so when a Judge administers justice, he causes fulfillment of the Creator's Will, thereby becoming a partner of the Holy One in creating the world.

See Jacob ben Asher, ARBA'AH TURIM, *Hoshen Mishpat* , Introduction to the Laws of Judges. Most of the above translation, with a few slight differences, may be found in the Pirchei Shoshanim Shulchan Aruch Learning Project, Dayanus Lesson One, at 8-10, available at http://www.shulchanaruch.com/wp-ontent/uploads/2013/11/01_Dayanus-Lesson-One.pdf.

70.  Moreover, the sages say that when one serves as a judge, one basks in the presence of G-D. For example, Exodus Rabbah 30:20 states: "When a judge sits in judgment . . . the Holy One, blessed be He, leaves the  highermost heavens and causes His Shekhinah to rest at the judge's side." See BLEICH IV, *supra*, at 3. The sages state: "Anyone who judges a case according to the true intent of the law causes the Divine Presence to dwell among the Jewish nation." BABYLONIAN TALMUD, *Sanhedrin* 7a. Similarly, it says that anyone who does not judge a case according to the true intent of the law causes the Divine Presence to depart from the Jewish nation. *Id.*

## THE CONGREGATIONAL RABBINICAL OF
## TARTIKOV, INC.'S COURSE OF RELIGIOUS STUDY

71. It is my opinion that the plaintiff Congregation Rabbinical College of Tartikov, Inc.'s proposed curriculum is excellent. (For purposes of this declaration, whenever I refer to "plaintiff" in the singular, I refer to plaintiff Congregation Rabbinic College of Tartikov, Inc.) I believe that the length of the program is one of its most outstanding strengths. Serving as a religious judge involves tremendous responsibility, as is repeatedly emphasized throughout Jewish religious literature. For example, the Talmud quotes Rabbi Samuel bar Nahmani in the name of Rabbi Yohanan, "A judge should always think of himself as if he had a sword hanging over his head and Gehenna [i.e.,

18

hell] gaping under him . . . ." BABYLONIAN TALMUD, *Sanhedrin* 7a, available at
http://halakhah.com/pdf/nezikin/Sanhedrin.pdf.

72. To perform his job properly, a Jewish judge must hurdle many obstacles. For instance,
an incredibly vast and extensive wealth of rabbinic literature must be mastered. This
literature, written in Hebrew and Babylonian Aramaic, is abstruse and both analytically
and conceptually challenging. In addition, because some Jewish law doctrines impart
religious significance to commercial customs and to particular portions of secular law,
these subjects must also be studied. In order for rabbinic court judgments to be
enforceable as arbitral awards in secular courts, rabbinic courts must comply with
applicable secular arbitration statutes. Thus, judges must become familiar with these
statutes. Furthermore, because       Jewish law enjoins religious judges to encourage
parties to reach voluntary compromises, prospective judges must receive training in
mediation.

73. Plaintiff's proposed course of study is longer than other rabbinic programs with which I
am familiar, but there are important reasons for this. Plaintiff's proposed program is
actually designed for students who intend to become "full-time" religious law judges
(*dayyanim*). Most United States rabbinic programs are intended to train pulpit rabbis,
not Jewish law     scholars. Even the advanced rabbinic studies programs in the United
States with which I am familiar are designed to enable students to further develop their
Jewish law skills, but not to make them thoroughly conversant with Jewish law. It is my
opinion that most students participate in such programs because of the immense
religious importance of rabbinic studies and the deeply religious experience of rabbinic
study. They are not intending to make "careers" of being rabbinic judges. The
prospective participants in Plaintiff's program intend to be rabbinic judges. It is my
opinion that they would not otherwise make the incredible commitment that the
program requires.

74. It is important to note that most rabbinic courts that currently exist will only agree to
hear a case if the parties explicitly relieve them of the responsibility for rendering a
decision that is in strict accord with Jewish law. One of the reasons for this is the
difficulty of reaching a correct decision. This can cause serious problems if one of the
parties demands a decision according to strict Jewish law. My understanding is that the
Plaintiff's program is designed to equip its graduates with the advanced degree of
expertise that would enable them to render decisions according to strict Jewish law if
the parties insist on this.

