UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., *et al.,*

Plaintiffs,

-against-                                                    **07 Civ. 6304 (KMK) (GAY)**

VILLAGE OF POMONA, NY; *et al.,*

Defendants.

-------------------------------------------------------------------

## DECLARATION OF WILLIAM D. FITZPATRICK, P.E., P.T.O.E.

William D. Fitzpatrick declares as follows, pursuant to 28 U.S.C. § 1746:

1. I make this declaration on behalf of the Plaintiff Congregation Rabbinical College of Tartikov, Inc. to support my opinion that the provisions of the Village of Pomona's zoning code that regulate "Educational Institutions,, are not justified by any need to regulate impacts to traffic or traffic infrastructure, that they treat certain types of educational institutions differently and worse than other land uses without justification, and that a Rabbinical College as proposed by the Plaintiff can be developed in the Village without creating unacceptable traffic impacts.

2. I am a licensed professional engineer (PE), and professional traffic operations engineer (PTOE). My qualifications are set forth with particularity in my curriculum vitae is attached hereto as **Exhibit A**.

3. I have been previously recognized as an engineering and traffic operations expert, and accident reconstruction expert in the New York State Court of Claims, New York State Supreme Court, and U.S. Federal Court, Southern District proceedings.

1

4.    I established FitzPatrick Engineering, LLC in January 2008 and as principal of this consulting firm, I provide and oversee traffic and safety engineering and forensic engineering services to clients who wish to determine the implications and potential impacts of a specific aspect of a transportation and/or facility infrastructure.

5.    I have previously been employed by the New York State Department of Transportation from 1969 to September 2004, I have extensive in-depth experience in transportation engineering and traffic operations.  As NYSDOT Director of Traffic Engineering and Safety for the Hudson Valley region, I was responsible for an extensive network of highways servicing millions of daily highway users extending from the rural counties of Columbia and Ulster to the urbanized Westchester and Rockland suburbs of New York City.  My responsibilities integrated traffic controls, signals, permits, design QA/QC, safety, Intelligent Transportation System strategies, truck/bus inspections, and roadway assistance services into an effective and efficient professional transportation program.

6.    PTOE responsibilities often include the analysis of those operations, detection of problems and deficiencies, setting of priorities, assignment of resources and development of improvements in operations through geometric design, traffic control or other means.

7.    In preparation for drafting this Affidavit, I have reviewed various documents including the Second Amended Complaint, Defendant's Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories, Answer to Second Amended Complaint, Defendants' Third Supplemental Responses to Plaintiffs' Second Set of Interrogatories; 2001 Draft of Local Law Amending 130-9 and Related Sections Regarding Standards for Schools of General Instruction; Local Law #1 of 2007; Local Law #5 of 2004; Local Law #5 of 2007; F.P. Clark's January 24, 2000 Memorandum RE: Zoning

Recommendations Regarding Schools; F.P. Clark's May 19, 2000 Memorandum RE: Zoning Recommendations Regarding Schools; related documents, photographs and aerial maps, site examination and inspection; applicable statutes, rules and regulations, guides, and manuals, including those applicable to good and sound transportation engineering, and traffic engineering and safety, and accident evaluations, including but not limited to the NYS Vehicle and Traffic Law; USDOT's National Manual of Uniform Traffic Control Devices (NMUTCD); New York State Supplement to the National Manual of Uniform Traffic Control Devices; NYSDOT Design Manual; NYSDOT Specifications and Standards; the Institute of Transportation Engineers' published Recommended Practice, "Transportation Impact Analysis for Site Development; NYSDOT Policy and Standards for Entrances to State Highways; American Association of State Highway and Transportation Officials (AASHTO) "A Policy on Geometric Design of Highways and Streets,,; Institute Transportation Engineer's (ITE) "Generation Handbook,,; ITE's "Traffic Engineering Handbook,,; and ITE's "Manual of Transportation Engineering Studies.,,

8. I have been requested by the Plaintiffs in this matter to ascertain the ability of the existing roadway network to absorb the proposed site traffic generation in a safe and efficient manner. The tools to do so are those common practices accepted by the traffic engineering profession as provided by various professional organizations and government agencies. Those organizations include the Institute of Transportation Engineers (ITE), the Association of American State Highway and Transportation Officials (AASHTO), the U.S. Department of Transportation (USDOT), the Federal Highway Administration (FHWA), The National Research Council's Transportation

3

Research Board (TRB) and the New York State Department of Transportation (NYSDOT).

9.    A second but equally important task integral to my assessment is the investigation of the potential effect and relevance of current specific land use zoning regulations and local laws to the proposed land use, *i.e.*, a Rabbinical College.


I.    **DESCRIPTION OF THE ROADWAY NETWORK OF THE VILLAGE OF POMONA AND THE SUBJECT PROPERTY**

10.   The use of the term "Rabbinical College," herein refers to that land use proposed to be developed by the Plaintiff Congregation Rabbinical College of Tartikov, Inc., on its property within the Village of Pomona, but which I understand is prohibited by the Village's land use regulations.  While no specific site plan or special permit application has been filed for such use (as it is prohibited), any such use will have certain characteristics, namely that it will be an unaccredited educational institution, and that it will seek to provide family housing with housekeeping facilities for its student body.

11.   The proposed Rabbinical College site is situated on an approximately 100-acre parcel located at the intersection of US Route 202 and NY Route 306 in the Village of Pomona, Rockland County.

12.   However, the precise location of the site within the Village boundaries will not alter my ultimate findings regarding the local roadway network in Pomona.  The Congregation's property location in this analysis is just an example used for a generic evaluation.

13.   The two roadways that will determine the degree of impact from any land use proposal within the Village are the two state highways in Pomona, Route 202 and Route 306. Attached as **Exhibit B** is an aerial overview of the general setting in Pomona.

4

14.     These two state highways dominate the roadway network within the Village of Pomona.

15.     Route 202 is an east-west roadway that traverses Rockland County and serves to provide both local and countywide access.  On the east it intersects with the Palisades Interstate Parkway ("PIP,,) and US Route 9W, both of which provide north-south regional access. To the west, Route 202 connects to the New York State Thruway, which provides statewide access.

