**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., *et al.,*

                                        Plaintiffs,

          -against-                                        **07 Civ. 6304 (KMK) (GAY)**

VILLAGE OF POMONA, NY; *et al.*,

                                        Defendants.
-------------------------------------------------------------------

**DECLARATION OF BARBARA B. BEALL, PWS, LEED® AP**

Barbara B. Beall declares as follows, pursuant to 28 U.S.C. § 1746:

1.      I make this declaration on behalf of the Plaintiff Congregation Rabbinical College of Tartikov, Inc. to support my opinion that the provisions of the Village of Pomona's zoning code regulating educational institutions and Wetlands Protection Law at issue in this litigation do not promote the environmental interests asserted by the Village, are unreasonable and treat educational institutions differently and worse than other institutional land uses without justification, and that a Rabbinical College as proposed by the Plaintiff can be developed in the Village without creating unacceptable environmental impacts to aquatic resources, flooding, floodplains, stormwater, water quality, and plant and animal life.

2.      I have a Bachelor of Science from Southampton College, Long Island University (Environmental Chemistry) and a Master of Science from State University of New York College of Environmental Science and Forestry (Graduate Program in Environmental Studies).

3.      I am a certified Professional Wetland Scientist under the Society of Wetland Scientists Professional Certification Program. I am also a LEED Accredited Professional.

4.      From 1985 through 1989 I worked for the US Army Corps of Engineers (herein referred to as "Corps of Engineers") Regulatory Program in the Los Angeles and Philadelphia Districts as an Environmental Scientist.

5.      In this role, I was responsible for delineating wetlands and other waters of the United States, reviewing and permitting projects and coordinating and consulting with state and federal regulatory agencies on regulatory matters.

6.      While with the Corps of Engineers, I received training on Advanced Wetland Delineation and Expert Witness Testimony, and Regulatory Procedures. I also received two official commendations for "Sustained Superior Performance."

7.    From 1991 to 2014, I worked for two different multi-disciplinary consulting firms; I have been with The Chazen Companies (Chazen) since 2000. At Chazen I advanced from Environmental Scientist to Director of Natural Resource Services. In this role, I am responsible for providing guidance to Chazen's engineers and project managers on all facets of aquatic resource (including wetlands) and ecological resources for internal Chazen projects.

8.    My work with Chazen engineers requires an understanding of project site design, engineering practices and regulatory review processes at the federal, state and local level in order to provide sound guidance in project site design.

9.    I also provide guidance on integrating wetland, ecological, State Environmental Quality Review Act (SEQRA) and site planning reviews.

10.   I have also been active in training others in wetland sciences and ecological regulation, including as: Presenter, Albany Law School Environmental Law Class (2014); Assistant Trainer with Charles Newling of Wetland Training Institute on Northcentral/Northeast Regional Supplemental Delineation Manual (2010); Presenter, Saratoga Springs Planning Conference (2011); Trainer, NYS Office of General Services Central Office (2011); Presenter, Dutchess County Water Regulations and Enforcement Forum (2011); Trainer, NYSDOT (statewide) Nationwide Permit Regulations (2009 and 2010); Continuing Educational Instructor, Lorman, Wetland Regulation in NYS (2008, 2009, 2010, 2014); Presenter (for PDH credits), NYS Engineering Week (2007, 2014); Presenter, Hudson Valley Builders Association (2007); Presenter (for PDH credits), ACEC Mid Hudson Valley Engineering Group  and ACEC-NY Annual Meeting (2007); Presenter, NYS Association of Professional Land Surveyors Annual Conference (2005); Continuing Education Instructor, Adirondack Community College, Wetland and Ecological Issues in Real Estate (2006); Wetland and Watershed Protection Toolkit: Guidance Materials for Governments in New York State, Association of State Wetland Managers (February 2002). Assisted with editing; Environmental Training Manual, Wetlands, Niagara Mohawk Power Company, Environmental Affairs (1996).

11.   I am a member of the New York State Wetlands Forum (and also its past Chair (1998 to 2000)); the Society of Wetland Scientists; SWS Professional Certification Program as a Certified Professional Wetland Scientist (I served on the National Board as Treasurer (2006-2009)).

12.   Attached as **Exhibit A** is a true and correct copy of my *curriculum vitae*, which includes matters in which I have served as a witness or expert witness, and a list of projects that I have managed in terms of ecological and wetland resources, including assessment and delineation of such resources, along with permitting and consultation on those resources and associated regulations.

13.   For purposes of this affidavit, the term "Rabbinical College" means a land use proposed to be developed by the Plaintiff, Congregation Rabbinical College of Tartikov, Inc., on Tax Lot 32.08-1-53, an approximately 97-acre parcel (herein referred to as the "Subject Parcel") within the Village of Pomona, but which is prohibited by the Village's land use regulations. While no specific site plan or special permit application has been filed for such use (as it is prohibited by the Village's land use regulations), any such use will have certain characteristics, namely that it will be an unaccredited educational institution, and

that it will seek to provide family housing with housekeeping facilities for its student body.

14. The term "mitigation" is used frequently in this affidavit. When I use the term relative to the SEQRA, it means "a way to avoid or minimize adverse environmental impacts." (6 NYCRR 617.2(x)). When I use the term relative to wetlands, it means to avoid wetland impacts, to minimize wetland impacts, and to provide compensatory mitigation (*i.e.*, enhancement, restoration or construction of wetlands) to mitigate for unavoidable impacts to wetlands.

## I.   AVAILABILITY OF PARCELS FOR EDUCATIONAL INSTITUTIONS IN POMONA

15. The Village of Pomona, Local Law 1 of 2007 amended Section 2, subparagraphs (a), (b) and (c) of paragraph (1) of subdivision F of Section 130-10 to read that: "(a) the minimum lot area of an educational institution shall be a net lot area of 10 acres. (b) No portion of any land under water shall be counted towards the net lot area. Not more than one-fourth of any land which is defined as wetland by the U.S. Army Corps of Engineers, the New York State Department of Environmental Conservation and/or Chapter 126 of this Code or which is within a one hundred year frequency floodplain or within access, utility or drainage easements or rights-of-way shall be counted towards the net lot area. (c) No portion of any land with unexcavated slopes over 35% shall be counted towards net lot area. Not more than 25% of any land with unexcavated slopes greater than 15% but less than 35% shall be counted toward the net lot area." These requirements have not been subsequently modified.

16. Based on a review of parcel mapping for the Village and lot sizes, there are no other available vacant lots within the Village of Pomona that could support an educational institution besides the Subject Parcel, regardless of whether one reduces net lot area by the wetland or steep slope areas of such properties. Attached as **Exhibits B, C** and **D** are maps showing: Parcels Regulated/Not Regulated by Village WPL 100' Adjacent Area; Parcel Map with Land Uses and Aquatic Resources Overlay; and Current FEMA FIRM Floodplain Mapping in Pomona, respectively.

17. As shown on Exhibits B, C and D, the largest vacant parcels in the Village of Pomona are 7.1 acres, 6.6 acres and 4.6 acres.

18. Other parcels north of Route 202 and west of Halley Drive are identified as single family residential lots even though current Land Parcel Data (Map 9) does not indicate buildings on the majority of those parcels. None of these lots are of adequate size to support an educational institution.

19. During the testimony of Village designee Doris F. Ulman, she noted the presence of a lot, identified as owned or previously owned by a "Schapiro," which could be larger than 10 acres. Attached as **Exhibit E** is a slope and contour map of Parcel ID 25.09-1-2.2 (Schapiro). This parcel is currently identified as parcel 25.09-1-2.2 and is 13.715 acres in size. Based on Geographic Information System (GIS) topographic data, Map 11 shows that there are 7.98 acres of 15%-to-35% slopes on the site. Under the Village Code 130-10(F)(1)(c), only 25% of this 7.98 acres (or 1.995 acres) can be counted towards the net

lot area. Therefore the net lot area is only 7.725 acres without any further deductions, and the parcel does not meet the 10-acre minimum net lot area required for Educational Institutions under Village Code 130-10(F)(a). The net lot area was calculated by taking the total lot area, at 13.715 acres, subtracting the area of steep slopes, at 7.98 acres, and then adding back 25% of the 7.98 acres of steep slope area, or 1.995 acres.

## II.   **WETLANDS PROTECTION LAW**

20.    The Village of Pomona local wetland protection law's ("WPL") stated legislative intent is to fill a regulatory void and supplement state and federal wetland laws pursuant to the reasoning that the protection of all wetlands is important to all people.

21.    Rather than adopt a version of the Westchester County Model Wetland Ordinance, which the County had a copy of and which would have been a reasonable regulation of potential wetland impacts, the Village chose to adopt a different law that has numerous substantial flaws.

22.    The WPL does not provide scientifically valid definitions of watercourses, waterbodies or wetlands.

23.    The Village's WPL provides no authority for the Village to review delineations of aquatic resources, as the review protocol in the WPL relies on the NYSDEC and/or outside wetland scientists or surveyors authorized by the NYSDEC; the NYSDEC does not authorize either.

24.    The Village and/or its consultants did not conduct any study, assessment or review of the aquatic resources in the Village prior to passage of the WPL to determine what agencies already regulated which wetlands and streams in the Village and/or to determine if there were any "regulatory voids" that needed to be filled.

25.    Instead, the Village board members, with no specialized education or training about wetlands or waters, "drove around" and based passage of this law on their "general knowledge" of wetlands.

26.    The Village designee's testimony demonstrates a lack of understanding of the state and federal wetland regulatory programs and how those programs operate.

27.    Even more importantly, the Village cannot even describe the locations, extent, and types of aquatic resources that they themselves would regulate under their own WPL.

28.    99% of the mapped aquatic resources in the Village are regulated by the Corps of Engineers under the Clean Water Act and 80% are regulated by the NYSDEC under Article 24 Freshwater Wetland Act.

29.    The Village's WPL does not fill a regulatory void but rather provides a duplicative level of regulatory review over federally regulated wetlands, a triplicate level of review over state and federally regulated wetlands and watercourses, and a duplicate level of review over the regulated 100-foot buffer of state-regulated wetlands.

30.    Despite the WPL's legislative intent stating that the protection of all wetlands is important to all people, and despite the fact that smaller wetlands are the ones more likely to be isolated and therefore not regulated by the Corps of Engineers under Section 404 of

the Clean Water Act, where a void could be filled, the Village WPL exempts from regulation wetlands smaller than 2,000 square feet.

31. The Village's WPL also exempts from regulation the 100-foot adjacent area around wetlands and watercourses on parcels developed as single family homes (of which there are 240, as opposed to only 45 non-single family residential parcels that are regulated).

32. The WPL's requirement of a "de facto taking" in order to obtain a wetland permit is unlike any other language in any other local wetland law I have reviewed in New York.

33. Without any studies or independent knowledge of the aquatic resources within the Village limits and without incorporating current, defensible, well-defined and understood terms and concepts in wetland regulation, the Village adopted a wetlands law that is ill-conceived, poorly written and illogical.

### A.  **The WPL does not directly address the asserted interests.**

#### a.  *Wetlands/Water Courses*

34. The WPL is not similar to established municipal wetland regulations in New York State. It does not follow suggested model ordinance language. Such variations from such standard ordinance language make the WPL inconsistent with standard practices.

35. Neither is the WPL similar to established wetland regulations for the Town of Brookhaven, Suffolk County, NY; the Town of Wappinger, Dutchess County, NY, or the Town of LaGrange, Dutchess County, NY, which demonstrate the use of regulatory language substantially similar to the Westchester Model Ordinance.

36. In comparison, there are many substantive problems with the WPL that render it ineffective and an unreasonable regulation of development. The following is a partial list of such deficiencies.

> i.  <u>"All" Wetlands are Vital to "Health, Safety and Welfare of All Persons"</u>

37. The Village WPL § 126-1's statement that "The protection of all wetlands is vital to the health, safety and welfare of all persons" is unreasonable and unsupported by general science or by any specific aquatic resource assessment conducted by the Village of Pomona prior to adoption of the WPL. Neither is this standard language for wetland ordinances.

38. This statement is inherently inconsistent with the Village of Pomona's regulatory exemption of wetlands smaller than 2,000 square feet at § 126-2 of the Code.  Such smaller wetlands are most likely to be "isolated" and thus not regulated by the Corps of Engineers or NYSDEC under their regulatory programs.

39. The physical, hydrological, biological, and chemical influences of aquatic resources do not have connectivity to or impacts on much of the Village population not only due to the watershed divides in the Village but also due to the existing physical development that has already occurred around these resources. Thus, impacts are likely localized to the areas immediately surrounding these resources.

40. It is appropriate—as the Village's expert witness Charles Voorhis agrees—for a municipality considering adoption of a WPL to complete an assessment and inventory of

the aquatic resources in that municipality, which would include an assessment of the geographic extent of the wetlands, hydric soils mapping, aerial photograph review, site specific reviews, examining regulatory jurisdictions to determine which wetlands are or may be regulated by the NYSDEC, and assessing the ecological values for each wetland. The Village did none of this.

41.   Thus, the Village's testimony that "the protection of all wetlands is vital to the health, safety and welfare of all people" was made without the benefit of a specific study, and without any expert input.

42.   In Pomona, there are no impaired waters mapped by the NYSDEC, and none of the streams in the Village flow into any Section 303(d) waters based on a mapping review of the NYSDEC list of Section 303(d) "Impaired Waters."   The current water quality of watercourses in the Village is not "threatened."   Attached as **Exhibit E** is a DEC map of impaired waterbodies.

