```
 1

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - X
     CONGREGATION RABBINICAL COLLEGE OF
 4   TARTIKOV, INC., RABBI MORDECHAI
     BABAD, RABBI WOLF BRIEF, RABBI
 5   HERMEN KAHANA, RABBI MEIR MARGULIS,
     RABBI GERGELY NEUMAN, RABBI MEILECH
 6   MENCZER, RABBI JACOB HERSHKOWITZ,
     RABBI CHAIM ROSENBERG, RABBI DAVID A.
 7   MENCZER, and RABBI ARYEH ROYDE,
                        Plaintiffs,
 8                                      07-CV8304
          -against-                     (KMK)
 9
     VILLAGE OF POMONA, NY; BOARD OF
10   TRUSTEES OF THE VILLAGE OF POMONA,
     NY; NICHOLAS SANDERSON AS MAYOR;
11   IAN BANKS as Trustee and in his
     official capacity, ALMA SANDERS
12   ROMAN as Trustee and in her official
     capacity, RITA LOUIE as Trustee and
13   in her official capacity, and BRETT
     YAGEL, as Trustee and in his official
14   capacity,
                        Defendants.
15   - - - - - - - - - - - - - - - - - X

16                      May 8, 2014
                        9:56 a.m.
17

18                      EXAMINATION BEFORE TRIAL of
          the Defendant, BRETT YAGEL, taken pursuant
19        to Notice, held at the offices of Savad
          Churgin, 55 Old Turnpike Road, Nanuet, New
20        York, before a Notary Public within and for
          the State of New York.
21

22                      *   *   *

23              SANDY SAUNDERS REPORTING
            254 South Main Street, Suite 216
24              New City, New York 10956
                    (845) 634-7561
25
```

1

2   A P P E A R A N C E S:

3

4

5       SAVAD CHURGIN
            Attorneys for Plaintiffs
6           55 Old Nyack Turnpike
            Suite 209
            Nanuet, New York 10954
7

8       BY:  JOHN G. STEPANOVICH, ESQ.
             DONNA C. SOBEL, ESQ.

9

10      ROBINSON & COLE, LLP
            Attorneys for Defendants
11          1055 Washington Boulevard
            9th Floor
12          Stamford, Connecticut 06901

13      BY:  JOHN F. X. PELOSO, JR., ESQ.

14

15      DORIS F. ULMAN, ESQ.
            Attorney for The Village of Pomona
16          134 Camp Hill Road
            Pomona, New York 10970
17

18

19                      *   *   *

20

21

22

23

24

25

1

2

3

4          IT IS HEREBY STIPULATED AND AGREED

5     by and between the attorneys for the

6     respective parties hereto that filing and

7     sealing are hereby waived.

8

9          IT IS FURTHER STIPULATED AND AGREED

10    that all objections, except as to the

11    form of the question, shall be reserved

12    to the time of the trial.

13

14         IT IS FURTHER STIPULATED AND AGREED

15    that the within examination may be signed

16    and sworn to before any Notary Public

17    with the same force and effect as though

18    signed and sworn to before this Court.

19

20

21

22

23

24

25

1               - Brett Yagel -

2         (At the request of Mr. Stepanovich the

3    following documents were marked.)

4         (Whereupon, Notice of Deposition was

5    marked Plaintiff's Exhibit 130 for

6    identification.)

7         (Whereupon, Defendant Yagel's

8    Supplemental Responses To Plaintiffs' Second

9    Set of Interrogatories was marked

10    Plaintiff's Exhibit 131 for identification.)

11 B R E T T  Y A G E L, a Defendant herein, having

12     been first duly sworn by Gale Salit, a

13     Notary Public of the State of New York, was

14     examined and testified as follows:

15         THE REPORTER:  May I have your full

16    name, please?

17         THE WITNESS:  Brett Louis Yagel.

18         THE REPORTER:  May I have your

19    address?

20         THE WITNESS:  9 Secor Court, Pomona,

21    New York 10970.

22 EXAMINATION BY

23 MR. STEPANOVICH:

24    Q     Good morning, Mr. Yagel.  My name is

25 John Stepanovich and this is Donna Sobel, and we

- Brett Yagel -

are two of the lawyers for the plaintiffs in this matter, Congregation Rabbinical College of Tartikov and others versus the Village of Pomona.

Have you ever given a deposition before?

A No.

Q One of the first things is that I ask that your answers be audible so the court reporter can take it down. Shaking or nodding of the head just cannot be transcribed properly. So we want to make sure we get your answers reflected properly, so an audible answer is requested. You understand?

A Yes.

Q If at any time you don't hear my question, will you please let me know so that I could make sure you hear it?

That's a yes?

A Yes.

Q And if any time you don't understand my question, will you make sure that you let know so that I could try to phrase it in a way that's understandable?

A Yes.

1                    - Brett Yagel -

2        Q        At any point you need to take a break,

3    will you let me know and we will take a break.

4    As long as there's not a question pending, you

5    can have your break at any time you want it.

6    Okay?

7        A        Yes.

8        Q        Have you taken any medication that may

9    interfere with your ability to testify here

10   today?  Have you?

11       A        I've taken medication, yes.

12       Q        Any of that medication have any effect

13   or ability on you testifying here today?

14       A        I do not know.

15       Q        What kind of medication did you take?

16       A        Cholesterol medication.

17       Q        Did you take it today?

18       A        Yes.

19       Q        Something you normally take?

20       A        I was just put on it.

21                Correction.  I just started retaking

22   it after my tests came back.

23       Q        No other medication?

24       A        None.

25       Q        Where are you employed?

1                    - Brett Yagel -

2        A        Princeton Information Systems.

3        Q        What do you do?

4        A        Project management.

5        Q        Is that in the IT field?

6        A        Yes.

7        Q        What specifically do you do?

8        A        Project manager.

9        Q        Can you describe generally your duties

10   as a project manager?

11       A        Make sure the plan software is

12   executed according to budget, plan, resources, et

13   cetera.

14       Q        Your employer is located where?

15       A        Manhattan.

16       Q        Generally what kind of company is your

17   employer?

18       A        Consulting firm.  Actually,

19   correction.  When I was originally employed by

20   Princeton they were in Manhattan, but I believe

21   they are now at Harborside Court in New Jersey.

22       Q        You don't commute every day, do you?

23       A        Can you rephrase that?

24       Q        Do you commute to work every day?

25                MS. NAPP:  To that location?

1                  - Brett Yagel -

2      Q      To that location.

3      A      No.

4      Q      What kind of consulting business is

5   your employer in?

6      A      IT consulting.

7      Q      You're currently an official with the

8   Village of Pomona?

9      A      Yes.

10     Q      What is your position?

11     A      Mayor.

12     Q      When were you elected mayor?

13     A      Three years ago.  I'm going into my

14  fourth year now.

15     Q      Prior to being elected mayor did you

16  serve the Village of Pomona in any other

17  capacity?

18     A      Prior to being mayor I was a trustee,

19  and that was in 2007.

20     Q      How long were you a trustee before you

21  were elected mayor?

22     A      Four years.

23     Q      So you've been on the board of

24  trustees for the Village of Pomona for

25  approximately seven years?

1                    - Brett Yagel -

2        A       Correct.

3        Q       Did you hold any other positions with

4   the Village of Pomona other than the ones you've

5   just described?

6        A       No.

7        Q       You're appearing here today on a

8   notice of deposition?

9        A       Yes.

10       Q       I'm handing you, Mr. Yagel, what's

11  been marked as Plaintiff's Exhibit 130.  If you

12  could take a look at that, please?

13       A       (Complying.)

14       Q       Have you seen Plaintiff's Exhibit 130

15  before?

16       A       Yes.

17       Q       Have you read it?

18       A       Yes.

19       Q       Mr. Yagel, could you just tell me

20  generally what you've done to prepare for your

21  deposition today?

22       A       I met with counsel yesterday and I

23  reviewed some documents that have already been

24  produced.

25       Q       Can you tell me what documents you

1              - Brett Yagel -

2    reviewed?

3        A       Local Law 2007 No. 5.  Some emails

4    between village board members.  That's about it.

5    Some constituent emails.

6        Q       You made a gesture of what I would

7    interpret as a stack of documents.  Am I

8    inaccurately reflecting that gesture?

9        A       No.

10       Q       Besides counsel, did you speak with

11   anybody in preparing for this deposition?

12       A       No.

13       Q       I'm handing you, Mr. Yagel, what's

14   been marked as Plaintiff's Exhibit No. 131.  If

15   you could take a look at that, please?

16       A       (Complying.)

17           MR. PELOSO:  Unless you want to, you

18       don't need to read everything.  He'll

19       probably have specific questions.  If you

20       want to, that's fine.

21       Q       I won't stop you if you wanted to

22   review it.

23           Have you ever seen that document

24   before, Plaintiff's 131?

25       A       Yes.

1                    - Brett Yagel -

2       Q      Did you participate in responding to

3    that document with your counsel?

4       A      Yes.

5       Q      You were stopped short, but do you

6    agree with the responses that were listed in that

7    answer to interrogatories?

8       A      Yes.

9       Q      That's all for now on that, Mr. Yagel.

10             Were you ever assigned any

11   responsibility with the Village of Pomona in

12   terms of technology development?

13      A      Technology?

14      Q      Yes.

15      A      Can you rephrase that, please?

16      Q      Sure.  Did you ever assume any

17   responsibility for the Village of Pomona IT or

18   website or anything like that?

19      A      I'm sorry, can you rephrase that

20   again?

21      Q      Sure.  Let's do it this way.

22             MR. STEPANOVICH:  (Handing document to

23        be marked.)

24             (Whereupon, Newsletter "The Village

25        Green" July 2007, Bates No. POM13285, was

1                    - Brett Yagel -

2        marked Plaintiff's Exhibit 132 for

3        identification.)

4        Q      Mr. Yagel, I'm handing you what's been

5    marked as Plaintiff's Exhibit No. 132.  On the

6    left side of the Mayor's Corner, about

7    three-quarters of the way down, reading, "Brett

8    Yagel was formally appointed board liaison to the

9    fire and emergency services, a new position, and

10   will also be responsible for office operations

11   and technology."

12             Do you see that?

13       A      Yes, I do.

14       Q      Did I read that correctly?

15       A      Yes.

16       Q      So that's -- let me ask you a

17   question.  What were your duties related to

18   office operations and technology with the Village

19   of Pomona?

20       A      What was your original question?

21       Q      That one is gone now.

22             MR. PELOSO:  There's a new question.

23   You should answer the question.

24       Q      This is the question.

25       A      What were my responsibilities?

1                    - Brett Yagel -

2              MR. STEPANOVICH:  Can you read it

3      back, please?

4              (The question was repeated.)

5      A       Village operations and technology.  To

6   suggest some methods for improving the

7   technology, to ensure that we had the latest

8   updates with regards to security patches and

9   stuff, to suggest upgrading the equipment due to

10  it being unsupported.  That's about it.

11     Q       You began those efforts sometime in

12  what, the summer of 2007; is that fair?

13     A       I believe so, yes.

14     Q       Do you currently perform any of those

15  duties that you just described?

16     A       They are usually performed -- no.

17             MR. STEPANOVICH:  (Handing document to

18      be marked.)

19             (Whereupon, Document entitled,

20      "Document Hold and Preservation

21      Notice-Privileged and Confidential," Bates

22      No. POM33617, was marked Plaintiff's Exhibit

23      133 for identification.)

24     Q       I'm handing you now, Mr. Yagel, what's

25  been marked as Plaintiff's Exhibit 133.

1                    - Brett Yagel -

2        A       (Perusing document.)  Yes.

3        Q       Have you ever seen Plaintiff's 133

4   before?

5        A       Yes.

6        Q       Did you comply with the directive set

7   forth in Plaintiff's 133?

8        A       Yes.

9        Q       How did you do that?

10       A       Any documents in my possession were

11  turned over to counsel.  My home computer, which

12  I had in my possession, have in my possession,

13  was imaged by counsel.  Any emails or data was

14  retained and turned over to counsel.

15       Q       Thank you.

16               What is Preserve Ramapo?

17       A       It is a local group comprised of

18  various -- various people with various diverse

19  backgrounds.

20       Q       Do you know if Preserve Ramapo has

21  members?

22       A       Can you rephrase that?

23       Q       Sure.  Let me see if I can ask it a

24  better way.

25               Are you a member of Preserve Ramapo?

1                    - Brett Yagel -

2       A       I have participated as being a member

3    of Preserve Ramapo.  As to whether there is a

4    defined membership listing or dues, I have no

5    knowledge.  I have never paid dues.

6       Q       Have you ever received communications

7    from Preserve Ramapo?

8       A       Yes.

9       Q       How do you receive those

10   communications?

11      A       Email blasts, sometimes emails to my

12   village address or my personal email address.

13      Q       How many email addresses do you have?

14              MR. PELOSO:  Presently?

15      Q       Presently, yes.

16      A       Well, I have an email address at work.

17      Q       What is that?

18      A       Let me quantify that.

19      Q       Sure.

20      A       I cannot send or receive any external

21   emails.  It's only an internal email address.

22      Q       This is the one at Village of Pomona?

23      A       No.

24              MR. PELOSO:  At his job.

25      A       At my job.  Other than that, I have

1          - Brett Yagel -

2    two email addresses:  Blyagel@optonline.net and

3    brett.yagel@pomonavillage.com.

4        Q     The email that you described at work,

5    do you receive emails at that email address?

6        A     At work?

7        Q     Yes.

8        A     My full-time position, no.  I might

9    have a Google email address, but it was only to

10   set up a Google calendar.  I don't recall what it

11   is.

12       Q     The email addresses that you just

13   described, did you have those email addresses

14   back in 2005, '6 and '7?

15       A     In 2005 it was blyagel@optonline.net.

16   I received my village email address when I became

17   a trustee in 2007.  And I cannot recall when I

18   set up the Google email address.

19       Q     In complying with Plaintiff's Exhibit

20   133, did you search all of the emails that you

21   had for documents that were in response to this

22   preservation letter?

23       A     Yes.

24       Q     How long have you lived in Rockland

25   County?

1                    - Brett Yagel -

2      A       Since I believe February 1998.  Closed

3  on the house on January 15th, 1998.

4      Q       Is that your home in Pomona?

5      A       Yes.

6      Q       Where did you live before you moved to

7  Pomona?

8      A       268-10 81st Avenue, New Hyde Park, New

9  York.

10     Q       Has Rockland County changed at all

11 since you've moved here?

12     A       Yes.

13     Q       Can you describe that, please?

14     A       A lot more traffic, more development.

15     Q       Anything else?

16             What do you mean by a lot more

17 development?

18     A       I've seen a lot more development in

19 the county over the years, a lot of green space

20 that has now been developed by the property

21 owners.

22     Q       You said, I think you mentioned

23 traffic as something that has changed.  Could you

24 just generally describe the change in traffic

25 since you moved to Rockland County?

                    - Brett Yagel -

     A      On 202 corridor it takes me a little
bit longer to get home than it did in 1998.

     Q      How much longer?

     A      About five minutes.

     Q      What about the schools in Rockland
County, have they changed at all since you moved
to Rockland County?

     A      Can you rephrase that?

     Q      Sure.  First of all, do you have any
children that attended public schools in Rockland
County?

     A      No.

     Q      Do you have any opinion of the school
district in Rockland County, specifically the
East Ramapo School District?

            MR. PELOSO:  Objection to form.  You
     can answer the question.

     A      Any objection?

     Q      No.  I think -- let me rephrase.

            Do you have any opinion on the East
Ramapo School District?

            MR. PELOSO:  Object to the form.

     Q      If you understand the question, you
can --

1          - Brett Yagel -

2          MR. PELOSO:  If you understand, you

3     can answer the question.

4     A     Do I have any opinion?

5     Q     Yes.

6     A     Any person that's elected to an

7     official office needs to execute their fiduciary

8     responsibilities to the best of their ability.

9     Q     Do you believe that the East Ramapo

10    School District isn't living up to that

11    responsibility?

12    A     No.

13    Q     Do you have children attending private

14    school now?

15    A     Yes.

16    Q     Do you know what a voting bloc is?

17    A     Yes.

18    Q     What is your understanding of a voting

19    bloc here in Rockland County?

20    A     A voting bloc is a group of people who

21    have similar interests or desires.

22    Q     Do you have any idea of whether or not

23    a voting bloc as you described exists in Rockland

24    County?

25    A     Do I have any idea if one exists?

1                    - Brett Yagel -

2       Q      Yes, that was the question.  Do you

3  understand it?

4       A      Yeah.

5       Q      Okay.

6       A      Yes.

7       Q      Do you know who comprises that voting

8  bloc?

9       A      Various groups, various people.

10      Q      So is there more than one voting bloc

11 in existence in Rockland County in your opinion?

12      A      Yes.

13      Q      Could you describe what those voting

14 blocs are?

15      A      A group of people who want to control

16 the school board elections, a group of people who

17 want to control town elections, a group of people

18 who want to control county elections, a group or

19 individuals of people who want to control

20 legislative elections.

21      Q      You mentioned about four groups of

22 people.  Is that all the same group of people

23 that you just described?

24      A      No.

25      Q      So is your testimony that a voting

```
 1              - Brett Yagel -
 2   bloc consists of a group of people that want to
 3   control a certain election?
 4              MR. PELOSO:  I think asked and
 5        answered, so I'll object.
 6        A     Yeah.
 7              MR. PELOSO:  You can ask the next
 8        question.
 9        Q     Have you ever heard of the term voting
10   bloc in Rockland County?
11              MR. PELOSO:  Objection.  Asked and
12        answered.  You can answer the question.
13        A     Yes.
14        Q     Does that term refer to any particular
15   group in your opinion?
16              MR. PELOSO:  Same objection.
17        Q     Does it?
18        A     Any particular group, no.
19        Q     Have you ever used the term voting
20   bloc?
21        A     Yes.
22        Q     When you use the term voting bloc what
23   do you mean by that term?
24        A     A group of people or individuals who
25   have similar interests or desires.
```

1                  - Brett Yagel -

2       Q       Are you familiar with tax exempt

3   properties within the Village of Pomona?

4       A       Yes.

5       Q       Do you have any idea how many tax

6   exempt properties there are in the Village of

7   Pomona?

8       A       No.

9       Q       What do you know about the Hasidic and

10  Orthodox Jewish community in Rockland County?

11              MR. PELOSO:  Object to the form as

12      vague.  You can answer the question.

13      A       A very tight-knit community, family

14  oriented.

15      Q       Do you know anything generally about

16  the size of their families?

17              MR. PELOSO:  You mean the average size

18      of each family?

19      Q       Yes, the average size of the

20  Orthodox --

21      A       Just that usually large families.

22  Quantity, no.

23      Q       Pardon me?

24      A       Quantity like numbers?

25      Q       No.  You've answered the question,

1                  - Brett Yagel -

2    that's fine.

3              I believe you stated in your

4    interrogatories that you read the local paper,

5    the Journal News, on a regular basis; is that

6    right?

7        A     Yes.

8        Q     And I think you also stated that you

9    read the online versions of the local paper,

10   which I believe at one time was called LoHud; is

11   that correct?

12       A     Yes.

13       Q     Is it still called LoHud, the online

14   version, if you know?

15       A     Yes.

16       Q     Have you ever spoken to anybody in the

17   media about land issues, land use issues in the

18   Village of Pomona?

19       A     I cannot recall.

20       Q     Have you ever spoken to anyone in the

21   media about land use issues in the Town of

22   Ramapo?

23       A     Yes.

24       Q     Do you know approximately when that

25   was?

                    - Brett Yagel -

1

2       A       I do not recall.

3       Q       What about, was it in the last three

4    years?

5       A       In Ramapo?

6       Q       The question is:  Did you ever speak

7    to anyone in the media about land use issues in

8    the Town of Ramapo?  And your answer I think was

9    I don't recall.  I'm trying to just get an idea

10   of --

11              MR. PELOSO:  I think the answer was

12          yes.  And I think your question was:  Has it

13          been within the last three years?

14      Q       Has it been within the last three

15   years?

16      A       I do not believe so.

17      Q       Would it have been beyond the last

18   three years?

19      A       Yes.

20      Q       Was there any specific issue that you

21   would have spoken to the media about in that

22   regard?

23      A       Patrick Farm.

24      Q       Patrick Farm is a parcel of real

25   estate located in the Village of Pomona?

                    - Brett Yagel -

1

2      A      No.

3      Q      It's right outside of the Village of

4  Pomona?

5      A      Yes.

6      Q      Do you recall generally what your

7  comments were regarding Patrick Farm to the

8  media?

9      A      No.

10     Q      Have you ever posted anything on any

11  Internet forum regarding land use issues in

12  Rockland County?

13     A      No.

14     Q      Do you do any posting at all on any

15  Internet forums regarding any issue?

16            MR. PELOSO:  Any issue, any topic?

17     Q      Any issue.

18            MR. PELOSO:  If you understand the

19     question, you can answer it.

20     A      Yes.

21     Q      What forums would that be?

22     A      Facebook.

23     Q      What else?

24     A      LinkedIn.

25     Q      What else?

1                  - Brett Yagel -

2     A     I can't recall.

3     Q     Are there more Hasidic and Orthodox

4  Jews in Rockland County now than when you first

5  moved here?

6              MR. PELOSO:  Object to the form.  Lack

7     of foundation.  If you know.

8     A     Any -- I'm having -- speak up.

9     Q     Are you generally familiar with the

10  number of Orthodox, Hasidic Jews that live in

11  Rockland County?

12    A     No.

13    Q     You don't have any specific knowledge?

14    A     No specific knowledge.

15    Q     Do you have any general idea of the

16  number of Orthodox and Hasidic Jews that live in

17  Rockland County?

18    A     No.

19    Q     Do you have any idea of whether or not

20  there are more Orthodox and Hasidic Jews that

21  live in Rockland County now than when you moved

22  here in 1998?

23    A     General idea of numbers?

24    Q     Not specific.

25    A     Yes.

1                    - Brett Yagel -

2        Q       Is there more now than when you moved

3    here in 1998?

4        A       I don't know.

5        Q       Are you aware of the lead plaintiff in

6    this case, the Congregation Rabbinical College of

7    Tartikov, Inc.?

8        A       Yes.

9        Q       When did you become aware of that lead

10   plaintiff?

11       A       January 2007.

12       Q       How did you become aware of them?

13       A       Through Preserve Ramapo website.

14       Q       Is it something that you became aware

15   of by going onto the Preserve Ramapo website?

16       A       Yes.

17       Q       Going onto the website, was that in

18   response to anything?

19       A       I cannot recall.

20               MR. STEPANOVICH:  (Handing document to

21       be marked.)

22               (Whereupon, Preserve Ramapo email,

23       1/9/07, Bates Nos. POM0013255-59, was marked

24       Plaintiff's Exhibit 134 for identification.)

25       Q       I'm handing you now, Mr. Yagel, what's

1                    - Brett Yagel -

2    been marked as Plaintiff's Exhibit 134.

3         A      (Perusing document.)  Okay.

4         Q      Have you ever seen Exhibit 134 before?

5         A      Yes.

6         Q      Where did you see Plaintiff's Exhibit

7    134?

8         A      Preserve Ramapo website.  And I

9    believe I also received an email.

10        Q      Similar to Plaintiff's Exhibit 134?

11        A      Yes.

12        Q      We are going to talk a bit today about

13   the subject property that this lawsuit involves,

14   and I just want to make sure that we get an

15   agreement on what that is.

16              As you know, the property is this

17   property located at Routes 202 and 306 owned by

18   the Congregation Rabbinical College of Tartikov,

19   do you know that?

20        A      Yes.

21        Q      So for the purpose of this deposition

22   we'll call it the property, okay?

23        A      Yes.

24        Q      So when I use that word you know what

25   I mean?

1                    - Brett Yagel -

2       A      Yes.

3       Q      Prior to this email in January of 2007

4    did you know who owned the property?

5       A      Yes.

6       Q      Who was that?

7       A      I cannot recall.

8       Q      If I --

9       A      Well, I don't know whether it was Camp

10   Dora Golding.

11      Q      What if I gave you the name Yeshiva

12   Spring Valley, does that refresh your memory?

13      A      Did I know that they owned the

14   property prior to 2007?

15      Q      Yes.

16      A      No.

17      Q      Plaintiff's Exhibit 134 contains five

18   pages.  Is this five pages what you recall

19   receiving back in January of '07?

20           MR. PELOSO:  I don't think he said he

21       received it.  He saw it on the website.

22      Q      Is this what you recall seeing, these

23   five pages, on the Preserve Ramapo website?

24      A      Yes.

25      Q      Once you read this Exhibit 134 on the

1              - Brett Yagel -

2    website what, if anything, did you do in response

3    to it?

4        A     I might have replied to Mike

5    Castelluccio an email about Pomona codes.

6        Q     That would have been an email that you

7    turned over to your counsel?

8        A     Yes.

9        Q     Would you have made that reply

10   somewhere in the time of January the 9th, 2007?

11       A     Yes.

12       Q     As a village trustee do you take into

13   account the positions of the citizens of the

14   village when you vote on particular legislation?

15       A     Yes.

16       Q     How do you do that?

17       A     I weigh the general interests of the

18   community as well as my elected office.

19       Q     What do you mean as well as your

20   elected office?  If you can expand on that,

21   please.

22       A     I might not agree with what the

23   position is that the constituency is requesting

24   and I might vote contrary to it.

25       Q     How do you become aware of the local

1              - Brett Yagel -

2    citizens' sentiments regarding village issues?

3        A      Emails, comments through the website,

4    phone calls.

5        Q      Newspapers?

6        A      Newspapers, blogs.

7        Q      Have you ever seen any letters to the

8    editor in the Rockland County Journal News

9    regarding the Rabbinical College of Tartikov and

10   this property?

11       A      Yes.

12       Q      Have you ever seen any Internet

13   postings and blogs regarding the Rabbinical

14   College of Tartikov and this property?

15       A      Yes.

16       Q      Would you describe those postings and

17   those letters to the editor as negative or

18   positive against this property?

19           MR. PELOSO:  You mean the property or

20       the development?

21       Q      The proposed use of this property.

22       A      Both.

23       Q      So you have seen or can you describe

24   whatever you recall regarding a positive position

25   regarding the use of this property?

1                    - Brett Yagel -

2        A       That it would serve a need of a

3   community.

4        Q       What community would that be?

5        A       They weren't specific.

6        Q       Is it fair to say that it would serve

7   a need of the Orthodox and Hasidic Jewish

8   community?

9        A       Yes.

10       Q       Would you say that the articles that

11  you've seen in the paper and online are more

12  negative than positive regarding the use of this

13  property?

14               MR. PELOSO:  Object to the form.

15       Q       If you understand, you can answer it.

16       A       Yes.

17       Q       You were on the village board on May

18  21st, 2007; is that correct?

19       A       Yes.

20       Q       Were you aware of a meeting that was

21  held by representatives of the Rabbinical College

22  of Tartikov at the Comfort Inn in Nanuet on May

23  21st, 2007?

24       A       Yes.

25       Q       How did you become aware of that?

                    - Brett Yagel -

1

2      A      I don't know -- recall.

3      Q      Do you recall getting an invitation to

4  attend that meeting?

5      A      Yes, but I do not recall from who.

6      Q      Did you attend that meeting?

7      A      No.

8      Q      Why not?

9      A      I could not attend that meeting that

10 evening.

11     Q      Why not?

12     A      Prior commitments.

13     Q      What kind of prior commitments?

14     A      I think -- I believe they were family

15 commitments.

16     Q      Do you know if any other trustees of

17 the Village of Pomona attended that meeting?

18     A      I have no knowledge of that.

19     Q      Was there any discussion among the

20 board of trustees whether to attend that meeting

21 or not?

22     A      I have no knowledge of that.

23     Q      Did you ever discuss with anyone else

24 on the board whether it was a good idea or a bad

25 idea to attend that meeting?

1                    - Brett Yagel -

2      A      No.

3      Q      Is it fair to say that the proposed

4  use of this property was a significant issue in

5  your election campaign for the Village of Pomona?

6                MR. PELOSO:  Object to the form.

7      Q      Do you understand the question?

8      A      Uh-huh.

9      Q      If you understand it, can you answer

10 it, please?

11     A      Yes.

12     Q      Knowing that it was a significant

13 issue to the Village of Pomona, you still decided

14 not to attend this meeting in May of '07; is that

15 right?

16                MR. PELOSO:  Objection.  I believe he

17         testified he couldn't attend.  But you can

18         answer the question.

19     Q      Is that right?

20     A      I could not attend.

21     Q      When did you become deputy mayor?

22     A      It wasn't the first year.  I believe

23 it was 2008, an organizational meeting.

24     Q      So do you recall --

25     A      I believe.

1          - Brett Yagel -

2     Q     Okay.  Do you recall who the deputy

3  mayor was in May of '07?

4     A     Yes.

5     Q     Who was that?

6     A     Ian Banks.

7     Q     Was Herb Marshall the mayor at that

8  point?

9     A     May of 2007?

10    Q     Yes.

11    A     No.

12    Q     Who was the mayor in May of 2007?

13    A     Nicholas Sanderson.

14    Q     Do you recall if anyone from the

15 Village Board of Trustees attended that meeting

16 in May of '07?

17    A     I was not there, I don't know.

18    Q     Were you told by anyone not to attend

19 the meeting of May 21st of '07?

20    A     No.

21    Q     Do you know whether or not any

22 representative from the Village of Pomona was in

23 attendance at the meeting on May 21st, 2007?

24         MR. PELOSO:  Objection.  Asked and

25     answered.

1                    - Brett Yagel -

2      Q     Do you know?

3      A     No.

4      Q     You don't know?

5      A     I don't know.  I wasn't there to

6   witness it.

7            MR. PELOSO:  You've answered the

8      question.

9            MR. STEPANOVICH:  (Handing document to

10     be marked.)

11           (Whereupon, Board of Trustees-Special

12     Meeting, Minutes 4/21/08, Bates No.

13     POM19945, was marked Plaintiff's Exhibit 135

14     for identification.)

15     A     (Perusing document.)  Okay.

16     Q     Do you know what Plaintiff's Exhibit

17  135 is?

18     A     Yes.

19     Q     What is it?

20     A     It's a copy of the board of trustees

21  special meeting held on April 21st, 2008.

22     Q     You were in attendance; is that right?

23     A     Yes.

24     Q     One of the issues that was brought up

25  at that meeting was a tax increase in the Village

1              - Brett Yagel -

2  of Pomona; is that right?

3      A     Yes.

4      Q     Do you recall the percentage of tax

5  increase that was proposed?

6      A     Yes.

7      Q     How much was that?

8      A     Approximately 70 percent.

9      Q     Do you recall prior to that proposal

10  when the last time there was a tax increase in

11  the Village of Pomona?

12      A     Yes.

13      Q     When was that?

14      A     I believe it was the prior year.

15      Q     So in 2007 there was a tax increase

16  that was passed by the Village of Pomona?

17      A     I believe so, yes.

18      Q     Do you recall what the percentage of

19  the tax increase was?

20      A     No.

21      Q     What was the basis, speaking now

22  regarding Plaintiff's 135, what was the basis for

23  the 70 percent tax increase?

24      A     The village was coming off a long-term

25  contract with the sanitation group.  I believe it

1                    - Brett Yagel -

2    was either a seven- or a nine-year contract.  And

3    we were faced with going out to bid on a new

4    sanitation contract, the cost of which was going

5    to be much larger than we had previously paid.

6    In addition, I believe that we had also put into

7    this budget an item for tax stabilization fund of

8    $100,000.

9         Q     What was the tax stabilization fund

10   for?

11        A     To assist the village residents should

12   an unforeseen expense hit it, to lower the tax

13   rates.

14        Q     What do you mean by that?  Could you

15   further expand that definition of unforeseen

16   incident?

17        A     Unforeseen incidents are, you know,

18   litigation.  By this time -- yup.

19        Q     By this time in April of '08

20   litigation had already been initiated against the

21   Village of Pomona regarding the Tartikov

22   property, correct?

23        A     Yes.

24        Q     This sanitation contract that you

25   described, do you recall what the additional

                    - Brett Yagel -

1

2     increase was going to be to the village?

3          A     Substantial.

4          Q     What do you mean by substantial?

5          A     It was over $100,000 increase.

6          Q     Would that have been $100,000

7     throughout the life of the contract?

8          A     No.

9          Q     It was a $100,000 per year increase?

10         A     I believe so.

11         Q     Did you receive any comment from your

12    constituents regarding this tax increase?

13         A     Please rephrase the question.

14         Q     Yes.  Did you receive any comment from

15    your constituency regarding this proposal to

16    raise taxes by 70 percent?

17         A     Yes.

18         Q     Can you generally describe whether or

19    not that comment was positive for passing the

20    increase or negative against the increase?

21         A     Positive or negative.

22         Q     For or against.

23         A     For.

24         Q     Do you recall receiving any negative

25    comment?

1                    - Brett Yagel -

2       A       Yes.

3       Q       Was it generally more favorable than

4   less favorable?

5       A       No.

6       Q       So are you suggesting that the comment

7   that you received was about even?

8       A       That I received, yes.

9       Q       Did you vote to pass the tax increase?

10      A       Yes.

11      Q       Who is the head of Preserve Ramapo

12  now?

13      A       I believe Bob Rhodes.

14      Q       Prior to him who was the head of

15  Preserve Ramapo, if you know?

16      A       I do not know.

17      Q       Do you know the name Michael

18  Castelluccio?

19      A       Yes.

20      Q       Do you know whether or not he was ever

21  the head of Preserve Ramapo?

22      A       Do I know if he was ever the head of

23  Preserve Ramapo?  Yes.

24      Q       Would he have been the head of

25  Preserve Ramapo prior to Bob Rhodes?

1                  - Brett Yagel -

2      A      Do I know if -- your question was do

3  you know -- can you read back the question?

4             MR. PELOSO:  He asked was your answer

5       yes he was the head or yes you know he was

6       the head.

7      A      No, he was not the head.

8      Q      Was Mr. Castelluccio ever the head of

9  Preserve Ramapo, to your knowledge?

10     A      To my knowledge, no.

11     Q      To your knowledge was Mr. Bob Rhodes

12 always the head of Preserve Ramapo?

13     A      Yes.

14     Q      Do you know Michael Tauber?

15             MR. PELOSO:  Does he know him

16      personally?

17     Q      Yes.  Do you know him personally?

18     A      No.

19     Q      Do you know whether or not he has any

20 affiliation with the Rabbinical College of

21 Tartikov?

22     A      Yes.

23     Q      What do you know about that?

24     A      He is the developer.

25     Q      How do you know that?

1                    - Brett Yagel -

2        A        Through newspaper articles,

3    litigation.

4        Q        Litigation, you are talking about the

5    subject litigation that we are here for today; is

6    that what you mean?

7        A        Yes.

8        Q        Do you know anything about Mr. Tauber

9    as it relates to any other litigation besides

10   this case?

11               MR. PELOSO:  Object to the form.  Are

12          you saying does he know whether he's in any

13          other litigation?

14       Q        Strike that.

15               You indicated litigation and that's

16   one of the reasons you know Mr. Tauber.  Do you

17   personally know whether or not Mr. Tauber has

18   been in any other litigation against the Village

19   of Pomona?

20       A        I have no knowledge of that.

21               MR. STEPANOVICH:  (Handing document to

22          be marked.)

23               (Whereupon, Email dated 8/7/07, Bates

24          No. POM16947, was marked Plaintiff's Exhibit

25          136 for identification.)

1           - Brett Yagel -

2     Q      Handing you what's been marked as

3   Plaintiff's Exhibit 136.

4     A      Yes.

5     Q      You've seen this document before?

6     A      Yes.

7     Q      At the top it appears to be an email

8   from you; is that right?

9     A      Yes.

10     Q      Dated August the 7th, 2007; is that

11   right?

12     A      Yes.

13     Q      Sending it to Nick Sanderson and Rita

14   Louie at Pomona Village Hall; is that right?

15     A      Yes.  Pomona village email.

16     Q      Yes, that's what I said.

17     A      No, you said Pomona Village Hall.

18     Q      You know, your distinction is noted on

19   the record.

20            At the top it says, "Tauber (Michael),

21   broker for Tartikov.  Second largest donation to

22   CSL.  Hit PR airwaves last night.  B."

23            Did you write this email?

24     A      Yes.

25     Q      Why did you send this email to Nick

```
 1              - Brett Yagel -
 2    Sanderson and Rita Louie?
 3        A      Because of the second largest donation
 4    to the St. Lawrence campaign traced back to
 5    Tartikov developer.
 6        Q      Why is that important to you?
 7               MR. PELOSO:  Object to the form.
 8        Q      Why was that important to you?
 9               MR. PELOSO:  Object to the form.
10        A      I thought it was interesting that Mr.
11    Tartikov or Mr. Tauber had donated $3500 to the
12    supervisor campaign in the Town of Ramapo.
13        Q      Why was that interesting to you?
14        A      I just thought it was interesting.
15        Q      Where did you get this information
16    that Mr. Tauber contributed money to Mr. St.
17    Lawrence?
18        A      From the email that was sent to me by
19    Preserve Ramapo highlighted in Exhibit 136.
20        Q      Why did you pass this email onto Nick
21    Sanderson and Rita Louie?
22               MR. PELOSO:  Asked and answered.
23        Q      I don't know if I asked that question,
24    but if I did I apologize and I'm asking it one
25    more time.
```

1                - Brett Yagel -

2            MR. PELOSO:  You can answer.

3       A     I thought it was interesting.

4       Q     Can you describe what your definition

5  of interesting is in this context, Mr. Yagel?

6       A     Mr. Tauber was the developer or is the

7  developer of a yet-to-be-proposed site in the

8  village.  And I thought it was interesting that

9  he had donated $3500 to the Christopher St.

10 Lawrence campaign.

11      Q     For the record, Christopher St.

12 Lawrence is the Town Supervisor in the Town of

13 Ramapo, right?

14            MR. PELOSO:  Presently?

15      Q     He was at the time in August of '07;

16 is that right?

17      A     Yes.

18      Q     Is Mr. St. Lawrence still the Town

19 Supervisor in Ramapo?

20      A     Yes.

21      Q     What did Mr. St. Lawrence have to do

22 with the Tartikov property located in Pomona, if

23 you know?

24      A     I do not know.

25      Q     Were you suggesting in this email that

                    - Brett Yagel -

1   Mr. Tauber was expecting some special treatment

2   from Mr. St. Lawrence?

3        A     Like I said, I thought it was

4   interesting.

5        Q     You were on the board of trustees in

6   August of '07, correct?

7        A     Yes.

8        Q     Why didn't you send this e-mail to the

9   entire board of trustees?

10       A     Because Nick Sanderson and Rita Louie

11  were my running mates in the campaign.

12       Q     By this time you had already been

13  elected to the board of trustees; is that right?

14       A     Yes.

15       Q     And there were other members on the

16  board besides Nick Sanderson and Rita Louie; is

17  that right?

18       A     Yes.

19       Q     You're familiar with the New York

20  rules on closed session meetings for public

21  bodies?

22       A     Yes.

23       Q     Can you generally describe your

24  understanding of those rules?

1                    - Brett Yagel -

2        A        Closed sessions meaning executive

3    session?

4        Q        Yes.

5        A        To discuss matters of litigation and

6    personnel.

7        Q        What is your understanding of matters

8    of litigation?  If you can expand that

9    definition, please.

10       A        Strategy sessions, actions against the

11   village that might have occurred that need to be

12   discussed.

13       Q        Is that related to matters of

14   litigation that are currently pending?

15       A        No.

16       Q        So the executive session in your

17   opinion includes meetings dealing with litigation

18   that is not pending?

19       A        It could be.

20       Q        Could you describe your understanding

21   of executive sessions in that context?

22       A        If the village wants to file an

23   Article 78 against say another municipality we

24   would discuss that in executive session.

25       Q        Or in your opinion is executive

                    - Brett Yagel -

session authorized if there is litigation

threatened against the Village of Pomona?

    A    Can you rephrase that?

    Q    Sure, yes.  I'm trying to understand

the definition of litigation, and you're helping

me, but I want to just make sure that I

understand completely.

         In your opinion is the Village of

Pomona authorized to go into executive session

and discuss a matter that potentially may arise

in litigation?

         MR. PELOSO:  Object to the form.

    A    If it's strategy, yes.

    Q    Do you know if there's any standards

or requirement that defines matters of litigation

that have not been filed yet?

    A    Can you rephrase that?

    Q    Yes.  I think you answered that in

your opinion the village board could go into

executive session in an instance when a lawsuit

has not yet been filed.  Did I accurately reflect

your statement on that?

    A    Yeah.

    Q    So what triggers that determination of

```
 1                    - Brett Yagel -
 2    whether or not you can go in and discuss a matter
 3    regarding a lawsuit that has yet not to be filed?
 4         A      Some type of overt action by another
 5    party.
 6         Q      Like what?
 7         A      A letter.
 8         Q      That says what?
 9         A      That says, for example it might state
10    we would like to meet with, you know, rather than
11    litigate.
12         Q      Are you referring to letters that came
13    from Mr. Savad to the board of trustees regarding
14    meeting with the village on this property?
15         A      Yes.
16         Q      And you're aware that letters did come
17    to the village from Mr. Savad in this regard; is
18    that right?
19         A      Correct.
20         Q      And you interpret those letters to
21    meet as a potential litigation matter?
22              MR. PELOSO:  Object to the form.
23         A      Those letters?
24         Q      Yes, sir.
25         A      Yes.  As well as other statements that
```

1                    - Brett Yagel -

2      were made by Mr. Savad.

3          Q      Let's talk about the letters, first of

4      all.  What was your recollection of those letters

5      that led you to believe that there was a threat

6      of litigation?

7                    MR. PELOSO:  I'm just going to

8              instruct the witness again in terms of to

9              the extent there are any questions regarding

10             the deliberations of the board even with

11             counsel on the subject laws and in

12             connection with these letters and the

13             subject laws you are free to answer the

14             questions.

15                    To the extent that any of the

16             questions will require you to reveal

17             discussions regarding litigation strategy or

18             anticipated litigation strategy, that's

19             privileged communication.

20                    With that caveat you're free to answer

21             the question.

22         A      Mr. Savad had made overtures in the

23     paper, publicly in the paper saying that his

24     client was well financed and that if he had to

25     use RLUIPA he would.  Some letters had been

1                    - Brett Yagel -

2    received by the village regarding meeting with

3    clients, Mr. Tauber, I don't know if it was Mr.

4    Tauber or Mr. Savad, regarding the

5    yet-to-be-proposed project.  And then there were

6    letters that were sent back on behalf of the

7    village stipulating that it would be premature at

8    this time to meet with them because no proposal

9    had yet been received, no application.

10       Q     In your tenure on the village board of

11   trustees there was never a meeting with a

12   proposed developer before any kind of application

13   was filed?

14       A     To my knowledge correct, while I have

15   been mayor or trustee.

16       Q     Why is that?

17       A     Because it would violate the

18   Constitution in New York State.

19       Q     In what regard?

20       A     In regards to open meetings laws and

21   due process.

22       Q     How would that be?

23       A     It would be inappropriate for an

24   applicant to have a discussion, because it could

25   be binding later on down the road, without having

1          - Brett Yagel -

2    an application filed.

3        Q      Since you've been on the board of

4    trustees have you ever participated in any

5    trustee workshops?

6        A      Yes.

7        Q      And those are held monthly?

8        A      The workshops are held on the second

9    Monday, usually on the second Monday of the

10   month.

11       Q      Those are less formal than the normal

12   board of trustee meetings?

13       A      What do you mean by less formal?

14       Q      Just tell me generally the purpose of

15   the workshops.

16       A      It's basically a working session to

17   discuss different issues, processes,

18   improvements, procedures that can be improved

19   upon at village hall.

20       Q      The public is invited to attend those

21   workshops, right?

22       A      Yes.

23       Q      Have you ever heard of the term

24   community review committee?

25       A      The CRC board, yes.

1                - Brett Yagel -

2       Q       Does the Village of Pomona have a CRC

3  board?

4       A       We have a TAC board.

5       Q       TAC stands for what?

6       A       I believe it's Technical Advisory

7  Committee.

8       Q       Who is on that board?

9               MR. PELOSO:  Presently?

10      Q       Yes, generally who --

11      A       Generally it's the planner, the

12 attorney, I believe the village engineer and

13 sometimes the building inspector or the secretary

14 to the building department, which is new, the

15 building inspector and the secretary.

16      Q       Does any representative of the board

17 of trustees sit on that committee?

18      A       No, usually not.

19      Q       How about any representative of the

20 Village Planning Board, do they sit on that

21 committee?

22      A       What do you mean by representative?

23      Q       Does that committee involve or include

24 any member of the Village Planning Board?

25      A       I don't believe so.

1                    - Brett Yagel -

2        Q       Does the TAC committee meet on a

3    regular basis?

4        A       Ad hoc.

5        Q       What determines their meetings?

6        A       An application being filed.

7        Q       So an application being filed triggers

8    a TAC meeting?

9        A       It could, yes.

10       Q       What else would trigger a TAC meeting?

11       A       To be quite truthful, I've given you

12   everything that I know regarding TACs.

13       Q       For the record, as you sit here today

14   you're not in a position to testify entirely

15   about TAC meetings and the standards for those

16   meetings within the Village of Pomona?

17               MR. PELOSO:  Object to the form.

18       Q       You understand?

19       A       Say it again.

20               MR. STEPANOVICH:  Can you read it

21       back, please?

22               (The question was repeated.)

23       A       Only to what I have given you.

24       Q       Okay.  You want a break?

25       A       Yes.

1                    - Brett Yagel -

2            MR. STEPANOVICH:  Let's take one now,

3       a five minute break.

4            (Recess held.)

5       Q      Mr. Yagel, are you familiar with the

6   adult student housing zoning in the Town of

7   Ramapo?

8       A      Yes.

9       Q      Can you generally describe your

10  knowledge of the adult student housing?

11      A      It was a law that was enacted by the

12  Town of Ramapo that allowed for 10 percent

13  related to educational facilities and I believe

14  90 percent related to housing.

15      Q      And that's a law in the Town of

16  Ramapo, correct?

17      A      It was a law.  I don't know if it's

18  still in existence, actually.

19      Q      Do you know when it was a law,

20  approximately?

21      A      Approximately 2004, 2005 I believe.

22  But don't quote me on that.

23            MR. PELOSO:  Well, you are quoted.

24      Q      You can qualify your answer as much as

25  you want.

- Brett Yagel -

    A     It was before I was trustee.

    Q     Did you ever have any opportunity to comment to the Town of Ramapo regarding the adult student housing laws?

    A     I do not recall.

    Q     At any time during the time they were being proposed or once they were passed did you have a personal opinion on adult student housing laws in Ramapo?

          MR. PELOSO:  You mean on the law he just described?

    Q     Yes, on the law you just described.

    A     Personal opinion?

    Q     Yes.

    A     Yes.

    Q     What is that?

    A     I thought it was unfair for the existing tax base to have an additional burden based upon the law.

    Q     The existing tax base would mean the current tax base or taxpayers within the Town of Ramapo?

    A     Yes.

    Q     Was it your opinion that the adult

```
 1                 - Brett Yagel -
 2   student housing laws would increase their tax
 3   obligation?
 4       A    Yes.
 5       Q    And how would that happen in your
 6   opinion?
 7       A    It would shift the burden of the
 8   services that were provided by the town to the
 9   other tax property owners.
10       Q    How would that happen?
11       A    How would that happen?
12       Q    Yes.
13       A    If, for example, a development was
14   built and this law was applicable to the
15   development and the properties were exempt from
16   taxes, the town if it was part of a dedicated
17   road would still have to incur costs associated
18   with the plowing, the paving, et cetera.
19       Q    Do you recall the specific number of
20   units that would be permitted per acre in
21   Ramapo's adult student housing law?
22       A    Specifically, no.
23       Q    You talked about exempting properties.
24   Why would those properties be exempt?
25       A    Educational use.
```

                    - Brett Yagel -

1

2     Q     Was the adult student housing use

3     associated with an educational use?

4     A     Yes.

5     Q     Do you recall or do you know how the

6     educational use was defined?

7     A     I do not recall.  It was just

8     educational.

9     Q     So that I can understand, the adult

10    student housing law applied to educational uses;

11    is that correct?

12              MR. PELOSO:  To the extent it calls

13         for a legal conclusion, I object.

14    Q     To your knowledge.

15              MR. PELOSO:  To your knowledge.

16    A     To my knowledge, yes.

17    Q     Do you know whether or not

18    developments occurred within Ramapo using the

19    adult student housing law?

20    A     Yes.

21    Q     Do you know generally whether or not

22    the Orthodox, Hasidic community lives in those

23    adult student housing complexes?

24    A     Yes.

25              MR. PELOSO:  Wait.  Just so I'm clear,

1             - Brett Yagel -

2      yes you know or yes you know they do?

3      A      I know there's four sites that were

4 designated and I believe one of them.  I don't

5 know if the others have been developed.  I know

6 one we have been involved in litigation over.

7      Q      Which one is that?

8      A      The Nike base.

9      Q      When you say we, you are talking about

10 the Village of Pomona?

11     A      The four villages versus.

12     Q      Is that the Chofetz Chaim case?

13     A      Yes.

14     Q      The four villages involved in that

15 litigation, what are they?

16     A      Montebello, Chestnut Ridge, Wesley

17 Hills and the Village of Pomona.

18     Q      Is that litigation still going on?

19     A      Yes.

20     Q      To your understanding what is that

21 litigation about?

22     A      The adult student housing law.

23     Q      What --

24     A      And SEQRA.

25     Q      What is the village's, Pomona's

```
 1                  - Brett Yagel -
 2    position in that litigation?
 3               MR. PELOSO:  Again, to the extent this
 4         is public knowledge you can reveal that.
 5         Q      Yes, 100 percent agree with your
 6    counsel.
 7         A      What was your question again?
 8         Q      I'm trying to get an idea of your
 9    understanding of the lawsuit.  You called it a
10    lawsuit?
11         A      Yes.
12         Q      Of the lawsuit among the villages and
13    I think it's Chofetz Chaim, I'm trying to get an
14    understanding of what that lawsuit is about.
15         A      It was a violation of SEQRA.
16         Q      So the villages claimed that the
17    Chofetz Chaim violated SEQRA?
18         A      Not that Chofetz Chaim violated SEQRA,
19    but that the town -- the SEQRA process was not
20    fully followed with notifications.
21         Q      So there wasn't -- in the villages'
22    opinion, there wasn't complete compliance with
23    SEQRA in the Town of Ramapo?
24         A      That's part of public record, so...
25         Q      I'm just trying to get an idea, an
```

1                  - Brett Yagel -

2    understanding of what the position was.

3        A      I don't know what the position was

4    originally.

5        Q      To your knowledge it's a SEQRA issue?

6        A      SEQRA issue.

7        Q      Do you believe that the proposal of

8    the rabbinical college could be located in

9    Ramapo?

10              MR. PELOSO:  Just so I'm clear, are

11       you asking that the rabbinical college --

12              MR. STEPANOVICH:  What he knows about

13       the proposal.

14       Q      Do you believe that it could be

15   located within the Village of Ramapo?

16       A      Yes.

17       Q      Why is that?

18       A      It could be located anywhere you want

19   to -- that the zone allows and an application is

20   filed.

21       Q      Do you believe it could be located

22   within the Town of Ramapo because it has adult

23   student housing legislation on the books?

24       A      I can't answer that.

25              MR. STEPANOVICH:  (Handing document

                    - Brett Yagel -

1      to be marked.)

2              (Whereupon, Emails, Bates No.

3      POM16953, was marked Plaintiff's Exhibit 137

4      for identification.)

5      Q      I'm handing you what's been marked,

6  Mr. Yagel, as Plaintiff's 137.  If you could take

7  a look at that?

8      A      (Complying.)  Yes.

9      Q      Now, Exhibit 137 is an email sent by

10  you; is that right?

11      A      That's correct.

12      Q      You sent it to deerkill@att.net,

13  correct; is that right?

14      A      Correct.

15      Q      Do you know whose email that is?

16      A      Bob Rhodes.

17      Q      You sent it also to Bob Prol; is that

18  right?

19      A      I responded to him, yes.

20      Q      And you copied Rita Louie and Nick

21  Sanderson; is that right?

22      A      Yes.

23      Q      Again, at this time in July of '07 you

24  were a member of the Village Board of Trustees?

                    - Brett Yagel -

1

2      A      Yes.

3      Q      But the other members of the village

4   board were not copied on this email; is that

5   right?

6      A      Yes.

7      Q      The top half of this document appears

8   to be an email written by you; is that right?

9      A      Yes.

10     Q      Did you write that email?

11     A      Yes.

12     Q      You write, "Good point Bob.  Also

13  their comment 'there is no other location for the

14  rabbinical college anywhere near the population

15  that will be served by this institution, as all

16  surrounding jurisdictions' zoning codes prohibit

17  such use.'"

18            Did I read that accurately?

19     A      Yes.

20     Q      Where did that quote come from?

21     A      It came from the response from a

22  tartikov@tartikovcollege.org response to Mr.

23  Prol's email, second sentence.

24     Q      The next paragraph says, "What about

25  the ASH areas in Ramapo?"

1                    - Brett Yagel -

2              Are you referring to the adult student

3    housing areas in Ramapo?

4       A    Yes.

5       Q    What do you mean by that sentence?

6       A    At the time I believe that there was

7    an adult student housing law still on the books

8    in the Town of Ramapo where this could

9    potentially be situated.

10      Q    Your next sentence says, "Why is it

11   okay for them to adhere to and respect the zoning

12   laws in the surrounding areas but not the Pomona

13   zoning laws?"

14              Did I read that accurately?

15      A    Yes.

16      Q    What do you mean by them, the word

17   them?

18      A    Tartikov organization.

19      Q    At the time you wrote this email did

20   you believe that zoning existed in the Town of

21   Ramapo where this Tartikov project could be

22   located?

23      A    Yes.

24      Q    Then you write, "Probably because they

25   thought we were a small village and they could

```
1                    - Brett Yagel -
2    run over us."
3              Is that what you write?
4       A     Yes.
5       Q     What did you mean by that?
6       A     I'm referring to Paul Savad's comment
7    again saying his client was well financed.
8       Q     Did you interpret that as some kind of
9    threat?
10      A     Yes.
11      Q     What did you specifically interpret
12   that as?
13      A     Litigation.  RLUIPA.
14      Q     What do you know about RLUIPA?
15            MR. PELOSO:  Again, he's not a lawyer
16       so objection.  But you can certainly answer
17       based on your knowledge.
18      A     I believe it's flawed.  I believe it
19   relegates everybody except the religious --
20   regarding the religious land use aspect.  It
21   relegates those who are not of a religious entity
22   to a second class citizenry with regards to
23   zoning.  If a commercial development wanted to
24   come into the village, we are not zoned for that.
25   We are zoned R40.  We have actually one
```

```
 1                    - Brett Yagel -
 2   commercial entity in the village, which is now
 3   the All Creatures Animal Hospital.  But I believe
 4   that RLUIPA relegates property owners to a second
 5   class status with regards to the law.
 6        Q     What property owners are you referring
 7   to?
 8        A     Residential property owners, business
 9   property owners, industrial property owners.
10        Q     You recognize that RLUIPA is a federal
11   statute; is that right?
12        A     Yes.
13        Q     And you indicated that you had an
14   opinion that it was flawed.  Did you just set
15   forth all the reasons why you believed RLUIPA was
16   flawed?
17        A     No.
18        Q     What are the other reasons?
19        A     Least restrictive means, part of the
20   statute.  You know, to use the least restrictive
21   means.
22        Q     What does that mean to you?
23              MR. PELOSO:  Same objection.
24              MR. STEPANOVICH:  Sure, I understand.
25        A     Again, I mean if you're a commercial
```

                    - Brett Yagel -

enterprise or you're an industrial enterprise or

you're a small business, you are subjected to

local zoning laws.  However, I feel that this

RLUIPA law trumps all the other people and gives

a higher priority to other organizations that

happen to be of a religious nature.

    Q    You just used the term least

restrictive means.  Is that what you understood

the term least restrictive means to be?

    A    I believe that's how it's specified in

the statute.  But then again, I'm not an

attorney.

    Q    I understand.  And I'm not asking you

to divulge any information that you received from

your counsel.

         But you are a village officer of

Pomona, correct?

    A    Yes.

    Q    And as such you have a fiduciary

obligation; is that right?

    A    Yes.

    Q    And does that include upholding a

federal statute?

    A    Yes.

```
 1                   - Brett Yagel -
 2       Q      I think you used the term hammer.  Did
 3  you use that term, RLUIPA is a hammer?
 4              MR. PELOSO:  I object.  I don't think
 5       he used it.
 6       Q      Then I'll withdraw it.
 7              Have you ever used that term that
 8  RLUIPA has been used as a hammer?
 9       A      I may have.
10       Q      What do you mean by that?
11       A      I think it's an overreach by the
12  Federal Government to come into local zoning
13  issues.
14       Q      What do you understand about the basis
15  for the law being passed at all?
16              MR. PELOSO:  Again, same caveat.
17       Legal conclusion.
18              MR. STEPANOVICH:  Exactly.  Noted.
19       A      I understand that not all sides were
20  truly represented when this law was passed.  That
21  the Congress went and passed it, it was not fully
22  informed.
23       Q      Do you know anything about the federal
24  circuits' jurisdiction in the United States?
25       A      No.
```

                    - Brett Yagel -

1

2      Q      Have you ever heard of the term the

3   Second Circuit Court of Appeals?

4      A      Yes.

5      Q      Do you understand their jurisdiction?

6      A      No.

7      Q      Are you aware that the Second Circuit

8   Court of Appeals has upheld RLUIPA as being a

9   constitutional statute?

10      A      I have heard that the Institutional

11   Persons Act has been upheld.  But I have not

12   heard that the Religious Land Use aspect has been

13   upheld.

14      Q      You're aware that there was a case

15   concerning RLUIPA that made it to the United

16   States Supreme Court, are you aware of that?

17      A      No.

18      Q      What steps have you taken to deal with

19   this flawed nature as you describe it of RLUIPA,

20   what have you done?

21          MR. PELOSO:  Are you talking about him

22      personally or in his capacity as mayor?

23          MR. STEPANOVICH:  No.  We'll start

24      with personally.

25          MR. PELOSO:  Objection.  If any.

                    - Brett Yagel -

1

2      Q      Then I'll withdraw the question.

3             What steps have you taken in your

4   official capacity as a trustee of the Village of

5   Pomona to cure this flawed nature of RLUIPA?

6             MR. PELOSO:  Object to the form.

7      Q      If you understand you can answer.

8      A      Can I answer this?

9      Q      Sure.

10     A      I have had informal conversations with

11  federal representatives.

12     Q      Like who would that be?

13     A      U.S. Senator Hillary -- Gillibrand,

14  Kirsten Gillibrand.  U.S. Congresswoman Nita

15  Lowey.

16     Q      When were those conversations?

17     A      Last year I had a conversation with

18  Kirsten Gillibrand briefly.  And I believe it was

19  the year before that with Nita Lowey.

20     Q      Did any further meetings result of

21  those conversations?

22     A      No.

23     Q      Have you had any meetings with any

24  other governmental officials besides those two

25  regarding RLUIPA?

                    - Brett Yagel -

1

2     A     I cannot recall.

3     Q     Have you had any meetings with anyone

4  else regarding your opinion, in your official

5  capacity, on RLUIPA?

6     A     Yes.

7     Q     Who would that be?

8     A     Counsels.

9     Q     Counsels?

10    A     (Indicating.)

11    Q     Oh, okay.  Off limits.

12          MR. PELOSO:  Just let the record

13    reflect the Mayor waved his hand at myself

14    and Miss Ulman.

15    Q     As it relates to this litigation?

16    A     Yes.

17          Can you ask that question again?

18          MR. STEPANOVICH:  I'll let her read it

19    back.

20          (The following question was repeated:

21    Have you had any meetings with anyone else

22    regarding your opinion, in your official

23    capacity, on RLUIPA?)

24    A     Okay, thank you.

25          What's the question before that?

1                    - Brett Yagel -

2      Q      Are you okay with that question?

3      A      Yes, I'm okay with that question.

4      Q      And your answer to that question?

5      A      Yes, thank you.

6      Q      If you want the court reporter to go

7  back one prior, feel free.

8      A      Could you?

9      Q      Sure.

10             (The following question and answer

11     were repeated:

12             Q   Have you had any meetings with any

13     other governmental officials besides those

14     two regarding RLUIPA?

15             A   I cannot recall.)

16     A      Thank you.

17     Q      Is that your answer?

18     A      Yes.

19     Q      Well, have you in your official

20  capacity had any meetings with anyone regarding

21  your position on RLUIPA, besides those people

22  that we have just spoken about?

23     A      Do not recall.

24     Q      Do you recall the timing of your

25  campaign back in 2007, do you recall when you

1                    - Brett Yagel -

2    started your campaign for election in 2007?

3        A       Approximately.

4        Q       When would that have been?

5        A       Started collecting signatures for the

6    campaign the first day that they were allowed.

7        Q       When would that have been?

8        A       Very early January.  I don't know the

9    specific date, but whatever date specified on

10   the...

11       Q       Did you run on a slate of candidates?

12       A       Yes.

13       Q       Who else did you run with?

14       A       Nicholas Sanderson was running for

15   mayor, myself and Rita Louie.

16       Q       Did you know Nicholas Sanderson prior

17   to running for office on his slate?

18       A       Yes.

19       Q       How did you know him?

20       A       He was my neighbor.

21       Q       How long was he your neighbor prior to

22   the election of 2007?

23       A       Since the day I moved into my home.

24       Q       1998?

25       A       1998.

- Brett Yagel -

Q    Why did you run for office in 2007?

A    Enact change, get the community back,
a sense of community which had been lost to
reconnect.  To ensure that the zoning codes and
the laws of Village of Pomona would be upheld.
To preserve the environment.  Beautiful place for
my kids to grow up.

Q    What effect did the Tartikov project
proposal have on your decision to run for office?

A    None, I was already committed prior to
knowing about the yet-to-be-proposed development.

Q    So then your knowledge about the
Tartikov land use you acquired prior to your
decision to run for office?

     MR. PELOSO:  Objection.  That's not
     what he said.

A    No.  I already answered that.

Q    I'm sorry, I didn't understand your
answer.

A    Well, it was several hours ago.

Q    Well, I'm asking you again, and I
apologize for asking you again.  But did you
understand the question?

A    Yes.

1                  - Brett Yagel -

2        Q       Can you give me an answer, please?

3        A       Yes.

4        Q       What is it?

5        A       I had no knowledge of the

6   yet-to-be-proposed Rabbinical College of Tartikov

7   prior to me running for public office.

8        Q       Well, you knew in January of '07 of

9   the project, right?

10       A       I knew when I got the email that was

11  exhibited to me.

12       Q       January 9th of 2007?

13       A       Yes, that's when I first heard of it.

14       Q       When did you start getting your

15  signatures?

16       A       I believe it might have been January

17  2nd or January 3rd.  But again that would be on

18  the signature pages that are on file.

19       Q       Did you have a party affiliation when

20  you ran with Nick Sanderson and Rita Louie?

21       A       Yes.

22       Q       What was that?

23       A       The Village Community Party.

24       Q       The signature pages that you refer to,

25  were those turned over to counsel?  Were they in

1          - Brett Yagel -

2    your possession?

3        A      I don't recall that I turned them

4    over.  They are part of village records.

5        Q      So you don't have those signature

6    pages?  I'm just trying to understand.

7        A      I don't have the original signature

8    pages, no.  I may have a copy somewhere, but that

9    wasn't part of this litigation.

10       Q      So the signature pages, if I'm

11   understanding correctly, you have to acquire a

12   certain amount of signatures to be put on a

13   ballot; is that correct?

14       A      Yes.

15       Q      That's what these signature pages are

16   about?

17       A      Yes.

18       Q      Do you recall how many signatures you

19   received?

20       A      How many signatures I received?

21       Q      Yes.

22       A      I believe I collected 187 signatures

23   approximately and I believe the total number

24   might have been just less than 250.

25       Q      Of eligible signators?

1                    - Brett Yagel -

2       A       I believe that at the time only 50

3    signatures were required and it was based upon

4    population census.

5       Q       So if I'm understanding you correctly,

6    it was a total eligible voters of 250 and you

7    received about 187.  I am just trying to discern

8    that.

9       A       No.  In order to run you needed to

10   collect -- in order to get on the ballot without

11   having a primary to my understanding you needed

12   to collect a minimum of 50 valid signatures, and

13   it was based upon a population threshold which I

14   believe at the time was less than 3,000.  I

15   believe now the village population is greater

16   than 3,000 and I can't recall if it's 75 or

17   larger that are required.  But I believe I had

18   about 187, I personally collected 187.

19      Q       At some point did you, Mr. Sanderson

20   and Miss Louie retain Attorney Marci Hamilton?

21      A       Yes.

22      Q       Were you three the only ones who

23   retained Marci Hamilton --

24      A       Yes.

25              MR. PELOSO:  You are talking about in

                        - Brett Yagel -

2    his official capacity?

3    Q       I'm talking about in any capacity.

4    A       We retained her, yes.

5    Q       Do you recall when that was?

6    A       Not the specific date; however, it was

7    after the plans had been leaked for the Tartikov

8    proposal and the articles about RLUIPA.

9    Q       Would that have been prior to the

10   election in March of '07?

11   A       Yes.

12   Q       What was the purpose of retaining Miss

13   Hamilton?

14           MR. PELOSO:  To the extent there's any

15       attorney/client communication I instruct you

16       not to answer the question.

17           MR. STEPANOVICH:  And the basis of

18       that privilege is?

19           MR. PELOSO:  They retained counsel.

20           MR. STEPANOVICH:  Well, I think he can

21       disclose the purpose of that.

22   Q       What was the purpose?

23   A       To advise on RLUIPA and its statute.

24   Q       To advise you, Mr. Sanderson and Miss

25   Louie on RLUIPA?

1                     - Brett Yagel -

2       A       Uh-huh, yes.

3       Q       Did you, Mr. Sanderson and Miss Louie

4    pay Miss Hamilton for her services?

5       A       Yes.

6               Can you read that back to me, please?

7       Q       She'll read it back to you, the court

8    reporter will read that back to you.

9               (The question was repeated.)

10      A       Yes, she was retained.

11      Q       Did you have a retainer letter with

12   Miss Hamilton in that regard?

13      A       Mr. Sanderson is in possession of that

14   retainer letter.

15      Q       You don't have a copy?

16      A       No.

17      Q       Do you know whether or not that

18   retainer letter was ever produced to your

19   lawyers?

20      A       I have no idea.  Not to my -- I have

21   no knowledge.

22              MR. PELOSO:  You've answered the

23      question.

24      Q       Did you, Mr. Sanderson and Miss Louie

25   hire Miss Hamilton to educate and advise you on

1              - Brett Yagel -

2    RLUIPA?

3        A       Yes.

4        Q       That representation that we are

5    referring to now began sometime in January of

6    2007?

7        A       I don't recall the actual date, but I

8    believe it might have been January 2007.

9        Q       Do you recall when that representation

10   among you, Mr. Sanderson and Miss Louie and Miss

11   Hamilton ended?

12           MR. PELOSO:  I just want to be clear.

13       Are you asking when Miss Hamilton ceased to

14       represent the three of them?

15           MR. STEPANOVICH:  Yes.

16           MR. PELOSO:  Okay, if you understand

17       the question of course you can answer.

18       A       I can't recall.

19       Q       Would it have been after your election

20   in March of '07?

21       A       Yes.

22       Q       Just generally how did that

23   relationship terminate, did you indicate that her

24   services were no longer necessary?

25       A       I did not communicate with her.

                    - Brett Yagel -

1

2      Q      Did you ever communicate with Miss

3  Hamilton, not disclosing your communications but

4  did you ever communicate with her?

5      A      Yes.

6      Q      Do you know whether or not it was Mr.

7  Sanderson who terminated that relationship?

8      A      I believe so.

9      Q      Do you know when Miss Hamilton was

10  hired by the village as co-counsel?

11      A      Yes, after we were served I believe.

12      Q      Served with a Complaint?

13      A      Yes.

14      Q      If I were to say to you that it was

15  sometime in --

16      A      July.

17      Q      -- July of 2007, does that sound

18  accurate?

19      A      Yes.

20      Q      Was there a single issue that

21  motivated you to run for mayor?

22      A      Yes.

23      Q      What was that?

24      A      That was the destruction of state and

25  federally protected wetlands on the Patrick Farm.

                    - Brett Yagel -

1

2      Q      Patrick Farm is not located within the

3  Village of Pomona; is that right?

4      A      Yes.

5      Q      So can you explain to me why that was

6  the single most important issue in your campaign?

7      A      Not in my campaign; however, Rockland

8  has a water issue, and the wetlands on the

9  Patrick Farm were damaged by the developer.  And

10  being that there's a water issue and the water is

11  a Class A drinking water source that goes into

12  the headwaters of Mahwah which has a well field

13  directly across, when somebody starts damaging

14  the water that we all need someone needs to stand

15  up.

16      Q      So you were one of the persons that

17  stood up?

18      A      One of several, yes.

19      Q      When did you start that process?

20          MR. PELOSO:  I'm unclear.

21          MR. STEPANOVICH:  Standing up.  I'm

22      trying to use his terminology.

23      A      2004, when the destruction of the

24  wetlands were first reported and made public

25  knowledge.

1                    - Brett Yagel -

2      Q      Did you continue your efforts in that

3  regard beyond 2004?

4      A      Yes.

5      Q      I want to come back for a second.  I

6  asked you a question and it may have been

7  confusing.  I asked you if there was a single

8  critical issue in your campaign.  And I don't

9  want to put words in your mouth.  Did you say it

10  was Patrick Farms, was that your answer?

11      A      It was the destruction of the state

12  and federally protected wetlands on the Patrick

13  Farm.

14      Q      Do you know the status of the

15  development of the Patrick Farms project?

16            MR. PELOSO:  Presently?

17      Q      Presently as we sit here today.

18      A      I don't believe there's any

19  development going on currently.  I know we are in

20  litigation.

21      Q      You say we, are you talking about the

22  Village of Pomona?

23      A      The Village of Pomona.

24      Q      What's the nature of that litigation?

25      A      The subdivision plans, zoning issues,

```
 1              - Brett Yagel -
 2   SEQRA.
 3       Q      Anything else?
 4       A      Over-utilization.
 5       Q      Of what?
 6       A      Of the property.
 7       Q      Do you know if all of those issues you
 8   mentioned, are those contained in one lawsuit or
 9   separate lawsuits?
10       A      Separate lawsuits.
11       Q      Those are filed in state court?
12       A      Yes.  I believe, yes.
13       Q      Would at least one of those be what's
14   called an Article 78, if you know?
15       A      I don't know.
16              MR. STEPANOVICH:  It's 12:15.  Why
17       don't we break now for lunch?  It's probably
18       a good time to do that.  And we'll reconvene
19       in about an hour.
20              MR. PELOSO:  That's fine.
21              (At this time a luncheon recess was
22       held, after which the deposition resumed.)
23   CONTINUED EXAMINATION
24   BY MR. STEPANOVICH:
25       Q      Mr. Yagel, have you ever hosted any
```

1                    - Brett Yagel -

2    fund-raisers, gatherings for Preserve Ramapo?

3        A      Yes.

4        Q      When was that?

5        A      I don't recall which campaign it was

6    for, but it was prior to me being elected.

7                MR. STEPANOVICH:  (Handing document to

8        be marked.)

9                (Whereupon, Copy of invitation to a

10       cocktail party, 10/22/05, Bates No.

11       LYAGEL00011, was marked Plaintiff's Exhibit

12       138 for identification.)

13       Q      I'm handing you, Mr. Yagel, what's

14   been marked as Exhibit 138.  Does that refresh

15   your recollection as to --

16       A      Yes.

17       Q      So when was it that you hosted a

18   fund-raiser for Preserve Ramapo?

19       A      October 22nd, 2005.

20       Q      Was that the only fund-raiser you

21   hosted for them, Preserve Ramapo?

22       A      No, there was one at my home, but I

23   don't recall the year.

24       Q      Would it have been after this or

25   before this 2005 date?

```
1                    - Brett Yagel -

2       A       I do not recall.

3       Q       Then to the best of your recollection

4    you hosted two fund-raisers for Preserve Ramapo?

5       A       Yes.

6       Q       Do you know what the Power of Ten is?

7       A       Yes.

8       Q       What is it?

9       A       It's -- mathematically it's

10   exponential.

11      Q       Do you know if there's a group or an

12   organization in Rockland County referred to as

13   the Power of Ten?

14      A       Yes.

15      Q       Do you know what that organization is?

16      A       I believe it's affiliated with the

17   East Ramapo School District community.

18      Q       Do you know if they had a mailing or

19   email list?

20      A       Yes.

21      Q       Were you ever on that email list?

22      A       Yes.

23              MR. STEPANOVICH:  (Handing document to

24      be marked.)

25              (Whereupon, Emails, Bates Nos.
```

1                   - Brett Yagel -

2       POM0031218-20, was marked Plaintiff's

3       Exhibit 139 for identification.)

4       Q       Take a minute to look at that, please?

5       A       (Complying.)

6       Q       Have you ever seen Exhibit 139 before?

7       A       Yes.

8       Q       When was that?

9       A       The date specified on the email.

10      Q       So the Power of Ten, is it an

11   affiliation dealing or related to the East Ramapo

12   School District, if you know?

13      A       I do not know.

14      Q       Do you know why you would be a

15   recipient in light of the fact that your children

16   don't go to the East Ramapo School District?

17      A       Yes, I attended one meeting, I can't

18   recall where but off of Route 45, with I believe

19   this group.

20      Q       What was the purpose of that meeting?

21      A       The people in attendance were

22   residents and also parents of children who were

23   attending the public school district and were

24   concerned with the cutbacks to the public school

25   programs that were being enacted.

                    - Brett Yagel -

1

2     Q     Did you speak at that meeting?

3     A     Only to state my name.

4     Q     Do you recall how many people were in

5    attendance at this meeting?

6     A     More than 10, less than 60.

7     Q     The second page, Page 2, the first

8    full paragraph reads, "There will be 497 homes

9    built there in various configurations."

10          Do you understand what "there" is

11   referring to?

12    A     I believe that had to do with the

13   subdivision plan that had been filed with the

14   Town of Ramapo.

15    Q     Would that have been a Patrick Farms

16   development?

17    A     Yes.

18    Q     In fact, that's the subject of the

19   email, isn't it, Patrick Farm Development, top

20   line?

21    A     Yes.

22    Q     Do you know whether or not the Patrick

23   Farms development was going to be inhabited by

24   Orthodox, Hasidic Jews?

25    A     No.

                    - Brett Yagel -

1

2      Q      Do you know whether or not the

3    developer for Patrick Farms was an Orthodox or

4    Hasidic Jew?

5      A      Yes.

6      Q      The developer was in fact an Orthodox

7    or Hasidic Jew?

8      A      Not the developer, the owner.

9      Q      What was his name?

10     A      Lebovits is his last name.

11     Q      What did you know about the

12   development of Patrick Farms?

13            MR. PELOSO:  Object to the form as

14       vague.  You can answer the question.

15     A      Only that the original zoning on the

16   property was one home per two acres.  During a

17   town master -- during many town master plan --

18   comprehensive master plan meetings it was

19   downzoned to one home per one acre and

20   subsequently in the 2000 -- approximately 2009

21   time frame there was another rezoning to allow

22   for multi-family use in the center of the

23   property ringed by single-family homes.  And that

24   the ownership slash developer had violations

25   cited against him for the destruction of state

1              - Brett Yagel -

2    and federally protected wetlands in the mid

3    2000s, I believe it was April 2004.

4        Q     Do you know approximately how many

5    homes were going to be built in that development?

6        A     Single family homes?

7        Q     Yes.

8        A     It was less than -- the current plan I

9    believe is less than 50 I believe.

10       Q     This email, first full paragraph on

11   the second page, says, "There will be 497 homes

12   built there in various configurations."

13             Was that your understanding of the

14   amount of homes being built on Patrick Farms?

15             MR. PELOSO:  Just what time period are

16       we talking about?

17       Q     At the time this email was written,

18   2010.

19             MR. PELOSO:  He just wants to know

20       what the time period is when you understood

21       this.

22       A     This was after the zoning.  It was not

23   497 homes, it was 497 units.

24       Q     Which translates into how many housing

25   units, do you recall?

1                    - Brett Yagel -

2       A      Household units?

3       Q      Yes.

4       A      497.

5       Q      The email reads, "Assuming there will

6    be a minimum of two adults per unit, there will

7    be 994 more bloc voters to vote down our school

8    budgets and against our public school Board of

9    Education candidates."

10              Is that what it says?

11      A      Yes.

12      Q      Do you have any idea who they mean by

13   the reference bloc voters?

14      A      No.

15      Q      Could that have been a reference to

16   the Orthodox, Hasidic Jewish community?

17              MR. PELOSO:  Objection.  He already

18         stated no.  You can answer the question.

19      A      Anybody is allowed to buy in Patrick

20   Farm, so...  You're asking me what I --

21              MR. PELOSO:  He's asking the

22         questions.

23      Q      I asked the question:  Could that have

24   been a reference to the Orthodox, Hasidic Jewish

25   community?

1                    - Brett Yagel -

2              MR. PELOSO:  Same objection.

3      A      You're asking me to conjecture what

4  somebody who wrote an e-mail that I had nothing

5  to do with but I happen to be a recipient of,

6  what that person was thinking.  And I'm saying I

7  don't know what that person was thinking.

8      Q      Is your answer I don't know what that

9  person is thinking?

10     A      I don't know what that person is

11 thinking.

12     Q      That's your answer?

13     A      Yes, sir.

14     Q      The last sentence there, "Assuming

15 that there will be at least four children per

16 household, there will be an additional 1988

17 additional Yeshiva students in the district.

18 This will spell disaster for our already

19 struggling school district."

20              You agree that's what it says?

21     A      Yes.

22     Q      Do you agree with that statement?

23     A      No.

24     Q      Why don't you agree with that

25 statement?

                    - Brett Yagel -

1

2    A    I just don't agree with it.

3    Q    Why not?

4    A    Because anybody is allowed to vote

5  and -- I just don't agree with it.

6    Q    I think you testified earlier that the

7  East Ramapo School District was having some

8  issues.  Is that a fair statement?

9    A    Yes.

10   Q    Would part of the issues be the amount

11 of students within the school district attending

12 the schools?

13   A    Yes.

14   Q    Do you think the school district is

15 overcrowded?

16        MR. PELOSO:  Presently?

17   Q    Presently.

18   A    No.

19   Q    I think you had an opinion about the

20 East Ramapo School District.  I'm just trying to

21 focus in on that.  What do you believe the

22 problems with the school district are?

23   A    Most good school districts have a

24 broad range of programs, both

25 educational-related, music-related,

```
 1                    - Brett Yagel -
 2   sports-related.  And it appears that in more
 3   recent times a lot of these programs have been
 4   cut back due to the actions of the school board.
 5        Q      Generally do you know are there
 6   Orthodox, Hasidic individuals on the school
 7   board?
 8        A      Yes.
 9        Q      Is it your belief that the programs
10   are being focused or concentrated to address that
11   Orthodox, Hasidic community?
12             MR. PELOSO:  Object to the form.
13        Q      You're indicating there's been a
14   cutback in some of the programs.
15        A      Yes.
16        Q      For instance, what programs have been
17   cut back?
18        A      Band.
19        Q      What else?
20        A      Music, band activities, some sports.
21   Larger class sizes.
22        Q      Do you know the reason for those
23   cutbacks?
24        A      They were because the board had to
25   take action due to their fiduciary
```

1                     - Brett Yagel -

2      responsibilities, the taxes.

3           Q      What do you mean by that?

4           A      They were running in the red on

5      certain programs.  I can't remember which ones

6      exactly.  But they were running in the red and

7      they needed to make some decisions rather than

8      raising taxes, they wanted to hold the line on

9      tax increases.

10          Q      So certain programs were discontinued?

11          A      Yes.

12          Q      In your mind that's a breach of their

13     fiduciary duty?

14          A      Yes.

15          Q      You understand what it's like to raise

16     taxes, right?

17          A      Yes.

18          Q      Tough decision?

19          A      Very.

20          Q      Are there alternatives to raising

21     taxes, generally speaking?

22          A      Yes.

23          Q      Last spring you allowed people -- the

24     Village of Pomona allowed speakers to speak at a

25     workshop concerning the importance of voting in

1            - Brett Yagel -

2    the East Ramapo School District; was that true?

3        A       We had two individuals that did come

4    before us who were affiliated with the East

5    Ramapo School District in some capacity.  Whether

6    they be taxpayers or employees or teachers, I

7    can't recall what their official capacity was.

8    But they were concerned with what was happening.

9        Q       Were they Orthodox, Hasidic Jews?

10       A       I didn't ask them.

11       Q       But you generally know how Orthodox or

12   Hasidic Jews dress in a community, don't you?

13       A       Yes.

14       Q       They are identifiable; is that right?

15       A       Yes.

16       Q       And how are they generally

17   identifiable?

18       A       They usually -- well, the women

19   usually wear long dresses down to their ankles,

20   usually have their arms covered up.  And the men

21   usually have white shirt, dark-colored pants,

22   tie, neat in appearance.  Some have facial hair,

23   some don't.

24       Q       Were these individuals that appeared

25   at your meeting dressed in that way?

1                    - Brett Yagel -

2      A      No.

3      Q      Did these speakers at this meeting we

4  are referring to, were they invited by the

5  village to speak?

6      A      I can't recall.

7      Q      Was this meeting, was it at a regular

8  board of trustees meeting or a workshop, if you

9  recall?

10      A      I recall the location and the room.

11  But sometimes we have regular meetings upstairs,

12  but we were in the boardroom upstairs.

13      Q      You said you couldn't recall whether

14  or not these individuals were dressed in

15  traditional Orthodox, Hasidic clothing.  Do you

16  recall anything about these speakers?

17              MR. PELOSO:  You are talking

18      appearance?

19      Q      Appearance-wise, description.  I'm

20  trying to get a description.

21      A      No.

22      Q      Can you say with certainty that these

23  speakers were non-Orthodox and Hasidic?

24      A      I did not ask them their religion.

25      Q      I don't mean in that context.  Can you

```
 1                    - Brett Yagel -
 2    say with certainty based on observing their dress
 3    they were not Orthodox or Hasidic?
 4        A       No.
 5        Q       Do you recall what they spoke about?
 6        A       Just that there was an upcoming
 7    election and -- as there were a lot of elections
 8    for school districts in the county in that time
 9    frame.  And they asked, you know, that people
10    come out and vote.
11        Q       I think you said you disagreed with
12    these last two sentences on Exhibit 139.
13    "Assuming that there will be at least four
14    children per household, there will be an
15    additional 1988 Yeshiva students in the district.
16    This will spell disaster for an already
17    struggling school district."
18               You disagree with that sentiment?
19               MR. PELOSO:  Objection.  Asked and
20         answered.
21        Q       You can answer.
22        A       I disagreed with it, yes.
23        Q       Did you interpret this email as an
24    attempt to sort of rally the vote?
25               MR. PELOSO:  Objection.
```

1                    - Brett Yagel -

2       A       No.

3               MR. PELOSO:  Sorry.  Objection.  Rally

4       the vote as to what, I don't know.

5       Q       What did you believe the purpose of

6   this email was?

7       A       There was a vote to be held in the

8   Town of Ramapo regarding some of the town board

9   members on the Patrick Farm.  And this individual

10  I am assuming, you know, what you can do to help.

11  You can write to the Town of Ramapo voicing your

12  concerns against the project or you can attend

13  the meeting or you can email the deputy

14  supervisor.  This was for a vote at the town.

15      Q       Town of Ramapo?

16      A       Town of Ramapo.

17      Q       This was sponsored by the Power of

18  Ten, correct?

19      A       I don't know who it was sponsored by.

20      Q       The first page says, "Dear Power of

21  Ten subscribers," is that what it says?

22      A       Yes.

23      Q       It was referenced to Patrick Farm

24  Development; is that right?

25      A       Yes.

1           - Brett Yagel -

2           MR. STEPANOVICH:  (Handing document

3      to be marked.)

4           (Whereupon, Document entitled, "Why A

5      Vote For Preserve Ramapo Is A Vote Against

6      Our Community's Interests," Bates No.

7      POM33279, was marked Plaintiff's Exhibit 140

8      for identification.)

9      Q      I'm handing you, Mr. Yagel, what's

10     been marked as Plaintiff's Exhibit No. 140.  Take

11     a look at that, please?

12     A      (Complying.)

13     Q      Did you ever see Exhibit 140 before?

14     A      I don't recall.

15          MR. STEPANOVICH:  (Handing document to

16     be marked.)

17          (Whereupon, Emails, Bates No.

18     POM33278, was marked Plaintiff's Exhibit 141

19     for identification.)

20     Q      I'm handing you now, Mr. Yagel, what's

21     been marked as Exhibit 141.  At the top it

22     appears to be an email from you, correct, Brett

23     Yagel?

24          MR. PELOSO:  Top of the first page?

25     Q      Very, very top, yes, on the first

1                    - Brett Yagel -

2    page.

3         A    Yes.

4         Q    What is that email address

5    byagel@siac.com?

6         A    That is the Securities Industry

7    Automation Corporation.  That's the technology

8    arm of the New York Stock Exchange.

9         Q    Is this the email you said you

10   couldn't send emails from?

11        A    No, this was when -- no, it is not.

12        Q    So this is an email at the Stock

13   Exchange?

14        A    Yes.

15        Q    Is this where you were working at the

16   time in November of '05?

17        A    Yes.

18        Q    You were working at the New York Stock

19   Exchange?

20        A    I was working at the Securities

21   Industry Automation Corporation.

22        Q    Was this one of the emails that you

23   searched for preservation of documents?

24        A    I guess it must have been.

25        Q    You pulled all the emails under that

1                    - Brett Yagel -

2   email address and delivered them to your counsel;

3   is that right?

4        A     My machine was imaged.  If this was on

5   my machine, then counsel has it.

6        Q     You sent this email to

7   nick.sanderson@pomonavillage.com, correct?

8        A     Correct.  I forwarded him this email.

9        Q     You forwarded an email?

10       A     I forwarded an email.

11       Q     And the attachment says, "Committee to

12  Protect Shuls and Yeshivas in Ramapo"; is that

13  right?

14       A     Yes.

15       Q     And does that not refresh your

16  recollection as to what Exhibit 140 is?

17       A     Yes.

18       Q     So is Exhibit 140 the attachment to

19  this email?

20       A     Yes.

21       Q     You write, "Thought you should be

22  aware that the Village of Pomona is mentioned in

23  a very negative light with regards to the Yeshiva

24  Spring Valley."  Signed Brett.  Is that what you

25  write?

1              - Brett Yagel -

2      A      Yes.

3      Q      Why did you write that email to Mr.

4   Sanderson?

5      A      Because in reading Exhibit 140, the

6   third line beginning with the sentence, "This

7   includes elected officials in villages such as

8   Airmont, Chestnut Ridge, Montebello, Pomona and

9   Wesley Hills."

10     Q      You indicated earlier, Mr. Yagel, that

11  you didn't have any recollection of when Yeshiva

12  Spring Valley owned the subject property.  Now

13  after reviewing these two emails does that

14  refresh your recollection as to when Yeshiva

15  Spring Valley was the owner of the subject

16  property?

17     A      Yes.

18     Q      Do you now know when Yeshiva Spring

19  Valley was the owner of the subject property?

20     A      I do not know the specific dates when

21  it purchased or sold the property.

22     Q      Do you now know after refreshing your

23  recollection with these exhibits whether or not

24  Yeshiva Spring Valley was the owner of the

25  subject property in November of '05?

1                 - Brett Yagel -

2        A       I am basing it on what's in this

3    attached Exhibit 140.

4        Q       So is the answer to that question that

5    yes, in November of '05 you understand that

6    Yeshiva Spring Valley was the owner of the

7    subject property?

8        A       Yes.

9                MR. STEPANOVICH:  (Handing document to

10          be marked.)

11               (Whereupon, Copy of pamphlet of

12          Village Community Party, Bates No. POM20045,

13          was marked Plaintiff's Exhibit 142 for

14          identification.)

15       Q       I'm handing you, Mr. Yagel, what's

16   been marked as Plaintiff's Exhibit 142, and ask

17   if you can identify that, please?

18       A       That is campaign literature when I

19   first ran for office back in 2007.

20       Q       If you turn to the second page -- if

21   I'm mistaken, I stand to be corrected.  I thought

22   you testified that the single most important

23   issue that motivated you to run was the Patrick

24   Farms development; is that accurate?

25       A       Yes.

                    - Brett Yagel -

1    

2    Q      If you turn to this Page 2, under

3    Issues, "The single most important issue facing

4    the village is clearly the Tartikov development.

5    We will vigorously defend our land use codes and

6    regulations."

7              Is that what it says?

8    A      Where are you reading that?

9    Q      Second page under Issues.

10   A      I testified that when I ran for office

11   it was prior to knowledge of the

12   yet-to-be-proposed Tartikov development.

13             MR. PELOSO:  If I may.  For the

14        record, I believe also that the witness

15        testified that the reason he ran for mayor

16        was that issue, not trustee.  If I'm

17        mistaken, you can clarify.

18   Q      Do you recall the year of this

19   pamphlet, when it was published?

20   A      2007.

21   Q      Do you recall approximately when these

22   pamphlets were distributed?

23   A      I do not.

24   Q      It would have been prior to March

25   20th, 2007, correct?

                    - Brett Yagel -

1

2     A      Yes.

3     Q      Sometime after January, early January

4  2007 when you got the signatures, correct?

5     A      Yes, after the signatures, yes.

6     Q      So these pamphlets were distributed

7  sometime between early January and March 20th of

8  2007; is that correct?

9     A      It could not have been early January.

10    Q      So when would it have been?

11    A      It had to have been after mid January.

12 I was -- also, I was not -- I contributed to some

13 of this, but I did not send this personally to

14 the printer.

15         MR. PELOSO:  You've answered the

16    question.

17    Q      What did you contribute to this?

18    A      Development and environment, fiscal

19 and government issues, quality of life.

20    Q      That box there?

21    A      Candidate for trustee.

22    Q      Under candidate for trustee, "Brett's

23 community service includes active membership in

24 Preserve Ramapo and The Coalition to Keep Ramapo

25 Green groups," that block?

1               - Brett Yagel -

2      A      Yes.

3      Q      I'm sure you saw this pamphlet before

4  it went out?

5      A      I do not recall.

6      Q      Do you know who was responsible for

7  the rest of the composition of this document?

8               MR. PELOSO:  You mean the content?

9      Q      The content, yes.

10     A      I think Nick Sanderson and also Rita

11  may have contributed.

12     Q      After looking at this document, Mr.

13  Yagel, is there anything here you disagree with?

14     A      (Perusing document.)  Yes.

15     Q      What would that be?

16     A      The word fight.

17     Q      Can you point me in that direction?

18     A      Left column, last sentence, "strategy

19  to fight for Pomona."  I would have used the word

20  defend.

21     Q      So instead of the word fight -- other

22  than the word fight, there's nothing else that

23  you disagree with there?

24     A      No.

25               MR. STEPANOVICH:  (Handing document to

```
 1                  - Brett Yagel -

 2       be marked.)

 3              (Whereupon, Document Re Pomona

 4       Election, Bates Nos. POM0012596-99, was

 5       marked Plaintiff's Exhibit 143 for

 6       identification.)

 7       Q      I'm handing you now, Mr. Yagel, what's

 8   been marked as Plaintiff's Exhibit No. 142,

 9   correct?

10              MR. PELOSO:  3.

11       Q      143.  If you could review that,

12   please?  Initially I'm going to ask you if you

13   know who composed this document?

14       A      I did.

15       Q      You composed this document.

16              And on the left-hand side there's a

17   column that has some language.  Where did you

18   retrieve those comments?

19              THE WITNESS:  (Addressing counsel)  Do

20       you know where those comments are from?

21       Those are from the Complaint --

22              MR. PELOSO:  No, no, he asks you the

23       questions, you answer the questions.

24       Q      I'm asking where you got this?

25              MR. PELOSO:  Where did this
```

1              - Brett Yagel -

2       information come from?

3       A       This information on the left came from

4    the Complaint that was filed with the village.

5       Q       What was the purpose of this document?

6       A       We had been asked by counsel to

7    research the Complaint to see if we could find

8    anything related to this Complaint.

9       Q       So then --

10      A       I should point --

11              MR. PELOSO:  No, you finished your

12      answer.

13      A       Yes.

14      Q       If your answer is not complete --

15      A       Yes.  My answer is complete.

16              MR. PELOSO:  Once you complete the

17      answer, that's fine.

18              MR. STEPANOVICH:  Let's let him decide

19      if he's completed his answer.

20              MR. PELOSO:  I'm not coaching him.

21              MR. STEPANOVICH:  Well, okay.

22      Q       Did you finish your answer, Mr. Yagel?

23      A       Yes.

24      Q       So on the right-hand side, Mr. Yagel,

25    did you prepare -- did you compose everything on

1                   - Brett Yagel -

2    the right-hand side?

3        A      I pulled it from the known sources on

4    the right-hand side, which was I believe the

5    Village Community Party pamphlet and/or the

6    website that had been set up for the campaign.

7        Q      So when you say pamphlet, you are

8    talking about the campaign material?

9        A      Yes.

10       Q      And then from the village hall

11   website?

12       A      No.

13       Q      I'm sorry.  Where --

14       A      From the campaign website.

15       Q      So the source of the information on

16   the right came from the campaign website, the

17   campaign pamphlet and where else?

18              MR. PELOSO:  You are talking about all

19       pages, correct?

20       Q      All pages, yes, so you got to look

21   through it.  I'm just trying to get an

22   understanding of the source.

23       A      The source of the left column was the

24   Complaint, which I believe I received -- may have

25   received in PDF format.  And the right side I

1                    - Brett Yagel -

2    believe was the pamphlet for the Community

3    Village Party website that Mr. Sanderson had set

4    up.

5        Q      Who did you distribute this document

6    to, 143?

7        A      I believe I may have given it to Mr.

8    Sanderson.  I know I gave a copy to counsel at

9    one point.

10           MR. STEPANOVICH:  (Handing document to

11       be marked.)

12           (Whereupon, Email dated 8/3/07, Bates

13       No. POM21331, was marked Plaintiff's Exhibit

14       144 for identification.)

15       Q      I'm handing you what's been marked,

16   Mr. Yagel, as Plaintiff's Exhibit 144.  Take a

17   look at that, please?

18       A      (Complying.)  Yup.

19       Q      It's an email from you, correct?

20       A      Yes.

21       Q      To Nick Sanderson, Rita Louie; is that

22   right?

23       A      Yes.

24       Q      The subject is, "I located the

25   election video interviews with the Journal News

```
1                    - Brett Yagel -
2    in March"; is that right?
3        A     Yes.
4        Q     In the bottom half of the first page
5    appears to be -- what is that, can you describe
6    that, please?  The bottom half of the first page.
7              MR. PELOSO:  Starting with "Yagel
8        Election"?
9        Q     Yes.  "Video at Journal News Offices."
10       A     This was a transcription of what was
11   said during the March interviews that were held
12   in Journal News headquarters, and this was a
13   transcription of what I had stated during that.
14       Q     All of that is in quotes, correct?
15       A     Yes.
16       Q     That's what you stated?
17       A     Yes.
18       Q     Can you read the last line of the
19   first paragraph, please -- The last line of the
20   last paragraph.
21       A     "Most importantly, I want to unite the
22   village residents so that we can stand together
23   and legally fight the development that is being
24   planned and to ensure that our zoning is
25   enforced."
```

1                    - Brett Yagel -

2        Q       In this election video you used the

3    word fight instead of the word defend; is that

4    right?

5        A       Yes.

6                MR. STEPANOVICH:  (Handing document to

7            be marked.)

8                (Whereupon, Email dated 3/17/07, Bates

9            No. POM16974, was marked Plaintiff's Exhibit

10           145 for identification.)

11       Q       I'm handing you, Mr. Yagel, what's

12   been marked as Plaintiff's Exhibit 145, and ask

13   if you can identify that?

14       A       It appears to be a letter from Rita

15   Louie to myself and Nick Sanderson.

16       Q       Subject is "Mass emailing letter to go

17   out"; is that right?

18       A       Yes.

19       Q       This was prior to the election; is

20   that right?

21       A       Yes.

22       Q       Did you approve of this mass emailing?

23               MR. PELOSO:  You mean of this

24           document?

25       Q       This document, yes.

1           - Brett Yagel -

2           MR. STEPANOVICH:  Thank you.

3      A     I do not know if this document went

4 out.

5      Q     The question was:  Did you approve of

6 this document -- Strike that.

7            Did you make any edits to this

8 document?

9      A     I do not recall.

10      Q     Do you recall what the purpose of this

11 document was?

12      A     No.

13      Q     Do you recall if your campaign sent

14 any mass emailings?

15      A     Yes.

16      Q     This mass email would have been what,

17 three days before the election in March of '07;

18 is that right?

19      A     Yes.

20      Q     Towards the end, the next to last full

21 sentence says, "So if you want more of the same,

22 go ahead and let the incumbents stay in office.

23 Then we'll all have to move."

24            Do you see that?

25      A     Yes.

1              - Brett Yagel -

2     Q      Is that what it says?

3     A      Yes.

4     Q      Do you agree with that statement?

5            MR. PELOSO:  Do you mean presently

6     does he agree with the statement or at the

7     time?

8     Q      Do you agree with this statement now,

9  what I just read?

10    A      I think it has to be taken in the

11  entire context of what Miss Louie was saying.

12    Q      So let's go back then.  On March 17th,

13  2007 did you agree with that statement?

14    A      Yes.

15           MR. STEPANOVICH:  (Handing document to

16    be marked.)

17           (Whereupon, Campaign literature, Bates

18    Nos. POM0012600-02, was marked Plaintiff's

19    Exhibit 146 for identification.)

20    Q      I'm handing you now, Mr. Yagel, what

21  has been marked as Plaintiff's Exhibit 146, and

22  ask if you can identify that document?

23    A      This was part of the overall

24  electronic document that you presented to me in a

25  prior, not the entire but the overall document, I

1          - Brett Yagel -

2     think it was 143, yes.

3          Q     Mr. Yagel, just representing we are

4     handing it to you as it was produced to us.  It

5     was produced in chunks if you will and so that's

6     why I'm producing it to you in chunks.

7          A     Thank you.  Can you put all the chunks

8     together?

9                MR. PELOSO:  Please stick to the

10         question and the answer.

11         Q     Mr. Yagel, you've testified that there

12    was a column here on the left.  Just for my own

13    clarification, was there another column out to

14    the left or what we're seeing is the first

15    column?

16         A     I don't recall.

17         Q     On Exhibit 146, did you compose this

18    document then?

19         A     Yes.

20         Q     On 146 there appears to be some black

21    blocked-out words starting on the second page.

22    Do you see that?

23         A     Yes.

24         Q     Did you do that?

25         A     Yes.

                    - Brett Yagel -

1

2      Q      The final page, Mr. Yagel, in the

3  right-hand side there's a reference to the Pomona

4  Civic Association meeting on April the 4th, 2007.

5      A      Uh-huh.

6      Q      So can you explain to me what you're

7  communicating there as it relates to the entire

8  document?

9      A      The left column that has the highlight

10 was part of the Complaint that was filed.

11     Q      Yes.

12     A      And I searched through, because I had

13 recalled not saying any of this, and I had

14 searched through some of these expressed comments

15 that were supposedly attributable to myself and

16 some of the running mates.  And found out that

17 the comment that's highlighted in black was

18 actually from one of the LoHud article blogs.

19     Q      You make a reference here to the

20 Pomona Civic Association meeting.

21     A      Yes.

22     Q      How does that meeting relate to this

23 explanation?

24     A      There was a Pomona Civic Association

25 meeting that was held after I was elected into

1                    - Brett Yagel -

2    the office and I assumed the office trustee.

3        Q      So what I'm trying to find out is, did

4    any of these comments on the left-hand side

5    result from the Pomona Civic Association meeting

6    on April 4, 2007?

7        A      Did any of the comments on the left

8    side?

9        Q      I'm reading here.  On the right side

10   it reads, "The Pomona Civic Association meeting

11   was held on April 4, 2007 at 7:30.  The quotes

12   attributed in Section 160 were posted on a blog

13   in February 7, 2007, two months prior to the

14   Civic Association meeting."

15              I guess what I'm asking you, Mr.

16   Yagel, is what do you mean by that?  I'm just

17   trying to follow this.

18       A      I tracked the source of the comment.

19       Q      So the source of the comment then was

20   an online posting instead of --

21       A      Yes.

22       Q      Is that what you're saying?

23       A      Not my online posting.

24       Q      No.  You're referring to Engarcon,

25   right?

```
 1              - Brett Yagel -
 2     A     Yes.
 3     Q     Were you at the Pomona Civic
 4 Association meeting on April the 4th?
 5     A     I was.
 6     Q     Were there any minutes of that
 7 meeting?
 8     A     I took no minutes of that meeting.
 9     Q     Do you know if minutes were taken?
10     A     I don't.
11     Q     Do you recall hearing, was the
12 Congregation Rabbinical College of Tartikov
13 discussed at that meeting?
14     A     I think it was, yes.
15     Q     Do you know who spoke at that meeting
16 regarding Tartikov?
17     A     I believe Nick spoke, because he was
18 head of the ticket as mayor.  I may have spoken.
19 There were a few chat and chews that we had,
20 so...
21     Q     Was this Pomona Civic Association, is
22 that what you're referring to as a chat and chew?
23     A     No, this was a Pomona Civic
24 Association meeting.  And I stated, what I stated
25 was that when an application is finally presented
```

                    - Brett Yagel -

1  to the board it will be evaluated on the facts.

2      Q      This is what you said at this meeting

3  in April of '07?

4      A      It's a summary of what I stated, yes.

5  It's not a quote of what I stated, but it's a

6  summary of what I stated.

7      Q      So it's not the exact -- it was not

8  your exact statement; is that right?

9      A      That's correct.  It's not in quotes.

10      Q      What did Nick Sanderson say at the

11  meeting about the Tartikov project?

12      A      I do not recall.

13      Q      Did Rita Louie speak?

14      A      She may have spoken.

15      Q      Do you recall what she said?

16      A      No, I do not.

17          MR. STEPANOVICH:  (Handing document to

18      be marked.)

19              (Whereupon, Campaign literature, Bates

20      No. POM20040, was marked Plaintiff's Exhibit

21      147 for identification.)

22      Q      I'm handing you, Mr. Yagel, what's

23  been marked as Plaintiff's Exhibit 147.  See if

24  you can identify that document, please?

1          - Brett Yagel -

2     A     I believe this was part of the

3 campaign literature when I was running initially

4 for office prior to being installed.

5     Q     For?

6     A     Trustee.

7     Q     Did you participate in drafting this

8 document?

9     A     Drafting it, no.

10     Q     Did you review it?

11     A     I might have.

12     Q     This document, Mr. Yagel, says in the

13 fourth paragraph, "From what we know of the plan

14 as it has been leaked to the public, it will have

15 real environmental and safety problems."

16          What did you know at this time about

17 the environmental and safety problems of the

18 Tartikov project?

19     A     Nothing.

20     Q     So how did you know there were real

21 environmental problems?

22     A     I didn't, I didn't write it.

23     Q     Well, you said this was your campaign

24 material.

25     A     Yes, but I didn't write this.

- Brett Yagel -

Q       But you didn't disapprove of anything
here, did you?

A       I told you a recent while ago I
disapproved of the word fight for Pomona.

Q       Then you said a few minutes later that
you used the word fight?

A       Yes.

Q       That's already been decided and
discussed.

        MR. PELOSO:  He's asking about this
    document.

Q       I'm just talking about this document.
I'm trying to find out what the basis was for
this statement that the plan would have real
environmental and safety problems.

        MR. PELOSO:  I'm going to object.  He
    testified he didn't write it.

A       I didn't write it.

Q       Did you at any time see a plan of the
Rabbinical College of Tartikov for this property?

        MR. PELOSO:  At any point in time?

Q       Any point in time.

A       In January when I got the Preserve
Ramapo email, that's my first recollection.

                   - Brett Yagel -

1

2     Q      I'm handing you again, Mr. Yagel,

3  what's been marked as 134.  I think if we turn to

4  the last two pages, is this what you were

5  referring to?

6     A      Yes.

7     Q      These two documents?

8     A      Yes.

9     Q      POM13258 and POM13259, those are the

10  two documents that you are referring to --

11     A      Yes.

12     Q      -- that you saw?

13            Have you ever seen any other documents

14  at all regarding the proposal or the plan by

15  Tartikov other than those two documents?

16     A      Not to my knowledge or recollection.

17     Q      In the context of RLUIPA, Mr. Yagel,

18  did you ever become aware of what the term

19  compelling interest is?

20     A      It was discussed a long time ago, yes.

21     Q      What is your understanding of what

22  that term means?

23            MR. PELOSO:  Same objection regarding

24     he's not a lawyer.  But if you understand

25     it.

```
 1                    - Brett Yagel -

 2      A      I don't understand it.

 3      Q      But you were educated on RLUIPA,

 4  weren't you?

 5      A      Seven years ago.

 6      Q      At the time you were educated on what

 7  the term compelling interest was, right?

 8      A      I believe I was.

 9      Q      You don't remember any of that?

10             The answer is no?

11      A      No.

12             MR. STEPANOVICH:  (Handing document to

13      be marked.)

14             (Whereupon, Document entitled,

15      "Candidate Endorsement," Bates No. POM20296,

16      was marked Plaintiff's Exhibit 148 for

17      identification.)

18      Q      I'm handing you now, Mr. Yagel, what's

19  marked as Plaintiff's Exhibit 148, and ask if you

20  can identify that document?

21      A      It's a campaign endorsement.

22      Q      An endorsement by whom?

23      A      I believe it was the Republican Party.

24      Q      This endorsement was for Nick

25  Sanderson, Rita Louie and yourself; is that
```

1                    - Brett Yagel -

2    right?

3        A       Yes.

4        Q       Do you know who drafted this

5    endorsement?

6        A       No.

7        Q       Did you draft this endorsement?

8        A       No.

9        Q       Did you review this endorsement before

10   it went out?

11       A       I do not recall.

12       Q       Do you know if this endorsement

13   actually was sent out?

14       A       No, I do not.

15       Q       Do you know whether or not your

16   candidacy was endorsed by the Republican Party?

17       A       I believe it was.

18       Q       Would that have been the Republican

19   Party of what, Rockland County?

20       A       Rockland County.

21            MR. STEPANOVICH:   (Handing document to

22       be marked.)

23            (Whereupon, Document to Rita, Bates

24       No. POM20311, was marked Plaintiff's Exhibit

25       149 for identification.)

```
 1                  - Brett Yagel -

 2       Q       I'm handing you, Mr. Yagel, what's

 3  been marked as Plaintiff's Exhibit 149.  Can you

 4  identify Plaintiff's 149?

 5       A       It looks like something that was

 6  written during the campaign.

 7       Q       Were you the author of this?

 8       A       I may have been.

 9       Q       There's a reference in the third

10  paragraph from the bottom that overtures with the

11  Tartikov Rabbinical College had been made.

12            Do you know what that reference is?

13            MR. PELOSO:  I'm unclear.  You're

14       asking what he means by overtures?

15            MR. STEPANOVICH:  That's a fair

16       objection.  Let me withdraw that question,

17       please.

18       Q       That whole paragraph says, "But wait.

19  At the opening of the cultural center in

20  February, I and Nick overheard the mayor

21  discussing with another resident, whom I later

22  located in the village in my door to door

23  campaigning, that overtures with the Tartikov

24  Rabbinical College had been made.  I will swear

25  in court to this."
```

1          - Brett Yagel -

2          Is that what this document says?

3     A     Yes.

4     Q     Does that refresh your recollection as

5  to that incident with the door to door campaign?

6          MR. PELOSO:  I object.

7     Q     If you know you can answer.

8     A     I recall the specific -- I recall the

9  resident saying just don't get the lawyers

10  involved, him saying that.  And I was like, oh

11  my, you know.  He said that.  And I did happen to

12  find out later on when I was still collecting

13  signatures who the specific resident was when I

14  was going through collecting signatures.

15     Q     So you ultimately identified who that

16  was, that resident?

17     A     I determined who it was after I

18  knocked on his door and he did or did not sign

19  the petition.  I don't know whether he signed or

20  did not sign the petition.  But I remembered him

21  from that statement and I remembered during the

22  canvassing.

23     Q     Who was that person?

24     A     I don't -- I can remember his

25  characteristics.  Tall gentleman over six feet,

1                    - Brett Yagel -

2    older, salt and pepper hair.

3        Q      The last sentence says, "And while the

4    mayor has the latitude to engage in discussions

5    like this, what part of the January meeting was

6    he missing?"

7               Are you referring to the January 22nd,

8    2007 meeting?

9               MR. PELOSO:  Let me object, because

10        the mayor hasn't testified that he wrote

11        this.  He said he may have.  But to the

12        extent you can answer the question, please

13        go ahead.

14       A      I do not recall why I wrote that one.

15               MR. STEPANOVICH:  (Handing document to

16        be marked.)

17               (Whereupon, Campaign literature, Bates

18        No. POM33090, was marked Plaintiff's Exhibit

19        150 for identification.)

20       Q      I'm handing you now, Mr. Yagel, what's

21    been marked as Plaintiff's 150.  If you could

22    take a look at that, please?

23       A      (Complying.)  Yes.

24       Q      Do you recognize this document?

25       A      It's something from the campaign, my

```
 1                  - Brett Yagel -
 2    first campaign.
 3         Q       Your first campaign for?
 4         A       Trustee.
 5         Q       Approximately when would that have
 6    been?
 7         A       Between January 2nd, 2007
 8    approximately and when I took office on -- well,
 9    before I took office, so before March 20th.
10         Q       Was this Exhibit 150, was this a
11    campaign material solely for you?
12         A       No, it was a joint thing between --
13    there was another party that was running, the
14    Fair Government Pomona Party.  And we were all
15    just coming together as a community to get out
16    the vote.
17         Q       So there was a slate of candidates
18    running at this time, right?
19         A       Yes.
20         Q       And you were on the slate with who
21    else?
22         A       Nick Sanderson and Rita Louie.
23         Q       So I'm trying to discern.  The Fair
24    Government For Pomona, that's a party also?
25         A       That was a party, yes.
```

1                    - Brett Yagel -

2        Q      In the Village of Pomona?

3        A      Yes.

4        Q      Did you write any of this literature?

5        A      I don't recall.

6        Q      Did you review it before it went out?

7        A      I may have.

8        Q      You don't disagree with anything here

9    in Plaintiff's 150, do you?

10       A      Now or at the time?

11       Q      At the time.

12       A      No.

13              MR. STEPANOVICH:  (Handing document to

14       be marked.)

15              (Whereupon, Campaign literature, Bates

16       No. POM20576, was marked Plaintiff's Exhibit

17       151 for identification.)

18       Q      I'm handing you, Mr. Yagel, what's

19   been marked as Plaintiff's Exhibit 151, and ask

20   if you can review that, please?

21       A      (Complying.)  Okay.

22       Q      Do you know what this Exhibit 151 is?

23       A      This was part of my first run for

24   office electioneering campaign literature.

25       Q      The second page says, "Brett's Blurb."

                    - Brett Yagel -

1

2   Was that composed by you?

3       A       To the best of my recollection, yes.

4       Q       Do you know what purpose this was used

5   for?

6       A       Campaign literature.

7       Q       This would have been campaign

8   literature back in the 2007 election, right?

9       A       Correct.

10      Q       You don't disagree with anything there

11  under your blurb, do you?

12              MR. PELOSO:  Presently or?

13      Q       Back then.

14              MR. PELOSO:  Okay.

15      A       No, I do not.

16              MR. STEPANOVICH:  (Handing document to

17      be marked.)

18              (Whereupon, Copy of pamphlet of

19      Village Community Party, Bates No. POM20039,

20      was marked Plaintiff's Exhibit 152 for

21      identification.)

22      Q       I'm handing you now, Mr. Yagel, what's

23  been marked as Plaintiff's Exhibit 152, and ask

24  if you'd take a look at that, please?

25      A       (Complying.)

                    - Brett Yagel -

1

2    Q    Can you identify Plaintiff's 152?

3    A    This was campaign literature for when

4    I first ran for office in 2007.

5    Q    There's a column with your name above

6    it, Brett Yagel; is that right?

7    A    Correct.

8    Q    The last full paragraph there's

9    quotations.  I'm going to read from that block.

10   "I have met a significant number of residents who

11   share similar interests and concerns for our

12   village.  The beauty that attracted most of us to

13   this area is diminishing.  Protecting our

14   resources is important, and maintaining our

15   diversity as well as the feeling of community is

16   essential.  In order to develop a solution, you

17   sometimes have to be a part of the equation.

18   Bringing these concerns to the table and finding

19   solutions is key."

20            Did I read that accurately?

21   A    Yes.

22   Q    That was your quote back in '07?

23   A    Yes.

24   Q    What did you mean, Mr. Yagel, about

25   maintaining our diversity as well as the feeling

```
 1              - Brett Yagel -
 2   of community is essential?
 3       A      Pomona is a very diverse community,
 4   many different nationalities, colors, creeds,
 5   ethenticities (sic).  And I felt that this was
 6   essential that the community maintain this.
 7       Q      How did you propose maintaining the
 8   diversity of Pomona?
 9       A      It was a statement, not a proposal.
10       Q      Well, the question right above it
11   says, "Brett, how do you think your community
12   experience will benefit Village of Pomona
13   residents?"
14           So the statement as you call it,
15   "maintaining our diversity as well as the feeling
16   of community is essential," you're saying that --
17   I don't want to put words in your mouth.  But was
18   that a campaign platform of yours, to maintain
19   our diversity as well as a feeling of community?
20       A      But it was also protecting our
21   resources was important.
22       Q      Absolutely.
23       A      Which is one of the main reasons I ran
24   for office.
25       Q      Understood.
```

1                  - Brett Yagel -

2              So then what's in this block then is

3      not simply a statement, but it's a reason why you

4      ran for office; is that a fair statement?

5              MR. PELOSO:  Object to the form.

6      Q      Is it?

7      A      Yes.

8              MR. STEPANOVICH:  (Handing document to

9         be marked.)

10             (Whereupon, Campaign literature, Bates

11        No. POM12974, was marked Plaintiff's Exhibit

12        153 for identification.)

13     Q      I'm handing you now, Mr. Yagel, what's

14     been marked as Plaintiff's 153, and ask if you

15     could identify that?

16     A      This was part of the previous exhibits

17     that were already presented to me regarding the

18     Complaint that was filed and trying to locate the

19     source.

20     Q      Did you compose Plaintiff's 153?

21     A      Yes.

22     Q      On the second page, Mr. Yagel, at the

23     top it reads, "Most importantly, Brett wants to

24     unite village residents so that we can stand

25     together and legally fight developments that

```
 1                    - Brett Yagel -

 2     threaten the environment and our quality of

 3     life."

 4               Did I read that correctly?

 5        A     Yes.

 6        Q     That's your statement?

 7        A     Yes.

 8        Q     When did you prepare this statement,

 9     if you know?

10        A     2007.

11        Q     On the first page, Mr. Yagel, in the

12     top block, do you recall where you retrieved that

13     information from?  It begins with "building,

14     planning and zoning."

15        A     No.

16        Q     You turned over all your documents to

17     counsel, correct?

18        A     Yes.

19        Q     So there's no more complete let's use

20     a comparison document than what we have seen here

21     today?

22        A     I've turned over everything I have.

23               MR. STEPANOVICH:  (Handing document to

24        be marked.)

25               (Whereupon, Campaign literature, Bates
```

- Brett Yagel -

No. POM154, was marked Plaintiff's Exhibit

154 for identification.)

Q      I'm handing you now, Mr. Yagel, what's

been marked as Plaintiff's Exhibit No. 154, and

ask if you can identify that, please?

A      This was answers to questions that

were posed by the Journal News, I believe Nancy

Cutler, and my responses.

Q      So, for instance, under number one,

the question number one is why are you running

for office and then there's two paragraphs.  Did

you compose those paragraphs?

A      Yes.

Q      So you composed everything here on

this document in response to the questions,

correct?

A      Yes.

Q      On the right-hand column there's a

Comment BLY1.  Is that comment yours also?

A      Yes.

Q      I'm sorry, I think you said, and I

apologize, this was submitted to Nancy Cutler of

the Rockland County Journal News?

A      The Journal News.  I believe her last

```
 1              - Brett Yagel -
 2    name was Cutler.
 3         Q      How long have you been involved in
 4    Preserve Ramapo?
 5         A      I couldn't tell you.
 6         Q      You're still involved in Preserve
 7    Ramapo, correct?
 8         A      Not in an active capacity, no.
 9         Q      Why is that?
10         A      I'm an elected official.  I get emails
11    like everybody else.
12         Q      You were endorsed by Preserve Ramapo;
13    is that right?
14         A      Yes.
15         Q      You still know people involved in
16    Preserve Ramapo, right?
17         A      Yes.
18         Q      You know Bob Rhodes?
19         A      Yes.
20         Q      How well do you know Bob Rhodes?
21         A      We don't hang out socially together.
22         Q      How long have you known Bob Rhodes?
23         A      I couldn't put a time frame on it.
24    2005, 2003.
25              MR. STEPANOVICH:  (Handing document to
```

```
 1                    - Brett Yagel -
 2      be marked.)
 3              (Whereupon, Campaign literature, Bates
 4      No. POM20314, was marked Plaintiff's Exhibit
 5      155 for identification.)
 6      Q      I'm handing you, Mr. Yagel, what's
 7  been marked as Plaintiff's Exhibit 155.  Just for
 8  clarity on my side, this appears to me to be a
 9  final letter in which 154 was a draft.  And I
10  know that wasn't a question.  But if you could
11  review that and just tell me if what I suggest is
12  accurate or not?
13      A      I do not know.
14      Q      155 then was prepared by you; is that
15  right?
16      A      Yes.
17      Q      Do you recall if 155 was sent to the
18  Rockland County Journal News?
19      A      I do not recall.
20              MR. STEPANOVICH:  (Handing document to
21      be marked.)
22              (Whereupon, Campaign literature, Bates
23      No. POM20315, was marked Plaintiff's Exhibit
24      156 for identification.)
25      Q      I'm handing you, Mr. Yagel, what's
```

1                   - Brett Yagel -

2     been marked as Plaintiff's Exhibit 156, and ask

3     if you can identify that, please?

4          A     It appears to be a draft of some form

5     of the campaign literature from my first run in

6     office in 2007.

7          Q     Was Plaintiff's 156 prepared by you?

8          A     I cannot recall.

9          Q     Besides you, did you have somebody

10    else prepare your campaign literature?

11         A     I can't recall.  I know Nick did some,

12    Rita did some.

13              MR. STEPANOVICH:  (Handing document to

14        be marked.)

15              (Whereupon, Document from Journal

16        News, Bates Nos. RC9-14, was marked

17        Plaintiff's Exhibit 157 for identification.)

18         Q     I'm handing you, Mr. Yagel, what's

19    been marked as Plaintiff's Exhibit 157, and ask

20    if you can identify that?

21         A     This was a response that I submitted

22    to the Journal News in regards to their

23    endorsement of other candidates for the 2007

24    campaign, as well as others' responses.

25         Q     Was this a LoHud document, if you

1                    - Brett Yagel -

2    recall?

3         A      I believe it was, yes.

4         Q      This was submitted or published four

5    days before the election in 2007; is that

6    accurate?

7         A      Yes.

8         Q      This first page, this whole paragraph

9    was prepared and submitted by you; is that right?

10        A      It was submitted by me.

11        Q      At the very beginning you write,

12   "Being extremely active in Preserve Ramapo and

13   Coalition to Keep Ramapo Green, I've daily stood

14   side by side with Ramapo residents, even though I

15   live in Haverstraw, fighting downzoning and adult

16   student housing zones."

17               Is that what it says?

18        A      Yes.

19        Q      "I haven't just awakened and decided

20   to fight; I've been there, boots on the ground,

21   prior to ASH's enactment."

22               Is that what it says?

23        A      Yes.

24               MR. STEPANOVICH:  (Handing document to

25        be marked.)

1              - Brett Yagel -

2              (Whereupon, Campaign literature, Bates

3       No. POM20303, was marked Plaintiff's Exhibit

4       158 for identification.)

5       Q      I'm handing you now, Mr. Yagel, what's

6    been marked as Plaintiff's Exhibit 158, and ask

7    if you can identify that, please?

8       A      It looks like a draft of some campaign

9    materials for the first campaign back in 2007.

10      Q      Would that draft have been composed by

11   you?

12      A      Yes.

13             MR. STEPANOVICH:  (Handing document to

14      be marked.)

15             (Whereupon, Campaign item, Bates No.

16      POM21311, was marked Plaintiff's Exhibit 159

17      for identification.)

18      Q      I'm handing you, Mr. Yagel, what's

19   been marked as Plaintiff's Exhibit 159, and ask

20   if you can identify this?

21      A      It's something from the 2007 campaign.

22      Q      Would this have been a campaign

23   placard for the 2007 campaign in which you were

24   involved?

25      A      It could have been a placard or it

                    - Brett Yagel -

1    could have been a cut and paste.

2        Q      To be placed where?

3        A      Telephone poles.

4        Q      Could it have been used in any other

5    way?

6        A      Could it --

7               MR. PELOSO:  Could it or was it?

8        Q      Was it used in any other way?

9        A      I think I have one hanging in my

10   garage, I think.

11              MR. STEPANOVICH:  (Handing document to

12        be marked.)

13              (Whereupon, Campaign literature, Bates

14        Nos. RC3-6, was marked Plaintiff's Exhibit

15        160 for identification.)

16       Q      Mr. Yagel, the court reporter has

17   handed you what's been marked as 160, and I ask

18   if you can identify that, please?

19       A      Page 1 of Exhibit 160 was I believe

20   the poster board that hung, it was a 4 by 8

21   poster board, that hung about the campaign.  And

22   it says, "Thank you.  One village one voice."

23   After we won the election that was put on it.

24              Pages 2, 3 and 4 of the document I

                    - Brett Yagel -

1  believe come from the Village Community Party

2  website.

3      Q     These are obviously, Pages 2, 3 and 4,

4  biographical sketches, for lack of a better term,

5  of you, Mr. Sanderson and Miss Louie; is that

6  correct?

7      A     Yes.

8      Q     Did you prepare your biographical

9  sketch?

10     A     Yes.

11     Q     Turning you to the final page, last

12 paragraph.  "Most importantly, Brett wants to

13 unite village residents so that we can stand

14 together and legally fight developments that

15 threaten the environment and our quality of

16 life."

17          That's what it says?

18     A     Yes.

19     Q     And that's what you included in your

20 biographical sketch?

21     A     Yes.

22          MR. STEPANOVICH:  (Handing document to

23     be marked.)

24          (Whereupon, Email dated 3/16/07, Bates

1              - Brett Yagel -

2        No. POM21292, was marked Plaintiff's Exhibit

3        161 for identification.)

4        Q      I'm handing you, Mr. Yagel, what's

5    been marked as Plaintiff's Exhibit 161, and ask

6    if you can identify that, please?

7        A      This was an email from Rita Louie

8    regarding meeting the candidates of the slates.

9        Q      Was there an actual event that this

10   email references?

11       A      Was there an event?

12       Q      Yes.

13       A      It was a meet and greet at a

14   neighbor's house or village resident's house, I

15   don't recall which one.

16       Q      Did citizens turn out for this meet

17   and greet?

18       A      Some residents turned out, yes.

19       Q      Were you present along with Mr.

20   Sanderson and Miss Louie at this meet and greet?

21       A      I believe we all were.

22           MR. STEPANOVICH:  Maybe we can take a

23       five minute break.  Can we do that?

24           MR. PELOSO:  Sure.

25           MR. STEPANOVICH:  Thanks.

1              - Brett Yagel -

2              (Recess held.)

3              MR. STEPANOVICH:  (Handing document to

4      be marked.)

5              (Whereupon, Journal News article,

6      4/2/07, Bates Nos. RC1682-83, was marked

7      Plaintiff's Exhibit 162 for identification.)

8      Q     I'm handing you, Mr. Yagel, what's

9  been marked as Plaintiff's 162, and ask if you

10  can identify that, please?

11     A     It looks like an article that appeared

12  in the Journal News on April 2nd, 2007 regarding

13  Nick, myself and Rita being installed into

14  office.

15     Q     Five paragraphs up from the bottom it

16  begins "Sanderson."  "Sanderson said he and his

17  running mates had studied the Religious Land Use

18  and Institutionalized Persons Act, hiring Marci

19  Hamilton, an expert of RLUIPA and a law professor

20  for the Yeshiva University."

21              Is that right, that's what it says?

22     A     Yes.

23     Q     And that's what you were testifying to

24  earlier about retaining Marci Hamilton, does that

25  accurately reflect what you described earlier?

```
 1              - Brett Yagel -

 2      A      Yes.

 3              MR. STEPANOVICH:  (Handing document to

 4      be marked.)

 5              (Whereupon, Printout from lohud.com,

 6      Bates Nos. RC1834-36, was marked Plaintiff's

 7      Exhibit 163 for identification.)

 8      Q      I'm handing you now, Mr. Yagel, what's

 9  been marked as 163, and ask if you can identify

10  that?

11      A      It's a Journal News article.  I don't

12  know what the year states.

13      Q      It looks like January 26, 2008.

14      A      Yes.

15      Q      I'm going to direct you to, Mr. Yagel,

16  the fifth paragraph down that starts, "Mayor Nick

17  Sanderson and two village trustees, Rita Louie

18  and Brett Yagel, took office in April.  The three

19  started studying the Religious Land Use and

20  Institutional Persons Act while they were still

21  campaigning, hiring Marci Hamilton, an expert on

22  the act and a law professor for Yeshiva

23  University, as their adviser."

24              Is that what it says?

25      A      Yes.
```

1                    - Brett Yagel -

2        Q       Does that accurately reflect the

3    purpose for which Marci Hamilton was hired by

4    you, Rita Louie and Nick Sanderson?

5        A       Yes.

6               MR. STEPANOVICH:  (Handing document to

7        be marked.)

8               (Whereupon, Emails, Bates No.

9        POM16975, was marked Plaintiff's Exhibit 164

10        for identification.)

11        Q       I'm handing you now, Mr. Yagel, what's

12    been marked as 164.  It appears to be an email

13    chain dated March 8, 2007.  I'm interested in

14    sort of the bottom half of an email from Rita

15    Louie looks like to jfleisc@optonline.net and

16    then brett@villagecommunityparty.com and

17    nick@villagecommunityparty.com.  "Hi Judy."

18               I direct your attention now to about

19    the third paragraph from the bottom.  It starts

20    out, "put out are placed with the blessing and

21    permission of the property owners.  Nick

22    Sanderson, Brett Yagel and myself have retained

23    prominent development counsel to guide us through

24    this election as it relates to RLUIPA and

25    development issues and have a well thought out,

```
 1                    - Brett Yagel -
 2    comprehensive plan to deal with the issues coming
 3    about, without opening the village up to
 4    unnecessary lawsuits.  Brett Yagel (Preserve
 5    Ramapo) will be contacting you to discuss our
 6    platform further."
 7             Is that what it says?
 8        A    Yes.
 9        Q    Well, what I'm trying to find out, and
10    I think you've answered it.
11             MR. STEPANOVICH:  But, John, here's
12        the issue.  I think that we haven't seen
13        this retainer letter and he's indicating --
14        I'm trying to clarify the purpose of the
15        representation.  And I think we need to see
16        the retainer letter before we can inquire
17        any further.  Because if not, I'm going to
18        continue to ask him questions about that,
19        about that retainer, about their services.
20             MR. PELOSO:  He's already testified
21        several times as to the retainer.
22             MR. STEPANOVICH:  I'm just not certain
23        that -- I don't know if the communications
24        were privileged in the capacity of this
25        lawsuit.  So I'm going to inquire.  If you
```

```
 1              - Brett Yagel -
 2    are going --
 3         MR. PELOSO:  It doesn't matter in this
 4    lawsuit.  Communications between an attorney
 5    and a client are privileged.  If it's legal
 6    advice with counsel, it's privileged.
 7    Whether it's in the context of this lawsuit
 8    is not relevant.
 9         MR. STEPANOVICH:  Even to educate?
10         MR. PELOSO:  Yes.  Seeking legal
11    advice.  If the legal advice is whether to
12    have that print on the wall, that's legal
13    advice.
14         MR. STEPANOVICH:  Well, until we see
15    the retainer I don't know if we can make
16    that determination.  So I'm going to not ask
17    him anymore questions about those
18    communications until we see the retainer
19    letter.  I think we'll just hold it open.
20         MR. PELOSO:  I think it makes sense if
21    you want to see the retainer letter to write
22    us a letter, just so that we have a record
23    of it.  I'm not going to agree at this point
24    to turn it over.
25         MR. STEPANOVICH:  Well, we are making
```

1                    - Brett Yagel -

2       a request now for the retainer letter.

3    DATA REQUESTED:_____

4             MR. PELOSO:  I'll make a note.

5             MR. STEPANOVICH:  (Handing document to

6       be marked.)

7             (Whereupon, Complaint Form, NYS Office

8       of the Attorney General, Public Integrity

9       Unit, Bates No. POM20321, was marked

10       Plaintiff's Exhibit 165 for identification.)

11       Q     I'm handing you, Mr. Yagel, what's

12    been marked as Plaintiff's Exhibit 165, and ask

13    if you can identify this, please?

14       A     It looks like a New York State Office

15    of Attorney General Public Integrity Unit

16    Complaint Form.

17       Q     Was this complaint filed by you?

18       A     Yes.

19       Q     Against whom?

20       A     Supervisor -- Christopher St.

21    Lawrence, Town of Ramapo Supervisor.

22       Q     What was the basis of your complaint

23    against Mr. St. Lawrence?

24       A     I do not recall.  It's there, it's in

25    very small print.  "I am writing to you briefly

```
 1                   - Brett Yagel -
 2   concerning potential criminal matters regarding
 3   Town of Ramapo" --
 4        Q     Holy mackerel.  Okay, please, I'm
 5   sorry.  Could you start over?
 6              (Off-the-record discussion.)
 7        Q     Let's start at the beginning then.
 8   What you are reading for the record is the basis
 9   of the complaint that you filed against Mr. St.
10   Lawrence.  If you could read it for the record,
11   please?
12        A     Yes, but I don't know the date that I
13   filed this.
14        Q     We'll come back to that.  We are
15   just going to --
16        A     "I'm writing to you today concerning
17   possible criminal matters regarding Town of
18   Ramapo government officials working in collusion
19   with the developer in order to gain votes during
20   the previous and possible" -- I can't read that
21   word.
22              MS. SOBEL:  Future.
23        A     "Town board election.  It is my
24   belief" -- and then I can't read the rest of it.
25   It's incomplete.
```

```
 1                - Brett Yagel -
 2       Q       Did you actually file a complaint
 3  against Mr. St. Lawrence with the Public
 4  Integrity Unit of the New York State Office of
 5  the Attorney General?
 6       A       I cannot recall.
 7       Q       Do you recall ever being contacted by
 8  the New York Office of the Attorney General?
 9       A       I know I had a conversation with the
10  New York State Attorney General Unit, Lemuel
11  Srolovic.
12       Q       Was it in reference to Mr. St.
13  Lawrence?
14       A       It could have been, yes.
15       Q       Would it have been, if you know, in
16  response to some complaint that you filed against
17  him?
18       A       Possibly, yes.
19       Q       Do you know how that complaint against
20  Mr. St. Lawrence was resolved, ultimately
21  resolved?
22       A       No.
23       Q       You referenced a developer on this
24  complaint form, which would be 165.  What
25  developer would that have been?
```

1                    - Brett Yagel -

2              MR. PELOSO:  Was that or would have

3      been?

4      Q      Do you recall which developer you

5  referenced?

6      A      This might have been with regards to

7  the Patrick Farm.

8              MR. STEPANOVICH:  (Handing document to

9      be marked.)

10             (Whereupon, Email dated 4/27/07, Bates

11     No. POM17046, was marked Plaintiff's Exhibit

12     166 for identification.)

13     A      (Perusing document.)  Okay.

14     Q      Do you recognize this document, Mr.

15  Yagel, 166?

16     A      Yes.

17     Q      What is it?

18     A      I believe that it is an email that I

19  sent to Mayor Nicholas Sanderson in late April of

20  2007 regarding reaching out to our elected

21  congressional representative at the time, John

22  Hall.

23     Q      In reference to what issue?

24     A      RLUIPA and the federally and state

25  protected wetlands on the Patrick Farm.

1                - Brett Yagel -

2     Q      First of all, this is an email from

3  Brett Yagel at brett_yagel@glic.com, correct?

4     A      Yes.

5     Q      Was that one of the emails that you

6  described earlier when you said you had three

7  emails?

8     A      I have three current emails.  This was

9  an email that was at my old job.  And I had

10  forwarded this home as part of the search

11  criteria.

12     Q      And you don't have this email address

13  anymore, correct?

14     A      I left that company.

15     Q      Did this email result in a letter to

16  the congressman?

17     A      I did not write an email to or a

18  letter to Congressman John Hall.

19     Q      This was sent to Mr. Sanderson.  What

20  was the purpose for which it was sent to Mr.

21  Sanderson?

22     A      As mayor he may have attended or

23  wanted to attend an upcoming event that

24  Congressman Hall was going to be at in the

25  region, and to provide him some background.

                    - Brett Yagel -

1

2    Q       Background on your position on RLUIPA,

3  is that one of the areas of background that you

4  wanted to provide?

5    A       Yes.

6    Q       Then it looks as if you were providing

7  information about water drainage off the Tartikov

8  property; is that right?

9    A       Yes.

10   Q       How did you know that there was an

11 issue with the water drainage on the Tartikov

12 property?

13   A       Because of the nor'easter that had

14 occurred, as I indicated there, and the

15 topography of the land and the way the water was

16 running from one side to the other side.

17   Q       The other side of the highway?

18   A       Yes, underneath the culvert.

19   Q       You personally observed that?

20   A       Yes.

21   Q       Approximately when was that

22 observation made?

23   A       It was either during or just after the

24 nor'easter.

25   Q       I'm not trying to guess, but sometime

1                    - Brett Yagel -

2    before April of '07?

3        A      I can't remember which nor'easter it

4    was, but I would assume that's -- I'm not going

5    to assume anything.  I can't recall.

6        Q      Okay, all right.

7               So you observed water running from the

8    Tartikov property into an underground culvert

9    under Route 202?

10       A      No, I observed water running from the

11   Tartikov property going underneath New York State

12   Route 306, not U.S. Route 202.

13       Q      The water was running in an

14   underground culvert?

15       A      In an underground culvert.

16       Q      And you observed this during what you

17   described as a nor'easter?

18       A      Yeah.

19       Q      Just generally for the record, how do

20   you describe -- what is a nor'easter?

21       A      A heavy rain event with wind-driven

22   rains.

23              MR. STEPANOVICH:  (Handing document to

24      be marked.)

25              (Whereupon, Document entitled,

1              - Brett Yagel -

2         "Community View - A Tale of Two Towns - One

3         Divided," Bates No. POM20328, was marked

4         Plaintiff's Exhibit 167 for identification.)

5         Q      I'm handing you now, Mr. Yagel, what's

6    been marked as Plaintiff's Exhibit 167, and ask

7    if you can identify that, please?

8         A      It looks like a draft of a potential

9    Community View letter.

10        Q      Written by you?

11        A      Yes.

12        Q      There's eight pages attached to this

13   document.  Did you write all eight pages?  I want

14   to ask you questions, but I want to ask you

15   questions only on what relate to you.

16        A      No.

17        Q      Can you just educate me, can you tell

18   me how many pages you wrote?

19        A      I believe up to -- just it stops after

20   my old work phone number 212-383-4300.  I did not

21   write "A village for Monsey area as well."

22        Q      I'm just trying to find that.

23        A      It's on the third to last page.

24        Q      Oh, I see.  I got it.

25               So where you say, "Thank you Brett

1                    - Brett Yagel -

2    Yagel 212-383-4300" that's where it cuts off?

3        A        Yes.

4        Q        Who was this Community View submitted

5    to?

6        A        It was not submitted.

7        Q        Was it ever published anywhere?

8        A        No.

9        Q        Did someone ask for you to prepare

10   this document?

11       A        No.

12       Q        In the first page, second from the

13   last paragraph, it starts "Perhaps."  I'm going

14   to ask you a question.  It says, the second

15   sentence there, "The same individuals who have

16   not abided by the zoning and development laws are

17   the first to articulate that their 'rights are

18   being violated'.  It appears that the

19   citizens/residents of this area are caught up in

20   a 'Catch 22'.  How convenient for the 'voting

21   bloc.'  And the politicians who are suppose to

22   listen to all sides and uphold the law are only

23   listening to those who 'provide a vote' and are

24   neglent in their duties at upholding town laws.

25   And yet, rather than enforce existing laws, the

```
 1              - Brett Yagel -
 2   town adopts another unenforceable law regarding
 3   adult student housing.  Question, if the town
 4   can't uphold their existing laws, then why are
 5   they creating new laws?  Of yes, to appease the
 6   'block vote.'"
 7              Did I read that accurately?
 8       A    Yes.
 9       Q    You wrote that?
10       A    I believe I did.
11       Q    And you write the final sentence, "Of
12   yes, to appease the 'block vote.'  Who are you
13   referring to?
14              MR. PELOSO:  Referring to in terms of
15       what?
16       Q    A particular bloc vote?
17       A    Yes.
18       Q    Who is that bloc vote that you are
19   referring to?
20       A    The developer on the Patrick Farm.
21       Q    Mr. Lebovits?
22       A    Yes.
23       Q    On the next page, Mr. Yagel, the next
24   to last paragraph.  "In theory, a politician
25   should be a leader.  An individual who is able to
```

1                  - Brett Yagel -

2   take charge and steer the community toward a

3   greater public good.  Sometimes the road to do

4   such is rough.  However, a politician has many

5   support mechanisms.  One of which is the law.  In

6   the end, however, it should be a politician's

7   responsibility to unite a community/region and

8   not divide it."

9              You wrote that?

10      A     Yes.

11      Q     The next page.  The fourth paragraph

12  from the bottom.  It starts, "which professes."

13  At the end, the last sentence, "For those of us

14  residents that live in the area most affected by

15  Ramapo's recent debacle and decisions, the times

16  (and our community) is changing and not for the

17  better."

18              Is that accurate what I read?

19      A     I was paraphrasing.

20              MR. PELOSO:  He's just asking if it's

21      accurate what he read.

22      A     Yes.

23      Q     What were you paraphrasing, Mr. Yagel?

24      A     It was the best of times, it was the

25  worst of times.

1              - Brett Yagel -

2      Q      Approximately what year was the best

3  of times and the worst of times?

4      A      Prior to the town's enacting -- the

5  Town of Ramapo enacting the comprehensive master

6  plan.

7      Q      That contained adult student housing

8  laws?

9      A      No, it didn't contain the adult

10  student housing laws at the time.  It allowed for

11  the downzoning of certain areas.

12      Q      So then in your opinion, I'm just

13  trying to discern when the best of the times was,

14  Mr. Yagel?

15      A      When the Patrick Farm was zoned at one

16  home per two acres on an ecologically sensitive

17  piece of property.

18      Q      When was the worst of times?

19      A      When the town started its downzoning

20  on this environmentally sensitive piece of

21  property and when it did not fine the developer

22  for the destruction of state and federally

23  protected wetlands.

24      Q      You reference the term downzoning.  I

25  just want to make sure I understand that concept.

1                    - Brett Yagel -

2    What is downzoning as you use that term?

3        A        Downzoning is when you zone down a

4    development, the acreage.  In this particular

5    instance it was one home per two acres down to

6    one home per acre.

7        Q        So it went -- I'm making sure I

8    understand it.  The zoning then went, originally

9    it was one home per two acres and it went then to

10   one home for one acre?

11       A        Yes.

12       Q        That was the downzoning that affected

13   Patrick Farms?

14       A        Yes.

15       Q        Was this article in response -- the

16   article the best of times and the worst of times,

17   was it in response to an earlier article in the

18   newspaper?

19       A        It was not an article.  It was a draft

20   that was never submitted.  And it was in response

21   to the comprehensive master plan that was enacted

22   and also the establishment of the four sites

23   afterwards.

24       Q        When you say sites, you mean the four

25   sites on Patrick Farms?

1                    - Brett Yagel -

2      A      No, the four adult student housing

3  zone sites.

4      Q      Your opinion here was in reference to,

5  I'm sorry, Patrick Farms and then the four sites

6  zoned for adult student housing?

7      A      It also had to do with the petition

8  that was before both the Ramapo Supervisor and

9  the Town of Haverstraw Supervisor regarding the

10  potential formation of the Village of Ladentown.

11      Q      What do you know about the Village of

12  Ladentown?

13              MR. PELOSO:  Object to the form of the

14      question.

15      Q      At the time back when you drafted this

16  was the movement to create the Village of

17  Ladentown created?

18      A      Was the movement?

19      Q      Yes.

20      A      Can you repeat the question or

21  rephrase it?

22      Q      Yes, I will.

23              At the time you wrote this document

24  was the effort to create the Village of Ladentown

25  in existence?

1                     - Brett Yagel -

2      A      I believe it was.

3      Q      Turn your attention on that document,

4  Mr. Yagel, to the page after where you say where

5  it's cut off, where you said that you stopped

6  writing.  And I'm going to turn your attention to

7  the second paragraph from the bottom.  "The

8  decision to create Ladentown was made long before

9  the town created the student housing law.

10 Members of the local population who are activists

11 on behalf of the Village of Ladentown have openly

12 said that they do not want Hasidics moving into

13 the neighborhood.  Now they are using the housing

14 law (that most likely will never be relevant to

15 the property at Patrick Farms if they allow the

16 developer to get on with developing his land

17 under the large, full-scale zoning that was

18 proposed by the master plan) as a new pretext for

19 concern."

20             Do you see that?

21     A      Yes.

22     Q      Did I read that accurately?

23     A      Yes.

24     Q      Was that your understanding generally?

25 Well, first of all, did you ever hear that the

                    - Brett Yagel -

Village of Ladentown was being proposed because

they didn't want Hasidics moving into the

neighborhood?

     A      No.

     Q      You never heard that?

     A      No.

     Q      Not at all?

     A      No.

     Q      From no one?

     A      No.

     Q      Ever?

     A      Ever.

     Q      What do you understand the Village of

Ladentown's incorporation efforts -- Strike that.

Do you understand?  I was going to try to

rephrase that question.

            MR. PELOSO:  Object to the form.

     Q      Let me just try to get a question out

there to protect this record.

            Did you understand what the basis was

for the formation of the Village of Ladentown?

     A      Yes.

     Q      What was your understanding back then?

     A      It was to control the zoning of the

1              - Brett Yagel -

2    local area on an environmentally sensitive piece

3    of property.

4         Q     Patrick Farms, would the Village of

5    Ladentown encompass Patrick Farms property?

6         A     Yes.

7         Q     Were you involved in the efforts to

8    incorporate the Village of Ladentown?

9         A     Yes.

10        Q     Was there an organization that came

11   about for the incorporation efforts of the

12   Village of Ladentown?

13        A     I believe it was the Coalition to Keep

14   Ramapo Green.

15        Q     Is that organization still in

16   existence?

17        A     Not to my knowledge.

18             MR. STEPANOVICH:  (Handing document to

19        be marked.)

20             (Whereupon, Document entitled,

21        "Another Example of Why Things Are Wrong In

22        Ramapo," Bates No. POM20326, was marked

23        Plaintiff's Exhibit 168 for identification.)

24        Q     I'm handing you what you have now in

25   front of you, Mr. Yagel, Plaintiff's Exhibit 168.

                    - Brett Yagel -

1  And ask if you have -- if you can identify that,

2  please?

3      A      (Perusing document.)  Okay.

4      Q      Do you recognize this document?

5      A      Yes.

6      Q      Did you write this document?

7      A      I do not recall.

8      Q      If you need some more time to go

9  through it to answer that question in a more

10 definitive way, I'll give you the time.

11     A      (Perusing document.)  Okay.

12     Q      Now after reviewing the document again

13 I ask the question again.  Did you author this

14 Exhibit 168?

15     A      I do not recall.

16     Q      Have you ever seen it before today?

17     A      I do not recall.

18     Q      Is there an Orthodox and Hasidic

19 voting bloc in Rockland County?

20     A      Yes.

21     Q      Is it fair to say that you didn't at

22 the time back in '07, '06/'07 you did not agree

23 with Mr. St. Lawrence's policies in the Town of

24 Ramapo?

1           - Brett Yagel -

2           MR. PELOSO:  Object to the form.

3      Q      If you understand the question.  Do

4   you understand the question?

5      A      No.

6      Q      Did you agree with the adult student

7   housing legislation that was enacted in Ramapo?

8      A      No.

9      Q      You keep using the word downzoning.

10  Did you agree with the downzoning that was

11  effected in the Town of Ramapo?

12     A      No.

13     Q      And you've never seen this document

14  before, 168, correct?

15     A      I cannot recall.

16     Q      And you don't recall whether or not

17  you authored it; is that right?

18     A      That's correct.

19     Q      Could you have authored that article?

20          MR. PELOSO:  Object to the form.

21     Q      Is it possible?

22     A      Is it possible, yes.

23          MR. STEPANOVICH:  (Handing document to

24      be marked.)

25          (Whereupon, Emails, Bates No.

1              - Brett Yagel -

2       POM20858, was marked Plaintiff's Exhibit 169

3       for identification.)

4       Q      I'm handing you now, Mr. Yagel, what's

5   been marked as Plaintiff's Exhibit 169, and ask

6   if you can identify that, please?

7       A      This is an email that was sent to --

8   it had to do with a letter and electronic email

9   that was going to be sent to Deputy Town

10  Supervisor Fran Hunter regarding an online

11  petition for the Patrick Farm.

12      Q      Was this letter at the bottom of the

13  first page, was that composed by you?

14      A      Yes.

15      Q      Do you know whether or not this letter

16  was ever sent?

17      A      I believe it was.

18             MR. STEPANOVICH:  (Handing document to

19      be marked.)

20             (Whereupon, Email dated 3/9/10, Bates

21      No. POM19274, was marked Plaintiff's Exhibit

22      170 for identification.)

23      Q      I'm handing you, Mr. Yagel, what's

24  been marked as Plaintiff's Exhibit 170, and ask

25  if you can identify that, please?

1                    - Brett Yagel -

2      A      It's an email that I sent to the

3  trustees in March of 2010 regarding a Google

4  alert that I had received.

5      Q      You composed this email, correct?

6      A      I composed the line, "Environmental

7  Lawyer: RLUIPA is bad"...  And what I added

8  personally, "but we already knew this."

9             "Environmental Lawyer: RLUIPA is bad"

10  was the title of the link for the alert that was

11  kicked off for RLUIPA.

12      Q      And then at the bottom some articles

13  popped up triggered by the search term RLUIPA is

14  bad, is that what that is?

15      A      Triggered by the search term RLUIPA.

16      Q      I see.  Okay.

17             Coming back, Mr. Yagel, you supported

18  the efforts of the movement to incorporate the

19  Village of Ladentown; is that right?

20      A      Yes.

21      Q      And you supported those efforts prior

22  to running for office in 2007?

23      A      Long before, yes.

24      Q      And you support those efforts after

25  your election to office in 2007?

1                    - Brett Yagel -

2      A      No.

3      Q      As we sit here today you do not

4  support the incorporation of the Village of

5  Ladentown?

6      A      That's correct.

7      Q      Why?

8      A      There is no Coalition to Keep Ramapo

9  Green any longer.

10     Q      I'm sorry, can you explain that answer

11 to me?

12     A      There is no membership now in the

13 Coalition to Keep Ramapo Green.

14     Q      And the Coalition to Keep Ramapo Green

15 was the coalition that was supporting the efforts

16 to incorporate Ladentown?

17     A      Correct.

18     Q      You personally support the

19 incorporation of the Village of Ladentown?

20     A      Yes.

21     Q      Were you a member of the Board of

22 Trustees of the Village of Pomona?

23     A      What year, month?

24     Q      January 22nd, 2007.

25     A      No.

1                    - Brett Yagel -

2        Q      That's when you were running for

3    election?

4        A      Yes.

5        Q      Do you recall speaking at the village

6    board meeting on January 22nd, 2007?

7        A      Yes.

8        Q      You recall what you spoke about?

9        A      I believe it was the dormitory laws

10   and it might have been related to the heights of

11   the buildings and the law.

12       Q      Do you recall your statement to the

13   board that night?

14       A      Not fully, no.

15       Q      I hand you, Mr. Yagel, what's been

16   previously marked as Plaintiff's Exhibit 118, and

17   specifically direct your attention to Page RC1113

18   and 1114.  I'll give you a chance to look at that

19   and I'll have a question or two for you.

20       A      111 --

21       Q      3, the Bates number on the bottom

22   right-hand corner.  It's actually on top, Page 49

23   of the transcript.

24              MR. PELOSO:  Right here.

25       A      Okay.

```
 1                   - Brett Yagel -

 2        Q      Okay?

 3        A      Okay.

 4        Q      You've had a chance to review that; is

 5   that right?

 6        A      Yes.

 7        Q      What appears to be statements

 8   attributed to you.

 9               Do you recall making those statements

10   at that meeting on January 22nd, 2007?

11        A      Yes.

12        Q      At that time what did you understand

13   about the codes on the book in the Village of

14   Pomona that you're referring to?  You say, "I

15   understand there are codes on the book in the

16   Village of Pomona, and I understand that you're

17   tweaking the laws based upon the precedents."

18               What were you referring to?

19               MR. PELOSO:  What codes you mean?

20        Q      Yes, what codes?

21        A      Regarding the dormitory law.

22        Q      On this night on January 22nd, 2007 do

23   you recall whether or not the dormitory

24   legislation came before the board to be voted

25   upon?
```

1                    - Brett Yagel -

2       A       I believe it did.  Page 50, first

3    paragraph.  "Regarding the dormitory law, on the

4    second, page, number twelve."  I was commenting

5    on the misspelling that sometimes occurs in laws

6    before they are fully adopted.

7       Q       Were you voicing your support for the

8    passage of the dormitory law?

9       A       I was voicing my support for

10   solidifying the codes in the Village of Pomona to

11   make them defendable in court.

12      Q       At this time on January 22nd, 2007 was

13   it your opinion that at least the dormitory code

14   was not, quote, defendable in court?

15      A       That it might have been indefensible

16   in court.

17      Q       As it existed prior?

18      A       At it existed prior to this public

19   hearing.

20      Q       Why did the dormitory law need to be

21   defended in court?

22      A       It didn't need to be.

23      Q       There was a law passed, a dormitory

24   law passed on January 22nd, 2007; is that

25   correct?

- Brett Yagel -

1

2     A     I believe there was, yes.

3     Q     Was that the law that you were

4   referring to that needed to be addressed as you

5   reference in your prior comments on Page 1113?

6     A     I was addressing the public hearing

7   regarding the dormitory law.

8     Q     It was your opinion then that the

9   dormitory law needed to be changed?

10    A     Yes.

11    Q     Why?

12    A     A law is only as good as it's

13  defensible in court.  As it was presented before

14  the board and the public, it was not defensible

15  and there were conflicts in the law.

16    Q     That is why in your opinion it needed

17  to be changed on January 22nd, 2007?

18    A     If that's why it needed to be changed

19  in January?

20    Q     Yes.

21    A     I don't know why it was put up for

22  January 22nd or not.  But it was a public hearing

23  that was held on that evening regarding the law.

24  Why that specific date was chosen, I have no

25  idea.

1              - Brett Yagel -

2      Q      Let's forget about the date for the

3      moment.  The law that we are talking about is the

4      dormitory law in the Village of Pomona, correct?

5      A      That's correct.

6      Q      Are you generally familiar with what

7      the change --

8      A      Not fully.

9      Q      Were you advocating that the board

10     adopt this change of law on January 22nd, 2007?

11     A      I was advocating that the law be

12     defensible in court.

13     Q      What do you mean by defensible in

14     court?

15     A      If there's a conflict in the law and

16     there's a lawsuit brought against the law, the

17     village would lose.

18     Q      Did you determine that there was a

19     conflict in the law prior to this?

20     A      I'm not an attorney.

21     Q      You supported the passage of the law

22     on January 22nd, 2007; yes or no?

23             MR. PELOSO:  Object to the form.

24     Q      Did you?

25             MR. PELOSO:  What law are you

1                    - Brett Yagel -

2        referring to?

3        Q        The dormitory law.

4        A        Local Law No. 1 2007.  I wasn't on the

5   board.  I wasn't privy to anything.

6        Q        Did you support that as a private

7   citizen?

8        A        Yes.

9        Q        You were running for trustee at that

10  point?

11       A        Yes.

12       Q        Did you support that because there was

13  a, quote, conflict in the dormitory law that

14  needed to be corrected?

15                MR. PELOSO:  Object to the form.

16       A        I did not know if there was a

17  conflict.  All I know is that periodically laws

18  are reviewed depending upon what case matter,

19  what case law has been established or what recent

20  decisions have come down as part of every

21  municipalities and to review cases that come down

22  and tweak the laws.

23       Q        What information did you have at this

24  time on January 22nd, 2007 that the dormitory law

25  needed to be tweaked?

- Brett Yagel -

1

2     A     All I had was the new case law and I

3     went online and saw the old case law, the village

4     law I should state.

5     Q     The village code that defined

6     dormitories, the prior definition of dormitory,

7     is that what you had?

8     A     I had the old code and looked at it.

9     I can't recall the specifics of it.  And I looked

10    at the new code that was available to the public

11    at the meeting.

12    Q     You referenced case law.  What case

13    law did you have available to you at this time?

14    A     In this particular instance, I did not

15    have any case law.  I was making a generalized

16    statement that now being an elected official I

17    realized that periodically you have to review

18    your laws depending upon what happens in courts.

19    Q     But at the time back in January '07

20    all that you reviewed was the prior dormitory law

21    and the proposed dormitory law in January of '07;

22    is that right?

23    A     Yes.

24    Q     You say, "Okay.  So in defense of the

25    board, they're doing this to protect all of us,

1              - Brett Yagel -

2    because when this goes to court, we will all be

3    in jeopardy, that's number one, okay."

4              Is that what it says?

5    A     Uh-huh.

6    Q     You said that, right?

7    A     Yes.

8    Q     And when you talk about when this goes

9    to court, what are you referring to?

10   A     I could be referring to Paul Savad's

11   comments about the Tartikov organization being

12   well financed.

13   Q     When you say "we will all be in

14   jeopardy," what do you mean by that?

15   A     Village taxpayers.

16   Q     Will have to potentially pay for

17   something, is that what you mean?

18   A     Where are you reading that from?

19   Q     It says, "In defense of the board,

20   they're all doing this to protect all of us,

21   because when this goes to court, we will all be

22   in jeopardy, that's number one, okay."

23             See that?

24   A     Yes.

25   Q     I asked you what jeopardy was and I

1                  - Brett Yagel -

2     thought your answer was taxpayers; is that right?

3         A       Uh-huh.

4         Q       I'm trying to understand why the

5     taxpayers would be in jeopardy.

6         A       We would be footing the bill for any

7     litigation.

8         Q       Prior to making this statement on

9     January 22nd, 2007 did you talk to any member of

10    the board of trustees about this dormitory law?

11        A       I don't recall.

12        Q       Do you recall expressing your

13    sentiment that the dormitory law needed

14    clarifying to any member of the board prior to

15    January 22nd, 2007?

16        A       Do not recall.

17        Q       Do you recall any member of the board

18    discussing that issue with you prior to January

19    22nd?

20        A       Nick Sanderson may have discussed it

21    with us because he was running with us in the

22    campaign.

23        Q       What did he tell you about that

24    dormitory law?

25        A       I cannot recall.

1                    - Brett Yagel -

2      Q      Do you recall whether or not he told

3  you the law needed to be changed?

4      A      I do not recall.

5      Q      Just for clarification, you say at

6  line 16, "And I understand that you're tweaking

7  the laws based upon the precedents that need to

8  be addressed."

9            What formulated your understanding

10  that the law needed to be tweaked based upon

11  precedents?

12            MR. PELOSO:  Object to the form.

13      Q      If you understand the question.

14      A      I believe it had to do with statements

15  that were made at the meeting regarding public

16  statements that had been made at the meeting

17  regarding laws on the books.

18      Q      That would have included public

19  statements by the public at large?

20      A      Yes.  But I don't recall everybody's

21  testimony or the specifics of it.

22      Q      I understand.

23            Do you recall at this meeting on

24  January 22nd, 2007 was the public comment in

25  support generally of passing this law?

                    - Brett Yagel -

    A       You know, I don't recall.

    Q       Were there a lot of people at this
meeting on January 22nd, 2007?

    A       Yes.

    Q       Was it a packed house?

    A       Yes.

    Q       Were there a lot of public speakers on
this issue of the dormitory law?

    A       There were a lot of public speakers.
Regarding this, I don't recall, because there was
also an open period when the public had a chance
to speak.

    Q       During this time prior to the passage
of this law did you ever talk with anybody in the
Village of Pomona that did not support the
passage of this dormitory law?

    A       I do not recall.

    Q       Did you express your opinion on this
law to Nick Sanderson?

            MR. PELOSO:  Object to the form.
    Vague as to time.

    A       I don't recall.

    Q       Did you ask Nick Sanderson to vote in
favor of this law?

1                    - Brett Yagel -

2      A      I don't recall.

3      Q      Did you ask anybody else on the board

4  of trustees to vote in favor of this law?

5      A      I do not recall.

6      Q      During the time of your statement on

7  January 22nd, 2007 was Marci Hamilton still

8  retained by you and Mr. Sanderson and Miss Louie?

9      A      I believe she was retained, but I'm

10 unsure.

11              (Recess held.)

12              MR. STEPANOVICH:  (Handing document to

13      be marked.)

14              (Whereupon, Email dated 4/7/07, Bates

15      No. POM16969, was marked Plaintiff's Exhibit

16      171 for identification.)

17      Q      I'm handing you, Mr. Yagel, what's

18 been marked as Plaintiff's Exhibit 171, and ask

19 if you can identify that?

20      A      This is an email regarding an RLUIPA

21 seminar that I believe was held or going to be

22 held at the Suffern Free Library.

23      Q      Did you attend the RLUIPA seminar?

24      A      Yes.

25      Q      It says, "at which Doris will be the

```
 1                    - Brett Yagel -
 2    speaker."  Is that a reference to Village Counsel
 3    Doris Ulman?
 4        A     Yes.
 5        Q     Did Miss Ulman speak at that seminar?
 6        A     Yes.  And I believe you were wearing a
 7    peach shirt.
 8        Q     I don't think so.
 9        A     I thought you were.
10        Q     Peach is not my color.
11        A     Okay.
12        Q     "PS," it says, "Brett, might want to
13    pass this on to some Pomona people on our email
14    list who might be interested in getting educated
15    on RLUIPA."
16              What did you understand that to mean?
17        A     Sending out a blast email.
18        Q     To Pomona residents?
19        A     Yeah.
20        Q     For what purpose?
21        A     To let them see the RLUIPA seminar.
22        Q     Did you in fact do a blast email in
23    reference to this seminar?
24        A     I do not recall if I did.
25        Q     Again, looking at the top of the
```

1           - Brett Yagel -

2    email.  It's from Rita Louie, correct?

3        A     Yes.

4        Q     To Nick Sanderson and yourself.  You

5    have any idea why it's only to you and Mr.

6    Sanderson and not the other members of the board?

7        A     No.

8              MR. STEPANOVICH:  (Handing document to

9        be marked.)

10             (Whereupon, Printout from lohud.com,

11        Bates Nos. RC614-21, was marked Plaintiff's

12        Exhibit 172 for identification.)

13       Q     You have been handed, Mr. Yagel,

14   what's been marked as Plaintiff's Exhibit 172.

15   And just for expediency I'm not going at this

16   point to ask you any questions about the content.

17   This appears to be a posting on the lohud.com.

18   Is that what it appears to be to you?

19       A     The New York Journal News, yeah.

20       Q     On the front page it says "Author

21   camphillroad."  Do you see that?

22       A     Yes.

23       Q     Did you post under the name

24   camphillroad to lohud.com?

25       A     No.

                    - Brett Yagel -

1

2     Q      Do you know who camphillroad is?

3     A      No.

4     Q      Did you ever post online in any other

5 name other than your own?

6     A      No.

7     Q      Did you ever write any letters to the

8 editor or to the newspapers in any name other

9 than your own?

10     A      No.

11     Q      Do you recall seeing this string of

12 postings back in 2007?

13     A      This specific one?

14     Q      Yes, let's -- well, the string but

15 specifically the first posting referenced.

16     A      Yes.

17     Q      You recall seeing it back then?

18     A      Yeah.

19     Q      And you recall seeing the entire

20 string posting back in '07?

21     A      Not every single one.

22     Q      But the first three pages?

23     A      It might have been I mean --

24     Q      More than three pages?

25     A      It might have been less than three

1                    - Brett Yagel -

2    pages.

3        Q      Let's turn specifically to the third

4    page.  Fourth paragraph, "People of Pomona you

5    are being manipulated.  Act professional.  Your

6    egos and anger are only going to work against us

7    all."

8              Do you see that paragraph?

9        A      Yes.

10       Q      Do you recall reading that posting

11   back in '07?

12       A      I do not recall reading that one.

13       Q      What I'm trying to figure out, you

14   indicated, and I'm not trying to put words in

15   your mouth, that you recalled seeing this

16   posting.  I'm just trying to figure out --

17       A      I recalled seeing the article.

18       Q      The article by camphillroad?

19       A      No, the article that was associated

20   with the rabbinical college.

21       Q      Do you know for sure whether or not

22   you saw this string of online comments back in

23   '07?

24              MR. PELOSO:  Objection.

25       Q      Is it possible that you saw this

```
1                  - Brett Yagel -
2    string of online comments back in '07?
3        A      Yes.
4               MR. STEPANOVICH:  (Handing document to
5        be marked.)
6               (Whereupon, Affidavit In Opposition To
7        Defendants' Motion To Dismiss, was marked
8        Plaintiff's Exhibit 173 for identification.)
9        Q      I'm handing you now, Mr. Yagel, what's
10   been marked as Plaintiff's Exhibit 173, and ask
11   you if you've ever seen it before?
12       A      I don't recall seeing this.
13       Q      Why don't you take a minute to look at
14   it?  And I'll ask you a few questions about it.
15       A      (Perusing document.)  Okay.
16       Q      Do you know who Laura Kraemer is?
17       A      Yes.
18       Q      Who is she?
19       A      She's an attorney that we -- has
20   attended many -- some of our meetings.  Oh, wait.
21   That's Susan Cooper.
22       Q      Right.
23       A      I don't know.  I don't recall knowing
24   Laura.
25       Q      On April the 4th, 2007 had you been
```

```
 1                    - Brett Yagel -
 2    sworn in as a trustee of the --
 3        A      I believe I had been, yes.
 4        Q      We had talked earlier about a Pomona
 5    Civic Association Meeting on April the 4th, 2007.
 6    Do you recall some discussion about that?
 7        A      Yes.
 8        Q      You indicated that - I thought you did
 9    and I don't want to put words in your mouth -
10    that you may have been at that meeting -- Strike
11    that.
12               I think you said you were at that
13    meeting?
14        A      I was at that meeting.
15        Q      I turn your attention to Paragraph 10.
16    It reads, "Trustee Yagel stated that the
17    residents should make sure that when they speak
18    publicly that they don't speak in a
19    discriminatory manner because that could be
20    construed as the village is discriminating."
21               Did I read that correctly?
22        A      You read that correctly.
23        Q      Does that refresh your recollection as
24    to whether or not you made such a comment?
25        A      Somewhat.
```

1               - Brett Yagel -

2       Q       Did you make that comment?

3       A       The specifics of it, I have documented

4    in one of the prior exhibits what I thought I had

5    said, so...

6       Q       What is it that you recall after

7    reading this now, Mr. Yagel?

8       A       I recalled saying something along the

9    lines of everybody is allowed to develop their

10   property and they should be careful not to state

11   discriminatory phrases.

12      Q       In public?

13      A       At all.

14      Q       So what, if anything, is incorrect

15   about Paragraph 10 of this affidavit?

16      A       It's not that anything is incorrect.

17   It's that I don't specifically recall saying as

18   the village is discriminating.

19      Q       Is it possible that you said exactly

20   what is stated in Paragraph 10 of this affidavit?

21              MR. PELOSO:  Object to the form.

22      A       Is it possible?

23      Q       Yes.

24      A       It's possible.

25              MR. STEPANOVICH:  (Handing document to

1                    - Brett Yagel -

2        be marked.)

3                (Whereupon, Emails, Bates No.

4        POM17094, was marked Plaintiff's Exhibit 174

5        for identification.)

6        Q      I'm handing you, Mr. Yagel, what's

7    been marked as Plaintiff's Exhibit 174 and asking

8    you to review that, please?

9        A      (Complying.)  Okay.

10       Q      At the top it appears to be an email

11   from Brett Yagel to Rita Louie and Nick

12   Sanderson; is that correct?

13       A      Yes.

14       Q      Dated April 2nd, 2007?

15       A      Yes.

16       Q      Do you recall the date that you were

17   sworn in as a village trustee board member?

18       A      No.

19       Q      Would you have been on the board on

20   April the 2nd, 2007?

21              MR. PELOSO:  Object.

22       Q      If you know.

23       A      The date I was sworn in is a matter of

24   public record that is kept by the village clerk

25   in the files, so I don't recall the specific

                    - Brett Yagel -

2  date.

3      Q      Fair enough.

4             The email says, "I will also attend,

5  kids in tow."

6             Attend, would that have been attending

7  the Pomona Civic Association meeting?

8      A      Yes.

9      Q      And you write "Must be very careful

10  about what we say"; is that accurate?

11     A      Yes.

12     Q      What does that mean?

13     A      Do not use discriminatory language.

14     Q      At the Pomona Civic Association

15  meeting; is that right?

16     A      Yeah.

17     Q      You write "Don't know who is in the

18  audience"; is that correct?

19     A      Yes.

20     Q      "Who knows, Savad might show up

21  again."  Is that what you write?

22     A      Yes.

23     Q      Why were you concerned about Mr. Savad

24  showing up at this meeting?

25     A      He likes to incite a crowd.

1                    - Brett Yagel -

2       Q       How is that?

3       A       His tone, his manner, his passion.

4       Q       Was it your concern that Mr. Savad

5    might incite the crowd at this meeting?

6       A       Mr. Savad had made prior remarks in

7    the paper about the client being well financed.

8       Q       How is that statement inciteful, Mr.

9    Yagel?

10              MR. PELOSO:  Object to the form.

11      A       Rephrase.

12      Q       The statement that Mr. Savad -- that

13   you attribute to Mr. Savad that the client is

14   well financed, is that an inciteful statement in

15   your opinion?

16      A       Not in and of itself, but coupled with

17   RLUIPA it is.

18      Q       What's inciteful about RLUIPA, in your

19   opinion?

20              MR. PELOSO:  Object to the form.

21      A       I believe the law is flawed.

22      Q       So because you believe it's flawed, in

23   your opinion, it therefore becomes inciteful to

24   reference the law?

25      A       Having witnessed Mr. Savad's tones and

1           - Brett Yagel -

2    actions in the January meeting, I was concerned

3    with him showing up at this meeting.

4        Q       I want to be clear for the record.

5    You weren't concerned about any fear for your

6    safety from Mr. Savad, were you?

7        A       No.

8        Q       And you weren't concerned about anyone

9    else's physical safety from Mr. Savad, were you?

10       A       I didn't know Mr. Savad and I don't

11   know Mr. Savad, so I don't know what he's capable

12   of.

13       Q       How many times have you seen Mr. Savad

14   in a public meeting?

15       A       At a public meeting or in general?

16       Q       Let's start there, public meeting.

17       A       At least once.

18       Q       Did you personally feel in any way

19   threatened by Mr. Savad when you saw him in a

20   public meeting?

21       A       Me personally?

22       Q       Yes, sir.

23       A       No.

24       Q       Did you feel as if anyone else in this

25   public meeting felt threatened by Mr. Savad?

                        - Brett Yagel -

1

2       A       I don't know what the others felt.

3       Q       Have you seen Mr. Savad in any other

4    setting besides a public hearing?

5       A       Yes.

6       Q       Where was that?

7       A       Rockland Municipal Planning

8    Federation.

9       Q       Did you feel threatened by Mr. Savad

10   at that meeting?

11      A       Yes.

12      Q       In what way?

13      A       When he started whispering in my ear

14   certain things.  I don't appreciate being spoken

15   to up closely.

16      Q       He whispered something in your ear?

17      A       Yes.

18      Q       Do you recall what it was?

19      A       Yes.  "This will be a career ending

20   case for me."

21      Q       Do you have any idea what he was

22   referring to?

23      A       No.

24      Q       You write, "We must be careful about

25   what we say."

1          - Brett Yagel -

2          Had anybody advised you to be careful

3    what you say in public?

4          MR. PELOSO:  Once again, to the extent

5       that --

6          MR. STEPANOVICH:  Yes.

7          MR. PELOSO:  Any comments by counsel.

8       If you can answer the question without

9       revealing any communications with counsel,

10      please do so.  If not, don't answer the

11      question.

12      Q     Can you answer the question?

13      A     I was advised by counsel.

14      Q     Is that the village counsel?

15         MR. PELOSO:  You know, if he answers

16      the question it's going to reveal who gave

17      the advice.  Do not answer.

18      Q     Withdrawn.

19         MR. STEPANOVICH:  (Handing document to

20      be marked.)

21         (Whereupon, Printout, "Save Ramapo,"

22      Bates Nos. RC423-446, was marked Plaintiff's

23      Exhibit 175 for identification.)

24      Q     You have in front of you Plaintiff's

25   Exhibit 175, Mr. Yagel.

                    - Brett Yagel -

1

2    A      Okay.

3    Q      Have you ever seen this document

4    before?

5    A      I don't recall.

6    Q      I think your prior testimony was that

7    you had been involved with Preserve Ramapo for --

8    since the beginning I thought you said.  If I'm

9    wrong, I stand to be corrected.

10   A      You're wrong.

11   Q      So how long have you been involved

12   with Preserve Ramapo?

13   A      I believe as stated prior, it may have

14   been 2003 or 2005.  I'm leaning towards -- I

15   can't recall.

16   Q      Again, I'm just trying to get a

17   general idea.  You began your involvement with

18   Preserve Ramapo either in 2003 or 2005?

19   A      Somewhere along during one of the

20   election campaigns.  I don't know which election

21   campaign it was.

22   Q      How did you get involved with Preserve

23   Ramapo?

24   A      Getting emails, talking to people.

25   Q      Do you agree with the goals of

1               - Brett Yagel -

2   Preserve Ramapo?

3               MR. PELOSO:  Object to the form.

4       Q       Do you know what the goals -- what is

5   the purpose of Preserve Ramapo, in your opinion?

6       A       I don't know what the overall goals of

7   Preserve Ramapo are.

8       Q       Why did you get involved with Preserve

9   Ramapo?

10      A       Because of the overdevelopment and the

11  environmentally sensitive nature and the

12  destruction of the wetlands in the Ramapo area.

13      Q       I direct your attention to Page 435 in

14  this document, Mr. Yagel.  First of all, I'm

15  sorry, did you say you didn't recall seeing this

16  document?

17      A       That's correct.

18      Q       I'll direct your attention to Page

19  435.  At the bottom it says, "I believe that the

20  real estate taxes generated by the Hasidic

21  community do not cover the cost of its children's

22  transportation and special services provided by

23  East Ramapo.  School taxes are the most

24  burdensome of all local real estate taxes."

25              Do you see that?

1              - Brett Yagel -

2      A      Yes.

3      Q      Did I read that accurately?

4      A      Yes.

5      Q      Do you agree with that position?

6      A      I haven't read this entire document

7    nor do I know the source or the substantive

8    nature of this information.

9      Q      If we go to the beginning on Page 423,

10   it looks like it was written by Robert Rhodes.

11   And I'll give you some time to go through that.

12   And at least see if what I'm quoting you is

13   contained in Mr. Rhodes' article.

14     A      (Perusing document.)

15             MR. PELOSO:  I assume this is for the

16         purpose so you can ask Mr. Yagel whether he

17         agrees with the statement?

18             MR. STEPANOVICH:  Yes.

19             MR. PELOSO:  Do you understand that?

20             THE WITNESS:  No, say it again.

21             MR. PELOSO:  He's asking you to go

22         through --

23             THE WITNESS:  24 pages.

24             MR. PELOSO:  He's asking about this

25         one statement down here.  I believe he's

1          - Brett Yagel -

2     asking, if I'm correct, whether as you sit

3     here today whether you agree with that

4     statement.

5          MR. STEPANOVICH:  Yes.

6     A     I can't make an informed basis on it.

7     Q     Have you ever heard that statement

8  before, that the real estate taxes generated by

9  the Hasidic community do not cover the cost of

10  its children's transportation --

11     A     No.

12     Q     -- and special services?

13          You've never heard that before?

14     A     No.

15     Q     If you could turn to Page 438, the

16  middle of the page.  The paragraph that reads,

17  "This is not a struggle between good and evil; it

18  is a struggle of rights in conflict.  On the one

19  hand we have a very poor community with a very

20  high birth rate that demands the right of its

21  children to remain in the community.  On the

22  other hand we have suburbanites who bought their

23  homes with the expectation that their way of life

24  would be protected by the existing zoning code.

25  They too would like affordable housing for their

```
 1                  - Brett Yagel -
 2   children.  Neither community is going to go
 3   away."
 4              Did I read that accurately?
 5      A     You read it as was on Page 438.
 6      Q     Do you agree with that proposition set
 7   forth in that paragraph?
 8      A     I can't make an informed decision on
 9   it.  I didn't write it and I don't know the
10   information behind it.
11      Q     Have you ever heard the sentiment of
12   the Orthodox, Hasidic community in Rockland
13   County being a community with a very high birth
14   rate?
15      A     Have I ever heard the sentiment?
16            MR. PELOSO:  Did anybody say that?
17      Q     Yes.  Have you ever heard anybody say
18   that?
19      A     Yes.
20      Q     Have you ever heard, continuing on
21   that sentiment, that on the one hand -- Have you
22   ever heard this sentiment?  That on the one hand
23   the Orthodox, Hasidic community is a very poor
24   community.  Have you ever heard that sentiment?
25            MR. PELOSO:  Again, did he hear
```

1                    - Brett Yagel -

2       someone say that?

3       A       I can't recall.

4       Q       Is it possible that you heard that

5       sentiment?

6               MR. PELOSO:  Object to the form.

7       Q       Is it?

8       A       Yes.  Do I recall it?  No.

9               MR. STEPANOVICH:  (Handing document to

10              be marked.)

11              (Whereupon, Document entitled, "The

12              Real Discrimination," Bates No. POM20308,

13              was marked Plaintiff's Exhibit 176 for

14              identification.)

15      Q       I'm sorry.  If you can go back to this

16      exhibit, Mr. Yagel.  Turn your attention to Page

17      425.

18      A       Okay.

19      Q       Towards the bottom of the page it's

20      entitled, "Population Growth in the Hasidic

21      Community."

22              "As we have just argued, an

23      examination of the population growth in Ramapo's

24      Hasidic communities should be the central focus

25      of any land use plan in Ramapo."

1                  - Brett Yagel -

2            Did I read that correctly?

3      A      Yes.

4      Q      Do you agree with that proposition?

5            MR. PELOSO:  Presently?

6      Q      Now.  Do you agree with that

7  proposition presently?

8      A      Yes.

9      Q      Would that have been your sentiment

10  back in 2007?

11      A      Again, I don't recall seeing this

12  document, and this document was dated 2004.

13      Q      I understand.  You just testified that

14  you agreed with that proposition now.  I'm asking

15  you if --

16      A      First of all, "As we have just argued,

17  an examination of population growth in Ramapo's

18  Hasidic community should be the central focus of

19  land," -- no, I correct myself.  I do not agree

20  with that.

21      Q      What is it that you disagree about

22  with that statement?

23      A      All population growth should be

24  examined and it shouldn't be specific to any

25  specific religion.  And I also disagree with "as

1                  - Brett Yagel -

2    we have just argued."  I don't know who the "we"

3    is.

4            MR. PELOSO:  He's not asking you that.

5        Q     I didn't ask you that.

6        A     Okay.  Thank you.

7        Q     Do you have any data, Mr. Yagel, about

8    the growth of the Orthodox, Hasidic population in

9    Rockland County?

10       A     I do not.

11       Q     Now we are on to 176.  And ask if you

12   can you identify 176?

13       A     It's a letter, correspondence, "The

14   Real Discrimination."

15       Q     Yes, have you ever seen this before?

16       A     Yes.

17       Q     When did you see this?

18       A     My wife wrote into the Journal News.

19       Q     Is 176 the letter written by your

20   wife?

21       A     I know there was something published

22   by my wife.  I don't know if this is what she

23   submitted.

24       Q     The second page, there's one line.

25   "The real discrimination comes more from the

```
1                  - Brett Yagel -
2    Hasidic communities who do not welcome or respect
3    other faiths and want to keep out anyone who is
4    not part of their community."
5              Do you see that?
6         A    Yes.
7         Q    Did I read that accurately?
8         A    Yes.
9         Q    Do you agree with that statement?
10        A    No.
11        Q    How do you disagree with that
12   statement?
13        A    Discrimination, "the real
14   discrimination comes from Hasidic communities."
15        Q    You disagree with that statement?
16        A    Uh-huh, yes.
17        Q    The rest of the statement do you agree
18   with?
19        A    Let me read the whole article.
20        Q    Sure.
21        A    (Reading document.)  I disagree with
22   the whole thing, the last -- the real
23   discrimination, that paragraph.
24        Q    Did you see this letter before it was
25   submitted to the newspaper?
```

1              - Brett Yagel -

2              MR. PELOSO:  I object.

3      Q      If in fact it was.

4              MR. PELOSO:  That's the basis of my

5      objection.

6              MR. STEPANOVICH:  I understand.

7      A      I may have, I don't recall.

8      Q      Did you edit this letter, Plaintiff's

9  Exhibit 176?

10     A      I may have.

11     Q      Do you recall the contents of any of

12 your edits?

13     A      No.

14             MR. STEPANOVICH:  (Handing document to

15     be marked.)

16             (Whereupon, Document entitled,

17     "Critique of Ramapo FGEIS," Bates Nos.

18     POM0012887-97, was marked Plaintiff's

19     Exhibit 177 for identification.)

20     Q      I'm handing you, Mr. Yagel, what's

21 been marked as Plaintiff's Exhibit 177, and ask

22 if you've ever seen this document before?

23     A      I may have seen it, yes.

24     Q      Do you recall when it was that you saw

25 this?

1                  - Brett Yagel -

2       A       No.

3       Q       This is entitled, "Critique of Ramapo

4    FGEIS," authored by Robert Rhodes; is that right?

5       A       That's what it states.

6       Q       Again, you don't recall when you saw

7    this before?

8       A       That's correct.

9            MR. STEPANOVICH:  (Handing document to

10       be marked.)

11            (Whereupon, Article entitled, "Trustee

12       looks at Ramapo housing," Bates No. RC408,

13       was marked Plaintiff's Exhibit 178 for

14       identification.)

15       Q       I'm handing you, Mr. Yagel, what's

16    been marked as 178, and ask if you've ever seen

17    this before?

18       A       I don't recall.

19       Q       It's entitled, "Trustee looks at

20    Ramapo housing," dated 4/18/03, authored by

21    Robert Rhodes.  Does that sound like an accurate

22    description?

23       A       The date is printed on it, but I don't

24    know if that's the actual date.  It appears to be

25    a Community View by Robert Rhodes.

1                     - Brett Yagel -

2        Q       The first paragraph reads, "There's

3    only one group in unincorporated that Ramapo that

4    is growing very rapidly and that is a religious

5    community."

6                 Did I read that accurately?

7        A       Yes.

8        Q       Do you agree that there's only one

9    group in unincorporated Ramapo that is growing

10   very rapidly and that is a religious community?

11               MR. PELOSO:  Presently?

12       Q       Back then in '03.

13       A       I can't make an informed decision

14   because I don't have the empirical data to base

15   that on.

16       Q       Did you ever have occasion to do any

17   research regarding the empirical data regarding

18   population growth in Rockland County?

19       A       I looked at the 1990 U.S. Census and

20   the maybe 2000 Census, but I don't even recall.

21       Q       The results of that investigation?

22       A       Exactly.

23       Q       Why would you have looked at the 1990

24   and 2000 Census figures?

25               MR. PELOSO:  Why would you or why did

1          - Brett Yagel -

2     you?

3     Q     Why did you?

4     A     We received since -- the Census has to

5 come out every ten years.  I know during one of

6 the periods we had to fill out the Census form

7 and I was interested to see how the numbers were,

8 what the latest Census and also the prior Census.

9     Q     Again you don't -- let me ask another

10 question.

11          Do you recall ever seeing this Exhibit

12 178 at all?

13     A     I don't recall.

14          MR. STEPANOVICH:  (Handing document to

15     be marked.)

16          (Whereupon, Document entitled, "Land

17     Use Leadership Alliance Training Program

18     2008 Rockland County," Bates No. POM20299,

19     was marked Plaintiff's Exhibit 179 for

20     identification.)

21     Q     I'm handing you now, Mr. Yagel, what's

22 been marked as Plaintiff's Exhibit 179, and ask

23 if you can identify that document, please?

24     A     This was information that was

25 submitted to the Land Use Law Center regarding

1              - Brett Yagel -

2    being a potential candidate to attend the Land

3    Use Leadership Alliance Training Program in 2008.

4        Q     Would this training program have been

5    in Rockland County?

6        A     I don't know.  Is Bear Mountain

7    Rockland County?

8        Q     You're asking the wrong guy.

9              MR. PELOSO:  He can't answer

10       questions.

11             MS. SOBEL:  He couldn't answer anyway.

12       Q     For a couple of reasons.

13       A     Could you be more specific?

14       Q     Withdrawn.

15             Did you prepare this application?

16       A     Yes, I did.

17       Q     On the second page, Mr. Yagel, under

18   number one the question is:  What are the major

19   projects, controversies, and land use issues

20   being dealt with in your community?  And then you

21   go on to list some issues.

22             Did you prepare this, Plaintiff's 179?

23       A     Yes, I did.

24             MR. STEPANOVICH:  (Handing document to

25       be marked.)

```
 1                    - Brett Yagel -

 2              (Whereupon, Email dated 2/25/07, Bates

 3        No. POM36716, was marked Plaintiff's Exhibit

 4        180 for identification.)

 5              MR. STEPANOVICH:  This is 181.

 6              (Whereupon, Various letters, Bates No.

 7        POM36717, was marked Plaintiff's Exhibit 181

 8        for identification.)

 9        Q     I'm handing you, Mr. Yagel, what's

10   been marked as Plaintiff's Exhibit 180, and ask

11   if you recognize that document?

12        A     Yes.

13        Q     This was an email sent from you to

14   Nick Sanderson and Rita Louie on February 25th,

15   2007; is that right?

16        A     Yes.

17        Q     This email address,

18   Brett@VillageCommunityParty.com, that was one of

19   the emails you had back in February '07?

20        A     Yes.

21        Q     That again was one of the emails that

22   you searched for documents?

23        A     Yes.

24        Q     The subject is "Preserve Ramapo RLUIPA

25   Letter - Being Killed."
```

```
 1                    - Brett Yagel -
 2             Is that what it says?
 3      A     Yes.
 4      Q     You write, "Nick, Rita - I just got
 5   off the phone with Bob Rhodes."
 6             And do you recall the conversation
 7   that you had with Bob Rhodes in reference to this
 8   email?
 9      A     I do not.
10      Q     Would it have had anything to do with
11   a letter regarding RLUIPA?
12      A     It could have based upon the next
13   sentence.
14      Q     Let's turn now to the next exhibit
15   which is Plaintiff's 181, and ask if you can
16   identify that document?
17      A     (Perusing document.)  Okay.
18      Q     Have you ever seen Plaintiff's 181
19   before?
20      A     I believe I have.
21      Q     Could Plaintiff's 181 be the
22   attachment that's referenced in Plaintiff's 180?
23             MR. PELOSO:  Object to the form.
24      Q     If you know.
25      A     I don't recall.
```

                    - Brett Yagel -

1

2    Q     Did you prepare these letters

3 contained in Plaintiff's 181?

4    A     I did not.

5    Q     Do you know who did?

6    A     I don't recall.

7    Q     Would it have been Mr. Rhodes?

8          MR. PELOSO:  Object to the form.

9    Q     If you know.

10    A     I don't recall.

11    Q     You composed the email of 180; is that

12 right?

13    A     Yes.

14    Q     You write, "I just got off the phone

15 with Bob Rhodes.  He'll have the link killed to

16 the RLUIPA letter that PR had drafted."

17          Did I read that accurately?

18    A     Yes.

19    Q     What do you mean by PR?

20    A     Preserve Ramapo.

21    Q     Does that refresh your recollection of

22 who might have drafted these letters?

23    A     No.  But I can tell you it wasn't me.

24    Q     Was it your intention to forward these

25 letters onto Marci Hamilton?

1          - Brett Yagel -

2          MR. PELOSO:  Object to the form.

3     Q     Was that what you said in the last

4  line of No. 180?

5     A     "So that we can forward."  I wasn't

6  going to forward.

7     Q     Do you have any idea who was going to

8  forward this onto Marci Hamilton for comment?

9     A     No.

10    Q     Now, on February 25th, 2007 was Marci

11 Hamilton still representing you, Mr. Sanderson

12 and Miss Louie?

13    A     Yes.

14    Q     You reference the subject "Preserve

15 Ramapo RLUIPA letter - Being Killed."

16          What did you mean by being killed?

17    A     Link killed to the RLUIPA letter.

18    Q     What does that mean?

19    A     PR must have had a link to it.

20    Q     I see.  So when you say Preserve

21 Ramapo -- PR references Preserve Ramapo, correct?

22    A     Yes.

23    Q     And is it your understanding that at

24 the time February of '07 PR had linked to this

25 RLUIPA letter?

                    - Brett Yagel -

1

2           MR. PELOSO:  I'm going to object.  I

3       don't think he's testified there's a link

4       between this email and the letters.  Based

5       on that you can still answer the question.

6       Q       I'm going to represent to you, Mr.

7   Yagel, that this --

8       A       This was on the -- I believe this

9   might have been on Preserve Ramapo site

10  (indicating).

11      Q       And when you say this, you are

12  referencing the letter to --

13      A       This may have.  I'm assuming that this

14  is what was referenced, but I can't know that for

15  sure.

16      Q       You recall seeing Plaintiff's 181

17  before; is that correct?

18      A       Yes.

19      Q       Did you make any edits to this letter,

20  Plaintiff's 181?

21      A       I don't recall.

22      Q       Do you recall sending this, I'm going

23  to use the word off of 180, RLUIPA collage.  181

24  contains what appears to be the same letter

25  addressed to Charles Schumer, Hillary Rodham

                    - Brett Yagel -

1  Clinton, Eliot Engel, Thomas Morahan, and Kenneth

2  Zebrowski.

3

4           Do you agree with my characterization

5  of that?

6      A     Yes.

7           MR. STEPANOVICH:  (Handing document to

8      be marked.)

9           (Whereupon, Document entitled, "The

10     Patrick Farm Sellout - Three Betrayals,"

11     Bates Nos. RC570-573, was marked Plaintiff's

12     Exhibit 182 for identification.)

13     Q     I'm handing you now, Mr. Yagel, what's

14  been marked as Plaintiff's Exhibit 182, and ask

15  if you can identify that document, please?

16     A     This is an article that appeared on

17  the Preserve Ramapo website.

18     Q     Were you one of the authors of this

19  article?

20     A     I did not write the article in its

21  entirety, but I provided some of the information.

22     Q     Your name is at the end of the

23  article, along with Michael Castelluccio and

24  Marlaine Paone; is that correct?

25     A     Yes.

                    - Brett Yagel -

1

2     Q     Do you recall when this article was

3 posted on the Preserve Ramapo website?

4     A     Shortly after the ASH zones were

5 established and the state -- and destruction of

6 state and federal wetlands.

7     Q     You agree with the contents of this

8 article, correct?

9           MR. PELOSO:  Presently or at the time?

10    Q     At the time it was written.

11    A     Yeah.  Yes.

12    Q     Why did you sign your name on the

13 article?

14    A     I had provided some information to

15 Michael.  I did not sign my name to it.  He

16 signed my name to it and gave me credit for some

17 of the information that was supplied.

18    Q     Do you recall by looking at this 182

19 what information it was that you supplied?

20    A     Background information on the size of

21 the parcel and its location, information about

22 the water leading into the Mahwah River, some of

23 the adult student housing zone information, the

24 protected wetlands information, the Army Corps

25 information May 17th, 2004, the damage, the

```
 1                    - Brett Yagel -
 2    damage, not all the damage has been remediated,
 3    the cutbacks to the staff of the Army Corps of
 4    Engineers, the petition to form the Village of
 5    Ladentown.  It was in early to late 2004 if I
 6    remember right.
 7        Q      Flipping back to the first page, the
 8    fourth paragraph down.  Did you provide that
 9    information on that paragraph - one, two, three,
10    four - the fourth paragraph that begins "Today,
11    Patrick Farm"?
12        A      No.
13        Q      Did you know at the time this was
14    written who was going to reside in the apartment
15    houses referenced in that paragraph?
16        A      No.
17        Q      Did you know at the time this was
18    written whether or not there were going to be
19    religious institutions on this property?
20        A      Yes.
21        Q      How did you know that?
22        A      Because this was one of the four sites
23    that the supervisor has designated under the ASH
24    zoning.
25        Q      When you say ASH, you are referring to
```

```
 1                    - Brett Yagel -
 2    the adult student housing zone?
 3        A      Adult student housing zone.
 4        Q      Now turn your attention to the final
 5    paragraph, Mr. Yagel.  It reads, "We have arrived
 6    at a point in Ramapo history when those who make
 7    fortunes in development also now control the
 8    access ordinary citizens have to their
 9    constitutional rights.  Yet on their part, the
10    developers ignore environmental regulations, and
11    ask for and get outrageous exemptions from the
12    zoning laws that apply to everyone but them.  And
13    at their side is the Town Supervisor Christopher
14    St. Lawrence with the Ramapo Town Board standing
15    right behind them."
16              Did I read that accurately?
17        A      Yes.
18        Q      Do you agree with that sentiment?
19              MR. PELOSO:  Presently or --
20        Q      Did you agree with that back at the
21    time?
22        A      Yes.
23              MR. STEPANOVICH:  (Handing document to
24        be marked.)
25              (Whereupon, Document entitled,
```

1              - Brett Yagel -

2     "Preserve Ramapo endorsement," Bates No.

3     POM20043, was marked Plaintiff's Exhibit 183

4     for identification.)

5     Q       In your election bid in 2007 you were

6     endorsed by Preserve Ramapo?

7     A       Yes.  2007, yes.

8     Q       I'm handing you Plaintiff's Exhibit

9     183, and ask you if you recognize that document?

10     A       Yes.  I read it.

11     Q       Is 183 the endorsement of your

12     candidacy by Preserve Ramapo?

13     A       Yes.  I believe so.

14     Q       At the time Bob Rhodes was the

15     chairman of Preserve Ramapo, correct?

16     A       Yes.

17             MR. STEPANOVICH:  (Handing document to

18     be marked.)

19             (Whereupon, Emails, Bates No.

20     POM17235, was marked Plaintiff's Exhibit 184

21     for identification.)

22     Q       Do you know a Rabbi Zaks?

23     A       Yes.

24     Q       How do you know Rabbi Zaks?

25     A       I know of Rabbi Zaks.  There are two

1              - Brett Yagel -

2    rabbis and they are affiliated with Mosdos

3    Chofetz Chaim, which was one of the developments

4    designated as ASH, the Nike base.

5        Q     Mosdos Chofetz Chaim, was that one of

6    the organizations that the Village of Pomona was

7    involved in litigation with, if you recall?

8        A     I don't recall if we were involved

9    with litigation against the organization.

10       Q     Do you recall anything about --

11       A     I know there's litigation on the

12   property.

13       Q     That's owned by?

14       A     Chofetz Chaim.

15       Q     I'm handing you now, Mr. Yagel, what's

16   been marked as 184.

17       A     Yes.

18       Q     Have you ever seen 184 before?

19       A     Yes.

20       Q     What is it?

21       A     It is a letter, an email that I

22   believe originated from Peter Katz, who was

23   involved or is involved with the Preserve Ramapo

24   organization.

25       Q     Do you want to complete your answer?

                    - Brett Yagel -

1

2      A      I'm not the author of this.  I just

3  was a recipient of it.

4      Q      Who did you send it to?

5      A      I sent it from my prior work address

6  to my home email address.

7      Q      Did you distribute this email to

8  anyone else?

9      A      I don't recall.

10     Q      What was the reason that you sent this

11 email from your work address to your home

12 address?

13     A      I don't recall.

14     Q      This apparently is a notification

15 about a court appearance for Rabbi Zaks.  Is that

16 your understanding?

17     A      It appears to be.  Well, I don't know

18 if this was from Peter Katz.  I don't know who

19 originated this.

20     Q      Is it possible that you sent blind

21 copies of this email to anyone besides yourself?

22            MR. PELOSO:  Object to the form.

23     A      Is it possible?

24     Q      Yes.

25     A      Anything is possible.  Did I?  I have

```
 1                    - Brett Yagel -
 2   no recollection of doing so.
 3        Q     Did you attend the court date?
 4        A     No.
 5              MR. STEPANOVICH:  (Handing document to
 6        be marked.)
 7              (Whereupon, Emails, Bates No.
 8        POM21307, was marked Plaintiff's Exhibit 185
 9        for identification.)
10        Q     I'm handing you now, Mr. Yagel, what's
11   been marked as Plaintiff's Exhibit 185, and ask
12   if you can identify that?
13        A     It's a letter that or correspondence,
14   an email that I had with Mike Castelluccio.
15        Q     There's an email, it begins on the
16   second page, from you to
17   preserveramapo@optonline.net.
18        A     Yeah.
19        Q     Preserveramapo@optonline.net, was that
20   Mike Castelluccio's email at that time on January
21   of '07?
22        A     I don't know if it was his personal
23   email.
24        Q     But you recognize that email is
25   something that you composed and sent to Mr.
```

```
 1                - Brett Yagel -
 2   Castelluccio; is that right?
 3        A      Yes.
 4        Q      Who is tinafrawley@optonline.net?
 5        A      She is somebody who is or was involved
 6   with the Preserve Ramapo organization.
 7        Q      Coming back to the first page, there's
 8   an email, what appears to be from you, January
 9   11, 2007 to llcastel merlin?
10        A      Uh-huh.
11        Q      It looks like would that be Mr.
12   Castelluccio's email?
13        A      I believe so, yeah.
14        Q      That's regarding the Camp Dora
15   property, Village of Pomona, is that what it
16   says?
17        A      Well, the subject of this entire email
18   is Camp Dora property, yes.
19        Q      And you composed this first page of
20   this exhibit, this email to Mr. Castelluccio?
21        A      I believe I did.
22        Q      Take as much time as you need.
23               MR. PELOSO:  He said he did.
24               MR. STEPANOVICH:  He said he believes.
25        A      I believe I did it.  Yes, I did.
```

1                    - Brett Yagel -

2              MR. STEPANOVICH:  Next.

3              (Whereupon, Draft of letter, Bates No.

4       POM20319, was marked Plaintiff's Exhibit 186

5       for identification.)

6       Q      I'm handing you, Mr. Yagel, what's

7   been marked as Plaintiff's 186, and ask if you

8   can identify that, please?

9       A      It looks like a draft of a letter

10  about the Patrick Farm property.

11      Q      Did you draft this letter?

12      A      I may have drafted portions, yes.

13      Q      Do you recall which portions that you

14  drafted?

15      A      No.

16      Q      The comments on the right-hand side

17  all have the initials BLY; is that right?

18      A      Yes.

19      Q      Would those be comments by you?

20      A      Those would be comments -- those would

21  be inserted electronic comments from the Word

22  feature.

23      Q      Track changes?

24      A      Track changes.  So whoever was on my

25  account or home machine could have done this too,

                    - Brett Yagel -

so...

Q      Well, if you take a minute --

A      Or at work or --

Q      Pardon me?

A      Or at work.

Q      Do you know whether or not those
comments on the right-hand side of the pages were
made by you?

A      Yeah, looks like it.

Q      Do you know who this letter was sent
to?

A      I don't think this letter was ever
sent.

Q      Well, it looks like -- you said the
comments were yours.  Do you know who drafted the
body of the letter?

        MR. PELOSO:  Objection.  I think he's
    addressed that.  But you can answer the
    question.

Q      I'm sorry if I missed it.

A      I could have been the author of
portions of this letter.

Q      By reviewing this letter could you
tell what portions you were not the author of?

1                     - Brett Yagel -

2       A       No, because this is a very old letter.

3       Q       How do you know it's a very old

4   letter?

5       A       Because it's when the Patrick Farm was

6   zoned RR80, which is two acres, so this is 2003,

7   2004 I believe.

8       Q       Do you know who the intended recipient

9   was of this letter?

10              MR. PELOSO:  Object to the form.

11      A       I don't know.

12              MR. STEPANOVICH:  (Handing document to

13      be marked.)

14              (Whereupon, Email dated 7/11/07, Bates

15      No. POM16958 was marked Plaintiff's Exhibit

16      187 for identification.)

17      Q       I'm handing you what has been marked

18  as Plaintiff's Exhibit 187, Mr. Yagel, and ask if

19  you recall receiving this email?

20      A       Do I recall receiving this specific

21  one?

22      Q       Yes, sir.

23      A       No.

24      Q       Do you know who Bob Prol is?

25      A       Yes.

                    - Brett Yagel -

1

2       Q       Back in July of '07 did you have

3    conversations with Mr. Prol regarding the

4    Tartikov property?

5       A       Yes.

6       Q       Back in July of '07 do you recall

7    having email communications with Mr. Prol

8    regarding the Tartikov property?

9       A       I may have, yes.

10      Q       This email appears to be from Mr. Prol

11   addressed to Nick Sanderson, Ian Banks, Rita

12   Louie and you.

13              Is that what it appears to be?

14      A       Yes.

15      Q       Subject:  Thank you for your

16   leadership of our village and your support of our

17   long-standing zoning laws.

18              Is that what it says?

19      A       Yes.

20      Q       The subject of your conversations with

21   Mr. Prol back in July of '07, did they concern

22   this subject line?

23      A       Yes.

24      Q       At the time in July of '07 you had

25   that email brett.yagel@pomonavillage.com?

1                     - Brett Yagel -

2      A      Yes.

3             MR. STEPANOVICH:  (Handing document to

4      be marked.)

5             (Whereupon, Email dated 8/3/07, Bates

6      No. POM33298, was marked Plaintiff's Exhibit

7      188 for identification.)

8      Q      I'm handing you, Mr. Yagel, what's

9  been marked as 188, and ask have you ever seen

10  this document before?

11     A      Yes.

12     Q      What is it?

13     A      It is a comment that was made from

14  somebody back in July of 2007 on the

15  yeshivaworld.com website.

16     Q      Did you extract the comment and place

17  it into this email?

18     A      Yes.

19     Q      You sent it on to Nick Sanderson and

20  Rita Louie?

21     A      Yes.

22     Q      On the bottom it's "Comment by

23  maitiv."  Do you know who maitiv was?

24     A      No.

25     Q      Why did you send this comment on to

```
 1                   - Brett Yagel -
 2   Mr. Sanderson and Miss Louie?
 3        A      Because it had the word Tartikov in
 4   it.
 5        Q      Why was the word Tartikov relevant to
 6   you at this time?
 7        A      Because a Complaint had been filed
 8   during the prior month by the Rabbinical College
 9   of Tartikov, Incorporated.
10        Q      Did you do any independent
11   investigation regarding the contents of this
12   email?
13        A      No.
14             MR. STEPANOVICH:  (Handing document to
15        be marked.)
16             (Whereupon, Board of Trustees Minutes,
17        3/24/08, Bates No. POM19941, was marked
18        Plaintiff's Exhibit 189 for identification.)
19        Q      Did you ever have the opportunity, Mr.
20   Yagel, to vote on the tax exemption request by
21   the Congregation Rabbinical College of Tartikov?
22        A      I did.
23        Q      What was your vote?
24        A      Nay.
25        Q      Who else voted nay on that tax
```

```
1                    - Brett Yagel -
2    exemption?
3        A      Trustee Louie.
4        Q      I'm handing you what's been marked as
5    189, and ask if those minutes accurately reflect
6    your vote on that topic?  Please feel free to
7    look at the whole document, but I'm going to
8    direct your attention to the first page.
9        A      Yes.
10       Q      So these minutes reflect your negative
11   vote on the tax exemption for the Rabbinical
12   College of Tartikov?
13       A      That's correct.
14       Q      Which was -- that vote again, I'm
15   sorry, was in?
16       A      3-2.  2008.
17              MR. STEPANOVICH:  (Handing document to
18          be marked.)
19              (Whereupon, Board of Trustees Minutes,
20          3/23/09, Bates No. POM20206, was marked
21          Plaintiff's Exhibit 190 for identification.)
22       Q      In 2009, Mr. Yagel, did you have
23   occasion to vote on a tax exemption by the
24   Rabbinical College of Tartikov?  I'm handing you
25   now what's been marked 190.  Maybe that will
```

```
 1                    - Brett Yagel -

 2    refresh your recollection.  And I direct you to

 3    the second page, midway down.

 4         A     Okay.

 5         Q     Does Plaintiff's Exhibit 190 refresh

 6    your recollection as to whether or not you voted

 7    on a tax exemption for the Congregation

 8    Rabbinical College of Tartikov in 2009?

 9         A     Yes.

10         Q     What was your vote?

11         A     Nay.

12         Q     Does Exhibit 190 accurately reflect

13    your vote on that issue?

14         A     I believe it does.

15              MR. STEPANOVICH:  (Handing document to

16         be marked.)

17              (Whereupon, Email dated 6/28/06, Bates

18         No. POM17244, was marked Plaintiff's Exhibit

19         191 for identification.)

20         Q     I'm handing you, Mr. Yagel, what's

21    been marked as Plaintiff's Exhibit 191, and ask

22    if you can identify it?

23         A     An email that was sent to my home

24    address from my prior work employer's address,

25    email address.
```

                    - Brett Yagel -

1

2    Q      Why would you do that?

3           MR. PELOSO:  Object to the form.

4    Q      Why would you send an email from your

5    prior work address to your home address?

6           MR. PELOSO:  Objection.

7    Q      If you know.

8    A      I recall my wife calling me and saying

9    that she had gotten a call from Ruth Graifman, I

10   believe it was Ruth Graifman, who was the wife

11   of Julius Graifman who was the Rockland County

12   Sewer Commissioner.

13          We had attended a meeting on or about

14   this date I believe it was and Miss Graifman had

15   called my home to my knowledge as my wife told me

16   and in response I guess to something, an article

17   that might have been written.  And said something

18   about, well, New Square -- this was not my wife.

19   This is what my wife said was stated to her by

20   one of the Graifmans.  "New Square are Hasidic

21   Jews and what's going to happen on the Patrick

22   Farm, those are best -- different types of

23   people."

24   Q      What you just said about Patrick Farms

25   being different types of people, that's not

1                          - Brett Yagel -

2      contained in this email, is it?

3           A       No.  But I know it was because of the

4      Patrick Farm development that was going in and

5      Mr. Graifman alluded to my wife that the sewers

6      had been upgraded in 1999.

7           Q       So does this appear to be -- I don't

8      want to put words in your mouth.  But this email

9      seems to be a capture of a phone call that your

10     wife had with Mr. Graifman?

11                  MR. PELOSO:  Objection.

12          Q       For lack of a better term.  I'm just

13     trying to figure out what it is.

14          A       It's notes that I wrote down after my

15     wife told me what had happened.

16          Q       Why would you write notes --

17          A       I thought it was interesting that --

18                  MR. PELOSO:  Let him finish the

19          question.

20          Q       So you thought it was interesting?

21          A       I thought it was interesting --

22                  MR. PELOSO:  I got to object to the

23          question first.

24          A       Okay.  Finish the question, please.

25          Q       Why would you write notes on this

1              - Brett Yagel -

2  phone call?

3              MR. PELOSO:  Objection.

4      Q      You can answer.

5      A      I thought it was interesting that an

6  official such as Mr. Graifman or Mrs. Graifman

7  would be calling my house.

8      Q      In June of '06 you weren't on the

9  village board, were you?

10     A      No.

11     Q      Do you have any idea why they were

12  calling your house?

13     A      I think this might have been a

14  response to an article that my wife had written

15  into the Journal News on.

16     Q      Would that have been the article that

17  we referenced prior that was written by your

18  wife?

19     A      I don't recall the specific dates of

20  it.

21     Q      Do you recall how many articles your

22  wife wrote to the Journal News regarding the,

23  quote, discrimination issues in Pomona?

24     A      I don't recall.  I think one regarding

25  the Patrick Farm.

1                    - Brett Yagel -

2      Q       The last line references a meeting

3  last night.  Do you have any idea what that

4  means?

5      A       There was a meeting I believe at the

6  Crowne Plaza regarding sewerage issues in the

7  Town of Ramapo.

8      Q       Did you attend that meeting?

9      A       Yes.

10     Q       Did your wife attend that meeting?

11     A       I believe she did, yes.

12     Q       Again, the subject was what?  I'm

13  sorry.

14     A       Sewer issues, overflow issues.

15     Q       In the Town of Ramapo?

16     A       In the Town of Ramapo.

17     Q       The meeting was sponsored by what

18  group, if you recall?

19     A       I can't recall.

20     Q       This email references Mr. Graifman

21  saying, "Where do you live?  Pomona.  We upgraded

22  the sewers in 1999.  You don't have a problem."

23             Do you recall that?

24             MR. PELOSO:  Recall what?

25     Q       Recall that statement, writing that

1                    - Brett Yagel -

2    statement.

3        A    I recall writing that statement based

4    upon what my wife had told me.

5        Q    That Mr. Graifman had told her?

6        A    Yes.

7             MR. STEPANOVICH:  (Handing document to

8        be marked.)

9             (Whereupon, Emails, Bates No.

10       POM34701, was marked Plaintiff's Exhibit 192

11       for identification.)

12       Q    I'm handing you now, Mr. Yagel, what's

13   been marked as 192.  Can you identify this

14   document?

15       A    I believe it was a letter from -- it

16   was an email from Lisa Thorsen to myself

17   regarding Doris Ulman, Village Counsel, faxing

18   over the attached letter regarding the above to

19   the Zoning Board of Appeals regarding a property

20   that bordered the Village of Pomona.

21       Q    So it regarded Bobover Yeshiva of

22   Monsey; is that right?

23       A    Yes.

24       Q    Do you recall there being any issue

25   regarding that yeshiva within the Village of

```
 1                - Brett Yagel -
 2  Pomona?
 3             MR. PELOSO:  Object to the form as
 4     vague.
 5     Q      In other words, I'm just trying to
 6  figure out why this would be a matter of concern
 7  to a Village of Pomona official.
 8             MR. PELOSO:  Objection.
 9     A      It was within 500 feet of the Village
10  of Pomona.
11     Q      Was it --
12     A      To my knowledge that's what I recall.
13     Q      Was it a yeshiva being built and they
14  were seeking comment from the Village of Pomona?
15     A      Whether it has been built or was
16  built, it was within 500 feet of the Village of
17  Pomona and the village had the opportunity to
18  comment on it.
19     Q      You write, "Thanks Lisa.  I see that
20  my correspondence with NYCOM has paid off.  Doris
21  included it in the email."
22             Who is NYCOM?
23     A      The New York Council or Conference of
24  Municipal Officials.
25     Q      What was your correspondence in
```

1                    - Brett Yagel -

2   reference to this issue?

3       A       I cannot recall.

4       Q       Were you opposed to the Bobover

5   Yeshiva of Monsey?

6               MR. PELOSO:  Object to the form.

7       Opposed to what?

8       Q       To the construction of the Bobover

9   Yeshiva of Monsey.

10      A       If this is the one in question on the

11  end of Babcock Lane, I believe it had to do with

12  an access road going into the Patrick Farm and

13  also the draining of wetlands on the property.

14              (Witness made a statement to counsel.)

15      Q       Was that something you wanted on the

16  record?

17      A       No.

18              MR. STEPANOVICH:  (Handing document to

19      be marked.)

20              (Whereupon, Email dated 8/13/07, Bates

21      No. POM33294, was marked Plaintiff's Exhibit

22      193 for identification.)

23      Q       I'm handing you now, Mr. Yagel, what's

24  been marked as 193, and ask if you can identify

25  that?

1          - Brett Yagel -

2     A     It's an email that I sent to the board

3  of trustees from myself when I did a search on

4  Tartikov Babad and an article on one of the

5  Jewish blogs came up and I posted the link and

6  email and I sent it on to the board members.

7               MR. STEPANOVICH:  (Handing document to

8          be marked.)

9               (Whereupon, Email dated 2/15/07, Bates

10         No. POM17119, was marked Plaintiff's Exhibit

11         194 for identification.)

12    Q     I'm handing you, Mr. Yagel, what's

13  been marked as Plaintiff's Exhibit 194, and ask

14  if you can identify that, please?

15    A     That was an email that I had received

16  from Bob Rhodes regarding population projections

17  back in February of 2007 by a company called

18  Geolytics, and I forwarded it to Nick Sanderson.

19    Q     Back in February of 2007 you were

20  running for board of trustees in Pomona; is that

21  right?

22    A     Yes.

23    Q     Did you do any further investigation

24  with this company Geolytics?

25    A     I did not.

```
1                    - Brett Yagel -

2       Q      What did you understand the purpose of

3   this --

4       A      I don't recall the full --

5              MR. PELOSO:  Let counsel ask his

6       question first.

7       Q      I'll withdraw that.

8              Let's go to the second paragraph from

9   the end.  First of all, let me retract that.

10  This email was -- I retract that as well.

11             Second paragraph from the bottom says,

12  "This data will be most useful both in court when

13  you argue, among other things, that there's a

14  compelling government interest in restricting

15  large scale religious housing and in the court of

16  public opinion."

17             Is that right?

18             MR. PELOSO:  You mean did you read

19      it --

20      Q      Did I read that accurately?  I'm

21  sorry.

22      A      You read that accurately.

23      Q      This again was from Bob Rhodes to you,

24  Nick Sanderson and Joe Meyers; is that right?

25      A      Yes.
```

1          - Brett Yagel -

2     Q     Then you forwarded it on to Nick

3 Sanderson; is that right?

4     A     Yes.

5     Q     Did you have any discussions with Mr.

6 Sanderson about this email?

7     A     I can't recall.

8     Q     Did you have any discussion with Mr.

9 Rhodes at all regarding the demographic

10 projections for Ramapo and Rockland County?

11          MR. PELOSO:  At what time period?

12     Q     During this time period, February of

13 '07, and after.

14     A     I don't recall.

15     Q     Do you have any idea - I may have

16 asked you this already - why Mr. Rhodes would be

17 sending you this information?

18          MR. PELOSO:  Object to the form.

19     Q     If you know.

20     A     I'd be making an assumption and I

21 can't go into why he sent this to me, except that

22 this was right around the time of the leaked

23 yet-to-be-proposed rabbinical college.

24     Q     So what relevance does the leaked

25 proposed rabbinical college have to do with this

                    - Brett Yagel -

email?

     A      Housing, large scale housing.

     Q      For Orthodox, Hasidic Jews?

     A      Large scale housing.

     Q      For Orthodox, Hasidic Jews?

            MR. PELOSO:  Object to the form.

     A      Large scale housing.

     Q      Well, you knew, Mr. Yagel, that the
property that Tartikov had purchased was intended
to be used for a rabbinical college; is that
right?

            MR. PELOSO:  At what point in time?

     Q      Back in February of '07.

     A      Did I know specifically?  All I knew
was from what was stated on the Preserve Ramapo
website and what was stated in the paper by Mr.
Savad and at the public hearings.  That's it.

     Q      But you knew based on that, you knew
that the proposed use was going to be for
Orthodox, Hasidic Jews; is that right?

            MR. PELOSO:  Object to the form.

     A      No.

     Q      Did you know it was proposed to be
used for a rabbinical college?

1                    - Brett Yagel -

2      A      According to statements that were made

3  by Mr. Savad, that a college of some sort would

4  be built or was intended to be built, yes.

5      Q      But you knew back then in February of

6  '07 that there was going to be some use for a

7  religious purpose; is that right?

8      A      Potentially, yes.

9      Q      You also knew back then in February

10  '07 that there was going to be a housing

11  component to that religious purpose; is that

12  right?

13      A      Did I know factually, no.  Based upon

14  things that were released, yes.

15      Q      You knew the owners of the Rabbinical

16  College of Tartikov were Orthodox and Hasidic

17  Jews; is that right?

18      A      I knew they were Jewish.  I didn't

19  know they were Orthodox or Hasidic.  I can't --

20  honestly, I don't make a distinction.

21      Q      Do you know Michael Tauber?

22          MR. PELOSO:  Asked and answered.

23      A      Asked and answered.

24      Q      Okay, fair enough.

25          Does Michael Tauber dress in the

```
 1                    - Brett Yagel -
 2   identifiable dress that you mentioned earlier
 3   about Orthodox, Hasidic and Jews?
 4        A     In terms of wearing dark clothing and
 5   light shirt, white shirt?
 6        Q     Yes.
 7        A     Yes.  But I believe he also has --
 8             MR. PELOSO:  There's no question
 9        pending, sir.
10             MR. STEPANOVICH:  (Handing document to
11        be marked.)
12             (Whereupon, Article entitled, "Where
13        Religion Meets Real Estate, a Developer and
14        a Town Face Off," Bates No. RC4137, was
15        marked Plaintiff's Exhibit 195 for
16        identification.)
17        Q     I've handed you what's been marked as
18   Plaintiff's Exhibit 195, ask if you can identify
19   this document?
20        A     This was an article written by Peter
21   Applebome of the New York Times.
22        Q     Entitled, "Where Religion Meets Real
23   Estate, a Developer and a Town Face Off"; is that
24   right?
25        A     Correct.
```

- Brett Yagel -

Q      Do you recall being interviewed for
this article?

A      I might have made a comment, yeah.

Q      Do you recall what your comment was
regarding this article?

A      "The attorney who represents the
developer and owner of the property appears ready
to file a lawsuit without knowing what the codes
in the Village of Pomona are," said one resident,
Brett Yagel.  "It's pretty disgusting.  They're
trying to create this mini city in our village
and push people out who have put their heart and
soul into the community for years."

Q      End of quote?

A      End of quote.

Q      That's your statement?

A      Yeah.

MR. STEPANOVICH:  (Handing document to
be marked.)

(Whereupon, Article by Lynn Yagel,
Bates No. RC4568, was marked Plaintiff's
Exhibit 196 for identification.)

Q      I'm handing you now, Mr. Yagel, what's
been marked as Plaintiff's 196, and ask if you

1                    - Brett Yagel -

2    recognize this document?

3        A      Yes.

4        Q      What is it?

5        A      It's something that my wife submitted

6    to the Journal News in February 2007.

7        Q      Did you agree with the contents of

8    this article?

9               MR. PELOSO:  As he sits here

10        presently?

11        Q      Back in February of '07 when it was

12    submitted.

13               MR. PELOSO:  I object.  Are you

14        seeking the opinion or the facts or --

15        Q      Do you agree with the --

16               MR. STEPANOVICH:  I don't want to go

17        through every line.  I'll give him a chance

18        to review it and then maybe I'll ask a

19        couple of questions to see how he responds

20        and we'll go through it.

21        A      (Reading document.)  Yes.

22        Q      You agree with the contents of this

23    article?

24        A      Not all, but yes.

25        Q      What in this article do you disagree

1                       - Brett Yagel -

2    with?

3        A      "To say that a virtual mini city

4    within the village that will house thousands of

5    homogenous individuals who can control village

6    elections," I disagree with that.

7        Q      What else?  Anything else?

8        A      No.

9              MR. STEPANOVICH:  (Handing document to

10        be marked.)

11              (Whereupon, Draft email to Journal

12        News Editorial Page, Bates No. POM20042, was

13        marked Plaintiff's Exhibit 197 for

14        identification.)

15        Q      I'm handing you now, Mr. Yagel, what's

16    been marked as Plaintiff's Exhibit No. 197, and

17    ask if you can identify this document?

18        A      It looks like a draft of the prior

19    exhibit.

20        Q      196?

21        A      Yeah.

22              MR. PELOSO:  Is there a question

23        pending?

24              MR. STEPANOVICH:  I'm sorry, I thought

25        he was still reviewing.

```
1                - Brett Yagel -
2       Q     Are you done reviewing it?
3       A     Yes.
4       Q     This draft was composed by yourself
5   and Rita Louie?
6       A     No.
7       Q     Well, at the bottom it says Rita Louie
8   and Brett Yagel.
9       A     It was composed by Rita Louie.
10      Q     Your name is on there as well?
11      A     I did not compose this email or this
12  draft.
13      Q     Did you edit this draft, 197?
14      A     I may have, yes.
15      Q     Was 197 ever submitted to the Journal
16  News editorial page under your name or Rita
17  Louie's name?
18            MR. PELOSO:  In this form?
19      Q     In this form.
20      A     No, not to my knowledge.
21      Q     I think that's it.  Just one second.
22            We have no further questions.
23            MR. PELOSO:  No questions.
24            MR. STEPANOVICH:  Other than, John, I
25      think we'll hold it open pending the
```

1                   - Brett Yagel -

2       resolution of the matter with Marci

3       Hamilton.

4             MR. PELOSO:  That's your prerogative.

5       I disagree, but...

6             MR. STEPANOVICH:  We've been down that

7       road.  So we'll discuss that.  So I'm not

8       concluding the deposition of Mr. Yagel.

9             (Time Noted:  6:26 p.m.)

10                     *   *   *

11

12             _____

13                   Brett Yagel

14

    Subscribed and sworn to
15  before me this     day
    of             , 2014
16

17  _____

18

19

20

21

22

23

24

25

1

2                    E X H I B I T S

3

4
                                          For Ident.
5    Plaintiff's      Description         Page/Line No.

6

7
     Ex 130    Notice of Deposition          4    4
8
     Ex 131    Defendant Yagel's             4    7
9             Supplemental Responses
              To Plaintiffs' Second
10            Set of Interrogatories

11   Ex 132    Newsletter "The Village      11    24
              Green" July 2007
12            Bates No. POM13285

13   Ex 133    Document entitled,           13    19
              "Document Hold and
14            Preservation
              Notice-Privileged and
15            Confidential"
              Bates No. POM33617
16
     Ex 134    Preserve Ramapo email,       27    22
17            1/9/07
              Bates Nos.POM0013255-59
18
     Ex 135    Board of                     36    11
19            Trustees-Special
              Meeting, Minutes
20            4/21/08
              Bates No. POM19945
21
     Ex 136    Email dated 8/7/07           42    23
22            Bates No. POM16947

23   Ex 137    Emails                       62    3
              Bates No. POM16953
24

25

1

2                    E X H I B I T S

3

4
                                              For Ident.
5    Plaintiff's      Description          Page/Line No.

6

7
     Ex 138   Copy of invitation to a        85      9
8            cocktail party 10/22/05
             Bates No. LYAGEL00011
9
     Ex 139   Emails                          86     25
10           Bates Nos.POM0031218-20

11   Ex 140   Document entitled, "Why        100      4
             A Vote For Preserve
12           Ramapo Is A Vote
             Against Our Community's
13           Interests"
             Bates No. POM33279
14
     Ex 141   Emails                         100     17
15           Bates No. POM33278

16   Ex 142   Copy of pamphlet of           104     11
             Village Community Party
17           Bates No. POM20045

18   Ex 143   Document Re Pomona            108      3
             Election
19           Bates Nos.POM0012596-99

20   Ex 144   Email dated 8/3/07            111     12
             Bates No. POM21331
21
     Ex 145   Email dated 3/17/07           113      8
22           Bates No. POM16974

23   Ex 146   Campaign literature          115     17
             Bates Nos.POM0012600-02
24

25

1

2                    E X H I B I T S

3

4
                                          For Ident.
5    Plaintiff's      Description          Page/Line No.

6

7
     Ex 147    Campaign literature          120    20
8             Bates No. POM20040

9    Ex 148    Document entitled,           124    14
              "Candidate Endorsement"
10            Bates No. POM20296

11   Ex 149    Document to Rita             125    23
              Bates No. POM20311
12
     Ex 150    Campaign literature          128    17
13            Bates No. POM33090

14   Ex 151    Campaign literature          130    15
              Bates No. POM20576
15
     Ex 152    Copy of pamphlet of          131    18
16            Village Community Party
              Bates No. POM20039
17
     Ex 153    Campaign literature          134    10
18            Bates No. POM12974

19   Ex 154    Campaign literature          135    25
              Bates No. POM154
20
     Ex 155    Campaign literature          138     3
21            Bates No. POM20314

22   Ex 156    Campaign literature          138    22
              Bates No. POM20315
23
     Ex 157    Document from Journal        139    15
24            News
              Bates Nos. RC9-14

25

1

2                    E X H I B I T S

3

4                                        For Ident.
      Plaintiff's      Description        Page/Line No.
5

6

7    Ex 158    Campaign literature         141      2
                Bates No. POM20303
8
     Ex 159    Campaign item               141     15
9                Bates No. POM21311

10   Ex 160    Campaign literature         142     14
                Bates Nos. RC3-6
11
     Ex 161    Email dated 3/16/07         143     25
12               Bates No. POM21292

13   Ex 162    Journal News article,       145      5
                4/2/07
14               Bates Nos. RC1682-83

15   Ex 163    Printout from lohud.com     146      5
                Bates Nos. RC1834-36
16
     Ex 164    Emails                      147      8
17               Bates No. POM16975

18   Ex 165    Complaint Form, NYS         150      7
                Office of the Attorney
19               General, Public
                Integrity Unit
20               Bates No. POM20321

21   Ex 166    Email dated 4/27/07         153     10
                Bates No. POM17046
22
     Ex 167    Document entitled,          156     25
23               "Community View - A
                Tale of Two Towns - One
24               Divided"
                Bates No. POM20328

25

```
1

2                    E X H I B I T S

3

4                                        For Ident.
       Plaintiff's      Description       Page/Line No.
5

6

7    Ex 168    Document entitled,          166    20
                "Another Example of Why
8               Things Are Wrong In
                Ramapo"
9               Bates No. POM20326

10   Ex 169    Emails                      168    25
                Bates No. POM20858
11
     Ex 170    Email dated 3/9/10          169    20
12              Bates No. POM19274

13   Ex 171    Email dated 4/7/07          183    14
                Bates No. POM16969
14
     Ex 172    Printout from lohud.com     185    10
15              Bates Nos. RC614-21

16   Ex 173    Affidavit In Opposition     188     6
                To Defendants' Motion
17              To Dismiss

18   Ex 174    Emails                      191     3
                Bates No. POM17094
19
     Ex 175    Printout, "Save Ramapo"     196    21
20              Bates Nos. RC423-446

21   Ex 176    Document entitled, "The     202    11
                Real Discrimination"
22              Bates No. POM20308

23   Ex 177    Document entitled,          206    16
                "Critique of Ramapo
24              FGEIS"
                Bates Nos.POM0012887-97
25
```

1

2                    E X H I B I T S

3

4                                        For Ident.
     Plaintiff's      Description        Page/Line No.
5

6

7    Ex 178    Article entitled,          207    11
                "Trustee looks at
8               Ramapo housing"
                Bates No. RC408
9
     Ex 179    Document entitled,         209    16
10              "Land Use Leadership
                Alliance Training
11              Program 2008 Rockland
                County"
12              Bates No. POM20299

13   Ex 180    Email dated 2/25/07        211    2
                Bates No. POM36716
14
     Ex 181    Various letters            211    6
15              Bates No. POM36717

16   Ex 182    Document entitled, "The    216    9
                Patrick Farm Sellout -
17              Three Betrayals"
                Bates Nos. RC570-573
18
     Ex 183    Document entitled,         219    25
19              "Preserve Ramapo
                endorsement"
20              Bates No. POM20043

21   Ex 184    Emails                     220    19
                Bates No. POM17235
22
     Ex 185    Emails                     223    7
23              Bates No. POM21307

24   Ex 186    Draft of letter            225    3
                Bates No. POM20319
25

1

2                    E X H I B I T S

3

4                                          For Ident.

5    Plaintiff's      Description          Page/Line No.

6


7

     Ex 187    Email dated 7/11/07          227    14
8               Bates No. POM16958

9    Ex 188    Email dated 8/3/07           229     5
                Bates No. POM33298
10

     Ex 189    Board of Trustees            230    16
11              Minutes, 3/24/08
                Bates No. POM19941
12

     Ex 190    Board of Trustees            231    19
13              Minutes, 3/23/09
                Bates No. POM20206
14

     Ex 191    Email dated 6/28/06          232    17
15              Bates No. POM17244

16   Ex 192    Emails                       237     9
                Bates No. POM34701
17

     Ex 193    Email dated 8/13/07          239    20
18              Bates No. POM33294

19   Ex 194    Email dated 2/15/07          240     9
                Bates No. POM17119
20

     Ex 195    Article entitled,            245    12
21              "Where Religion Meets
                Real Estate, a
22              Developer and a Town
                Face Off"
23              Bates No. RC4137


24   Ex 196    Article by Lynn Yagel        246    21
                Bates No. RC4568
25

E X H I B I T S

|            |                        | For Ident.      |
|------------|------------------------|-----------------|
| Plaintiff's | Description           | Page/Line No.   |

Ex 197    Draft email to Journal      248    11
          News Editorial Page
          Bates No. POM20042


D A T A   R E Q U E S T E D

                                    Page/Line No.


Production of Marci Hamilton      150    3
retainer letter

```
1
2   STATE OF NEW YORK   )
                        )        ss.
3   COUNTY OF ROCKLAND )
4
5
6            I, Gale Salit, a shorthand reporter and
7        Notary Public within and for the State of New
8        York, do hereby certify:
9            That BRETT YAGEL, the witness whose
10       examination is hereinbefore set forth, was

11       duly sworn by me and that the transcript

12       of said examination is a true record of the

13       testimony given by the witness.

14            I further certify that I am not related

15       to any of the parties to this action by blood

16       or marriage and that I am in no way interested

17       in the outcome of this matter.

18            IN WITNESS WHEREOF, I have hereunto set

19       my hand this 20th day of May, 2014.

20

21

22       _____

23       Gale Salit
         Shorthand Reporter

24

25
```

Errata Sheet

NAME OF CASE: CONGREGATION RABBINICAL COLLEGE OF TARTIKOV -against- VILLAGE OF POMONA

DATE OF DEPOSITION: 05/08/2014

NAME OF WITNESS: BRETT YAGEL

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

          _____

## $

**$100,000** 38:8 39:5,6,9

**$3500** 44:11 45:9

## 0

**03** 208:12

**05** 101:16 103:25 104:5

**06** 235:8

**06/'07** 167:23

**07** 29:19 34:14 35:3,16,19 45:15 46:7 62:24 75:8 78:10 80:20 114:17 120:4 132:22 156:2 167:23 178:19,21 186:20 187:11,23 188:2 211:19 214:24 223:21 228:2,6,21,24 242:13 243:14 244:6,10 247:11

**08** 38:19

## 1

**1** 142:20 177:4

**1/9/07** 27:23 251:17

**10** 55:12 88:6 190:15,20 253:17 254:21 255:14

**10/22/05** 85:10 252:8

**100** 60:5 252:11, 14

**104** 252:16

**108** 252:18

**10970** 4:21

**11** 224:9 251:11, 18 252:16 255:21 258:7

**111** 252:20

**1113** 175:5

**1114** 172:18

**113** 252:21

**115** 252:23

**118** 172:16

**12** 257:20

**120** 253:7

**124** 253:9

**125** 253:11

**128** 253:12

**12:15** 84:16

**13** 251:13

**130** 4:5 9:11,14 251:7 253:14

**131** 4:10 10:14,24 251:8 253:15

**132** 12:2,5 251:11

**133** 13:23,25 14:3, 7 16:20 251:13

**134** 27:24 28:2,4, 7,10 29:17,25 123:3 251:16 253:17

**135** 36:13,17 37:22 251:18 253:19

**136** 42:25 43:3 44:19 251:21

**137** 62:4,7,10 251:23

**138** 85:12,14 252:7 253:20,22

**139** 87:3,6 98:12 252:9 253:23

**14** 253:9 254:10 255:13 257:7

**140** 100:7,10,13 102:16,18 103:5 104:3 252:11

**141** 100:18,21 252:14 254:7,8

**142** 104:13,16 108:8 252:16 254:10

**143** 108:5,11 111:6 116:2 252:18 254:11

**144** 111:14,16 252:20

**145** 113:10,12 252:21 254:13

**146** 115:19,21 116:17,20 252:23 254:15

**147** 120:22,24 253:7 254:16

**148** 124:16,19 253:9

**149** 125:25 126:3, 4 253:11

**15** 253:14,23 254:8

**150** 128:19,21 129:10 130:9 253:12 254:18

**151** 130:17,19,22 253:14

**152** 131:20,23 132:2 253:15

**153** 134:12,14,20 253:17 254:21

**154** 136:3,5 138:9 253:19

**155** 138:5,7,14,17 253:20

**156** 138:24 139:2, 7 254:22

**157** 139:17,19 253:23

**158** 141:4,6 254:7

**159** 141:16,19 254:8

**15th** 17:3

**16** 181:6 255:23 256:9 257:10

**160** 118:12 142:16,18,20 254:10

**161** 144:3,5 254:11

**162** 145:7,9 254:13

**163** 146:7,9 254:15

**164** 147:9,12 254:16

**165** 150:10,12 152:24 254:18

**166** 153:12,15 254:21 255:7

**167** 157:4,6 254:22

**168** 166:23,25 167:15 168:14 255:7,10

**169** 169:2,5 255:10,11

**17** 252:14,23 253:12 257:14

**170** 169:22,24 255:11

**171** 183:16,18 255:13

**172** 185:12, 255:14

**173** 188:8,10 255:16

**174** 191:4,7 255:18

**175** 196:23,25 255:19

**176** 202:13 204:11,12,19 206:9 255:21

**177** 206:19,21 255:23

**178** 207:13,16 209:12 256:7

**179** 209:19, 210:22 256:9

**17th** 115:12 217:25

**18** 253:15

**180** 211:4,10 212:22 213:11 214:4 215:23 256:13

**181** 211:5,7 212:15,18,21 213:3 215:16,20, 23 256:14

**182** 216:12,14 217:18 256:16

**183** 220:3,9,11 255:13 256:18

**184** 220:20 221:16,18 256:21

**185** 223:8,11 255:14 256:22

**186** 225:4,7 256:24

**187** 76:22 77:7,18 227:16,18 257:7

**188** 229:7,9 255:16 257:9

**189** 230:18 231:5 257:10

**19** 251:13 256:21 257:12

**190** 231:21,25 232:5, 257:12

**191** 232:19,21 255:18 257:14

**192** 237:10,13 257:16

**193** 239:22,24 257:17

**194** 240:11,13 257:19

**195** 245:15,18 257:20

**196** 246:23,25 248:20 255:19 257:24

**197** 248:13,16 249:13,15 258:7

**1988** 92:16 98:15

**1990** 208:19,23

**1998** 17:2, 18:3 26:22 27:3 73:24, 25

**1999** 234:6 236:22

## 2

**2** 88:7 105:2 142:25 143:4 254:7 256:13

**2/15/07** 240:9 257:19

**2/25/07** 211:2 256:13

**20** 255:7,11 257:17

**2000** 208:20,24

**2000s** 90:3

**2003** 137:24 197:14,18 227:6

**2004** 55:21 82:23 90:3 203:12 217:25 218:5 227:7

**2005** 16:14,15 55:21 85:19,25 137:24 197:14,18

**2007** 8:19 10:3 11:25 13:12 16:17 27:11 29:3,14 30:10 32:18,23 35:9,12,23 37:15 43:10 72:25 73:2, 22 74:2 75:12 80:6,8 81:17 104:19 105:20,25 106:4,8 115:13 117:4 118:6,11,13 128:8 129:7 131:8 132:4 135:10 139:6,23 140:5 141:9,21,23 145:12 147:13 153:20 170:22,25 171:24 172:6 173:10,22 174:12, 24 175:17 176:10, 22 177:4,24 180:9, 15 181:24 182:4 183:7 186:12 188:25 189:5 191:14,20 203:10 211:15 214:10 220:5,7 224:9 229:14 240:17,19 247:6 251:11

**2008** 34:23 36:21 146:13 209:18 210:3 231:16 256:11

**2009** 89:20 231:22 232:8

**2010** 90:18 170:3

**2014** 250:15 259:19

**202** 18:2 28:17 156:9,12 255:21

**206** 255:23

**207** 256:7

**209** 256:9

**20th** 105:25 106:7 129:9 259:19

**21** 255:19 257:24

**211** 256:13,14

**212-383-4300** 157:20 158:2

**216** 256:16

**219** 256:18

**21st** 32:18,23 35:19,23 36:21

**22** 251:16 253:22

**22'** 158:20

**220** 256:21

**223** 256:22

**225** 256:24

**227** 257:7

**229** 257:9

**22nd** 85:19 128:7 171:24 172:6 173:10,22 174:12, 24 175:17,22 176:10,22 177:24 180:9,15,19 181:24 182:4 183:7

**23** 251:21 253:11

**230** 257:10

**231** 257:12

**232** 257:14

**237** 257:16

**239** 257:17

**24** 199:23 251:11

**240** 257:19

**245** 257:20

**246** 257:24

**248** 258:7

**25** 252:9 253:19 254:11,22 255:10 256:18

**250** 76:24 77:6

**25th** 211:14 214:10

**26** 146:13

**268-10** 17:8

**27** 251:16

**2nd** 75:17 129:7 145:12 191:14,20

## 3

**3** 108:10 142:25 143:4 172:21 251:23 252:18 253:20 255:18 256:24 258:16

**3,000** 77:14,16

**3-2** 231:16

**3/16/07** 143:25 254:11

**3/17/07** 113:8 252:21

**3/23/09** 231:20 257:13

**3/24/08** 230:17 257:11

**3/9/10** 169:20 255:11

**306** 28:17 156:12

**36** 251:18

**3rd** 75:17

## 4

**4** 118:6,11 142:21, 25 143:4 251:7,8 252:11

**4/18/03** 207:20

**4/2/07** 145:6

**4/21/08** 36:12 251:20

**4/27/07** 153:10 254:21

**4/7/07** 183:14 255:13

**42** 251:21

**423** 199:9

**425** 202:17

**435** 198:13,19

**438** 200:15 201:5

**45** 87:18

**49** 172:22

**497** 88:8 90:11,23 91:4

**4th** 119:4 188:25 189:5

## 5

**5** 10:3 254:13,15 257:9

**50** 77:2,12 90:9 174:2

**500** 238:9,16

## 6

**6** 16:14 255:16 256:14

**6/28/06** 232:17 257:14

**60** 88:6

**62** 251:23

**6:26** 250:9

## 7

**7** 16:14 118:13 251:8 254:18 256:22

**7/11/07** 227:14 257:7

**70** 37:8,23 39:16

**75** 77:16

**78** 47:23 84:14

**7:30** 118:11

**7th** 43:10

## 8

**8** 142:21 147:13 252:21 254:16

**8/13/07** 239:20 257:17

**8/3/07** 111:12 229:5 252:20 257:9

**8/7/07** 42:23 251:21

**81st** 17:8

**85** 252:7

**86** 252:9

## 9

**9** 4:20 252:7 257:16,19

**90** 55:14

**994** 91:7

**9th** 30:10 75:12

## A

**abided** 158:16

**ability** 6:9,13 19:8

**Absolutely** 133:22

**access** 219:8 239:12

**account** 30:13 225:25

**accurate** 81:18 104:24 138:12 140:6 160:18,21 192:10 207:21

**accurately** 48:22 63:18 64:14 132:20 145:25 147:2 159:7 164:22 199:3 201:4 205:7 208:6 213:17 219:16 231:5 232:12 241:20,22

**acquire** 76:11

**acquired** 74:14

**acre** 57:20 89:19 162:6,10

**acreage** 162:4

**acres** 161:16 162:5,9 227:6

**act** 69:11 145:18 146:20,22 187:5

**action** 49:4 94:25 259:15

**actions** 47:10 94:4 194:2

**active** 106:23 137:8 140:12

**activists** 164:10

**activities** 94:20

**actual** 80:7 144:9 207:24

**Ad** 54:4

**added** 170:7

**addition** 38:6

**additional** 38:25 56:19 92:16,17 98:15

**address** 4:19 15:12,16,21 16:5, 9,16,18 94:10 101:4 102:2 154:12 211:17 222:5,6,11,12 232:24,25 233:5

**addressed** 175:4 181:8 215:25 226:19 228:11

**addresses** 15:13 16:2,12,13

**addressing** 108:19 175:6

**adhere** 64:11

**adopt** 176:10

**adopted** 174:6

**adopts** 159:2

**adult** 55:6,10 56:4,9,25 57:21 58:2,9,19,23 61:22 64:2,7 140:15 159:3 161:7,9 163:2, 168:6 217:23 219:2,3

**adults** 91:6

**advice** 149:6,11, 13 196:17

**advise** 78:23,24 79:25

**advised** 196:2,13

**adviser** 146:23

**Advisory** 53:6

**advocating** 176:9,11

**affected** 160:14 162:12

**affidavit** 188:6 190:15,20 255:16

**affiliated** 86:16 96:4 221:2

**affiliation** 41:20 75:19 87:11

**affordable** 200:25

**agree** 11:6 30:22 60:5 92:20,22,24 93:2,5 115:4,6,8, 13 167:23 168:6, 10 197:25 199:5 200:3 201:6 203:4, 6,19 205:9,17 208:8 216:4 217:7 219:18,20 247:7, 15,22

**agreed** 203:14

**agreement** 28:15

**agrees** 199:17

**ahead** 114:22 128:13

**Airmont** 103:8

**airwaves** 43:22

**alert** 170:4,10

**Alliance** 209:17 210:3 256:10

**allowed** 55:12 73:6 91:19 93:4 95:23,24 161:10 190:9

**alluded** 234:5

**alternatives** 95:20

**amount** 76:12 90:14 93:10

**and/or** 110:5

**anger** 187:6

**Animal** 66:3

**ankles** 96:19

**answers** 5:9,12 136:7 196:15

**anticipated** 50:18

**anymore** 149:17 154:13

**apartment** 218:14

**apologize** 44:24 136:23

**apparently** 222:14

**Appeals** 69:3,8 237:19

**appearance** 96:22 97:18 222:15

**Appearance-wise** 97:19

**appeared** 96:24 145:11 216:16

**appearing** 9:7

**appears** 63:7 94:2 100:22 112:5 113:14 116:20 138:8 139:4 147:12 158:18 173:7 185:17,18 191:10 215:24 222:17 224:8 228:10,13 246:8

**appease** 159:5,12

**Applebome** 245:21

**applicable** 57:14

**applicant** 51:24

**application** 51:9, 12 52:2 54:6,7 61:19 119:25 210:15

**applied** 58:10

**apply** 219:12

**appointed** 12:8

**approve** 113:22 114:5

**approximately** 8:25 23:24 37:8 55:20,21 73:3 76:23 89:20 90:4 105:21 129:5,8 155:21 161:2

**April** 36:21 38:19 90:3 117:4 118:6, 11 120:4 145:12 146:18 153:19 156:2 188:25 189:5 191:14,20

**area** 132:13 157:21 158:19 160:14 166:2 198:12

**areas** 63:25 64:3, 12 155:3 161:11

**argue** 241:13

**argued** 202:22 203:16 204:2

**arise** 48:11

**arm** 101:8

**arms** 96:20

**Army** 217:24 218:3

**arrived** 219:5

**article** 47:23 84:14 117:18 145:5, 146:11 162:15,16,17, 168:19 187:17,18, 19 199:13 205:19 207:11 216:16,19, 20,23 217:2,8,13 233:16 235:14,16 240:4 245:12,20 246:3,6,21 247:8, 23,25 254:13 256:7 257:20,24

**articles** 32:10 42:2 78:8 170:12 235:21

**articulate** 158:17

**ASH** 63:25 217:4 218:23,25 221:4

**ASH'S** 140:21

**asks** 108:22

**aspect** 65:20 69:12

**assigned** 11:10

**assist** 38:11

**Association** 117:4,20,24 118:5, 10,14 119:4,21,24 189:5 192:7,14

**assume** 11:16 156:4,5 199:15

**assumed** 118:2

**assuming** 91:5 92:14 98:13 99:10 215:13

**assumption** 242:20

**attached** 104:3 157:12 237:18

**attachment** 102:11,18 212:22

**attempt** 98:24

**attend** 33:4,6,9, 20,25 34:14,17,20 35:18 52:20 99:12

183:23 192:4,6
210:2 223:3 236:8,
10

**attendance** 35:23
36:22 87:21 88:5

**attended** 18:11
33:17 35:15 87:17
154:22 188:20
233:13

**attending** 19:13
87:23 93:11 192:6

**attention** 147:18
164:3,6 172:17
189:15 198:13,18
202:16 219:4
231:8

**attorney** 53:12
67:13 77:20 149:4
150:8,15 152:5,8,
10 176:20 188:19
246:7 254:18

**attorney/client**
78:15

**attracted** 132:12

**attributable**
117:15

**attribute** 193:13

**attributed** 118:12
173:8

**audible** 5:9,13

**audience** 192:18

**August** 43:10
45:15 46:7

**author** 126:7
167:14 185:20
222:2 226:22,25

**authored** 168:17,
19 207:4,20

**authorized** 48:2,
10

**authors** 216:18

**Automation**
101:7,21

**Avenue** 17:8

**average** 22:17,19

**awakened** 140:19

**aware** 27:5,9,12,
14 30:25 32:20,25
49:16 69:7,14,16
102:22 123:18

**B**

**Babad** 240:4

**Babcock** 239:11

**back** 6:22 13:3
16:14 29:19 41:3
44:4 51:6 54:21
71:19 72:7,25 74:3
79:6,7,8 83:5 94:4,
17 104:19 115:12
131:8,13 132:22
141:9 151:14
163:15 165:24
167:23 170:17
178:19 186:12,17,
20 187:11,22
188:2 202:15
203:10 208:12
211:19 218:7
219:20 224:7
228:2,6,21 229:14
240:17,19 243:14
244:5,9 247:11

**background**
154:25 155:2,3
217:20

**backgrounds**
14:19

**bad** 33:24 170:7,9,
14

**ballot** 76:13 77:10

**band** 94:18,20

**Banks** 35:6
228:11

**base** 56:19,21,22
59:8 208:14 221:4

**based** 56:20
65:17 77:3,13 98:2
173:17 181:7,10
212:12 215:4
237:3 243:19
244:13

**basically** 52:16

**basing** 104:2

**basis** 23:5 37:21,

22 54:3 68:14
78:17 122:14
150:22 151:8
165:21 200:6
206:4

**Bates** 11:25 13:21
27:23 36:12 42:23
62:3 85:10 86:25
100:6,17 104:12
108:4 111:12
113:8 115:17
120:20 124:15
125:23 128:17
130:15 131:19
134:10 135:25
138:3,22 139:16
141:2,15 142:14
143:25 146:6
147:8 150:9
153:10 157:3
166:22 168:25
169:20 172:21
183:14 185:11
191:3 196:22
202:12 206:17
207:12 209:18
211:2,6 216:11
220:2,19 223:7
225:3 227:14
229:5 230:17
231:20 232:17
237:9 239:20
240:9 245:14
246:22 251:12,15,
17,20,22,23 252:8,
10,13,15,17,19,20,
22,23 253:8,10,11,
13,14,16,18,19,21,
22,24 254:7,9,10,
12,14,15,17,20,21,
24 255:9,10,12,13,
15,18,20,22,24
256:8,12,13,15,17,
20,21,23,24 257:8,
9,11,13,15,16,18,
19,23,24 258:8

**Bear** 210:6

**Beautiful** 74:7

**beauty** 132:12

**began** 13:11 80:5
197:17

**beginning** 103:6
140:11 151:7
197:8 199:9

**begins** 135:13
145:16 218:10
223:15

**behalf** 51:6
164:11

**belief** 94:9 151:24

**believed** 66:15

**believes** 224:24

**benefit** 133:12

**Betrayals** 216:10
256:17

**bid** 38:3 220:5

**bill** 180:6

**binding** 51:25

**biographical**
143:5,9,21

**birth** 200:20
201:13

**bit** 18:3 28:12

**black** 116:20
117:17

**blast** 184:17,22

**blasts** 15:11

**blessing** 147:20

**blind** 222:20

**bloc** 19:16,19,20,
23 20:8,10 21:2,
10,20,22 91:7,13
159:16,18 167:20

**bloc.'** 158:21

**block** 106:25
132:9 134:2
135:12 159:6,12

**blocked-out**
116:21

**blocs** 20:14

**blog** 118:12

**blogs** 31:6,13
117:18 240:5

**blood** 259:15

**blurb** 130:25
131:11

**BLY** 225:17

**BLY1** 136:20

**Blyagel@**
**optonline.net**
16:2

**blyagel@**
**optonline.net.**
16:15

**board** 8:23 10:4
12:8 20:16 32:17
33:20,24 35:15
36:11,20 46:6,10,
14,17 48:20 49:13
51:10 52:3,12,25
53:3,4,8,16,20,24
62:25 63:4 91:8
94:4,7,24 99:8
120:2 142:21,22
151:23 171:21
172:6,13 173:24
175:14 176:9
177:5 178:25
179:19 180:10,14,
17 183:3 185:6
191:17,19 219:14
230:16 231:19
235:9 237:19
240:2,6,20 251:18
257:10,12

**boardroom** 97:12

**Bob** 40:13,25
41:11 62:17,18
63:12 137:18,20,
22 212:5,7 213:15
220:14 227:24
240:16 241:23

**Bobover** 237:21
239:4,8

**bodies** 46:22

**body** 226:17

**book** 173:13,15

**books** 61:23 64:7
181:17

**boots** 140:20

**bordered** 237:20

**bottom** 112:4,6
126:10 145:15
147:14,19 160:12
164:7 170:12
172:21 202:19
229:22 241:11
249:7

**bought** 200:22

**box** 106:20

**breach** 95:12

**break** 6:2,3,5
54:24 55:3 84:17
144:23

**Brett** 4:1,17 12:1,7
100:1,22 102:1,24
132:1,6 133:1,11
134:1,23 143:1,13
146:1,18 147:1,22
148:1,4 154:1,3
157:1,25 184:1,12
191:1,11 246:1,11
249:1,8 250:1,12
259:1

**Brett's** 106:22
130:25

**brett.yagel@
pomonavillage.
com** 228:25

**brett.yagel@
pomonavillage.
com.** 16:3

**brett@
villagecommunit
yparty.com**
147:16 211:18

**brett_yagel@
glic.com** 154:3

**briefly** 70:18
150:25

**Bringing** 132:18

**broad** 93:24

**broker** 43:21

**brought** 36:24
176:16

**budget** 7:12 38:7

**budgets** 91:8

**building** 53:13,
14,15 135:13

**buildings** 172:11

**built** 57:14 88:9
90:5,12,14 238:13,
15,16 244:4

**burden** 56:19
57:7

**burdensome**
198:24

**business** 8:4 66:8
67:3

**buy** 91:19

**byagel@siac.
com** 101:5

---

**C**

**calendar** 16:10

**call** 28:22 133:14
234:9 235:2

**called** 23:10,13
60:9 84:14 233:15
240:17

**calling** 233:8
235:7,12

**calls** 31:4 58:12

**Camp** 29:9
224:14,18

**campaign** 34:5
44:4,12 45:10
46:12 72:25 73:2,
82:6,7 83:8 85:5
104:18 110:6,8,14,
16,17 114:13
115:17 120:20
121:3,23 124:21
126:6 127:5
128:17,25 129:2,3,
11 130:15,24
131:6,7 132:3
133:18 134:10
135:25 138:3,22
139:5,10,24 141:2,
8,9,15,21,22,23
142:14, 180:22
197:21 252:23
253:7,12,14,17,19,
20,22 254:7,8,10

**campaigning**
126:23 146:21

**campaigns**
197:20

**camphillroad**
185:21,24 186:2
187:18

**candidacy**
125:16 220:12

**candidate**
106:21,22 124:15
210:2 253:9

**candidates** 73:11
91:9 129:17
139:23 144:8

**canvassing**
127:22

**capable** 194:11

**capacity** 8:17
69:22 70:4 71:5,23
72:20 78:2,3 96:5,
7 137:8 148:24

**capture** 234:9

**career** 195:19

**careful** 190:10
192:9 195:24
196:2

**case** 27:6 42:10
59:12 69:14
177:18,19 178:2,3,
12,15 195:20

**cases** 177:21

**Castelluccio**
30:5 40:18 41:8
216:23 223:14
224:2,20

**Castelluccio's**
223:20 224:12

**Catch** 158:20

**caught** 158:19

**caveat** 50:20
68:16

**ceased** 80:13

**census** 77:4
208:19,20,24
209:4,6,8

**center** 89:22
126:19 209:25

**central** 202:24
203:18

**certainty** 97:22
98:2

**certify** 259:1,14

**cetera** 7:13 57:18

**Chaim** 59:12

60:13,17,18 221:3,
5,14

**chain** 147:13

**chairman** 220:15

**chance** 172:18
173:4 182:12
247:17

**change** 17:24
74:3 176:7,10

**changed** 17:10,
23 18:7 175:9,17,
18 181:3

**changing** 160:16

**characteristics**
127:25

**characterization**
216:4

**charge** 160:2

**Charles** 215:25

**chat** 119:19,22

**Chestnut** 59:16
103:8

**chew** 119:22

**chews** 119:19

**children** 18:11
19:13 87:15,22
92:15 98:14
200:21 201:2

**children's** 198:21
200:10

**Chofetz** 59:12
60:13,17,18 221:3,
5,14

**Cholesterol** 6:16

**chosen** 175:24

**Christopher**
45:9,11 150:20
219:13

**chunks** 116:5,6,7

**Circuit** 69:3,7

**circuits'** 68:24

**cited** 89:25

**citizen** 177:7

**citizenry** 65:22

**citizens** 30:13
144:16 219:8

**citizens'** 31:2

**citizens/
residents** 158:19

**city** 246:12 248:3

**Civic** 117:4,20,24
118:5,10,14 119:3,
21,23 189:5 192:7,
14

**claimed** 60:16

**clarification**
116:13 181:5

**clarify** 105:17
148:14

**clarifying** 180:14

**clarity** 138:8

**class** 65:22 66:5
82:11 94:21

**clear** 58:25 61:10
80:12 194:4

**clerk** 191:24

**client** 50:24 65:7
149:5 193:7,13

**clients** 51:3

**Clinton** 216:2

**closed** 17:2 46:21
47:2

**closely** 195:15

**clothing** 97:15
245:4

**co-counsel** 81:10

**coaching** 109:20

**coalition** 106:24
166:13 171:8,13,
14,15

**cocktail** 85:10
252:8

**code** 174:13
178:5,8,10 200:24

**codes** 30:5 63:16
105:5 173:13,15,
19,20 174:10
246:9

**collage** 215:23

**collect** 77:10,12

**collected** 76:22
77:18

**collecting** 73:5
127:12,14

**college** 5:3 27:6
28:18 31:9,14
32:21 41:20 61:8,
11 63:14 75:6
119:12 122:21
126:11,24 187:20
230:8,21 231:12,
24 232:8 242:23,
25 243:11,25
244:3,16

**collusion** 151:18

**color** 184:10

**colors** 133:4

**column** 107:18
108:17 110:23
116:12,13,15
117:9 132:5
136:19

**Comfort** 32:22

**comment** 39:11,
14,19,25 40:6 56:4
63:13 65:6 117:17
118:18,19 136:20
189:24 190:2
214:8 229:13,16,
22,25 238:14,18
246:4,5

**commenting**
174:4

**comments** 25:7
31:3 108:18,20
117:14 118:4,7
175:5 179:11
187:22 188:2
196:7 225:16,19,
20,21 226:8,16

**commercial**
65:23 66:2,25

**Commissioner**
233:12

**commitments**
33:12,13,15

**committed** 74:11

**committee** 52:24
53:7,17,21,23 54:2
102:11

**communicate**
80:25 81:2,4

**communicating**
117:7

**communication**
50:19 78:15

**communications**
15:6,10 81:3
148:23 149:4,18
196:9 228:7

**communities**
202:24 205:2,14

**community**
22:10,13 30:18
32:3,4,8 52:24
58:22 74:3,4 75:23
86:17 91:16,25
94:11 104:12
106:23 110:5
111:2 129:15
131:19 132:15
133:2,3,6,11,16,19
157:2,9 158:4
160:2,16 198:21
200:9,19,21 201:2,
12,13,23,24
202:21 203:18
205:4 207:25
208:5,10 210:20
246:16 253:16
254:23

**Community's**
100:6 252:12

**community/
region** 160:7

**commute** 7:22,24

**company** 7:16
154:14 240:17,24

**comparison**
135:20

**compelling**
123:19 124:7
241:14

**complaint** 81:12
108:21 109:4,7,8
110:24 117:10
134:18 150:7,16,
17,22 151:9 152:2,

16,19,24 230:7
254:18

**complete** 60:22
109:14,15,16
135:19 221:25

**completed**
109:19

**completely** 48:8

**complexes** 58:23

**compliance**
60:22

**comply** 14:6

**complying** 9:13
10:16 16:19 62:9
87:5 100:12
111:18 128:23
130:21 131:25
191:9

**component**
244:11

**compose** 109:25
116:17 134:20
136:13 249:11

**composed**
108:13,15 131:2
136:15 141:10
169:13 170:5,6
213:11 223:25
224:19 249:4,9

**composition**
107:7

**comprehensive**
89:18 148:2 161:5
162:21

**comprised** 14:17

**comprises** 20:7

**computer** 14:11

**concentrated**
94:10

**concept** 161:25

**concern** 164:19
193:4 228:21
238:6

**concerned** 87:24
96:8 192:23 194:2,
5,8

**concerns** 99:12

132:11,18

**concluding** 250:8

**conclusion** 58:13
68:17

**Conference**
238:23

**Confidential**
13:21 251:15

**configurations**
88:9 90:12

**conflict** 176:15,19
177:13,17 200:18

**conflicts** 175:15

**confusing** 83:7

**Congregation**
5:3 27:6 28:18
119:12 230:21
232:7

**Congress** 68:21

**congressional**
153:21

**congressman**
154:16,18,24

**Congresswoman**
70:14

**conjecture** 92:3

**connection** 50:12

**consists** 21:2

**constituency**
30:23 39:15

**constituent** 10:5

**constituents**
39:12

**Constitution**
51:18

**constitutional**
219:9

**construction**
239:8

**construed** 189:20

**consulting** 7:18
8:4,6

**contacted** 152:7

**contacting** 148:5

**contained** 84:8
161:7 199:13
213:3 234:2

**content** 107:8,9
185:16

**contents** 206:11
217:7 230:11
247:7,22

**context** 45:5
47:21 97:25
115:11 123:17
149:7

**continue** 83:2
148:18

**CONTINUED**
84:23

**continuing**
201:20

**contract** 37:25
38:2,4,24 39:7

**contrary** 30:24

**contribute**
106:17

**contributed**
44:16 106:12
107:11

**control** 20:15,17,
18,19 21:3 165:25
219:7 248:5

**controversies**
210:19

**convenient**
158:20

**conversation**
70:17 152:9 212:6

**conversations**
70:10,16,21 228:3,
20

**Cooper** 188:21

**copied** 62:21 63:4

**copies** 222:21

**copy** 36:20 76:8
79:15 85:9 104:11
111:8 131:18
252:7,16 253:15

**corner** 12:6
172:22

**Corporation** 101:7,21

**Corps** 217:24 218:3

**correct** 9:2 23:11 32:18 38:22 46:7 49:19 51:14 55:16 58:11 62:12,14,15 67:18 76:13 99:18 100:22 102:7,8 105:25 106:4,8 108:9 111:19 112:14 120:10 131:9 132:7 136:17 143:7 154:3,13 168:14, 18 170:5 171:6,17 174:25 176:4,5 185:2 191:12 192:18 198:17 200:2 203:19 207:8 214:21 215:17 216:24 217:8 220:15 231:13 245:25

**corrected** 104:21 177:14 197:9

**correction** 6:21 7:19

**correctly** 12:14 76:11 77:5 135:4 189:21,22 203:2

**correspondence** 223:13 238:20,25

**corridor** 18:2

**cost** 38:4 198:21 200:9

**costs** 57:17

**Council** 238:23

**counsel** 9:22 10:10 11:3 14:11, 13,14 30:7 50:11 60:6 67:16 75:25 78:19 102:2,5 108:19 109:6 111:8 135:17 147:23 149:6 184:2 196:7,9,13, 14 237:17 239:14 241:5

**Counsels** 71:8,9

**county** 16:25 17:10,19,25 18:7, 8,12,15 19:19,24 20:11,18 22:10 25:12 26:4,11,17, 21 31:8 86:12 98:8 125:19,20 136:24 138:18 167:20 201:13 204:9 209:18 210:5,7 233:11 242:10 256:11 259:1

**couple** 210:12 247:19

**coupled** 193:16

**court** 4:20 5:9 7:21 69:3,8,16 72:6 79:7 84:11 126:25 142:17 174:11,14,16,21 175:13 176:12,14 179:2,9,21 222:15 223:3 241:12,15

**courts** 178:18

**cover** 198:21 200:9

**covered** 96:20

**CRC** 52:25 53:2

**create** 163:16,24 164:8 246:12

**created** 163:17 164:9

**creating** 159:5

**Creatures** 66:3

**credit** 217:16

**creeds** 133:4

**criminal** 151:2,17

**criteria** 154:11

**critical** 83:8

**Critique** 206:17 207:3 255:23

**crowd** 192:25 193:5

**Crowne** 236:6

**CSL** 43:22

**cultural** 126:19

**culvert** 155:18 156:8,14,15

**cure** 70:5

**current** 56:22 154:8

**cut** 94:4,17 142:2 164:5

**cutback** 94:14

**cutbacks** 87:24 94:23 218:3

**Cutler** 136:9,23 137:2

**cuts** 158:2

---

**D**

**daily** 140:13

**damage** 217:25 218:2

**damaged** 82:9

**damaging** 82:13

**dark** 245:4

**dark-colored** 96:21

**data** 14:13 150:3 204:7 208:14,17 241:12

**date** 73:9 78:6 80:7 85:25 87:9 151:12 175:24 176:2 191:16,23 192:2 207:23,24 223:3 233:14

**dated** 42:23 43:10 111:12 113:8 143:25 147:13 153:10 169:20 191:14 203:12 207:20 211:2 227:14 229:5 232:17 239:20 240:9 251:21 252:20,21 254:11, 21 255:11, 256:13 257:7,9,14,17,19

**dates** 103:20 235:19

**day** 7:22,24 73:6,

23 250:15 259:19

**days** 114:17 140:5

**deal** 69:18 148:2

**dealing** 47:17 87:11

**dealt** 210:20

**Dear** 99:20

**debacle** 160:15

**decide** 109:18

**decided** 34:13 122:9 140:19

**decision** 74:10,15 95:18 201:8 208:13

**decisions** 95:7 160:15 177:20

**dedicated** 57:16

**deerkill@att.net** 62:13

**defend** 105:5 107:20 113:3

**defendable** 174:11,14

**Defendant** 4:7,11 251:8

**Defendants'** 188:7 255:16

**defended** 174:21

**defense** 178:24 179:19

**defensible** 175:13,14 176:12, 13

**defined** 15:4 58:6 178:5

**defines** 48:16

**definition** 38:15 45:4 47:9 178:6

**definitive** 167:11

**deliberations** 50:10

**delivered** 102:2

**demands** 200:20

**demographic** 242:9

**department** 53:14

**depending** 178:18

**deposition** 4:4 5:5 9:8,21 10:11 28:21 84:22 250:8 251:7

**deputy** 34:21 35:2 99:13 169:9

**describe** 7:9 17:13,24 20:13 31:16,23 39:18 45:4 46:24 47:20 55:9 69:19 112:5 156:20

**description** 97:19,20 207:22 253:5 256:4 258:5

**designated** 59:4 218:23 221:4

**desires** 19:21 21:25

**destruction** 81:24 82:23 83:11 89:25 161:22 198:12 217:5

**determination** 48:25 149:16

**determine** 176:18

**determined** 127:17

**determines** 54:5

**develop** 132:16 190:9

**developed** 17:20 59:5

**developer** 41:24 44:5 45:6,7 51:12 82:9 89:3,6,8,24 151:19 152:23,25 153:4 159:20 161:21 164:16 245:13,23 246:8 257:22

**developers** 219:10

**developing** 164:16

**development** 11:12 17:14,17,18 31:20 57:13,15 65:23 74:12 83:15, 19 88:16,19,23 89:12 90:5 104:24 105:4,12 106:18 147:23,25 158:16 162:4 219:7 234:4

**developments** 58:18 134:25 143:15 221:3

**diminishing** 132:13

**direct** 146:15 147:18 172:17 198:13,18 231:8 232:2

**direction** 107:17

**directive** 14:6

**directly** 82:13

**disagree** 98:18 107:13,23 130:8 131:10 203:21,25 205:11,15,21 247:25 248:6 250:5

**disagreed** 98:11, 22

**disapprove** 122:2

**disapproved** 122:5

**disaster** 92:18 98:16

**discern** 77:7 129:23 161:13

**disclose** 78:21

**disclosing** 81:3

**discontinued** 95:10

**discriminating** 189:20 190:18

**discrimination** 202:12 204:14,25 205:13,14, 235:23 255:21

**discriminatory** 189:19 190:11 192:13

**discuss** 33:23 47:5,24 48:11 49:2 52:17 148:5 250:7

**discussed** 47:12 119:13 122:10 180:20

**discussing** 126:21 180:18

**discussion** 33:19 51:24 189:6 242:8

**discussions** 50:17 128:4 242:5

**disgusting** 246:11

**Dismiss** 188:7 255:17

**distinction** 43:18 244:20

**distribute** 111:5 222:7

**distributed** 105:22 106:6

**district** 18:15,16, 22 19:10 86:17 87:12,16,23 92:17, 19 93:7,11,14,20, 22 96:2,5 98:15,17

**districts** 93:23 98:8

**diverse** 14:18 133:3

**diversity** 132:15, 25 133:8,15,19

**divide** 160:8

**Divided** 157:3 254:24

**divulge** 67:15

**document** 10:23 11:3,22 13:17,19, 20 14:2 27:20 28:3 36:9,15 42:21 43:5 61:25 85:7 86:23 100:2,4,15 104:9 107:7,12,14,25 108:3,13,15 111:5,

10 113:6,24,25 114:3,6,8,11 115:15,22,24,25 116:18 117:8 120:18,25 121:8, 122:12,13 124:12, 14,20 125:21,23 127:2 128:15,24 130:13 131:16 134:8 135:20,23 136:16 137:25 138:20 139:13,15, 25 140:24 141:13 142:12,25 143:23 146:3 147:6 150:5 153:8,13,14 156:23,25 157:13 158:10 163:23 164:3 166:18,20 167:4,5,7,12, 168:13,23 169:18 183:12 185:8 188:4,15 190:25 196:19 197:3 198:14,16 199:6, 14 202:9,11 203:12 205:21 206:14,16,22 207:9 209:14,16, 23 210:24 211:11 212:16,17 216:7,9, 15 219:23,25 220:9,17 223:5 227:12 229:3,10 230:14 231:7,17 232:15 237:7,14 239:18 240:7 245:10, 246:19 247:2,21 248:9,17 251:13 252:11,18 253:9,11,23 254:22 255:7,21, 23 256:9,16,18

**documented** 190:3

**documents** 4:3 9:23,25 10:7 14:10 16:21 101:23 123:7,10,13,15 135:16 211:22

**donated** 44:11 45:9

**donation** 43:21 44:3

**Donna** 4:25

**door** 126:22 127:5,18

**Dora** 29:10 224:14,18

**Doris** 183:25 184:3 237:17 238:20

**dormitories** 178:6

**dormitory** 172:9 173:21,23 174:3,8, 13,20,23 175:7,9 176:4 177:3,13,24 178:6,20,21 180:10,13,24 182:9,17

**downzoned** 89:19

**downzoning** 140:15 161:11,19, 24 162:2,3,12 168:9,10

**draft** 125:7 138:9 139:4 141:8,10 157:8 162:19 225:3,9, 248:11,18 249:4,12,13 256:24 258:7

**drafted** 125:4 163:15 213:16,22 225:12,14 226:16

**drafting** 121:7,9

**drainage** 155:7, 11

**draining** 239:13

**dress** 96:12 98:2 244:25 245:2

**dressed** 96:25 97:14

**dresses** 96:19

**drinking** 82:11

**due** 13:9 51:21 94:4,25

**dues** 15:4,5

**duly** 4:12 259:11

**duties** 7:9 12:17 13:15 158:24

**duty** 95:13

**E**

**e-mail** 46:9 92:4

**ear** 195:13,16

**earlier** 93:6 103:10 145:24,25 154:6 162:17 189:4 245:2

**early** 73:8 106:3,7, 9 218:5

**East** 18:16,21 19:9 86:17 87:11, 16 93:7,20 96:2,4 198:23

**ecologically** 161:16

**edit** 206:8 249:13

**editor** 31:8,17 186:8

**editorial** 248:12 249:16 258:8

**edits** 114:7 206:12 215:19

**educate** 79:25 149:9 157:17

**educated** 124:3,6 184:14

**Education** 91:9

**educational** 55:13 57:25 58:3, 6,8,10

**educational-related** 93:25

**effect** 6:12 74:9

**effected** 168:11

**effort** 163:24

**efforts** 13:11 83:2 165:15 166:7,11 170:18,21,24 171:15

**egos** 187:6

**elected** 8:12,15, 21 19:6 30:18,20 46:14 85:6 103:7 117:25 137:10

153:20 178:16

**election** 21:3 34:5 73:2,22 78:10 80:19 98:7 108:4 111:25 112:8 113:2,19 114:17 131:8 140:5 147:24 151:23 170:25 172:3 197:20 220:5 252:18

**electioneering** 130:24

**elections** 20:16, 17,18,20 98:7 248:6

**electronic** 115:24 169:8 225:21

**eligible** 76:25 77:6

**Eliot** 216:2

**else's** 194:9

**email** 15:11,12,13, 16,21 16:2,4,5,9, 12,13,16,18 27:22 28:9 29:3 30:5,6 42:23 43:7,15,23, 25 44:18,20 45:25 62:10,16 63:4,8, 10,23 64:19 75:10 86:19,21 87:9 88:19 90:10,17 91:5 98:23 99:6,13 100:22 101:4,9,12 102:2,6,8,9,10,19 103:3 111:12,19 113:8 114:16 143:25 144:7,10 147:12,14 153:10, 18 154:2,9,12,15, 17 169:7,8,20 170:2,5 183:14,20 184:13,17,22 185:2 191:10 192:4 211:2,13,17 212:8 213:11 215:4 221:21 222:6,7,11,21 223:14,15,20,23, 24 224:8,12,17,20 227:14,19 228:7, 10,25 229:5,17 230:12 232:17,23, 25 233:4 234:2,8

236:20 237:16 238:21 239:20 240:2,6,9,15 241:10 242:6 243:2 249:11 251:16,21 252:20, 21 254:11,21 255:11, 256:13 257:7,9,14,17,19 258:7

**emailing** 113:16, 22

**emailings** 114:14

**emails** 10:3,5 14:13 15:11,21 16:5,20 62:3 86:25 100:17 101:10,22, 25 103:13 137:10 147:8 154:5,7,8 168:25 191:3 197:24 211:19,21 220:19 223:7 237:9 251:23 252:9,14 254:16 255:10,18 256:21, 22 257:16

**emergency** 12:9

**empirical** 208:14, 17

**employed** 6:25 7:19

**employees** 96:6

**employer** 7:14,17 8:5

**employer's** 232:24

**Enact** 74:3

**enacted** 55:11 87:25 162:21 168:7

**enacting** 161:4,5

**enactment** 140:21

**encompass** 166:5

**end** 114:20 160:6, 13 216:22 239:11 241:9 246:15,16

**ended** 80:11

**ending** 195:19

**endorsed** 125:16 137:12 220:6

**endorsement** 124:15,21,22,24 125:5,7,9,12 139:23 220:2,11 253:9 256:19

**enforce** 158:25

**enforced** 112:25

**engage** 128:4

**Engarcon** 118:24

**Engel** 216:2

**engineer** 53:12

**Engineers** 218:4

**ensure** 13:7 74:5 112:24

**enterprise** 67:2

**entire** 46:10 115:11,25 117:7 186:19 199:6 224:17

**entirety** 216:21

**entitled** 13:19 100:4 124:14 156:25 166:20 202:11,20 206:16 207:3,11,19 209:16 216:9 219:25 245:12,22 251:13 252:11 253:9 254:22 255:7,21,23 256:7, 9,16,18 257:20

**entity** 65:21 66:2

**environment** 74:7 106:18 135:2 143:16

**environmental** 121:15,17,21 122:16 170:6,9 219:10

**environmentally** 161:10 166:2 198:11

**equation** 132:17

**equipment** 13:9

**essential** 132:16 133:2,6,16

**established** 177:19 217:5

**establishment** 162:22

**estate** 24:25 198:20,24 200:8 245:13,23 257:21

**ethenticities** 133:5

**evaluated** 120:2

**evening** 33:10 175:23

**event** 144:9,11 154:23 156:21

**everybody's** 181:20

**evil** 200:17

**exact** 120:8,9

**examination** 4:22 202:23 203:17 259:10,12

**examined** 4:14 203:24

**Exchange** 101:8, 13,19

**execute** 19:7

**executed** 7:12

**executive** 47:2, 16,21,24,25 48:10, 21

**exempt** 22:2,6 57:15,24

**exempting** 57:23

**exemption** 230:20 231:2,11, 23 232:7

**exemptions** 219:11

**exhibit** 4:5,10 9:11, 10:14 12:2,5 13:22,25 16:19 27:24 28:2,4,6,10 29:17,25 36:13,16 42:24 43:3 44:19 62:4,10 85:11,14

87:3,6 98:12 100:7,10,13,18,21 102:16,18 103:5 104:3,13,16 108:5, 8 111:13,16 113:9, 12 115:19,21 116:17 120:21,24 124:16,19 125:24 126:3 128:18 129:10 130:16,19, 22 131:20,23 134:11 136:2,5 138:4,7,23 139:2, 17,19 141:3,6,16, 19 142:15,20 144:2,5 146:7 147:9 150:10,12 153:11 157:4,6 166:23,25 167:15 169:2,5,21,24 172:16 183:15,18 185:12,14 188:8, 10 191:4,7 196:23, 25 202:13,16 206:9,19,21 207:13 209:11,19, 22 211:3,7,10 212:14 216:12,14 220:3,8,20 223:8, 11 224:20 225:4 227:15,18 229:6 230:18 231:21 232:5,12,18,21 237:10 239:21 240:10,13 245:15, 18 246:23 248:13, 16,19

**exhibited** 75:11

**exhibits** 103:23 134:16 190:4

**existed** 64:20 174:17,18

**existence** 20:11 55:18 163:25 166:16

**existing** 56:19,21 158:25 159:4 200:24

**exists** 19:23,25

**expand** 30:20 38:15 47:8

**expectation** 200:23

**expecting** 46:2

**expediency** 185:15

**expense** 38:12

**experience** 133:12

**expert** 145:19 146:21

**explain** 82:5 117:6 171:10

**explanation** 117:23

**exponential** 86:10

**express** 182:19

**expressed** 117:14

**expressing** 180:12

**extent** 50:9,15 58:12 60:3 78:14 128:12 196:4

**external** 15:20

**extract** 229:16

**extremely** 140:12

**F**

**Face** 245:14,23 257:22

**Facebook** 25:22

**faced** 38:3

**facial** 96:22

**facilities** 55:13

**facing** 105:3

**fact** 87:15 88:18 89:6 184:22 206:3

**facts** 120:2 247:14

**factually** 244:13

**fair** 13:12 32:6 34:3 93:8 126:15 129:14,23 134:4 167:22 192:3 244:24

**faiths** 205:3

**familiar** 22:2 26:9 46:20 55:5 176:6

**families** 22:16,21

**family** 22:13,18 33:14 90:6

**Farm** 24:23,24 25:7 81:25 82:2,9 83:13 88:19 91:20 99:9,23 153:7,25 159:20 161:15 169:11 216:10 218:11 225:10 227:5 233:22 234:4 235:25 239:12 256:16

**Farms** 83:10, 88:15,23 89:3,12 90:14 104:24 162:13,25 163:5 164:15 166:4,5 233:24

**favor** 182:25 183:4

**favorable** 40:3,4

**faxing** 237:17

**fear** 194:5

**feature** 225:22

**February** 17:2 118:13 126:20 211:14,19 214:10, 24 240:17,19 242:12 243:14 244:5,9 247:6,11

**federal** 66:10 67:24 68:12,23 70:11 217:6

**federally** 81:25 83:12 90:2 153:24 161:22

**Federation** 195:8

**feel** 67:4 72:7 194:18,24 195:9 231:6

**feeling** 132:15,25 133:15,19

**feet** 127:25 238:9, 16

**felt** 133:5 194:25 195:2

**FGEIS** 206:17 207:4 255:24

**fiduciary** 19:7 67:20 94:25 95:13

**field** 7:5 82:12

**fight** 107:16,19, 21,22 112:23 113:3 122:5,7 134:25 140:20 143:15

**fighting** 140:15

**figure** 187:13,16 234:13 238:6

**figures** 208:24

**file** 47:22 75:18 152:2 246:9

**filed** 48:17,22 49:3 51:13 52:2 54:6,7 61:20 84:11 88:13 109:4 117:10 134:18 150:17 151:9,13 152:16 230:7

**files** 191:25

**fill** 209:6

**final** 117:2 138:9 143:12 159:11 219:4

**finally** 119:25

**financed** 50:24 65:7 179:12 193:7, 14

**find** 109:7 118:3 122:14 127:12 148:9 157:22

**finding** 132:18

**fine** 10:20 23:2 84:20 109:17 161:21

**finish** 109:22 234:18,24

**finished** 109:11

**fire** 12:9

**firm** 7:18

**fiscal** 106:18

**flawed** 65:18 66:14,16 69:19 70:5 193:21,22

**Flipping** 218:7

**focus** 93:21 202:24 203:18

**focused** 94:10

**follow** 118:17

**footing** 180:6

**forget** 176:2

**form** 18:17,23 22:11 26:6 32:14 34:6 42:11 44:7,9 48:13 49:22 54:17 70:6 89:13 94:12 134:5 139:4 150:7, 16 152:24 163:13 165:18 168:2,20 176:23 177:15 181:12 190:21 193:10,20 198:3 209:6 212:23 213:8 214:2 218:4 222:22 227:10 238:3 239:6 242:18 243:7,22 249:18,19 254:18

**formal** 52:11,13

**formally** 12:8

**format** 110:25

**formation** 163:10 165:22

**formulated** 181:9

**fortunes** 219:7

**forum** 25:11

**forums** 25:15,21

**forward** 213:24 214:5,6,8

**forwarded** 102:8, 9, 154:10 240:18 242:2

**found** 117:16

**foundation** 26:7

**fourth** 8:14 121:13 160:11 187:4 218:8,10

**frame** 89:21 98:9 137:23

**Fran** 169:10

**free** 50:13,20 72:7 183:22 231:6

**front** 166:25 185:20 196:24

**full** 4:15 88:8 90:10 114:20 132:8 241:4

**full-scale** 164:17

**full-time** 16:8

**fully** 60:20 68:21 172:14 174:6 176:8

**fund** 38:7,9

**fund-raiser** 85:18,20

**fund-raisers** 85:2 86:4

**Future** 151:22

**G**

**gain** 151:19

**Gale** 4:12 259:1, 23

**garage** 142:11

**gatherings** 85:2

**gave** 29:11 111:8 217:16

**general** 26:15,23 30:17 150:8,15 152:5,8,10 194:15 197:17 254:19

**generalized** 178:15

**generally** 7:9,16 9:20 17:24 22:15 25:6 26:9 39:18 40:3 46:24 52:14 53:10,11 55:9 58:21 80:22 94:5 95:21 96:11,16 156:19 164:24 176:6 181:25

**generated** 198:20

200:8

**gentleman** 127:25

**Geolytics** 240:18, 24

**gesture** 10:6,8

**Gillibrand** 70:13, 14,18

**give** 75:2 167:11 172:18 199:11 247:17

**goals** 197:25 198:4,6

**Golding** 29:10

**good** 33:24 63:12 84:18 93:23 160:3 175:12 200:17

**Google** 16:9,10, 18 170:3

**government** 68:12 106:19 129:14,24 151:18 241:14

**governmental** 70:24 72:13

**Graifman** 233:9, 10,11,14 234:5,10 235:6 236:20 237:5

**Graifmans** 233:20

**greater** 77:15 160:3

**green** 11:25 17:19 106:25 140:13 166:14 171:9,13, 14 251:11

**greet** 144:13,17, 20

**ground** 140:20

**group** 14:17 19:20 20:15,16,17,18,22 21:2,15,18,24 37:25 86:11 87:19 208:3,9 236:18

**groups** 20:9,21 106:25

**grow** 74:8

**growing** 208:4,9

**growth** 202:20,23 203:17,23 204:8 208:18

**guess** 101:24 118:15 155:25 233:16

**guide** 147:23

**guy** 210:8

---

**H**

**hair** 96:22 128:2

**half** 63:7 112:4,6 147:14

**hall** 43:14,17 52:19 110:10 153:22 154:18,24

**Hamilton** 77:20, 23 78:13 79:4,12, 25 80:11,13 81:3,9 145:19,24 146:21 147:3 183:7 213:25 214:8,11 250:3 258:16

**hammer** 68:2,3,8

**hand** 71:13 172:15 200:19,22 201:21,22 259:19

**handed** 142:18 185:13 245:17

**handing** 9:10 10:13 11:22 12:4 13:17,24 27:20,25 36:9 42:21 43:2 61:25 62:6 85:7,13 86:23 100:2,9,15, 20 104:9,15 107:25 108:7 111:10,15 113:6, 11 115:15,20 116:4 120:18,23 123:2 124:12,18 125:21 126:2 128:15,20 130:13, 18 131:16,22 134:8,13 135:23 136:4 137:25 138:6,20,25 139:13,18 140:24

**hang** 137:21

**hanging** 142:10

**happen** 57:5,10, 11 67:7 92:5 127:11 233:21

**happened** 234:15

**happening** 96:8

**Harborside** 7:21

**Hasidic** 22:9 26:3, 10,16,20 32:7 58:22 88:24 89:4,7 91:16,24 94:6,11 96:9,12 97:15,23 98:3 167:19 198:20 200:9 201:12,23 202:20, 24 203:18 204:8 205:2,14 233:20 243:4,6,21 244:16, 19 245:3

**Hasidics** 164:12 165:3

**Haverstraw** 140:15 163:9

**He'll** 10:18 213:15

**head** 40:11,14,21, 22,24 41:5,6,7,8, 12 119:18

141:5,13,18 142:12 143:23 144:4 145:3,8 146:3,8 147:6,11 150:5,11 153:8 156:23 157:5 166:18,24 168:23 169:4,18,23 183:12,17 185:8 188:4,9 190:25 191:6 196:19 202:9 206:14,20 207:9,15 209:14, 21 210:24 211:9 216:7,13 219:23 220:8,17 221:15 223:5,10 225:6 227:12,17 229:3,8 230:14 231:4,17, 24 232:15,20 237:7,12 239:18, 23 240:7,12 245:10 246:19,24 248:9,15

**headquarters** 112:12

**headwaters** 82:12

**hear** 5:16,18 201:25

**heard** 21:9 52:23 69:2,10,12 75:13 165:6 200:7,13 201:11,15,17,20, 22,24 202:4

**hearing** 119:11 174:19 175:6,22 195:4

**hearings** 243:18

**heart** 246:13

**heavy** 156:21

**heights** 172:10

**held** 36:21 52:7,8 55:4 84:22 99:7 112:11 117:25 118:11 145:2 175:23 183:11,21, 22

**helping** 48:6

**Herb** 35:7

**hereinbefore** 259:10

**hereunto** 259:18

**high** 200:20 201:13

**higher** 67:6

**highlight** 117:9

**highlighted** 44:19 117:17

**highway** 155:17

**Hillary** 70:13 215:25

**Hills** 59:17 103:9

**hire** 79:25

**hired** 81:10 147:3

**hiring** 145:18 146:21

**history** 219:6

**headquarters** 112:12

**hit** 38:12 43:22

**hoc** 54:4

**hold** 9:3 13:20 95:8 149:19 249:25 251:13

**Holy** 151:4

**home** 14:11 17:4 18:3 73:23 85:22 89:16,19 154:10 161:16 162:5,6,9, 10 222:6,11 225:25 232:23 233:5,15

**homes** 88:8 89:23 90:5,6,11,14, 200:23

**homogenous** 248:5

**honestly** 244:20

**Hospital** 66:3

**hosted** 84:25 85:17,21 86:4

**hour** 84:19

**hours** 74:21

**house** 17:3 144:14 182:6 235:7,12 248:4

**household** 91:2 92:16 98:14

**houses** 218:15

**housing** 55:6,10, 14 56:5,9 57:2,21 58:2,10,19,23 59:22 61:23 64:3,7 90:24 140:16 159:3 161:7,10 163:2,6 164:9,13 168:7 200:25 207:12,20 217:23 219:2,3 241:15 243:3,5,8 244:10 256:8

**hung** 142:21,22

**Hunter** 169:10

**Hyde** 17:8

## I

**Ian** 35:6 228:11

**idea** 19:22,25 22:5 24:9 26:15,19,23 33:24,25 60:8,25 79:20 91:12 175:25 185:5 195:21 197:17 214:7 235:11 236:3 242:15

**Ident** 258:4

**identifiable** 96:14,17 245:2

**identification** 4:6,10 12:3 13:23 27:24 36:14 42:25 62:5 85:12 87:3 100:8,19 104:14 108:6 111:14 113:10 115:19 120:22 124:17 125:25 128:19 130:17 131:21 134:12 136:3 138:5,24 139:17 141:4,17 142:16 144:3 146:7 150:10 153:12 157:4 166:23 169:3,22 183:16 185:12 188:8 191:5 196:23 202:14 206:19 207:14 209:20 211:4,8 216:12 220:4,21 223:9 225:5 227:16 229:7 230:18 231:21 232:19 237:11 239:22 240:11 245:16 246:23 248:14

**identified** 127:15

**identify** 104:17 113:13 115:22 120:25 124:20 126:4 132:2 134:15 136:6 139:3,20 141:7,20 142:19 144:6 145:10 146:9 150:13 157:7 167:2 169:6,25

183:19 204:12 209:23 212:16 216:15 223:12 225:8 232:22 237:13 239:24 240:14 245:18 248:17

**ignore** 219:10

**imaged** 14:13 102:4

**importance** 95:25

**important** 44:6,8 82:6 104:22 105:3 132:14 133:21

**importantly** 112:21 134:23 143:13

**improved** 52:18

**improvements** 52:18

**improving** 13:6

**inaccurately** 10:8

**inappropriate** 51:23

**incident** 38:16 127:5

**incidents** 38:17

**incite** 192:25 193:5

**inciteful** 193:8,14, 18,23

**include** 67:23

**included** 143:20 181:18 238:21

**includes** 47:17 103:7 106:23

**incomplete** 151:25

**incorporate** 166:8 170:18 171:16

**Incorporated** 230:9

**incorporation** 165:15 166:11 171:4,19

**incorrect** 190:14, 16

**increase** 36:25 37:5,10,15,19,23 39:2,5,9,12,20 40:9 57:2

**increases** 95:9

**incumbents** 114:22

**incur** 57:17

**indefensible** 174:15

**independent** 230:10

**indicating** 71:10 148:13 215:10

**individual** 99:9 159:25

**individuals** 20:19 21:24 94:6 96:3,24 97:14 158:15 248:5

**industrial** 66:9 67:2

**Industry** 101:6,21

**informal** 70:10

**information** 7:2 67:15 109:2,3 110:15 135:13 155:7 177:23 199:8 201:10 209:24 216:21 217:14,17,19,20, 21,23,24,25 218:9 242:17

**informed** 68:22 200:6 201:8 208:13

**inhabited** 88:23

**initially** 108:12 121:3

**initials** 225:17

**initiated** 38:20

**Inn** 32:22

**inquire** 148:16,25

**inserted** 225:21

**incorrect** / **inspector** 53:13, 15

**installed** 121:4 145:13

**instance** 48:21 94:16 136:10 162:5 178:14

**institution** 63:15

**Institutional** 69:10 146:20

**Institutionalized** 145:18

**institutions** 218:19

**instruct** 50:2 78:15

**Integrity** 150:8,15 152:4 254:19

**intended** 227:8 243:10 244:4

**intention** 213:24

**interest** 123:19 124:7 241:14

**interested** 147:13 184:6 209:7 259:16

**interesting** 44:10,13,14 45:3, 5,8 46:5 234:17, 20,21 235:5

**interests** 19:21 21:25 30:17 100:6 132:11 252:13

**interfere** 6:9

**internal** 15:21

**Internet** 25:11,15 31:12

**interpret** 10:7 49:20 65:8,11 98:23

**interrogatories** 4:9 11:7 23:4 251:10

**interviewed** 246:2

**interviews** 111:25 112:11

**investigation** 208:21 230:11 240:23

**invitation** 33:3 85:9 252:7

**invited** 52:20 97:4

**involve** 53:23

**involved** 59:6,14 127:10 137:3,6,15 141:24 197:7,11, 22 198:8 221:7,8, 23 224:5

**involvement** 197:17

**involves** 28:13

**issue** 24:20 25:15, 16,17 34:4,13 61:5,6 81:20 82:6, 8,10 83:8 104:23 105:3,16 148:12 153:23 155:11 180:18 182:9 232:13 237:24 239:2

**issues** 23:17,21 24:7 25:11 31:2 36:24 52:17 68:13 83:25 84:7 93:8,10 105:3,9 106:19 147:25 148:2 210:19,21 235:23 236:6,14

**item** 38:7 141:15 254:8

## J

**January** 17:3 27:11 29:3,19 30:10 75:8,12,16, 17 80:5,8 106:3,7, 9,11 122:24 128:5, 129:7 146:13 171:24 172:6 173:10,22 174:12, 24 175:17,19,22 176:10,22 177:24 178:19,21 180:9, 15,18 181:24 182:4 183:7 194:2 223:20 224:8

**jeopardy** 179:3, 14,22,25 180:5

**Jersey** 7:21

**Jew** 89:4,7

**Jewish** 22:10 32:7 91:16,24 240:5 244:18

**Jews** 26:4,10,16, 20 88:24 96:9,12 233:21 243:4,6,21 244:17 245:3

**jfleisc@ optonline.net** 147:15

**job** 15:24,25 154:9

**Joe** 241:24

**John** 4:25 148:11 153:21 154:18 249:24

**joint** 129:12

**Journal** 23:5 31:8 111:25 112:9,12 136:8,24,25 138:18 139:15,22 145:5,12 146:11 185:19 204:18 235:15,22 247:6 248:11 249:15 253:23 254:13 258:7

**Judy** 147:17

**Julius** 233:11

**July** 11:25 62:24 81:16,17 228:2,6, 21,24 229:14 251:11

**June** 235:8

**jurisdiction** 68:24 69:5

**jurisdictions'** 63:16

**K**

**Katz** 221:22 222:18

**Kenneth** 216:2

**key** 132:19

**kicked** 170:11

**kids** 74:8 192:5

**killed** 211:25 214:15,16,17

**kind** 6:15 7:16 8:4 33:13 51:12 65:8

**Kirsten** 70:14,18

**knew** 75:8,10 170:8 243:9,15,19 244:5,9,15,18

**knocked** 127:18

**knowing** 74:12 188:23 246:9

**knowledge** 15:5 26:13,14 33:18,22 41:9,10,11 42:20 51:14 55:10 58:14, 15,16 60:4 61:5 65:17 74:13 75:5 79:21 82:25 105:11 123:16 166:17 233:15 238:12 249:20

**Kraemer** 188:16

**L**

**lack** 26:6 143:5 234:12

**Ladentown** 163:10,12,17,24 164:8,11 165:2,22 166:5,8,12 170:19 171:5,16,19 218:5

**Ladentown's** 165:15

**land** 23:17,21 24:7 25:11 65:20 69:12 74:14 105:5 145:17 146:19 155:15 164:16 202:25 203:19 209:16,25 210:2, 19 256:10

**Lane** 239:11

**language** 108:17 192:13

**large** 22:21 164:17 181:19 241:15 243:3,5,8

**larger** 38:5 77:17 94:21

**largest** 43:21 44:3

**late** 153:19 218:5

**latest** 13:7 209:8

**latitude** 128:4

**Laura** 188:16,24

**law** 10:3 55:11,15, 17,19 56:11,13,20 57:14,21 58:10,19 59:22 64:7 67:5 68:15,20 145:19 158:22 159:2 160:5 164:9,14 172:11 173:21 174:3,8,20,23,24 175:3,7,9,12,15,23 176:3,4,10,11,15, 16,19,21,25 177:3, 4,13,19,24 178:2, 3,4,12,13,15,20,21 180:10,13,24 181:3,10,25 182:9, 15,17,20,25 183:4 193:21,24 209:25

**Lawrence** 44:4, 17 45:10,12,18,21 46:3 150:21,23 151:10 152:3,13, 20 219:14

**Lawrence's** 167:24

**laws** 50:11,13 51:20 56:5,10 57:2 64:12,13 67:4 74:6 158:16,24,25 159:4,5 161:8,10 172:9 173:17 174:5 177:17,22 178:18 181:7,17 219:12 228:17

**lawsuit** 28:13 48:21 49:3 60:9, 10,12,14 84:8 148:25 149:4,7 176:16 246:9

**lawsuits** 84:9,10 148:4

**lawyer** 65:15 123:24 170:7,9

**lawyers** 5:2 79:19 127:9

**lead** 27:5,9

**leader** 159:25

**leadership** 209:17 210:3 228:16 256:10

**leading** 217:22

**leaked** 78:7 121:14 242:22,24

**leaning** 197:14

**Lebovits** 89:10 159:21

**led** 50:5

**left** 12:6 107:18 109:3 110:23 116:12,14 117:9 118:7 154:14

**left-hand** 108:16 118:4

**legal** 58:13 68:17 149:5,10,11,12

**legally** 112:23 134:25 143:15

**legislation** 30:14 61:23 168:7 173:24

**legislative** 20:20

**Lemuel** 152:10

**letter** 16:22 49:7 79:11,14,18 113:14,16 138:9 148:13,16 149:19, 21,22 150:2 154:15,18 157:9 169:8,12,15 204:13,19 205:24 206:8 211:25 212:11 213:16 214:15,17,25 215:12,19,24 221:21 223:13 225:3,9, 226:11, 13,17,23,24 227:2, 4,9 237:15,18 256:24 258:17

**letters** 31:7,17 49:12,16,20,23 50:3,4,12,25 51:6 186:7 211:6 213:2, 22,25 215:4 256:14

**liaison** 12:8

**Library** 183:22

**life** 39:7 106:19 135:3 143:17 200:23

**light** 87:15 102:23 245:5

**likes** 192:25

**limits** 71:11

**lines** 190:9

**link** 170:10 213:15 214:17,19 215:3 240:5

**linked** 214:24

**Linkedin** 25:24

**Lisa** 237:16 238:19

**list** 86:19,21 184:14 210:21

**listed** 11:6

**listen** 158:22

**listening** 158:23

**listing** 15:4

**literature** 104:18 115:17 120:20 121:3 128:17 130:4,15,24 131:6, 8 132:3 134:10 135:25 138:3,22 139:5,10 141:2 142:14 252:23 253:7,12,14,17,19, 20,22 254:7,10

**litigate** 49:11

**litigation** 38:18, 20 42:3,4,5,9,13, 15,18 47:5,8,14,17 48:2,6,12,16 49:21 50:6,17,18 59:6, 15,18,21 60:2 65:13 71:15 76:9 83:20,24 221:7,9,

11

**live** 17:6 26:10,16, 21 140:15 160:14 236:21

**lived** 16:24

**lives** 58:22

**living** 19:10

**llcastel** 224:9

**local** 10:3 14:17 23:4,9 30:25 67:4 68:12 164:10 166:2 177:4 198:24

**locate** 134:18

**located** 7:14 24:25 28:17 45:22 61:8,15,18,21 64:22 82:2 111:24 126:22

**location** 7:25 8:2 63:13 97:10 217:21

**Lohud** 23:10,13 117:18 139:25

**lohud.com** 146:5 185:10,24 254:15 255:14

**lohud.com.** 185:17

**long** 6:4 8:20 16:24 73:21 96:19 123:20 137:3,22 164:8 170:23 197:11

**long-standing** 228:17

**long-term** 37:24

**longer** 18:3,4 80:24 171:9

**looked** 178:8,9 208:19,23

**lose** 176:17

**lost** 74:4

**lot** 17:14,16,18,19 94:3 98:7 182:3,8, 10

**Louie** 43:14 44:2, 21 46:11,17 62:21 73:15 77:20 78:25 79:3,24 80:10 111:21 113:15 115:11 120:14 124:25 129:22 143:6 144:7,20 146:17 147:4,15 183:8 185:2 191:11 211:14 228:12 229:20 230:2 231:3 249:5, 7,9

**Louie's** 249:17

**Louis** 4:17

**lower** 38:12

**Lowey** 70:15,19

**lunch** 84:17

**luncheon** 84:21

**LYAGEL00011** 85:11 252:8

**Lynn** 246:21 257:24

---

**M**

**machine** 102:4,5 225:25

**mackerel** 151:4

**made** 10:6 30:9 50:2,22 69:15 82:24 126:11,24 155:22 164:8 181:15,16 189:24 193:6 226:9 229:13 239:14 244:2 246:4

**Mahwah** 82:12 217:22

**mailing** 86:18

**main** 133:23

**maintain** 133:6, 18

**maintaining** 132:14,25 133:7, 15

**maitiv** 229:23

**major** 210:18

**make** 5:12,18,22 7:11 28:14 114:7 117:19 149:15 150:4 161:25 174:11 189:17 190:2 200:6 201:8 208:13 215:19 219:6 244:20

**makes** 149:20

**making** 149:25 162:7 173:9 178:15 180:8 242:20

**management** 7:4

**manager** 7:8,10

**Manhattan** 7:15, 20

**manipulated** 187:5

**manner** 189:19 193:3

**March** 78:10 80:20 105:24 106:7 112:2,11 114:17 115:12 129:9 147:13 170:3

**Marci** 77:20,23 145:18,24 146:21 147:3 183:7 213:25 214:8,10 250:2 258:16

**marked** 4:3,5,9 9:11 10:14 11:23 12:2,5 13:18,22,25 27:21,23 28:2 36:10,13 42:22,24 62:2,4,6 85:8,11, 14 86:24 87:2 100:3,7,10,16,18, 21 104:10,13,16 108:2,5,8 111:11, 13,15 113:7,9,12 115:16,18,21 120:19,21,24 123:3 124:13,16, 19 125:22,24 126:3 128:16,18, 21 130:14,16,19 131:17,20,23 134:9,11,14

**135:24 136:2,5 138:2,4,7,21,23 139:2,14,16,19 140:25 141:3,6,14, 16,19 142:13,15, 18 143:24 144:2,5 145:4,6,9 146:4,6, 9 147:7,9,12 150:6,9,12 153:9, 11 156:24 157:3,6 166:19,22 168:24 169:2,5,19,21,24 172:16 183:13,15, 18 185:9,11,14 188:5,7,10 191:2, 4,7 196:20,22 202:10,13 206:15, 18,21 207:10,13, 16 209:15,19,22 210:25 211:3,7,10 216:8,11,14 219:24 220:3,18, 20 221:16 223:6,8, 11 225:4,7 227:13, 15,17 229:4,6,9 230:15,17 231:4, 18,20,25 232:16, 18,21 237:8,10,13 239:19,21,24 240:8,10,13 245:11,15,17 246:20,22,25 248:10,13,16**

**Marlaine** 216:24

**marriage** 259:16

**Marshall** 35:7

**mass** 113:16,22 114:14,16

**master** 89:17,18 161:5 162:21 164:18

**material** 110:8 121:24 129:11

**materials** 141:9

**mates** 46:12 117:16 145:17

**mathematically** 86:9

**matter** 5:3 48:11 49:2,21 149:3 177:18 191:23 238:6 250:2 259:17

**matters** 47:5,7,13 48:16 151:2,17

**mayor** 8:11,12,15, 18, 34:21 35:3,7, 12 51:15 69:22 71:13 73:15 81:21 105:15 119:18 126:20 128:4,10 146:16 153:19 154:22

**Mayor's** 12:6

**meaning** 47:2

**means** 66:19,21 67:9,10 123:22 126:14 236:4

**mechanisms** 160:5

**media** 23:17,21 24:7,21 25:8

**medication** 6:8, 11,12,15,16,23

**meet** 49:10,21 51:8 54:2 144:13, 16,20

**meeting** 32:20 33:4,6,9,17,20,25 34:14,23 35:15,19, 23 36:12,21,25 49:14 51:2,11 54:8,10 87:17,20 88:2,5 96:25 97:3, 7,8 99:13 117:4, 20,22,25 118:5,10, 14 119:4,7,8,13, 15,24 120:3,12 128:5, 144:8 172:6 173:10 178:11 181:15,16,23 182:4 189:5,10,13, 14 192:7,15,24 193:5 194:2,3,14, 15,16,20,25 195:10 233:13 236:2,5,8,10,17 251:19

**meetings** 46:21 47:17 51:20 52:12 54:5,15,16 70:20, 23 71:3,21 72:12, 20 89:18 97:11 188:20

**Meets** 245:13,22

257:21

**member** 14:25 15:2 53:24 62:25 171:21 180:9,14, 191:17

**members** 10:4 14:21 46:16 63:3 99:9 164:10 240:6

**membership** 15:4 106:23 171:12

**memory** 29:12

**men** 96:20

**mentioned** 17:22 20:21 84:8 102:22 245:2

**merlin** 224:9

**met** 9:22 132:10

**methods** 13:6

**Meyers** 241:24

**Michael** 40:17 41:14 43:20 216:23 217:15 244:21,25

**mid** 90:2 106:11

**middle** 200:16

**midway** 232:3

**Mike** 30:4 223:14, 20

**mind** 95:12

**mini** 246:12 248:3

**minimum** 77:12 91:6

**minute** 55:3 87:4 144:23 188:13 226:3

**minutes** 18:5 36:12 119:6,8,9 122:6 230:16 231:5,10, 251:19 257:11,13

**missed** 226:21

**missing** 128:6

**misspelling** 174:5

**mistaken** 104:21 105:17

**moment** 176:3

**Monday** 52:9

**money** 44:16

**Monsey** 157:21 237:22 239:5,9

**Montebello** 59:16 103:8

**month** 52:10 171:23 230:8

**monthly** 52:7

**months** 118:13

**Morahan** 216:2

**morning** 4:24

**Mosdos** 221:2,5

**Motion** 188:7 255:16

**motivated** 81:21 104:23

**Mountain** 210:6

**mouth** 83:9 133:17 187:15 189:9 234:8

**move** 114:23

**moved** 17:6,11,25 18:7 26:5,21 27:2 73:23

**movement** 163:16, 170:18

**moving** 164:12 165:3

**multi-family** 89:22

**Municipal** 195:7 238:24

**municipalities** 177:21

**municipality** 47:23

**Music** 94:20

**music-related** 93:25

**N**

**Nancy** 136:8,23

**Nanuet** 32:22

**NAPP** 7:25

**nationalities** 133:4

**nature** 67:7 69:19 70:5 83:24 198:11 199:8

**nay** 230:24,25 232:11

**neat** 96:22

**needed** 77:9,11 95:7 175:4,9,16,18 177:14,25 180:13 181:3,10

**negative** 31:17 32:12 39:20,21,24 102:23 231:10

**neglent** 158:24

**neighbor** 73:20, 21

**neighbor's** 144:14

**neighborhood** 164:13 165:4

**News** 23:5 31:8 111:25 112:9,12 136:8,24,25 138:18 139:16,22 145:5,12 146:11 185:19 204:18 235:15,22 247:6 248:12 249:16 253:24 254:13 258:8

**Newsletter** 11:24 251:11

**newspaper** 42:2 162:18 205:25

**newspapers** 31:5,6 186:8

**Nicholas** 35:13 73:14,16 153:19

**Nick** 43:13,25 44:20 46:11,17

62:21 75:20 107:10 111:21 113:15 119:17 120:11 124:24 126:20 129:22 139:11 145:13 146:16 147:4,21 182:20,24 185:4 191:11 211:14 212:4 228:11 229:19 240:18 241:24 242:2

**nick. sanderson@ pomonavillage. com** 102:7

**nick@ villagecommunit yparty.com.** 147:17

**night** 43:22 172:13 173:22 236:3

**Nike** 59:8 221:4

**nine-year** 38:2

**Nita** 70:14,19

**nodding** 5:10

**non-orthodox** 97:23

**nor'easter** 155:13,24 156:3, 17,20

**normal** 52:11

**Nos** 27:23 86:25 108:4 115:18 139:16 142:15 146:6 185:11 196:22 206:17 216:11 253:24 254:10,14, 255:15, 20 256:17

**Nos. pom0012596-99** 252:19

**Nos. pom0012600-02** 252:23

**Nos. pom0012887-97** 255:24

**Nos. pom0013255-59** 251:17

**Nos. pom0031218-20** 252:10

**Notary** 4:13 259:1

**note** 150:4

**noted** 68:18 250:9

**notes** 234:14,16, 25

**notice** 4:4 9:8 251:7

**Notice-privileged** 13:21 251:14

**notification** 222:14

**notifications** 60:20

**November** 101:16 103:25 104:5

**number** 26:10,16 57:19 76:23 136:10,11 157:20 172:21 174:4 179:3,22 210:18

**numbers** 22:24 26:23 209:7

**NYCOM** 238:20, 22

**NYS** 150:7 254:18

**O**

**object** 18:23 21:5 22:11 26:6 32:14 34:6 42:11 44:7,9 48:13 49:22 54:17 58:13 68:4 70:6 89:13 94:12 122:17 127:6 128:9 134:5 163:13 165:18 168:2,20 176:23 177:15 181:12 191:21 193:10,20 198:3 202:6 206:2 212:23 213:8 215:2 222:22

227:10 233:3
234:22 238:3
239:6 242:18
243:7,22 247:13

**objection** 18:17,
19 21:11, 34:16
35:24 65:16 66:23
69:25 74:16 91:17
92:2 98:19,25 99:3
123:23 126:16
187:24 206:5
226:18 233:6
234:11 235:3
238:8

**obligation** 57:3
67:21

**observation**
155:22

**observed** 155:19
156:7,10,16

**observing** 98:2

**occasion** 208:16
231:23

**occurred** 47:11
58:18 155:14

**occurs** 174:5

**October** 85:19

**off-the-record**
151:6

**office** 12:10,18
19:7 30:18,20
73:17 74:2,10,15
75:7 104:19
105:10 114:22
118:2 121:4 129:8,
9 130:24 132:4
133:24 134:4
136:12 139:6
145:14 146:18
150:7,14 152:4,8
170:22,25 254:18

**officer** 67:17

**Offices** 112:9

**official** 19:7 71:4,
22 72:19 78:2 96:7
137:10 178:16
235:6 238:7

**officials** 70:24
72:13 103:7
151:18 238:24

**older** 128:2

**online** 23:9,13
32:11 118:20,23
169:10 178:3
186:4 187:22
188:2

**open** 51:20
149:19 182:12
249:25

**opening** 126:19
148:3

**openly** 164:11

**operations**
12:10,18 13:5

**opinion** 18:14,21
19:4 20:11 21:15
47:17,25 48:9,20
56:9,14,25 57:6
60:22 66:14 71:4,
22 93:19 161:12
163:4 174:13
175:8,16 182:19
193:15,19,23
198:5 241:16
247:14

**opportunity** 56:3
230:19 238:17

**opposed** 239:4,7

**Opposition** 188:6
255:16

**order** 77:9,10
132:16 151:19

**ordinary** 219:8

**organization**
64:18 86:12,15
166:10,15 179:11
221:9,24 224:6

**organizational**
34:23

**organizations**
221:6

**oriented** 22:14

**original** 12:20
76:7 89:15

**originally** 7:19
61:4 162:8

**originated** 221:22
222:19

**Orthodox** 22:10,
20 26:3,10,16,20
32:7 58:22 88:24
89:3,6 91:16,24
94:6,11 96:9,11
97:15 98:3 167:19
201:12,23 204:8
243:4,6,21 244:16,
19 245:3

**others'** 139:24

**outcome** 259:17

**outrageous**
219:11

**Over-utilization**
84:4

**overcrowded**
93:15

**overdevelopmen
t** 198:10

**overflow** 236:14

**overheard** 126:20

**overreach** 68:11

**overt** 49:4

**overtures** 50:22
126:10,14,23

**owned** 28:17
29:4,13 103:12
221:13

**owner** 89:8
103:15,19,24
104:6 246:8

**owners** 17:21
57:9 66:4,6,8,9
147:21 244:15

**ownership** 89:24

---

**P**

**p.m.** 250:9

**packed** 182:6

**Page/line** 253:5
256:4 258:5,14

**pages** 29:18,23
75:18,24 76:6,8,
10,15 110:19,20
123:4 142:25
143:4 157:12,13,
18 186:22,24

187:2 199:23
226:8

**paid** 38:5 238:20

**pamphlet** 104:11
105:19 107:3
110:5,7,17 111:2
131:18 252:16
253:15

**pamphlets**
105:22 106:6

**pants** 96:21

**Paone** 216:24

**paper** 23:4,9
32:11 50:23 193:7
243:17

**paragraph** 63:24
88:8 90:10 112:19,
20 121:13 126:10,
18 140:8 143:13
146:16 147:19
158:13 159:24
160:11 164:7
174:3 187:4,8
190:15,20 200:16
201:7 205:23
208:2 218:8,9,10,
15 219:5 241:8,11

**paragraphs**
136:12,13 145:15

**paraphrasing**
160:19,23

**parcel** 24:24
217:21

**Pardon** 22:23
226:5

**parents** 87:22

**Park** 17:8

**part** 57:16 60:24
66:19 76:4,9 93:10
115:23 117:10
121:2 128:5
130:23 132:17
134:16 154:10
177:20 205:4
219:9

**participate** 11:2
121:7

**participated** 15:2
52:4

**parties** 259:15

**party** 49:5 75:19,
23 85:10 104:12
110:5 111:3
124:23 125:16,19
129:13,14,24,25
131:19 143:2
252:8, 253:16

**pass** 40:9 44:20
184:13

**passage** 174:8
176:21 182:14,17

**passed** 37:16
56:8 68:15,20,21
174:23,24

**passing** 39:19
181:25

**passion** 193:3

**paste** 142:2

**patches** 13:8

**Patrick** 24:23,24
25:7 81:25 82:2,9
83:10,12, 88:15,
19,22 89:3,12
90:14 91:19 99:9,
104:23 153:7,25
159:20 161:15
162:13,25 163:5
164:15 166:4,5
169:11 216:10
218:11 225:10
227:5 233:21,24
234:4 235:25
239:12 256:16

**Paul** 65:6 179:10

**paving** 57:18

**pay** 79:4 179:16

**PDF** 110:25

**peach** 184:7,10

**PELOSO** 10:17
12:22 15:14,24
18:17,23 19:2
21:4,7,11,16
22:11,17 24:11
25:16,18 26:6
29:20 31:19 32:14
34:6,16 35:24 36:7
41:4,15 42:11
44:7,9,22 45:2,14
48:13 49:22 50:7

53:9 54:17 55:23 56:11 58:12,15,25 60:3 61:10 65:15 66:23 68:4,16 69:21,25 70:6 71:12 74:16 77:25 78:14,19 79:22 80:12,16 82:20 83:16 84:20 89:13 90:15,19 91:17,21 92:2 93:16 94:12 97:17 98:19,25 99:3 100:24 105:13 106:15 107:8 108:10,22, 25 109:11,16,20 110:18 112:7 113:23 115:5 116:9 122:11,17, 22 123:23 126:13 127:6 128:9 131:12,14 134:5 142:8 144:24 148:20 149:3,10, 20 150:4 153:2 159:14 160:20 163:13 165:18 168:2,20 172:24 173:19 176:23,25 177:15 181:12 182:21 187:24 191:21 193:10,20 196:4,7,15 198:3 199:15,19,21,24 201:16,25 202:6 203:5 204:4 206:2, 4 208:11,25 210:9 212:23 213:8 215:2 217:9 219:19 222:22 224:23 226:18 227:10 233:3,6 234:11,18,22 235:3 236:24 238:3,8 239:6 241:5,18 242:11, 18 243:7,13, 244:22 245:8 247:9,13 248:22 249:18,23 250:4

**pending** 6:4 47:14,18 245:9 248:23 249:25

**people** 14:18 19:20 20:9,15,16, 17,19,22 21:2,24 67:5 87:21 88:4

95:23 98:9 137:15 182:3 184:13 187:4 197:24 233:23,25 246:13

**pepper** 128:2

**percent** 37:8,23 39:16 55:12,14 60:5

**percentage** 37:4, 18

**perform** 13:14

**performed** 13:16

**period** 90:15,20 182:12 242:11,12

**periodically** 178:17

**periods** 209:6

**permission** 147:21

**permitted** 57:20

**person** 92:6,7,9, 10 127:23

**personal** 15:12 56:9,14 223:22

**personally** 41:16, 42:17 69:22,24 77:18 106:13 155:19 170:8 194:18,21

**personnel** 47:6

**persons** 69:11 82:16 145:18 146:20

**perusing** 14:2 28:3 36:15 107:14 153:13 167:4,12 188:15 199:14 212:17

**Peter** 221:22 222:18 245:20

**petition** 127:19, 20 163:7 169:11 218:4

**phone** 31:4 157:20 212:5 213:14 234:9 235:2

**phrase** 5:23

**phrases** 190:11

**physical** 194:9

**piece** 161:17,20 166:2

**placard** 141:23,25

**place** 74:7 229:16

**plaintiff** 27:5,10

**Plaintiff's** 4:5,10 9:11, 10:14,24 12:2,5 13:22,25 14:3,7 16:19 27:24 28:2,6,10 29:17 36:13,16 37:22 42:24 43:3 62:4,7 85:11 87:2 100:7, 10,18 104:13,16 108:5,8 111:13,16 113:9,12 115:18, 120:21,24 124:16, 19 125:24 126:3,4 128:18,21 130:9, 16,19 131:20,23 132:2 134:11,14, 20 136:2,5 138:4, 7,23 139:2,7,17,19 141:3,6,16,19 142:15 144:2,5 145:7,9 146:6 147:9 150:10,12 153:11 157:4,6 166:23,25 169:2,5, 21,24 172:16 183:15,18 185:11, 14 188:8,10 191:4, 7 196:22,24 202:13 206:8,18, 21 207:13 209:19, 210:22 211:3,7,10 212:15,18,21,22 213:3 215:16,20 216:11,14 220:3,8, 20 223:8,11 225:4, 7 227:15,18 229:6 230:18 231:21 232:5,18,21 237:10 239:21 240:10,13 245:15, 18 246:22,25 248:13,16 253:5 256:4 258:5

**plaintiffs** 5:2

**Plaintiffs'** 4:8

251:9

**plan** 7:11,12 88:13 89:17,18 90:8 121:13 122:15,20 123:14 148:2 161:6 162:21 164:18 202:25

**planned** 112:24

**planner** 53:11

**planning** 53:20, 24 135:14 195:7

**plans** 78:7 83:25

**platform** 133:18 148:6

**Plaza** 236:6

**plowing** 57:18

**point** 6:2 35:8 63:12 77:19 107:17 109:10 111:9 122:22, 149:23 177:10 185:16 219:6 243:13

**poles** 142:4

**policies** 167:24

**politician** 159:24 160:4

**politician's** 160:6

**politicians** 158:21

**POM0012596-99** 108:4

**POM0012600-02** 115:18

**POM0012887-97** 206:18

**POM0013255-59** 27:23

**POM0031218-20** 87:2

**POM12974** 134:11 253:18

**POM13258** 123:9

**POM13259** 123:9

**POM13285** 11:25 251:12

**POM154** 136:2 253:19

**POM16947** 42:24 251:22

**POM16953** 62:4 251:23

**POM16958** 227:15 257:8

**POM16969** 183:15 255:13

**POM16974** 113:9 252:22

**POM16975** 147:9 254:17

**POM17046** 153:11 254:21

**POM17094** 191:4 255:18

**POM17119** 240:10 257:19

**POM17235** 220:20 256:21

**POM17244** 232:18 257:15

**POM19274** 169:21 255:12

**POM19941** 230:17 257:11

**POM19945** 36:13 253:7

**POM20039** 131:19 253:16

**POM20040** 120:21 253:8

**POM20042** 248:12 258:8

**POM20043** 220:3 256:20

**POM20045** 104:12 252:17

**POM20206** 231:20 257:13

**POM20296** 124:15 253:10

**POM20299** 209:18 256:12

**POM20303** 141:3 254:7

**POM20308** 202:12 255:22

**POM20311** 125:24 253:11

**POM20314** 138:4 253:21

**POM20315** 138:23 253:22

**POM20319** 225:4 256:24

**POM20321** 150:9 254:20

**POM20326** 166:22 255:9

**POM20328** 157:3 254:24

**POM20576** 130:16 253:14

**POM20858** 169:2 255:10

**POM21292** 144:2 254:12

**POM21307** 223:8 256:23

**POM21311** 141:16 254:9

**POM21331** 111:13 252:20

**POM33090** 128:18 253:13

**POM33278** 100:18 252:15

**POM33279** 100:7 252:13

**POM33294** 239:21 257:18

**POM33298** 229:6 257:9

**POM33617** 13:22 251:15

**POM34701** 237:10 257:16

**POM36716** 211:3 256:13

**POM36717** 211:7 256:15

**Pomona** 4:20 5:4 8:8,16,24 9:4 11:11,17 12:19 15:22 17:4,7 22:3, 7 23:18 24:25 25:4 30:5 33:17 34:5,13 35:22 37:2,11,16 38:21 42:19 43:14, 15,17 45:22 48:3, 10 53:2 54:16 59:10,17 64:12 67:18 70:5 74:6 82:3 83:22,23 95:24 102:22 103:8 107:19 117:3,20,24 118:5, 10 119:3,21,23 122:5 129:14,24 130:2 133:3,8,12 171:22 173:14,16 174:10 176:4 182:16 184:13,18 189:4 192:7,14 221:6 224:15 235:23 236:21 237:20 238:2,7,10, 14,17 240:20 246:10 252:18

**Pomona's** 59:25

**poor** 200:19 201:23

**popped** 170:13

**population** 63:14 77:4,13,15 164:10 202:20,23 203:17, 23 204:8 208:18 240:16

**portions** 225:12, 13 226:23,25

**posed** 136:8

**position** 8:10 12:9 16:8 30:23 31:24 54:14 61:2,3 72:21 155:2 199:5

**positions** 9:3 30:13

**positive** 31:18,24 32:12 39:19,21

**possession** 14:10,12 76:2

79:13

**Possibly** 152:18

**post** 185:23 186:4

**posted** 25:10 118:12 217:3 240:5

**poster** 142:21,22

**posting** 25:14 118:20,23 185:17 186:15,20 187:10, 16

**postings** 31:13, 16 186:12

**potential** 49:21 151:2 157:8 163:10 210:2

**potentially** 48:11 64:9 179:16 244:8

**Power** 86:6,13 87:10 99:17,20

**PR** 43:22 213:16, 214:19,21,24

**precedents** 173:17 181:7,11

**premature** 51:7

**prepare** 9:20 109:25 135:8 139:10 158:9 210:15,22 213:2

**prepared** 138:14 139:7 140:9

**preparing** 10:11

**prerogative** 250:4

**present** 144:19

**presented** 115:24 119:25 134:17 175:13

**presently** 15:14, 15 45:14 53:9 83:16,17 93:16,17 115:5 131:12 203:5,7 208:11 217:9 219:19 247:10

**preservation** 13:20 16:22

101:23 251:14

**preserve** 14:16, 20,25 15:3,7 27:13,15,22 28:8 29:23 40:11,15,21, 23,25 41:9,12 44:19 74:7 85:2, 18,21 86:4 100:5 122:24 137:4,6,12, 16 140:12 148:4 197:7,12,18,22 198:2,5,7,8 211:24 213:20 214:14,20, 21 215:9 216:17 217:3 220:2,6,12, 15 221:23 224:6 251:16 252:11 256:19

**Preserveramapo @optonline.net** 223:19

**preserveramapo @optonline.net.** 223:17

**pretext** 164:18

**pretty** 246:11

**previous** 134:16 151:20

**previously** 38:5 172:16

**primary** 77:11

**Princeton** 7:2,20

**print** 149:12 150:25

**printed** 207:23

**printer** 106:14

**Printout** 146:5 185:10 196:21 254:15 255:14,19

**prior** 8:15,18 29:3, 14 33:12,13 37:9, 40:14,25 72:7 73:16,21 74:11,14 75:7 78:9 85:6 105:11,24 113:19 115:25 118:13 121:4 140:21 161:4 170:21 174:17,18 175:5 176:19 178:6,20

180:8,14,18 182:14 190:4 197:6,13 209:8 222:5 230:8 232:24 233:5 235:17 248:18

**priority** 67:6

**private** 19:13 177:6

**privilege** 78:18

**privileged** 50:19 148:24 149:5,6

**privy** 177:5

**problem** 236:22

**problems** 93:22 121:15,17,21 122:16

**procedures** 52:18

**process** 51:21 82:19

**processes** 52:17

**produced** 9:24 79:18 116:4,5

**producing** 116:6

**Production** 258:16

**professes** 160:12

**professional** 187:5

**professor** 145:19 146:22

**program** 209:17 210:3,4 256:11

**programs** 87:25 93:24 94:3,9,14,16 95:5,10

**prohibit** 63:16

**project** 7:4,8,10 51:5 64:21 75:9 83:15 120:12 121:18

**projections** 240:16 242:10

**projects** 210:19

**Prol** 62:18 227:24 228:3,7,10,21

**Prol's** 63:23

**prominent** 147:23

**properly** 5:11,13

**properties** 22:3,6 57:15,23,24

**property** 17:20 28:13,16,17,22 29:4,14 31:10,14, 18,19,21,25 32:13 34:4 45:22 49:14 57:9 66:4,6,8,9 84:6 89:16,23 103:12,16,19,21, 25 104:7 147:21 155:8,12 156:8,11 161:17,21 164:15 166:3,5 190:10 218:19 221:12 224:15,18 225:10 228:4,8 237:19 239:13 243:10 246:8

**proposal** 37:9 39:15 51:8 61:7,13 74:10 78:8 123:14 133:9

**propose** 133:7

**proposed** 31:21 34:3 37:5 51:12 56:8 164:18 165:2 178:21 242:25 243:20,24

**proposition** 201:6 203:4,7,14

**protect** 102:12 165:20 178:25 179:20

**protected** 81:25 83:12 90:2 153:25 161:23 217:24

**protecting** 132:13 133:20

**provide** 154:25 155:4 158:23 218:8

**provided** 57:8 198:22 216:21 217:14

**providing** 155:6

**PS** 184:12

**public** 4:13 18:11 46:21 52:20 60:4, 24 75:7 82:24 87:23,24 91:8 121:14 150:8,15 160:3 174:18 175:6,14,22 178:10 181:15,18, 19,24 182:8,10, 190:12 191:24 194:14,15,16,20, 25 195:4 196:3 241:16 243:18 254:19 259:1

**publicly** 50:23 189:18

**published** 105:19 140:4 158:7 204:21

**pulled** 101:25 110:3

**purchased** 103:21 243:10

**purpose** 28:21 52:14 78:12,21,22 87:20 109:5 114:10 131:4 147:3 148:14 184:20 198:5 199:16 241:2 244:7,11

**push** 246:13

**put** 6:20 38:6 76:12 83:9 116:7 133:17 137:23 142:24 147:20 175:21 187:14 189:9 234:8 246:13

**Q**

**qualify** 55:24

**quality** 106:19 135:2 143:16

**quantify** 15:18

**Quantity** 22:22,24

**question** 5:17,22

6:4 12:17,20,22, 23,24 13:4 18:18, 24 19:3 20:2 21:8, 22:12,25 24:6,12 25:19 34:7,18 36:8 39:13 41:2,3 44:23 50:21 54:22 60:7 70:2 71:17,20,25 72:2,3,4,10 74:24 78:16 79:9,23 80:17 83:6 89:14 91:18,23 104:4 106:16 114:5 116:10 126:16 128:12 133:10 136:11 138:10 158:14 159:3 163:14,20 165:17, 19 167:10,14 168:3,4 172:19 181:13 196:8,11, 12,16 209:10 210:18 215:5 226:20 234:19,23, 24 239:10 241:6 245:8 248:22

**questions** 10:19 50:9,14,16 91:22 108:23 136:7,16 148:18 149:17 157:14,15 185:16 188:14 210:10 247:19 249:22,23

**quotations** 132:9

**quote** 55:22 63:20 120:6 132:22 174:14 177:13 235:23 246:15,16

**quoted** 55:23

**quotes** 112:14 118:11 120:10

**quoting** 199:12

**R**

**R40** 65:25

**Rabbi** 220:22,24, 25 222:15

**rabbinical** 5:3 27:6 28:18 31:9,13 32:21 41:20 61:8, 11 63:14 75:6 119:12 122:21

126:11,24 187:20 230:8,21 231:11, 24 232:8 242:23, 25 243:11,25 244:15

**rabbis** 221:2

**rain** 156:21

**rains** 156:22

**raise** 39:16 95:15

**raising** 95:8,20

**rally** 98:24 99:3

**Ramapo** 14:16, 20,25 15:3,7 18:16,22 19:9 23:22 24:5,8 27:13,15,22 28:8 29:23 40:11,15,21, 23,25 41:9, 44:12, 19 45:13,19 55:7, 12,16 56:4,10,23 58:18 60:23 61:9, 15,22 63:25 64:3, 8,21 85:2,18,21 86:4,17 87:11,16 88:14 93:7,20 96:2,5 99:8,11,15, 16 100:5 102:12 106:24 122:25 137:4,7,12,16 140:12,13,14 148:5 150:21 151:3,18 161:5 163:8 166:14,22 167:25 168:7,11 171:8,13,14 196:21 197:7,12, 18,23 198:2,5,7,9, 12,23 202:25 206:17 207:3,12, 20 208:3,9 211:24 213:20 214:15,21 215:9 216:17 217:3 219:6,14 220:2,6,12,15 221:23 224:6 236:7,15,16 242:10 251:16 252:12 255:8,19, 23 256:8,19

**Ramapo's** 57:21 160:15 202:23 203:17

**ran** 75:20 104:19

105:10,15 132:4 133:23 134:4

**range** 93:24

**rapidly** 208:4,10

**rate** 200:20 201:14

**rates** 38:13

**RC1113** 172:17

**RC1682-83** 145:6 254:14

**RC1834-36** 146:6 254:15

**RC3-6** 142:15 254:10

**RC408** 207:12 256:8

**RC4137** 245:14 257:23

**RC423-446** 196:22 255:20

**RC4568** 246:22 257:24

**RC570-573** 216:11 256:17

**RC614-21** 185:11 255:15

**RC9-14** 139:16 253:24

**reaching** 153:20

**read** 9:17 10:18 12:14 13:2 23:4,9 29:25 41:3 54:20 63:18 64:14 71:18 79:6,7,8 112:18 132:9,20 135:4 151:10,20,24 159:7 160:18,21 164:22 189:21,22 199:3,6 201:4,5 203:2 205:7,19 208:6 213:17 219:16 220:10 241:18,20,22

**reading** 12:7 103:5 105:8 118:9 151:8 179:18 187:10,12 190:7 247:21

**reads** 88:8 91:5 118:10 134:23 200:16 208:2 219:5

**ready** 246:8

**real** 24:24 121:15, 20 122:15 198:20, 24 200:8 202:12 204:14,25 205:13, 22 245:13,22 257:21

**realized** 178:17

**reason** 94:22 105:15 134:3 222:10

**reasons** 42:16 66:15,18 133:23 210:12

**recall** 16:10,17 23:19 24:2,9 25:6 26:2 27:19 29:7, 18,22 31:24 33:2, 3,5 34:24 35:2,14 37:4,9,18 38:25 39:24 56:6 57:19 58:5,7 71:2 72:15, 23,24,25 76:3,18 77:16 78:5 80:7,9, 18 85:5,23 86:2 87:18 88:4 90:25 96:7 97:6,9,10,13, 16 98:5 100:14 105:18,21 107:5 114:9,10,13 116:16 119:11 120:13,16 125:11 127:8 128:14 130:5 135:12 138:17,19 139:8, 11 140:2 144:15 150:24 152:6,7 153:4 156:5 167:8, 16,18 168:15,16 172:5,8,12 173:9, 23 178:9 180:11, 12,16,17,25 181:2, 4,20,23 182:2,11, 18,23 183:2,5 184:24 186:11,17, 19 187:10, 188:12, 23 190:6,17 191:16,25 195:18 197:5, 198:15 202:3,8 203:11 206:7,11,24 207:6,

18 208:20 209:11, 13 212:6,25 213:6, 10 215:16,21,22 217:2,18 221:7,8, 10 222:9, 225:13 227:19,20 228:6 233:8 235:19,21, 24 236:18,19,23, 24,25 237:3,24 238:12 239:3 241:4 242:7,14 246:2,5

**recalled** 117:13 187:15,17 190:8

**receive** 15:9,20 16:5 39:11,14

**received** 15:6 16:16 28:9 29:21 40:7,8 51:2,9 67:15 76:19,20 77:7 110:24,25 209:4 240:15

**receiving** 29:19 39:24 227:19,20

**recent** 94:3 122:4 160:15 177:19

**recess** 55:4 84:21 145:2 183:11

**recipient** 87:15 92:5 222:3 227:8

**recognize** 66:10 128:24 153:14 167:5 211:11 220:9 223:24 247:2

**recollection** 50:4 85:15 86:3 102:16 103:11,14,23 122:25 123:16 127:4 131:3 189:23 213:21 232:2,6

**reconnect** 74:5

**reconvene** 84:18

**record** 43:19 45:11 54:13 60:24 71:12 105:14 149:22 151:8,10 156:19 165:20 191:24 194:4 239:16 259:12

**records** 76:4

**red** 95:4,6

**refer** 21:14 75:24

**reference** 91:13, 15,24 117:3,19 126:9, 152:12 153:23 161:24 163:4 175:5 184:2, 23 193:24 212:7 214:14 239:2

**referenced** 152:23 153:5 178:12 186:15 212:22 215:14 218:15 235:17

**references** 144:10 214:21 236:2,20

**referencing** 215:12

**referred** 86:12

**referring** 49:12 64:2 66:6 80:5 88:11 97:4 118:24 119:22 123:5,10 128:7 159:13,14, 19 173:14,18 175:4 177:2 179:9, 10 195:22 218:25

**reflect** 48:22 71:13 145:25 147:2 231:5,10 232:12

**reflected** 5:13

**reflecting** 10:8

**refresh** 29:12 85:14 102:15 103:14 127:4 189:23 213:21 232:2,5

**refreshing** 103:22

**regard** 24:22 49:17 51:19 79:12 83:3

**regarded** 237:21

**region** 154:25

**regular** 23:5 54:3 97:7,11

**regulations** 105:6 219:10

**relate** 117:22 157:15

**related** 12:17 55:13,14 87:11 109:8 172:10 259:14

**relates** 42:9 71:15 117:7 147:24

**relationship** 80:23 81:7

**released** 244:14

**relegates** 65:19, 21 66:4

**relevance** 242:24

**relevant** 149:8 164:14 230:5

**religion** 97:24 203:25 245:13,22 257:21

**religious** 65:19, 20,21 67:7 69:12 145:17 146:19 208:4,10 218:19 241:15 244:7,11

**remain** 200:21

**remarks** 193:6

**remediated** 218:2

**remember** 95:5 124:9 127:24 156:3 218:6

**remembered** 127:20,21

**repeat** 163:20

**repeated** 13:4 54:22 71:20 72:11 79:9

**rephrase** 7:23 11:15,19 14:22 18:9,20 39:13 48:4,18 163:21 165:17 193:11

**replied** 30:4

**reply** 30:9

**reported** 82:24

**reporter** 4:15,18 5:10 72:6 79:8 142:17 259:1,23

**represent** 80:14 215:6

**representation** 80:4,9 148:15

**representative** 35:22 53:16,19,22 153:21

**representatives** 32:21 70:11

**represented** 68:20

**representing** 116:3 214:11

**represents** 246:7

**Republican** 124:23 125:16,18

**request** 150:2 230:20

**requested** 5:14 150:3

**requesting** 30:23

**require** 50:16

**required** 77:3,17

**requirement** 48:16

**research** 109:7 208:17

**reside** 218:14

**resident** 126:21 127:9,13,16 246:10

**resident's** 144:14

**Residential** 66:8

**residents** 38:11 112:22 132:10 133:13 134:24 143:14 144:18 160:14 184:18 189:17

**resolution** 250:2

**resolved** 152:20, 21

**resources** 7:12 132:14 133:21

**respect** 64:11 205:2

**responded** 62:20

**responding** 11:2

**responds** 247:19

**response** 16:21 27:18 30:2 63:21, 22 136:16 139:21 152:16 162:15,17, 20 233:16 235:14

**responses** 4:8 11:6 136:9 139:24 251:9

**responsibilities** 12:25 19:8 95:2

**responsibility** 11:11,17 19:11 160:7

**responsible** 12:10 107:6

**rest** 107:7 151:24 205:17

**restricting** 241:14

**restrictive** 66:19, 20 67:9,10

**result** 70:20 118:5 154:15

**results** 208:21

**resumed** 84:22

**retain** 77:20

**retained** 14:14 77:23 78:4,19 79:10 147:22 183:8,9

**retainer** 79:11,14, 18 148:13,16,19, 21 149:15,18,21 150:2 258:17

**retaining** 78:12 145:24

**retaking** 6:21

**retract** 241:9,10

**retrieve** 108:18

**retrieved** 135:12

**reveal** 50:16 60:4 196:16

**revealing** 196:9

**review** 10:22 52:24 108:11 121:10 125:9 130:6,20 138:11 173:4 177:21 178:17 191:8 247:18

**reviewed** 9:23 10:2 177:18 178:20

**reviewing** 167:13 226:24 248:25 249:2

**rezoning** 89:21

**Rhodes** 40:13,25 41:11 62:17 137:18,20,22 199:10 207:4,21, 25 212:5, 213:7,15 220:14 240:16 241:23 242:9,16

**Rhodes'** 199:13

**Ridge** 59:16 103:8

**right-hand** 109:24 110:2,4 117:3 136:19 172:22 225:16 226:8

**rights** 158:17 200:18 219:9

**ringed** 89:23

**Rita** 43:13 44:2,21 46:11,17 62:21 73:15 75:20 107:10 111:21 120:14 124:25 125:23 129:22 139:12 144:7 145:13 146:17 147:4,14 185:2 191:11 211:14 212:4 228:11 229:20 249:5,7,9, 16 253:11

**River** 217:22

**RLUIPA** 50:25

65:13,14 66:4,10, 15 67:5 68:3, 69:8, 15,19 70:5,25 71:5,23 72:14,21 78:8,23,25 80:2 123:17 124:3 145:19 153:24 155:2 170:7,9,11, 13,15 183:20,23 184:15,21 193:17, 18 211:24 212:11 213:16 214:15,17, 25 215:23

**road** 51:25 57:17 160:3 239:12 250:7

**Robert** 199:10 207:4,21,25

**Rockland** 16:24 17:10,25 18:6,8, 11,15 19:19,23 20:11 22:10 25:12 26:4,11,17,21 31:8 82:7 86:12 125:19, 20 136:24 138:18 167:20 195:7 201:12 204:9 209:18 210:5,7 233:11 242:10 256:11 259:1

**Rodham** 215:25

**room** 97:10

**rough** 160:4

**Route** 87:18 156:9,12

**Routes** 28:17

**RR80** 227:6

**rules** 46:21,25

**run** 65:2 73:11,13 74:2,10,15 77:9 81:21 130:23 139:5

**running** 46:12 73:14,17 75:7 95:4,6 117:16 121:3 129:13,18 136:11 145:17 155:16 156:7,10, 13 170:22 172:2 177:9 180:21 240:20

**Ruth** 233:9,10

**S**

**safety** 121:15,17 122:16 194:6,9

**Salit** 4:12 259:1, 23

**salt** 128:2

**Sanderson** 43:13 44:2,21 46:11,17 62:22 73:14,16 75:20 77:19 78:24 79:3,13,24 80:10 81:7 103:4 107:10 111:3,8,21 113:15 120:11 124:25 129:22 143:6 144:20 145:16 146:17 147:4,22 154:19,21 182:20, 24 183:8 185:4,6 191:12 211:14 228:11 229:19 230:2 240:18 241:24 242:3,6

**sanitation** 37:25 38:4,24

**Savad** 49:13,17 50:2,22 51:4 192:20,23 193:4,6, 12,13 194:6,9,10, 11,13,19,25 195:3, 9 243:18 244:3

**Savad's** 65:6 179:10 193:25

**Save** 196:21 255:19

**scale** 241:15 243:3,5,8

**school** 18:14,16, 22 19:10,14 20:16 86:17 87:12,16,23, 24 91:7,8 92:19 93:7,11,14,20,22, 23 94:4,6 96:2,5 98:8,17 198:23

**schools** 18:6,11 93:12

**Schumer** 215:25

**search** 16:20 154:10 170:13,15 240:3

**searched** 101:23 117:12,14 211:22

**Secor** 4:20

**secretary** 53:13, 15

**Section** 118:12

**Securities** 101:6, 20

**security** 13:8

**seeking** 149:10 247:14

**Sellout** 216:10 256:16

**seminar** 183:21, 23 184:5,21,23

**Senator** 70:13

**send** 15:20 43:25 46:9 101:10 106:13 222:4 229:25 233:4

**sending** 43:13 184:17 215:22 242:17

**sense** 74:4 149:20

**sensitive** 161:16, 20 166:2 198:11

**sentence** 63:23 64:5,10 92:14 103:6 107:18 114:21 128:3 158:15 159:11 212:13

**sentences** 98:12

**sentiment** 98:18 180:13 201:11,15, 21,22,24 202:5 203:9 219:18

**sentiments** 31:2

**separate** 84:9,10

**SEQRA** 59:24 60:15,17,18,19,23 61:5,6 84:2

**serve** 8:16 32:2,6

**served** 63:15 81:11,12

**service** 106:23

**services** 12:9 57:8 79:4 80:24 148:19 198:22 200:12

**session** 46:21 47:3,16,24 48:2, 10,21 52:16

**sessions** 47:2,10, 21

**set** 4:9 14:6 16:10, 18 66:14 110:6 111:3 201:6 259:10,18

**setting** 195:4

**seven-** 38:2

**Sewer** 233:12 236:14

**sewerage** 236:6

**sewers** 234:5 236:22

**Shaking** 5:10

**share** 132:11

**She'll** 79:7

**shift** 57:7

**shirt** 96:21 184:7 245:5

**short** 11:5

**shorthand** 259:1, 23

**Shortly** 217:4

**show** 192:20

**showing** 192:24 194:3

**Shuls** 102:12

**sic** 133:5

**side** 12:6 108:16 109:24 110:2,4,25 117:3 118:4,8,9 138:8 140:14 155:16,17 219:13 225:16 226:8

**sides** 68:19

158:22

**sign** 127:18,20 217:12,15

**signators** 76:25

**signature** 75:18, 24 76:5,7,10,15

**signatures** 73:5 75:15 76:12,18,20, 22 77:3,12 106:4,5 127:13,14

**signed** 102:24 127:19 217:16

**significant** 34:4, 12 132:10

**similar** 19:21 21:25 28:10 132:11

**simply** 134:3

**single** 81:20 82:6 83:7 90:6 104:22 105:3 186:21

**single-family** 89:23

**sir** 49:24 92:13 227:22 245:9

**sit** 53:17,20 54:13 83:17 171:3 200:2

**site** 45:7 215:9

**sites** 59:3 162:22, 24,25 163:3,5 218:22

**sits** 247:9

**situated** 64:9

**size** 22:16,17,19 217:20

**sizes** 94:21

**sketch** 143:10,21

**sketches** 143:5

**slash** 89:24

**slate** 73:11, 129:17,20

**slates** 144:8

**small** 64:25 67:3 150:25

**Sobel** 4:25 151:22 210:11

**socially** 137:21

**software** 7:11

**sold** 103:21

**solely** 129:11

**solidifying** 174:10

**solution** 132:16

**solutions** 132:19

**sort** 98:24 147:14 244:3

**soul** 246:14

**sound** 81:17 207:21

**source** 82:11 110:15,22,23 118:18, 134:19 199:7

**sources** 110:3

**space** 17:19

**speak** 10:10 24:6 26:8 88:2 95:24 97:5 120:14 182:13 184:5 189:17,18

**speaker** 184:2

**speakers** 95:24 97:3,16,23 182:8, 10

**speaking** 95:21 172:5

**special** 36:21 46:2 198:22 200:12

**specific** 10:19 24:20 26:13,14,24 32:5 57:19 73:9 78:6 103:20 127:8, 13 175:24 186:13 191:25 203:24,25 210:13 227:20 235:19

**specifically** 7:7 18:15 57:22 65:11 172:17 186:15 187:3 190:17

243:15

**specifics** 178:9 181:21 190:3

**spell** 92:18 98:16

**spoke** 98:5 119:15,17 172:8

**spoken** 23:16,20 24:21 72:22 119:18 120:15 195:14

**sponsored** 99:17,19 236:17

**sports** 94:20

**sports-related** 94:2

**spring** 29:12 95:23 102:24 103:12,15,18,24 104:6

**Square** 233:18,20

**Srolovic** 152:11

**ss** 259:1

**St** 44:4,16 45:9,11, 18,21 46:3 150:20, 23 151:9 152:3,12, 20 167:24 219:14

**stabilization** 38:7,9

**stack** 10:7

**staff** 218:3

**stand** 82:14 104:21 112:22 134:24 143:14 197:9

**standards** 54:15

**standing** 82:21 219:14

**stands** 53:5

**start** 69:23 75:14 82:19 151:5,7 194:16

**started** 6:21 73:2, 5 161:19 195:13

**starting** 112:7 116:21

**starts** 82:13 146:16 147:19 158:13 160:12

**state** 4:13 49:9 51:18 81:24 84:11 88:3 89:25 150:14 152:4,10 153:24 156:11 161:22 178:4 190:10 217:5,6 259:1

**stated** 23:3,8 91:18 112:13,16 119:24 120:5,6,7 189:16 190:20 197:13 233:19 243:16,17

**statement** 48:23 92:22,25 93:8 115:4,6,8,13 120:9 122:15 127:21 133:9,14 134:3,4 135:6,8 172:12 178:16 180:8 183:6 193:8,12,14 199:17,25 200:4,7 203:22 205:9,12, 15,17 236:25 237:2,3 239:14 246:17

**statements** 49:25 173:7,9 181:14,16, 19 244:2

**states** 68:24 69:16 146:12 207:5

**status** 66:5 83:14

**statute** 66:11,20 67:12,24 69:9 78:23

**stay** 114:22

**steer** 160:2

**Stepanovich** 4:2, 23,25 11:22 13:2, 17 27:20 36:9 42:21 54:20 55:2 61:12,25 66:24 68:18 69:23 71:18 78:17,20 80:15 82:21 84:16,24 85:7 86:23 100:2, 15 104:9 107:25 109:18,21 111:10 113:6 114:2

115:15 120:18
124:12 125:21
128:15 130:13
131:16 134:8
135:23 137:25
138:20 139:13
140:24 141:13
142:12 143:23
144:22,25 146:3
147:6 148:11,22
149:9,14,25 150:5
153:8 156:23
166:18 168:23
169:18 183:12
185:8 188:4
190:25 196:6,19
199:18 200:5
202:9 206:6,14
207:9 209:14
210:24 211:5
216:7 219:23
220:17 223:5
224:24 225:2
227:12 229:3
230:14 231:17
232:15 237:7
239:18 240:7
245:10 246:19
247:16 248:9,
249:24 250:6

**steps** 69:18 70:3

**stick** 116:9

**stipulating** 51:7

**Stock** 101:8,12,18

**stood** 82:17
140:13

**stop** 10:21

**stopped** 164:5

**stops** 157:19

**strategy** 47:10
48:14 50:17,
107:18

**Strike** 42:14 114:6
165:15 189:10

**string** 186:11,14,
20 187:22 188:2

**struggle** 200:17,
18

**struggling** 92:19
98:17

**student** 55:6,10
56:5,9 57:2,21
58:2,10,19,23
59:22 61:23 64:2,7
140:16 159:3
161:7,10 163:2,6
164:9 168:6
217:23 219:2,3

**students** 92:17
93:11 98:15

**studied** 145:17

**studying** 146:19

**stuff** 13:9

**subdivision**
83:25 88:13

**subject** 28:13
42:5 50:11,13
88:18 103:12,15,
19,25 104:7
111:24 113:16
211:24 214:14
224:17 228:15,20,
22 236:12

**subjected** 67:3

**submitted** 136:23
139:21 140:4,9,10
158:4,6 162:20
204:23 209:25
247:5,12 249:15

**Subscribed**
250:14

**subscribers**
99:21

**subsequently**
89:20

**substantial** 39:3,
4

**substantive**
199:7

**suburbanites**
200:22

**Suffern** 183:22

**suggest** 13:6,9
138:11

**suggesting** 40:6
45:25

**summary** 120:5,7

**summer** 13:12

**supervisor**
45:12,19 99:14
150:20,21 163:8,9
169:10 218:23
219:13

**Supplemental**
4:8 251:9

**supplied** 217:17,
19

**support** 160:5
170:24 171:4,18
174:7,9 177:6,12
181:25 228:16

**supported**
170:17, 176:21

**supporting**
171:15

**suppose** 158:21

**supposedly**
117:15

**Supreme** 69:16

**surrounding**
63:16 64:12

**Susan** 188:21

**swear** 126:24

**sworn** 4:12 189:2
191:17,23 250:14
259:11

**Systems** 7:2

---

**T**

**table** 132:18

**TAC** 53:4,5 54:2,8,
10,15

**TACS** 54:12

**takes** 18:2

**Tale** 157:2 254:23

**talk** 28:12 50:3
179:8 180:9
182:15

**talked** 57:23
189:4

**talking** 42:4 59:9
69:21 77:25 78:3

83:21 90:16 97:17
110:8,18 122:13
176:3 197:24

**Tall** 127:25

**Tartikov** 5:4 27:7
28:18 31:9,14
32:22 43:21 44:5,
11 45:22 64:18,21
74:9,14 75:6 78:7
105:4, 119:12,16
120:12 121:18
122:21 123:15
126:11,23 155:7,
11 156:8, 179:11
228:4,8 230:3,5,9,
21 231:12,24
232:8 240:4
243:10 244:16

**tartikov@
tartikovcollege.
org** 63:22

**Tauber** 41:14
42:8,16,17 43:20
44:11,16 45:6 46:2
51:3,4 244:21,25

**tax** 22:2,5 36:25
37:4,10,15,19,23
38:7,9, 39:12 40:9
56:19,21,22 57:2,
95:9 230:20,25
231:11,23 232:7

**taxes** 57:16 95:2,
8,16,21 198:20,23,
24 200:8

**taxpayers** 56:22
96:6 179:15 180:2,
5

**teachers** 96:6

**Technical** 53:6

**technology**
11:12,13 12:11,18
13:5, 101:7

**Telephone** 142:4

**ten** 86:6,13 87:10
99:18,21 209:5

**tenure** 51:10

**term** 21:9,14,19,
22, 52:23 67:8,10
68:2,3,7 69:2
123:18,22 124:7

143:5 161:24
162:2 170:13,15
234:12

**terminate** 80:23

**terminated** 81:7

**terminology**
82:22

**terms** 11:12 50:8
159:14 245:4

**testified** 4:14
34:17 93:6 104:22
105:10,15 116:11
122:18 128:10
148:20 203:13
215:3

**testify** 6:9 54:14

**testifying** 6:13
145:23

**testimony** 20:25
181:21 197:6
259:13

**tests** 6:22

**theory** 159:24

**thing** 129:12
205:22

**things** 5:8 166:21
195:14 241:13
244:14 255:8

**thinking** 92:6,7,9,
11

**Thomas** 216:2

**Thorsen** 237:16

**thought** 44:10,14
45:3,8 46:4 56:18
64:25 104:21
147:25 180:2
184:9 189:8 190:4
197:8 234:17,20,
21 235:5 248:24

**thousands** 248:4

**threat** 50:5 65:9

**threaten** 135:2
143:16

**threatened** 48:3
194:19,25 195:9

**three-quarters**
12:7

**threshold** 77:13

**ticket** 119:18

**tie** 96:22

**tight-knit** 22:13

**time** 5:16,21 6:5 37:10 38:18,19 44:25 45:15 46:13 51:8 56:7 62:24 64:6,19 77:2,14 84:18, 89:21 90:15,17,20 98:8 101:16 115:7 121:16 122:20,22, 23 123:20 124:6 129:18 130:10,11 137:23 153:21 161:10 163:15,23 167:9,11,23 174:12 177:24 178:13,19 182:14, 22 183:6 199:11 214:24 217:9,10 218:13,17 219:21 220:14 223:20 224:22 228:24 230:6 242:11,12, 22 243:13 250:9

**times** 94:3 148:21 160:15,24,25 161:3,13,18 162:16 194:13 245:21

**timing** 72:24

**tinafrawley@ optonline.net** 224:4

**title** 170:10

**today** 6:10,13,17 9:7,21 28:12 42:5 54:13 83:17 135:21 151:16 167:17 200:3 218:10

**told** 35:18 122:4 181:2 234:15 237:4,5

**tone** 193:3

**tones** 193:25

**top** 43:7,20 63:7 88:19 100:21,24, 25 134:23 135:12

172:22 184:25 191:10

**topic** 25:16 231:6

**topography** 155:15

**total** 76:23 77:6

**Tough** 95:18

**tow** 192:5

**town** 20:17 23:21 24:8 45:12,18 55:6,12,15 56:4,22 57:8,16 60:19,23 61:22 64:8,20 88:14 89:17 99:8, 11,14,15,16 150:21 151:3,17, 23 158:24 159:2,3 161:5,19 164:9 167:24 168:11 169:9 219:13,14 236:7,15,16 245:14,23 257:22

**town's** 161:4

**Towns** 157:2 254:23

**traced** 44:4

**Track** 225:23,24

**tracked** 118:18

**traditional** 97:15

**traffic** 17:14,23,24

**training** 209:17 210:3,4 256:10

**transcribed** 5:11

**transcript** 172:23 259:11

**transcription** 112:10,13

**translates** 90:24

**transportation** 198:22 200:10

**treatment** 46:2

**trigger** 54:10

**triggered** 170:13, 15

**triggers** 48:25 54:7

**true** 96:2 259:12

**trumps** 67:5

**trustee** 8:18,20 16:17 30:12 51:15 52:5,12 56:2 70:4 105:16 106:21,22 118:2 121:6 129:4 177:9 189:2,16 191:17 207:11,19 231:3 256:7

**trustees** 8:24 33:16,20 35:15 36:20 46:6,10,14 49:13 51:11 52:4 53:17 62:25 97:8 146:17 170:3 171:22 180:10 183:4 230:16 231:19 240:3,20 257:10,12

**Trustees-special** 36:11 251:19

**truthful** 54:11

**turn** 104:20 105:2 123:3 144:16 149:24 164:3,6 187:3 200:15 202:16 212:14 219:4

**turned** 14:11,14 30:7 75:25 76:3 135:16,22 144:18

**Turning** 143:12

**tweak** 177:22

**tweaked** 177:25 181:10

**tweaking** 173:17 181:6

**twelve** 174:4

**type** 49:4

**types** 233:22,25

**U**

**U.S.** 70:13,14 156:12 208:19

**Uh-huh** 34:8 79:2 179:5 180:3 205:16 224:10

**Ulman** 71:14 184:3,5 237:17

**ultimately** 127:15 152:20

**unclear** 82:20 126:13

**underground** 156:8,14,15

**underneath** 155:18 156:11

**understand** 5:14, 21 18:24 19:2 20:3 25:18 32:15 34:7,9 48:5,8 54:18 58:9 66:24 68:14,19 69:5 70:7 74:19,24 76:6 80:16 88:10 95:15 104:5 123:24 124:2 161:25 162:8 165:14,16,21 168:3,4 173:12,15, 16 180:4 181:6,13, 22 184:16 199:19 203:13 206:6 241:2

**understandable** 5:24

**understanding** 19:18 46:25 47:7, 59:20 60:9,14 61:2 76:11 77:5,11 90:13 110:22 123:21 165:24 181:9 214:23 222:16

**understood** 67:9 90:20 133:25

**unenforceable** 159:2

**unfair** 56:18

**unforeseen** 38:12,15,17

**unincorporated** 208:3,9

**unit** 91:6 150:9,15 152:4,10 254:19

**unite** 112:21 134:24 143:14 160:7

**United** 68:24 69:15

**units** 57:20 90:23, 25 91:2

**University** 145:20 146:23

**unnecessary** 148:4

**unsupported** 13:10

**unsure** 183:10

**upcoming** 98:6 154:23

**updates** 13:8

**upgraded** 234:6 236:21

**upgrading** 13:9

**upheld** 69:8,11,13 74:6

**uphold** 158:22 159:4

**upholding** 67:23 158:24

**upstairs** 97:11,12

**use.'** 63:17

**V**

**vague** 22:12 89:14 182:22 238:4

**valid** 77:12

**Valley** 29:12 102:24 103:12,15, 19,24 104:6

**version** 23:14

**versions** 23:9

**versus** 5:4 59:11

**video** 111:25 112:9 113:2

**View** 157:2,9 158:4 207:25 254:23

**vigorously** 105:5

**village** 5:4 8:8,16,

24 10:4 11:11,17,
24 12:18 13:5
15:12,22 16:16
22:3,6 23:18 24:25
25:3 30:12,14 31:2
33:17 34:5,13
35:15,22 36:25
37:11,16,24 38:11,
21 39:2 42:18
43:14,15,17 45:8
47:11,22 48:3,9,20
49:14,17 51:2,7,10
52:19 53:2,12,20,
24 54:16 59:10,17
61:15 62:25 63:3
64:25 65:24 66:2
67:17 70:4 74:6
75:23 76:4 77:15
81:10 82:3 83:22,
23 95:24 97:5
102:22 104:12
109:4 110:5,10
111:3 126:22
130:2 131:19
133:12 134:24
142:23 143:2,
144:14 146:17
148:3 157:21
163:10,11,16,24
164:11 165:2,14,
22 166:4,8,12
170:19 171:4,19,
22 172:5 173:13,
16 174:10 176:4,
17 178:3,5 179:15
182:16 184:2
189:20 190:18
191:17,24 196:14
218:4 221:6
224:15 228:16
235:9 237:17,20,
25 238:7,9,14,16,
17 246:10,12
248:4,5 251:11
253:16

**village's** 59:25

**villages** 59:11,14
60:12,16 103:7

**villages'** 60:21

**violate** 51:17

**violated** 60:17,18

**violated'** 158:18

**violation** 60:15

**violations** 89:24

**virtual** 248:3

**voice** 142:23

**voicing** 99:11
174:7,9

**vote** 30:14,24 40:9
91:7 93:4 98:10,24
99:4,7,14 100:5
129:16 158:23
159:12,16,18
182:24 183:4
230:20,23 231:6,
11,14,23 232:10,
13 252:11,12

**vote.'** 159:6

**voted** 173:24
230:25 232:6

**voters** 77:6 91:7,
13

**votes** 151:19

**voting** 19:16,18,
20,23 20:7,10,13,
25 21:9,19,22
95:25 167:20

———————

**W**

**wait** 58:25 126:18
188:20

**wall** 149:12

**wanted** 10:21
65:23 95:8 154:23
155:4 239:15

**water** 82:8,10,11,
14 155:7,11,15
156:7,10,13
217:22

**waved** 71:13

**wear** 96:19

**wearing** 184:6
245:4

**website** 11:18
27:13,15,17 28:8
29:21,23 30:2 31:3
110:6,11,14,16
143:3 216:17
217:3 229:15
243:17

**weigh** 30:17

**Wesley** 59:16
103:9

**wetlands** 81:25
82:8,24 83:12 90:2
153:25 161:23
198:12 217:6,24
239:13

**WHEREOF**
259:18

**whispered**
195:16

**whispering**
195:13

**white** 96:21 245:5

**wife** 204:18,20,22
233:8,10,15,18,19
234:5,10,15
235:14,18,22
236:10 237:4
247:5

**wind-driven**
156:21

**withdraw** 68:6
70:2 126:16 241:7

**Withdrawn**
196:18 210:14

**witnessed** 193:25

**women** 96:18

**won** 142:24

**word** 28:24
107:16,19,21,22
113:3 122:5,7
151:21 168:9
215:23 225:21
230:3,5

**words** 83:9
116:21 133:17
187:14 189:9
234:8 238:5

**work** 7:24 15:16
16:4,6 157:20
187:6 222:5,11
226:4,6 232:24
233:5

**working** 52:16
101:15,18,20
151:18

**workshop** 95:25
97:8

**workshops** 52:5,
8,15,21

**worst** 160:25
161:3,18 162:16

**write** 43:23 63:10,
12 64:24 65:3
99:11 102:21,25
103:3 121:22,25
122:18,19 130:4
140:11 149:21
154:17 157:13,21
159:11 186:7
192:9,17,21
195:24 201:9
212:4 213:14
216:20 234:16,25
238:19

**writing** 150:25
151:16 164:6
236:25 237:3

**written** 63:8 90:17
126:6 199:10
204:19 217:10
218:14,18 233:17
235:14,17 245:20

**wrong** 166:21
197:9,10 255:8

**wrote** 64:19 92:4
128:10,14 157:18
160:9 163:23
204:14 234:14
235:22

———————

**Y**

**Yagel** 4:1,17,24
9:1,10,19 10:1,13
11:1,9 12:1,4,8
13:1,24 27:1,25
45:1,5 55:1,5 62:1,
7 84:1,25 85:1,13
100:1,9,20,23
103:1,10 104:1,15
107:1,13 108:1,7
109:1,22,24 111:1,
16 112:1,7 113:1,
11 115:1,20 116:1,
3,11 117:1,2
118:1,16 120:1,23
121:1,12 123:1,2,
17 124:1,18 126:1,

2 128:1,20 130:1,
18 131:1,22 132:1,
6,24 134:1,13,22
135:1,11 136:1,4
138:1,6,25 139:1,
18 141:1,5,18
142:1,17 144:1,4
145:1,8 146:1,8,
15,18 147:1,11,22
148:1,4 150:1,11
153:1,15 154:1,3
157:1,5 158:1,2
159:1,23 160:1,23
161:1,14 164:1,4
166:1,25 169:1,4,
23 170:1,17 172:1,
15 183:1,17 185:1,
13 188:1,9 189:1,
16 190:1,7 191:1,
6,11 193:1,9
196:1,25 198:1,14
199:1,16 202:1,16
204:1,7 206:1,20
207:1,15 209:1,21
210:1,17 211:1,9
215:1,7 216:1,13
219:1,5 221:1,15
223:1,10 225:1,6
227:1,18 229:1,8
230:1,20 231:1,22
232:1,20 237:1,12
239:1,23 240:1,12
243:1,9 246:1,11,
21,24 248:1,15
249:1,8 250:1,8,12
257:24 259:1

**Yagel's** 4:7 251:8

**year** 8:14 34:22
37:14 39:9 70:17,
19 85:23 105:18
146:12 161:2
171:23

**years** 8:13,22,25
17:19 24:4,13,15,
18 209:5 246:14

**yeshiva** 29:11
92:17 98:15
102:23 103:11,14,
18,24 104:6
145:20 146:22
237:21,25 238:13
239:5,9

**Yeshivas** 102:12

**yeshivaworld.com** 229:15

**yesterday** 9:22

**yet-to-be-proposed** 45:7 51:5 74:12 75:6 105:12 242:23

**York** 4:13,21 17:9 46:20 51:18 101:8, 18 150:14 152:4,8, 10 156:11 185:19 238:23 245:21 259:1

**yup** 111:18

---

**Z**

---

**Zaks** 220:22,24,25 222:15

**Zebrowski** 216:3

**zone** 61:19 163:3 217:23 219:2,3

**zoned** 65:24,25 161:15 227:6

**zones** 140:16 217:4

**zoning** 55:6 63:16 64:11,13,20 65:23 67:4 68:12 74:5 83:25 89:15 90:22 112:24 135:14 158:16 162:8 164:17 165:25 218:24 219:12 228:17 237:19