Doris Ullman Final 8-15-14dfu(10).txt

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK
     ----------------------------------------------X
4    CONGREGATION RABBINICAL COLLEGE OF
     TARTIKOV, INC., RABBI MORDECHAI BABAD, RABBI
5    WOLF BRIEF, RABBI HERMEN KAHANA, RABBI MEIR
     MARGULIS, RABBI GERGELY NEUMAN, RABBI MEILECH
6    MENCZER, RABBI JACOB HERSHKOWITZ, RABBI CHAIM
     ROSENBERG, RABBI DAVID A. MENCZER, AND
7    RABBI ARYEH ROYDE,

8                        Plaintiffs,

9        - against -              CASE NO. 07-CV6304
                                           (KMK)
10

     VILLAGE OF POMONA, NY; BOARD OF TRUSTEES OF
11   THE VILLAGE OF POMONA, NY; NICHOLAS SANDERSON,
     AS MAYOR; IAN BANKS AS TRUSTEE AND IN HIS
12   OFFICIAL CAPACITY, ALMA SANDERS ROMAN AS
     TRUSTEE AND IN HER OFFICIAL CAPACITY, RITA
13   LOUIE AS TRUSTEE AND IN HER OFFICIAL CAPACITY,
     AND BRETT YAGEL, AS TRUSTEE IN HIS OFFICIAL
14   CAPACITY,

15
                         Defendants.
16   ----------------------------------------------X

17              DEPOSITION OF DORIS F. ULMAN, taken by
     Plaintiffs, pursuant to Notice, at the offices of
18   Savad Churgin, 55 Old Turnpike Road, Suite 209,
     Nanuet, New York, on Friday, August 15, 2014,
19   commencing at 10:02 a.m., before Chandra D. Brown,
     a Registered Professional Reporter and Notary
20   Public within and for the State of New York.

21

22

23              SANDY SAUNDERS REPORTING
            254 South Main Street, Suite 216
24            New City, New York 10956
                  (845) 634-7561
25

                                                         2

1

2    A P P E A R A N C E S :

3

4                SAVAD CHURGIN
              Attorneys for the Plaintiffs

Page 1

```
                    Doris Ullman Final 8-15-14dfu(10).txt
  5                 55 Old Turnpike Road, Suite 209
                    Nanuet, NY 10954
  6                 By: DONNA C. SOBEL, ESQ.
                    E-mail:  D.sobel@savadchurgin.com
  7


  8
                    STEPANOVICH LAW, PLC
  9                 Attorneys for the Plaintiffs
                    516 Baylor Court
 10                 Chesapeake, VA 23320
                    By: JOHN G. STEPANOVICH, ESQ.
 11                 E-mail:  John@stephanovichlaw.com

 12

 13                 STORZER & GREENE, P.L.L.C
                    Attorneys for the Plaintiffs
 14                 1025 Connecticut Avenue, Northwest
                    Suite One Thousand
 15                 Washington, D.C. 10036
                    By: ROMAN P. STORZER, ESQ.
 16                 E-mail:  Storzer@strozerandgreen.com
                             (Via Telephone)
 17

 18
                    ROBINSON & COLE LLP
 19                 Attorneys for Defendants and Witness
                    1055 Washington Boulevard, 9th Floor
 20                 Stamford, CT 06901-2249
                    By:  JOHN F. X. PELOSO, JR., ESQ.
 21                 E-mail:  Jpeloso@rc.com

 22

 23   ALSO PRESENT:

 24        Marci A. Hamilton

 25
                                                              3
  1                    D. Ulman - 8/15/14

  2   D O R I S   U L M A N, called as a witness, having

  3        been first duly sworn by a Notary Public of the

  4        State of New York, was examined and testified

  5        as follows:

  6   EXAMINATION BY

  7   MR. STEPANOVICH:

  8        Q    Ms. Ulman, you have indicated before, but

  9        I just can't recall it, you have been the

 10        Village attorney for Pomona for how long?
```

Doris Ullman Final 8-15-14dfu(10).txt

11    A    Eleven years.  Eleven years.

12    Q    Okay.

13         And you were also the Village attorney for

14    New Hempstead?

15    A    Yes, among others.

16    Q    What were the years for New Hempstead?

17    A    New Hempstead was 1984 to 2003.  Almost 20

18    years.

19    Q    And when you were the Village attorney

20    with New Hempstead, were you involved in --

21    A    Let me backtrack.  I was assistant Village

22    attorney first until 19 -- from '84 to 1990,

23    and I believe it was sometime in the early '90s

24    that I became the Village attorney.

25    Q    And were you involved in any Zoning Code

                                                            4

1                    D. Ulman - 8/15/14

2    revisions while you were the Village attorney

3    for New Hempstead?

4    A    Probably.

5    Q    And did any of those revisions include

6    laws regarding educational institutions?

7    A    It might have.  I don't recall

8    specifically.

9    Q    What do you recall regarding any Zoning

10   Code amendments regarding educational

11   institutions?

12   A    I really don't recall except for the fact

13   that the first mayor of New Hempstead -- under

14   the first mayor of New Hempstead, there were

15   quite a few local law changes, including

                        Page 3

Doris Ullman Final 8-15-14dfu(10).txt

16    zoning, but I don't -- as I said, I was not the

17    Village attorney at that time, I was assistant,

18    and so I do not recall specifically what they

19    were.

20    Q   What about zoning changes regarding

21    dormitory restrictions or regulations; were you

22    involved in any of those at the Village of New

23    Hempstead?

24    A   I don't -- I don't believe the Village of

25    New Hempstead permits dormitories as part of

5

1                D. Ulman - 8/15/14

2    educational uses in their local law, or at

3    least not up until 2003.  I don't know what the

4    law is today.

5    Q   Was that a law that you had any

6    involvement in drafting?

7    A   No.

8    Q   No dormitory law?

9    A   No.  What I'm saying is they do not have

10    the law permitting dormitories in the Village

11    of New Hempstead.

12    Q   So if I understand that correctly, then,

13    are dormitories prohibited in the Village of

14    New Hempstead?

15    A   They were up until 2003.

16    Q   Were you also the Village attorney for

17    Montebello?

18    A   No.

19    Q   Were you involved at all in any Zoning

20    Code amendments with the Village of Montebello?

21    A   I have never worked for the Village of

Doris Ullman Final 8-15-14dfu(10).txt

22    Montebello.
23    Q    How about the Village of Suffern; did you
24    ever work for them?
25    A    Yes.

                                                        6

1                      D. Ulman - 8/15/14
2     Q    And when was that?
3     A    In the Village of Suffern, I did special
4     counsel work.  I was not a regular attorney.
5     If Mr. Riess had a conflict, I would be called
6     in to handle whatever that case was, whatever
7     that application was with the Planning Board.
8          The one I remember, the most recent, which
9     is probably about 10 years ago, was -- I think
10    it was an amendment to Ramapo Cirque,
11    C-I-R-Q-U-E, which is a fairly large housing
12    development in Suffern.
13    Q    So you were -- were you involved in any
14    amendments to their Zoning Code?
15    A    No.
16    Q    And I believe you testified that you have
17    been the Village attorney for Wesley Hills?
18    A    Assistant.
19    Q    Assistant.
20         When was that?
21    A    1984 to the present.
22    Q    In that capacity, have you been involved
23    in any amendments to Wesley Hills Zoning Code?
24    A    No.  My work in Wesley Hills is strictly
25    with the Zoning Board of appeals.  I do not

                                                        7

Doris Ullman Final 8-15-14dfu(10).txt

D. Ulman - 8/15/14

1

2      represent the Village Board.

3      Q     Have you ever done any -- strike that.

4      I'm sorry.

5            Were you ever a Village attorney for

6      Airmont?

7      A     No.

8            MR. STEPANOVICH:  Off the record.

9            (Whereupon, an off-the-record discussion

10     was held.)

11           MR. STEPANOVICH:  Back on.

12   BY MR. STEPANOVICH:

13     Q     Then I take it you have not been involved

14     in any Zoning Code amendments in the Village of

15     Airmont?

16     A     No.

17     Q     Have you worked as a Village attorney for

18     Chestnut Ridge?

19     A     Yes.

20     Q     And what were the years?

21     A     I was assistant Village attorney from 1986

22     to 1991, '92, at which time I became Village

23     attorney, and I resigned in December 2012.

24     Q     And in that capacity, were you ever

25     involved in any amendments to the Zoning Code

8

1                    D. Ulman - 8/15/14

2      of Chestnut Ridge?

3      A     Yes.

4      Q     And did any of those amendments include

5      laws regarding educational institutions?

6      A     I don't believe so.

Page 6

Doris Ullman Final 8-15-14dfu(10).txt

```
 7     Q     Did any of those amendments include laws
 8           regarding dormitory regulations?
 9     A     No.  Those were in the original zoning law
10           that was adopted by the Board in 1987.
11     Q     So the Village of Chestnut Ridge permits
12           dormitories?
13     A     Oh, yes.
14     Q     Okay.
15           So that I understand, you had no personal
16           involvement in any of those regulations
17           regarding dormitories; is that right?
18     A     Well, yes, because at the very beginning
19           of the establishment of the Village in 1986, I
20           was part of the committee that worked on
21           developing the zoning law that was then to be
22           adopted as the first zoning law for the Village
23           of Chestnut Ridge.  I was not the only person
24           on the committee.
25           As I recall, ^ Terry Rice was on it, a
```

9

```
 1                 D. Ulman - 8/15/14
 2     couple of people who were to be on the Planning
 3     Board and Zoning Board were on that committee,
 4     but I was the -- Terry and I were the legal
 5     components of that committee.
 6     Q     I think you testified that Chestnut Ridge
 7           permits dormitories?
 8     A     Yes.
 9     Q     Do you know whether or not there is any
10           limitations on the size of dormitories in
11           Chestnut Ridge?
```

Page 7

Doris Ullman Final 8-15-14dfu(10).txt

12  A    The only limitation is that there can only

13  be one dormitory building on a lot.

14  Q    And is that dormitory building restricted

15  in terms of percentage of the --

16  A    No.

17  Q    The dormitories' rooms, do they provide

18  for separate cooking and housekeeping and

19  facilities?

