UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CONGREGATION RABBINICAL COLLEGE OF TARTIKOV, INC., et. al., | : | |
| | : | |
| | : | CIVIL NO. 07:CV 6304 (KMK) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VILLAGE OF POMONA, NY, et. al., | : | |
| | : | April 2, 2015 |
| Defendants. | : | |
| | : | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS

Plaintiffs respectfully submit the following opposition to Defendants' Local Civil Rule 56.1 Statement of Material Facts:

Statement No. 1:

Defendant, The Village of Pomona ("Village") is a municipal corporation that was incorporated in 1967 in compliance with New York law, and is comprised of roughly 2.4 square miles of land, half in the Town of Ramapo and half in the neighboring Town of Haverstraw, in Rockland County, New York. (*See Village of Pomona Website Home Page* (accessed January 21, 2015), available at http://www.pomonavillage.com/ ("Village Home Page"); The Village of Pomona Master Plan Update (1997)). [Amanda E. Gordon Affidavit ¶ 30, Exhibit 25] ("Gordon Aff."); [Doris Ulman Affidavit ¶ 23, Exhibit 17] ("Ulman Aff.").

Response to Statement No. 1:

Admit.


Statement No. 2:

The Village has a population of approximately 3,000 persons.  (*See* United States Census

Bureau/American FactFinder, *2010 Census*, (accessed January 20, 2015), available at

http://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml; *see also* (Village Home

Page.) [Gordon Aff. ¶ 30-31, Exhibit 25-26]


Response to Statement No. 2:

Admit.


Statement No. 3:

Defendant Board of Trustees of the Village of Pomona ("Board of Trustees") is the Village's

legislative body.  At the time suit was filed, the Board of Trustees was comprised of 5 Trustees

(Ian Banks, Nicholas Sanderson, Alma Sanders Roman, Rita Louie, and Brett Yagel), one of

whom (Sanderson) was, at the time suit was filed, the elected Mayor of the Village.  *See* New

York State Village Law Section, § 3-301(1); (*See generally*, Second Amended Complaint

(November 15, 2007) ("SAC")). [Ulman Aff. ¶ 20, Exhibit 14].


Response to Statement No. 3:

Admit.

Statement No. 4:

Defendants Banks, Sanderson, Roman, Louie and Yagel have been named as defendants in their

official capacities as Trustees.  (*See generally*, SAC).


Response to Statement No. 4:

Admit.


Statement No. 5:

Plaintiff Congregation Rabbinical College of Tartikov ("Tartikov" or "Plaintiff") is a religious

corporation formed under the laws of the State of New York on August 1, 2004.  (Certificate of

Incorporation of Congregation Rabbinical College of Tartikov, Inc., August 1, 2004)

("Certificate of Incorporation"); (Deposition of Congregation Rabbinical College of Tartikov

pursuant to FRCP 30(b)(6) ("Tartikov 30(b)(6) Dep."), 148:15-149:3, May 5, 2014). [Gordon

Aff. ¶¶ 15, 23, Exhibit 10, 18].


Response to Statement No. 5:

Admit.


Statement No. 6:

At the time of incorporation, Tartikov's officers included Chaim Babad, Abraham Halberstam,

Naftali Babad, Samuel Chimmel, Michael Tauber and Asher Mandel. (Certificate of

Incorporation, RC_00002811). (Tartikov 30(b)(6) Dep., 148:15-149:3, May 5, 2014). [Gordon

Aff. ¶¶ 15, 23, Exhibit 10, 18].

Response to Statement No. 6:

Deny.  The Certificate of Incorporation lists these individuals as trustees, not officers.  Gordon Aff. Ex. 18.

Statement No. 7:

Michael Tauber ("Tauber") is a real estate developer in Rockland County with 30 years of experience in development.  He has developed numerous projects in Rockland County, including multi-family housing, synagogues and schools.  (Tauber, Michael, 33:21-36:8, 80:20-81:4, 148:1-148:5, May 7, 2014). [Gordon Aff. ¶ 14, Exhibit 9].

Response to Statement No. 7:

Admit.

Statement No. 8:

Tauber manages the Tartikov corporate entity, which management includes locating and purchasing the land, hiring professionals needed, and running the day-to-day business of the corporation.  He was elected as Trustee of Tartikov for purposes including the "related litigation of the Pomona Property." (Tartikov 30(b)(6) Dep., 15:5-15:15, May 5, 2014); (Resolution of Board of Trustees and Members of Congregation Rabbinical College of Tartikov, Incorporated, August 6, 2004); (Tauber, Michael., 124:10-126:4, May 7, 2014). [Gordon Aff. ¶¶ 14, 25, Exhibit 9, 20].

Response to Statement No. 8:

Deny that Tauber solely manages the corporation. Michael Tauber is an officer of Congregation Rabbinical College of Tartikov, Inc., and thus shares management responsibilities of the corporation, including locating and purchasing the land, hiring professionals needed, and running the day-to-day business of the corporation.  Gordon Ex. 10 at 15:5-15:15.

Statement No. 9:

Chaim Babad is involved in real estate investment, with a management company based out of New York City.  He currently owns, though (sic) various corporate entities, approximately 40 properties, located primarily in New York City.  (Babad, Chaim, 24:3-25:15, 27:6-27:11, May 19, 2014). [Gordon Aff. ¶ 6, Exhibit 1].

Response to Statement No. 9:

Admit that Chaim Babad is a shareholder of corporate entities which own properties. Plaintiff Local Rule 56.1 Statement of Undisputed Material Facts, dated January 22, 2015, Docket No. 139, submitted in support of Plaintiffs' Motion for Summary Judgment ("P. SOMF")[1] ¶ 83.

Statement No. 10:

Chaim Babad provides the funding for Tartikov.  (Tartikov 30(b)(6) Dep., 15:18-15:20, 66:5-66:15, 67:3-67:11, 81:15-81:17, May 5, 2014); (Babad, Chaim, 159:19-160:14, May 19, 2014). [Gordon Aff. ¶¶ 6, 15, Exhibit 1, 10].

---

[1] All references to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts include references to the documents cited therein.

Response to Statement No. 10:

Deny that Chaim Babad provides the funding directly.  It is a religious practice for Orthodox/Hasidic Jews to donate 10% of their earnings to charitable causes, and Chaim Babad's religious beliefs compel him to do the same.  Chaim Babad's business ventures are designed to ensure that 10% of their earnings are contributed to Kahal Minchas Chinuch.  Kahal Minchas Chinuch provides the funding for Tartikov.  P. SOMF ¶ 83.

Statement No. 11:

Tartikov claims that it was formed to establish a rabbinical college in Rockland County. (Tartikov 30(b)(6) Dep., 9:14-9:16, May 5, 2014).  [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 11:

Deny that Tartikov only "claims" that it was formed to establish a rabbinical college.  Admit that Tartikov was established to form a rabbinical college. P. SOMF. ¶ 1.

Statement No. 12:

The Certificate of Incorporation does not indicate that Tartikov was formed to operate a rabbinical college.  (Certificate of Incorporation, RC_00002807-RC_00002808); (Tartikov 30(b)(6) Dep.), 148:15-149:3, May 5, 2014). [Gordon Aff. ¶¶ 15, 23, Exhibit 10, 18].

Response to Statement No. 12:

Deny.  The Certificate of Incorporation formed the "Congregational **Rabbinical College** of Tartikov, Inc." (emphasis added).  The Certificate of Incorporation clearly lists the purposes for which the entity was formed, including "to establish, maintain and conduct a school for the (sic)

6

of the Holy Torah and to maintain classes for the teaching of the customs, traditions and mode of worship of the Jewish Orthodox faith" and "to promote and increase interest in the teaching and ideals of world renowned scholars of the Jewish Orthodox faith. Gordon Aff Ex. 18 at RC 2807.

Statement No. 13:

Instead, the stated purposes are "(a) To promote the religious, intellectual, moral and social welfare among its members and families, (b) To provide a suitable place of divine worship for the members of the corporation, their families and others of the Jewish Orthodox faith, (c) To promote and increase interest in the teaching and ideals of the worlds renowned scholars of the Jewish Orthodox faith, (d) To establish, maintain and conduct a school for the of [sic] the holy Torah and to maintain classes for the teachings of the customs, traditions and mode of worship of the Jewish Orthodox faith, (e) To aid and assist worthy indigent members of the corporation with loans and housing, (f) To do all things necessary to the accomplishment of the foregoing purposes and if the Trustees shall so decide, to associate itself with persons and organizations desiring to assist on the effectuation of the purposes hereinabove set forth. . . ." (Certificate of Incorporation, RC_00002807-RC_00002808); (Tartikov 30(b)(6) Dep.), 148:15-149:3, May 5, 2014). [Gordon Aff. ¶¶ 15, 23, Exhibit 10, 18].

Response to Statement No. 13:

Deny that the stated purposes are "instead" of operating a rabbinical college. Rather the stated purposes are purposes associated with operating a rabbinical college. P. SOMF. ¶¶ 69-77.

Statement No. 14:

Plaintiffs Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir

Margulis, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, and

Rabbi David A. Menczer (collectively the "Individual Plaintiffs") are rabbis who seek to live,

teach, and/or study at Tartikov's proposed rabbinical college. (SAC ¶¶ 11-20)

Response to Statement No. 14:

Admit.

Statement No. 15:

The Individual Plaintiffs receive stipends from Tartikov because they have committed to teach or

attend the proposed rabbinical college in the event it is built.  (Tartikov 30(b)(6) Dep., 19:1-20:5,

May 5, 2014); (Hershkowitz, Jacob, 67:13-67:16, May 13, 2014); (Rosenberg, Chaim, 9:3-9:17,

May 2, 2014). [Gordon Aff. ¶¶ 10, 13, 15, Exhibit 5, 8, 10].

Response to Statement No. 15:

Admit that the individual plaintiffs who are students receive stipends because they would be

unable to commit to the program for fifteen years without financial assistance and because they

would otherwise have to be employed and would be unable to engage in such intensive study.

Deny that the plaintiffs who are teachers receive stipends.   P. SOMF. ¶¶ 87, 559-560.

Statement No. 16:

Tartikov owns an approximately 100 acre tract of land in the Village between Routes 202 and

Route 306 (the "Subject Property").  (Bargain and Sale Deed with Covenant Against Grantor's

Acts—Individual or Corporation, August 17, 2004, RC_00002024-RC_00002028); (SAC ¶¶ 50,

89); (Tauber, Michael., 124:10-126:4, May 7, 2014). [Gordon Aff. ¶¶ 14, 24, Exhibit 9, 19].


Response to Statement No. 16:

Admit that Tartikov owns an approximately 100 acre tract of land in the Village.  Deny that such

tract is located "between" Routes 202 and 306 but rather is located in the southeast quadrant of

the Route 202 and Route 306 intersection.  P. SOMF. ¶¶99-100.


Statement No. 17:

Tartikov purchased the Subject Property on August 17, 2004 and recorded the deed with

Rockland County on August 31, 2004.  The Village was not aware of the sale of the Subject

Property until November 2004. Bargain and Sale Deed with Covenant Against Grantor's Acts—

Individual or Corporation, August 17, 2004, RC_00002024-RC_00002028); (Tauber, Michael.,

124:10-126:4, May 7, 2014); (Rockland County Recording Certificate of Transfer of Deed,

August 31, 2014, RC_00002023); (SAC ¶¶ 50-51); (Deposition of Village of Pomona and

Village of Pomona Board of Trustees pursuant to FRCP 30(b)(6) ("Village 30(b)(6) Dep."),

89:21-90:7, July 15, 2014). [Gordon Aff. ¶¶ 14, 16, 24, Exhibit 9, 11, 19].


Response to Statement No. 17:

Admit that Tartikov purchased the Property on August 17, 2004 and that Defendants knew about

Tartikov's purchase of the Property in November, 2004.

The sale was public record when it was recorded with the County Clerk on August 31, 2004.

Defendants have not specifically stated that no Village employee or official knew about the

purchase prior to November, 2004. Rather, the Village made that assertion "upon information and belief." P. SOMF. ¶ 148; Gordon Dec. Ex. 19.

Statement No. 18:

In its Second Amended Complaint, Tartikov has alleged that it intends to construct a rabbinical college on this piece of property. (SAC ¶ 1).

Response to Statement No. 18:

Admit.

Statement No. 19:

Tartikov has never filed any application with the Village seeking to construct a rabbinical college. (Tartikov 30(b)(6) Dep., 120:3-120:5, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 19:

Admit that Tartikov never filed an application for any land use permit, variance or approval to construct a rabbinical college because no such application for permit, variance or approval is available for its use. Tartikov's land use, which is a non-accredited educational institution with housing for married students with families, is explicitly prohibited under the Village Code, and the Village has admitted that the Plaintiffs cannot obtain a variance for its use. P. SOMF. ¶¶ 580-581, 583; Declaration of Paul Savad submitted in support of Plaintiffs' Motion for Summary Judgment, January 22, 2015, Docket No. 155 ("Savad Dec. 1") Ex. 28 (Tauber 30(b)(6) Tr.) 153:9-25; P. SOMF. ¶ 626; Savad Dec. 1 Ex. 313 (Motion to Dismiss Hearing Transcript) at 94:13-16; Declaration of Paul Savad in Opposition to Defendants' Motion for Summary

Judgment submitted herewith ("Savad Dec. 2") Ex.401, Savad Dec. 2 Ex.402 ; Savad Dec. 2 Ex.

403 (May 14 letter from Doris); VILLAGE OF POMONA CODE BOOK ("VILLAGE CODE") §§ 130-4,

130-5, 130-9(A), 130-10(F), 130-28(D), 130-28(E).  The Village has already repeatedly admitted

that Tartikov <u>cannot obtain variances</u> for its proposed use.  Doris Ulman, Village Counsel and

the Village's 30(b)(6) witness, has made the following admissions: "A variance under State law

requires -- a use variance, which this would be, requires a specific standard that this applicant

cannot meet," "And he agrees and I agreed that it would be wasteful for them to apply for a

variance," "They need an amendment, yes. . . .  It would be an amendment to one of our laws,

yes," "Your Honor, I am not suggesting variances." Savad Dec. Ex. 313 at 7:13-14, 18:20-22,

19:7-8, 94:13-16; *See also id.* at 54 ("The Court: . . . [E]verybody acknowledges you can't get a

variance here.").  The Village had also previously informed Tartikov of the same fact, SOMF ¶

626, which it admitted: "Mr. Savad and I have discussed this on the phone."  Savad Dec. Ex. 313

at 19:1.


## Statement No. 20:

As a result, prior to discovery in this action, the Village did not know any details regarding the

proposed rabbinical college because no information had been communicated to the Village or its

officials. (Village 30(b)(6) Dep., 69:4-69:9, July 15, 2014). [Gordon Aff. ¶ 16, Exhibit 11].


## Response to Statement No. 20:

Deny. Plaintiffs' attorneys corresponded with and spoke to the Village Attorney and Village

officials regarding the proposed rabbinical college and requested to meet with them on numerous

occasions to further discuss the proposed rabbinical college.  Plaintiffs' attorneys also addressed

Village officials regarding the proposed rabbinical college at Village Board meetings. Pl. St of

Facts ¶¶ 153; 407-409; Savad Dec. 1 Ex. 12 (Ulman 30(b)(6) Tr.) at 77:17-78:24; Savad Dec. 1

Ex. 9 (Louie Tr.) at 234:19-235:2; Savad Dec. 1 Ex. 214.

Plaintiffs also invited all Village officials and the Village Attorney to a meeting in which they

described the proposed rabbinical college to the public, but Village officials did not attend the

meeting and discouraged village residents from attending the meeting.   A Preserve Ramapo

leader reported about the public informational meeting at a Village Board meeting.  P. SOMF. ¶¶

429-435; Savad Dec. 1 Ex. 21 (Castelluccio Tr.) at 95:15-98:2; Savad Dec. 1 Ex.277; Savad Dec.

1 Ex. 285;  Savad Dec. 1 Ex. 15 (Ulman 30(b)(6) Tr.) at 1036:5—24; Savad Dec. 1 Ex.17 (N.

Sanderson Tr.) at 82:12-17; 82:22-83:4;83:8-23; Savad Dec 1 Ex.203; Savad Dec. 1 Ex. 4 (Yagel

Tr.) at 32:17-33:8; Savad Dec. 1 Ex. 23 (Ulman Tr.) at 57:6-58:25; 59:2-60:6; Savad Dec. 1 Ex.

285.

The Village 30(b)(6) representative and Village officials testified that they heard about the

proposed rabbinical college through press reports and that they understood that the proposed

rabbinical college was an Orthodox/Hasidic school which would train rabbinical judges.  P.

SOMF ¶¶ 149-150; 152; 201-209; 228; 262-264.  Village officials were also informed about a

conceptual plan for a rabbinical college on the Property after Preserve Ramapo leaked such

information.  P. SOMF. ¶ 158.


Statement No. 21:

All facts regarding the proposed facilities, proposed number of students and proposed academic

requirements were learned through discovery. [Ulman Aff. ¶ 40].


Response to Statement No. 21:

Deny.  *See* Plaintiffs' Response to No. 20.

Additionally, because this is a facial challenge to Defendants' laws, the parties mutually agreed that Plaintiffs would not produce documents regarding the intended physical use of the Property because such documents would be irrelevant, other than producing a non-privileged site plan and Wetlands map. The reasoning for this is because *any* rabbinical college with housing as planned by the Plaintiffs would be prohibited under the challenged zoning laws, and thus any specific hypothetical layout is irrelevant. Savad Dec. 2 Ex. 397; Savad Dec. 2 Ex.398; Savad Dec. 2 Ex. 399. In fact, Defendants told this Court that "the Plaintiffs' property [is] completely irrelevant." Savad Dec. 2 Ex. 413. This was later confirmed by the Court. Savad Dec. 2 Ex. 364.


Statement No. 22:

Those facts learned through discovery include conceptual site plans prepared in 2004 by Leonard Jackson ("Mr. Jackson") of Leonard Jackson Associates, engineer hired by Tartikov, and Saccardi & Schiff, Incorporated, planner hired by Tartikov. Mr. Jackson testified that, a preliminary concept plan is "[w]hatever the engineer can come up with to suit the needs of the client . . . . it's "the beginning of the process." Mr. Jackson also testified that eight buildings on the conceptual site plan were dormitory buildings. (Leonard, Jackson, 22:25-23:10, 29:17-30:18, 56:7-58:2, 59:25-62:9, August 13, 2004); (Saccardi & Schiff, Inc., Site Location-Rabbinical College of Tartikov at RC_0004129); (Saccardi & Schiff, Inc., Site Layout Plan-Rabbinical College of Tartikov at RC_0004130). [Gordon Aff. ¶¶ 11, 28, Exhibit 6, 23].


