UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONGREGATION RABBINICAL COLLEGE
OF TARTIKOV, INC., RABBI MORDECHAI
BABAD, RABBI WOLF BRIEF, RABBI HERMEN
KAHANA, RABBI MEIR MARGULIS, RABBI
AKIVA POLLACK, RABBI MEILECH MENCZER,
RABBI JOSEPH HERSHKOWITZ, RABBI CHAIM
ROSENBERG, and RABBI DAVID A. MENCZER,

                          Plaintiffs,

            -v-

VILLAGE OF POMONA, BOARD OF TRUSTEES
OF THE VILLAGE OF POMONA, NICHOLAS
SANDERSON, as Mayor, IAN BANKS, as Trustee,
ALMA SANDERS-ROMAN, as Trustee, RITA
LOUIE, as Trustee, and BRETT YAGEL, as Trustee,

                          Defendants.

Case No. 07-CV-6304 (KMK)

OPINION & ORDER

Appearances:

Paul Savad, Esq.
Joseph Allan Churgin, Esq.
Susan E. Cooper, Esq.
Savad, Churgin
Nanuet, New York
*Counsel for Plaintiffs*

Roman P. Storzer, Esq.
Storzer & Greene, P.L.L.C.
Washington, D.C.
*Counsel for Plaintiffs*

Donna Corby Sobel, Esq.
Furgang & Adwar, L.L.P.
West Nyack, NY
*Counsel for Plaintiffs*

John George Stepanovich, Esq.
Lentz, Stepanovich & Bergethon, P.L.C.

Virginia Beach, Virginia
*Counsel for Plaintiffs*

Robert Leo Greene, Esq.
Law Office of Robert L. Greene
New York, NY
*Counsel for Plaintiffs*

Andrea Donovan Napp, Esq.
Amanda E. Gordon, Esq.
James A. Wade, Esq.
Robinson & Cole LLP
Hartford, CT
*Counsel for Defendants*

John Francis Xavier Peloso, Jr., Esq.
Robinson & Cole LLP
Stamford, CT
*Counsel for Defendants*

Joseph L. Clasen, Esq.
Robinson & Cole LLP
New York, NY
*Counsel for Defendants*

Marci A. Hamilton, Esq.
The Law Office of Marci Hamilton
Washington Crossing, PA
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiffs bring challenges to certain zoning and environmental ordinances enacted by

Defendant Village of Pomona (the "Village"), alleging they are unlawful under the First and

Fourteenth Amendments of the United States Constitution, the Religious Land Use and

Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, the Fair Housing

Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, New York Civil Rights Law § 40-c(1) and (2), §§ 3, 8, 9

and 11 of the New York State Constitution, and New York common law.  Specifically, Plaintiffs

challenge the enactment and enforcement of portions of the Village of Pomona, New York Code

("Village Code") §§ 130–4 (defining educational institutions and dormitories) ("Accreditation

Law"), 130-10(F)(12) (limiting the size of dormitories) (together with the definition of

"dormitory" in § 130–4, the "Dormitory Law"), and 126 (establishing wetlands protections)

("Wetlands Law") (together, the "Challenged Laws").[1]  Plaintiffs move for Summary Judgment

on several of their claims and Defendants' affirmative defenses, and for sanctions due to the

spoliation of evidence.  Defendants cross-move for Summary Judgment on all of Plaintiffs'

claims, and for certain evidence to be stricken from the record.  For the reasons discussed below,

the Court grants summary judgment to Defendants on Plaintiffs' Free Speech and New York

Common law claims, grants summary judgment to Plaintiffs on Defendants' affirmative

defenses, denies summary judgment to all Parties as to all other claims, grants Plaintiffs' Motion

for Sanctions as discussed below, and grants Defendants' Motion to Strike in part.

## I.  Background

The Court assumes familiarity with the basic allegations of Plaintiffs' Second Amended

Complaint, (Second Am. Compl. ("SAC") (Dkt. No. 27)), as discussed in the Court's January 7,

2013 Opinion and Order, (Dkt. No. 53.)  *See Congregation Rabbinical Coll. of Tartikov, Inc. v.*

*Vill. of Pomona*, 915 F. Supp. 2d 574, 607 (S.D.N.Y. 2013) ("2013 Opinion and Order").  In

short, Plaintiffs bring this Action alleging that the Challenged Laws prohibit the owning,

holding, building, and operation of a rabbinical college within the Village (the "Village").  (SAC

---

[1] Full versions of the Challenged Laws can be found attached to the Ulman Affidavit. (Dkt. No. 145.)  They can also be found online at http://www.ecode360.com/12718511 (Wetlands Law) and http://www.ecode360.com/12718574 (Accreditation Law and Dormitory Law).

¶ 1.)  While Plaintiffs specifically claim that the Challenged Laws prohibit Plaintiff

Congregation Rabbinical College of Tartikov (the "Congregation") from building its planned

rabbinical college on a 100-acre tract (the "Subject Property") located in the Village and owned

by the Congregation, the Court dismissed Plaintiffs' as-applied challenges, as well as their New

York Civil Rights Law § 40–c claim, in its 2013 Opinion and Order.  *Congregation Tartikov*,

915 F. Supp. 2d at 607.  It is for this reason that Plaintiffs now proceed based solely on facial

challenges to the Challenged Laws.  The Court briefly reviews the salient factual background

below.

     A.  Factual Background[2]

          1.  The Parties

Plaintiffs are a corporation and individuals affiliated with the Orthodox Jewish

community, including various sects of the Hasidic community, all of whom allege an interest in

the construction of a rabbinical college on the Subject Property.  (Pls.' Rule 56.1 Statement of

Material Facts in Supp. of Pls.' Mot. for Summ. J. ("Pls.' 56.1") ¶¶ 1, 88, 90, 92, 94–95, 97, 525

(Dkt. No. 139).)  The Congregation, officially "the Rabbinical College of Tartikov, Inc.," the

owner of the Subject Property, is a religious corporation that was formed on August 1, 2004.  (*Id.*

¶¶ 1, 69–70, 101; Defs.' Response Pursuant to Local Rule 56.1(b) to Pls.' Statement of Material

Facts ("Defs.' Counter 56.1") ¶ 121 (Dkt. No. 175) (citing Aff. of Amanda E. Gordon ("Gordon

Aff.") Ex. 18 (Certificate of Incorporation) (Dkt. No. 150); *see also* Defs.' Local Rule 56.1(a)

Statement in Supp. of their Mot. for Summ. J. ("Defs.' 56.1) ¶ 5 (Dkt. No. 142).)  At the time of

---

[2] The following facts are derived from undisputed portions of the Parties' Rule 56.1
Statements, unless otherwise noted.  The Court has reviewed the evidence offered in support of
certain disputed statements, as noted, where applicable, below.

incorporation, the Congregation's trustees included Chaim Babad ("C. Babad"), who indirectly financed the Congregation at least in part, Abraham Halberstam, Naftali Babad, Samuel Chimmel, Michael Tauber ("Tauber"), and Asher Mandel.  (Defs.' 56.1 ¶¶ 6, 10; Pls.' Opp'n to Defs.' Local Rule 56.1 Statement of Facts ("Pls.' Counter 56.1") ¶ 6 (Dkt. No. 176) (citing Gordon Aff. Ex. 18).)  Plaintiffs Rabbi Mordechai Babad ("M. Babad"), Rabbi Wolf Brief ("W. Brief"), Rabbi Hermen Kahana ("H. Kahana"), Rabbi Meir Margulis ("M. Margulis"), Rabbi Akiva Pollack ("A. Pollack"), Rabbi Meilech Menczer ("M. Menczer"), Rabbi Jacob Hershkowitz ("J. Hershkowitz"), Rabbi Chaim Rosenberg ("C. Rosenbenberg"), and Rabbi David A. Menczer ("D. Menczer") (collectively, the "Individual Plaintiffs") are rabbis who seek to live, teach, and/or study at the Congregation's proposed rabbinical college.  (Defs.' 56.1 ¶ 14; *see also* Pls.' 56.1 ¶¶ 88, 90, 92, 94–95, 97.)  Defendants consist of the Village, its Board of Trustees, its current Mayor Brett Yagel ("Mayor Yagel"), its former mayor and Trustee Nicholas Sanderson ("Former Mayor Sanderson"), and other members of its Board of Trustees—Ian Banks ("Banks"), Alma Sanders Roman ("Roman"), and Rita Louie ("Louie")—each sued in his or her official capacity.  (Defs.' 56.1 ¶¶ 1, 3–4.)

## 2.  Rabbinical Colleges

According to Orthodox Jewish belief, Orthodox Jews are not permitted to resolve conflicts in the secular court system, but rather must have their conflicts adjudicated in rabbinical courts, before rabbinical judges applying Jewish law.  (Pls.' 56.1 ¶¶ 49, 52.)  For this reason, Orthodox Jews require rabbinical courts sufficiently proximate to their homes.  (*See id.* ¶ 51.)  However, there are very few rabbinical judges, and very few rabbinical courts, in the United States today, and those courts are overburdened.  (*See id.* ¶¶ 50–51, 59–61.)

5

In response to this growing need, the Congregation's proposed rabbinical college would enroll students, at no charge, who have completed a "high school level program in the Talmud" and who are deemed qualified by M. Babad, some of whom have already received offers of admission. (*Id.* ¶¶ 550, 552–53, 555, 558; Defs.' Counter 56.1 ¶ 555 (citing Decl. of Paul Savad in Supp. of Pls.' Mot. for Summ. J. ("Savad Decl.") Ex. 29 (M. Babad Tr.) 133 (Dkt. No. 155)); Defs.' 56.1 ¶ 51). The rabbinical college would therefore have no entrance examination, written examination, or written criteria for admission. (Pls.' 56.1 ¶ 551; Defs.' 56.1 ¶¶ 37, 39–40.) For 13 to 15 years, between 6:00 a.m. and 10:30 p.m. on Sunday through Thursday and in study sessions on Friday and Saturday, the students would study the four books, or "divisions," of the Shulchan Aruch, a compellation of Jewish laws of the Orthodox Hasidic tradition. (*See* Pls.' 56.1 ¶¶ 36–37, 65–66, 68, 528, 531, 537.) Of central importance here, Plaintiffs "believe that Jewish men are religiously obligated to marry at a young age and have large families," (*id.* ¶ 38), that "Judaism . . . directs [them] to dwell among a community that is directed to the Torah," (*id.* ¶ 44), and that "Jewish males [must] . . . learn the Torah day and night," (*id.* ¶ 46). Accordingly, Plaintiffs believe that students of the proposed rabbinical college must live, study, and pray in the same place, full-time, in a "Torah Community" separated from the outside world, which in turn requires that their education be free and that multi-family housing be available such that students can live with their families. (*Id.* ¶¶ 71–74; 450 (citing, inter alia, Decl. of Meilech Menczer ¶ 55 (Dkt. No. 147), 499 (citing, inter alia, Savad Decl. Ex. 27 (M. Tauber Tr.) 84), 539–540, 559, 562.) The proposed rabbinical college would therefore include "somewhere between 50 and 250 units of housing, which will be apartments that have 3 or 4 bedrooms, ranging in size from 1800-2000 square feet." (Defs.' 56.1 ¶ 44.) The rabbinical college would

also include at least four rabbinical courtrooms, ritual baths ("mikvahs"), synagogues, and multiple libraries.  (Pls.' 56.1 ¶¶ 513, 518.)[3]

While there are three other schools that currently train rabbinical judges in the area, namely Kollel Belz and Mechon L' Horoya near Monsey, NY and Kollel Beth Yechiel Mechil of Tartikov in Brooklyn, NY, the Congregation's proposed rabbinical college is the only one that offers an immersive Torah Community, which enables the college to train full-time rabbinical judges.  (*See id.* ¶¶ 565, (citing, inter alia, Savad Ex. 34 (Steven Resnicoff Dep. Tr.) 19–22), 568–71; Defs.' Counter 56.1 ¶ 570–71.)  Plaintiffs also contend that Kollel Belz and Mechon L'Horoya "only teach certain sections of the Shulchan Aruch," that Kollel Beth Yechiel Mechil of Tartikov "does not have the same program" as the proposed rabbinical college, and that none of the three schools has on-campus housing essential to "the Torah Community environment that Plaintiffs believe" is necessary for the course of study to be offered and "essential to [the] exercise their religious belief[s]."  (*See* Pls.' 56.1 ¶¶ 563, 568–571; Pls.' Counter 56.1 ¶¶ 55, 58.)[4]

---

[3] Beyond the Torah Community being part of Plaintiffs' "religious belief," (Pls.' 56.1 ¶ 539), Plaintiffs allege a variety of benefits attendant to studying in a Torah Community, including the ability to study day and night, to isolate oneself from outside influences, and to study all four books of the Shulchan Aruch.  (*See, e.g.,* Pls.' 56.1 ¶¶ 449–457, 459–469, 473, 529–30, 655; Defs.' 56.1 ¶ 49.)  Defendants dispute the necessity of a Torah community, as well as the purported need for libraries and mikvahs on campus.  (Defs.' Counter 56.1 ¶¶ 449–457, 459–469, 473, 516, 520; Defs.' 56.1 ¶ 46.)

[4] Kollell Beth Yechiel Mechil of Tartikov also has no synagogue, libraries, or mikvah on campus.  (Defs.' 56.1 ¶¶ 62–64.)  Moreover, J. Hershkowitz and C. Rosenberg aver that their studies at Kollel Belz "will not allow [them] to become a full-time rabbinical judge[s]" because they cannot "learn the entire four categories of Jewish Law" at Kollel Belz.  (Decl. of Jacob Hershkowitz ¶¶ 42, 44 (Dkt. No. 146); Decl. of Chaim Rosenberg ¶¶ 44–46 (Dkt. No. 149).)

It is not clear from the record how different the programs at these other schools are from the putative rabbinical college in this case.  Tauber, for example, characterized Mechon

As of the date of this Opinion and Order, the Congregation has not yet provided a formal plan for, or submitted an application to the Village seeking to construct, their proposed rabbinical college; only a "preliminary concept plan" exists.  (Defs.' 56.1 ¶¶ 19, 22; Pls.' Counter 56.1 ¶ 22.)  Additionally, the proposed curriculum at this point consists only of a document prepared at Tauber's request (he thought that his "'counsel wanted to see [the curriculum] in writing,'") by M. Menczer, which only includes class names and "reflects the religious source of the studies," namely the four "divisions" of the Shulchan Aruch.  (Defs.' 56.1 ¶¶ 26–28; Gordon Aff. Ex. 10 (M. Tauber Dep. Tr.) 22–23 (explaining that M. Tauber asked M. Menczer to prepare the curriculum, and that there is no other document describing "what a specialized kollel" is); Gordon Aff. Ex. 21 (proposed curriculum).)  Additionally, the Congregation has not hired any teachers, the would-be dean has done "[n]othing" thus far, and the Congregation does not yet know how many students will attend the rabbinical college.  (Defs.' 56.1 ¶¶ 34–35 (citing Gordon Aff. Ex. 2 (M. Babad Depo.) 83), 66.)

### 3.  Chronology of the Challenged Laws

The Village, incorporated in 1967, adopted a master plan in 1974 which it updated in 1997 "to maintain the low density residential character of the Village" in response to rapid growth.  (Defs.' 56.1 ¶¶ 1, 73–76 (internal quotation marks omitted) (quoting Aff. of Doris Ulman ("Ulman Aff.") Ex. 17 (1997 Master Plan Update) 17 (Dkt. No. 145).)  Around the same

---

L'Horoya Kollel Beth Yechiel Mechil of Tartikov as providing "the same course of study" as that of the proposed rabbinical college and noted that a student at Kollel Beth Yechiel Mechil of Tartikov can "get the same studies done" as a student at the proposed rabbinical college.  (Savad Decl. Ex. 27 (Tauber Dep. Tr.) 44, 46.)

time, in May 1996, the Village Attorney, then Ruben Ortenberg, advised residents to contact the Town of Ramapo to object to the expansion of an Orthodox Hasidic school, whose development the Village had challenged in court and had been "involved [with] for two years" at the time. (*See* Pls.' 56.1 ¶ 376; Savad Decl. Ex. 187 (May 20, 1996 Board of Trustees meeting minutes), at 7–8.)

At a December 1999 Village Planning Board meeting, Yeshiva Spring Valley, in an "informal appearance," laid out plans to build a Yeshiva on the Subject Property. (*Id.* ¶ 121; Defs.' Counter 56.1 ¶ 121.)[5] That same month, the Village's planning consultant, Mark A. Haley ("Haley"), reviewed the zoning provisions of the Village Code "in conjunction with" Yeshiva Spring Valley's appearance. (Defs.' 56.1 ¶ 92.) Subsequently, in January 2000, he circulated a memorandum entitled "Proposed Primary School and Pre-School ([Yeshiva Spring Valley] Pomona) and the Village Zoning Regulations regarding schools," noting the existence of only "scant" regulations on schools and recommending that the Village amend the pertinent laws. (Pls.' 56.1 ¶ 123; Defs.' 56.1 ¶ 94; Pls.' Counter 56.1 ¶ 94 (citing Ulman Aff. Ex. 28 (memorandum)).) Haley and the Village Attorney subsequently drafted Local Law 1 of 2001 and "included many of the recommendations from the January[] 2000 memos by the Village Planner." (Pls.' 56.1 ¶ 124.)[6]

---

[5] Yeshiva Spring Valley had been granted tax exempt status that year, and in subsequent years through 2003. (Pls.' 56.1 ¶ 324; Defs' Counter 56.1 ¶ 324.)
  Yeshiva Spring Valley only filed a formal application for a "25-lot single-family residential development," together with a Yeshiva, in June 2001. (Defs.' 56.1 ¶ 104.) It subsequently failed to submit an environmental study required for a New York State Environmental Equality Review Act determination. (*Id.*)

[6] It bears noting that there were no schools in the Village at the time. (*See* Pls.' 56.1 ¶ 129.)

9

On January 22, 2001, following a public hearing, the Board of Trustees adopted Local Law 1 of 2001. (Defs.' 56.1 ¶¶ 96, 98.)  Local Law 1, in relevant part, defined educational institution, for the first time, as "[a]ny school or other organization or institution conducting a regularly scheduled comprehensive curriculum of academic and/or alternative vocational instruction similar to that furnished by kindergartens, primary[,] or second schools and operating under the Education Law of New York State, and duly licensed by the State of New York," and subjected such institutions to certain restrictions under the special permit approval process, including minimum net lot area, maximum development intensity, frontage, access, set back, parking, and noise guidelines.  Local Law 1 of 2001, as codified at Village Code §§ 130-4, 130–10.  (*See also* Defs.' 56.1 ¶¶ 88–90; Ulman Aff. Exs. 1 (Local Law 1 of 2001), 7 (Village Code § 130-4), 10 (Village Code § 130-10).)

In March of the same year, then-Mayor Herbert Marshall ("Mayor Marshall") emphasized in a letter that nothing could be done to prevent the construction of a group home facility in the Village and that it "must be treated no different[ly] than any other residences or planned residences within the community" because residents "simply do not have the right to choose who [their] neighbors will be."  (Savad Decl. Ex. 184 (Open Letter from Mayor Marshall (March 5, 2001).)  Additionally, in May 2002, all but one Village Trustee expressed no objection to the concept of Barr Laboratories' constructing an office building with parking in the Village. (Savad Decl. Ex. 176 (May 21, 2002 Board of Trustees meeting minutes) 3.)

Starting in 2003, Village Attorney Doris Ulman ("Ulman"), who was appointed in July of that year, "began to review the Village laws" and recommended that further amendments be

made due to "deficiencies or inaccuracies in the laws." (Defs.' 56.1 ¶ 106–07.)[7]  That same year, at a February 17, 2003 Board of Trustees Meeting, the Board of Trustees determined not to weigh in on a neighboring municipality's open space proposal because it "could not tell another municipality how to spend [its] money or what to do with [its] property." (Savad Decl. Ex. 188 (Feb. 17, 2003 Board of Trustees meeting minutes) 4.)

Subsequently, on August 17, 2004, the same year in which the Village denied Yeshiva Spring Valley tax exempt status for the first time, (Pls.' 56.1 ¶ 324), the Congregation purchased the Subject Property from Yeshiva Spring Valley, (Defs.' 56.1 ¶ 17.)[8]  The Subject Property is a 100-acre parcel located in the Village at the intersection of Route 202 and Route 306, and zoned, like the rest of the Village, as an R-40 district (40,000 square feet per lot for the development of single-family homes), (id. ¶¶ 4, 99.)  It is the only property that the Congregation owns, (Pls.' 56.1 ¶ 106 (citing Savad Ex. Ex. 31 (C. Babad Dep. Tr.) 76–78)), and appears to be the only available parcel suitable for Plaintiffs' proposed rabbinical college under Village law, (id. ¶ 616 (citing Decl. of Barbara B. Beall ("Beall Decl.") ¶ 16 (Dkt. No. 153)).)  In June of that same

───────────────

[7] In the interim, namely from December 2002 through 2004, the Parties dispute whether the Board of Trustees actively supported the incorporation of Ladentown, which Plaintiffs contend was a response to the proposed development of adult student housing for the Orthodox Hasidic Jewish community at a site called Patrick Farms, (see Pls.' 56.1 ¶¶ 136, 313, 368–72; Defs.' Counter 56.1 ¶¶ 136, 313, 368–72), though the Parties agree that Ulman "performed free legal work for the appeal regarding the efforts to incorporate Ladentown," (Pls.' 56.1 ¶ 373.)

[8] The Parties dispute the exact day on which the Subject Property was purchased in August.  Plaintiffs' claim it was purchased on August 4, 2004, (Pls.' 56.1 ¶ 101), while Defendants contend it was purchased on August 17, 2004, (Defs.' Counter 56.1 ¶ 101 (citing Savad Decl. Ex. 291).)  Plaintiffs admit their error in their Counter Rule 56.1 Statement. (Pls.' Counter 56.1 ¶ 17.)

Additionally, while the Village denied Yeshiva Spring Valley tax exempt status in 2004, the local Humane Society did receive a tax exemption despite not having "timely filed its application for exemption."  (Pls.' 56.1 ¶ 380.)

year, the Village filed suit to challenge the Town of Ramapo's Adult Student Housing Law

("ASHL").  (Pls.' 56.1 ¶¶ 138, 360.)[9]

On September 7, 2004, Ulman presented the Board of Trustees with her

recommendations for amendments to the zoning law pertaining to educational institutions, which

addressed removing the half-acre-per-student lot area requirement, adding a provision allowing

dormitories, clarifying the definition of educational institution, and removing the requirement

that educational institutions be on a state or county road.  (Defs.' 56.1 ¶¶ 110, 112; Pls.' Counter

56.1 ¶ 113.)  Subsequently, on September 27, 2004, following a public hearing, the Board of

Trustees adopted Local Law 5 of 2004, (Defs.' 56.1 ¶¶ 114, 116), which, in relevant part, re-

defined "educational institution" as "[a]ny private or religious elementary, junior high or high

school, college, graduate[,] or post-graduate school conducting a full-time curriculum of

instruction . . . accredited by the New York State Education Department or similar recognized

accrediting agency," and amended the minimum lot area, frontage, access, setback, and

screening guidelines, Local Law 5 of 2004, as codified at Village Code § 130-4.  (*See also* Defs'

56.1 ¶¶ 105, 122; Ulman Aff. Exs. 2 (Local Law 5 of 2004), 7 (Village Code § 130–4).)

Local Law 5 also addressed dormitories, providing that "[a] dormitory is permitted as an

accessory use to an educational use and that there shall be not more than one dormitory building

on a lot," Local Law 5 of 2004, as codified at Village Code § 130-10(F)(12).  (*See also* Defs.'

56.1 ¶ 117; Ulman Aff. Exs. 2, 10).  It further defined a dormitory as "a building . . . [which

---

[9] The Adult Student Housing Law "permits married, adult, student, multi-family, high-density housing in single-family residential zones . . . in the unincorporated portion of Ramapo." *Vill. of Chestnut Ridge v. Town of Ramapo*, No. 07-CV-9278, 2008 WL 4525753, at *1 (S.D.N.Y. Sept. 30, 2008).

contains] sleeping quarters for administrative staff, faculty[,] or students," and provided that "[d]ormitory rooms shall not contain separate cooking, dining[,] or housekeeping facilities except that one dwelling unit with completed housekeeping facilities may be provided for a use of a Superintendent or supervisory staff for every fifty dormitory rooms."  Local Law 5 of 2004, as codified at Village Code § 130–4.  (*See also* Ulman Aff. Exs. 2, 10.)  Local Law 5 also explicitly provided that "[s]ingle-family, two-family, and/or multi-family dwelling units other than as described above shall not be considered to be dormitories or part of dormitories."  Local Law 5 of 2004, as codified at Village Code § 130–4.  (*See also* Defs.' 56.1 ¶ 118; Ulman Aff. Exs. 2, 10.)

The Village learned that the Congregation had purchased the subject property, and, in general, that it would be used as a rabbinical college in November 2004.  (Pls.' 56.1 ¶¶ 148–49; Defs.' 56.1 ¶ 17.)[10]  The Village subsequently, in late 2005 or 2006, learned of the Congregation's actual development plans for the Subject Property.  (*See* Pls.' 56.1 ¶¶ 152–53.) Nonetheless, the Village approved the Congregation's tax exemption applications in both years. (*Id.* ¶ 322.)

On December 11, 2006, Ulman, after reviewing the wetlands laws of Chestnut Ridge, New Hempstead, and South Nyack, and the New York State Environmental Conservation Law, distributed a memo to Mayor Marshall discussing a proposed Wetlands law.  (*Id.* ¶ 183; Defs.' 56.1 ¶ 151.)  On December 18, 2006, the Board of Trustees held a public hearing entitled

---

[10] On November 8 of that year, the Village resolved not to oppose an agricultural project outside the Village because it was the "policy of the village" not to comment on projects that did "not directly affect the Village."   (Pls.' 56.1 ¶ 37; Savad Decl. Ex. 185 (Board of Trustees Meeting Agenda) 2.)

"Amending the Zoning Law of the Village of Pomona in Relation to Dormitory Buildings," at which a proposed law regarding dormitories was to be discussed.  (Pls.' 56.1 ¶ 157; Defs.' Counter 56.1 ¶ 157; Defs.' 56.1 ¶ 133.)  The Board of Trustees adjourned discussion of the proposed local law, at the request of Plaintiffs' counsel, to the next board meeting.  (Defs.' 56.1 ¶ 134.)  Early the next year, on January 9, 2007, Preserve Ramapo, a political action group in the region, leaked tentative plans for the Congregation's proposed rabbinical college to the public. (*See* Defs.' 56.1 ¶ 135; Pls.' Counter 56.1 ¶ 135; *see also* Pls.' 56.1 ¶ 158; Defs.' Counter 56.1 ¶ 158.).  A week later, on January 14, 2007, an article in *The Journal News* reported that the proposed rabbinical college would bring 4,500 additional residents to the Village.  (Defs.' 56.1 ¶ 137.)

Subsequently, on January 22, 2007, the Board of Trustees held another hearing on the proposed law regulating dormitories and on the proposed law regarding wetlands, but most public comments "were aimed at the plans for the proposed rabbinical college."  (Pls.' 56.1 ¶ 159; Defs.' 56.1 ¶ 140.)  For the first time, the Congregation had a videographer and court reporter record and transcribe the meeting.  (Defs.' 56.1 ¶ 141.)[11]

After the hearing, the Village adopted Local Law 1 of 2007, (Defs.' 56.1 ¶ 142), which provided, in relevant part, that "[a] dormitory building shall not occupy more than twenty (20) percent of the total square footage of all buildings on the lot," Local Law 1 of 2007, as codified at Village Code § 130-10(F)(12).  (*See also* Defs.' 56.1 ¶ 143; Ulman Aff. Exs. 3, 16.)[12]  The

---

[11] The Village also denied the Congregation's application for tax exempt status that year. (*Id.* ¶ 323.)

[12] There remained no schools in the Village at the time.  (Pls.' 56.1 ¶ 172.)

14

Board of Trustees extended the public hearing on the proposed wetlands law because it "had not yet received a response from [the] Rockland County Planning Department." (Defs.' 56.1 ¶ 153.) In the interim, from January 2007 through March 2007, Plaintiffs allege that Mayor Marshall campaigned for reelection as Mayor on a slate with Alan Lamer, who ran for reelection as Trustee, and Former Mayor Sanderson ran for Mayor on a slate with Yagel and Louie, who were running for election as Trustees. (Pl.'s 56.1 ¶ 269.)[13]  The proposed rabbinical college "was a significant issue" during the campaign, and Sanderson, Yagel, and Louie promised "they would fight the rabbinical college." (*Id.* ¶¶ 273, 276.)

On February 26, 2007, the Board of Trustees continued its public hearing on the proposed wetlands law, which was attended by Plaintiffs' attorney, Susan Cooper, who requested that the public be given "further opportunity" to comment. (Defs.' 56.1 ¶¶ 154–55.) In response, the Board of Trustees held another public hearing on the proposed wetlands law on March 26, 2007. (*Id.* ¶¶ 156–57.) On April 23, 2007, the Board of Trustees adopted Local Law 5 of 2007, (*id.* ¶ 158), which added a chapter to Village Law pertaining to wetlands and provided, in relevant part, and except for certain exceptions that are inapplicable here, that

> it shall be unlawful to conduct, directly or indirectly, any of the following activities upon any wetland . . . or within 100 feet of the boundary of any wetland . . . unless a permit is issued therefor . . . . (A) [a]ny form of draining dredging, excavation[,] or removal of material, except removal of debris or refuse[;] (B) [a]ny form of depositing of any material such as but not limited to soil, rock, debris, concrete, garbage, chemicals, etc.[;] (C) [e]recting any building or structure of any kind, roads, driveways, the driving of pilings or placing of any other restrictions, whether or not they change the ebb and flow of water[;] (D)

---

[13] While Plaintiffs fail, pursuant to Local Rule 56.1, to support this statement with admissible evidence, Defendants admit its contents in its responses to subsequent statements. (*See* Defs.' Counter 56.1 ¶¶ 273 (admitting timing of campaign), 270 (admitting that Mayor Marshall served as Mayor, and Alan Lamer as Trustee, during the campaign), 274 (admitting that Sanderson, Louie, and Yagel ran on a ticket together).

> [i]nstalling a septic tank, running a sewer outfall, discharging sewage treatment
> effluent or other liquid waste into or so as to drain into any wetland, water body[,]
> or watercourse[;] (E) [a]ny other activity which substantially impairs any of the
> several functions served by wetlands . . . .

Local Law 5 of 2007, codified at Village Code § 126-3(A).  (*See also* Defs.' 56.1 ¶ 159; Ulman

Aff. Exs. 4–5.)  The law further provided that "[t]he aforesaid one-hundred-foot buffer . . . shall

not apply to lots that are improved with single-family residences."  Local Law 5 of 2007,

codified at Village Code § 126-3(D).  (*See also* Defs.' 56.1 ¶ 160; Ulman Aff. Exs. 4–5.)  Soon

thereafter, in a May 9, 2007 email, Former Mayor Sanderson indicated her opposition to an

Orthodox middle school proposed to be constructed near the Village, noting that it did "not

sound good" and encouraging others to attend public hearings on the matter.  (Pls.' 56.1 ¶ 375

(citing Savad Decl. Ex. 11 (Sanderson Dep. Tr.) 224–26)); Savad Ex. 170 (May 9, 2007 email).)

Both prior to and after the passage of the Wetlands Law, the Congregation sent letters to

the Village regarding its plans for the proposed rabbinical college, specifically on March 28,

April 25, and June 22, 2007, and Susan Cooper spoke about the Congregation's plans at a Board

of Trustees meeting on April 12, 2007.  (Pls.' 56.1 ¶ 409.)  While what requests those letters and

statements contained, and whether they constituted a proper application for a meeting, is in

dispute, (*see* Defs.' Counter 56.1 ¶ 409–10), the Parties agree that the Congregation was never

granted any type of meeting to discuss its proposal, (Pls.' 56.1 ¶ 411).  Nonetheless, in May

2007, the Congregation held a meeting "to present information to the public about the proposed

rabbinical college," and Village officials appear to have, on a few occasions, encouraged

residents not to attend.  (Pls.' 56.1 ¶¶ 429–30, 432–34; Defs.' Counter 56.1 ¶¶ 432–33.)

