## PLAINTIFFS' PROPOSED FINDINGS OF FACT

### Facts Regarding Plaintiffs[1]

Background of Tartikov

 1. Tartikov is a New York religious corporation incorporated on August 1, 2004.  It was formed to establish a rabbinical college with a Torah community in Rockland County, New York.

 2. Tartikov's religious purpose is to develop and operate a rabbinical college that will be a Torah Community to educate students to become full time rabbinic judges who are trained in all four sections of the Code of Jewish Law.

 3. Michael Tauber and Chaim Babad are trustees of Tartikov.  (STIPULATED)

 4. Tauber and Chaim Babad discussed their religious commitment and vision for the rabbinical school with housing for families for years. Their respective religious commitment to this rabbinical school stems from each of their family's long histories with rabbinical courts.

 5. The Babad family name is rooted in the name *Bais din,* or son of Bais din, and the first Babad family judge goes back over 500 years in Krakow, Poland.  Before World War II, the Babad family had rabbis that served in 40 cities and towns, but the war wiped them out.

 6. Chaim Babad's father told him to support rabbinical colleges in order to replenish the rabbinical judges who had been killed during the Holocaust.

 7. Chaim Babad believes that it is customary for Orthodox Jews to donate 10% of their earnings to charitable causes. He does this through his business enterprises.

 8. Kahal Minchas Chinuch is the charitable organization to which Babad's money is donated.

 9. Kahal Minchas Chinuch purchased the Subject Property (the "Property" or "Subject Property") and transferred it to Tartikov.

 10. Tartikov will be self-funding; it is not seeking any infrastructure from Pomona.


Overview of Plaintiffs' Religious Beliefs and Exercise

 11. Plaintiffs believe that Jewish law or *Halakhah* is a religiously based system, and the religious beliefs of its adherents require them to obey its tenets.

---

[1] Headings are included for reference and are not intended to serve as proposed findings of fact.

12.     There are different sources of Jewish law which Orthodox Jews believe embody the word and will of God and that it is authoritative.  Plaintiffs therefore believe that they are religiously and morally obligated to follow its rules.

13.     Plaintiffs believe that Jewish men are religiously obligated to marry at a young age and have large families.

14.     Plaintiffs believe that in order to meet this religious obligation, Jewish law imposes conjugal duties upon a husband and wife while forbidding them to engage in family planning and forbidding them from using birth control.

15.     Plaintiffs believe that the Torah commands them to learn the Torah day and night, or to "speak of them [the Torah's precepts] while you sit in your home, while you walk on the way, when you retire and when you arise."

16.     Plaintiffs believe, as a matter of religious faith, that Orthodox/Hasidic Jews are prohibited from resolving their disputes in secular courts, so there is a need for rabbinical judges.

17.     The religious courts are called *bais din* and the judges who sit on these religious courts are called *dayanim* (plural) and *dayan* (singular).

18.     Plaintiffs believe that Orthodox/Hasidic Jews also look for help on a daily basis from the *dayanim* on the many religious issues that come up because our religious laws direct every part of their lives.

19.     Plaintiffs believe that to serve as a *dayan*, and judge cases according to the true intent of our religious law, the judge "becomes a partner with G-d." By doing justice and settling disputes, the *dayan* helps keep the world according to G-d's Will.

20.     Plaintiffs believe that a backlog of cases often forces Orthodox Jews involved in disputes to go to secular courts.  Even in the nearby Monsey community, there is a backlog of cases and not enough qualified religious judges to handle all of the cases.

21.     Plaintiffs believe that there is a great need for rabbinical judges, so Orthodox Jews are not forced to go to secular courts.

22.     Plaintiffs believe that only qualified Jewish religious judges shall hear and decide disputes between and among Jews.

23.     Plaintiffs believe that because there is a shortage of sufficiently trained rabbinic judges, capable of handling all of the cases, currently, rabbis that are not really capable are handling cases now.

24.     Plaintiffs believe that, by sitting in judgment, the rabbinical judge "basks in the presence of G-d" because the Holy One, blessed be He, leaves the highermost heavens and causes His Shekhinah [Divine Presence] to rest at the judge's side," thus, serving as a religious judge is a spiritually fulfilling act.

Tartikov's Rabbinical College Program /the *Shulchan Aruch*

25.    Tartikov's rabbinical college program will focus on Jewish Law, or "*Halacha*," which is based on the four sections (sometimes called the four books or four divisions) of the *Shulchan Aruch*, which includes everything that pertains to all facets of daily Orthodox Jewish life.

26.    The *Shulchan Aruch* (literally meaning the Set Table) is known by most Jewish communities as the Code of Jewish Law.  Students at Tartikov's rabbinical college program will study the four sections of the *Shulchan Aruch*.

27.    Plaintiffs believe that to master this study, there are thousands of religious commentaries that must be read and understood in order to be fully knowledgeable in the Code of Jewish Law and to become a qualified rabbinical judge.

28.    This is a long and difficult process that will require a total commitment from the plaintiff students, for which they are prepared.

29.    The proposed schedule at Tartikov is a full-time course of study for approximately thirteen to fifteen years.

30.    This lengthy period of study is necessary because of the complexity of the third and fourth volume of the *Shulchan Aruch*.

31.    The religious study method that will be used at Tartikov is called *chevrusa*, where students study in one large study hall with a partner.

32.    The four divisions of the *Shulchan Aruch* are:

    a.    *Chosen Mishpat* -- are the laws of finance, interest and financial responsibility; law of personal and financial damages; legal procedure, including the rules of the *Bais Din* and rules of witnesses.

    b.    *Yoreh De'ah* -- are laws related to *kashrut* (Jewish religious dietary laws, "kosher"); religious conversion laws; laws regarding mourning; laws of family purity; and laws related to Israel.

    c.    *Orach Chayim* -- are laws related to prayers, synagogue, Sabbath and holidays)

    d.    *Even Ha'ezer* -- are laws related to marriage and divorce.

33.    Plaintiffs did not put this program schedule into writing until they were asked to do so in this litigation because the program is based on the *Shulchan Aruch*, an ancient document.

34.     It was understood by Plaintiffs what the sections of the *Shulchan Aruch* are, so they did not have any reason to write it down.


Torah Community

35.     The Rabbinical College of Tartikov, Inc. was formed and the Property was purchased for the purpose of developing and operating a rabbinical college with a Torah community.

36.     Tartikov's intended Torah community is a living and learning religious campus that will provide students with the opportunity to have total dedication to religious obligations of mastering the Code of Jewish Law in order to become a full-time rabbinical judge while at the same time meeting their religious obligations to their families (including teaching them the Torah) and to worshipping God in the proper way.

37.     Tartikov's intended Torah community involves intensive learning interaction, day and night, among the students, teachers and lecturers and will allow the rabbinical college's students to have the opportunity to constantly gain knowledge from the teachers and students by interacting with the teachers and discussing the issues with their fellow students.

38.     The student plaintiffs believe as a religious matter that they should live together and study together in Tartikov's intended Torah Community.

39.     The student plaintiffs believe that to become a Torah scholar as defined by the religious books, the plaintiffs should dedicate themselves to a certain kind of study program, studying day and night while being surrounded by other Torah students to the exclusion of all worldly pleasures and distractions, with no outside influences to distract them.

40.     Tartikov believes that it cannot offer its religious program to train rabbis to become full-time rabbinical judges if it cannot include a Torah community with on-campus housing.

41.     Tartikov's officers believe, based on their religious background and what is required in their religious books, that students will only be able to complete the rabbinical judge program in all four books of the *Shulchan Aruch* if they live in a Torah community.

42.     Plaintiffs believe that a Torah community is necessary because rabbinical students can devote themselves completely to their studies; it creates a situation where they can devote themselves fully to their task at hand without having to deal with other difficulties; it is a rarified atmosphere and is especially important in response to contemporary society because they are trying to live according to Jewish law and the world outside of the Torah community is not in tune with that.

43.     There is currently no Torah community in which the plaintiff students can live and study the complete *Shulchan Aruch* around the Town of Ramapo, New York.

44.     The housing component of Tartikov's rabbinical college is only for students and teachers who are committed to the full-time religious training program along with their families, as well as one or two caretakers of the subject Property.

45.     Students who drop out of Tartikov's full-time religious training program will not be permitted to live in the Torah community.

46.     Students will be required to live on the campus of the rabbinical college, but housing will be provided by Tartikov at no cost to them.  Tartikov will also provide the students with financial assistance in the form of a stipend.

47.     Because plaintiffs' religious belief is that the students at the rabbinical college must live with their families, the rabbinical college students require their own housing unit with separate cooking facilities.

48.     The Torah Community is similar to a monastery, but unlike Catholic seminarians or Buddhist monks, plaintiffs' religious beliefs require them to be married and have children.

49.     Student family housing at a Rabbinical College would be part of the Educational Institution's principal use.

50.     The residential experience itself can be central to the educational enterprise of an educational institution.

51.     Any resident at the Rabbinical College will be either a student or faculty, and their families.


Shuls, Courtrooms, Library and Mikvahs on Campus

52.     In order to provide the opportunity for the rabbinical students to observe how rabbinical judges fulfill their duties, plaintiffs intend to have courtrooms on campus.

53.     Plaintiffs believe that this experience is necessary for everyone who wants to become a judge, and is called *Shimush Talmidei Chachamim* (rabbinic apprenticeship).

54.     Plaintiffs believe that having courtrooms on the campus is essential to the religious learning.

55.     Plaintiffs believe that there must be a library on campus.

56.     This belief is rooted in the same religious sources which requires them to train rabbinical judges, because students need to have access to religious books for their studies.

57.     The rabbinical college intends to provide libraries that will contain all of the books necessary for the students to learn according to their religious beliefs and to become proficient in the Code of Jewish Law in this Torah Community.

58.     Tartikov intends to provide *mikvahs* on its rabbinical college campus.

59.     Plaintiffs believe that there should be *mikvahs* (ritual baths) on its rabbinical college campus.

60.     Plaintiffs believe that the religious need for *mikvah* is based in the Talmud, as well as other Jewish sources.

61.     Plaintiffs believe that Tartikov must have *shuls* (synagogues) on campus so that everyone at the campus can pray together

62.     Tartikov intends to have *shuls* (synagogues) on campus so that everyone at the campus can pray together

*Smichas*

63.     A *smicha* is a certification that a student has accomplished proficiency in an area of Jewish law.

64.     A *smicha* is not a degree recognized by the New York Board of Regents.

65.     A *smicha* is not a test; and one who gives *smicha* can give it orally.  The student goes to a senior rabbi who evaluates the student's knowledge.

66.     A *smicha* is given by rabbi, not a school.

Admission to Tartikov

67.     Tartikov will admit qualified students.

68.     To be admitted into Tartikov, Dean Mordechai Babad will make a determination that the student is qualified

69.     Prospective students will need to complete a high school level program in the Talmud and meet with Dean Mordechai Babad in order to be considered for admission.  Anyone interested in Tartikov's program must arrange a meeting with Mordechai Babad.

70.     Mordechai Babad will verbally test the prospective student, and determine if he is qualified.  There is no written document that serves as an admission application.

71.     Mordechai Babad is one of the few judges fully trained in all four books of the *Shulchan Aruch*.

72.     In 2007, Chaim Babad offered to financially support the studies of ten students under Rabbi Mordechai Babad.

73.     Those ten students were therefore able to commit to full-time studies in the Talmud to prepare to enter Tartikov.

74.     Of those ten students, Jacob Hershkowitz, Meilech Menczer, Chaim Rosenberg, Meir Margulis and David Menczer are Plaintiffs.

75.     Mordechai Babad has stated that all of the student Plaintiffs are qualified to be admitted into Tartikov.

76.     The students cannot begin studies at Tartikov's full-time program with housing because Tartikov's use is not permitted in the Village of Pomona.

77.     All of the plaintiff students intend to begin studies at Tartikov when the college is built and becomes operational


Accreditation

78.     Tartikov's proposed rabbinical college cannot be accredited by the New York State Education Department.

79.     Tartikov's proposed rabbinical college cannot be accredited by the Association of Advanced Rabbinical and Talmudic Schools ("AARTS"), whose purpose is to accredit Jewish educational institutions.  Dr. Bernard Fryschman is the Executive Vice President of AARTS.

80.     Tartikov's program as described by Mr. Tauber to Mr. Fryschman, was informed that it cannot be accredited by AARTS. (STIPULATED)

81.     There is no other accreditation agency that can accredit Tartikov's proposed rabbinical college.

82.     To be accredited by any New York State body, an educational institution would have to offer degrees or a certificate in which credits count toward a degree.

83.     All religious institutions that are accredited in New York are degree-granting institutions.

84.     Tartikov will not grant any of the degrees recognized by the New York Board of Regents.

85.     To be accredited by any New York State body or by AARTS, an educational institution would have to be in existence and fully operational.  In addition, the educational institution must submit to a site visit and conduct a self-study reviewing its facilities, curriculum and faculty.

