UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONGREGATION RABBINICAL COLLEGE       :
OF TARTIKOV, INC., et. al.,           :
                                      :
                                      :    CIVIL NO. 07:CV 6304 (KMK)
        Plaintiffs,                   :
                                      :
V.                                    :
                                      :
                                      :
VILLAGE OF POMONA, NY, et. al.,       :
                                      :
                                      :    APRIL 28, 2017
        Defendants.                   :

## DEFENDANTS' PROPOSED FINDINGS OF FACT

## I.      THE PARTIES AND THEIR ACTORS

1.      Defendant, The Village of Pomona ("Village") is a municipal corporation that was incorporated in 1967 in compliance with New York law, and is comprised of roughly 2.4 square miles of land, half in the Town of Ramapo and half in the neighboring Town of Haverstraw, in Rockland County, New York.

2.      The Village has a population of approximately 3,000 persons.

3.      Defendant Board of Trustees of the Village of Pomona ("Board of Trustees") is the Village's legislative body.  At the time suit was filed, the Board of Trustees was comprised of 5 Trustees (Ian Banks, Nicholas Sanderson, Alma Sanders Roman, Rita Louie, and Brett Yagel), one of whom (Sanderson) was, at the time suit was filed, the elected Mayor of the Village.

4.      Defendants Banks, Sanderson, Roman, Louie and Yagel have been named as defendants in their official capacities as Trustees.

5.     Doris Ulman has been Village Counsel since July 2003.

6.     Plaintiff Congregation Rabbinical College of Tartikov ("Tartikov" or "Plaintiff") is a religious corporation formed under the laws of the State of New York on August 1, 2004.

7.     At the time of incorporation, Tartikov's officers included Chaim Babad, Abraham Halberstam, Naftali Babad, Samuel Chimmel, Michael Tauber and Asher Mandel.

8.     Michael Tauber ("Tauber") is a real estate developer in Rockland County with 30 years of experience in development.  He has developed numerous projects in Rockland County, including multi-family housing, synagogues and schools.

9.     Tauber manages the Tartikov corporate entity, which management includes locating and purchasing land, hiring professionals needed, and running the day-to-day business of the corporation.  He was elected as Trustee of Tartikov for purposes including the present litigation with the Village.

10.     Chaim Babad provides the monetary funding for Tartikov.  Mr. Babad is involved in real estate investment, with a management company based out of New York City.  He currently owns, through his various corporate entities, approximately 40 properties, located primarily in New York City.

11.     Tartikov claims that it was formed to establish a rabbinical college in Rockland County.

12.     The Tartikov Certificate of Incorporation does not indicate that Tartikov was formed to establish or operate a rabbinical college.

13.     Instead, Tartikov's stated purposes are (a) To promote the religious, intellectual, moral and social welfare among its members and families, (b) To provide a suitable place of

- 2 -

divine worship for the members of the corporation, their families and others of the Jewish Orthodox faith, (c) To promote and increase interest in the teaching and ideals of the worlds renowned scholars of the Jewish Orthodox faith, (d) To establish, maintain and conduct a school for the of [sic] the holy Torah and to maintain classes for the teachings of the customs, traditions and mode of worship of the Jewish Orthodox faith, (e) To aid and assist worthy indigent members of the corporation with loans and housing, (f) To do all things necessary to the accomplishment of the foregoing purposes.

14.    Plaintiffs Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, and Rabbi David A. Menczer (collectively the "Individual Plaintiffs") are rabbis who claim that the wish to live, teach, and/or study at the proposed rabbinical college.

15.    The Individual Plaintiffs receive monetary stipends from Tartikov because they have committed to teach or attend the proposed rabbinical college in the event it is built.

## II.    THE HYPOTHETICAL NATURE OF THE PROPOSED RABBINICAL COLLEGE

16.    Tartikov owns an approximately 100 acre tract of land in the Village between Routes 202 and Route 306 (the "Subject Property" or the "Property").

17.    Tartikov purchased the Property on August 17, 2004 and recorded the deed with Rockland County on August 31, 2004. No Village official or defendant in this case became aware that Tartikov purchased the Property until, at the earliest, November 2004.

18.    Tartikov claims that it intends to construct a rabbinical college on the Property.

19.    Tartikov has never filed any application with the Village seeking to construct a rabbinical college or, for that matter, anything else on the Property.

