UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONGREGATION RABBINICAL COLLEGE
OF TARTIKOV, INC., RABBI MORDECHAI
BABAD, RABBI WOLF BRIEF, RABBI HERMEN
KAHANA, RABBI MEIR MARGULIS, RABBI
MEILECH MENCZER, RABBI JACOB
HERSHKOWITZ, RABBI CHAIM ROSENBERG,
and RABBI DAVID A. MENCZER,

                    Plaintiffs,

      -v-

VILLAGE OF POMONA, NY, BOARD OF
TRUSTEES OF THE VILLAGE OF POMONA, NY,
NICHOLAS SANDERSON, as Mayor, IAN BANKS,
ALMA SANDERS-ROMAN, RITA LOUIE, and
BRETT YAGEL, as Trustees and in their official
capacities,

                    Defendants.

No. 07-CV-6304 (KMK)

OPINION & ORDER

---

Appearances:

Paul Savad, Esq.
Savad, Churgin, Attorneys at Law
Nanuet, New York
*Counsel for Plaintiffs*

Roman P. Storzer, Esq.
Storzer & Greene, P.L.L.C.
Washington, D.C.
*Counsel for Plaintiffs*

Donna C. Sobel, Esq.
Furgang & Adwar, L.L.P.
West Nyack, NY
*Counsel for Plaintiffs*

Terry A. Rice, Esq.
Rice & Amon
Suffern, NY
*Counsel for Plaintiffs*

John G. Stepanovich, Esq.
Stepanovich Law P.L.C.
Virginia Beach, VA
*Counsel for Plaintiffs*

Andrea D. Napp, Esq.
John F. X. Peloso, Jr., Esq.
Karla Chaffee, Esq.
Thomas J. Donlon, Esq.
Robinson & Cole LLP
Hartford, CT
Stamford, CT
Boston, MA
New York, NY
*Counsel for Defendants*

Marci A. Hamilton, Esq.
The Law Office of Marci Hamilton
Washington Crossing, PA
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff Rabbinical College of Tartikov, Inc. ("Tartikov") is the owner of an

approximately 100-acre parcel of land (the "Subject Property") located within the Village of

Pomona (the "Village"), upon which it seeks to build a rabbinical college that, in addition to

providing all of the facilities necessary to train rabbinical judges, will include housing for its

students and their families.  Plaintiffs, which include Tartikov and its future students and faculty,

challenge certain zoning and environmental ordinances enacted by the Village, alleging that they

are unlawful under the First and Fourteenth Amendments of the United States Constitution, the

Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc

et seq., the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., §§ 3, 9, and 11 of the New York

State Constitution, and New York common law.  Specifically, Plaintiffs seek to enjoin the enforcement of portions of the Village of Pomona, New York Code ("Village Code") §§ 130-4 (defining educational institutions and dormitories) (the "Accreditation Law"), § 130-10(F)(12) (limiting the size of dormitories) (together with the definition of "dormitory" in § 130-4, the "Dormitory Law"), and § 126 (establishing wetlands protections) (the "Wetlands Law," and together, the "Challenged Laws").[1]  Beginning in May and ending in June 2017, the Court conducted a 10-day bench trial.  On September 7, 2017, the Court heard closing statements.  (*See* Dkt. (entry for September 7, 2017).)  What follows are the Court's findings of fact and conclusions of law.

## I.  Background

### A.  Factual Background

The facts leading up to the passage of the Challenged Laws are largely undisputed.  The dispute lies in whether the reasons given for their adoption are lawful.

#### 1.  The Parties

Plaintiffs are a corporation and individuals affiliated with the Orthodox Jewish community, including various sects of the Hasidic community, all of whom allege an interest in the construction of a rabbinical college on the Subject Property.  Plaintiffs Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Hermen Kahana, Rabbi Meir Margulis, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, and Rabbi David A. Menczer

---

[1] Full versions of the Challenged Laws can be found online.  *See* Village of Pomona, NY, *Chapter 126: Wetlands Protection*, http://www.ecode360.com/12718511 (last visited Nov. 20, 2017) (Wetlands Law); Village of Pomona, NY, *Chapter 130: Zoning*, http://www.ecode360.com/12718574 (last visited Nov. 20, 2017) (Accreditation Law and Dormitory Law).

(with Chaim Rosenberg, Jacob Hershkowitz, and Meilech Menczer defined as the "Students")
are rabbis who seek to live, teach, and/or study at Tartikov's proposed rabbinical college.[2]

Tartikov was formed in 2004.  (*See* Pl.'s Ex. 1, at RC_00002809.)  At the time of
incorporation, Tartikov's trustees included Chaim Babad, who indirectly financed Tartikov,
Michael Tauber ("Tauber"), and four other individuals.  (*See id.* at RC_00002810.)  The
corporation was formed, among other reasons, "[t]o promote the religious, intellectual, moral,
and social welfare among its members and their families," "[t]o establish, maintain and conduct a
school for the [study] of the holy Torah and to maintain classes for the teachings of the customs,
traditions and mode of worship of the Jewish Orthodox faith," and "[t]o aid and assist worthy
indigent members of the corporation with loans and housing."  (*Id.* at RC_00002807–08.)
Tauber explained that Tartikov was formed to "establish[] a rabbinical college in Rockland
County, New York in order to provide a religious learning and living community to train [a] new
generation of students to become full-time rabbinical judges."  (Pl.'s Ex. 1500 ("Tauber Decl.")
¶ 11; *see also* Pl.'s Ex. 1506 ¶ 10).)  In August 2004, Tartikov purchased the Subject Property
for approximately $13 million dollars.  (*See* Trial Tr. 364, 896.)  The Subject Property is the only
parcel of land owned by Tartikov, (*see* Tauber Decl. ¶ 40), but a related entity owns an additional
30 acres of property within the Village, all of which abut the Subject Property, (*see* Trial Tr.
128.)

Defendants consist of the Village, its Board of Trustees (or "Board"), its current Mayor
Brett Yagel ("Yagel"), (*see* Trial Tr. 707), its former mayor and Trustee Nicholas Sanderson
("Sanderson"), and other current and former members of its Board of Trustees—Ian Banks

---

[2] Rabbi Gergely Neuman, Rabbi Aryeh Royde, and Kolel Belz of Monsey are no longer
parties to this Action.

("Banks"), Alma Sanders Roman ("Roman"), and Rita Louie ("Louie")—each sued in his or her

official capacity.[3]  Each of the individual Defendants voted to amend or adopt one or more of the

Challenged Laws.

### 2.  Individual Plaintiffs' Religious Beliefs & Tartikov's Proposed College

According to Orthodox Jewish belief, Orthodox Jews are not permitted to resolve

conflicts in the secular court system, but rather must have their conflicts adjudicated in rabbinical

courts (bais din) before rabbinical judges (dayanim or dayan) applying Jewish law.  (*See* Pls.'

Post-Trial Proposed Findings of Fact ("Pls.' FOF") ¶¶ 31, 33, 34 (Dkt. No. 326).)  Presently,

however, Plaintiffs have observed that the rabbinical courts in the United States are

overburdened because there are not enough qualified rabbinical judges, forcing

Orthodox/Hasidic Jews to go to secular courts to resolve their disputes.  (*See id.* ¶¶ 38, 40.)  To

help alleviate this backlog, the Students are seeking to become full-time rabbinical judges trained

in all four books of the Shulchan Aruch, a compilation of Jewish laws of the Orthodox Hasidic

tradition, also known as the Code of Jewish Law.  (*See id.* ¶¶ 20, 42.)  They currently are

enrolled at Kollel Belz in Monsey, New York, (*see id.* ¶¶ 21–23), but Kollel Belz does not offer

a "complete" program on the Shulchan Aruch, (Pl.'s Ex. 1503 ("Jacob Hershkowitz Decl.")

¶ 38), leading to their desire to enroll at Tartikov's rabbinical college.

Tartikov's rabbinical program will focus specifically on all four books of the Shulchan

Aruch, (*see* Pls.' FOF ¶ 41), which means that Tartikov will be considered a "specialized kollel,"

(*id.* ¶ 44 (internal quotation marks omitted)).  Compared to a regular kollel, where students spend

---

[3] Sanderson served as a member of the Board of Trustees from 1998-2007, and was mayor from 2007-2011.  (*See* Trial Tr. 460.)  Banks has served on the Board since 1997 and remains a member to this day.  (*See id.* at 562.)  Roman served on the Board for approximately 16 years, some period of which is relevant to this Action.  (*See id.* at 569.)  Louie served on the Board from approximately 2007-2012.  (*See id.* at 676–77.)

their time studying anything related to Jewish law, students at Tartikov will specialize in a "directed and intense study" of the Shulchan Aruch.  (Pls.' Ex. 1502 ("Mordechai Babad Decl.") ¶ 49.)  Tartikov estimates that its proposed program will take approximately 13 to 15 years to complete because its students must master thousands of religious texts and commentaries, and certain aspects of secular law.  (*See* Pls.' FOF ¶¶ 48, 53, 57.)  During this period of study, the students will be required to "spend their days from about 6 a.m. until about 10 p.m. . . . in study, in observation of judges, [and] in collegial examination of the issues that are presented by their studies."  (Tauber Decl. ¶ 69.)  Students will break from their studies only "as is required to fulfill the other religious obligations in daily life for an Orthodox Jew."  (*See id.*)  No other rabbinical college in the United States offers this type of program, (*see* Pls.' FOF ¶ 51), but one institution in Israel offers one similar to it, (*see id.* ¶ 52).

Admission to the program will be based on interviews conducted by Tartikov's future dean, Mordechai Babad, who will review the applicants' backgrounds and assess their knowledge of Jewish law.  (*See id.* ¶ 94; Tauber Decl. ¶ 60.)  Admission will also be conditioned on completing a high school level program in the Talmud.  (*See* Tauber Decl. ¶ 60.)  The Students and David Menczer have satisfied these conditions and will be admitted into the college when it opens.  (*See* Mordechai Babad Decl. ¶ 50.)

Student progress will be measured by regular testing.  (*See* Tauber Decl. ¶ 51.)  Some students also may undergo an oral examination to determine whether they are qualified to serve as rabbinical judges.  (*See id.*)  If a student passed that examination, the rabbi conducting it will give the student a smicha, which signifies that the student has accomplished proficiency in an area of Jewish law.  (*See* Pls.' FOF ¶¶ 88, 91.)  The smicha is not a degree recognized by the

New York State Board of Regents (the "Board of Regents"), (*see id.* ¶ 90), and Tartikov does not plan on offering any degree recognized by that body, (*see* Pls.' Ex. 1507 ("Kinser Decl.") ¶ 29).

As part of the program, Tartikov plans to construct and foster the development of a Torah community, i.e., on-campus housing where its students and their families can live, so that the students can study from 6 a.m. until 10 p.m., (*see* Tauber Decl. ¶ 69), and also meet their religious obligations to their families. (*See id.* ¶ 19; Pls.' Ex. 1501 ("Chaim Rosenberg Decl.") ¶ 52; Pls.' FOF ¶ 62.) Jewish law requires that Tartikov's students live with their families, (*see* Chaim Rosenberg Decl. ¶ 55; Jacob Hershkowitz Decl. ¶ 86(n); Pls.' Ex. 1504 ("Meilech Menczer Decl.") ¶ 38(n)), and teach their children the Torah, (*see* Trial Tr. 197). Jewish law also requires men to marry at a young age and have large families, and imposes conjugal duties upon a husband and wife while forbidding them from engaging in any family planning or using birth control. (*See* Pls.' FOF ¶¶ 24, 25.)

The purpose of a Torah community is to isolate the students from the distractions of the outside world, permitting them to devote themselves to the study of Jewish law. (*See* Pls.' FOF ¶ 69.) The Students have professed that they are motivated by their religious beliefs to live in such a community. (*See* Chaim Rosenberg Decl. ¶ 54 ("My religious beliefs motivate me to be part of such a Torah community."); Jacob Hershkowitz Decl. ¶ 49 ("To become a rabbinical judge, I must participate in a program that teaches Shulchan Aruch, and do so in a community of like-minded students and teachers, what we refer to as a Torah community."); Meilech Menczer Decl. ¶ 46 ("My religious beliefs motivate me to become part of this Torah Community's living, learning, and worshipping environment as proposed by the Congregation Rabbinical College of Tartikov.").) Their belief is grounded in religious texts that, for example, direct Jews to "[e]xile yourself to a place of Torah." (Pls.' Ex. 1508 ("Resnicoff Decl.") ¶ 70 (internal quotation marks

omitted).)  Without on-campus housing, Tartikov believes that its program will fail, (*see* Pls.'
FOF ¶ 66), in part because two other kollels in the area that do not have on-campus housing or a
Torah community—Kollel Belz and Mechon L'Hoyora—have been unsuccessful in producing
rabbinical judges trained in all four books of the Shulchan Aruch, (*see id.* ¶ 70).

    In addition to housing, Tartikov's facilities will include classrooms, study halls,
courtrooms, a library, one or more shuls, and a facility to house a mikvah.  (*See* Tauber Decl.
¶ 61.)  The library will hold the "[t]housands of studies and commentaries" that discuss and
explain the Shulchan Aruch.  (*Id.* ¶ 65.)  The mikvahs, or ritual baths, will be provided out of
religious necessity.  (*See* Pls.' FOF ¶ 85.)  One or more shuls will be constructed so that
everyone on campus can pray together.  (*See* Tauber Decl. ¶ 22.)

    As proposed, Tartikov's rabbinical college cannot be accredited by the Board of Regents
or any other accrediting body.  It cannot be accredited by the Board of Regents because it will
not offer a degree recognized by that body and educational institutions cannot be accredited by
the Board of Regents until they are fully operational.  (*See* Kinser Decl. ¶¶ 29, 41; Trial Tr. 446.)
The college cannot be accredited by the Association of Advanced Rabbinical and Talmudic
Schools, the accrediting agency for Jewish educational institutions, because it plans to admit
students without an admissions test, will not offer a broad enough curriculum, and must be in
existence for at least two years before it can be accredited.  (*See* Pls.' Ex. 2; Trial Tr. 447–49.)

    Little else is known about the structures, curriculum, or features of Tartikov's rabbinical
college because it has not provided a formal plan for, or submitted an application to the Village
seeking to construct, their proposed rabbinical college.

3.  Chronology of the Challenged Laws

The Village, incorporated in 1967, adopted a Master Plan in 1974 which it updated in 1997.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 8 (Dkt. No. 257).)  It first adopted zoning laws in 1968, (*see* Defs.' Ex. 2000 ("Ulman Aff.") ¶ 6), which were designed to preserve and enhance the rural residential character of the Village, (*see id.*).  Since its inception, the Village has been designated as an R-40 residential zoning district.  (*See id.* ¶ 5; Defs.' Proposed Post-Trial Findings of Fact ("Defs.' FOF") ¶ 1 (Dkt. No. 324).)  The R-40 designation requires that there be a minimum of 40,000 square feet per lot.  (*See* Ulman Aff. ¶ 5.)  One-family residences, public utilities rights-of-way, libraries and museums, public parks and playground, and agricultural pursuits are permitted land uses as of right.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 6.)[4]

On December 15, 1999, Yeshiva Spring Valley ("YSV") made an informal appearance before the Village's Planning Board regarding its desire to build a yeshiva on the Subject Property.  (*See* Pls.' FOF ¶ 127.)  During the meeting, a representative from Frederick P. Clark Associates Inc. ("FPC"), the Village's planner, noted that the Village's zoning laws for schools "really stink" and recommended that the laws be updated.  (*See id.* ¶ 128; Trial Tr. 799.)  One month later, FPC circulated memoranda entitled "YSV-Pomona (Primary School and Pre-School)," and "Proposed Primary School and Pre-School (YSV Pomona) and the Village's Zoning Regulations regarding schools," both of which noted the existence of only "scant" regulations for schools and recommended that the Village amend the pertinent laws.  (Pls.' Exs.

---

[4] The Parties originally stipulated that "houses of worship" are also permitted as of right within the Village, (*see* Joint Pretrial Order Stipulations of Fact ¶ 6), but agreed at oral argument that this stipulation was incorrect.  House of worship are special permit uses.  *See* Village Code § 130-10(G).

111, 130; *see also* Pls.' FOF ¶ 129.)[5]  These recommendations spurred the creation of Local Law No. 1 of 2001, a law designed to regulate educational institutions.  While discussing a rough draft of the law, the Mayor of the Village at the time, Herbert Marshall ("Marshall"), stated: "This thing's going to come in.  They're going to come in and we're going to be caught with our pants down if we don't move.  That's why I want to make sure that we're moving ahead."  (Pls.' Ex. 114, at 69.)[6]

On January 22, 2001, following a public hearing, the Board of Trustees adopted Local Law No. 1 of 2001.  (*See* Pls.' FOF ¶ 130; Defs.' FOF ¶ 114.)  As relevant here, the law defined "educational institution," for the first time, as "[a]ny school or other organization or institution conducting a regularly scheduled comprehensive curriculum of academic and/or alternative vocational instruction similar to that furnished by kindergartens, primary[,] or secondary schools and operating under the Education Law of New York State, and duly licensed by the State of New York," and subjected such institutions to certain restrictions under the special permit approval process, including minimum net lot area, maximum development intensity, frontage, access, set back, parking, and noise guidelines.  (*See* Defs.' Ex. 1010 ("Local Law No. 1 of 2001"), as codified at Village Code §§ 130-4, 130-10.)  For example, the law imposed a minimum net lot area of 10 acres, "plus an additional 0.05 acres for each pupil enrolled."  (*Id.* § 4(F)(1)(a).)  The Board of Trustees passed the law because it sought to have educational institutions as special permit uses rather than uses as of right and to set standards by which such uses would be regulated.  (*See* Ulman Aff. ¶ 25.)  Following the passage of Local Law No. 1 of

---

[5] There were no schools in the Village in 2001.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 11.)

[6] Marshall served as mayor from 1998 until 2007.  (*See* Trial Tr. 586.)

2001, YSV determined that it was impossible for it to build the yeshiva it wanted on the Subject Property, (*see* Nathan Fromowitz Dep. 60), and eventually built the yeshiva outside of the Village, (*see id.* at 14–15).

In December 2002, Marshall spoke on behalf of the Village at a community meeting to support the formation of the Village of Ladentown.  (*See generally* Pls.' Ex. 94.)  The Village of Ladentown was proposed in opposition to the Town of Ramapo's ("Ramapo") September 2002 Draft Comprehensive Plan, which sought to re-zone a 200-acre parcel of land known as the Patrick Farm Property.  (*See id.* at 1.)  The plan specifically contemplated the development of multi-family housing for adult students on the property.  (*See id.*; Trial Tr. 729.)  Marshall stated that Ramapo's plan reflected its decision to "support the special agenda of a small but vocal group of citizens who would prefer replacing our trees with apartment buildings, our wetlands with asphalt, and our wildlife with traffic."  (Pls.' Ex. 94, at 1.)

In May 2004, the Village filed a lawsuit against Ramapo seeking to set aside Ramapo's Comprehensive Plan for failing to comply with the New York State Environmental Quality Review Act ("SEQRA").  (*See generally* Pls.' Ex. 155.)  The petition noted that Ramapo "attracted a burgeoning Hassidic community," which "caused development and political pressures in the Town to increase its housing stock and infrastructure."  (*Id.* ¶¶ 31–32.)

On June 15, 2004, Ramapo adopted the Adult Student Housing Law ("ASHL") which permitted married adult student multi-family housing for Orthodox/Hasidic Jews in residential zones throughout the unincorporated portion of Ramapo.  (*See* Pls.' Ex. 156 ¶¶ 7, 133.)[7]  On

---

[7] The ASHL "permits married, adult, student, multi-family, high-density housing in single-family residential zones . . . in the unincorporated portion of Ramapo."  *Village of Chestnut Ridge v. Town of Ramapo*, No. 07-CV-9278, 2008 WL 4525753, at *1 (S.D.N.Y. Sept. 30, 2008).

June 28, 2004, the Board of Trustees voted to challenge the ASHL.  (*See id.* ¶ 27.)  The petition,

which was filed in October 2004, noted that the law was passed "to secure for one religious

community a unique and significant zoning benefit."  (*Id.* ¶ 215.)  Marshall strongly opposed the

ASHL, stating that Ramapo officials "were pandering to the special interest groups able to

deliver the critically important block vote."  (Pls.' Ex. 109, at POM0013281.)  The "block vote"

Marshall was referring to was the Orthodox Jewish vote out of New Square, New York.  (*See*

Trial Tr. 619.)

During the summer of 2004, the Board of Trustees discussed amending the laws relating

to educational institutions.  (*See* Ulman Aff. ¶ 42.)[8]  On September 7, 2004, Village Attorney

Doris Ulman ("Ulman") provided formal recommendations to the Board regarding which

provisions should be amended.  (*See id.*; Defs.' Ex. 1016.)  Ulman recommended removing the

.05 acre-per-student lot area requirement, adding a provision allowing dormitories, clarifying the

definition of educational institution, and removing the requirement that educational institutions

be on a state or county road.  (*See* Defs.' Ex. 1016.)  These recommendations served as the bases

for Local Law No. 5 of 2004.  As relevant here, Local Law No. 5 of 2004 re-defined

"educational institution" as "[a]ny private or religious elementary, junior high or high school,

college, graduate[,] or post-graduate school conducting a full-time curriculum of instruction . . .

*accredited by the New York State Education Department or similar recognized accrediting*

*agency*," and amended the minimum lot area, frontage, access, setback, and screening guidelines.

(Defs.' Ex. 1011 ("Local Law No. 5 of 2004") §§ 1, 4–5, as codified at Village Code §§ 130-4,

130-10 (emphasis added).)  The minimum lot area was changed to 10 acres—omitting the "net

---

[8] There were no schools or institutions of higher education located in the Village in 2004.
(*See* Joint Pretrial Order Stipulations of Fact ¶ 14.)

lot" requirement—and the .05 acre-per-student requirement was eliminated.  (*See id.* § 4.)  The law also included a provision permitting the development of dormitories:

> A building that is operated by a school located on the same lot and which contains private or semi-private rooms which open to a common hallway, which rooms are sleeping quarters for administrative staff, faculty or students.  Communal dining, cooking, laundry, lounge and recreation facilities may be provided.  Dormitory rooms shall not contain separate cooking, dining or housekeeping facilities except that one dwelling unit with complete housekeeping facilities may be provided for use of a Superintendent or supervisory staff for every fifty dormitory rooms.  Not more than one communal dining room shall be provided in any building used for dormitory purposes.  Single family, two-family and/or multi-family dwelling units other than as described above shall not be considered to be dormitories or part of dormitories.

(*Id.* § 2.)  Ulman based this definition on the laws in Chestnut Ridge and Ramapo, (*see* Ulman Aff. ¶ 46), both of which provide that dormitories "shall not contain separate cooking" facilities, (Defs.' Ex. 1017, at 2; Defs.' Ex. 1018, at XVIII-12.)[9]  The Board of Trustees adopted Local Law No. 5 of 2004 on September 27, 2004.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 24.)

Prior to the adoption of Local Law No. 5 of 2004, dormitories were not permitted in the Village.  (*See* Ulman Aff. ¶ 38.)[10]  Ulman said she drafted the law to authorize schools to build dormitories to house their students on campus, (*see id.* ¶ 39), to comply with "recent case law developments in New York State," (*id.* ¶ 48), and to fix "inconsistencies and vagueness" in the existing laws, (*see id.* ¶ 52).  For example, the code provided different accreditation requirements for "schools" and "educational institutions."  (*See id.*)  Schools had to be approved by the Board

---

[9] There also is some confusion as to who drafted Chestnut Ridge's definition for "dormitory."  The definition dates back to 1987, (*see* Ulman Aff. ¶ 47), but Ulman testified at trial that that she "probably" wrote "Local Law 6 of 2001 in Chestnut Ridge limiting student housing to define dormitories," (Trial Tr. 871).  It is unclear what this means.  In any event, even if Chestnut Ridge's "dormitory" definition dates back to 1987, Ulman served as a consultant to Chestnut Ridge when it was drafted.  (*See* Trial Tr. 827.)

[10] However, Ulman admitted that it is unconstitutional to prohibit educational institutions from building dormitories.  (*See* Trial Tr. 836.)

of Regents or the New York State Department of Education.  (*See id.*)  Educational institutions were required to be licensed by the State of New York.  (*See id.*)  The Village Code was amended to remove the definition for "school" and clarify that educational institutions could be approved by the New York State Education Department or similar accrediting body.  (*See id.*) The accreditation requirement was not completely eliminated from the Village Code because Ulman wanted to prevent certain institutions that might call themselves schools from building in the Village.  (*See id.* ¶ 51.)  Ulman believed that these changes would make it easier for applicants and Village officials to understand the laws applicable to educational institutions. (*See id.* ¶ 52.)