75. Some of the prospective faculty of Plaintiff's proposed program are experienced
members of a rabbinic court, the Beis Din L'Hoyra of Monsey. My understanding is
that, as judges in that court, they have been willing to decide cases according to strict
Jewish law, except,    perhaps, as to the administration of religious oaths, and that they
have the same expectation for the graduates of Plaintiff's proposed program.

76. Another way in which Plaintiff's program is more ambitious than most is in the
comprehensiveness of its program. The Shulhan Arukh, known as the Code of Jewish

Law, is organized into four sections, Oreh Hayyim, Yoreh De'ah, Hoshen Mishpat, and Even Ha-     Ezer. Plaintiff's program is designed for students to master all four of these sections. Other programs may only focus on all, or perhaps parts, of only two of these sections.

77. In addition, Torah knowledge is gained not merely from formal study, but also from observing and attending to Torah scholars. In fact, the Babylonian Talmud, tractate Berakhot 7b, states: "Attending to Torah [scholars] is even greater than studying from them." The intensity of Plaintiff's program and the planned on-campus housing provides the students invaluable opportunities to interact with and attend to their teachers. Moreover, to learn to be a rabbinical judge requires on-site training. Plaintiff's program will include substantial opportunities, especially for advanced students, for their observation of - and, ultimately, their participation in - actual rabbinic court proceedings. This further distinguishes Plaintiff's proposed program from other rabbinic programs currently available in the United States.

78. It is noteworthy that most United States jurisdictions require that a person, in addition to being a member of the bar, have extensive legal experience before being eligible to serve as a judge.

79. It is not possible in this declaration to adequately describe the complexities of Jewish law analysis, but I will mention just two of its many facets. The first facet regards the cluster of questions that arise from the various types of Jewish laws. There are biblical laws and non-biblical laws. As to biblical laws, some are characterized as "positive" and some are characterized as "negative." The extent to which a person may be obligated to abide by a particular law, i.e., the personal cost that a person is required to bear in abiding by the particular law, may vary substantially depend upon whether it is a positive or a negative law. But there are different opinions as to the basis on which a given law is so characterized. For example, there is a biblical law that directs a person "not to stand idly while your fellow bleeds." This verse is phrased in negative language, i.e., it says, "don't" be idle. On the other hand, the impact of this verse is to demand action. The implicit message of "don't be idle," is "act!" Rabbinic authorities disagree as to whether characterization of the law depends on the way in which the law was biblically phrased or on the substantive impact of the law. There may even be differences regarding the extent to which a person is required to perform two biblical obligations that are clearly both deemed to be negative obligations.

80. Without identifying the various types of non-biblical laws, let's just consider one of the important distinctions between biblical laws and non-biblical laws. This distinction involves specific cases in which there is uncertainty as to whether a particular law applies. If the rule is biblical, then one is obligated to act as if the rule applies even if there is only a small, but not *de minimus*, likelihood that the law applies. On the other hand, if the rule is not biblical, then one is not obligated to act as if the law applies unless there it is more likely than not that it applies. Regarding many laws, of course, there is rabbinic disagreement as to whether or not they are biblical.

81. A second complicating facet of Jewish law involves the significance of minority opinions. In Jewish law, far from being ineffective, minority views can continue to have significant legal impact. The effect of a minority position in a particular case can depend on factors such as the number and identity of the authorities espousing the various minority views, the identity of any litigants (e.g., whether they are Ashkenazic or Sephardic), the relevant jurisdiction, and which party presently is in possession of any disputed property. In addition, the facts of any particular case may raise multiple legal questions, and each of those questions may be subject to a debate among Jewish law authorities. A particular prospective ruling may depend on how each of these questions is resolved. Even if as to each point the majority view is in accordance with one ruling, the presence of multiple minority views may result in a contrary decision. This raises the exceedingly complicated doctrine known as *sfeik sfeika*.

82. The job of a Jewish law judge is challenging in different ways than that of secular judges. In secular law, there are courts, such as the United States Supreme Court and the New York Court of Appeals, that can render binding decisions regarding questions within their respective areas of authority. Decisions by such courts often provide importance guidance for lower courts in their jurisdictions. The Jewish law system lost its version of a "Supreme Court" centuries ago with the dissolution of the Sanhedrin HaGadol, and, consequently lacks such guidance. In addition, secular judges have the advantage of organized systems of reported decisions and increasingly sophisticated, up-to-date, and cross-referenced legal databases. For a variety of reasons, and in many different ways, the resources available for rabbinic judges are far less useful.