16.     The Village portion of Route 202 consists of a two-lane roadway, one lane eastbound and one lane westbound, with 2-4 feet shoulders.  The roadway lanes are asphalt approximately 12 feet wide.

17.     Route 202 within the Village of Pomona carries an Average Annual Daily Traffic (AADT) of 9,070 vehicles (2011) according to the NYSDOT.  For a NYS state highway this activity is considered to be light to moderate.

18.     Appropriate traffic controls are in place on Route 202 including yellow centerlines and white edge lines.  The regulatory speed limit is 50 mph as a motorist enters the Village from the west and is reduced to 45 mph within the boundaries of the Village.

19.     The pavement of Route 202 is in good condition.

20.     The primary intersection along Route 202 within the Village is its intersection with Route 306, which is controlled by a three-color signal.  A second three-color signal is located on Route 202 at North and South Camp Road.  These two signals mark the west boundary and the east boundary, respectively, of the Village.  The distance between signals is approximately 3,733 feet or 0.7 miles.

21.     Route 306 is a north-south roadway that connects Route 59 to the south with Route 202 to the north. It serves to provide both local and countywide access to other state

thoroughfares.

22.     The Village portion of Route 306 consists of a two-lane roadway, one lane northbound and one lane southbound, with 2-4 feet shoulders.  The roadway lanes are asphalt approximately 11 feet wide.

23.     Route 306 within the Village of Pomona carries an AADT of 3,860 vehicles (2011) according to the NYSDOT.  For a NYS state highway this activity is considered to be very light.

24.     Appropriate traffic controls on Route 306 are in place including yellow centerlines and white edge lines.  The regulatory speed limit is 45 mph.

25.     The pavement of Route 306 is in good condition.

26.     The primary intersection along Route 306 within the Village is where it terminates at its intersection with Route 202, which as noted is controlled by a three-color signal.  County Road 86, Pomona Road, intersects Route 306 at a point that marks the southern boundary of the Village.

27.     County Road 86, Pomona Road, is a Rockland County-owned and maintained roadway, a portion of which is located within the Village of Pomona.

28.     That segment of Pomona Road, approximately 898 feet in length (0.17 miles), is the only county roadway in the Village.

29.     That segment of Pomona Road carries an AADT of 3,205 vehicles.

30.     Pomona Road functions as a connector between Route 306 to Route 45 (near the PIP).

31.     Pomona Road consists of a two-lane roadway, one lane eastbound and one lane westbound, with 1-foot shoulders.  The roadway lanes are asphalt approximately 13 feet wide.

32.   Appropriate traffic controls on Pomona Road are in place including yellow centerlines and white edge lines.  The regulatory speed limit is 30 mph.

33.   The pavement of Pomona Road is in very good condition.

34.   The intersection of Route 202 and Route 306 is the busiest intersection in the Village relative to vehicular traffic, and is controlled by a microprocessor-driven three-color signal.

35.   The intersection of Routes 202 and 306 is a 4-way junction with Route 306 entering Route 202 from the south.  Each approach on Route 202 has a dedicated left-turn lane and a separate right through lane.  The Route 306 approach has a single lane for all movements, as does the opposing leg, which is known as Ladentown Road.  Attached as **Exhibit C** is an aerial view of the intersection.

36.   The signal phasing is a simple two-phase operation: one phase for each roadway with Route 306 and Ladentown Road moving together.   A left-turn phase is not included due to the adequate gaps in Route 202 traffic flow.

37.   The Village of Pomona is partly in the Town of Ramapo and partly in the Town of Haverstraw.

38.   The Village lies north of the Town of New Hempstead, east of Harriman State Park, north of the hamlet of Monsey and west of the hamlet of Mount Ivy.

39.   The Village of Pomona is 2.4 square miles in total area.

40.   The Village has approximately 3,000 residents.

41.   The Rabbinical College's property is located in the southeast quadrant of the Route 202 and Route 306 intersection.  It has significant frontage on Route 202 and on Route 306.

42.   Currently the property has direct access to Route 306 via an existing driveway.

II.     **DESCRIPTION OF THE DEVELOPMENT PROPOSAL**

43.     The Congregation Rabbinical College of Tartikov, Inc., has proposed, on property owned by the Congregation, to build and operate a Rabbinical College that will include places of worship, religious educational facilities, religious courts, libraries of Jewish texts, and student housing solely dedicated for the religious use by the Congregation's full-time rabbinical students, lecturers and their families on a portion of the Congregation's large approximately 100-acre property in Pomona.

44.     In the instance of the Rabbinical College proposal, the site being used as an example for this investigation is located at the junction of the two state highways that are located in the Village of Pomona.

45.     Given the example site's noted location with direct access to the state system, the key location to be reviewed for impact would be the intersection of Route 202 and Route 306.

46.     However, any site within the Village will have the same roadway involvement and thus the same determination of area impact.


III.    **ANALYSIS OF THE VILLAGE'S "EDUCATIONAL INSTITUTION" ZONING PROVISIONS AS A MEANS OF REGULATING TRAFFIC IMPACTS**

47.     Having reviewed the Village designee's (Doris Ulman) testimony, as well as the background documents related to the challenged Educational Institution ordinance provisions at issue, it appears that the Village's position is that its "educational institution,, and "dormitory,, laws are necessary in part to protect the Village from traffic

impacts.  This is not only absurd but contrary to all existing professional engineering standards and practices.  In my 45 years of experience in this field, never have I seen such a strategy employed.  No generally accepted transportation planning or traffic engineering principles suggest that limitations on the type of student housing, type of dormitory buildings, or whether a school is accredited should be regulated in order to protect traffic flow or safety.  Such a strategy simply has no positive impact on potential traffic impacts.  In fact, the attempt to prevent on-campus housing for students will have the opposite effect: requiring students to drive to and from campus every day instead of living on-site.  Clearly, the lack of any rational engineering relationship to the stated objectives indicates that the laws are likely meant to target some specific use rather than regulate traffic.

48.   In reviewing the relevant documents and the testimony by the Village designee, it is clear that the Village has no documentary evidence and has made no apparent attempt to obtain factual data supporting these laws with respect to traffic issues.