43.   The 1997 Pomona Master Plan Update lacks detail regarding wetlands. It provides one homogenized map (Figure 1 of the Master Plan Update) that illustrates mapped NYSDEC and National Wetlands Inventory ("NWI") wetlands, along with steep slopes and all other land uses. It provides very limited statements to describe the existing wetlands, streams and watercourses in the Village.  It does not inventory the existing wetlands, streams, and watercourses in the Village. It does not detail additional areas where wetlands might occur based on a review of aerial photographs.

44.   The 1997 Village of Pomona Master Plan Update also does not discuss the existing regulation of wetlands and streams by the federal and state government, and where there were regulatory overlaps or regulatory gaps.

45.   Therefore, the 1997 Village of Pomona Master Plan Update does not provide a rationale for why a local wetland protection law is needed.

46.   The aquatic resources in the Village of Pomona are generally not "threatened" and the watercourses in the Village are not impaired under 303(d).

ii.   "Wetlands" Definition

47.   The WPL's definition of "Wetlands" in Code § 126-2 is based on an outdated 1970's understanding of wetland science, which relied heavily on a short list of plants to identify the boundaries of wetlands. It is not consistent with current wetland definitions, nor is it consistent with its own definition of wetlands found in the Village of Pomona's Stormwater Management Code at § 114-24, which more closely aligns with federal wetland definition under Section 404 of the federal Clean Water Act (33 CFR 328.3(b)).

48.   Current wetland delineation manuals, such as the U.S. Army Corps of Engineers 1987 Manual, and more importantly, the U.S. Army Corps of Engineers Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Northcentral and Northeast Region, links current wetland science with the current regulatory definition.

49.   The Village Code, however, does not have a modern or consistent definition of wetlands, nor does it define the delineation methodology, (including the protocols, the wetland criteria and the field indicators) to be used in the field.

50.   In 1995, the NYSDEC adopted a Freshwater Wetlands Delineation Manual that also

strongly referenced the Corps of Engineers' 1987 manual while including additional field indicators relevant to New York State.

51.   In 2002, the Corps of Engineers began developing "regionalized" supplements to address regional problem issues in wetland delineation. In 2012, the Corps of Engineers released the Northcentral/Northeast Region Supplemental Manual (v. 2.0). This is the supplemental manual currently used by the Corps of Engineers that would cover Rockland County.

52.   Delineations completed by wetland consultants in accordance with the Corps' 1987 Manual and Regional Supplement are regularly accepted by both the Corps of Engineers and the NYSDEC, although NYSDEC staff have discretion to add or remove wetland areas from their own validated delineation.

53.   Delineations completed under Corps of Engineers methodology are also often accepted by municipalities under local wetland laws.

54.   The Village WPL's definition of wetlands is not compatible with this accepted methodology.  It is unreasonable to define wetlands in the manner of the WPL. Furthermore, it is unreasonable for the Village WPL to not state what delineation methodology will be used to establish the wetland/upland boundary.

>            iii.   Lack of Definition for Boundaries of Watercourses or Water Bodies

55.   The Village's WPL unreasonably fails to define where a wetland consultant should place the boundary around such watercourses.

56.   Aquatic resource regulations generally define or identify the features that will be used to define the horizontal and upstream limits of the watercourse. This is important because without such a methodology statement, there is no common understanding regarding these limits between the regulator and the regulated public. This can result in greater potential for the abuse of regulatory discretion on the part of the regulator.

57.   However, the Village of Pomona WPL defines the term "Water body" only as "any body of standing water which is not dry more than three (3) months of the year as computed from the average of the last two (2) consecutive years and which, when wet, is customarily more than 500 square feet in surface water area. "

58.   The term "Watercourse" is defined as "any body of flowing water flowing in an identifiable channel or course and which is not dry more than three (3) months of the calendar year during a year of normal rainfall."

59.   The definition of watercourse does not identify the physical horizontal limit of the watercourse or water body.  (For example, the Corps of Engineers would regulate a stream to the Ordinary High Water Mark with field indicators stated in their 2005-5 Regulatory Guidance Letter on this issue. The Westchester County Soil and Water Conservation District 1998 Model Ordinance for Wetland Protection also provides a definition of Ordinary High Water Mark modeled after the Corps definition. The NYSDEC regulates disturbances to the bed and banks of protected streams and the NYSDEC regulations provide definitions for both the bed and banks.)

60.   However, given the WPL definition of "watercourse" and "waterbody," a landowner would not know where the jurisdictional limits are under the Village's WPL, and thus

cannot know what area is regulated.

iv.     There Is No Authority to Determine Wetland Delineations

61.    The Village WPL's "Application Submissions" section (§ 126-5(A)(6)) states that a map showing the area of wetland, water body or watercourse directly affected with specific dimensions of the affected area should be provided, and continues: "[I]n addition, the wetland, water body or watercourse shall be flagged in the field. A certification of the map and field locations certified by a <u>licensed professional authorized by the New York State Department of Environmental Conservation to identify wetlands</u> shall be filed by the applicant together with the application." (Emphasis added.)

62.    The language is unreasonable, inaccurate and ineffectual because: A) land surveyors are licensed in New York State by the Department of Education, not NYSDEC; and B) NYSDEC does not certify or authorize professionals to identify wetlands.

63.    A land surveyor is a licensed professional that can locate and place on a survey those flags that have been properly placed in the field along the wetland/upland boundary or water body or watercourse boundary by a wetland scientist (*i.e.*, "delineator"). The surveyor may certify that the map is a correct representation of the location of the flagging established in the field by the delineator. However, a professional land surveyor's license is not, in and of itself, a qualification to delineate aquatic resources, such as wetlands, which involves identifying the physical limits of the wetland, watercourse or water body in the field.

64.    The applicant's wetland scientist would also not certify such maps, as required by the Village WPL. The responsibility to certify that a map submitted to the Village under the WPL is an accurate representation of the aquatic resources regulated by the Village under the WPL should be made by a qualified representative of the Village. In this context, qualified means someone with adequate training in wetland science and delineation to provide concurrence on the accuracy of a delineation relative to the definitions in the WPL.

65.    The NYSDEC does not certify their own NYSDEC biologists responsible for validating the boundaries of state wetlands or streams nor is there any licensing or certification currently in place for wetland delineators working in either the public or private realm. Even a Professional Wetland Scientist certification is not a certification of a professional's expertise in wetland delineation.

66.    Not all wetlands or streams are regulated by the NYSDEC. Where the aquatic resources are only regulated by the Corps of Engineers, or not regulated by either agency, the NYSDEC would have no involvement in the review of the resource (*e.g.*, to field check their location, validate the map, or even to authorize a surveying professional, since that is done by the State Education Department).

67.    The Village of Pomona adopted its own WPL with a stated purpose of regulating aquatic resources otherwise not regulated by the NYSDEC or Corps of Engineers in order to "fill a regulatory void." It is therefore unreasonable for the Village to not take responsibility for reviewing and validating the boundaries of those aquatic resources where a Wetland Application was before the Village.

68.    Taken together, the WPL's procedures do not result in a feasible methodology to obtain a

8

validated wetland boundary to satisfy the Village of Pomona requirements.

> v.  The Unique "Takings" Standard for Wetland Permits Is Unreasonable and Unjustified.

69.  Regarding the permitting procedure at WPL § 126-5 and standards for permit issuance at WPL § 126-6, the Village's WPL uses unreasonably burdensome language and concepts not seen in the Westchester Model Ordinance nor in any other local wetland regulation I have reviewed in New York State.

70.  WPL § 126-5 links the need to submit a permit application to a situation where "[the] regulation of wetlands pursuant to this Chapter results in a deprivation of the reasonable use of a property so as to constitute a de facto taking of such property, the owner of said property may apply to the Board of Trustees for a permit to conduct a specific activity otherwise prohibited herein."  (Emphasis added.)

71.  The WPL permit procedures and standards for permit issuance do not discuss in any great length relevant and typical standards which would be appropriate for permit applications and permit issuance such as: (a) evaluating impacts to wetlands, functions or values; (b) describing how the project has avoided, minimized and/or provided compensatory mitigation for unavoidable wetland impacts; or (c) weighing the public interest factors of the project. Such requirements are found in federal wetland regulations, New York State wetland regulations (NYSDEC 2014a), the Westchester County model ordinance, and many municipal wetland protection laws.

72.  Including such information in an application also provides a starting point for negotiation with the regulatory agency under a presumption that a project can be developed to meet permit issuance standards. The Village's WPL unreasonably omits such standards that are actually related to wetlands protection.

73.  Moreover, the permit issuance standards do not provide defined standards against which a permit application can be judged.

74.  There are five towns and nineteen incorporated villages in Rockland County. Attached as **Exhibit F** is a table summarizing the wetland regulations, or lack thereof, for these 24 municipalities in Rockland County.

75.  None of the municipalities in Rockland County are protecting wetlands under the assumed/delegated jurisdiction of New York State's Article 24 Freshwater Wetlands Program.  Only three municipalities in New York State have adopted the Article 24 Freshwater Wetlands program (the Town of Union in Broome County, the Town of Hempstead in Nassau County, and the Village of Southampton in Suffolk County).

76.  Seven municipalities (which includes the Village of Pomona) in Rockland County have passed a local Wetland Protection Law, under general municipal, municipal home rule, town, village, or other law as allowed and described in ECL Article 24, Title 5; 24-0509: Relationship to Other Laws. These municipalities are the Town of Haverstraw, Town of Stony Point, Village of Airmont, Village of Montebello, Village of Pomona, Village of Spring Valley, and Village of Wesley Hills.  Two other municipalities, the Village of Nyack and the Village of Piermont have avoidance/conservation language for wetlands and watercourse included within the Zoning portion of their Village Code.

77.     Of the seven local wetland laws in Rockland County, only the Village of Pomona used a "takings" standard (found in WPL §§ 126-5, 126-6A) as a threshold for allowing a permit application to be submitted to the Village. I could not find a single instance of the concept of takings as a threshold for application in Rockland County or in any of the wetland regulations reviewed in New York State.

78.     While there is a wide range of standards among these other eight municipalities, none uses the strongly non-approachable language of demonstrating a "taking" of property rights as a requirement to both apply for and receive a wetland permit that Pomona's does.

79.     Furthermore, the WPL's Standards for Granting a Permit, found at § 126-6(B), state instead that "In granting, denying or granting a permit with conditions, the Board of Trustees shall <u>consider</u> the effect of the proposed activity with reference to the public health and welfare, fishing, flood, hurricane and storm dangers and the protection or enhancement of the several functions of the wetlands and the benefits derived therefrom.."  (Emphasis added.)   The words "[c]onsider the effect of the proposed activity on" is a <u>procedural</u> requirement and not a permit issuance standard.

80.     Section 126-6(B) is unreasonable in not stating how such issues are to be considered. It does not provide a standard against which to measure the proposed project.

> vi.    Regulatory "Void"

81.     Under the "Legislative Intent" provision of the Village's WPL, § 126-1, the Village of Pomona gives one reason why this law was passed, stating "[d]ue to recent court decisions, a void may exist in the protection of wetlands that do not meet the threshold acreage for New York State protection. The purpose of this chapter is to fill that void and to supplement existing state and federal laws."

82.     The Village of Pomona appears to be suggesting that there may be small isolated wetlands in the Village that are too small to be regulated by the NYSDEC, and not connected to interstate waters via a significant nexus, and thus also not regulated by the Corps of Engineers.

83.     However, the Village's testimony demonstrates that it is unaware of the location, size, or overall number of any non-regulated wetland resources in the Village, or how to even assess whether they are or are not regulated by other state or federal agencies. The Village does not have maps illustrating aquatic resource areas. It has not completed any type of assessment or evaluation of wetlands in the Village to determine what wetlands were or were not likely regulated by the Corps of Engineers.

84.     The Village's determination that it had isolated non-regulated aquatic resources relied on "[m]embers of the board driv[ing] around." This is not adequate for determining whether a wetland is isolated or non-regulated.  The Village did not and does not provide any determination that isolated wetlands, not subject to regulation under Section 404 of the Clean Water Act, exist within the Village of Pomona.

85.     Based on existing state and federal wetland laws, and a desktop review of existing wetland mapping, there is no such "void" in the protection of wetlands in the Village. Attached as **Exhibit G** is the assessment methodology I used to identify waters and wetlands in the Village and how they would be regulated, together with the results of

such assessment.  Attached as **Exhibit H** is the NYSDEC Streams and Wetlands Map for Pomona.  Attached as **Exhibit I** is the National Wetlands Inventory ("NWI") Wetlands Map for Pomona.  Attached as **Exhibit J** is the Soil Map for Pomona.  Attached as **Exhibit K** is the Land Use Map (2012) for Pomona. Attached as **Exhibit L** is the Parcel Map with Aquatic Resource Overlay.  Attached as **Exhibit M** is the Photo Location Map. Additionally, Exhibits B, C and D, described above, are maps showing: Parcels Regulated/Not Regulated by Village WPL 100' Adjacent Area; Parcel Map with Land Uses and Aquatic Resources Overlay; and Current FEMA FIRM Floodplain Mapping in Pomona, respectively.  Attached as **Exhibit N** are aerial photography images used in my analysis.

86. The results of my assessment indicate that the WPL duplicates existing state and federal wetland regulatory protection much more than it "supplements" such protection.