20  A    They do not.  The dormitory provision in

21  Chestnut Ridge was taken directly from the

22  provision in the Town of Ramapo's zoning law.

23  It's almost identical, except that I believe

24  Ramapo does not have the restriction of one

25  building per lot.

10

1                    D. Ulman - 8/15/14

2   Q    Have you ever worked as a Village attorney

3   for Kaser?

4   A    No.

5   Q    Then I take it you had no involvement with

6   any of their zoning regulations; is that right?

7   A    I did not.

8   Q    What about the Village of New Square?

9   A    Yes.

10  Q    And in what capacity did you work for New

11  Square?

12  A    I was Village attorney from 1990 until

13  about '96 or '7.  And then I did not work for

14  them again until the year 2000, and I worked

15  from 2000 until 2007 or '8.  No, wait.  2010.

16  I'm sorry.

17  Q    And in those capacities, were you involved

Doris Ullman Final 8-15-14dfu(10).txt

18      in any amendments to New Square's Zoning Code?

19      A    Yes.  Particularly during the period from

20      2000 to 2010 we did major revisions in the

21      zoning law.  That's one of the reasons they

22      hired me.

23      Q    And did any of those revisions include

24      laws regarding educational institutions?

25      A    I don't believe so.

                                                    11

1                       D. Ulman - 8/15/14

2       Q    Did any of those revisions include laws

3       regarding dormitory regulations?

4       A    No.

5       Q    Does the Village of New Square permit

6       dormitories?

7       A    I don't recall that portion of the zoning

8       law of the Village of New Square.  I don't

9       know.

10      Q    I think you also testified earlier that

11      you have been the Village attorney for Grand

12      View-on-Hudson?

13      A    I still am.

14      Q    And were you involved in any Zoning Code

15      amendments there?

16      A    Yes.

17      Q    Any amendments regarding educational

18      institutions?

19      A    No.

20      Q    Any amendments regarding dormitory

21      regulations?

22      A    No.

                        Page 9

```
                Doris Ullman Final 8-15-14dfu(10).txt
23     Q     Does Grand View-on-Hudson permit
24  dormitories?
25     A     NO.
                                                             12
 1                 D. Ulman - 8/15/14
 2     Q     Are there any villages that you have
 3  served as a Village attorney that I have not
 4  mentioned?
 5     A     Yes.
 6     Q     Could you please tell me those.
 7     A     Spring Valley, South Nyack.
 8           You just want Village attorney?
 9     Q     We'll start there.
10     A     Okay.
11           How many have we covered so far?
12     Q     We covered New Hempstead and Wesley Hills,
13  Chestnut Ridge, New Square, Suffern and now
14  you've indicated Spring Valley, South Nyack.
15     A     And also covered Grand View.  So that's
16  seven.
17     Q     Grand View-on-Hudson.
18     A     There were three more.
19           What did I say, South Nyack?
20     Q     Yes.
21     A     Those, and I also have done special
22  counsel work for the Village of West
23  Haverstraw.
24           So Spring Valley, South Nyack and West
25  Haverstraw would make the ten.  I've done 10 of
                                                             13
 1                 D. Ulman - 8/15/14
 2  the 19 villages in Rockland County in one way
                        Page 10
```

Doris Ullman Final 8-15-14dfu(10).txt

3      or another.

4      Q     When did you serve as Village attorney for

5      Spring Valley?

6      A     Again, I started as Housing attorney in

7      1970 and I became Village attorney in 1975.

8      Q     And in your capacity as Village attorney

9      at Spring Valley, were you involved in any

10     Zoning Code amendments?

11     A     Probably.

12     Q     Any amendments regarding educational

13     institutions?

14     A     I don't think so, but I really don't

15     remember.

16     Q     Any --

17     A     Long time ago.

18     Q     Any amendments regarding dormitory

19     restrictions?

20     A     I don't think so.

21     Q     Do you know whether or not dormitories are

22     permitted in Spring Valley?

23     A     They probably are.

24     Q     In your work as Village attorney for South

25     Nyack, were you involved in any Zoning Code

                                                          14

1                    D. Ulman - 8/15/14

2      amendments?

3      A     Yes.

4      Q     Did any of those involve laws regarding

5      educational institutions?

6      A     I don't believe so.

7      Q     What about laws regarding dormitory

                       Page 11

Doris Ullman Final 8-15-14dfu(10).txt

8  restrictions?

9  A    I don't recall any changes.  They do

10  permit dormitories.

11      Nyack College, for example, is in South

12  Nyack and they have many dormitories.  They

13  have many dormitory buildings.

14  Q    In your work as Village attorney for the

15  Village of West Haverstraw, were you involved

16  in any Zoning Code amendments?

17  A    No.  I only do special counsel work at

18  West Haverstraw, similar to Suffern.  When

19  their Village attorney has a conflict, they

20  call me in for the Planning Board or the Zoning

21  Board.

22      The most recent one I had was the

23  desalination plant, desalination power project.

24  John Edwards, who is their Village attorney,

25  had a conflict and so they asked me to fill in

                                                    15

1               D. Ulman - 8/15/14

2  for him, and that was just maybe two or three

3  years ago.

4  Q    Do you know whether or not the Village of

5  West Haverstraw permits dormitories?

6  A    I really don't know.

7  Q    Now, you had mentioned earlier if I just

8  wanted villages.  Do you serve as a Town

9  attorney or in any other capacity for any

10  municipality?

11  A    No.

12  Q    So besides the villages that you just

13  recited, then you have not served any

Doris Ullman Final 8-15-14dfu(10).txt

14      municipality in New York?

15      A      I have.  I worked for the City of New York

16      many, many years ago.

17      Q      What capacity?

18      A      Contractual.

19      Q      Doing what kind of work?

20      A      Our job was to rewrite the Administrative

21      Code of the City of New York in conjunction

22      with the recently adopted New York City

23      Charter.

24      Q      Anywhere else?

25      A      I have worked for the County of Rockland

                                                    16

1                       D. Ulman - 8/15/14

2       as an assistant county attorney, primarily with

3       the Office of Community Development, and also

4       as counsel to the president of Rockland

5       Community College.  That's not recent.  That

6       was 15, 20 years ago, as was the City of New

7       York many, many years ago.

8            In my work with the Village of South Nyack

9       and the Village of Grand View-on-Hudson, I was

10      also the attorney for the -- they have a joint

11      police department which is a separate entity,

12      and I was attorney for the South Nyack/Grand

13      View police administration board for many

14      years.

15            I think those are the only municipality

16      positions I've held.  I've done, of course, pro

17      bono work for some organizations but no

18      municipality.

                        Page 13

Doris Ullman Final 8-15-14dfu(10).txt

```
19    Q    And we learned the other day that there
20    are no members of Preserve Ramapo, so are you a
21    friend of Preserve Ramapo?
22    A    I do not use e-mail and so I have never --
23    other than what I've seen here during these
24    depositions, I have not seen any of their
25    websites nor do I get their communications.
                                                    17
1                     D. Ulman - 8/15/14
2         I do know Bob Rhodes, of course.  I've
3    known him for many years before he was involved
4    in Preserve Ramapo as well, when he was on the
5    Board in Wesley Hills, because I've worked for
6    Wesley Hills during that period.  And I have
7    met Mike Casteluccio several times.
8    Q    When did you find out about the Rabbinical
9    College of Tartikov purchasing the subject
10   property?
11        MR. PELOSO:  Just when did she find out
12   when they purchased the property?
13   Q    When did you become aware that the
14   Tartikov purchased the property?
15   A    I don't recall.
16   Q    Do you remember the year?
17   A    No.
18   Q    Do you recall when you realized that the
19   property was intended to be used for a
20   Rabbinical college?
21   A    Probably when I learned of the purchase
22   because that's in the name.  It would be quite
23   obvious that they wanted to use it for that
24   purpose as a Rabbinical college.
```

Page 14

Doris Ullman Final 8-15-14dfu(10).txt

25      Q     And you don't remember when that was?

                                                          18

1                       D. Ulman - 8/15/14

2       A     I don't.

3       Q     Now, you're familiar with the movement to

4       form Ladentown; is that right?

5       A     Yes.

6       Q     And you performed -- did you perform any

7       legal work for that movement?

8       A     I did.

9       Q     And can you explain what that was?

10      A     I was asked in, I think it was 2006, to

11      handle the appeal of their lawsuit.  Warren

12      Berbet was the attorney for the group during

13      the Supreme Court process and during the

14      petition process.  I had no involvement during

15      that time.  I didn't follow it at all.  But

16      when Warren did not want to do the appeal, I

17      was asked to do it and I agreed to handle it

18      for them pro bono.

19      Q     And you said you only got involved at the

20      appeal stage?

21      A     Yes.

22      Q     And do you know why Ladentown was seeking

23      to be incorporated?

24      A     My understanding was that they did not

25      want the Patrick Farm property to be developed

                                                          19

1                       D. Ulman - 8/15/14

2       as high density housing and the Village, the

3       primary -- I don't know whether this is true or

                          Page 15

Doris Ullman Final 8-15-14dfu(10).txt

4    not -- but it was my understanding that the

5    primary reason for the petition to incorporate

6    was to prevent down zoning of the Patrick Farm

7    property.

8    Q    How long did you do work for Ladentown?

9    A    The briefs were filed, I believe, in

10    either late 2006 or early 2007.  That was it.

11    It was a very short period of time.

12    Q    And when you were doing work for

13    Ladentown, did you work with any Pomona Village

14    officials in that regard?

15    A    No.

16    Q    Besides the work that you just described,

17    did you ever do any other work for the

18    Ladentown movement?

19    A    No.

20    (Whereupon, the aforementioned document

21    beginning with Bates stamp POMO031222, was

22    marked as Plaintiffs' Exhibit 802 for

23    identification as of this date by the

24    reporter.)

25

    20

1    D. Ulman - 8/15/14

2  BY MR. STEPANOVICH:

3    Q    You've been handed Plaintiffs'

4    Exhibit 802, Ms. Ulman, and I ask if you can

5    identify it, please.