Response to Statement No. 22:

Deny that this fact was first learned by Defendants through discovery. Defendants had possession of and produced that same plan as disseminated by Preserve Ramapo in January, 2007. P. SOMF. ¶ 158; Savad Dec. 2 Ex. 398.

Statement No. 23:

Plaintiffs have alleged that the proposed rabbinical college is a "specialized kollel." (SAC ¶ 52).

Response to Statement No. 23:

Admit.

Statement No. 24:

Tartikov cannot articulate what a "specialized kollel" is.  (Tartikov 30(b)(6) Dep., 20:22-21:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 24:

Deny.  Plaintiffs have testified that Tartikov's specialized kollel will offer a guided curriculum with a specific goal of training students to become full-time rabbinical judges, rather than a kollel in which students study a general curriculum. P. SOMF ¶¶ 565-567. Further, in the testimony cited by Defendants, Tartikov's representative specifically articulates that Tartikov will be "specialized versus a regular kollel" because in a general kollel "students could be spending a half a day or a full day studying anything related to Jewish studies, could be history, could be the Bible, could be Talmud, could be Halacha, could be anything you want", as opposed to Tartikov which "will specialize that they have to commit themselves from early morning to

late evening studying nothing but these four volumes of the Shulchan Aruch." Gordon Aff. Ex.

10 at, 20:22-21:11.

Statement No. 25:

The only document that Tartikov is aware of that explains what constitutes a "specialized kollel"

is a single page proposed Curriculum that outlines the full rabbinical judge training program for

all fifteen years. (Tartikov 30(b)(6) Dep., 22:3-23:2, May 5, 2014); *see* Proposed Rabbinical

College of Tartikov Program Schedule ("Curriculum"). [Gordon Aff. ¶¶ 15, 26, Exhibit 10, 21].

Response to Statement No. 25:

Deny.  Deny that Gordon Exhibit 21, entitled Proposed Rabbinical College of Tartikov Program

Schedule ("program schedule"), is the only place where the difference between a specialized and

general kollel is explained. *See* Plaintiffs' Response to No. 24 above.  Deny that the program

schedule is only a "single page."  The curriculum will follow the four major divisions of Jewish

law as set out in the *Shulchan Aruch*, which includes everything that pertains to all facets of daily

Orthodox Jewish life.  P. SOMF ¶¶ 36-37; 65-68.

Statement No. 26:

The proposed Curriculum was prepared by one of the individual plaintiffs, Meilech Menczer

("Rabbi Menczer"), a putative student. (Tartikov 30(b)(6) Dep., 19:14-19:21, 23:3-23:5, May 5,

2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 26:

Deny. The program schedule was not "prepared" by Meilech Menczer.  The proposed curriculum will follow the four major divisions of Jewish law as set out in the *Shulchan Aruch*, which includes everything that pertains to all facets of daily Orthodox Jewish life.  P. SOMF ¶¶ 36-37; 65-68; 528-536.  These four divisions are (1) Chosen Mishpat- laws of finance, interest and financial responsibility; laws of personal and financial damages; legal procedure, including the rules of the Bes Din and rules of witnesses; (2) Yoreh De'ah- laws related to kashrut (Jewish religious dietary laws, "kosher"); religious conversion laws; laws regarding mourning; laws of family purity; and laws related to Israel; (3) Orach Chayim- laws related to prayers, synagogue, Sabbath and holidays and (4) Even Ha'ezer- laws related to marriage and divorce. P. SOMF ¶ 68.  Plaintiff Meilech Menczer is one of the students who has been approved for admission into the rabbinical school campus proposed to be built by Tartikov and who intends to and is committed to study all four volumes of the *Shulchan Aruch* at Tartikov to become a rabbinical judge.  He is currently studying the *Chosen Mishpat* at Kollel Belz.  P. SOMF ¶ 90.   He was asked by Plaintiffs' attorneys to prepare a document that would reflect the religious source for their studies.  Savad Dec. Ex. 26 Menczer Dep. 62:21-63:12 .


Statement No. 27:

The proposed Curriculum was prepared a few months prior to the deposition of Tartikov, pursuant to FRCP 30(b)(6), which occurred in May 2014. (Tartikov 30(b)(6) Dep., 23:9-23:13, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].


Response to Statement No. 27:

Deny.  The *Shulchan Aruch* was written by Rabbi Joseph Karo centuries ago.  P. SOMF ¶ 36.

As set forth in Plaintiffs' Response to No. 26, Plaintiff Meilech Menczer put the program

schedule on paper in a written synopsis in 2014.


Statement No. 28:

Mr. Tauber asked Rabbi Menczer to prepare it "knowing my counsel wanted to see it in writing,

not just verbally." (Tartikov 30(b)(6) Dep., 23:14-23:16, May 5, 2014); *see also* (Babad,

Mordechai 75:13-76:4, May 9, 2014) ("[S]o I guess [Resnicoff], as part of his expert witness, did

feel that it must be put into an exhibit . . ."). [Gordon Aff. ¶¶ 7, 15, Exhibit 2, 10].


Response to Statement No. 28:

Admit.


Statement No. 29:

The Curriculum does not provide any information concerning what constitutes a "specialized

kollel." *See* Curriculum; (Tartikov 30(b)(6) Dep., 22:12-23:2, May 5, 2014)  [Gordon Aff. ¶¶

15, 26, Exhibit 10, 21].


Response to Statement No. 29:

Deny.  The program schedule does provide information as to the specialization of this kollel, as it

describes the field of study that will take place at the rabbinical college.  Gordon Ex. 21.

*See also* Response to Statement No. 25.


Statement No. 30:

The Curriculum does not provide any details concerning what, exactly, the proposed rabbinical college scholars would do. *See* Curriculum; (Tartikov 30(b)(6) Dep., 22:12-23:2, May 5, 2014). [Gordon Aff. ¶¶ 15, 26, Exhibit 10, 21].

Response to Statement No. 30:

Deny. Gordon Ex. 21. *See also* Response to Statement No. 25.

Statement No. 31:

Rather, the Curriculum simply identifies subject areas for study. *See* Curriculum; (Tartikov 30(b)(6) Dep., 22:12-23:2, May 5, 2014); (Babad, Mordechai, 69:3-73:25, May 9, 2014). [Gordon Aff. ¶¶ 7, 15, 26 Exhibit 2, 10, 21].

Response to Statement No. 31:

Deny. The subject areas for study is not "simply" the only thing identified by the document written by Meilech Menczer. The document also identifies sub-sections of the *Shulchan Aruch*, including which subjects will be studied, and when they will be studied. Gordon Ex. 21.

Statement No. 32:

Mordechai Babad ("Rabbi Babad"), the putative dean of the proposed rabbinical college, "[g]lanced through" the Curriculum but did not do anything more with the document. (Babad, Mordechai, 68:3-68:8, May 9, 2014.) [Gordon Aff. ¶ 7, Exhibit 2].

Response to Statement No. 32:

Deny.  Admit that Mordechai Babad is Tartikov's intended dean and that he reviewed the program schedule synopsis written by Meilech Menczer by glancing at it.  Deny that is Mordechai Babad's only familiarity with the four major subjects of the *Shulchan Aruch*. Mordechai Babad became a rabbinical judge in the 1980's and is trained in and is qualified to rule on matters within all four books of the *Shulchan Aruch*.  He is one of the only people trained in all four books of the *Shulchan Aruch* and is considered to be one of the most respected scholars in Monsey, New York.  P. SOMF ¶¶ 94-95.

Statement No. 33:

In his capacity as putative dean, Rabbi Babad has neither prepared nor asked anyone to prepare any documents that would reflect the course of study at the proposed rabbinical college.  (Babad, Mordechai, 74:25-75:7, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

Response to Statement No. 33:

Deny.  The curriculum is based on the *Shulchan Aruch* which was written by Rabbi Joseph Karo centuries ago.  P. SOMF ¶ 36.

Statement No. 34:

In his capacity as putative dean, Rabbi Babad has not hired any teachers.  (Babad, Mordechai, 83:16-83:18, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

Response to Statement No. 34:

Admit that the corporation does not have any current teachers employed but deny to the extent that it implies that Mordechai Babad is expected to hire teachers for a school that has not yet been built.

Statement No. 35:

In fact, Rabbi Babad testified that he has done "[n]othing" as the prospective dean and that he thought the job was "premature." (Babad, Mordechai, 83:12-83:15, May 9, 2014). [Gordon Aff. ¶ 7, Exhibit 2].

Response to Statement No. 35:

Admit.

Statement No. 36:

The Curriculum is the only written document pertaining to the proposed rabbinical college's intended program of study. (Tartikov 30(b)(6) Dep., 31:23-32:9, May 5, 2014); (Babad, Mordechai, 94:24-95:14, May 9, 2014). [Gordon Aff. ¶¶ 7, 15, Exhibit 2, 10].

Response to Statement No. 36:

Deny.  Tartikov's intended program of study follows the four sections of Jewish law as set out in the *Shulchan Aruch*, which includes everything that pertains to all facets of daily Orthodox Jewish life.  The *Shulchan Aruch* encompasses multiple volumes of Jewish law.  P. SOMF ¶¶ 36-37; 65-68; 528-536.

Statement No. 37:

Specifically, the proposed rabbinical college does not have any written criteria for admission. (Tartikov 30(b)(6) Dep., 31:23-32:9, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 37:

Admit. *See* Response to Statement No. 38.

Statement No. 38:

All that is required for admission is a meeting with Rabbi Babad.  Once Rabbi Babad feels that an individual is "for real and ready for this program, he will give them the go-ahead to get into it. So once they get the go-ahead from Rabbi Babad, he can go ahead and start and will be able to live in there and get into the program."  (Tartikov 30(b)(6) Dep., 30:19-30:24, 31:17-31:22, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 38:

Deny.  There are various other requirements, including that students must also be capable of learning all four sections of the *Shulchan Aruch* and must have completed a high school level program in the Talmud.  At the meeting with Mordechai Babad, he will verbally test the prospective student, and determine if he is qualified.  P. SOMF ¶¶ 549-550; 552.

Statement No. 39:

The proposed rabbinical college does not have any written application. (Tartikov 30(b)(6) Dep., 32:8-32:9 May 5, 2014); (Babad, Mordechai, 94:24-95:10, May 9, 2014). [Gordon Aff. ¶¶ 7, 15, Exhibit 2, 10].

Response to Statement No. 39:

Admit.


Statement No. 40:

The proposed rabbinical college will have no entrance examination.  (Tartikov 30(b)(6) Dep.,

32:6-32:7, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].


Response to Statement No. 40:

Admit.


Statement No. 41:

The proposed rabbinical college will not require entering students to have any degree as a

prerequisite to admission.  (Tartikov 30(b)(6) Dep., 32:15-32:18, May 5, 2014). [Gordon Aff. ¶

15, Exhibit 10].


Response to Statement No. 41:

Deny.  Entering students must have completed a high school program in the Talmud.  P. SOMF ¶

550.


Statement No. 42:

The proposed rabbinical college is composed primarily of housing, with accessory religious uses

that include synagogues, study halls, and courtrooms.  (Tartikov 30(b)(6) Dep., 34:23-36:17,

42:1-43:14, May 5, 2014); (Religious School with 4500 Residents Planned for Pomona, January

9, 2007); (Castelluccio, Michael, 33:10-33:25, 44:3-44:8, August 12, 2014) ("Website Plans");
(Leonard, Jackson, 56:7-58:2, August 13, 2004); (Saccardi & Schiff, Inc., Site Location-
Rabbinical College of Tartikov at RC_0004129); (Saccardi & Schiff, Inc., Site Layout Plan-
Rabbinical College of Tartikov at RC_0004130). [Gordon Aff. ¶¶ 8, 11, 15, 28, 29, Exhibit 3, 6,
10, 23, 24].


Response to Statement No. 42:

Deny.  Under the Village's Code, the principal use proposed by Tartikov is a non-accredited
"Educational Institution."  Such proposed Educational Institution includes a study hall,
synagogue, shul, library, courtrooms, and housing for its students.  P. SOMF ¶¶ 448- 468; 476-
478; 486-527.


Statement No. 43:

According to Plaintiffs, the housing and the other buildings would be located on the campus of
the Subject Property.  (SAC ¶ 68-70); (Tartikov 30(b)(6) Dep., 39:7-43:14, May 5, 2014).
[Gordon Aff. ¶ 15, Exhibit 10].


Response to Statement No. 43:

Admit.


Statement No. 44:

Plaintiffs contemplate initially building somewhere between 50 and 250 units of housing, which
will be apartments that have 3 or 4 bedrooms, ranging in size from 1800-2000 square feet.

(Tauber, Michael, 165:24-166:10, May 7, 2014); (Babad, Chaim, 102:6-102:11, 177:24-178:8, May 19, 2014). [Gordon Aff. ¶¶ 6, 14, Exhibit 1, 9].

Response to Statement No. 44:

Admit.[2]

Statement No. 45:

The purpose of the housing included in the plans for the proposed rabbinical college is to house the families of students.  It is not contemplated that any rabbinical training will occur in the housing.  (Tartikov 30(b)(6) Dep., 26:7-26:25, 34:23-35:24, 159:23-160:6, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 45:

Deny. The purpose of the housing is for the students to live within a Torah community, to facilitate the religious exercise of the rabbinical college, and to fulfill the religious obligations of the students and teachers to their wives and children.  P. SOMF ¶¶ 70-75; 448-501. Furthermore, religious exercise, expression and study will also take place in the housing component of the rabbinical college. P. SOMF ¶¶ 46, 71, 72, 73, 74, 450.

Statement No. 46:

---

[2] Plaintiffs object to the characterization of Chaim Babad's testimony as that of the "Plaintiffs."  Chaim Babad is neither a Plaintiff in this action nor the individual who was designated to testify for Congregation Rabbinical College of Tartikov, Inc. under Federal Rule of Civil Procedure 30(b)(6).  He was deposed as a "Non-Party Witness."  Savad Dec. Ex. 31 at page 1.

Plaintiffs can point to no authority that it is necessary that all facilities of the proposed rabbinical college be on campus apart from vague, unspecified references to the requirements contained in the Torah.  *See generally* (Tartikov 30(b)(6) Dep., 27:2-43:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 46:

Deny. Plaintiffs have cited significant authority supporting their religious beliefs, including their sincere religious belief that housing should be provided on campus. *See, e.g.,* P. SOMF ¶¶ 71; 448; 452-456; 460-464; 493; 502-503; 505-508; 512; 519; 523-526.  Additionally, the Village Code states that any permitted dormitory building must be "on the same lot as the educational use . . . ." P. SOMF ¶ 13.

Statement No. 47:

The proposed rabbinical college will require its students to be married and to live on campus, in the multi-family homes, with their families. (Tartikov 30(b)(6) Dep., 24:16-26:25, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 47:

Deny.  Admit that it is generally a religious requirement for Orthodox/Hasidic Jews men to marry young and have children, but the cited deposition testimony states that there could be exceptions.  The rabbinical college will not have a formal policy that its students be married. Savad Dec. Ex. 311(Plaintiffs' Response to Defendants' Second Set of Interrogatories No. 3).

Statement No. 48:

The Plaintiffs claim that this requirement is found in the Torah but failed to identify any specific sections in the Torah specifying this requirement. *See generally* (Tartikov 30(b)(6) Dep., 25:9-30:10, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 48:

Deny. Plaintiffs have provided citations for the requirement that Orthodox/Hasidic men marry young, and procreate (and are prohibited from using birth control), and tend to their family. The individual Plaintiffs share this belief. P. SOMF ¶¶ 38-43; 493.

Statement No. 49:

Plaintiffs claim that living on campus is necessary so the student will have the full support of his friends, neighbors, families, wife and children in order to commit himself to the fifteen year program. (Tartikov 30(b)(6) Dep., 28:6-28:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 49:

Admit that these are some, but not all reasons why Plaintiffs must live on campus. Plaintiffs are required to live on campus for other reasons related to the exercise of their religious beliefs. *See e.g.* P. SOMF ¶¶ 70-74; 448-468; 471-473; 488-492; *see also* Response to Statement No. 45.

Statement No. 50:

Chaim Babad testified: "Because you got to understand, the only way they can keep it is they need—it's like a two-stage thing. I mean, the husband studies, but the wife has to agree that he should study. Because if the wife doesn't agree, and she needs money, and she needs to go to parties, she needs to go and he has to babysit at night or whatever it is, then automatically he

doesn't have the capability for the—it will take him forever.   And by the time he'll finish one,

he'll forget the second one.  He'll finish the second one, he'll forget the third one.  And in order

that he should be able to study and work it, his wife has to be that he doesn't have no problem

with the —where to live and doesn't have no problem with —to go and to see that the neighbor's

wife got a new dress and I have to match a new dress. So they'll all be like over here, and they'll

have to live in this kind of a style in the next 15 years.  And this way, hopefully it will work."

He continued "[s]o we came to the figure that the reason how its gonna work is that if we make a

separate, complete isolated thing over there with housing, with everything.  Perhaps [in Pomona]

its gonna work." (Babad, Chaim, 99:2-99:25, 125:22-126:8, May 19, 2014); *see also* (Neubeger,

Sheftel, 79:1-79:19, July 23, 2014)(comparing the benefit of students living together at Princeton

to the benefits of rabbinical college students living together on campus). [Gordon Aff. ¶¶ 6, 12,

Exhibit 1, 7].


Response to Statement No. 50:

Admit.


Statement No. 51:

The proposed rabbinical college will pay for all tuition and housing expenses for its students.

(Tartikov 30(b)(6) Dep., 65:24-67:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].


Response to Statement No. 51:

Admit.


Statement No. 52:

Funding for the proposed rabbinical college will be provided by Chaim Babad.  (Tartikov 30(b)(6) Dep., 66:3-67:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 52:

Deny.  *See* Response to Statement No. 10.

Statement No. 53:

There are no written documents evidencing this arrangement.  (Tartikov 30(b)(6) Dep., 67:12-67:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 53:

Deny.  The arrangement described in Statement No. 52 does not exist.

Statement No. 54:

Although the sponsors of the proposed rabbinical college allege that there is a dire need for rabbinical judges within the Orthodox community, they admit that students will not study at the proposed rabbinical college unless the college commits to pay full tuition, all of their housing and other living costs, and provide education for their children. (Tartikov 30(b)(6) Dep., 61:23-61:25, May 5, 2014); (Babad, Chaim, 168:7-169:25, May 19, 2014). [Gordon Aff. ¶¶ 6, 15, Exhibit 1, 10].

Response to Statement No. 54:

Admit that there is a need for rabbinical judges within the Orthodox community, but deny the balance of the statement.  The rabbinical students <u>are not able</u> to study without the housing and

the stipend because they would otherwise have to be employed to support their families and therefore would be unable to dedicate themselves to the intense full-time study regimen. Intended Tartikov students and former Plaintiffs Gergley Neuman and Aryeh Royde have already dropped out because they could not wait for Tartikov's program.  Further, it is unknown who Defendants refer to as "sponsors."  P. SOMF ¶¶ 88, 90; 92; 540; 559-562; 573, 575.