16

4.  The Impact of the Challenged Laws

Plaintiffs allege that, collectively, the Challenged Laws prevent the construction of the rabbinical college in the Village.  Because the entire Village, as noted, is zoned R-40, the Village Code permits only a limited number of land uses in the normal course, namely houses, libraries, museums, public parks, and playgrounds, *see* Village Code § 130-9, and, by special use permit, some other developments, including educational institutions, *see* Village Code § 130-10(F), and houses of worship, *see* Village Code §130-10(G).[14]  Plaintiffs contend that their rabbinical college is foreclosed by the Challenged Laws because (1) the Accreditation Law requires that educational institutions be "accredited by the New York State Education Department or similar recognized accreditation agency" and Plaintiffs' rabbinical college allegedly cannot be accredited, (2) the Dormitory Law excludes rooms that "contain separate cooking, dining or housekeeping facilities" as well as "single-family, two-family, and/or multifamily dwelling units," constrains dormitory use to administrative staff, faculty, and students, and limits dormitory construction to 20% "of the total square footage of all buildings on the lot," which effectively bar Plaintiffs from building the housing they desire, and (3) the Wetlands Law requires a 100-foot buffer around wetlands of 2,000 square feet or more on properties not improved with single family homes, which renders it impossible for Plaintiffs' to build a suitable access road to the rabbinical college on the Subject Property, the only available property on which an educational institution can be built in the Village.  (*See* Mem. of Law in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem.") 4–9, 18 (Dkt. No. 138).)  Plaintiffs also allege that the

---

[14] As noted, R-40 refers to residential district zoning, requiring a minimum of 40,000 square feet per lot.  (*See* Pls.' 56.1 ¶ 4.)  *See also* Village Code § 130-5.

Congregation cannot obtain a variance for its hoped-for use, (*id.* at 8), and that the Challenged Laws were motivated by discrimination, (*id.* at 4.)   Accordingly, as limited by the Court's 2013 Opinion and Order, Plaintiffs seek a declaratory judgment finding the Challenged Laws unconstitutional and illegal.  (SAC 64.)

   B.  Procedural History

   Plaintiffs' filed their first Complaint on July 10, 2007, (Dkt. No. 1), and then filed an Amended Complaint on July 30, 2007, (Dkt. No. 12).  Plaintiffs filed a Second Amended Complaint on November 19, 2007, (Dkt. No. 27).[15]  Defendants filed a Motion to Dismiss, (Dkt. No. 36), which the Court granted in part in an Opinion and Order dated January 7, 2013, (Dkt. No. 53).

   Following discovery, the Court held a pre-motion conference on October 27, 2014, (*see* Dkt. (minute entry for Oct. 27, 2014)), at which the Court adopted a Scheduling Order for summary judgment motions, (Dkt. No. 135).  Pursuant to that Order, Plaintiffs filed their Motion for Partial Summary Judgment and associated documents, (Dkt. Nos. 137–139, 143–144, 146–149, 151–155), and Defendants filed their Motion for Summary Judgment and associated documents, (Dkt. Nos. 140–142, 145, 150), on January 22, 2015.  Pursuant to an extension of time granted by the Court, (*see* Dkt. Nos. 163, 187), the Parties filed opposition papers on April 2, 2015, (Dkt. Nos. 167–173, 175–76), and replies on May 21, 2015, (Dkt. Nos. 190, 193).  Defendants also filed their Counter Statement to Plaintiffs' Supplemental Rule 56.1 Statement on May 21, 2015.  (Dkt. No. 194.)  Additionally, pursuant to an extension of time granted by the

_____

[15] Plaintiffs appear to have filed an identical version of their Second Amendment Complaint on two occasions.  (*See* Dkt. Nos. 27, 28.)

Court, (Dkt. No. 166), the United States of America ("United States") filed a Motion to Intervene and a brief defending the constitutionality of RLUIPA on April 23, 2015, (Dkt. Nos. 182–183), which Motion the Court granted on April 24, 2015, (Dkt. No. 184).

On April 27, 2015, the Court held a pre-motion conference on Plaintiffs' putative motion for sanctions for spoliation of evidence.  (*See* Dkt. (minute entry for April, 27, 2015).)  Pursuant to a Scheduling Order of the same date, (Dkt. No. 185), and an extension of time granted by the Court, (Dkt. No. 189), Plaintiffs filed their Motion for Sanctions and associated documents on June 3, 2015, (Dkt. Nos. 195–197).  Defendants filed their Opposition and associated documents on July 1, 2015, (Dkt. Nos. 200–204), and Plaintiffs filed their Reply on July 15, 2015, (Dkt. No. 205).  The Court held Oral Argument on the pending Summary Judgment Motions on July 8, 2015.  (*See* Dkt. (minute entry for July 8, 2015).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River. v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists." *Vt. Teddy Bear Co.. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Comm. Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co.. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care, LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Accordingly, "[a]

20

[party] opposing a motion for summary judgment must lay bare his proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *Weiss v. La Suisse, Société D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003) (internal quotation marks omitted).  A court's goal should, therefore, be "'to isolate and dispose of factually unsupported claims.'" *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

    B.  Analysis

        1.  Standing

    The Court begins, as it did in the 2013 Opinion and Order, with the threshold issue of standing.  *See Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009) ("[S]tanding . . . is intended to be a threshold issue at least tentatively decided at the outset of the litigation.").  Defendants argue that Plaintiffs lack standing to challenge two of the Challenged Laws: the Dormitory Law and the Wetlands Law.  (*See* Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Defs.' Mem.") 11–14 (Dkt. No. 141).)

    Generally, under Article III, to obtain retrospective relief, a plaintiff must show (1) that he or she suffered an injury in fact which is concrete and particularized and actual or imminent, (2) that the injury is fairly traceable to the alleged unlawful conduct of the defendant, and (3) that it is likely that the injury will be redressed by a favorable federal court decision.  *See Marcavage v. The City of N.Y.*, 689 F.3d 98, 103 (2d Cir. 2012) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992)); *see also Pac. Capital Bank, N.A. v. Conn.,* 542 F.3d 341, 350 (2d Cir. 2008) ("[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered

an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw*

*Envt'l. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000)).  Additionally, "[t]o establish standing

to obtain prospective relief," e.g., declaratory relief, "a plaintiff must show a likelihood that he

will be injured in the future," *Carver v. City of N.Y.*, 621 F.3d 221, 228 (2d Cir. 2010) (internal

quotation marks omitted); *see also Abidor v. Napolitano*, 990 F. Supp. 2d 260, 272 (E.D.N.Y.

2013) ("An action for declaratory judgment does not provide an occasion for addressing a claim

of alleged injury based on speculation as to conduct which may or may not occur at some

unspecified future date."), "[t]hat is, a plaintiff must demonstrate a certainly impending future

injury," and to do so, "a plaintiff cannot rely solely on past injuries; rather, the plaintiff must

establish how he or she will be injured prospectively and that injury would be prevented by the

equitable relief sought," *Marcavage*, 689 F.3d at 103.  As indicated above, each of these factors

"must be supported in the same way as any other matter on which . . . Plaintiff bears the burden

of proof."  *Lujan*, 504 U.S. at 561.

   In addition to the requirements of Article III, there are also prudential limits on standing.

*See Lerman v. Bd. of Elections*, 232 F.3d 135, 143 (2d Cir. 2000) ("The question of standing

encompasses both constitutional and prudential considerations.").  Generally, a plaintiff may not

"rest his claim to relief on the legal rights or interest of third parties." *Warth v. Seldin*, 422 U.S.

490, 499 (1975).  In the First Amendment context, however, "litigants . . . are permitted to

challenge a statute not because their own rights . . . are violated, but because of a judicial

22

prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected [conduct]." *Va. v. Am. Booksellers Assn.*, 484 U.S. 383, 392–93 (1988) (internal quotation marks omitted). More specifically, while "[t]he issue of whether a facial challenge may be entertained is one prudential consideration . . . .," *Lerman*, 232 F.3d at 143, in the First Amendment context a plaintiff "need only demonstrate a substantial risk that application of the provision will lead to the suppression" of First Amendment rights, *id.* at 144 (internal quotation marks omitted); *see also Dickerson v. Napolitano*, 604 F.3d 732, 742 (2d Cir. 2010) ("[T]he plaintiff is allowed to challenge a law that may be legitimately applied to his or her own expressive conduct if the law has the potential to infringe unconstitutionally on the expressive conduct of others."); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 907 F. Supp. 2d 310, 322 (E.D.N.Y. 2012) (noting, with respect to standing in a facial challenge to statute on free exercise grounds, that "'[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it'") (some internal quotation marks omitted) (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)); *Savago v. Vill. of New Paltz*, 214 F. Supp. 2d 252, 254 (N.D.N.Y. 2002) ("Exceptions . . . in the First Amendment context allow a plaintiff to challenge a law on its face on the grounds that it is content-based [and] that it might chill the First Amendment rights not only of the plaintiff, but of others before the court.").

        In its 2013 Opinion and Order, the Court held that the Congregation "ha[d] shown that it ha[d] standing to challenge the ordinances at issue because, accepting as true the allegations in the Second Amended Complaint, the Congregation ha[d] alleged a particularized injury that

would be redressed if the Court granted the requested relief." *Tartikov,* 915 F. Supp. 2d at 591.

While it remains "the burden of the party invoking federal jurisdiction to establish standing,"

*Lujan,* 504 U.S. at 561, the Court cannot merely rely on the allegations of the Second Amended

Complaint at this stage of the case.  Rather, "[t]o defend against summary judgment for lack of

standing, . . .  [P]laintiff must set forth by affidavit or other evidence specific facts supporting

standing . . . ." *N. Res. Def. Council, Inc. v. U.S. Food and Drug Admin.*, 710 F.3d 71, 79 (2d

Cir. 2013) (internal quotation marks omitted).

    The Court previously found standing on the basis of five separate allegations in the

Second Amended Complaint, namely:

> (1) the Congregation owns the Subject Property; (2) it purchased the Subject
> Property with the intention of building a rabbinical college thereon; (3) it already
> has begun to develop plans to build the rabbinical college; (4) the Subject Property
> is subject to [§§] 130–4, 130–9, and 130–10 of the Village Zoning Code, as well as
> [§] 126 (the Village's wetlands ordinance), which on their face prohibit
> unaccredited educational institutions and some of the Congregation's planned
> accessory uses; and (5) those provisions were enacted unlawfully to prevent the
> Congregation from building its rabbinical college.

*Tartikov*, 915 F. Supp. 3d at 61.  As outlined above, there is no dispute among the Parties as to

the first and third allegations, that the Congregation owns the Subject Property and has at least

begun to develop plans to build a rabbinical college, though the extent of that development is in

dispute, (*compare* Defs.' 56.1 ¶¶ 26–27, *with* Pls.' Counter 56.1 ¶¶ 26–27 (discussing the state of

the curriculum)), and Defendants have offered no evidence to rebut Plaintiffs' second allegation,

which *is* supported by evidence, that the Congregation *purchased the Subject Property* to build a

rabbinical college.  (*See* Pls.' 56.1 ¶ 102 (citing Decl. of Michael Tauber ("Tauber Decl") ¶ 3

(Dkt. No. 148)).)[16]  Moreover, Plaintiffs need not prove the fifth allegation—that the provisions

were enacted to prevent the rabbinical college from being built—in order to establish standing to

challenge them.  *See Chabad Lubavitch v. Borough of Litchfield,* 796 F. Supp. 2d 333, 338 (D.

Conn. 2011) (holding that religious corporation which owned property had standing to challenge

zoning ordinance); *cf. Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365,

373–75 (2d Cir. 2004) (finding that standing requirements were satisfied where an ordinance

prevented the plaintiff from building certain signs); *M.J. Entm't Enter. v. City of Mount Vernon*,

234 F. Supp. 2d 306, 310 (S.D.N.Y. 2002) (determining that the plaintiff had established

standing with respect to one claim where the challenged ordinance kept the plaintiff from

"offer[ing] topless dancing as entertainment at its business establishment").  Accordingly, the

central question is whether the Challenged Laws apply to, and foreclose, the Congregation's

planned rabbinical college.

    With regard to the Dormitory Law, Defendants argue that while the Challenged Laws

permit dormitories as accessory uses to an educational use, (Defs.' Mem. 12 (citing Local Law 5

of 2014 and Local Law 1 of 2007)), "[a]s a matter of law, the housing aspect of Plaintiffs'

hypothetical plan is not an accessory use, because it is so disproportionate to the educational use

that it cannot be subordinate or incidental," (*id.* at 11.)  In support, Defendants cite two dated

cases in which state courts held that certain land uses were not accessory uses because they were

not "naturally and normally incidental to the main use of the premises."  (*Id.* at 12 (citing *Ames*

---

[16] In response, (*see* Defs.' Counter 56.1 ¶102), Defendants cite only the Congregation's
Certification of Incorporation, which does not mention the Subject Property but does indicate
that the Congregation was incorporated "[t]o establish, maintain[,] and conduct a school . . . of
the holy Torah and to maintain classes for the teachings of the customs, traditions[,] and mode of
worship of the Jewish Orthodox faith," (Gordon Aff. Ex. 18, at unnumbered 2.)

*v. Palma*, 384 N.Y.S.2d 587, 587 (App Div. 1976) and *Town Hall, Inc. v. Tax Comm'n*, 234

N.Y.S.2d 760, 761 (App. Div. 1962).)  Defendants also cite the deposition of C. Babad as

evidence that housing, rather than education, was the primary purpose of the proposed

residences.  (*Id.* at 13 (citing Savad Decl. Ex. 31 (C. Babad Dep. Tr.) 102 ("Because if we come

in with 250 families—and lucky they only can have one child a year, but can you imagine if they

. . . have two a year?  Probably in the next ten years we'll have several thousand of them over

there.")).)

The Village Code contains no language proclaiming that certain uses cannot be because

of their size, but rather defines accessory as "[a] use which is customarily incidental and

subordinate to the principal permitted use on the lot and located on the same lot therewith . . . ."

Village Code § 130–4.  Defendants' cases likewise do not stand for the proposition that the mere

size of a proposed use, either in absolute terms or in proportion to other uses, renders it non-

accessory.  Rather, as the court in *Ames* put it, "[a]n accessory use *that is too large for an*

*applicant's proven needs* ceases to be naturally and normally incidental to the main use of the

premises," 384 N.Y.S.2d at 587 (emphasis added); *see also Town Hall, Inc. v. Tax Comm'n of*

*City of N.Y.*, 234 N.Y.S.2d 760, 761 (App. Div. 1962) (finding that a clubhouse was not an

accessory use to an educational institution not because of its size, but because "the exhibits

which detailed the record of events held in the club [made] it manifestly clear that such use was

the dominant one and that the use for educational purposes was merely incidental").  As

Plaintiffs point out, there is ample case law indicating that the size of a development is not

dispositive to whether it is accessory.  *See, e.g., Mamaroneck Beach & Yacht Club, Inc. v.*

*Zoning Bd. of Appeals of Vill. of Mamaroneck*, 862 N.Y.S.2d 81, 85 (App. Div. 2008) ("The

26

[zoning board of appeals], in engrafting area requirements upon provisions defining a permissive

accessory use, based upon the square footage of other building structures on the property,"

namely by ruling that a structure that constituted more than 50% of total building square footage

on the property could not be an accessory use, "was irrational and unreasonable."). Rather, what

matters is the size of the accessory use relative to the *need* for that use. *See De Mott v. Notey*,

143 N.E.2d 804, 806 (App. Div. 1957) (finding that use of two out of three buildings as

dwellings was permissible accessory use to hospital because "[i]t is . . . generally known . . . that

hospitals customarily provide living accommodations for at least some of their personnel").

The evidence in the record is sufficient to establish standing as to the Dormitory Law.

Plaintiffs contend, repeatedly, that they intend, and need, to build family housing for students of

the proposed rabbinical college, and that such housing will *only* be used by students, faculty, and

their families. (*See* Pl.'s 56.1 ¶¶ 457, 459–62, 465–67, 471–73, 489–491 (discussing need for

such housing); *see also* ¶ 486 ("The housing component of the rabbinical college is only for

students (and teachers) who are committed to the full-time religious training program along with

their families, as well as one or two caretakers of the subject property."); ¶ 497 (noting that,

when the Congregation was formed, "the understanding was that the planned rabbinical college

would be only for students (and teachers) committed to the full-time program, along with their

families"); ¶¶ 493–495 (discussing need for family housing with housekeeping, cooking, and

dining facilities); ¶¶ 603–614 (discussing how the Dormitory Law prohibits plaintiffs' desired

housing).) While some of the families living in the proposed dormitories may be large,

potentially requiring the construction of large facilities, that fact does not make their size

disproportionate, as a matter of law, to their need. *See Assoc. of Zone A & B Homeowners*

27

*Subsidiary, Inc. v. Zoning Bd. of App. of City of Long* Beach, 749 N.Y.S.2d 68 (App. Div. 2002) ("Educational institutions are generally permitted to engage in activities and locate on their property facilities for such social, recreational, athletic, and other accessory uses as are reasonably associated with their educational purpose." (internal quotation marks omitted)). While Defendants may maintain that this is not Plaintiffs' true motive, the question of whether Plaintiffs intend the housing to serve *only* the rabbinical college, or the Orthodox Hasidic community generally, is, at most, a question of material fact for the jury. But, viewing the facts in favor of the Plaintiffs, as non-movants on this issue, Defendants' argument falls short.

　　　　Additionally, the question of whether the housing at issue here is actually an accessory use is beside the point. The Dormitory Law, in concert with other Village laws, including the Challenged Laws, prevent Plaintiffs from building the family housing they seek as part of their rabbinical college. The Dormitory Law, specifically, prohibits any sort of housing as part of an educational institution that is not defined as a "dormitory" in that statute. *See* Village Code § 130-9. Because the Dormitory Law explicitly precludes housing for students with families, housing that comprises greater than 20% of building square footage on the property at issue, or the building of separate cooking or housekeeping facilities, it is an insurmountable barrier to Plaintiffs' rabbinical college as currently conceived, regardless of how "accessory use" is defined. (*See* Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") 5–6 (Dkt. No. 167).)[17] Thus, the merits of Plaintiffs' challenge to the Dormitory Law notwithstanding, Plaintiffs' have provided sufficient evidence to indicate that the Dormitory Law, on its face,

---

[17] In fact, Plaintiffs contend that the dormitories are not an "accessory" use at all, but rather a component of the primary use: the rabbinical college itself. (*See* Pls.' Mem. 6 n.7.)

forecloses Plaintiffs' proposed rabbinical college, or any educational institution that may seek

include housing for families of students, and therefore Plaintiffs have standing to levy a facial

challenge against it.

With regard to the Wetlands Law, Defendants argue that "[t]here is no evidence the

wetlands local law applies to any or some of the wetlands on the Subject Property because

Plaintiffs have provided no wetlands studies of this property that would identify wetlands

covered by the local wetlands law."  (Defs.' Mem. of Law in Opp'n to Pls.' Partial Mot. for

Summ. J. ("Defs.' Opp'n") 27 (Dkt. No. 170).)  Plaintiffs do, however, produce at least some

evidence of wetlands on the Property, (*see* Beall Decl. ¶¶ 281–84, 287, 289 (discussing wetlands

on property in the context of state and federal regulations), Ex. H (indicating the existence of

wetlands on the east side of the property, and a stream on the west side of the property); Ex. I

(same); Ex. T (property map identifying wetlands); *see also* Aff. of Amanda E. Gordon ("Second

Gordon Aff.") Ex. A (Report of Charles J. Voorhis) at 63 (Dkt. No. 173) (indicating the

existence of wetlands on the Subject Property)), which Defendants do not rebut.[18]  Plaintiffs are

therefore permitted to bring a facial challenge against the Wetlands Law, and there is therefore

no basis to grant summary judgment to Defendants on standing grounds.

> ### 2.  Ripeness

Defendants also contend that Plaintiffs' challenge is unripe because Plaintiffs never

submitted a formal application related to the proposed rabbinical college.  (*See, e.g.,* Defs.'

Mem. 14 ("Plaintiffs' claims are not ripe . . . because they never filed an application . . . .");

---

[18] The Court below addresses the question of whether the Wetlands Law changed the regulatory environment with respect to Subject Property.

Defs.' Opp'n 4 n.6 ("[T]he dormitory regulations and wetlands regulations are beyond this

Court's jurisdiction due to a lack of standing and ripeness."); *id.* at 26 ("Plaintiffs lack standing

on the wetlands regulation, as discovery has shown that their attack on them is unripe and a

claim at this point is merely speculative.  Therefore, the Court lacks jurisdiction over the

wetlands provisions, even as to a facial challenge.").)  For the reasons stated in the Court's 2013

Opinion and Order, which is unaffected by the evidence adduced after that Opinion and Order

was issued, Plaintiffs' facial challenges, by virtue of being facial challenges, are ripe and have

been ripe from "'the moment the [Challenged laws] [were] passed.'" *Tartikov*, 915 F. Supp. 2d

at 595 (quoting *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 736 n.10 (1997)); *see*

*also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524, 536 (D. Conn.

2008) ("[F]acial challenges are generally ripe the moment the challenged regulation or ordinance

is passed." (internal quotation marks omitted)); *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d

149, 155 (W.D.N.Y. 2006) ("[F]acial challenges to legislative acts are ripe by their very nature."

(internal quotation marks omitted)).

   In a similar vein, Defendants suggest that Plaintiffs' RLUIPA substantial burden claim is

unripe because Plaintiffs have not filed an application, meaning the Village has not yet

"impose[d]" the Challenged Laws on them.  (*See* Defs.' Mem. 36–37.)  Plaintiffs disagree,

noting that the inclusion of "implement" in the statute suggests that "impose" has a different

meaning and is analogous to "enact."  (*See* Pls.' Mem. 10–11.)  The Court agrees with Plaintiffs:

a substantial burden can be imposed by the mere enactment of legislation.  *See Elijah Group,*

*Inc. v. City of Leon Valley*, 643 F.3d 419, 422 (5th Cir. 2011) ("When we focus on the text of the

Clause, we read it as prohibiting the government from 'imposing,' i.e., enacting, a facially

30

discriminatory ordinance or 'implementing,' i.e. enforcing a[n ordinance]."); *Roman Catholic Diocese*, 2012 WL 1392365, at *8 (upholding facial challenge to zoning law because the plaintiff had adequately alleged that the "conditions imposed by the [law] would significantly restrict the [plaintiff's] use of their [p]roperty for religious burial purposes").  Accordingly, Plaintiffs' facial challenges are ripe for adjudication.

       3.  Spoliation

          a.  Factual Background

     Plaintiffs, in their Motion for Sanctions, request that the Court sanction Defendants for destroying a Facebook post (the "Facebook Post") written by Louie and related text messages between Mayor Yagel and Louie, and for failing to produce "the non-destroyed portion of those texts," which Plaintiffs allege contained relevant evidence.  (Pls.' Mem. of Law in Supp. of Pls.' Mot. for Sanctions Due to Spoliation of Evidence ("Pls.' Sanctions Mem.") 2 (Dkt. No. 196).)

     In May 2013, Louie posted a comment on her personal Facebook page noting her disapproval of an all-male gathering of Hasidic/Orthodox Jews, though without directly referencing their religion.  (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Sanctions Due to Spoliation of Evidence ("Defs.' Sanctions Opp'n") 1–2 (Dkt. No. 200).)[19]  Thereafter, following an angry text message exchange between Mayor Yagel and Louie, Louie deleted the Facebook post.  (*Id.* at 2; *see also* Decl. of Brett Yagel ("Yagel Sanctions Decl.") ¶ 19 (Dkt. No. 202)

---

[19] Louie claims that, as a women's rights activist, she objected to an "all-male gathering being held at a municipal facility, where women were not permitted to attend," and that she did not think the Facebook post was relevant to the this Action.  (*See* Decl. of Rita J. Louie ("Louie Sanctions Decl.") ¶¶ 14–17 (Dkt. No. 201); *see also* Defs.' Sanctions Opp'n 2.)

(referencing "any text message").)[20]  In March 2015, Mayor Yagel posted a comment on his personal Facebook page about a *Rockland County Times* newspaper article.  (Pls.' Sanctions Mem. 2.)  Mayor Yagel's comment stated, in relevant part:

> FACT: Rita Louie, while still a Trustee, posted on Facebook, inappropriately, about an 'ALL MALE gathering' at the Provident Bank Ballpark.  Especially given the lawsuit which the Village of Pomona is involved with and the NATION [sic] IMPLICATIONS it could have. i.e. federal law potentially being struck down as unconstitutional, just as it's [sic] predecessor (RFA) was.  Total lapse in reason and judgment.  Here [sic] explanation (have the text still Rita), on medication and I've removed it.  And if a vacancy should occur (post this village election), how could anyone in their right mind (i.e. New Mayor), consider this person as a viable candidate to fill an [sic] trustee unexpired (his), given their predisposition to making such blatant and inappropriate remarks.

(Decl. of Paul Savad in Supp. of Pls.' Mot. for Sanctions Due to Spoliation of Evidence ("Savad Suppl. Decl.") Ex. 1 (Comment) (Dkt. No. 197).)

After learning that Louie had made such remarks, Plaintiffs requested "all responsive social media posts and comments," including Louie's Facebook post and the text of the post the Mayor Yagel indicated that he retained.  (*See* Savad Suppl. Decl. Ex. 2 (Mar. 19, 2015 email demanding production).)  Defendants responded they were unable to produce the Facebook post because Mayor Yagel did not have a copy and produced a partial copy of text messages discussing the post.  (*Id.* Ex. 3 (Mar. 25, 2015 letter from Andrea Donovan Napp to Donna Sobel, Esq. describing disclosures).)  The text messages contained the following exchange:

> [Mayor Yagel]: Is it your position to cause damage to the village?  Someone just sen[t] me a screenshot of your Facebook post!  If it is your intent to jeopardize target . . . then you are succeeding and may cause us to loose! [sic]  You should consider . . . .

---

[20] Mayor Yagel avers that he did not believe the post "reflected a religious animus" or was relevant to the instant Action but that he was worried that the post would be mischaracterized as anti-Semitic by Plaintiffs.  (Yagel Sanctions Decl. ¶¶ 16–17.)

[Louie]: A little over the top but I understand your anger.  All taken down and I reviewed all my accounts to make sure there are no other unfortunate mistakes.  But no, I don't think I should consider resigning.

[Mayor Yagel]: I am so angry now that my heads [sic] about to pop.  Their lawyers will use everything.  Remember the case in NJ where the federal judge ruled that comments made by a public official in a non official [sic] setting led him to decide potential prejudice even though there was no final ruling but based on prior witness testimony.  We have too much riding on this case for you to jeopardize it.  Everything is fair game in the lawsuit.  Judge Karas is watching this case . . . publicly commenting on an all male [sic] gathering when it's related to a religious entity, is not good!

(Savad Suppl. Decl. Ex. 4.)  Plaintiffs allege that a portion of the text message is missing after Mayor Yagel writes "[y]ou should consider," (Pls.' Sanctions Mem. 4), though Louie's response at least suggests that Mayor Yagel encouraged Louie to consider resigning, (Savad Suppl. Decl. Ex. 4; *see also* Defs.' Sanctions Opp'n 10 n.11), as Mayor Yagel himself avers, (Yagel Sanctions Decl. ¶ 20).  Plaintiffs nonetheless allege that Defendants intentionally destroyed the Facebook post, and failed to retain a complete set of the texts.  (Pls.' Sanctions Mem. 5.)[21]

Plaintiffs further allege that Mayor Yagel lied about his preservation of this evidence when he certified, on July 3, 2013, only two months after the exchange at issue, and in response to Plaintiffs' interrogatories, that Defendants preserved "all potentially relevant" electronic screen images.  (Pls.' Sanctions Mem. 5; Savad Suppl. Decl. Ex. 5 at 4 (interrogatory), 19 (verification).)  In response, Yagel avers that he did not think the Facebook post was relevant to the instant action.  (*See* Yagel Sanctions Decl. ¶ 26.)[22]

---

[21] Additionally, on the basis of these texts, and the fact that they were sent on Friday, May 10, Plaintiffs determined that the exchange occurred on Friday, May 10, 2013.  (Pls.' Sanctions Mem 4 n.2.)

[22] The Court does not take a position on whether Yagel intentionally lied when making this certification.  As discussed below, even if Yagel did not believe the evidence was relevant,

b.  Applicable Law

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted).  While "[c]ourts cannot and do not expect that a party can meet a standard of perfection," *Pension Comm. of the Univ. of Montreal Pension Plan v. Bank of Am. Sec. LLC*, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010), *abrogated on other grounds*, *Chin v. Port Auth.*, 685 F.3d 136 (2d Cir. 2012), sanctions serve to "(1) deter[] parties from destroying evidence; (2) plac[e] the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restor[e] the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation."  *Id.* at 469 (internal quotation marks omitted).  A spoliation sanction is appropriate where "(1) . . . the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) . . . the records were destroyed with a culpable state of mind; and (3) . . . the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (internal quotation marks omitted).  "[D]etermining the proper sanction to impose for spoliation is 'confined to the sound discretion of the trial judge . . . and is assessed on a case-by-case basis.'"  *Adorno v. Port Auth.*, 258 F.R.D. 217, 227 (S.D.N.Y. 2009) (quoting *Fujitsu Ltd. V. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

---

his bad faith is evidenced by the fact that, as he explained in his Facebook post, he still sought ensure that Plaintiffs did not discover it.

c.  Application

As to the first element, the duty to preserve, an obligation to preserve evidence "usually arises when a party has notice that the evidence is relevant to litigation . . . but also on occasion in other circumstances, as for example when the party should have known that the evidence may be relevant to future litigation." *Byrnie*, 243 F.3d at 107 (internal quotation marks omitted); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (same).  Indeed, "[w]hile a litigant is under no duty to keep or retain every document in its possession, once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." *Adorno*, 258 F.R.D. at 227 (alterations and internal quotation marks omitted); *see also Gren v. McClendon*, 262 F.R.D. 284, 289 (S.D.N.Y. 2009) (describing this time as "the point where relevant individuals anticipate becoming parties in imminent litigation"); *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (noting that the duty to preserve evidence "attache[s] at the time that litigation was reasonably anticipated").  "Relevant documents are those that a party should reasonably know are relevant in the action, reasonably calculated to lead to the discovery of admissible evidence, reasonably likely to be requested during discovery and/or are the subject of a pending discovery request." *Adorno*, 258 F.R.D. at 217 (alterations and internal quotation marks omitted).

It is clear that Defendants were under an obligation to preserve the Facebook post and related text messages as of the date of the Facebook post: May 10, 2013.  This action was filed in July 10, 2007, (*see* Dkt No.1), and there was a litigation hold in place as of August 29, 2007, nearly six years before the comment at issue was posted, (*see* Savad Suppl. Decl. Ex. 11 (Aug.

35

29, 2007 letter from Former Mayor Sanderson to village officials re: litigation hold)). The Facebook post is also subject to the litigation hold because it appears to reference a gathering of individuals with the same religious observance as the Plaintiffs in this Action, who allege that Louie, among others, discriminated against them. Indeed, Mayor Yagel's strong reaction to the post is suggestive not only of the obligation to preserve the post and related text messages but also of their relevance.

    As to the second element, culpable state of mind, "at times [the Second Circuit has] required a party to have intentionally destroyed evidence; at other times [the Second Circuit has] required action in bad faith; and at other times [the Second Circuit] has allowed an adverse inference based on gross negligence" and, accordingly, "a case by case approach [is] appropriate." *Byrnie*, 243 F.3d at 107–08; *see also id.* at 109 (noting that "intentional destruction of documents in the face of a duty to retain those documents is adequate" to show a "culpable state of mind"). In other words, "the culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even without intent to breach a duty to preserve it, or negligently." *Residential Funding*, 306 F.3d at 108 (emphasis, alterations, and internal quotation marks omitted).[23] Gross negligence, in this context, is "the failure to exercise even that care

---

[23] The Court recognizes that a recent amendment to Federal Rule of Civil Procedure 37, subdivision (e) provides that

    If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
        (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
        (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

which a careless person would use," *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 419 (S.D.N.Y. 2010) (internal quotation marks omitted), and "[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake*, 220 F.R.D. at 220; *see also Orbit One Comm'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 (S.D.N.Y. 2010) ("In this circuit, a culpable state of mind for purposes of spoliation inference includes ordinary negligence." (internal quotation marks omitted); *see also Residential Funding*, 306 F.3d at 108 ("[The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference.").