86.     Tartikov's rabbinical college program does not yet exist and is not fully operational.

87.    To be accredited by any New York State body or by AARTS, an institution would have to have entrance exams to be fully accredited.

88.    Tartikov will not have entrance exams. .

89.    To be accredited by AARTS, an institution would have to have a broader curriculum than Tartikov will offer.

90.    Tartikov cannot apply for a special permit for its proposed rabbinical college because, pursuant to the Village's Zoning Code, only accredited institutions can apply for a special permit as an educational institution.

The Individual Plaintiffs

91.    Jacob Hershkowitz, Meleich Menczer, Chaim Rosenberg, are each motivated by personal sincere religious beliefs to become full-time rabbinical judges who have studied all four sections of the *Shulchan Aruch* and intend to do so.

The Property

92.    The subject Property is situated on an approximately 100-acre parcel located at the intersection of U.S. Route 202 and N.Y. Route 306 in the Village of Pomona, Rockland County. (STIPULATED)

93.    Tartikov purchased the Property from Yeshiva Spring Valley in August 2004.

94.    Camp Dora (an Orthodox Jewish Summer Day Camp) was the owner of the Property prior to Yeshiva Spring Valley. (STIPULATED)

95.    People in the Village continue to refer to the Property as "Camp Dora" even when it was owned by Yeshiva Spring Valley or Tartikov.

96.    The Property can accommodate the needs of Tartikov as a site for its rabbinical college as well as the needs of the rabbinical students and teachers and their families.

97.    There is no mortgage on the Property.

98.    The Property is the only parcel of property owned by Tartikov.

**Facts Regarding Defendants**

Village Background

99.   The Village regulates its own land use, subject to New York State law. (STIPULATED)

100.   The entire area of the Village is designated as a residential district, known as the "R-40 District". (STIPULATED)

101.   The R-40 District requires that there be a minimum of 40,000 square feet per lot.

102.   Permitted land uses as of right within the R-40 zoning district are one-family residences, houses of worship, public utilities rights-of-way, libraries and museums, public parks and playgrounds, and agricultural pursuits. (STIPULATED

103.   Special permit uses within the R-40 District are recreational facilities; playgrounds, swimming clubs, tennis courts and recreational buildings; reservoirs, water towers and water tanks; telephone exchanges and public utility substations, communications centers for emergency and other purposes, and any and all other public utility facilities which are or support the primary function of the public utility company; camps; wireless telecommunication services facility; educational institutions; and houses of worship.

104.   The Village, incorporated in 1967, adopted a master plan in 1974 which it updated in 1997. (STIPULATED)

105.   Pomona's Village Board consists of a Mayor, Deputy Mayor and three Trustees. (STIPULATED)


Awareness that Orthodox/Hasidic Jews lived in the Neighboring Community

106.   Village officials and employees are aware that Orthodox/Hasidic families have large families and can recognize Orthodox/Hasidic Jews by the manner in which they dress.

107.   The Village has knowledge of the Orthodox Jewish population in and around the Town of Ramapo and its villages.

108.   Village officials and employees have knowledge that the New Square area of Monsey, New York is predominantly occupied by Orthodox/Hasidic residents.

109.   Former Planning Board Member Mel Cook referred to New Square, the area occupied by Orthodox/Hasidic Jewish people as a "tribal ghetto".

110.   Mayor Marshall told former Deputy Mayor Appel that "Monsey grew up under your watch" when he was chairman of the Ramapo zoning board.

111.    Village officials and employees have knowledge that the term "voting bloc" is sometimes used as another way to refer to Orthodox/Hasidic Jews.

112.    When speaking about adult student housing, Brett Yagel has stated "how convenient for the voting bloc."

113.    Village officials and employees have knowledge that Rockland's Hasidic Jewish population has "exploded" or increased.


Timeline Leading up to Passage of Laws

114.    In 1997, Mayor Marshall and Trustee Banks stated that they had concerns with Orthodox Jews as it related to the school district.

115.    On December 15, 1999, Yeshiva Spring Valley appeared at an informal appearance before the Planning Board regarding its plans to build a yeshiva on the Property.

116.    At the December 1999 meeting of the Village Planning Board, the Village planner commented that the zoning for schools "really stinks" and recommended that a law be drafted in response to that fact.

117.    One month later in January 2000, the Village Planner provided memos to the Village Board and Planning Board with recommendations that were incorporated into Local Law No. 1 of 2001 entitled "Proposed Primary School and Pre-School (YSV Pomona) and the Village Zoning Regulations Regarding Schools."

118.    On January 22, 2001, following a public hearing, the Board of Trustees adopted Local Law 1 of 2001.  (STIPULATED)

119.    In December 2002, Mayor Marshall spoke on behalf of the Village at a community meeting to support the formation of the Village of Ladentown.   Ladentown was proposed to be created to prevent Ramapo from changing the zoning of Patrick Farm to permit Adult Student Housing.  Mayor Marshall said that this change in zoning to Patrick Farm was to support the "special agenda of a small but vocal group of citizens."

120.    In April 2003, Mayor Marshall told Ramapo on behalf of Pomona that zero population growth should be a major plan objective of Ramapo's Comprehensive Plan.  He knows that Orthodox/Hasidic Jews have large families.

121.    In June 2003, the Village passed a law banning overnight parking.  This was in direct response to concerns that Orthodox Jews were parking overnight because they are religiously banned from driving on Friday nights.

122.    In January 2004, the Village adopted a resolution chiding public officials who place politics of special interest groups above others.  The Village representative has stated that the special interest group could refer to the Orthodox/Hasidic Jewish bloc vote.

123.   In March 2004, the Village promoted its "Good Neighbor" policy in its newsletter, the Village Green.  The policy provided that the Village would fully prohibit or severely restrict actions or projects which had potentially adverse implications for any member of their community or were "oppositional to the character and nature of the Village."

124.   In May 2004, the Village filed a lawsuit against Ramapo seeking to set aside Ramapo's adoption of its Comprehensive Plan.  Its Petition stated that Ramapo had a burgeoning Hasidic community, which has for the most part settled around the central hub of Monsey and areas to the east of Monsey.

125.   In June 2004, Mayor Marshall reported about a meeting with all Villages in the County to discuss insurance coverage for claims under RLUIPA.

126.   On June 15, 2004, Ramapo adopted an Adult Student Housing ("ASH") law which permitted housing for adult students with families.

127.   On June 28, 2014, the Village voted to commence legal action against Ramapo based on its passage of the ASH law.

128.   In July 2004, Mayor Marshall wrote in the Village newsletter about his opposition to Ramapo's actions and referred to the "pandering" of Ramapo officials to the special interest groups able to deliver the critically important "bloc[k] vote."

129.   In August 2004, Congregational Rabbinical College of Tartikov, Inc. filed its certificate of incorporation in Rockland County clerk's office, listing its principal place of worship at Route 306 and Route 202 in Pomona and indicating that it had the purpose of developing and operating a rabbinical college as a Torah community, as described by Orthodox/Hasidic religious sages.

130.   In August 2004, Tartikov became the owner of the Property.

131.   On August 31, 2004, Tartikov filed its deed in the Rockland County clerk's office.

132.   On September 7, 2004, Ulman, in a memo, presented the Board of Trustees with her recommendations for amendments to the zoning law pertaining to schools and dormitories. (STIPULATED)

133.   On September 27, 2004, the Village enacted Local Law No. 5 of 2004. (STIPULATED)

134.   In October 2004, the Village filed a lawsuit to challenge Ramapo's ASH law.

135.   The Village learned that the Congregation had purchased the subject Property at least as early as November 2004. (STIPULATED)

136.   At least as early as February 2005, the Village trustees and employees knew that the Property was owned by a "Rabbinical College."

137.   In May 2006, Village Clerk Leslie Sanderson sent an email to Mayor Marshall and her husband, Trustee Nick Sanderson, entitled "Here we go."   The email informed them that a resident came in to Village Hall to report that surveyors were on the Property.

138.   In early January 2007, Preserve Ramapo emailed what they claimed was a site plan regarding Tartikov's proposed rabbinical college and posted it on its website.  The email was received by Village board members and trustees.

139.   In January 2007, following Preserve Ramapo's post on its website, there was much local press regarding Tartikov's plans.

140.   On January 22, 2007, the Village held a public hearing on Local Law No. 1 of 2007 and Local Law No. 5 of 2007, where many people spoke out against Tartikov.  Mayor Marshall described the meeting as hostile.

141.   On January 22, 2007, the Village enacted Local Law No. 1 of 2007. (STIPULATED)

142.   In or around of January 2007, Mayor Marshall directed the secretary who transcribed the minutes of the January 22, 2007 meeting to remove all of the public comments from the minutes.

143.   From January 2007 to March 2007, Nick Sanderson, Brett Yagel and Rita Louie ran for office on a platform that promised to fight Tartikov.

144.   In February 2007, Rita Louie and Brett Yagel secretly authored and edited a letter to the Journal News that referred to Orthodox/Hasidic Jews as "homogenous individuals" and stated that the potential influx of Orthodox/Hasidic Jews into Pomona would not be "a natural progression" for the Village.

145.   In February 2007, the Village passed a resolution to ask Congress to revisit RLUIPA.

146.   In February 2007, the Village denied Tartikov's tax exemption application, after approving it in 2005 and 2006.

147.   On February 26, 2007 and on March 26, 2007, the Board of Trustees continued its public hearing on the proposed wetlands law (Local Law No. 5 of 2007). (STIPULATED)

148.   From March 2007 through July 2007, Tartikov's attorneys sent letters, made phone calls and made requests at Board Meetings to Mayor Sanderson, the trustees and the Village Attorney requesting an informal meeting to discuss Tartikov's proposed plans.  The Village denied those requests, claiming that it doesn't hold such meetings.  During this same period, Mayor Sanderson corresponded with a developer regarding his proposed project and told him that the Village meets with developers who are or who wish to be involved with the Village as a courtesy.

149.   On April 4, 2007, Mayor Sanderson and Trustees Yagel and Louie attended a meeting of the Pomona Civic Association.  In advance of the meeting, Trustee Yagel emailed Mayor Sanderson and Trustee Louie telling them that they must be very careful about what they say because Tartikov's attorney could be there.  When discussing Tartikov at the meeting, Louie and Yagel warned people to be careful about what they say and to make sure that when they speak in public they do not speak in a discriminatory manner.

150.   On April 23, 2007, the Village enacted Local Law No. 5 of 2007. (STIPULATED)

151.   Local Law No. 1 of 2001 regulates school land uses within the Village.  The law adopted imposed upon schools a 10% maximum building coverage requirement, a 20% floor area ratio, and a 25% maximum impervious surface limitation.

152.   Local Law No. 1 of 2001 was under consideration by the Board of Trustees from December 1999 through its passage in January of 2001

153.   The law was created in response to Yeshiva Spring Valley's proposal to build a yeshiva on the Property where the Village planner commented that the zoning for schools "really stinks" and warned that based on the fact that the property is 100 acres, Yeshiva Spring Valley could build over 800,000 square feet of school development as of right.

154.   The Village planner recommended that a law be drafted in response to that fact.

155.   The January 2000 memos from the Village Planner referred to Yeshiva Spring Valley specifically and indicated that Village regulations on schools are "scant" and recommended that the Village amend the zoning laws for schools.

156.   The Village Planner, in conjunction with the Village Attorney, drafted a new law regarding schools that eventually became Local Law No. 1 of 2001 and included many of the recommendations from the January 2000 memos by the Village Planner.

157.   During the time-frame between the December 1999 informal appearance and the passage of Local Law No. 1 of 2001 in January 2001, Yeshiva Spring Valley's director felt that the Village delayed and obstructed Yeshiva Spring Valley's applications until the new law could be passed.

158.   When discussing proposed Local Law No. 1 of 2001 at a meeting Mayor Marshall said "This thing's going to come in.  They're going to come in and we're going to be caught with our pants down if we don't move.  That's why I want to make sure that we're moving ahead.  If you miss a meeting, no problem, you're going to be involved in the discussion anyway."

159.   As passed, Local Law No. 1 of 2001 prevented Yeshiva Spring Valley from being able to build its yeshiva as envisioned.

160.   The Village has produced no evidence showing that it conducted a SEQRA review in conjunction with Local Law No. 1 of 2001.

161.   There were no schools in the Village in 2001.  There have been no schools in the Village to this day. (STIPULATED)

162.   Yeshiva Spring Valley's director felt that there was an undercurrent that Yeshiva Spring Valley was not wanted in the Village.

163.   Yeshiva Spring Valley sold the Property in 2004 and moved to another location.

164.   Upon hearing that Yeshiva Spring Valley moved to another location, then-Trustee Nicholas Sanderson commented that that perhaps Yeshiva Spring Valley was advised to go to a "friendlier place such as Ramapo" due to Local Law No. 1 of 2001.