20.    As a result, prior to discovery being conducted in this case, none of the defendants, or the Village Attorney, knew any details regarding the proposed rabbinical college because no specific information had been communicated to the Village, its officials or Ms. Ulman, Village Attorney.

21.    Aside from information contained in a newspaper article published in January 2007, all facts regarding the proposed facilities, proposed number of students and proposed academic requirements were learned through discovery.

22.    Those facts learned through discovery include conceptual site plans prepared in 2004 by Leonard Jackson ("Mr. Jackson") of Leonard Jackson Associates, an engineer hired by Tartikov, and Saccardi & Schiff, Incorporated, a planner hired by Tartikov.

### 1.    The Definition of a Specialized Kollel

23.    Plaintiffs claim that the proposed rabbinical college is a "specialized kollel."

24.    Tartikov cannot articulate what a "specialized kollel" is.

25.    The only document that purports to explain what a "specialized kollel" is is a single page proposed "Curriculum" that purportedly outlines the Tartikov  rabbinical judge training program.

### 2.    Tartikov's Proposed Curriculum and Course of Study

26.    This "Curriculum" document was prepared by plaintiff, Meilech Menczer, a putative Tartikov student.

27.    Rabbi Menczer prepared that document after the lawsuit was filed and just a few months prior to the FRCP 30(b)(6) deposition of Michael Tauber, which occurred in May 2014.

28.    Mr. Tauber claims to have asked Rabbi Menczer to prepare the document because plaintiffs' lawyer wanted to see the "Curriculum" in writing.

29.    The "Curriculum" does not provide any information concerning what constitutes a "specialized kollel."

30.    Aside from stating topics for study, the "Curriculum" does not provide any details concerning what the students will do while attending the college.

31.    Mordechai Babad is the putative dean of the proposed rabbinical college.  Rabbi Babad has seen the "Curriculum" document but has not done anything more with the document.

32.    In his capacity as putative dean, Rabbi Babad has neither prepared nor asked anyone to prepare any documents concerning the course of study at the proposed rabbinical college.

33.    In his capacity as putative dean, Rabbi Babad has not hired any teachers.

34.    Rabbi Babad has done nothing as the prospective dean because he believes that any such tasks are "premature."

**3.    The Dearth of Written Standard for Admission or Performance**

35.    The proposed rabbinical college does not have any written criteria for admission.

36.    All that is required for admission is a meeting with Rabbi Babad.  If Rabbi Babad believes that an individual is ready for the proposed program, he is admitted to the program.

37.    The proposed rabbinical college does not have any written application.

38.    The proposed rabbinical college has no entrance examination.

39.   The proposed rabbinical college does not require applicants to have any specific degree as a prerequisite to admission.

**4.      The Proposed Rabbinical College's Facilities and Student Housing**

40.   The proposed rabbinical college is composed primarily of housing, with accessory religious uses including synagogues, study halls, courtrooms and a mikveh.

41.   To plaintiffs' knowledge, there is no other college in the world the same as the rabbinical college being proposed by plaintiffs.

42.   Plaintiffs have not identified any Hasidic, Orthodox or Rabbinical College that is not accredited by some accrediting body.

43.   Tartikov's intent is that housing for all of the college's students and other buildings will be located entirely on the Property.

44.   Plaintiffs contemplate initially building somewhere between 50 and 250 units of housing, each unit consisting of an apartment that has 3 or 4 bedrooms, ranging in size from 1800-2000 square feet.

45.   The purpose of the housing is to house the families of students and teachers. It is not contemplated that any rabbinical training will occur in the housing.

46.   Aside from the provision in the Torah that one must 'exile' oneself, plaintiffs can point to no authority legal, religious or otherwise that requires that all facilities of the proposed rabbinical college be on the Property.

47.   The proposed rabbinical college will require its students to be married and to live on campus, in the multi-family homes, with their families.

48.   Plaintiffs fail to provide any authority, legal, religious or otherwise that requires that the students and teachers are required to live in multi-family housing in order to become rabbinical judges.

49.   Plaintiffs claim that this requirement is found in the Torah but, except for the "exile" statement noted above, fail to identify any specific sections in the Torah stating this requirement.