The Village learned that Tartikov had purchased the Subject Property at least as early as November 2004.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 15.)  In 2005 and 2006, the Village approved Tartikov's tax exemption applications.  (*See id.* ¶ 16.)  Ten board meeting agendas from July 2006 through December 2006 reflect that the Board planned to discuss Tartikov in executive session.  (*See* Pls.' Exs. 80, 83, 85, 87, 89–92, 119–20.)[11]  The agendas do not provide the basis upon which the Board determined that executive session was necessary, but minutes from the September 25 and December 18, 2016 Board meetings reveal that the Board closed the meeting to the public to discuss "matters of litigation."  (*See* Pls.' Ex. 105, at 12; *see also* Pls.' Ex. 121, at 6.)  During some of these same Board meetings, certain of the Challenged Laws were discussed.  (*See* Pls.' Ex. 115, at 5 (Board of Trustees minutes from November 27, 2006, noting that Ulman distributed proposed laws relating to dormitory buildings and houses of

---

[11] The meeting agendas reflect that "Camp Dora" was to be discussed in executive session.  Camp Dora was the owner of the Subject Property prior to YSV.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 17.)

worship); Pls.' Ex. 121, at 5 (Board of Trustees minutes from September 25, 2006, noting that

Ulman was working on a "local law revision for wetlands").)

As Village Counsel, Ulman regularly reviewed the Village Code and made

recommendations to the Board of Trustees regarding additions and amendments. (*See* Defs.'

FOF ¶¶ 132, 134.)  In 2006, Ulman determined that the code provisions relating to dormitories

needed to be amended, so she drafted Local Law No. 1 of 2007. (*Id.*)  As relevant here, the law:

(1) requires an educational institution to have a net lot area of 10 acres; (2) removes certain

slopes from net lot area calculations; (3) provides that "[a] dormitory building shall not occupy

more than twenty (20) percent of the total square footage of all buildings on the lot"; and (4)

provides that the maximum height for a dormitory building is 25 feet.  (Defs.' Ex. 1012 ("Local

Law No. 1 of 2007"), as codified at Village Code § 130-10(F).)  Ulman testified that the law was

designed to make clear that a dormitory use is an accessory use to a principal educational use, to

clarify that Local Law No. 5 of 2004 imposed "net" lot area requirements rather than "lot area"

requirements, and to remove references to "school" that had inadvertently been left in the code

after the definition for school was deleted in 2004.  (*See* Ulman Aff. ¶ 54; Local Law No. 5 of

2004.)

On December 18, 2006, the Board of Trustees held a public hearing on Local Law No. 1

of 2007.  (*See* Ulman Aff. ¶ 55; Defs.' Ex. 1041, at 4.)[12]  During the hearing, an attorney for

Tartikov, Paul Savad ("Savad"), asked the Board of Trustees to delay voting on the law until the

next Board meeting.  (*See* Defs.' FOF ¶ 135.)  The Board agreed to continue discussing the law

at the Board meeting scheduled for January 22, 2007.  (*See id.*)

---

[12] There were no educational institutions in the Village at this time.  (*See* Joint Pretrial
Order Stipulations of Fact ¶ 20.)  Additionally, the Village denied Tartikov's tax exemption
application for 2007.  (*See* Pls.' Ex. 146 ¶ 91.)

Before the Board held its next meeting, on January 9, 2007, Preserve Ramapo, a political action group in the region, leaked tentative plans for Tartikov's proposed rabbinical college to the public.  (*See* Pls.' Ex. 65.)  The leaked information stated that Tartikov was planning to build "1,800 square feet" residences that would house 4,500 people.  (*Id.* at POM0013256.)  Shortly thereafter, *The Journal News* published an article referencing Preserve Ramapo's disclosure and adding additional information.  (*See* Pls.' Ex. 157.)  Savad is quoted in the article as stating that the rabbinical college would house 1,000 rabbis and their families.  (*See id.* at RC_1634.)  Ulman learned about Tartikov's plan for the Subject Property from reading the article in *The Journal News*.  (*See* Ulman Aff. ¶ 57.)

On January 22, 2007, the Board of Trustees held a public hearing on Local Law No. 1 of 2007, during which it passed the law.  (*See* Pls.' FOF ¶¶ 148–49; Defs.' FOF ¶¶ 138, 148.)  The turnout was overwhelming, (*see* Pls.' FOF ¶ 235), likely because of the information that was leaked by Preserve Ramapo and contained in *The Journal News* article.  During the hearing, the Board considered changing the height limitation for dormitories from 25 feet to 35 feet.  Ulman stated that the proposed change would make dormitories consistent with all other uses in the Village Code.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 18.)  The Board also considered increasing the number of permitted dining halls from one to two.  (*See* Pls.' Ex. 137, at 45.) After receiving input from the largely hostile audience, the Board decided to keep the height limitation at 25 feet and declined to increase the number of dining halls.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 19; Pls.' Ex. 137, at 77 (Sanderson stating that "based on the input from the public this evening, I think . . . [w]e should cut out the two dining rooms and go back to one"); Trial Tr. 633 (Marshall testifying that increasing the height limit "was rejected based on the comments from the—from the citizenry who attended"); Local Law No. 1 of 2007 § 3.)

Many of the people who spoke during the hearing expressed opposition to Tartikov's proposal, as they understood it based on the rumors that were circulating.  Many of the comments focused on the size of the project and its effect on the Village, rather than the fact that it was being proposed by Orthodox/Hasidic Jews.  (*See, e.g.*, Pls.' Ex. 137, at 10–11 ("I urge you not to allow that type of housing that's being discussed in that law.  I don't think the area calls for it.  The village is too small, and I don't think that we should have that kind of housing anywhere in the village.").)  However, comments related to the religious nature of Tartikov's proposal and its proposed student body.  (*See, e.g.*, *id.* at 47 ("You know, let me ask you one thing, it's really funny how we're talking about law, when you have a group that breaks every law there is, and we are talking about law."); *id.* at 56 ("You know in America, we have the sense of community.  That's our face.  We're going to be another Kiryas Joel [a Hasidic community].  That's why we are emotional.  You can get into the environmental impact and all that.  That's all I have to say.").)  Approximately half-way through the meeting, in an attempt to calm the audience, Marshall stated:

> Ladies and gentlemen, let me say something.  We sitting at this table have limitations that are placed on us as to what we can say, and what we can't say, because our attorney tells us what we can say and what we can't say.  I can't say what I feel—I can't—if I agree with you, I don't agree with you, I don't have that luxury of being able to say that here.  All that I can say is that every member of this board works very, very hard to do what is best for this community.  You you're your issues.  Don't assume because no one has gotten up and said, wow, I agree with you, oh boy; don't assume that because we didn't do that that we don't agree.  We may or we may not, but please give us the benefit of the doubt.  We have all been doing this—we work very hard at what we do.  We try and do what is best for the community, but it's our home.

(*Id.* at 58–59.)

Around this same time, the Board of Trustees was considering whether to adopt a wetlands protection law.  The Village had considered adopting a similar law in 1998, but

ultimately decided against it.  (*See* Ulman Aff. ¶ 92.)  In December 2006, Ulman created a first

draft and circulated it to the Board.  (*See* Pls.' Ex. 123.)  As originally proposed, the law

prohibited certain development activities from occurring on all properties in the Village within

100 feet of the boundary of any wetland, water body, or watercourse, unless a permit was issued

by the Board of Trustees.  (*See id.* §§ 126-3, 126-5.)  Ulman claims that the law was drafted

because the Board was concerned about wetlands in the Village that were not regulated by the

state or federal governments.  (*See* Ulman Aff. ¶ 68.)  Ulman drafted the law after reviewing

wetlands laws from other villages and a wetlands study prepared for Westchester County, New

York.  (*See id.* ¶ 71.)  The idea for the 100-foot buffer zone was taken directly from the New

York State Environmental Conservation Law, which requires a permit from the New York State

Department of Environmental Conservation for any proposed disturbance within 100 feet of

regulated wetlands.  (*See id.* ¶ 68.)  Ulman believed that the law would protect the health, safety,

and welfare of Village residents.  (*See id.* ¶ 69.)

Before the Board voted on the proposed wetlands law, Village residents began

campaigning to become or remain members of the Board.  Sanderson, Yagel, and Louie ran

together on a slate in the March 2007 Village election.  (*See* Pls.' FOF ¶ 275.)  A major piece of

their platform was opposition to Tartikov's development of the Subject Property.  (*Id.* ¶ 276.)

One campaign flier stated:

> This year it is imperative that all village residents vote for leadership that have an
> unwavering long-term commitment to the Village.
>
> We are, according to the lawyers for the Rabbinical College of Tartikoff who have
> purchased land on Route 306 in the village, going to be faced with a proposal for a
> huge development that will include housing for thousands of adult students and
> their families.  Their lawyers have not been shy to point out that they will use every
> legal avenue to pursue their plans, including the federal statute RLUIPA.

> From what we know of the plan as it has been leaked to the public, it will have real environmental and safety problems; compelling interests that will allow the village to fight this plan, if and when presented to the Village Board.
>
> You need to vote for a team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute as a hammer against our village. A team that is in it for the long term, and one that has already prepared themselves with a strategy to fight for Pomona.

(Pls.' Ex. 41.) This same flier states that "[t]he single most important issue facing the Village is clearly the Tartikoff development." (*Id.*) Sanderson, Yagel, and Louie vowed to "vigorously defend [the Village's] land use codes and regulations." (*Id.*) A second flier reiterated these same concerns and made the same promises. (*See* Pls.' Ex. 42, at 2.) In a campaign video, Sanderson stated that Tartikov "could completely change the village and the make-up of the village." (Pls.' Ex. 47, at 1.) Shortly before the election, Yagel and Louie drafted a submission for *The Journal News* editorial page, (*see* Pls.' FOF ¶ 286), stating their opposition to Tartikov's proposal and noting that "a virtual mini-city within the village[] that will house thousands of homogenous individuals" was not a "'natural' progression" for the Village. (Pls.' Ex. 17.) Yagel was also quoted in the *New York Times* describing Plaintiff's plans for the Subject Property as "disgusting." (Pls.' Ex. 169, at 1 (internal quotation marks omitted).)[13] Sanderson, Yagel, and Louie won the March 2007 election. (Joint Pretrial Order Stipulations of Fact ¶ 22.)

The wetlands protection law that ultimately was adopted by the Board on April 23, 2007—Local Law No. 5 of 2007—includes an exemption for lots improved with single family homes. (*See* Defs.' Ex. 1013 ("Local Law No. 5 of 2007"), as codified at Village Code § 126-

---

[13] The full quote from the *New York Times* is as follows: "'The attorney who represents the developer and owner of the property appears ready to file a lawsuit without knowing what the codes for the village are,' said one resident, Brett Yagel. 'It's pretty disgusting. They're trying to create this minicity in our village, and push out people who've put their heart and soul into the community for years.'" (Pls.' Ex. 169, at 1.)

3(D) ("The aforesaid 100 foot buffer in which regulated activities are not permitted to take place

shall not apply to lots that are improved with single family residences.").)  As relevant here, the

law prohibits certain activities within "100 feet of the boundary of any wetland, water body or

watercourse unless a permit is issued therefor by the Board of Trustees or the Planning Board."

(Village Code § 126-3.)  To obtain a permit, the landowner must show that the law "results in a

deprivation of the reasonable use of a property so as to constitute a de facto taking of such

property."  (*Id.* § 126-5.)  Prior to its passage, the Village and members of the Board of Trustees

knew that there were wetlands located on the Subject Property.  (*See* Trial Tr. 670 (Marshall

stating that he knew there were wetlands on the Subject Property prior to 2007); Pls.' Ex. 69, at 1

(email from Yagel discussing the presence of wetlands on the Subject Property); Pls.' Ex. 104, at

1 (Marshall noting, in January 2002, that there are wetlands on the Subject Property); Pls.' Ex.

107, at 2 (October 22, 2001 Board meeting minutes noting that Marshall "stressed" that YSV

needed to protect the wetlands located on the Subject Property); Pls.' Ex. 141, at 20 (1997

Update to the Village's Master Plan noting that the Subject Property contains "part of a large

State-regulated wetland").

### 4.  The Impact of the Challenged Laws

Collectively, the Challenged Laws prevent the construction of Tartikov's rabbinical

college in the Village.  Because the entire Village is zoned R-40, the Village Code permits only a

limited number of land uses in the normal course, namely houses, libraries, museums, public

parks, and playgrounds, *see* Village Code § 130-9, and, by special use permit, some other

developments, including educational institutions, *see* Village Code § 130-10(F), and houses of

worship, *see* Village Code §130-10(G).  The Accreditation Law bars the construction of the

rabbinical college because Tartikov, as proposed, cannot be accredited by any accrediting body.

(*See* Kinser Decl. ¶ 29; Trial Tr. 446–51.)  The Dormitory Law also presents several challenges

for Tartikov's proposed development.  The prohibitions on student family housing and separate

cooking, housekeeping, and dining facilities preclude the rabbinical college from being built in

the Village.  Limiting housing to 20% of the total square footage of other buildings on the

Subject Property is also problematic because Tartikov seeks to provide housing in excess of this

limitation.  The Wetlands Law restricts Tartikov's use of the Subject Property because the

location of the driveway onto the property falls within the 100-foot buffer mandated by that law.

(*See* Trial Tr. 1018.)  An access road cannot be built in any other location because of the

presence of wetlands and steep slopes, which would require significant regrading.  (*See id.* at

781, 1017–18; Pls.' Ex. 1510 ("Beall Decl.") ¶¶ 264–65.)

        Moreover, Tartikov cannot obtain a variance to develop its rabbinical college because

"State law requires an applicant who applies for a use variance to prove that there is no other

economic use for the property" and this would be "impossible" for Tartikov to prove.  (Ulman

Aff. ¶ 80.)  Another possible way for Tartikov to build its rabbinical college would be for it to

apply for an amendment to the zoning laws.  (*See id.* ¶ 87.)[14]  However, the Board of Trustees is

not required to consider a petition for a text amendment, (*see* Trial Tr. 783), and any such

amendment would be subject to the full SEQRA review process, (*see* Trial Tr. 877).

        B.  Procedural Background

        Plaintiffs filed their first Complaint on July 10, 2007, (*see* Dkt. No. 1), and then filed an

Amended Complaint on July 30, 2007, (*see* Dkt. No. 12).  Plaintiffs filed a Second Amended

_____

        [14] Ulman has suggested that Tartikov can apply for a "zone change," (Ulman Aff. ¶ 87),
but a zone change would require an amendment to the zoning law, (*see* Trial Tr. 786).

21

Complaint on November 19, 2007.  (*See* Dkt. No. 27).[15]  Defendants filed a Motion to Dismiss, (Dkt. No. 36), which the Court granted in part in an Opinion and Order dated January 4, 2013. *See Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574 (S.D.N.Y. 2013) ("*Tartikov I*").

Following the close of discovery, Plaintiffs filed a Motion for Partial Summary Judgment, (*see* Dkt. No. 137), and Defendants filed a Motion for Summary Judgment, (*see* Dkt. No. 140), on January 22, 2015.  The Court granted in part and denied in part both motions.  *See Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015) ("*Tartikov II*").

On May 15, 2017, the Court held the final pretrial conference and the bench trial commenced.  The trial lasted 10 days and the Court heard testimony from 23 witnesses.[16] Pursuant to the Court's direction at the conclusion of the trial, the Parties submitted their post-trial memoranda and accompanying papers on August 7, 2017.  (*See* Dkt. Nos. 323–29.)  The Court heard closing statements on September 7, 2017.

## II.  Discussion

The issue before the Court is whether Tartikov's permit application to build its rabbinical college should be governed by the standards set forth in the Challenged Laws.  Plaintiffs argue that the Court should enjoin Defendants from enforcing the Challenged Laws because they are discriminatory and substantially burden their religious exercise.  Defendants assert that the laws were passed for legitimate reasons and do not burden the creation of a run-of-the-mill rabbinical

---

[15] Plaintiffs appear to have filed an identical version of their Second Amendment Complaint on two occasions.  (*See* Dkt. Nos. 27, 28.)

[16] At the Court's direction, the direct testimony of each party's witnesses was done by way of affidavit.

college.  Any burden, Defendants claim, results from the fact that Tartikov seeks to build a

"rabbinical college extraordinaire."  The primary source of Defendants' opposition to Tartikov's

proposed use is that it will include housing for its students and their families.  Indeed, it appears

that they challenge little else about Tartikov's proposal.  Defendants are particularly concerned

that providing housing for students and their families will overburden the Village's infrastructure

and detract from its rural character.  A secondary source of Defendants' opposition rests in their

severe distrust of Plaintiffs' motives.  Defendants are adamant that Plaintiffs' primary wish is not

to build a rabbinical college, but rather a housing complex for Orthodox/Hasidic Jews and their

families dressed as a college.  Although the Court finds no support for Defendants' mistrust of

Plaintiffs' motives, the Court is sympathetic to Defendants' concerns about the size and scope of

Tartikov's proposed development.  Ultimately, however, the Court concludes that Defendants

enacted the Challenged Laws to prevent the spread of the Orthodox/Hasidic community into the

Village, and in certain respects, to specifically target the Subject Property and Tartikov.  This

holding is based on the context in which the laws were adopted and the unsatisfactory and

incredible reasons presented for their adoption.  The Court takes no position on what Plaintiffs

may build upon the Subject Property.  The Court's ruling is limited only to the fact that

Tartikov's putative permit application need not comport with the requirements imposed by the

Challenged Laws.

> A.  The Standard Applicable to Facial Challenges

Because Tartikov has not applied for a permit to build a rabbinical college on the Subject

Property, Plaintiffs are limited to challenging only the facial validity of the Challenged Laws.

*See Tartikov I*, 915 F. Supp. 2d at 596–607 (dismissing the plaintiffs' as applied challenge

because they failed to submit a single proposal).  "Facial invalidation is, manifestly, strong

medicine that has been employed by [courts] sparingly and only as a last resort," wherein a plaintiff has a "heavy burden in advancing [his or her] claim."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted); *see also Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) ("A plaintiff making a facial claim faces an uphill battle because it is difficult to demonstrate that the mere enactment of a piece of legislation violates the plaintiff's constitutional rights." (internal quotation marks omitted)).  The oft-cited standard for facial challenges is derived from dicta in *United States v. Salerno*, 481 U.S. 739 (1987), wherein then-Chief Justice Rehnquist wrote that "the challenger must establish that no set of circumstances exists under which the [challenged law] would be valid."  *Id.* at 745.  In *Tartikov II*, the Court determined that this standard is inapplicable to Plaintiffs' claims.  *See* 138 F. Supp. 3d at 403–07.  The Court provided several reasons for this holding.

First, the Court concluded that *Salerno* does not apply to First Amendment claims.  *See id.* at 404; *see also Finley*, 524 U.S. at 580 ("To prevail [on a facial challenge], respondents must demonstrate a substantial risk that application of the provision will lead to the suppression of speech."); *United States v. Farhane*, 634 F.3d 127, 138–39 (2d Cir. 2011) (acknowledging that the *Salerno* standard is not applicable to First Amendment claims); *Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 144 (2d Cir. 2000) ("*Salerno*, however, does not apply to this case, in which the plaintiffs assert the violation of rights protected by the First Amendment.").  Second, relying on rulings made in *Tartikov I*, the Court echoed that the *Salerno* line of cases was "distinguishable from the instant case because no case in the *Salerno* line involved allegations of discriminatory animus grounded in race or religion."  *Tartikov II*, 138 F. Supp. 3d at 404 (internal quotation marks omitted).  Thus, the Court reiterated that "the *Salerno* test would be met if the Challenged Laws violate Plaintiffs' Equal Protection or Free Exercise rights because 'a

law that violates the Equal Protection Clause or the Free Exercise Clause will be invalid when applied under any conceivable circumstance, even if it can be justified by a conceivably benign motive.'"  *Id.* (quoting *Tartikov I*, 915 F. Supp. 2d at 613 n.18).  Third, the Court held that, in the context of the Free Exercise Clause, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), offered an alternate and directly applicable standard to apply.  *Tartikov II*, 138 F. Supp. 3d at 406.  *Lukumi* provides that "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." 508 U.S. at 543; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status'" (quoting *Lukumi*, 508 U.S. at 533, 542)); *Cent. Rabbinical Congress v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014) ("[W]here some purposeful and exclusive regulation exists—where the object of the law is itself the regulation of religious conduct—the law is subject to heightened scrutiny, and not to rational basis review."); *id.* (noting that the "burdens" of the challenged regulation fell "on only a particular religious group—and in fact *exclusively* on members of one particular subset of that religious group"); *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210 (2d Cir. 2012) (applying this standard to a facial challenge under the Free Exercise Clause).

In reliance on this body of law, the Court concluded that the "effect of the Challenged Laws on Plaintiffs is relevant to determining whether the Challenged Laws were discriminatory under the Equal Protection Clause and/or targeted at religious practice under *Lukumi* (and the Free Exercise Clause), and may be suggestive of the effect they have on other religious groups." *Tartikov II*, 138 F. Supp. 3d at 406.  The Court will adhere to this ruling because Plaintiffs'

experience serves as an important source of evidence on the question of the constitutionality of the Challenged Laws.  *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1123–24 (10th Cir. 2012) (rejecting application of *Salerno* and analyzing, in the context of a facial challenge, the particular circumstances of the plaintiffs, and noting that it is proper to "appl[y] the appropriate constitutional test to the restriction at issue," rather than "conjur[ing] up whether or not there is a hypothetical situation in which application of the statute might be valid"); *Cty. Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 167 (3d Cir. 2006) (finding allegations that the defendant township "knew exactly how [the] appellants intended to use their land and passed [an] [o]rdinance specifically tailored to prevent that use" to constitute a ripe facial challenge to that ordinance); *Dibbs v. Hillsborough Cty.*, 67 F. Supp. 3d 1340, 1349–50 (M.D. Fla. 2014) ("A property owner makes a facial challenge by claiming that a municipality knew exactly how he intended to use his property and passed an ordinance specifically tailored to prevent that use." (internal quotation marks omitted)); *Cornell Cos., Inc., v. Borough of New Morgan*, 512 F. Supp. 2d 238, 258 (E.D. Pa. 2007) ("The basis of an EPC facial challenge is that the mere enactment of the ordinance violates the EPC because it treats the plaintiff's property differently than other similarly situated landowners.").

    B.  Substantive Liability

    Plaintiffs assert that the Challenged Laws violate the First and Fourteenth Amendments of the United States Constitution, RLUIPA, the FHA, §§ 3, 9, and 11 of the New York State Constitution, and New York common law.  Although there is substantial overlap between many of Plaintiffs' claims, the Court will address each of them in turn.

### 1. Equal Protection—Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same).[17]  "Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of discriminatory purpose." *Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) ("*Pyke II*") (internal quotation marks omitted); *see also Tartikov I*, 915 F. Supp. 2d at 615 ("To prove an equal protection violation, claimants must prove purposeful discrimination by a government actor, directed at a suspect class, such as a racial group, or a religion." (citations and internal quotation marks omitted)).  If Plaintiffs make such a showing, the government action at issue is "subject to strict judicial scrutiny," such that the law may be upheld only if it "further[s] a compelling state interest and [is] narrowly tailored to accomplish [that] purpose." *Pyke II*, 567 F.3d at 77.

Plaintiffs may establish an equal protection violation by identifying (1) "a law that expressly classifies on the basis of race," (2) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (3) "a facially neutral [law or] policy that has an adverse effect and that was motivated by discriminatory animus." *Id.* at 76 (internal quotation marks omitted); *see also Jana-Rock Constr., Inc. v. N.Y.S. Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (noting that the Equal Protection Clause is violated, unless justified

---

[17] Because the equal protection provisions of the New York Constitution are interpreted consistently with the corollary provisions in the federal Constitution, *see People v. Kern*, 554 N.E.2d 1235, 1240 (N.Y. 1990) (holding that the guarantee of equal protection under the New York Constitution is co-extensive with that of the federal Constitution); *People v. McCray*, 443 N.E.2d 915, 919 (N.Y. 1982) ("[O]ur State constitutional equal protection clause is no more broad in coverage than its Federal prototype." (citation omitted)), the Court addresses both challenges here.

by strict scrutiny, when government action is "motivated by discriminatory animus and its application results in discriminatory effect" (internal quotation marks omitted)).  As the Court previously held, Plaintiffs rely on the third method here.  *See Tartikov I*, 915 F. Supp. 2d at 615.