83. Furthermore, a Jewish judge requires more comprehensive command of applicable law than most secular judges. Although some secular courts are restricted to certain types of issues, such as family law, and some judges focus on particular issues, such as guardianships or foreclosures, rabbinic court judges face a broad spectrum of cases - and must be prepared to do so.

84. In addition, Jewish law encourages courts to reach decisions expeditiously. The discussion of this principle arises in connection with criminal trials, as to which alacrity is especially important because of the emotional distress of a criminal defendant. Nevertheless, similar emotional distress can be present in some civil cases as well. Indeed, in civil matters delay can result in incidental and unnecessary harm to one or both parties, irrespective of the court's ultimate decision. The judges feel the religious obligation to avoid or at least minimize such losses. Consequently, it is important that rabbinic judges not only enjoy the analytical skills necessary for legal reasoning, but that they possess an expansive, thorough knowledge of substantive law. By contrast, secular judges may enjoy relatively little time pressure to render a decision.

85. Plaintiff's proposed program is both physically and intellectually grueling. Sunday through Thursday, a student may start as early as 6:00 a.m. and end as late as 10:30 p.m., with relatively short intervals for meals, prayers and perhaps a little rest. It also includes study sessions on Friday morning and on the Sabbath. There are various reasons why I believe that the students who will be engaged in Plaintiff's proposed

program will be serious and     dedicated.  First, only the most committed individuals would be willing to undertake so daunting a task.  Second, I have met and spoken with several of the individual plaintiffs, and they seemed to be quite sincerely convinced of the religious importance of studying Jewish law.  Third, the program does not lead to a financially rewarding career; it is designed for someone who seeks religious, not materialistic, fulfillment.

### THE RELIGIOUS SIGNIFICANCE OF THE TYPICAL MARITAL AND FAMILY STATUS OF RABBINICAL STUDENTS.

86. Jewish law strongly encourages young men to marry early and to raise large families.  Because of this encouragement, it would seem likely that many, if not all, of the young men who would matriculate to Plaintiff's intended rabbinical school would be married, and with one or more children, either at the time of their matriculation or relatively shortly thereafter.

87. Jewish males are biblically obligated to marry and endeavor to have children: "Each man is obligated to marry a woman in order to reproduce, and anyone who does not engage in reproduction is like a murderer who diminishes the image of G-d and causes the Divine Presence to depart from the people of Israel."  SHULHAN ARUKH, *Even Ha-Ezer* 1; BABYLONIAN TALMUD, *Yevamot* 63b-64a.  In his gloss on this rule in Shulhan Arukh, Rabbi Moses Isserles (1520-1572) adds, "Whoever lacks a wife is without blessing and without Torah and is not called a man; once he marries his sins are erased."  SHULHAN ARUKH, *Even   Ha-Ezer* 1.  The Talmud quotes Abba Hanan, in the name of Rabbi Yose, who says that a person who does not involve himself in reproduction deserves death. BABYLONIAN TALMUD, *Yevamot* 64a.

88. Another law underscores the importance of marriage.  A Torah scroll is a most sacred object.  Jewish law prohibits the sale of a Torah scroll for most all purposes.  Nonetheless, it permits a Torah scroll to be sold in order to engage in Torah studies or to marry. SHULHAN ARUKH, *Even Ha-Ezer* 2.

89. Shulhan Arukh states that a man should marry while he is young.  It says that he fulfills the commandment properly if he marries at 18, see Pirkei Avot 5:25, but it would be even     better if he married somewhat younger than that.  SHULHAN ARUKH, *Even Ha-Ezer* 3.

90. The Five Books of Moses repeatedly emphasize the importance of marriage and human reproduction.  G-d declared that it was not good for Adam to be alone, and, therefore, G-d created Eve to be Adam's mate.  G-d told Adam and Eve, representing all of humankind, to "be fruitful and multiply." (Genesis 1:28).  After the flood that consumed almost all humankind, G-d repeated this statement to Noah and his sons when they exited the Ark. (Genesis 9:1,7).  Similarly, when Jacob entered the land of Israel, G-d said to him:  "I am the Almighty G-d; be fruitful and multiply." (Genesis 35:11).