49.   The Village appears to be unaware or uninterested in the fact that the basis in professional traffic engineering for estimating traffic generation for a site and thus its potential impact on existing infrastructure is the proper application of the Institute of Transportation Engineering (ITS) published database.  More specifically, from reviewing the Village's testimony, they had no evidence, studies or reports supporting their contention that regulating Educational Institutions in this manner was necessary to "protect„ traffic.

50.   The Village never conducted or authorized any studies regarding this issue. The vague reference to certain traffic studies concerning a retail use or housing in a different

jurisdiction has no probative value in determining whether there is any need to regulate Educational Institutions in the Village.

51. The Village witness's testimony that she "do[es]n't recall if the Ram[apo] study actually reviewed educational uses,, indicates a lack of any legitimate review and study of this issue by the Village. All of these studies, other than those concerning the Town of Ramapo's Master Plan, were undertaken after the passage of the laws at issue here.

52. Furthermore, to my understanding, the Village produced no specific documents justifying these laws at issue.

53. Additionally, the vague references to studies conducted by other municipalities lack any specificity to roadways in Pomona if indeed such roadways were even part of those studies. The Village witness's statement that they "ha[ve] no knowledge of the kind of traffic that would be generated by an educational use because number one there are no educational uses in the Village so [they]'ve never dealt with that problem or that concept,, indicate a complete lack of due consideration of the relevant issues involved from a transportation perspective. It is unreasonable for a jurisdiction to prohibit certain types of land uses based on "traffic,, concerns when it has "no knowledge,, of such impacts.

54. The ITE methodology utilizes an independent variable that is most directly causal for the variation in trip ends. In the case of the Land Use #550, University/College, that variable is number of students.

55. Although every land use generates traffic, including Educational Institutions, potential impact is measured by the traffic engineering profession through capacity and safety analyses of existing infrastructure.

56.   The mere generation of traffic activity is not indicative of impact or of impact that is not capable of being mitigated.

57.   The noted provisions to Local Law No. 5 are not sufficient in the domain of professional traffic engineering to assess the degree of impact.

58.   The Village's justification for their Education Institution laws that "[a]ll dwelling units, by their   nature, generate traffic,, is wholly unreasonable and uninformed, and insufficient for the purpose of measuring potential infrastructure impact, for the reasons described above.

59.   Furthermore, the goals of "maintaining community character,, or preventing excessive "noise,, or "air pollution,, caused by vehicle traffic can be achieved by constraining the proposal size via student population to be consistent with any capacity or safety concerns identified and established through quantitative analyses or through implementation of mitigation techniques to eliminate said concerns.

*Accreditation*

60.   In reviewing the Village designee's testimony, it is clear that the Village's traffic generation knowledge is superficial at best and wholly inaccurate at worst.

61.   While it is true that potential traffic impacts must be measured on the basis of a specific use and a specific project, there is absolutely no connection between accreditation and traffic generation, and potential infrastructure impact.

62.   More specifically, the Village's designee defends its accreditation requirement by stating, "usually non-accredited schools are going to generate more traffic.,,   This is completely false.   There is no relationship between the accreditation status of an

educational institution and how much traffic is generated by the use.   Neither is accreditation used as a means of determining traffic impacts by the ITE or any other methodology used by professionals in the field.

63.   The Village's witness further provides the example of an "automotive school," as potentially generating more traffic.  The witness appears to be unaware that such schools are in fact capable of becoming accredited by organizations such as the Accrediting Commission of Career Schools and Colleges ("ACCSC,"), the National Automotive Technicians Education Foundation ("NATEF,"), and the Council on Occupational Education.  For example, the New York Automotive and Diesel Institute automotive program in Queens, N.Y. has been accredited by NATEF.  Its use apparently would therefore be permitted on the Rabbinical College's property while the training of rabbis would not, despite a total lack of analysis of traffic generation for either scenario and an assessment of the affected infrastructure.  This approach to investigation is absurd and unprofessional and highlights the irrationality of the Village's explanation.

64.   Furthermore, accreditation of an educational institution is not related to an independent variable that measures trips in the formulation of traffic activity.  The ITS methodology is recognized nationally and state-wide as the professional procedure for measuring traffic activity and facility accreditation simply has no relevance or scientific importance.

65.   The traffic generation will be the same for an accredited facility and a non-accredited facility with an equal number of students.

66.   Relative to traffic generation, local government should have no interest in the issue of accreditation.

67.   The fact that "accreditation," has no effect on the traffic generation for ITE Land Use

University/College does not change within a single-family residential district or any other district approved for University/College use.   Traffic impact is solely related to number of students, the independent variable.

68.   With respect to community character insofar as traffic impacts are relevant, accreditation has no significance.

69.   Accreditation of a "University/College,, facility has no effect on the impact caused by vehicles to "air quality.,,

70.   Similarly, accreditation of a "University/College,, use has no effect on the "noise,, levels caused by vehicles.


*Prohibition on family housing*

71.   Labeling dwelling units in an Educational Institution as dormitories or some other residential unit within a facility classified as a University/College would have no effect on the traffic generation or traffic issues generally.

72.   The independent variable used to measure traffic activity has no relationship to how a housing unit is labeled.   However, the number of students can serve reliably as an indicator of trips based upon historical data.

73.   Family housing as defined in terms of a University/College land use has no effect on the traffic generation of a site, assuming an equal number of students populate the site.

74.   If the label "Family Housing,, is defined beyond a certain number of students occupying a "unit,, (suite, room, housing area, etc.) to mean a lineage household (parents and children), the activity rate would vary only inconsequently, and therefore degree or severity of impact would not change significantly.

75.  This "household,, type of social unit based upon an understanding of the ITE database information will not significantly change the generation rate for this land use.  Many University/College facilities incorporate teacher, student, and/or service professionals' family units within their campuses and therefore such conditions are inherent to the stated generation rates.

76.  Traffic generation will be the same regardless of whether student housing permits family housing or not, assuming an equal number of students.

77.  Relative to traffic generation, local government should have no interest in the issue of whether an educational institution has student family housing or not.

78.  With respect to traffic impacts, permitting or prohibiting student family housing has no significance to community character.

79.  With respect to traffic impacts, permitting or prohibiting student family housing has no significance to air quality.