87. The Corps of Engineers regulates waters of the United States (of which wetlands are a subset) under Section 404 of the Clean Water Act when those waters have a significant nexus to interstate commerce. A "significant nexus" is typically identified based on a traceable hydrological, physical, biological or chemical connection to a Traditionally Navigable Water (TNW). Generally, an aquatic resource will be regulated by the New York District Corps of Engineers unless the wetland or water is completely hydrologically disconnected from the tributary system.

88. The Corps of Engineers will typically regulate streams and wetlands already regulated by the NYSDEC, as well as streams with lower water quality standards and smaller wetlands with a "significant nexus."

89. The Army Corps does not regulate a buffer area adjacent to aquatic resources.

90. The NYSDEC regulates disturbance to the bed and banks of Class C(T) streams or higher under ECL Article 15, Use and Protection of Waters Law. Mapped streams are classified, with classifications and standards identified at NYSDEC Regulations Chapter X, Division of Water, Subchapter B, Classes and Standards of Quality and Purity Assigned to Fresh Surface and Tidal Salt Water (6 NYCRR Parts 800 – 941).

91. The NYSDEC regulates wetlands and their 100-foot adjacent area mapped in accordance with the NYSDEC Freshwater Wetland Maps and Classification regulations found at 6 NYCRR 664.

92. Regulated wetlands are typically: A) pre-mapped by the NYSDEC; B) 12.4 acres in size or larger; or C) smaller wetlands of unusual local importance. The NYSDEC can extend their jurisdiction 500 feet in any direction from a mapped wetland into otherwise unmapped wetland areas; this is different than the regulated 100 foot adjacent area buffer.

93. Attached as **Exhibit O** is a table summarizing the state and federal jurisdiction over mapped wetlands and watercourses in Village of Pomona.  Exhibits C & L illustrates these resources and the physical relationship between Mapped Streams and Mapped Wetlands.

94. In the Village, all eight streams mapped in the Village (equaling approximately 19,433 linear feet) would be regulated by the Corps of Engineers under Section 404 of the Clean Water Act. These streams have hydrological connections to "Traditionally Navigable Waters." The western portion of the Village flows west to the Mahwah River. The eastern

portion of the Village flows east to the South Branch of Minisceongo Creek which flows into the Hudson River. The Corps would regulate these streams to the Ordinary High Water Mark or the limit of any adjacent wetland.

95.    The three streams in the Mahwah watershed (Streams 1, 6 and 7 equaling 6,000 linear feet)) would also be regulated by the NYSDEC under Article 15, Use and Protection of Waters. The NYSDEC would regulate to the top of the stream's bank.

96.    Stream 1, on the western portion of the Subject Parcel, is regulated by both the Corps of Engineers under Section 404 of the Clean Water Act, and the NYSDEC under Article 15.

97.    Of the 21 NWI wetlands mapped in the Village (equaling 62.8 acres using NWI mapping areas), the largest (Wetland 1, also known as NYSDEC Wetland TH-15, equaling 51 acres on NWI mapping) would be regulated by the NYSDEC under Article 24 of the Freshwater Wetlands Act. This wetland is located in the eastern portion of the Subject Parcel.

98.    The NYSDEC would regulate impacts to this wetland (Wetland 1) and its 100-foot adjacent area. Wetlands 12 and 13 are within 500 feet of NYSDEC Mapped Wetland TH-15, and so could also be regulated under NYS Environmental Conservation Law, Article 24 Freshwater Wetlands Act, if the NYSDEC decided to assert jurisdiction. These three wetlands would also be regulated by the Corps of Engineers under Section 404 of the Clean Water Act.

99.    Of the remaining 20 NWI mapped wetlands in the Village (equaling 11.7 acres), eighteen wetlands had visible hydrological connections or were located in close proximity to interstate waters based on desktop mapping review. Wetland 19 (at 0.2 acre) was not visible on aerial photography. Wetland 15 (at 0.1 acre) is located in the headwaters of an unmapped wetland system discussed below. The outlet of that wetland area could not be identified on aerial photography; this system may connect into Stream 3 to the west.

100.    Therefore, 99% of the NWI mapped wetlands in the Village of Pomona are regulated by the Corps of Engineers under Section 404 of the Clean Water Act for direct impacts.

101.    At least 51 acres (80%) of the total acreage of NWI mapped wetlands in the Village of Pomona are regulated by the NYSDEC under Article 24, which includes regulation of 100-foot adjacent area. This includes the wetland in the eastern portion of the Subject Parcel.

102.    As described in Exhibit G, four additional areas of potential wetlands/watercourses in the Village were identified after reviewing the maps above and BING Bird's Eye View mapping in the Village. See Exhibit N (photos 1-22).  These are: (1) additional wetland resources between Wetlands 9 and 10 which continue to the west of Ladentown Road and connect to the wetlands continuous with the Mahwah River; (2) an unmapped drainage course appears to connect Wetlands 11 and 14 and continue south under Ladentown Road and into the NYSDEC mapped wetland which flows into Stream 3, part of the Minisceongo stream, which is a perennial, relatively permanent water, and thus regulated under the Clean Water Act; (3) an unmapped stream corridor that flows northeast to southwest starting near Laura Lane Court then east of Klingher Court and under Camp Hill Road continues west out of the Village and into the Mahwah River (and there appears to have a significant nexus to interstate waters); and (4) an unmapped

wetland/stream corridor that, based on aerial photography, appears to flow south from a location near Wetland 15 to a location south of Ormian Drive. I was unable to find a clear significant nexus only for this last unmapped wetland/stream corridor.

103. The Village's WPL therefore does not fill any significant wetland regulatory voids in the Village of Pomona, as it appears that all the streams and 99% of the NWI mapped wetlands are regulated by the Corps of Engineers under Section 404 of the Clean Water Act, with an additional 80% of the NWI mapped wetland area (along with a 100-foot adjacent area) also regulated by the NYSDEC.   In addition, Streams 1, 6 and 7 on the west side of the Village are also regulated by the NYSDEC's Article 15 Use and Protection of Waters. Additionally, three out of the four unmapped aquatic resources observed in the Village on aerial photography also appear to be regulated under Section 404 of the Clean Water Act.

104. The Village's WPL regulates a 100-foot adjacent area over parcels not improved with a single family residence that are within 100 feet of a wetland. This clause in the Village of Pomona's WPL results in more wetland regulatory duplication than wetland regulatory supplementation.

105. Exhibit B demonstrates, in color, all the parcels in the Village of Pomona falling within 100 feet of a mapped or unmapped wetland or watercourse. The orange parcels illustrate the 240 single family residential parcels within the Village of Pomona (equaling 252 acres) that are not regulated by the WPL, despite being within 100 feet of a mapped or unmapped wetland or watercourse. The 11 light green parcels (equaling 62.03 acres) are "public" land uses (*e.g.*, parks, utilities, Village Hall) located within 100 feet of a mapped or unmapped watercourse or wetland. The 33 gray parcels (equaling 78 acres) are those "private" land uses (vacant, two family/multi-family, Institutional/Quasi Public) where the WPL 100 foot adjacent area would be applied. The large dark green parcel is the Subject Parcel, at 97 acres, where the WPL 100-foot buffer would also be applied. Attached as Exhibit P is a summary of this data.

106. The Village's WPL would regulate the 100-foot adjacent area of Wetland 1/NYSDEC Wetland TH-15 (overlapping the NYSDEC's area of jurisdiction), but only the Subject Parcel and the five private non-single-family parcels would be subject to regulation of the WPL 100-foot buffer. Two public park parcels are also within 100 feet of this wetland. The 32 single family residential parcels within 100 feet of Wetland 1/NYSDEC Wetland TH-15 would not be subjected to the WPL 100 foot adjacent area regulated area.

107. Stream 1 is regulated along its entire length by the NYSDEC under Article 15 and by the Corps of Engineers under Section 404. However, the Village of Pomona WPL's 100-foot buffer to this watercourse would only apply where the stream crosses private, non-single-family residential uses, which includes the Subject Parcel, and five vacant parcels. The public Village Hall and two utility parcels are also within 100 feet of this watercourse. The 30 single family residential parcels within 100 feet of this stream and associated wetlands would not be subjected to the WPL 100-foot adjacent area regulated area.

108. There are also 18 single family residential parcels within 100 feet of Wetlands 12 and 13 that would not be subjected to the WPL 100-foot adjacent area.

109. Similarly, Streams 6 and 7 are regulated along their entire length by the NYSDEC under

13

Article 15 and by the Corps of Engineers under Section 404. However, the Village of Pomona WPL's 100 foot buffer to this watercourse would only apply where the stream crosses non-single-family residential uses. This is one parcel, an Institutional/Quasi-Public land use east of Call Hollow Road. The 15 single family residential parcels within 100 feet of these two streams would not be subjected to the WPL 100-foot adjacent area.

110. The remaining wetlands and watercourses in the Village of Pomona appear to be regulated by the Corps of Engineers. All of these wetlands are regulated for direct impacts by the Village of Pomona WPL. There are 28 parcels within 100 feet of these wetlands and watercourses that are not occupied by single-family land uses. Of these, 22 are private parcels that would also be subject to the Village of Pomona WPL 100-foot adjacent area. There are six public or utility parcels within 100 feet of a wetland or watercourse. The 163 single family residential parcels within 100 feet of these wetlands and watercourses would not be subjected to the WPL 100-foot adjacent area regulated area.

111. The WPL 100-foot adjacent area thus results in more wetland regulatory duplication than wetland regulatory supplementation. The NYSDEC wetlands in the Village of Pomona, mapped by NWI at 51 acres, or 80% of the total mapped NWI wetland acreage in the Village is already regulated by a 100 foot adjacent area. This includes the wetland on the 97-acre Subject Parcel.

112. In addition to the Subject Parcel, the WPL places a 100-foot adjacent area over 33 parcels equaling 78 acres where those land uses are vacant, two or multi-family residential or Institutional/Quasi Public. In contrast, the WPL does not regulate a 100-foot adjacent area over 240 parcels in the Village equaling 252 acres, where those parcels are within 100 feet of a mapped or unmapped wetland or watercourse yet are occupied by single family homes.

> vii.   The WPL Was Not Necessary to Comply with Federal or State Statutory Requirements

113. Although the Village has stated that the purpose of Local Law No. 5 of 2007 was to comply with Section 401 of the federal Clean Water Act, Article 24 of the NYS Environmental Conservation Law and MS4 Permitting requirements and manuals, there are no such requirements that a local municipality must adopt a WPL (much less this WPL) in either Section 401 of the Federal Clean Water Act, Article 24 of the NYS Environmental Conservation law, or the MS4 Permitting Requirements and/or Manuals, or any implementing regulations associated with these laws.

114. This Village designee's testimony concerning the need for the Village to adopt the WPL in order to comply with federal and state law is unsupported, confusing and inaccurate. There is no regulation applicable in New York State that requires a local municipality to adopt a WPL at all.

115. Previously, in the Defendants' Amended Response to Certain of Plaintiff's Second Set of Interrogatories, dated December 11, 2013, the Village stated that it passed the WPL to comply with Section 401 of the federal Clean Water Act. There is no requirement in Section 401 of the federal Clean Water Act that mandates adoption of a WPL.

116. Neither is there any requirement that a local municipality adopt a WPL to comply with

Article 24 of New York's Freshwater Wetland Act. Title 5, "Local Implementation" of Article 24 of the Environmental Conservation Law states "On or after September 1, 1975, each local government <u>may</u> adopt, amend, and upon the filing of the appropriate freshwater wetland map, implement a freshwater wetlands protection law or ordinance in accordance with this article to be applicable to all freshwater wetlands wholly or partially within its jurisdiction." (Emphasis added.) However, nothing in Title 5 or elsewhere in Article 24 mandates or requires that a municipality assume jurisdiction under Article 24 in order to "comply" with ECL Article 24, Freshwater Wetlands Act.

117. Only three municipalities in New York State have assumed Article 24 jurisdiction (the Town of Union in Broome County, the Town of Hempstead in Nassau County, and the Village of Southampton in Suffolk County).

118. Section 24-0509 of this Title also allows, but does not mandate, local municipalities to adopt, under home rule, their own wetland protection laws provided such laws are at least as restrictive as the law under Article 24.

119. Neither is there any requirement that a municipality adopt a WPL in order to comply with the MS4 permitting requirements or manuals. In 1990, the USEPA published Phase I Stormwater Management Regulations establishing a federal stormwater management program. This rule required operators of Municipal Separate Storm Sewer Systems (MS4s) in large urbanized areas to implement stormwater management programs to control polluted discharges. The Phase II Stormwater Management Program, established in 1999, expanded the stormwater program to cover smaller MS4s and smaller construction disturbances.

120. The Village of Pomona is in an MS4 area. In January 2003, New York State required that regulated MS4s establish a stormwater management program by January 8, 2008 employing six Minimum Control Measures established by the USEPA or demonstrate that the program that the regulated MS4 implemented provides equivalent protection.

121. The Manual also provides a sample Local Law for Stormwater Management and Erosion and Sediment Control for discretionary use by the municipality under local Home Rule. A comparison of the sample Local Law for Stormwater Management and Erosion and Sediment Control with the Village of Pomona's Chapter 114 Stormwater Law demonstrates substantial similarities in wording and requirements.