6    A    (Witness views document.)

7    This is a letter that I sent to the Town

8    Board of the Town of Ramapo, to the attention

9    of Alan Berman, he's deputy Town attorney,

Doris Ullman Final 8-15-14dfu(10).txt

```
10        dated January 19, 2010, concerning the Patrick
11        Farm final environmental impact statement.
12        Q     Did you send this letter on behalf of the
13        Village of Pomona?
14        A     I did.
15        Q     So it was in your capacity as Village
16        attorney and authorized by the Village Board of
17        Trustees; is that right?
18        A     That's correct.
19        Q     That's all I have.
20              How long have you lived in Rockland
21        County?
22        A     I moved to Rockland County in 1965.
23        Q     And I'm sure Rockland County has changed
24        since 1965?
25        A     Substantially.
                                                      21
1                   D. Ulman - 8/15/14
2         Q     Could you, in general, describe your
3         impressions of that change, please?
4         A     Well, when I moved to Rockland County, we
5         lived on a 7-acre property.  Across the street
6         was a small farm.  Next to that was a chicken
7         farm.  Across the street from that was a truck
8         farm, and right down the line on Pinebrook Road
9         in what is now the Village of Chestnut Ridge.
10        All of those farms are gone.
11        Q     So development has increased, correct?
12        A     Yes.
13        Q     Are there any farms left?
14        A     There are a couple.  There's one right
```

Doris Ullman Final 8-15-14dfu(10).txt

15   near Pomona.  In fact, it has a Pomona address

16   on Route 45 in the Town of Ramapo, and, in

17   fact, Ramapo bought the development rights to

18   that property so that would always remain a

19   farm, and they still farm to this day.

20        There's a farm in New City called the

21   Cropsey Farm.  There are a couple of small

22   farms around.  There was one on Camphill Road

23   in Pomona.  That was a very small one.  It was

24   kind of a community farm, but it's not there

25   anymore.

                                                    22

1                D. Ulman - 8/15/14

2        Yeah, we have about a half dozen, I would

3    say, still in the area.

4    Q    So I'm sure traffic has increased?

5    A    Traffic has increased.  Population has

6    increased.  Taxes have increased.  When I moved

7    to the County, my 7-acre property paid $500 in

8    property taxes.  I can't imagine what they are

9    paying today.

10   Q    You are familiar with -- strike that.  I'm

11   sorry.

12        Are you familiar, Ms. Ulman, with

13   Orthodox, Hassidic Jews and their customs and

14   cultures?

15   A    I'm familiar with the people.  I am not

16   familiar with the customs and cultures, other

17   than I know they are very strict observants of

18   their religion.

19   Q    When you say you're familiar with the

20   people, what do you mean by that?

Doris Ullman Final 8-15-14dfu(10).txt

21    A    I work with them, and I have worked with
22    them over the years.
23    Q    Can you generally identify Orthodox,
24    Hassidic and individuals by their dress?
25    A    Generally.

                                                          23

1                    D. Ulman - 8/15/14
2    Q    And could you describe that, please?
3    A    Most of the men are bearded.  The dress of
4    the Ultra Orthodox and Hassidic are generally
5    black trousers, long black coats, always with
6    their heads covered.  Generally you'll see a
7    prayer or religious shawl of some kind that
8    they are wearing, and that's for the most part.
9         Some of them -- I think one of the
10   Hassidic sects have what are called peyos,
11   which are the curls on the side of the head.
12   That's pretty much...
13   Q    Has the population of Orthodox and Jews
14   increased in Rockland County since you lived
15   here?
16   A    Yes.
17   Q    And is there any particular location where
18   that is incurring within Rockland County?
19   A    Primarily in the Monsey, New Square, Kaser
20   areas, although you do see more and more
21   families in other areas of the county, in
22   Clarkstown, in Haverstraw and the Pomona area.
23   But the high concentrations are, I believe,
24   generally in Monsey, New Square and Kaser.
25   Q    Did the Village of -- in your capacity as
                      Page 19

Doris Ullman Final 8-15-14dfu(10).txt

1                    D. Ulman - 8/15/14

2      village attorney, do you have an opportunity to

3      review the census figures for Pomona?

4      A      I have the opportunity if I take it.

5      Q      And have you reviewed the census figures

6      for the Village of Pomona?

7      A      I did in preparation for one of my answers

8      that was submitted.  It's Exhibit --

9             MR. PELOSO:  800.

10     A      -- 800.

11            I think one of the questions you asked me

12     during the 30(b)(6) was about the Hassidic

13     population in the Village of Pomona and I did

14     ask the clerk to pull and she faxed me all of

15     the census documents she had, and it turns out

16     there is no breakout of religion.  They do have

17     breakouts of every race, I think there are five

18     or six, but there is no breakout of religion,

19     so there is no way of knowing what the Hassidic

20     population of Pomona is.

21     Q      Is there any breakout for Jews?

22     A      No.

23     Q      Would Jews -- is there a breakout for --

24     is there an "other" classification in the

25     census figures for Pomona?

1                    D. Ulman - 8/15/14

2      A      I think there's an "other" of race, not of

3      religion.  There is no religious -- of the

4      papers that we have in the Village, there may

5      be -- you know, the raw data may have

                         Page 20

Doris Ullman Final 8-15-14dfu(10).txt

6        additional information, but the census
7        information that we have in the Village does
8        not list any population by religion.
9        Q    Are you aware of any Hassidic families
10       living in Pomona?
11       A    I don't know about Hassidic, ultra
12       Orthodox.  I don't know the distinction between
13       Hassidic and Ultra Orthodox.  I have seen, I
14       believe, there's a Shabbat up on the mountain,
15       because they have sent flyers to residents to
16       come to religious services, particularly their
17       high holy days.  And I do see people walking on
18       Saturdays in the area.  Not many.  And I
19       believe Rabbi Richards is either Ultra Orthodox
20       or Hassidic, and he is the person of 12
21       Sherwood that we discussed the last time.
22       Q    Do you read the Rockland County Journal
23       News?
24       A    Unfortunately, yes.
25       Q    And so that's where, contrary to Lenny

                                                        26

1                    D. Ulman - 8/15/14
2        Jackson, that's where you get your news, right?
3        A    I do.  Right.  He's lucky.  I have to read
4        it.
5        Q    And I think that we know by now that you
6        don't have Internet access so you don't go to
7        the loha.com?
8        A    I have Internet access.  I don't use
9        e-mail.  I have never gone to loha.com.
10       Q    So I take it you've never done any posting
                        Page 21

Doris Ullman Final 8-15-14dfu(10).txt

11     or anything like that on there?

12     A     No.

13           (Whereupon, the aforementioned document

14     beginning with Bates stamp POM0010567, was

15     marked as Plaintiffs' Exhibit 803 for

16     identification as of this date by the

17     reporter.)

18  BY MR. STEPANOVICH:

19     Q     You've been handed, Ms. Ulman, Plaintiffs'

20     Exhibit 803 and I ask if you can identify this,

21     please.

22     A     (Witness views document.)

23           These are invoices that I have submitted

24     to the Village of Pomona starting February 1,

25     2006, and it looks like it goes to December,

                                                              27

1                      D. Ulman - 8/15/14

2     December 2006.

3     Q     And these were produced for what purpose?

4     A     It looks like it was for a request from

5     Mr. Savad's office.

6     Q     And there are some redactions and --

7     A     Yes.

8     Q     And that looks also like these have been

9     produced to us by the Village of Pomona.  So

10     the redactions are -- why are there redactions

11     is the question?

12     A     The redactions would be any work that I

13     did of a privileged nature.  I really can't

14     tell.  We did a pretty good job.  I can't tell

15     what's underneath, but it looks like they are

16     anything that might be privileged.

Doris Ullman Final 8-15-14dfu(10).txt

17    Q    I note on January 24, 2006, there's a TAC,
18    T-A-C, name?
19    A    I don't have January.
20    Q    On the first page of this exhibit.
21    A    It's February 1.
22    Q    Line item, it says "January 24, 2006"?
23    A    I'm sorry.  It says TAC meeting.
24    A    Yes.
25    Q    Could you provide for me the code, Pomona
                                                        28
 1                    D. Ulman - 8/15/14
 2    code authority for TAC?  Is such a meaning
 3    provided for in the Pomona Zoning Code?
 4    A    I don't believe so.
 5    Q    And again, could you define what a TAC
 6    meeting is, please?
 7    A    A TAC meeting is a technical advisory
 8    committee meeting that is an arm of the
 9    Planning Board.  It consists of the Village
10    engineer, the Village planner, and the Village
11    attorney, and if a Planning Board member wishes
12    to attend, although I haven't -- might have
13    been one or two times that a Planning Board
14    member has attended but not often.
15          And the purpose of these meetings is for
16    the TAC committee to review the application
17    that's been submitted by the applicant,
18    question them as to some of the technical
19    aspects, determine whether the application is
20    complete.
21          The first meeting of TAC would be to

Doris Ullman Final 8-15-14dfu(10).txt

22     determine if the application is complete enough

23     to go to the Planning Board or whether

24     additional information is needed, and if the

25     applicant then goes on to the Planning Board,

29

1                     D. Ulman - 8/15/14

2      the TAC committee makes -- issues a memorandum

3      to the Planning Board with its comments.

4      Comments could be that the application -- the

5      variances are needed for certain bulk

6      requirements.  It's really any aid of the

7      Planning Board.

8      Q     What does the TAC committee do that the

9      Planning Board doesn't do?

10     A     It does not make decisions.

11     Q     But it makes recommendations?

12     A     Only to the Planning Board.

13     Q     And does it do that in writing?

14     A     Generally.  Although all of us also attend

15     every Planning Board meeting and so we discuss

16     at the Planning Board meetings some of the

17     things that we -- some of the recommendations

18     that we made for TAC.

19     Q     It sounds as if it's a duplication of

20     effort and I'm trying to understand the

21     distinction.