Statement No. 55:

Two similar rabbinical colleges exist in the immediate area, one in Monsey, Mechon L'Hoyroa, and one in Brooklyn, Kollel Beis Yechiel Mechel of Tartikov ("Tartikov of Brooklyn"). (Tartikov 30(b)(6) Dep., 43:15-44:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 55:

Deny.  Mechon L'Hoyroa and Kollel Beth Yechiel Mechil of Tartikov of Brooklyn are not "similar" rabbinical colleges to Tartikov.

Mechon L'Hoyroa only teaches certain sections of the Shulchan Aruch, as opposed to Kollel Beth Yechiel Mechil of Tartikov of Brooklyn which will teach all four sections.  P. SOMF ¶¶ 568, 570.  Kollel Beth Yechiel Mechil of Tartikov of Brooklyn has a different program than Tartikov.  P. SOMF ¶ 571.  Neither Mechon L'Hoyroa nor Kollel Beth Yechiel Mechil of Tartikov of Brooklyn provide the Torah Community environment that Plaintiffs believe is essential to exercise their religious belief.  P. SOMF ¶¶ 475; 570; 571.

Deny that Kollel Beth Yechiel Mechil of Tartikov of Brooklyn is in the immediate area as Pomona in Rockland County.

Statement No. 56:

Both Mechon L'Horoya and Tartikov of Brooklyn train students in the four books of Shulchan Aruch, which are the same as those intended to be studied at the proposed rabbinical college. (Tartikov 30(b)6) Dep., 43:15-46:9, 63:15-63:17, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No.56:

Deny.  P. SOMF ¶¶ 568; 570-571.

Statement No. 57:

Despite the Plaintiffs' claim that there is a great need for rabbinical judges, there are only a handful of rabbinical judge students at Mechon L'Horoya, and no students currently studying to be rabbinical judges at Tartikov of Brooklyn. (Tartikov 30(b)(6) Dep., 43:15-44:14, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 57:

Admit that there are a small number of students studying to be rabbinical judges at Mechon L'Horoya and Kollel Beth Yechiel Mechil of Tartikov of Brooklyn.  Deny that this is "despite" the great need for such judges.  Rather, the great need is because Mechon L'Horoya and Tartikov of Brooklyn do not offer the program that Tartikov will, including a Torah community, only training students who are studying to be full-time rabbinical judges, teaching all four sections of the *Shulchan Aruch,* and providing free housing and stipends to facilitate such study. P. SOMF ¶¶ 475; 540; 558-562; 568-575.

Statement No. 58:

Neither Mechon L'Horoya nor Tartikov of Brooklyn offer on-campus housing for their students. (Tartikov 30(b)(6) Dep., 46:10-46:17, 62:23-63:3, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 58:

Admit.

Statement No. 59:

Rabbinical judge students enrolled at Tartikov of Brooklyn are all married and live with their families off campus.  (Tartikov 30(b)(6) Dep., 47:2-47:13, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No.59:

Admit.

Statement No. 60:

Rabbinical judge students enrolled at Mechon L'Hoyroa are currently studying to become rabbinical judges despite the fact that they do not live on campus. (Tartikov 30(b)(6) Dep., 64:19-64:21, May 5, 2014); (Babad, Chaim, 175:6-175:12, May 19, 2014). [Gordon Aff. ¶¶ 6, 15, Exhibit 1, 10].

Response to Statement No. 60:

Admit that they are studying to be something that is sometimes referred to as "rabbinical judges."  Deny that this is the same religious program that will be offered by Tartikov.  Mechon L'Hoyroa only teaches certain sections of the *Shulchan Aruch*, as opposed to Tartikov, which

will teach all four books of the *Shulchan Aruch*. P. SOMF ¶¶ 568. Some talmudic institutions may give students credentials to call themselves rabbinical judges, but that does not mean that they are actually training to be rabbinical judges trained in all four sections of the *Shulchan Aruch*. Savad Dec. Ex. 34 at 28:9-30:5; 63:2-15; Tauber Dec. ¶ 39.

Statement No. 61:

Mechon L'Horoya's facilities are housed in a single building, containing synagogues, a library and a mikveh. (Tartikov 30(b)(6) Dep., 63:4-63:11, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No.61:

Admit.

Statement No. 62:

Tartikov of Brooklyn does not have a synagogue on campus. (Tartikov 30(b)(6) Dep., 46:18-46:19, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 62:

Admit.

Statement No. 63:

Tartikov of Brooklyn does not have libraries on campus. (Tartikov 30(b)(6) Dep., 46:20-46:21, May 5, 2014). [Gordon Aff. ¶ 15, Exhibit 10].

Response to Statement No. 63:

Admit.


Statement No. 64:

Tartikov of Brooklyn does not have a mikveh on campus. (Tartikov 30(b)(6) Dep., 46:22-46:23, May 19, 2014). [Gordon Aff. ¶ 15, Exhibit 10].


Response to Statement No. 64:

Admit.


Statement No. 65:

Although the proposed rabbinical college expects to start with 250 students, Plaintiffs hope that it will grow over the years and "[p]robably in the next ten years we'll probably have several thousand of them over there." (Babad, Chaim, 102:6-102:11, May 19, 2014); *see* (Tartikov 30(b)(6) Dep., 60:15-60:21, May 5, 2014). [Gordon Aff. ¶ 6, 15, Exhibit 1, 10].


Response to Statement No. 65:

Deny.  There is no formal application to the Village (complete with the necessary details about the use of the subject property), since no family housing, housekeeping facilities or non-accredited Educational Institution is permitted under the Village Code and therefore Plaintiffs cannot apply for such use.  P. SOMF ¶¶ 580-581, 603-614.  The reference of Chaim Babad, (who was not testifying for the corporation or as an individual plaintiff), to "several thousand of them" was to students and their family members living on campus, not merely the number of students. Gordon Ex. 1 at, 102:6-102:11, as cited above.

Statement No. 66:

Currently, Tartikov does not know how many students will attend the proposed rabbinical

college if it constructed.  (Tartikov 30(b)(6) Dep., 62:16-62:22, May 5, 2014). [Gordon Aff. ¶ 15,

Exhibit 10].


Response to Statement No. 66:

Deny to the extent that it implies that a school that has not yet been built would be expected to

know the number of students who will attend.  There is no formal application to the Village

(complete with the necessary details about the use of the subject property), since no family

housing, housekeeping facilities or non-accredited Educational Institution is permitted under the

Village Code and therefore Plaintiffs cannot apply for such use.  P. SOMF ¶¶ 580-581, 603-614.


Statement No. 67:

Rabbi Babad, the putative dean of the proposed rabbinical college, is not aware whether any

students have yet been admitted. (Babad, Mordechai, 93:24-94:11, May 9, 2014). [Gordon Aff. ¶

7, Exhibit 2].


Response to Statement No. 67:

Deny.  Mordechai Babad stated that he did not understand what the attorney meant by

"admitted", but stated that he knew who the student plaintiffs were and stated that they are all

capable, but also stated that everything is premature because the school hasn't yet been built.  P.

SOMF ¶¶ 554, 556-557.

Statement No. 68:

The Village was formed in 1967 "[t]o fulfill the vision of a close-knit community vested in [its] rural roots." *Village of Pomona Website Home Page* (accessed January 20, 2015), available at http://www.pomonavillage.com/ ("Village Home Page"). [Gordon Aff. ¶ 30, Exhibit 25].

Response to Statement No. 68:

Object to the extent that the statements in this paragraph refer to, rely on, are supported by, as inadmissible hearsay.

Deny.  The Village was formed to preserve its exclusionary one-acre zoning.  Village Code §§ 130-2, 130-5, 130-9.  The website referenced in the statement further indicates that the motivation to form the village was to prevent the development of apartment housing units, and Mayor Jan. H. van den Hende stated: "They say there is no more development plan, but who says there won't be a plan next week?," referring to a proposed garden-apartment complex.  Savad Dec. 2 Ex. 385 at 2-3 (Village of Pomona, *About the Village* (accessed Mar. 5, 2015), http://www.pomonavillage.com/about.html); Savad Dec. 2 Ex. 386 (R. Blumenthal, *Pomona Debate: To Be or Not to Be a Village,* New York Times at 72 (Jan. 15, 1967).  The Village further states that the Village founders did not want to build schools.  Savad Dec. 2 Ex. 385 at 2. Denied that the Village is "rural" but rather suburban in nature.  P. SOMF ¶ 998.

Statement No. 69:

Ever since its formation almost 50 years ago, the Village has limited land use to single-family residences on one-acre zoned property, commonly known as R-40.  VILLAGE OF POMONA CODE BOOK ("VILLAGE CODE") § 130-5; Village of Pomona Master Plan Update (1997), and the

Village of Pomona Development Policies Plan (1974)(cited therein) ("Village Master Plan").
[Ulman Aff. ¶¶ 14, 23, Exhibit 8, 17].

Response to Statement No. 69:

Object to the extent that the statements in this paragraph refer to, rely on, are supported by, as
inadmissible hearsay; and Object that Defendants fail to proffer support for this statement other
than Village Attorney's uncorroborated testimony.  Admit that Village Counsel so asserts under
oath.

Deny.  Various other land uses are permitted, and do exist, within the Village.  These include
public utilities rights-of-way, libraries, museums, public parks, playgrounds and agricultural
pursuits as permitted uses, and recreational facilities; playgrounds, swimming clubs, tennis
courts and recreational buildings; reservoirs, water towers and water tanks; telephone exchanges
and public utility substations, communications centers for emergency and other purposes, and
any and all other public utility facilities which are or support the primary function of the public
utility company; camps; wireless telecommunication services facility; educational institutions;
and houses of worship by special permit.  P. SOMF ¶¶ 5- 6.  Land uses that currently exist on
various parcels within the Village include "General Business/Community Commercial," "Two
Family Residential," "Three Family Residential," "Multi Family Residential,"
"Institutional/Quasi-Public," "Utilities," "Agricultural," and parks.  Beall Dec. Exhibit K.  More
specifically, in addition to multi-family residential uses, there exist the following uses within the
Village: Sri Ranganatha Temple, group homes, Hudson Valley Society for the Prevention of
Cruelty to Animals, Ladentown Methodist Church, the Pomona Cultural Center, among others.
P. SOMF ¶¶ 383, 399, 862; D. SOMF ¶ 83.

Statement No. 70:

The Village first adopted its zoning laws, contained in Chapter 130 of the Village Code, in 1968, shortly after the Village was created, to preserve and enhance the rural residential character of the area. VILLAGE CODE § 130-2. [Ulman Aff. ¶ 12, Exhibit 6].

Response to Statement No. 70:

Admit that the words "to preserve and enhance the rural residential character of the" appears in § 130-2 ("Purpose and intent") of the Village Code. Deny that it is the only phrase listed or that the quoted portion contains the complete sentence, which reads "To preserve and enhance the rural residential character of the Village and to encourage the orderly and beneficial development of the entire Village. VILLAGE CODE § 130-2(A). Furthermore, there are six other purposes listed in § 130-2. Deny that the Village is "rural," and that § 130-2(A) states the true motivation of the Village in adopting its zoning laws. *See* Responses to Statement Nos. 68 & 69.

Statement No. 71:

The zoning laws reflect the Village's long-time concerted purpose and its history as a low-density residential community, providing "[w]hereas areas of commercial, industrial and high- and medium-density residential development are to be found elsewhere in Rockland County, and whereas the area embraced by the Village of Pomona conforms to the low-density concept of the outlying areas of the existing Town of Ramapo Master Plan and the Zoning Ordinances of the Towns of Haverstraw and Ramapo, therefore this chapter is intended to provide for the orderly and desirable development of the Village of Pomona and to regulate and restrict the use of land and the construction and use of buildings and accessory land improvements in the following manners:

To preserve and enhance the rural residential character of the Village and to encourage the orderly and beneficial development of the entire Village.

To prevent the overcrowding of land with persons and structures in relation to open spaces, circulation and neighboring land uses and to require adequate provision for off-street parking.

To prevent the contamination of streams and ponds, to safeguard the water table and to encourage the wise use and sound management of the natural resources throughout the Village in order to preserve the integrity, stability and beauty of the community and the value of the land.

To provide adequate light, air and privacy for residents, to secure safety from fire, flood and other danger and to discourage uses inimical to public health.

To encourage any construction which will tend to enhance the natural, rural beauty of the area.

To discourage auxiliary construction which detracts from the rural aesthetic beauty of the community.

To facilitate such services as utilities, sewerage, parks and other public requirements.

VILLAGE CODE § 130-2. [Ulman Aff. ¶ 12, Exhibit 6].


Response to Statement No. 71:

Object that Defendants fail to proffer support for this statement other than Village Attorney's

uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Admit that Village Code § 130-2 contains the quoted text. Deny that the Village has a "long-

time concerted purpose and its history as a low-density residential community," and that the

zoning laws reflect such "purpose" and "history." See response to Statement Nos. 68 and 69.


Statement No. 72:

This stated purpose is in keeping with the plans and resolutions of the Towns of Ramapo and

Haverstraw, in which the Village is located. VILLAGE CODE § 130-2 (Purpose and Intent: "the

area embraced by the Village . . . conforms to the low-density concept of the outlying areas of the existing Town of Ramapo Master Plan and the Zoning Ordinances of the Towns of Haverstraw and Ramapo . . . ."); *See also* (<u>Rockland County Department of Planning General Municipal Law Review of the Town of Ramapo Comprehensive Plan</u>). [Ulman Aff. ¶¶ 12, 36, Exhibit 6, 30].

<u>Response to Statement No. 72:</u>

Object that Defendants fail to proffer support for this statement other than Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Object that Defendants fail to proffer support for this statement other than Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Deny. The Village has filed a lawsuit against the Town of Ramapo, attempting to prevent any development that may impact their exclusionary zoning. *See Village of Pomona v. Town of Ramapo*, 94 A.D.3d 1103, 943 N.Y.S.2d 146 (2 Dept. 2012). Additionally, it is untrue that the Village's purposes are "in keeping with the plans and resolutions of the Towns of Ramapo and Haverstraw, but rather directly contrary to the Town of Ramapo's Comprehensive Plan, which recognizes that "consideration must be given to regional and local housing needs and requirements. There must be a balancing of the local desire to maintain the status quo within the community and the greater public interest that regional and local needs be met. A municipality that has been found to be zoned in an exclusionary fashion can be required by the courts to amend its zoning ordinance to meet its fair share of housing needs." Savad Dec. Ex. 388 at B-1 (Town of Ramapo Comprehensive Plan, Housing). The Town of Ramapo designated the "Patrick Farm" property as one of four adult student housing districts within the Town (and

would have involved a similar land use as Tartikov's), which is located adjacent to the Village.
P. SOMF ¶ 361.

Statement No.  73:

In 1974, a comprehensive plan for the Village of Pomona, entitled "Development Policies Plan" (otherwise known as the "The Village of Pomona Master Plan" or "1974 Plan") was prepared. Village Master Plan, at POM0004828. [Ulman Aff. ¶ 23, Exhibit 17].

Response to Statement No. 73:

Admit.

Statement No.  74:

In 1997, an addendum to the Development Policies Plan, entitled "Village of Pomona Master Plan Update" was prepared.  Village Master Plan. [Ulman Aff. ¶ 23, Exhibit 17].

Response to Statement No. 74:

Admit.

Statement No.  75:

From 1974 to 1997, the population of the Village grew by at least 46%, and the amount of developed area in the Village increased by 42%.  Village Master Plan, at POM0004828. [Ulman Aff. ¶ 23, Exhibit 17].

Response to Statement No. 75:

Admit.

Statement No. 76:

When the Village updated its Master Plan in 1997, it called for a "policy to maintain the low-density residential character of the Village should remain unchanged. . . . Care should be taken that future development is designed so as to preserve open space and important natural features." Village Master Plan, at POM0004852. [Ulman Aff. ¶ 23, Exhibit 17].

Response to Statement No. 76:

Admit.

Statement No. 77:

The entire Village, including the Subject Property, is designated as an R-40 District, which requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of single-family residences.  (SAC ¶ 88); *See* VILLAGE CODE § 130-5. [Ulman Aff. ¶ 14, Exhibit 8].

Response to Statement No. 77:

Deny to the extent that the statement indicates that VILLAGE CODE § 130-5 limits properties to development of single family residences.  VILLAGE CODE § 130-5 indicates that it is designated as a "residential district."   As set forth in Plaintiffs' Response to Defendants' Statement of Material Facts No. 69, various other land uses, including "Educational Institutions" with

"Dormitories," are permitted either by right or by special permit.  Admit that VILLAGE CODE §
130-5 requires 40,000 square feet per lot for single family residences.

Statement No.  78:

Single-family residences, public utilities rights-of-way, libraries and museums, public parks and
playgrounds, and agricultural pursuits are all permitted uses as-of-right in the Village. VILLAGE
CODE, § 130-9; (Village Master Plan). [Ulman Aff. ¶¶ 15, 23, Exhibit 9, 17].

Response to 78:

Admit.

Statement No.  79:

The construction of educational institutions (with attendant dormitories), houses of worship[2]
and other stated uses are permitted by special use permit, some of which are under the
jurisdiction of the Board of Trustees and others under the jurisdiction of the Zoning Board of
Appeals.  See VILLAGE CODE §§ 130-10, 130-11. [Ulman Aff. ¶¶ 16-17, Exhibit 10-11].

Response to Statement No.  79:

Deny that all educational institutions, or all dormitories, are permitted by special use permit.
Unaccredited educational institutions, and dormitories that can house families, are prohibited
throughout the Village.  P. SOMF ¶¶ 580-581.  Admit that houses of worship are permitted by
special use permit.  Admit that certain special use permits are under the jurisdiction of the Board
of Trustees and others under the jurisdiction of the Zoning Board of Appeals.

Statement No. 80:

The Zoning Board of Appeals has authority to grant use or area variances to a property owner. *See* VILLAGE CODE § 130-28(D); New York State Village Law Section, § 7-712(b), *et seq.* [Ulman Aff. ¶¶ 18, 21, Exhibit 12, 15].

Response to Statement No. 80:

Admit that the while the Zoning Board of Appeals has the authority to grant certain variances for specific reasons, such authority is limited by local and State law. VILLAGE CODE § 130-28(D); New York State Village Law § 7-712-B. There is no § 7-712(b) in New York's Village Law. Furthermore, deny that the Zoning Board of Appeals can grant Tartikov variances to permit its use. VILLAGE CODE § 130-28(D); New York State Village Law § 7-712-B. The Village advised Tartikov that it could not receive a variance and the Village Attorney specifically told Tartikov's attorney in 2007 that "it would be wasteful for them to apply for a variance" and the Village has admitted that Tartikov "cannot meet" the standard for a variance. P. SOMF ¶ 626 ; Savad Dec. Ex. 290 at 153:9-25; Savad Dec. Ex. 313 at 94:13-16; Savad Dec. 2 Ex. 401; Savad Dec. 2 Ex. 402; Savad Dec. 2 Ex.403.