Here, the culpable state of mind element is met.  Mayor Yagel clearly stated his concern about the Court or Plaintiffs learning about Louie's Facebook post in his comment, and in response Louie deleted the post.  Indeed, rather than seek to preserve the post or any other relevant social media, Louie assured Mayor Yagel that she had "reviewed all [her] accounts to make sure there [were] no other unfortunate mistakes."  (Savad Suppl. Decl. Ex. 4.)  While Defendants emphasize the fact that Mayor Yagel did not recognize the "significance" of Louie's

---

(A) presume that the lost information was unfavorable to the party;
(B) instruct the jury that it may or must presume the information
was unfavorable to the party; or
(C) dismiss the action or enter a default judgment.

While the amendment, as Defendants admit, does not take effect until December 1, 2015, (Defs.' Sanctions Opp'n 8 n.10), it would "abrogate *Residential Funding* insofar as it holds that sanctions may be appropriate in instances where evidence is negligently destroyed." *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 503 n.51 (S.D.N.Y. 2013) (discussing an earlier version of the proposed amendment).  Therefore, to impose any remedy beyond one that merely "cure[s]" any "prejudice," the Court would have to find an "intent to deprive."  Because the amendment is not yet effective, the Court need not follow the rule here, but the Court notes that, as explained below, it nonetheless finds that Defendants had the requisite intent to deprive Plaintiffs of the evidence at issue.

statement that she had deleted the post, (*see* Defs.' Sanctions Opp'n 9), neither that detail nor the

fact that Mayor Yagel "continued to castigate" Louie means that Mayor Yagel did not instigate

the destruction of the evidence; his tirade may have been aimed at preventing Louie from posting

similar comments in the future, (*id.* at 9).  Assuming Mayor Yagel's concern about the post truly

was rooted in his "perception that Plaintiffs would . . . have[] twisted any incidental reference to

Orthodox/Hasidic Jews into something far more nefarious," that alone not only demonstrates that

Mayor Yagel did not want Plaintiffs to obtain the Facebook post but also, as the text messages

make clear, suggests that Mayor Yagel was concerned about the Court learning about the post as

well.  (*Id.* at 9–10; *see also* Reply Mem. of Law in Supp. of Pls.' Mot. for Sanctions Due to

Spoliation of Evidence ("Pls.' Sanctions Reply") 3 (Dkt. No. 205).)  Thus, regardless of whether

there was actually a "conspiracy" between Mayor Yagel and Louie to destroy the Facebook post,

(*see* Defs.' Sanctions Opp'n 10), this is the rare case where bad faith, and a clear intent to

deprive Plaintiffs of the evidence at issue, is sufficiently clear from the face of the record.

       As to the third element, "[t]he burden of proving that evidence would have been relevant

to a party's claims or defense is proportional to the mens rea of the party who destroyed the

evidence, and where the party destroyed the evidence due to ordinary negligence [as opposed to

bad faith], the burden falls on the prejudiced party to produce some evidence suggesting that a

document or documents relevant to substantiating his claim would have been included among the

destroyed files." *Williams v. N.Y.C. Transit Auth.*, No. 10-CV-882, 2011 WL 5024280, at *8

(E.D.N.Y. Oct. 29, 2011) (emphasis and internal quotation marks omitted).  "To satisfy this

burden, the innocent party may provide sufficient evidence that would tend to show that the lost

documents would have been favorable to [its] case." *Id.* (internal quotation marks omitted); *see*

*also Adorno*, 258 F.R.D. at 228 ("Although the burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, . . . when the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party." (citations and internal quotation marks omitted)).

Because the Court has found that Defendants' destruction of evidence was in bad faith, there is a presumption that the evidence was relevant. *See Residential Funding* 306 F.3d at 109 ("Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."); *Chan v. Triple 8 Palace, Inc.*, No. 03-CV-6048, 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) (same).  However, even if the presumption of relevance did not apply, the Facebook post and text messages are plainly relevant to Plaintiffs' discrimination claims because any subsequent discriminatory animus may indicate a pattern of discrimination, *cf. Arlington Heights*, 429 U.S. at 266 (noting propriety of considering "circumstantial" evidence and the relevance of a "pattern" of discrimination), or whether seeking a text amendment to (or variance from) the Challenged Laws would be futile, *see, e.g., Westchester Day Sch. v. Vill. of Mamaroneck* ("*WDS II*"), 504 F.3d 288, 349, 352 (2d Cir. 2007) ("*WDS II*").[24]

Facebook posts are regularly produced in litigation as evidence of a party's thoughts and actions, *see, e.g., Reid v. Ingerman Smith LLP*, No. 12-CV-307, 2012 WL 6720752, at *1

_____

[24] Defendants assert that this argument "holds no sway in this case," but they do not explain why.  (Defs.' Sanctions Opp'n 14.)  As discussed below, and as explained by Plaintiffs in their Reply, (*see* Pls.' Sanctions Reply 7–8), whether Plaintiffs' efforts to obtain a text amendment would be futile is a material fact in this Action.

(E.D.N.Y. Dec. 27, 2012) (ordering such posts produced), and, as Plaintiffs point out, (Pls.' Sanctions Mem. 9), the post at issue here is responsive to Plaintiffs' Document Request No. 53 which sought, among other things, all "documents concerning statements . . . concerning Jews, Hasidic Jews[,] and Orthodox Jews[] including, but not limited to, all blogs [and] on-line forums," (Savad Suppl. Decl. Ex. 13).[25]  In fact, Defendants previously produced a Facebook post from the day after the offending post.  (*See id.* Ex. 15 at unnumbered 1.)[26]  Likewise, the texts are responsive to Plaintiff's Document Request No. 45, which sought, among other things "documents including . . . correspondence [and] notes . . . concerning communications by or with the Village Board and/or its Members . . . concerning the Subject Property and/or the proposed Rabbinical College." (*Id.* Ex. 13.)  Moreover, as noted above, the relevance of the evidence is confirmed by Mayor Yagel's response to the Facebook Post, particularly given he noted that it "may cause [Defendants] to loose [sic]." (*Id.* Ex. 4.)  Accordingly, the Court finds that sanctions of some type are warranted for Defendants destruction of—and failure to produce—this evidence.[27]

---

[25] Defendants' assertion that the Facebook post is not covered by Plaintiffs' Document Request No. 53 is not credible.  (*See* Defs.' Sanctions Opp'n 14–15.)  The fact that the individuals at issue in Louie's post are Hasidic and/or Orthodox Jews does, by its very nature, render it a comment "concerning" Hasidic and/or Orthodox Jews.

[26] Defendants' assertion that the text messages are not covered by Plaintiffs' Document Request No. 45 also is not credible.  (*See* Defs.' Spoliation Opp'n 15.)  By virtue of referencing how Plaintiffs may use the post to show discriminatory animus in the passage of the Challenged Laws to prevent the construction of the proposed rabbinical college, they clearly relate to the proposed rabbinical college.

[27] While Defendants suggest that Magistrate Judge George A. Yanthis limited production of post-2007 materials to those pertinent to the Village's interest in passing the Challenged Laws, (*see* Defs.' Sanctions Opp'n 15), the Court's reading of Judge Yanthis's Order is that it

d.  Appropriate Sanction

"[A] district court has broad discretion in crafting a proper sanction for spoliation," which should "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West v. Goodyear Tire and Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  In so doing, "[a] court should impose the least harsh sanction that can provide an adequate remedy." *Hawley v. Msphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Regulatory Fundamentals Grp. v. Governance Risk Mgmt. Compliance*, No. 13-CV-2493, 2014 WL 3844796, at *15 (S.D.N.Y. Aug. 5, 2014) (noting that "a court should always impose the least harsh sanction that can provide an adequate remedy.").  In other words, it "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West*, 167 F.3d at 776.  "In determining whether to impose severe sanctions, such as the entry of a default judgment or an adverse inference instruction, the Court must assess whether the requesting party suffered prejudice as a result of the loss or withholding of evidence." *F.D.I.C. v. Horn*, No. 12-CV-5958, 2015 WL 1529824, at *15 (E.D.N.Y. Mar. 31, 2015) (internal quotation marks omitted).

Plaintiffs contend that Defendants' behavior warrants "'severe disciplinary measures.'" (Pls.' Sanctions Mem. 14 (quoting *Metro. Opera Ass'n Inc. v. Local 100 Hotel employees & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003)).)  They argue that "[a]ny

---

did not place limits on document requests that were previously in place, (*see generally* Decl. of Andrea Donovan Napp ("Napp Sanctions Decl.") Ex. 2 (transcript) (Dkt. No. 204)).

sanction short of a terminating sanction would 'fail to account for the prejudice or to sufficiently penalize [Defendants] or deter others,'" (*id.* at 14 (quoting *Regulatory Fundamental*, 2014 WL 3844796, at *16), and that striking Defendants' Answer and affirmative defenses, together with entering judgment for Plaintiffs, is "appropriate," (*id.*). Plaintiffs also maintain that even if this specific instance of Defendants' misconduct is insufficient to justify severe sanctions, considered together with Defendants' other acts of spoliation, severe sanctions are warranted. (*See id.* at 15.) Such misconduct allegedly includes failure to forensically image or preserve all electronically-stored information, failure to timely inform the individual Defendants of the litigation hold, and the deletion of comments from the minutes of a key meeting (and the failure to provide a copy of the minutes after those comments were restored). (Pls.' Sanctions Mem. 15–20.)[28]

While the Court recognizes that terminating sanctions may be appropriate "if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party," *West*, 167 F.3d at 779, such sanctions are most appropriate in "extreme circumstances, usually after consideration of alternative, less drastic sanctions," *id.* The Court finds, therefore, that while there is bad faith here, the circumstances of the case are not sufficiently "extreme" to justify a terminating sanction, particularly in light of the fact that, as Defendants suggest, this is the only instance of

---

[28] While the Court ultimately finds consideration of the alleged "pattern" of misconduct unnecessary in determining the appropriate sanction for the primary misconduct alleged in Plaintiffs' Motion, the other allegations Plaintiffs make are (a) not raised as independent grounds for sanctions, (b) suspect given, as Defendants point out, if Plaintiffs were concerned about Defendants' behavior, "they should have raised [the] concern in the spring of 2013 or, at the latest[,] in the summer of 2014," when they were first aware of these issues, (Defs.' Sanctions Opp'n 18), and (c) satisfactorily explained by Defendants, with the possible exception of Defendants' delay in issuing the litigation hold (which Plaintiffs have not demonstrated was prejudicial), (*see id.* at 19–23).

clear bad faith in what has been a case involving voluminous discovery.  (*See* Defs.' Sanctions Opp'n 24.)  Less drastic sanctions are sufficient in this case, as discussed below.  *See West*, 167 F.3d at 780 (finding terminating sanctions were inappropriate because the district judge could have instructed the jury to presume the conclusions the spoliated evidence would have been used to establish and precluded the guilty party from offering contrary evidence).

As an alternative to terminating sanctions, Plaintiffs argue that Defendants should "be precluded from offering any evidence that Local Law 1 of 2007 and Local Law 5 of 2007 were not passed with discriminatory animus" and that "the jury should be given an averse inference instruction" on this issue.  (Pls.' Sanctions Mem. 20.)  Plaintiffs also ask that Defendants be precluded from offering evidence that a text amendment would be considered or that the Defendants' interests were not pre-textual, and that the jury should be given an adverse inference instruction on this issue as well.  (*See id.* at 21.)  Plaintiffs maintain that any lesser sanction would be insufficient.  (*See id.* at 22.)

An adverse inference is "an extreme sanction and should not be imposed lightly." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008); *Zubulake*, 220 F.R.D. at 219 ("In practice, an adverse inference instruction often ends litigation—it is too difficult a hurdle for the spoliator to overcome.").  And because Plaintiffs are "free to explore at trial the issue of records being [lost], without an adverse inference charge, certainly during cross-examination or for impeachment purposes," *Horn*, 2015 WL 1529824, at *16, Defendants are likely to "feel the impact of this issue at trial in any event, even without an adverse inference," *id.*  Nonetheless, "[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence."

43

*Residential Funding Corp.*, 306 F.3d at 108; *see also Linde v. Arab Bank, PLC*, 269 F.R.D. 186,

204 (E.D.N.Y. 2010) (precluding evidence); *Zubulake*, 229 F.R.D. at 436–37 (giving an adverse

inference instruction for willful destruction of emails).

      The Court finds such a limited sanction justified here.  While, as noted above, there is

sufficient evidence of bad faith to justify an adverse inference sanction, even if Defendants were

only grossly negligent, such conduct is sufficient for the imposition of an adverse inference

sanction.  *See Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 268–69 (2d Cir. 1999) (noting

that adverse inference and issue preclusion are appropriate sanctions for gross negligence, even

when there is no evidence of bad faith or willfulness); *Augstein v. Leslie,* No. 11-CV-7512, 2012

WL 4928914, at *5–6 (S.D.N.Y. Oct. 17, 2012) (imposing adverse inference sanction due to "at

least negligent" destruction of hard drive); *Chan*, 2005 WL 1925579, at *7 ("A showing of gross

negligence is plainly enough to justify sanctions at least as serious as an adverse inference.");

*Shaffer v. RWP Grp., Inc.*, 169 F.R.D. 19, 26 (E.D.N.Y. 1996) (providing adverse inference

sanction where the defendants destroyed document without finding of willfulness or bad faith).

Because Defendants concealed—and failed to disclose—the relevant Facebook post and

potentially a portion of the accompanying text messages, the jury will be instructed that it may

infer that the contents of the Facebook Post indicated discriminatory animus towards the Hasidic

Jewish population.  Defendants also will be precluded from offering evidence to rebut that

*specific inference*, though they can still present evidence to indicate that the Challenged Laws

were not adopted for discriminatory reasons.

      These sanctions are sufficient, as they give Plaintiffs the most powerful inference the jury

could draw from the spoliated evidence, without rebuttal, thereby serving the remedial, punitive,

and deterrent purposes of sanctions.  *See Kronisch*, 150 F.3d at 126 (providing adverse

presumption instruction); *Daval Steel Prods. v M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir.

1991) (barring party from presenting evidence opposing claim at issue).  Any greater sanction

(with the exception of an award of fees, as discussed below)—for example, precluding any

evidence on discriminatory animus of the Challenged Laws at all—would be functionally

equivalent to a terminating sanction in this case, as discriminatory animus is one of the critical

factual contentions at issue, and therefore would be "[in]congruent with the [Defendants'] degree

of culpability."  *See Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 288

(S.D.N.Y. 2009); *cf. West*, 167 F.3d at 780 (suggesting sanctions but leaving their precise form

"to the sound discretion" of the district judge on remand).  Indeed, because the portions of the

text messages have "permit[ted] [Plaintiffs] to determine the substance of the" deleted post, *see*

*Miller v. Time-Warner Commc'ns Inc.*, No. 07-CV-7286, 1999 WL 749528, at *2 (S.D.N.Y.

Sept. 22, 2009) (noting that the moving party was not prejudiced because it could determine the

substance of an erased writing), an adverse inference instruction is sufficient to address any

prejudice.

      Plaintiffs' request for attorneys' fees and costs is also warranted.  Attorneys' fees and

costs "may be appropriate to punish the offending party for its actions or to deter the litigant's

conduct, sending the message that egregious conduct will not be tolerated."  *Doe v. Norwalk*

*Community Coll.*, 248 F.R.D. 372, 381 (D. Conn. 2007) (brackets and internal quotation marks

omitted).  Because Defendants appear to have acted in bad faith, the Court awards Plaintiffs the

attorneys' fees incurred in connection with its Motion for Sanctions.  *See Dorchester Fin.*

*Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) ("To fully correct the

45

prejudice to [the defendant] from [the plaintiff's] spoliation, the [c]ourt also orders [the

defendant] to pay [the plaintiff's] reasonable attorney's fees and costs in connection with this

spoliation dispute.").[29]

### 3.   Plaintiffs' Rule 56.1 Statements

Local Rules 56.1(a) and (d) require that a moving party file "a separate, short[,] and

concise statement . . . of the material facts to which the moving party contends there is no

genuine issue to be tried," "followed by citation to evidence."  The purpose of these rules is "to

streamline the consideration of summary judgment motions by freeing district courts from the

need to hunt through voluminous records without guidance from the parties."  *Holtz v.

Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001).  Accordingly, a Rule 56.1 statement "is

not itself a vehicle for making factual assertions that are otherwise unsupported in the record."

*Id.*  For that reason, "where the record does not support the assertions in a Local 56.1 statement,

those assertions [are] disregarded and the record reviewed independently."  *Id.; see also Baity v.

Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (finding statements "lack[ing] citations to

admissible evidence" to violate Local Rule 56.1 and Federal Rule of Civil Procedure 56); *id.* at

*3 (disregarding facts "not supported by citations to admissible evidence in the record").

Similarly, the Court can also disregard legal conclusions or unsubstantiated opinions in a Local

Rule 56.1 statement.  *See Am Gen. Life Ins. Co. v. Diana Spira 2005 Irrevocable Life Ins. Trust*,

No. 08-CV-6843, 2014 WL 6694502, at *1 (S.D.N.Y. Nov. 25, 2014) ("The Court grants [the

[plaintiff's] motion to strike as to argumentative statements in the [56.1 statement] and as to

---

[29] Plaintiffs have until October 31, 2015 to submit evidence of the attorneys' fees they
seek.  Defendants will have two weeks from the date of Plaintiffs' submission to respond.

purported factual statements which are unsupported by any citation to the record."); *Epstein v. Kemper Ins. Co.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2012) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence."); *Simmons v. Woodycrest Ctr. For Human Dev., Inc.*, No. 10-CV-5193, 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (disregarding portions of the defendants' Rule 56.1 statement consisting of legal conclusions or "gross distortions of the summary judgment record").

Defendants devote nearly half of their Opposition to the contention that Plaintiffs' Rule 56.1 Statements should be stricken or disregarded.  Among other things, Defendants contend that Plaintiffs' 56.1 Statements are "nothing short of abusive" and consist of a "voluminous compendium of assertions, accompanied by opinion-laden declarations, that read[] more like a complaint, containing allegations, mischaracterizations, opinions[,] and legal conclusions." (Defs.' Opp'n 3.)  Indeed, Defendants suggest that Plaintiffs filed their lengthy Rule 56.1 Statements intentionally, using their allegedly deep coffers to "outlast" the Village.  (*See* Defs.' Opp'n 4 (citing Savad Decl. Ex. 31(C. Babad Dep. Tr.) 107).)  Defendants ask that the Court "us[e] its discretion to strike Plaintiffs' Statement[s] of Facts in [their] entirety or, alternatively, consider[] only those paragraphs containing truly undisputed facts, as contemplated by the Local Rules and the well-developed body of case law."  (*Id.* at 5.)  The Court will take up each of the flaws that Defendants identify in Plaintiffs' Rule 56.1 Statements in turn.

First, Defendants are correct that Plaintiffs' Rule 56.1 Statements are certainly not "short and concise."  As Defendants point out, Plaintiffs' main Rule 56.1 Statement is 998 paragraphs long and is supported by 11 declarations and 370 exhibits.  (*Id.* at 1.)  Plaintiffs also submitted a

Supplemental Rule 56.1 Statement at the end of their Counter Rule 56.1 Statement, sporting an additional 43 paragraphs (one of which contains 31 subparagraphs) and 88 additional exhibits. (*See* Pls.' Counter 56.1; Decl. of Paul Savad in Opp'n to Defs.' Mot. for Summ. J. (Dkt. No. 169).)  Plaintiffs' prolixity is therefore pronounced, and worsened by redundancy; many of the paragraphs in Plaintiff's Rule 56.1 Statements are repetitive, some to the point that they are nearly identical to paragraphs that precede them.  (*Compare, e.g.,* Pls.' 56.1 ¶ 489 ("Housing is required for the rabbinical college use.") *with id.* ¶ 492 ("Providing housing on campus is critical to the success of the proposed rabbinical college program."); *id.* ¶ 50 ("A backlog of cases often forces Orthodox Jews involved in disputes to go to secular courts.") *with id.* ¶ 631 ("The backlog in religious courts forces Orthodox and Hasidic Jews to go to secular courts.")).  Moreover, Plaintiffs' Rule 56.1 Statements should likely have included *more* paragraphs, as Defendants are correct that some paragraphs contain multiple factual assertions, which appears to violate the spirit, if not the explicit text, of Local Rule 56.1.  (*See, e.g.,* ¶ 140 ("The Village rushed Local Law 5 through the legislative process and failed to comply with many required formalities.  The resolution passing Local Law 5 of 2004 did not contain a SEQRA resolution.  There were no studies for Local Law 5 of 2004.  The Village does not have any records to suggest that there was a New York General Municipal Law review of Local Law 5 of 2004." (citations omitted)).)  Defendants are also correct that some of the statements appear malformed such that they are difficult to understand, (*see, e.g., id.* ¶¶ 342 ("Rita Louie, Nick Sanderson"), 384 ("This was done despite the Village's knowledge of RLUIPA, since at least 2004 and was proposed by the Village Board one month after Tartikov was first mentioned RLUIPA at January, 2007 meeting."), whereas others appear to still contain drafting notes, (*see, e.g.,* ¶ 641 (containing, as

explanatory parentheticals, "good quotes re: serving god," "would take 50 years currently," and "don't live forever")).

Of course, Plaintiffs are correct that the mere fact that a Local Rule 56.1 statement is lengthy does not render it in violation of the Rule, *see, e.g., Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 509 (S.D.N.Y. 2013) (denying motion to strike and finding that a "ninety-page, 403-paragraph 56.1 statement" was not "unduly lengthy in light of the numerous an complex issues raised . . . and the large body of evidence"), and they attempt to justify the length of their Rule 56.1 Statements on the basis of the volume of discovery and, in particular, "Defendants' 'kitchen sink' approach" represented by their summary judgment Motion on all fourteen of Plaintiffs' causes of action.  (Reply Mem. of Law in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Reply") 7 (Dkt. No. 190).)  Even in light of those considerations, Plaintiffs' Rule 56.1 Statements are unnecessarily lengthy, due especially to the inclusion of redundant or incomprehensible facts, as discussed above.  The Court will disregard all such repetitive or incomprehensible statements but notes that doing so does not alter the Court's evaluation of the pending Motions.  *Cf. UPS Store, Inc. v. Hagan*, — F. Supp. 3d —, 2015 WL 1456654, at *1–*2 (S.D.N.Y. Mar. 24, 2015) (noting that Local Rule 56.1 is designed to "fashion a pragmatic solution aimed at advancing [the] litigation").

Second, Defendants contend that Plaintiffs' Rule 56.1 Statements are "composed primarily of assertions that are neither relevant nor material to Plaintiffs' summary judgment motion."  (Defs. Opp'n 7.)  Certainly, "[f]actual disputes which are irrelevant or unnecessary" to the claims at issue "will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Defendants contend that because Plaintiffs' facial challenges, by definition, do not

49

address the application of the Challenged Laws to Plaintiffs specifically, but rather look to the

legality of the local laws themselves, "[h]undreds of . . . paragraphs [that] contain statements that

relate specifically to Plaintiffs' religious practices or the hypothetical development they have

broadly outlined" should be disregarded.  (Defs.' Opp'n 8–9.)  As discussed in the next section,

the Court finds that a least some of these factual statements—particularly as they relate to

Plaintiffs' plans for the rabbinical college and its relationship to Plaintiffs' religious beliefs—*are*

relevant to Plaintiffs' facial claims.  The Court therefore declines to make a blanket ruling on the

relevance of Plaintiffs' Rule 56.1 Statements, although it will, as a matter of course, not consider

irrelevant facts because they are, by nature, not pertinent to the case.

Third, Defendants contend that Plaintiffs' Rule 56.1 Statements are "replete with

argument, mischaracterizations[,] [and/]or opinions to which Plaintiffs cannot reasonably have

expected Defendants to agree."  (*Id.* at 9.)  Defendants cite a list of facts Plaintiffs represented as

undisputed, many of which, the Court agrees, are clearly in dispute.  (*See, e.g.,* Pls.' 56.1 ¶¶ 580

("The Village prohibits Plaintiffs' religious land use . . . by right or by special permit within its

jurisdiction."), 972 ("Existing Village regulations sufficiently protect the Village's interest in the

water supply.").)  The Court will not consider these facts as undisputed, though it declines to

outline specifically which paragraphs are implicated because Defendants have indicated their

opposition to them in their Counter Rule 56.1 Statements, meaning they are, for purposes of the

instant motion, disputed.

Fourth, Defendants contend that Plaintiffs' Rule 56.1 Statements contain improper legal

conclusions.  The Court agrees.  (*See, e.g.,* Pls.' 56.1 ¶¶ 483 ("The Village is a 'jurisdiction,' and

both the Village and the Board of Trustees are 'governments' under RLUIPA."); 526 ("Shuls,

50

libraries, courtrooms, and classrooms constitute religious exercise and religious land use."
(italics omitted)).)  Even some of the headings to sections of Plaintiffs' Rule 56.1 Statements
contain impermissible argument or legal conclusion.  (*See, e.g., id.* at 40 ("The Village's
Targeting of Orthodox/Hasidic Jews and Their Property.").)  As noted above, the Court will
disregard such statements.

Fifth, Defendants contend that certain statements do not support the propositions for
which they are asserted.  The Court agrees that, in some circumstances, Plaintiffs' claims are not
supported by the evidence cited, (*see, e.g., id.* ¶ 501 (asserting that Defendants have "no facts to
indicate that Plaintiffs' religious beliefs concerning the need to live with their families are not
sincere," citing pages of an exhibit that do not exist); *id.* ¶ 793 (asserting that Defendants had "no
studies or reports demonstrating a need for laws regulating educational institutions in order to
protect its traffic interests" and incorrectly citing Savad Declaration Exhibit 312 rather than
Exhibit 310 for this proposition, the latter of which only indicates that Defendant had no "*formal*
studies or reports establishing a need for controlling traffic" at the time) (emphasis added)), or
are not accompanied by citations to evidence at all, (*see, e.g., id.* ¶ 269 (containing no citation to
the record to support assertions about the campaign for the Village Board of Trustees)).
However, as noted above, and as with any other disputed statements of material fact, the Court
will consider the sources for the claims made in dueling Rule 56.1 Statements when they are
disputed, rather than rely on the Rule 56.1 Statements themselves, so there is no need to
separately strike or disregard these statements.

Overall, Defendants claim that the infirmities in Plaintiff's Rule 56.1 Statements have
"prejudiced" them because they have had to "expend countless hours and considerable sums in

order to fashion and appropriate response," including "verify[ing] each and every one of the 998 'facts' asserted." (Defs' Opp'n 11–12.) Defendants accordingly ask that the Court strike or disregard the entirety of Plaintiffs' Rule 56.1 Statements or, at least, "only consider those assertions that are properly included pursuant to Local Rule 56.1(a)." (*Id.* at 12.)

The Court is sympathetic to Defendants' concerns. Plaintiffs' Rule 56.1 Statements are redundant and contrary to the letter and spirit of Local Rule 56.1. Further, Plaintiffs make little attempt to justify the length of their Rule 56.1 Statements or to respond to the other infirmities Defendants identified, except as already explained above. (Pls.' Reply 6–9.) Rather, Plaintiffs argue that the remedy is "not . . . to strike the statement, but to simply disregard the faulty sections." (Pls.' Reply 18 (citing, inter alia, *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410, 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012), *adopted in part by* 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013)).) The Court agrees that Defendants' proposed sanction is too severe. Accordingly, the Court will, as outlined above, disregard the portions of Plaintiffs' Rule 56.1 Statements that are not compliant with Local Rule 56.1. The Court also denies Defendants' request for attorneys' fees, which is only made in passing in a footnote, (*see* Defs.' Opp'n. 5 n.10), because the Court finds that Plaintiffs' transgressions are relatively minor.[30]

---

[30] There is also a unique issue with Plaintiffs' Supplemental Rule 56.1 Statement, namely that it references a large number of statements posted anonymously on websites and blogs. (*See* Pls.' Counter 56.1 97–110 (Pls.' Suppl. Statement of Facts ("Pls.' Suppl. 56.1")) ¶ 4.) Because the speaker in each of those anonymous statements is unidentifiable, it is not clear if the statements at issue can be traced to anyone affiliated with the Village. The Court therefore finds them irrelevant and will disregard them.

Additionally, in their Reply, Plaintiffs argue that Defendants did not meet their "obligations" in opposing Plaintiffs' Rule 56.1 Statements, such that large portions of it should be deemed admitted. (Pls.' Reply 4.) Plaintiffs fault Defendants for "reciting verbatim the

### 4.  Admissibility of Declarations

#### a.  Legal Standard for Expert Opinions

Defendants lodge several specific challenges to Plaintiffs' experts.  They contend that "[a]ll but one of Plaintiffs' expert declarations should be stricken in their entirety, or the indicated portions disregarded, and the corresponding Statement of Fact paragraphs disregarded as well."  (Defs.' Opp'n 12.)

An expert may offer testimony to assist the factfinder in "understand[ing] unfamiliar terms and concepts."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).[31]  Federal Rule of Evidence 702 provides that a witness qualified as an expert may only provide such testimony if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of expert testimony has the burden of establishing these elements by a preponderance of the evidence.  *See United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004).

---

evidence already relied upon by Plaintiffs and/or recharacterizing or restating the cited evidence, including adding irrelevant facts or legal arguments."  (*Id.*)  While Defendants are under no obligation to cite *different* evidence in support of their counter-statements—indeed, they may simply maintain that the evidence cited by Plaintiffs does not support the proposition in the statement at issue—the Court, as discussed below, will discount any statements it deems irrelevant or that constitute legal argument.

[31] For example, an expert may testify about the relevant statutory or regulatory framework.  *See, e.g., Bilzerian*, 926 F.2d at 1294–95 (assisting with federal securities regulation); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190–91 (S.D.N.Y. 2009) (assisting with FDA regulations).

The district court must "ensure[] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 800 (1993), by applying the elements of Rule 702, as well as the relevance standard in Rule 401, *see Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002) ("In fulfilling this gatekeeping role, the trial court should look to the standards or Rule 401 in analyzing whether proffered expert testimony is relevant . . . . and whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." (internal quotation marks omitted)).

"Rule 26 of the Federal Rules of Civil Procedure requires all expert witnesses to submit a written report that includes a complete statement of all opinions the witness will express[,] the basis and reasons for them[,] [and] the facts or data considered by the witness in forming them." *Morrit v. Stryker Corp.*, No. 07-CV-2319, 2011 WL 3876960, at *5 (E.D.N.Y. Sept. 1, 2011) (internal quotation marks omitted). Further, Rule 47(c)(1) "provides that a party who fails to provide information required by Rule 26(a) is not permitted to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or . . . harmless." *Id.*; *see also Commercial Data Servers., Inc. v. IBM*, 262 F. Supp. 2d 50, 61 (S.D.N.Y. 2003) ("[A] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . . on a motion any witness or information not so disclosed."). Such a prohibition does not extend to new facts and "evidentiary details." *See Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011). Accordingly, if a party fails to offer a satisfactory reason for failing to comply with Rule 26, that fact "weighs very strongly in favor of preclusion." *Morrit*, 2011 WL 3876960, at *6; *see also Prendergast v. Hobart Corp.*, No. 04-CV-4132, 2010

54

WL 3199699, at *5 (E.D.N.Y. Aug. 12, 2010) (finding that the "[p]laintiff had ample time for

expert discovery in this case and has provided no justification for her failure to disclose the

opinions in [the expert's] affidavit with his expert report or during his deposition," and that

"[t]he opinions set forth for the first time in [the expert's] affidavit are therefore properly

stricken on this ground alone.").

 "Because the purpose of summary judgment is to weed out cases in which there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law, it is appropriate for district courts to decide questions regarding the admissibility

of evidence on summary judgment," where the Court must exercise this "gatekeeper" role.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (citations, footnotes, and internal quotation

marks omitted).  "Districts courts have broad discretion in determining how to ascertain whether

proffered expert testimony is admissible."  *Berk v. St. Vincent's Hosp. and Medical Ctr.*, 380 F.