Local Law No. 5 of 2004 Passed in Response to Concerns Regarding Orthodox/Hasidic Dormitories in Neighboring Areas

165.   The Village knew that dormitory housing for Orthodox/Hasidic students was a concern in the surrounding area because as early as 1999, during the Yeshiva Spring Valley informal appearance, Village Planning Board members asked its representatives multiple times if the yeshiva would include dormitories and mentioned a local yeshiva which had dormitories.

166.   Beginning in 2002, the Village, Village officials, and Village employees supported efforts to form a proposed village called "Ladentown," which was designed to prevent the development of adult student housing for Orthodox/Hasidic Jewish students and their families at neighboring Patrick Farm.

167.   In 2004, Yeshiva Spring Valley was still in talks with the Village in an attempt to obtain zoning approval to build its yeshiva as envisioned.   In one of its submissions to the Village, Yeshiva Spring Valley's engineer accidentally mislabeled a building which was an educational center as a dormitory.  It clarified the mistake almost immediately.

168.   The Village believed that Ramapo adopted its ASH law in June 2004, in response to a yeshiva's request for adult student housing to accommodate religious married students.

169.   Doris Ulman drafted Local Law No. 5 of 2004.

170.   Doris Ulman was Pomona's point of contact with the attorney who filed the lawsuit opposing Ramapo's ASH laws.

171.   The Village limited dormitories to one building in response to Ramapo's ASH laws which determined that a dormitory use could be 90% of use.

172.   The Village proceeded quickly with the legislative process of Local Law No. 5 and failed to comply with many required formalities.

173.   The resolution passing Local Law No. 5 of 2004 did not contain a SEQRA resolution.

174.    There were no studies performed for Local Law No. 5 of 2004.

175.    The Village does not have any records to suggest that there was a New York General Municipal Law review of Local Law No. 5 of 2004.

176.    There were no schools or higher education institutions of any kind in the Village in 2004. (STIPULATED)

177.    Doris Ulman stated at the meeting where Local Law No. 5 of 2004 was passed that the purpose of the law was to strengthen the Village's control over schools.

The Village Knew About Tartikov and Was Waiting to Hear About Its Plans

178.    Village Attorney Doris Ulman knew that the Property was going to be used as a rabbinical college from the time she learned of the purchase because of the name, The Congregational Rabbinical College of Tartikov, Inc.

179.    In June 2005 at a joint meeting of the Village Board and the Village Planning Board, Mayor Marshall commented that "nothing has come into the Village yet regarding the use of the Property (referring to Tartikov).

180.    In late 2005, the Village became aware of rumors regarding Tartikov's intended use of the Property.

181.    Tartikov's attorney, Paul Savad, told Village Attorney Doris Ulman about Tartikov's intended use of the Property in 2005 or 2006.

182.    Village trustees and officials knew that Tartikov's proposal was for an Orthodox/Hasidic School.

Local Law No.1 of 2007 Passed in Response to Tartikov

183.    Local Law No. 1 of 2007 regulates Educational Institution land uses within the Village.  The law stated the following requirement for Educational Institutions: "(a) The minimum lot area for an educational institution shall be a net lot area of 10 acres. (b) No portion of any land under water shall be counted toward the net lot area.  Not more than one-fourth of any land which is defined as wetland by the U.S. Army Corp of Engineers, the New York State Department of Environmental Conservation and/or Chapter 126 of this Code or which is within a one hundred year frequency floodplain or within access, utility or drainage easements or rights-of-way shall be counted toward the net lot area. (c) No portion of any land with unexcavated slopes over 35% shall be counted toward net lot area. Not more than 25% of any land with unexcavated slopes greater than 15% but less than 35% shall be counted toward the net lot area."

184.   Local Law No. 1 of 2007 also added the following language to the "Educational Institution" special permit regulations: "A dormitory building is permitted as an accessory use to an educational use provided it is located on the same lot as the educational use and there shall be not more than one dormitory building on the lot.  A dormitory building shall not occupy more than twenty (20) percent of the total square footage of all buildings on the lot."

185.   A draft of Local Law No. 1 of 2007 was first distributed to board members  in November 2006.

186.   On December 18, 2006, the Village held a public hearing at its Board meeting on the topic of: "Amending the Zoning Law of the Village of Pomona in relation to Dormitory Buildings."

187.   Local Law No. 1 of 2007 was considered at a January 22, 2007 meeting. At the meeting, Village Attorney Doris Ulman reported that the meeting was the most packed that she had ever seen the meeting room, well more than the 49-person room capacity.  Ms. Ulman was not surprised by the turnout because people came to speak out against Tartikov due to the article two weeks before.  Mayor Marshall reported that at the January 22, 2007 meeting "[t]here was a hostility engendered from the article in the Journal News regarding the Tartikov project"; "there was a general degree of ill will."  He also stated that there were "a lot of people there- too many."  Brett Yagel reported that it was a "packed house" with a lot of public speakers.  Trustee Sanderson reported that there were 150 residents packed into a room with a legal occupancy of 49.  Trustee Lamer stated that there were a large number of residents at the meeting.

188.   At its January 22, 2007 hearing, the Village Board considered changing the height limitation for dormitories from 25 feet to 35 feet.  Village Attorney Doris Ulman stated that the proposed change would make dormitories consistent with all other uses in the Village's zoning law. (STIPULATED)

189.   In light of this, Ms. Ulman proposed a change to 35 feet to be consistent with other height requirements in the Village's laws.

190.   At the January 22, 2007 meeting, Village officials received feedback from the public expressing opinions that the height should be the lowest amount possible in order to make it as difficult as possible for Tartikov's proposed use.

191.   After receiving that feedback, Trustees Sanderson, Lamer and Banks all stated that they wanted to maintain the 25-foot limitation, rather than increase it to 35 feet. Trustee Sanderson specifically stated that the Village should keep the 25-foot limit because "based on the input from the public this evening, I think it's very clear that there is a great deal of concern."

192.   The Village Board voted to keep the height limitation at 25 feet. (STIPULATED)

193.   The Village also considered changing the law to increase the number of dining halls to two dining halls per building from only one dining hall per building based on a suggestion from Rockland County.

194.   When Mayor Marshall explained that the Village was considering this increase from one dining hall to two, members of the public shouted in opposition.

195.   The law was passed without increasing the number from one dining hall to two. The Village overrode Rockland County's recommendation.

196.   When a public speaker asked what could be done to protect the Village from the Tartikov proposal, Mayor Marshall stated that requiring that a dormitory be an accessory use accomplishes that.

197.   People spoke out at the meeting and made the following statements expressing opposition to Tartikov and Orthodox/Hasidic Jews:

   a.   "We are going to be another Kiryas Joel (a Hasidic community).  That's why we are emotional.  You can get into the environmental impact and all of that. That's all I have to say."  Mayor Marshall responded to this comment by stating "[l]adies and gentlemen, there isn't anyone sitting up here who doesn't know how you feel."

   b.   "The frustration that we have is that you knew of the press that had come out, whether it be true or not.  You knew that it was out there, and you know we were very, very upset.  I think what would have helped us is if at the beginning of this meeting you had said, this is what is going on, we know that you've read this, we are here to protect your interests and the amendments to this law, this project, this alleged project, with the alleged attorney who is allegedly sitting here, produces it, that these amendments will defend us.  If you had said that in the beginning, I don't think as many people would be as upset as they are, because we don't know where you stand."

   c.   Mayor Marshall responded to this comment by stating "[l]adies and gentlemen, let me say something.  We sitting at this table have limitations that are placed on us as to what we can say and what we can't say, because our attorney tells us what we can say and what we can't say.  I can't say what I feel, I can't.  If I agree with you, I don't agree with you, I don't have that luxury of being able to say that here. All that I can say is that every member of this board works very, very hard to do what is best for this community.  You have your issues.  Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that that we don't agree.  We may or may not, but please give us the benefit of the doubt. We have all been doing this.  We work very hard at what we do.  We try and do what is best for the community but it's our home. There are limitations under the law that restrict what we can say and when we can say it."

   d.   Tartikov "would entirely change the character of the village.  It would entirely change the politics of the village.  And I think there has to be a solution through the zoning laws and through the amendments to the zoning laws that

> prohibits such a large number of people being within one property, and one
> institution.  Thank you very much."

198.   The Village had no studies to support a conclusion that there was a need for Local Law No. 1 of 2007.

199.   There remained no schools in the Village at the time. (STIPULATED)

200.   No Educational Institutions existed within the Village in 2001, in 2004, in 2007, or presently. (STIPULATED)

Local Law No. 5 of 2007 Passed in Response to Tartikov and Exempted Most Properties in the Village

201.   Local Law No. 5 of 2007 regulates wetlands and other areas within the Village.

202.   Local Law No. 5 of 2007, titled the Wetlands Protection Law ("WPL"), prohibited various forms of development activity from occurring within 100 feet of the boundary of any wetland, water body or watercourse (the "100-foot buffer provision"), unless a permit is issued by the Board of Trustees or Planning Board, which can be granted only if the regulation results in a deprivation of "the reasonable use of a property so as to constitute a de facto taking of such property."

203.   Local Law No. 5 of 2007 exempted "lots that are improved with single-family residences" from the application of its 100-foot buffer provision.

204.   The 100-foot buffer provision of the Wetlands law, as originally proposed, applied to all properties in the Village.

205.   A new draft of the law in March 2007 added a section providing that the 100-foot buffer provision would not apply to lots improved with single family residences.

206.   Defendants' proffered land use expert does not know of any other municipalities where the local wetlands law exempts lots improved with single family residences.

207.   Defendants' proffered land use expert states that wetlands do in fact exist on lots improved with single family residences within the Village and such wetlands are not less important than other wetlands.

208.   In the 1990s, the Village considered a Model Wetlands law, but decided it was not necessary.

209.   Village Attorney Doris Ulman did not discuss drafting a Wetlands law with the Board when she became Village attorney in 2003.

210.  Village Attorney Doris Ulman drafted and worked on less stringent, more general Wetlands laws when she was Village Attorney in Chestnut Ridge, New Hempstead and South Nyack.

211.  Before the Village passed the WPL in 2007, it had prior knowledge that wetlands existed on the Property.

212.  The Village first mentioned that it was working on the WPL in September 2006, and the first draft of the WPL was distributed in December 2006.

213.  At the January 22, 2007 meeting of the Village Board of Trustees, in addition to consideration of the dormitory law, the Village also accepted public comment concerning the WPL.  In response, at least one public speaker at the hearing addressed Tartikov and at least one speaker directed their comments to Orthodox/Hasidic Jews.

214.  At the April 4, 2007 Pomona Civic Association Meeting, just prior to passing the WPL, Trustee Sanderson stated that there are things that the Village has to do to prepare for the Tartikov "looming crisis."

215.  The Property is subject to and not exempt from Local Law No. 5 of 2007 and its 100-foot buffer requirement.

216.  The Village did not conduct any studies before passing Local Law 5 of 2007.

217.  The Village has not had any applications under Local Law 5 since it was passed in 2007.

Village Officials and Employees Opposed RLUIPA After they Became Concerned that RLUIPA Would Permit Tartikov to Build its Rabbinical College

218.  Village officials expressed concerns regarding RLUIPA from 2004 through 2006.

219.  The Village did not seek to have Congress revisit RLUIPA from 2004-2006.

220.  The Village passed a Resolution to ask Congress to revisit RLUIPA in February 2007, just after Tartikov mentioned that it believed that its development plans would be protected under RLUIPA.

Village Officials Ran for Office on a Platform of Fighting Tartikov

221.  Sanderson, Yagel and Louie ran on a platform of opposing Tartikov in the March 2007 Village election.  Such platform included the following:

    a.    During the campaign, Sanderson voted in favor of Local Law No. 1 of 2007 and in favor of the resolution to ask Congress to revisit RLUIPA.

    b.     Sanderson, Yagel and Louie stated that Tartikov was "the single most important issue" facing the Village.

    c.     Sanderson, Yagel and Louie stated that they would vigorously defend Pomona's land use codes and regulations.

    d.     Sanderson, Yagel and Louie's campaign materials mention Tartikov by name and promise to "stand up to the threat," and their message to constituents was that they would fight the proposed rabbinical college.

    e.     Sanderson, Yagel and Louie's campaign placards promised to "fight" for Pomona.

    f.     Sanderson, Yagel and Louie promised to create a legal defense fund that would grow over time in order to fight Tartikov.

    g.     Sanderson, Louie and Yagel ran on platform opposed to the development of Tartikov; however, they admitted that they had no knowledge regarding Tartikov's plans and that their opposition was just conjecture that Tartikov would be bad for the environment.

    h.     While running for office, Trustee Sanderson met with hundreds of Village residents who stated their concerns and opposition to Tartikov.

    i.     Nicholas Sanderson believes that they won the election because they seemed to satisfy the village residents regarding Tartikov.

    j.     He also did not disagree with Preserve Ramapo's election endorsement that he, Yagel and Louie will "fight" Tartikov.

    k.     Nicholas Sanderson submitted a campaign video to the Journal News that stated that Tartikov could completely change the make-up of the village.

    l.     Brett Yagel submitted an election video to the Journal News that stated that he wanted to fight Tartikov.

    m.     Candidate Louie sent an e-mail to Sanderson and Yagel on March 17, 2007 proposing language for an e-mail blast stating that they will be able to "defeat any developers who plan to take over our village and our area" and they "have the plan, the experience, the knowledge, the legal counsel and the guts."

    n.     Sanderson, Yagel and Louie believed that it was important to tell the public that they hired counsel to educate them on RLUIPA so the public would know that they shared their concerns.