50.   Plaintiffs claim that living on campus is necessary so that students will have the full support of friends, neighbors, families, wives and children.

51.   The proposed rabbinical college will pay for all tuition and housing expenses for its students.

52.   Plaintiffs fail to provide any credible evidence that there is a shortage of rabbinical judges in the United States or elsewhere.

**5.    Other Rabbinical Colleges**

53.   Two rabbinical colleges (i.e., colleges that train rabbis to become rabbinical judges) exist in the immediate area, one in Monsey, Mechon L'Hoyroa, and one in Brooklyn, Kollel Beis Yechiel Mechel of Tartikov ("Tartikov of Brooklyn").

54.   Both Mechon L'Horoya and Tartikov of Brooklyn train students in the 4 books of Shulchan Aruch, which are the same 4 books to be studied at the proposed rabbinical college.

55.   Despite Plaintiffs' claim that there is a great need for rabbinical judges, there are only a handful of rabbinical judge students at Mechon L'Horoya, and no students currently studying to be rabbinical judges at Tartikov of Brooklyn.

56.     Neither Mechon L'Horoya nor Tartikov of Brooklyn have or offer on-campus student housing.

57.     Students at Tartikov of Brooklyn are all married and live with their families off campus.

58.     Students enrolled at Mechon L'Hoyroa are currently studying to become rabbinical judges despite the fact that they do not live on campus.

59.     Mechon L'Horoya's facilities are housed in a single building, containing synagogues, a library and a mikveh.

60.     Tartikov of Brooklyn does not have a synagogue on campus.

61.     Tartikov of Brooklyn does not have libraries on campus.

62.     Tartikov of Brooklyn does not have a mikveh on campus.

63.     Although the Tartikov proposed rabbinical college expects to start with 250 students, plaintiffs hope that it will grow over the years to have several thousand students.

64.     Currently, Tartikov does not know how many students will attend the proposed rabbinical college if it is constructed.

65.     Rabbi Babad, the putative dean of the proposed rabbinical college, is not aware whether any students have yet been admitted to the proposed rabbinical college.


**III.     LAND USE REGULATION IN THE VILLAGE OF POMONA**

**1.     History of the Village's Land Use and Development**

66.     The Village was formed in 1967.

- 8 -

67.     Since its formation, the Village has limited land use to single-family residences on one-acre zoned property, commonly known as R-40.

68.     The Village first adopted its zoning laws, contained in Chapter 130 of the Village Code, in 1968. The purpose of the zoning laws was and remains to preserve and enhance the rural residential character of the Village.

69.     The zoning laws reflect the Village's uninterrupted history as a low-density residential community. Because areas of commercial, industrial and high-and medium-density residential development exist in areas around Pomona, the Village seeks to maintain low-density development. To accomplish this goal, the Village's zoning laws regulate and restrict the use of land and the construction and use of buildings improvements in the following manner:

> They preserve and enhance the rural residential character of the Village and encourage the orderly and beneficial development of the entire Village.

> They prevent the overcrowding of land with persons and structures in relation to open spaces, circulation and neighboring land uses and require adequate provision for off-street parking.

> They prevent the contamination of streams and ponds, safeguard the water table and encourage the wise use and sound management of the natural resources throughout the Village in order to preserve the integrity, stability and beauty of the community and the value of the land.

> They provide adequate light, air and privacy for residents, secure safety from fire, flood and other danger and to discourage uses inimical to public health.

> They encourage any construction which will tend to enhance the natural, rural beauty of the area.

> They discourage auxiliary construction which detracts from the rural aesthetic beauty of the community.

> They facilitate such services as utilities, sewerage, parks and other public requirements.

70.   Any change in a municipality's zoning law should be consistent with the municipality's master plan.

71.   In 1974, a comprehensive plan for the Village of Pomona, entitled "Development Policies Plan" was prepared.

72.   In 1997, an addendum to the Development Policies Plan, entitled "Village of Pomona Master Plan Update" was prepared.

73.   From 1974 to 1997, the population of the Village grew by at least 46%, and the amount of developed area in the Village increased by 42%.

74.   When the Village updated its Master Plan in 1997, it called for a policy to maintain the low-density residential character of the Village.