### a.  Discriminatory Purpose

"Discriminatory purpose implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999) (internal quotation marks and emphasis omitted).  Though the desire to discriminate need not be the sole motivating factor, *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."), it must be "a significant reason for a public body's actions," *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 786 (2d Cir. 2007). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266 (internal quotation marks omitted).  In assessing discriminatory intent in the land use context, courts consider "the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmaking process departed from established norms, statements made by the decisionmaking body and community members, reports issued by the decisionmaking body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available."  *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir.

28

1995) ("Discriminatory intent may be inferred from the totality of the circumstances," including "historical background" and "contemporary statements by members of the decision-making body," or "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." (internal quotation marks omitted)); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (explaining that "[i]ntent to discriminate may be established in a number of ways," and may be "inferred from the totality of the relevant facts," including "historical background . . . particularly if it reveals a series of official actions taken for invidious purposes; [and] the specific sequence of events leading up to the challenged decision, such as zoning changes for a given site enacted upon . . . learning of [the plaintiff's] plans for . . . construction" (alterations and internal quotation marks omitted)).

Judged against this standard, the evidence and testimony presented during trial proves that Defendants passed the Challenged Laws with a discriminatory purpose. First, the timing of each of the Challenged Laws is suspect, to say the least. The Accreditation Law, the relevant provisions of which were adopted in January 2001 (Local Law No. of 2001) and amended in September 2004 (Local Law No. 5 of 2004), was enacted in direct response to YSV's desire to build an Orthodox yeshiva on the Subject Property. During an informal presentation made by YSV to the Village's Planning Board on December 15, 1999, FPC advised the Village that its zoning laws for schools "really stink." (Pls.' FOF ¶¶ 127–28.) One month later, FPC circulated memoranda entitled "YSV-Pomona (Primary School and Pre-School)," and "Proposed Primary School and Pre-School (YSV Pomona) and the Village Zoning Regulations regarding schools," both of which noted the existence of only "scant" regulations on schools and recommended that the Village amend the pertinent laws. (Pls.' Exs. 111, 130; *see also* Pls.' FOF ¶ 129.) Both

29

memoranda specifically mention YSV and make reference to YSV's development plans.  (*See* Pls.' Ex. 111, at 1 ("As the Village Board may know, the Planning Board has recently been approached regarding a proposed 100,000 square foot, 2-story primary school and a 35,000 square foot, 1-story pre-school on the 100-acre Camp Dora Golding property."); Ex. 130, at POM0004316 ("We have reviewed the *Narrative Summary* and the *Preliminary Master Plan Study* . . . in connection with the [YSV-Pomona] project.").)  The timing of these recommendations is significant because there were no other schools located in the Village in 2001.  (*See* Joint Pretrial Order Stipulations of Fact ¶ 11.)  At the time, Marshall noted that the Board need to move quickly because "[t]hey[]," meaning YSV, "[are] going to come in" and the Board of Trustees was "going to be caught with [its] pants down."  (Pls.' Ex. 114, at 69.)

Then, in 2004, the year in which Local Law No. 5 of 2004 was passed, Defendants took a number of actions which are indicative of discriminatory purpose.  In January 2004, the Village passed a resolution noting that the Board of Trustees "opposes in the strongest possible terms any public officials who abdicate their responsibility of office by placing the politics of special interest groups and individual developers ahead of the best interest of the people they are committed to serve."  (Pls.' Ex. 126, at 7.)  The "block vote of the Orthodox Hasidic Jews" is such a special interest group.  (Trial Tr. 820.)  In May 2004, the Village filed a lawsuit against Ramapo seeking to set aside Ramapo's Comprehensive Plan for failing to comply with SEQRA.  (*See generally* Pls.' Ex. 155.)  Of particular note, the petition asserted that Ramapo "attracted a burgeoning Hassidic community," which "caused development and political pressures in the Town to increase its housing stock and infrastructure."  (*Id.* ¶¶ 31–32.)  After Ramapo adopted the ASHL in June 2004, the Village voted to challenge that law.  (*See* Pls.' Ex. 156 ¶ 27.)  The petition stated that the ASHL was passed "to secure for one religious community a unique and

significant zoning benefit." (*Id.* ¶ 215.)  Although this petition does not specifically name this

"religious community," it is clear the petition is referring to Orthodox/Hasidic Jews.  (*See id.*

¶ 38 (alleging that Yeshiva Chofetz Chaim of Radin was the owner of two of the properties on

which adult student housing was proposed); *id.* ¶ 141 (noting that the ASHL "was proposed

specifically in response to the request from a religious group for multi-family housing . . . to

house married adult students and their families").)  Marshall strongly opposed the ASHL, stating

that Ramapo officials "were pandering to the special interest groups able to deliver the critically

important block vote," (Pls.' Ex. 109, at POM0013281), i.e., the Orthodox Jewish vote out of

New Square, New York, (*see* Trial Tr. 619).  Also during 2004, YSV had its tax-exempt status

denied for the first time, (*see* Joint Pretrial Order Stipulations of Fact ¶ 12), and Tartikov

purchased the Subject Property, (*see* Defs.' Ex. 1057).  Although there is no evidence that

Defendants were aware that Tartikov purchased the Subject Property until November 2004, (*see*

Joint Pretrial Order Stipulations of Fact ¶ 15), Defendants were aware of the growth of the

Orthodox/Hasidic community in Ramapo and sought to prevent the spread of that community

into the Village.  Significantly, as noted, there were no schools within the Village in 2004.  (*See*

*id.* ¶ 14.)

    With regard to the Dormitory Law, the relevant provisions of which were adopted in

September 2004 (Local Law No. 5 of 2004) and January 2007 (Local Law No. 1 of 2007), the

evidence of discriminatory purpose is even stronger.  The Village opposed Ramapo's ASHL, and

then, to prevent the spread of Orthodox/Hasidic adult student housing into the Village, the Board

of Trustees adopted Local Law No. 5 of 2004, which prohibits "[s]ingle family, two-family

and/or multi-family dwelling units," (Local Law No. 5 of 2004 § 2), housing similar to that

permitted under the ASHL.  Moreover, Local Law No. 1 of 2007, which amended provisions of

the Dormitory Law, was passed during a contentious Board of Trustees meeting.  Village residents were vehemently opposed to what they believed to be Tartikov's development, although the information they learned came from Preserve Ramapo.  (*See* Pls.' Ex. 65.)  Many of the attendees' comments focused on the nature and size of the development, but some of the attendees were opposed to the development because it was proposed by Orthodox/Hasidic Jews.  One attendee noted that he or she had heard that Tartikov's proposal was for "rabbinical students and their families," and sought a way to prevent institutions from being "flooded with family members and children, *and all of that sort*." (Pls.' Ex. 137, at 70 (emphasis added).)[18]  Marshall indicated, in response, that the "[a]ccessory use" provision of the Dormitory Law "addresses that to some degree." (*Id.* at 71.)  Another attendee stated, in reference to Tartikov's apparent plan, that "[e]veryone should understand that this is not going to happen, and we're not going to let it happen.  Let's stop it now.  [Multiple shouts of 'Stop it now']  Their counsel is here to protect their interests.  We're here, the people who live in this village, to protect our interests, okay." (*Id.* at 21.)  Yet another attendee was fearful that the Village would turn into another "Kiryas Joel," a Hasidic community located in the Town of Monroe.  (*Id.* at 56.)  The Village's actions and the statements made by the attendees at the Board meeting reveal a fear that Tartikov, and its students, were going to take over the Village and change its "character" and "politics." (*Id.* at 10.)  Although the opposition from the public was not overtly discriminatory, these statements support a finding of discriminatory animus.  *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 608–09 (2d Cir. 2016) (noting that comments about the "flavor" and "character" of a village, although "not overtly race-based" could be "code words for racial animus" (internal quotation marks omitted)).

---

[18] The transcript does not identify the gender of the attendee.

The Wetlands Law, the relevant provisions of which were adopted in April 2007 (Local Law No. 5 of 2007), was enacted despite the fact that there is no evidence that the Village conducted any studies prior to the adoption of the law to determine where the Village's wetlands were, what threats they faced, or how best to protect them.  Village officials did, however, know there were wetlands located on the Subject Property before the law was adopted, (*see* Trial Tr. 670 (Marshall stating that he knew there were wetlands on the Subject Property prior to 2007); Pls.' Ex. 69, at 1 (email from Yagel discussing the presence of wetlands on the Subject Property); Pls.' Ex. 104, at 1 (Marshall noting, in January 2002, that there are wetlands on the Subject Property); Pls.' Ex. 107, at 2 (October 22, 2001 Board meeting minutes noting that Marshall "stressed" that YSV needed to protect the wetlands located on the Subject Property); Pls.' Ex. 141, at 20 (1997 Update to the Village's Master Plan noting that the Subject Property contains "part of a large State-regulated wetland")), indicating that this law was designed to prevent Tartikov from building its proposed rabbinical college.  Further evidence that the Village passed the Wetlands Law to target Tartikov is found in the scope of the law's provisions.  The law exempts from its coverage residences improved with single family residences.  *See* Village Code § 126-3(D) ("The aforesaid [100] foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences.")  In the Village, there are 1,156 parcels of land, with 285 of them located within 100 feet of mapped wetlands.  (*See* Beall Decl. ¶ 180.)  Of those 285 parcels, 240 of them are improved with single family residences, leaving a maximum of 45 parcels subject to regulation.  (S*ee id.* ¶¶ 180–81.) The fact that the Subject Property just so happens to be one of the 45 parcels subject to regulation is telling.  Also troubling is the Village's decision to adopt a law relating to wetlands in 2007, after it learned of Tartikov's proposed use, despite the fact that it considered passing a

similar law in the 1990s.  (*See* Ulman Aff. ¶ 92.)  It was not until Tartikov came along that such

a law became "necessary" to prevent the unidentified risks to the Village's unidentified wetlands.

    The Court need not rely solely on this circumstantial evidence to conclude that the

Wetlands Law was conceived of and passed with a discriminatory purpose.  Village officials

explicitly stated their intent to thwart Tartikov's plans.  Between the time the Wetlands Law was

first proposed and the time that it was adopted, Sanderson, Louie, and Yagel indicated in

campaign materials that voters needed to "stand up to the threat" that Tartikov posed, further

stating "[y]ou need to vote for a team that is prepared to stand up to this threat of using the

fundamentally unfair RLUIPA statute as a hammer against our village."  (Pls.' Ex. 41.)

Sanderson also specifically indicated in a campaign video that the rabbinical college "could

completely change the village and the *make-up* of the village."  (Pls.' Ex. 47, at 1 (emphasis

added).)  The campaign materials for all three candidates indicated that "the single most

important issue facing the village [was] clearly the Tartiko[v] development."  (Pls.' Ex. 41.)

Sanderson, Louie, and Yagel won the election in March 2007, (*see* Joint Pretrial Order

Stipulations of Fact ¶ 22), and, at least, Yagel and Louie voted in favor of passing the Wetlands

Law, (*see* Defs.' Post-Trial Brief ("Defs.' Mem.") 19 (Dkt. No. 323)).

    In addition to these comments, Plaintiffs have identified a number of other statements by

Village officials indicative of Defendants' prejudice against Tartikov and Orthodox/Hasidic

Jews, *see Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead*, 98 F. Supp. 2d 347,

355 (S.D.N.Y. 2000) (holding that "discriminatory comments by the [m]ayor . . . present grounds

for allowing a jury to judge the credibility, and motivation, of the [m]ayor . . . as well as the

motivation that can be attributed to the [v]illage itself in passing the disputed provisions"),

including:

- In February 2007, Yagel and Louie authored a letter to *The Journal News* stating that "a virtual mini-city within the village . . . that will house thousands of homogenous individuals" was not a "natural" progression for the Village. (Pls.' Ex. 17 (internal quotation marks omitted).)  Yagel was also quoted in the *New York Times* stating that it was "disgusting" that Tartikov was "trying to create [a] mini city in our village." (Pls.' Ex. 169, at 1 (internal quotation marks omitted).)[19]

- Sanderson has publicly stated that the Village should "maintain[] its cultural and religious diversity." (Pls.' Ex. 146 ¶ 106 (internal quotation marks omitted).)  However, Sanderson is unaware whether any Hasidic Jews live in the Village. (*See* Trial Tr. 559.)

- Leslie Sanderson, who served as Village Clerk, testified that she was worried Tartikov would "usurp" the Village and Board of Trustees. (Trial Tr. 543.)

- Louie made a Facebook post which indicated discriminatory animus towards the Orthodox/Hasidic Jewish population. (*See* Pls.' Ex. 72.) *See Tartikov II*, 138 F. Supp. 3d at 392–93.

Significantly, these statements were made despite Defendants' efforts to refrain from publicly making disparaging or discriminatory comments. (*See* Pls.' Ex. 13, at 1 (email from Yagel to Louie and Sanderson noting that they "[m]ust be very careful about what we say" because they "[d]on't know who is in the audience"); Pls.' Ex. 146 ¶¶ 110–11 (admitting that Louie and Yagel told "everyone" at a Pomona Civic Association meeting that they "must be careful about their statements").)

Members of the community also expressed animus against Orthodox/Hasidic Jews.  Mel Cook, a Village resident who served on the Village's Planning Board from 1998-2003, (Melvin Cook Dep. ("Cook Dep.") 17), wrote to *The Journal News* and corresponded with Village officials about his views on Tartikov and Orthodox/Hasidic Jews, (*see* Pls.' FOF ¶ 306; Pls.'

---

[19] Defendants take solace in the fact that these statements were admitted as exhibits, but not for the truth of the matters asserted.  However, these statements were offered, and admitted, not for their truth, but because they reveal Yagel's and Louie's animus toward Tartikov and Orthodox/Hasidic Jews.

Exs. 38, 54).  With specific reference to Tartikov, Cook stated that "[i]f it looks like a duck, walks like a duck and quacks like a duck, it's an ultra-Orthodox housing project," (Cook Dep. 99 (internal quotation marks omitted)), that he saw the rabbinical college as "another restricted religious community similar to New Square," (*id.* at 102 (internal quotation marks omitted)), and described New Square as a "tribal ghetto," (*see id.* at 89–90).  Robert Prol, another Village resident, made similarly disparaging comments about Tartikov.  Prol stated that Tartikov would be a "slum," (Robert Prol Dep. ("Prol Dep.") 92 (internal quotation marks omitted)), referred to the Babad family as the "baBad" family, (Pls.' Ex. 20), and sent emails to Village officials stating that the Village should fight Tartikov's proposal, (*see* Prol Dep. 31–32; Pls.' Ex. 20).  In spite of his expressed opposition to Tartikov's development, Sanderson appointed Prol to the Village's Planning Board in May 2008.  (*See* Prol Dep. 13.)  Prol's and Cook's comments are in addition to the negative sentiment expressed by village residents.[20]  During his campaign, Sanderson met with hundreds of residents who were opposed to Tartikov's project.  (*See* Trial Tr. 472.)

Of course, statements by Village residents can be attributed to the Board of Trustees only if the Board was aware of these sentiments and was responsive to the displayed animus.  *See Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (noting that the "hostility [of neighborhood residents] motivated the [municipality] in initiating and continuing its enforcement efforts"); *LeBlanc-Sternberg*, 67 F.3d at 425 (explaining that discriminatory intent may be demonstrated "by showing that animus against the protected group was a

_____

[20] Plaintiffs have identified a number of anonymous comments posted on the Internet in support of their claim that the community opposed Orthodox/Hasidic developments.  (See Pls.' FOF ¶ 300.)  These comments do reveal a bias against the Orthodox/Hasidic community, but the Court places little reliance on them because they are not attributed to Village residents or officials.

significant factor in the position taken by . . . those to whom the decision-makers were knowingly responsive." (internal quotation marks omitted)).  The evidence adduced at trial reveals that Defendants were aware of the residents' animus and acted on that animus.  In one instance, based on public comments made during the January 22, 2007 meeting—the meeting during which Local Law No. 1 of 2007 was passed—the Board voted to impose a 25-foot height restriction on dormitories, even though no other building in the Village is subject to a 25-foot height limitation.  (*See* Trial Tr. 633 (Marshall testifying that increasing the height limitation "was rejected based on the comments from the—from the citizenry who attended").)  Based on comments made during that same meeting, the Board rejected a proposal to increase the number of dining halls permitted in dormitories from one to two.  (*See* Pls.' Ex. 137, at 77 (Sanderson stating that "based on the input from the public this evening, I think . . . [w]e should cut out the two dining rooms and go back to one").)  Marshall also strongly implied his agreement with the sentiment expressed during this meeting.  (*See id.* at 58–59 ("We sitting at this table have limitations that are placed on us as to what we can say, and what we can't say, because our attorney tells us what we can say and what we can't say.  I can't say what I feel—I can't—if I agree with you, I don't agree with you, I don't have that luxury of being able to say that here.").)  Aside from the January 22, 2007 meeting, the members of the Board testified that they take into consideration residents' opinions when voting on laws, (*see* Pls.' FOF ¶ 326), and Sanderson, Yagel, and Louie created their campaign literature and platform to be responsive to the public's concerns, i.e., by stating that they would "fight" against Tartikov, (Pls.' Ex. 41).  They carried through on this promise by voting in favor of Local Law No. 5 of 2007.  Additionally, certain Trustees aligned themselves with Preserve Ramapo, the group that opposed Tartikov's

development and leaked its plans to the public. (*See, e.g.*, Trial Tr. 499–500 (Sanderson testifying that his campaign slate had close ties to Preserve Ramapo).)

Finally, Defendants' behavior with respect to other proposed projects is indicative of their intent to thwart the expansion of the Orthodox/Hasidic community. The Village has a demonstrated history of opposing various Orthodox/Hasidic Jewish land uses near the Village. As early as 1996, the Village opposed the expansion of Bais Yaakov, an Orthodox Hasidic yeshiva in Ramapo. (*See* Pls.' Ex. 125, at 7.) The Village wrote a letter in opposition to the expansion, attended a Ramapo meeting and read an opposition statement, challenged the expansion in court, and encouraged Village residents to object to the expansion. (*See id.* at 7–8; *see also* Trial Tr. 808 (Ulman affirming that the Village encouraged opposition to the expansion of Bais Yaakov).) In 1999, the Village did not object to the "Anna Mann" property becoming an assisted living facility, but then when it was later proposed that the property be used for a yeshiva, the Village did oppose the development. (*See* Trial Tr. 802.) In 2004, as noted above, the Village opposed Ramapo's Comprehensive Plan and the ASHL. (*See* Pls.' FOF ¶¶ 136–38, 141.) The Village also expressed opposition to the development of three yeshivot outside of the Village. (*See* Trial Tr. 808–11.)

The Village does not, however, have this same history of opposition when it comes to non-Orthodox/Hasidic land uses. In 2001, Marshall informed residents that they had to accept group homes within the Village because such land uses were protected under the FHA. (*See* Trial Tr. 614.)[21] In May 2002, the Board, with the exception of one Trustee, informally approved Barr Laboratories' purchase of land within the Village to erect an office building, even

---

[21] The Village did not provide similar instructions with regard to RLUIPA. Instead, it passed a resolution in February 2007 asking Congress to revisit the law. (*See* Pls.' Ex. 58.)

though the land was zoned residential.  (*See* Pls.' Ex. 124, at POM0002022.)  Furthermore, on

the same day it adopted Local Law No. 1 of 2007, the Board voted in favor of applying for funds

to create a senior citizen center within the Village.  (*See* Pls.'s Ex. 75, at POM0016278.)  Ulman

testified that the Village has "consistently opposed high-intensity development," (Ulman Aff.

¶ 16), as a means of showing that the Village opposes large developments regardless of who

proposes them, but the fact remains that the Village has consistently opposed proposals by

Orthodox/Hasidic Jews.

Not all of the evidence, however, points in favor of finding that Defendants acted with a

discriminatory purpose.  Some of the outrage directed toward Tartikov was premised on the size

and scope of its proposed development.  Based on what is currently known, which is very little

because Tartikov has not revealed the full plan for the Subject Property, Tartikov's proposal has

the potential to add thousands of residents to a village that has a current population of

approximately 3,000.  *See* Village of Pomona, *About The Village*,

http://www.pomonavillage.com/about.html (last visited Nov. 11, 2017).  Nonetheless, given the

totality of the credible evidence, the Court concludes that discriminatory purpose was "a

significant reason for [Defendants'] actions," *Cine SK8*, 507 F.3d at 786.  There is no escaping

the fact that the events leading up to the enactment of the Challenged Laws, the context in which

they were adopted, the Village's specific focus on opposing Orthodox/Hasidic development in

and around the Village, and the public statements of Village officials and residents, to which the

officials were responsive, all reveal that Defendants passed the Challenged Laws to thwart the

spread of the Orthodox/Hasidic Jewish community into the Village.

b.  Discriminatory Effect

In establishing discriminatory effect, Plaintiffs are not "obligated to show a better treated, similarly situated group of individuals." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) ("*Pyke I*") (holding that a plaintiff who alleges "that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection").  Indeed, the courts "recognize[] that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 546 (S.D.N.Y. 2006).

At trial, Plaintiffs demonstrated that Defendants' animus hit its mark; the Challenged Laws prohibit Plaintiffs from constructing the type of rabbinical college they seek to obtain. First, with respect to the Accreditation Law, educational institutions are, in general, permitted in the Village, provided that those who wish to build an educational institution first obtain a special use permit.  *See* Village Code § 130-10(F).  Unaccredited educational institutions, however, are not permitted under any circumstances, because "educational institution" is defined by Village law as one that is "accredited by the New York State Education Department or similar recognized accrediting agency."  Village Code § 130-4.  There is no dispute that Tartikov's proposed rabbinical college cannot be accredited by any accrediting body.  (*See* Kinser Decl. ¶ 29; Trial Tr. 446–51.)  Indeed, Defendants' expert witness on accreditation requirements, Preston Green, focused on the steps Tartikov could take to modify its plan so as to qualify for accreditation.  (*See id.* 452.)  The proposed modifications were painted as easy fixes, but fail to resolve the largest impediment to Plaintiffs' proposal—the rabbinical college cannot be accredited until it is operational, (*see id.* ("So the first step it would have to do is to be in the

40

position where it could be operational . . . .")), but it cannot become operational under the Accreditation Law until it is accredited.  At the end of the day, no matter what Tartikov does to its curriculum or admissions standards, it cannot be accredited without first being operational. Thus, the Accreditation Law blocks Tartikov from building a rabbinical college within the Village.

Second, with regard to the Dormitory Law, the Village Code explicitly provides that "[s]ingle-family, two-family[,] and/or multifamily dwelling units . . . shall not be considered to be dormitories or part of dormitories."  Village Code § 130-4 (defining "dormitory"). Dormitories likewise cannot "contain separate cooking, dining or housekeeping facilities" and cannot "occupy more than 20% of the total square footage of all buildings on the lot."  Village Code §§ 130-4, 130-10(F)(12).  These provisions were designed to prevent the spread of Orthodox/Hasidic adult student housing into the Village and they achieve their desired effect. Tartikov seeks to erect family housing on the Subject Property with kitchens in each residence so that students can diligently study the Shulchan Aruch while also meeting their religious obligations to their families.  (*See* Pls.' FOF ¶¶ 24–25, 69.)  The definition for "dormitory" prohibits these types of residences because separate cooking and dining facilities are prohibited. *See* Village Code § 130-4.  The 20% floor space limitation on dormitories is similarly problematic because, to comply with the Property Maintenance Code of New York, Plaintiffs would have to construct residences that are at least 700 square feet.  (*See* Pls.' Ex. 1512 ("Weinstein Decl.") ¶ 30.)  Thus, even if Plaintiffs were to build a campus consisting of academic buildings totaling 100,000 square feet, the Dormitory Law's 20% floor space restriction would permit a dormitory only 20,000 square feet in size—enough to accommodate roughly 30 students and their families.  On its face, the Dormitory Law does not prohibit student

41

housing within the Village—reflecting the ingenuity of Defendants' actions—but when one digs deeper, it is evident that the law was designed to block the exact type of housing Tartikov seeks to construct.