91. The Talmud discusses the details of a Jewish man's obligation to engage in procreation.  It debates the details of the commandment, including how many children a person must

have in order to fulfill this obligation. BABYLONIAN TALMUD, *Yevamot* 61b. Nevertheless, even after a person fulfills the biblical commandment, rabbinic law continues to require that he      endeavor to have additional children. SHULHAN ARUkh, *Even Ha-Ezer* 1:8. Maimonides states:

> Although a man has fulfilled the mitzvah of be fruitful and multiply – he is commanded by the rabbis not to desist from procreation while he yet has strength, for whoever adds even one Jewish soul is considered as having created an entire world.

> See Moses Maimonides (1135-1204), MISHNEH TORAH, *Hilkhot Ishut* 15:16.

92. One reason for this continued duty is the perceived purpose of the biblical rule. As one thirteenth-century Jewish scholar explains, "[T]he root purpose of this [biblical] precept is in order that the world should be settled, inhabited. For the Eternal Lo-d, blessed is He, desires its settlement, as it is written 'He did not create it a chaos; He formed it to be inhabited.' (Isaiah 45:18)." See, e.g., Aaron Halevi, SEFER HAHINNUKH I, Commandment 1(New York: Feldheim Publishers, 1992) 83.  The more children one produces, the more one contributes to such habitation.

93. Another reason is that having more children is believed to hasten the arrival of the Messiah.  The Talmud states that a certain, but unknown, number of souls is stored in Heaven, and that the Messiah will only come after all of those souls have been born. See BABYLONIAN TALMUD, *Yevamot* 62a, 63b, *Avodah Zara* 5b, *Niddah* 13b.

94. The Talmud underscores the importance of reproductive activity by stating that when a man dies and appears before the Heavenly Tribunal to be judged, one of the six questions he is asked is "Were you busy with being fruitful and multiplying?" See BABYLONIAN TALMUD, *Shabbat* 31a. Jewish religious literature repeatedly stresses the importance of family and children.

95. For example, it refers to the male founders of the faith, Abraham, Isaac and Jacob, as "the Avot" ("the fathers"), and it refers to the leading females as "the Imahot" ("the mothers").  It refers to the nation of Israel as "Beit Israel" (the house of Israel).  It refers mystically to      the relationship between G-d and the nation of Israel as a marriage.  Fellow Jews are called brothers.  See, generally, Maurice Lamm, THE JEWISH WAY IN LOVE & MARRIAGE (New York:  Harper & Row, 1980) 127.

96. In the Pentateuch, G-d refers to Jews as his children.  Many of the leading religious figures, including, for example, Abraham and the four Jewish matriarchs, beseech G-d for children.

97. As Yoel Jakobovits, former Chief Rabbi of the United Kingdom, writes:

> Judaism regards the gift of children as one of life's preeminent endowments – and challenges.  Fecundity is among the most cherished of blessings, an attitude graphically amplified in Psalm 128 which speaks of "a wife as fruitful as a vine",

whose 'children are as olive plants around the table' leading to the ultimate joy of seeing "children to thy children."

See Yoel Jakobovits, *Male Infertility: Halakhic Issues in Investigation and Management*, in JEWISH LAW AND THE NEW REPRODUCTIVE TECHNOLOGIES 116 (Emanuel Feldman and Joel B. Wolowelsky, eds.; (Hoboken, N.J.: Ktav Publishing House, Inc., 1997).

98. Judaism, as well as Jewish law, is based on the passing down of faith, laws, and traditions from father to son. The biblical commandment to study Torah is immediately accompanied by the duty to teach the laws of the Torah to one's children. A core element of the "Haggadah" (the "Telling") that is read at the religious celebration of Passover is a discussion of what one should say to four types of sons.

99. Another reason why religious Jewish couples may have many children is that, as a general rule, Jewish law imposes conjugal duties upon husband and wife while forbidding them to engage in various birth control measures. See, e.g., Fred Rosner, *Contraception in Jewish Law*, TRADITION 12:2 (Fall 1971), pp. 90-103

## THE IMPORTANCE OF THE RABBINICAL
## STUDENTS LIVING CLOSE TO JEWISH SERVICES

100. Because of the reasons mentioned above, a typical Orthodox Jewish family is large. It may have children of various ages, who need to attend different religious schools. One's sons need to start their religious studies by age 5. For various reasons, including curricular differences, there are traditionally separate religious schools for boys and girls. Consequently, it is essential for the intended students in Plaintiff's program to be able to live close to religious schools for their children. Otherwise, prospective participants in Plaintiff's program could be forced to compromise between the fulfillment of their religious duty to learn Torah and their religious duty to ensure that their children learn Torah.