80.  Similarly, with respect to "noise,, caused by traffic, permitting or prohibiting student family housing has no significance to noise issues.

*20% Limitation on Dormitories*

81.  The Village designee's explanation for why the 20% dormitory limitation is necessary to prevent traffic impacts is similarly unfounded.  It appears to be based solely on the mistaken assumption that if fewer students live on campus, less traffic would be generated.  Further, she argues that by limiting the dormitory square footage, such action would necessarily mean less campus activity.

82.  Putting aside the fact that there is plenty of traffic capacity for the Rabbinical College,

14

even for 2,500 students, and also putting aside the fact that any traffic impacts can be mitigated through generally accepted and utilized practices, the Village witness's statement is wrong on both accounts.

83.   First, if students don't live on campus that simply means they must live off campus and thus they must drive to and from campus.  That scenario would increase campus activity interaction between the campus and the adjacent roadway network.  Clearly this would not accomplish the alleged intent of the Local Law.  Factual evidence in the form of the ITE database shows the more that a campus can be self-contained relative to housing for students, the less traffic will be generated and dispersed to the surrounding roadway network.

84.   Secondly, the mere limitation on dormitory square footage does not preclude high-density student suites labeled as such rather than dormitories.

85.   Limiting dormitory area to 20%, or any percentage, of the total square footage of all buildings on the lot has no effect on the traffic generation.

86.   The traffic generation will be the same regardless of the percent of dormitories' square footage assuming an equal number of students attending the facility.

87.   As noted above, given the same number of students attending an Educational Institution, the campus providing the most on-site student housing will, given all other generation parameters being equal, generate the least traffic activity interacting with the adjacent roadway network.

88.   By not permitting sufficient on-campus housing, a jurisdiction will in effect mandate that students travel to and from the Educational Institution on a daily basis.  This translates directly into increased activity entering and exiting the campus.

89.   Fewer housing units on campus do not translate to fewer trips involving students, but rather increases activity.   Further, housing on campus, including family units or dormitories or suites, are most always accompanied by campus eating facilities, student dispensaries providing books, essentials, snacks, etc., thus limiting the need to leave campus.   The Village's view of how to limit campus activity is contrary to established engineering protocols and procedures.

90.   Therefore, the 20% limitation on dormitories is not necessary or narrowly tailored to protect the Village's "need for controlling traffic,,.

91.   With respect to traffic impacts, the 20% dormitory limitation has no significance to air quality.

92.   Similarly, with respect to "noise,, caused by traffic, the 20% dormitory limitation has no significance to noise issues.

IV.   **AVAILABLE REGULATORY MEANS TO CONTROL TRAFFIC IMPACTS**

93.   The New York State Environmental Quality Review Act ("SEQRA,,) Handbook states "SEQR establishes a process to systematically consider environmental factors early in the planning stages of actions that are directly undertaken, funded or approved by local, regional and state agencies. By incorporating environmental review early in the planning stages, projects can be modified as needed to avoid adverse impacts on the environment.,,

94.   Key elements of SEQRA include the fact that "SEQR is both a procedural and a substantive law. In addition to establishing environmental review procedures, the law mandates that agencies act on the substantive information produced by the environmental

review. This often results in project modifications <u>and can lead to project denial if the</u> <u>adverse environmental impacts are overriding and adequate mitigation or alternatives are</u> <u>not available.</u>,, (Emphasis added.)

95. Relative to which agencies must comply with the law, the Handbook states: "All agencies of government at the state, county and local level within New York must comply with SEQR. State agencies are defined as any department, agency, board, public benefit corporation, public authority or commission. The Department of State, the Department of Health, the Dormitory Authority, Department of Transportation and DEC are examples of state agencies that are subject to SEQR. Local agencies include any agency, board, district, commission or governing body, including any city, county or other political subdivision of the state. Local legislative bodies, planning boards, zoning boards of appeal, county health departments, school districts and industrial development authorities (IDAs) are examples of local agencies subject to SEQR. Multi-municipal, multi-county or regional agencies, which have approval authority over a particular action, are also subject to SEQR.

96. It is clearly stated in the Handbook that SEQR applies to decisions of local legislative bodies in that the legislative decisions of city, town, village and county governing bodies that may affect the environment are subject to review under SEQR.

97. And finally, the Handbook states categorically that if an agency does not comply with SEQR and fails to undertake a proper review, citizens or groups who can demonstrate that they may be harmed by this failure may take legal action against the agency under Article 78 of the New York State Civil Practice Law and Rules. A court may rescind project approvals and a new review required under SEQR. The Handbook further states

17

that the New York State's court system has consistently ruled in favor of strong compliance with the provisions of SEQR.

98. New York Code, Village Law, Article 7, provides for Village authority and procedures relative to Building Zones. It mandates "Compliance with State Environmental Quality Review Act,, in that the "authorized board shall comply with the provisions of the state environmental quality review act under article eight of the environmental conservation laws and its implementing regulations.,,

99. Local Laws cannot obviate adherence to State Law and relative to review of site plans, subdivisions, special use permits, and plats must adopt SEQRA procedures and assessment protocols. Local Laws should work with and enhance the SEQRA process.

100. The NYS Highway Law and the NYS Vehicle and Traffic Law work within SEQRA to establish a hierarchy of rules and regulations. Within this hierarchy, the New York State Department of Transportation has the sole duty and responsibility to establish the access design for access to the state infrastructure network. Attached as Exhibit D is a copy of New York Highway Law Article 52.

101. The NYSDOT will review and approve access through its Highway Work Permit process that is based upon a thorough professional engineering review of the proposed land use and its impact on the highway network.

102. Even where significant degradation in Level of Service ("LOS,,) takes place (unlike with the proposed Rabbinical College, which would not create significant degradation), mitigation could be provided such as left-turn signal phasing and timing changes that could alleviate impact.