122. With regard to adoption of a WPL, the only thing that the NYSDEC Stormwater Management Guidance Manual states is "[f]loodplain regulations and wetland and watercourse protection laws are other mechanisms that municipalities <u>can</u> adopt as local laws or ordinances to restrict land uses near streams and wetlands and to control stormwater runoff into Waterbodies." (Emphasis added.) The single sentence in the manual regarding adoption of local WPLs and the use of the word "can" relative to their adoption by municipalities indicates that this is not a mandatory requirement.

      b. *Flooding / Floodplains*

123. The Village of Pomona has also stated in its response to interrogatories dated December 11, 2013 that one of the governmental interests in the adoption of the WPL is "reducing flooding."

124. Neither the WPL, nor any other prospective regulatory program will accomplish a

reduction in existing flooding conditions within the Village. Reducing flooding in a Village as developed as Pomona (nearly 77% of the Village is developed, see Exhibit K) can only occur by infrastructure retrofitting, and even then, it would be difficult to achieve any meaningful reduction.

125.  It does not appear that the existing development incorporated adequate stormwater management practices; only one stormwater basin was observed on aerial photographs of the Village.

126.  With respect to preventing future impacts on flooding and floodplains, the Corps of Engineers' regulatory program requires documentation of compliance with local floodplain regulations from the local floodplain administrator as part of its public interest review. The NYSDEC's Article 15 regulations at 6 NYCRR 608.7 also require a review of impacts on "hydrology, including such criteria as water velocity, depth, discharge volume, flooding potential." Similarly, and as an example, the NYSDEC's blanket Section 401 Water Quality Certification requires that "authorized projects be in compliance with State and Local Floodplain Regulations." Proper implementation of the Village's MS4's Stormwater Management at § 114 and § 79 (Flood Damage Prevention), in combination with its reviews under SEQRA and § 119 Site Development Review are much more robust tools available to the Village to prevent increased pollution, runoff and flooding from any new development than the WPL.

127.  The WPL will not reduce existing flooding. Measures that could be implemented to reduce flooding include infiltrating stormwater from existing hardscapes, retaining stormwater runoff higher in the watershed, reforestation of existing hardscapes, and eliminating encroachments and restrictions on the width and volume of floodways and floodplains. Practices could include adding rain gardens on existing single family properties to collect and infiltrate runoff from roofs and driveways; adding infiltration basins or swales along roadways to infiltrate stormwater runoff from roads; enlarging roadway culvert over streams to reduce backwater flooding upstream of the culverts; and removing existing encroachments from floodways and floodplains. The municipality would typically be responsible for this effort due to the need for comprehensive planning, public outreach, and potential impacts to existing landowners.

c.  *Stormwater Systems*

128.  It is irrational to state that the WPL is necessary to protect stormwater systems.  Rather, stormwater systems are necessary to protect wetlands and watercourses.

129.  In this instance, the use of the term "stormwater systems" means man-made facilities, such as stormwater ponds, conveyances, and other infrastructure, engineered to detain, treat and convey stormwater. See, for example, Pomona Code § 114-2 Definition: "Municipal separate stormwater system."

130.  In nearly all instances, a stormwater system is constructed a low point in the development footprint yet upslope of (*i.e.*, above) the aquatic resources.

131.  WPL § 126-5(A)(8) does states that "in the case of applications affecting water retention capabilities, water flow or other drainage characteristics of any wetland, water body or watercourse, the Board of Trustees may require the inclusion of a statement of the upstream and downstream watersheds, impact analysis and information as to rainfall

intensity in the vicinity for not less than a one-hundred-year return frequency, together with approximate runoff coefficients to determine the capacity and size of any channel sections, pipes or waterway openings, together with plans for necessary bridges, culverts, stormwater or pipe drains and such other information and data that, in the opinion of the Board of Trustees, are needed to arrive at a proper determination on the application, consistent with this chapter."  However, this discretionary option is very similar to that required under the NYSDEC Stormwater Management Design Manual, particularly for the Extreme (100 year) Storm, which requires a demonstration that the stormwater system will not adversely impact the watercourse or wetland (not the other way around).

132.    The 100-year Storm Requirements have been included in the NYSDEC Stormwater Management Design Manual since 2002 whereas the WPL is from 2007. The WPL is therefore entirely duplicative of the Design Manual in this respect.

d.    *Water Pollution*

133.    The WPL is unnecessary to achieve the governmental purpose and interest in protecting against "water pollution," because there are other regulations that are sufficient to achieve the Village's stated interest in protecting against water pollution.

134.    The Village of Pomona Stormwater Management Code is a much more robust regulatory program with respect to preventing water pollution than the WPL, assuming, of course that the Village of Pomona correctly follows and enforces this regulation.

135.    While § 126-3 lists regulated activities that would otherwise cause pollution if they were located in a wetland (*e.g.*, depositing garbage and chemicals, installing a septic tank or allowing liquid waste to drain into a wetland), in comparison, the Village of Pomona Code (§ 114 Stormwater Management) has an entire Article for Illicit Discharges that is much more comprehensive and robust than the WPL's short § 126-3.

136.    As an MS4, the entire land area of the Village of Pomona is regulated under the Stormwater Management chapter of the Code, whereas under the WPL, only direct impacts to wetlands and streams and the 100 foot adjacent area on 45 other parcels are regulated, as discussed above.

e.    *Plant Life / Wildlife*

137.    The WPL is unnecessary to protect animal and plant life. Existing regulatory programs sufficiently protect the Village's stated interest in protecting plants and wildlife without the need for the WPL. These include the federal US Fish and Wildlife Service (USFWS) Endangered Species Act, the NYSDEC Endangered Species Act, SEQRA, the Village's Chapter 114 Stormwater Management review, and state and federal wetland permitting requirements.

138.    SEQRA is a robust procedural and regulatory mechanism for reviewing potential impacts to plant and wildlife. As part of any SEQRA review, the lead agency can evaluate the nature of the plants and wildlife on the site and determine whether the project has the potential for adverse impacts on those resources.

139.    The USFWS Endangered Species Act requires that landowners or applicants demonstrate that activities do not result in a "takings" of federal listed endangered or threatened species.

17

140.   The NYSDEC Endangered Species Act regulations at 6 NYCRR 182 also prohibits the taking of any state-listed endangered or threatened species without a NYSDEC Incidental Take Permit. Typically, to comply with the regulations, an Applicant or designated ecologist contacts the NYSDEC Natural Heritage Program to determine if there are any known occurrences of state-regulated endangered or threatened species known to exist on or in the vicinity of the site. If species are known to occur, then review and/or consultation with the NYSDEC is recommended. This review determines if additional site specific presence/absence surveys are required, if mitigation can be incorporated into the site design to avoid impacts, or if an Incidental Take permit is required.

141.   State and federal wetland permitting both have requirements for the protection and review of endangered species.  Federal wetland permitting triggers reviews under Section 7 of the Endangered Species Act.  State wetland permitting requires that all permit applications to the Department be submitted at one time, and this would include an application under the State's Endangered Species Act. The review of a freshwater wetland permit application under NYSDEC's Article 24 would take into account the type of wetland present including habitat, the functions and values that the wetland provides including fish and wildlife values, and the impact to those resources.

142.   Mitigation methods that are available for protection of plant life and wildlife include assessing of significant habitats, including wetlands; incorporating conditions into development site plan review; creating buffers to protect known occurrences of species; developing avoidance, and minimization and mitigation measures for the vernal pools and other wetlands. Such targeted review under SEQRA sufficiently permits the development of avoidance, minimization and mitigation measures specifically tailored to the interface of a project and the conditions of the site where the project is proposed.

143.   The Village's Chapter 114 Stormwater Management Chapter also implements the requirements of the NYSDEC SPDES General Permit for Stormwater Discharges from Construction Activities. "Activities which are ineligible for coverage under this General Permit" include "Discharges from construction activities that adversely affect a listed, or proposed to be listed, endangered or threatened species or its habitat." Projects with such impacts would require individual SWPPP review and coverage by the NYSDEC. This would also trigger a review by the NYSDEC under their Endangered Species regulations.

144.   Within this list of existing regulatory mechanisms the Village currently has direct control over review of any projects (except Type II actions) under SEQRA. This would allow the lead agency to impose "substantive conditions upon an action to ensure that the requirements of [SEQRA] have been satisfied. The conditions imposed must be practicable and reasonably related to the impacts identified in the EIS or the conditioned negative declaration." (6 NYCRR 617.3(b.).)

145.   The SEQRA regulations and the Stormwater Management chapter are strong and substantive reviewing authorities available to the Village to review a project's impacts on endangered and threatened species and other plant and animal life.

### B.   The Exception for Single Family Homes Defeats the Purpose of the WPL

146.   According to WPL § 126.3(D), the "one-hundred foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family

residence."

147.  Federal, state and Village environmental regulations are designed to reduce impacts caused by new development on wetlands, water quality, storm flows, and other environmental resources.

148.  In comparison, existing, on-going human activities in close proximity to aquatic resources that are not reviewed under current environmental regulations have the potential to continue to threaten those resources. Existing land uses that pre-date the implementation of the NYSDEC and Corps regulations, especially residential development, often have issues with creeping regulatory violations to wetlands and streams. This can include the disposal of leaves, debris and other materials; cutting of large trees next to streams; relocating streams; adding riprap to streams; and building additional ancillary structures around streams and wetlands.

149.  For example, at the location at 28 Klingher Court in the Village, the rear of the home on that lot has some type of recreational facility directly abutting, and perhaps extending into the wetland/watercourse. (See Exhibit N, Photo 16.) This facility post-dates the 2007 adoption of the Village's WPL. If the activity is located outside the watercourse, but within 100 feet, it is an example of why the Village of Pomona WPL should not exempt single-family homes from requiring permits, as this activity has the potential to result in additional erosion, runoff to the stream, and also has the potential to destabilize the riparian edge of this stream.

150.  Other examples of such creeping regulatory violations in the Village may include:

   a.  An area of fill in Wetland 1 (NYSDEC Wetland TH-1) to the west of Camp Hill Road associated with a residential subdivision. (Exhibit N, Photos 34 & 35.)

   b.  An increasing number of structures behind a residential home west of South Camp Hill Road presumably within 100 feet of Wetland 1, NYSDEC Wetland TH-15. (Exhibit N, Photos 35a, 35b & 35c.)

   c.  A series of landscaping ponds excavated from or near Stream 3 at a single-family residential property off of the south side of the Grey Beech Lane cul-de-sac. (Exhibit N, Photos 36a & 36b.) The ponds are not shown on aerial photographs from March 31, 2007 that predate the WPL.

   d.  Several ponds in the Village are either diked or impounded (Wetland Ponds 8, 11 & 14) or excavated (Wetland Ponds 2, 5, 6, 7 & 9), which creates environmental concerns.  (Exhibit N, Photos 9, 24, 29, 30, 30a, 31.) Wetland Ponds 2, 5, 6, 7, 9 and 11 are associated with residential developments in the Village, and Pond 14 is associated with a Village Park.

151.  Out of the 1,156 parcels in the Village, there are 285 parcels of land that are located within 100 feet of a mapped or unmapped wetland or watercourse in the Village of Pomona. (Exhibit B.) 240 of these 285 parcels are single-family parcels that are not regulated by the Village of Pomona WPL, even though they are within 100 feet of a mapped or unmapped wetland or watercourse.

152.  There are only 45 parcels that are not already developed by single family homes located within 100 feet of a mapped or unmapped wetland or watercourse to which the Village of

Pomona 100 buffer could even theoretically be applied. These are: (a) The Subject Parcel; (b) 20 vacant lots (six of which are being developed near Klingher Court/Cornell Peak Road); (c) 6 are associated with local parks/open space; (d) 8 are two or multi-family residences; (e) 4 are occupied by utilities; (f) 5 are institutional/quasi-public; and (g) 1 is a wooded area with single family homes identified as "agricultural."

153.    Thus, the WPL's 100 foot buffer will not be applied to at least 240 (or 260 if the 20 vacant lots are developed with single family residences) parcels out of 285 parcels in the Village that are within 100 feet of a mapped or unmapped wetland or watercourse.

154.    As noted above, ¶¶ 105-112, the WPL is duplicative of existing regulations and in practice accomplishes very little, as there are very few properties located within a 100-foot buffer that is not already regulated or is not located on a property that is improved with a single family residence.

155.    The Village of Pomona's WPL has a stated Legislative Intent of filling the "regulatory void" for smaller wetlands not regulated by the NYSDEC that may not be regulated by the Corps. However, the Village of Pomona's law does not regulate 240 single-family residential parcels, which is 5 times the number of parcels (45) that it does regulate within a 100 foot adjacent area.

156.    The lack of regulation of an adjacent area on single family residential lands means that the Village of Pomona cannot stop impacts to wetlands and waters on these properties before they occur. On an individual parcel basis, the area of impacts are typically small, although cumulatively, there can be significant effect.