22     A     No.  What it is, it's really any aid to

23     the -- it really helps the applicant, because

24     if any application comes in, and let's say the

25     drainage information is incomplete, the

30

1                     D. Ulman - 8/15/14
                       Page 24

Doris Ullman Final 8-15-14dfu(10).txt

2      engineer will tell the applicant what he needs
3      in order to review, to determine whether or not
4      there will be, whether or not he can accept the
5      drainage system that's been provided in the
6      application.  The applicant has the opportunity
7      to do that before he goes to the Planning Board
8      so that when he gets to the Planning Board that
9      issue is not raised for the first time and it
10     helps speed up the process, if you will, and it
11     also gives the Planning Board a more complete
12     view of the application.
13          Similarly, let's say that there were bulk
14     variances needed for the application, the
15     applicant is told that at the TAC meeting so he
16     can prepare to make his application to the
17     Zoning Board as soon as he gets his negative
18     DEC from the Planning Board.
19          We also discuss any studies that, from a
20     technical point of view, we would recommend to
21     the Planning Board so that the applicants can
22     start working on those.
23          The planner will review the proposal and
24     say to the applicant, you know, where you
25     placed the parking is not so good, move it over

                                              31

1               D. Ulman - 8/15/14
2      a little bit, and we would, like, we're going
3      to recommend some landscaping between the
4      property lines.  Has an opportunity to do that
5      and make those changes before it goes to public
6      hearing and before it goes to the Planning

Page 25

Doris Ullman Final 8-15-14dfu(10).txt

7    Board, because we always try to hold the TAC

8    meetings with sufficient time before the

9    Planning Board meetings so that the changes

10   could be made and the public hearings can be

11   scheduled after the TAC meeting.

12   Q    Is a TAC meeting held for every

13   application?

14   A    Every application that goes to the

15   Planning Board must go to TAC in advance.

16       In addition, an applicant can ask to meet

17   with TAC and not submit an application to the

18   Planning Board, just send a letter with a

19   proposal and a plan, conceptual plan, and ask

20   TAC for -- the people that do that are

21   generally those who don't know the process in

22   the Village, and they would come in and ask

23   what are the procedures and the process, what

24   do I have to do to move this along.

25   Q    So the TAC is a -- if it's not authorized

                                   32

1              D. Ulman - 8/15/14

2   by the Code of Pomona, then what is its --

3   A    It's an advisory committee.

4   Q    Now, I'm familiar with CDRC.  What does

5   that stand for?

6   A    Community design review committee.  Ramapo

7   version of TAC.

8   Q    Okay.  So you've answered the question.

9   CDRC would be similar to a TAC?

10   A    Right.  Exactly.

11   Q    And so coming back to 803, Ms. Ulman, as I

12   indicated, this was produced to us by Pomona.

Doris Ullman Final 8-15-14dfu(10).txt

13          Do you have any reason -- have any idea
14     what this billing record was in response to?
15     A    I know that there were many FOIL requests.
16     We produced hundreds and hundreds and hundreds
17     of documents to Mr. Savad's office in response
18     to FOIL requests, and I know he did ask for
19     copies of invoices, and that's why I said I
20     believe this was because every FOIL request
21     that comes in is sent to me by the clerk.
22     Q    Then the redactions, again, on 803, you
23     say are because that work was privileged?
24     A    Yeah.  When I submit any invoice, so that
25     the Village knows what I'm billing for, I will

                                                    33
1                    D. Ulman - 8/15/14
2      put down generally, you know, a sentence about
3      what work I actually did.  And that's why it's
4      redacted.  It's privileged.
5          (Whereupon, the aforementioned document
6      beginning with Bates stamp POM0010510, was
7      marked as Plaintiffs' Exhibit 804 for
8      identification as of this date by the
9      reporter.)
10     BY MR. STEPANOVICH:
11     Q    You've been handed now 804, Ms. Ulman.  If
12     you could review that, please.
13     A    (Witness views document.)
14          Uhm-uhm.
15     Q    Is this another one of your billing
16     records?
17     A    (Witness views document.)
                        Page 27

                    Doris Ullman Final 8-15-14dfu(10).txt
18          It is.
19     Q     And it appears that everything during this
20     billing period was privileged?
21     A     I believe this was given to you by
22     Counsel.
23     Q     Yes.
24     A     This was not in response to FOIL.
25     Q     Okay.
                                                           34
 1                    D. Ulman - 8/15/14
 2          So that designation of attorney-client
 3     privilege, that was not made by you?
 4          MR. PELOSO:   I can represent that Counsel
 5     made the designation.
 6          MR. STEPANOVICH:   Okay.
 7          (Whereupon, the aforementioned document
 8     beginning with Bates stamp POM0008453, was
 9     marked as Plaintiffs' Exhibit 805 for
10     identification as of this date by the
11     reporter.)
12   BY MR. STEPANOVICH:
13     Q     You've been handed Plaintiffs'
14     Exhibit 805, Ms. Ulman, and I ask if you could
15     identify this, please.
16     A     (Witness views document.)
17          This appears to be a letter to the
18     Rockland Journal News issued by a person by the
19     name of Phillip Nelson, 42 Harmony Road, Spring
20     Valley, New York, and he sent a copy to me and
21     to Michael Cline, the Town attorney of Ramapo.
22     Q     It appears as if Mr. Nelson was suggesting
23     a -- I'm sorry.   He made a suggestion to the
                         Page 28

Doris Ullman Final 8-15-14dfu(10).txt
```
24        Village, and it appears as if he was suggesting
25        a -- suggesting to the Village.
                                                              35
 1                      D. Ulman - 8/15/14
 2             My question to you, Ms. Ulman, is, did
 3        you, on behalf of the Village, ever respond to
 4        Mr. Nelson?
 5        A    I did not.
 6        Q    Did you ever have any discussions with the
 7        Board in terms of responding to Mr. Nelson?
 8        A    I did not.
 9        Q    That's all I have.
10             (Whereupon, the aforementioned document
11        Bates stamped POM17162, was marked as
12        Plaintiffs' Exhibit 806 for identification as
13        of this date by the reporter.)
14   BY MR. STEPANOVICH:
15        Q    Handing you -- you've been handed,
16        Ms. Ulman, Plaintiffs' Exhibit 806, and can you
17        identify this, please.
18        A    This looks like an e-mail from Alan Lamer
19        to the Board of Trustees in September 2006, the
20        Board of Trustees of the Village of Pomona,
21        with a request that it be sent to me as well.
22        Q    And this is a notification that there was
23        a lawsuit, an RLUIPA lawsuit against the
24        Village of Suffern; is that correct?
25        A    Yes.
                                                              36
 1                      D. Ulman - 8/15/14
 2        Q    Do you recall Leslie Sanderson telling you
```
Page 29

Doris Ullman Final 8-15-14dfu(10).txt

```
 3        about that lawsuit?
 4        A     I believe a copy of this e-mail was faxed
 5        to me.
 6        Q     And do you know why it was faxed to you?
 7              MR. PELOSO:  Just remember there is a
 8        privilege as it relates to Counsel.  So if you
 9        can answer.
10        A     Because it was an RLUIPA case.
11        Q     And what significance did that have in
12        September of '06?
13        A     I don't recall, other than that
14        discussions on RLUIPA were common during this
15        period and before, and it's every municipality
16        has to be aware of the RLUIPA cases.  I had the
17        decision before Mr. Lamer sent this e-mail and
18        I had read it, had also been reported in the
19        newspaper and so I was familiar with the case.
20        Q     You indicated there were discussions.  Are
21        you talking discussions in front of the Pomona
22        Village Board regarding RLUIPA?
23              MR. PELOSO:  Same instruction to the
24        witness.
25        A     General discussions in the community.
```

                                                    37

```
 1                   D. Ulman - 8/15/14
 2              You must remember certain insurance
 3        companies were refusing to provide officers and
 4        directors liability coverage to some
 5        municipalities in Rockland County, particularly
 6        in Ramapo, because of RLUIPA.
 7        Q     And why was that?
 8        A     Because there were too many lawsuits going
```

                          Page 30

Doris Ullman Final 8-15-14dfu(10).txt

9      on.

10     Q    Did they deny any --

11     A    Many municipalities canceled their

12     coverage or did not renew their coverage with

13     NIMR, which is an excellent state insurance

14     chartered by the State of New York, because

15     NIMR was one of those companies that did not

16     provide officers and directors insurance for

17     communities in the Town of Ramapo.  I think,

18     perhaps, throughout Rockland County.

19     Q    Did that include --

20     A    Because they didn't cover land use.  They

21     refused to cover land use.

22     Q    You're saying insurance companies refused

23     to cover lawsuits dealing with land use issues?

24     A    Under their officers and directors

25     policies.  Many of us left NIMR at that time

                                                      38

1                    D. Ulman - 8/15/14

2      and went to other companies which do provide

3      the coverage.

4      Q    When you indicated they refused to provide

5      land use coverage, would that also include a

6      non-RLUIPA land use case?

7      A    Yes.  But the reason given was primarily

8      RLUIPA.

9           Remember, during this period the four

10     Villages against the Town of Ramapo was still

11     going on.  The owners of properties were filing

12     discrimination claims against villages.  There

13     was a lot going on at that time.

                     Page 31

Doris Ullman Final 8-15-14dfu(10).txt

14    Q    Is the Village covered by insurance in
15    this case?
16    A    No.
17         (Whereupon, the aforementioned document
18    entitled "Village of Pomona Audio Tapes:  1 of
19    4", was marked as Plaintiffs' Exhibit 807 for
20    identification as of this date by the
21    reporter.)
22    BY MR. STEPANOVICH:
23    Q    You have been handed, Ms. Ulman,
24    Plaintiffs' Exhibit 807 and ask if you have
25    seen this before?

                                                    39

1                   D. Ulman - 8/15/14
2    A    (Witness views document.)
3         No.
4    Q    I represent to you that this is a document
5    that we received from the Village's counsel
6    along with a CD of Village meetings, and I
7    believe it was in response to one of our
8    document demands.
9    A    Uhm-uhm.
10    Q    And I think you see it at the bottom of
11    this "Compiled by:  Legal Presentations
12    Solutions."
13    A    Yes.
14    Q    Are you familiar with that company?
15    A    No, I'm not.
16    Q    I think during your 30(b)(6) deposition,
17    you had indicated that the Village meetings are
18    audibly recorded?
19    A    Yes.