Statement No. 81:

A property owner may also petition to amend the zoning law or apply for a zone change should its use not be encompassed by a special use permit or be suitable for a variance. VILLAGE CODE §§ 130-35 - 130-45. [Ulman Aff. ¶ 19, Exhibit 13].

Response to Statement No. 81:

Admit that section 130-35 *et seq.* of the Village Code permits and regulates certain petitions for amendments to the Zoning map or Zoning chapter of the Village Code.  Deny that "a property owner may . . . apply for a zone change," as such application process does not exist within the Code.

Admit that while an applicant <u>may petition</u> to amend the zoning law, the Board of Trustees is not required to even consider the applicant's request.  Savad Dec. Ex. 15 at 927:18-23; Savad Ex. 314 (Code §130-38); P. SOMF ¶¶ 657, 662.


Statement No.  82:

Houses of worship have been approved by the Village as special permit uses after review to minimize the adverse effects of non-residential uses on the adjacent single family residential neighborhoods.  VILLAGE CODE § 130-10(G); (Village 30(b)(6) Dep., 939:8-940:23, July 18, 2014). [Ulman Aff. ¶ 16 Exhibit 10], [Gordon Aff. ¶ 19, Exhibit 14].


Response to Statement No.  82:

Admit.


Statement No.  83:

The Ladentown Church, Hindu Temple, and Zoroastrian Temple are uses of property in Pomona that have a principally religious use. (Village 30(b)(6) Dep., 30:22-33:25, July 15, 2014). [Gordon Aff. ¶ 16, Exhibit 11].


Response to Statement No. 83:

Admit that the Ladentown United Methodist Church, the Darbe Mehr Zoroastrian Temple and the Sri Ranganath Temple are religious uses of land in Pomona.

Statement No. 84:

The Village has opposed other high-intensity development. *Village of Pomona v. Zoning Board of Appeals of Town Haverstraw et. al*, Index No. 904/2013 (Alfieri, J.); *Village of Pomona v. Town of Haverstraw et. al*, Index No. 2205/2012) (Alfieri, J.). [Ulman Aff. ¶ 39].

Response to Statement No. 84:

Deny.  The Village has not opposed all other high-intensity development. Admit that the Village has opposed the development set forth in the above cited cases.  Deny that the opposition was solely because of the "intensity" of the proposed developments.  The Village regularly opposed Hasidic/Orthodox development, but did not oppose development by non-Hasidic/Orthodox entities which would have the same or similar land use effects as those that they opposed. P. SOMF ¶¶ 360-383; (Village 30(b)(6) Dep. 1022:9-1023:23, July 18, 2014). [Gordon Aff. ¶ 19, Exhibit 14].

Statement No. 85:

Local Law Number 1 of 2001, which relates to the definition, permitting and requirements for Educational Institutions, was adopted by the Board of Trustees on January 22, 2001. Village of Pomona, Board of Trustees Meeting Minutes, (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

Response to Statement No. 85:

Admit.

Statement No. 86:

Prior to 2001, educational institutions were permitted as-of-right throughout the Village. (Village 30(b)(6) Dep., 374:18-374:21, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No. 86:

Admit.


Statement No. 87:

New York case law permits and encourages educational use of land to be governed by special permit rather than as-of-right so the impact of high intensity use may be addressed by local governments. (Village 30(b)(6) Dep., 395:21-396:6, 397:20-398:6, July 16, 2014); *Cornell University v. Bagnardi*, 510 N.Y.S 2d 861 (N.Y. 1986). [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No. 87:

Object that the proposed statement is a legal conclusion and not appropriate for inclusion in Defendants' Rule 56.1 Statement.

Deny. The statement, which is a legal conclusion, misinterprets the New York Court of Appeals' decision in *Cornell University v. Bagnardi*, which holds that "the total exclusion of such institutions from a residential district serves no end that is reasonably related to the morals, health, welfare and safety of the community . . . ." 68 N.Y.2d 583, 594. The court recognized that one permissible means of balancing the interests of educational institutions and the ability of municipalities to regulate land use is through the special permit process, *id.* at 596, but did not state that it "encourage[d]" such means of regulation. The court also recognized that the

availability of a <u>variance</u> (*i.e.*, a showing of "special need") was not sufficient to satisfy the requirement that such uses not be excluded from residential districts. *Id.* at 596-97.

<u>Statement No.  88:</u>

Local Law 1 of 2001 amended § 130-4 of the Village Code by adding the definition of "Educational Institution," which was defined as "any school or other organization or institution conducting a regularly scheduled comprehensive curriculum of academic and/or alternative vocational instruction similar to that furnished by kindergartens, primary or secondary schools and operating under the Education Law of New York State, and licensed by the State of New York." Local Law 1 of 2001, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 7, 13, Exhibit 1, 7].

<u>Response to Statement No. 88:</u>

Admit.

<u>Statement No.  89:</u>

Local Law 1 of 2001 further amended § 130-10 of the Village Code by adding provisions to make Educational Institutions subject to special permit approval by the Board of Trustees and site plan approval by the planning board.  Local Law 1 of 2001 at § 4, *codified as* VILLAGE CODE § 130-10(F). [Ulman Aff. ¶¶ 7, 16, Exhibit 1, 10].

<u>Response to Statement No. 89:</u>

Admit.

Statement No. 90:

Local Law 1 of 2001 also added requirements and standards for granting a special use permit for an educational institution, including minimum net lot area, maximum development intensity, road frontage and access, setbacks and screening, parking, noise and exterior lightning, and public water and sewer. Local Law 1 of 2001 at § 4, *codified as* VILLAGE CODE § 130-10(F). [Ulman Aff. ¶¶ 7, 16, Exhibit 1, 10].


Response to Statement No. 90:

Admit.


Statement No. 91:

The need for Local Law 1 of 2001 was first identified by the Village's planning consultant, Mark A. Healey, AICP ("Mr. Healey" or "the Village planning consultant") of Frederick P. Clark Associates Inc. (Village 30(b)(6) Dep., 355:2-355:11, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No. 91:

Deny. There was no statement of "need" articulated for Local Law 1 of 2001 by the planning consultant. Gordon Ex 12 355:2-355:11


Statement No. 92:

In December 1999, Mr. Healey reviewed the zoning provisions of the Village Code in conjunction with an informal presentation by Yeshiva Spring Valley to the Village Planning Board regarding its plans to build a school in the Village on the Subject Property. Memorandum,

Frederick P. Clark Associates, Inc. (January 14, 2000); Memorandum, Frederick P. Clark Associates, Inc. (January 24, 2000). [Ulman Aff. ¶¶ 33-34, Exhibit 27-28].

Response to Statement No. 92:

Admit.

Statement No. 93:

As a result of this review, Mr. Healey noted that the Village's standards for the development of educational institutions were inadequate and out of date.  (Village 30(b)(6) Dep., 358:15-358:17; 374:12-374:17, July 16, 2014); Memorandum, Frederick P. Clark Associates, Inc. (January 14, 2000). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 33, Exhibit 27].

Response to Statement No. 93:

Deny.  Admit that Mr. Healey made certain statements regarding Yeshiva Spring Valley and zoning for schools, including stating that the zoning for schools "really stinks."  His statements regarding what could be built if the law was not changed specifically referenced what could be built by Yeshiva Spring Valley.  Deny that Defendants have presented evidence that the Village's standards for the development of educational institutions were "inadequate and out of date."  P. SOMF ¶¶ 121, 123.

Statement No. 94:

On January 24, 2000, Mr. Healey issued a memorandum to the Village's then mayor and Board of Trustees, in which he stated that the standards for the development of educational institutions were inadequate and out of date. (Village 30(b)(6) Dep., 358:15-358:17; 374:12-374:17, July 16,

2014); Memorandum, Frederick P. Clark Associates, Inc. (January 24, 2000). [Gordon Aff. ¶ 17 Exhibit 12]; [Ulman Aff. ¶ 34, Exhibit 28].

Response to Statement No. 94:

Admit that Mr. Healey issued a memorandum to the Mayor and Board of Trustees dated January 24, 2000. Deny that the memorandum stated that the standards are "out of date." Ulman Aff. Ex. 28. The memorandum actually stated in its "Subject" line that it is regarding the "Proposed Primary School and Pre-School (YSV Pomona) and the Village's Regulations Regarding Schools." *See* Ulman Aff. Ex. 28. The memorandum also stated that the Village Planning Board was approached by Yeshiva Spring Valley, that the current standards for schools are "rather scant" and stated that there is a need to "control the total/ future development of a school property." Ulman Aff. Ex. 28. There is no question that the memorandum was referring to Yeshiva Spring Valley, as Mr. Healey stated that the "**subject property** could theoretically be developed with over 800,000 square feet of floor space" (emphasis added). Ulman Aff. Ex. 28.

Statement No. 95:

The Healey memoranda to the Planning Board, Mayor, and Board of Trustees proposed a series of comprehensive and coordinated zoning amendments aimed at addressing the following issues: Modification of the lot area requirement for educational institutions; Restrictions on the maximum building coverage and maximum impervious surface coverage; Modification to the Village's off-street parking requirements for educational institutions; Modification of the zoning regulations to include signage requirements; and Amendment of the Village zoning to make educational institutions a special permit use, rather than as-of-right.

Memorandum, Frederick P. Clark Associates, Inc. (January 14, 2000); Memorandum, Frederick P. Clark Associates, Inc. (January 24, 2000). [Ulman Aff. ¶¶ 33-34, Exhibit 27-28].

Response to Statement No. 95:

Admit.

Statement No. 96:

On January 22, 2001, the Board of Trustees held a public hearing regarding proposed Local Law 1 of 2001. Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

Response to Statement No. 96:

Admit.

Statement No. 97:

No one from the public spoke at the January 22, 2001 public hearing regarding proposed Local Law 1 of 2001. Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

Response to Statement No. 97:

Admit.

Statement No. 98:

On January 22, 2001, the Board of Trustees adopted Local Law 1 of 2001.  Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2001). [Ulman Aff. ¶ 24, Exhibit 18].

Response to Statement No.  98:

Admit.

Statement No.  99:

The law was enacted because (1) the Board of Trustees wanted to have educational institutions as special permit uses rather than as of right, and (2) to set standards to reduce the impact of non-residential use on adjacent residential neighborhoods and properties.  (Village 30(b)(6) Dep., 350:14-351:2, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 99:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Deny.  See P. SOMF. ¶¶ 118-130; Plaintiffs' Response to Statement No. 93.  The "Whereas" clauses of Local Law No. 1 of 2001 stated "it has come to the attention of the Board of Trustees that the provisions of the Pomona Code relating to the standards for the development of Educational Institutions within the Village are inadequate" and "the Board of Trustees has consulted with the planning consultants for the Village and has reviewed various standards imposed by the State of New York and otherwise."  Savad Dec. Ex. 152.  The Board did not state in the Whereas clause or in the meeting in which they passed the law that the purpose was to set standards to reduce the impact of non-residential use on adjacent residential neighborhoods and properties.  Savad Decl. Ex. 152; Gordon Aff. E. 12.  Rather, the Board's motivation for passing

Local Law No. 1 of 2001 was to keep Yeshiva Spring Valley from being able to move forward with its proposed plans. The memorandum from the Village's planners stated that the recommended law related to Yeshiva Spring Valley and their concern that Yeshiva Spring Valley could "be developed with over 800,000 square feet of floor space." *See* Plaintiffs' Response to Defendants' Statement of Fact No. 94, above. When discussing proposed Local Law No. 1 of 2001, Mayor Marshall said "[t]his thing's going to come in. They're going to come in and we're going to be caught with our pants down if we don't move. That's why I want to make sure that we're moving ahead. If you miss a meeting, no problem, you're going to be involved in the discussion anyway." P. SOMF. ¶ 126. The Village has produced no evidence showing that it even conducted a SEQRA review in conjunction with Local Law No. 1 of 2001. P. SOMF. ¶ 127.


Statement No.  100:

The impact on adjacent residential neighborhoods and properties that the law sought to reduce included traffic, water runoff, water quality, noise, air pollution, destruction of wildlife and plant life, water usage, the sanitary sewer system, and community character. (Village 30(b)(6) Dep., 389:16-397:19, July 16, 2104); (Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories at ¶ 4, December 11, 2013). [Gordon Aff. ¶¶ 17, 21, Exhibit 12, 16].


Response to Statement No. 100:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Deny.  *See* Responses to Statement Nos. 91, 93, 94, 99.  Furthermore, a law cannot "seek" to

reduce anything; and nothing in the text of Local Law No. 1 of 2001 reduces "traffic," "water

runoff," "water quality," "noise," "air pollution," "destruction of wildlife and plant life," "water

usage," "the sanitary sewer system," and "community character."  Furthermore, Local Law No. 1

of 2001 was not meant to reduce such impacts, does not reduce such impacts, and is not

necessary to reduce such impacts.  P. SOMF  ¶¶ 752, 754, 780-789, 792-794, 796-801, 806-07,

813-818, 820-822, 825-826, 828-831, 856-858, 860-864, 866, 868-877,[3] 898-908, 911-914, 917,

923-933, 935-939, 945-952, 955-957, 958-960, 962-966, 972-979, 988-997.


Statement No.  101:

The inadequate standards the law sought to clarify included:

a.      The five acre gross area minimum lot size was not enough to protect adjacent
neighborhood and properties;

b.      The minimum setback of 125 feet gave more space between the development property and
property lines;

c.      Minimum frontage of 250 feet was necessary for sufficient area, particularly at the front of
the property, when developing non-residential use; and

d.      Clarified whether or not educational uses were to be permitted on small subdivision streets

as opposed to state or county roads.

(Village 30(b)(6) Dep., 375:20-382:21, July 16, 2014).  [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No. 101:

---

[3] Local Law No. 1 of 2007 was inadvertently referred to as "Local Law No. 7 of 2007" in Plaintiffs' Statement Nos.
876 and 877.

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Deny. A law cannot "seek" to clarify anything. Admit that Local Law No. 1 of 2001 amended the Village Code to require a net lot area of 10 acres for educational institutions, created setback and frontage requirements, and required access to a state or county highway.


Statement No. 102:

Although Mr. Healey's suggestion to amend the Village Code with regard to the standards for schools was first voiced during a discussion related to Yeshiva Spring Valley, Yeshiva Spring Valley was never told that they would have to wait to file their application pending the adoption of a new law. Memorandum, Frederick P. Clark Associates, Inc. (January 14, 2000); Memorandum, Frederick P. Clark Associates, Inc. (January 24, 2000); (Village 30(b)(6) Dep., 125:4-128:20, July 15, 2014). [Ulman Aff. ¶¶ 33-34, Exhibit 27-28]; [Gordon Aff. ¶ 16, Exhibit 11].


Response to Statement No. 102:

Deny. Rabbi Fromowitz, the executive director of Yeshiva Spring Valley stated that during the time-frame between the December, 1999 informal appearance and the passage of Local Law No. 1 of 2001 in January, 2001, the Village delayed and obstructed Yeshiva Spring Valley's application's until the new law could be passed. P. SOMF. ¶ 125.


Statement No. 103:

The Village testified through its counsel that, had Yeshiva Spring Valley filed an application and had site plan been approved prior to January 22, 2001, the previous law, not Local Law 1 of

2001, would have applied to it.  (Village 30(b)(6), 363:14-363:23, July 16, 2014); (Fromowitz, Nathan, 49:23-56:21, June 25, 2014). [Gordon Aff. ¶¶ 9, 17, Exhibit 4, 12].

Response to Statement No. 103:

Object that the proposed statement is a legal conclusion and not appropriate for inclusion in Defendants' Rule 56.1 Statement.

Admit that Village counsel made such statement.  Deny that such statement is true.  Under New York law, a property owner will not be permitted to complete a structure or a development that an amendment has rendered nonconforming unless the owner has undertaken substantial construction and made substantial expenditures prior to the effective date of the amendment. *See Matter of Ellington Construction Corp. v. Zoning Board of Appeals of the Incorporated Village of New Hempstead*, 77 N.Y.2d 114 (1990). See also Matter of Vecce v. Town of Babylon, 32 A.D.3d 1038 (2d Dept. 2006).  Rabbi Fromowitz stated that the Village delayed and obstructed Yeshiva Spring Valley's application's until the new law could be passed.  P. SOMF ¶ 125.  The Village attempted to get the law passed quickly so that they wouldn't be "caught with [their] pants down." P. SOMF ¶ 126.

Statement No.  104:

However, Yeshiva Spring Valley did not file an application until sometime around June 2001, then subsequently did not submit the environmental studies required for New York State Environmental Quality Review Act ("SEQRA") determination.  The application filed in June 2001 was for a 25-lot single-family residential development and a Yeshiva, rather than the primary school and preschool Yeshiva Spring Valley had previously considered.  (Village 30(b)(6), 133:23-139:5, July 15, 2014); (Village 30(b)(6), 366:22-367:2, July 16, 2014);

<u>Memorandum</u>, Frederick P. Clark Associates, Inc. (January 24, 2000). [Gordon Aff. ¶ 16-17 Exhibit 11-12]; [Ulman Aff. ¶ 34, Exhibit 28].

<u>Response to Statement No. 104:</u>

Admit that Yeshiva Spring Valley did not file an application until sometime in June 2001; and admits that the application was for a subdivision of 25 residential parcels rather than the primary school and preschool Yeshiva Spring Valley had originally proposed at the December 15, 1999 informal appearance at the Village Planning Board; but further answers that the reason for this delay and change was because the Village had given the message to YSV that it would not accept application until the laws regarding schools were re-written.  Savad Dec. Ex. 33 at 45:11-48:4; and these fears were confirmed because the Village delayed any action on Yeshiva Spring Valley's original plans for a religious school until passage of Local Law No. 1 of 2001; Savad Dec. Ex. 33 at 55:13-56:25.

<u>Statement No. 105:</u>

Local Law Number 5 of 2004, which amended the definition of educational institutions, added provisions for dormitories, and amended minimum lot areas, frontage and access requirements and set backs, was adopted on September 27, 2004.        <u>Village of Pomona, Board of Trustees Meeting Minutes</u> (September 27, 2004). [Ulman Aff. ¶ 27 Exhibit 21].

<u>Response to Statement No. 105:</u>

Admit.