Supp. 2d 334, 351 (S.D.N.Y. 2005).  Nonetheless, excluding expert testimony is a "drastic

remedy," *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* No. 94-CV-5587, 2002 WL 31780188,

at *3 (S.D.N.Y. Dec. 11, 2002), and should be used sparingly, "even when there has not been

strict compliance with Rule 26," because exclusion "may at times tend to frustrate the Federal

Rules' overarching objective of doing substantial justice to litigants."  *Scientific Components*

*Corp. v. Sirenza Microdevices, Inc.,* No. 03-CV-1851, 2008 WL 4911440, at *4 (E.D.N.Y. Nov.

13, 2008).

<u>b.  Application to Experts</u>

 Defendants first contend that the declarations prepared by Plaintiffs' Wetlands, Traffic,

Planning, and Architecture Experts—Barbara Beall ("Beall"), William Fitzpatrick

("Fitzpatrick"), Alan Weinstein ("Weinstein), and Susannah Drake ("Drake")—should be stricken because they are irrelevant to a facial challenge. (*See* Defs.' Opp'n 14.)

Before proceeding to the specific challenges to each expert, two overall contentions are worth addressing. First, as described in the next section, the Court finds Defendants' contention that the experts' findings "would only be relevant [to] an as-applied challenge," (*id.*), to be without merit. The effect of the Challenged Laws on Plaintiffs is not only relevant to their discrimination claims, but is also suggestive of the degree to which the Challenged Laws may affect other religious groups. The Court therefore denies Defendants' relevance challenge.[32] Second, Defendants contend that the declarations at issue contain opinions not disclosed in the expert reports, as required by Rule 26. (*See* Defs.' Opp'n 13–14.) In support of this claim, Defendants only identify paragraphs which they claim were not disclosed. Plaintiffs contest Defendants' claim, arguing that "[e]ach opinion stated by the expert witnesses was disclosed to the Defendants in either the initial or rebuttal reports," citing supporting evidence and contending that some of the supposedly new opinions just contain new facts or elaborations on previously disclosed opinions. (Pls.' Reply 12–13 (citing Reply Decl. of Paul Savad in Supp. of Pls.' Mot. for Summ. J. ("Savad Reply Decl.") Ex. 417 (documenting disclosures) (Dkt. No. 191).) The Court is satisfied that Plaintiffs disclosed the reports at issue and therefore denies Defendants' Rule-26-based challenge. (*See, e.g.*, Beall Decl. ¶¶ 16, 19 (discussing, in paragraph 19, Ulman's statement that there may be another lot in the Village that is larger than 10 acres, which is an elaboration on Beall's previously-disclosed opinion, embodied in paragraph 16, that "there are

---

[32] The same applies to Defendants' relevance challenge to the declarations of the individual Plaintiffs and that of Plaintiffs' expert, Steven H. Resnicoff, an expert in Jewish religion and law.

no other available vacant lots within the Village of Pomona that could support an educational institution besides the Subject [Property]").)

Regarding specific expert opinions, Defendants first challenge the Beall Declaration, Plaintiffs' wetlands expert, on a few grounds. First, Defendant contends that Beall discusses matters beyond her expertise, including "the Village's Master Plan, the utility of the SEQRA process, and the Village's laws related to Educational Institutions and Dormitories." (Defs.' Opp'n 15 (citations omitted).) While Defendants' discussion of this issue is rather flippant, the Court agrees that Beall does, at times, venture past her area of expertise in her declaration. (*See, e.g.,* Beall Decl. ¶ 231 (declaring that "automotive repair schools [and] driving schools . . . . can be accredited by various accrediting bodies"). The Court will disregard those statements in considering the pending Motions for Summary Judgment, without prejudice to Defendants' renewing their Motion to Strike. *See Takeda Chem. Industr., Ltd. v. Mylan Labs., Inc.*, Nos. 03-CV-8253 et al., 2006 WL 44053, at *2 (S.D.N.Y. Jan. 9, 2006) (striking portions of expert's opinion that "fall far outside the realm" of his "area of . . . expertise").

Second, Defendants contend that Beall improperly offers "legal conclusions and policy analysis." (Defs.' Opp'n 16.) The Court is not convinced that Beall cannot engage in "policy analysis" related to wetlands use, nor does the mere use of legal jargon, or reference to laws that govern wetlands use, render an opinion a "legal conclusion." Therefore, the vast majority of Beall's opinions are admissible. However, the Court will exclude any statements that cross the line from policy analysis to pure legal conclusions, such as when Beall only interprets the applicable law itself. (*See, e.g.,* Beall Decl. ¶¶ 113–122 (stating, and explaining, legal conclusion that the Wetlands Law was not necessary for the Village to comply with federal or

57

statute statutory requirements); ¶ 257 ("The Village has the authority to complete an EIS review under SEQRA for an educational institutional project.").)  *See Jones v. Midland Funding, LLC*, 616 F. Supp. 2d 224, 227 (D. Conn. 2009) ("An expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the [c]ourt." (brackets and internal quotation marks omitted)).  This holding is again without prejudice to Defendants' renewing their Motion To Strike.

Third, Defendants contend that the Beall Declaration "should be stricken or disregarded in substantial part because it is based on speculation and/or lacks any reliable methodology." (Defs.' Opp'n 16.)  Defendants allege, more specifically, that Beall "makes sweeping statements with little or no support," and "purports to apply methodologies that are unreliable at best," e.g., identifying wetlands by looking at aerial photos and maps.  (Defs.' Opp'n 17.)  While the Court will consider the evidence cited—which properly may, as Plaintiffs point out, be personal knowledge, (*see* Pls.' Reply 11); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (noting that expert testimony may be based on "personal knowledge or experience")—to assess the probative value of Beall's testimony, Defendants' fleeting challenge to Beall's conclusions and methodology, without evidence or support for that challenge beyond citation to a couple of paragraphs in the Beall Declaration, is unsubstantiated.  *See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 749 F. Supp. 2d 130, 132 (S.D.N.Y. 2010) (denying motion for summary judgment in part because challenge to expert's methods consisted of "nothing more than attorney argument," and the "[d]efendants did not offer the opinion of a single expert discrediting or casting doubt on [the expert's] methodology").  Further, given Beall has identified support for her conclusions throughout her report, the Court finds that her opinions are

admissible, and that Defendants' objections, at best, go to weight. *See Amorgianos,* 303 F.3d at 267 ("Where an expert otherwise reliably utilizes ... methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility[,] of the expert's testimony."); *Cohalan v. Genie Indus., Inc.,* No. 10–CV–2415, 2013 WL 829150, at *5 (S.D.N.Y. Mar. 1, 2013) ("'Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony.'" (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995))); *Quiles v. Bradford–White Corp.,* No. 10–CV–0747, 2012 WL 1355262, at *3 (N.D.N.Y. Apr. 18, 2012) ("'[G]aps or inconsistencies' in an expert's reasoning, or arguments that an expert's conclusions are wrong, 'go to the weight of the evidence, not to its admissibility.'") (quoting *Campbell v. Metro. Prop. and Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir. 2001)); *CIT Group/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.,* 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011) ("Questions about the . . . sufficiency of the evidence upon which the expert relied . . . are for cross-examination."); *see also MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* No. 09–CV–3255, 2012 WL 2568972, at * 15 (S.D.N.Y. July 3, 2012) ("Indeed, most objections to expert testimony are related only to the weight of the evidence, not its admissibility.").  Accordingly, Defendants' Motion to Strike the Beall Declaration is denied in its entirety without prejudice.

Defendants next challenge the Declaration of Fitzpatrick, Plaintiffs' traffic expert. According to Defendants, Fitzpatrick's opinions are "entirely unsupported" because Plaintiffs' rabbinical college is hypothetical, and because Plaintiffs "have not provided any site plans, estimated traffic volumes, attendance or population estimates[,] or any other information that

might in some way substantiate his analysis."  (Defs.' Opp'n 17.)  Defendants provide no support

for the contention that Fitzpatrick is required to rely on previously provided reports on traffic

volumes and population estimates, nor do they levy specific challenges to the particular

conclusion that Fitzpatrick draws.  *See Astra Aktiebolag v. Andrx Pharm., Inc.,* 222 F. Supp. 2d

423, 491 (S.D.N.Y. 2002) (denying motion to strike portions of expert's testimony and report

because "[p]ursuant to Rule 703, an expert may rely on any facts or data 'of a type reasonably

relied upon by experts in the particular field,' including facts, data, and opinions that are

otherwise inadmissible.  There is no requirement that an expert must run his own tests.").

Moreover, Fitzpatrick's opinions appear to be, for the most part, supported.  (*See, e.g.,* Decl. of

William D. Fitzpatrick ¶¶ 35 (citing aerial view of intersection in support of its description), 49

(noting that "the basis in professional traffic engineering for estimating traffic generation for a

site . . . is the proper application of the Institute of Transportation Engineering (ITS) published

database"), 54 (describing ITS database methodology); 120–173 (describing University/College

ITS database reference, and assessing traffic impact under a variety of conditions) (Dkt. No.

152).)  The Court accordingly denies Defendants' Motion to Strike the Fitzpatrick Declaration,

without prejudice.

       Defendants also challenge the Declaration of Weinstein, Plaintiffs' planning expert,

"because it contains conclusions of law, conclusory expert opinions not supported by appropriate

evidence, expert opinions not previously disclosed . . . . , and opinions not relevant to a facial

challenge."  (Defs.' Mem. 18)  The Court agrees in part.  While the Court finds that Weinstein's

opinions were previously disclosed, even if they have changed slightly from their initial form,

(*see* Defs.' Opp'n Ex. D (noting, for example, that Weinstein's initial expert report indicated that

38 New York jurisdictions have an accreditation requirement, and that Weinstein's Declaration

changed that number to five); *see also Newell Puerto Rico, Ltd. v. Rubbermaid Inc.,* 20 F.3d 15,

22 (1st Cir. 1994) (finding that "[i]t is not unusual for experts to make changes in their opinions

and revise their analyses and reports frequently in preparation for, and sometimes even during, a

trial"), and that, as discussed below, Weinstein's opinions that are specific to the proposed

rabbinical college are still relevant to Plaintiffs' facial challenge, (*see, e.g.,* Decl. of Alan C.

Weinstein ¶ 34 (Dkt. No. 143) (noting that dormitory space is especially important for the

proposed rabbinical college because "of the length of the program of instruction"), the

declaration does contain several unsupported opinions and improper legal conclusions.  For

example, with respect to the former, Weinstein's discussion of the proposed rabbinical college's

"focused curriculum and mode of instruction" only cites unidentified "information . . . received

from Michael Tauber."  (*Id.* ¶ 29).  With respect to legal conclusions, Weinstein improperly

determines that the Challenged Laws prohibit the construction of a rabbinical college, (*see, e.g.,*

*id.* ¶ 10 (concluding that the Accreditation Law "totally exclude[s]" "an unaccredited [r]abbinical

[c]ollege")) and defines an "accessory use" as "one that is subordinate and incidental to the

primary use," (*id.* ¶ 50).  The Court will disregard such unsupported statements or legal

conclusions.  Once again, this ruling is without prejudice to Defendants' renewing their Motion

to Strike.

　　　Defendants also challenge the Declaration of Drake, Plaintiffs' Architecture expert,

arguing that it "fails to meet the required evidentiary standards under *Daubert*."  (Defs.' Mem.

19.)  Defendants specifically contend that the Drake Declaration "gives no indication that

[Drake] has ever had any experience . . . with a rabbinical college, a Torah Community, or, for

that matter, any type of religious institution of higher education," and that she also "has no idea of the nature, size, shape, capacity[,] or intended location of any of the structure that Plaintiffs intend to build at the subject site," and if the proposed rabbinical college is at all comparable to the universities she uses as comparators. (*Id.* at 20–21.)  The Court disagrees.  While Defendants are correct that Drake has no information about the exact plans for the rabbinical college, it is entirely within the scope of her expertise to opine, based on her knowledge of the field and her investigation of the Subject Property, on ways in which the community impact of a rabbinical college may be minimized.  Indeed, two of the paragraphs that Defendants specifically identify as flawed proceed in precisely this way; Drake opines that a rabbinical college *can* be built in a way that is sensitive to the surrounding community, (*see* Declaration of Susannah C. Drake ¶ 15 (Dkt. No. 154)), and provides examples of how that can be achieved, e.g., by using building materials that blend into the surrounding landscape, (*see id.* ¶ 21).  Accordingly, the Court will not strike the Drake Declaration on this basis, without prejudice to Defendants' renewing their Motion to Strike.

### c.  Tauber Declaration

Relatedly, Defendants challenge the Declaration of M. Tauber, "Tartikov's principal," on several grounds, including relevance and the inclusion of opinion testimony, information beyond Tauber's personal knowledge, and legal conclusions.  (Defs.' Mem. 22–23.)  The same standards with regard to legal conclusions and opinions apply to his Declaration, and personal knowledge is required for admissibility.  *See DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is

competent to testify on the matters stated.'" (quoting Fed. R. Civ. P. 56(c)(4)) (citing Fed. R. Evid. 602)); *Sellers v. M.C. Floor Crafters, Inc,*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

While the relevance challenge is meritless for the reasons discussed below, Defendant is correct that there are inadmissible statements in the Tauber Declaration.  It contains statements that are unsupported by personal knowledge, (*see, e.g.,* Tauber Decl. ¶ 7 (Dkt. No. 148) ("Every student who will attend the [r]abbinical college is compelled by his religious beliefs to pursue this study.")), statements that are unhelpful lay opinion, (*see id.* ¶ 14 ("I know that there is a great shortage of qualified rabbinical judges who can resolve issues according to the true meaning of our religious laws."), and statements that are improper legal conclusions, (*see id.* ¶ 41 (explaining that the process for "a zone/text amendment or variance . . . is a long and discretionary process")).  The Court will disregard such statements, but otherwise not strike the Declaration.  This ruling is, once again, without prejudice to Defendants' refiling their Motion to Strike.

### 5.  Governing Standards for a Facial Challenge

As the Court previously noted, "[f]acial invalidation is, manifestly, strong medicine that has been employed by [courts] sparingly and only as a last resort," wherein a plaintiff has a "heavy burden in advancing her claim."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569,

580 (1998) (internal quotation marks omitted); *see also Cranley v. Nat'l Life Ins. Co. of Vt.*, 318

F.3d 105, 110 (2d Cir. 2003) ("A plaintiff making a facial claim faces an uphill battle because it

is difficult to demonstrate that the mere enactment of a piece of legislation violates the plaintiff's

constitutional rights.").  The oft-cited standard for facial challenges is derived from dicta in

*United States v. Salerno*, 481 U.S. 739 (1987), wherein Chief Justice Rehnquist wrote that "the

challenger must establish that no set of circumstances exists under which the [challenged law]

would be valid."  *Id.* at 745.  Defendants spill substantial ink pressing the *Salerno* formulation in

their briefing, arguing that Plaintiffs need to show that the Challenged Laws are unconstitutional

"in all applications."  (Defs.' Mem. 7; *see also* Defs.' Opp'n 1 ("It is well-established that the

inquiry in a facial challenge, as opposed to an as-applied challenge, is whether the challenged

provisions are *ever* capable of constitutional application."); *id.* at 8 ("Rather, the crux of the

inquiry in this straightforward facial challenge is whether the challenged laws can ever be

capable of constitutional application.").  It is for this reason that Defendants often contend that

Plaintiffs' "religious practices" and "the specifications of their still-hypothetical rabbinical

college" are "immaterial and irrelevant," (Defs.' Opp'n 1; *see also id.* at 9 (contending that facts

about "Plaintiffs' religious practices or the hypothetical development they have broadly

outlined" are "not relevant or material to the discussion, which should focus on the

circumstances surrounding the consideration and passage of the Code Provisions."), arguing that

facial challenges "do not take into account the facts and circumstances of particular plaintiffs,"

(*id.* at 8).  Defendants do recognize an exception for facial challenges made pursuant to the Free

Exercise Clause, "when a facially neutral law targets a particular religious entity," (*id.* (citing,

inter alia, *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 544 (1993)), but they

argue that such exception does not apply in this case, (*id.*; *see also id.* at 24 ("The *Lukami* exception to the entrenched facial challenge doctrine has no purchase [sic] in this case because none of the challenged laws burden Plaintiffs' hypothetical plan *and* they do not burden other developers' actions, religious or not.")).

As this Court previously explained, Defendants are correct that "[a] facial challenge is one that addresses not the application of an ordinance to a particular set of plaintiffs, but the legality of the ordinance itself." *Tartikov*, 915 F. Supp. 2d at 611 (brackets, alterations, and internal quotation marks omitted). And, despite criticism among commentators and some courts, there is a substantial body of case law that indicates the *Salerno* standard remains controlling, at least insofar as the standard's inverse is true: a law must have a "plainly legitimate sweep" to be constitutional. *See, e.g., Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (applying this standard); *United States v. Decastro,* 682 F.3d 160, 168 (2d Cir. 2012) (noting that a party making a facial challenge must show that "no set of circumstances exists under which the statute would be valid, *i.e.,* that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep" (internal quotation marks and brackets omitted)); *see also United States v. Booker*, 543 U.S. 220, 275 (2005) ("[I]t is abundantly clear that the fact that a statute, or any provision of a statute, is unconstitutional in a portion of its applications does not render the statute or provision invalid . . . .").

However, there are exceptions to the *Salerno* standard. First, it plainly does not apply to First Amendment claims. *See United States v. Farhane*, 634 F.3d 127, 138–39 (2d Cir. 2011) (acknowledging that the *Salerno* standard is not be applicable to First Amendment claims); *Lerman*, 232 F.3d at 144 ("*Salerno*, however, does not apply to this case, in which the plaintiffs

65

assert the violation of rights protected by the First Amendment."); *see also Finley*, 524 U.S. at 580 ("To prevail [on a facial challenge], respondents must demonstrate a substantial risk that application of the provision will lead to the suppression of speech."). Second, in its 2013 Opinion and Order, the Court found that the *Salerno* line of cases is distinguishable from the instant case because no case in the *Salerno* line "involved allegations of discriminatory animus grounded in race or religion." *Tartikov*, 915 F. Supp. at 613 n.18. Thus, the Court noted that the *Salerno* test would be met if the Challenged Laws violate Plaintiffs' Equal Protection or Free Exercise rights because "a law that violates the Equal Protection Clause or the Free Exercise Clause will be invalid when applied under any conceivable circumstance, even if it can be justified by a conceivably benign motive." *Id.*[33] This ruling is law of the case, *see Brentwood Pain & Rehab. Servs., P.C. v. Allstate Ins. Co.,* 508 F. Supp. 2d 278, 288 (S.D.N.Y. 2007) (citing *In re PCH Assocs.*, 949 F.3d 585, 592 (2d Cir. 1991)); *see also United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (explaining that "[a]s a general matter . . . [a court should] adhere to its own decision at an earlier stage of the litigation" (internal quotation marks omitted)), and Defendants have failed to point to any "extraordinary circumstances" justifying its

---

[33] The Court also found motive to be relevant to Plaintiffs' facial challenges, which Defendants do not contest at this stage of the litigation. *See Tartikov*, 915 F. Supp. 2d at 611–14; *see also Santa Fe Independent Sch. Distr. v. Doe*, 530 U.S. 290, 317 (2000) (noting that it is proper for courts to examine the purpose of a law when facially challenged); *Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002) (same); *cf. Gray v. City of Valley Park, Mo.*, No. 07-CV-881, 2008 WL 294294, at *19 n.26 (E.D. Mo. Jan. 31, 2008) (noting that a facial challenge may be based on the theory that an ordinance was "passed with discriminatory intent"); *Nev. Fair Hous. Ctr., Inc.* v. *Clark County*, 565 F. Supp. 2d 1178, 1187 (D. Nev. 2008) (noting that while "legislative motive is irrelevant to a facial challenge . . . evidence of some intent to disadvantage a class of people makes the determination of the basis for the overt disparate treatment much easier"). *But see Estvanko v. City of Perry*, No. 09-CV-137, 2010 WL 4812996, at *3 (M.D. Ga. Nov. 17, 2010) ("When a facial challenge is made, the motive of the drafters of the ordinance is irrelevant.")

reconsideration, *see N. River Ins. Co. v. Phila. Reins. Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (noting that a court should be "loathe to revisit an earlier decision in the absence of extraordinary circumstances" (internal quotation marks omitted)); *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at \*3 (S.D.N.Y. July 12, 2011) (defining extraordinary circumstances as "cogent or compelling reasons not to [follow the earlier decision], such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error to prevent manifest injustice" (internal quotation marks omitted)).  Further, there is ample precedent supporting the Court's ruling, including some cases suggesting that *Salerno* is no longer the governing standard for facial challenges at all.  *See City of Chicago v. Morales*, 527 U.S. 41, 54 n.2 (1999) (plurality opinion) ("To the extent we have articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself . . . "); *Farrell v. Burke*, 449 F.3d 470, 496 n.12 (2d Cir. 2006) ("[I]t appears that the Supreme Court might decline to apply the 'impermissibly vague in all applications' standard for facial challenges wherever fundamental rights are at stake, not merely in those cases where First Amendment rights are at stake."); *accord Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) ("The idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority." (collecting cases)); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir. 2002) (finding that the *Salerno* test is a "suggestion" and that it "must give way" to more recent Supreme Court precedent (internal quotation marks omitted) (citing, inter alia, *Sternberg v. Carhart*, 540 U.S. 914 (2000))); *cf. United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) (explaining that the *Salerno*

test "has been subject to a heated debate in the Supreme Court, where it has not been consistently followed"); *Inturri v. City of Hartford*, 365 F. Supp. 2d 240, 253 n.13 (D. Conn. 2005) ("Although in some limited situations a facial challenge to a statute that does not implicate the First Amendment may be brought, there is considerable disagreement as to what standard would be applied.").[34]  *But see S.D. Myers, Inc. v. City and Cty. of S.F.*, 253 F.3d 461 (9th Cir. 2001) ("While we have held that *Casey* overruled *Salerno* in the context of facial challenges to abortion statutes, we will not reject *Salerno* in other contexts until a majority of the Supreme Court clearly directs us to do so." (citation and internal quotation marks omitted)); *United States v. Arzberger*, 592 F. Supp. 2d 590, 599 (S.D.N.Y. 2008) (noting that *Salerno*, despite criticism, remains "the basis for evaluating facial constitutional challenges in the Second Circuit").

Third, in the context of the Free Exercise Clause, despite Defendants' claim to the contrary, *Church of the Lukumi Babalu Aye, Inc. v. City Hialeah*, 508 U.S. 520 (1993), offers an alternate, directly applicable standard to apply, as it provides that "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens on conduct motivated by religious belief." *Id.* at 543.  *See also Cent. Rabbinical Congress v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014) ("But where some purposeful and exclusive regulation exists—where the object of the law is itself the regulation of religious conduct—the law is subject to heightened scrutiny, and not to rational basis review."); *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 220 (2d Cir. 2012) (applying this standard to a

---

[34] As the Tenth Circuit explained, even after *Salerno*, the Supreme Court "has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid."  *Doe*, 667 F.3d at 1124.

facial challenge under the Free Exercise Clause).  Accordingly, *Salerno* is not the appropriate standard to apply here.

More generally, based on broader principles of constitutional analysis, Plaintiffs' experience is also appropriately the backbone of their constitutional claims.  In general, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction." *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 844, 894 (1992); *see also Al Falah Ctr. v. Twp. of Bridgewater*, No. 11-CV-2391, Slip Op. at 12–14 (D.N.J. Sept. 30, 2013) (denying summary judgment to the defendants on First and Fourteenth Amendment facial challenges based on the challenged law's impact on the plaintiff and the defendant's motivation for passing that law). Here, the effect of the Challenged Laws on Plaintiffs is relevant to determining whether the Challenged Laws were discriminatory under the Equal Protection Clause and/or targeted at religious practice under *Lukumi* (and the Free Exercise Clause), and may be suggestive of the effect they have on other religious groups.  Moreover, given the Court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases," *Wash. State Grange*, 552 U.S. at 449–50, Plaintiffs' experience is especially important as a source of evidence on the constitutionality of the Challenged Laws, *see Doe*, 667 F.3d at 1123–24, 1127–28 (analyzing, in the context of a facial challenge, the particular circumstances of the plaintiffs and noting that it is proper to "appl[y] the appropriate constitutional test to the restriction at issue," rather than "conjur[ing] up whether or not there is a hypothetical situation in which application of the statute might be valid"); *Cty. Concrete Corp v. Town of Roxbury*, 442 F.3d 159, 167 (3d Cir. 2006) (finding allegations that the defendant township "knew exactly how [the] appellants intended to use their land and passed [an] [o]rdinance specifically tailored to

prevent that use" to constitute a ripe facial challenge to that ordinance); *Dibbs v. Hillsborough Cty.*, 67 F. Supp. 3d 1340, 1349–50 (M.D. Fla. 2014) ("A property owner makes a facial challenge by claiming that a municipality knew exactly how he intended to use his property and passed an ordinance specifically tailored to prevent that use." (internal quotation marks omitted)); *Cornell Cos., Inc.*, *v. Borough of New Morgan*, 512 F. Supp. 2d 238, 258 (E.D. Pa. 2007) ("The basis of an EPC facial challenge is that the mere enactment of the ordinances violates the EPC because it treats the plaintiff's property differently than other similarly situated landowners.").

Of course, this does not mean that an extended discussion of Jewish Law, the nature of a Torah Community, or the Congregation's history, among other things, necessarily are dispositive in this case. As discussed above, the unwieldiness of Plaintiffs' Rule 56.1 Statement is partially due to the repetitive inclusion of facts of this sort, which may or may not even be relevant to an as-applied challenge. Nonetheless, Defendants err in their wholesale dismissal of facts specific to Plaintiffs' experience, because it is that experience that may be the only way for the Court or a fact-finder to determine whether the Challenged Laws are facially constitutional.

### 6. Equal Protection (Claim 4)

In their Fourth Claim, Plaintiffs allege that Defendants have violated the Equal Protection Clause of the Fourteenth Amendment. (*See* SAC ¶¶ 260–63.) The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same). "Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of

discriminatory purpose." *Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009); *see also Tartikov*, 915 F. Supp. 2d 574, 614 ("To prove an equal protection violation, claimants must prove purposeful discrimination by a government actor, directed at a suspect class, such as a racial group, or a religion." (citations and internal quotation marks omitted)).  If Plaintiffs make such a showing, the government action at issue is "subject to strict judicial scrutiny," such that the law may be upheld only if it "further[s] a compelling state interest and [is] narrowly tailored to accomplish [that] purpose."  *Pyke*, 567 F.3d at 77.

Plaintiffs may establish an equal protection violation by identifying (1) "a law that expressly classifies on the basis of race," (2) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (3) "a facially neutral [law or] policy that has an adverse effect and that was motivated by discriminatory animus."  *Id.*  As the Court previously held, Plaintiffs rely on the third method here.  *See Tartikov*, 915 F. Supp. 2d at 615; *see also Jana-Rock Constr., Inc. v. N.Y.S. Dep't of Econ. Dec.*, 438 F.3d 195, 204 (2d Cir. 2006) (noting that the Equal Protection Clause is violated, unless justified by strict scrutiny, when government action is "motivated by discriminatory animus and its application results in discriminatory effect" (citations omitted)).

### a.  Discriminatory Purpose

"Discriminatory purpose implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  *Hayden v. Cty. of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999) (internal quotation marks omitted).  Though the desire to discriminate need not be the sole motivating factor, *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)

71

("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."), a plaintiff will only "be permitted to take his case to trial if he proffers evidence that strongly indicates that discrimination was a significant reason for a public body's actions and the defendant body, or its members, fails to counter that evidence with its own clear evidence that a majority acted with permissible motives," *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 786 (2d Cir. 2007). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266 (internal quotation marks omitted). In assessing discriminatory intent in the land use context, courts consider "the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmkaing process departed from established norms, statements made by the decisionmaking body and community members, reports issued by the decisionmaking body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available." *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014); *see also id.* ("Discriminatory intent may be inferred from the totality of the circumstances," including "historical background" and "contemporary statements made by the decision-making body," or "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive."); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (same); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (explaining that "[i]ntent to

72

discriminate may be established in a number of ways," and may be "inferred from the totality of

the relevant facts," including "historical background . . . particularly if it reveals a series of

official actions taken for invidious purposes; [and] the specific sequence of events leading up to

the challenged decision, such as zoning changes for a given site enacted upon . . . learning of [the

plaintiff's] plans for . . . construction" (alterations and internal quotation marks omitted) (quoting

*Arlington Heights*, 429 U.S. at  267–68)).  However, Plaintiffs cannot rely on mere conclusory

allegations to establish this element of their Equal Protection claim.  *See Tiraco v. N.Y.S. Bd. of

Elections*, 963 F. Supp. 2d 184 (E.D.N.Y. Aug. 7, 2013) ("[The] [p]laintiff's conclusory

allegations likewise fail to state a viable Fourteenth Amendment equal protection claim."); *33

Seminary LLC v. City of Binghamton*, 869 F. Supp. 2d 282, 310 (N.D.N.Y. 2012) (finding the

plaintiff's allegations insufficient because they were "wholly conclusory").

There is ample evidence in the record to make the question of discriminatory purpose a

disputed fact.  First, there is the timing of the Challenged Laws.  With regard to the Accreditation

Law, the relevant provisions of which were adopted in January 2001 and amended in September

2004, while the Parties dispute exactly what the nexus of the relevant local laws was, they agree

that, in January 2000, the Village Planner circulated memos entitled "Proposed Primary School

and Pre-School ([Yeshiva Spring Valley] Pomona) and the Village Zoning Regulations regarding

Schools," recommending that the Village adopt zoning laws for schools, which were otherwise

"scant." (Pls.' 56.1 ¶¶ 123–24.)  Mayor Marshall at the time stated, in the context of the

Accreditation Law, that "[t]hey[]," presumably the Orthodox Jews behind the Yeshiva, "[are]

going to come in and we're going to be caught with our pants down if we don't move."  (Pls.'

56.1 ¶ 126 (citing Savad Decl. Ex. 3 (Marshall Tr.) 96–98).)  Additionally, in 2004, the year that

73

the Accreditation Law was amended, Yeshiva Spring Valley had its tax-exempt status denied for the first time, the Congregation purchased the Subject Property, and the Village participated in a lawsuit filed to challenge Ramapo's adoption of the ASHL.  (Pls.' 56.1 ¶¶ 4, 99, 138, 324, 360; Defs.' 56.1 ¶¶ 138.)  Moreover, while Ulman indicated that the Accreditation Law was passed to "strengthen the Village's control over schools," (Pls.' 56.1 ¶ 144; Defs.' Counter 56.1 ¶ 144), since 2001 there have been no schools or higher education institutions of any kind in the Village, (Pls.' 56.1 ¶ 143).  Also in 2004, the Village passed a resolution noting that the Board of Trustees "opposes in the strongest possible terms any public officials who abdicate their responsibility of office by placing the politics of special interest groups and individual developers ahead of the best interest of the people they are committed to serve."  (Savad Decl. Ex. 179 (Jan. 26, 2004 Board of Trustees meeting minutes), at 2–3)  Ulman admitted that Orthodox Hasidic Jews are one such special interest group.  (*See* Savad Decl. Ex. 15 (Ulman Decl.) 979.)  Therefore, even if Defendants were not aware until November of 2004 that the Congregation had purchased the Subject Property and that it would be used for a rabbinical college, (*see* Pls.' 56.1 ¶¶ 148–49), the evidence suggests that Defendants were at least aware of the growth of Orthodox/Hasidic community in Ramapo prior to that time, and that this community may have sought to expand in the Village through educational institutions, at the time of the passage of the relevant portions of the Accreditation Law in January 2001, as amended in September 2004.