222.   Sanderson, Yagel and Louie won the March 2007 election. (STIPULATED)

<u>Village Residents, Trustees and Employees' Opposition to Tartikov</u>

223.   Village Residents, Trustees and Employees Voiced Their Opposition to Tartikov in the following ways:

a.   In a February 2007 letter to the editor signed by Village resident Lynn Yagel, but authored by Rita Louie and Brett Yagel, the writers:

i.   refer to "homogenous individuals," referring to Orthodox/Hasidic Jews; and

ii.   state that the potential influx of Orthodox/Hasidic Jews into Pomona would not be a natural progression for the Village.

b.   Former Village Planning Board Chairperson and Village resident Mel Cook was opposed to Tartikov and stated "[s]ome of us see the Rabbinical College as the beginnings of another restricted religious community similar to New Square" and also said regarding Tartikov that secular Jews and non-Jews hope that the end result will be to the benefit of Village residents.

c.   Former Village Planning Board Chairperson and Village resident Mel Cook wrote to the Rockland County Journal News multiple times and wanted his views opposing Tartikov heard.

d.   Former Village Planning Board Chairperson and Village resident Mel Cook wrote Mayor Sanderson regarding the Tartikov website, regarding accreditation issues for Tartikov and regarding Tartikov's application for tax exemption.

e.   Village Clerk and Village resident Leslie Sanderson stated that Tartikov would "usurp the Village, perhaps the Village Board."

f.   Village Clerk and Village resident Leslie Sanderson stated that the Village would not be diverse if the ratio of people coming in is much greater than the people already there.

g.   Village resident Lynn Yagel also stated that there is no hope for Rockland County due to RLUIPA development.

h.   Trustee Rita Louie stated that she made judgments against the rabbinical college even though she did not know any specifics of the proposal.

      i.     Village residents were interested in finding out about Tartikov from Village officials and they came to, sent correspondence to, and called Village Hall to express their opinions on the topic of Tartikov.

      j.     The Village received no positive reaction regarding Tartikov; all of the reactions were negative.

      k.     Village residents were concerned about maintaining the status quo and having the Village carry on more or less the way it exists.

      l.     Village Clerk and Village resident Leslie Sanderson stated that "[p]retty much everybody" was "talking about it" and that "[e]veryone I talk to is concerned about the Rabbinical College."

224.  Many Village residents, officials and employees stated that they would rather pay to oppose Tartikov than allow it to be built in the Village.

225.  Village residents showed great support for an almost 70% tax hike to cover a "tax stabilization fund" to pay for the Tartikov litigation.

226.  Village resident Robert Prol believed Tartikov would be a "slum" and posted on LoHud.com that all of the Village residents he knows want Village officials to oppose the project.

227.  Village resident Robert Prol wanted his opinions to be heard by Village officials.

228.  Village resident Robert Prol sent a letter to Village officials stating that as a Village resident he supported the Board opposing Tartikov

229.  Village resident Robert Prol sent another letter to Village officials stating "There is only one outcome acceptable to the community, and that is to maintain our fair zoning laws and the way of life we have all invested in."

230.  Soon after Robert Prol sent these letters, Mayor Sanderson appointed him to the Village Planning Board.

231.  The Defendants are aware that private citizens within the Village expressed opposition to the development of a Rabbinical College through online and print comments.

232.  In January 2007, Brett Yagel, then a resident and Trustee candidate, was quoted in a New York Times article regarding Tartikov that it is "disgusting" that "[t]hey're trying to create this mini city in our village."

233.  The Village Trustees communicated among themselves regarding Tartikov.

234.  Village officials took residents' opinions into account when voting on laws.

235.   Village officials found out about residents' opinions through correspondence, in meetings and by reading newspapers and on-line comments.

236.   Village Officials and employees made comments hostile to Hasidic/Orthodox Jews.


Village Officials Wanted the Village to Maintain its Demographic Make-Up

237.   Village officials and employees made statements regarding their desire for Pomona to maintain its "diversity," which meant preventing an influx of Orthodox/Hasidic Jews, including:

      a.    Sanderson, Yagel and Louie campaigned on a platform of maintaining Pomona's diversity.

      b.    Sanderson, Yagel and Louie campaigned on a platform to keep Pomona Pomona, meaning "keep Pomona the village that it is and not change it."

      c.    Louie sent an e-mail to a Village resident stating that she wanted to keep the Village diverse because she wanted to "maintain[] the demographic makeup of the village the way it is."

      d.    Louie stated, regarding Tartikov, that "[i]t's a little unsettling what's going on, but we are sure we can maintain our zoning laws in Pomona and keep our neighborhood rural and diverse."

      e.    Nicholas Sanderson publicly stated that the Village should "maintain[] its cultural and religious diversity."

      f.    Village Clerk Leslie Sanderson "prefer[s] Pomona to stay the way it currently is."

      g.    Village officials and employees are not aware of any Orthodox/Hasidic Jews who live in the Village.

Village Officials Stated their Intentions to Thwart Tartikov's Plans

238.   Village officials and employees made the following public statements regarding their intention to prevent Tartikov from having its plan approved:

      a.    Trustee Sanderson told the Rockland County Journal News just before the March 2007 election he had a vision for Pomona that, by 2011:

            i.    no decision would have been made on an application by Tartikov;

            ii.    the Board would have had a strong legal team in place from 2007 to 2011 and is well prepared to fight for the village;

iii.   the legal defense fund created in 2007 is almost $1 million for a Religious Land Use and Institutional Persons Act lawsuit; and

iv.   he asked residents to vote for him so that his vision for the Village can come true.

b.   Mayor Sanderson stated at an April 4, 2007 Pomona Civic Association Meeting, which was also attended by Trustees Louie and Yagel, that with respect to Tartikov, the Village has the "gift of time" and he will recommend that the Village start putting away money for future legal fees.

## Tax Exemption Treatment

239.   The Village approved Tartikov's tax exemption applications in 2005 and 2006. (STIPULATED)

240.   The Village denied Tartikov's tax exemption application in 2007 after Tartikov's attorney spoke about Tartikov's plans at the Village Board meeting in January 2007.

241.   Nothing changed with respect to the use or ownership of the Property in between these times.

242.   Yeshiva Spring Valley had been granted tax-exempt status in 1999, and in subsequent years through 2003. (STIPULATED)

243.   In 2004, the Village denied Yeshiva Spring Valley its tax-exempt status for the first time. (STIPULATED)

## General Anti-Orthodox/Hasidic Sentiment

244.   There is evidence of general anti-Orthodox/Hasidic sentiment in the surrounding community, including:

a.   A community activist who was trying to form a new village called "Ladentown" in order to prevent Patrick Farm from becoming adult student family housing for Orthodox/Hasidic Jews described the area near Patrick Farm as "like a snake pit"; Village resident Lynn Yagel has heard similar sentiments from others
.

b.   Distrust between the Orthodox/Hasidic community and the non-Orthodox/Hasidic community.

c.   Many anti-Orthodox/Hasidic statements in the press and on-line comments.

245.   Village officials and employees worked with Preserve Ramapo to oppose Tartikov and other Orthodox/Hasidic development projects.

246.   Preserve Ramapo was opposed to Tartikov as it understood its plans in January 2007.

247.   At the time of Preserve Ramapo's opposition to Tartikov in January 2007, its leader  Robert Rhodes knew that Tartikov was planning an Orthodox rabbinical college that would include family housing.

Village Opposition to Orthodox/Hasidic Land Uses but not non-Orthodox/Hasidic Land Uses

248.   The Village opposed Orthodox/Hasidic land uses beyond its jurisdiction, including:

  a.   Mayor Marshall claimed that Patrick Farm, which was proposed to be Adult Student Housing for Orthodox/ Hasidic Jews, must remain zoned as 1 house for every 2 acres, when Pomona only has 1 house for every 1 acre.

  b.   The Village did not oppose the neighboring Anna Mann property proposal becoming an assisted living facility in 1999.  However, when it was later proposed that the Anna Mann property become a *yeshiva*, Leslie Sanderson opposed the sale of the property to the Orthodox for a middle school, she said "that does not sound good" and "we must all go to the public hearings when they announce them."

  c.   In 1996, Bais Yaakov, a *yeshiva*, was applying for expansion in Ramapo. The Village wrote to Ramapo opposing it, went to a Ramapo meeting to read statement from Mayor Klingher in opposition, challenged the plans in Court, and the Village Attorney advised residents to contact Ramapo to object to the planned expansion.

249.   But the Village did not oppose development for non-Hasidic Orthodox land uses outside of its jurisdiction, including:

  a.   The assisted living facility at the Anna Mann property.

  b.   An agricultural operation in Wesley Hills, despite many environmental concerns, because the Village did not want to "get involved" in other Village's issues.

  c.   In 2003 on an open space item in New Hempstead because it did not want to get involved in other Village's issues.

250.   The Village has opposed Orthodox/Hasidic land uses inside of the Village while allowing similar non-Hasidic/Orthodox land uses, including:

    a.      The Village worked with the Humane Society/Animal Hospital to get its proposed land use approved.

    b.      Every Village Trustee but one was in favor of the concept of Barr Laboratories purchasing property in 2002 to build an office building with parking in the Village, which was not a permitted use.

    c.      The Village applied for funds for a senior citizen center in the Village.

251.   The Village denied Yeshiva Spring Valley's tax exemption in 2004, but voted in favor of the Humane Society's tax exemption on the same day, even though the Humane Society had not timely filed its application for exemption.  The Village treated the animal hospital/humane society favorably.  The Village did not pursue violations by the Humane Society despite receiving a letter from an attorney for the mortgagee of the Property demanding that the Village issue violations.

252.   In 2003, the Village passed a law prohibiting overnight parking because residents complained that Orthodox Jews, who are prohibited from using their cars on the Sabbath, from sundown Friday to sundown Saturday, were parking their cars on the street overnight.

253.   When speaking about Local Law No. 2 of 2007 regarding houses of worship, Mayor Marshall stated: "these are rules that are necessary to maintain control over development within a community to protect its integrity."

254.   In 2001, just after passing Local Law No. 1 of 2001, Mayor Marshall encouraged residents to accept group homes because the federal Fair Housing Act permits them.  The Village did not seek to have the Fair Housing Act reviewed, amended or repealed.

### The Village Denied of Tartikov's Request to meet regarding its Rabbinical School while Offering to Meet with Other Land Owners who Wanted to Develop their Property

255.   The Village denied Tartikov's request for an informal meeting.

256.   At the same time the Village refused to meet with Tartikov, Mayor Sanderson e-mailed developer Joyce, telling him that the Village meets with developers who are or who wish to be involved with the Village "as a courtesy."

257.   Tartikov was not offered a TAC meeting or any type of informal meeting with the Planning Board in response to any of its requests; nor was it told that it could simply submit a letter with a proposal and a plan (as available to others).

258.   The Board discussed Barr Laboratories' approval of a potential non-permitted use of property at a Village Board meeting before the property was even purchased by Barr.

<u>Village Officials, Employees and Residents Watched What They Said in Order to Avoid Being
Caught Making Discriminatory Remarks</u>

259.   Village officials and employees attempted to mask their true intentions with
respect to Tartikov and urged one another and residents to watch what they said in order to avoid
being caught making discriminatory remarks:

      a.     Prior to the February 2007 Village Board meeting, Mayor Marshall sent an
e-mail to the trustees warning them that Tartikov's attorney might be at
the meeting.

      b.     When discussing Tartikov at the April 2007 Pomona Civic Association
meeting, Mayor Sanderson stated that he did not want to make the
mistakes that the developers want him to make.

      c.     Trustee Louie reported to Mayor Sanderson that a person from Tartikov's
law firm had been at the Planning Meeting.  Louie asked Sanderson to
have Village Attorney Doris Ulman give the village planning board the
"ground rules" for such situations.

      d.     When corresponding with Village resident Robert Prol regarding
organizing a spin-off of Preserve Ramapo to oppose Tartikov, Trustee
Louie asked Prol to send the information to Preserve Ramapo because she
could not do it because of her position with the Village.

      e.     Village Clerk Leslie Sanderson spoke "in code" when corresponding
about Tartikov.

      f.     Village officials and employees refused to attend a public informational
meeting held by Tartikov and tried to encourage others not to go, telling
them that if they did attend, they might incriminate the village.

260.   Rita Louie posted on Facebook a statement regarding a gathering of
Orthodox/Hasidic Jews.

261.   The Facebook post indicated discriminatory animus towards the
Orthodox/Hasidic Jewish population.

262.   Mayor Yagel and Trustee Louie intentionally destroyed evidence regarding the
Facebook post because they did not want Tartikov's attorneys or this Court to see that evidence.