**2.      The Village's Current Land Use and Development**

75.   The entire Village, including the Subject Property, is designated as an R-40 District. R-40 zoning requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of single-family residences.

76.   Single-family residences, public utilities rights-of-way, libraries and museums, public parks and playgrounds, and agricultural pursuits are all permitted uses as-of-right in the Village.

77.   The construction of educational institutions (with attendant dormitories), houses of worship and other stated uses are permitted by special use permit, some of which are under the jurisdiction of the Board of Trustees (the "Board") and others under the jurisdiction of the Zoning Board of Appeals.

78.   The Zoning Board of Appeals has authority to grant use and/or area variances to a property owner.

79.   A property owner may also petition to amend a zoning law or apply for a zone change if the use proposed by the owner is not encompassed by a special use permit or suitable for a variance.

80.   Houses of worship have been approved by the Village as special permit uses after review to minimize the adverse effects of non-residential uses on the adjacent single family residential neighborhoods.

81.   The Ladentown Church, Hindu Temple, and Zoroastrian Temple are uses of property in Pomona that have a principally religious use.

82.   The Village has opposed other high-intensity development at its borders.  The Village opposed the Urban Forest Corporation mulch plant, the Minisceongo Park project (originally a multi-family housing project, then changed to a Walmart shopping center) in the Town of Haverstraw, Patrick Farm downzoning to multi-family, the Town of Ramapo Comprehensive Plan and multi-family adult student housing in the Town of Ramapo.

**3.      The Specific Local Laws at Issue**

83.   3 out of the 4 of the Village laws at issue in this case (the "Subject Laws") were drafted by Doris Ulman, Village Counsel.

84.   When the Subject Laws were drafted by Village counsel the BOT had reviewed traffic studies performed for the Town of Ramapo's Comprehensive Plan revisions.

- 11 -

85.    The Village never commissioned and/or had a traffic study done in connection with schools because it was not necessary:  no application to build a school in the Village had ever been submitted.

86.    Despite the Village requesting that it do so, Yeshiva Spring Valley ("YSV") never submitted any traffic studies to the Village.

87.    It is not the practice of the Village to commission studies in connection with enacting or amending a law unless the law being considered requires an Environmental Impact Statement ("EIS").

88.    In enacting the Subject Laws the Board relied on its counsel and its consultants, including its planners.

89.    Yeshiva Spring Valley would not have been able to build a dormitory on the Property prior to the enactment of LL 5 of 2004.

        **a.**    **Local Law 1 of 2001**

90.    Local Law Number 1 of 2001, which relates to the definition, permitting and requirements for Educational Institutions, was adopted by the Board of Trustees on January 22, 2001.

91.    Prior to 2001, educational institutions were permitted as-of-right in all parts of the Village.

92.    New York State permits and encourages educational use of land to be regulated by special permit (rather than as-of-right) so the impact of high intensity use by educational institutions can be addressed by local governments.

93.    Local Law 1 of 2001 amended § 130-4 of the Village Code by adding the definition

of "Educational Institution," which was defined as "any school or other organization or

institution conducting a regularly scheduled comprehensive curriculum of academic and/or

alternative vocational instruction similar to that furnished by kindergartens, primary or secondary

schools and operating under the Education Law of New York State, and licensed by the State of

New York."

94.    Local Law 1 of 2001 further amended § 130-10 of the Village Code by adding

provisions to make Educational Institutions subject to special permit approval by the Board and

site plan approval by the Village planning board.

95.    Local Law 1 of 2001 also added requirements and standards for granting a special

use permit for an educational institution, including minimum net lot area, maximum

development intensity, road frontage and access, setbacks and screening, parking, noise and

exterior lightning, and public water and sewer.

96.    The need for Local Law 1 of 2001 was first identified by the Village's planning

consultant, Mark A. Healey of Frederick P. Clark Associates Inc. ("FPC").

97.    Mark Healey drafted Local Law 1 of 2001 with the assistance of the then Village

Attorney.

98.    Local Law 1 of 2001 was Mr. Healey's idea.

99.    At the time Local Law of 2001 was enacted no application of any kind had been

filed by YSV with regard to the Property.

100.  In December 1999, Mr. Healey reviewed the zoning provisions of the Village Code in conjunction with an informal presentation by Yeshiva Spring Valley to the Village Planning Board regarding its plans to build a school in the Village on the Subject Property.