Finally, with regard to the Wetlands Law, two provisions, working together, bar construction of the rabbinical college in the Village. First, Village law provides that "[t]he minimum lot area for an educational institution" is "a net lot area of 10 acres." Village Code § 130-10(F)(1)(a). The only non-government-owned property available in the Village that can accommodate an educational institution is the Subject Property. (*See* Trial Tr. 310 ("Well, I knew [the] Tartikov site was the only 100-acre site or only site large enough to build an actual campus based on the zoning. I think you need a 10-acre site, it's the only site available.").)[22] Second, the Wetlands Law itself defines wetlands as "all lands and waters of the Village of Pomona . . . which have a contiguous area of at least 2,000 square feet" which contain, or are enclosed by, certain submerged vegetation, or that otherwise contain "poorly drained soils." Village Code § 126-2. "[W]ithin 100 feet of the boundary" of such lands, or of any watercourse or "water body," defined as a "body of standing water which is not dry more than three months of the year . . . and which, when wet, is customarily more than 500 square feet in water surface area," it is unlawful to, in relevant part, "[e]rect[] any building or structure of any kind," including "roads [or] driveways," without a permit. *Id.* § 126-3(A)(3), (B). Exempted from the permit requirement, however, are properties improved by single family homes, *see id.* § 126-

---

[22] Defendants "do not agree that the [Subject] Property is the only" property suitable in the Village for an educational intuition, (Defs.' Mem. 35), but have not cited any evidence to support this assertion. If another property exists in the Village that meets the minimum "net lot area of 10 acres," Defendants have not identified it.

3(D), meaning that only approximately 45 parcels are subject to regulation.  (*See* Beall Decl. ¶¶ 180–81.)  And of those regulated parcels, 20 of them are vacant lots.  (*See id.* ¶ 181.)

The 100-foot buffer imposed on the regulated parcels, of which the Subject Property is one, prevents the construction of the rabbinical college because the only suitable location for the driveway onto the property falls within 100 feet of regulated wetlands.  (*See* Trial Tr. 1017–18 (Barbara Beall ("Beall") confirming that there are wetlands located within 100 feet of the current driveway)).)  No other location is feasible because of the existence of other wetlands and steep slopes on the property.  (*See* Trial Tr. 781 (Ulman confirming the existence of "steep slopes" on the "easterly side of the property"); Beall Decl. ¶ 250 ("The existing driveway, and any new driveway providing access to Route 306 on the west side of the [Subject] Property would be within the WPL's 100 foot wetland buffer."); *id.* ¶ 265 ("Any driveway access to Route 202 would require significant regrading of the slopes.").)  Of course, Plaintiffs could apply for a permit to modify the existing driveway, but Plaintiffs would need to show that the Wetlands Law "results in a deprivation of the reasonable use of [the] property so as to constitute a de facto taking."  Village Code § 126-5.  Tartikov cannot meet this standard; the Parties have stipulated that "Tartikov cannot establish that the Challenged Laws have deprived it of economically reasonable use or value of the Subject Property, as it may be developed with single family residences."  (Joint Pretrial Order Stipulations of Law ¶ 18 (Dkt. No. 257); *see also* Ulman Aff. ¶ 80 (stating that it would be "impossible" for Plaintiffs to prove "that there is no other economic use for the property")).)

Accordingly, Plaintiffs have carried their burden and established by a preponderance of the evidence that the Challenged Laws "ha[ve] an adverse effect and . . . [were] motivated by discriminatory animus."  *Pyke II*, 567 F.3d at 77 (internal quotation marks omitted).

c.  Strict Scrutiny—Compelling Interest

Because Plaintiffs have carried their burden of establishing a prima facie case, strict

scrutiny applies to the Challenged Laws.  *See United States v. Bannister*, 786 F. Supp. 2d 617,

664 (E.D.N.Y. 2011) ("In cases involving alleged racial discrimination, once a discriminatory

purpose and a discriminatory effect are shown, the law is subject to strict scrutiny.").  Thus,

Defendants bear the burden of proving that the Challenged Laws are "narrowly tailored measures

that further compelling governmental interests."  *Johnson v. California*, 543 U.S. 499, 505

(2005) (internal quotation marks omitted).  A compelling state interest involves "some

substantial threat to public safety, peace[,] or order,*" Sherbert v. Verner*, 374 U.S. 398, 403

(1963), and includes only "interests of the highest order," *Westchester Day Sch. v. Village of*

*Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) ("*WDS II*") (internal quotation marks omitted),

and the "gravest abuses," *Sherbert*, 374 U.S. at 406.

At summary judgment, the Court concluded that the Challenged Laws do not survive

strict scrutiny because the interests Defendants have offered justifying their adoption are not

compelling.  *See Tartikov II*, 138 F. Supp. 3d at 418 ("While the Challenged Laws may be

justifiable under a rational basis test, they do not survive strict scrutiny."); *see also id.* at 420

("[T]he stated aesthetic and community character rationales are generally not compelling state

interests, and Defendants have not demonstrated that these interests are so overwhelming or

gravely threatened by the institutions such as the proposed rabbinical college to render them

compelling."); *id.* ("[W]ith regard to the Dormitory Law, while certain aspects of the law may be

justified by a need to comply with other laws, Defendants offer no defense of the scope of the

restrictions it contains . . . ."); *id.* ("[W]ith regard to the Wetlands Law, while there is some

evidence to suggest a need for a wetlands law, . . . Defendants offer no evidence beyond Ulman's

testimony . . . .").  Defendants have not presented any evidence or made any argument regarding whether the Challenged Laws can survive strict scrutiny.  (*See generally* Defs.' Mem.)  Their arguments focus entirely on whether Plaintiffs have established a prima facie case of discrimination.  Defendants do, however, offer several justifications for the Challenged Laws.  Although none of these justifications rises to the level of a compelling governmental interest, the Court will address each of them in turn.  Before doing that, the Court notes that Defendants commissioned no studies or experts when examining the compelling need for the Challenged Laws, suggesting that any proffered interests are an "afterthought effort to bolster a flimsily supported decision," *Westchester Day Sch. v. Village of Mamaroneck*, 417 F. Supp. 2d 477, 554 (S.D.N.Y. 2006), or "contrived for the sole purpose of rationalizing the" Village's decisions, *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 505 (S.D.N.Y. 2010) ("*Fortress Bible I*"), *aff'd*, 694 F.3d 208 (2d Cir. 2012).

### i.  Local Law No. 1 of 2001

Local Law No. 1 of 2001 was enacted because the Board of Trustees "wanted to have educational institutions as special permit uses rather than as of right, and to set up standards by which density and impacts on adjoining properties would be regulated."  (Ulman Aff. ¶ 25.)  In support of this justification, Marshall testified that he was "very much in favor of . . . Yeshiva Spring Valley" and thought that YSV's proposal was "the best possible use of" the Subject Property.  (*See* Trial Tr. 650.)  Defendants further contend that Local Law No. 1 could not have been designed to discriminate against YSV because "[h]ad YSV filed an application and had a site plan approved prior to the enactment of Local [Law No.] 1 of 2001, the previous law, not Local Law [No.] 1 of 2001, would have applied to YSV's application."  (Ulman Aff. ¶ 31; *see*

*also* Defs. Mem. 11 n.8 (citing *Exeter Bldg. Corp. v. Town of Newburgh*, 980 N.Y.S.2d 154 (App. Div. 2014)).)

The Court does not credit these justifications or the testimony that was offered in support of them.  As a general matter, Defendants' understanding of what law would have applied to YSV's application is incorrect.  Their argument is premised on a faulty understanding of the doctrine of vested rights, which "is implicated when a property owner seeks to . . . initiate the use of property . . . in a way that was permissible before enactment of amendment of a zoning ordinance but would not be permitted under a new zoning law." *Exeter Bldg. Corp.*, 980 N.Y.S.2d at 158–59.  "[A] vested right can be acquired when, pursuant to a legally issued permit, the landowner demonstrates a commitment to the purpose for which the permit was granted by effecting *substantial changes and incurring substantial expenses* to further the development." *Id.* at 159 (emphasis added) (internal quotation marks omitted).  The landowner's reliance on the existing zoning law "must be so substantial that the municipal action results in serious loss rendering the improvements essentially valueless."  *Id.* (internal quotation marks omitted). There is absolutely no evidence in the record that YSV had made substantial changes to the property or incurred substantial expenses before Local Law No. 1 was adopted.  In fact, the record reveals the opposite.  YSV had not even filed an application before the law was adopted.  (*See* Ulman Aff. ¶ 29.)  Thus, YSV's application likely would have been subject to the amended provisions of the Village's laws.

A second reason the Court does not credit Defendants' justifications is that they largely ignore the context in which the law was passed.  The only reason the Village made educational institutions special permit uses was because of YSV's informal presentation to the Board in December 1999.  (*See* Pls.' FOF ¶ 127.)  That presentation precipitated a series of events that

culminated in the adoption of Local Law No. 1 of 2001, a law which ultimately prevented YSV

from building a yeshiva in the Village.  (*See* Fromowitz Dep. 59–62.)[23]

Thus, Defendants have failed to offer a credible, non-discriminatory justification for

enacting this local law.

### ii.  Local Law No. 5 of 2004

Ulman, who became Village Attorney in July 2003, (Ulman Aff. ¶ 1), drafted Local Law

No. 5 of 2004, (*see id.* ¶ 90).  Ulman testified that the "purpose" of this law was to: (1) remove

the .05 acre-per-student requirement for educational institutions imposed by Local Law No. 1 of

2001; (2) permit dormitories within the Village; (3) clarify the definition of "educational

institution" and remove the definition for "school"; and (4) remove the requirement that

educational institutions be located on state or county roads.  (*See id.* ¶ 40.)[24]  Ulman explained

that prior to the enactment of this law, dormitories were prohibited in the Village, (*see id.* ¶ 38),

and that she copied the definition for "dormitory" from laws passed in Ramapo and Chestnut

Ridge, (*see id.* ¶ 47), which similarly do not permit kitchens in dormitories, (*see id.* ¶ 46; *see also*

Defs.' Ex. 1017, at 2 (Ramapo's definition for "dormitory"); Defs.' Ex. 1018, at XVIII-12

---

[23] Defendants argue that Fromowitz was unable to identify a single instance in which a
Village official opposed YSV's proposal, but Defendants overlook the obvious instance in which
Village officials did just that—the passage of Local Law No. 1 of 2001.  YSV proposed a school
for 1,000 students.  (*See* Fromowitz Dep. 59.)  Local Law No. 1 imposed a minimum lot
requirement of 10 acres, with an additional .05 acres per student, but subtracted from the total
acreage steep slopes and certain wetlands.  (*See* Local Law No. 1 of 2001 § 4.)  After all of the
excluded areas were subtracted from the total acreage of the Subject Property, the law made it
"impossible" for YSV to build the proposed yeshiva.  (*See* Fromowitz Dep. 60.)

[24] Ulman described the acreage-per-student requirement as a "half-acre requirement," but
this is incorrect.  (*Id.* ¶ 40.)  Local Law No. 1 of 2001 mandated that educational institutions
have a minimum net lot area of 10 acres and additional "0.05 acre for each pupil enrolled."
(Local Law No. 1 of 2001.)

(Chestnut Ridge's definition for "dormitory").[25]  Ulman also claimed that the inclusion of provisions regarding dormitories was motivated by "recent case law developments in New York State."  (Ulman Aff. ¶ 48 (citing *Congregation Mischknois Lavier Yakov Inc. v. Board of Trustees of Village of Airmont*, No. 02-CV-5642 (S.D.N.Y. filed July 19, 2002); *Diocese of Rochester v. Planning Bd. of the Town of Brighton*, 136 N.E.2d 827 (N.Y. 1956); and *Cornell Univ. v. Bagnardi*, 503 N.E.2d 509 (N.Y. 1986)).)  According to Ulman, these cases indicated that the Village could not prohibit educational institutions from constructing dormitories on campus.  (*See id.*)

Local Law No. 5 of 2004 is also the law that amended the accreditation requirements such that educational institutions must be accredited by "the New York State Education Department or similar recognized accrediting agency."  (*See* Local Law No. 5 of 2004 § 1.)  The purpose of this amendment purportedly was to clarify an inconsistency in the Village code, (*see* Ulman Aff. ¶ 52), which mandated that "schools" be approved by the New York State Board of Regents or the New York State Education Department, while "educational institutions" had to be licensed by New York State, (*see* Local Law No. 1 of 2001 §§ 1–2).  By eliminating the definition for "schools," and broadening the universe of accrediting agencies, Ulman believed that she was making it easier for applicants to understand the Village's zoning requirements. (Ulman Aff. ¶ 52.)

---

[25] Ulman testified that "the laws in Chestnut Ridge, Ramapo and Orangetown and many other municipalities do not permit kitchens in dormitories."  (*See* Ulman Aff. ¶ 46.)  Tellingly, Ulman has identified only three other jurisdictions that do not permit kitchens in dormitories. Also significant is the fact that Defendants have admitted as exhibits only the code provisions for Chestnut Ridge and Ramapo.  The Court has independently reviewed the code for Orangetown and finds no provision similar to that which the Village adopted.  Orangetown does have a provision regulating dormitories, but that provision does not prohibit separate cooking or dining facilities.  *See* Town of Orangetown Code § 43-8.2.

The Court finds some of Ulman's testimony on these matters credible.  For example, the Court has no reason to doubt that removing the definition for "school," and the duplicative and inconsistent accreditation requirements imposed by that definition, made the Village Code easier to understand.  In other respects, however, the Court does not credit Ulman's stated justifications for Local Law No. 5 of 2004.  First, Ulman testified that none of the stated justifications required the Village to ban multi-family housing.  (*See* Trial Tr. 835.)  Second, by "recent" developments in case law, Ulman refers to cases decided in 1956 and 1986 and one filed in 2002.  (*See* Ulman Aff. ¶ 48.)  The case filed in 2002 would have been "recent," but Ulman's inclusion of cases decided decades before Local Law No. 5 of 2004 was under consideration shows a willingness to stretch the truth and detracts from her overall credibility.  Third, although the amendment to the accreditation provision expanded the universe of accrediting bodies, the purpose of the accreditation requirement was to regulate "commercial-type training schools, . . . such as automotive . . . [and] driving schools,"  (Trial Tr. 898), which can be accredited, (*see* Kinser Decl. ¶ 10).  In any event, Ulman offered no testimony, and Defendants have offered no evidence, that the Village was about to be besieged by such trade schools or otherwise explained the timing of the promulgation of this requirement.  Finally, Ulman's reliance on the similarities between Local Law No. 5 and Ramapo's laws relating to dormitories is misplaced.  Ramapo's zoning laws do prohibit individual kitchens within dormitories, (Defs.' Ex. 1017, at 2), but Ramapo's ASHL, which the Village actually opposed, contemplates the existence of adult student housing.  *See Village of Chestnut Ridge v. Town of Ramapo*, No. 07-CV-9278, 2008 WL 4525753, at *1 (S.D.N.Y. Sept. 30, 2008) (noting that the ASHL "permits married, adult, student, multi-family, high-density housing in single-family residential zones . . . in the

unincorporated portion of Ramapo.").  The Village does not have a similar provision permitting
such housing.

Setting aside the testimony described above, Defendants point to other evidence that they
argue proves that Local Law No. 5 of 2004 was passed for legitimate reasons.  (*See* Defs.' Mem.
14–15.)  The law was originally discussed by the Board of Trustees during the summer of 2004,
(*see* Ulman Aff. ¶ 41), several months before the Village learned in November 2004 that
Tartikov purchased the Subject Property, (*see* Joint Pretrial Order Stipulations of Fact ¶ 15), and
years before the Village learned of Tartikov's plans for the property, (*see* Ulman Aff. ¶ 57).
Furthermore, the Trustees who voted in favor of the law—Marshall, Sanderson, Roman, and
Alan Lamer ("Lamer"), (*see* Pls.' Ex. 131, at POM0000432)—testified that they would not
condone discriminatory behavior, (*see* Trial Tr. 521 (Sanderson stating that he has "no animus
towards [Orthodox/Hasidic Jews] at all"); *id.* at 574 (Roman, an African American woman,
stating that her community has been "fighting discrimination" since 1865 and that she would not
engage in discriminatory behavior); *id.* at 668 (Marshall testifying that he is Jewish and finds
"any allegation of anti-Semitism" to be "repugnant"); *id.* at 736 (Lamer stating that his decision
to vote in favor of Local Law No. 1 of 2007 was not "motivated by any desire to keep Tartikov
from building a school within the Village")).

The flaw in Defendants' reasoning is that Local Law No. 5 of 2004 was not adopted in a
vacuum; other events that occurred around the time of adoption undercut Defendants' position.
For example, the same Board that voted in favor of Local Law No. 5 and disclaimed a
discriminatory purpose also voted to challenge Ramapo's ASHL because it was allegedly passed
"to secure for one religious community a unique and significant zoning benefit."  (Pls.' Ex. 156
¶¶ 27, 215.)  That religious community was Orthodox/Hasidic Jews.  It is unsurprising, then, that

Local Law No. 5 was designed to prohibit the exact same type of multi-family housing permitted under the Ramapo ASHL.  Additionally, while Defendants have highlighted favorable testimony from the Trustees that voted in favor of Local Law No. 5, they overlook other damaging testimony indicative of discriminatory animus.  For example, in June 2004, Marshall stated that officials in Ramapo were "pandering to the special interest groups able to deliver the critically important block vote," (Pls.' Ex. 109, at POM0013281), in reference to the Orthodox Jewish community, (*see* Trial Tr. 619).  In another example, during his campaign for mayor in 2007, Sanderson stated that Tartikov "could completely change the village and the *make-up* of the village."  (Pls.' Ex. 47, at 1 (emphasis added).)  There is no evidence that Roman and Lamer made similar statements, but they were Trustees when the Board took concrete steps to prevent the spread of the Orthodox/Hasidic community into the Village.

Thus, while Defendants' proffered justifications for enacting Local Law No. 5 of 2004 are not entirely incredible, the Court finds that discriminatory purpose was "a significant reason for [Defendants'] actions," *Cine SK8*, 507 F.3d at 786.

### iii.  Local Law No. 1 of 2007

Ulman drafted Local Law No. 1 of 2007 "to address errors, inconsistencies and vagueness issues in relation to the previously enacted educational institution and dormitory laws."  (Ulman Aff. ¶ 53.)  The law was originally presented to the Board of Trustees in December 2006.  (*See id.* ¶ 55.)  Ulman testified that she did not learn about Tartikov's proposal until January 2007, (*see id.* ¶ 57), and thus Defendants contend that the law was not drafted to discriminate against Plaintiffs.

The Court credits only part of Ulman's testimony on this matter.  Ulman may not have been aware of Tartikov's *specific* plan, but Ulman and the Board of Trustees were preparing to

oppose Tartikov's use of the Subject Property before January 2007.  Between July 2006 and

December 2006, the Board of Trustees was scheduled to meet ten times in executive session to

discuss Tartikov.  (*See* Pls.' Exs. 80, 83, 85, 87, 89–92, 119–20.)  In New York, a public body

may conduct an executive session for the following reasons:

   a.  matters which will imperil public safety if disclosed;
   b.  any matter which may disclose the identity of a law enforcement agent or
       informer;
   c.  information relating to current or future investigation or prosecution of a
       criminal offense which would imperil effective law enforcement if disclosed;
   d.  discussions regarding proposed, pending or current litigation;
   e.  collective negotiations pursuant to article fourteen of the civil service law;
   f.  the medical, financial, credit or employment history of a particular person or
       corporation, or matters leading to the appointment, employment, promotion,
       demotion, discipline, suspension, dismissal or removal of a particular person or
       corporation;
   g.  the preparation, grading or administration of examinations; and
   h.  the proposed acquisition, sale or lease of real property or the proposed
       acquisition of securities, or sale or exchange of securities held by such public
       body, but only when publicity would substantially affect the value thereof.

N.Y. Public Officers Law § 105.  When pressed during oral argument about which exception is

applicable here, Defendants had no answer.  The only exception that seems plausible is the

exception for litigation.  However, Ulman submitted an affidavit earlier in this Action stating that

she first sensed that the Village could have a dispute with Tartikov in January 2007, (*see* Decl. of

Doris F. Ulman, Esq. ¶ 16 (Dkt. No. 203) ("At or around [January 2007], as Village Attorney, I

sensed the possibility that the Village may have a dispute with Plaintiffs in the future regarding

their stated intentions.  I do not recall discussing this feeling, which was nothing more than a

suspicion, with anyone in January 2007.")), making that exception inapplicable.  Defendants'

fallback position is that Plaintiffs have proffered only meeting *agendas*, which only prove that

the Board planned to discuss Tartikov, not that it actually discussed Tartikov.  Plaintiffs do not

know what was actually discussed during the executive sessions because anything discussed

during those portions of the Board meetings is privileged. (*See* Trial Tr. 852.) The only way for the Court to know for sure what happened is for Defendants to waive the privilege. They have not done so, as is their right. The Court can only draw one conclusion from this refusal— Defendants discussed Tartikov and the ways in which they could limit Tartikov's use of the Subject Property during executive sessions from July 2006 through December 2006. Ulman's testimony that she did not know how Tartikov planned to use the Subject Property until January 2007 is therefore unpersuasive. Regardless of when Ulman learned of the specifics of Tartikov's plan, the Board was preparing to oppose Plaintiff's use of the property as early as July 2006.

Moreover, Ulman's stated justifications also do not explain why she added the provision mandating that a "dormitory building shall not occupy more than 20% of the total square footage of all buildings on the lot." Village Code § 130-10(F)(12). The addition of this provision goes well beyond fixing errors and inconsistencies, but instead imposed substantial restrictions on Tartikov's ability to build student housing sufficient to support the rabbinical college.

Defendants spend little time addressing these issues. Instead, they contend that Plaintiffs worked behind the scenes to incite an atmosphere of hostility to make it appear as though Defendants were targeting Plaintiffs. (*See* Defs.' Mem. 17.) Specifically, Defendants focus on the events leading up to the January 22, 2007 Board meeting. The Board was initially scheduled to vote on Local Law No. 1 of 2007 on December 18, 2006, but Savad asked that the hearing on the law be adjourned. (*See* Defs.' Ex. 1041, at 4.) Then, on January 12, 2007, *The Journal News* ran the article describing the size and scope of Tartikov's proposal. (*See* Pls. Ex. 157.) The article, attributing the figures to Savad, stated that the rabbinical college would house 1,000 rabbis and their families. (*See id.* at RC1634.) Defendants imply that Plaintiffs, with the help of Savad, leaked the plans to the public to incite opposition to Tartikov's proposal. As evidence of

this scheme, Defendants point to the fact that Savad hired a stenographer and videographer to attend the January 22, 2007 meeting.  (*See* Ulman Aff. ¶ 60.)  Defendants construct an interesting theory, but that is all that it is.  They have no evidence to back it up.  In any event, none of this theorizing changes in any way the overwhelming evidence of discriminatory animus, or the fact that this law served no compelling interests.

iv.  Local Law No. 5 of 2007

Ulman drafted Local Law No. 5 of 2007 because "the Board was concerned about wetlands in the Village that were not regulated by the State or federal government."  (*Id.* ¶ 68.) She copied "the 100 foot buffer requirement in th[is] . . . [l]aw from the New York State Environmental Conservation Law, which requires a permit from the NYDEC for any proposed disturbance within 100 feet of any NYDEC regulated wetlands."  (*Id.*)  In addition to reviewing these regulations, Ulman "consulted a wetlands study prepared for Westchester County, NY . . . and reviewed the wetlands laws of the villages of Chestnut Ridge, New Hempstead, and South Nyack."  (*Id.* ¶ 71.)  She further explained that "additional events . . . make it clear that the Village had to enact this legislation," i.e., "Hurricanes Floyd and Irene and super storm Sandy." (*Id.* ¶ 73.)  Ulman believed that the Wetlands Law "would protect the health, safety, and welfare of Village residents."  (*Id.* ¶ 69.)

There are several issues with Ulman's testimony that detract from her credibility, thus yielding the conclusion that none of the stated justifications holds any water.  First, the Village did not adopt the Wetlands Law until 2007, even though the idea of adopting such a law dates back to 1997.  (*See* Trial Tr. 1227–28.)  Apparently, the Village's wetlands were not at risk until after Tartikov appeared on the scene.  The Court finds this coincidence very suspicious.  *See Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,* 218 F. Supp. 2d 1203, 1225 (C.D.

54

Cal. 2002) ("At first blush, the [defendant] [c]ity's concern about blighting rings hollow.  Why had the [defendant], so complacent before [the plaintiff] purchased the [subject] [p]roperty, suddenly burst into action? . . . [T]he activity suggests that the [defendant] was simply trying to keep [the plaintiff] out of the [c]ity, or at least from the use of its own land.").