101. In addition, because the young couples may have both pre-school children, who need to remain at home, and school-aged children who may need to go to separate schools, it is also important that they be able to live among other Orthodox families with similarly aged children. This is essential in developing feasible car-pooling arrangements.

102. Orthodox Jews only eat kosher food. As a result, it is essential that they live within convenient distance of purveyors of kosher foods.

103. Orthodox Jews need to abide by a fairly strict religious dress code. Because of issues of modesty, clothes that are "in-style" for secular women are simply not deemed religiously acceptable by many Orthodox Jews. Therefore, it is necessary for them to have reasonable access to clothing stores that specialize in serving an Orthodox Jewish clientele.

104. Another very important issue involves a rather delicate subject, but, because of its important, it must be mentioned. As I have already explained, the Jewish religion strongly encourages large families. However, Jewish law prohibits conjugal relations during various times related to each particular woman's menstrual cycle. Once a woman experiences her "period," there is a process she must go through before conjugal relations would be permitted. This process can take many days, and it ends with the woman's bathing in a ritual bath known as a "mikva." Typically, a mikva is a specially constructed facility that is located within some communal building. Because various religious requirements must be met, a mikva usually costs a considerable amount of money to build. It is only regularly available where there is a sufficiently sizeable Orthodox community to support it. A woman must bathe in a mikva in the evening, not during the day. It is religiously important for a woman to visit the mikva as soon as she is eligible to do so. Not only does Judaism posit a religious duty to engage in efforts to procreate, but it imposes conjugal duties on husband and wife. Because of their menstrual cycles and the strictures of Jewish law, some women may only have a few days per month on which conjugal relations are permitted. Access to a mikva is therefore very important according to Jewish law. See, generally, Binyomin Forst, THE LAWS OF NIDDAH (Brooklyn, N.Y.: Mesorah Publications, 2002).

105. For these reasons, it is essential that a Jewish woman live close to a mikva. On Friday evening, which is part of the Jewish Sabbath, all forms of motorized transportation are forbidden. It would not only be difficult, but in some cases completely infeasible for a woman to walk to and from a mikva that is not near her home. Moreover, in many instances, it may well be unsafe for her to so.

106. There is another religious reason why it is important for the participants in Plaintiff's program to live near a mikva. The Talmud actually states that Friday night is the time when rabbinic students should engage in conjugal relations with their wives. See BABYLONIAN TALMUD, *Yevamot* 64. Consequently, if their wives needed to go to a mikva on Friday night, but there was none available, the husband would be unable to comply with this Talmudic prescription.

### THE INTENSITY OF THE RABBINICAL STUDENTS RELIGIOUS STUDY AND THE IMPORTANCE OF ON CAMPUS HOUSING TO ACCOMMODATE SUCH STUDY AND RELIGIOUS LIFE

107. Not only is living within a community committed to Torah studies religiously important in a number of ways, it is also essential to the success of Plaintiff's rabbinic program.

108. Judaism believes that a person is significantly influenced by his environment, and therefore directs him not only to avoid associating with actually evil people, but affirmatively to dwell among a community that is dedicated to Torah.

109. As to avoiding bad people, the Mishnah states: "Nittai the Arbelite says: Keep Far from an evil neighbor, do not associate with a wicked man . . . ." Pirkei Avot 1:7. One

reason for this rule is lest a person learn from and adopt his neighbor's evil ways. Rabbi Joseph H. Hertz, former Chief Rabbi of the British Empire, comments:

> A hundred years before Nittai, Ben Sira taught, 'He that toucheth pitch shall be defiled' (Ecclesiasticus 13, 1). Nittai's warning may be connected with the clause that follows: when thou seest the wicked profit from their evil ways and escape punishment, be not thou tempted to join them in the hope of the same immunity. The day of reckoning will come." See Joseph H. Hertz, SAYINGS OF THE FATHERS (New York: Behrman House, 1945) 18, n. 7.