103. There is a whole tool box of mitigating actions at the disposal of traffic engineers to

alleviate potential impact such as geometric modifications (adding lanes, widening lanes and/or shoulders, separating specific movements, etc.), traffic control upgrades, including signal implementation, variable phasing, multiple timing plans, detection techniques, signing improvements, movement elimination, pavement rehabilitation, superelevation enhancements, clear zone improvements, guide rail placement and/or upgrade, speed regulations, advisory signing, and many more too numerous to mention. Each possible mitigation is of course specific to the issues at-hand, however, examples of typical measures, to name a few, are:

- ☐ If a particular intersection is experiencing a pattern of right-angle accidents, a possible solution or mitigation is the implementation of a three-color signal that would assign automatically, but based upon measured demand, right-of-way;

- ☐ If the capacity of an intersection is insufficient, an additional lane may be added to accommodate current or higher demand, and if the location is signalized, a revised phasing and/or timing plan might improve traffic flow and safety;

- ☐ If a signalized location has long left-turn delays or accidents, a separate exclusive phase could be implemented;

- ☐ If a location is experiencing higher speeds then practical, additional warning signing including recommended speed signs could be installed;

- ☐ If an intersection traffic control is being ignored, additional signing with or without flashing beacons could be installed to provide a greater degree of warning;

- ☐ If vehicular speeds are too high, a reduced regulatory speed limit may be implemented;

19

☐ If pavement condition is hampering safe and efficient traffic flow, refurbished pavement may be installed;

☐ If pedestrians have increased in number so as to need a dedicated infrastructure, sidewalks could be constructed to accommodate the increased pedestrian activity;

☐ If drainage is overflowing the roadway during heavy rain events, new open or closed drainage systems could be constructed;

☐ If a particular movement at an intersection or driveway is causing congestion or safety issues, the movement can be prohibited;

☐ If a new access to a public roadway is to be established, the design of that access should incorporate sufficient capacity and safety elements to minimize impact on traffic, which could include any of the above actions.

104.    Whenever a state facility is involved pertaining to possible mitigation, the State of New York will assess operational parameters and mandate the appropriate mitigation. This includes where a state highway and a local County, Town, Village, or City roadway intersect.   Mandated improvements would include the local roadways if necessary. Where only local roadways are involved or separate locations under local jurisdiction, then the local municipality has authority but must use standard SEQRA protocols.

105.    The NYSDOT Design Manual and the NMUTCD contains further detail of possible actions, as well as the cited AASHTO and ITE publications.

106.    Rather than address traffic impacts through indirect means such as "Educational Institution,, ordinances that are wholly unrelated to traffic impacts, the appropriate means for a jurisdiction to "control traffic,, with respect to the development of land is to adhere

20

to the ITE's Recommended Practice report titled: <u>Transportation Impact Analyses for Site Development, and ITE's two documents: Trip Generation Handbook, an ITE Recommended Practice, and Trip Generation, an ITE Informational</u> Report.

107.   The methodology described above is applied within the State Environmental Quality Review Act ("SEQRA,,) process.   Attached as **Exhibit E** is the New York State Department of Environmental Conservation's "Environmental Impact Assessment in New York State.,,

108.   The New York State Department of Environmental Conservation states: "In New York State, most projects or activities proposed by a state agency or unit of local government, and all discretionary approvals (permits) from a NYS agency or unit of local government, require an environmental impact assessment as prescribed by 6 NYCRR Part 617 State Environmental Quality Review (SEQR). [Statutory authority: Environmental Conservation Law Sections 3-0301(1)(b), 3-0301(2)(m) and 8-0113]. SEQR requires the sponsoring or approving governmental body to identify and mitigate the significant environmental impacts of the activity it is proposing or permitting.,, Exhibit E at 1.

109.   Mitigation measures as those described above are a basis for transportation and traffic engineers to resolve undesirable impacts; it is part of the ITE baseline methodology in assessing site development.

110.   However, as described below, the potential Rabbinical College use would have insufficient traffic impact, and thus no mitigation means are necessary.

111.   Even if the Rabbinical College would impact traffic in the Village, if the law-mandated process is applied, an Educational Institution as proposed by the Rabbinical College will

have no adverse impact on traffic capacity (level-of-service) or highway safety.

112. Having reviewed the Village designee's testimony, it would appear she is suggesting that relative to traffic generation, and more specifically relative to accreditation, family housing, and restrictive dormitory limits effects on traffic generation, SEQRA does not provide the means to measure and assess potential traffic impact and therefore it is necessary for the Village to enact specific laws addressing these SEQRA omissions.

113. This is wholly inaccurate. There is no need for specious local laws to address this issue. Simple application of SEQRA will address the issue.


## V.  **TRAFFIC IMPACT OF THE PROPOSED RABBINICAL COLLEGE USE**

114. The potential site generation associated with this educational land use is consistent with the ability of the surrounding roadway infrastructure to absorb safely and efficiently the additional traffic activity.

115. Further, the existing infrastructure has excess capacity and is devoid of any unusual safety issues that could be exacerbated by added traffic.

116. The Village designee's opinion of the safety of Routes 202 and 306 stated during deposition testimony is devoid of any documented evidence substantiating her opinion, and misstates the responsibility of the Village officials if safety is being compromised on these State highways.

117. The Village has the absolute duty to advise in writing to the NYS Department of Transportation their concerns since they represent the residents of Pomona. Not to do so is a failure to perform their duties.

118. However, my review of the safety issues on these State routes found no discernable pattern or indication of anything unusual relative to safety. If the Village has evidence to the contrary, they have an obligation to provide that evidence to the State.

119. Additionally, the local zoning and land use regulations noted and addressed in my assessment have no relevance to the degree of potential traffic impact associated with an educational institution.

120. In arriving at this conclusion, I used the Institute of Transportation Engineers (ITE) methodology of assessment, which is to use independent variables that relate directly to the degree of generation based upon documented studies. For example, based upon field studies a direct correlation has been drawn between the number of students at an Educational Institution and the number of vehicular trips associated with that facility. The number of dorms or the level of accreditation or terminology used to identify residential units has been found through studies to not have any direct correlation to number of trips.

121. The transportation and traffic engineering profession relies on the documents and database produced by the ITE to forecast site generation. ITE has produced the Trip Generation Handbook, an ITE Recommended Practice, and Trip Generation, an ITE Informational Report.

122. The Trip Generation Handbook has two primary purposes: (1) To provide instruction and guidance in the proper use of data presented in Trip Generation; and (2) To provide additional information and data on supplemental issues of importance in estimating trip generation for development sites.