157.    Various facilities or activities in close proximity to watercourses in the Village of Pomona, as described above, demonstrate how the single family residential development can create conflict with flood damage prevention. In some instances, they also demonstrate that as a watercourse moves within its natural floodplains, it may encroach upon structures built within that floodplain.

    a.    Exhibit N, Photos 16a and 16b show the outlet of an unmapped stream west of Klingher Court that crosses under Camp Hill Road and flows west to Call Hollow Road. Aerial Photo 16b is a close-up of this stream and shows that it has been riprapped and channelized to a narrow corridor between existing residential homes. Activities observed within the adjacent area of this stream include the removal of trees, installation of lawns, installation of sheds (not regulated by the WPL), and placement of riprap within the stream. This watercourse is constrained, especially when compared to the width of the watercourse upstream of Camp Hill Road (see Exhibit N, Photo 16.). While this is not a FEMA regulated floodplain, these activities can exacerbate headwater flooding.

    b.    Exhibit N, Photo 16 of 28 Klingher Court shows construction of additional impervious surfaces to the rear of the home adjacent to the stream. This impervious area was not present in 2007 and potentially constricts the watercourse. (Exhibit N, Photos 14 and 22a, bottom blue arrow.)

    c.    Exhibit N, Photo 22a illustrates an unmapped watercourse west of Halley Drive, where that watercourse is in close proximity to the rear of homes and a tennis court.

    d.    Exhibit N, Photos 36a and 36b illustrate:

- A tennis court constructed over Stream 3. This tennis court may contribute to upstream backwater flooding when the culvert or other drainage facility under the tennis court is filled to capacity with runoff. The stream is then conveyed under Secor Court, likely within a culvert.

- A home south of Gray Beech Lane (the one with the swimming pool) that appears to be constructed over or within the Stream 3 corridor. Streams move within their floodplain. Stream 3 appears to be at or near to the bottom of the west side of this home's foundation.

- A series of ponds excavated next to a second house and connecting into Stream 3.

e. Exhibit N, Photos 37a and 37b illustrate homes, sheds, garages and driveways constructed immediately adjacent to Stream 4, the outlet stream of Wetland 1 and two foot bridges crossing this stream. Both Stream 4 and Wetland 1 are mapped FEMA floodplains as illustrated in Exhibit D. With the exceptions of the foot bridges, these homes and structures are outside of the watercourse, and are residential, so could be constructed without permits under the Village's WPL. They are in a floodplain. The bridges over the stream can break away in a flood event, clog the culvert at South Camp Hill Road and cause additional backwater flooding. Clogged culverts are a major reason why roads wash out during large storm events.

f. Exhibit N, Photo 38 is a view east of the Stream 2 crossing of Tara Drive that pre-dates the Village's WPL. The stream appears to have been conveyed via a culvert under this road and residential development. The silt fence and re-grading north of Tara Road suggests that during a storm event the stream may have been flowing with greater volume than the capacity of the culvert, and went overland to the north.

158. These specific examples show that residential development in the Village of Pomona is not only impacting wetlands and water courses directly but also that associated residential activities within 100 feet of those resources is causing or has the potential to cause adverse impacts to the Village of Pomona's stated governmental interest in "reducing flooding," by restricting smaller watercourses, their natural floodplains and potential adjacent wetlands with buildings and other encroachments.

### C. Less Restrictive Means of Achieving the Village's Interests.

159. The asserted governmental interests of the Village of Pomona in regulating wetlands could be protected through various other means, for example, existing federal and state wetland regulations, SEQRA review, Site Plan and Special Permit Processes, Floodplain Regulations, and Stormwater Regulations.

#### i. *Protection of Wetlands*

160. There are numerous alternative means to achieve the Village's stated interest in protecting wetlands other than enactment and enforcement of the WPL, which include NYSDEC Article 24 and NYSDEC Article 15, the state regulation of wetlands and stream and which, under the NYSDEC Uniform Procedures Regulations, provide an opportunity for the municipality to comment on any major permits before the NYSDEC.

161. The Village can also use SEQRA, their own local ordinances such as the Village of Pomona Chapter 114 (Stormwater Management) and Chapter 79 (Flood Prevention

Management), and site plan review to examine impacts to wetlands and waters.

162. The Village of Pomona can use non-regulatory means to protect aquatic resources such as developing partnerships with land conservation agencies and seeking grants and funding to purchase important wetlands in the Village.

163. The Corps' Section 404 Clean Water Act regulations provide a strong level of protection over all of the watercourses and 99% of the NWI mapped wetlands in the Village.  The Corps would also regulate the majority of otherwise unmapped wetlands in the Village.

164. The Corps regulates the discharge of dredged or fill material into Waters of the United States (of which wetlands are a subset) under Section 404 of the Clean Water Act.

165. For all such projects, compliance with the federal Clean Water Act Section 404(b)(1) Guidelines is required. These guidelines require an applicant to sequentially demonstrate that a project has avoided and minimized aquatic resource impacts to the maximum extent practicable and has provided adequate compensatory mitigation for unavoidable impacts.

166. Further, the Corps must find that the project is consistent with a variety of associated federal laws (*e.g.*, National Environmental Policy Act, federal Endangered Species Act, National Historic Preservation Act, federal floodplains management regulations, and Section 401 of the Clean Water Act), and that that the project is not contrary to the public interest.

167. In sum, the permitted project must be the "Least Environmentally Damaging Practicable Alternative" ("LEDPA").

168. The Corps' regulatory program has the effect of generally limiting project impacts to aquatic resource to less than 0.5 acres, and often to less than 0.1 acre, regardless of the size of the property or the size of the aquatic resource.

169. A standard practice of the New York Corps District is to send copies of any issued permits or authorizations to the Chief Executive Officer of the municipality where the project is authorized. For Individual Permits (*i.e.*, aquatic resource impacts greater than 0.5 acre) the Corps also sends public notice to the municipality. This provides the municipality with an opportunity to comment on the project to the Corps.

170. With respect to the Village's testimony about the purported inadequacy of such regulatory protections of wetlands, it is clear that it has a fundamental misunderstanding of such regulation and is simply wrong on a number of issues, including the following inaccuracies:

   a. That the NYSDEC does not get involved in the Corps Nationwide Permit program.

   b. That one does not have to flag wetlands as part of the Corps of Engineers Nationwide Permit Program. The Corps of Engineers Nationwide Permit Program, General Condition 31(b)(4) states that delineation of aquatic resources is necessary.

   c. That the Corps does not come out into the field and verify the delineation.

   d. That "[t]he Army Corps lets you fill or do almost anything you want within that

22

half acre under the nationwide permit." The Corps requires that a Pre-Construction Notice (PCN) be submitted for any project, except maintenance activities, impacting any area of wetlands (special aquatic site).

e. That the Corps only regulates streams and waters that are within a certain number of feet of navigable waters, and that the Corps doesn't have jurisdiction over all waterways. Rather, the Corps regulates those waters (including wetlands, a subset of waters of the United States), based on a significant nexus to traditionally navigable waters

171. Under New York law, Article 24, the NYSDEC regulates many different types of activities within mapped NYSDEC Wetlands (generally 12.4 acres in size or larger, or smaller wetlands of local importance), along with their 100-foot adjacent area. The NYSDEC Freshwater Wetlands Permit Requirements regulations are found 6 NYCRR 663, and activities regulated in NYSDEC wetlands and adjacent areas are described in 6 NYCRR 663.4.

172. Nearly all new activities in wetlands require a permit. For activities that cannot meet the standards for compatibility, and for activities that are considered incompatible, the more stringent weighing standards that must be met to receive a permit for these activities as summarized in Exhibit Q, attached hereto. These standards assess the impact of the activity on the wetland, the alternatives analysis, and a weighing of the potential detriments to the wetland (based on Class) versus the benefits of the proposed project. For example, for a Class 1 wetland, a portion of the Standards state "Class 1 wetlands provide the most critical of the state's wetland benefits, reduction of which is acceptable only in the most unusual circumstances. A permit shall be issued only if it is determined that the proposed activity satisfied a compelling economic or social need that clearly and substantially outweighs the loss of or detriment to the benefit(s) of the Class I wetland."

173. Under Article 15 ("Use and Protection of Waters"), the NYSDEC regulates the disturbance of the bed or banks of protected streams and waters (those mapped waters with water quality classification of C(t) or higher). This means that crossing a protected stream, or undertaking work within the defined bed and banks of that stream, requires a permit. Permit review criteria are at 6 NYCRR 608.9 as summarized in **Exhibit R**, attached hereto.

174. Also under Article 15, the NYSDEC regulates the potential water quality issues associated with a proposed project when that project requires a federal permit.

175. The NYSDEC has issued blanket Section 401 Water Quality Certificates for many activities authorized under the Corps Nationwide Permit Program. The relationship between the Army Corps and NYSDEC Section 401 Water Quality Certificate program is illustrated in **Exhibit S**, attached hereto.

176. The NYSDEC Uniform Procedures Regulations describes how the NYSDEC will process permit applications. This includes identifying which type of projects are minor projects that do not require public notice versus those projects that are major projects that must go to public notice. Minor projects under NYSDEC Article 24 and Article 15 are limited in scope and area. For major projects under Article 24 of the Freshwater Wetlands Act, Article 15 of the Stream Disturbance Program, or for most individual

Section 401 Water Quality Certifications being reviewed, the NYSDEC must provide public notice to the Chief Executive Officer of the municipality where the project will be located; the regulations also allow anyone who has an interest in receiving such notices (*i.e.*, a wetland inspector for the Village) to receive a copy of the public notice.

177. Such notice would give the Village of Pomona an opportunity to review and comment on major projects that impact a NYSDEC regulated stream or regulated wetland, as well as most individual Section 401 Water Quality Certifications reviews.

178. These regulations also serve to coordinate a local municipality's SEQRA review process with the NYSDEC and Corps of Engineers aquatic resource permitting process. The Corps of Engineers and NYSDEC have a joint permit application process, where permits to both agencies are submitted under a single package.

179. The Village of Pomona also can use State Environmental Quality Review Act ("SEQRA") to protect important wetlands and other waters.

180. For project reviews at the municipal level, "the purpose of SEQRA is to incorporate the consideration of environmental factors, [including, for instance, aquatic resources] into the existing planning, review and decision making projects of state, regional and local governments at the earliest possible time. To accomplish this goal, SEQRA requires that all agencies determine if the actions they directly undertake, fund or approve may have a significant impact on the environment, and, if it is determined that the action may have a significant adverse impact, prepare or request an environmental impact statement." 6 NYCRR 671.1(c).

181. Particularly, streams and wetlands are an important natural resource under SEQRA that should receive a "hard look" in any SEQRA review evaluating the significance of environmental impacts. Specifically listed under "Criteria for Significance" are "substantial adverse change in existing … ground or surface water quality; … a substantial increase in potential for erosion, flooding, leaching or drainage problems. The removal or destruction of large quantities of vegetation or fauna; substantial interference with the movement of any residential or migratory fish or wildlife species; impacts on a significant habitat area; substantial adverse impacts on a threatened or endangered species of animal or plant, or the habitat of such a species; or other significant adverse impacts to natural resources; …" 6 NYCRR 617.7(c)(1).

182. The SEQRA Environmental Assessment Form completed for a project requires documentation about aquatic resources present on a site, their classification and regulation, and proposed project impacts to those resources.

183. For a project before the Village of Pomona, the Village can request to be lead agency, can circulate a request to involved agencies such as the NYSDEC and can review potential impacts of a project on those resources. The areas of review are broad and can include state and federal aquatic resources including wetlands, upland and wetland ecological resources, water quality, stormwater, floodplains and flooding, among other concerns.

184. The Village would then be required to take a hard look at the potential impacts to determine whether they have the potential to be significant and thus whether an Environmental Impact Statement must be prepared for the proposed project.

185.  In making a determination of significance, the Village could review copies of aquatic resource delineations, review the type of permit application made to the Corps and/or NYSDEC; the type and area of wetlands being impacted (*i.e.*, are they high quality or low quality); and the type and nature of compensatory wetland mitigation being proposed. All aquatic resources on a site can be reviewed under SEQRA, regardless of their regulatory designation and even if they are "unregulated."

186.  If a project has the potential for significant environmental impacts, then the Village can issue a positive declaration requiring that a draft environmental impact statement ("DEIS") be prepared. It is typically prepared by the Applicant and their consultants. The Village would then typically retain consultants in similar fields of expertise to review the DEIS for adequacy of addressing the Scoping Document or the identified significant issues from the Positive Declaration. These consultants advise the Village Board serving as lead agency whether the DEIS is adequate for public review and comment, and, given all the information provided the Village Board then makes its own decision whether to move into the public notice comment period. The lead agency may charge a fee to the Applicant to recover the actual costs of its consultants to either prepare or review the draft and/or final EIS, in accordance with the formulas at that part. 6 NYCRR 617.13(a).

187.  The DEIS is circulated to involved and interested agencies during a public comment period, which may also include a public hearing. The lead agency's consultants also typically provide technical comments on the DEIS relative to their areas of expertise on whether the project and its avoidance, minimization and mitigation measures meet the requirements of SEQRA or whether additional review or study or mitigation is required.

188.  Either the applicant or the lead agency prepares a Final Environmental Impact Statement ("FEIS"), that responds to the comments received during the public notice process. The lead agency controls the content of the responses to the comments provided in the FEIS.

189.  The lead agency must then make findings about the proposed project prior to any final actions. The findings must "consider the relevant environmental impacts, facts and conclusions disclosed in the FEIS; weigh and balance relevant environmental impacts with social, economic and other considerations; provide a rationale for the agency's decision; certify that the requirements [of SEQRA] have been met; and certify that consistent with social, economic and other essential considerations from among the reasonable alternatives available, the action is one that avoids or minimizes adverse environmental impacts to the maximum extent practicable, and that adverse environmental impacts will be avoided or minimized to the maximum extent practicable by incorporating as conditions to the decision those mitigation measures that were identified as practicable." 6 NYCRR 617.11(d).

190.  The SEQRA regulations are a very strong and comprehensive tool that a municipality can use to review a project and its impacts on the environment, including to aquatic resources.