                        Page 32

Doris Ullman Final 8-15-14dfu(10).txt

20    Q     And turning your attention to the last
21    page, midway down.  I'm looking under the
22    column that says "File Name."  That appears to
23    have the date of the meeting.  And up and to
24    that point, it looks as if meetings have been
25    routine.  Strike that.

                                                    40

1                    D. Ulman - 8/15/14
2          There appears to be no audiotape for the
3     meeting held on January 22, 2007.  And my
4     question to you is, by reviewing this document,
5     do you agree that this document does not
6     reflect an audiotape for that meeting 1/22/07?
7          MR. PELOSO:  Object to the form.
8     A     It does not seem to reflect an audiotape
9     for that meeting.
10    Q     And it also doesn't reflect an audiotape
11    for the March '07 meeting and April '07
12    meeting --
13         MR. PELOSO:  Objection to form.
14    Q     -- is that correct?
15    A     That's correct.
16    Q     And do you know why?
17    A     No.
18    Q     And do you know whether or not the audio
19    recording for January 22, '07 was preserved?
20    A     It should have been.
21    Q     Do you know if it was?
22    A     I do not see the tapes.  I can't say for
23    sure, but it's normal practice to preserve all
24    tapes.

                     Page 33

Doris Ullman Final 8-15-14dfu(10).txt
25      Q    What about the -- same question for the

41

1                    D. Ulman - 8/15/14
2       March '07 meeting.  Do you know if that audio
3       was preserved?
4       A    I would assume that it was.
5       Q    And same question for April of '07, was
6       that preserved?
7       A    It should have been.
8       Q    So maybe counsel could shed some light.
9            MR. STEPANOVICH:  John, do you have any
10      idea where those three audiotapes are?
11           MR. PELOSO:  I can't comment at this time.
12      If you want to inquire, you can do that.
13           MR. STEPANOVICH:  Off the record.
14           (Whereupon, an off-the-record discussion
15      was held.)
16           MR. STEPANOVICH:  Back on the record.
17           The Plaintiffs have a video of the
18      January 22, 2007 meeting that we have agreed to
19      provide to Ms. Ulman for the purpose of viewing
20      and the ultimate purpose of authenticating that
21      that is the video of that meeting.  And we were
22      going to do it today, and then, in interest of
23      time, Counsel for the Village has another
24      suggestion.
25           So, John, I'll let you do that.

42

1                    D. Ulman - 8/15/14
2            MR. PELOSO:  We have agreed to -- we'll do
3       it another time.  We'll accept the video.
4       We'll have Ms. Ulman review it and if it is
                          Page 34

Doris Ullman Final 8-15-14dfu(10).txt

5        authentic, we'll so indicate.

6            MR. STEPANOVICH:  And we agree.

7            (Whereupon, the aforementioned document

8        Bates stamped POM17039, was marked as

9        Plaintiffs' Exhibit 808 for identification as

10        of this date by the reporter.)

11   BY MR. STEPANOVICH:

12        Q    You've been handed, Ms. Ulman,

13        Plaintiffs' 808.

14        A    (Witness views document.)

15            Yes.

16        Q    And so the question -- I have a few

17        questions.  It appears this e-mail is about the

18        minutes to the January 22, 2007 meeting; is

19        that right?

20        A    Yes.

21        Q    And Malverne -- who is that, please?

22        A    Malverne Toll, T-O-L-L, is the person who

23        prepares the minutes for the Board of Trustees'

24        meeting and the workshops and the Board of

25        Trustees' workshops.

                                                          43

1                    D. Ulman - 8/15/14

2        Q    And how does she take the minutes?

3        A    She has two tape recorders and she takes

4        notes by hand.

5        Q    And at the conclusion of the meeting, then

6        she compiles a draft of the minutes; is that

7        correct?

8        A    That's correct.

9        Q    She does that from the tape recorders and

Doris Ullman Final 8-15-14dfu(10).txt

10      her --

11      A      -- and from her personal notes, yes.

12      Q      And then could you explain the process of

13      what happens after that?

14      A      Yes.  The normal process is she -- she

15      prepares the draft.  At this time, in 2007, it

16      would first -- the draft would go to the mayor

17      for his corrections and then his corrected

18      draft would come to me for my corrections.

19      Then it would go back to Malverne to make the

20      corrections and distribute to the Board members

21      for their approval at whatever the next meeting

22      would be.

23      Q      And the -- what would the mayor base his

24      corrections on?

25      A      Generally, it would be based on sentence

                                                    44

1                   D. Ulman - 8/15/14

2       structure, sometimes the minutes would be too

3       verbatim, and we don't do verbatim minutes, we

4       do summaries of what people say.  And sometimes

5       the summary that would be used by Malverne

6       would not be accurate.  So he would review them

7       for accuracy, for grammar, for -- these are

8       historical records, so they should be in fairly

9       good form, and duplication.

10           As a general rule, if somebody says the

11      sky is blue and then repeats it four times,

12      we're not going to put it four times in the

13      minutes because he said it once, and so that

14      would be what the mayor would be looking for.

15      It's what I would be looking for when I review

Doris Ullman Final 8-15-14dfu(10).txt

16      them.
17      Q     Now, every speaker, though, at the public
18      hearing would be reflected in the minutes; is
19      that right?
20      A     Generally, yes.  At a public hearing, the
21      name and address of the person should be
22      reflected and a short statement as to what they
23      said, yes.
24      Q     Now, you've indicated that accuracy was
25      one of the reasons the minutes were reviewed by
                                                        45
1                    D. Ulman - 8/15/14
2       you and the mayor; is that right?
3       A     Yes.
4       Q     And do you know what the mayor relied on
5       to determine accuracy?
6             MR. PELOSO:  Are you talking about these
7       particular minutes?
8             MR. STEPANOVICH:  This one, yes.  Yes.
9       These particular minutes.
10      A     Probably his memory.
11      Q     And what about you, what did you rely on
12      to determine the accuracy of these minutes,
13      January 22, 2007?
14      A     I very often take notes at the meetings
15      when I think something is said that's important
16      and that should be reflected in the minutes.
17      Not all the time.  And generally from my memory
18      and the content of what's in the minutes.
19            We've seen in some of the exhibits, even
20      here during the depositions, that some of the

Doris Ullman Final 8-15-14dfu(10).txt

21      older minutes were things that people said were

22      unintelligible because they weren't corrected

23      properly.  That's basically what the mayor's

24      job and my job is.

25      Q    Malverne writes that she, I think

46

1                    D. Ulman - 8/15/14

2       referring to you, was not happy with what Herb

3       had condensed the minutes down to.

4            Could you explain that, please?

5            MR. PELOSO:  Of course the privileged

6       issue, you know.

7            THE WITNESS:  Yeah.

8       A    I think the -- he had deleted -- he had

9       condensed the minutes into a very short

10      statement of what actually happened and it was

11      a public hearing and we did have to reflect

12      what everybody said, and even though we were

13      not on -- much of the discussion was not on

14      point of the public hearing, and what he did

15      was to take out a lot of comments that had

16      nothing to do with the local law that was under

17      consideration, but because the comments were

18      made, I felt they had to be in the minutes.

19      And that's what I was referring to.  He had --

20      he had basically just removed things that were

21      extraneous to the public hearing.

22      Q    Removed things that were extraneous?

23      A    Comments.

24      Q    You're talking about comments by speakers

25      at the meeting?

47

Page 38

Doris Ullman Final 8-15-14dfu(10).txt

```
 1                    D. Ulman - 8/15/14
 2     A     Yes, members of the public.
 3     Q     Members of the public.
 4           And when you say "extraneous," what do you
 5     mean by that?
 6     A     The public hearing January 22nd was
 7     strictly for the purpose of obtaining public
 8     comment on the proposed Local Law 1 of 2007,
 9     which was the amendment to the dormitory law
10     and the -- I think -- to the definition section
11     I believe as well, and the majority of comments
12     at that meeting had nothing to do with that
13     local law, and it was the mayor's feeling that
14     since it had nothing to do with the local law,
15     it did not have to be -- those comments did not
16     have to be in the minutes.
17     Q     And did you -- did you talk with the mayor
18     about getting those comments back into the
19     minutes?
20     A     I did.
21     Q     And what happened?
22     A     They were placed back in.
23     Q     So you were satisfied then, Ms. Ulman,
24     that the, I think you used the word delete
25     earlier, and I'll just stick with that word,
```
                                                    48
```
 1                    D. Ulman - 8/15/14
 2     that the deletions by the mayor were -- all
 3     those public comments were reinserted back into
 4     the record?
 5     A     I believe we did, yes.
```

Doris Ullman Final 8-15-14dfu(10).txt

```
 6   Q    Now, that meeting room holds, I think, 49
 7   people; is that right?
 8   A    I did check it, yes.
 9   Q    And --
10   A    Well, it's not that it holds.
11   Q    That's the maximum occupancy?
12   A    It's listed as the maximum occupancy.
13   Q    Legal occupancy?
14   A    Yes.
15   Q    There were more than 49 people in that
16   room that night?
17   A    I think so, yes.
18   Q    Did anyone do a head count?
19   A    No.
20   Q    Was the room packed?
21   A    Yes.
22   Q    Now, the mayor had testified that he has
23   never seen such a meeting like that one on
24   1/22/07.  What about you?
25        MR. PELOSO:  You mean in terms of size or
```
                                                    49
```
 1                D. Ulman - 8/15/14
 2   in terms of --
 3        MR. STEPANOVICH:  We'll start with size.
 4   A    I've seen larger meetings in other
 5   Villages.  Not in Pomona.
 6   Q    Were you surprised by the comments from
 7   the public during that meeting?
 8   A    I don't think I was surprised.  I was
 9   concerned.
10   Q    Why?
11   A    Why was I not surprised?
```
                      Page 40

Doris Ullman Final 8-15-14dfu(10).txt

12    Q    Let's start there.  Why were you not
13    surprised?
14    A    Well, two weeks before this meeting, there
15    was an article in the Journal News about the
16    Tartikov project, which appeared to have been
17    a -- which had originated, according to the
18    newspaper article, on the Preserve Ramapo
19    website and was picked up by the Journal News,
20    and Jim Walsh then did an article verifying
21    what was on the Preserve Ramapo website, which
22    indicated that the property on Route 306 would
23    contain a thousand apartment units and 4,500
24    people, and the Rabbinical College.  And so I
25    wasn't surprised at the big turnout because I

                                                    50

1                   D. Ulman - 8/15/14
2    knew that type of article would generate a lot
3    of public comment.
4         Unfortunately, the people who spoke, even
5    though the mayor cautioned them that the public
6    hearing had nothing to do with that property,
7    the majority of people who came out really
8    couldn't care less about the local law except
9    for the fact that, I guess, they thought the
10   dormitories were being incorporated into the
11   law to benefit the property owner on 306.
12        So the majority of the discussion was not
13   with reference to the local law but was in
14   opposition to the development as proposed or as
15   stated in Journal News.  The timing was,
16   unfortunately, bad.