<u>Statement No. 106:</u>

Current Village Counsel, Doris Ulman ("Ms. Ulman" or "Village Counsel"), was appointed in July 2003. (Village 30(b)(6) Dep., 303:20-303:21, July 16, 2014).[3] [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 106:

Admit

Statement No. 107:

As newly-appointed Village Counsel, in 2003 Ms. Ulman began to review the Village laws. She noted pre-existing laws that could be improved, or where there were deficiencies or inaccuracies in the laws and recommended amendments to the Board of Trustees. This review resulted in the adoption of 9 local laws in 2003, 8 local laws in 2004, and 5 local laws in 2005. (Village 30(b)(6) Dep., 399:23-400:7, July 16, 2014); (Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories at ¶ 7, December 11, 2013). [Gordon Aff. ¶¶ 17, 21, Exhibit 12, 16].

Response to Statement No. 107:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Admit that Ms. Ulman began reviewing the Village laws in 2003. Admit that Defendants have made such statements. Deny that Ms. Ulman's review was the sole motivation in adopting the cited local laws. P. SOMF. ¶¶ 131-144

Statement No. 108:

Prior to 2004, dormitories were not permitted as accessory uses to educational institutions in the Village. (Village 30(b)(6), 404:15-404:18, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 108:

Deny that dormitories were not permitted uses within the Village prior to 2004, as New York State law required that such uses be permitted.  P. SOMF. ¶ 132.  Deny that dormitory uses are "accessory" to educational institutions; rather they are part of the principal use.  P. SOMF. ¶ 845. Admit that the Village Code did not explicitly state that dormitories were permitted prior to the passage of Local Law No. 5 of 2004.

Statement No. 109:

Ms. Ulman examined the existing law and recommended amendments to the law that would enhance the ability of an applicant to build a school.  (Village 30(b)(6) Dep., 401:12-401:20, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 109:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath; and further object to the word "enhance" as vague and ambiguous and thus Plaintiffs are unable to assess the accuracy of this statement.

Admit that Ms. Ulman recommended amendments.  Deny that the amendments enhanced the ability of an applicant to build a school.  While caselaw prohibited the Village from prohibiting dormitories, Local Law No. 5 of 2004 was more restrictive in that it prohibited dormitories for

married students and their families, prohibited dormitories with housekeeping facilities, and prohibited non-accredited educational institutions.  P. SOMF. ¶ 132.

Statement No.  110:

The amendments recommended by Ms. Ulman were aimed at addressing the following issues:

a.       Removal of the half-acre requirement for each student so that the minimum lot area required for an educational institution is substantially reduced to 10 acres net lot area;

b.       Addition of the provision allowing dormitories, as prior to 2004 dormitories were not permitted as accessory uses to schools in the Village of Pomona;

c.       Clarification of the definition of "educational institution" and removal of the definition of school so that there was only one definition relating to the same use;

d.       Removal of the requirement that an educational institution be located on a state or county road; and

e.       Tightening and clarifying language in general.

 (Village 30(b)(6) Dep., 401:21-406:9, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 110:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony.

Admit that Local Law No. 5 of 2004 amended the Village Code with respect to the minimum lot area, dormitories, definitions of "educational institution" and "school," frontage on a state or county road, and amended the language of such provisions in general.  Deny that prior to 2004, dormitories were not permitted or that dormitories are an "accessory" use.  *See* response to

Statement No. 108.  Deny that these are the only issues addressed by passing Local Law No. 5 of 2004.  P. SOMF. ¶¶ 131-144.

Statement No.  111:

These amendments, as well as potential revisions to the Village fence and sign law, were discussed by the Board of Trustees in the summer of 2004.  Village of Pomona, Board of Trustees Meeting Minutes (August 23, 2004). [Ulman Aff. ¶ 25, Exhibit 19].

Response to Statement No. 111:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony.

Deny.  See Ulman Exhibit 19.

Statement No.  112:

On September 7, 2004, Ms. Ulman presented the Board of Trustees with a memorandum regarding the proposed amendments to the zoning law in relation to schools.  Memorandum Proposed Amendment to Zoning Law in Relation to Schools (September 7, 2004); Village of Pomona, Board of Trustees Meeting Minutes (September 7, 2004). [Ulman Aff. ¶¶ 26, 35, Exhibit 20, 29].

Response to Statement No. 112:

Admit.

Statement No.  113:

The memorandum proposed a series of amendments to the zoning law in relation to schools and dormitories aimed at addressing the issues noted in Paragraph 110 (a)-107(sic)(e).  Memorandum Proposed Amendment to Zoning Law in Relation to Schools (September 7, 2004). [Ulman Aff. ¶ 35, Exhibit 29].


Response to Statement No.  113:

Admit that the September 7, 2004 memorandum speaks about issues listed in Paragraph 110(a)-(e).  Deny that the amendments were proposed to address these issues.  The Village Attorney stated at the public hearing that the law "strengthens the Village's **control** over the development of schools" (emphasis added).  P. SOMF. ¶ 144.  Local Law No. 5 of 2004 was adopted in order to target Hasidic/Orthodox Jews and prevent land use by such individuals. P. SOMF. ¶¶ 131-144. See Response to Statement No. 123.


Statement No.  114:

On September 27, 2004, the Board of Trustees held a public hearing regarding proposed Local Law 5 of 2004.  Village of Pomona, Board of Trustees Meeting Minutes (September 27, 2004). [Ulman Aff. ¶ 27, Exhibit 21].


Response to Statement No. 114:

Admit.


Statement No.  115:

Only one Village resident spoke at the September 27, 2004 public hearing regarding proposed Local Law 5 of 2004. Village of Pomona, Board of Trustees Meeting Minutes (September 27, 2004). [Ulman Aff. ¶ 27, Exhibit 21].

Response to Statement No. 115:

Admit.

Statement No. 116:

On September 27, 2004, the Board of Trustees adopted Local Law 5 of 2004. Village of Pomona, Board of Trustees Meeting Minutes (September 27, 2004). [Ulman Aff. ¶ 27, Exhibit 21].

Response to Statement No. 116:

Admit.

Statement No. 117:

Local Law 5 of 2004 states in relevant part: "A dormitory building is permitted as an accessory use to an educational use provided it is located on the same lot as the educational use and there shall be not more than one dormitory building on the lot." Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-4(F). [Ulman Aff. ¶¶ 8, 13, Exhibit 2, 7].

Response to Statement No. 117:

Admit that Local Law No. 5 of 2004 includes such sentence, among many others. Deny that such sentence is the "relevant part" of the law. The law is 4 pages long and contains many provisions relevant to this lawsuit. Ulman Aff. Ex. 2.

<u>Statement No. 118:</u>

The definition of dormitory included the provision:  "Single-family, two-family and/or multifamily dwelling units other than as described above shall not be considered to be dormitories or part of dormitories."  Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 8, 13, Exhibit 2, 7].

<u>Response to Statement No.118:</u>
Admit.

<u>Statement No.  119:</u>

Dormitories were also required to be on the same lot as the primary educational use and there could be no more than one dormitory building on the lot. Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-10. [Ulman Aff. ¶¶ 8, 16, Exhibit 2, 10].

<u>Response to Statement No.119:</u>
Admit.

<u>Statement No.  120:</u>

The definition of dormitory contained in Local Law 5 of 2004 was modeled after the Town of Ramapo's definition and is nearly identical.  (Village 30(b)(6) Dep., 301:13-301:17, 303:5-303:8, July 16, 2014); (Revised Code of the Town of Ramapo, Ch. 376). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 38, Exhibit 32].

Response to Statement No.120:

Object as vague and ambiguous as to the meaning of "modeled" and "nearly identical" and Plaintiffs are thus unable to assess the accuracy of this statement.

Subject to and without in any way waiving the foregoing objection, deny.  In addition to Ramapo's general dormitory definition, Ramapo's code also provides for Adult Student Housing, the definition of which is "Housing designated to be used only for adult married students, faculty, spouses and minor children while the adult student is pursuing full-time postsecondary education at an educational institution."  Pomona's code does not include such provision. Savad Dec. 2 Ex. 405.  During the same time-period during which Pomona adopted Local Law No. 5 of 2004, Pomona actively opposed Ramapo's Adult Student Housing laws, which Village officials, employees and residents knew was to be used by Orthodox/Hasidic students.  P. SOMF. ¶¶ 360-373.


Statement No.  121:

It was also similar to the definition of dormitory used by the Village of Chestnut Ridge, as testified to by Village Counsel.  (Village 30(b)(6) Dep., 301:19-301:20, July 16, 2014); (Chestnut Ridge Definition of Dormitory, pg. XVIII-10). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 37, Exhibit 31].


Response to Statement No. 121:

Object as vague and ambiguous as to the meaning of "similar" and Plaintiffs are thus unable to assess the accuracy of this statement.

Subject to and without in any way waiving the foregoing objection, admit that the Village's definition of "dormitory" has some similarities to the dormitory law of the Village of Chestnut

Ridge, which previously employed Doris Ulman as its Village Attorney, and which joined Pomona in its lawsuit against the Town of Ramapo to prevent Orthodox/Hasidic educational uses. The Chestnut Ridge does not impose any percentage limitations, as the Pomona law does. Savad Ex. 23 at 7:17-9:25; *Vill. of Chestnut Ridge v. Town of Ramapo*, 45 A.D.3d 74, 78 (2d Dept. 2007).

Statement No. 122:

The definition of educational institution was also amended to require that educational institutions be "accredited by the New York State Education Department or similar recognized accrediting agency." Local Law 5 of 2004, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 8, 13, Exhibit 2, 7].

Response to Statement No. 122:

Admit.

Statement No. 123:

The Law was enacted in part to reduce the impact of non-residential use on adjacent residential neighborhood and properties. The impact on adjacent residential neighborhood and properties that the law sought to reduce included traffic, water runoff, water quality, noise, air pollution, destruction of wildlife and plant life, water usage, the sanitary sewer system, and community character. Village Counsel testified "[w]e don't distinguish between one resident and another. The protection of all of these facilities, of all of these elements are for everybody." (Village 30(b)(6) Dep., 389:9-397:19, July 16, 2014); (Defendants' Amended Responses to Certain of

Plaintiffs' Second Set of Interrogatories at ¶ 6, December 11, 2013). [Gordon Aff. ¶¶ 17, 21, Exhibit 12, 16].

Response to Statement No. 123:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony.

Deny the first sentence of the Statement.  When asked by a member of the public at the public hearing why the law was being proposed, the Village Attorney stated that the law "strengthens the Village's **control** over the development of schools" (emphasis added).  P. SOMF. ¶ 144.  The law was passed in response to concerns that the Subject Property would be developed by an Orthodox/Hasidic institution with Adult Student Housing and because of the Village's opposition to Ramapo's Adult Student Housing laws, which accommodate the religious exercise of Orthodox/Hasidic Jews.  P. SOMF. ¶¶ 131-144.

Object as vague and ambiguous as to the meaning of "sought" and Plaintiffs are thus unable to assess the accuracy of this statement.

Subject to and without in any way waiving the foregoing objection, deny the second sentence of the Statement, as a law cannot "seek" to reduce anything; and nothing in the text of Local Law No. 5 of 2004 reduces "traffic," "water runoff," "water quality," "noise," "air pollution," "destruction of wildlife and plant life," "water usage," "the sanitary sewer system," and "community character."  Furthermore, Local Law No. 5 of 2004 was not meant to reduce such impacts, does not reduce such impacts, and is not necessary to reduce such impacts.  P. SOMF ¶¶ 752, 754, 756-760, 762-777, 780-789, 792-794, 796-803, 806-07, 813-818, 820-822, 823, 825-826, 828-831, 856-858, 860-864, 866, 868-877, 878-883, 887-888, 898-908, 911-914, 915-916, 917, 923-933, 935-939, 940-942, 945-952, 955-957, 958-960, 962-966, 968-970, 972-979,

982-985, 988-997.  Admit the third sentence of the Statement, that Village Counsel made such

statement at her deposition.

Statement No.  124:

The dormitory portion of Local Law 5 of 2004 was enacted in response to requirements in case

law, including but not limited to *Congregation Mischknois Lavier Yakov Inc. v. Board of*

*Trustees of Village of Airmont*, *Diocese of Rochester v. Planning Board of the Village of*

*Brighton*, and *Cornell University v. Bagnardi.*  In Village Counsel's opinion, the *Village of*

*Airmont* case, which was filed in 2002, indicated that dormitories could not be prohibited in

relation to an educational use.  Additionally, *Bagnardi* discussed the special status afforded to

educational institutions in land use cases and set forth the factors to be considered by local

governments when reviewing applications for such uses.  (Village 30(b)(6) Dep., 430:14-435:18,

July 16, 2014); *Congregation Mischknois Lavier Yakov Inc. v. Board of Trustees of Village of*

*Airmont, 7:*02-cv-05642-SCR (S.D.N.Y. filed July 19, 2002); *Cornell University v. Bagnardi*,

510 N.Y.S 2d 861 (N.Y. 1986); *Diocese of Rochester v. Planning Board of the Village of*

*Brighton*, 154 N.Y.S 2d 849 (N.Y. 1956). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No.124:

Object that Defendants fail to proffer support for the first sentence of the statement other than the

Village Attorney's uncorroborated testimony.

Object that the third sentence of the statement contains a statement of law inappropriate to a

Local Rule 56.1 statement.

Deny the first sentence of the Statement.  Local Law No. 5 of 2004 was passed in response to

concerns that the Subject Property would be developed by an Orthodox/Hasidic institution with

Adult Student Housing and because of the Village's opposition to Ramapo's Adult Student Housing laws, which accommodate the religious exercise of Hasidic Jews.  P. SOMF. ¶¶ 131-144.  Deny that the cases cited by Defendants required Defendants to adopt a dormitory law which prohibit family housing and housekeeping facilities.  *See* cases cited.

Admit the second sentence of the Statement.

Admit that *Bagnardi* "discussed the special status afforded to educational institutions in land use cases."  Deny that *Bagnardi* "set forth the factors to be considered by local governments when reviewing applications for such uses."  The Court of Appeals did not set forth a specific legal standard that must be followed in reviewing such applications, but rather determined that the "possible ill effects their proposed uses may have on the surrounding area may be taken into account."  *Cornell University v. Bagnardi*, 510 N.Y.S 2d 861 (N.Y. 1986).


Statement No.  125:

Ms. Ulman's review of the aforementioned cases brought to light an issue with the pre-existing Village Code, which required an educational institution to have a minimum net lot area of ten acres plus a half-acre per student.  Village Counsel was of the opinion that the "per student" requirement in the then-existing Code provision would not be permitted under *Bagnardi* because student population is not considered to be a zoning or land use issue.  Thus, the law was changed to comply with these case requirements.  This change was important to the Village because it prevented the entire educational institution requirement from being declared unconstitutional. (Village 30(b)(6) Dep., 434:22-435:18, July 16, 2014); *Cornell University v. Bagnardi*, 510 N.Y.S 2d 861 (N.Y. 1986). [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No. 125:

Deny the first, third, and fourth sentences of the Statement.  See objections and responses to Statement Nos. 113, 123-124.

Admit the second sentence of the Statement.

Statement No.  126:

The accreditation portion of Local Law 5 of 2004 was added to create a distinction between an educational institution bearing the special status, required by the New York State Court of Appeals, and a commercial-type educational use, such as an automotive school which is not protected by the special status standard.  Due to its residential character, the Village preferred to avoid commercial-type educational land use in Pomona. (Village 30(b)(6) Dep., 418:8-421:25, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No.  126:

Object as vague and ambiguous as to the meaning of "special status" and "special status standard" and Plaintiffs are thus unable to assess the accuracy of this statement.

Deny the first sentence of the Statement.  See objections and responses to Statement Nos. 113, 123-124.  There is no distinction, and Defendants have not provided any evidence that the New York State Court of Appeals has created a distinction between the status to be afforded to accredited educational institutions and the status to be afforded to unaccredited educational institutions.  *Cornell University v. Bagnardi*, 510 N.Y.S 2d 861 (N.Y. 1986).  Furthermore, a commercial automotive school (and other "commercial" types of educational institutions) can be accredited and is therefore permitted by Pomona's law.  P. SOMF. ¶ 692.  However, a non-commercial unaccredited rabbinical school is not permitted by Pomona's law.  P. SOMF. ¶¶ 580-581.

Admit that the Village Attorney has stated that it preferred to avoid commercial-type land use in Pomona.

Statement No. 127:

Twenty eight other municipalities in the state of New York have similar accreditation requirements. Seven municipalities specifically require that institutions of higher education be accredited. Sixteen municipalities limit education use to public and/or private accredited schools. Five zoning ordinance provisions limit such education use to accredited elementary and/or secondary schools. (*See* Green, Preston, Expert Witness Report in Congregation Rabbinical College of Tartikov, Inc. et al. v. Village of Pomona, pp. 12-16 (May 14, 2014)). [Gordon Aff. ¶ 20, Exhibit 15].

Response to Statement No. 127:

Object to the use of Prof. Green's report as inadmissible hearsay. *See Cornell Research Foundation, Inc. v. Hewlett–Packard Co.,* 2007 WL 4349135, at *19 (N.D.N.Y. Jan. 31, 2007) (stating that "the greater weight of authority" supports the argument that unsworn expert reports constitute inadmissible hearsay and "thus are not worthy of consideration on motion for summary judgment").

Plaintiffs further object to the use of Prof. Green's report as its conclusions and methodology are unreliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). While Prof. Green provided examples within the cited Town and Village codes for specific educational uses in specific zoning districts that had an accreditation requirement, he failed to state that some non-accredited educational institutions are permitted in such jurisdictions (see below). This approach does not provide a reliable basis for Prof. Green's conclusions that the

cited zoning ordinance provisions "limit educational use to 'accredited educational institutions,' .
. . require that institutions of higher education be accredited,' 'limit educational use to public
and/or private accredited schools,' [or] 'limit such educational use to accredited elementary,
and/or secondary schools,'" and that "Pomona is far from alone in limiting educational use to
accredited educational institutions." Gordon Aff. Exh. 15 at 12, 16.

**Deny**. Each of the four sentences in the Statement is false. Nearly all of the municipalities listed
in Defendants' brief and Green's report permit non-accredited educational institutions (see
below).[4] P. SOMF. ¶ 771. Furthermore the statement "[t]wenty eight other municipalities in the
state of New York have similar accreditation requirements" is false, as several of the
jurisdictions are listed more than once in the various categories of Green's report (*e.g.*, Hamburg,
Scottsville, Williamsville). Gordon Aff. Exh. 15 at 12-16.

- Colden, N.Y. permits a "Trade or Industrial School" without any accreditation
  requirement within its R-RB Residential and C Commercial districts, respectively.
  Colton, N.Y., Code §§ 108-28(A)(23), 108-44(A)(23), attached as Savad Dec. 2 Ex. 335.

- Evans, N.Y. permits colleges and universities, theological schools, technical schools, and
  private and parochial schools in its Public Facilities district and Rural Residential district
  without any accreditation requirement. Evans, N.Y., Code §§ 200-18(B)(1)(d), (h),
  (2)(b), 200-9(B)(1)(g),(2)(1), attached as Savad Dec. 2 Exs. 336, 337.