With regard to the Dormitory Law, the relevant provisions of which were adopted in September 2004 and January 2007 at the aforementioned January 22, 2007 meeting, Mayor Marshall reported that there was "a hostility" among attendees "engendered from [an] article in

*The Journal News* regarding the Tartikov project," (Pls.' 56.1 ¶ 161 (citing Savad Decl. Ex. 3

(Marshall Tr.) 176 ("There were several meetings during my time that were nasty, this was one

of them"); Defs.' Counter 56.1 ¶ 161; *see generally* Savad Decl. Ex. 78 (Jan. 22, 2007 Meeting

Transcript).)[35]  One meeting attendee noted that he or she had heard that the Congregation's

proposal was for "rabbinical students and their families," and sought a way prevent institutions

from being "flooded with family members and children, *and all of that sort*." (*Id.* at 69–70

(emphasis added).)  Mayor Marshall indicated, in response, that the "[a]ccessory use" provision

of the Dormitory Law "addresses that to some degree." (*Id.* at 71.)  Another meeting attendee,

who appears to live just outside the Village, stated, in reference to the Congregation's apparent

plan, that "[e]veryone should understand that this is not going to happen, and we're not going to

let it happen.  Let's stop it now.  [Multiple shouts of 'Stop it now!']  Their counsel is here to

protect their interests.  We're here, the people who live in this village, to protect our interests,

okay." (*Id.* at 21.)  Yet another attendee specifically indicated that because the rabbinical college

"would entirely change the character . . . . [and] politics of the village . . . . there has to be a

solution through the zoning laws that prohibits such a large number of people being within one

property, and one institution." (*Id.* at 10.)[36]  Therefore, the evidence at the very least indicates

---

[35] The Court recognizes that Defendants note the first portion of the Dormitory Law was
passed before Defendants became aware of the Congregation's purchase of the subject property
in November 2004.  (Defs.' Mem. 27; *see also* Pls.' 56.1 ¶ 148–49; Defs.' 56.1 ¶ 116.)  This fact,
however, does not place Plaintiffs' equal protection claim outside of the zone of disputed facts.

[36] As laid out below in the context of comments made outside of this particular meeting,
contrary to Defendants' objections, statements by community members, even if not a part of the
decisionmaking body, are relevant in assessing discriminatory purpose, *see Tsombanidis v. West
Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (directing the district court to consider
whether private citizens' "hostility motivated the [municipality] in initiating . . . its . . . efforts"
on remand); *LeBlanc Sternberg*, 67 F.3d at 425 ("Discriminatory intent may [be demonstrated]

that the Dormitory Law was passed at a time at which there was great hostility towards the

Orthodox Jews in the community or, at the very least, hostility to the construction of a large

school of the type that Plaintiffs sought, namely one with on-campus family housing.

The Wetlands Law, the relevant provisions of which were adopted in April 2007, was

first considered at the aforementioned January 22, 2007 meeting.  (Pls.' 56.1 ¶ 173; Defs.'

Counter 56.1 ¶ 173.)  The Village did not conduct any studies prior to the adoption of the law to

determine where the Village's wetlands were, what threats they faced, or how best to protect

them, (Pls.' 56.1 ¶ 190; Defs.' Counter 56.1 ¶ 190), though Mayor Marshall was generally aware

of the existence of Wetlands on the Subject Property at the time, (Pls.' 56.1 ¶ 180; Defs.'

Counter 56.1 ¶ 180).  Nonetheless, between the January meeting and the passage of the Wetlands

Law, Trustees Sanderson, Louie, and Yagel indicated in campaign materials that voters needed

to "stand up to the threat" that the Congregation posed, further stating "[y]ou need to vote for a

team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute

as a hammer against our village."  (Pls. 56.1 ¶ 275; Defs.' Counter 56.1 ¶ 275.)  Trustee

Sanderson also specifically indicated in a campaign video that the rabbinical college "could

completely change the village and the make-up of the village," (Pls.' 56.1 ¶ 279 (citing Savad

Decl. 17 (Sanderson Tr.) 125–128); Defs.' Counter 56.1 ¶ 279), and each candidate also more

generally campaigned on a platform to "keep Pomona Pomona," which Trustee Louie indicated

---

. . . by showing that animus against the protected group was a significant factor in the position
taken by . . . those to whom the decision-makers were knowingly responsive." (internal quotation
marks omitted)), particularly to the extent that Village officials were aware of these comments,
(see Pls.' 56.1 ¶¶ 220–223; see also id. ¶¶ 248, 251, 253–54, 256, 258 (indicating the Village
officials took public comments into account.)  Therefore, unlike the statements on websites and
blogs discussed above, these statements are not offered for the truth, but rather to demonstrate
that such statements were made to, or in the presence of, Defendants.

meant to "keep Pomona the village that it is and not change it," (Pls.' 56.1 ¶ 294 (citing Savad

Decl. Ex. 9 (Louie Tr.) 156).  In fact, the campaign materials for all three candidates indicated

that "the single most important issue facing the village is clearly the Tartikov development."

(Pls.' 56.1 ¶ 274; Defs.' Counter 56.1 ¶ 274.)  Accordingly, as was the case with the Dormitory

Law, the Wetlands Law was passed at a time when there was intense focus on the proposed

rabbinical college but when no studies or analysis had been conducted of the needs, or nature, of

wetlands in the Village.  The juxtaposition of these facts supports Plaintiffs' claim that

Defendants adopted the Wetlands Law as a pre-textual means to unlawfully target Plaintiffs'

land use plans for the Subject Property.

Second, in addition to some of the suggestive comments described above, a number of

arguably discriminatory comments made by Village officials and community members prior to

the passage of the Challenged Laws suggest animus towards the Hasidic Jewish community.[37]

*See Yeshiva Chofetz Chaim Radin Inc. v. Vill. of New Hempstead by its Bd. of Tr.*, 98 F. Supp. 2d

347, 355 (S.D.N.Y. 2000) (holding that "discriminatory comments by the [m]ayor . . . present

grounds for allowing a jury to judge the credibility, and motivation, of the [m]ayor . . . as well as

---

[37] Of note, a number of the statements Plaintiffs cite do *not* indicate discriminatory animus, but rather indicate the degree of opposition to the rabbinical college, or indicate that the reason for the opposition was (and is) the rabbinical college's size.  (*Compare, e.g.,* Pls'. 56.1 ¶ 231 (noting that Lynn Yagel stated "there is no hope for Rockland County due to RLUIPA development" *with* Savad Decl. Ex. 11 (L Yagel Tr.) 127 (noting that the statement referred to "overdevelopment").)  While these statements are relevant to whether the rabbinical college was targeted, they do not themselves reveal a *discriminatory* purpose.  Nonetheless, there is enough other evidence to suggest a discriminatory motive to send this case to a jury to determine if the Challenged Laws were motivated by discriminatory animus.

the motivation that can be attributed to the [v]illage itself in passing the disputed provisions").

These statements are undisputed as described below:

- Village Planning Board Chairperson Melvin Cook, who admittedly was not employed by the Village until after the Challenged Laws were adopted, indicated that "[s]ome of us see the Rabbinical College as the beginnings of another restricted religious community similar to New Square," (Pls.' 56.1 ¶ 211 (citing, inter alia, Savad Decl. Ex. 1 (Cook Dep. Tr.) 102); Defs.' Counter 56.1 ¶ 211), which Cook called a "tribal ghetto" of ultra-orthodox Jews, (Pls.' 56.1 ¶ 111 (citing Savad Decl. Ex. 1, at 89–90)). Cook indicated that the increased number of Orthodox Hasidic Jews hurt the community because of their adverse effect on the school systems and diversity in Ramapo. (Pls.' 56.1 ¶ 296 (citing Savad Decl. Ex. 1, at 79–80 ("I felt [the increase in Ultra Orthodox Jews] has hurt the community and it certainly affected the school systems in Ramapo.")); Defs.' Counter 56.1 ¶ 296.)[38]

- Village Clerk Leslie Sanderson indicated that if "rampant rumors" about "how many people" the rabbinical college would bring in "were true[,] it would usurp the Village, perhaps the Village Board and the amount of people that live there." (Pls.' 56.1 ¶ 214 (citing Savad Decl. Ex. 11 (Sanderson Dep. Tr.) 200); Defs.' Counter 56.1 ¶ 214.)

- A published letter to the editor of *The Journal News*, which Defendants admit was authored at least in part by Trustee Yagel, contended that "[t]o say that a virtual mini-city within the village—that will house thousands of homogenous individuals who can control village elections—is 'natural' in any way is simply not true." (Pls.' 56.1 ¶ 215; Defs.' Counter 56.1 ¶ 215 (citing Savad Decl. Ex. 150 (published letter)).) Trustee Yagel was also quoted in a *New York Times* article as saying that it is "disgusting" that the Congregation was "trying to create this mini city in our village." (Pls.' 56.1 ¶ 246 (citing Savad Decl. Ex. 4 (B. Yagel Tr.) 245–46; *id.* Ex. 112); Defs.' Counter 56.1 ¶ 246.)

---

[38] The Court disagrees with Defendants' assertion that Cook's motives are irrelevant because he was not employed by the Village when the laws were passed. The Village's perception of the Hasidic community after the passage of the Challenged Laws is at least circumstantial evidence that is suggestive of the Villages' prior views. *Cf. Arlington Heights*, 429 U.S. at 266 (noting propriety of considering "circumstantial evidence" and the relevance of a "pattern" of discrimination).

Additionally, Plaintiffs contend that references to "diversity" are "code for keeping Hasidic and Orthodox Jews out of the Village because the people making these statements know that there are few Orthodox Jews and no Hasidic Jews in the Village." *See McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (indicating that neutral terms of this sort can be facially discriminatory when put into context).

- Village resident Robert Prol sent a letter to Mayor Sanderson and Trustees Yagel, Banks, and Louie less than a year before he was appointed to the Village planning board, stating, "[t]here is only one outcome acceptable to the community, and that is to maintain our fair zoning laws and the way of life we have all invested in." (Pls.' 56.1 ¶¶ 234–35 (citing, inter alia, Savad Decl. Ex. 2 (Prol Dep. Tr.) 123–24); Defs.' Counter 56.1 ¶ 234.) Trustee Louie responded by admitting "[i]t's a little unsettling what's going on, but we are sure we can maintain our zoning laws in Pomona and keep our neighborhood rural and diverse." (Pls.' 56.1 ¶ 236 (citing Savad Decl. Ex. 9 (Louie Dep. Tr.) 221–26).) Robert Prol also referred to the Congregation as "trying to force their slum on everyone else," though he later clarified that by "slum" he meant that the "density level . . . would [result in] lots of garbage and packages and everything else all over the place." (Pls.' 56.1 ¶ 244; Defs.' Counter 56.1 ¶ 244 (citing Savad Decl. Ex. 2, at 86, 92).) A year after Robert Prol sent the aforementioned letter, Mayor Sanderson appointed him to the planning board. (Pls.' 56.1 ¶ 235.)

- Trustee Sanderson, in an email to Trustee Yagel, provided draft language for an email blast that included the need to "defeat any developers who plan to take over our village and our area." (*Id.* ¶ 281 (citing Savad Decl. Ex. 9 (Louie Dep. Tr.) 115–116); Defs.' Counter 56.1 ¶ 281.) Trustee Sanderson also publicly stated that the Village needed to "maintain[] its cultural and religious diversity," (Pls.' 56.1 ¶ 284 (citing Savad Decl. Ex. 310 (Request for Admission) Response No. 106)), and highlighted her concern about the Orthodox Hasidic "bloc vote" because of its impact on the Ramapo School District, (*see* Pls.' 56.1 ¶ 295 (citing, inter alia, Savad Decl. Ex. 11 (Sanderson Dep. Tr.) 155–56); Defs.' Counter 56.1 ¶ 295.)

- Trustee Louie emailed a Village resident indicating that a goal of hers was to "[m]aintain[] the demographic makeup of the village the way it is." (Pls.' 56.1 ¶ 307 (citing Savad Decl. Ex. 9 (Louie Dep. Tr.) 139–140); Defs.' Counter 56.1 ¶ 307.)

- The aforementioned Facebook post and related text messages between Mayor Yagel and Louie, concerning a gathering of Hasidic Jews at Provident Bank Ballpark, (*see* Savad Suppl. Decl. Ex. 1), and the associated adverse inference sanction.

It is worth noting that all of these statements were made *despite* evidence of an attempt to take care not to make incriminating statements, as Mayor Marshall indicated at the aforementioned January 22, 2007 meeting:

> Ladies and gentleman, let me say something. We sitting at this table have limitations that are placed on us as to what we can say and what we can't say, because our attorney tells us what we can say and what we can't. I can't say what I feel, I can't. If I agree with you, if I don't agree with you, I don't have the

> luxury of being able to say that here.  All I can say is that every member of this
> board works very, very hard to do what is best for this community.  You have
> your issues.  Don't assume because no one has gotten up and said, wow, I agree
> with you, oh boy; don't assume that because we didn't do that we don't agree.
> We may or may not, but please give us the benefit of the doubt.

(Pls.' 56.1 ¶ 416 (citing, inter alia, Savad Decl. Ex. 78, at 58); *see also,* Pls.' 56.1 ¶ 422 (noting that in advance of a meeting, "Trustee Yagel warned Mayor Sanderson and Trustee Louie that they '[m]ust be very careful about what we say.  Don't know who's in the audience.  Savad might show up again.") (citing, inter alia, Savad Decl. Ex. 105 (email from Yagel)); *id.* ¶ 425 ("Trustee Yagel stated that the residents should make sure that when they speak in public that they don't speak in a discriminatory manner because that can be construed as 'the village is discriminating.'" (quoting Savad Decl. Ex. 239 (Affidavit of Laura M. Kramer) ¶ 10) (citing Savad Decl. Ex. 4, at 189–90); Defs.' 56.1 ¶ 425 (clarifying this statement).)

Third, the Village's behavior with respect to other proposed projects is suggestive.  For example, Trustee Sanderson opposed an Orthodox middle school on property outside the town in May 2007, indicating that it did "not sound good" and encouraging others to attend public hearings.  (Pls.' 56.1 ¶ 375 (citing Savad Decl. Ex. 11 (Sanderson Dep. Tr.) 224–26).)  Additionally, as early as 1996, the Village Attorney, then Ruben Ortenberg, advised residents to contact the Town of Ramapo to object to the expansion of an Orthodox Hasidic school.  (Pls.' 56.1 ¶ 376.)  At the same time, the Village did not challenge a variety of secular development projects of equal size that may have "threatened" the Village in the same way.  (*See,* e.g., Pls.' 56.1 ¶¶ 381 (noting support for concept of Barr Laboratories office building); 399 (noting that Mayor Marshall encouraged the Village to accept the construction group homes and that residents "simply [did] not have the right to choose who [their] neighbors [would] be").)  *Cf.*

*LeBlanc-Sternberg*, 67 F.3d at 431 (finding relevant that the municipality "cited potential traffic and noise problems among their reasons for opposing home synagogues but tolerated existing traffic and noise caused by secular uses").[39]

Of course, not all of the facts demonstrate discriminatory motives.  Many of the statements post-date the laws in question, and some reflect concern about over-development of property in the Village.  (*See* Defs.' Mem. of Law in Reply to Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Defs.' Reply") 6 (Dkt. No. 193).)  And the Village, in the past, has shown a willingness in other contexts to facilitate religious land use.  (*See, e.g., id.* at 7–8 (noting that Local Law 2 of 2007 for the first time allowed single-family residents to be used as houses of worship, as requested by ultra-Orthodox, Hasidic communities).)  Taken together, though, in the light most favorable to the non-movant Plaintiffs, and given the unique burden the Challenged Laws place on Plaintiffs, there is sufficient evidence for a reasonable jury to conclude that the Challenge Laws were passed with a discriminatory purpose.[40]

### b.  Discriminatory Effect

Plaintiffs also allege that the Challenged Laws had a discriminatory effect on them.  In establishing discriminatory effect, Plaintiffs are not "obligated to show a better treated, similarly

---

[39]Plaintiffs also indicate that the Village challenged other Yeshivas, (Pls.' 56.1 ¶¶ 360, 363, 376; Pls.' Supplemental 56.1 ¶¶ 23–25), yet did not challenge a large agricultural operation because it did not want to "get involved" in other villages' affairs, (Pls.' 56.1 377–78.)  In fact, in one instance, the Village did not object to an assisted living facility located just outside the Village yet encouraged residents to oppose a Yeshiva on the same property when proposed.  (Pls. 56.1 ¶¶ 374–75, 401.)

[40] Because the evidence above is sufficient for Plaintiffs' claim to survive summary judgment, the Court need not consider the claim that the Village is closely entwined with the Preserve Ramapo organization.

situated group of individuals." *Pyke*, 258 F.3d at 110 (holding that a plaintiff who "alleges that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus [] is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection."). Indeed, the cases "recognize[] that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 546 (S.D.N.Y. 2006).

Plaintiffs have established, at the very least, that whether the Challenged Laws prohibit the building of a rabbinical college is an issue of material fact. Defendants offer a defense of the Challenged Laws but devote no more than a few conclusory paragraphs to the "neutral purpose[s]" of each law. (*See, e.g.,* Defs.' Mem. 45.) To the extent Defendants offer a substantive defense, it is addressed in the context of the relevant law below.

First, with respect to the Accreditation Law, educational institutions are, in general, permitted in the Village, provided those who intend to build the institution obtain a special permit. *See, e.g.,* Defs.' Counter 56.1 ¶ 579 (citing Village Code § 130-10(F)). However, unaccredited educational institutions are not permitted under any circumstances, because an educational institution is defined by Village law as one that is "accredited by the New York State Education Department or similar recognized accrediting agency," Village Code § 130–4. (*See also* Pls.' 56.1 ¶¶ 580–81; Defs.' Counter 56.1 ¶¶ 580–81.) Plaintiffs present expert testimony indicating that their proposed rabbinical college cannot be accredited by any New York State body, which Defendants do not rebut with any evidence of their own. (*See* Pls.' 56.1 ¶¶ 583–84, 591; Defs.' Counter 56.1 ¶¶ 583–84, 591.) In fact, Defendants do not dispute that "[t]o be

82

accredited" at all, an educational institution has to first be in existence and fully operational, (Pls.' 56.1 ¶ 590; Defs.' Counter 56.1 ¶ 590), placing Plaintiffs, and likely any other group that sought to build an educational institution in the Village, in a catch-22: they cannot build a rabbinical college unless it is accredited, and they cannot have their rabbinical college accredited until it is built, (see Pls.' 56.1 ¶ 588–9; Defs.' Counter 56.1 ¶ 589–89; Savad Decl. Ex. 16 (Preston Green Dep. Tr.) 49, 89–90 (noting that the relevant accredited bodies require institutions to be operational)).  Indeed, the rabbinical college could not even be accredited by the Association of Advanced Rabbinical and Talmudic Schools ("AARTS"), a body designed to accredit schools like the proposed rabbinical college, absent changes to its curriculum and the rabbinical college being operational.  (See Savad Decl. Ex. 16 (Green Tr.) 89–90; Gordon Aff. Ex. 15 (Preston Green Witness Report) at 20–21.)  To that end, the Accreditation Law at least arguably prevents Plaintiffs from building their proposed rabbinical college.

Second, with regard to the Dormitory Law, the Village Code explicitly provides that "single-family, two-family[,] and/or multifamily dwelling units . . . shall not be considered to be dormitories or part of dormitories."  Village Code § 130–4.  (See also Pls.' 56.1 ¶ 603.)  Dormitories likewise cannot "contain separate cooking, dining or housekeeping facilities" and cannot "occupy more than 20% of the total square footage of all buildings on the lot."  Village Code §§ 130-4, 130-10(F)(12).  (See also Pls.' 56.1 ¶¶ 610, 695.)  These prohibitions arguably render it impossible for Plaintiffs, who, by religious belief, have obligations to their families that can only be fulfilled by living with them, (see Pls.' 56.1 ¶¶ 42 (noting that Jewish law imposes "conjugal duties upon a husband and wife"), 493 (noting that students must "live with their families in order to raise their family in a religious environment"); Defs.' Counter 56.1 ¶¶ 42,

83

493), and who allegedly can best complete the course of study by remaining on school grounds, (*see, e.g.,* Pls.' 56.1 ¶¶ 72 (noting that rabbinical college will be a "Torah Community" and will "involve[] intensive learning interaction, day and night, among the students, teachers[,] and lecturers," 455–56 (noting that students must "exile [themselves] into a Torah Community"); Defs.' Counter 56.1 ¶¶ 455–56), to complete their studies at the proposed rabbinical college. While it is for the jury to decide the authenticity of Plaintiffs' beliefs—and the degree that such Torah Community with multi-family housing is necessary to achieve them, which is Defendants' central dispute with these contentions—there is sufficient evidence to conclude that the Dormitory Law has a disparate impact on Plaintiffs.[41]

        Third, with regard to the Wetlands Law, two provisions, working in concert, have the apparent effect of barring construction of the rabbinical college in the Village.  First, Village law provides that "[t]he minimum lot area for an educational institution" is 10 acres. Village Code § 130-10(F)(1)(a).  (*See also* Pls.' 56.1 ¶ 14; Defs.' 56.1 ¶ 14.)  Plaintiffs argue, with sufficient evidentiary support, that the Subject Property is the only such non-government-owned property in the Village, meaning it is the only location where which the proposed rabbinical college can be built.  (Pls.' 56.1 ¶ 616 (citing Beall Decl. ¶¶ 15–19).)[42]  Second, the Wetlands Law itself

---

[41] Defendants allege, in response, that the "dormitory regulations expanded opportunities for dormitories and were enacted for the neutral purpose of conforming the village code with New York case law."  (Defs.' Mem. 46.)  First, the fact that dormitory use was permitted in such a way as to carve out Plaintiffs' plan for dormitories at the proposed rabbinical college means it has a discriminatory effect; by design, some individuals benefitted, while Plaintiffs, because of their professed religious beliefs, did not.  Second, Plaintiffs dispute that dormitories were not permitted in the Village under New York law prior to the passage of the law.  (*See* Pls.' 56.1 ¶ 132; Defs.' Counter 56.1 ¶ 132 (citing Savad Decl. Ex. 13 (Ulman Dep. Tr.) 303–304.)

[42] None of the evidence cited contradicts Plaintiffs' statement, though, as noted above, this is arguably outside the scope of Plaintiffs' Wetlands Experts' field of knowledge.

defined wetlands as "all lands and waters of the Village of Pomona . . . which have a contiguous area of at least 2,000 square feet" which contain, or are enclosed by, certain submerged vegetation, or that otherwise contain "poorly drained soils."  Village Code § 126-2.  "[W]ithin 100 feet of the boundary" of such lands, or of any water course or "water body," defined as a "body of standing water which is not dry more than three months of the year . . . and which, when wet, is customarily more than 500 square feet in water surface area," it is unlawful, unless with a permit issued by the Board of Trustees or the Planning Board, to, in relevant part, "[e]rect[] any building or structure of any kind," including "roads [or] driveway," without a permit.  *Id.* § 126-3.  The Wetlands Law also exempts properties improved by single-family homes, rendering the Subject Property only one of a handful of the 1,156 parcels in the Village affected by the law.  Village Code § 126–3(D).  (*See also* Beall Decl. ¶¶ 151–53).[43]

Plaintiffs have proffered evidence of the existence of wetlands on the Subject Property, specifically wetlands covering the vast majority of the west side of the property abutting Route 306.  (*See* Beall Decl. ¶ 280 & Ex. T (survey map of the Subject Property).)  Based on a survey map, it appears that a driveway cuts between the wetlands on the Subject Property.  (*See id.* Ex. T; *see also* Pls.' 56.1 ¶¶ 618–620 (discussing wetlands on the Subject Property and their impact); Beall Decl. ¶¶ 280–89 (discussing wetlands on property in the context of state and federal regulations), Ex. T (property map identifying wetlands) (Dkt. No. 153); Tauber Decl ¶ 28

---

[43] Defendants contend that the exception only applies to pre-existing single-family homes.  (*See* Defs.' Mem. 30.)  However, the plain language of the Wetlands Law does not contain such a qualifier.  *See* Village Code § 126-3(D) ("The aforesaid one-hundred-foot buffer in which regulated activities are not permitted to take place shall not apply to lots that *are* improved with single-family residences." (emphasis added)).

(averring that the Wetlands Law renders the Subject Property inaccessible); Second Gordon Aff. Ex. A, at 61–63 (maps identifying wetlands on property).)  Plaintiffs, however, offer evidence that "the current access road" would have "to be improved" in order to be usable for the proposed rabbinical college because there is "no other practicable access location for the Property," but that cannot be completed because the current driveway falls within 100 feet of the wetlands.  (Tauber Decl. ¶ 5.)  Plaintiffs have also proffered evidence, which Defendants do not rebut with any evidence of their own, that the Village was aware of the existence of wetlands on the Subject Property, (*see* Pls.' 56.1 ¶ 180 (noting that Mayor Marshall knew there were wetlands on the property; Defs.' 56.1 ¶ 180), such that it is plausible that Defendants targeted the rabbinical college with the Wetlands Law.

Two issues remain unresolved by the record, however.  First, it is not clear from the record why Plaintiffs cannot build an entirely new entrance road off of Route 202, which is not abutted by wetlands.[44]  Second, it is not clear to what extent the area between the wetlands is otherwise regulated by state and federal law.  In her Declaration, Beall, Plaintiffs' wetlands expert, notes that "[t]he wetlands on the west side of the Property would, at a minimum, be regulated by the Corps of Engineers, as noted on the map by the comment 'ACOE wetlands.'" (Beall Decl. ¶ 283.)[45]  Plaintiffs further suggest, in their Rule 56.1 Statement, that "99% of

---

[44] Plaintiffs indicate that "[a]ccess from the Property to Route 202 is impracticable because of the existence of steep slopes, wetlands, and wetland buffers," but the only evidence they cite is the M. Tauber Declaration.  (Pls.' 56.1 ¶ 621.)  M. Tauber, however, as discussed above, is an expert neither on environmental topography nor Village law, and as such this evidence is insufficient.

[45] An Environmental and Planning Analysis by one of Plaintiffs' experts indicates that federal regulation of wetlands ends at the wetlands themselves, suggesting there is no buffer

86

mapped aquatic resources" in the village are currently regulated by the Corps of Engineers and 80% are regulated by the N[Y]SDEC, (Pls.' 56.1 ¶ 870 (citing Beall Decl. ¶¶ 100–101)), and that "development near the wetlands on the [S]ubject Property would be regulated by the NYSDEC," (Pls.' 56.1 ¶ 906 (citing Beall Decl. ¶¶ 282–85)), which, according to an analysis prepared by one of Plaintiffs' experts, requires a permit for "activity within 100 feet of NYS designated wetlands," (Second Gordon Aff. Ex. A, at 8; *see also id.* at 27 (noting that the Wetlands Law is "critical and necessary and is in keeping with municipal functions in New York State as well as other national wetland protection interests," and that "it mirrors the NYSDEC provisions for a 100 foot jurisdiction area"); Exs. H (indicating the existence of a NYSDEC-regulated stream on the west side of the property).  If the wetlands at issue are already regulated by state and federal law in the same way as that provided for in the Wetlands Law, then it is unclear what, if any, unique impact the Wetlands Law has on the proposed rabbinical college.[46]  In this regard, it is noteworthy that Defendants claim that the Wetlands Law was intended to protect "wetlands in the Village that fell between the cracks and were not regulated by the state or the federal government."  (Defs.' Mem. 30; *see also* Defs.' 56.1 ¶ 161 (citing, inter alia Gordon Aff. Ex. 12 (Ulman Dep. Tr.) 461.)  The testimony cited, however, is unsupported by evidence and, more importantly, does not establish that the wetlands on the Subject Property were not already subject to federal or state regulation.  Defendants also argue, in conclusory fashion, that "there is no

---

requirement under federal law.  (Second Gordon Aff. Ex. A, at 8; *see also* Defs.' Mem. 30 (citing Savad. Decl. Ex. 313, at 461) (noting that there is no federal buffer requirement).)

[46] Based on exhibits to the aforementioned report, there are certainly state and federally regulated wetlands in the Village, though it is not clear whether they fall in the Subject Property or not.  (Second Gordon Aff. Ex. A, at 61–63.)

evidence that the wetlands local law has any effect whatsoever on the [P]roperty" because no study had been done. (Defs.' Mem. 46.)  However, as stated above, the *only* evidence on this issue is advanced by Plaintiffs.  Therefore, Defendants are not entitled to summary judgment as to the Wetlands Law on Plaintiffs' Equal Protection claim.[47]

In response to the fact that the Challenged Laws appear to have a discriminatory effect on Plaintiffs' proposed rabbinical college, Defendants assert that Plaintiffs could potentially build a rabbinical college "through a zone change [or] a text amendment," *see* Village Code § 130-35 (power to amend), a "use variance," *see* Village Code § 130-28(D) (variances), or a "special use permit," *see* Village Code § 130-10, through which the Parties can work together "to bring to fruition something that is legal and beneficial to all involved," (*see, e.g.,* Defs.' Mem 3, 34–35, 41, 42.)  First, as the Court previously noted, a zone change or text amendment is a "legislative process" that "Plaintiffs allege would be cumbersome and, given the hostility of Defendants, fraught with indefinite delay and uncertainty."  *Tartikov*, 915 F. Supp. 2d at 633.  (*See also* Savad Decl. Ex. 313 (Hearing Tr.) 94 (Ulman admitting that Plaintiffs "would need an amendment to one of [the Village's] laws" to build the rabbinical college).)  While Plaintiffs offer only minimal evidence to support their contention that process would be as cumbersome as they claim, (*see* Tauber Decl. ¶ 41), given the aforementioned evidence of discriminatory animus, and the fact that the decision to grant an amendment is a matter of Village discretion,

---

[47] In their Opposition, Defendants claim that because Plaintiffs have not challenged the Village's R-40 zoning they could not have built the rabbinical college anyway.  (Defs.' Opp'n 29.)  The special use permitting process, as described below, provides for educational institutions "subject to special permit approval."  *See* Village Code § 130-10(F).  The problem is that the Challenged Laws impose conditions on qualifying as an acceptable educational institution and on development near wetlands more generally, which are conditions that Plaintiffs allege the proposed rabbinical college cannot meet.

(*see* Savad Decl. Ex. 313, at 19; *see also* Pls.' 56.1 ¶¶ 657, 662; Defs.' Counter 56.1 ¶¶ 657,

662), Plaintiffs have a viable claim that seeking a zoning change or text amendment would be a

futile exercise, *see Grace Church of North Cty. v. City of San Diego,* 555 F. Supp. 2d 1126, 1138

(S.D. Cal. 2008) (granting summary judgment to plaintiff based on evidence that plaintiff had no

"reasonable expectation that any application for an extension" to use its property would be

granted), or at the very least would be fraught with delay, which may harm, or even completely

undermine, Plaintiffs' ability to construct the proposed rabbinical college.  Second, with regard

to applying for a variance, Ulman made clear that the Congregation would not have been granted

a variance even had it applied, (*see* Pls. 56.1 ¶ 626; Defs.' Counter 56.1 ¶ 626; *see also* Pls.'

Opp'n 17 (citing Savad Decl. Ex. 313, at 19 ("I agreed that it would be wasteful for them to

apply for a variance."))), suggesting that such an application would also be futile.  Third,

Plaintiffs are unable to obtain a special use permit for the rabbinical college, the mechanism by

which houses of worship and educational institutions are approved in the Village, because, as

discussed, the Challenged Laws impose conditions on special use permits by limiting what

qualifies as an "educational institution," *see* Village Code § 130-10(F); *see also Tartikov*, 915 F.

Supp. 2d at 604 ("[I]t is undisputed that the Village's zoning authorities would not have the

discretion to issue a special use permit for an unaccredited institution or to issue certain

variances under the Village's Zoning code."), and by restricting development on or near

wetlands, *see* Village Code § 126-3.  Accordingly, at a minimum, there is enough evidence to

suggest that whether Plaintiffs can successfully obtain a change in the Challenged Laws, or variance from them, is a question of fact subject to a resolution by a fact-finder.[48]

### c.  Strict Scrutiny

If Plaintiffs are able to prove that the Challenged Laws were passed with a discriminatory purpose and have a discriminatory effect, strict scrutiny would apply.  *See United States v. Bannister*, 786 F. Supp. 2d 617, 664 (E.D.N.Y. 2011) ("In cases involving alleged racial discrimination, once a discriminatory purpose and a discriminatory effect are shown, the law is subject to strict scrutiny.")  While the Challenged Laws may be justifiable under a rational basis test, they do not survive strict scrutiny.