<u>Availability of Land Use Process</u>

263.   Tartikov cannot obtain variances from the Challenged Laws to develop and
operate its proposed Rabbinical College.

264.   Village Attorney Ulman admitted that Tartikov would not have been able to obtain a variance to operate the proposed rabbinical college on the Property.

Land Use Regulation in the Village

265.   No educational institutions existed within the Village in 2001, in 2004, in 2007, or presently.

266.   Land use in the Village of Pomona is governed by the Village Code, as well as state law and federal law.

267.   The proposed Rabbinical College use will involve building construction, employment of workers to construct the facility, purchase of materials to build the facility, and use of interstate highways and communication.

268.   The proposed Rabbinical College will involve transfers of funds to those it engages to construct the facility.

269.   The proposed Rabbinical College use will involve employment of individuals.

270.   The proposed Rabbinical College use will serve students from both New York and outside of New York.

271.   The ongoing use of the proposed Rabbinical College will involve the purchase of goods and services related to its operations and maintenance.

272.   Plaintiffs' proposed land use will involve the gathering of people for purposes of religious education, worship, and other religious exercise.

273.   Tartikov is an organization founded for religious and educational purposes.

274.   The Village admits that the reason for its differential treatment between accredited and non-accredited Educational Institutions is that "if a school is unaccredited, there is no way of knowing what impacts on the wetlands or anything else it is going to have because the you know the number of different schools that can apply for approval are different types of schools is limitless and so it's impossible to determine what impact and unaccredited school is going to have on a on a piece of land until you know what the unaccredited school is proposing and what type of work it does.  Using my example before the automotive school is going to have a tremendous impact on wetlands."

275.   There is no land use justification for excluding non-accredited educational institutions completely from a jurisdiction.

276.   Automotive schools, driving schools and carpentry schools can be accredited, and thus permitted in the Village.

277.   The Village Code does not permit Educational Institutions within its jurisdiction anywhere by right.

278.   Any use not listed under section 130-9 of the Village Code is prohibited, unless it is permitted by special use permit.

279.   Educational Institutions are only permitted under the Village Code as a special use.

280.   Educational Institutions that meet the Code's definitions of such use and its "accessory" use (housing) may be permitted in the Village with a Special Permit.

281.   The Village prohibits Plaintiffs' religious land use, and any unaccredited Rabbinical College, by right or by special permit within its jurisdiction.


Burden on Religious Exercise

282.   Prohibiting non-accredited educational institutions precludes the Plaintiffs' Rabbinical College from being developed in the Village.

283.   Prohibiting student family housing would preclude the Plaintiffs' Rabbinical College from being developed in the Village.

284.   Prohibiting separate cooking, housekeeping and dining facilities would preclude the Plaintiffs' Rabbinical College from being developed in the Village.

285.   The specific needs of a Rabbinical College are minimal in terms of classroom space, as the actual space needed for education programs, which involve a study method called *chavrusa* (pairs of students analyzing, discussing and debating shared texts) are minimal and do not include athletic facilities, laboratories, theaters, and other facilities typically found at a secular college.

286.   A Rabbinical College, where students will be married with children, also requires greater living space.

287.   A three- or four- bedroom residential unit would require, at a minimum, approximately 700 or 900 square feet of space, respectively, to comply with the Property Maintenance Code of New York.

288.   The number of students that could be housed at the Plaintiffs' proposed rabbinical college are estimated at six to eight.

289.   The 20% dormitory limitation renders it impossible to develop a viable residential campus in the Village.

290.   On-campus housing is necessary for a Rabbinical College in the Village, where there is no reasonable opportunities for affordable student housing near the campus.

291.   The students who will attend the Rabbinical College will not be able to afford to rent or purchase single family homes in the Village.

292.   Six percent of the Village is currently occupied with rental homes and the Village has low vacancy rates.

293.   The average rental rate for a house in the Village is $2000-$3000 per month.

294.   There is a need in the Village for affordable, multi-family housing as identified in its 1997 Master Plan.

295.   Plaintiffs believe that they should provide on-campus housing for the proposed Rabbinical College, which features extremely long hours and an emphasis on student-to-student intellectual interaction outside of formal classes.

296.   On-campus housing is necessary for a Rabbinical College, which has a long program of instruction.

297.   Prohibiting student family housing is a more severe restriction for the Rabbinical College than for secular institutions of higher education.

298.   Limiting housing to 20% of total square footage is a more severe restriction for the Rabbinical College than for secular institutions of higher education.

299.   Religious educational institutions overwhelmingly have greater need for more on-campus housing.  Schools that provide at least one dormitory space per student are dominated by theological seminaries.

300.   Any proposed text amendment that would permit a rabbinical college would be subject to the full SEQRA review process.

301.   Given the fact that any amendment to eliminate the accreditation requirement would affect all land in the Village, the impact on all potentially impacted parcels would be required to be considered.

302.   The process for a text amendment is a discretionary process that is highly uncertain as it is subject to approval of various boards and agencies in the Village, such as the Planning Board, Village Attorney, Village Engineer, and Code Enforcement Officer.

303.   When it purchased the Property, Tartikov did not expect that its educational institution would be subject to an "accreditation" requirement; that its Rabbinical College would not be allowed to have family housing (with housekeeping facilities), or that it would be limited to only 20% of the total square footage limitation for its housing.

304.   Tartikov did not expect that it would lose access to its Property by operation of the Wetlands Protection Law.

305.   Tartikov reasonably believed that it would be permitted to build the rabbinical college with student housing when it purchased the subject property in 2004.

306.   Zoning ordinances that prohibited institutions of higher learning and student housing for such institutions were unconstitutional under New York law.

307.   The Village zoning code in place prior to the passage of Local Law No. 5 of 2004 "did not specifically address dormitories."

308.   The Village's Code prior to the passage of Local Law 5 of 2004 was

unconstitutional.

309.    The "net lot area" for Educational Institutions is defined under the Village Code as:

(a) The minimum lot area for an educational institution shall be a net lot area of 10 acres.

(b) No portion of any land under water shall be counted toward the net lot area. Not more than 1/4 of any land which is defined as wetland by the U.S. Army Corps of Engineers, the New York State Department of Environmental Conservation and/or Chapter 126 of this Code or which is within a one-hundred-year-frequency floodplain or within access, utility or drainage easements or rights-of-way shall be counted toward the net lot area.

(c) No portion of any land with unexcavated slopes over 35% shall be counted toward net lot area. Not more than 25% of any land with unexcavated slopes greater than 15% but less than 35% shall be counted toward the net lot area.

310.    There are only two properties within the Village of Pomona that are larger than ten acres and not owned by a governmental or utility entity are the Subject Property, and a property known as the "Shapiro Property."

311.    The Shapiro Property contains many steep slopes, which reduces its net lot area to less than ten acres.

312.    The only non-governmental or utility property within the Village of Pomona that satisfies the net lot area requirement for an Educational Institution is the Subject Property.

313.    Local Law No. 5 of 2007 provides: "[i]n the event the regulation of wetlands pursuant to this Chapter results in a deprivation of (all) the reasonable use of a property so as to constitute a de facto taking of such property, the owner of said property may apply to the Board of Trustees for a permit to conduct a specific activity otherwise prohibited herein."

314.    On December 11, 2006 Village Attorney Doris Ulman distributed a memo to Mayor Marshall regarding the proposed Wetlands law, enclosing a draft of the law.  She stated that "the purpose of the proposed law is to prohibit as much disturbance of wetlands as possible while at the same time protecting property rights and not effecting a taking."

315.    The WPL's permit scheme does not take into account the purposes of wetlands protection by creating any standards regarding impacts, mitigation, or the public interest.

316.    The Subject Property may be developed with single family residences.

317.    The Wetland Protection Law applies to the Subject Property; it is not exempt from the 100-foot buffer provision of the WPL.

318.    Because of the existence of wetlands on the west side of the property adjacent to Route 306, access to the property would be limited to an area between such wetlands.

319.    This area where driveway access to Route 306 could be located falls within the 100'

buffer provision, where no development is permitted for lots that are not improved with single family residences.

320.   Access from the Property to Route 202 is impracticable because of the existence of steep slopes, wetlands, utility easements and wetland buffers.

321.   A Columbia Gas transmission easement extends across the entire width of the Property, from approximately the midpoint of its western boundary to the northeast corner of the Property.

322.   Columbia Gas will not permit alteration of the grade of more than one to two feet maximum over its easement.

323.   There are significant slopes of up to 50% along the northern boundary of the Property.

324.   It would be impossible to extend a driveway to Route 202 on the northern boundary of the Property without re-grading the driveway to a greater extent than would be permitted by Columbia Gas.

325.   Therefore, access to the Property from Route 202 would be impossible.

326.   An Orange & Rockland utility easement and high tension electrical wires cross the subject Property from the west to the northeast.  Placing a driveway within the easement would present significant challenges.


Background of Challenged Laws

327.   The Village commissioned no studies or experts when examining the need for the Challenged Laws, other than its own planning firm.

328.   The Village sought the advice of no experts or consultants regarding the Challenged Laws, other than its own planning firm.

329.   The only reports, studies, memoranda or other documents identified by the Village that supported the passage of the challenged zoning code provisions were: (1) two memoranda written by their own planning firm, Frederick P. Clarke, commissioned in response to the predecessor Orthodox owner of the Property, Yeshiva Spring Valley; (2) the New York Court of Appeals' decision in *Cornell University v. Bagnardi*, 68 N.Y.2d 583, 510 N.Y.S.2d 861 (1986), and related cases; (3) the County of Westchester Model Ordinance, a Survey of Municipal Ordinances in Westchester County, and the Village's draft 1998 local law addressing wetlands; and (4) sec. 401 of the federal Clean Water Act, Article 24 of the NYS Environmental Conservation Law, and MS4 Permitting requirements and manuals.

330.   On January 22, 2001, the Village enacted Local Law No. 1 of 2001, which regulates school land uses within the Village, relates to the definition, permitting and requirements for Educational Institutions.

331. The Village has produced no evidence showing that it conducted a SEQRA review in conjunction with Local Law No. 1 of 2001.

332. Local Law No. 1 of 2001 adopted a 10% maximum building coverage requirement for schools and amended Village Code § 130-10(F)(2)(a) to state, with regard to Educational Institutions, that "[t]he total building coverage shall not exceed ten percent of the net lot area."

333. Local Law No. 1 of 2001 adopted a 10% maximum building coverage requirement for schools.

334. Local Law No. 1 of 2001 adopted a 20% floor area ratio for schools.

335. Local Law No. 1 of 2001 adopted a 25% maximum impervious surface limitation for schools.

336. On September 27, 2004, the Village enacted Local Law No. 5 of 2004, which regulates Educational Institution land uses within the Village.

337. Prior to passing Local Law No. 5 of 2004, Village Attorney Doris Ulman believed that the existing Village law regarding schools was contrary to case law.

338. Local Law No. 5 of 2004 eliminated the definition of the word "School."

339. Local Law No. 5 of 2004 adopted a definition of the word "Educational Institution," which included a requirement that any Educational Institution must be "accredited by the New York State Education Department or similar recognized accrediting agency."

340. Local Law No. 5 of 2004 adopted a "Dormitory" provision that read: "DORMITORY  - A building that is operated by a school located on the same lot and which contains private or semi-private rooms which open to a common hallway, which rooms are sleeping quarters for administrative staff, faculty or students.  Communal dining, cooking, laundry, lounge and recreation facilities may be provided.  Dormitory rooms shall not contain separate cooking, dining or housekeeping facilities except that one dwelling unit with complete housekeeping facilities may be provided for use of a Superintendent or supervisory staff for every fifty dormitory rooms.  Not more than one communal dining room shall be provided in any building used for dormitory purposes.  Single family, two-family and/or multi-family dwelling units other than as described above shall not be considered to be dormitories or part of dormitories."

341. Any family housing component of Tartikov's proposed rabbinical college would be prohibited as part of an educational institution, as it would be considered "Single family, two-family and/or multi-family dwelling units . . . ."

342. Multi-family dwellings are prohibited anywhere within the Village either by right or by special permit.

343. Any family housing component of Tartikov's proposed rabbinical college that would "contain separate cooking, dining or housekeeping facilities" would not be prohibited as part of an educational institution.

344.   Local Law No. 5 of 2004 added the following language to the "Educational Institution" special permit regulations: "A dormitory is permitted as an accessory use to an educational use and there shall be not more than one dormitory building on a lot."

345.   Local Law No. 5 of 2004 added the following language to the "Educational Institution" special permit regulations: "The maximum height of a dormitory shall be two stories or 25 feet, whichever is less."

346.   On January 22, 2007, the Village enacted Local Law No. 1 of 2007, which regulates Educational Institution land uses within the Village and amended previously enacted educational institution and dormitory laws.