101.  As a result of this review, Mr. Healey noted that the Village's standards for the development of educational institutions were inadequate and out of date.

102.  On January 24, 2000, Mr. Healey issued a memorandum to the Village's then mayor and Board, in which he stated, among other things, that the standards for the development of educational institutions were inadequate and out of date.

103.  Mr. Healey proposed a series of comprehensive and coordinated zoning amendments aimed at addressing the following issues: Modification of the lot area requirement for educational institutions; Restrictions on the maximum building coverage and maximum impervious surface coverage; Modification to the Village's off-street parking requirements for educational institutions; Modification of the zoning regulations to include signage requirements; and Amendment of the Village zoning to make educational institutions a special permit use, rather than as-of-right.

104.  On January 22, 2001, the Board of Trustees held a public hearing regarding proposed Local Law 1 of 2001.

105.  No one from the public spoke at the January 22, 2001 hearing.

106.  On January 22, 2001, the Board of Trustees adopted Local Law 1 of 2001.

107.  The law was enacted because: 1) the Board wanted to have educational institutions as special permit uses rather than as of right; and 2) to set standards to reduce the impact of non-residential use on adjacent residential neighborhoods and properties.

108.  The inadequate standards the law sought to clarify included:

    a.   The five acre gross area minimum lot size was not enough to protect adjacent neighborhood and properties;

    b.   The minimum setback of 125 feet gave more space between the development property and property lines;

    c.   Minimum frontage of 250 feet was necessary for sufficient area, particularly at the front of the property, when developing non-residential use; and

    d.   Whether or not educational uses were to be permitted on small subdivision streets as opposed to state or county roads.

109.  Although Mr. Healey's suggestion to amend the Village Code with regard to the standards for schools was first voiced during a discussion related to Yeshiva Spring Valley, Yeshiva Spring Valley was never told that they would have to wait to file their application pending the adoption of any new law relating to schools.

110.  If YVS had filed an application and obtained site plan approval before January 22, 2001, the previous law, not Local Law 1 of 2001, would have applied to it.

111.  YVS did not file an application until sometime around June 2001.  It failed to submit the environmental studies required for a New York State Environmental Quality Review Act ("SEQRA") determination.  The application filed in June 2001 by YSV was for a 25-lot single-family residential development and a Yeshiva, rather than a primary school and preschool YVS had previously considered building.

        **b.**     **Local Law 5 of 2004**

112.  Local Law 5 of 2004, which amended the definition of educational institutions, added provisions for dormitories, and amended minimum lot areas, frontage and access requirements and setbacks, was adopted on September 27, 2004.

113.  Current Village Counsel, Doris Ulman ("Ms. Ulman" or "Village Counsel"), was appointed in July 2003.

114.  As newly-appointed Village Counsel, in 2003 Ms. Ulman began to review the Village laws.  She noted pre-existing laws that could be improved, including where there were deficiencies or inaccuracies in the laws.  Ms. Ulman recommended to the Board that certain amendments be made to the existing village Code.  This review resulted in the adoption of 9 local laws in 2003, 8 local laws in 2004, and 5 local laws in 2005.

115.  Prior to 2004, dormitories were not permitted as an accessory use to an educational institutions in the Village.

116.  Ms. Ulman examined the existing law and recommended amending the law to enhance the ability of an applicant to build a school that could house its students on campus.

117.  The amendments recommended by Ms. Ulman were aimed at addressing the following issues and to make the existing law less restrictive:

   a.  Removal of the half-acre requirement for each student so that the minimum lot area required for an educational institution is substantially reduced to 10 acres net lot area;

   b.  Addition of the provision allowing dormitories, as prior to 2004 dormitories were not permitted as accessory uses to schools in the Village of Pomona;

   c.  Clarification of the definition of "educational institution" and removal of the definition of school so that there was only one definition relating to the same use; and

   d.  Removal of the requirement that an educational institution be located on a state or county road.

118.  On September 7, 2004, Ms. Ulman presented the Board of Trustees with a memorandum regarding the proposed amendments to the zoning law in relation to schools.

119.  The memorandum proposed a series of amendments to the zoning law in relation to schools and dormitories aimed at addressing the issues noted above.