Second, there is no evidence that a regulatory void in fact existed prior to the enactment of this law.  Beall, Plaintiffs' expert on wetlands science, testified that "federal and state wetland regulations covered over 99% of all aquatic resources within the Village prior to the passage of the [Wetlands Law]."  (Beall Decl. ¶ 51; *id.* ¶ 58 (noting that "99% of the . . . mapped wetlands in the Village" are regulated by the Corps of Engineers under the Clean Water Act); *id.* ¶ 59 (noting that "80%" of "the total acreage of . . . mapped wetlands in the Village . . . are regulated by the NYSDEC under Article 24").  This testimony is unrebutted.  Charles Voorhis, Defendants' expert on environmental planning, did not do "a full inventory of wetlands in the [V]illage," and therefore was unaware of any wetlands that were not protected by state or federal law.  (Trial Tr. 1275.)  The only possible void filled by the Wetlands Law is that it imposes a 100-foot buffer around *all* wetlands, while federal and state law do not.  (*See id.* at 1290.)  However, there is no evidence about whether this gap is significant because the Village did not commission a study to determine whether unprotected wetlands existed in the Village or whether the Wetlands Law was tailored to protect those areas.

Third, Ulman identified "Hurricanes Floyd and Irene" and "super storm Sandy" as events that justified the passage of the Wetlands Law, but the timing of these events further reinforce the conclusion that the law was passed to thwart Tartikov's proposal.  (Ulman Aff. ¶ 73.)  Hurricane Floyd occurred in 1999.  *See* Andrew C. Revkin, *The Big Storm: The Northern Suburbs*, The New York Times (Sept. 18, 1999),

http://www.nytimes.com/1999/09/18/nyregion/the-big-storm-the-northern-suburbs-lost-lives-ruined-homes-and-close-calls.html?mcubz=1.  No explanation has been proffered for why the Village waited almost a decade after that hurricane to enact legislation regulating wetlands.  The obvious explanation is that the Village did not deem it necessary.  Hurricane Irene occurred in 2011 and Superstorm Sandy occurred in 2012, postdating the passage of the Wetlands Law by several years.  Defendants cannot rely on these events to justify a law that was passed in 2007.  Even if Defendants are relying on these events merely to show that the Village's wetlands have the potential to damage the Village and thus needed to be regulated, Defendants have not explained whether the Wetlands Law prevented or lessened the damage that Hurricane Irene and Superstorm Sandy would have caused without regulation.

Finally, the Wetlands Law states that the "protection of all wetlands is vital to the health, safety and welfare of all persons," Village Code § 126-1, yet exempts from its coverage "lots that are improved with single-family residences," *id.* § 126-3(D), effectively rendering the law toothless.  Out of over 1,000 parcels of land in the Village, only 285 of them are located within 100 feet of protected wetlands.  (*See* Beall Decl. ¶ 180.)  Of those 285 regulated parcels, 240 of them are improved with single family residences.  (*See id.* ¶ 181.)  Thus, at most, 45 parcels are subject to the law's restrictions.  By its own terms, the exception swallows the rule.

Despite Defendants' failure to credibly explain why the Wetlands Law was adopted, they have proffered other evidence that indicates, on its face, that the Board of Trustees adopted the Wetlands Law for legitimate, non-discriminatory reasons.  Defendants contend that the law was not enacted to prevent Tartikov from developing a college because Ulman had "no knowledge of what, if any, wetlands were on the [Subject] Property" at the time the law was drafted.  (Defs.' Mem. 19; *see also* Ulman Aff. ¶ 70 ("While the [Subject] Property is legally subject to this, the

Law was not prepared or enacted with the [Subject] Property in mind.  I can say this because, as I have stated, I drafted the law and when I drafted it, I had no knowledge of what, if any, wetlands were on the property.").)  Even if Ulman did not know whether there were wetlands on the Subject Property (which is dubious, at best), other Village officials did know that there were wetlands on the property.  Marshall made reference to wetlands on the Subject Property as early as 2001, (*see* Pls.' Ex. 107, at 2 (October 22, 2001 meeting minutes noting that Marshall "stressed" that Yeshiva Spring Valley needed to protect the wetlands located on the Subject Property)), and acknowledged during trial that he knew prior to 2007 that there were wetlands on the property, (*see* Trial Tr. 670).  Although Marshall was voted out of office before the Board of Trustees voted on the Wetlands Law, he was the mayor during the drafting process.  (*See id.* at 670–71; Ulman Aff. ¶ 74.)  Yagel, who was elected to the Board in March 2007, discussed the presence of wetlands on the property in January 2007.  (*See* Pls.' Ex. 69, at 1, 3.)  And, the 1997 Village Master Plan Update contains a large diagram showing that there are wetlands on the property.  (*See* Pls.' Ex. 141, at Fig. 1.)

Defendants also cite to the testimony of Sanderson, Yagel, and Louie to argue that the Wetlands Law was not meant to discriminate against Tartikov.  (*See* Defs.' Mem. 19.)  Sanderson testified that the law was not passed with the intention of keeping Tartikov out of the Village.  (*See* Trial Tr. 521.)  The Court does not credit this testimony because Sanderson ran for mayor on a platform that included a promise to fight to keep Tartikov from developing the Subject Property and expressed concerns about the "make-up" of the Village changing if Tartikov were to build on the property.  (*See* Pls.' Ex. 41; Pls.' Ex. 47, at 1.)  Yagel similarly testified that the Wetlands Law was not adopted to prevent Tartikov from building a rabbinical college, (*see* Trial Tr. 728), and also that he was unaware of the existence of wetlands on the

57

property, (*see id.* at 727). The Court does not credit this testimony, and in one respect, it is false. The Court does not credit Yagel's testimony that the law was not adopted to discriminate against Tartikov because Yagel made discriminatory comments leading up to the adoption of the law. For example, in early 2007, Yagel co-authored a letter to *The Journal News* stating that "a virtual mini-city within the village . . . that will house thousands of homogenous individuals" was not a "natural" progression for the Village, (Pls.' Ex. 17 (internal quotation marks omitted)), and was quoted in the *New York Times* saying that it was "disgusting" that Tartikov was "trying to create this minicity in our village," (*see* Pls. Ex. 169, at 1 (internal quotation marks omitted)). The Court does not credit the remainder of Yagel's testimony because it is demonstrably false. As indicated in the preceding paragraph, Yagel discussed the existence of wetlands on the Subject Property in January 2007. (*See* Pls.' Ex. 69, at 1, 3.) Finally, Louie testified that the Wetlands Law was "absolutely not" enacted to prevent Tartikov from developing the property. (*See* Trial Tr. 703.) For similar reasons as those provided for Yagel, the Court does not credit this testimony. For example, Louie was a co-author of the letter to *The Journal News*. (*See* Pls.' Ex. 17.)

In light of Defendants' failure to provide any credible justification for the passage of the Wetlands Law, or even explain what purpose it serves, the Court is left to conclude that the law was enacted to thwart Tartikov's proposed rabbinical college.

### d.  Strict Scrutiny—Narrowly Tailored

Even if Defendants had proffered evidence proving that the Challenged Laws were justified by compelling interests, the Challenged Laws would still fail to pass strict scrutiny because they are not narrowly tailored to serve those interests. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (noting that a municipality must show "that the regulation will

in fact alleviate [claimed] harms in a direct and material way").  When "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree[,] [then] [t]he absence of narrow tailoring suffices to establish the invalidity of the [actions]."  *Lukumi*, 508 U.S. at 546; *Jana-Rock Constr.*, 438 F.3d at 210 ("Strict scrutiny is applied in order to determine whether the harm stemming from a particular decision . . . is justified.").

The Challenged Laws are not narrowly tailored because the Village Code already provides several layers of regulation through which Defendants could limit the development of the Subject Property.  Before an educational institution can be built in the Village, the developer must obtain a special permit from the Board of Trustees, *see* Village Code § 130-10(F), obtain site plan approval from the Village Planning Board, *see id.*, and go through the Village's architectural review process, *see id.* § 3-4(a) ("The [Board of Architectural Review] shall review all applications for building permits for nonresidential construction . . . .").  All special permit uses are subject to two standards: (1) those generally applicable to all special permit uses, and (2) those specifically required for the special permit use at issue.  Village Code § 130-28(E).

All special permit uses are subject to the conditions set forth in Village Code § 130-28(E)(6).  This provision permits the Board of Trustees to "attach all such additional conditions and safeguards to any special permit as are, in its opinion, necessary to ensure initial and continual conformance to all applicable standards and requirements," including:

a)  The location and size of the special permit use, nature and intensity of the operations involved in it or conducted in connection with it, the size of the site in relation to it and the location of the site with respect to streets giving access to it are such that it will be in harmony with the appropriate and orderly development of the area in which it is located.

b)  The location, nature and height of buildings, walls and fences and the nature and extent of existing or proposed plantings on the site are such that the special

permit use will not hinder or discourage the appropriate development and use of adjacent land and buildings.

  c) Operations in connection with any special permit use will not be more objectionable to nearby properties by reason of noise, traffic, fumes, vibration or other characteristics than would be the operations of permitted uses not requiring a special permit.

*Id.* § 130-28(E)(6)(a)–(c).  The special permit provisions applicable to educational institutions allow the Board of Trustees to impose additional conditions on the issuance of a special permit, including:

  (9) The Board of Trustees may impose such restrictions and regulations which would avoid or minimize traffic hazards, impairment of the use, enjoyment or value of property in the surrounding area, or generally protect the health, safety and welfare of the neighborhood and to otherwise implement the purpose and intent of this chapter.

  (10) The location and size of the use, the nature and intensity of operations involved in or conducted in connection therewith, its site layout and its relation to access streets shall be such that both pedestrian and vehicular traffic to and from the use and the assembly of persons in connection therewith shall not be hazardous.

  (11) The location and height of buildings, the location, nature and height of walls and fences and the nature and extent of landscaping on the site shall be such that the use will not hinder or discourage the development and use of adjacent land and buildings.

*Id.* § 130-10(F)(9)–(11).  Defendants have not offered a credible explanation as to why these provisions are incapable of restricting the development of the Subject Property in the way they seek.[26]

---

[26] Ulman testified that the Village "does not have the ability to control the size of an educational institution through the special permit application process unless the zoning law has a limitation (as the Village Local Laws do)."  (Ulman Aff. ¶ 77.)  This testimony is vague and conclusory and belied by the code provisions discussed above.  *See* Village Code § 130-28(E)(6)(a) (authorizing the Board of Trustees to place restrictions on the "location and size" of special permit uses).

60

Moreover, during the site plan review process, the Planning Board has the "authority to impose such reasonable conditions and restrictions as are directly related to and incidental to a proposed site plan." *Id.* § 119-3(B)(1). No site plan can be approved unless the Planning Board finds that "the proposed activity and manner in which it is to be accomplished are in accordance with the purpose and findings set forth in this chapter," and that "the proposed activity and the manner in which it is to be accomplished will not adversely affect the preservation and protection of existing wetlands, water bodies, watercourses and floodplains." *Id.* § 119-3(A)(1), (3). The Planning Board must also "take into consideration the public health, safety and general welfare and shall set appropriate conditions and safeguards which are in harmony with the general purpose and intent of this chapter." *Id.* § 119-5(D).

These Village Code provisions are not the only restriction on Plaintiffs' development of the Subject Property. An application to establish an educational institution in the Village also would likely be subject to SEQRA, (*see* Trial Tr. 1242), which is "an overall environmental review process," (Defs.' Ex. 2002 ¶ 97). SEQRA review can address environmental impacts on wetlands and water pollution, plant life and wildlife, floodplains, stormwater, air quality, noise, population concentration, distribution and growth, existing community character, and human health impacts. (*See* Trial Tr. 1243–44; Beall Decl. ¶¶ 134, 140; Pls. Ex. 200.) Furthermore, as alluded to above, the New York State Environmental Conservation Law requires permitting from the New York State Department of Environmental Conservation for activity within 100 feet of designated wetlands, (*see* Ulman Aff. ¶ 68), and wetlands that qualify as "Waters of the United States" are federally protected by the Clean Water Act, (Beall Decl. ¶ 89).

Plaintiffs do not dispute that they are subject to all of these regulations. During oral argument, they went so far as to suggest one condition that Defendants may wish to consider:

61

conditioning the issuance of a special permit on a requirement that only students and their families live on Tartikov's campus.  This suggestion is significant because it directly addresses Defendants' concern that Plaintiffs are secretly planning to build a housing project for Orthodox/Hasidic Jews.  Defendants have not explained why this type of condition would not resolve their concerns.  Additionally, Defendants have not explained why only accredited schools and traditional student-only dormitories are preferable to unaccredited schools and nontraditional dormitories, or how they pose greater threats to the Village.  Without this information, the Challenged Laws do not survive strict scrutiny review.

### 2.  RLUIPA's Substantial Burden Provision

#### a.  Jurisdiction

Plaintiffs assert that Defendants must be enjoined from enforcing the Challenged Laws because the laws substantially burden their religious exercise in violation of RLUIPA. Defendants contend that the Court is without jurisdiction to address this claim because Plaintiffs have not established the applicability any of the jurisdictional prerequisites necessary to litigate a substantial burden challenge.  (*See* Defs.' Mem. 27–29.)  The substantial burden provision of RLUIPA provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  This provision

> prohibits a governmental entity from applying a land use regulation "in a manner that imposes a substantial burden on the religious exercise of a person . . . or

institution, unless the government demonstrates that imposition of the burden . . .
is in furtherance of a compelling governmental interest; and . . . [the burden
imposed] is the least restrictive means of furthering that compelling governmental
interest."

*Westchester Day Sch. v. Village of Mamaroneck*, 386 F.3d 183, 186 (2d Cir. 2004) ("*WDS I*")

(alterations in original) (quoting 42 U.S.C. § 2000cc(a)(1)); *see also Fortress Bible Church v.*

*Feiner*, 694 F.3d 208, 218–19 (2d Cir. 2012) ("*Fortress Bible II*").  It serves to "backstop[] the

explicit prohibition of religious discrimination in [a] later section of [RLUIPA], much as the

disparate-impact theory of employment discrimination backstops the prohibition of intentional

discrimination."  *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*,

396 F.3d 895, 900 (7th Cir. 2005).

The protections afforded by the substantial burden provision are triggered only if one of

three conditions are met:

(A) the substantial burden is imposed in a program or activity that receives Federal
financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would
affect, commerce with foreign nations, among the several States, or with Indian
tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation
or system of land use regulations, under which a government makes, or has in place
formal or informal procedures or practices that permit the government to make,
individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2).  "To establish a claim, a plaintiff bears the burden of demonstrating

that at least one of these predicates applies . . . ."  *Chabad Lubavitch*, 768 F.3d at 192.

Defendants argue that Plaintiffs have not satisfied any of these jurisdictional

prerequisites, devoting most of their attention to subsection (a)(2)(C).  (*See* Defs.' Mem. 28.)

That subsection requires that the substantial burden be "imposed *in the* implementation of a land

use regulation."  42 U.S.C. § 2000cc(a)(2)(C) (emphasis added).  "[T]his predicate is satisfied

when the 'government may take into account the particular details of an applicant's proposed use

of land when deciding to permit or deny that use.'"  *Chabad Lubavitch*, 768 F.3d at 193 (quoting

*Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 986 (9th Cir. 2006)).  In

*Guru Nanak*, the Ninth Circuit explained:

> By its own terms, it appears that RLUIPA does not apply directly to land use
> regulations, such as the [z]oning [c]ode here, which typically are written in general
> and neutral terms.  However, when the [z]oning [c]ode *is applied to grant or deny*
> *a certain use to a particular parcel of land, that application is an 'implementation'*
> under 42 U.S.C. § 2000cc[(a)](2)(C).

456 F.3d at 987 (emphasis added).  Under this reading of subsection (a)(2)(C), Plaintiffs cannot

sustain a substantial burden challenge because the zoning laws have not been "applied to grant or

deny" Tartikov's proposed use of the Subject Property.  *Id.*

Plaintiffs mount no opposition to this interpretation of subsection (a)(2)(C).  They instead

rely on subsection (a)(2)(B) to argue that the Court has jurisdiction to hear their substantial

burden claim.  (*See* Pls.' Post-Trial Mem. of Law ("Pls.' Mem.") 8 n.6 (Dkt. No. 329).)  That

provision applies where "the substantial burden affects, or removal of that substantial burden

would affect, commerce . . . among the several states . . . ."  42 U.S.C. 2000cc(a)(2)(B).

Defendants argue that this provision is inapplicable here because "the effect, if any, of

[Tartikov's] hypothetical proposal on commerce is speculative and incalculable."  (Defs.' Mem.

28.)

The basis for Plaintiffs' argument is that "commercial building construction is activity

affecting interstate commerce."  *WDS II*, 504 F.3d at 354.  In *Chabad Lubavitch*, the Second

Circuit noted that the construction of a "17,000-square-foot addition" to a property "almost

certainly renders RLUIPA applicable under the interstate commerce predicate."  768 F.3d at 192

n.6.  Plaintiffs have not proffered any evidence about the square footage of the buildings

64

necessary for their proposed college, but Tartikov seeks to build "classrooms, study halls, courtrooms, a library, residences, . . . one or more shuls, and a facility to house a mikvah." (Tauber Decl. ¶ 61.)  The square footage of these facilities is likely to total in the thousands.  To build these facilities, Tartikov intends to hire contractors and purchase all of the supplies necessary for their construction.  (*See id.* ¶ 84.)  The Court has no reason to doubt that the construction of these buildings constitutes "commercial building construction."  *WDS II*, 504 F.3d at 354.  Accordingly, the Court has jurisdiction to hear Plaintiffs' substantial burden claim.

Although not challenged by Defendants at this stage, as the Court has previously ruled on this issue, *see Tartikov II*, 138 F. Supp. 3d at 385, the Court notes that while the Challenged Laws have not been "imposed in the implementation" of a land use regulation, as that phrase is used in subsection (a)(2)(C), the laws were "impose[d]" on Plaintiffs for purposes of subsection (a)(1).  The difference being that subsection (a)(1) does not require that the burden be imposed *in the* implementation of a land use regulation; it requires that the burden be "impose[d] *or* implement[ed]."  *See Elijah Grp., Inc. v. City of Leon Valley*, 643 F.3d 419, 422 (5th Cir. 2011) ("When we focus on the text of the Clause, we read it as prohibiting the government from 'imposing,' i.e., enacting, a facially discriminatory ordinance or 'implementing,' i.e., enforcing a facially neutral ordinance in a discriminatory manner."); *Roman Catholic Diocese of Rockville Centre v. Incorporated Village of Old Westbury*, No. 09-CV-5195, 2012 WL 1392365, at *8 (E.D.N.Y. Apr. 23, 2012) (upholding facial challenge to zoning law because the plaintiff had adequately alleged that "the conditions imposed by the [law] would significantly restrict the [plaintiff's] use of their [p]roperty for religious burial purposes").

65

b.  Substantial Burden on Religious Exercise

To establish a substantial burden claim, Plaintiffs "bear[] the burden of demonstrating,"

*Chabad Lubavitch*, 768 F.3d at 192, that the "government . . . impose[d] . . . a land use

regulation" on the Subject Property "in a manner that imposes a substantial burden" on their

"religious exercise."  42 U.S.C. § 2000cc(a)(1); *see also id.* § 2000cc-2(b) ("[T]he plaintiff shall

bear the burden of persuasion on whether the law (including a regulation) or government practice

that is challenged by the claim substantially burdens the plaintiff's exercise of religion.").  "The

burden then shifts to the defendant to demonstrate that it acted in furtherance of a compelling

governmental interest and that its action is the least restrictive means of furthering that interest."

*Chabad Lubavitch*, 768 F.3d at 192 (internal quotation marks omitted).  The Parties have

stipulated that the Village and the mayor and trustees of the Village are a "government," and that

the Challenged Law are "land use regulations."  (*See* Joint Pretrial Order Stipulations of Law

¶¶ 1–8.)  The Court's focus, then, is on whether Plaintiffs' "religious exercise" has been

"substantial[ly] burden[ed]."  42 U.S.C. § 2000cc(a)(1).

i.  Plaintiffs' Religious Exercise & its Sincerity

RLUIPA "defines 'religious exercise' to include 'any exercise of religion, whether or not

compelled by, or central to, a system of religious belief,' and provides further that '[t]he use,

building, or conversion of real property for the purpose of religious exercise shall be considered

. . . religious exercise.'"  *WDS I*, 386 F.3d at 186 (alterations in original) (quoting 42 U.S.C.

§ 2000cc-5(7)(A), (B)); *see also Sts. Constantine & Helen*, 396 F.3d at 900 (same).  "Religious

exercise" under RLUIPA is defined broadly "'to the maximum extent permitted by the terms of

this chapter and the Constitution.'"  *WDS II*, 504 F.3d at 347 (quoting 42 U.S.C. § 2000cc-3(g));

*see also Bikur Cholim, Inc. v. Village of Suffern*, 664 F. Supp. 2d 267, 275, 288 (S.D.N.Y. 2009)

(same).  It is not for the Court to say that Plaintiffs' "religious beliefs are mistaken or insubstantial.  Instead, [the Court's] narrow function in this context is to determine whether the line drawn reflects an honest conviction."  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) (alteration and internal quotation marks omitted); *see also Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) ("Sincerity analysis seeks to determine an adherent's good faith in the expression of religious belief . . . [and] provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.").

Upon the Subject Property, Tartikov intends to construct "classrooms, study halls, courtrooms, a library, residences, . . . one or more shuls, and a facility to house a mikvah." (Tauber Decl. ¶ 61.)  Tartikov does not seek to provide just any type of residences; rather, it seeks to provide multi-family housing to accommodate the rabbinical students *and* their families. Neither Defendants nor the Court question the sincerity of Plaintiffs' beliefs as they relate to the necessity for classrooms, study halls, courtrooms, a library, shuls, and a mikvah on the Subject Property.  Defendants do, however, challenge the sincerity of Plaintiffs desire to build multi-family housing.  (*See* Defs.' Mem. 30 ("The evidence demonstrates that the requirement of multifamily housing on the campus of a rabbinical college is <u>not</u> a sincerely held religious belief.").)

The Students are each motivated by their religious beliefs to become full-time rabbinical judges qualified in all four books of the Shulchan Aruch.  (Pls.' FOF ¶ 20 (citing Chaim Rosenberg Decl. ¶¶ 14–18, 21; Meilech Menczer Decl. ¶¶ 18–19, 35, 51–52; Jacob Hershkowitz Decl. ¶¶ 48, 49, 57, 92, 100).)  They further believe that the Torah commands them to study the Torah day and night.  (*See* Pls.' FOF ¶ 27; Chaim Rosenberg Decl. ¶ 14; M. Babad Decl. ¶¶ 14–

17; Jacob Hershkowitz Decl. ¶¶ 18–20; Meilech Menczer Decl. ¶¶ 14–15; Resnicoff Decl. ¶ 30–

31, 33–38.)  Any unjustified detraction from Torah study is a sin, known as bitul Torah.

(Meilech Menczer Decl. ¶ 15.)  To avoid bitul Torah, Tartikov wants to build a Torah

community—a community that exists nowhere else in the United States, (see Pls.' FOF ¶ 51), the

purpose of which is to isolate the students from the distractions of the outside world, permitting

them to devote themselves to the study of Jewish law, (see Pls.' FOF ¶ 69; Resnicoff Decl.

¶¶ 68–70).  Living in such a community facilitates the learning experience because the students

live among their fellow students and teachers.  (See Tauber Decl. ¶ 25.)  The desire to create this

type of community is grounded in religious texts that, for example, direct Jews to "[e]xile

yourself to a place of Torah."  (Resnicoff Decl. ¶ 70 (internal quotation marks omitted).)  A

second motivation for Plaintiffs' desire for on-campus housing is that they believe the rabbinical

college would otherwise be unsuccessful in training judges versed in the four books of the

Shulchan Aruch.  (See Tauber Decl. ¶ 56 ("[O]ur prior experiences have confirmed that the effort

that we plan to undertake cannot succeed if students are not living together with like-minded

students and their families.").)  Tauber explained that over the past 30 years students at two other

kollels in the area have not been successful in finishing all four books.  (See Trial Tr. 69.)

Tartikov believes that the only way to fix this problem is to create a Torah community.  (See id.

at 69–70.)

By themselves, these religious beliefs would justify the existence of *student* housing on

the Subject Property.  The necessity for *family* housing is explained by other of Plaintiffs'

beliefs.  Jewish law requires men to live with their families.  (See Chaim Rosenberg Decl. ¶ 55

("According to my religious beliefs, I must live with my family."); Jacob Hershkowitz Decl.