110. Furthermore, the sages emphatically stress that a person must live amongst Torah scholars. Pirkei Avot, Chapter 6, Mishnah 9, states:

> Rabbi Yose ben Kisma said: One time as I was walking on the road a man met me and greeted me and I returned his greeting. He said to me: "From where do you come?" I replied: "I come from a great city of sages and scholars." He then said to me: "Rabbi, if you would be willing to live with us in our vicinity, I would give you a million golden dinars and precious stones and pearls." I replied: "Were you to give me all the silver, gold, precious stones, and pearls in the world, I would not live anywhere except in a place of Torah."

111. Similarly, Pirkei Avot, Chapter 4, Mishnah 18 cites Rabbi Nehorai as saying, "Exile yourself to a place of Torah." Rabbi Moshe Almosnino (c. 1518-1579) commented on this Mishnah in his commentary, Pirkei Moshe, published in 1563. He said that by "a place of Torah," the Mishnah means a place that fundamentally prides itself on its study of Torah. He points out that the Mishnah does not say that one should necessarily go to the place where the biggest Torah scholar happens to reside. Instead, it says to go to a "place of Torah," to emphasize that the goal of the people who live there is to learn Torah, that the entire community was founded with this intention. The reason, Rabbi Almosnino explains, is that a person going to such a place will certainly immerse himself in Torah when he sees that everyone in that place is doing so.

112. Providing on-campus housing is critical to the success of Plaintiff's rabbinic program in many ways. First, the unavailability of on-campus housing would make it very difficult to   accommodate proper religious observance of the Sabbath. As already mentioned, during the Jewish Sabbath - which is from Friday night through Saturday night - all forms of motorized transportation are forbidden. Similarly, using all forms of electronic communication - e.g., phones - is forbidden. In light of these religious restrictions the lack of on-campus housing would force the rabbinic students to compromise on one or more of three very important ways in which to observe the Sabbath: (1) learning Torah; (2) engaging in conjugal relations; and (3) interacting with one's children, including teaching them Torah.

113. A multitude of rabbinic sources state that the religious value of studying Torah on the Sabbath is much greater than on weekdays. See Shlomo ben Amram Cohen, MENUHAH SHLEIMAH III, at 48-49 (citing authorities). Indeed, the Jerusalem Talmud

states that the Sabbath was given for the purpose of studying Torah. JERUSALEM TALMUD, *Sabbath* 9:7.

114. On the other hand, the Shulhan Arukh states that the time for rabbis to engage in conjugal relations is on the night of the Sabbath. SHULHAN ARUKH, *Oreh Hayyim* 280:1. See also Maimonides, COMMENTARY ON THE MISHNAH, *Nedarim* 8:6. Unless the participants in the Plaintiff's program were able to live near each other and near the Plaintiff's planned facility, they might well be forced to forego either conjugal relations with their wives or rabbinical studies with their colleagues during the Sabbath.

115. Moreover, participants in Plaintiff's program would be required to engage in a normal day's study on Sunday, and their male children who attend religious Jewish schools would typically have school on Sunday. The rabbinical program's daily schedule is so time-consuming and demanding that it would leave no time for family. Consequently, the Sabbath would be the only time during a typical week for participants in the Plaintiff's program to have any meaningful opportunity for engaging in the religiously important relationship with their children. Nevertheless, because of the Sabbath laws, unless the rabbinic students lived within walking distance of Plaintiff's rabbinic seminary, they would have to choose to give up one of these two important religious activities: spending part of the Sabbath with their children and spending part of the Sabbath pursuing their rabbinic studies with their colleagues and mentors.

116. Another way in which on-campus housing is *instrumentally* important is that success in one's Torah studies depends heavily on immersing oneself in a community of Torah scholars. This is another message that is learned from the Mishnah mentioned before, Pirkei Avot, Chapter 4, Mishnah 18, that states: "Rabbi Nehorai say, 'Exile yourself to a place of Torah, and do not say that it [i.e., the Torah] will come after you, because it is through the give and take with your colleagues that your Torah knowledge will stay with you. Do not rely on your wisdom." See MIDRASH SHMUEL, *supra*, at 301.