123. The ITE Trip Generation informational report has been obtained from the research and

experiences of transportation engineering and planning professionals. Trip Generation is an educational tool for planners, transportation professionals, zoning boards and others who are interested in estimating the number of vehicle trips generated by a proposed development. This document is based on more than 4800 trip generation studies submitted to ITE by public agencies; consulting firms; universities and colleges; developers; associations; and local sections, districts and student chapters of ITE.

124.  In order to utilize the generation data and rates found in Trip Generation, the transportation analyst must identify an entity known as the "independent variable,, which is defined as a physical, measurable and predictable unit describing the study site or trip generator (*e.g.*, gross floor area, employees, seats, dwelling units).

125.  Trip Generation presents, for each land use, the independent variable or variables that appear to be a "cause,, for the variation in the number of trip ends generated by a land-use.  This is determined through primary measurement, it produces a rate/equation with the "best fit,, of data; it can be reliably forecast for applications; and it is related to the land-use type and not solely to the characteristics of the site tenants.

126.  Relative to the Rabbinical College's use, ITE land use #550 ("University/College,,) is the appropriate database reference.  Relative to this land use, ITE has identified two independent variables, students and employees.  In this case the number of students is the "best fit,, for the independent variable.  The number of students is considered a stable parameter for the University/College land use and is not a direct function of actual site tenants.  This means the number of students has a direct causal relationship to trips generated based on the ITS database.  The number of non-students who happen to live on campus has proven not to have a causal relationship to trips.

24

127.    ITE also recommends that if there is some unique feature that does not fit the standard land use definitions, that local data be collected or a similar use be monitored and mined for generation information.   Regardless of the source of the data, it must logically represent the intended use of the site.

128.    This also applies to special situations where a specific land use is appropriate, such as Educational Institution, but where specific circumstances may lead to the addition of extra trips in conjunction with the normal land-use generated trips.   Those extra trips would be referred to as a "surcharge,, of activity.   An example could be, in the case of the Rabbinical College, the acknowledgment of student family members all living on campus.   The ITE database for Educational Institutions takes into account the fact that on most campuses there are family members living on campus and thus adding to the total trip-ends for the site and to a degree that is reflected in the database.

129.    However, with respect to the Rabbinical College, if every student had family living on-campus, then that could be a unique condition.   Therefore, it may make sense to add a surcharge to the total trips to reflect that condition.   Detailing the above example more closely, we could add bus pick-up of children in the morning and drop-off in the afternoon, and spouses leaving and coming back to and from work and any other rational observations of need.   Then the total trips would be applied to the surrounding infrastructure to assess potential impact.

130.    The analysis of the Rabbinical College followed the normal ITE procedures in that the anticipated site generation was added to the then current volumes on the surrounding roadways.   The result of this analysis yielded an excellent capacity result: LOS B. However, my analysis went even further in that as a test of excess capacity, I increased

the volume of traffic on the adjacent roadways by 20%, which was the equivalent of increasing student population ten-fold, to 2500 students on the campus.  Even this 20% increase still yielded a very good capacity level of LOS C and further capacity was available for future growth.

131.  Using a hypothetical scenario related to the possibility of extensive family activity on campus, a traffic and safety engineer could elect to treat the campus both as a 250 student Educational Institution and a 250 unit apartment complex (Land Use #220 in the ITE database).  Although this methodology would be unorthodox and would not describe the actual functioning of the proposed Rabbinical College, as it would result in significant overstating of traffic generation (double counting), it could be used to address a the issue of family activity on a campus in its most embellished form.  In other words, this scenario would assume that there was both a 250-student college and a 250-unit apartment complex.  This scenario would add apartment trips, using the heaviest generation hour for this Land Use (the PM peak hour), to those trips generated by the Educational Institution; in this case the 250 apartments would generate 155 trips that would be added to the 53 trips generated by the 250 students.  This total would be 208 trips in and out of the driveway access during the PM peak hour.

132.  This surcharge analysis shows the issue of family activity in the proposed Rabbinical College use to be a non-issue relative to traffic capacity.

133.  Clearly, the Rabbinical College use, even with the addition of more family trips, be they trips for school, work, entertainment, shopping, would not even begin to stress the excess traffic capacity of the adjacent infrastructure with 250 students or, for that matter, 2500 students.  The infrastructure could handle the generation.

134. In the analysis of trip generation, the peak hours of the adjacent roadway network is most often the time frame scrutinized since the concept is to identify the worst-case potential interaction of network traffic activity and site generation.

135. This methodology identifies the contribution that a particular site makes to roadway system traffic loads (*i.e.*, transportation impacts), provides a credible basis for estimating transportation improvement requirements attributable to a particular project, and assesses compatibility with local transportation plans.

136. I utilized the ITE methodology in assessing the potential traffic capacity and safety impacts of the Rabbinical College.  By reviewing existing conditions using standard highway capacity techniques, a traffic engineer such as myself can determine the ability of key intersections and roadways to absorb additional traffic that would emanate from a newly developed or expanded site. Similarly, a review of the current infrastructure network's safety history will allow an informed decision on how additional traffic loads will impact that history.

137. Additionally, the transportation profession utilizes the USDOT/FHWA sponsored Transportation Research Board's (TRB) <u>Highway Capacity Manual</u> (HCM 2010) to determine levels-of-service or capacity, by measuring delays experienced.  Attached as **Exhibit F** is the Level of Service criteria used in the analysis.

138. Specific software is used to interpret and computerize the extensive calculations and in my assessment I utilized SYNCHRO, which is favored by the NYSDOT for traffic impact studies.

139. Upon reviewing the relevant documents and testimony of the Village's designee, it is apparent that the Village has no existing basis to suspect that the state highways, Route

202 and Route 306, are in any way constrained by capacity (delays).

140.  A capacity analysis of the intersection of Routes 202 and 306 shows the existing level-of-service to be excellent, *i.e.*, LOS B in the AM peak hour and LOS B in the PM peak hour.  **Exhibit G** contains the SYNCHRO worksheets.