191.  As part of any Site Plan Review for a project, and even without a WPL, the Village of Pomona can require applicants to illustrate on site plans the work limits, preservation areas, erosion control measures, engineering designs, deed restrictions, methods of construction, and requirements for inspection, that incorporate the mitigation measures

developed during SEQRA review, site plan review, and review under the other local ordinances discussed below. This provides the Village of Pomona significant latitude to include measures that protect water courses, waterbodies and wetlands from direct impacts and from secondary impacts such as flooding, siltation, and pollution.

192.   These mitigations measures are available to the Village pursuant to Pomona's Site Development Review provisions, located in Chapter 119 of its Code, which contains means to protect environmental resources such as steep slopes, wetlands, waterbodies, floodplains, flora, fauna, soil, drainage systems, trees, stormwater runoff, and "[o]ther public needs and requirements, including the … protection of the environment, shall also be properly and adequately provided for."  Code § 119-5(D)(11).

193.   The Village of Pomona has also adopted local regulations for flood damage prevention in Chapter 79 of the Village Code.

194.   As an MS4, the Village of Pomona has also adopted a Stormwater Management regulation (Village Code, Chapter 114). Article II of this regulation generally follows the NYSDEC model ordinance language for Stormwater Management found in the NYDEC's Stormwater Management Guidance Manual for Local Officials. These regulations protect wetlands and watercourses from stormwater runoff rates and water quality degradation associated with new development.

195.   In addition, a municipality can also report violations of freshwater wetlands and water courses to the Army Corps and NYSDEC.

196.   Proposed projects that are designed, reviewed, approved, constructed and maintained in compliance with these various regulations are sufficient to reduce the threat of adverse environmental impacts from proposed activities.

ii.   _Flooding, Floodplains_

197.   Additionally, the WPL is not necessary to "avoid or reduce the potential increase in flooding associated with new development."

198.   There are a number of other regulatory options available to the Town to avoid potential increased flooding associated with new development. Specifically, stormwater and floodplain regulations, administered by the Village of Pomona as the MS4, require that new developments not increase flooding over the existing condition.  The Village can use SEQRA, its own local ordinances such as the Village of Pomona Chapter 114 Stormwater Management and Chapter 79 Flood Prevention Management, and Site Plan Review to review efforts to control runoff from new development in order to avoid increased flooding.

199.   The Village could also establish a drainage district requiring all landowners within the district to pay towards drainage improvements including retrofits and riparian restoration.

200.   **SEQRA.** The discussion above at paragraph 179-190 with respect to SEQRA's requirement of taking a "hard look" at the impacts of any project on environmental considerations applies equally to potential impacts from flooding.

201.   Under SEQRA, the Village can review whether road crossings over streams are adequately sized to convey flows, whether development is proposed in accordance with floodplain regulations, and, beyond that, whether there are other flooding concerns that

the project should address. Stormwater management plans completed for a project can also be reviewed to determine if they are in compliance with local regulations and the New York State Stormwater Management Design Manual ("Design Manual") and if they are adequate to reduce flooding from new development stormwater runoff.

202.  **Stormwater Regulations.** Additionally, the Village of Pomona is an MS4 and responsible for implementing NYSDEC's Stormwater Regulations, including reviewing and approving the Stormwater Pollution Prevention Plans ("SWPPPs") for any proposed development in accordance with the current NYSDEC General Permit for Construction Activities (GP-0-10-001) which references (at III.B.2) the current New York State Department of Environmental Conservation Stormwater Management Design Manual.

203.  The Village of Pomona has discretion to use the Stormwater Regulations to maintain pre-construction rates of stormwater discharged from a developed site and to minimize increases in overall volume of flow that would otherwise increase flooding. The NYSDEC Stormwater Management Design Manual is to be followed in this process. The Design Manual requires effective control of water quality, channel protection, overbank flooding and extreme storm events so that the post-construction stormwater runoff conditions will, to the maximum extent practicable, mimic or improve the pre-existing site stormwater runoff conditions.

204.  The MS4's review of stormwater management, including correct design, implementation and management of practices is an effective method to ensure no increase in flooding from new development.

205.  **Flood Damage Prevention.** The Village of Pomona's Flood Damage Prevention regulations, which appear to follow FEMA model ordinance language, are found at § 79 of the Village Code.

206.  The stated purpose of these regulations (§ 79-2) include "control of natural floodplains, stream channels and natural protective barriers which are involved in the accommodation of floodwaters," and "control filling, grading dredging or other development which may increase erosion or flood damages."

207.  Under the Village's own code, a development permit is required for any work within a special flood hazard area as defined at § 76-6. Exhibit D illustrates the Flood Insurance Rate Map (FIRM) for the Village of Pomona that was updated on March 3, 2014.

208.  The Subject Property contains a portion of a FEMA 100-year floodplain in the southeast portion of the site; while smaller in extent, the FEMA Floodplain is found in the same general location as this NYSDEC and Corps regulated wetland.

209.  If an Applicant wishes to construct within the limits of the floodzone, they must provide plans illustrating existing and proposed structures, storage facilities and drainage facilities, including elevations, floodproofing requirements, and discussion of any watercourse alterations.

210.  The local administrator is required to review whether the proposed development adversely affects the area of special flood hazard, including physical damages to adjacent properties. If there is an adverse effect, then flood damage mitigation is required.

211.  If a development encroaches upon a special flood hazard area there are requirements that

the development analyze the flood-carrying capacity of the waterbody, and/or determine if the development will cause an increase in the water surface elevation of the base flood.

212. The WPL adds nothing in terms of flood protection. The Village already regulates development in floodplains and floodways under the § 79 of the Code. The Village already regulates stormwater flows from new development under the § 114 of the Code in a manner to match existing runoff volumes and rates including for Channel Protection Volume, the Overbank Flood Control discharge, and the Extreme Storm peak discharge rates.

213. Any on-going flooding issues in the Village of Pomona are a result of a community that is significantly and densely built-out, with much development in close proximity to streams and wetlands, without proper infrastructure to control or address stormwater runoff or flooding.

### iii. *Stormwater Systems*

214. The Village of Pomona Code's Stormwater Management chapter, specifically at § 114-28(B)-(D), is sufficient to achieve the Village's stated interest in protecting stormwater systems and protecting against stormwater pollution, assuming that the Village of Pomona correctly follows and enforces this clause of its regulation; the WPL is unnecessary to achieve this goal.

215. The regulations require maintenance easements for the stormwater management facility to allow access by the Village of Pomona inspectors to ensure they are in good working order, as well as maintenance agreements via deed restrictions applied to all subsequent landowners. They require written operations and maintenance procedures and training of personnel that operate the system.

216. Further, the Village of Pomona Stormwater regulations at § 114-30 provide mechanisms for a financial performance guarantee, maintenance guarantee and recordkeeping. These requirements are in place for both the commonly identified stormwater infrastructure and for those other green infrastructure practices that might be less obvious.

217. The details of these stormwater plans and requirements would typically be reviewed by the Village Engineer and negotiated during Site Plan Review and/or SEQRA. They are then incorporated into Site Plan Approvals and the MS4 approval of the Stormwater Management Facility.

218. These requirements ensure that the stormwater systems are protected during and after construction, including requirements for routine inspection and maintenance, requirements to protect them, to reduce the potential for modification during the project's long-term operation, and keep them functioning as designed. In contrast, the WPL does not include any provisions for the protection of stormwater systems except for the paragraph at § 126-5(A)(8), which is repetitive with the NYSDEC Stormwater Management Design Manual for the extreme storm.

219. As part of any SEQRA review, the lead agency can consider the types of materials utilized on site, the types of activities proposed, and identify whether those activities have the potential to have a significant adverse impact on the environment (including water pollution and water quality), and identify appropriate mitigation measures to protect against those impacts. These mitigation measures can then be incorporated into the Site

Plans during Site Plan Review that are then approved for the project.

220. Ironically, the specific activities (i.e., building an addition, an accessory structure) that the Village exempted from review on improved single family parcels within the 100-foot wetland buffer area (see WPL at § 126-3(D)) are the same activities the Village uses as examples of activities that it cannot regulate under SEQRA and that could cause water pollution. As stated previously, there are five times more (i.e., 240) single family parcels where this exemption would apply, than the 45 parcels, including the Subject Parcel, where this exemption would not be in effect.

221. The NYSDEC Freshwater Wetlands Act regulates the introduction of sewage effluent, runoff from pesticides, and/or disposal or storage of any chemical, petrochemical, solid waste, nuclear waste, toxic material, sewage effluent or other pollutant into a regulated NYSDEC wetland.

   iv.  *Plant life/Wildlife*

222. Because of its inherent requirements to take a "hard look" and its built in flexibility, SEQRA, as described above, is the best tool adapted to reviewing, avoiding, minimizing and mitigating potential impacts on plant life and wildlife.

## III.   EDUCATIONAL INSTITUTION LAWS

223. The Village's "educational institution" laws, which are not directly related to the protection of environmental resources, are less efficient and effective in protecting such resources than the federal Clean Water Act, the federal Endangered Species Act, the State's Article 24 Freshwater Wetlands Act, the State's Article 15 Use and Protection of Waters, the State's Article 11 Endangered Species Act, the State's Environmental Quality Review Act, the Village's § 79 Flood Damage Prevention, the Village's § 114 Stormwater Management, and the Village's § 119 Site Development Review, all of which are directly related to protection of various aspects of the environment.

224. The Village of Pomona Master Plan Update of 1997 did not discuss educational institutions, and the Village has no schools within its jurisdiction, so it had no evidence of any adverse impacts from any existing school or educational institution in the Village that triggered the Village's interest in protecting environmental resources.

225. There is no documentation that the Village made a finding that reducing the building size or regulating the internal layout of such buildings would protect environmental resources, especially since it had no knowledge of adverse impacts from the land use in the first place.  It had conducted no formal studies prior to its practice about how Local Law 5 of 2005 would protect environmental resources.  There is no documentation in the record that the Village of Pomona Trustees had any specific expertise, training or knowledge about wetland, ecology, or regulation of those resources or that they relied on experts in these areas.  There is no documentation in the record of the pamphlets or leaflets that were allegedly used as a basis for this decision.

226. There has been nothing produced in the record demonstrating a deliberative link between the passage of the Educational Institution Laws and wetland protection.

### 1. *Wetlands & Water Pollution*

227. Given the fact that Educational Institution Laws were not planned, purposed or designed to protect wetlands, it is irrational to suggest that these laws are now an effective tool for the protection of wetlands.

228. The Village currently has available to it numerous less restrictive alternatives to protect wetlands and prevent water pollution, as described above in paragraphs 160-196.  The discussion of these regulatory systems is equally applicable as adequate alternatives to the Educational Institution laws.

229. **Accreditation.**  Accreditation does not relate to the potential environmental impacts of an educational institution.  If it can meet the required financial assurances for the proposed construction and operation of the institution, accreditation in a particular course of study is wholly irrelevant to the governmental purpose and interest in protecting wetlands.

230. The Village Code, at § 114-30(A), has a specific provision allowing the Village of Pomona to require a performance bond or other form of financial guarantee for satisfactory execution of the work. The Corps also commonly requires financial assurances for compensatory mitigation.  Even the Village Code (§ 126-6(D)) also includes a provision for providing financial assurances.

231. The Village has testified that there is need for accreditation is because of potential adverse impacts from "unaccredited" schools such as automotive repair schools or driving schools.   However, such schools <u>can be accredited by various accrediting bodies</u> (*e.g.*, the Board of Cooperative Occupational Services or BOCES vocational education programs, NYS Department of Motor Vehicles).  Regardless, accreditation is not relevant to the potential for impacts to wetlands. What is relative to wetland impacts is the design, construction and operation of the education facility, which can be controlled through conditions imposed during SEQRA and Site Plan Review, together with financial assurances provided by the applicant to construct and operate the facility in accordance with those conditions.

232. An automotive repair school located completely within an enclosed building properly sized relative to the any specific site constraints where it is located, where cars are stored under cover, with strong environmental controls in that building to collect waste products, and with no external discharges, would not cause significant adverse environmental impacts.

233. **No Housekeeping Facilities.** Regarding separate cooking, dining or housekeeping facilities, the only potential impact is sewage treatment. If a site is serviced by off-site sewer, then—presuming that there is adequate system capacity—the activities within the building have no impact on the protection of wetlands.

234. Assuming proper sewage treatment, the activities in the housing units, whether separate or combined cooking/dining/housekeeping is irrelevant to the governmental purpose and interest and protecting wetlands.

235. **No Family Housing.** The Village of Pomona testifies in its deposition that prohibiting family housing would protect the wetlands because the family housing footprint would be bigger than a dormitory facility and take up more land, and that it cannot mitigate the

effect of family housing versus dormitories on wetlands under its current regulations.  It is wrong on both counts.

236.  Ensuring that any type of development does not have an adverse impact on environmental resources requires proper design, review, approval, construction and maintenance of the development.  The potential for impacts to wetlands is not related to the use inside the building.  It is related to how the building are located on the site, how the facilities are designed relative to site constraints, and what happens on the outside of the buildings.

237.  There is no relationship between whether housing is traditional "dormitories" or "family housing" and protecting wetlands.  If there is a limitation on the footprint of the buildings, the specific use (single students vs. families) is not a factor in protecting wetlands.