                         Page 41

Doris Ullman Final 8-15-14dfu(10).txt

17   Q     And as stated in the Journal News, as
18   you've indicated, which was an article
19   regarding the information disclosed by Preserve
20   Ramapo regarding the Rabbinical College
21   project; is that right?
22   A     Well, the article referred to the Preserve
23   Ramapo website and then indicated that they had
24   done independent research and came up with the
25   same numbers.

                                                    51

1                    D. Ulman - 8/15/14
2    Q     Preserve Ramapo had done independent
3    research?
4    A     No.  The Journal News had done independent
5    research.  There was a quote there, as I
6    recall, from -- maybe not a quote but a
7    reference to someone at Saccardi & Schiff,
8    which appears to be the planner who released
9    the information that was picked up by the
10   website, by the Preserve Ramapo website and by
11   the Journal News because the Journal News
12   referred to a conversation that Jim Walsh had
13   had with her, I don't recall her name, and she
14   told him any additional information should be
15   obtained from Mr. Savad.
16   Q     Did you do any research into the
17   information that was reflected on the Preserve
18   Ramapo e-mail?
19   A     I did not see the Preserve Ramapo e-mail.
20   I saw the article in the Journal News which
21   referred to it.  I did no independent research,
22   I just read the article.

Doris Ullman Final 8-15-14dfu(10).txt

23    Q     Do you know how Preserve Ramapo got that
24    information?
25    A     No.  According to the newspaper article,

                                                          52

1                     D. Ulman - 8/15/14
2     it was released by the planner.  I don't know
3     how it was released or why Preserve Ramapo was
4     the first agency to get it, but it appears to
5     have been released by Saccardi & Schiff
6     according to the newspaper article.  And I read
7     that article recently which is why it's fresh
8     in my mind.
9     Q     Conceptual plans, if you can agree with me
10    for a moment on that term, a conceptual plan,
11    are conceptual plans normally released to local
12    fire departments, police departments in Pomona?
13          MR. PELOSO:  Object to the form.
14          By whom?
15          Objection stands.
16          If you understand, fine.
17    A     If let's say a developer comes in with a
18    conceptual plan for the one we had recently,
19    the House of Worship for the Zoroastrian
20    Temple, at the time it goes to the Planning
21    Board, that's why we require so many copies of
22    the plan, even though it may be just conceptual
23    and a narrative, the earlier you get comment
24    from the agencies, of course, the better.
25          So when it comes into the Village, we then

                                                          53

1                     D. Ulman - 8/15/14
                      Page 43

Doris Ullman Final 8-15-14dfu(10).txt

```
 2    send out a copy to the various agencies,
 3    including the fire department, the ambulance
 4    corps.  I don't think she sent it to the police
 5    department.  But particularly with a site plan,
 6    it's important for the fire department to be
 7    able to get in and around all of the
 8    structures.
 9         So, yes, it is sent by the municipality
10    when an application, or even for a conceptual
11    plan, it's produced, it's submitted.
12    Q    Are you aware of any -- is it -- are you
13    aware of any instances where a developer or a
14    land owner can send such a plan directly to the
15    agencies without going through the
16    municipality?
17    A    Any property owner has a right to do
18    whatever that property owner wants to do.  The
19    problem with it is he could be wasting his time
20    because if that conceptual plan is not in
21    compliance with what's required by the Village
22    or the Town, or if there are other problems
23    with it and he has to completely revise his
24    plan, which is quite expensive, it has to go
25    back for further review to the same agency.  So
```

                                                        54

```
 1                 D. Ulman - 8/15/14
 2    it's wasteful.
 3    Q    On the part of the developer?
 4    A    Yes.  But if he wants to do it, he
 5    certainly has the right to do it.
 6         (Whereupon, the aforementioned document
 7    Bates stamped POM33403, was marked as
```

Doris Ullman Final 8-15-14dfu(10).txt

 8          Plaintiffs' Exhibit 809 for identification as
 9          of this date by the reporter.)
10     BY MR. STEPANOVICH:
11          Q     You've been handed 809, Ms. Ulman.  If you
12          could take a look at that, I have a few
13          questions.
14          A     (Witness views document.)
15          Q     And so it looks like the minutes of the
16          January meeting were still in your "court" in
17          May of '07; is that right?
18          A     Obviously, yes.
19          Q     And do you recall when the minutes of the
20          January 22, 2007 meeting were approved?
21          A     I don't.
22          Q     And does this e-mail from Malverne to Nick
23          essentially reflect your testimony that you
24          gave a few minutes ago and sort of what
25          transpired with the minutes between you and the

                                                        55

 1                    D. Ulman - 8/15/14
 2          mayor?
 3          A     Yes.  I think this -- I hadn't remembered
 4          that he cut out everything they said, but it
 5          certainly reflects what I said.
 6          Q     And I'm not certain we've ever seen a
 7          final set of minutes for that meeting, and I
 8          may be mistaken.
 9                As you sit here today, are you aware of
10          final minutes ever being approved for the
11          January 22, 2007 meeting?
12          A     I think they were.  When I was preparing
                         Page 45

Doris Ullman Final 8-15-14dfu(10).txt

13    for the 30(b)(6) deposition, I did look at

14    minutes.  I specifically looked at minutes from

15    January 22, 2007 to refresh my memory, and I

16    believe -- I believe there were final minutes.

17    I do not recall when they were adopted or if

18    they were adopted, I'm assuming they were, but

19    I don't recall exactly when or if.

20    Q    Well, if you could review that.

21        MR. STEPANOVICH:  John, I don't think

22    we've seen it.  So we would like to have those

23    final adopted minutes, please.

24        (Whereupon, the aforementioned document

25    beginning with Bates stamp RC 1823, was marked

                                                    56

1                D. Ulman - 8/15/14

2    as Plaintiffs' Exhibit 810 for identification

3    as of this date by the reporter.)

4  BY MR. STEPANOVICH:

5    Q    You've been handed Plaintiffs' 810,

6    Ms. Ulman, and represent this appears to be a

7    news article from the Journal News.  Feel free

8    to review it.

9        I'm just going to ask you one question,

10    and that is whether or not you were accurately

11    quoted in this newspaper article, and that's a

12    quote on the first page, four paragraphs up

13    from the bottom.

14        The quote, the article, there's just no

15    quotations marks so let me read it into the

16    record.  It says:  "But Village Attorney Doris

17    Ulman has said she disagreed with Savad's

18    interpretation of the law, saying that had the

Doris Ullman Final 8-15-14dfu(10).txt

```
19        Village granted an exemption to one group, it
20        would have to do the same to every group in a
21        similar situation."
22             My question to you is:  Is that an
23        accurate reflection of a statement that you
24        made for that article?
25        A    (Witness views document.)
```
                                                            57
```
 1                  D. Ulman - 8/15/14
 2             I don't recall if it's an exact quote, and
 3        it's not in quotations, but I probably would
 4        have said that, yes.  I think I did.
 5        Q    Okay.  That's all I have on that.
 6             Now, Ms. Ulman, did you receive an
 7        invitation to the meeting sponsored by Tartikov
 8        in May of '07?
 9             MR. PELOSO:  She personally or as Village
10        counsel?
11             MR. STEPANOVICH:  In any capacity.
12        Q    Not as a representative of the Board.  In
13        your own capacity individually or as Village
14        attorney.
15        A    I don't think so.
16             (Whereupon, the aforementioned document
17        beginning with Bates stamp POM0013260, was
18        marked as Plaintiffs' Exhibit 811 for
19        identification as of this date by the
20        reporter.)
21   BY MR. STEPANOVICH:
22        Q    You have been handed Exhibit 811,
23        Ms. Ulman, and if you flip to the second page,
```

Doris Ullman Final 8-15-14dfu(10).txt

24      it appears to be a copy of an envelope.

25          Does that accurately reflect your name and

58

1                   D. Ulman - 8/15/14

2       address on that envelope?

3       A    It does.  It does.

4       Q    The first page, can you identify the first

5       page?

6       A    The first page looks like a card that

7       says: "Please join us for a discussion of

8       development plans for the Rabbinical College of

9       Tartikov in Pomona NY.  Leaders of the College

10      will discuss school's mission and proposed

11      construction plans, as well as answer questions

12      from the community on Date:  Monday, May 21,

13      2007.  Time:  7:00 to 10:00 p.m.  Place:

14      Comfort Inn Nanuet, 425 East Route 59, Nanuet,

15      NY 10954.  Residents of Pomona Village are

16      invited to attend.  For more information please

17      visit:  www.Tartikovcollege.org."

18      Q    Does that refresh your recollection that

19      you --

20      A    No.

21      Q    That you --

22      A    No.

23      Q    You don't recall?

24      A    I don't recall receiving it, but I don't

25      deny that I probably did.