- Hamlin, N.Y. permits "commercial schools such as barber, beauty, art of dancing
  schools, driver education schools and similar uses" without any accreditation requirement
  within its Commercial/General Business districts subject to site plan approval. Hamlin,
  N.Y., Code § 520-19(A)(2)(m), attached as Savad Dec. 2 Ex. 338.

---

[4] The entire text of the codes referenced below are available on the www.ecode360.com website.

- Orangeburg, N.Y. permits a "School of special instruction – A school for the teaching of technical skills, trades or arts and the physically, but not mentally handicapped" within its CO/CS/R-80 Districts without any accreditation requirement and "Trade schools and other schools of special instruction" are permitted by right without any accreditation requirement.  Orangetown, N.Y., Code §§ 11.2, Table of General Use Regulations § 3.11, attached as Savad Dec. 2 Exs. 340-343.

- Mastic Beach, N.Y. permits "Schools: private, public, parochial, business and professional" without any accreditation requirement in its B-2 Business District.  Mastic Beach, N.Y., Code § 530-3-1.6(A)(8), attached as Savad Dec. 2 Ex. 344.

- Patchogue, N.Y. permits "Schools: private, public, parochial, business and professional," without any accreditation requirement in its D3 Business District.  Patchogue, N.Y. Code § 435-22(A)(1)(b), attached as Savad Dec. 2 Ex. 345.

- Concord, N.Y. permits a "[t]rade or industrial school, provided that such activity is conducted wholly within an enclosed building" without any accreditation requirement in its R-RB Residence-Restricted Business and C-1 Local Retail Business Districts.  Concord, N.Y., Code §§ 150-54(A)(24), 150-73(A)(25), attached as Savad Dec. 2 Exs. 346, 347.

- East Rochester, N.Y. permits unaccredited "Specialized trade, professional or business schools" without any accreditation requirement and "[p]ublic and semipublic uses, such as but not limited to the following: . . . [s]chool or college" without any accreditation requirement in its LC, C/I districts and the latter in its GC district.  East Rochester, N.Y., Code §§ 193-56(B)(3), 193-56(E)(4)(6), 193-57(C)(6)(b), attached as Savad Dec. 2 Ex. 348.

- Gates, N.Y. permits "[n]onprofit private schools" without any accreditation requirement in its MR Multiple Residence District, "nonprofit schools" without any accreditation requirement in its BN-R Business, Nonretail District, and "[c]ommercial schools, such as barber, beauty, art and dancing studios and similar uses" without any accreditation requirement in its GB General Business District.  Gates, N.Y., Code §§ 190-141(B), 190-101(C), 190-126(G) attached as Savad Dec. 2 Ex. 349, 362-363.

- Greenburgh, N.Y. permits, without any accreditation requirement, the following uses: "[i]nstitutions for higher learning, including colleges, universities, junior colleges, technical schools, seminaries and convents, along with accompanying service and administration buildings, dormitories, fraternity and sorority houses and customary indoor and outdoor recreation facilities, such as playfields, gymnasiums and stadiums, . . . ." in its Office Building (OB) District; "[a]rt, business or vocational schools, excluding dancing, music and instrumental music schools" in its Limited Office Building (LOB) District; "[e]ducational institutions, to include only facilities of higher education such as postsecondary, business, beauty, or computer schools, dance or music schools, etc., are allowed as commercial uses and regulated as such" in its Hartsdale Center (HC) District; "Business or vocational schools" in its Intermediate Business (IB), Light Industrial (LI), and PD Nonresidential Planned Development (PD) districts. Greenburgh, N.Y., Code §§ 285-25(A)(2)(d) (OB), 285-27(A)(1)(f) (LOB), 285-29.2(B)(2)(e) (HC), 285-31(A)(1)(d) (IB), 285-32(A)(1)(h) (LI), 285-34(B)(2)(a)(10) (PD), attached as Savad Dec. 2 Ex. 350.

- Halfmoon, N.Y. permits schools as of right in its C-I Commercial District and further defines "schools" as "A building or part thereof utilized for training, instruction and learning, including but not limited to a school, seminary, college, university, or other

74

educational establishment, regardless of whether operated for profit, <u>whether or not licensed through the New York State Education Department</u>."  Halfmoon, N.Y., Code §§ 165-14(A)(23), 165-5 (emphasis added), attached as Savad Dec. 2 Exs. 351-352.

- Hamburg, N.Y. permits "colleges and universities" without any accreditation requirement within its R-3 Multifamily district, and unaccredited "[a]rt, dance, music schools . . . ." within the NC Neighborhood Commercial General Residence district.  Hamburg, N.Y., Code §§ 280-45(A)(6) (R-3), 280-60(A)(6) (NC), attached as Savad Dec. 2 Exs. 353-354.

- Johnstown, N.Y. permits "place[s] of . . . religious education," without any accreditation requirement in its R-2 Residence district.  Johnstown, N.Y., Code § 84-8(B)(2), attached as Savad Dec. 2 Ex. 355.

- Naples, N.Y. permits: "A combined use of the permitted uses of agricultural activity, single-family dwelling, two-family dwelling, bed-and-breakfast up to two rooms, municipal structures or municipal park, together with a semi-public special use of a church or other religious facility, cemetery, private school, college or other educational activity, medical care facility, charitable use facility or philanthropic use facility," without any accreditation requirement.  Naples, N.Y., Code § 132-17(D)(14), attached as Savad Dec. 2 Ex. 356.

- Scottsville, N.Y. permits within its Residence Districts a "seminary" by right, and a "[c]ollege, university" by special exception, both without any accreditation requirement.  Scottsville, N.Y., 170a Table of Use Regulations for Residential Districts, attached as Savad Dec. 2 Ex. 357.

- Westfield, N.Y. permits schools within its Residential-Agricultural district without any accreditation requirement. Westfield, N.Y., Code § 185-24(J)(19), attached as Savad Dec. 2 Ex. 358.

- Williamsville, N.Y. broadly defines "school" and permits schools within the C-1, C-2, C-3 and MU districts without any accreditation requirement. Williamsville, N.Y., Code §§ 112-17(A)(1)(k), 112-18(A)(1)(a), 112-19(A)(1)(a), 112-16A(6)(b)(27), attached as Savad Dec. 2 Exs. 359, 360.

- Irondequoit, N.Y. permits "Municipally owned and/or operated buildings or structures and other strictly governmental uses and activities, including, but not limited to, schools," without any stated accreditation requirement in its Open Space (OS) District, and "[e]ducation, learning and training centers and/or uses" within its Tourism and Resort Redevelopment district, with no accreditation requirement. Irondequoit, N.Y., Code §§ 235 Attachment 5, 235-59(A)(2), attached as Savad Dec. 2 Exs. 339, 361.

## Statement No. 128:

There were also, in the opinion of Village Counsel, inconsistencies and vagueness issues in the pre-existing Zoning Code that the Local Law sought to clarify. Village Counsel testified that the old definition of "school" required that an educational land use be approved by the New York State Board of Regents or the New York State Education Department. Conversely, the definition of "educational institution" required that it be duly licensed by the State of New York. The accreditation requirement replaced the previous licensing requirement and the requirement for approval by the New York State Board of Regents or New York State Education Department in an effort to make it easier and clear for applicants, as well as Village officials, to understand

Zoning requirements. (Village 30(b)(6) Dep., 416:25-418:24, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No. 128:

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement.

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony.

Deny the first sentence of the Statement. See objections and responses to Statement Nos. 113, 123-124.

Admit the second sentence of the Statement, that Village Counsel so testified.

Admit the third sentence of the Statement.

Admit that the accreditation requirement replaced the previous requirements.

Deny the fourth sentence of the Statement. The language of the new requirement is no easier to understand than the previous provision.


Statement No. 129:

Local Law Number 1 of 2007, addressing errors, inconsistencies and vagueness issues in relation to previously enacted educational institution and dormitory laws, was adopted on January 22, 2007. Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-4, 130-10; Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2007). [Ulman Aff. ¶¶ 9, 13, 16, 29, Exhibit 3, 7, 10, 23].


Response to Statement No. 129:

Admit that Local Law No. 1 of 2007 was adopted on January 22, 2007. Deny that the purpose or effect of adopting the laws was to address errors, inconsistencies and vagueness issues. P. SOMF. ¶¶ 145-172, 842-854; Local Law 1 of 2007. The purpose of Local Law No. 1 of 2007 was to prevent the subject property from being developed by Hasidic Jews as an educational institution. P. SOMF. ¶¶ 145-172; 192-317; 322-443. The effect of Local Law No. 1 of 2007 is to prohibit any such educational institution in the Village of Pomona. P. SOMF. ¶¶ 651-654. Local Law No. 1 of 2007 continues to use both terms "educational institution" and "school". Ulman Aff. ¶¶ 9, 13, Exhibit 3, 7.

Statement No. 130:

As Village Counsel, Ms. Ulman continued on a regular basis to review the Village laws and made recommendations to the Board of Trustees on amendments where she believed the laws could be improved, or where there were deficiencies or inaccuracies in pre-existing laws. (Village 30(b)(6) Dep., 399:23-400:7, July 16, 2014); Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, 4:14-4:21 (January 22, 2007). [Gordon Aff. ¶¶ 17, 22, Exhibit 12, 17].

Response to Statement No. 130:

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement. Object as vague and ambiguous as to the meaning of "deficiencies" and Plaintiffs are thus unable to assess the accuracy of this statement.

Admit that the Village Attorney reviewed Village laws for the purpose of creating recommendations regarding amendments to such laws. Gordon Aff Exs. 12 and 17. Deny that

eliminating deficiencies or inaccuracies in pre-existing laws was Ms. Ulman's sole motivation in making such recommendations.  P. SOMF. ¶¶ 145-172; 192-317; 322-443.

Statement No.  131:

With regard to Local Law 1 of 2007, Ms. Ulman examined the existing law and recommended amendments to the law. (Village 30(b)(6) Dep., 446:17-446:19, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 131:

Deny.  The testimony cited by Defendants merely states that Local Law No. 1 of 2007 was initiated at the Village Attorney's request.  It does not state that she examined the existing law and recommended amendments to the law.  Gordon Aff. Ex. 12 at 446:17-19.

Statement No.  132:

Ms. Ulman believed there were errors, as well as inconsistencies and vagueness issues, in the pre-existing Zoning Code, including:

a.       Clarification that dormitory use is an accessory use to a principal educational use;

b.       The 2001 law referenced "net lot area" requirements that had been incorrectly carried forward during the 2004 amendment as "lot area," inadvertently omitting the word "net"; and

c.       The definition of dormitory contained the language "a building that is operated by a school," whereas the definition of school had been previously deleted and replaced with "educational institution."

(Village 30(b)(6) Dep., 442:23-443:6, 444:8-445:4, 448:5-449:25, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 132:

Admit that the cited testimony states that dormitory use is an accessory use and that the law changed the word "school" to "educational institution." Deny that the cited testimony refers to lot area or that Ms. Ulman believed there were errors, as well as inconsistencies and vagueness issues, in the pre-existing Zoning Code. Gordon Aff. Ex. 12  442:23-443:6, 444:8-445:4, 448:5-449:25. Deny that dormitory use is an "accessory use to a principal educational use." P. SMOF ¶ 845.


Statement No.  133:

On December 18, 2006, the Board of Trustees held a public hearing regarding proposed Local Law 1 of 2007.  Village of Pomona, Board of Trustees Meeting Minutes (December 18, 2006). [Ulman Aff. ¶ 28, Exhibit 22].


Response to Statement No. 133:

Admit.


Statement No.  134:

At the hearing, an attorney for Tartikov, Paul Savad ("Attorney Savad"), was present and asked the Board to continue the hearing to the next Board meeting, alleging that the proposed local law had not been properly posted on the Village website. The Board of Trustees granted Attorney Savad's request and adjourned the public hearing to the next Board meeting, to be held on January 22, 2007.  Village of Pomona, Board of Trustees Meeting Minutes (December 18, 2006). [Ulman Aff. ¶ 28, Exhibit 22].

Response to Statement No. 134:

Admit.


Statement No. 135:

On January 9, 2007, plans for the proposed rabbinical college were leaked to the public and

disseminated by a political action group, Preserve Ramapo, via its website and email distribution

list.  Tartikov claims that these plans were "leaked" by "agencies" who were provided the plans

by Tartikov.  The plans depicted a large housing component of the proposed rabbinical college.

Religious School with 4500 Residents Planned for Pomona, January 9, 2007; (Castelluccio,

Michael, 33:10-33:25, 44:3-44:8, August 12, 2014) ("Website Plans"); (Tartikov 30(b)(6) Dep.,

111:1-112:25, May 5, 2014). [Gordon Aff. ¶¶ 8, 15, 29, Exhibit 3, 10, 24].


Response to Statement No. 135:

Object to the use of Gordon Aff. Exh. 24, titled "Religious School with 4500 Residents Planned

for Pomona" (other than the last two pages) as inadmissible hearsay.

Admit that Preserve Ramapo distributed the document referred to, but deny that such information

constituted a finalized "plan."  Deny that the document depicted only a housing component.

Gordon Aff. Ex. 24; Response to Statement Nos. 65 and 66.


Statement No.  136:

The leaked plans the same conceptual site plans prepared by Tartikov's engineer and planner,

Leonard Jackson Associates, in 2004 but were reduced in size and with the buildings colored in.

Supra ¶ 22; (Leonard, Jackson, 56:7-58:2, 74:10-74:25, August 13, 2004); (Saccardi & Schiff,

Inc., Site Location-Rabbinical College of Tartikov at RC_0004129); (Saccardi & Schiff, Inc.,

Site Layout Plan-Rabbinical College of Tartikov at RC_0004130); (Website Plans). [Gordon Aff. ¶¶ 11, 28-29, Exhibit 6, 23-24].

Response to Statement No. 136:

Deny that the document referred to was created only by Leonard Jackson in 2004.  The document was developed by Leonard Jackson and later by Saccardi & Schiff.  Gordon Aff. Ex. 6 at 57:23-58:2.  Michael Castelluccio of Preserve Ramapo colored in the buildings prior to disseminating information regarding Tartikov.  Savad Ex. 21 at 33:2-36:8.

Statement No.  137:

On January 14, 2007, an article appeared in the local newspaper, the Rockland Journal News, stating that the property would bring 4,500 or more people to Pomona.  In the article, Attorney Savad stated, among other things, that "nothing they do will stop our project."  (Walsh, James, Rural Setting Could Change in Pomona, (Rockland Journal News January 14, 2007)). [Gordon Aff. ¶ 27, Exhibit 22].

Response to Statement No.  137:

Object to the use of the article as inadmissible hearsay, other than the quote from attorney Paul Savad.

Admit, but deny that is the full quote.  The full quote was "As far as we're concerned nothing that they do will stop our project.  We feel that under federal and state law we have a right to our project as long as we meet safety and health ordinances."  Gordon Aff. Ex. 22.

Statement No.  138:

On January 22, 2007, the Board of Trustees continued the public hearing regarding proposed Local Law 1 of 2007.  Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

Response to Statement No. 138:

Admit.

Statement No. 139:

The January 22, 2007 public hearing regarding proposed Local Law 1 of 2007 was attended by many members of the public, whose comments addressed the high density housing reported in the Journal News article of January 12, 2007, rather than addressing the proposed local law that was being considered by the Board of Trustees.  At the public hearing, the then-mayor urged the attendees not to discuss the housing project reported by the Journal News, since it was not before the Board, and to limit their remarks to the proposed local law that was at issue.  Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, 2:5-3:22, 10:16-10:20, 13:10-14:2, 19:16-19:5, 24:3-24:12, 24:20-25:12, 30:18-31:1, 70:17-71:4 (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

Response to Statement No. 139:

Object to the use of argument and opinion, specifically that the reported project was a "high density housing" project instead of a rabbinical college, inappropriate to a Local Rule 56.1 statement.

Admit that the public hearing occurred on January 22, 2007 and that it was attended by many members of the public.  Admit that members of the public addressed the Tartikov project at the meeting, but deny that such statements were not also in relation to the Board's consideration of Local Law No. 1 of 2007.  For example, when discussing the possibility of changing the height limitation for dormitories from 25 feet to 35 feet (to make it consistent with other uses in the Village), one speaker stated "Let's change the law in our favor as opposed to accommodating, going up to 25 or 35.  I think we can go 25 to 15 and everybody here will be real happy." P. SOMF. ¶¶ 162-163.  Another member of the public stated that Tartikov "would entirely change the character of the village.  It would entirely change the politics of the village.  And I think there has to be a solution through the zoning laws and through the amendments to the zoning laws that prohibits such a large number of people being within one property, and one institution." P. SOMF. ¶ 168.  The Board members admitted that they took public comments into consideration when they voted in favor of Local Law No. 1 of 2007 in particular and when voting on laws in general.  P. SOMF. ¶¶ 164 and 169; 248; 251; 252, 254-256; Savad Dec. Ex. 6 at 19:22-20:5; P. SOMF ¶ 164; Savad Dec. Ex. 17 at 2:14-25; Savad Dec. Ex. 6 at 25:19-23; Savad Dec. Ex. 5 at 91:19-24.  Trustee Sanderson specifically stated that the Village should keep the 25-foot limit because "based on the input from the public this evening, I think it's very clear that there is a great deal of concern." P. SOMF. ¶ 164.

Any attempt by the Mayor to limit any remarks regarding Tartikov was tempered by his assurances to the public that he and the Board knew how the public felt.  When a speaker said "[w]e are going to be another Kiryas Joel [a Hasidic community].  That's why we are emotional. You can get into the environmental impact and all of that.  That's all I have to say."  Mayor Marshall responded by stating "[l]adies and gentlemen, there isn't anyone sitting up here who

doesn't know how you feel." P. SOMF. ¶ 168(a). He also assured the public "[w]e sitting at this table have limitations that are placed on us as to what we can say and what we can't say, because our attorney tells us what we can say and what we can't say. I can't say what I feel, I can't. If I agree with you, I don't agree with you, I don't have that luxury of being able to say that here. All that I can say is that every member of this board works very, very hard to do what is best for this community. You have your issues. Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that that we don't agree. We may or may not, but please give us the benefit of the doubt. We have all been doing this. We work very hard at what we do. We try and do what is best for the community but it's our home. There are limitations under the law that restrict what we can say and when we can say it." P. SOMF. ¶ 168(c).


Statement No.  140:

Despite the admonition by the then-mayor stated in Paragraph 139, most of the comments from the public were aimed at the plans for the proposed rabbinical college, which had been leaked to the public just thirteen days prior. *See generally* Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, (January 22, 2007); *see also* (Walsh, James, Rural Setting Could Change in Pomona, (Rockland Journal News January 14, 2007)); (Website Plans). [Gordon Aff. ¶¶ 22, 27, 29, Exhibit 17, 22, 24].