A compelling state interest involves "some substantial threat to public safety, peace[,] or order*," Sherbert v. Verner*, 374 U.S. 398, 403 (1963), and includes only "interest of the highest order," *WDS II*, 503 F.3d at 353, and the "gravest abuses," *Sherbert*, 374 U.S. at 408.  Given this high bar, courts have held that "[a]esthetics," traffic, and "community character" are normally not compelling interests.  *See Westchester Day Sch. v. Vill. Of Mamaroneck,* 417 F. Supp. 2d 477, 554 (S.D.N.Y. 2006) ("[T]he visual impact of the [p]roject does not implicate a compelling government interest."), *aff'd*, 504 F.3d 338 (2007); *Clear Channel Outdoor, Inc. v. Town Bd. of Town of Windham*, 352 F. Supp. 2d 297, 304 (N.D.N.Y. 2005) ("[W]hile aesthetics and traffic safety are regularly found to be substantial enough government interests to support a content-neutral regulation, those interests are rarely compelling enough to support a content-based regulation."); *XXL of Ohio, Inc. v. City of Broadview Heights*, 341 F. Supp. 2d 765, 789–90

---

[48] While the Parties do not explicitly address the issue, the same analysis applies to the prospect of the Congregation obtaining a permit to build an access road within the buffer area of the wetlands on the west side of the Subject Property, pursuant to Village Code § 126–3.

(N.D. Ohio 2004) (holding that aesthetics and neighborhood preservation are not sufficiently compelling interests to withstand strict scrutiny analysis); *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1227–28 (C.D. Cal. 2002) (noting that "aesthetic harm" is not "compelling"); *Knoeffler v. Town of Mamakating*, 87 F. Supp. 2d 322, 330 (S.D.N.Y. 2000) ("Even where the government has declared a policy of promoting aesthetics and traffic safety, . . . restrictions intended to accomplish those interests have failed to pass strict scrutiny and have been struck down.").

Defendants contend that the Challenged Laws were passed "to retain [the Village's] rural and residential character" and because of a "lack of enthusiasm for high-intensity development." (Defs.' Mem. 23.)  With regard to the specific Challenged Laws: first, Defendants contend that the Dormitory Law was passed to "minimize[] the impact of a non-residential use in a single-family district," including the effect on traffic and storm-water systems," (*id.* at 25), and to comply with state law, (*id.* at 24–25).[49]  Defendants also claim they have a "compelling interest in adding permission to have dormitories as accessory uses to educational uses and a compelling

_____

[49] Specifically, Defendants contend that the Dormitory Law was passed "in response to requirements in case law."  (Defs.' 56.1 ¶ 124.)  The Village determined that the district court in *Congregation Mischknols Lavier Yakov, Inc. v. Bd. of Tr. of Vill. of Airmont*, No. 02-CV-5642 (S.D.N.Y. filed July 19, 2002) "indicated that dormitories could not be prohibited in relation to an educational use," and that the New York Court of Appeals in *Cornell Univ. v. Bagnardi*, 503 N.E.2d 509 (App. Div. 1986), "discussed the special status afforded to educational institutions in land use cases and set forth the factors to be considered by local governments when reviewing applications for such uses." (Defs.' 56.1 ¶ 124.)  Therefore, Defendants contend that the Village changed its "per-student" lot area requirement to ensure that "the entire educational institution requirement [would not be] declared unconstitutional."  (*Id.* ¶ 125.)  Defendants further contend that they adopted the accreditation requirement in order to "create a distinction between an educational institution bearing the special status, required by the New York Court of Appeals, and a commercial-type educational use, such as an automotive school[,] which is not protected by the special status standard," and the village "preferred to avoid commercial-type educational land use in Pomona."  (*Id.* ¶ 126.)

interest in further expanding opportunities for schools to have dormitories by shifting the calculus from a per-student analysis to one that is based on land use," (*id.* at 26).  Second, Defendants maintain that the Wetlands Law was passed to protect wetlands that were not otherwise protected by state and federal law, (Defs.' Mem. 30), "to protect property and infrastructures that can be severely damaged by severe storms if not properly protected through appropriate oversight and control of wetlands," (*id.* at 29), i.e., "to make sure they were not destroyed, for the health, safety, and welfare of all the residents," (*id.* at 31 (internal quotation marks omitted)), and to "protect[] the waterways and prevent[] flooding," (*id.* at 32).  Third, with regard to the Accreditation Law, Defendants allege that Local Law 1 of 2001 was passed so that educational institutions would require a special permit and so that their "density and impacts on adjoining properties would be regulated," (*id.* at 32–33), and that the definition of educational institution was expanded with Local Law 5 of 2004 to ensure it "allowed accreditation from a broader, generic entity," (*id.* at 33).  Defendants further contend that the "intent behind the definition [of educational institution] and the accreditation requirement was to ensure that only those educational uses consistent with a residential and rural area would be permitted, and that inconsistent uses would not, *e.g.*, automotive or other trade schools."  (*Id.* at 33.)

These explanations are insufficient to justify granting summary judgment to Defendants. In general, as discussed above, the stated aesthetic and community character rationales are generally not compelling state interests, and Defendants have not demonstrated that these interests are so overwhelming or gravely threatened by the institutions such as the proposed rabbinical college to render them compelling.  Defendants cite only one case suggesting otherwise, *Murphy v. Zoning Comm'n of Town of New Milford*, 148 F. Supp. 2d 173 (D. Conn.

2001), which at best only cites contradictory precedent, *see id.* at 189–90.  Further, specifically

with regard to the Dormitory Law, while certain aspects of the law may be justified by a need to

comply with other laws, Defendants offer no defense of the scope of the restrictions it contains

(for example, its ban on separate cooking, dining, or housekeeping facilities).  And, specifically

with regard to the Wetlands Law, while there is some evidence to suggest a need for a wetlands

law, (*see, e.g.,* Aff. of Amanda Gordon Ex. A, at 27 (noting that the Wetlands law is "critical and

necessary and is in keeping with municipal functions in New York State as well as other national

wetland protection interests"), Defendants offer no evidence beyond Ulman's testimony, (*see*

Defs.' Mem. 30–31), as to the nature of the threat to wetlands and the extent to which the

Village's wetlands were not already protected by state and federal law.

      Nonetheless, even if the Challenged Laws were justified by compelling interests, they

would still fail to pass strict scrutiny because they are not narrowly tailored to serve those

interests.  *See Turner Broad. Sys. Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (noting that a

municipality must show "that the regulation will in fact alleviate [claimed] harms in a direct and

material way").  When "[t]he proffered objectives are not pursued with respect to analogous non-

religious conduct, and those interests could be achieved by narrower ordinances that burdened

religious conduct to a far lesser degree[,] [then] [t]he absence of narrow tailoring suffices to

establish the invalidity of the actions."  *Lukumi*, 508 U.S. at 546; *Jana-Rock Constr., Inc. v.

N.Y.S. Dep't of Econ. Dev.*, 438 F.3d 195, 210 (2d Cir. 2006) ("Strict scrutiny is applied in order

to determine whether the harm stemming from a particular decision . . . is justified").[50]  There are

---

[50] Of note, Plaintiff repeatedly cites *Holt v. Hobbs*, 135 S. Ct. 853 (2015) as governing
Plaintiff's facial challenge.  (*See* Pls.' Mem. 34 (citing *Holt*, 135 S. Ct. at 863 (noting that
RLUIPA "requires the Government to demonstrate that the compelling interest test is satisfied

a variety of reasons why the Challenged Laws arguably fail this test, as implied by the prior discussion of discriminatory effect.  Nonetheless, the Court recounts a few below.

First, Defendants have admitted that a generalized restriction on the intensity and size of development would serve all of its allegedly compelling interests.  (*See* Pls.' 56.1 ¶ 709; Defs.' Counter 56.1 ¶ 709.)  While, as noted above, this is just the sort of generalized interest that does not justify a burden on religious exercise, *see Gonzales*, 546 U.S. at 438, it also demonstrates that there is no reason that Plaintiffs' development implicates these interests more than any other development.

Second, as noted above in the context of the Wetlands Law, Defendants admit that they commissioned no studies or experts when examining the need for the Challenged Laws, suggesting the allegedly compelling interests may be an "afterthought effort to bolster a flimsily supported decision," *Westchester Day School*, 417 F. Supp. 2d at 554, or "contrived for the sole purpose of rationalizing the" Village's decisions, *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 505 (S.D.N.Y. 2010), *aff'd by* 694 F.3d 208 (2d Cir. 2012).  (*See also* Pls. Mem. 35 (discussing the lack of evidence generally), 38 (discussing the lack of evidence for traffic concerns), 45 (discussing the lack of evidence for noise concerns); Pls.' 56.1 ¶¶ 742, 749, 821.)

---

through application of the challenged law to the person" (internal quotation marks omitted)).) While that case concerned facial *hair*, it did not concern a facial *challenge*, or even a constitutional challenge at all, and therefore does not provide the proper standard to apply to facial challenges rooted in constitutional rights, despite Plaintiffs' insistence otherwise.  *See Holt*, 136 S. Ct. 843, 859 ("We hold that the Department's policy, *as applied in this case*, violates the Religious Land Use and Institutionalized Persons Act of 2000 . . . ." (emphasis added)); *Snodgrass v. Robinson*, No. 14-CV-269, 2015 WL 4743986, at *9, *11 (W.D. Va. Aug. 10, 2015) (applying *Holt* only to the Plaintiff's as-applied challenge but not to his facial challenge).

Third, Village law already provides "several layers of regulation" to protect the interests at issue through operation of the special permit process for educational institutions.  (Pl.'s Mem. 36.)  First, the Village Code provides that the Board of Trustees may, "impose . . . restrictions and regulations" on educational institutions to "minimize traffic hazards, impairment of the use, enjoyment or value of property in the surrounding area, or generally protect the health, safety[,] and welfare of the neighborhood." (*Id.* at 37 (internal quotation marks omitted).)  *See also* Village Code § 130–10(F).  Second, the Zoning Board of Appeals, in approving individual special use permit applications, may impose "reasonable conditions and restrictions as are directly related to and incidental to the proposed special use permit."  (Pls.' Mem. 37 (internal quotation marks omitted).)  *See also* Village Code § 130–28(E)(1).  Third, the permitting Board may attach "additional conditions and safeguards . . . to ensure initial and continual conformance to all applicable standards and requirements" including "[t]he location and size of the special permit use, nature and intensity of the operations involved in it or conducted in connection with it," and ensuring that the use does not "change . . . the character of the neighborhood."  (Pls.' Mem. 37 (internal quotation marks omitted).)  *See also* Village Code § 130–28(E)(6).  Fourth, the Village Planning Board can "impose such reasonable conditions and restrictions as are directly related to and incidental to a proposed site plan," and cannot approve a site plan unless it takes into account "public health, safety[,] and general welfare" with respect to traffic, parking, and other aspects of development, (Pls.' Mem. 37 (internal quotation marks omitted).  *See also* Village Code § 119-3(B).  Furthermore, as alluded to above, Article 24 of the New York State Environmental Conservation Law requires permitting from the New York State Department of Environmental Conservation for activity within 100 feet of designated wetlands and wetlands

95

that are "part of [the] 'waters of the United States' are federally protected" by the River and
Harbors Act of 1899 and the Clean Water Act, administered by the Army Corps of Engineers.
(Second Gordon Aff. Ex. A, at 8; Pls.' Mem. 50–51.)   It is not clear from the record the extent to
which the wetlands on the Subject Property are covered by these laws.  Accordingly, it is unclear
what compelling interests the Challenged Laws uniquely serve.

   Fourth, specifically with regard to traffic, while it is not always foreclosed as a
compelling interest, *see Westchester Day Sch. v. Vill. of Mamaroneck*, 386 F.3d 183, 191 (2d
Cir. 2004) ("*WDS I*") ("We know of no controlling authority, either in the Supreme Court or any
circuit[,] holding that traffic problems are incapable of being deemed compelling."), Defendants'
only evidence connecting the Challenged Laws to alleviating traffic concerns is that "all
dwelling units, by their nature, generate traffic." (Pls.' Mem. 41 (citing Pls.' 56.1 ¶ 791).)  This
explanation is insufficient, particularly given, among other reasons, there is evidence that the
proposed rabbinical college would be largely self-contained, generating little to no traffic at all.
(*See* Pls.' 56.1 ¶¶ 805–06; Pls.' Mem. 43.)  *See also Congregation Etz Chaim v. City of L.A.*,
Civ. No. 10-1587, 2011 WL 12472550, at *7 (C.D. Cal. July 11, 2011) (granting summary
judgment to the plaintiff where the defendant city "present[ed] no evidence that any traffic or
parking concerns actually existed, nor that such concerns could not be mitigated in such a way as
to allow the Congregation's use at the subject property" (internal quotation marks omitted).)

   Fifth, there is no reason to believe, nor any evidence indicating, that accredited schools
have a lesser impact on traffic, aesthetics, or any other interest Defendants claim, as compared to
unaccredited schools.  (*See* Decl. of William D. Fitzpatrick ¶ 65 (Dkt. No. 152) ("[T]raffic
generation will be the same for an accredited facility and a non-accredited facility with an equal

96

number of students.".)  Nor do Defendants offer any evidence that automobile schools are not

capable of being accredited.  (*See* Pls.' 56.1 ¶ 759 (asserting that automobile schools can be

accredited).)  Regardless, given there are no accredited—or unaccredited—schools in the

Village, it is difficult to understand why accreditation suddenly became a concern for the

Village, unless considered in light of the growth of the Orthodox Hasidic community in the

Pomona area and the proposed rabbinical college.  (Pls.' 56.1 ¶ 723.)  *See Cottonwood Christian*

*Ctr. v. Cypress Redev. Agency,* 218 F. Supp. 2d 1203, 1225 (C.D. Cal. 2002) ("At first blush, the

[defendant] [c]ity's concern about blighting rings hollow.  Why had the [defendant], so

complacent before [the plaintiff] purchased the [subject] [p]roperty, suddenly burst into action?

. . . [T]he activity suggests that the [defendant] was simply trying to keep [the plaintiff] out of the

[c]ity, or at least from the use of its own land.").  The same issue applies to the Dormitory Law,

as Defendants do not make clear why dormitories with kitchens or housekeeping facilities pose

any greater threat to the environment or character of the Village than more traditional, student-

only dormitories.

What all of these concerns make clear is that the justification for the discriminatory effect

of the Challenged Laws is hardly beyond dispute.  The laws are structured such that they

arguably carve out Plaintiffs' use with questionable reasons for doing so, and general claims that

the Challenged Laws are "reasonable limitations so that the expansion in the use would be

consistent with the rural and residential character of the community," (Defs.' Mem. 27), are

insufficient.  Accordingly, the Court finds that Plaintiffs' Equal Protection Claim survives

summary judgment.

### 5.  Free Exercise (Claim 1)

Plaintiffs also bring a claim under the Free Exercise Clause of the First Amendment.  The

First Amendment, which is applicable to the States by operation of the Fourteenth Amendment,

"prohibits the enactment of any law prohibiting the free exercise of religion." *Bronx House of*

*Faith v. Cmty. Sch. Distr. No. 10*, 127 F.3d 207, 216 (2d Cir. 1997) (internal quotation marks

omitted); *see also Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 132 S. Ct.

694, 702 (2012) ("The First Amendment provides, in part that 'Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof.'").  "At a

minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates

against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for

religious reasons." *Lukumi*, 508 U.S. at 532 (alteration omitted); *see also Commack*, 680 F.3d at

210 (same).  It is not a violation of the Free Exercise Clause, however, to enforce a generally

applicable rule, policy, or statute that incidentally burdens a religious practice, as long as the

government can "demonstrate a rational basis for [the] enforcement" of the rule, policy, or

statute, and the burden is only an incidental effect, rather than the object, of the law.  *Fifth Ave.*

*Presbyterian Church v. City of N.Y.,* 293 F.3d 570, 574 (2d Cir. 2002); *see also Emp't. Div.,*

*Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 878–79 (1990) (explaining that enforcement

of a neutral law of general applicability does not offend the Free Exercise Clause), *superseded by*

*statute on other grounds*, 42 U.S.C. § 2000bb *et seq*., *as recognized by Holt v. Hobbs*, 135 S. Ct.

at 859.

Thus, to state a free exercise claim under the aforementioned *Lukumi* standard, a plaintiff

must establish that "the object of [the challenged] law is to infringe upon or restrict practices

98

because of their religious motivation," or that the law's "purpose . . . is the suppression of religion or religious conduct." *Lukumi,* 508 U.S. at 533.  Such a law is subject to strict scrutiny review, and it "will survive strict scrutiny only in rare cases." *Id.* at 546; *see also Smith*, 494 U.S. at 890 (noting that a facially neutral, generally applicable law is only subject to rationality review); *Fifth Ave.*, 293 F.3d at 574 (noting rational basis review applies when a burden on religion is incidental to, rather than the object of, the law at issue).

"To determine the object of a law, [the Court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. But, even if neutral on its face, a law may still run afoul of the Free Exercise Clause if it "targets religious conduct for distinctive treatment." *Id.* at 534 ("Facial neutrality is not determinative."). As the Supreme Court has cautioned, the Free Exercise Clause "forbids subtle departures from neutrality," *Gillette v. United States,* 401 U.S. 437, 452 (1971), and "covert suppression of particular religious beliefs," *Bowen,* 476 U.S. at 703; *see also Lukumi,* 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.  The Free Exercise Clause protects against governmental hostility which is masked, as well as overt.").  In this regard, courts may find "guidance" in Equal Protection jurisprudence, which, among other things, requires consideration of direct and circumstantial evidence regarding the goals of those who enacted the law in question.  *Lukumi,* 508 U.S. at 540.  Indeed, "[r]elevant evidence includes . . . the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by the decisionmaking body."  *Id.*  Another measure of a

99

law's object is the temporal proximity between the perceived land use and the adoption of the

regulation of that use. *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir.

2006) (suggesting that the "temporal proximity between [the plaintiff's] dispute with the

[defendant] [v]illage over a special use permit and the enactment of the [o]rdinance" at issue was

evidence of the purpose of the ordinance). Based on these factors, "if the object of a law is to

infringe upon or restrict practice because of their religious motivation, the law is not neutral."

*Lukumi*, 508 U.S. at 533.

      As the Court indicated in its 2013 Opinion and Order, "it is . . . debatable that the above-

mentioned animosity to the rabbinical college stemmed from 'legitimate concern[s] . . . for

reasons quite apart from discrimination.'" *Tartikov*, 915 F. Supp. 2d at 621 (alterations in

original) (quoting *Lukumi*, 508 U.S. at 535). The question here, then, is whether the record

reveals a nefarious motive for the Challenged Laws. Before reaching that question, however, the

Court notes that Defendants contend once again, in the context of Plaintiffs' free exercise claim,

that housing is not eligible for free exercise protection because it is not a religious use. (*See,

e.g.,* Defs.' Mem. 2.) However, at least in the context of RLUIPA, the Court has already found

that "the building of rabbinical college," of which student housing would be a part, "falls

squarely within [the] definition of 'religious exercise,'" and that "the multi-family dormitories

that [Plaintiffs] seek to build are intended to facilitate religious exercise." *Tartikov*, 915 F. Supp.

2d at 629. The same analysis is applicable here. Because the definition of religious exercise is

quite broad, *see WDS I*, 386 F.3d at 186 (holding that religious exercise is "any exercise of

religion, whether or not compelled by, or central to, a system of religious belief" and that "the

use, building, or conversion of real property for the purpose of religious exercise shall be

considered . . . religious exercise."), accessory housing, and particularly accessory housing that is intended to be the center of religious learning and teaching, is arguably religious exercise, *see WDS II,* 504 F.3d at 348 (noting that the correct inquiry to determine whether an educational facility is covered as "religious exercise" by RLUIPA is whether it "would be used at least in part for religious education and practice"); *see also Fifth Ave*, 293 F.3d at 574–75 (finding provision of a location for homeless to sleep to be religious exercise); *Candlehouse, Inc. v. Town of Vestal,* No. 11-CV-93, 2013 WL 1867114, at *18 (N.D.N.Y. May 3, 2003) (noting that there was sufficient evidence to support a finding that the residential component of a religious ministry for substance abuse to be religious exercise); *Bikur Cholim,* 664 F. Supp. 2d at 276 (holding that operation "of a facility to enable observant individuals to visit the sick on the Sabbath and holidays as well as the other individual plaintiff's [sic] obligations to observe the Sabbath while being able to visit their family members at [a nearby hospital] implicates their religious exercise").  Thus, there is sufficient evidence in the record to conclude that the housing at issue here is "inextricably integrated with, and necessary for [Plaintiffs'] ability to provide, religious education and practice, i.e., engage in 'religious exercise.'"  *Westchester Day Sch.*, 417 F. Supp. 2d at 545–46.  Accordingly, the rabbinical college, *in its entirety*, is at least arguably deserving of free-exercise protections.

At the outset, as discussed in the next section in more detail, the Court notes that each of the Challenged Laws is facially neutral.  As Defendants repeatedly point out, and as the Court previously found, the Challenged Laws, on their face, apply to all development projects and educational institutions.  *Tartikov*, 915 F. Supp. 2d at 621; *see also id.* at 615 ("[T]he Challenged Laws are facially neutral with respect to religion (and race).").  Accordingly, absent any other

evidence, only intermediate scrutiny would apply.  (*See* Pls.' Mem. 27.)  *See also Turner Broad.*, 512 U.S. at 662 (noting that "the intermediate level of scrutiny [is] applicable to content-neutral restrictions that impose an incidental burden on speech"); *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 98 (2d Cir. 2006) ("Regulations that . . . are . . . content-neutral . . . trigger intermediate, rather than strict, scrutiny."); *Hobbs v. Cty. of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) ("[A] less stringent test—applying 'intermediate scrutiny'—is applicable to regulations of expressive activity that are not based on content.").  However, as discussed above, Plaintiffs have offered sufficient evidence to raise a question of material fact as to whether the Challenged Laws were passed with a discriminatory purpose—to infringe on Plaintiffs' free exercise of religious beliefs.  This renders the Challenged Laws non-neutral and therefore subject to strict scrutiny. *See Lukumi*, 508 U.S. at 533 ("[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.").   And, for the reasons discussed in the previous section, a reasonable jury could find that the Challenged Laws do not pass strict scrutiny.  Accordingly, summary judgment is denied as to Plaintiffs' free exercise claim.

### 6.  Free Speech (Claim 2)

In their second cause of action, Plaintiffs allege that the Challenged Laws violate Plaintiffs' right to free speech under the First Amendment.  Plaintiffs move for summary judgment "to the extent that [the] claim[] does not involve issues of discriminatory motivation," (Pls.' Mem. 4), and Defendants cross-move for summary judgment.

"When conducting First Amendment [free speech] analysis, courts examine challenged governmental regulations to discern whether they are content based or content neutral since 'the scope of protection for speech generally depends on whether the restriction is imposed because

of the content of the speech.'" *Bd. of Managers of Soho Int'l Arts Condo. v. City of N.Y.*, No. 01-CV-1226, 2004 WL 1982520, at *10 (S.D.N.Y. Sept. 8, 2004) (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 450 (2d Cir. 2001)).  Indeed, this inquiry is "critical, because it informs the level of scrutiny the regulation should receive.  Content-based restrictions are viewed as presumptively invalid and are subject to strict scrutiny." *Tartikov*, 915 F. Supp. 2d at 623.

Generally, if a law is content-based, "strict scrutiny applies and the municipality must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Sugarman v. Vill. of Chester*, 192 F. Supp. 2d 282, 291–92 (S.D.N.Y. 2002) (internal quotation marks omitted); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").  By contrast, content-neutral restrictions are subject to intermediate scrutiny, whereby "the government may impose reasonable time, place[,] and manner restrictions on speech as long as they are content neutral, narrowly tailored to serve a significant government interest[,] and leave open 'ample channels for communication.'" *Sugarman*, 192 F. Supp. 2d at 292 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007) ("The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes only an incidental burden on speech is the intermediate level of scrutiny."); *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 495 n.16 (2007) ("Content-neutral criteria for political and other signage that are sufficiently objective and precise, and that permit residents to engage in some form of spontaneous speech, have been held to be constitutionally permissible.").  Of note, "[t]he First Amendment's hostility to content-

103

based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion on an entire topic." *Consol. Edison Co., Inc. v. Publ. Serv. Comm'n*, 447 U.S. 530, 537 (1980); *Hobbs*, 397 F.3d at 148 (same).

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys . . . . A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *Tunick v. Safir*, 209 F.3d 67, 91 (2d Cir. 2000) (same). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or message expressed." *Reed*, 135 S. Ct. at 2227. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," *Turner Broad.*, 512 U.S. at 643. In other words, "[a]n ordinance is content-based when the content of the speech determines whether the ordinance applies," *Sugarman*, 192 F. Supp. 2d at 292. By contrast, "government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Time Warner*, 729 F.3d at 155 (emphasis and internal quotation marks omitted).

As noted above, each of the challenged laws is facially neutral as to content. *See Tartikov*, 915 F. Supp. 2d at 621. *See also id.* at 615 ("[T]he Challenged Laws are facially neutral with respect to religion (and race)."). However, because there is a question of material fact as to whether the laws were passed with a discriminatory purpose, it is unclear if intermediate or strict scrutiny applies. *See Lukumi*, 508 U.S. at 533 ("[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not

neutral."). The Court need not reach this issue with respect to Plaintiffs' free speech claim, however, because it finds that Plaintiffs' have not established that they have a viable free speech claim.

The Court previously held that Plaintiffs had barely "pled enough facts to establish that the rabbinical college would engage in and foster expressive conduct." *Tartikov*, 915 F. Supp. 2d at 625; *see also Kleindienst v. Mandel,* 408 U.S. 753, 762 (1972) (discussing the "First Amendment right to 'receive information and ideas'"). The Court also noted that while simply limiting potential locations of the proposed rabbinical college in the Village would likely not violate the Free Speech Clause of the First Amendment, *see Merrimack Congregation of Jehovah's Witnesses v. Town of Merrimack,* No. 10–CV–581, 2011 WL 1236133, at *4 (D.N.H. Mar. 31, 2011) ("Courts have held that, absent other expressive conduct, limitations on the geographical location of a religious institution do not implicate the right to free expression under the First Amendment."); *Grace Church of Roaring Fork Valley v. Bd. of Cty. Comm'n of Pitkin Cty.,* 742 F. Supp. 2d 1156, 1167 (D. Colo. 2010) (noting that "denial of the [plaintiff's] proposal to build a worship facility at a particular location did not improperly regulate the [plaintiff's] dissemination of its religious message"); *see also Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1037 (9th Cir. 2004) (finding town's refusal to rezone site designated for hospital to religious affiliated college did not violate the Free Speech Clause); *Town of Islip v. Caviglia*, 540 N.E.2d 215, 222 (App. Div. 1989) (finding zoning ordinance that limited the location of certain land uses did not violate the plaintiff's free speech rights), here the Challenged Laws arguably prevent Plaintiffs from building the rabbinical college anywhere in the Village, *see Tartikov*, 915 F. Supp. 2d at 626. The Court thus focuses not on whether the Challenged Laws prevent the

105

construction of a rabbinical college, but rather on whether the act of constructing a rabbinical college is free speech at all.

Defendants, citing the same two cases they cited at the motion to dismiss stage, *see id.* at 624, contend that constructing a rabbinical college is not an act of free speech but instead only implicates the Free Exercise Clause, (*see* Defs.' Mem. 52 ("[T]he act of building a house of worship, let alone a religious school[,] does not implicate the Free Speech Clause; instead, courts analyze zoning regulations limiting such construction under the Free Exercise Clause, which addresses religiously motivated conduct." (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 163 (3d Cir. 2002) (finding that "the act of erecting a wall separating the interior of a building from the secular world" does not constitute speech); *San Jose Christian College v. City of Morgan Hill*, 360 F.3d at 1032 (9th Cir. 2004) (finding religious college's desire to educate was not speech)).  Plaintiffs, by contrast, encourage a broad view of the concept of speech, claiming, in principal, that the proposed rabbinical college is designed to "foster the expression of certain ideas among and between faculty members and students."  *Tartikov*, 915 F. Supp. 2d at 625; *see also Adhi Parasakthi Charitable, Med., Edu., and Cultural Soc'y v. Twp. of West Pikeland*, 721 F. Supp. 2d 361, 374 (E.D. Pa. 2010) ("The act of worshipping . . . inherently communicates something to others about that individual's views on society, life, and other more philosophical subjects . . . . [T]he use of the land as a place of worship allows an individual's conduct to communicate these thoughts with other members of the congregation."); *id.* at 372 ("Expressive conduct will constitute protected speech if the conduct is imbued with elements of communication, given the factual context of the conduct." (internal quotation marks omitted)).

106

The case law supports a broad view of what can be considered speech.  *See, e.g.,*
*Kleindienst*, 408 U.S. at 762–63 (discussing "First Amendment right to receive information and
ideas"); *Bd. of Tr. of SUNY v. Fox*, 492 U.S. 469, 473–74 (1989) (finding "Tupperware parties"
to be speech); *Adhi Parasakthi*, 721 F. Supp. 2d at 372, 374 (noting that an "act of worship is
communicative," and that it must be "imbued with elements of communication").  Indeed, the
word "speech" itself in the First Amendment "is not construed literally, or even limited to the use
of words."  *Tenafly*, 309 F.3d at 158.  Further, the Court previously distinguished the two cases
Defendants cite—*San Jose Christian* and *Tenafly*.  *Tartikov*, 915 F. Supp. 2d at 624–25.  *San
Jose* is distinguishable because, unlike the plaintiff in that case, Plaintiffs here alleged that the
Village's action was motivated by discrimination.  *Id.* at 624.  Plaintiffs, as discussed above, now
have evidence supporting this allegation, and so the case remains distinguishable.  *Tenafly* is also
distinguishable, as the court in that case found that construction of a religious boundary "did not
communicate any idea or message; rather, it served only a 'purely functional purpose.'"
*Tartikov*, 915 F. Supp. 2d at 625 (quoting *Tenafly*, 309 F.3d at 164).  The construction of the
boundary "allowed [Orthodox Jews] to engage in certain activities on the Sabbath" that were
"'otherwise forbidden,'" e.g., pushing baby strollers.  *Id.* at 624–25 (quoting *Tenafly*, 309 F.3d at
152, 162).  By contrast, the construction of the rabbinical college does not just enable Orthodox
Jews to practice everyday activities in ways that are consistent with their religion, but rather
directly enables religious education and worship.  The question is, then, whether an action that
facilitates speech can be an act of speech itself.

On the basis of Plaintiffs' pleadings, the Court previously answered this question in the
affirmative.  Now that evidence has been gathered and provided to the Court, however, the Court

is persuaded that the fact that building a rabbinical college might *enable* religious speech does not render its construction speech itself.  *See Adhi Parasakthi*, 721 F. Supp. 2d at 373–74 ("[I]n the absence of evidence supporting a contrary conclusion, the building of a place of worship will not be considered expressive conduct protected by the Free Speech Clause."); *cf. City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 814 (1984) ("[T]he mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted.").  On this point, the Third Circuit has bluntly explained that if "every religious group that wanted to challenge a zoning regulation preventing them from constructing a house of worship could" claim a violation of free speech, it would be "so astonishing that [the Third Circuit is] unaware of any court—or even law review article—that has suggested it."  *Tenafly*, 309 F.3d at 163; *see also id.* ("Otherwise, the act of constructing houses of worship would implicate the Free Speech Clause, whereas courts consistently analyze the constitutionality of zoning regulations limiting such construction under the Free Exercise Clause, not the Free Speech Clause.").[51]  While Plaintiffs have offered evidence as to the expressive conduct they hope to engage in after the rabbinical college is built, Plaintiffs have not offered "any evidence to attempt to show that the building itself will convey some attitude or belief," *Adhi Parasakthi*, 721 F. Supp. 2d at 374, nor have they made any argument or showing

---

[51] The *Tenafly* court made clear that "courts consistently analyze the constitutionality of zoning regulations limiting [the] construction of houses of worship under the Free Exercise Clause, not the Free Speech Clause." *Tenafly*, 309 F.3d at 163 (citing *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997); *Messiah Baptist Church v. Cty. of Jefferson,* 859 F.2d 820, 823–26 (10th Cir. 1988); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood,* 699 F.2d 303, 307–08 (6th Cir. 1983); *Church of Jesus Christ of Latter–Day Saints v. Jefferson Cty.,* 741 F. Supp. 1522, 1527–34 (N.D. Ala. 1990)).

that the building of a rabbinical college is an "indispensable instrument[] of effective public speech," *Saia v. People of State of N.Y.*, 334 U.S. 558, 561 (1948).  Therefore, the Court "cannot find any violation of the First Amendment's Free Speech Clause."  *Adhi Parasakthi*, 721 F. Supp. 2d at 374.  Accordingly, the Court grants Summary Judgment to Defendants on Plaintiffs' free speech claim and denies Plaintiffs' Motion for Summary Judgment as to this claim.[52]

### 7.  Free Association (Claim 3)

In their third cause of action, Plaintiffs allege that the Challenged Laws violate Plaintiffs' right to free exercise of religion under the First Amendment.  As with Plaintiffs' Free Speech claim, Plaintiffs' once again move for summary judgment insofar as the claim does not involve discriminatory motivation, (Pls.' Mem. 4), and Defendants cross-move for summary judgment.