347.   Local Law No. 1 of 2007 added the minimum net area requirement for Educational Institutions.

348.   Many public comments at the January 22, 2007 Village Board meeting "were aimed at the plans for the proposed rabbinical college."

349.   Local Law No. 1 of 2007 was proposed in November of 2006.

350.   On April 23, 2007, the Village enacted Local Law No. 5 of 2007 ("Wetlands Protection Law"), which regulates some wetlands within the Village.

351.   Local Law No. 5 of 2007 provided that it shall be:

[U]nlawful to conduct, directly or indirectly, any of the following activities upon any wetland, water body or watercourse or within 100 feet of the boundary of any wetland, water body or watercourse unless a permit is issued therefor by the Board of Trustees or the Planning Board, as the case may be;

A. Any form of draining, dredging, excavation or removal of material, except removal of debris or refuse.

B. Any form of depositing, of any material such as but not limited to soil, rock, debris, concrete, garbage, chemicals. etc.

C. Erecting any building or structure of any kind, roads, driveways, the driving of pilings or placing of any other obstructions, whether or not they change the ebb and flow of water.  The definitions of the words BUILDING and STRUCTURE shall be defined in the Zoning Law of the Village of Pomona.

D. Installing a septic tank, running a sewer outfall, discharging sewage treatment effluent or other liquid waste into or so as to drain into any wetland, water body or watercourse.

E. Any other activity which substantially impairs any of the several functions served by wetlands, water bodies and watercourses or the benefits derived therefrom, as set forth herein."

352.   The Village has stated that "every single wetland is vital to the health and safety of

every single person."

353.   The Village possessed no formal studies or reports establishing a need for controlling traffic when it adopted Local Law 5 of 2007.

354.   The Village possessed no formal studies or reports establishing a need for controlling environmental impacts when it adopted Local Law 5 of 2007.

355.   The Village possessed no formal studies or reports establishing a lack of Village infrastructure when it adopted Local Law 5 of 2007.


Governmental Interests

356.   The Village's concern with impacts to environmental resources, including wetlands, is the size and intensity of development.

357.   The Village testified as follows: "Q  Is it the case that any zoning law that would reduce building development would advance all of the governmental interests that we've discussed? . . . .  A  Yes."

358.   The Village's specific concern with respect to its asserted interest of impacts to floodplains is the size of impervious surface created by development.

359.   The Village's specific concern with respect to its asserted interest of impacts to plant life and wildlife is the size of development.

360.   The Village's specific concern with respect to its asserted interest of impacts to air quality is the size of development.

361.   The Village's specific concern with respect to its asserted interest of impacts to its water supply and sanitary sewer system is the size of development.

362.   The Village's specific concern with respect to its asserted interest of impacts to its stormwater systems is the size of development.

363.   All of the governmental interests asserted by the Village in support of the Challenged Laws apply equally to any land development within the Village.


Less Restrictive Means

364.   In order to locate in the Village of Pomona, Educational Institutions are subject to special permit approval by the Village Board of Trustees under the Village Code 130-10(F).

365.   In order to locate in the Village of Pomona, Educational Institutions are subject to site plan approval by the Village Planning Board.

366.   All special permit uses in the Village must meet the following standards: "All

special permit uses shall comply with the following standards, in addition to the site plan standards of this chapter. The permitting Board shall attach such additional conditions and safeguards to any special permit as are, in its opinion, necessary to ensure initial and continual conformance to all applicable standards and requirements.  The location and size of the special permit use, nature and intensity of the operations involved in it or conducted in connection with it, the size of the site in relation to it and the location of the site with respect to streets giving access to it are such that it will be in harmony with the appropriate and orderly development of the area in which it is located. The location, nature and height of buildings, walls and fences and the nature and extent of existing or proposed plantings on the site are such that the special permit use will not hinder or discourage the appropriate development and use of adjacent land and buildings.  Operations in connection with any special permit use will not be more objectionable to nearby properties by reason of noise, traffic, fumes, vibration or other characteristics than would be the operations of permitted uses not requiring a special permit.  Parking and loading areas will be of adequate size for the particular special permit use, properly located and suitably screened from adjoining residential uses, and the entrance and exit drives shall be laid out so as to achieve maximum convenience and safety.  The special permit use will not result in diminution of the value of property in the neighborhood or a change in the character of the neighborhood in which the use would be situated."

367.   Educational Institutions are subject to the general "requirements of this Code for special permit and site plan approval," and are also subject to the specific "standards and requirements" described in Village Code § 130-10(F).

368.   With respect to Educational Institutions, the Board of Trustees may impose such restrictions and regulations which would avoid or minimize traffic hazards, impairment of the use, enjoyment or value of property in the surrounding area, or generally protect the health, safety and welfare of the neighborhood and to otherwise implement the purpose and intent of this chapter.

369.   The Board of Trustees may impose such reasonable conditions and restrictions as are directly related to and incidental to a special use permit, and "each specific permit shall be considered as an individual case . . . ."

370.   The Board of Trustees may attach such additional conditions and safeguards to any Educational Institution special permit as are, in its opinion, necessary to ensure initial and continual conformance to all applicable standards and requirements.

371.   The special permit process allows the Village to mitigate land use impacts created by the special permit use.

372.   Site plan approval under § 118-32 of the Village Code is required for all special permit uses.

373.   In order to receive site plan approval, an Educational Institution must demonstrate: "That the proposed activity and the manner in which it is to be accomplished are in accordance with the purpose and findings set forth in this chapter.  That the proposed activity and the manner in which it is to be accomplished can be completed without increasing the possibility of creep or sudden slope failure and will minimize additional erosion to the maximum extent practicable.  That the proposed activity and the manner in which it is to be accomplished will not adversely affect the preservation and protection of existing wetlands, water bodies, watercourses and floodplains.

That the proposed activity and the manner in which it is to be accomplished can be completed in such a way so as not to adversely affect existing, proposed or potential future wells or sewage disposal systems or any endangered species of flora or fauna.  That the proposed activity and the manner in which it is to be accomplished are consistent with the principles and recommendation of the adopted Village Master Plan."

374.    In granting site plan approval, the Village's Planning Board has the authority to impose such reasonable conditions and restrictions as are directly related to and incidental to a proposed site plan.

375.    The Village's Planning Board cannot approve a site plan unless it takes into consideration the "public health, safety and general welfare and sets appropriate conditions and safeguards which are in harmony with the general purpose and intent of this chapter," including with respect to traffic, parking, landscaping and buffering, lighting, drainage, water and sewage, and building design, among other criteria.

376.    Educational Institutions are subject to review under New York's State Environmental Quality Review Act ("SEQRA").

377.    The Village Code section 130-10(F)(11) requires that, with respect to Educational Institutions, the location and height of its buildings, the location, nature and height of walls and fences and the nature and extent of landscaping on the site shall be such that the use will not hinder or discourage the development and use of adjacent land and buildings.

*Asserted Interest: Community Character*

378.    The Village has asserted that protecting "community character" is a governmental interest justifying the Challenged Laws.

379.    The Village has provided no specific definition of "community character."

380.    The Village had no studies, reports or documentation regarding "community character" prior to the passage of Local Law Numbers 1 of 2001, 5 of 2004, and 1 of 2007.

381.    The Village has no evidence that community character was threatened by educational institutions.

382.    The Village did not consider any alternatives to achieve its goals of protecting community character when it passed Local Law No. 1 of 2001.

383.    "Community character" is not mentioned in the text of Local Laws No. 1 of 2001, Local Law No. 5 of 2004, Local Law No. 1 of 2007, and Local Law No. 5 of 2007.

384.    The Challenged Laws do not protect community character in the Village.

385.    The Challenged Laws adversely impact community character in the Village.

386.    The Challenged Laws are not necessary to protect community character in the Village.

387. Protecting community character is a pretextual and/or disingenuous ad hoc justification for the Challenged Laws.

388. Community character can be protected through the imposition of conditions on a special permit and site plan application.

389. The Challenged Laws prohibiting student housing that is more similar to the Village's community character, *i.e.* family housing, than traditional student housing.

390. The community character of the Village is not a typical village, which has greater density near a collective center and single family houses accessed by individual driveways from main roads, but is rather a typical suburban community with cul-de-sac developments.

391. The Village is not "rural," but suburban in character.

392. The Village testified that the accreditation requirement for Educational Institutions "was imposed as a restriction on the use of organizations that might call themselves schools but are not subject to the special status of the state case law.  That was all it was intended to do."

393. The Village's justification for the accreditation requirement as necessary to protect community character was that schools such as "driving education school," "automotive school" and "carpenter's union" might locate in Pomona.

394. Prohibiting non-accredited educational institutions is not a practice generally accepted in the planning field, nor do other jurisdictions completely prohibit non-accredited educational institutions.

395. Only five jurisdictions in New York's eCode360 Library website have accreditation provisions in their zoning code, and none of them completely excludes non-accredited educational activity from their jurisdictions as Pomona does.

396. Libraries, museums and camps do not need to be accredited in the Village of Pomona.

397. Libraries, museums and an accredited educational institution would in general have just as much of an effect on community character as a comparable unaccredited educational institution.

398. The permitted dormitories described in the Village Code would create greater negative impacts on community character than student family housing, which is prohibited in the Village Code.

399. Student family housing would be more similar to the character of the surrounding community than permitted dormitories.

400. Defendants' expert Voorhis has never seen a land use regulation that restricts separate cooking, dining or housekeeping facilities in student housing.

401. An educational institution with housekeeping facilities would not impact community character more than an educational institution without such facilities.

402.   It is common for educational institutions to have student housing that provides separate cooking, dining and housekeeping facilities.

403.   The Village justifies the "dormitory" land use restrictions on the basis of limiting size and intensity of use.

404.   The Village stated that the "one dormitory building" limitation advances its interest in maintaining community character by limiting the "intensity" of the use.

405.   The one dormitory rule is contradictory to the goal of maintaining residential character, because it prevents any flexibility in design and ensures that sure building would have the greatest possible bulk, thus in conflict with surrounding homes.

406.   The Village stated that the "20% limitation" for dormitories advances its interest in maintaining community character by limiting the "intensity" of the use.

407.   Typically, residential space on educational institution campuses is over 20% of total square footage.

408.   No other jurisdiction in New York limits student housing space to 20% of total square footage.

409.   The WPL 100' buffer does not protect community character, and allows other significant impacts to community character, as it does not prevent any development outside of such buffer

410.   The WPL 100' buffer does not protect community character, and allows other significant impacts to community character, as it does not apply to properties improved with single family residences.

411.   The impacts on the Village's community character that could have potentially occurred with respect to a Hindu temple land use in the Village of Pomona were all addressed in its application process.

412.   The impacts on the Village's community character that could have potentially occurred with respect to an animal hospital land use in the Village of Pomona were all addressed in its application process.

413.   The Village Code requires that all buildings, recreation areas, parking areas and other property uses and structures for an Educational Institution must be set back a minimum of 125 feet from each property line. Such setback must include a buffer area of a minimum of 35 feet in width consisting of trees, shrubs, plants, fencing and/or other materials as determined by the Planning Board to be sufficient to screen the educational use from adjoining uses and streets.

414.   The Village Code requires that, with respect to Educational Institutions, the location and height of its buildings, the location, nature and height of walls and fences and the nature and extent of landscaping on the site shall be such that the use will not hinder or discourage the development and use of adjacent land and buildings.

415.   A Rabbinical College could be developed in Pomona in a manner consistent with

the Village's interest in preserving its community character, which can be accomplished by working with the roof slopes, materials, building massing and siting.

416.   Landscape strategies that use topography, plan massing, trees and careful access and circulation design can also help minimize the appearance of a new campus on a site such as the Property.

417.   The topography, size and vegetation of the subject property will also minimize any visual impact of a Rabbinical College.

418.   A Rabbinical College would not have a greater impact than other institutional and residential uses such as museums, libraries, or traditional dormitory buildings for accredited schools.


*Asserted Interest: Traffic*

419.   The Village has asserted "traffic" as a governmental interest justifying the Challenged Laws.

420.   The Village had no studies or reports demonstrating a need for laws regulating educational institutions in order to protect its traffic interests.

421.   Reference to traffic studies concerning a retail use or housing in a different jurisdiction is irrelevant to the regulation of Educational Institutions in the Village.

422.   The Village admitted that it "has no way of knowing" whether an Educational Institution with 250 students would create an unacceptable traffic safety risk.

423.   The Village had no knowledge of the traffic that would be generated by an Educational Institution when it adopted the challenged zoning code provisions.

424.   The Village has no evidence demonstrating any issues with traffic capacity on Routes 202 and 306, the main routes in the Village.

425.   The two roadways that will determine the degree of impact from any land use proposal within the Village are the two state highways in Pomona, Route 202 and Route 306, which dominate the roadway network within the Village of Pomona.  The key location to be reviewed for traffic impact is the intersection of Route 202 and Route 306.  Any potential Rabbinical College site within the Village will have the same roadway involvement and thus the same determination of area impact.