120.  On September 27, 2004, the Board of Trustees held a public hearing regarding proposed Local Law 5 of 2004.

121.  Only one Village resident spoke at the September 27, 2004 public hearing regarding proposed Local Law 5 of 2004.

122.  On September 27, 2004, the Board of Trustees adopted Local Law 5 of 2004.

123.  Local Law 5 of 2004 states in relevant part: "A dormitory building is permitted as an accessory use to an educational use provided it is located on the same lot as the educational use and there shall be not more than one dormitory building on the lot."

124.  The definition of dormitory included the provision: "Single-family, two-family and/or multifamily dwelling units other than as described above shall not be considered to be dormitories or part of dormitories."

125.  Dormitories were also required to be on the same lot as the primary educational use and there could be no more than one dormitory building on the lot.

126.  The definition of dormitory contained in Local Law 5 of 2004 was modeled after the Town of Ramapo's definition and is nearly identical.

127.  It was also similar to the definition of dormitory used by the Village of Chestnut Ridge.

- 17 -

128.  The definition of educational institution was also amended to require that educational institutions be "accredited by the New York State Education Department or similar recognized accrediting agency."

129.  Like Pomona, the laws in Chestnut Ridge, Ramapo and Orangetown do not permit kitchens in dormitories.

130.  Chestnut Ridge's school law limits dormitories to a single building.

131.  Local Law 5 of 2004 was enacted in part to reduce the impact of non-residential use on adjacent residential neighborhood and properties.

132.  The dormitory portion of Local Law 5 of 2004 was enacted in response to requirements in case law, including but not limited to *Congregation Mischknois Lavier Yakov Inc. v. Board of Trustees of Village of Airmont*, *Diocese of Rochester v. Planning Board of the Village of Brighton*, and *Cornell University v. Bagnardi.* In Ms. Ulman's opinion, the *Village of Airmont* case, which was filed in 2002, indicated that dormitories could not be prohibited in relation to an educational use. Additionally, *Bagnardi* discussed the special status afforded to educational institutions in land use cases and set forth the factors to be considered by local governments when reviewing applications for such uses.

133.  Ms. Ulman's review of the aforementioned cases brought to light an issue with the then existing Village Code, which required an educational institution to have a minimum net lot area of ten acres plus a half-acre per student. Ms. Ulman was of the opinion that the "per student" requirement in the then-existing Code provision would not be permitted under *Bagnardi* because student population is not considered to be a zoning or land use issue. Thus, the law was changed to comply with these case requirements. This change was important to the Village

- 18 -

because it prevented the entire educational institution requirement from being declared unconstitutional.

134. The accreditation portion of Local Law 5 of 2004 was added to impose a restriction on the use of organizations that might call themselves schools but which were not subject to the special status outlined in New York case law. Specifically, the New York Court of Appeals created "special status" for the purpose of requiring municipalities to permit educational institutions and houses of worship anywhere within their municipality. The special status prevents them from being prohibited and also, in the course of its review, a municipality is required to give these institutions a more liberal review than a residential or commercial project would get.

135. Twenty eight other municipalities in New York State have similar accreditation requirements. Seven municipalities specifically require that institutions of higher education be accredited. Sixteen municipalities limit educational use to public and/or private accredited schools. Five zoning ordinance provisions limit educational use to accredited elementary and/or secondary schools.

136. There were also, in the opinion of Ms. Ulman, inconsistencies and vagueness issues in the pre-existing Zoning Code that the Local Law sought to clarify. The old definition of "school" in the Code required that an educational land use be approved by the New York State Board of Regents or the New York State Education Department. Conversely, the definition of "educational institution" required that it be duly licensed by the State of New York. The accreditation requirement replaced the previous licensing requirement and the requirement for approval by the New York State Board of Regents or New York State Education Department in

- 19 -

an effort to make it easier and clear for applicants, as well as Village officials, to understand

zoning requirements.

<strong>c.      Local Law 1 of 2007</strong>

137.  As Village Counsel, Ms. Ulman continued on a regular basis to review the Village

laws and made recommendations to the Board of Trustees on amendments where she believed

the laws could be improved, or where there were deficiencies or inaccuracies in pre-existing

laws.