¶ 86(n) ("Jews are obligated to live with [their] family."); Meilech Menczer Decl. ¶ 38(n)

(same).)  Jewish men are also required to marry at a young age, have large families, and teach

their children the Torah.  (*See* Trial Tr. 197; Pls.' FOF ¶¶ 24–25.)  Thus:

> Only by [students] being able to live in a Torah Community, a Bais Din community
> where they live together with their families on-site where the entire community
> who lives there together are immersed 24/7 into the Torah studies all of them
> together with their rabbis, with their mentors, where they are always there together
> studying, all of them learning the same Shulchan Aruch, all together, full-time,
> they're fully supported by their families, by their wives, their children, being all
> together they're not distracted, they're not in any way falling, dropping out because
> the circumstances of the family does not allow it, therefore, by them—in addition
> to the religious beliefs, where it's so many times mentioned in our text in the Torah,
> the importance of living in the Torah Community, in addition to that, those who
> don't live in a Torah Community cannot immerse themselves 24/7 into the Torah
> studies and they're losing out time because of that which those who don't live there
> and don't live that kind of a lifestyle do not fulfill their full religious beliefs, they
> cannot, they don't have the ability sometimes.  If they can't, they can't.  Our goal
> is, and we strongly believe that this is the only way, not only for them to be able to
> fulfill their religious beliefs, but this is the only way it's going to get them to
> accomplish what we're looking for them to accomplish.  To be able to stay on for
> 15, 16 [years], sometimes more as needed to complete everything and to be able to
> become certified judges.

(Trial Tr. 69–70.)  As a matter of religious faith, the Students are motivated to live in this type of

community.  (*See* Chaim Rosenberg Decl. ¶ 54 ("My religious beliefs motivate me to be part of

such a Torah community."); Jacob Hershkowitz Decl. ¶ 49 ("To become a rabbinical judge, I

must participate in a program that teaches Shulchan Aruch, and do so in a community of like-

minded students and teachers, what we refer to as a Torah community."); Meilech Menczer Decl.

¶ 46 ("My religious beliefs motivate me to become part of this Torah Community's living,

learning, and worshipping environment as proposed by the Congregation Rabbinical College of

Tartikov.").)

Defendants argue that having family housing on a rabbinical college campus is not a

religious belief, citing testimony offered by the Students and Tauber.  (*See* Defs.' Mem. 30–32.)

For example, Jacob Hershkowitz and Chaim Rosenberg testified that traveling from off-campus

housing to campus is not bitul Torah.  (*See* Trial Tr. 167 (Chaim Rosenberg affirming that "the

time [he] spend[s] going back and forth to the kollel is justifiable time"); *id.* at 235–36 (Jacob

Hershkowitz affirming that he is "not committing a sin when [he] travel[s] to and from the

kollel").)  Chaim Rosenberg also testified that someone building a kollel without on-campus

housing would get "rewarded" for building the kollel because "[n]ot everybody has the means."

(*Id.* at 168.)  Furthermore, Tauber testified that he does not believe that "Tartikov students are

religiously obligated to live in multifamily housing," (*id.* at 128), and Meilech Menczer stated

that his religion does not require him to live in multi-family housing because "there's no

requirement how housing should be," (*id.* at 278).

      The Court sees two problems with Defendants' argument.  First, it is based on a

misstatement of Tartikov's proposal.  Defendants are fixated on the provision of student family

housing, but completely ignore the other aspects of Tartikov's plan.  It is not simply to build

multi-family housing within the Village for Orthodox/Hasidic Jews, it is to build on-campus

housing for rabbinical students and their families in a manner consistent with Jewish law and the

Students' beliefs.  The purpose of the housing is to facilitate religious exercise, bringing it within

RLUIPA's protections.  *See* 42 U.S.C. § 2000cc-5(7)(B) ("The use, building, or conversion of

real property for the purpose of religious exercise shall be considered to be religious exercise of

the person or entity that uses or intends to use the property for that purpose."); *see also Fifth Ave.

Presbyterian Church v. City of New York*, 293 F.3d 570, 574–75 (2d Cir. 2002) (finding

provision of a location for homeless to sleep to be religious exercise); *Candlehouse, Inc. v. Town

of Vestal*, No. 11-CV-93, 2013 WL 1867114, at *18 (N.D.N.Y. May 3, 2013) (noting that there

was sufficient evidence at the summary judgment phase to create a dispute of fact as to whether

the residential component of a religious ministry for substance abuse was part of the plaintiff's

religious exercise); *Bikur Cholim*, 664 F. Supp. 2d at 276 (holding that operation of "a facility to enable observant individuals to visit the sick on the Sabbath and holidays as well as the other individual plaintiff's [sic] obligations to observe the Sabbath while being able to visit their family members at [a nearby hospital] implicate[s] their religious exercise"); *Mintz v. Roman Catholic Bishop of Springfield*, 424 F. Supp. 2d 309, 319 (D. Mass. 2006) (holding that a church's proposed development of a "parish center" that would "house an office for religious education[,] and . . . serve as a meeting place for the parish council . . . [and as] the locus of small gatherings related to church services" constituted "religious exercise" under RLUIPA).

Second, the testimony upon which Defendants rely is of little value.  Focusing on whether it is bitul Torah to travel from off-campus housing to campus ignores all of the other aspects of Tartikov's proposed Torah community.  Tartikov is not seeking to create on-campus housing to cut down on travel time, but rather to create a particular type of living and learning community—one that is free from the distractions of the outside world and permits students to focus on studying to Torah day and night, while surrounded by like-minded individuals.  (*See* Pls.' FOF ¶¶ 27, 69; Tauber Decl. ¶ 25.)  Tauber's and Meilech Menczer's testimony that Tartikov's students are not religiously required to live in "multifamily housing" is similarly of little value.  (*See* Trial Tr. 128, 278.)  Defendants place too much reliance on it because the Court understands this testimony to mean exactly what the witnesses stated—there is no religious *obligation* to live in "multifamily housing."  Plaintiffs, however, have professed a sincere religious belief based on religious doctrine to live on campus with their families, whether that

housing be "multifamily" or otherwise.  Meilech Menczer summed it up best: "there's no requirement how housing should be."  (*Id.* at 278.)[27]

Defendants also cite the actions of Students to cast doubt upon the sincerity of their beliefs.  (*See* Defs.' Mem. 32.)  The Students are all currently enrolled at Kollel Belz, which does not provide on-campus housing.  (*See* Trial Tr. 165, 167, 228, 234, 266.)  The implication of this testimony is that the Students do not sincerely believe that on-campus housing is necessary because they do not currently live on-campus or in a Torah community.  The Court does not see it this way.  The Students are studying the Torah at Kollel Belz because they have no other option.  They cannot study in a Torah community because no such community exists within the United States.  (*See* Pls.' FOF ¶ 51.)  Defendants also focus on the fact that three of Tartikov's trustees were able to study all four books of the Shulchan Aruch without living in on-campus family housing, (*see* Trial Tr. 98), and that Tauber admitted that "if someone wishes to or he has the will and he can pull through the whole program, he can get the studies done," (*id.* at 93; *see also id.* at 273 (Meilech Menczer stating that "in order to become a rabbinical judge, there's no requirement the way you have to study").)  This testimony reveals that there may be other ways to become conversant in the Shulchan Aruch, but does not discredit the Students' beliefs that they "have to live in a Torah community in order to study, to succeed in the studies to become a rabbinical judge."  (Trial Tr. 273.)  The effectiveness of these alternative avenues also is in serious doubt because over the past 30 years, students studying at the kollel at which the three Tartikov trustees studied have not successfully completed all four books of the Shulchan Aruch.

---

[27] The Court notes that this interpretation of the Students' and Tauber's testimony is supported by the fact that during trial it was evident that English is not their first language. When these witnesses said that multi-family housing was not required, they were not saying that they are not required to live with their families on campus.

(Trial Tr. 69; *see also id.* 439 ("[T]he[] other programs in America are not designed . . . to create people who really know Jewish law.").)  Plaintiffs blame that failure on the absence of a Torah community, the purpose of which is to facilitate the learning environment.  (*See id.* at 439 ("[T]he reason why the[] [students] have to live together with them, the other students, and with the teachers, is because they learn from the other students and they really learn from the teachers.").)

Accordingly, the Court concludes that Plaintiffs' religious beliefs regarding the Torah community are sincere.

### ii.  The Burden Imposed by the Challenged Laws

RLUIPA does not itself define the phrase "substantial burden," but the Second Circuit has held that a land use regulation constitutes a "substantial burden" within the meaning of RLUIPA if it "directly *coerces* the religious institution to change its behavior."  *WDS II*, 504 F.3d at 348–49.  "The burden must have more than a minimal impact on religious exercise, and there must be a close nexus between the two."  *Fortress Bible II*, 694 F.3d at 219.  Among the types of burdens the courts have found to be minimal, and hence not protected by RLUIPA, are facially neutral permit and variance requirements.  Thus, courts have regularly found that zoning ordinances that merely require religious institutions to go through a routine permit or variance application process do not run afoul of RLUIPA.  *See, e.g.*, *id.* ("A denial of a religious institution's building application is likely not a substantial burden if it leaves open the possibility of modification and resubmission."); *Konikov v. Orange County*, 410 F.3d 1317, 1323 (11th Cir. 2005) ("[R]equiring applications for variances, special permits, or other relief provisions [does] not offend RLUIPA's goals."); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) (holding that a city's requirement that the plaintiff refile a "complete "

permit application did not constitute a substantial burden (emphasis omitted)); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761–62 (7th Cir. 2003) ("*CLUB*") (finding that "the scarcity of affordable land available for development in R zones, along with the costs, procedural requirements, and inherent political aspects of the Special Use, Map Amendment, and Planned Development approval processes" did not impose substantial burden on religious institutions); *Hale O Kaula Church v. Maui Planning Comm'n*, 229 F. Supp. 2d 1056, 1071 (D. Haw. 2002) (holding that laws requiring special use permits did not impose a substantial burden on religious institution). Indeed, to exempt religious institutions from the normal permit/variance process would result in favoring these institutions, something which neither RLUIPA nor the Free Exercise Clause more generally require (and which the Establishment Clause might prohibit). *See CLUB*, 342 F.3d at 762 ("Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations. . . . [N]o such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise."); *WDS I*, 386 F.3d at 189 ("As a legislative accommodation of religion, RLUIPA occupies a treacherous narrow zone between the Free Exercise Clause, which seeks to assure that government does not interfere with the exercise of religion, and the Establishment Clause, which prohibits the government from becoming entwined with religion in a manner that would express preference for one religion over another, or religion over irreligion.").

While RLUIPA does not exempt religious institutions from complying with facially neutral permit and variance applications procedures, it does not wholly exempt zoning laws from scrutiny. Rather, RLUIPA protects religious institutions from land use regulations that

substantially affect their ability to use their property in the sincere exercise of their religion.  *See Fortress Bible II*, 694 F.3d at 218 ("[T]o hold that RLUIPA is inapplicable to what amounts to zoning actions taken in the context of a statutorily mandated environmental quality review would allow towns to insulate zoning decisions from RLUIPA review. . . .  [The court] decline[s] to endorse a process that would allow a town to evade RLUIPA by what essentially amounts to a re-characterization of its zoning decisions.").  For example, courts have held zoning ordinances, or zoning decisions, that significantly lessen the prospect of a religious institution's being able to use the property to further its religious mission can contravene RLUIPA.  *See, e.g., Guru Nanak*, 456 F.3d at 992 (holding that the defendant county's two denials of variance permits, under the circumstances, had "to a significantly great extent lessened the prospect of [the religious institution] being able to construct a temple in the future," thus imposing a "substantial burden" on the religious institution's "religious exercise"); *Roman Catholic Diocese of Rockville Centre*, 2012 WL 1392365, at *8 (upholding plaintiff's facial challenge to zoning law because plaintiff had adequately alleged that the "conditions imposed by the [law] would significantly restrict the [plaintiff's] use of their [p]roperty for religious burial purposes").  Zoning schemes that impose conditions on the use of the property, such as limitations on the size of the facilities that can permissibly be used by the religious institution, also may impose a substantial burden.  *See Cathedral Church of the Intercessor v. Inc. Village of Malverne*, No. 02-CV-2989, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006) (finding that the plaintiff adequately alleged a substantial burden, where space limits imposed by the defendants "constrained" the ability of the church's parishioners to "observe or participate" in religious services).

Courts likewise have found a substantial burden where municipal zoning schemes impose significant "delay, uncertainty, and expense."  *Sts. Constantine & Helen*, 396 F.3d at 901; *see*

75

*also WDS II*, 504 F.3d at 349 (noting that "a complete denial" of a religious institution's zoning application which results in substantial "delay, uncertainty, and expense" can be a substantial burden (internal quotation marks omitted)); *Grace Church of N. Cty. v. City of San Diego*, 555 F. Supp. 2d 1126, 1137–39 (S.D. Cal. 2008) (finding that the plaintiff had established a substantial burden based on the uncertainty and expense resulting from the municipality's zoning regulations and from municipal officials' consistent hostility toward plaintiff in their review of the plaintiff's land use applications).  In one recent case, the Second Circuit held that when a municipality's "willingness to consider [a] proposal is disingenuous, a conditional denial may rise to the level of a substantial burden," *Fortress Bible II*, 694 F.3d at 219, and "when [a] town's actions are arbitrary, capricious, unlawful, or taken in bad faith, a substantial burden may be imposed because it appears that the [religious institution] may have been discriminated against on the basis of its status as a religious institution," *id.*  In sum, "a complete denial" of a religious institution's intended or applied-for use of its property "is not necessary for the Court to find that the government regulation . . . impose[s] a substantial burden on religious exercise." *Cathedral Church*, 2006 WL 572855, at *8; *see also Sts. Constantine & Helen*, 396 F.3d at 899–901 (finding that to establish substantial burden, a religious group need not "show that there was no other parcel of land on which it could build its church"); *Westchester Day Sch. v. Village of Mamaroneck*, 379 F. Supp. 2d 550, 556–57 (S.D.N.Y. 2005) (same).

The Second Circuit has not provided an exhaustive list of factors to be considered in determining whether a substantial burden has been imposed.  Relevant considerations, however, include "whether the law is neutral and generally applicable," the arbitrary and unlawful nature of defendant's conduct, "whether feasible alternatives exist[] for [the plaintiff] to exercise its faith," and whether the plaintiff "reasonably believed" it would be able to undertake its proposal

"when it purchased the property."  *See Chabad Lubavitch*, 768 F.3d at 195–96; *see also Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 96–97 (1st Cir. 2013) (listing factors courts have considered relevant when determining whether a land use restriction imposes a substantial burden).

Taken together, the Challenged Laws substantially burden Plaintiffs' religious exercise in several ways.  The Accreditation Law prevents Tartikov from building a rabbinical college within the Village because only accredited educational institutions are eligible for special use permits, *see* Village Code § 130-4, and Tartikov cannot be accredited by any accrediting body, (*see* Trial Tr. 446–51; Kinser Decl. ¶¶ 29, 41; Pls.' Ex. 2.)  Defendants argue that this issue is easily fixable and therefore does not present a substantial burden.  (*See* Defs.' Mem. 39–42.)  In some respects, this argument is appealing.  Tartikov could make some changes that put it on the road to accreditation.  (*See* Trial Tr. 453–57.)  For example, Tartikov was informed that it cannot be accredited by the Association of Advanced Rabbinical and Talmudic Schools because its proposed curriculum is not broad enough and it would need to offer an admissions test.  (*See* Pls.' Ex. 2.)  Likewise, Tartikov cannot be accredited by the Board of Regents because it does not plan to award a degree recognized by that body.  (*See* Kinser Decl. ¶ 29.)  Plaintiffs have not explained why Tartikov cannot offer an admissions test or what burden Tartikov would suffer if it had to change its curriculum to offer a wider array of programs.  Indeed, Plaintiffs have taken the questionable position that they do not have to make any changes to their rabbinical program, no matter how insubstantial the burden.  (*See* Trial Tr. 116 ("There was no discussion about changing the curriculum, our curriculum is what it is, and were are not going to change the purpose of our curriculum of certifying the judges for the four volumes of the Shulchan Aruch to be accredited . . . .").)  This cannot be the case, as RLUIPA requires that Plaintiffs demonstrate a

*substantial* burden; Tartikov cannot hide behind RLUIPA to avoid making insubstantial changes. At the very least, offering an admissions test appears to represent an insubstantial change, as Plaintiffs have not provided a religious basis for Tartikov's decision to admit students without any such examination.

Defendants' argument, however, suffers from a fatal flaw.  Tartikov must be operational before it can be accredited, but Tartikov cannot become operational until it obtains a special use permit, which requires accreditation.  (*See* Trial Tr. 452.)  Therefore, even if Tartikov changed its curriculum and instituted an admissions test, it cannot be accredited.  Defendants contend that Plaintiffs could seek provisional accreditation to overcome this problem, explaining that the American Bar Association regularly grants provisional accreditation to law schools, (Defs.' Mem. 41 & n.41), but there is no evidence that Plaintiffs can pursue that avenue here.  Indeed, Defendants offer no proof that Plaintiffs could seek provisional accreditation from the Board of Regents, the Association of Advanced Rabbinical and Talmudic Schools, or any other body that accredits rabbinical colleges.  Accordingly, the Court concludes that the Accreditation Law imposes a substantial burden of Plaintiffs' religious exercise.  This holding is significant because it does not require the Court to examine any of the peculiarities of Tartikov's proposal, i.e., the creation of a Torah community.  Indeed, Defendants argue repeatedly that the issue in this case "is whether Plaintiffs have demonstrated that the [Challenged] Laws impose a substantial burden on their wish to build a <u>rabbinical college</u> in Pomona." (Defs.' Mem. 44.)  Thus, even under Defendants' understanding of the issues presented in the case, Plaintiffs have demonstrated a substantial burden because they cannot build a rabbinical college on *any* parcel of land within the Village.

The Dormitory Law similarly presents a substantial burden on Plaintiffs' use of the Subject Property, because the law prohibits dormitories from occupying more than 20% of the total square footage of all of the educational institution's buildings and prohibits the development of "multi-family dwelling units" with separate "cooking, dining or housekeeping facilities." Village Code §§ 130-4, 130-10(F)(12). Defendants contend that the 20% square footage limitation on dormitories does not represent a substantial burden because Plaintiffs need only increase the size of the academic buildings on the campus to increase the capacity of the dormitory building. (*See* Defs.' Mem. 36–37.) Plaintiffs concede that the 20% restriction does not represent a total prohibition of their proposed use, as Plaintiffs could construct a dormitory building, but argue that the limitation renders their use effectively impracticable. (Pls.' Mem. 16.) The Court agrees with Plaintiffs; this size limitation places a substantial burden on Plaintiffs' religious exercise because it prevents them from building a Torah community. *See Cathedral Church*, 2006 WL 572855, at *8 ("[A] complete denial . . . is not necessary for the Court to find that the government regulation . . . impose[s] a substantial burden on religious exercise."). As discussed above in the context of Plaintiffs' equal protection claim, Plaintiffs would have to build academic buildings totaling 100,000 square feet to house roughly 30 students.[28] However, Plaintiffs do not seek to build 100,000 square feet of academic buildings because academic buildings for small colleges typically cover no more than 30,000 to 45,000

---

[28] In their Post-Trial Proposed Findings of Fact, Plaintiffs state that the Challenged Laws restrict the number of students that could be housed at Tartikov's rabbinical college to approximately 6 to 8 students. (*See* Pls.' FOF ¶ 396.) This assertion finds no support in the record. The 20% housing space restriction is tied to the size of the other buildings on the property. No evidence was offered about the size of the other buildings that are going to be built upon the Subject Property.

square feet.  (Pls.' Ex. 1505 ( ¶ 45.)  Thus, the Dormitory Law needlessly requires Tartikov to construct academic buildings far in excess of its need to achieve its intended purpose.

Defendants argue that the prohibition on multi-family housing does not place a substantial burden on Plaintiffs' religious exercise because Plaintiffs have "feasible alternatives" available to them.  (Defs.'s Mem. 38 (quoting *Chabad Lubavitch*, 768 F.3d at 196).)  During trial, Tauber testified that a "subagent" of Tartikov, Pomona 306 LLC, was formed to purchase other property in the Village, including 30 acres of property abutting the Subject Property upon which 14 single family homes are built.  (*See* Trial Tr. 128.)  Tauber also testified that Tartikov currently has 10 prospective students.  (*See id.* at 79.)  Defendants argue that these 10 students could live in the single family residences owned by Pomona 306 LLC and thus Tartikov has all of the housing it presently needs.  (*See* Defs.' Mem. 38.)[29]  The Court does not consider this arrangement to be feasible.  Although Tartikov presently has 10 students, it is burdensome to limit Tartikov's student body to 14.[30]  Defendants' argument is also premised on its belief that the Dormitory Law is otherwise valid.  As discussed above, and as will be discussed in further detail below, the Dormitory Law represents a substantial burden because of its discriminatory

---

[29] Defendants also argue that Tartikov could subdivide the Subject Property and build single family residences to house the students.  (*See* Defs.' Mem. 38.)  The problem with this argument is that it would not result in the quantity of homes that Defendants imply because even though the Subject Property is approximately 100 acres, Tartikov needs at least 10 acres to comply with the minimum lot area requirements for educational institutions, *see* Village Code § 130-10(F)(1)(a), and would additionally have to subtract the area for wetlands, steep slopes, and utility easements, *see id.* § 118-25(C).

[30] The Court assumes that Defendants' response to this argument would be that Plaintiffs could continue buying property in the Village as needed.  The Court concludes that this arrangement is not a feasible alternative.  Tartikov owns sufficient land upon which it can build the on-campus housing it seeks.  Defendants' passage of laws designed to target multi-family housing for Orthodox/Hasidic Jews imposes a substantial burden on Plaintiffs religious exercise.  But for this burden, Plaintiffs could apply for a permit to build what they seek without the need to buy yet more property.

purpose. *See Chabad Lubavitch*, 768 F.3d at 195 (noting that the Second Circuit considers many factors in determining whether a challenged action imposes a substantial burden, including "the 'arbitrary and unlawful nature' of [the] defendant's conduct" (quoting *WDS II*, 504 F.3d at 352)).

Along these same lines, Defendants argue that the prohibition on multi-family housing does not impose a burden of Tartikov's proposed rabbinical college because Plaintiffs' do not need a Torah community on campus to have a successful rabbinical college. (*See* Defs.' Mem. 42–43.) In *WDS II*, the Second Circuit "expressed doubt as to whether RLUIPA immunize[s] all conceivable improvements by religious schools." 504 F.3d at 347. To receive protection from RLUIPA "religious schools need to demonstrate more than that the proposed improvement would enhance the overall experience of its students." *Id.* The Second Circuit cited gymnasiums used "exclusively for sporting activities" and a headmaster's residence as examples of improvements that may fall outside of RLUIPA's protections. *Id.* Thus, Tartikov must show that on-campus housing will be "used at least in part for religious education and practice." *Id.* at 348.

Defendants argue that Plaintiffs cannot meet this standard, citing the aforementioned testimony of certain witnesses explaining and highlighting the differences between Tartikov's rabbinical college and a Torah community. Also, Chaim Rosenberg testified that "[t]here's no requirement to—in order to become a rabbinical judge, there's no requirement the way you have to study." (Trial Tr. 273.) Mordechai Babad, Tartikov's proposed dean, described a Torah community as the "ideal" learning environment, but he was able to become a qualified rabbinical judge without living in such a community. (*Id.* at 213–14.) Tauber testified that living in a Torah community "has nothing to do with . . . Tartikov about the judges." (*See id.* at 95.) The Students also testified that they cannot study the Torah at home by themselves. (*See id.* at 184

81

(Chaim Rosenberg affirming that he cannot "study to become a rabbinical judge at home"); *id.* at 244 (Jacob Hershkowitz stating that he cannot study at home "without . . . students and teachers"); *id.* at 285 (Meilech Menczer explaining that the study of Torah "usually takes place with a study partner").)  Defendants take this testimony to mean that Tartikov can build a rabbinical college without a Torah community.

While rabbinical colleges can and do exist without on-campus housing, Defendants' argument ignores the sincere religious purpose that the Torah community will serve here. Tartikov's students will not study at home by themselves because that is not how Orthodox/Hasidic Jews study the Torah.  Meilech Menczer explained that the study of the Torah is usually done in study groups where "everybody has a partner."  (*Id.* at 286.)  The study of the Torah also "depends heavily on immersing oneself in a community of Torah scholars." (Resnicoff Decl. ¶ 75.)  The provision of on-campus housing is a means to serve these ends. And while Tartikov's students are not required to study the Torah in any particular way, they sincerely believe that they have to live in a Torah community to "succeed in the study to become a rabbinical judge."  (Trial Tr. 274.)  Accordingly, Plaintiffs have made the connection between their religious exercise and the provision of on-campus housing and have demonstrated that the Dormitory Law substantially burdens that religious exercise by banning student family housing outright.

With respect to the Wetlands Law, the 100-foot buffer prohibits Tartikov from building a driveway onto the campus because the location in which the driveway must be located falls within 100 feet of regulated wetlands.  (*See* Trial Tr. 1018; Beall Decl. ¶ 250.)  This law would not be problematic if Tartikov's rabbinical college could be built elsewhere in the Village, but the Subject Property is the only vacant, non-government owned parcel large enough to satisfy the

minimum net lot requirement of 10 acres for educational institutions. (*See* Trial Tr. 310.)