117. Use of the world "exile" is unusual. It could have said "Go to a place of Torah." One commentator points out that the word "exile" is the same word that is used with respect to a person who kills accidentally and who therefore needs to flee to a "city or refuge" (i.e., a safe haven) to be protected from the deceased's blood-avenger. When he does so, he acts with a sense of urgency. Here, too, a person should run, not merely walk, from an environment that is not a community of scholars. *Id.* The reason is that the Torah will not go after a person; he must pursue it. Nor should a person rely on his own wisdom alone to be able to attain Torah knowledge. The constant give and take with colleagues is essential. *Id.* In fact, without the benefit of a Torah environment, a person cannot even maintain the level of Torah scholarship that he has already acquired. *Id.*

118. The Mishnah may also mean that even if someone is wealthy and can hire a Torah teacher to come to teach him, if the person does not dwell in a community of Torah scholars, he will not succeed. Although having a teacher is important, interaction with and among many colleagues is much more essential. *Id.*, at 302. Being in a Torah community is necessary not only to acquire Torah knowledge but to retain it. *Id.*

119. This Mishnah provides a good basis for understanding a particular Talmudic narrative:

> In . . . light [of Pirkei Avot, chapter 4, Mishnah 18], we can gain insight into an
> otherwise puzzling incident. The Gemara [Babylonian Talmud](Shabbos 147b)
> relates that Rabbi Elazar ben Arach who was highly praised by his mentor,
> Rabban Yochanan ben Zakkei . . . forsook his yeshivah for an extended vacation
> at the spas of Diumsus. Upon returning, and realizing how much of his learning
> he had forgotten . . . he acknowledged the wisdom of this *mishnah*. It is difficult
> to believe that the sainted Rabbi Elazar sought an extended vacation from
> yeshivah. He certainly would never have forsaken the 'four cubits of Halachah'
> for the hedonistic pleasures of a spa. Rather, Rabbi Elazar felt he could enhance
> his spiritual growth by becoming the 'resident' scholar of Diumsus, trusting that
> his piety would shine by comparison to the crass hedonism of the resort's
> townspeople. Upon realizing the pitfalls of such an approach and the effect of
> being away so long from yeshiva, he proclaimed, . . . [i]t is better to be an exile
> in a *place of Torah* than to be a 'star' in a wasteland. This theme is restated
> forcefully in a subsequent *mishnah* (4:20): . . . it is better to be a *tail* (i.e., an
> insignificant presence) among spiritual lions than to be the *head* (the leading
> spirit) among foxes." See STERN, *supra*, at 281-282.

120. Meir Meiseles points out that this ideas is also implicit in another Talmudic passage,
specifically, by the interpretation, in Babylonian Talmud, Berakhot 63, of Deuteronomy
27:9: "'Attend (*hasket*) and hear, O Israel.' The word *hasket* implies [based on the root
of the words *hasket* and *kittot*]: Make yourself into groups (*kittot*) to study the Torah,
since the knowledge of the Torah can be acquired only association with others . . . ."
See Meir Meiseles, JUDAISM - THOUGHT AND LEGEND (Jerusalem, Israel:  Feldheim
Publishers, Ltd., 1964) 162.

121. However, in addition to learning from scholarly exchanges with colleagues and from
lessons from teachers, one learns from watching, observing and attending to teachers.
The Babylonian Talmud, Berakhot 7b, states: "Attending to Torah [scholars] is even
greater than studying from them." Rabbi Nisan Wachtfogel, former Dean of Students at
BMG, writes that there is no place to grow in Torah and religious commitment like in
the yeshiva, where there is *shimush* [attendance on Torah scholars] as well as discourse
with students. See Nisan Wachtfogel, KOVETZ SIHOS V (5762; Vaad to Publish the
Mashgiah's Talks, 5762) 29.

122. Much of one's academic studies are conceptual. One needs to translate the theoretical
concepts to actual cases, cases that arise through human interactions. The number of
cases that are expressly addressed in literature are finite, and the correct applications
may depend on many factual variables. Students can most effectively learn how to act
and how to rule in such cases by constantly observing what Torah scholars do in such
situations - and by having the opportunity to speak with them to clarify their reasoning.
This cannot be accomplished through a handful of observations. But it can be achieved
through Plaintiff's program. Plaintiff's program calls, first, for the students, both the

beginning students and the much more advanced students (who are themselves Torah scholars and teachers), to live together, on campus, throughout the duration of the rabbinical program.  In addition, the intensity of the plaintiff's program plus its emphasis on students' observation of and participation in actual rabbinic court proceedings, will enable students to learn how to conduct themselves as religious judges.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: January 21, 2015
at   Chicago, IL  60645

Steven H. Resnicoff
Steven H. Resnicoff

29