141.  Excess capacity on Routes 202 and 306 is extraordinarily high.  My capacity work sheets (Exhibit G) would confirm that even after putting a surcharge of 20% on all approaches to the critical intersection as a test of excess capacity, the resulting delay and congestion were still nominal: LOS C.  Without the 20% surcharge, meaning just the application of the Rabbinical College 250 student generation, the LOS results were B in both the AM and PM peak hours.  Additionally, as noted previously, any degree of family activity associated with the 250 students will fall far short of reaching the activity levels of the 20% surcharge test case that proved total acceptability relative to traffic capacity.

142.  LOS B is representative of delays for each vehicle to be between 10 and 20 seconds, which means that many vehicles do not have to stop on the primary roadway.  Queuing is nominal with motorists' comfort level (stress) without concern.  Vehicles always pass through on one cycle of the signal.  Motorists' would consider the operation of the signal to be without a problem.  Transportation officials would consider this operation very good.

143.  LOS C is indicative of delays of from 20 to 35 seconds per vehicle, which means that more vehicles have to stop on the primary roadway, but most vehicles pass through on one cycle of the signal.  Motorists still have low stress and consider the signal operating well.  Transportation officials would consider this operation good.

144.  LOS D is indicative of delays of from 35 to 55 seconds per vehicle, which means that

many vehicles have to stop on the primary roadway, but still most vehicles pass through on one cycle of the signal, although on rare occasions two cycles may be necessary. Motorists will have some stress but would consider the signal operating normally. Transportation officials would consider this operation normal.

145.  LOS D is considered more than acceptable; therefore, further growth can be accommodated without mitigation.  If at some point mitigation is appropriate, simply adding a left-turn phase to the existing signal operation will allow for even further area growth.

146.  LOS E is indicative of delays of from 55 to 80 seconds per vehicle, which means that as many vehicles have to stop on the primary roadway as those who do not, and most vehicles do not pass through on one cycle of the signal.  Motorists will have stress and would consider the signal operating slowly.  Transportation officials would consider this operation as reaching saturation, meaning a high flow rate compared to capacity.

147.  The result of the Rabbinical College capacity analysis means that there is considerable excess capacity in the operation of this intersection, which is the key location for virtually any proposed development within the Village of Pomona.

148.  Based upon my experience and trial modeling of the software, the amount of activity at this key location could be increased by 20% before the LOS would even be affected.

149.  For comparison purposes, a capacity analysis was done with an across-the-board 20% increase in all movements at this key intersection, and the LOS only went from B to C in each peak hour. As noted previously, LOS C is a good level-of-service.  This activity increase would be the equivalent to an approximate 10-fold increase in the student population cited as an example (250) for analysis purposes, or 2,500 students.

150.  Further, given the activity levels and geometric factors associated with Route 202, Route 306, and CR 86, the level-of-service on these roadways is currently very good, again with excess capacity to accommodate future development of considerable size and generation.

151.  Thus, with respect to traffic capacity, there is significant excess current capacity to accommodate new or expanded development.

152.  With respect to my assessment of site generation for the Rabbinical College use with 250 students, a number used as an example to provide a foundation for analysis and future comparisons, the peak weekday hours in the a.m. and p.m. would be chosen for worst-case conditions.

153.  Based upon NYSDOT volume information for Routes 202 and 306, the hours of review would specifically be 7:45 a.m. to 8:45 a.m. and 4:45 p.m. to 5:45 p.m.

154.  Table 1, below, provides the trip generation associated with the Rabbinical College proposal.  The trip generation rate means the number of trips per independent variable. The volume means the number of trip ends entering and exiting the site during the peak hour in the a.m. and p.m.

| Table 1 | | | | | |
|---|---|---|---|---|---|
| Trip Generation Rates and Volumes | | | | | |
| Land Use | | AM | | PM | |
| Rabbinical College 250 Students | Rates | Enter 0.17 | Total 0.21 | Enter 0.06 | Total 0.21 |
| | | Exit 0.04 | | Exit 0.15 | |

| | | Enter | Total | Enter | Total |
|---|---|---|---|---|---|
| | Volumes | 43 | 53 | 15 | 53 |
| | | Exit | | Exit | |
| | | 10 | | 38 | |

155.   A total of 53 vehicle trips will be added to the surrounding roadway network during the a.m. and p.m. peak hours resulting from the Rabbinical College use with a 250-student campus example.

156.   Fifty-three vehicle trips is a negligible amount of additional traffic and would have no capacity or safety impact on the roadway network based upon my review of existing capacity and safety conditions.

157.   During off-peak hours, both the generation from the site would be less, as would the background traffic on the highways that it would be interacting with on the adjacent roadway network.   The NYSDOT volumes data confirms the off-peak volumes.   Thus the potential traffic impact would be less during off-peak hours.

158.   In fact, based upon the 20% surcharge placed upon the existing traffic activity, student population of the Rabbinical College could be 10-fold the cited 250-student example without significant traffic impact occurring.

159.   The capacity and safety analysis of Routes 202 and 306 demonstrates that there is ample excess capacity to efficiently and safely accommodate virtually any size educational institution within the Village of Pomona.

160.   As discussed above, in certain instances a traffic engineering analyst will choose to augment specific generation data based upon a unique set of circumstances.   For

instance, if there is identified an unusual number of family members in residence within the Rabbinical College campus, thus making the normal number of trip-ends based upon student population possibly deficient (despite the ITS database recognizing such activity) it would be appropriate to add what would be called a "surcharge,, of activity.

161. A number of additional trips to reflect the unusual nature of the land use may be added with an explanation of its genesis.    For instance, if sufficient numbers of family members left the campus every day to work off-site that exceeded "normal,, conditions, then appropriate trips would be added.  Or if a large number of children on site left to attend school off-campus and possibly to multiple schools at different time, then a surcharge should be added.

162. In the case of the Rabbinical College scenario, any similar surcharges would be negligible compared to the excess capacity already noted in the capacity discussion and in the 20% surcharge added to test the ability of the infrastructure to handle such growth. Even this ten-fold increase in on-campus population (the 20% equivalent) had little impact on the ability of the infrastructure to handle the additional traffic, and this is without even considering the need and ability to provide mitigation.