238.  A monolithic dormitory structure may be more likely to impact wetlands than individual family housing units.  Individual family housing units may be able to be tucked into smaller spots on site, avoiding wetland impacts, whereas the larger dormitory building might not provide that flexibility.

239.  As discussed above, the Village of Pomona can use its regulatory powers under SEQRA, along with Chapter 114 Stormwater Management, Chapter 79, Flood Damage Prevention, and Chapter 119, Site Development Review to avoid, minimize and mitigate the effects of construction, including student housing, be it single or family, on wetlands.  There is no necessity of prohibiting "family" housing for students.

240.  **20% Dormitory Limitation.**  The 20% limit on square footage of dormitories relative to total square footage of all buildings is wholly arbitrary and ineffective in protecting wetlands.

241.  Given that the total square footage of development is limited to 10% building coverage and impervious surface is limited to 25%, there is no need for any limitations on the dormitory coverage relative to the overall building coverage for purposes of protecting wetlands.

242.  There is no difference on impacts to wetlands from dormitories or classrooms, as stated by the Village itself.  Since there is a limit on overall building footprint for educational institutions, and since there is no difference in impacts between a dormitory and a classroom, the ratio of dormitories to classrooms is irrelevant to wetland impacts.

243.  An educational institution's design could provide more densely packed buildings or multi-story buildings with a smaller footprint to meet the same program housing requirements in a smaller footprint. Compact building and project footprints reduce the amount land needed for the program, the amount of impervious surfaces and the amount of runoff and pollution.

244.  Ensuring that wetlands and other environmental resources are protected from developmental impacts cannot be achieved by regulating the size of dormitory buildings. Ensuring that any type of development, including an Educational Institution, does not have an adverse impact on wetlands and watercourses requires proper design, review, approval, construction and maintenance of the development.

245. The Village has the authority to complete an Environmental Impact Statement review under SEQRA for a new educational institutional project. Such a review, combined with the Village's Site Plan Review process, would identify an appropriate development footprint individualized for a particular site and its conditions. The conditions resulting from the SEQRA review would be incorporated into Site Plans for approval by the Village to ensure that wetlands and watercourses would be protected.

246. Wetlands could be impacted or threatened to an equal or greater extent by uses that remain permitted in the Village.  For example, accredited educational institutions, permitted dormitories, non-dormitory educational facilities, libraries, museums, and camps could all potentially result in a greater level of wetland impact.  The level of wetland impacts (or avoidance) does not result from the use allowed or not allowed on a site.   Preventing wetland impacts results from proper design, review, approval, construction and maintenance of the development.

247. The Village's testimony that it had no other alternatives to mitigate wetland impacts from educational facilities than the passage of the educational institution laws prohibiting unaccredited colleges, family student housing, housekeeping facilities, and limit housing to 20% of square footage is unsupported and false.  It can be accomplished through SEQRA review, Site Plan Review, Special Permit uses, and the environmental regulations (Stormwater Management, Flood Damage Prevention, Site Development Review) at the Village as well as wetland regulation at the federal and state level, as described in detail above.

2. *Flooding & Floodplains*

248. The Village's use of educational institutions law to prevent flooding or protect floodplains when the Village has § 79 Flood Damage Prevention, § 114 Stormwater Management, and § 119 Site Development Review and SEQRA is like using a hammer to drill a screw when it already has more than one screwdriver in its tool belt. Other laws also protect floodplains including the federal Clean Water Act (Section 404), the State's Article 24 Freshwater Wetlands Act, and the State's Article 15 Use and Protection of Waters.

249. The Village currently has available to it numerous less restrictive alternatives to protect against flooding, as described above in paragraphs 197-213.  The discussion of these regulatory systems is equally applicable as adequate alternatives to the Educational Institution laws.

250. Accreditation status has no effect on an educational institution's avoidance of impacts to flooding or floodplains.

251. Floodplain protection is provided by having an institution financially capable of completing the work; financial assurances provide that guarantee to the Village and to other regulatory entities that regularly seek such assurances. If the educational institution can meet these financial assurances, accreditation in a particular course of study is irrelevant.

252. The Village's explanation of why accreditation is necessary again relies solely on the example of an automotive school's impact on floodplains due to pollutants entering the floodplains (a stormwater management issue) and additional water runoff entering the

floodplains (also a stormwater management issue).  Automotive repair schools can be accredited and their impacts can be mitigated, as discussed above.  There is no necessity for an accreditation requirement to protect floodplains.

253.    Whether provided housing is family housing or dormitory housing is irrelevant, assuming that existing regulations are followed.

254.    The Village's testimony that that single family and multi-family housing are more intense land uses than dormitories and so would have more runoff, pollution and garbage, and therefore impacts to floodplains, than dormitories is unsupported and false.  A square footage of family housing unit would not have any greater impact on floodplains than a square footage of a traditional dormitory housing unit.  It is what happens outside the building, not inside the building, that results in floodplain impacts.

255.    Similarly, with regard to the 20% dormitory limitation, since the Educational Institution portion of the Code already places a restriction on the maximum development intensity of total building and impervious surface coverage, and since there is no difference in stormwater effects between a square footage of housing and a square footage of classroom (as the Village agrees), then additional protection against flooding or impacts to floodplains is not achieved by regulating the  size of dormitory buildings.

256.    Ensuring that any type of development, including an Educational Institution, does not have an adverse impact on floodplains requires proper design, review, approval, construction and maintenance of the development.

257.    The Village has the authority to complete an EIS review under SEQRA for an educational institutional project. Such a review, combined with the Village's Site Plan Review process, and its § 79 Flood Damage Prevention review and § 114 Stormwater Management review, would identify an appropriate development footprint individualized for a particular site and its conditions.  The conditions resulting from the SEQRA review, and the studies completed under § 79 and § 114, would be incorporated into Site Plans for approval by the Village to ensure that floodplains would be protected.

    3.  *Stormwater Systems*

258.    Similarly, the Village's use of educational institutions law to prevent impacts to stormwater management when the Village Code includes chapters 79, 114 and 119, and SEQRA, is inefficient and unreasonable.

259.    The Village currently has available to it numerous less restrictive alternatives to protect stormwater systems, as described above in paragraphs 214-221.  The discussion of these regulatory systems is equally applicable as adequate alternatives to the Educational Institution laws.

260.    Regarding accreditation, for the reasons discussed above in paragraphs 228-231 and 248-250, and elaborated upon here, the provision requiring accreditation of educational institutions is irrelevant to achieving the governmental purpose and interest in regulating stormwater management or drainage. What is relevant is requiring financial assurances to ensure that the proposed project is undertaken in accordance with approved plans including those associated with stormwater management and drainage.

261.    The Village's testimony that such law is justified by preventing an automotive school,

which would "generate many more pollutants into the storm water system just by the nature of the use," is unreasonable for the same reasons as discussed above.

262. Regarding family housing versus dormitory housing, presuming the project design complies with the Village Code, § 79, Flood Damage Prevention, and § 114 Stormwater Management, the type of building proposed is irrelevant to stormwater management.

263. The use inside a building (whether housing classrooms, single people or families) is irrelevant to the quantity of volume of stormwater generated per square foot. The quantity of stormwater generated is related to the overall area of impervious surface on a site.

264. With regard to the 20% dormitory limitation, the Educational Institution portion of the code already restricts maximum impervious surface (25% of the total net lot area (§130-10(F)(2)(c))), and since there is no difference in stormwater effects between a square footage of housing and a square footage of classroom (as the Village agrees), no additional reduction in stormwater runoff is achieved by a 20% dormitory limitation.

265. Each site is different and each building design is different; therefore, setting an arbitrary limit on the dormitory footprint is not necessary to achieve the government's interest in regulating stormwater management, water retention and/or drainage.

266. The Village's testimony that it cannot mitigate the effects of dormitories on stormwater management or floodplains unless the 20% dormitory limitation is in the zoning law is illogical, unsupported and false. There are several regulatory means for ensuring proper stormwater management.  These include: the Village of Pomona's § 114 Stormwater Management regulations, which promote an iterative engineering design process to arrive at a design that balances the area of impervious surfaces with the area available to treat the stormwater runoff volumes; the NYSDEC Stormwater Design Manual, which will adequately minimize impacts to stormwater management, water retention, drainage and flooding by providing treatment for Water Quality volume, Runoff Reduction Volume, Channel Protection Volume, and Overbank Flood Control flow and Extreme Storm peak discharge rate; compliance with SEQRA; and Village Code § 79, Flood Damage Prevention.  These are sufficient to achieve the Village's stated interest in regulating stormwater management and/or drainage, without the need for the additional zoning regulations requiring accreditation of Educational Institutions, a prohibition on family housing, or a 20% Dormitory Limitation.

### 4. *Plant Life/Wildlife*

267. The Village's use of educational institutions law to protect plants and wildlife is inefficient and unreasonable.

268. The Village currently has available to it numerous less restrictive alternatives to protect plant life and wildlife, as described above at paragraphs 160-196.  The discussion of these regulatory systems is equally applicable as adequate alternatives to the Educational Institution laws.

269. Regarding accreditation, for the reasons discussed previously in paragraphs 228-231 and 248-250, and elaborated upon here, achieving the government's purpose and interest in protecting wildlife and plants requires the developer of the educational institution to be financially capable of complying with the federal, state and local permit conditions placed on the project during review to protect wildlife and plants.  Accreditation is

irrelevant.

270. The Corps of Engineers also commonly requires financial assurances for compensatory mitigation. The Corps of Engineers also commonly requires preservation in perpetuity (through deed restriction) of wetlands and non-impacted uplands as mitigation for impacts to public interest resources such as plant and wildlife habitats.

271. The Village's red herring argument concerning "automotive" schools as a basis for prohibiting non-accredited educational institutions is an irrational explanation of its "plant and wildlife" justification for the same reasons as discussed above.

272. Regarding separate cooking, dining or housekeeping facilities, the type of use within a building (*i.e.*, whether there are separate or combined cooking/dining/housekeeping) is wholly irrelevant to the protection of plants or wildlife.  It is not the use inside the building that results in impacts to plants or wildlife, it is the activities on the outside of the building that cause such impacts.

273. The Village's justification that separate housekeeping facilities such as kitchens might create "garbage" is irrational.  Kitchens don't generate garbage, people do.  The number of kitchens in a facility is not relevant to the amount of garbage generated.  The number of people in a facility is relevant to the amount of garbage generated.  Garbage does not necessarily impact plant or wildlife when it is appropriately stored and managed on a site.

274. The Village of Pomona's designee testified that prohibiting family housing would protect plant and wildlife because the family housing footprint would be bigger than a dormitory facility and take up more land.  Ensuring that any type of development does not have an adverse impact on environmental resources including plants and wildlife requires proper design, review, approval, construction and maintenance of the development.  The potential for impacts to plants and wildlife is not related to the use inside the building.  It is related to how the building and facilities are located on the site, how the facilities are designed relative to significant habitats, and what happens on the outside of the buildings.

275. Assuming the same footprint for an Educational Institution (see above), the use (single student housing versus family housing) is not the factor protecting significant ecological communities.  The protection comes from the siting and design of the building relative to the site constraints.  A monolithic traditional dormitory structure may have greater impacts to significant ecological communities than family housing units.  Individual family housing units may be able to be tucked into smaller spots on site as well as placed over existing disturbance footprints thus protecting significant habitats, whereas the larger dormitory building might not provide that flexibility.

276. The same interest in protecting ecological resources is implicated and threatened by uses that remain permitted (accredited educational institutions, permitted dormitories, non-dormitory educational institution facilities, libraries, museums).

277. There are existing regulatory programs, as described above in paragraphs 160-196, that sufficiently protect the Village's stated interest in protecting plant life and wildlife without the need for Village Local Law No. 5 of 2004 or Local Law No. 1 of 2007. These include the federal USFWS Endangered Species Act, the NYSDEC Endangered Species Act, SEQRA, the Village's Chapter 114 Stormwater Management, the Village's Chapter 119 Site Development Review, and state and federal wetlands permitting.

**IV.    TARTIKOV'S USE WOULD NOT RESULT IN THE ASSERTED HARMS.**

278.    Although there is no specific site plan that exists with respect to Tartikov's Rabbinical College development (which would be a non-accredited educational institution with greater than 20% of floor space devoted to student family housing and housekeeping facilities), which is currently prohibited by the Village's laws, can be constructed without harming the Village's interests in protecting wetlands and plant/wildlife, avoiding flooding, and preserving water and air quality.

279.    As noted above at paragraphs 15-19, the only private parcel in Pomona that can accommodate an educational institution use is the Subject Property.

280.    In reaching this conclusion, I additionally reviewed the Village's 1997 Master Plan Update (including Figure 1 of that Update); and a map of a sketched "wetland delineation" on the subject property titled "Boundary Survey, Area = 99.8180," prepared by Atzl, Scatassa & Zigler, P.C, for Tax Lot 32.01-1-53, Congregation Rabbinical College of Tartikov, Inc. dated October 11, 2006, at 1" = 100' scale.  Attached as **Exhibit T** is a copy of such map.

281.    The wetland delineation map includes the location of wetlands along the eastern limit of the subject property.  A 100-foot adjacent area would also be placed on this line following survey, which, given the scale of the map (1" = 100').  These wetlands would also be regulated by the Corps of Engineers.

282.    The NYSDEC and Corps-regulated wetlands on the east side of the property, along with their 100 foot adjacent area could easily be avoided by the Rabbinical College development.