59

1                   D. Ulman - 8/15/14

2       Q    And you chose not to attend this meeting?

3       A    That's correct.

Page 48

Doris Ullman Final 8-15-14dfu(10).txt

```
 4    Q    And why was that?
 5    A    Because the only place I discuss and want
 6    to hear about Village projects are at Village
 7    halls.
 8    Q    Did you discuss the fact that you were not
 9    attending the meeting with any other Village
10    officials?
11    A    I did.
12    Q    And who was that with?
13    A    The mayor and the Board of Trustees.
14    Q    And they all -- could you tell me what
15    those discussions were about?
16    A    I don't remember specifically.
17         MR. PELOSO:  Those are privileged.
18    Q    But those officials, did they express to
19    you that they were not going to attend this
20    meeting as well?
21         MR. PELOSO:  Again, it's privileged
22    information.
23         MR. STEPANOVICH:  She's asserting
24    privilege.
25         MR. PELOSO:  No, I'm just saying to the
```

                                              60
```
 1              D. Ulman - 8/15/14
 2    extent you can answer the question without
 3    revealing privileged information.
 4         MR. STEPANOVICH:  I agree.  That's all I'm
 5    asking for.
 6    A    I believe they did.
 7         MR. STEPANOVICH:  Could you read back my
 8    question?
```
                        Page 49

Doris Ullman Final 8-15-14dfu(10).txt

9          (Whereupon, the requested question was

10    read back by the Court Reporter.)

11    Q    Did you discuss the fact that you were not

12    going to attend this meeting with any of your

13    friends, your neighbors?

14    A    No.

15          (Whereupon, the aforementioned document

16    Bates stamped POM0008547, was marked as

17    Plaintiffs' Exhibit 812 for identification as

18    of this date by the reporter.)

19 BY MR. STEPANOVICH:

20    Q    You've been handed, Ms. Ulman, Plaintiffs'

21    Exhibit 812, and I ask if you can identify

22    that, please.

23    A    This is a flyer that was distributed, I

24    don't know to whom, by the Rockland Coalition

25    for the Future, which is a grassroots

                                                    61

1                    D. Ulman - 8/15/14

2     organization in Rockland County, sponsoring a

3     public forum at which I would be speaking about

4     RLUIPA, to be held Tuesday, May 1 at 7 p.m. at

5     the Suffern Free Library.

6     Q    And did you speak at this forum on

7     May 1st?

8     A    I did.

9     Q    And were you the only speaker?

10    A    Yes.

11    Q    And do you know why the -- strike that.

12    I'm sorry.

13          What is the Rockland Coalition for the

14    Future?

                    Page 50

Doris Ullman Final 8-15-14dfu(10).txt

15          MR. PELOSO:  She indicated that, but you
16      can answer the question.
17          MR. STEPANOVICH:  Okay.
18      A    I don't know what their mission is
19      specifically.  One of their leaders is a friend
20      of mine who also was a member of the Planning
21      Board of the Village of Chestnut Ridge and she
22      is the one who asked me to speak.
23      Q    Who is that?
24      A    A woman by the name of Myrna, M-Y-R-N-A,
25      Arin, A-R-I-N.

                                                    62
1                   D. Ulman - 8/15/14
2       Q    And was there a good showing for this
3       meeting?
4       A    Surprisingly, yes.
5       Q    Now, how long did you speak; do you
6       remember?
7       A    I spoke first and then there was a
8       question-and-answer period afterwards.  My
9       recollection is it didn't end until the library
10      closed.  So it was probably about two hours.
11      Q    You know who Laura Kramer is, right?
12      A    Yes.
13      Q    And do you know that Laura Kramer was in
14      attendance at that meeting?
15      A    At the time?
16      Q    Do you know now?
17      A    Now, yes.
18      Q    And apparently by your answer you didn't
19      know that she was there at the time?

                            Page 51

Doris Ullman Final 8-15-14dfu(10).txt

20    A    That's correct.

21    Q    During this seminar, did you tell the

22    residents that they should not "cave in to them

23    and sell our houses, period"?

24    A    Not -- I don't remember the exact quote,

25    but that comment was made in response -- not to

                                                        63

1                   D. Ulman - 8/15/14

2    the residents.  It was made in response to a

3    question from the floor by a woman in the

4    audience who said, in effect, that she has been

5    inundated with calls and people coming to her

6    door, real estate agents on a regular basis

7    asking her to sell her property.  And her --

8    the question was since RLUIPA is so strong,

9    should I sell my property.  And my answer to

10   her was don't cave in to those people who are

11   banging on your doors, to those real estate

12   agents who just want you to sell your property.

13   RLUIPA is not going to hurt you.  Don't cave

14   in.

15        If I said that -- if I used those words,

16   it would have been don't cave in to those

17   people who are asking you to sell.

18   Q    Those people that you are referring to,

19   did any of them bang on your door asking you to

20   sell?

21   A    Of my house?

22   Q    Uhm-uhm.

23   A    In Pomona?

24   Q    Uhm-uhm.

25   A    I don't own my property.

                      Page 52

Doris Ullman Final 8-15-14dfu(10).txt

64

1                    D. Ulman - 8/15/14
2           MR. STEPANOVICH:  Maybe, John, we'll just
3      take five minutes and we don't have long.
4      We'll just kind of finalize our documents.
5           Does that sound okay?
6           MR. PELOSO:  That's fine.
7           (Whereupon, a short recess was taken.)
8           MR. STEPANOVICH:  Back on the record.
9           (Whereupon, the aforementioned Second
10     Amended Complaint, was marked as Plaintiffs'
11     Exhibit 813 for identification as of this date
12     by the reporter.)
13          (Whereupon, the aforementioned Answer to
14     Second Amended Complaint, was marked as
15     Plaintiffs' Exhibit 814 for identification as
16     of this date by the reporter.)
17  BY MR. STEPANOVICH:
18     Q     You've been handed, Ms. Ulman,
19     Exhibits 813 and 814.  And I just have a
20     question regarding one allegation in the
21     Complaint and the Answer.  That's
22     Paragraph 151.  The Paragraph 151 has denied
23     the allegation of the Complaint.  I'll let you
24     get to it.  Page 33.
25          The Allegation 151 reads, "Upon

65

1                    D. Ulman - 8/15/14
2      information and belief, Pomona Village attorney
3      Doris Ulman volunteers her time to the
4      Ladentown incorporation effort."

                          Page 53

Doris Ullman Final 8-15-14dfu(10).txt

5       The answer reads, at 151, "Defendants deny

6     the allegations contained in 151, Paragraph 151

7     of the Complaint," and so is -- is the

8     allegation contained in 151 accurate?

9     A   Yes.

10    Q   That's all I have on that.

11    A   I beg your pardon.  The Answer?  The

12    allegation?

13    Q   Yes.

14     MR. PELOSO:  The question was the

15    allegation.

16    A   No.  No.  So the allegation --

17    Q   So the allegation is not --

18    A   I have never volunteered my time for the

19    Ladentown incorporation effort.  I handled an

20    appeal for them at one specific point in time.

21    I was never involved with anything else with

22    respect to the -- that's why that was denied,

23    because it was too broad.

24    Q   Okay.

25    A   I was not denying that I did the appeal.

                           66

1          D. Ulman - 8/15/14

2    I was denying that I was involved in any

3    portion of the petition and incorporation

4    effort up until the appeal.

5    Q   Okay.

6     So I think -- so the record is accurate.

7    Let me see if I can, quote, characterize your

8    testimony, just so we're on the same page.

9     Is it your testimony that you, in fact,

10   volunteered legal work for the Ladentown

Doris Ullman Final 8-15-14dfu(10).txt

11      incorporation appeal?

12      A    Yes.

13      Q    You agree with that statement?

14      A    Yes, I do.

15           (Whereupon, the aforementioned document

16      beginning with Bates stamp RC 1746, was marked

17      as Plaintiffs' Exhibit 815 for identification

18      as of this date by the reporter.)

19  BY MR. STEPANOVICH:

20      Q    You've been handed Plaintiffs' 815,

21      Ms. Ulman, and fifth  paragraph down reads,

22      "Village attorney Doris Ulman said the complain

23      is 'full of innuendo undocumented statements,

24      misstatements and lies.'"

25           Do you see that?

                                                    67

1                    D. Ulman - 8/15/14

2       A    I do.

3       Q    Could you explain to me the basis of that

4       statement?

5       A    The allegations in the Complaint regarding

6       discrimination and animus against any religious

7       group, which prevails throughout the whole

8       document, without -- and statements in there

9       that are undocumented and not attributed to any

10      person which attempt to by innuendo apply to

11      things said, perhaps by officials of the

12      Village, which are untrue, misstatements and

13      lies, such as the one we just discussed, where

14      Ms. Kramer in her affidavit suggested, by

15      innuendo, that I said something that I did not

                        Page 55

Doris Ullman Final 8-15-14dfu(10).txt

16    say.

17         Similarly Rabbi Framowitz in his affidavit

18    suggested, by innuendo, that I said something I

19    did not say, taken out of context, as was the

20    Kramer affidavit.

21         Those are the kind of things I'm referring

22    to.

23    Q    What was it in Rabbi Framowitz's affidavit

24    that you're referring to?

25    A    Rabbi Framowitz stated in his affidavit

                                                        68

1               D. Ulman - 8/15/14

2    that I had said that if he withdrew the site

3    plan application for the Yeshiva, he would get

4    a tax exemption, the Yeshiva Spring Valley

5    would get a tax exemption, and that's about as

6    far from the truth.

7         And further which was, I felt, very

8    insulting, that I had told him to remove

9    Village files.  That's a crime.  That is a lie

10   and a misstatement.  For me to even -- for me

11   to even suggest something like that, I should

12   be disbarred.

13   Q    Anything else, Ms. Ulman?

14   A    I believe I was referring to, you know,

15   many of the -- and I have not gone through

16   every single allegation in here -- but there

17   are many, many allegations in the Complaint

18   that where full of innuendo and undocumented

19   statements and misstatements, yes.  It's

20   permeated with it.