Response to Statement No. 140:

Admit that most comments were aimed at Tartikov. Deny that such comments were "despite" any "admonition." *See* Response to Defendants' Statement of Fact Paragraph 139.

Statement No.  141:

Although they had never previously done so, Tartikov or its representatives had a videographer videotape and a court reporter transcribe this Village public hearing.  Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands. (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17]; [Ulman Aff. ¶ 41].

Response to Statement No. 141:

Admit.

Statement No.  142:

On January 22, 2007, the Board of Trustees adopted Local Law 1 of 2007.  Village of Pomona, Board of Trustees Meeting Minutes (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].

Response to Statement No. 142:

Admit.

Statement No.  143:

Local Law 1 of 2007 states in relevant part:  "A dormitory building shall not occupy more than 20% of the total square footage of all buildings on the lot."  Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-10(F). [Ulman Aff. ¶¶ 9, 16, Exhibit 3, 10].

Response to Statement No. 143:

Admit that the law includes the quoted provision, among many others.  Ulman Aff. Ex. 3.

Statement No.  144:

The word "net" was also added as to the minimum net lot area standards required of an educational institution. Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-10(F). [Ulman Aff. ¶¶ 9, 16, Exhibit 3, 10].


Response to Statement No. 144:

Admit.


Statement No.  145:

Additionally, the definition of dormitory was also readopted with the words "educational institution" replacing the word "school" and adding "as accessory to a principal use."  Local Law 1 of 2007, *codified as* VILLAGE CODE § 130-4. [Ulman Aff. ¶¶ 9, 13, Exhibit 3, 7].


Response to Statement No. 145:

Deny.  The statement does not accurately describe the changes in the definition of dormitory between Local Law No. 5 of 2004 and Local Law No. 1 of 2007, as the latter added the phrase "as accessory to a principal school use."  Ulman Aff. ¶¶ 9, 13, Exhibit 3, 7.


Statement No.  146:

Local Law 1 of 2007 was enacted to fix errors and clarify inconsistencies and vagueness in the pre-existing laws. (Village 30(b)(6) Dep., 459:5-459:24, July 16, 2014); Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands, 4:11-4:25, 13:25-14:2, 24:20-25:3, 27:23-28:11, 31:21-32:1, 53:8-53:9 (January 22, 2007). [Gordon Aff. ¶¶ 17, 22, Exhibit 12, 17].

Response to Statement No. 146:

Deny.  P. SOMF. ¶¶ 145-172.  *See also* Response to Statement Nos. 129, 130, 132, 139.  Local Law No. 1 of 2007 continues to use both terms "educational institution" and "school".  Ulman Aff. ¶¶ 9, 13, Exhibit 3, 7.


Statement No. 147:

Local Law Number 5 of 2007, enacting a wetlands protection law for the Village, was adopted on April 23, 2007.  Local Law 5 of 2007, *codified as* VILLAGE CODE § 126-3; Village of Pomona, Board of Trustees Meeting Minutes (April 23, 2007). [Ulman Aff. ¶¶ 10-11, Exhibit 4-5].


Response to Statement No. 147:

Admit that Local Law Number 5 was called the "Wetlands Protection Law" and was adopted on April 23, 2007.  Deny that it was codified only as VILLAGE CODE § 126-3.  Savad Dec. Ex. 314.


Statement No.  148:

Since the 1990s, the Village had discussed enacting a wetlands protection law. (Village 30(b)(6) Dep., 463:23-464:24, July 16, 2014).  [Gordon Aff. ¶ 17, Exhibit 12].


Response to Statement No.  148:

Deny.  P. SOMF. ¶¶ 177-178.


Statement No.  149:

Events of the 21st century underscored the critical need to control and protect wetlands. Hurricanes Floyd and Irene and Super Storm Sandy both particularly affected the Village of Pomona, including flooding conditions and resulting damage. (Village 30(b)(6) Dep., 464:5-464:24, July 16, 2014). [Gordon Aff. ¶ 17, Exhibit 12].

Response to Statement No. 149:

Object to this statement as immaterial to the resolution of Defendants' motion for summary judgment.

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement.

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony. Admit that Village Counsel so asserts under oath.

Deny. P. SOMF. ¶¶ 177-178; 865-933.

Statement No. 150:

Through various discussions, the Board of Trustees proposed a series of comprehensive and coordinated environmental amendments aimed at addressing the following issues:

a.      Protection of plant life and wildlife;

b.      Protection against flooding;

c.      Protection of a natural filtration system to reduce pollutants into streams and rivers, and ultimately into the water supply; and

d.      Protection of wetlands to ensure they are not destroyed.

(Village 30(b)(6) Dep., 565:9-565:18; 579:12-579:18, July 17, 2014); (Village 30(b)(6) Dep., 847:3-847:10, July 18, 2014). [Gordon Aff. ¶¶ 18-19, Exhibit 13-14].

Response to Statement No. 150:

Object as vague and ambiguous as to the meaning of "comprehensive" and "coordinated" and Plaintiffs are thus unable to assess the accuracy of this statement.

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony.

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement.

Admit that the Board of Trustees had discussions concerning Local Law No. 5 of 2007. Deny that there was any series of comprehensive and coordinated environmental amendments. Gordon Ex.13 565:9-565:18; 579:12-579:18; Ex. 14 847:3-847:10. Deny that Local Law No. 5 of 2007 addresses the issues of protecting plant life and wildlife, flooding, natural filtration system and water supply, and wetlands. P. SOMF ¶¶ 856-858, 860-864, 866, 868-877, 889-896, 898-908, 911-914, 917, 919-021, 923-933, 935-939, 945-952, 955-957, 958-960, 962-966, 971-979, 988-997. *See* Response to Statement Nos. 130, 132, 139.

Statement No. 151:

Before drafting the wetlands protection law, Ms. Ulman reviewed the wetlands laws of the villages of Chestnut Ridge, New Hempstead, and South Nyack. Ms. Ulman also reviewed the New York State Environmental Conservation Law. (Village 30(b)(6) Dep., 470:16-472:13, July 16, 2014); (New York State Environmental Conservation Law §§ 24-0103, 24-0105, 24-0107, 24-0701). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶ 22, Exhibit 16].

Response to Statement No. 151:

Admit that Ms. Ulman reviewed those laws.  Deny that the Pomona Wetlands law was based on,

or similar to, those laws.  Gordon Aff. Ex. 12 at 471:2-7; P. SOMF ¶¶ 622.


Statement No. 152:

On January 22, 2007, the Board of Trustees held a public hearing regarding proposed Local Law

5 of 2007.  Transcript on Public Hearings on Local Law Amendment: Dormitories (Continued),

Local Law Amendment: Wetlands (January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].


Response to Statement No. 152:

Admit.


Statement No.  153:

At the hearing, it was noted that the Board of Trustees had not yet received a response from

Rockland County Planning Department on proposed Local Law 5 of 2007.  Thus, the Board of

Trustees voted to extend the public hearing to February 26, 2007.  Transcript on Public Hearings

on Local Law Amendment: Dormitories (Continued), Local Law Amendment: Wetlands

(January 22, 2007). [Gordon Aff. ¶ 22, Exhibit 17].


Response to Statement No. 153:

Admit.


Statement No. 154:

On February 26, 2007, the Board of Trustees continued the public hearing regarding proposed

Local Law 5 of 2007.  Village of Pomona. Board of Trustees Meeting Minutes (February 26,

2007). [Ulman Aff. ¶ 30, Exhibit 24].


Response to Statement No. 154:

Admit.


Statement No. 155:

The February 26, 2007 public hearing regarding proposed Local Law 5 of 2007 was attended by

Attorney Susan Cooper ("Attorney Cooper"), counsel for Tartikov.  Attorney Cooper requested

that the public have further opportunity to later comment on any new proposals put forth as to

Local Law 5 of 2007.  Village of Pomona. Board of Trustees Meeting Minutes (February 26,

2007). [Ulman Aff. ¶ 30, Exhibit 24].


Response to Statement No.  155:

Admit.


Statement No.  156:

In response to Attorney Cooper's request, and on advice of Village Counsel, the Board of

Trustees voted to extend the public hearing to March 26, 2007.  Village of Pomona. Board of

Trustees Meeting Minutes (February 26, 2007). [Ulman Aff. ¶ 30, Exhibit 24].


Response to Statement No. 156:

Admit.

Statement No.  157:

On March 26, 2007, the Board of Trustees continued the public hearing regarding proposed

Local Law 5 of 2007.  Village of Pomona, Board of Trustees Meeting Minutes (March 26, 2007).

[Ulman Aff. ¶ 31, Exhibit 25].


Response to Statement No. 157:

Admit.


Statement No.  158:

On April 23, 2007, the Board of Trustees adopted Local Law 5 of 2007.  Village of Pomona,

Board of Trustees Meeting Minutes (April 23, 2007). [Ulman Aff. ¶ 32, Exhibit 26].


Response to Statement No.  158:

Admit.


Statement No.  159:

Local Law 5 of 2007 states, in pertinent part, that: "(A) Except as provided in § 126-4 below, it

shall be unlawful to conduct, directly or indirectly, any of the following activities upon any

wetland, water body or watercourse or within 100 feet of the boundary of any wetland, water

body or watercourse unless a permit is issued therefor by the Board of Trustees or the Planning

Board, as the case may be.

(1) Any form of draining, dredging, excavation or removal of material, except removal of debris

or refuse.

(2) Any form of depositing of any material such as but not limited to soil, rock, debris, concrete, garbage, chemicals, etc.

(3) Erecting any building or structure of any kind, roads, driveways, the driving of pilings or placing of any other obstructions, whether or not they change the ebb and flow of water. The definitions of the words "building" and "structure" shall be defined in the Zoning Law of the Village of Pomona.

(4) Installing a septic tank, running a sewer outfall, discharging sewage treatment effluent or other liquid waste into or so as to drain into any wetland, water body or watercourse.

(5) Any other activity which substantially impairs any of the several functions served by wetlands, water bodies and watercourses or the benefits derived therefrom as set forth herein." Local Law 5 of 2007, *codified as* VILLAGE CODE § 126-3. [Ulman Aff. ¶¶ 10-11, Exhibit 4-5].


Response to Statement No. 159:

Admit that the law contains such provision. The law is 10 pages long, and also contains the relevant provision that parcels improved with single family residences are exempt from the quoted provision, among others. Ulman Aff. Ex. 4.


Statement No. 160:

Local Law 5 of 2007 further provided that "The aforesaid one-hundred-foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences." Local Law 5 of 2007, *codified as* VILLAGE CODE § 126-3. [Ulman Aff. ¶¶ 10-11, Exhibit 4-5].


Response to Statement No. 160:

Admit.

Statement No. 161:

The law was enacted because the Board of Trustees was concerned about wetlands in the Village that were not regulated by the state or the federal government. The 100 foot buffer requirement in the Village Wetlands Law was taken from the New York State Environmental Conservation Law, which requires a permit from the New York State Department of Environmental Conservation ("DEC"), for any proposed disturbance of land within 100 feet of any DEC-regulated wetlands. (Village 30(b)(6) Dep., 461:2-461:17, July 16, 2014); (New York State Environmental Conservation Law §§ 24-0103, 24-0105, 24-0107, 24-0701). [Gordon Aff. ¶ 17, Exhibit 12]; [Ulman Aff. ¶¶ 22, Exhibit 16].

Response to Statement No. 161:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's uncorroborated testimony, except for the existence of the New York State Environmental Conservation Law.

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement.

Deny. The law was enacted in response to concerns about Tartikov's Orthodox/Hasidic school with housing for its Orthodox/Hasidic residents. *See* P. SOMF. ¶¶ 173-317; 322-443; *see* Response to Statement Nos. 130, 132, 139. The Village had knowledge that there were Wetlands on the Subject Property. Savad Dec. Ex. 151 Figure 1; P. SOMF. ¶¶ 180-181. The Board members admitted that they took public comments into consideration when they voted on laws in general. P. SOMF. ¶¶ 164 and 169; 248; 251; 252, 254-256; Savad Ex. 7at 19:22-20:5; P. SOMF ¶ 164; Savad Ex. 17 at. 2:14-25; Savad Ex. 6 at Tr. 25:19-23; Savad Ex. 9 at 36:7-

37:20; Savad Ex. 4 Tr. 30:12-31:6.  Deny that the law protects wetlands.  *See* Response to

Statement No. 150.  Deny that the New York State Environmental Conservation Law contains a

100-foot buffer that prohibits any development unless such prohibition would constitute a

"taking" of property, and thus the Village's 100-foot buffer requirement cannot have been

"taken" from it.  P. SOMF. ¶¶ 622-623; Declaration of Barbara Beall submitted in support of

Plaintiffs' Motion for Summary Judgment ¶ 32.


Statement No.  162:

The law was also enacted because the Board of Trustees sought to protect the health, safety, and

welfare of all of the residents of the Village. (Village 30(b)(6) Dep., 565:9-565:18; 579:9-

579:18; 581:5-582:8, July 17, 2014). [Gordon Aff. ¶ 18, Exhibit 13].


Response to Statement No.  162:

Object that Defendants fail to proffer support for this statement other than the Village Attorney's

uncorroborated testimony.

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement.

Deny.  *See* P. SOMF. ¶¶ 173-191; *see* Response to Statement Nos. 130, 132, 139, 150, 161.


Statement No.  163:

The health, safety, and welfare of the residents of the Village was protected through the law by

preserving plant life and wildlife, reducing pollution, protecting the wetlands as a natural

filtration system and thus the Village water supply, and preserving community character and

quality of life. (Village 30(b)(6) Dep., 565:9-565:18; 579:7-579:18; 581:5-582:7, July 17, 2014);

(Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories at ¶ 16,

December 11, 2013). [Gordon Aff. ¶¶ 18, 21, Exhibit 13, 16].


Response to Statement No. 163:

Object that the proffered statement is a contested legal conclusion central to this litigation and

not appropriate for inclusion in Defendant's Rule 56.1 statement.

Object to the use of argument and opinion inappropriate to a Local Rule 56.1 statement.

Deny.  See response to Statement No. 162.


Statement No. 164:

The Plaintiffs filed the instant lawsuit approximately three months after enactment of Local Law

5 of 2007.  Chaim Babad testified:  "Make sure you win the case.  If not, you're gonna pay a

lot."  (Babad, Chaim, 153:5-153:7 May 19, 2014); (*See* Complaint, July 10, 2007). [Gordon Aff.

¶ 6, Exhibit 1].


Response to Statement No. 164:

Admit.


## PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS

Plaintiffs Congregation Rabbinical College of Tartikov, Inc. ("Tartikov" or the "Rabbinical

College"), Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir

Margulis,, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg,

Rabbi David A. Menczer, (collectively, the "Plaintiffs") submit this Supplemental 56.1 Statement of Material Facts as to which there is no genuine issue to be tried in support of Plaintiffs' Motion for Summary Judgment.

1.  The Plaintiffs specifically informed Defendants that § 130-9(A) was part of their challenge in response to a letter sent by Defendants' counsel dated July 28, 2014 requesting "a list of all code provisions that Tartikov is challenging." *See* Email from D. Sobel to J. Peloso (Aug. 6, 2014) ("The specific provisions of the Village Code that Tartikov is facially challenging are as follows: . . . Section 130-9(A) . . . ."). Savad Dec 2 Ex. 400.

2.  At deposition, the Village denied that there was any "clear cut" standard as to what constitutes accessory use. Savad Dec. Ex. 12 at 28:3-14.

3.  At the January 22, 2007 meeting during which the Village held hearings regarding Local Law No. 1 of 2007 and Local Law No. 5 of 2004, and during which the Village mayor and trustees passed Local Law No. 1 of 2007:

   a.  Mayor Marshall called the meeting hostile, nasty and unruly. Savad Dec. 1 Ex. 78 at 175:20-176:10; 229:7-230:4;

   b.  Residents stated:

      i.  Tartikov would entirely change the character of the Village. Savad Dec. 1 Ex. 78 at 10:9-11;

      ii.  "when the nature of the law says that we must make fair accommodations for religious practice, we don't have to make fair accommodations for a change in our government, for a change in our neighborhood, and for a change in everything that we moved to Pomona to get" and "I don't look forward to having blights on the landscape, and a change in the nature of the community". Savad Dec. 1 Ex. 78 at 12:20-13:8;

iii. "I am a resident of Pomona.  This is a disgrace.  It is an absolutely (sic) disgrace.  You are in the wrong town, and the wrong village." Savad Dec. 1 Ex. 78 at RC 14:10-13;

iv. "I believe these amendments are warranted." followed by questions about RLUIPA loopholes.  Savad Dec. 1 Ex. 78 at 15:25-16:11;

v. "I mean to think of the concept of changing the entire neighborhood here to accommodate people who have the federal law on their side…" "it just seems unfair that the burden should be placed on the people who have lived in the village by other people who want to come in and change the whole nature of the village." Savad Dec. 1 Ex. 78 at 18:16-19; 19:10-14;

vi. "Everyone should understand that this is not going to happen, and we're not going to let it happen.  Let's stop it now."  [Multiple shouts of 'Stop it now!]  Their counsel is here to protect their interests. We're here, the people who live in this village, to protect our interests, okay." Savad Dec. 1 Ex. 78 at 21:16-22.

vii. "we're here to tell you that we don't want to change."  Savad Dec. 1 Ex. 78 at 26:12-13.

viii. "I think what everybody is trying to say is we would like to make it tougher for these projects to go on, rather than easier, so if you can tell us how we can vote for that." Savad Dec. 1 Ex. 78 at 35:18-21;

ix. "It seems like you just make it easier for these projects to go on and we as the people are screaming out how can we make it harder." Savad Dec. 1 Ex. 78 at 37:2-4;

x. "these changes are making it very easy for these people to move here, very easy - - you know what, I'm going to this school, and guess what, so are five of my kids and so is my wife.  How are you going to help us make sure this doesn't happen?  How are you going to enforce this law?" Savad Dec. 1 Ex. 78 at 39:19-25.