In addition to Freedom of Speech, the First Amendment also protects the Freedom of Association.  *See Baird v. State Bar of Ariz.,* 401 U.S. 1, 6 (1971). The Supreme Court has "identified two types of 'freedom of association' that merit constitutional protection: (i) 'choices to enter into and maintain certain intimate human relationships' and (ii) association 'for the purpose of engaging in those activities protected by the First Amendment.'" *URI Student Senate*

---

[52] In *Adhi Parasakthi*, the court found that the plaintiffs' desire to use land for worship and an annual religious festival was protected by the First Amendment. 721 F. Supp. 2d at 374. Here, however, Plaintiffs, offer no evidence that they intend to use the land for any other expressive activity that is foreclosed by the Challenged Laws.  Rather, all of the claimed speech is contingent on construction of the rabbinical college.

Plaintiffs also suggest that, if the Court accepts Defendants' argument that the laws can simply be amended, the Challenged Laws are a prior restraint on speech because they afford unbridled discretion to Defendants.  (*See* Pls.' Opp'n 20–22; Defs.' Opp'n 35–36.)  The Court need not address this argument because Plaintiffs' have failed to establish a viable free speech claim.  *See Adhi Parasakthi*, 721 F. Supp. 2d at 374 (rejecting claim that defendant town's conduct was a "prior restraint" because the construction of a Hindu temple was not speech).

*v. Town of Narragansett,* 631 F.3d 1, 12–13 (1st Cir. 2011) (quoting *Roberts v. U.S. Jaycees,* 468

U.S. 609, 617–18 (1984)); *see also Sanitation & Recycling Indus., Inc. v. City of N.Y.,* 107 F.3d

985, 995–96 (2d Cir. 1997) (same); *AK Tournament Play, Inc. v. Town of Wallkill,* No. 09–CV–

10579, 2011 WL 197216, at *2 (S.D.N.Y. Jan. 19, 2011) (same).

    In evaluating a free association claim, "[t]he first question . . . is whether and to what

extent [the] defendants' actions burdened that right." *Tabbaa v. Chertoff,* 509 F.3d 89, 100 (2d

Cir. 2007).  "To be cognizable, the interference with associational rights must be direct and

substantial or significant," rather than simply make it "more difficult" for Plaintiffs "to exercise

their freedom of association." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (1996) (internal

quotation marks omitted).  Plaintiffs contend that they seek to "pass[] knowledge from teacher

and mentor to student, student to student, and student to children . . . throughout all the facilities

of the proposed rabbinical college."  (Pls. Opp'n 22 (citing *Tabbaa*, 509 F.3d at 101 (discussing

protected right of expression "through association at" an Islamic conference).)  The connection is

more direct than with respect to Plaintiffs' free speech rights; Plaintiffs' arguably cannot

associate at all in the context of their rabbinical studies, *see Tartikov*, 915 F. Supp. 2d at 627,

because the venue of that association—the rabbinical college—is arguably foreclosed by the

Challenged Laws.  Indeed, even if Plaintiffs could "associate" elsewhere, the locational burden is

sufficient to state a claim, *see LeBlanc-Sternberg*, 781 F. Supp. at 269 (finding that the plaintiffs

had standing to bring a free association claim when they alleged that the defendant village

incorporated "to prevent the Orthodox Jewish community from establishing a synagogue in the

village," causing other Orthodox Jews to "hesitate[] to move into the [] area.").

"Having found a cognizable burden," the second question is "the appropriate level of scrutiny to employ in evaluating [the] defendants' actions." *Tabbaa*, 509 F.3d at 102. "[A]n infringement on associational rights is not unconstitutional so long as it serves compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly restrictive of associational freedoms." *Id.* (brackets and internal quotation marks omitted). As discussed above, taking the facts in the light that is most favorable to Plaintiffs, a reasonably jury could conclude that Defendants' stated interests are not compelling, and that the Challenged Laws are not narrowly tailored to serve those interests. On the other hand, as discussed in the next section, taking the facts in the light most favorable to Defendants, it is plausible that the Challenged Laws do not burden Plaintiffs' associational rights because they arguably may still build, and associate at, a rabbinical college in the Village, just not one of the exact design they desire. That is an issue for a jury, and not the Court, to sort out. Accordingly, summary judgment is denied to both Parties as to this claim.

### 8.  RLUIPA Claims

#### a.  Substantial Burden (Claim 5)

##### i.  Substance of Claim

In their fifth claim, Plaintiffs assert that Defendants have violated RLUIPA by unlawfully imposing a substantial burden on their religion. The Parties have filed Cross-Motions for summary judgment on this claim.

The Substantial Burden provision of RLUIPA

> prohibits a governmental entity from applying a land use regulation "in a manner
> that imposes a substantial burden on the religious exercise of a person . . . or
> institution, unless the government demonstrates that imposition of the burden . . .
> is in furtherance of a compelling governmental interest; and . . . [the burden

111

imposed] is the least restrictive means of furthering that compelling governmental interest."

*WDS I*, 386 F.3d at 189 (alterations in original) (quoting § 2000cc(a)(1)); *see also Fortress Bible,* 694 F.3d at 218–19.  This provision "backstops the explicit prohibition of religious discrimination in the later section of [RLUIPA], much as the disparate-impact theory of employment discrimination backstops the prohibition of intentional discrimination."  *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 900 (7th Cir. 2005).  Thus, for example, "[i]f a land use decision . . . imposes a substantial burden on religious exercise . . . and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision."  *Id.*

"The statute defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' and provides further that '[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered . . . religious exercise.'"  *WDS I,* 386 F.3d at 186 (alterations in original) (quoting 42 U.S.C. § 2000cc–5(7)(A), (B)); *see also Sts. Constantine & Helen,* 396 F.3d at 900 (same).  "Religious exercise" under RLUIPA is defined broadly "'to the maximum extent permitted by the terms of this chapter and the Constitution.'"  *WDS II,* 504 F.3d at 347 (quoting 42 U.S.C. § 2000cc–3(g)); *see also Bikur Cholim,* 664 F.Supp.2d at 275, 288 (same).  On this basis, the Court previously found that "the building of a rabbinical college, with the alleged purpose of training rabbinical judges for religious courts," together with the multi-family dormitories, "falls squarely within this definition of 'religious exercise.'"  *Tartikov,* 915 F. Supp. 2d at 629; *see also id.* ("[T]he multi-family dormitories that [Plaintiffs] seek to build are intended to facilitate religious exercise, thus bringing this accessory use within RLUIPA's protections.").  Particularly in light

112

of the Court's discussion of the religious aspect of the proposed multi-family housing above, the Court sees no reason to disturb this ruling.  *Cf. Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 869–70 (2d Cir. 1988) ("Seminary grounds . . . form an 'apron' of quietude  . . . and contribute to the 'atmosphere of quiet reflection' essential to the 'academic, spiritual, psychological[,] and pastoral preparation of young men for the priesthood.").  Accordingly, Plaintiffs' desire to build the proposed rabbinical college is a religious exercise.

While RLUIPA does not itself define the phrase "substantial burden," the Second Circuit has held that a land use regulation constitutes a "substantial burden" within the meaning of RLUIPA if it "directly *coerces* the religious institution to change its behavior."  *WDS II,* 504 F.3d at 349 (emphasis in original).  "The burden must have more than a minimal impact on religious exercise, and there must be a close nexus between the two."  *Fortress Bible,* 694 F.3d at 219.  Among the types of burdens the courts have found to be minimal, and hence not protected by RLUIPA, are facially neutral permit and variance requirements.  Thus, courts have regularly found that zoning ordinances that merely require religious institutions to go through a routine permit or variance application process do not run afoul of RLUIPA.  *See, e.g., id.* ("A denial of a religious institution's building application is likely not a substantial burden if it leaves open the possibility of modification and resubmission."); *Konikov v. Orange Cty.,* 410 F.3d 1317, 1323 (11th Cir. 2005) ("[R]equiring applications for variances, special permits, or other relief provisions [does] not offend RLUIPA's goals."); *San Jose,* 360 F.3d at 1035–36 (holding that a city's requirement that the plaintiff refile a "complete " permit application did not constitute a substantial burden); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761–62 (7th Cir. 2003) ("*CLUB*") (finding that "the scarcity of affordable land available for development

in R zones, along with the costs, procedural requirements, and inherent political aspects of the

Special Use, Map Amendment, and Planned Development approval processes" did not impose

substantial burden on religious institutions); *Roman Catholic Bishop of Springfield v. City of*

*Springfield,* 760 F. Supp. 2d 172, 187 (D. Mass. 2011) (finding that a routine application process

did not violate RLUIPA), *vacated in part on other grounds*, 724 F.3d 78 (1st Cir. 2013); *Hale O*

*Kaula Church v. Maui Planning Comm'n,* 229 F. Supp. 2d 1056, 1071 (D. Haw. 2002) (holding

that laws requiring special use permits did not impose a substantial burden on religious

institution).  Indeed, to exempt religious institutions from the normal permit/variance process

would result in favoring these institutions, something which neither RLUIPA nor the Free

Exercise Clause more generally require (and which the Establishment Clause might prohibit).

*See CLUB,* 342 F.3d at 762 ("Otherwise, compliance with RLUIPA would require municipal

governments not merely to treat religious land uses on an equal footing with nonreligious land

uses, but rather to favor them in the form of an outright exemption from land-use regulations . . .

. [N]o such free pass for religious land uses masquerades among the legitimate protections

RLUIPA affords to religious exercise."); *WDS I,* 386 F.3d at 189 ("As a legislative

accommodation of religion, RLUIPA occupies a treacherous narrow zone between the Free

Exercise Clause, which seeks to assure that government does not interfere with the exercise of

religion, and the Establishment Clause, which prohibits the government from becoming entwined

with religion in a manner that would express preference for one religion over another, or religion

over irreligion.").

    While RLUIPA does not exempt religious institutions from complying with facially

neutral permit and variance applications procedures, it does not wholly exempt zoning laws from

scrutiny.  Rather, RLUIPA protects religious institutions from land use regulations that substantially affect their ability to use their property in the exercise of their religion.  *See Fortress Bible*, 694 F.3d at 218 ("[T]o hold that PLUIPA is inapplicable to what amounts to zoning actions taken in the context of a statutorily mandated environmental quality review would allow towns to insulate zoning decisions from RLUIPA review . . . . [The court] decline[s] to endorse a process that would allow a town to evade RLUIPA by what essentially amounts to a re-characterization of its zoning decisions.").  For example, courts have held zoning ordinances, or zoning decisions, that significantly lessen the prospect of a religious institution's being able to use the property to further its religious mission contravene RLUIPA.  *See Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter,* 456 F.3d 978, 992 (9th Cir. 2006) (holding that the defendant county's two denials of variance permits, under the circumstances, had "to a significantly great extent lessened the prospect of [the religious institution] being able to construct a temple in the future," thus imposing a "substantial burden" on the religious institution's "religious exercise"); *Roman Catholic Diocese of Rockville Centre v. Inc. Vill. of Old Westbury,* No. 09-CV-5195, 2012 WL 1392365, at *8 (E.D.N.Y. Apr. 23, 2012) (upholding plaintiff's facial challenge to zoning law because plaintiff had adequately alleged that the "conditions imposed by the [law] would significantly restrict the [plaintiff's] use of their Property for religious burial purposes").  Courts have also held that zoning schemes that impose conditions on the use of the property, such as limitations on the size of the facilities that can permissibly be used by the religious institution, can impose a substantial burden.  *See Chabad Lubavitch,* 796 F. Supp. 2d at 343 (finding substantial burden allegations sufficient based on claims that municipality limited plaintiff's expansion to an area 17,000 square feet smaller than

115

plaintiff proposed, and describing that "if [the plaintiff] conformed its plans to the [municipality's] specification, it would need to sacrifice a good portion of the spaces that it believes is necessary to the exercise of its religion"); *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne,* No. 02–CV–2989, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006) (finding plaintiff adequately alleged substantial burden, where space limits imposed by the defendants "constrained" the ability of the church's parishioners to "observe or participate" in religious services).

Courts have likewise found a substantial burden requirement where municipal zoning schemes impose significant "delay, uncertainty, and expense." *Sts. Constantine & Helen,* 396 F.3d at 901; *see also WDS II,* 504 F.3d at 349 (noting that a complete denial of a religious institution's zoning application which results in substantial "delay, uncertainty, and expense" can be a substantial burden); *Grace Church,* 555 F. Supp. 2d at 1137–39 (finding that the plaintiff had established a substantial burden based on the uncertainty and expense resulting from the municipality's zoning regulations and from municipal officials' consistent hostility toward plaintiff in their review of plaintiff's land use applications). In one recent case, the Second Circuit even held that when a municipality's "willingness to consider [a] proposal is disingenuous, a conditional denial may rise to the level of a substantial burden," *Fortress Bible,* 694 F.3d at 219, and "when [a] town's actions are arbitrary, capricious, unlawful, or taken in bad faith, a substantial burden may be imposed because it appears that the [religious institution] may have been discriminated against on the basis of its status as a religious institution," *id.* In sum, "a complete denial" of a religious institution's intended or applied-for use of its property "is not necessary for the Court to find that the government regulation . . . impose[s] a substantial burden

116

on religious exercise." *Cathedral Church,* 2006 WL 572855, at *8; *see also Sts. Constantine &*
*Helen,* 396 F.3d at 899–900 (finding that to establish substantial burden, a religious group need
not "show that there was no other parcel of land on which it could build its church");
*Westchester Day Sch. v. Vill. of Mamaroneck,* 379 F. Supp. 2d 550, 556–57 (S.D.N.Y. 2005)
(same).

      The Court's analysis of the discriminatory effect prong of Plaintiffs' Equal Protection
claim, and the Court's discussion of Plaintiffs' Free Exercise claim, *see WDS II,* 504 F.3d at
348–49 (noting that the test for a substantial burden is guided by Free Exercise jurisprudence),
apply here.  While unnecessary to establish a substantial burden, *see Tartikov,* 815 F. Supp. 2d at
632, Plaintiffs have offered sufficient evidence to at least suggest that the combined effect of the
Challenged Laws is to completely bar the construction of a rabbinical college of the type desired
by Plaintiffs, namely one with the desired curriculum that includes multi-family housing.  (*See*
Pls.' Mem. 16–17 (citing, inter alia, *WDS II,* 504 F.3d at 349 (noting a substantial burden exists
when there is no "reasonable opportunity" for a modified application that would suffice).)  *See*
*also Roman Catholic Diocese,* 2012 WL 1392365, at *8 (E.D.N.Y. Apr. 23, 2012) (granting
motion to amend complaint bringing facial challenge to zoning ordinance, based on the
conclusion that plaintiff had adequately alleged the ordinance imposed a substantial burden by,
among other things, reducing the portion of the property that could be used for religious purposes
and requiring plaintiff to meet certain groundwater testing and landscaping requirements);
*Cottonwood,* 218 F. Supp. 2d at 1226 ("Preventing a church from building a worship site
fundamentally inhibits its ability to practice its religion."); *cf. Town of Mount Pleasant v. Legion*
*of Christ,* Index No. 14047/97, 2003 WL 23515112, at *5 (N.Y. Sup. Ct. 2003) (finding that

defendant's "option of violating the law or abandoning an important part of its mission" was "untenable").  Likewise, Plaintiffs have offered sufficient evidence to suggest that the Challenged Laws were passed with a discriminatory motive.  *See Fortress Bible*, 694 F.3d at 219; *WDS II*, 504 F.3d at 351–52.  Accordingly, Plaintiffs have established an issue of material fact as to whether the Challenged Laws place a substantial burden on their religious exercise in violation of RLUIPA.  *See Tartikov*, 915 F. Supp. 2d at 632 (noting that if "[t]he ordinances . . . in fact completely prevent Plaintiffs from building and running a rabbinical college at all in Pomona," then "Plaintiffs have established a substantial burden").

Further, as discussed above, Defendants have failed to demonstrate as a matter of law that their passage of the Challenged Laws was justified by compelling state interests and that the laws were the least restrictive means of furthering those interests.  *See* 42 U.S.C. § 2000cc(a)(1).  The fact that Defendants may, in general, allow other religious and educational uses in the Village is irrelevant.  *See Hobbs*, 135 S. Ct. at 862 (finding "the availability of alternative means of practicing religion" irrelevant under RLUIPA).  Indeed, it is the religious entity, and not the Village, that has the right to determine its religious exercise, and RLUIPA protection is "not limited to beliefs which are shared by all of the members of a religious sect."  *Id.* at 863 (internal quotation marks omitted).  Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' substantial burden claim.

The question of whether Plaintiffs' are entitled to summary judgment on their substantial burden claim is a closer one.  Certainly, "religious institutions do not have a constitutional right to build wherever they like."  *Fortress Bible*, 694 F.3d at 221.  Nonetheless, in the Court's view, the core of Plaintiffs' substantial burden claim has two parts: (a) is the proposed rabbinical

118

college, *exactly as proposed* with libraries, mikvahs, student housing, etc., essential to their religious exercise, and (b) if not, can Plaintiffs build a rabbinical college that is sufficient to meet their needs within the confines of the Challenged Laws?

With regard to the necessity of building a rabbinical college exactly as proposed (to the extent Plaintiffs have even offered a proposal), as discussed above, there are three other rabbinical colleges in the general area: Kollel Belz, Mechon L'Horoya, and Kollel Beth Yechiel Mechil of Tartikov. (Pls.' 56.1 ¶¶ 563–571; Pls.' Counter 56.1 ¶ 57; *see also* Savad Decl. Ex. 34 (Resnicoff Dep. Tr.) 19–22 (noting that "Tartikov in Brooklyn and Mechon L'Hoyroa" train rabbinical judges" but students do not live on campus).) As outlined, however, there are several differences between the programs at these schools and that which is proposed by the Congregation. Kollel Belz and Mechon L' Horoya "only teach[] certain sections of the Shulchan Aruch," which two individual Plaintiffs contend means these schools cannot train full-time rabbis, while Kollel Beth Yechiel Mechil of Tartikov simply "has a different program." Kollel Belz and Kollel Beth Yechiel Mechil of Tartikov have no libraries or mikvahs on campus (and Kollel Beth Yechiel Mechil of Tartikov lacks a synagogue), and none of the three schools has on-campus housing, meaning none can provide the Torah Community envisioned by the Congregation. (Pls.' 56.1 ¶¶ 569–572; Defs.' 56.1 ¶¶ 62–64; Pls.' Counter 56.1 ¶¶ 55, 58; Decl. of Jacob Hershkowitz ¶¶ 42–50 (Dkt. No. 146); Decl. of Chaim Rosenberg ¶¶ 44–50 (Dkt. No. 149).) Plaintiffs contend that these differences not only mean that the proposed rabbinical college would offer a higher quality education and offer the only way to study the full Shulchan Aruch, but also that a rabbinical college *as proposed by Plaintiffs* is essential to the exercise of their religious beliefs. (*See* Pls.' 56.1 ¶¶ 449–473, 489, 655; Pls.' Counter 56.1 ¶ 49).

119

Defendants, of course, contest these claims.  They allege that Plaintiffs have not articulated any religious belief that requires a Torah Community, never mind a rabbinical college that has mikvahs on campus.  (Defs.' 56.1 ¶ 46; Pls.' Counter 56.1 ¶¶ 49, 516, 520.)  They also repeatedly cite a portion of the deposition of M. Menczer in which he admits that it is possible to "study to become a rabbinical judge in a synagogue" without being immersed in a Torah Community, though M. Menczer also makes clear that to be a "Great Torah scholar," a student has to "dedicate [himself] to a certain kind of study program, study day and night, [he has] to surround [himself] [with] Torah students, and [he has] to exclude [himself] from all worldly pleasures, all distractions," and that this is a "requirement" under Jewish law, even though not necessary to ordination as a rabbi.  (Savad Decl. Ex. 26 (M. Menczer Dep. Tr.) 88–90.)  Given Plaintiffs do not allege a complete lack of ordained rabbis in the region, and other schools do produce rabbinical judges—even if they are not "Great Torah scholars" or full-time rabbinical judges—whether Plaintiffs require a rabbinical college exactly as proposed is at least a disputed issue of fact.  Based on the credibility of witnesses at trial, a reasonable jury may find that a Torah Community, while ideal, is not essential to Plaintiffs' exercise of their religious beliefs, and that training a number of part-time rabbis would be sufficient to meet the Plaintiffs' need for rabbinical judges in the Pomona area, such that the Challenged Laws do not impose a substantial burden.[53]

---

[53] Plaintiffs allege that M. Babad is "one of the few [rabbinical] judges fully trained in all four books of the Shulchan Aruch.  (Pls.' 56.1 ¶ 553.)  While, on the one hand, this suggests that there may be a lack of adequately fully trained rabbinical judges, it also suggests that the training that most rabbinical judges receive is in less than the full Shulchan Aruch, implying that training in the full Shulchan Aruch is unnecessary.

In this context, it is worth noting that the precise contours of the rabbinical college the Congregation proposes is far from clear.  The only curriculum document, as noted above, was prepared by a student apparently due to the existence of the instant Action, (*see* Defs.' 56.1 ¶¶ 26–28; Pls.' Counter 56.1 ¶¶ 26–28; Gordon Aff. Ex. 10, at 23; *see also* Gordon Aff. Ex. 21 (proposed curriculum)), and it provides no specific information about the anticipated curriculum—the Shulchan Aruch—beyond the names of a series of classes (e.g., "Kosher Diet," "Prayer," "Renting, Leasing & Borrowing"), (*see* Gordon Aff Ex. 22).  Additionally, there is no architectural plan for the rabbinical college contained in the record beyond a "preliminary concept plan," (Defs.' 56.1 ¶¶ 19, 22; Pls.' Counter 56.1 ¶ 22), nor has any such plan been formally submitted to the Village for approval, (*see* Savad Decl. Ex. 27, at 120).  Unsurprisingly, therefore, no teachers have been hired, and the dean admits having done "nothing" so far to begin the hiring process.  (*See* Defs.' 56.1 ¶¶ 14, 34–35, 66.)  Accordingly, it is difficult for the Court to determine, before sending the case to a jury, that the Congregation's vision for a rabbinical college, while perhaps a vision they hope to pursue, is essential to the exercise of specific religious beliefs, such that an inability to build that college campus is a substantial burden.

Of course, even if Plaintiffs cannot prove that their proposed rabbinical college is essential to their religious exercise, if *no* rabbinical college of any kind is compatible with the Challenged Laws, then the Challenged Laws may unlawfully impose a substantial burden.  With regard to the Dormitory Law, it is clear, as outlined, that three other rabbinical colleges in the area train students without on-campus housing.  Therefore, the Dormitory Law arguably is not a substantial burden on the operation of *a* rabbinical college.  With regard to the Accreditation

Law, as discussed above, it is undisputed that the proposed rabbinical college as currently proposed cannot be accredited by the State of New York or AARTS because, among other reasons, it is not a degree-granting institution and is not yet operational.  (*See* Pls.' 56.1 ¶¶ 580–81, 583–84. 591; Defs.' Counter 56.1 ¶¶ 580–81, 590.)  Nonetheless, Plaintiffs' expert makes clear that, at least in general "a higher education institution that trains Rabbinical Judges can be accredited."  (Gordon Aff. Ex. 15 (Preston Green Expert report), at 18.)  Indeed, the expert makes clear that, with modifications to the proposed rabbinical college curriculum and admission requirements, the proposed rabbinical college could at least be accredited by AARTS (though the college would still need to be operational first).  (*See* Pls.' 56.1 ¶ 594, 596, 598–99, 601–02; Savad Decl. Ex. 16 (Green Dep. Tr.) at 89–90; Gordon Aff. Ex. 15 (Preston Green Witness Report) 20–21.)  In fact, Plaintiffs' expert's suggestion is along these lines:

> [I]f the educational institution meets all other criteria for accreditation, Pomona can grant Tartikov a conditional use variance that would permit the school to become operational on the condition that the school obtain accreditation in a reasonable time from the Board of Regents or similar accrediting body.  Failure to obtain accreditation could result in the variance[] being annulled and set aside.

(Gordon Aff. Ex. 15, at 20.)  Accordingly, the Court cannot conclude, as a matter of law, that the Accreditation Law prevents the construction of a rabbinical college in the Village.

With regard to the Wetlands Law, as discussed above, Plaintiffs have offered evidence of the existence of wetlands covering the west side of the Subject Property along Route 306 and that the access road that runs through the west side would have to be improved for the proposed rabbinical college to be usable.  (*See* Beall Decl. ¶ 280 & Ex. T (survey map of the Subject Property); Tauber Decl. ¶¶ 5, 28; *see also* Pls.' 56.1 ¶ 180 (indicating that Mayor Marshall was generally aware of the existence of wetlands on the Subject Property); Defs.' Counter 56.1 ¶ 180

122

(same).)  However, as noted above, there are holes in Plaintiffs' claim that the Wetlands Law

imposes a substantial burden, namely (a) a lack of evidence that Plaintiffs cannot build an access

road through the other side of the property, from Route 202, and (b) the possibility that the

Wetlands Law is duplicative of state and federal regulations.  If the Wetlands Law does not

prevent the construction of an access road, or otherwise does not create an additional burden

beyond that created by state and federal law, then it does not impose a substantial burden on

Plaintiffs' religious exercise.

Accordingly, because a series of disputed material facts remain as to (a) the exact form

the rabbinical college must take in order to be sufficient for Plaintiffs' exercise of religion, and

(b) to what extent the Challenged Laws alone make it difficult (or impossible) to build a

rabbinical college in the Village, summary judgment is denied to Plaintiffs on their substantial

burden claim.

### ii.  Constitutional Challenge

Defendants also challenge the constitutionality of RLUIPA's substantial burden

provision.  (Defs.' Mem. 54–59.)  While the courts, as the United States points out, normally

avoid addressing constitutional questions when possible, *see Allstate Ins. Co. v. Serio*, 261 F.3d

143, 149–50 (2d Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid

reaching constitutional questions."); *see also Slack v. McDanie*, 529 U.S. 472, 485 (2000)

(articulating this rule), because the Court has found that Plaintiffs' substantial burden claim

survives summary judgment the Court must address the merits of Defendants' constitutional

challenge.  Plaintiffs, as well as Intervenor United States, oppose Defendants' claim.

123

Defendants contend that the substantial burden provision is unconstitutional on its face because it "distort[s] the relationship between the local and state governments and the federal government in violation of settled federalism principles," relying on the "Tenth Amendment's limitations on Article I power," and further argue that the provision is "beyond the power of Congress, a violation of the separation of powers, and the Establishment Clause." (Defs.' Mem. 55 (citing *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 135–36 (3d Cir. 2002) ("[L]and use law is one of the bastions of local control, largely free of federal intervention."); *id.* at 57). In support of their contention, Defendants cite, among other cases, *Gorieb v. Fox*, 274 U.S 603 (1927), for the proposition that "[s]tate legislatures and city councils, who deal with the situation from a practical standpoint, are better qualified than the courts to determine the necessity, character, and degree of regulation which . . . new and perplexing conditions require; and their conclusion should not be disturbed by the courts," *id.* at 608. Second, Defendants contend that the "RLUIPA formula . . . does not regulate land use principles per se, but rather never uses a constitutional standard of review to reduce the effect of state and local land use law across the board," further asserting that "Congress never considered actual land use issues, such as the importance or value of residential neighborhoods, setbacks, parking and traffic concerns, density, property values, or aesthetics," when debating RLUIPA's merits. (Defs.' Mem. 56 (emphasis omitted).) Third, Defendants note that the Supreme Court has explicitly reserved judgment on the constitutionality of RLUIPA's land use provisions, *Cutter v. Wilkinson*, 544 U.S. 709, (2005), *id.* 716 n.3 ("Section 2 of RLUIPA is not at issue here. We therefore express no view on the validity of that part of the Act."), and limited the scope of RLUIPA in *Sossamon*

124

*v. Tex.*, 131 S. Ct. 1651 (2011), *see id.* at 1656–57.[54]  Fourth and finally, in support of their

Establishment Clause challenge, Defendants contend that RLUIPA unconstitutionally "grant[s]

religious developers a privilege and financial advantages that no other developer can obtain."

(Defs.' Mem. 58 (citing, inter alia, *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 14 (1989); *Bronx

Household of Faith v. Bd. of Educ.*, 750 F.3d 184, 207–09 (2d Cir. 2014)).

        In response, Plaintiffs rely, in principal, on the Second Circuit's decision in *WDS II*.  (*See*

Pls. Opp'n 57.)  In that case, the Second Circuit held, among other things, that RLUIPA does not

violate the Tenth Amendment because it "leaves it to each state to enact and enforce land use

regulations as it deems appropriate so long as the state does not substantially burden religious

exercise in the absence of a compelling interest achieved by the least restrictive means," *WDS II*,

504 F.3d at 354–55, and that "RLUIPA's land use provisions do not violate the [E]stablishment

[C]lause," *id.* at 355.  Defendants do not address this holding, which the Court is required to

follow.  *See Fernandes v. Johnson*, No. 12-CV-2774, 2013 WL 796542, at *3 (S.D.N.Y. Mar. 5,

2013) ("This [c]ourt must follow binding Second Circuit precedent unless a subsequent decision

of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second

Circuit." (brackets and internal quotation marks omitted)); *see also Fortress Bible*, 734 F. Supp.

2d at 509 (finding that RLUIPA does not violate the Establishment Clause because "the Second

---

        [54] Defendants also contend that RLUIPA was passed illegally, noting that "[i]t was not
passed unanimously," and that it was enacted "negligently or intentionally without reference to
the most relevant Supreme Court doctrine in derogation of federalism."  (Defs.' Mem. 58.)
However, there is certainly no requirement that Congress must pass legislation unanimously, *see
Skaggs v. Carle*, 110 F.3d 831, 841 (D.C. Cir. 1997) ("[T]he framers positively concluded that a
simple 'majority vote' was sufficient for the passage of legislation in Congress."), nor is there
any authority suggesting that Congress must reference any particular "Supreme Court doctrine"
in the legislative process or that failing to do so is a violation of federalism, *cf. WDS II*, 504 F.3d
at 354–55 (finding that RLUIPA does not violate the 10th Amendment).

Circuit has held that RLUIPA's land use provisions . . . do not violate the Establishment Clause"). Moreover, as the United States points out in its brief, the precedents that Defendants cite do not support their claims. For example, in *Gorieb*, the Supreme Court only noted that local land use decisions "should not be disturbed by the courts, unless clearly arbitrary and unreasonable," 274 U.S. at 608, not that Congress could not legislate in this field, (*see* Br. of the United States of Am. in Intervention in Defense of the Religious Land Use and Institutionalized Persons Act of 2000 ("USA Br.") 17 (Dkt. No. 183).) Likewise, in *Congregation Kol Ami*, the court rejected the defendants' challenge to RLUIPA. (*See* USA Br. 18 (citing 309 F.3d 120).) *See also Congregation Kol Ami v. Abington Twp.*, No. 01-CV-1919, 2004 WL 1837037, at *9–15 (E.D. Pa. Aug. 17, 2004).