426.   The subject property is located in the southeast quadrant of the Route 202 and Route 306 intersection.   The property's location is well positioned from a traffic infrastructure perspective on two under-utilized state highways for access to the local area and the region.

427.   Existing levels of service on Routes 202 and 306 are excellent and excess capacity is extraordinarily high.

428.   Existing levels of service on Routes 202 and 306 are excellent, LOS B in the AM

peak hour and LOS B in the PM peak hour, meaning that there is significant excess capacity on the highways.

429.  The Average Annual Daily Traffic for Route 202 is 9,070 vehicles and is considered to be light to moderate.

430.  The Average Annual Daily Traffic for Route 306 is 3,860 vehicles and is considered to be very light.

431.  The Village has no evidence of any unusual safety issues on Routes 202 and 306 in the Village.  There is no indication based on accident history that there are any substantive problems on Routes 202 and 306.

432.  There are no unusual safety issues on Routes 202 and 306 in the Village.

433.  Village "has no way of knowing" whether an Educational Institution with 250 students would create an unacceptable traffic safety risk.

434.  The Challenged Laws do not protect against adverse traffic impacts in the Village.

435.  The Challenged Laws adversely impact traffic in the Village by requiring more vehicle trips to Educational Institutions.

436.  The Challenged Laws are not necessary to protect against adverse traffic impacts in the Village.

437.  Protecting against adverse traffic impacts is a pretextual and/or disingenuous post hoc justification for the Challenged Laws.

438.  The Village can be protected from adverse traffic impacts through the imposition of conditions on a special permit and site plan application.

439.  The Challenged Laws are insufficient for the purpose of measuring potential traffic infrastructure impact.

440.  No other jurisdiction in New York employs accreditation or dormitory zoning laws to protect against traffic impacts.

441.  The Village stated that the accreditation provision is justified by traffic concerns because of the possibility of an automotive school locating in the Village.

442.  There is no distinction between accredited and non-accredited educational institutions in terms of traffic impact.

443.  Prohibiting student family housing is not necessary to prevent adverse traffic impacts.

444.  Prohibiting on-campus housing for students with families will create more traffic as students will be required to drive to and from campus every day instead of living on-site.

445.  The Village stated that the 20% dormitory limitation was justified with respect to

traffic impacts because "[a] smaller living facility that houses fewer people is going to generate less traffic than one that is larger and houses a larger number of people."

446.   The 20% housing limitation creates greater traffic impacts, as more students will be required to drive to the campus.  Given the same number of students attending an Educational Institution, the campus providing the most on-site student housing will, given all other generation parameters being equal, generate the least traffic activity interacting with the adjacent roadway network.

447.   The stated basis for the Village's contention that the Challenged Laws advance its interest in traffic regulation is that: "All dwelling units, by their nature, generate traffic."

448.   The mere generation of traffic activity is not indicative of impact or of impact that is not capable of being mitigated.

449.   The Village stated: "mitigation of traffic is considered during the review process and is dependent upon the traffic that is generated by the particular project that's being proposed and so I cannot answer whether or not it can be mitigated because I don't know what the project is."

450.   The proposed Rabbinical College will not create adverse traffic impacts.

451.   There are no safety issues in the local traffic infrastructure that would justify exclusion of the Rabbinical College's proposed use.

452.   The permitted uses within the Village, including accredited educational institutions (including community colleges), single family residential, libraries and museums, would have greater impacts on the local traffic infrastructure than the proposed Rabbinical College use.

453.   Traffic impacts may be considered under SEQRA evaluation, and the Village's site plan and special permit application processes.

454.   The special permit application process can address impacts on traffic.

455.   The site plan application process can address impacts on traffic, including that the Planning Board must review and set appropriate conditions to ensure that "maximum safety will be achieved and function properly provided for."

456.   With respect to any special permit use, including Educational Institutions, the Village may impose conditions to ensure that "[o]perations in connection with any special permit use will not be more objectionable to nearby properties by reason of . . . traffic, . . . than would be the operations of permitted uses not requiring a special permit."

457.   The Village Code requires that "[t]he location and size of the [Educational Institution] use, the nature and intensity of operations involved in or conducted in connection therewith, its site layout and its relation to access streets shall be such that both pedestrian and vehicular traffic to and from the use and the assembly of persons in connection therewith shall not be hazardous."

458.   The New York State Environmental Quality Review Act ("SEQRA") requires

consideration of environmental factors, including those related to traffic impacts, of actions approved by local governments.

459.    Village review of special permits and site plan applications review SEQRA review.

460.    The New York State Department of Transportation will review and approve access through its Highway Work Permit process that is based upon a thorough professional engineering review of a Rabbinical College land use and its impact on the highway network.

461.    There are various means of mitigating traffic impacts of proposed development including geometric modifications (adding lanes, widening lanes and/or shoulders, separating specific movements, etc.), traffic control upgrades, including signal implementation, variable phasing, multiple timing plans, detection techniques, signing improvements, movement elimination, pavement rehabilitation, superelevation enhancements, clear zone improvements, guide rail placement and/or upgrade, speed regulations, and advisory signing.

462.    Rather than address traffic impacts through indirect means such as "Educational Institution" ordinances that are wholly unrelated to traffic impacts, the appropriate means for a jurisdiction to control traffic with respect to the development of land is to adhere to the ITE's Recommended Practice report titled: Transportation Impact Analyses for Site Development, and ITE's two documents: Trip Generation Handbook, an ITE Recommended Practice, and Trip Generation, an ITE Informational Report.

463.    The methodology described in the ITE documents listed above is applied within the SEQRA process.

464.    No means of mitigation such as those described above would be necessary for the proposed Rabbinical College.

465.    The proposed Rabbinical College would have no adverse impact on traffic capacity (level-of-service) or highway safety.

466.    Any Rabbinical College of less than 2,500 students will have no more than a *de minimis* impact on traffic in the Village.

467.    Proper application of the Institute of Transportation Engineering ("ITE") published database is the correct methodology to analyze potential traffic impacts of an educational institution.

468.    An ITE analysis of the proposed use involves the identification of an "independent variable," in this case number of students, which has a direct causal relationship to trips generated based on the ITS database.

469.    The number of non-students who happen to live on campus has proven not to have a causal relationship to trips.

470.    The result of a normal ITE analysis of a hypothetical 250-student Rabbinical College, which followed the normal ITE procedures adding the anticipated site generation to the then current volumes on the surrounding roadways, yielded an excellent capacity result: Level of Service "B."

471.   As a test of excess capacity, increasing the volume of traffic on the adjacent roadways by 20%, which was the equivalent of increasing student population tenfold to 2,500 students on the campus, still yielded a very good capacity Level of Service C.

472.   Student family housing at a University/College land use has no effect on the traffic generation of a site, assuming an equal number of students populate the site.

473.   The ITE database for Educational Institutions takes into account the fact that on most campuses there are family members living on campus and thus adding to the total trip-ends for the site and to a degree that is reflected in the database.

474.   Adding a "surcharge" of family activity could be applied to the ITE analysis to assess potential impact.

475.   To address the "surcharge" of family activity, adding a 250-unit apartment complex to the ITE analysis--which would effectively by double-counting the use--would still not stress the excess traffic capacity of the adjacent infrastructure with 250 students or even 2,500 students.

476.   The potential site traffic generation associated with the Rabbinical College land use is consistent with the ability of the surrounding roadway infrastructure to absorb safely and efficiently the additional traffic activity.

477.   Other permitted uses would generate greater traffic impacts than the proposed Rabbinical College, including single family housing, library, museum, or community college.


*Asserted Interest: Noise*

478.   The Village stated that all of the challenged code provisions, other than the "no housekeeping facilities" provision and the Wetlands Protection Law, are meant to advance its interests in regulating noise impacts.

479.   The Village possessed no reports, studies or other documents demonstrating that its noise interest was threatened by educational institutions.

480.   "Noise" was not mentioned in the text of the Challenged Educational Institution Laws, nor was it discussed by the Board of Trustees as a basis for adopting them.

481.   The Challenged Laws do not protect against adverse noise impacts in the Village.

482.   The Challenged Laws adversely impact noise in the Village.

483.   The Challenged Laws are not necessary to protect against adverse noise impacts in the Village.

484.   Protecting against adverse noise impacts is a pretextual and/or disingenuous post hoc justification for the Challenged Laws.

485.   The Village can be protected from adverse noise impacts through the imposition of conditions on a special permit and site plan application.

486.   Any connection between the Challenged Laws and adverse noise impacts is very attenuated.

487.   Accreditation of educational institutions is irrelevant in terms of noise impacts.

488.   The Village stated that the Challenged Laws were justified based on noise impacts because the Board members "had knowledge that if the building is limited in size, it will accommodate fewer people and create less noise."

489.   The Village also stated that the noise referred to as justifying the educational institution restrictions was "[m]ostly from traffic."

490.   The Village's claim that student housing by its very nature generates more noise than non-housing Educational Institution facilities is unsupported by any evidence.

491.   The Village can regulate noise impacts of land uses through the "Noise" chapter of its Code, which states that "[i]t shall be unlawful for any person to make, continue or cause to be made or continued any loud, unnecessary or unusual noise or any noise which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others within the limits of the village."

492.   The special permit application process can address noise impacts.

493.   The site plan application process can address noise impacts.

494.   The Village can impose conditions on any special permit to ensure that such use "will not be more objectionable to nearby properties by reason of noise, . . . than would be the operations of permitted uses not requiring a special permit."

495.   The Village did not rely on any zoning handbooks or manuals in using the 20% figure for dormitories in Local Law No. 1 of 2007.

496.   The Village did not rely on the advice of any planning professional in using the 20% figure for dormitories in Local Law No. 1 of 2007.

*Asserted Interest: Environmental Impacts*

497.   The Village has asserted that various "environmental" interests, which are wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality, justify the Challenged Laws.

498.   The Village stated that the elements of the Educational Institution laws that are necessary to control environmental impacts are: "Setbacks, buffers, landscaping and height restrictions."

499.   The Village stated that the Village infrastructure (sanitary sewer system, stormwater system and roads) cannot accommodate "high density housing."

500.   No reports, documents, experts or consultants provided any environmental

justification for the challenged Code provisions in 2001, 2004 or 2007.

501.   The Village has no evidence that environmental interests are threatened by educational institutions.

502.   The texts of Local Law No. 1 of 2001, Local Law No. 5 of 2004 and Local Law No. 7 of 2007 do not refer to protection of the environment.

503.   The environment was not discussed by the Board of Trustees as a reason for enacting Local Law No. 1 of 2001, Local Law No. 5 of 2004 and Local Law No. 1 of 2007.

504.   The Challenged Laws do not protect the environment.

505.   The Challenged Laws adversely impact the environment.

506.   The Challenged Laws are not necessary to protect the environment.

507.   Protecting the environment is a pretextual and/or disingenuous post hoc justification for the Challenged Laws.

508.   The Village can protect the environment through the imposition of conditions on a special permit and site plan application.

509.   Any connection between the Challenged Laws and protecting the environment is very attenuated.

510.   The accreditation status of educational institutions has no impact on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

511.   Whether educational institutions provide student family housing has no impact on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

512.   Whether educational institutions provide separate housekeeping, cooking and dining facilities for students has no impact on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

513.   The percentage of square footage devoted to student housing has no impact on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

514.   The number of dormitory buildings has no impact on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

### Wetlands

515.   The Village's justification for the accreditation provision with respect to its interest in wetlands is that "[w]ith an unaccredited school since you don't know what type of use is going to be proposed, there is no way of knowing if the wetlands will be affected or not," providing an example of an "automotive school."

516.   The Village's justification for the "20% dormitory" limitation with respect to its interest in wetlands is that "a limitation on the size of the building has a direct relationship to the protection of wetlands," which is false.

517.   The Village states that every single wetland is vital to the health and safety of every single person.

518.   The Village's knowledge of its wetlands comes from "[m]embers of the board [who] drive around," which is an unreasonable and adequate methodology for making legislative determinations regarding wetlands.

519.   All facilities in an Educational Institution, whether housing or non-housing facilities, would be equally limited by the Village's building coverage, floor area, and impervious surface limitations.

520.   The Village's justification for the "one dormitory" limitation with respect to its interest in wetlands is that multiple buildings would necessarily have more of an impact than one building, which is untrue.

521.   Wetlands are protected by properly locating and designing buildings relative to site constraints.

522.   There are numerous flaws with the Wetlands Protection Law, including: (1) The Village is not aware of the locations, extent and types of aquatic resources in its jurisdiction and did not conduct an assessment or inventory of such resources, which is necessary to reasonably regulate wetlands and watercourses; (2) it does not provide scientifically sound definitions of wetlands, but uses an unreasonable and outdated method of wetland delineation used in the 1970s; (3) it does not define boundaries of watercourses or waterbodies; and (4) it does not provide authority for the Village to review wetlands delineations but rather relies on professionals "authorized" by the NYSDEC--which does not authorize such professionals.