138.  Local Law 1 of 2007, addressing errors, inconsistencies and vagueness issues in

relation to previously enacted educational institution and dormitory laws, was adopted on

January 22, 2007.

139.  With regard to Local Law 1 of 2007, Ms. Ulman examined the existing law and

recommended that the law be amended.

140.  Ms. Ulman believed there were errors, as well as inconsistencies and vagueness

issues, in the law, including:

   a.  Clarification that dormitory use is an accessory use to a principal
       educational use;

   b.  The 2001 law referenced "net lot area" requirements that had been
       incorrectly carried forward during the 2004 amendment as "lot area,"
       inadvertently omitting the word "net"; and

   c.  The definition of dormitory contained the language "a building that is
       operated by a school," whereas the definition of school had been
       previously deleted and replaced with "educational institution."

141.  On December 18, 2006, the Board of Trustees held a public hearing regarding

proposed Local Law 1 of 2007.

142. At the hearing, an attorney for Tartikov, Paul Savad was present and asked the Board to continue the hearing to the next Board meeting, alleging that the proposed local law had not been properly posted on the Village website. The Board of Trustees granted Mr. Savad's request and adjourned the public hearing to the next Board meeting, to be held on January 22, 2007.

143. On January 9, 2007, plans for the proposed rabbinical college appeared on Preserve Ramapo's website. Tartikov claims that these plans were leaked by agencies who were provided the plans by Tartikov. The plans depicted a large housing development.

144. The leaked plans were the same as the conceptual site plans prepared by Tartikov's engineer and planner, Leonard Jackson Associates, but were reduced in size with the buildings colored in.

145. In January, 2007, an article appeared in the local newspaper, the Rockland Journal News, stating that the property would bring 4,500 or more people to Pomona. In the article, Mr. Savad stated, among other things, that "nothing they do will stop our project."

146. On January 22, 2007, the Board of Trustees continued the public hearing regarding proposed Local Law 1 of 2007.

147. The January 22, 2007 public hearing occurred after the college plans appeared on the Preserve Ramapo website and after the Rockland Journal News article. The purpose of the hearing was proposed Local Law 1 of 2007. The hearing was attended by many members of the public, whose comments addressed the high density housing reported in the Rockland Journal News article rather than the proposed local law that was being considered. At the hearing, the

then-mayor urged the attendees not to discuss the housing project reported by the Journal News, since it was not before the Board, and to limit their remarks to the proposed local law.

148.  Most of the comments from the public were aimed at the plans for the proposed rabbinical college.

149.  Although they had never previously done so, Tartikov or its representatives had a videographer videotape and a court reporter transcribe this public hearing.

150.  On January 22, 2007, the Board of Trustees adopted Local Law 1 of 2007.

151.  Local Law 1 of 2007 states in relevant part: "A dormitory building shall not occupy more than 20% of the total square footage of all buildings on the lot."

152.  The word "net" was also added as to the minimum net lot area standards required of an educational institution.

153.  Additionally, the definition of dormitory was also readopted with the words "educational institution" replacing the word "school" and adding "as accessory to a principal use."

154.  Local Law 1 of 2007 was enacted to fix errors and clarify inconsistencies and vagueness in the pre-existing laws.

### d.     Local Law 5 of 2007

155.  Local Law 5 of 2007 was not intended to apply to the Property.

156.  At the time Local Law 5 of 2007 was enacted, no Village official had any knowledge of what wetlands were on the Property.

157.  Local Law Number 5 of 2007 was adopted on April 23, 2007.

158.  Since the late 1990s, the Village had discussed enacting a wetlands protection law.

159.   In drafting Local Law 5 of 2007, Ms. Ulman consulted a wetlands study prepared for Westchester County, NY, NYDEC law and he wetlands laws of Chestnut Ridge, New Hempstead and South Nyack.

160.   At all relevant times, the Village was a member of the Rockland County Storm-Water Management Consortium.

161.   As members of the Consortium, Village counsel and the Village engineer attend monthly meetings of the Consortium.

162.   All water used by the Village comes from aquifers.

163.   Recent events underscored the need to control and protect wetlands.  Hurricanes Floyd and Irene and super storm Sandy particularly affected the Village with flooding conditions and resulting damage.