Defendants, ignoring the problem with the driveway, argue that Plaintiffs can build a rabbinical

college on the Subject Property without running afoul of the Wetlands Law. (*See* Defs.' Mem.

37.) This argument is beside the point, as it is undisputed that a rabbinical college could be built

upon the Subject Property but for the need for a new driveway. (*See* Trial Tr. 1012 (Beall

testifying that the rabbinical college "would have no impacts on the wetlands but for the access

drive")).

  Defendants' second argument is stronger. They contend that any burden on Plaintiffs'

religious exercise existed before the passage of the Wetlands Law because the wetlands on the

Subject Property were already regulated by federal and state law. (*See* Defs.' Mem. 37; *see also*

Trial Tr. 981 (Beall testifying that 99% of the Village's wetlands are regulated by state and local

law).) The problem, however, is that the standard for receiving a permit under the Wetlands Law

is much more stringent than under federal and state law. A permit applicant under the Wetlands

Law must show that the law "results in a deprivation of the reasonable use of a property so as to

constitute a de facto taking." Village Code § 126-5. The "taking" requirement does not exist

under federal or state law. *See* 40 C.F.R. § 230.10 (setting forth the standard for the issuance of

a permit under § 404 of the Clean Water Act as precluding permit "if there is a practicable

alternative to the proposed discharge which would have less adverse impact on the aquatic

discharge, so long as the alternative does not have other significant adverse environmental

consequences"); N.Y. Comp. Codes R. & Regs. tit. 6, § 665.7 (2017) (setting standards for

permit issuance, including "weighing of need against benefits"). (*See also* Beall Decl. ¶¶ 60

(describing NYSDEC regulations covering wetland areas in the Village), 123 ("The Village's

standard is unlike any other standard I have reviewed in other wetlands regulation in New York

State.").)  It is undisputed that Tartikov cannot establish that "the Challenged Laws have deprived it of economically reasonable use or value of the Subject Property, as it may be developed with single family residences."  (Joint Pretrial Order Stipulations of Law ¶ 18.)  Accordingly, the Court concludes that the Wetlands Law imposes a substantial burden on Plaintiffs' religious exercise.

Defendants offer one other alternative means of alleviating these burdens, arguing that Plaintiffs could seek a text amendment or a zone change, but have done neither.  (*See* Defs.' Mem. 41.)  Before addressing the merits of this argument, one clarification is necessary.  Text amendments and zone changes are the same thing.  A zone change requires an amendment to the zoning law.  (*See* Trial Tr. 786.)  Therefore, no matter what Defendants want to call the process, Defendants contend that Plaintiffs cannot succeed on a substantial burden claim until they request an amendment to the Village Code.

Turning to the merits, the Board of Trustees is the body responsible for determining whether to amend the zoning laws and the Board is not required to consider a petition for a text amendment.  (*See* Trial Tr. 783.)  The amendment process thus leaves Plaintiffs at the mercy of the same body that has a now-proven history of discriminating against them.  This history demonstrates that a zoning amendment does not represent a feasible solution.  *See Grace Church*, 555 F. Supp. 2d at 1138 (granting summary judgment to the plaintiff based on evidence that the plaintiff had "no reasonable expectation that any application for an extension" to use its property would be granted).

The discriminatory nature of the Challenged Laws bolsters Plaintiffs' substantial burden claim.  *See Fortress Bible II*, 694 F.3d at 219 ("[W]hen the town's actions are arbitrary, capricious, unlawful, or taken in bad faith, a substantial burden may be imposed because it

appears that the applicant may have been discriminated against on the basis of its status as a religious institution."); *WDS II*, 504 F.3d at 350 ("The arbitrary application of laws to religious organizations may reflect bias or discrimination against religion."); *id.* at 351 ("Where the arbitrary, capricious, or unlawful nature of a defendant's challenged action suggests that a religious institution received less than even-handed treatment, the application of RLUIPA's substantial burden provision usefully backstops the explicit prohibition of religious discrimination in the later section of the Act." (internal quotation marks omitted)); *see also Sts. Constantine & Helen*, 396 F.3d at 900 ("If a land-use decision . . . imposes a substantial burden on religious exercise . . . and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely a particular sect, influenced the decision."). As discussed above, Defendants have failed to offer a credible justification for the Challenged Laws, suggesting that their only purpose was to single out Tartikov and other Orthodox/Hasidic land uses.

There is one consideration, however, that weighs against finding that all of the Challenged Laws impose a substantial burden. The Second Circuit has instructed district courts to consider whether a plaintiff "reasonably believed it would be permitted to undertake its proposed modifications when it purchased the [relevant] property." *Chabad Lubavitch*, 768 F.3d at 196. Plaintiffs proffer an interesting interpretation of what restrictions were in place prior to Tartikov's purchase of the Subject Property. (*See* Pls.' Mem. 17–18.) They argue that only certain building coverage and floor area restrictions were in place, but that otherwise, Tartikov's proposed use would have been permitted prior to the adoption of Local Law No. 5 of 2004, which is the first law that placed restrictions on dormitories. (*See id.*; Local Law No. 5 of 2004.) Plaintiffs' understanding of the restrictions in place prior to its purchase of the Subject Property

in August 2004 is incorrect.  Educational institutions have been subject to an accreditation requirement since at least 2001.  Local Law No. 1 of 2001 mandated that all educational institutions be "duly licensed by the State of New York."  (Local Law No. 1 of 2001 § 2.)[31]  The accreditation requirement was amended after Tartikov purchased the property, but the amendment broadened the number of accrediting bodies from which Tartikov could seek accreditation, arguably lessening the burden imposed by the original requirement.  *See* Local Law No. 5 of 2004 § 1 (requiring that educational institutions be "accredited by the New York State Education Department or similar recognized accrediting agency").  During trial, Tauber admitted that he was not aware "that educational institutions had to be duly licensed by New York State" until after he purchased the property and that he has never spoken to a New York State official about accreditation.  (Trial Tr. 112–13.)  Moreover, even if the accreditation requirement was imposed in 2004 shortly after Tartikov purchased the property, there is no evidence that Tartikov, or anyone associated with Tartikov, examined the accreditation requirements until January 2007, when Tauber met with a representative from the Association of Advanced Rabbinical and Talmudic Schools.  (*See* Pls.' Ex. 2.)  Therefore, Tartikov's supposed belief in 2004 that it could build an unaccredited rabbinical college within the Village should not have been free of doubt.  Even setting aside the accreditation requirement, there is no evidence about what Tauber and Tartikov reasonably believed could be built on the Subject Property because no one examined the zoning restrictions placed on the Subject Property until after Tartikov purchased the land.  (*See* Trial Tr. 104–08.)

---

[31] The Court reiterates that Local Law No. 1. of 2001 was adopted *after* town officials learned about YSV's plans to build a school.  (*See* Pls.' Exs. 111, 130 (FPC memoranda regarding updates to the Village Code in light of YSV's proposal).)

In the absence of other evidence, this deficiency may have been fatal.  *See Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) ("Having decided to go ahead and purchase the property outright after it knew that the permit would be denied, [the plaintiff] assumed the risk of having to sell the property and find an alternative site for its church should the denial be upheld . . . just like any other religious organization that wanted to build in the industrial zone.").  However, all of the Challenged Laws were passed for a discriminatory purpose and they bar completely Tartikov's rabbinical college from the Village. *See id.* ("Any such organization would have to show that a paucity of other land available for churches made the exclusion from the industrial zone a substantial burden to it."); *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 558 (4th Cir. 2013) ("[W]e find it significant that the County has completely prevented [the plaintiff] from building any church on its property, rather than simply imposing limitations on a new building.").  Therefore, the Court concludes that Plaintiffs have carried their burden of showing that the Challenged Laws substantially burden their religious exercise.

### iii.  Compelling Governmental Interest & Least Restrictive Means

Plaintiffs having carried their burden, Defendants must demonstrate that the Challenged Laws were adopted "in furtherance of a compelling governmental interest" and that they were "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc(a)(1)(A)–(B); *see also Chabad Lubavitch*, 768 F.3d at 192 (same).  For the same reasons discussed above in the context of Plaintiffs' equal protection claim, Defendants have failed to carry their burden.  Defendants have proffered no compelling governmental interest justifying the Challenged Laws.  Even more fundamentally, Defendants have not proffered a credible justification for their passage.  Had Defendants shown a compelling governmental

interest, their defense nonetheless would have failed because the Challenged Laws are not the least restrictive means of achieving their desired goals.  Defendants are able to limit the size and scope of Plaintiffs' use through other provisions in the Village Code.  Before Plaintiffs can build any rabbinical college, they must obtain a special permit from the Board of Trustees, *see* Village Code § 130-10(F), obtain site plan approval from the Village Planning Board, *see id.*, and go through the Village's architectural review process, *see id.* § 3-4(a).  Defendants have not credibly explained why these processes are inadequate to protect any interests that they seek to protect.

Accordingly, the Court concludes that Plaintiffs have proven a violation of RLUIPA's substantial burden provision.

### 3.  Free Exercise

Plaintiffs contend that the Challenged Laws burden the free exercise of their religion. The First Amendment, which is applicable to the states by operation of the Fourteenth Amendment, "prohibits the enactment of any law prohibiting the free exercise of religion." *Bronx Household of Faith v. Cmty. Sch. Distr. No. 10*, 127 F.3d 207, 216 (2d Cir. 1997) (internal quotation marks omitted); *see also Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 181 (2012) ("The First Amendment provides, in part, that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." (internal quotation marks omitted)).  "Because the free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires, courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists."  *Fifth Ave. Presbyterian Church*, 293 F.3d at 574 (alteration and internal quotation marks omitted).  "An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are

sincerely held and in the individual's own scheme of things, religious." *Id.* (internal quotation marks omitted).

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532; *see also Trinity Lutheran Church*, 137 S. Ct. at 2019 ("The Free Exercise Clause protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." (alteration and internal quotation marks omitted)).  It is not a violation of the Free Exercise Clause, however, to enforce a generally applicable rule, policy, or statute that incidentally burdens a religious practice, as long as the government can "demonstrate a rational basis for [the] enforcement" of the rule, policy, or statute, and the burden is only an incidental effect, rather than the object, of the law.  *Fifth Ave. Presbyterian Church*, 293 F.3d at 574; *see also Emp't. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990) (explaining that enforcement of a neutral law of general applicability does not offend the Free Exercise Clause), *superseded by statute*, 42 U.S.C. § 2000bb et seq., *as recognized by Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015).  Thus, to state a free exercise claim under the aforementioned *Lukumi* standard, a plaintiff must establish that "the object of [the challenged] law is to infringe upon or restrict practices because of their religious motivation," or that the law's "purpose . . . is the suppression of religion or religious conduct."  *Lukumi*, 508 U.S. at 533.  Such a law is subject to strict scrutiny review, and it "will survive strict scrutiny only in rare cases."  *Id.* at 546.  A plaintiff alleging such a "religious gerrymandering" claim, "must be able to show the absence of a neutral, secular basis for the lines [the] government has drawn."  *Commack Self-Serv.*, 680 F.3d at 211 (emphasis and internal quotation marks omitted).

"To determine the object of a law, [the Court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. But, even if neutral on its face, a law may still run afoul of the Free Exercise Clause if it "targets religious conduct for distinctive treatment." *Id.* at 534 ("Facial neutrality is not determinative."). As the Supreme Court has cautioned, the Free Exercise Clause "forbids subtle departures from neutrality," *id.* (internal quotation marks omitted), and "covert suppression of particular religious beliefs," *Bowen v. Roy*, 476 U.S. 693, 703 (1986); *see also Lukumi*, 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.  The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."). In this regard, courts may find "guidance" in equal protection jurisprudence, which, among other things, requires consideration of "both direct and circumstantial evidence" regarding the goals of those who enacted the law in question. *Lukumi*, 508 U.S. at 540.  Indeed, "[r]elevant evidence [of the basis for a law] includes . . . the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.*  Another measure of a law's object is the temporal proximity between the perceived land use and the adoption of the regulation of that use.  *See Vision Church v. Village of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006) (suggesting that the "temporal proximity between [the plaintiff's] dispute with the [defendant] [v]illage over a special use permit and the enactment of the [o]rdinance" at issue was evidence of the purpose of the ordinance).  Based on these factors, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533.

As the Court has previously held, each of the Challenged Laws is facially neutral. *Tartikov I*, 915 F. Supp. 2d at 621; *see also id.* at 615 ("[T]he challenged ordinances are facially neutral with respect to religion (and race).").  Therefore, absent evidence of discriminatory intent, only intermediate scrutiny would apply.  *See Turner Broad.*, 512 U.S. at 662 (noting that "the intermediate level of scrutiny [is] applicable to content-neutral restrictions that impose an incidental burden on speech"); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006) ("Regulations that . . . are . . . content-neutral . . . trigger intermediate, rather than strict, scrutiny."); *Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) ("[A] less stringent test—applying 'intermediate scrutiny'—is applicable to regulations of expressive activity that are not based on content.").  Also, the Parties agree that to succeed on this claim Plaintiffs must show that their religious beliefs are sincerely held, that the Challenged Laws burden Plaintiffs' religious practice, and that the Challenged Laws were enacted to infringe upon or restrict religious practices because of their religious motivation.  (*See* Pls.' Mem. 23; Defs.' Mem. 45.)[32]

Plaintiffs have satisfied each of the elements necessary to mandate strict scrutiny review. First, the Court has already explained the underpinnings of Plaintiffs' religious beliefs and concluded that those beliefs are sincerely held.  Second, as the Court discussed in relation to Plaintiffs' RLUIPA substantial burden claim, the burden imposed by the Challenged Laws is substantial.  Finally, drawing "guidance" from the discussion regarding Plaintiffs' equal

---

[32] The Parties disagree on the extent to which the Challenged Laws must burden Plaintiffs' religious exercise.  Defendants argue that the burden must be "substantial."  (Defs.' Mem. 45.)  Plaintiffs, on the other hand, argue that any burden is sufficient.  (*See* Pls.' Proposed Conclusions of Law ("Pls.' COL") ¶ 16 (Dkt. No. 328).)  The Court need not resolve this dispute because, as discussed above, the Challenged Laws impose a substantial burden of Plaintiffs' religious exercise.

protection claim, *Lukumi*, 508 U.S. at 540, the Court holds that the laws were enacted to infringe upon religious practices because of their religious motivation.

The Court will briefly reiterate certain of its findings in response to specific arguments raised by Defendants.  Defendants argue that "laws regarding educational institutions first were enacted because the pre[-]2001 laws were lacking—they were 'scant'—[and] did not address the upsurge in development that was occurring in Pomona as noted in the [Village's] Master Plan." (Defs.' Mem. 46.)  The Court does not credit this argument because it overlooks the context in which Local Law No. 1 of 2001 was passed.  Defendants have not cited to any evidence indicating that the Board of Trustees was concerned with an "upsurge" in development.  Rather, the only evidence proffered on this issue shows that Local Law No. 1 of 2001 was passed in response to YSV's informal presentation regarding its desire to build a yeshiva on the Subject Property.  (*See* Pls.' Exs. 111, 130 (FPC memoranda regarding updates to the Village Code in light of YSV's proposal).)  There was certainly no "upsurge" regarding the development of schools within the Village because none exist, (*see* Joint Pretrial Order Stipulations of Fact ¶ 27 ("No Educational Institutions existed within the Village in 2001, in 2004, in 2007, or presently.")), and the only institution seeking to build a school within the Village at the time Local Law No. 1 of 2001 was passed was YSV, (*see* Trial Tr. 594).  Therefore, the purported increase in development does little to rebut the inference of discrimination that arises from the context in which the laws regarding educational institutions were first passed.

Defendants next argue that the other local laws were adopted to "address[] inconsistencies and case law requirements," (Defs.' Mem. 46), relying on Ulman's testimony, (*see* Ulman Aff. ¶¶ 48–55).  As explained above, the Court credits very little of Ulman's

testimony on these matters.  None of Ulman's proffered justifications detracts from the strength of Plaintiffs' case.

Finally, Defendants argue that the Wetlands Law was adopted "to protect wetlands not subject to Federal or State wetland regulations" and "had been under consideration by the Village for many years."  (Defs.' Mem. 46.)  The last piece of this argument is particularly harmful to Defendants' position.  The fact that the Wetlands Law was under consideration dating back to the 1990s, but was not adopted until after Defendants were aware of Tartikov's desired use for the Subject Property, is proof that the law was designed to single out Plaintiffs' religious practices.  Moreover, Beall's testimony that there was no meaningful regulatory gap between federal and state regulations went unrebutted at trial.  (*See* Beall Decl. ¶ 60.)  Accordingly, the reasons behind the Wetlands Law do not support a finding that it serves a neutral, secular purpose.

As Plaintiffs have carried their burden of showing that the Challenged Laws were passed to infringe on religious practices because of their religious motivation, the burden shifts to Defendants to show that the laws are "narrowly tailored" to "further a compelling state interest." *Pyke II*, 567 F.3d at 77.  Defendants have not done so, as discussed at length earlier. Accordingly, Plaintiffs have proven a violation of the Free Exercise Clause.

### 4.  Free Association

In addition to the freedom of exercise, the First Amendment protects the freedom of association.  *See Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971).[33]  The Supreme Court has

---

[33] Because the Parties agree that the corollary provision to the First Amendment's Free Association clause in the New York Constitution is interpreted consistently with the federal Constitution, the Court addresses both Plaintiffs' state and federal free association claims here. (*See* Pls.' COL ¶ 18; Defs.' Proposed Conclusions of Law ("Defs.' COL") 16 ¶ 5 (Dkt. No. 279).)  *See also Tartikov I*, 915 F. Supp. 2d at 622 n.21.

"identified two types of 'freedom of association' that merit constitutional protection: (i) 'choices to enter into and maintain certain intimate human relationships' and (ii) association 'for the purpose of engaging in those activities protected by the First Amendment.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12–13 (1st Cir. 2011) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984)); *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995–96 (2d Cir. 1997) (same); *AK Tournament Play, Inc. v. Town of Wallkill*, No. 09-CV-10579, 2011 WL 197216, at *2 (S.D.N.Y. Jan. 19, 2011) (same).

In evaluating Plaintiffs' free association claim, "[t]he first question . . . is whether and to what extent [D]efendants' actions burdened" Plaintiffs' right to associate for the purpose of engaging in those activities protected by the First Amendment, *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007), "such as speech, assembly, redress of grievances, and the exercise of religion," *see NYC C.L.A.S.H., Inc. v. City of New York*, 315 F. Supp. 2d 461, 472 (S.D.N.Y. 2004). "To be cognizable, the interference with associational rights must be direct and substantial or significant," rather than simply "make it more difficult" for Plaintiffs "to exercise their freedom of association." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (internal quotation marks omitted). Plaintiffs meet this burden here, as the Challenged Laws directly and substantially interfere with Plaintiffs' associational rights because the laws bar completely Tartikov's rabbinical college from the Village. Defendants disagree with this conclusion, arguing that any interference posed by the Challenged Laws is insignificant because "[t]he laws do not prohibit Tartikov from building classrooms and study halls for . . . students to associate with teachers and each other." (Defs.' Mem. 52.) However, Defendants' argument is factually incorrect because the Village Code requires that Tartikov be accredited before it may obtain a special use permit, which cannot happen under the challenged laws. Defendants offer

no rebuttal to the challenge posed by the accreditation requirement.  Setting aside this issue, even

if Tartikov could be accredited, the prohibition on student family housing likewise represents a

substantial burden for all of the reasons discussed above—Plaintiffs sincerely believe that a

Torah community serves as a necessary part of their rabbinical college and religious exercise.

The Challenged Laws present insurmountable obstacles to Plaintiffs achieving their desired

community.

"Having found a cognizable burden," the second question is "the appropriate level of

scrutiny to employ in evaluating [D]efendants' actions."  *Tabbaa*, 509 F.3d at 102.  "[A]n

infringement on associational rights is not unconstitutional so long as it serves compelling state

interests, unrelated to the suppression of ideas, that cannot be achieved through means

significantly less restrictive of associational freedoms."  *Id.* (alteration and internal quotation

marks omitted).  As already discussed at length, Defendants have not proffered a compelling

state interest to justify the adoption of the Challenged Laws.  Accordingly, Plaintiffs' have

established a Free Association claim.

### 5.  RLUIPA Exclusions and Limits

The Exclusions and Limits provision of RLUIPA provides that "[n]o government shall

impose or implement a land use regulation that . . . (A) totally excludes religious assemblies

from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures

within a jurisdiction."  42 U.S.C. § 2000cc(b)(3).  Plaintiffs assert claims under both the total

exclusion and the unreasonable limitations prongs.

The Parties disagree on the appropriate frame of reference for the Court to utilize in

determining whether the Challenged Laws totally exclude religious assemblies from the Village.

Defendants argue that Plaintiffs must "prove that the [Challenged] Laws totally exclude religious

95

assemblies from the entire Village." (Defs.' Mem. 49.)  Plaintiffs, on the other hand, argue that

the appropriate frame of reference is *Plaintiffs'* total exclusion from the Village. (*See* "Pls.'

COL" ¶ 100 ("To prove a violation of RLUIPA's [t]otal [e]xclusion provision, the Plaintiffs

must produce prima facie evidence demonstrating that the Challenged Laws completely exclude

the Plaintiffs from the Village.").)  Plaintiffs' interpretation of the total exclusion provision finds

no support in the law.[34]  To succeed on a total exclusion claim, Plaintiffs must demonstrate that

the Village has totally excluded *all* religious assemblies from the Village. *See Vision Church*,

468 F.3d at 989–90 (holding that the total exclusion provision applies "only to the complete and

total exclusion of activity or expression" and that the defendant did not "completely or totally

exclude[] religious assemblies from its jurisdiction"); *Miles v. Lansdowne Borough*, No. 11-CV-

1913, 2012 WL 5960874, at *9 (E.D. Pa. Nov. 29, 2012) ("There is no evidence that [the

defendant] imposed or implemented a land use regulation that *totally excludes religious*

*assemblies from its borders . . . .*" (emphasis added)); *Adhi Parasakthi Charitable, Med., Educ.,*

*and Cultural Soc'y v. Township of West Pikeland*, 721 F. Supp. 2d 361, 386–87 (E.D. Pa. 2010)

(noting that the plaintiff's religious use was not totally excluded and that the defendant's zoning

ordinance "d[id] not operate as a *total exclusion upon religious land use*" (emphasis added));

*House Where Jesus Shines, Inc. v. City of Bellmead*, No. 08-CV-117, 2009 WL 10669584, at *5

(W.D. Tex. Sept. 11, 2009) (noting that under the total exclusion clause a defendant is

"prohibited from imposing or implementing a land use regulation that completely excludes

religious assemblies from [its] jurisdiction").[35]  While Plaintiffs' proposed religious use is

---

[34] To the extent the Court indicated otherwise in *Tartikov I* or *II*, it has reconsidered its earlier position.

[35] Plaintiffs cite *Vision Church* as supportive of their position, including the following parenthetical: "(classifying *Schad* as addressing an ordinance [that] completely prohibit[ed] the

excluded from the Village, there is no evidence that other religious institutions are similarly excluded. The evidence actually indicates the opposite—there currently are "three houses of worship" in the Village. (*See* Trial Tr. 760.) Accordingly, Plaintiffs have not established a violation of RLUIPA's total exclusion provision.

The Parties likewise disagree over the appropriate frame of reference with respect to Plaintiffs' unreasonable limitations claim. (*See* Pls.' COL ¶ 106 ("To prove a violation of RLUIPA's [u]nreasonable [l]imitations provision, the Plaintiffs must produce prima facie evidence demonstrating that the Challenged Laws have the effect of depriving Plaintiffs or any rabbinical college of reasonable opportunities to practice their religion, including the use and construction of structures, with the Village."); Defs.' Mem. 49 ("To prove the RLUIPA unreasonable limitations claim, . . . Plaintiffs must show that the [Challenged] Laws unreasonably limit religious assemblies, institutions and structures across the Village.").) "From the plain language of the statute it is clear that the purpose of this subsection is not to examine the restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate." *Adhi Parasakthi*, 721 F. Supp. 2d at 387; *accord Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*, 613 F.3d 1229, 1238 (10th Cir. 2010) (noting that district court's jury instruction properly required the plaintiff to establish that the county's "regulation, as applied or implemented, ha[d] the effect of depriving both [the plaintiff] and other religious institutions or assemblies of reasonable opportunities to practice their

---

expressive conduct at issue. . . . The same is true of section 2(b)(3)(A) of RLUIPA.)." (Pls.' COL ¶ 102 (alterations in original) (internal quotation marks omitted).) However, this quotation is inaccurate. Plaintiffs have misattributed language quoted by the court in a parenthetical to the court itself. *See Vision Church*, 468 F.3d at 989.

religion, including the use and construction of structures, within [the defendant] [c]ounty"
(internal quotation marks omitted)).