163. Furthermore, it must be emphasized that the ITE data for educational institutions already takes into account a degree of family activity on the campuses.

164. The Plaintiff's Property is well positioned with two under-utilized state highways for access to the local area and the region.   These two state highways will easily accommodate any additional generated activity.

165. An Educational Institution with on-site student family housing would not present a grave threat to public health, safety or welfare with respect to the Village of Pomona's stated

32

interest in controlling traffic.

166. Such a land use would also generate less activity than potential other uses given its nominal generation rates in comparison to other reasonable uses.

167. Furthermore, relative to the Palisades Interstate Parkway, this limited access, multilane freeway is designed and continuously maintained to accommodate countywide traffic inflows and will not be impacted significantly by Village of Pomona growth.

168. With respect to issues of traffic safety, my analysis relied on information obtained from the NYSDOT's Safety Information Management System (SIMS) for the state highways for the last 5 years, and information from the Accident Location Information System (ALIS) for the CR 86 and the village roadways, also for the last 5 years.  Attached as **Exhibit H** is a New York State Safety Information Management System Summary Report describing such information.

169. Reviewing the testimony of the Village designee, it is evident that the Village has no existing basis to suspect that a proposed educational institution would create an unacceptable traffic safety risk.  However, the Village would have had an avenue to obtain such information by simply contacting the NYSDOT.

170. If Village officials had checked with NYSDOT, they would determine whether the state system, the county system, and the village system have any safety issues that are unusual, indicative of a recurring pattern, or in need of mitigation.

171. Review of the NYSDOT accident information does not show any indication based on the accident history that there are any substantive problems on any of the relevant roadways. Traffic engineers look for patterns of accidents or an unusual number of accidents based upon the type of roadway under review.  Both the state system and the local system do

33

not show any locations of concern. Every roadway will have accidents since there are three factors involved in every incident: vehicle, roadway and human (unfortunately, human factors are most often the genesis behind the occurrence of incidents). The subject accident history does not highlight any relevant roadway or intersection location that is unusual from a safety perspective.

172. Clearly, the safety environment within the Village of Pomona relative to vehicular traffic is satisfactory. The meaning of this conclusion is that any additional traffic generation from new or expanded development is not encumbered by existing safety problems.

173. With respect to the Rabbinical College proposal, based upon these review conclusions, the site's traffic generation would stand on its own merits relative to capacity and safety, as there are no existing capacity or safety issues.


VI.    **COMPARISON WITH PERMITTED USES**

174. In addition to the analysis described above, I also used the same methodology to analyze scenarios where the 100-acre subject property was developed with other land uses that are permitted under the zoning ordinance, including (1) residential, (2) community college, (3) library, and (4) museum in order to test generation rates.

175. Table 2, below, summarizes these generation rate comparisons. Attached as **Exhibit I** are the generation worksheets.

| **Table 2** |
| :---: |
| **Trip Generation Rate Comparison** |

34

| Land Use | | AM | | PM | |
|---|---|---|---|---|---|
| **Rabbinical College**<br><br>**250 Students** | *Rates* | *Enter*<br>0.17<br>*Exit*<br>0.04 | *Total*<br>**0.21** | *Enter*<br>0.06<br>*Exit*<br>0.15 | *Total*<br>**0.21** |
| **Single Family Detached Housing**<br><br>**60 Dwelling Units** | *Rates* | *Enter*<br>0.19<br>*Exit*<br>0.56 | *Total*<br>**0.75** | *Enter*<br>0.64<br>*Exit*<br>0.37 | *Total*<br>**1.01** |
| **Library**<br><br>**15,000 Square Feet** | *Rates* | *Enter*<br>*0.66*<br>*Exit*<br>*.27* | *Total*<br>**0.93** | *Enter*<br>*3.46*<br>*Exit*<br>*3.75* | *Total*<br>**7.21** |
| **Museum** (ITE notes a small sample size)<br><br>**55 Employees** | *Rates* | *Enter*<br>*0.77*<br>*Exit*<br>*0.12* | *Total*<br>**0.89** | *Enter*<br>*0.09*<br>*Exit*<br>*0.49* | *Total*<br>**0.58** |

| Table 2 |
|---|
| **Trip Generation Rate Comparison** |

| Land Use | AM | PM |
|---|---|---|

| Community College 250 Students | Rates | Enter 0.42 | Total 0.51 | Enter 0.46 | Total 0.72 |
|---|---|---|---|---|---|
| | | Exit 0.09 | | Exit 0.26 | |

176. The proposed Rabbinical College generation rate for both a.m. and p.m. peak hours is considerably lower than each of the alternative land uses, including the institutional land uses of a community college, library and museum.

177. The ITE difference, in part, from the "University/College„ and "Community College„ land uses is that the former is associated with on-site housing while the latter is not, *i.e.*, no housing on-site and all students commute to the site under the Community College use.

178. The proposed Rabbinical College generation rate for a.m. and p.m. hours would also be significantly less than the generation rate for single family residential use (assuming 60 lots with a minimum of one acre).

179. The traffic impacts of a subdivision of the Subject Property with single family homes would be significantly <u>more</u> severe than the traffic impacts of an unaccredited Educational Institution. As shown in the table above, the generation rate for Single-Family homes is <u>more than 3 to 4 times</u> the rate for University/College.

180. There would be virtually <u>no difference</u> in the generation rate with or without family housing within the Education Institution site.

181. As discussed above, "family housing„ as defined in terms of a University/College

36

land use has no effect on the traffic generation of a site assuming an equal number of students populate the site.

182.   This Affidavit is made consistent with the documentation before me at this place and time, and may be supplemented at a later date subsequent to additional information.

183.   For the foregoing reasons, the specific provisions of the Village's zoning code regulating "Educational Institutions" do not reasonably advance its stated interests in preventing traffic impacts.  Furthermore, they permit equivalent impacts by other land uses.  Finally, it is clear that a Rabbinical College as proposed by the Plaintiff can be developed in the Village without creating unacceptable traffic impacts by adhering to existing regulatory systems.

184.   I declare under penalty of perjury, that the foregoing is true and correct.


Executed on:   January 15, 2015
               Hyde Park, New York


                                        William FitzPatrick, PE, PTOE