283.    The wetlands on the west side of the Property would, at a minimum, be regulated by the Corps of Engineers, as noted on the map by the comment "ACOE wetlands."

284.    The stream, south of the existing macadam driveway would also be regulated by the NYSDEC based on its Class B standard.

285.    Clustered land use associated with the existing summer camp on the Property, including a number of framed buildings, lean-tos and a swimming pool, is already occurring.  Except for the existing bathhouse near the entrance drive, none of the existing buildings come close to encroaching with 100 feet of any wetland.

286.    Any Rabbinical College on the subject property would have clustered classroom and housing buildings and parking areas, generally located in the same zone as the existing development. Such a design would be consistent with the discussion in the 1997 Village of Pomona Master Plan Update, and with the Village's stated goals of preservation of ecological resources.

287.    This clustered development would therefore be able to avoid the majority of the NYSDEC and Corps of Engineers wetlands and buffer areas, the steep slopes, and the upland woods located within those buffer areas and on the steep slopes.  Clustered development promotes conservation, as described by the NYSDEC in § 5.1.5 of the Stormwater Design Manual.

288.   Preserving the woodlands within the wetland areas, adjacent buffers, and steep slopes would represent preservation of a large wooded habitat area and the sensitive wetlands.

289.   An overall larger and less fragmented habitat area would be preserved under such a clustered Rabbinical College layout than if the parcel were subdivided into individual one-acre single family lots, which is the main permitted land use in the Village.

290.   The single family residential land use in the Village, on one acre lots, with numerous roadways, driveways, houses, fences, and channelized streams, has significantly fragmented the landscape and any natural resources and environmental features that may have been present.  This type of zoning has not been effective at or appropriate for protecting natural terrain (steep slopes) or environmental features such as wetlands.

291.   Furthermore, proper design, review, approval, construction and maintenance of the Rabbinical College development would ensure that it would not have significant adverse environmental impacts.  Combining a SEQRA review with Site Plan Review would ensure that it would not have an adverse impact on the environment.

292.   Incorporated into the SEQRA review could be a demonstration that the project complies with the requirements of the Village of Pomona Code § 114 (Stormwater Management) and § 79 (Flood Damage Prevention) as well as state and federal wetland and stream regulations, as described above.

293.   Various existing conditions such as improving the hydraulic and aquatic species connectivity (north to south), areas where wetlands can be restored, and elimination of invasive plants can be improved in the Rabbinical College's site development.  By using the existing regulatory means of controlling development so as to prevent environmental impacts, any such development by Tartikov should actually improve the wetland environmental conditions.

294.   With regard to floodplains, the southeast corner of the site is mapped as FEMA and Village regulated floodplains. There are no other FEMA mapped floodplains on the site. There would be no direct impacts to the regulated floodplain as it located with the NYSDEC and Corps of Engineers regulated wetland.

295.   With regard to stormwater management, there is currently no stormwater management for any of the facilities on the site. Under existing regulations, including the Village's § 114 Stormwater Management, § 119 Site Development Review, and SEQRA, the proposed Rabbinical College project would be required to provide water quality treatment for the new driveway; this could include pervious pavers, infiltration swales along the driveway, and could be an improvement over existing site conditions.

296.   With regard to plant and wildlife, the discussion above describes the process for reviewing potential impact to ecological resources. Additional site specific studies would be required to determine if there are any occurrence records of endangered species at the subject property.  Regardless, sound ecological practices would continue to cluster development in the already developed center portion of the subject property, avoid impacts and preserve the Corps and NYSDEC regulated wetlands and buffer on the east side, and restore and preserve wetland habitat in the Corps regulated wetland and NYSDEC regulated stream on the west side of the site.  This focuses impacts where they have already occurred, including into areas maintained as mowed lawn.  This protects

and preserves a significant area of forested habitat on site within the wetlands on the east and west sides of the subject property and within the associated buffer and steep slope area.

## V.     THE "ONE DORMITORY BUILDING LIMITATION"

### a.     *Wetlands/Water Pollution*

297.    The number of dormitory buildings is irrelevant in terms of protecting wetlands. A single dormitory building of 30,000 square feet versus two dormitory buildings of 15,000 square feet or three dormitories of 10,000 square feet would equal the same building footprint. The single dormitory building of 30,000 square feet could have the same or even more impacts on wetlands than multiple buildings. When a site contains wetlands, smaller buildings are often easier to place on a site while avoiding wetlands compared to a single larger monolithic structure.

298.    The proper design and location of buildings and the configuration of aquatic resources on a site is relevant to the avoidance or minimization of impacts to those resources.  Such location of a building relative to aquatic resources can be reviewed under SEQRA, Site Plan Review, and Stormwater Management, including as part of an alternatives analysis. Therefore, the location of multiple dormitory buildings can also be reviewed.

### b.     *Flooding/Floodplains*

299.    With respect to reducing flooding, the number of dormitory buildings is not relevant because it would be very difficult to locate any part of a dormitory building in a floodplain under the Village's § 79 regulations, and because the amount of runoff generated from one dormitory building at 30,000 square feet would be the same as the amount of runoff generated from two at 15,000 square feet or from three at 10,000 square feet.

300.    Given that the Village Code controls the total percentage of impervious coverage on a site, and that buildings are included in that total, the area of impervious cover is the determining factor in the amount of runoff generated from the site and the number of dormitory buildings on the site is irrelevant to stormwater runoff volume generated.

### c.     *Stormwater Systems*

301.    The provision of Local Law No. 5 of 2004 allowing only one dormitory building on a site is not relevant to achieving the governmental purpose and interest in regulating stormwater management and/or drainage.  As discussed above, given that the Village Code controls the total percentage of impervious coverage on a site, and that buildings are included in that total impervious coverage, the area of impervious cover is the determining factor in the amount of runoff generated from the site; the number of dormitory buildings on the site is irrelevant to stormwater runoff volume generated.

302.    In response to the Village's testimony that two or three buildings take up more space than one building, three buildings at 10,000 square feet equals one building at 30,000 square feet. With regard to the land between the buildings, if it is left in an impervious state, then that area is counted towards the 25% overall impervious coverage restriction regulated by the Village at § 130-10(F)(2)(c). If that land is not left in an impervious condition, the SWPPP prepared for the project would identify the runoff coefficient for the final

treatment of that area and incorporate that into the SWPPP prepared for the site.

     d.    *Plant life/Wildlife*

303.    Regarding the number of dormitory buildings and the types of housing facilities, similar to wetlands, with respect to protecting wildlife and plant life the number of dormitory buildings is irrelevant. One could propose one dorm building of 30,000 square feet versus two of 15,000 square feet, and they would equal the same building footprint.

304.    Although there may be separation between multiple buildings, the Village Code regulates the percentage of total impervious surfaces as well, so the area of land between buildings may also be regulated if it is impervious.

## VI.   COMPARISON WITH PERMITTED USES

     A.    *Accreditation*

305.    The environmental land use justifications offered by the Village for the accreditation requirement do not justify such differential treatment because curriculum taught inside a classroom has no impact on the environment. Accreditation versus non-accreditation is not relevant to the environmental impacts identified by the Village such as impacts to wetlands, floodplains, stormwater, or plant and animal life.

     B.    *The 10% building coverage, 20% floor area and 25 foot/2-story height limitation.*

306.    The Village of Pomona Zoning Code includes 10% total building coverage and 20% total floor area limitations for Educational Institutions, and dormitories additionally have a 25-foot or 2-story maximum height limitation, whichever is less. Code § 130-10(F)(2)(a)-(b),(12)(c). The building coverage and floor area limitations are based on the "net lot area" (which excludes land under water; 75% of wetlands, floodplains, access, utility and drainage easements, and rights-of-way; steep slopes greater than 35%; and 75% of steep slopes between 15% and 35%) and not the total lot area of a parcel of land.

307.    These limitations are more restrictive than "Libraries" and "Museums" within the Village.

308.    Libraries and Museums are identified as permitted uses under § 130-9(A)(5) of the Village Zoning Code. Permitted uses do not have a building coverage limitation, although there is a 15% impervious surface limitation. However, the 15% is calculated on the total lot area, and not the net lot area. See § 130-9(A)(5) and § 130-12.

309.    Neither do Libraries and Museums have any floor area limitation.

310.    Libraries and Museums are subject to the general bulk regulations regarding maximum height of buildings in the R-40 zoning district, which is 35 feet. Code § 130-12(H). Such uses would therefore be permitted three stories.

311.    Thus, for example, in a parcel with 100 acres of total area and 60 acres of net lot area (after deductions for wetlands, slopes, easements, etc.), a Rabbinical College would be permitted 20% of 60 acres = 12 acres = 522,720 square feet of floor area. The impervious surface permitted for a library or museum would be 15% of 100 acres = 15 acres. A reasonable percentage of that space that could be devoted to buildings (as opposed to parking and driveways) would be 50%. Using this example, a library or museum would be permitted [15 acres * 50% * 3 stories * 43,560 =] 980,100 square feet

of floor space, or nearly twice the size of an educational institution.

312.   The environmental land use justifications offered by the Village for the 10% building coverage for Educational Institutions do not justify such differential treatment because there is no difference in impacts to wetlands, floodplains, stormwater or plant/wildlife from a square footage of library or museum building compared to a square footage of educational building. What happens inside the building is not relevant to direct impacts to wetlands, floodplains, stormwater or plant/wildlife.

313.   Rather, the proper design, review, approval, construction and maintenance of the development is relevant to protecting these environmental resources. Existing environmental laws such as SEQRA, §119 Site Development Review, §114 Stormwater Management, as well as federal and state wetland and endangered species permitting, as examples, provide adequate protections against environmental impacts without the need for a 10% building coverage limitation on Educational Facilities, a restriction which is not borne by libraries or museum land uses in the Village.

314.   There is also no difference in stormwater runoff volumes from a square footage of building versus a square footage of pavement (or other impervious surface). All are considered impervious surfaces and have the same runoff coefficient.

315.   Moreover, a three story building would have roughly a 33% reduction in direct footprint on the land compared to a two story building with the same square footage and would result in 33% less stormwater runoff compared to a two story building. If the total area of impervious surface can be maintained or decreased compared to a development only allowing two story buildings, in such a scenario, it would be a significant environmental benefit to allow three story buildings, and thus the two-story, 25 foot height limitation is contrary to the Village's own stated environmental interests.

## VIII.   THE VILLAGE IS NOT "RURAL"

316.   The Village has described the Village of Pomona's jurisdiction as "rural."  This is inaccurate.  The Village of Pomona is not "rural." The U.S. Department of Commerce, United States Census website, defines the Geographic Terms and Concepts of Urban and Rural.

317.   According to the U.S. Environmental Protection Agency, "Urbanized Areas or (UAs) constitute the largest and most dense areas of settlement. UA calculations delineate boundaries around these dense areas of settlement and, in doing so, identify the areas of concentrated development.... The Bureau of the Census determines UAs by applying a detailed set of published UA criteria (see 55 FR 42592, October 22, 1990) to the latest decennial Census data.... An urbanized area is a land area comprising one or more places -- central place(s) -- and the adjacent densely settled surrounding area -- urban fringe -- that together have a residential population of at least 50,000 and an overall population density of at least 1,000 people per square mile."

318.   Attached as **Exhibit U** are two maps provided by the U.S. Census Bureau encompassing the Village of Pomona. Urban Areas are shown in purple, and Urban Clusters are shown as green dots. The red arrow points to the approximate location of the Village of Pomona, which is in a purple Urban Area.

319.   The NYSDEC states that "Small municipal stormwater systems (MS4s) that are located

within the boundaries of a Census Bureau defined 'urbanized area' are regulated under EPA's Phase II Stormwater Rule."

320. Attached as **Exhibit V** is NYSDEC's mapping of MS4 areas within the vicinity of the Village overlain on Google Earth. The yellow overlay with orange boundaries illustrate municipalities that are within UAs and MS4, and the two red arrows point to the Village of Pomona. The yellow overlay in Exhibit V aligns with the purple Urban Area in Exhibit U, as it should, because the Village of Pomona is in an MS4, which corresponds to the US Census Bureau mapping of this area as an Urbanized Area.

321. The Village of Pomona is associated with a metropolitan area with a population of at least 50,000, and the Village itself has a density of > 1,000 people per square mile.

322. As defined by the US Census Bureau, "rural consists of all territory, population, and housing units located outside UAs and UCs." (UC are Urban Clusters, located outside of Urban Areas, but which have populations of 2,500 to less than 50,000 people at a density of >1,000 people per square mile). The Village of Pomona is within an Urban Area, and therefore, as defined by the US Census Bureau cannot be classified as "rural."

323. I declare under penalty of perjury, that the foregoing is true and correct.

**IX.    CONCLUSION**

324. For the foregoing reasons, the specified provisions of the Village's zoning code regulating educational institutions and its Wetlands Protection Law do not reasonably advance the Village's stated interests in preventing environmental impacts. Additionally, they leave unregulated other development that would have impacts similar to the prohibited and regulated uses. The WPL contains numerous flaws, is unlike any other statutory protection of wetlands that I have reviewed, and leaves unregulated the great majority of the Village's jurisdiction. Furthermore, it is clear that a Rabbinical College as proposed by the Plaintiff can be developed in the Village without creating unacceptable environmental impacts by adhering to existing regulatory protections of environmental resources.

325. I declare under penalty of perjury, that the foregoing is true and correct.

Executed on: January 19, 2015

_____
Barbara B. Beall, PWS, LEED® AP