21         (Whereupon, the aforementioned letter
                    Page 56

Doris Ullman Final 8-15-14dfu(10).txt

22          dated March 28, 2007, was marked as Plaintiffs'
23          Exhibit 816 for identification as of this date
24          by the reporter.)
25
                                                                    69
1                           D. Ulman - 8/15/14
2     BY MR. STEPANOVICH:
3          Q    You've been handed now, Ms. Ulman,
4          Plaintiffs' 816.  My question is, did you
5          receive this letter from Mr. Savad?
6          A    (Witness views document.)
7               Yes, I did.
8          Q    Okay.  That's all I have.
9               Does the Village of South Nyack's Zoning
10         Code prohibit family housing?
11         A    The Village of South Nyack is a very
12         densely-populated village.  It's an old village
13         and as many -- as is true of many of the older
14         villages, such a Nyack, such as Haverstraw, the
15         Village of Haverstraw, West Haverstraw and so
16         on.  They are hubs.  They are places of high
17         density housing and commercial uses.  So the
18         zoning would permit -- they have multi-family
19         housing zones.  They have two-family housing
20         zones, single-family housing zones.  It's a
21         mixture.
22         Q    So Nyack College has family housing on its
23         campus, correct?
24         A    It does.  And off campus.  They own a lot
25         of property that's not specifically on the
                                                                    70

Doris Ullman Final 8-15-14dfu(10).txt

1               D. Ulman - 8/15/14

2    college campus.

3    Q    Is it bordered by single family

4    residential districts at all?

5    A    I don't recall.  I really don't recall

6    what it's bordered by.

7    Q    Are you aware of any negative land use

8    impacts caused specifically by the family

9    housing at Nyack College?

10    A    There were impacts from -- caused by some

11    of the housing in that area, yes.

12    Q    And what kind of impacts?

13    A    That is a very steep slope area.  We used

14    to get some drainage problems up there.  There

15    was some overcrowding of some of the buildings.

16    I don't remember specifics but I do recall at

17    one point we considered limiting some of the

18    construction up there because of the sensitive

19    nature of the property.

20    Q    Anything else?

21    A    No.

22    Q    So the steep slope area, does the Village

23    of South Nyack have a steep slope law?

24    A    I believe they do.

25    Q    And so the construction of the family

                                      71

1               D. Ulman - 8/15/14

2    housing units at Nyack College, they comply

3    with steep slopes?

4    A    The college and most of its housing has

5    been there for a very long time, I would say

6    probably 30, 50 years.  So I don't know if they

Doris Ullman Final 8-15-14dfu(10).txt

```
 7      comply with code zoning.
 8      Q    But, I mean, you are not aware of any
 9      issues regarding the family housing at Nyack
10      College --
11      A    No.
12      Q    -- are you?
13      A    No.
14      Q    You indicated that there was some
15      overcrowding of buildings.  Are you talking
16      about the family housing buildings?
17      A    That's my recollection.
18      Q    And how was that addressed?
19      A    Through code enforcement.
20      Q    And I think the final thing you indicated
21      was there was some discussions about limiting
22      concentration.
23           Did I get that right?
24      A    Limiting some of the construction.
25      Q    Construction.  Okay.
```

                                                        72

```
 1                 D. Ulman - 8/15/14
 2           And was there a law passed in that regard?
 3      A    I believe it was during an application
 4      they had to the Planning Board, and I think it
 5      was dealt with at the Planning Board.
 6      Q    I did make a note here.  I think you
 7      mentioned that there was something regarding a
 8      sensitivity issue.
 9      A    Because the sensitivity of the land.
10      Q    I see.
11           Is that part of the steep slope issue?
```

Doris Ullman Final 8-15-14dfu(10).txt

12    A    That's part of the steep slope issue, yes.

13    Q    Any other issue relating to the

14    sensitivity of the land besides the steep

15    slopes?

16    A    One of the reasons that the steep slope

17    issue was a problem with Nyack College, or

18    there was some problems related to it, below

19    the college is another very steep slope on

20    which exists houses.  They are built into the

21    mountain.  And so we always had some problems

22    with runoff and drainage from the college,

23    because it was there -- into this wooded area

24    of single family homes.  So, you know, but you

25    deal with them.

                                                     73

1                     D. Ulman - 8/15/14

2     Q    And the Village did deal with those

3     issues, correct?

4     A    Yes.

5     Q    What jurisdictions are you aware of that

6     explicitly prohibit housekeeping facilities and

7     kitchens in housing for educational

8     institutions?

9          MR. PELOSO:  Object to the form.

10    A    You mean those that permit dormitories,

11    because --

12    Q    Yes.

13    A    -- some of them do not permit dormitories

14    at all.

15    Q    Yes.  Those jurisdictions that permit

16    dormitories but prohibit housekeeping

17    facilities and kitchens?

Doris Ullman Final 8-15-14dfu(10).txt

18    A    The Town of Ramapo, the Village of

19    Chestnut Ridge.  I had done some research on it

20    some time ago.  There were a couple of other

21    municipalities, not county.  I believe

22    Orangetown.  I'm not sure.

23        Let me not guess.  I don't recall the

24    other municipalities.

25    Q    Those at Chestnut Ridge, were you involved

                                                      74

1                   D. Ulman - 8/15/14

2    in -- in your role as Village attorney,

3    Chestnut Ridge, were you involved in that

4    legislation?

5    A    As I said, that was part of -- I was part

6    of the committee that put together the first

7    zoning law, and that particular provision was

8    taken right from the Town of Ramapo.  A good

9    portion of Chestnut Ridge's zoning law was

10   taken from the Town of Ramapo, with some

11   adjustments for what they wanted to do for the

12   policies in the new Village of Chestnut Ridge.

13   But that particular provision was taken

14   right -- taken right from Ramapo.

15   Q    What jurisdictions are you aware of that

16   limit dormitory space to 20 percent or less?

17        MR. PELOSO:  Object to the form.

18   A    I think I said in my response I'm not

19   aware of any.  I don't know.

20   Q    What jurisdictions are you aware of that

21   limit educational institutions only to

22   accredited educational institutions throughout

```
                   Doris Ullman Final 8-15-14dfu(10).txt
23    their jurisdiction?
24         MR. PELOSO:  Object to the form.
25    A    Several.
                                                           75

 1                   D. Ulman - 8/15/14
 2    Q    Who would that be?
 3    A    You know, again, the research I did on
 4    this was some time ago.  I don't recall which
 5    municipalities they were.
 6    Q    What jurisdictions are you aware of that
 7    use a taking standard for wetlands permits?
 8         MR. PELOSO:  I'll object to the form.
 9    A    Specifically as a taking standard?
10    Q    Yes.
11    A    I'm not aware of any.
12         MR. STEPANOVICH:  I think that's it.
13         Donna, is that it?
14         MS. SOBEL:  :  Roman?
15         MR. STEPANOVICH:  You know, give us --
16    we'll walk out of the room.  Give us two
17    minutes just to make sure that's it and we'll
18    come back.
19         Roman, we're just going to hang up on you
20    here and we'll call you back.
21         (Whereupon, a short recess was taken.)
22         MR. STEPANOVICH:  Back on the record.
23         That concludes our questioning.
24         MR. PELOSO:  I do not have any questions.
25         MR. STEPANOVICH:  Thank you.
                                                           76

 1                   D. Ulman - 8/15/14
 2         THE WITNESS:  Thank you.
                        Page 62
```

Doris Ullman Final 8-15-14dfu(10).txt

3           MR. STEPANOVICH:  Thank you, Doris.

4           (Whereupon, at 12:24 p.m., the Examination

5     of this Witness was concluded.)

6

7                  _____

8                  DORIS F. ULMAN

9

10    Subscribed and sworn to before me

11    this ____ day of _____, 2014.

12

13    _____

14    NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

                                                    77

1

2                    I N D E X

3     WITNESS                              PAGE

4     DORIS F. ULMAN

5     EXAMINATION BY

6     MR. STEPANOVICH                       3

7

```
                  Doris Ullman Final 8-15-14dfu(10).txt
 8                          oOo

 9    PRODUCTION REQUESTS                          PAGE/LINE

10    Final adopted minutes from the              55/24
      January 22, 2007 meeting
11

12                    E X H I B I T S

13        PLAINTIFFS'        DESCRIPTION              PAGE

14        Ex 802             Document beginning with    19
                             Bates stamp POM0031222
15
          Ex 803             Document beginning with    26
16                           Bates stamp POM0010567

17        Ex 804             Document beginning with    33
                             Bates stamp POM0010510
18
          Ex 805             Document beginning with    34
19                           Bates stamp POM0008453

20        Ex 806             Document Bates stamped     35
                             POM17162
21
          Ex 807             Document entitled         38
22                           "Village of Pomona
                             Audio Tapes:  1 of 4"
23
          Ex 808             Document Bates stamped     42
24                           POM17039

25        Ex 809             Document Bates stamped     54
                             POM33403

                                                              78


 1

 2        PLAINTIFFS'        DESCRIPTION              PAGE

 3        Ex 810             Document beginning with    56
                             Bates stamp RC 1823
 4
          Ex 811             Document beginning with    57
 5                           Bates stamp POM0013260

 6        Ex 812             Document Bates stamped     60
                             POM0008547
 7
          Ex 813             Second Amended           64
 8                           Complaint

 9        Ex 814             Answer to Second         64
                             Amended Complaint
10
          Ex 815             Document beginning with    66
11                           Bates stamp RC 1746

12        Ex 816             Letter dated             68
                             March 28, 2007
                                  Page 64
```

Doris Ullman Final 8-15-14dfu(10).txt

13
14
15
16
17
18
19
20
21
22
23
24
25
                                                        79

 1
 2              C E R T I F I C A T I O N
 3   STATE OF NEW YORK   )
 4                   :  SS.:
 5   COUNTY OF NEW YORK  )
 6          I, CHANDRA D. BROWN, a Notary Public for
 7   and within the State of New York, do hereby certify:
 8          That the witness whose examination is
 9   hereinbefore set forth was duly sworn and that such
10   examination is a true record of the testimony given
11   by that witness.
12          I further certify that I am not related to
13   any of the parties to this action by blood or by
14   marriage and that I am in no way interested in the
15   outcome of this matter.
16          IN WITNESS WHEREOF, I have hereunto set my
17   hand the 5th day of September, 2014.
18
                    Page 65

Doris Ullman Final 8-15-14dfu(10).txt

19                    _____

20               CHANDRA D. BROWN, RPR, CLR

21

22

23

24

25