4. The challenged laws were passed against the backdrop of anti-Orthodox/ Hasidic statements on-line and in the local press.  Village officials admitted that they reviewed local

press and on-line postings.  P. SOMF ¶¶ 221, 252-253, 261.  Anti-Orthodox/ Hasidic

statements on-line and in the press include:

    a.  "I'm sick of this cult getting whatever they want"  Savad Dec. 2 Ex. 383  (at RC 714)

    b.  how many Torah thumpers with 15 kids and no real income should one community have to support? Savad Dec. 2 Ex. 382 (at RC 944)

    c.  religious inbreeding produces nutty people Savad Dec. 2 Ex. 382 (at RC 945)

    d.  statements admonishing Pomona Village residents for comments made at the January 22, 2007 meeting and stating "We need to strategize as a community in private"," I know it is very hard to hold back, but we have to and do it right" and "We have to play the game and do it right.  If we have to be tricky, fine, that's the legal system" and "I have seen many other plans fail here in the county.  Mostly because the Villages were able to hold them off and have endless meetings." Savad Dec. 2 Ex. 385 (RC 614-621)

    e.  "are these fake people?" and "I really hope that someone, someday can get inside this cult and expose what is really going on"  Savad Dec. 2 Ex. 368 (at RC 636)

    f.  "maybe these idiots will light too many candles again and oops!" Savad Dec. 2 Ex. 384 (at RC 640)

    g.  Regarding Tartikov: "what right does this group have to come in and destroy our way of life" and "we have to protect our way of life." Savad Dec. 2 Ex. 407 and "Tartikov must go".

    h.  "We need to take back OUR community" and "today Ramapo; tomorrow Rockland; the next day the 'ganser velt'" (regarding proposed yeshiva on Burgess Meredith property)  Savad Dec. 2 Ex. 370 (at RC 1720)

    i.  "just what the (orthodox) doctor ordered: another Rabbinical college in Rockland, … this tiny village of Pomona" and "will the last Non-Israelite leaving Rockland County besides jerry Seinfeld please turn off the lights?" Savad Dec. 2 Ex. 371 (at RC 633)

    j.  Mel Cook Letter to Editor Journal News "we all have our opinions as to the motivation of the people involved with the rabbinical college.  To me if it looks like a duck, walks like a duck and quacks like a duck, it's an ultra-Orthodox housing project." Savad Dec. 2 Ex. 372 (at RC 1730)

    k.  "I have written to [our federal representatives] about our community's concern regarding the application of RLUIPA for the purpose of building a rabbinical college." Savad Dec. 2 Ex. 372 (at RC 1729)

l.   "maintain your spine, and continue to rigorously review, and reject, phoney applications by the Hasidic schemers for "religious property" free rides now, band into the 23ʳᵈ Century" Savad Dec. 2 Ex. 373 (at RC 630)

m.   "all these Dark Hatted Orthodox Men prancing around Pomona, to prepare for a religious ... decision-making in the Rockland County suburbs" and "Tartikov's tax defeat by Ramapo is a great Civic victory for the non-Hasidic people" Savad Dec. 2 Ex. 374 (at RC 930)

n.   Journal News Letter to Editor by Robert Prol (directed to Michael Tauber) "I have not one single person in Pomona who supports your poorly conceived plan, and the vast majority will encourage our village leadership to fight you all the way to the Supreme Court. . . My wife and I bought our home in good faith that the zoning ordinances established by the Pomona village board are great planning, and will preserve the lifestyle we ultimately invested in." Savad Dec. 2 Ex. 375 (RC 1736)

o.   "liag" posted on Journal News storychat "As usual, you have a group that thinks that the law does not apply to them" Savad Dec. 2 Ex. 376 (RC 1749)

p.   "Why and how do you think they are literally taking over the County. It's only a matter of time before they merge Monroe, Middletown, and Rockland County into one Hasidic nation; and then they will secede from the U.S.A." Savad Dec. 2 Ex. 377 (at RC 1751)

q.   "Every one knows that lives in Rockland that Hasidics contribute NOTHING to society." Savad Dec. 2 Ex. 377 (at RC 1751)

r.   "Bob Prol" posted to Tartkov attorney Paul Savad "you seem to forget that the Constitution was written for (all) of us, not just money grubbing anti-Goyim semites." Savad Dec. 2 Ex. 378 (at RC 678)

s.   "hasidics are just simply not very nice to other people... They are filthy and neglect their properties" and "and please don't forget that the fact that we have allowed the Hasidic community to come and settle here in the first place is proof that we are open to all religions, all lifestyles and all people. but i think we have been too nice for too long. i say it's time we say NO. Now our real concern will be to protect OUR way of life and OUR people and OUR homes.". (supports preserve Ramapo) Protect our way of life Savad Dec. 2 Ex. 379 (at RC 701)

t.   "the article in Rockland Magazine stated that Hasids don't care about pretty lawns and that is obvious. The fact is that New Square and most of Monsey are complete dumps." Savad Dec. 2 Ex. 379 (at RC 702)

u.   "the Hasids are a cancer on Rockland the terminal kind" Savad Dec. 2 Ex. 379 (at RC 704)

    v. You know what it insensitive? <u>Those people</u> blasting their music behind my house in a freak parade moving a torah from one house to another Savad Dec. 2 Ex. 380 (at RC 749)

    w. Don't you hate it when you see Hasids rummaging through all those shirts (at Wal-Mart)? RC Savad Dec. 2 Ex. 408 (at RC 857)

    x. it's going to stink in that heat with the body odor Savad Dec. 2 Ex. 409 (at RC 860)

    y. Ramapo will turn into a slum Look at Monsey, New Square, Kiryos Joel Savad Dec. 2 Ex. 410 (at RC 925)

    z. "personally, I am sick of paying taxes that go to support people who claim exemptions from the ridiculous tax burden that the rest of us have to shoulder for religious reasons, contribute nothing to the community except overpopulation, shady politics, making our county look trashy, and demanding preferential treatment. I'm sick of the antisemitism crap too. I guess if having a problem with a group of inconsiderate people who care nothing about anyone but themselves coming in and trashing my town and driving my taxes through the roof because they manipulate the system makes me antiemetic then I guess that is a problem for those who feel slighted by my opinion." Savad Dec. 2 Ex. 411 (at RC 659)

    aa. "I'd like to see who will be blamed when Rockland turns into a ghetto . . . . It may be time to go- Tartikov is coming" Savad Dec. 2 Ex. 412  (RC 689)

    bb. "how anyone who is not religious can be happy with the retrogression of this area, needs to have their head examined" and "let the religious create their own ghetto slum." Savad Dec. 2 Ex. 410 (at RC 923)

    cc. "most hasids are arrogant, condescending, manipulating and down right rude." and "Ramapo will turn into a slum... Look at New Square, Monsey, Kiros Joel" Savad Dec. 2 Ex. 410 (at RC 925)

    dd. Lynn Yagel stated "The real discrimination comes more from the Hasidic communities who do not welcome or respect other faiths and want to keep out anyone who is not part of their community." Savad Dec. 2 Ex. 406

    ee. Hasidic residents of Tartikov would be on Medicaid. Savad Dec. 2 Ex. 381 (at RC 1724)

5. Mayor Marshall stated "zero population growth should be a major plan objective." Savad Dec. 2 Ex. 369.

6. As set forth in a separate request to move for sanctions for spoliation of evidence, Plaintiffs' counsel was just this week made aware that Defendants Louie and Yagel

conspired to remove and presumably destroy an on-line post which revealed Louie's anti-Hasidic animus and also withheld and partially destroyed the correspondence regarding such.  Savad Dec. 2 Exs. 365, 365(A)-(H).

7.  Tartikov's intent to provide housing for married students is not unique or extraordinary.  Savad Dec. Ex. 34 at 14:25-15:13.  Even the website of the educational institution that employs Defendants' counsel states "Married kollel members may apply for rental housing in the Laurel Hill apartments."  Rabbi Isaac Elchanan Theological Seminary, available at http://www.yu.edu/riets/apply/ (accessed Mar. 1, 2015); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 196 (S.D.N.Y. 2014) ("Mosdos intended to use this land 'for the purposes of creating an adult religious studies institution and student housing [(]commonly referred to as a 'Kollel') for adult students, their spouses and children in a campus-like environment.'"); Savad Dec. Ex. 36 at 18:21-194; 52:8-53:2.

8.  A large portion of Preserve Ramapo's website, located at http://www.preserveramapo.org, contains statements and republished articles focused on and critical of the Hasidic community in the Town of Ramapo and elsewhere.  Savad Dec. 2 Exs. 389-394.

9.  Preserve Ramapo published an article on its website titled "Hasidic Community's bloc vote is a far cry from democracy," and further compares the residents of Kaser and New Square are to "Saddam Hussein's Iraq and Joseph Stalin's Soviet Union."  Savad Dec. 2 Ex. 392 at 1.

10. The "Hasidic Community's bloc vote is a far cry from democracy" article published on the Preserve Ramapo website also states: "How do those village families with four, five

and six kids exist? Is it a self-imposed poverty or are they victims of an unsympathetic economy?" Savad Dec. 2 Ex. 392 at 2.

11. The "Hasidic Community's bloc vote is a far cry from democracy" article published on the Preserve Ramapo website also states: "I say to the accusers, if I am anti-Semitic and a 'self-hating Jew' then so are millions of Israeli Jews who resent the 'haredim's' (Hebrew word for ultra-Orthodox) perversion of their democracy." Savad Dec. 2 Ex. 392 at 2.

12. Preserve Ramapo published an article on its website titled "Mona's Donors and Sampson's Screw-ups" regarding the "bloc vote"/"ward system" issue stating that the voices of voters were "<u>overridden by the Hasidic villages</u>." Savad Dec. 2 Ex. 393 (emphasis added).

13. The "bloc vote" refers to "ultra-Orthodox and Hasidic" Jews. Savad Dec. 2 Ex. 394 at 66.

14. Preserve Ramapo published the following statement on its website: "'Jihadis' enforce obedience to grand rebbe in New Square, residents say." Savad Dec. 2 Ex. 394 at 134.

15. Preserve Ramapo republished an article on its website titled "Hasidim Spark Backlash in NYC Exurbs That Entangles Cuomo," focused on the Hasidic Jewish population generally, and states in part "Community groups fighting the growing influence of the ultra-Orthodox Jewish population in New York City's northwestern exurbs are joining forces to counter the Hasidic bloc vote in this year's gubernatorial election. " Savad Dec. 2 Ex. 390.

16. Preserve Ramapo published an opinion piece on its website that stated that it was "wrong" for the "ultra-Orthodox and Hasidic community" to rent the Provident Bank Park for a private rally. Savad Dec. 2 Ex. 389.

17. Preserve Ramapo published statements criticizing funding for nonprofits located in Hasidic communities, including: "According to Preserve Ramapo, and confirmed by

documents obtained by The Journal News through Freedom of Information Law, nearly 80 percent of the town's funding for nonprofits for 2014, or $309,000, have been allocated to organizations based in the hamlet of Monsey or the villages of New Square and Kaser, communities that are heavily populated by ultra-Orthodox and Hasidic Jews." Savad Dec. 2 Ex. 394 at 38.

18. Preserve Ramapo frequently publishes criticism of yeshivas and other Orthodox/Hasidic educational institutions on its website. Savad Dec. 2 Ex. 394, *passim*, http://www.preserveramapo.org.

19. Preserve Ramapo publishes statements concerning Hasidic Jewish demographics, including "Rockland's Orthodox Jewish villages, Kaser (34%) and New Square (32%), have seen the region's biggest population increases, as they continue to build more housing to accommodate growing families there." Savad Dec. 2 Ex. 394 at 149.

20. Preserve Ramapo published a statement concerning "fears from Ramapo residents" caused by a land annex plan for New Square, a Hasidic community. Savad Dec. 2 Ex. 394 at 88.

21. Preserve Ramapo published various information about Hasidic communities outside of the Town of Ramapo and Rockland County, including the Hasidic community in Bloomingburg, Sullivan County, N.Y., and Kiryas Joel, Orange County, N.Y. Savad Dec. 2 Ex. 394 at 12, 37.

22. Preserve Ramapo's Michael Castelluccio stated in an article about Tartikov and Hasidic Jews "You drive through Monsey now and it's a slum" says Michael Castelluccio of Preserve Ramapo which according to the article "is why Castelluccio and his allies want to

keep the Tartikov College out of Pomona.'"" Savad Dec. Ex. 21 at 50:18-54:18; Savad 2 Ex. 407.

23. The Village "investigate[d]" the Bobover Yeshiva of Monsey, and "sent a letter to the town" regarding that application for that land use located outside the Village of Pomona. The Village "raised certain concerns with respect to the project." Savad Decl. Ex. 14, Defendants' 30(b)(6) Tr. 987:21-989:7.

24. The Village requested that the Town of Ramapo delay the hearing of an application by Congregation Khal Torath Chaim, another yeshiva located outside of the Village of Pomona, while it could review and have the opportunity to comment on it. Savad Decl. Ex. 14 at 991:7-992:11.

25. The Village Attorney was "going to seek comments from the Board" of Trustees of the Village of Pomona regarding Masifta Beth Shraga, another yeshiva also located outside the Village of Pomona, and the Hebrew Academy for Special Children. Savad Decl. Ex. 14 at 993:9-994:10.

26. When the humane society/animal hospital applied for land use approvals to increase the size of this use, the Village granted such permission, instead of passing laws targeting it. Savad Dec. Ex. 15 at 1001:18-21.

27. As part of the environmental review of the Halley Estates II application, the Village's planners, Frederick P. Clark Associates, Inc., its attorney Doris Ulman, the Village Engineer P.J. Corless, the Rockland County Planning Department, the Town of Haverstraw, and others provided various comments to the Village's Planning Board regarding the application and plans submitted by that developer. Savad Dec. 2 Ex. 366 at 1-3; Savad Dec. 2 Ex. 395 at 1-

16; Savad Dec. 2 Ex. 367 at X-5 - X-7; Savad Dec. 2 Ex. 367 at X-38 - X-39; Savad Dec. 2 Ex. 367 at X-69 - X-70.

28. The Village's concerns about drainage and flooding with respect to the Halley Estates II development are addressed ("drainage [was] clearly the biggest issue with regard to the project" (Savad Dec. 2 Ex. 367 at X-62)), in addition to the drainage study submitted by the applicant, with a recommendation of a meeting involving various different agencies "so that an approach acceptable to all could be determined." Savad Dec. 2 Ex. 366 at 2.

29. With respect to water quality and stormwater management, onsite stormwater management systems (designed to meet the concerns of the Rockland County Drainage Agency, the Village, and the Town of Haverstraw) would result in a "zero rate of runoff increase." Savad Dec. 2 Ex. 367 at IX-5, X-14 - X-15, X-22, X-31 - X-37.

30. Rockland County Drainage Agency itself and engineers for the Town of Haverstraw provided very specific comments regarding hydrologic analysis, drainage patterns, study of the stream network, detention basin, etc., for the Halley Estates II development. Savad Dec. 2 Ex. 367 at X-26 - X-28, X-40 - X-44.

31. The Village of Pomona's Engineer stated that "The applicant will have to respond to the various storm water management comments on the report and plans. These changes will have to be incorporated into revised plans and report." Savad Dec. 2 Ex. 367 at X-69.

32. The Halley Estates II developer was required to provide a soil and erosion control plan that met New York State guidelines. Savad Dec. 2 Ex. 367 at X-22.

33. Other comments regarding the Halley Estates II development included requiring new trees to be planted to replace ones removed, Savad Dec. 2 Ex. 395 at 6, requiring the planting of street trees, presumably to enhance community character, Savad Dec. 2 Ex. 395 at 6,

modifications to the stormwater management proposal, Savad Dec. 2 Ex. 395 at 6-7, conservation area and buffer being submitted and approved by the Village attorney and Planning Board, Savad Dec. 2 Ex. 395 at 11, details regarding traffic flow Savad Dec. 2 Ex. 395 at 11, specifications and details of the retention grading and landscaping plan, Savad Dec. 2 Ex. 395 at 13-14, and sewer service permit must be obtained.  Savad Dec. 2 Ex. 367 at X-22.

34. The Final Environmental Impact Statement for the Halley Estates II project states in relevant part:

> The subdivision plans for the proposed Halley Estates II Subdivision has been revised in response to the comments and concerns raised by the Village of Pomona, and by residents in the community. . . . [T]here are somewhat more severe environmental impacts than is desirable.  The Average Density Subdivision plan was arrived at through extensive evaluation of the reduction in environmental impacts to the site and surrounding areas . . . .

Savad Dec. 2 Ex. 367 at IX-3 (emphases added).

35. The Halley Estates II development area contains the headwaters of a NYSDEC class B stream, was entirely wooded and has steep slopes between 10 percent to 20 percent slope. Savad Dec. 2 Ex. 367 at IX-4.

36. Approximately 28 acres (42%) of the wooded area of the Halley Estates II subdivision was to be cleared for the development.  Savad Dec. 2 Ex. 367 at IX-4.

37. Visual impacts of the Halley Estates II development were reduced through a native woodland buffer and conservation areas, and "could be mitigated through appropriate landscaping provided throughout the proposed development."  Savad Dec. 2 Ex. 367 at X-39, IX-5 - IX-6.

38. With respect to the Halley Estates II development, Village Planners suggested "a more naturalistic design of the retention [pond], plantings within the retention area as appropriate, and vegetative screening around the perimeter of it." Savad Dec. 2 Ex. 367 at X-6.

39. Despite the significant environmental impacts, the Halley Estates II plan was "developed in conjunction with the Village consultants and the Planning Board . . . ." Savad Dec. 2 Ex. 367 at IX-4.

40. The Village's Planner stated that leaving large undisturbed areas in the Halley Estates II development was an "important mitigation measure." Savad Dec. 2 Ex. 367 at X-5.

41. Village Planners noted that the Halley Estates II developer could use deed restrictions to protect areas. Savad Dec. 2 Ex. 367 at X-5.

42. Traffic issues related to the Halley Estates II development were addressed by various governmental entities, including the Rockland County Highway Department and the Town of Haverstraw, and permits would have to be issued by the former. Savad Dec. 2 Ex. 367 at X-8 - X-9, X-22, X-39.

43. The Village of Pomona's Planning Board approved the Halley Estates II development in 2006, subject to various conditions. Savad Dec. 2 Ex. 396 at 1-4.

Dated: April 2, 2015

_____
PAUL SAVAD (PS 5358)
Donna C. Sobel (DS 3267)
Savad Churgin
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
(845) 624-3820

Roman P. Storzer (admitted *pro hac vice*)
Storzer & Greene, P.L.L.C.
1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20036

John G. Stepanovich (JS 8876)
Stepanovich Law, PLC
516 Baylor Court
Chesapeake, Virginia 23320
*Attorneys for Plaintiffs*

---

[1] Further inaccuracy and need for clarification in Village law was discovered during discovery.  Village Code § 130-9 states:  A.  All uses listed hereunder are permitted in the R-40 District, all others not listed are prohibited, except as provided in §§ 130-10 and 130-11 . . . . (2) Houses of worship, subject to the requirements of Subsection C below (Subsection C repealed). However, Village Code § 130-10(G) lists houses of worship as a special permit use. [Ulman Aff. ¶ 43]. Admit.

[2] Ms. Ulman testified as Village of Pomona representative pursuant to FRCP 30(b)(6), Village of Pomona Board of Trustees representative pursuant to FRCP 30(b)(6), and in her personal capacity over a period of 5 days. (Village 30(b)(6) Dep., July 15, 2014, July 16, 2014, July 17, 2014, July 18, 2014, August 15, 2014). [Ulman Aff. ¶ 42]. Admit.