Additionally, Plaintiffs properly characterize Defendants' theory of unconstitutionality as relying only on the proposition that "local governments engage in land use regulation" and that "Congress is powerless to regulate in that sphere," which Plaintiffs correctly point out would "render innumerable federal statutes" that affect local land use unconstitutional, including the Americans with Disabilities Act, Fair Housing Act, and Clean Water Act. (Pls.' Opp'n 57–58.) *See also United States v. Maui Cty.*, 298 F. Supp. 2d 1010, 1015 (D. Haw. 2003) ("Although RLUIPA does 'intrude' to some extent on local land use decisions, there is nothing about it that violates principles of federalism . . . *if* the federal statute is otherwise grounded in the Constitution. RLUIPA is not federal zoning of [local] land; it is federal enforcement of federal rights."). Plaintiffs further argue that RLUIPA's substantial burden provision has a jurisdictional limitation, providing that it can only be applied when the government action affects interstate commerce, is imposed in a program that receives federal funding, or in a circumstance where

126

individualized assessments of the property are involved.  (Pls.' Opp'n 58 (citing 42 U.S.C. § 2000cc(a)(2)).)  The substantial burden provision is thus grounded as a proper exercise of Congress's power under the Spending Clause, Commerce Clause, and § 5 of the Fourteenth Amendment, *see WDS II*, 504 F.3d at 354 ("[T]he Supreme Court has made plain [that] the satisfaction of [] a jurisdictional element . . . is sufficient to validate the exercise of congressional power because an interstate commerce nexus must be demonstrated in each case for the statute in question to operate."); *see also Fortress Bible*, 734 F. Supp. 2d at 509 ("By limiting RLUIPA's scope to cases that present one of these jurisdictional nexuses, Congress alternatively grounded RLUIPA, depending on the facts of a particular case, in the Spending Clause, the Commerce Clause, and § 5 of the Fourteenth Amendment.").[55]

Defendants do not respond to either of these contentions, nor do they claim that any of the jurisdictional elements of RLUIPA's substantial burden provision is not met here; they only indicate that they "stand by their facial challenge" in their reply.  (Defs.' Reply 19.) Accordingly, the Court finds that the governing case law supports the conclusion that RLUIPA, because of its jurisdictional provision and as has already been determined by the Second Circuit, constitutes a proper constitutional exercise of Congress' power and does not run afoul of any constitutional provisions.  *See Sossamon*, 131 S. Ct. at 1664 ("Though the Court reserves the

---

[55] It is also worth noting that Plaintiffs at least make an argument, however tenuous, as to why the proposed rabbinical college would affect interstate commerce, which Defendants do not rebut, (*see* Pls.' Mem. 9 ("Plaintiffs' use and development of the Subject Property unquestionably meets this criteria." (citing *Chabad Lubavitch*, 768 F.3d at 183, 192 (construction of religious facility meets jurisdictional element); *WDS II.*, 504 F.3d at 354 ("[C]ommercial building construction is activity affecting interstate commerce."), such that the application of RLUIPA's substantial burden provision in these circumstances is constitutional under the Commerce Clause, *see WDS II*, 504 F.3d at 354–55.

general question whether RLUIPA is a valid exercise of Congress' power under the Spending

Clause, there is apparently no disagreement among the Federal Courts of Appeals."); *see also*

*Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 328, n.34 (5th Cir. 2009) ("Every circuit to

consider whether RLUIPA is Spending Clause legislation has concluded that it is constitutional

under at least that power.").

      Apart from their facial challenge, Defendants also contend that, as applied, the substantial

burden provision is unconstitutional because, more than asking the court to "'become [a] super

land-use board[] of appeals,'" (Defs.' Mem. 59 (quoting *Sameric Corp. v. City of Phila.*, 142

F.3d 582, 598 (3d Cir. 1998)), "the Court is being asked to step into the shoes of the *original*

land-use board, to abandon the local laws regarding housing, and to *sua sponte* grant permission

for their hypothetical plan." According to Defendants, "it is difficult to overstate the steepness

of the slippery slope." (*Id.*) In their Reply, Defendants further allege that, as applied in this

case, RLUIPA's substantial burden provision would violate the Due Process clause, (Defs.'

Reply 20 (citing *League of Residential Neighborhood Advocates v. City of L.A.*, 498 F.3d at

1052, 1053)), though the explanation and authority for this claim is missing from Defendants'

submissions.

      In response, Plaintiffs insist that they do not seek the Court's approval of their plan

without proceeding through the applicable approval process, but rather seek only "the right to

apply." (Pls.' Opp'n 59.) While this does not appear to be exactly true, given, in their Second

Amended Complaint, Plaintiffs sought a declaratory judgment directing the Village to "grant

[Plaintiffs'] site plan final approval for a [r]abbinical [c]ollege and directing the Building

Inspector to issue a building permit for up to 250 residential units," (SAC 68), this ground for

relief is unripe because there is no pending application before the Village.  It is in this vein that

the United States argues, convincingly, that ripeness provides sufficient protection of

Defendants' federalism interests because it "affords local officials an opportunity to adjudicate

an application before the dispute may be brought to federal court," as embodied in the Court's

finding that Plaintiffs' as-applied challenges were unripe in its 2013 Opinion and Order.  (USA

Br. 22 (citing *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005).)

Indeed, simply striking down the Challenged Laws (as opposed to directing acceptance of

Plaintiffs' proposed rabbinical college) would not force the Village to make particular land use

decisions or "short circuit its land use decision-making process," but rather would require the

Village to craft new land use laws that are consistent with the requirements of federal law (and,

of course, the Constitution).  (*Id.* at 23.)

At its core, the Court finds that Defendants' fleeting as-applied challenge, which does not

appear to be meaningfully different from its facial challenge, is wanting of legal authority.  *See*

*Lima v. Hatsuhana of USA, Inc.*, No. 13-CV-3389, 2014 WL 177412 (S.D.N.Y. Jan. 16, 2014)

("Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived." (alteration omitted)).  The Court agrees with the United

States that, as limited by the Court's 2013 Opinion and Order, a finding in favor of Plaintiffs

does not "require the imposition of a housing development on Pomona in contravention of the

zoning on the property without the applicant having to file an application or pursue ordinary land

us procedures."  (Defs.' Reply 20.)  Indeed, as noted "religious institutions do not have a

constitutional right to build wherever they like," *Fortress Bible*, 694 F.3d at 221, and

invalidation of the Challenged Laws is not tantamount to a finding that Plaintiffs should "prevail

in their quest to build a rabbinical college on the Subject Property," *Tartikov*, 915 F. Supp. 2d at

623; *see also id.* at 638 ("This ruling is not tantamount to saying that Plaintiffs will be able to

build a rabbinical college, let alone one that is the size or structure [of] their liking.").

Accordingly, Defendants' as applied challenge is denied.

b.  Discrimination and Exclusion

i.  Equal Terms (Claim 6)

In their sixth claim, Plaintiffs assert that Defendants have violated RLUIPA by

unlawfully imposing a land use regulation that treats the proposed rabbinical college on less than

equal terms with nonreligious institutions.  Unlike Plaintiffs' other RLUIPA claims, only

Defendants have moved for summary judgment on this claim.  (*See* Pls.' Mem. 4.)  The Equal

Terms provision of RLUIPA provides that "[n]o government shall impose or implement a land

use regulation in a manner that treats a religious assembly or institution on less than equal terms

with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).  This "statutory

command 'requires equal treatment of secular and religious assemblies and allows courts to

determine whether a particular system of classifications adopted by a city *subtly or covertly*

*departs from requirements of neutrality and general applicability.*'" *Primera Iglesia Bautista*

*Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307 (11th Cir. 2006) (brackets

omitted) (emphasis in original) (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d

1214, 1232 (11th Cir. 2004)).  As with the Substantial Burden component of RLUIPA, the

meaning of the Equal Terms section is far from clear, *see Guru Nanak,* 326 F. Supp. 2d at 1154

(asserting that this section "is even less clear" than the "substantial burden" section), but the

courts have determined that the "substantial burden and nondiscrimination provisions are

130

operatively independent of one another," *CLUB,* 342 F.3d at 762.  Moreover, some courts have concluded that the nondiscrimination provisions of RLUIPA, which include the Equal Terms provision, "codify existing Equal Protection Clause and Free Exercise Clause jurisprudence." *Petra Presbyterian Church v. Vill. of Northbrook,* No. 03–CV–1936, 2003 WL 22048089, at *11 (N.D. Ill. Aug. 29, 2003); *accord Guru Nanak,* 326 F. Supp. 2d at 1155; *Freedom Baptist Church of Del. nty. v. Twp. of Middletown,* 204 F. Supp. 2d 857, 869 (E.D. Pa. 2002).

As the Court explained in its 2013 Opinion and Order, there are four fundamental elements of an Equal Terms claim: (1) the plaintiff must be a religious institution; (2) subject to a land use regulation; that (3) treats the religious institution on less than equal terms; with (4) a nonreligious institution.  *See Primera,* 450 F.3d at 1307–08; *Tartikov,* 915 F. Supp. at 634; *see also Chabad Lubavitch*, 768 F.3d at 197 (noting that a plaintiff must produce prima facie evidence of "unequal treatment").  As far as how to prove an "equal terms" claim, however, "[d]ivision exists" among the Federal Circuits as to "whether the . . . provision invariably requires evidence of a 'similarly situated' secular comparator . . . and, where such evidence is necessary, on what ground the comparison much be made."  *Chabad Lubavitch*, 768 F.3d at 196; *see also Lighthouse Inst. for Evangelism, Inc.*, *v. City of Long Branch*, 510 F.3d 253, 266 (3rd Cir. 2007) ("[A] regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well that secular assemblies or institutions that are similarly situated as to the regulatory purpose." (emphasis omitted)); *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010) (summarizing various approaches and advocating a focus on zoning criteria rather than regulatory purpose).  The Second Circuit has thus far "declined to define 'the precise outlines of what it takes to be a valid comparator under

RLUIPA's equal-terms provision.'" *Chabad Lubavitch*, 768 F.3d at 197 (citing *Third Church of Christ, Scientist v. City of N.Y.*, 626 F.3d 667, 669 (2d Cir. 2010)).

With that division in mind, the consensus among courts is that there are three distinct kinds of Equal Terms violations: (i) a statute that facially differentiates between religious and secular assemblies or institutions; (ii) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to secular, assemblies or institutions; and (iii) a truly neutral statute that is selectively enforced against religious, as opposed to secular, assemblies or institutions. *See Primera*, 450 F.3d at 1308; *accord Vision Church*, 468 F.3d at 1003 (following same analysis); *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1361 (N.D. Ga. 2012) (same); *Covenant Christian Ministries, Inc. v. City of Marietta*, No. 06–CV–1994, 2008 WL 8866408, at *13 (N.D. Ga. Mar. 31, 2008) (same); *Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978, 989 (N.D. Ill. 2008) (same).

While, as discussed above, the Challenged Laws are facially neutral, the Court previously found that Plaintiffs had only stated a "gerrymander" claim, and Plaintiffs have not provided any evidence—or advanced any claim—to support a different theory here. *Tartikov*, 915 F. Supp. 2d at 636.  While Defendants contend that Plaintiffs' failure to offer evidence of "'a secular comparator that is similarly situated as to the regulatory purpose of the regulation in question,'" sinks Plaintiffs' Equal Terms claim, (Defs.' Mem. 49 (quoting *Lighthouse*, 510 F.3d at 264), as the Court previously found, a gerrymander claim does not require the pleading of comparators. *See Lukumi*, 508 U.S. at 535 (defining "religious gerrymander" as "an impermissible attempt to target [a group] and their religious practices" (internal quotation marks omitted)); *Tartikov*, 915

F. Supp. 2d at 636 (discussing allegations of intent that support a gerrymander claim).

Therefore, as discussed above in the context of Plaintiffs' Equal Protection and Free Exercise

Claims, which are codified in RLUIPA's Equal Terms provision, *id.* at 633, the evidence, taken

in a light most favorably to Plaintiffs, provides sufficient support to the contention that

Defendants engaged in a religious gerrymander, as it suggests that Defendants used the

Challenged Laws to uniquely restrict the ability of Plaintiffs to build their rabbinical college in

the Village.  Accordingly, summary judgment is denied.

### ii.  Nondiscrimination (Claim 7)

The Court denies summary judgment to Defendants' on Plaintiffs' Nondiscrimination

claim "for the same reasons" as its Equal Terms claim because "the elements of a

Nondiscrimination claim differ little, if at all, from an Equal Terms claim."  *Tartikov*, 915 F.

Supp. 2d at 636.

### iii.  Exclusions and Limits (Claims 8–9)

The exclusions and limits provision of RLUIPA provides that "[n]o government shall

impose or implement a land use regulation that . . . (A) totally excludes religious assemblies

from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures

within a jurisdiction."  42 U.S.C. § 2000cc(b)(3).  The purpose of this provision "is not to

examine the restrictions placed on individual landowners, but to prevent municipalities from

broadly limiting where religious entities can locate."  *Adhi Parasakthi*, 721 F. Supp. 2d at 387;

*accord Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs,* 613 F.3d 1229, 1238 (10th

Cir. 2010) (noting that district court's jury instruction properly required plaintiff to establish that

the county's "regulation, as applied or implemented, has the effect of depriving both [plaintiff]

133

and other religious institutions or assemblies of reasonable opportunities to practice their religion, including the use and construction of structures, within [the defendant] [c]ounty" (internal quotation marks omitted)).

As noted above, it is at least arguable that the effect of the Challenged Laws is to completely exclude the rabbinical college from the Village and that pursuing a text amendment or the like is futile. *See Rocky Mountain,* 613 F.3d at 1238 (upholding jury's verdict for RLUIPA plaintiff based, in part, on evidence that county official stated that it would allow only a 100–seat synagogue because "there will never be another mega church . . . in Boulder County," and on testimony that another congregation ran out of money going through the defendant county's special use application process (alteration in original) (internal quotation marks omitted)); *see also Tartikov*, 915 F. Supp. 2d at 637–38 (denying motion to dismiss as to this claim). However, as discussed in the context of Plaintiffs' substantial burden claim, Plaintiffs have failed to offer sufficient evidence to establish as a matter of law that the rabbinical college, as theoretically proposed, is essential to Plaintiffs' religious exercise or that the effect of the Challenged laws is to completely exclude the construction of any rabbinical college in the Village. Accordingly, summary judgment is denied as to this claim.

### 10.  Remaining Claims/Defenses

#### a.  Fair Housing Act (Claims 11 and 12)

The FHA "prohibits governmental agencies from implementing or enforcing housing policies in a discriminatory manner." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003). Under the FHA, "it shall be unlawful [t]o . . . make unavailable . . . a dwelling to any person because of race [or] color." 42 U.S.C. § 3604(a); *see also Orange Lake Assocs., Inc.*

134

*v. Kirkpatrick*, 21 F.3d 1214, 1227 (2d Cir. 1994) (same).  Because, as discussed above,

Plaintiffs have sufficiently raised an issue of material fact as to whether "the Village adopted the

Challenged Laws with a discriminatory purpose," namely to prevent the construction of the

rabbinical college and its associated housing, *Tartikov*, 915 F. Supp. 2d at 610, their FHA claims

also survive summary judgment, *see Ryan v. Ramsey*, 936 F. Supp. 417, 427 (S.D. Tx. 1996)

(denying summary judgment on FHA claim because there were "outstanding issues of material

fact" as to discriminatory intent, namely whether "a jury could have reasonably inferred that race

was a significant factor in the defendants' decision").  It also bears noting that in light of the

Supreme Court's recent decision in *Tex. Dep't of Housing and Cmty. Affairs v. Inclusive Cmty.

Project*, 135 S. Ct. 2507 (2015), Plaintiffs' Fair Housing Act claim would also survive on a

theory of disparate impact, *see id.* at 2525 ("The Court holds that disparate-impact claims are

cognizable under the Fair Housing Act . . . . "); *see also LeBlanc-Sternberg*, 67 F.3d at 425 ("An

FHA violation may be established on a theory of disparate impact or one of disparate

treatment."), because Plaintiffs have raised an issue of material fact as to whether the facially

neutral Challenged Laws have a "significantly adverse or disproportionate impact on persons of

a particular type," namely by preventing a subsection of the Orthodox Hasidic community from

building a rabbinical college, *Tsombanidis*, 352 F.3d at 574.

### b.  *Berenson* (New York Common Law) (Claim 14)

Plaintiffs allege that Defendants violated the *Berenson* doctrine by "not consider[ing] the

present regional housing needs of the region in which the Village is located, and that such

regional housing needs are not otherwise adequately provided for," namely those "in need of

adult student housing or those who can only afford low or moderate income housing in the

Village and in the region in which the Village is located." (SAC ¶¶ 292–94.) Accordingly,

Plaintiffs contend that Defendants "either acted for an exclusionary purpose, or the Zoning Code

. . . brought about an exclusionary effect." (*Id.* ¶ 295.) They call on the Court to direct

Defendants "to provide a comprehensive zoning plan to meet the regional needs and the

requirements of the Jewish community seeking religious education, and to provide for multi-

family housing that can provide affordable housing to Plaintiffs and others who seek religious

educational opportunities within the Village." (*Id.* ¶ 297.)

   *Berenson* provides that "[i]n determining the validity of an ordinance excluding

multifamily housing as a permitted use, [the court] must consider the general purposes which the

concept of zoning seeks to serve. The primary goal of a zoning ordinance must be to provide for

the development of a balanced, cohesive community which will make efficient use of the town's

available land." *Berenson v. Town of New Castle*, 341 N.E.2d 236, 241 (N.Y. 1975). Under

*Berenson*, a board passing a zoning ordinance must (1) have "provided a properly balanced and

well[-]ordered plan for the community," and (2) "in enacting a zoning ordinance, [given]

consideration . . . to regional needs and requirements," including "not only the general welfare of

the residents of the zoning township, but . . . also . . . the effect of the ordinance on the

neighboring communities." *Id.* at 242; *see also Cont'l Bldg. Co. v. Town of N. Salem*, 625

N.Y.S.2d 700, 703 (App. Div. 1995) (same). Accordingly, "a zoning ordinance enacted for a

statutorily permitted purpose will be invalidated only if it is demonstrated that it actually was

enacted for an improper purpose *or* if it was enacted without giving proper regard to local and

regional housing needs and has an exclusionary effect." *Robert E. Kurzius, Inc. v. Inc. Vill. of*

*Upper Brookville*, 414 N.E.2d 680, 683 (App. Div. 1980) (internal quotation marks omitted) (emphasis added)); *Cont'l Bldg. Co.*, 625 N.Y.S.2d at 703 (same).

Defendants are correct that "discovery has uncovered no facts showing there are regional needs for fair housing."  (Defs.' Mem. 54.)  Indeed, the only evidence that Plaintiffs identify, in a single paragraph supporting their *Berenson* claim, is a fact that they claim Defendants admit: a need for affordable, multifamily housing in the Village's Master Plan.  (Pls. Opp'n 57 (citing Pls.' 56.1 ¶ 26).)  However, Defendants explicitly dispute this "fact," (Defs.' Counter 56.1 ¶ 26), and Plaintiffs overstate the evidence:  Ulman only indicated in her deposition that "multi-family housing [w]as something to be looked at for future use within the Village," (Savad Decl. Ex. 12, at 180–81), that the Master Plan itself only notes a need for "housing to accommodate an *aging population and small families*" (Savad Decl. Ex. 151 (Village of Pomona Master Plan Update) 21 (emphasis added)), and that it would be "inappropriate" to "increase[] development density" in order to create "affordable housing," (*id.* at 22).  In fact, Defendants argue in their Reply that there is adequate multi-family housing nearby in Ramapo and in the region, (Defs.' Reply 19 (citing Pls.' 56.1 ¶ 138)), though, granted, the only evidence offered for that assertion is the existence of the ASHL.[56]  Nonetheless, the Court concludes that there is insufficient evidence in the record to suggest that the Village failed to give consideration to regional housing needs when passing the Challenged Laws or that there is a general need for multi-family housing in the region.

---

[56] Defendants reliance on this law is ironic, given they challenged the ASHL upon its adoption.  (*See* Pl.'s 56.1 ¶ 138.)

As discussed above, however, the *Berenson* test is disjunctive.  *Cf. N. Shore Unitarian Universalist Soc., Inc. v. Inc. Vill. of Upper Brookville*, 493 N.Y.S.2d 564, 567 (App. Div. 1985) ("In sum, [the] plaintiff has failed to show that the ordinance in question was enacted with an exclusionary purpose, *or* that it ignored local or regional housing needs." (emphasis added)). Therefore, even though Plaintiffs have failed to demonstrate that the Challenged Laws were "enacted without giving proper regard to local and regional housing needs and has an exclusionary effect," there is, as discussed extensively in this Opinion and Order, sufficient evidence for a reasonable jury to conclude that the Village enacted the Challenged Laws for an improper exclusionary purpose, namely to discriminate against the Hasidic Jewish community. Therefore, the Court denies Defendants' Motion as to Plaintiffs' *Berenson* claim.

c.  Remaining State Claim

The only remaining claim is claim 10 (Article 1 §§ 3, 8, 9 and 11 of the New York State Constitution), which concerns freedom of worship, assembly, and equal protection.  (SAC ¶¶ 274–75.)[57]  The Parties cross-move for summary judgment on this claim.  Defendants contend that these claims should be resolved according to the same (or similar) standards as the corresponding federal claims.  (*See* Defs.' Mem. at 18–19 n.14 (seeking summary judgment on § 3 claim), 44 n.28 (seeking summary judgment on § 11 and New York Civil Rights Law claims (citing, inter alia, *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 754–55 (2d Cir. 2003) (applying Equal Protection clause analysis to Article 1, § 11 claim)), 53 n.30 (seeking summary judgment

---

[57] The Court previously dismissed Plaintiffs' New York Civil Rights Law § 40–c claim (claim 11) as unripe, and, despite discussing that claim in the motion papers, (*see* Defs.' Mem. 44 n.28; Pls.' Opp'n 26), neither Party has offered any reason for the Court to re-examine that ruling here.  *See Tartikov*, 915 F. Supp. 2d at 607.

on § 8 and § 9 claims (citing *Tartikov*, 915 F. Supp. 3d at 623 ("The corollary provisions for the

First Amendment's Free Speech and Free Association Clauses in the New York Constitution are

interpreted consistently with the Federal Constitution.")).)  Plaintiffs appear to agree, and first

pair their analysis of their § 3 claim with their RLUIPA substantial burden claim, noting that,

"like RLUIPA, this provision[] applies to 'incidental burdens' on religious exercise."  (Pls.'

Mem. 10 (citing *Tartikov*, 915 F. Supp. 2d at 619 n.20).)  They do so for good reason, as "in

analyzing a state free exercise claim, 'when the State imposes an incidental burden on the right

to free exercise of religion,' the courts are to consider the 'interest advanced by the legislation

that imposes the burden,' and then 'the respective interests must be balanced to determine

whether the incidental burdening is justified.'"  *Tartikov*, 915 F. Supp. 2d at 618 n.20 (quoting

*Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006)).

Accordingly, for the same reason that the Court denied summary judgment on Plaintiffs'

RLUIPA substantial burden claim—namely failure to establish a burden on the exercise of

religion as a matter of law—the Court also denies summary judgment on Plaintiffs' § 3 claim.

Plaintiffs also pair their analysis of their § 8 claim with their Free Speech claim, noting

that the New York Constitution "provides additional protection for expression and expressive

activity."  (Pls.' Mem. 27.)  As noted in the Court's 2013 Opinion and Order, and as Defendants

point out, "the corollary provisions for the First Amendment's Free Speech and Free Association

Clauses in the New York Constitution," namely §§ 8 and 9, "are interpreted consistently with the

Federal Constitution," *Tartikov*, 915 F. Supp. 3d at 623, and accordingly the Court resolves those

claims in the same way.  Therefore, for the same reasons as those discussed above, the Court

grants summary judgment to Defendants as to Plaintiffs' § 8 claim because Plaintiffs have failed

139

to show that the construction of a rabbinical college constitutes an exercise of free speech, but denies summary judgment to both Parties as to Plaintiffs' § 9 claim (free association).[58] Additionally, because the "equal protection provisions of the New York Constitution are interpreted consistently with the corollary provisions of the Federal Constitution," *Tartikov*, 915 F. Supp. 2d at 615 n.19 (citing *People v. Kern*, 554 N.E.2d 1235, 1240–41 (App. Div. 1990), for the reasons stated above, the Court denies summary judgment to Defendants as to Plaintiffs' § 11 claim.

<u>d.  Affirmative Defenses</u>

Plaintiffs also move for "summary judgment dismissing Defendants' affirmative defenses." (Pls.' Mem. 57.)  Defendants concede that their third, fourth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fifteenth, seventeenth, eighteenth, nineteenth, twenty-third, twenty-fourth, and twenty-fifth affirmative defenses can be dismissed. (*See* Defs.' Opp'n 41–46.)  Likewise, Defendants' first (failure to state a claim), second (standing), fifth (lack of case or controversy), sixteenth (constitutionality of RLUIPA), twenty-sixth (failure to assert facial challenge), and twenty-seventh (residential or housing use is not an exercise of religion or religion use) defenses have already been addressed, and explicitly or implicitly rejected, in this Opinion and Order and the Court's 2013 Opinion and Order. (*See* Defs.' Answer (Dkt. No. 55); *see also* Defs.' Opp'n 41 n.26 (noting that Defendants' affirmative defenses were stated in the Answer filed as Docket Number 55).)  Accordingly, the only affirmative defenses that remain in

---

[58] While Plaintiffs cite *O'Neill v. Oakgrove Const., Inc.*, 523 N.E.2d 277 (N.Y. 1988), for the proposition that § 8 is "more expansive" than the First Amendment, *id.* at 531 (Kaye, J., concurring), the portion of the opinion cited is the concurrence, and there is no authority in that opinion for determining that the building of a rabbinical college is speech.

140

dispute are Defendants' sixth (failure to exhaust), fourteenth (unclean hands), and twentieth, twenty-first, and twenty-second (immunity).

Regarding exhaustion, Plaintiffs argue that "[e]xhaustion is not required where the questions presented include facial challenges to legislation, or for claims brought under 42 U.S.C. § 1983." (Pls.' Mem. 60 (citing *Oesterich v. Selective Serv. Bd.*, 393 U.S. 233, 234 (1966); *Karaebel v. N.Y. City Dep't of Hous. Pres.and Dev.*, 959 F.3d 395, 404 (2d Cir. 1992)). Defendants, in response, contend that *Oesterich* is inapplicable here, that, in general, "a party must exhaust his administrative remedies before seeking judicial review," (Defs.' Opp'n 43 (citing *Gonzalez v. Perrill*, 919 F.2d 1, 2 (2d Cir. 1990))), and that exhaustion is distinct from ripeness, (*id.* (citing *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193 (1985), *superseded by statute on other grounds*, 47 U.S.C. § 332(c)(7)(B)(v), as stated in *Sprint Spectrum L.P. v. City of Carmel*, 361 F.3d 998, 1004 (7th Cir. 2004))). Specifically, Defendants rely heavily on the Second Circuit's decision in *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005), in which the court required the plaintiffs to apply to a local zoning board of appeals prior to proceeding with their lawsuit because "the resolution of the constitutional and statutory claims . . . hinge[d] on factual circumstances not yet fully developed," *id.* at 351

The Court concludes that exhaustion is not required for Plaintiffs' remaining claims, as the overwhelming weight of authority indicates that exhaustion is not required for facial challenges. *See Lamar*, 356 F.3d at 374 (explaining that "[the plaintiff] need not have first sought and been denied *any* permit prior to filing a facial challenge"); *MacDonald v. Safir*, 206 F.3d 183, 189 (2d Cir. 2000) ("[T]here is no need for a party actually to apply or to request a

141

permit in order to bring a facial challenge to an ordinance (or parts of it) . . . .").   Indeed, as

Plaintiffs argue, it is not even clear what administrative review procedures Plaintiffs should have

sought before bringing their challenge, or what "adverse decision" there was to review at all.

(*See* Pls.' Reply. at 30.)  Accordingly, "because defendants have the burden of raising an

affirmative defense in their answer and establishing it . . . on a motion for summary judgment,"

*Reach Music Pub. Inc. v. Warner/Chappell Music, Inc.*, No. 09-CV-5580, 2009 WL 3496115, at

*2 (S.D.N.Y. Oct. 23, 2009) (brackets and internal quotation marks omitted), and Defendants

have not met their burden here, summary judgment is granted to Plaintiffs as to this affirmative

defense.

Regarding unclean hands, Plaintiffs contend that the defense only applies "where the

misconduct alleged as the basis for the defense 'has immediate and necessary relation to the

equity that [the plaintiff] seeks in respect of the matter in litigation.'"  (Pls.' Mem. 58–59

(quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).  Plaintiffs also

argue that "[t]here is no evidence that Plaintiffs engaged in an unconscionable act" or that any

such act "had an immediate and necessary relation to the Plaintiffs' sought relief."  (Pls.' Mem.

59.)  Defendants respond that the application of the doctrine is subject to the discretion of the

district court, and that there is evidence in the record supporting the claim that the rabbinical

college "is a deceptive front for a scheme to develop high density housing," namely that there are

no definite construction plans and the curriculum for the school was developed only by one

putative student.  (Defs.' Opp'n 42 (citing *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,

792 F. Supp. 969, 970 (S.D.N.Y. 1992)).  As noted above, there are certainly disputed facts as to

the degree to which the rabbinical college has been seriously planned.  (*See, e.g.,* Defs.' 56.1 ¶¶

142

25–36; Pls.' Counter 56.1 ¶¶ 25–36.)  However, Defendants have offered no evidence to suggest that Plaintiffs have no interest in building a rabbinical college.  The central question in this case is not Plaintiffs' sincerity, but rather whether Plaintiffs' right to build their rabbinical college has been violated.  Accordingly, the Court grants summary judgment to Plaintiffs on Defendants' unclean hands affirmative defense.

Regarding immunity from damages, Plaintiffs contend that because they do not seek monetary damages, Defendants' affirmative defenses based on claims of immunity from damages fail.  (Pls.' Mem. 60.)  In response, Defendants argue that the defenses—absolute immunity and qualified immunity—do not bar only damages claims.  (Defs.' Mem. 60.)  This is only half-correct.  While absolute immunity bars claims for damages and injunctive relief, *see Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) ("Absolute immunity bars not only [the plaintiff's] § 1983 claim for damages but also his claim for injunctive relief."), but not prospective declaratory relief, *See B.d.S. v. Southold Union Free Sch. Distr.*, Nos. 08-CV-1319, 08-CV-1364, 2009 WL 1875942, at *20 (E.D.N.Y. June 24, 2009) ("[T]he doctrine of absolute immunity does not extend to claims for declaratory relief based upon continuing violations of federal law."), qualified immunity only bars damages claims, *see Sudler v. City of N.Y.*, 689 F.3d 159, 177 (2d Cir. 2012) ("[Q]ualified immunity does not bar actions for declaratory or injunctive relief." (alteration and internal quotation marks omitted)).

Keeping this framework in mind, Defendants' immunity-based affirmative defenses fail for two reasons.  First, Plaintiffs are suing the individual Defendants in their official capacities, and therefore they are not entitled to any immunity that the Village does not also possess, meaning they cannot claim qualified or absolute immunity.  *See Shubert v. City of Rye*, 775 F.

143

Supp. 2d 689, 699 (S.D.N.Y. 2011) ("[A] public official named as a defendant in his or her

official capacity in a § 1983 action is not entitled to personal immunity defenses, but only the

immunities available to the government entity, and it is well settled that a municipal entity has no

claim to such immunity from § 1983 liability." (citation omitted)); *see also Johnson ex rel.*

*Johnson v. Bd. of Educ. of Albion Centr. Sch. Dist.*, No. 02-CV-115, 2003 WL 23350123, at *2

(W.D.N.Y. Oct. 16, 2003) ("[The defendant] may not claim the defense of qualified immunity

because he was sued in his official capacity."); *cf. Ying Jing Gan v. City of N.Y.*, 996 F.2d 522,

529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity,

such a suit is deemed to be a suit against the state, and the official is entitled to invoke the

Eleventh Amendment immunity belonging to the state.").  Second, because, as explained above,

qualified immunity only apples to damages claims, that defense is inapplicable here.

Accordingly, the Court grants summary judgment to Plaintiffs on the immunity affirmative

defenses.[59]

## III.  Conclusion

The Court grants summary judgment to Defendants as to Plaintiffs' Free Speech and

corresponding Article 1, § 8 New York Constitution claims, and the Court grants summary

judgment to Plaintiffs on Defendants' affirmative defenses noted herein.  The Court denies

summary judgment to all Parties as to all other claims, grants Plaintiffs' Motion for Sanctions,

---

[59] Defendants argue that, if the Court strikes any of the affirmative defenses, particularly Defendants' standing, lack of case or controversy, and failure to assert a facial challenge defenses, "there is a body of case law holding that . . . [they] will be treated as waived." (Defs.' Mem. 44.)  Because the Court does not strike any of Defendants' affirmative defenses, but instead grants summary judgment on them, there is no waiver concern here.

and grants Defendants' Motion to Strike in part.  The Clerk of the Court is respectfully directed

to terminate the pending motions.  (Dkt. Nos. 137, 140, 195.)


SO ORDERED.

Dated:          September 29, 2015
                White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

145