523.   There are no "impaired waters" in the Village.

524.   Most wetlands in the Village are currently regulated by the Corps of Engineers and the NYSDEC.

525.   The Village suggests that there are "isolated wetlands," although not "a tremendous amount," that need protection yet cannot identify any of them, and admits that it has no mapped wetlands.

526.   The Wetlands Protection Law excludes most of the Village from the application of its 100' buffer provision.

527.   285 of 1,156 parcels of land in the Village are located within 100' of a mapped or unmapped wetland or watercourse. 240 of the 285 parcels of land within 100' of a mapped or unmapped wetland or watercourse in the Village are improved with single family residences and are thus exempt from the Wetlands Protection Law's 100' buffer restrictions.  Of the 45 parcels of land within 100' of a mapped or unmapped wetland or watercourse in the Village, twenty are vacant, and six are associated with local parks or open space.  The 20 vacant lots within 100' of a

mapped or unmapped wetland or watercourse in the Village will be exempt from the Wetlands Protection Law's 100' buffer restrictions if they become improved with a single-family residence. Only 19 out of 1,156 parcels of land are effectively limited by the Wetlands Protection Law's 100' buffer restrictions.

528.   Single family residential uses have created recent impacts to wetlands in the Village, including excavation and construction of structures and impervious surface within the 100' wetlands buffer.

529.   The Village has justified the WPL's exemption by claiming that it desired prior single family construction to be "grandfathered."

530.   The WPL's exemption applies to lots improved with new single family residences, as well as single family residences that existed at the time of the WPL's adoption.

531.   Concerns regarding the protection of wetlands would be the same for vacant lots that are developed with single family homes in the future.

532.   SEQRA requires a lead agency on a development project to take a "hard look" at potential environmental impacts, including impacts on wetlands.

533.   A municipality determines whether a development will have potential environmental impacts, and assess whether the mitigation for addressing such impacts are adequate, subject to the qualification that the lead agency makes the determination.

534.   The Village's site plan and special permit approval processes require the Village to "address the issue of wetlands on any property" for such approvals, and such requirement is mandated by state law.

535.   The special permit process can address impacts on wetlands and water pollution.


**Floodplains**

536.   The Village stated that the challenged code provisions prevent floodplain impacts because more development creates more impact.

537.   Buildings devoted to housing have no greater effect on floodplains than buildings devoted to classroom space.

538.   The special permit process can address impacts on floodplains.

539.   The Village Code contains a "Flood Damage Prevention" chapter that regulates development in terms of preventing flood damage and protecting floodplains.

540.   No development in the Village is permitted within a flood hazard area without being in compliance with Chapter 79 of the Village's Code.

541.   State law, including NYSDEC's Article 15 regulations, protects floodplains.

**Animal and plant life**

542.   The Village's stated evidence justifying the challenged zoning code provisions with respect to protecting plant life and wildlife is a reference to the New York DEC and "general local concerns" and "general knowledge."

543.   The Village stated that the justification for the accreditation requirement with respect to plant life and wildlife is that "automotive schools" will harm plant life and wildlife.

544.   The Village stated that the justification for the challenged dormitory provisions with respect to plant life and wildlife is that the prohibited housing will "us[e] a greater amount of the land . . . .  You're using more -- that would be the primary, the primary difference."

545.   The Village must address plant life and wildlife when it conducts the SEQRA review.

546.   The Village Planning Board must establish conditions of site plan approval for "[t]he protection of existing trees and other vegetation where feasible."

**Air quality**

547.   The Village states that the justification for the challenged code provisions with respect to air quality is that there would be "fumes" from traffic and that such development would involve "cutting too many trees."

548.   The Village has the authority to impose conditions on any special permit use to ensure that such use "will not be more objectionable to nearby properties by reason of . . . fumes, . . . than would be the operations of permitted uses not requiring a special permit."

**Stormwater Management**

549.   Stormwater management is regulated through the Village's "stormwater management" chapter.

550.   The Village Code's stormwater management chapter "provide[s] for the health, safety, and general welfare of the citizens of the Village of Pomona through the regulation of nonstormwater discharges to the municipal separate storm sewer system . . . ."

551.   No application for approval of a land development activity shall be reviewed by the Village until the Pomona Planning Board or the Building Inspector, as the case may be, has received a stormwater pollution prevention plan prepared in accordance with the requirements of chapter 114.

552.   All land development activities must meet the standards of the New York State Stormwater Design Manual, the New York Standards and Specifications for Erosion and Sediment

Control, or the technical equivalent.

553.   Within the Village, any approved site plan for a special permit use must include a stormwater pollution prevention plan in accordance with Chapter 114 of the Village Code.

554.   The special permit process can address impacts on stormwater systems.

555.   A stormwater plan generally must mimic or improve the pre-existing site stormwater runoff conditions.

## Less restrictive means of achieving environmental interests

556.   The Village stated that "it cannot mitigate the effect of unaccredited educational institutions," multiple dormitory buildings, or "family housing" on wetlands without banning such development.

557.   The Village has stated that "The entire site plan and special permit process require the Village to address the issue of wetlands on any property that comes into the Village for site plan or special permit approval and that is by State Law."

558.   The special permit process can address impacts on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

559.   The site plan process can address impacts on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

560.   No site plan for a special permit use in the Village can be granted unless the Planning Board determines: "(1) That the proposed activity and the manner in which it is to be accomplished are in accordance with the purpose and findings set forth in this chapter. (2) That the proposed activity and the manner in which it is to be accomplished can be completed without increasing the possibility of creep or sudden slope failure and will minimize additional erosion to the maximum extent practicable. (3) That the proposed activity and the manner in which it is to be accomplished will not adversely affect the preservation and protection of existing wetlands, water bodies, watercourses and floodplains. (4) That the proposed activity and the manner in which it is to be accomplished can be completed in such a way so as not to adversely affect existing, proposed or potential future wells or sewage disposal systems or any endangered species of flora or fauna. (5) That the proposed activity and the manner in which it is to be accomplished are consistent with the principles and recommendation of the adopted Village Master Plan."

561.   SEQRA requires a lead agency on a development project to take a "hard look" at potential environmental impacts, including impacts on wetlands.

562.   SEQRA review can address impacts on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, and air quality.

563.   NYSDEC Articles 15 & 24 and Stormwater Regulations and Design Manual, SEQRA, the Village Code Chapters 114 (Stormwater) and 79 (Flooding), and the federal Clean Water Act and the Village's site plan and special permit application process protect wetlands and

water pollution, plant life and wildlife, floodplains, and stormwater management within the Village more efficiently and effectively than the Challenged Laws.

564.   As part of the environmental review of the Halley Estates II application, the Village's planners, Frederick P. Clark Associates, Inc., its attorney Doris Ulman, the Village Engineer P.J. Corless, the Rockland County Planning Department, the Town of Haverstraw, and others provided various comments to the Village's Planning Board regarding the application and plans submitted by that developer.

565.   With respect to water quality and stormwater management, onsite stormwater management systems (designed to meet the concerns of the Rockland County Drainage Agency, the Village, and the Town of Haverstraw) would result in a "zero rate of runoff increase."

566.   Rockland County Drainage Agency itself and engineers for the Town of Haverstraw provided very specific comments regarding hydrologic analysis, drainage patterns, study of the stream network, detention basin, etc., for the Halley Estates II development.

567.   With respect to the Halley Estates II development, the Village of Pomona's Engineer stated that "The applicant will have to respond to the various stormwater management comments on the report and plans.  These changes will have to be incorporated into revised plans and report."

568.   The Halley Estates II developer was required to provide a soil and erosion control plan that met New York State guidelines.

569.   The Final Environmental Impact Statement for the Halley Estates II project states in part: "The subdivision plans for the proposed Halley Estates II Subdivision has been revised in response to the comments and concerns raised by the Village of Pomona, and by residents in the community. . . .  [T]here are somewhat more severe environmental impacts than is desirable.  The Average Density Subdivision plan was arrived at through extensive evaluation of the reduction in environmental impacts to the site and surrounding areas . . . ."

570.   The Halley Estates II development area contains the headwaters of a NYSDEC class B stream, was entirely wooded and has steep slopes between 10 percent to 20 percent slope.

571.   Approximately 28 acres (42%) of the wooded area of the Halley Estates II subdivision was to be cleared for the development.

572.   Visual impacts of the Halley Estates II development were reduced through a native woodland buffer and conservation areas, and "could be mitigated through appropriate landscaping provided throughout the proposed development."

573.   With respect to the Halley Estates II development, Village Planners suggested "a more naturalistic design of the retention [pond], plantings within the retention area as appropriate, and vegetative screening around the perimeter of it."

574.   The Village's Planner stated that leaving large undisturbed areas in the Halley Estates II development was an "important mitigation measure."

575.   The Village Planners noted that the Halley Estates II developer could use deed

restrictions to protect areas.

576.    Traffic issues related to the Halley Estates II development were addressed by various governmental entities, including the Rockland County Highway Department and the Town of Haverstraw, and permits would have to be issued by the former.

577.    Permitted uses, including accredited Educational Institutions, permitted dormitories, libraries and museums, could have equal or greater impacts on the environment as the Rabbinical College.

578.    The Rabbinical College's proposed use could be developed in some form, with student family housing (greater than 20% of the total square footage) in more than one building and with housekeeping facilities, and with access through the 100' wetland buffer, without harming the Village's interests in protecting environmental resources and infrastructure.

579.    An Educational Institution can be appropriately integrated into an environmental sensitive area with a proper degree of analysis and site-specific assessment.

*Asserted interest: Village Infrastructure*

580.    The Village has stated that a purpose of the building, floor area and height restrictions, the accreditation requirement, the family housing and housekeeping prohibitions, the one dormitory building and 20% dormitory limitations, and the Wetlands Protection Law was to protect the local water supply and sanitary sewer system.

581.    The Village possessed no reports, studies or other documents demonstrating that water supply and the sanitary sewer system were threatened by educational institutions.

582.    Neither water supply nor the sanitary sewer system was mentioned in the text of the Challenged Educational Institution Laws, nor was it discussed by the Board of Trustees as a basis for adopting them.

583.    The Challenged Laws do not protect water supply and the sanitary sewer system in the Village.

584.    The Challenged Laws are not necessary to protect water supply and the sanitary sewer system in the Village.

585.    Protecting water supply and the sanitary sewer system is a pretextual and/or disingenuous post hoc justification for the Challenged Laws.

586.    The only basis for the Village's position that the challenged code provisions are intended to protect the Village's water supply and sanitary sewer system is a "general awareness" of water use issues from newspaper reports and discussions, and "general knowledge" of the water usage of Educational Institutions.

587.    The Village states that the justification for the challenged dormitory provisions with respect to water usage and sanitary sewers is only related to the size of such housing.

588.   The Village has no evidence of negative impacts on the water supply and sanitary sewer systems caused by Educational Institutions.

589.   The Village does not regulate its water supply

590.   In granting site plan approval, the Village Planning Board must determine that "[t]he proposed systems for water supply . . . on the site shall be adequate, and facilities shall be sufficient to handle the increase in service."

591.   In granting site plan approval, the Village Planning Board must determine that "[t]he proposed systems for sewage collection and disposal on the site shall be adequate, and facilities shall be sufficient to handle the increase in service."

592.   The special permit process can address impacts on water supply and sanitary sewers.

593.   The Village's "Board of Sewer Commissioners shall also have authority to determine the manner and conditions under which said building sewers shall be installed and maintained . . . ."

594.   Standards for the Village's sewer systems are set forth in the Code.

595.   The Village Code also regulates "prohibited discharges" in the sanitary sewer system.


Other Permitted Uses

596.   The Village Code limits the maximum building coverage for Educational Institutions to 10% of the net lot area.

597.   The Village Code limits the maximum total floor area for Educational Institutions to 20% of the net lot area of a property.

598.   The maximum impervious surface coverage requirement for libraries and museums is 15%.

599.   There is no maximum building coverage for libraries and museums under the Village Code's bulk regulations.

600.   There is no maximum floor area for libraries and museums under the Village Code's bulk regulations.

601.   The maximum height for a Library or Museum within the Village is 35 feet.

602.   There is no maximum number of stories for a Library or Museum within the Village under the Village Code's bulk regulations.

603.   A Library or Museum would effectively be permitted to build a three-story building in the Village.

604.    There is no "net lot area" calculation for Libraries or Museum land uses.

605.    The square footage of a Library or Museum could be approximately twice as large as a rabbinical college.

606.    Libraries are not required to obtain a special permit to locate in the Village of Pomona.

607.    Museums are not required to obtain a special permit to locate in the Village of Pomona.

608.    The Village's stated purpose for the building coverage and floor area limitations is to limit development generally, which would (according to the Village) reduce impacts to floodplains; reduce air, water and noise pollution; prevent impacts to wetlands, water, sanitary and stormwater sewer systems and traffic; and maintain community character.

609.    Colleges and universities with enrollments under 2,500 students that are religiously affiliated overwhelmingly provide housing for a very high percentage of their students.

610.    Many theological schools offer 100% housing for their students.