164.   Through various discussions, the Board of Trustees proposed a series of comprehensive and coordinated environmental amendments aimed at addressing the following issues:

  a.   Protection of plant life and wildlife;

  b.   Protection against flooding;

  c.   Protection of a natural filtration system to reduce pollutants into streams and rivers, and ultimately into the water supply; and

  d.   Protection of wetlands to ensure they are not destroyed.

165.   On January 22, 2007, the Board of Trustees held a public hearing regarding proposed Local Law 5 of 2007.

166.   On April 23, 2007, the Board of Trustees adopted Local Law 5 of 2007.

167.  Local Law 5 of 2007 states, in pertinent part, that: "(A) Except as provided in §

126-4 below, it shall be unlawful to conduct, directly or indirectly, any of the following activities

upon any wetland, water body or watercourse or within 100 feet of the boundary of any wetland,

water body or watercourse unless a permit is issued therefor by the Board of Trustees or the

Planning Board, as the case may be.

> (1) Any form of draining, dredging, excavation or removal of material, except removal of debris or refuse.

> (2) Any form of depositing of any material such as but not limited to soil, rock, debris, concrete, garbage, chemicals, etc.

> (3) Erecting any building or structure of any kind, roads, driveways, the driving of pilings or placing of any other obstructions, whether or not they change the ebb and flow of water. The definitions of the words "building" and "structure" shall be defined in the Zoning Law of the Village of Pomona.

> (4) Installing a septic tank, running a sewer outfall, discharging sewage treatment effluent or other liquid waste into or so as to drain into any wetland, water body or watercourse.

> (5) Any other activity which substantially impairs any of the several functions served by wetlands, water bodies and watercourses or the benefits derived therefrom as set forth herein."

168.  Local Law 5 of 2007 further provides that "The aforesaid one-hundred-foot buffer

in which regulated activities are not permitted to take place shall not apply to lots that are

improved with single-family residences."

169.  The law was enacted because the Board of Trustees was concerned about wetlands

in the Village that were not regulated by the state or the federal government.  The 100 foot buffer

requirement in the Law was taken from the New York State Environmental Conservation Law,

which requires a permit from the New York State Department of Environmental Conservation

("NYDEC"), for any proposed disturbance of land within 100 feet of any NYDEC-regulated wetlands.

170.  The law was also enacted because the Board sought to protect the health, safety, and welfare of all of the residents of the Village.

171.  The health, safety, and welfare of the residents of the Village was protected through the law by preserving plant life and wildlife, reducing pollution, protecting the wetlands as a natural filtration system and thus the Village water supply, and preserving community character and quality of life.

172.  Plaintiffs filed the instant lawsuit approximately three months after enactment of Local Law 5 of 2007.

173.  On several occasions the Board of Trustees, through its counsel Doris Ulman requested information on the proposed Rabbinical College, Ms. Ulman only received general information; there was no discussion of the type or number of buildings or the number of students.

174.  The Board was aware of the May 2007 Tartikov presentation at the Comfort Inn, but the Village does not go to potential applicants, i.e. Tartikov had not filed an application.

175.  No members of the then Board discouraged anyone from attending the May 2007 Tartikov presentation.

176.  None of the Subject Laws were enacted to prevent plaintiffs from building a rabbinical college or anything else on the Property, or to prevent plaintiffs from building anything anywhere else in the Village.

177.   None of the Subject Laws were enacted as a result of any religious animus or bias
against Orthodox Jews, Hasidic Jews or persons of any other religion or faith.

Dated: April 28, 2017

DEFENDANTS

By:  */s/ Andrea Donovan Napp*
    John F. X. Peloso, Jr. (JP6110)
    Andrea Donovan Napp (AN1978)
    Karla Chaffee *pro hac vice*
    Robinson & Cole LLP
    1055 Washington Blvd.
    Stamford, CT 06901
    Tel. No.  (203) 462-7503
    Fax. No.  (203 462-7599
    jpeloso@rc.com
    anapp@rc.com
    kchaffee@rc.com

    Marci A. Hamilton (*pro hac vice*)
    36 Timber Knoll Drive
    Washington Crossing, PA 18977
    Tel. No.:  (215) 353-8984
    Fax No.:  (215) 493-1094
    hamilton.marci@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing though the Court's CM/ECF System.

*/s/ Andrea Donovan Napp*
Andrea Donovan Napp