The Court is unaware of any case, and Plaintiffs do not cite to one, holding that the Court
should consider only the plaintiff's use or the use of similarly situated entities in determining
whether the unreasonable limitation clause has been violated.  (*See* Pls.' COL ¶ 106.)  In *Adhi
Parasakthi*, the court mentioned the plaintiff's proposed use for a parcel of land, but ultimately
concluded that the plaintiff did not demonstrate that the defendant "broadly limit[ed] where
religious entities c[ould] locate."  721 F. Supp. 2d at 387.  In *Vision Church*, the court focused on
the ability of churches to locate within the defendant village, but ultimately concluded that
churches were not unreasonably limited and therefore did not consider whether other religious
institutions were unreasonably limited.  468 F.3d at 990.  Given the lack of directly applicable
precedent, the Court will rely on the plain meaning of RLUIPA's text.  The unreasonable
limitation clause prohibits a government from "unreasonably limit[ing] religious assemblies,
institutions, or structures within [its] jurisdiction."  42 U.S.C. § 2000cc(b)(3)(B).  Nothing in this
provision suggests that the Court should constrain its focus to Plaintiffs' proposed use and the
uses of similarly situated entities.  The question, then, is whether the Village's zoning ordinance
unreasonably limits religious institutions within its jurisdiction.

No evidence was offered during trial regarding the limitations placed generally on
religious assemblies, institutions, or structures.  Plaintiffs' proposed rabbinical college is
excluded, but only because of its unique nature and the way that the Challenged Laws were
crafted, i.e., in a way tailored to prevent Plaintiffs' use.  Indeed, this has been a theme of
Plaintiffs' case.  Houses of worship are designated as special permit uses, (*see* Village Code
§ 130-10(G)), but Plaintiffs have offered no evidence that this places any real limitation on their

location within the Village.  And, as already noted, there are three houses of worship within the

Village already.  (*See* Trial Tr. 760.)  Plaintiffs also are mistaken about the evidence relevant to

an unreasonable limitations claim.  They argue that the Wetlands Law is "hardly . . . reasonable"

because it does not apply to "98.4% of the parcels in Pomona," (*see* Pls.' Mem. 20 (internal

quotation marks omitted)), but this information is irrelevant.  If the Wetlands Law does not apply

to 98.4% of parcels, the location of religious institutions on those parcels is not unreasonably

limited.  Plaintiffs offer only evidence about the limitations placed on the Subject Property when

the relevant question is the limitations placed on all religious uses within the Village's

jurisdiction.  *See* 42 U.S.C. § 2000cc(b)(3)(B) (barring governments from unreasonably limiting

religious structures "*within a jurisdiction*" (emphasis added)).  Essentially, Plaintiffs brief this

claim as if it should be treated similar to a substantial burden claim.  That is not the case.  *See*

*Adhi Parasakthi*, 721 F. Supp. 2d at 387 (noting that the unreasonable limitation provision was

designed "to prevent municipalities from broadly limiting where religious entities can locate").

The unreasonable limitations provision does not mandate that the Village have a reasonable

zoning ordinance; it requires only that the zoning ordinance in place not unreasonably limit

religious uses.  As Plaintiffs have failed to present evidence on the way in which religious uses

were otherwise limited by the Village's zoning ordinance, they have failed to establish an

unreasonable limitations claim.

### 6.  RLUIPA Nondiscrimination

RLUIPA's nondiscrimination provision provides that "[n]o government shall impose or

implement a land use regulation that discriminates against any assembly or institution on the

basis of religion or religious denomination."  42 U.S.C. § 2000cc(b)(2).  Defendants concede that

"Plaintiffs must provide the same proof required under an Equal Protection claim" to succeed on

an RLUIPA nondiscrimination claim.  (*See* Defs.' COL 12 ¶ 1.)  Plaintiffs bear the "initial

burden of establishing a prima facie claim, after which [Defendants] bear[] the burden of

persuasion on the elements of the nondiscrimination claim."  *See Chabad Lubavitch*, 768 F.3d at

198.  Because Plaintiffs have established an equal protection violation, they also have established

a violation of RLUIPA's nondiscrimination provision.

### 7.  RLUIPA Equal Terms

The equal terms provision of RLUIPA provides that "[n]o government shall impose or

implement a land use regulation in a manner that treats a religious assembly or institution on less

than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).  This

"statutory command 'requires equal treatment of secular and religious assemblies and allows

courts to determine whether a particular system of classifications adopted by a city *subtly or*

*covertly departs from requirements of neutrality and general applicability.*'"  *Primera Iglesia*

*Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1307 (11th Cir. 2006)

(alterations and internal quotation marks omitted).  As with the substantial burden component of

RLUIPA, the meaning of the equal terms section is far from clear, *see Guru Nanak Sikh Soc'y of*

*Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140, 1154 (E.D. Cal. 2003) (asserting that this

section "is even less clear" than the "substantial burden" section), *aff'd*, 456 F.3d 978 (9th Cir.

2006), but courts have determined that the "substantial burden and nondiscrimination provisions

are operatively independent of one another," *CLUB*, 342 F.3d at 762.  Moreover, some courts

have concluded that the nondiscrimination provisions of RLUIPA, which include the equal terms

provision, "codify existing Equal Protection Clause and Free Exercise Clause jurisprudence."

*Petra Presbyterian Church v. Village of Northbrook*, No. 03-CV-1936, 2003 WL 22048089, at

*11 (N.D. Ill. Aug. 29, 2003), *adopted by* 2004 WL 442630 (N.D. Ill. March 8, 2004); *accord*

*Guru Nanak*, 326 F. Supp. 2d at 1155; *Freedom Baptist Church of Del. Cty. v. Twp. of Middletown*, 204 F. Supp. 2d 857, 869 (E.D. Pa. 2002).

An equal terms claim has four elements: "(1) the plaintiff must be a religious assembly or institution; (2) subject to a land use regulation, that (3) treats the religious assembly on less than equal terms, with (4) a nonreligious assembly or institution."  *See Primera*, 450 F.3d at 1307; *see also Chabad Lubavitch*, 768 F.3d at 197 (noting that a plaintiff must produce prima facie evidence of "unequal treatment" (emphasis and internal quotation marks omitted)).  The Eleventh Circuit has "discern[ed]" three kinds of equal terms violations:

> (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless 'gerrymandered' to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious[,] assemblies or institutions.

*Primera*, 450 F.3d at 1308; *accord Vision Church*, 468 F.3d at 1003 (following same analysis); *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1361 (N.D. Ga. 2012) (same); *Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978, 989 (N.D. Ill. 2008) (same).  Plaintiffs assert that the first ("*Primera* Type 1 Cases") and second ("*Primera* Type 2 Cases") categories are applicable here.  (*See* Pls.' Mem. 54–55.)

In *Primera* Type 1 Cases, the Court is concerned with "facial discrimination."  *Primera*, 450 F.3d at 1308.  Plaintiffs assert that the Challenged Laws facially differentiate between its proposed use and the use of other nonreligious institutions, such as libraries, museums, and recreational facilities, but the Court is unpersuaded.  Plaintiffs believe that Tartikov is treated differently than museums and libraries because Tartikov is subject to two area requirements while libraries and museums are not subject to any specific building coverage requirements. (*See* Pls.' Mem. 55 ("'Libraries' and 'Museums' are not subject to *any specific building*

*coverage or floor area limitation . . . .*" (emphasis added)).)  However, they are only partially correct.  The Village Code limits maximum building coverage for educational institutions to 10% of the net lot area of a property and maximum total floor area to 20% of the net lot area.  *See* Village Code § 130-10(F)(2)(a)–(b).  Museums and libraries are not subject to any explicit floor coverage limitation, (*see* Weinstein Decl. ¶ 81), but are subject to a maximum lot coverage restriction, *see* Village Code § 130-12(I) ("In order to ensure the maximum coverage of a lot with vegetation, the prevention of over development of lots, to minimize the adverse visual impacts and to minimize negative impacts of stormwater runoff, there is hereby established a maximum lot coverage of 15%.").  Plaintiffs refer to this limitation as an "impervious surface coverage limitation," (Pls.'s Mem. 55), but they offer no support for this description.  Indeed, their own expert admits that museums and libraries are "subject to the 15% *lot coverage limitation* in Village Code § 130-12 I."  (Weinstein Decl. ¶¶ 77–78 (emphasis added).)

Plaintiffs also assert that Tartikov is treated differently than museums and libraries because Tartikov must obtain a special use permit to operate within the Village while those other uses are permitted as of right, citing *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163 (9th Cir. 2011).  (*See* Pls.' Mem. 56.)  In a parenthetical, Plaintiffs state that *Centro* stands for the proposition that the "requirement of having to obtain a conditional use permit, while other nonreligious assembly were permitted by right, was by itself an Equal Terms violation."  (*Id.*)  This is not how the Court interprets *Centro*.  In *Centro*, the Ninth Circuit held that the defendant city's code violated the equal terms provision because it required *all* "religious assemblies" to obtain a conditional use permit, but did not require "similarly situated secular membership assemblies to do the same."  651 F.3d at 1175.

102

In the Village, *all* educational institutions are subject to the special permit requirement and building and floor area restrictions and *all* libraries and museums are subject to the lot coverage limitation.  *See* Village Code §§ 130(10)(F), 130(12).  It does not matter whether those institutions are religious or secular.  Plaintiffs mistakenly believe that *Primera* Type 1 Cases are concerned with the limitations placed on the Subject Property in comparison to limitations placed on other uses within the Village.  Their belief is incorrect because the key question is whether the Village's zoning ordinance "*facially* differentiates between *religious* and *nonreligious* assemblies or institutions."  *Primera*, 450 F.3d at 1308 (emphases added).  There is no proof that the Village's zoning ordinances do that.  All Plaintiffs have established is that the Village Code treats educational institutions differently than libraries and museums.  Accordingly, Plaintiffs have not established a violation of the equal terms provision on this ground.

Plaintiffs argue next that this is a *Primera* Type 2 Case because the Village's zoning ordinance is "'gerrymandered' to place a burden solely on religious, as opposed to secular, assemblies or institutions."  (Pls.' Mem. 57.)  To succeed on this type of claim, Plaintiffs must "show that the challenged zoning regulation separates permissible from impermissible assemblies or institutions in a way that burdens 'almost only' religious uses."  *Primera*, 450 F.3d at 1309.[36]  Plaintiffs contend that the 20% restriction on student housing space treats religious

---

[36] In *Tartikov II*, the Court denied summary judgment on this claim because Plaintiffs had proffered sufficient evidence that Defendants had "engaged in a religious gerrymander," focusing on the fact that the evidence suggested that "Defendants used the Challenged Laws to uniquely restrict the ability of Plaintiffs to build their rabbinical college in the Village."  138 F. Supp. 3d at 442.  Upon further reflection, this may not have been the appropriate standard.  The Court relied on evidence that Defendants discriminated against Plaintiffs in adopting the Challenged Laws, but *Primera* suggests that the focus should be on whether the challenged zoning ordinance "burdens almost only religious institutions," 450 F.3d at 1309 (internal quotation marks omitted), placing the focus on the effect of the ordinance rather than on whether the ordinance was adopted to discriminate against the plaintiff.  This distinction makes sense.  If discrimination against the plaintiff is sufficient to establish an equal terms violation, RLUIPA's

educational institutions worse than nonreligious ones because the "vast majority of colleges and universities that offer 100% housing for their students are religious in nature."  (Pls.' Mem. 58.)  *See also* Village Code § 130-10(F)(12) ("A dormitory building shall not occupy more than 20% of the total square footage of all buildings on the lot.").  What the vast majority of religious colleges do, however, is not evidence that the 20% restriction places a limitation on that practice.  As far as the Court knows, those colleges could both offer housing to 100% of their students and comply with the 20% housing space restriction.  In any event, this requirement applies to religious and secular educational institutions.  Accordingly, Plaintiffs have not established an equal terms violation.

### 8.  Fair Housing Act

The FHA "prohibit[s] governmental entities from implementing or enforcing housing policies in a discriminatory manner."  *Tsombanidis*, 352 F.3d at 573.  The Act itself make it unlawful to "otherwise make unavailable . . . a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).[37]  "The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions."  *LeBlanc-Sternberg*, 67 F.3d at 424.

---

nondiscrimination clause could be rendered superfluous, violating the maxim that effect be given to all of a statute's provisions.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (noting that "one of the most basic interpretive canons" of statutory construction is that "a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant" (alteration and internal quotation marks omitted)).

[37] It is undisputed that Tartikov's student family housing qualifies as a dwelling under the FHA.  *See* 42 U.S.C. § 3602(b) (defining "[d]welling" to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families").

A plaintiff can establish a violation of the FHA by proving discrimination in the form of: (1) "disparate treatment or intentional discrimination" or (2) "disparate impact of a law." *Human Res. Research & Mgmt. Grp., Inc. v. County of Suffolk*, 687 F. Supp. 2d 237, 254 (E.D.N.Y. 2010); *see also Tex. Dep't of Housing and Cmty. Affairs v. Inclusive Cmty. Project*, 135 S. Ct. 2507, 2525 (2015) ("The Court holds that disparate-impact claims are cognizable under the Fair Housing Act . . . "); *LeBlanc-Sternberg*, 67 F.3d at 425 ("An FHA violation may be established on a theory of disparate impact or one of disparate treatment.").  "To establish a prime facie case of intentional discrimination under the FHA, plaintiffs must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Human Res. Research*, 687 F. Supp. 2d at 254 (internal quotation marks omitted).  Relevant considerations for "discerning a racially discriminatory intent include the historical background of the decision particularly if it reveals a series of official actions taken for invidious purposes, departures from the normal procedural sequence, substantive departures, and the legislative or administrative history especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Mhany Mgmt.*, 819 F.3d at 606 (alterations, citations, and internal quotation marks omitted).

"After the plaintiff has established a prima facie case, the burden then must shift to the defendant to articulate some legitimate, nondiscriminatory reason for the action."  *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).  If the defendant proffers such a reason, the burden shifts back to the plaintiff to show that he or she has "been the victim of intentional discrimination, either directly by persuading the court that a discriminatory reason more likely motivated the defendant or indirectly by showing that the defendant's proffered explanation is

unworthy of credence." *Id.* (alterations and internal quotation marks omitted); *see also Mhany Mgmt.*, 819 F.3d at 613 ("If a defendant meets its burden of production, the sole remaining issue is discrimination *vel non*. The plaintiffs must prove that the defendants intentionally discriminated against them on a prohibited ground." (alteration and internal quotation marks omitted)).

The considerations relevant to whether Defendants acted with discriminatory intent are the same as those the Court has already considered in connection with Plaintiffs' equal protection claim. The Court need not rehash them here. Plaintiffs have established that discriminatory animus was a significant factor in the passage of the Challenged Laws. Focusing on the housing aspect of the Challenged Laws specifically, Defendants first adopted the laws prohibiting student family housing in direct response to Ramapo's decision to enact the ASHL, crafting Local Law No. 5 of 2004 to prohibit the student family housing contemplated by the ASHL. Marshall was particularly displeased with the ASHL, stating that Ramapo officials passed the law to cater to the Orthodox Jewish vote. (*See* Trial Tr. 619; Pls.' Ex. 109, at POM0013281.) Then, as more information became available about Tartikov's intended use for the Subject Property, Defendants supported and passed additional laws placing even more hurdles in front of Plaintiffs.[38]

---

[38] The allocation of burdens for a disparate impact claim are slightly different than those applicable to disparate treatment claims. First, a plaintiff "must . . . establish a prima facie case by showing, (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Mgmt.*, 819 F.3d at 617 (internal quotation marks omitted). The defendant may rebut the prima facie case by "proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the . . . defendant." *Id.* (internal quotation marks omitted). "[I]f the defendant meets its burden, the burden of proof shifts back to the *plaintiff* to show that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* (internal quotation marks omitted). Because Plaintiffs have established a disparate treatment claim, the Court declines to consider whether the same evidence also is sufficient to establish a disparate impact claim.

Because Plaintiffs have carried their initial burden, Defendants must come forward with "legitimate, nondiscriminatory reason[s] for the[ir] action[s]." *Harris*, 183 F.3d at 1051. None of the reasons Defendants proffer for adopting the Challenged Laws is legitimate. As discussed above, the Court credits very little of Ulman's testimony about what motivated the adoption of the laws. Plaintiffs have proven that their intended purpose was to thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews. Accordingly, Plaintiffs have established a violation of 42 U.S.C. § 3604.

The FHA also makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" by the FHA. 42 U.S.C. § 3617. The implementing regulations interpret § 3617 to cover "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." 24 C.F.R. § 100.400(c)(2). To establish a § 3617 claim, Plaintiffs "must demonstrate (1) that they aided or encouraged members of a protected class in the exercise or enjoyment of their FHA rights, and (2) that as a result of their actions, they suffered coercion, intimidation, threats, interference or retaliation." *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 565 (E.D.N.Y. 2007); *see also United States v. Weisz*, 914 F. Supp. 1050, 1054 (S.D.N.Y. 1996) ("[T]o bring a claim within § 3617, a plaintiff must allege conduct on the part of a defendant which in some way or other implicates the concerns expressed by Congress in the FHA. If it were otherwise, the FHA would federalize any dispute involving residences and people who live in them."). Plaintiffs' proof is sufficient to establish a violation of § 3617 because Defendants have piled on layers of regulation to interfere

107

with Plaintiffs' use of the Subject Property.  Indeed, Defendants' principal purpose in enacting

the Challenged Laws was to prohibit Plaintiffs from building dwellings on the property.

### 9.  New York Constitutional Right to Freedom of Worship

The New York State Constitution provides that "[t]he free exercise and enjoyment of

religious profession and worship, without discrimination or preference, shall forever be allowed

in this state to all humankind . . . ."  N.Y. Const. Art I, § 3.  The New York Court of Appeals has

held, in analyzing a state free exercise claim, that "when the State imposes an incidental burden

on the right to free exercise of religion," the courts are to consider the "interest advanced by the

legislation that imposes the burden," and then "the respective interests must be balanced to

determine whether the incidental burdening is justified."  *Catholic Charities of Diocese of*

*Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006) (alteration and internal quotation marks

omitted); *see also Fortress Bible II*, 694 F.3d at 221 n.9 (noting that New York state courts

"employ a balancing test to determine if the interference with religious exercise was

unreasonable").  As discussed above, the burden imposed on Plaintiffs' religious exercise is

substantial.  Therefore, Defendants interests must be equally substantial.  Defendants fall short of

the mark because their stated interests and justifications for the Challenged Laws do not hold up

to scrutiny.  Moreover, Defendants can achieve many of their goals through other avenues, such

as imposing size restrictions on the issuance of a special permit.  Accordingly, balancing the

burden imposed on Plaintiffs' religious exercise against the interests advanced by the Challenged

Laws, the Court concludes that Defendants have violated the New York State Constitution.

### 10.  *Berenson*

Plaintiffs contend that Defendants' zoning ordinance must be set aside because it violates

the standard established by the New York Court of Appeals in *Berenson v. Town of New Castle*,

341 N.E.2d 236 (N.Y. 1975).  In *Berenson*, the plaintiffs filed a declaratory judgment action

attacking the "validity of the [z]oning [o]rdinance of the Town of New Castle in its entirety on

the ground that the ordinance exclude[d] multifamily housing from the list of permitted uses."

*Id.* at 238.  The court established a two-part test for determining whether an ordinance

"excluding multifamily housing as a permitted use" is valid.  *Id.* at 241–42.  "The first branch of

the test . . . is simply whether the board has provided a properly balanced and well ordered plan

for the community."  *Id.* at 242.  The second requirement is that, "in enacting a zoning

ordinance," the town or village board must give "consideration . . . to regional needs and

requirements."  *Id.*  The court noted that "a town need not permit a use solely for the sake of the

people of the region if regional needs are presently provided for in an adequate manner."  *Id.* at

242–43.

     In *Tartikov II*, the Court stated that there are two ways to prove a *Berenson* violation: (1)

by showing that the town's or village's zoning ordinance was enacted with an exclusionary

purpose, or (2) that it ignored local or regional housing needs.  *See* 138 F. Supp. 3d at 444–45.

The Court concluded that summary judgment was inappropriate on this claim because, although

Plaintiffs failed to demonstrate that the Challenged Laws were enacted without giving proper

regard to local and regional housing needs, there was "sufficient evidence for a reasonable jury

to conclude that the Village enacted the Challenged Laws for an improper exclusionary

purpose."  *Id.* at 445.  In reaching this conclusion, the Court focused on the Challenged Laws

rather than the Village's Zoning Code as a whole.  But, the issue before the Court in *Berenson*

was the validity of "the [z]oning [o]rdinance of the Town of New Castle" and the town's

decision to exclude "multifamily residential housing from the list of permitted uses."  *Berenson*,

341 N.E.2d at 238.  While no Party directly addresses the Court's approach in their papers, the

Court finds it significant that Plaintiffs' papers focus on the Village's Zoning Code rather than the Challenged Laws themselves in addressing their *Berenson* claim.  (*See* Pls.' Mem. 59 ("With respect to the second *Berenson* prong, the appropriate inquiry is whether the *zoning ordinance* on its face allows the construction of sufficient housing to meet the town's share of the region's housing needs.  Here, Plaintiffs established that Pomona's *zoning scheme* is impermissible pursuant to New York law because its exclusionary scheme was enacted for an improper, discriminatory purpose and, consequently, is invalid." (emphases added) (internal quotation marks omitted)).)  Certain provisions of the Village's zoning ordinance were enacted for a discriminatory purpose, i.e., the Challenged Laws, but no evidence was introduced proving that the zoning scheme itself was enacted for an improper purpose.  Nor is there any evidence that the Board of Trustees failed to consider regional housing needs in adopting the Village's zoning ordinance.  Indeed, Ulman testified that the Village has always believed that it is in "compliance with the regional requirements of housing."  (Trial Tr. 922.)  Therefore, Plaintiffs have not established a *Berenson* violation.

## C.  The Appropriate Remedy

Plaintiffs' seek an order enjoining the enforcement of the Challenged Laws such that Tartikov will be permitted to "apply for a special permit and site plan not subject to the challenged provisions."  (Pls.' Mem. 60.)  The Court finds that this is an appropriate and adequate remedy.  *Cf. United States v. City of New York*, 717 F.3d 72, 95(2d Cir. 2013) ("Once liability for racial discrimination has been established, a district court has the duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future.")  Plaintiffs shall submit a proposed judgment consistent with the Court's rulings within 30 days from the date of this Opinion.  Within 15 days of Plaintiffs'

submission, Defendants may file a letter specifying its position on the proposed judgment. The Court will review the submissions and enter the judgment forthwith.

Plaintiffs also ask that the Court appoint a federal monitor to oversee all future proceedings. "This Court has broad discretion to appoint a compliance monitor as a form of equitable remedy." *See U.S. Commodity Futures Trading Comm'n v. Deutsch Bank AG*, 16-CV-6544, 2016 WL 6136664, at *2 (S.D.N.Y. Oct. 20, 2016); *see also United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994) ("The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established."). The Court holds that the appointment of a monitor is not warranted in this case. The only issue before the Court is whether Tartikov's special use permit should be subject to the Challenged Laws. The Court has held that Defendants cannot enforce the Challenged Laws against Tartikov. The onus is now on Plaintiffs to submit an application to the appropriate body. The Court finds it inappropriate to insert a federal monitor into the permit application process. "[F]ederal courts should not become zoning boards of appeal." *Harlen Assocs.*, 273 F.3d at 505. "State courts are better equipped in this arena" and "principles of federalism" dictate that the Court should refrain for interfering unnecessarily in the application process. *Id.* (internal quotation marks omitted). Accordingly, Plaintiffs' request is denied.

## III. Conclusion

For the foregoing reasons, the Court holds that Plaintiffs have established violations of

the First and Fourteenth Amendments of the United States Constitution, certain provisions of

RLUIPA, the FHA, and §§ 3, 9, and 11 of the New York State Constitution. Plaintiffs are

directed to submit a proposed judgment within 30 days of the date of this Opinion that is

consistent with the Court's ruling. Defendants have 15 days to respond.

SO ORDERED.

Dated: December 7, 2017
       White Plains, New York

KENNETH M. KARAS
United States District Judge

112