170523tartikovT1          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CONGREGATION RABINNICAL COLLEGE
    of TARTIKOV, INC. et al.,
4
                    Plaintiffs,
5
                    v.                        07 Civ. 6304 (KMK)
6
    VILLAGE of POMONA, NY, et al.,
7
                    Defendants.
8
    ------------------------------x          White Plains Courthouse
9                                            White Plains, N.Y.
                                             May 23, 2017
10                                           9:40 a.m.

11  Before:

12              THE HONORABLE KENNETH M. KARAS,

13                                                    District Judge

14                            APPEARANCES

15  JOHN STEPANOVICH
    ROMAN STORZER
16  DONNA SOBEL
    TERRY RICE
17  PAUL SAVAD
            Attorneys for Plaintiffs
18
    JOHN PELOSO
19  ANDREA DONOVAN NAPP
    KARLA CHAFFEE
20          Attorneys for Defendants

21

22

23

24

25

170523tartikovT1          Trial

1         (Case called)

2         THE COURT:  Any housekeeping issues?

3         MR. STEPANOVICH:  No, your Honor, not on behalf of the

4    plaintiffs.

5         MS. NAPP:  None for defendants, your Honor.

6         THE COURT:  Okay.  I guess we'll have Mr. Marshall

7    take the stand.

8         MR. STEPANOVICH:  Yes.  If we would just ask the

9    witnesses be separated.  I think there's one witness who is not

10   under your control, the defendants' control.  That would be

11   Mr. Lamer.

12        THE COURT:  Okay.  Separated meaning?

13        MR. STEPANOVICH:  Meaning excluded.

14        THE COURT:  From the courtroom?

15        MR. STEPANOVICH:  Yes.

16        THE COURT:  Yes.

17        MR. LAMER:  I'll be outside.

18        THE COURT:  It's not personal.  It's what happens with

19   witnesses.

20        MR. LAMER:  I've been practicing 30 years.  I've

21   thrown out better people than me.

22        THE COURT:  Come on up, Mr. Marshall.

23        Some people take that personally and get really mad.

24        I'll remind you you're under oath, sir.

25        THE WITNESS:  Okay.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Marshall - direct

1          MR. STEPANOVICH:  Thank you, your Honor.

2     HERBERT MARSHALL, resumed.

3    DIRECT EXAMINATION CONTINUED

4    BY MR. STEPANOVICH:

5    Q.  Mr. Marshall, good morning.

6    A.  Good morning.

7    Q.  And I was informed yesterday maybe you might have had a

8    hard time hearing a few of my questions and I apologize.  And

9    if you can't hear me or you need me to repeat a question,

10   please let me know so that I can make sure --

11   A.  You're coming more clearly now.

12   Q.  I'm a little closer to the microphone.  Thank you.

13          Mr. Marshall, I just want to wrap up a few questions

14   regarding Exhibit 137 that you had in front of you.  Do you

15   have it?

16   A.  Yes, I do.

17   Q.  If you can turn to page 56, please.  Reading line 18:  You

18   know in America we have a sense of community.  That's our face,

19   we're going to be another Kiryas Joel.  That's why we are

20   emotional.  You can get into the environmental impact and all

21   of that.  That's all I have to say.

22          Did I read that accurately?

23   A.  Yes, you did.

24   Q.  And your response:  Ladies and gentlemen, there isn't

25   anyone sitting up that doesn't know how you feel.

170523tartikovT1              Marshall - direct

1         Did I read that accurately?

2    A.   Yes.

3    Q.   Turn now, Mr. Marshall, if you will, to page 57.

4    A.   Okay.

5    Q.   And I'm going to begin at line 13.

6         MS. NAPP:  Your Honor, I would object to this line of

7    questioning.  We spent two hours watching the video yesterday,

8    and it's cumulative at best to have Mr. Marshall read the same

9    dialogue from the transcript itself.

10        MR. STEPANOVICH:  I understand that, your Honor.  I'm

11   going to limit it just to a few questions, but the video was

12   not transcribed, and I understand the transcript can be used as

13   an aid for the Court.

14        THE COURT:  Is there a difference between what's on

15   the video and what's in the transcript?

16        MR. STEPANOVICH:  No, there's not.

17        THE COURT:  I'm certainly giving you some leeway.  If

18   there are things you want to ask him about his reaction to what

19   was said or what he understood to certain things.  And if you

20   want to repeat a couple of them for dramatic effect, that's

21   fine, too, but I think counsel's point is a fair one.

22        I'll give you some leeway on this.

23        MR. STEPANOVICH:  I just have two more with

24   Mr. Marshall.

25        THE COURT:  That's fine.

170523tartikovT1              Marshall - direct

1        MS. NAPP:  Thank you, your Honor.

2   Q.  Page 57, Mr. Marshall, line 13.

3   A.  Okay.

4   Q.  It's frustrating, like I said, I've been involved since day

5   one with everything.  It sounds to me like they are on our

6   side.  They're not against us.  I think there's some

7   misinterpretation going on around here.  I think the changes

8   that they are going to try to make are positive things, not a

9   negative thing, with all the negative information that usually

10  happens in a situation like this, everybody just be cool.  I

11  really think that they have our best interests in mind in my

12  honest opinion.

13        Continuing, from the floor unidentified:  I think a

14  lot of us would have been happier if they had -- if they'd said

15  that right off the bat.

16        Continuing, line four from the floor, Greg Briem:  The

17  frustration that we have is that you knew of the press that had

18  come out, whether it be true or not.  You knew that it was out

19  there and you knew we were very, very upset.  I think that

20  would have helped us if, at the beginning of this meeting, you

21  had said this is what is going on, we know that you've read

22  this, we are here to protect your interest, and the amendments

23  to this law, this project, this alleged project with the

24  alleged attorney who is allegedly sitting here produces it,

25  that these amends will defend us.  If you had said that in the

170523tartikovT1          Marshall - direct

1  beginning, I don't think as many people would be as upset as

2  they are because we don't know where you stand.

3          Did I read that accurately?

4  A.  Yes, you did.

5  Q.  And Mr. Marshall, turning now to line 19, Mayor Marshall:

6  Ladies and gentlemen, let me say something.  We sitting at this

7  table have limitations that are placed on us as to what we can

8  say and what we can't say because our attorney tells us what we

9  can say and what we can't say.  I can't say what I feel.  I

10  can't.  If I agree with you, I don't agree with you, I don't

11  have that luxury of being able to say that here.  All that I

12  can say is that every member of this board works very, very

13  hard to do what is best for this community.  You have your

14  issues.  Don't assume because no one has gotten up here and

15  said, wow, I agree with you, oh, boy, don't assume that because

16  we didn't do that, we don't agree.  We may or may not, but

17  please give us the benefit of the doubt.  We have all been

18  doing this.  We work very hard at what we do.  We try and do

19  what is best for the community, but it's our home.  There are

20  limitations under the law that restrict what we can say and

21  when we can say it.

22          Did I read that accurately, Mr. Marshall?

23  A.  Yes, you did.

24          MR. STEPANOVICH:  That's all I have, your Honor.

25  Thank you, again, for the indulgence.

170523tartikovT1              Marshall - direct

1            THE COURT:  Okay.

2    Q.  Mr. Marshall, I'm going to turn you back now to around

3    1997, I think you were on the board at that time.

4    A.  I was.

5    Q.  Maybe you were -- were you the deputy mayor?

6    A.  I was deputy mayor.

7    Q.  Okay.  And at that time in 1997, did the board have any

8    concerns about the Orthodox Jews as it related to the school

9    district?

10           MS. NAPP:  Objection, objection, your Honor.

11           THE COURT:  Basis.

12           MS. NAPP:  I'm not sure -- vague, I don't understand

13   the question.

14           THE COURT:  Do you understand the question?

15           THE WITNESS:  No.  I don't know where counsel is

16   going.

17           MR. STEPANOVICH:  Okay.

18           THE COURT:  Where he's going is not your concern.  The

19   question is, do you understand the question?

20           THE WITNESS:  I understand the question.

21           THE COURT:  You can answer it go ahead.

22   A.  Okay.  I -- my recollection is not clear enough to

23   succinctly state the -- a good answer to your question.

24   Q.  Back in 1997, did there come a time, Mr. Marshall, if you

25   recall, that the board was concerned about the taxes as it

170523tartikovT1          Marshall – direct

1   related to the Orthodox Jewish community?

2   A.   As I recall, not necessarily in Pomona.

3            MR. STEPANOVICH:  May I approach, your Honor.

4            THE COURT:  Yes.

5   Q.   Now, Mr. Marshall, if you could turn to page nine of that

6   exhibit.

7   A.   Okay.

8   Q.   And under line 17, have maybe one more question, but I

9   wanted you to have an opportunity to review that before I asked

10  anymore questions.

11  A.   Okay.

12  Q.   Does that refresh your recollection, Mr. Marshall?

13  A.   To some degree, yes.

14  Q.   Okay.  So, the board was concerned back in 1997 about the

15  Orthodox Jewish community and taxes as it related to Pomona;

16  isn't that correct?

17  A.   I -- as it related to town taxes on Pomona residents, yes.

18  Q.   Okay.  Now, Mr. Marshall, I'm going to turn your attention

19  to group homes in the Village of Pomona, and do you recall

20  there was some concern back in 2001 in Pomona about group homes

21  coming to Pomona?

22  A.   Yes, I recall there was some concern.

23  Q.   And do you recall that you basically communicated to the

24  residents of Pomona that they had to accept group homes in

25  Pomona?

170523tartikovT1              Marshall - direct

1   A.  That's correct.

2   Q.  And that you told residents of Pomona that no government

3   action is available which will prevent this particular facility

4   from being built; do you recall that?

5   A.  I recall that.  I believe that was in the context of

6   telling them that group homes were covered -- were protected

7   under the Fair Housing Act.

8   Q.  And the Fair Housing Act was the basis of telling the

9   residents of Pomona why they had to accept group homes?

10  A.  In my recollection.

11  Q.  Did the village seek to revise or repeal the Fair Housing

12  Act?

13  A.  No.

14  Q.  And to your knowledge, Mr. Marshall, did you or any village

15  official seek to speak with any congressional representatives

16  regarding your complaints to the Fair Housing Act?

17  A.  No, not to my recollection.

18  Q.  And to your knowledge, Mr. Marshall, did you or any village

19  official join any groups designed to defeat the Fair Housing

20  Act?

21  A.  Only on the first application.  On subsequent applications,

22  we tried to explain, as I recall, to the public that group

23  homes were allowed under the provision of the Fair Housing Act.

24  Q.  In fact, Mr. Marshall, as group homes continued to come

25  into the village, it became apparent that they integrated

170523tartikovT1            Marshall - direct

1   pretty well into the community; isn't that correct?

2   A.  They certainly did.

3   Q.  And many of those homes came in and you didn't even know

4   they were there; isn't that correct?

5   A.  That's correct.

6   Q.  And that's the way it should be; isn't that correct?

7   A.  That's correct.

8   Q.  Now, Mr. Marshall, when you were mayor, did you support the

9   formation of the Village of Ladentown?

10  A.  I did.

11  Q.  And I believe you attended some regional meetings with

12  other mayors regarding the formation of Ladentown; isn't that

13  correct?

14  A.  I recall some meetings, I don't recall who was in

15  attendance.

16          MR. STEPANOVICH:  May I approach, your Honor.

17          THE COURT:  Yes.

18  Q.  Handing you what's been mark as Plaintiffs' Exhibit 94.

19  Can you identify that, Mr. Marshall?

20  A.  Yes.  This looks like a summary of my comments during

21  public informational meeting that took place in, I don't know

22  what the date is, but in conjunction with the passing of the

23  Ramapo -- opposition to the Ramapo Comprehensive Plan.  That's

24  the Town of Ramapo Comprehensive Plan.

25  Q.  And this letter was dated, if you look at the second page

170523tartikovT1          Marshall - direct

1   maybe, it might be helpful.

2   A.  I beg your pardon?

3   Q.  The second page.

4   A.  Oh, I see.  Okay.  Yes.  It's dated December 12, 2002.

5           MR. STEPANOVICH:  Plaintiffs move into evidence

6   Plaintiffs' Exhibit 94.

7           MS. NAPP:  No objection, your Honor.

8           THE COURT:  All right, 94 is received.

9           (Plaintiffs' Exhibit 94 received in evidence) Ramapo

10  Q.  Now, Mr. Marshall, as mayor of the Village of Pomona, you

11  were concerned that Ramapo's comprehensive plan would forever

12  change the nature and the character of your region; isn't that

13  correct?

14  A.  That's correct.

15  Q.  And in fact, you did not want your area to turn into the

16  sixth borough of New York city; isn't that correct?

17  A.  That's -- the reference to the sixth borough of New York

18  City as I recall in my statement was to the County of Rockland,

19  not necessarily the Village of Pomona.

20  Q.  And the Village of Monsey is in the County of Rockland?

21  A.  It is.

22  Q.  New Square is in the County of Rockland?

23  A.  It is, as is New Hempstead, Wesley Hills, Montebello,

24  Airmont, Suffern, Haverstraw, Nyack.

25  Q.  So, all of those villages that you just mentioned, it's

170523tartikovT1          Marshall - direct

1   those villages that you didn't want to turn into the sixth

2   borough of the city of New York; is that right?

3   A.   No.   It's the entire county.

4   Q.   The county which includes all of those villages; isn't that

5   correct?

6   A.   Correct.

7   Q.   Okay.   Thank you.   Now, Mr. Marshall, what's the Village

8   Green?

9   A.   The village newsletter.   Village of Pomona -- excuse me,

10  Village of Pomona newsletter.

11  Q.   The -- how long if you know has the Village of Pomona used

12  the Village Green as its newsletter?

13  A.   I don't know specifically.   I know that throughout my time

14  in office from 1986 to 2007, I certainly used the Village

15  Green.

16  Q.   How often is the Village Green published?

17  A.   I don't know how often it's published now.   I know that

18  when I was mayor, it was published every month.

19  Q.   Every month?

20  A.   Yes.

21  Q.   And when it was published, did you have an opportunity to

22  write -- write an article for the Village Green?

23  A.   Yes.

24       MR. STEPANOVICH:   May I approach, your Honor.

25       THE COURT:   Yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - direct

1   Q.  Handed you what has been marked as Plaintiffs' Exhibit 109,

2   Mr. Marshall.  Can you identify that document, please.

3   A.  Yes.

4   Q.  What is that?

5   A.  It appears to be the Village Green from July 2004.

6          MR. STEPANOVICH:  Your Honor, Plaintiffs move 109 into

7   evidence.

8          MS. NAPP:  No objection.

9          THE COURT:  Okay.  109 received.

10          (Plaintiffs' Exhibit 109 received in evidence)

11   Q.  On the first page, there's a block there, Mr. Marshall,

12   that says "Message from Mayor Herbert Marshall."

13          You see that?

14   A.  Yes.

15   Q.  Is that typically where you would write your message to the

16   residents?

17   A.  It is the -- it is in that column that I would attempt to

18   communicate what the news was from around the area and how it

19   affected the residents.

20   Q.  And part of your message in July of 2004 was that the town

21   was pandering to special interest groups; isn't that correct?

22   A.  Well, as I recall, my -- I was expressing my displeasure

23   with the format of the Ramapo master plan and its negative

24   effects -- possible negative effects on the Village of Pomona.

25   Other than that, I can't say that I -- that I definitely took

170523tartikovT1            Marshall - direct

1    the position that you -- you're implying that I did.

2    Q.  Well, I don't want to imply anything, Mr. Marshall.  I

3    just -- let's go to the -- to the exhibit itself.

4            Reading from the middle of the first paragraph:  It

5    now seems unfortunately clear that they consider their

6    responsibility to the 75 percent of town residents living in

7    its 12 villages, and to those of us living in the surrounding

8    community, fully subordinate to their pandering to the special

9    interest groups able to deliver the critically important block

10   vote, which has become so essential to those seeking office in

11   Ramapo.

12           Did I read that correctly?

13   A.  Yes, you did.

14   Q.  And the block vote that you're referring to here is the

15   Orthodox Hasidic Jewish vote; isn't that correct?

16   A.  It's the Orthodox vote primarily out of New Square; yes.

17   Q.  And in your opinion, that's who the officials of Ramapo

18   were pandering to; isn't that true?

19   A.  What I was trying to say here, more importantly, is that

20   Ramapo was excluding having an even-handed policy as related to

21   the 12 villages in opposition to the population of Ramapo that

22   was in the unincorporated area; that of course included the

23   Orthodox community.

24   Q.  Mr. Marshall, if you could turn to the third page of that

25   Exhibit 109, please.  And there's a block there.  That block is

170523tartikovT1              Marshall - direct

1   entitled "How Does the Formation of the New Village of

2   Ladentown and Ramapo's Recent Passing of Their Adult Student

3   Housing Law Affect Our Interests?"

4        Do you see that?

5   A.  Yes.

6   Q.  Is that -- was that block written by you, also?

7   A.  I don't recall if it was written by me or the deputy mayor.

8   The deputy mayor at the time was -- was the editor of the

9   newsletter.

10  Q.  That's all I have with that.  Thank you, Mr. Marshall.

11       Did there come a time, Mr. Marshall, when overnight

12  parking became an issue in the Village of Pomona?

13  A.  The question of overnight parking was an issue for the

14  village for as long as I could remember.

15  Q.  And do you recall receiving any correspondence relative to

16  that issue of overnight parking?

17  A.  I don't specifically recall that, but I'm sure that there

18  was over the years there was some that came in.

19  Q.  And do you -- do you know who Irving Shucker is?

20  A.  I don't recall.

21       MR. STEPANOVICH:  Approach, your Honor.

22       THE COURT:  Yes.

23  Q.  I've handed you an exhibit, Plaintiffs' Trial Exhibit 74.

24  Do you see that, Mr. Marshall?

25  A.  I do.

170523tartikovT1          Marshall - direct

1   Q.  If you can turn to the last three pages.

2   A.  There is a transmittal and -- are you referring to this

3   letter?

4   Q.  Yes.  I'm trying to refresh --

5   A.  Oh, I see it.  Sure.  Sure.  Okay.

6   Q.  Does that refresh your recollection, Mr. Marshall, first as

7   to who Irving Shucker is?

8   A.  Not specifically about Mr. Shucker, it refreshes my memory

9   only in terms of the question that we -- that we had to deal

10  with at that time.

11  Q.  And what was the question that you had to deal with at that

12  time?

13  A.  Well, as Mr. Shucker's states --

14          MS. NAPP:  Objection, your Honor.

15          THE COURT:  You can't read from the document.

16          MR. STEPANOVICH:  I'm not moving the document.

17  Q.  From your recollection, if you can recall, Mr. Marshall?

18  A.  I'm afraid I don't recall a great deal about that.

19          MR. STEPANOVICH:  I would move the admission of 94

20  into evidence.

21          MS. NAPP:  Your Honor, I don't think a sufficient

22  foundation has been layed for this document in its entirety and

23  it contains a lot more than just the letter that Mr. Marshall

24  looked at.

25          MR. STEPANOVICH:  First of all, I misspoke.  That was

170523tartikovT1           Marshall - direct

1   Exhibit 74 instead of 94.

2           THE COURT:  Right.

3           MR. STEPANOVICH:  And these are documents that were

4   produced by the defendants.  They are official records of the

5   Village of Pomona.  It's a letter that was addressed to the

6   mayor in his capacity as mayor, and we believe it should come

7   in as a business record.

8           MS. NAPP:  Your Honor, the defendants would disagree.

9   While this appears to be -- well, we would agree that this was

10  produced by the Village of Pomona, it appears to be several

11  documents that are stapled together and it includes various

12  instances of hearsay, including on the second page of the

13  document, as well as the letter that Mr. Stepanovich referenced

14  earlier.

15          THE COURT:  If this is the official business of

16  Pomona, why isn't it a statement by a party opponent?

17          MS. NAPP:  There's no statement -- the documents that

18  I was referencing your Honor are letters that were written to

19  the Village of Pomona from I don't know.  I don't know who they

20  are.

21          THE COURT:  I don't know if you want to offer the

22  whole thing.

23          MR. STEPANOVICH:  I was just going to suggest, if

24  there's no objection, I'll just offer the letter that I'm

25  referring to that was sent by Mr. Shucker.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - direct

1          THE COURT:  For what purpose?

2          MR. STEPANOVICH:  For the effect on what the Village

3    of Pomona did as a result of that letter.

4          THE COURT:  Not for the truth of anything that's in

5    that letter, but how it is the village responded to the letter.

6          MR. STEPANOVICH:  Yes.  Not offering it for the truth

7    of the matter, but for what the village did in response to the

8    letter.

9          THE COURT:  Ms. Napp, that seems reasonable under the

10   circumstances.

11         MS. NAPP:  Yes.  For the sake of the record, we're

12   talking about only the last three pages of the document that is

13   currently marked as 74 for identification purposes.

14         THE COURT:  For now, right?

15         MR. STEPANOVICH:  That's correct, your Honor.

16         THE COURT:  All right, so the last three pages are

17   received for the limited purpose that we just discussed.

18         (Plaintiffs' Exhibit 74 received in evidence)

19         MR. STEPANOVICH:  Thank you.

20   Q.  Mr. Marshall, you have the exhibit in front of you;

21   correct?

22   A.  Yes.

23   Q.  And you were informed -- or the village was informed

24   through you as mayor that there were some parking issues in the

25   Village of Pomona; isn't that right?

170523tartikovT1              Marshall - direct

1   A.   That's correct.

2   Q.   And as a result of this letter and probably some other

3   complaints, the village took action to address the parking laws

4   in the village; isn't that true?

5   A.   The question of parking laws were addressed prior to these

6   letters.  As a result of the letters, it was incumbent upon us

7   as representatives of all of the people in an even-handed

8   manner to try to enforce our laws.

9   Q.   So, is it your testimony, Mr. Marshall, that prior to this

10  letter of April 15, 2003, is it your testimony that the Village

11  of Pomona had a parking law?

12  A.   It is.

13  Q.   And did it have a parking law that banned overnight

14  parking?

15  A.   It did.

16  Q.   And after this letter, did the Village of Pomona amend that

17  law?

18  A.   I don't recall.  It's possible, but I don't recall.  If it

19  was amended, it was -- the substance was not the -- changed

20  drastically.

21          MR. STEPANOVICH:  May I approach, your Honor.

22          THE COURT:  Yes.

23  Q.   Handed you what has been marked, Mr. Marshall, Plaintiffs'

24  Exhibit 73.  Can you identify that, please.

25  A.   This appears to be Local Law 1 of 2003.

170523tartikovT1              Marshall - direct

1   Q.  And this Local Law 1 of 2003 for the Village of Pomona?

2   A.  For the Village of Pomona; correct.

3            MR. STEPANOVICH:  Plaintiffs move the admission of 73.

4            MS. NAPP:  No objection, your Honor.

5            THE COURT:  All right, 73 is received.

6            (Plaintiffs' Exhibit 73 received in evidence)

7   Q.  Now, Mr. Marshall, this Local Law 1 of 2003 was passed on

8   the 23rd day of June, 2003; isn't that correct?

9   A.  What page are you reading from?

10  Q.  The last -- sorry, the last page.

11  A.  23rd day of June, 2003; correct.

12  Q.  And if you -- sorry.  If you refer to the prior exhibit,

13  the letter that Mr. Shucker wrote you was in April -- April 15

14  of 2003; isn't that correct?

15  A.  Yes.  Correct.

16            MR. STEPANOVICH:  May I approach.

17            THE COURT:  Yes.

18            THE WITNESS:  Do you have any further questions on

19  this, counsel?

20            THE COURT:  "This" being what?  Which exhibit?

21            THE WITNESS:  The minutes.

22            THE COURT:  73 or 74?

23            THE WITNESS:  73.

24            THE COURT:  Wait and see.

25            THE WITNESS:  Okay.

170523tartikovT1          Marshall - direct

1          MR. STEPANOVICH:  Yes, I do, I have one question for
2    Mr. Marshall.  I don't.  I retract that.
3    Q.  Mr. Marshall, I'm going to move on to Exhibit 110.
4    A.  No questions on 73?
5    Q.  No more.  Thank you.
6          I've handed you what has been marked, Mr. Marshall, as
7    Plaintiffs' Exhibit 110.  Can you identify that document?
8    A.  Yes.  It's the Village Green from March 2004.
9    Q.  And again, the Village Green is the Village of Pomona
10   newsletter?
11   A.  Newsletter.
12   Q.  And this is a newsletter dated March 2004; is that correct?
13   A.  That's correct.
14         MR. STEPANOVICH:  Plaintiffs move the admission of
15   110.
16         MS. NAPP:  No objection.
17         THE COURT:  110 received.
18         (Plaintiffs' Exhibit 110 received in evidence)
19   Q.  If you could turn to the last page of this exhibit, please.
20   A.  Okay.
21   Q.  And there is a message from you, is that correct?
22   A.  It is.
23   Q.  And it looks like it might be continued from your message
24   on the front page; is that right?
25   A.  It appears to, yeah.

170523tartikovT1            Marshall - direct

1   Q.  In your message to the residents of Pomona, you were

2   promoting the village's good neighbor policy, is that true?

3   A.  That's correct.

4   Q.  And the good neighbor policy that you described in this

5   newsletter was meant to send a message to the village

6   residents, isn't that true?

7   A.  The good neighbor policy that was referred to in this

8   newsletter was the concept that the Village of Pomona was a

9   village of neighbors.  What is concluded in this newsletter is

10  information to the people about some of the actions and laws

11  that were taken to help promote that good neighbor policy, the

12  pooper-scooper law, that is referred to on page one is

13  clearly -- says to people who are walking their dogs, be a good

14  neighbor, and clean up after your dogs.  And the same thing

15  with the real estate law, the bulk trash, all of the laws

16  simply go to emphasize the fact that we -- we in Pomona are a

17  village of neighbors, and that everyone in Pomona is -- should

18  be compelled to act like a neighbor.

19  Q.  Mr. Marshall, you also -- besides the pooper-scooper

20  message that you wanted to send to your citizens, you also sent

21  a message that the effect of any action or project that has a

22  potentially adverse implication for any members of the

23  community or is oppositional to the character and nature of the

24  village, it will be severely restricted or fully prohibited;

25  isn't that true?

170523tartikovT1            Marshall - direct

1    A.  That's correct.

2    Q.  And the message you were trying to send to the Village of

3    Pomona residents is that the Village of Pomona would take all

4    of its action, all of the power that it had to restrict

5    anything that interfered with the character and nature of the

6    Village of Pomona; isn't that true?

7    A.  Basically, yes.  At this time, there was a great deal of

8    construction going on in the village.  This most specifically

9    refers to what was happening on top of our mountain where there

10   was excessive building on steep slopes, and there were a lot of

11   problems with that.  And we ultimately passed a steep slope

12   law.  I don't recall if it was before or after this.  But that

13   was all part of what our effort was to maintain our community.

14          Actually, as I recall this newsletter, the laws that

15   are mentioned here and the action that was taken were all laws

16   that were on the books.  And this -- this, again, as I recall,

17   was an effort to inform the public of the Local Laws that were

18   designed to protect the integrity of the community that they

19   may not know about.

20   Q.  And the date of this newsletter is March of 2004; isn't

21   that correct?

22   A.  Correct.

23   Q.  Village of Village of Pomona challenged Ramapo's

24   comprehensive plan, didn't it?

25   A.  It did.

170523tartikovT1              Marshall - direct

1   Q.  And that happened in June of 2004; isn't that correct?

2   A.  If you say so.  I don't recall specifically.

3         MR. STEPANOVICH:  May I approach.

4         THE COURT:  Yes.

5   Q.  Handed you what has been marked, Mr. Marshall, Plaintiff

6   Exhibit 103.  Can you identify that, please.

7   A.  They appear to be the adopted minutes of March 28, 2005.

8   Q.  And would those have been the minutes of the February 15,

9   2005 meeting that were adopted in March of '05?

10  A.  They -- yes, the grievance -- which appears to have been

11  the grievance day hearing for the Village of Pomona.

12  Q.  Okay.  So we can be clear for the record, these are minutes

13  that -- these are minutes of the February 15, 2005 board of

14  trustees' meeting?

15  A.  Yes, so it appears.

16        MR. STEPANOVICH:  Plaintiffs move 103 into evidence.

17        MS. NAPP:  No objection.

18        THE COURT:  103 is received.

19        (Plaintiffs' Exhibit 103 received in evidence)

20  Q.  Mr. Marshall, if you can turn to page three of this

21  document.

22  A.  Okay.

23  Q.  And do you see the heading, "Congregation Rabbinical

24  College of Tartikov"?

25  A.  Yes.

170523tartikovT1          Marshall - direct

1   Q.  And on this date, the Village of Pomona approved a full tax

2   exemption for the Congregation Rabbinical College of Tartikov;

3   isn't that true?

4   A.  Yes.  This meeting was a combination of grievance day and

5   our regular board meeting.  I believe this -- this approval of

6   the exemption was part of grievance day.

7   Q.  But this exemption was approved for the Congregation

8   Rabbinical College of Tartikov, Inc.; isn't that true?

9   A.  Yes, it's true.

10          MR. STEPANOVICH:  Approach, please.

11          THE COURT:  Yes.

12   Q.  Mr. Marshall, I've handed you what's been marked as

13   Plaintiff Exhibit -- Trial Exhibit 95 and ask if you can

14   identify that document.

15   A.  It appears to be the adopted Village of Pomona Joint Board

16   Meeting Workshop of June 27, 2005, which were adopted on

17   June -- on January 23rd, 2006.

18   Q.  So, just for my understanding, what we have here in

19   Exhibit 95 would have been the board -- the Village of Pomona

20   Joint Board Meeting Workshop dated June 27, 2005?

21   A.  It appears to be that; yes.

22   Q.  If you can turn, Mr. Marshall, to page 3 of that document.

23   A.  Okay.

24   Q.  And towards the bottom, it appears that -- you see where it

25   says "Mayor Marshall"?

170523tartikovT1              Marshall - direct

1   A.  Yes.  All lines?  Which line?

2   Q.  "Mayor Marshall mentioned."  Do you see that?

3   A.  Yeah.

4   Q.  Can you read that, please.

5   A.  Mayor Marshall mentioned Camp Dora and stated that nothing

6   has come into the village yet regarding the use of the property

7   Mayor Marshall also brought to the board members -- brought the

8   board members up to date on the Ramapo lawsuit ruling.

9           MR. STEPANOVICH:  And if I didn't, I would move the

10  admission of 95, I thought I did, but I'm sorry if I did not.

11          I tender the admission of 95.

12          MS. NAPP:  No objection.

13          THE COURT:  I figured there wasn't.  Received.

14          (Plaintiffs' Exhibit 95 received in evidence)

15  Q.  And you just read that Mayor Marshall mentioned Camp Dora,

16  and Camp Dora is the subject property we're -- that this law

17  suit involves; isn't that correct?

18  A.  Yes, uh-huh.  You had me read this paragraph.  As I recall,

19  the first sentence is not related to the second sentence.

20  Q.  I didn't ask you that, Mr. Marshall, but since you bring it

21  up, you were advising the board members that there has been no

22  application come into the village regarding Camp Dora?

23  A.  That's correct.

24  Q.  And you were waiting for something to come in?

25  A.  No.  It was -- it obviously had come up somewhere else.  I

170523tartikovT1            Marshall - direct

1  don't recall when it first came up, but there was some question

2  about the development of Camp Dora a week -- we can go back

3  to -- it is possible that it has to do with the grievance day

4  ruling that Camp Dora or the Tartikov group -- let me just go

5  back if I can.

6  Q.  Let me ask you a question?

7  A.  Yeah, go ahead.

8  Q.  Isn't it also possible that you were advising the board

9  members of the Village of Pomona that no application had come

10 into the village?

11 A.  Yes, it certainly is.

12 Q.  Now, Mr. Marshall, do you recall advising the board members

13 that their meetings might be taped by Savad & Company?

14 A.  I don't recall, but I'm sure that I could have said that.

15 Q.  And you would have said that to them prior to the meetings;

16 isn't that correct?

17 A.  I would have think -- I would think that; yes.  It -- as I

18 recall during that period, Mr. Savad & Company were -- were

19 attending and taping a great number of our meetings.  And in

20 this particular meeting, there were planning board members and

21 zoning board members that were not regularly in attendance to

22 our village board meetings.

23 Q.  And you're referring to what particular meeting, the

24 meeting that's referenced in the prior exhibit?

25 A.  As I recall, I wasn't referring to any particular meeting.

170523tartikovT1              Marshall - direct

1   What are you -- you mean as far as --

2   Q.  I'll withdraw the question, Mr. Marshall.

3   A.  Okay.  That's fine.

4   Q.  Mr. Marshall, we heard the video yesterday of the

5   January 22, 2007 meeting or let me stand corrected, a portion

6   of that meeting?

7   A.  Correct.

8   Q.  And do you recall that at that meeting, there was some

9   discussion about changing the maximum height for dormitories,

10  do you recall that?

11  A.  Yes.

12  Q.  And it was suggested that the maximum height be raised from

13  25 feet to 35 feet, do you recall that?

14  A.  Yes, I recall, yes.

15  Q.  And do you recall, Mr. Marshall, that the Village of Pomona

16  rejected that idea?

17  A.  As I recall, it was rejected based on the comments from

18  the -- from the citizenry who attended.

19  Q.  Now, Mr. Marshall, turning your attention to -- we're going

20  to come back to the Ramapo Comprehensive Plan.

21  A.  Okay.  Any of the -- any of the exhibits --

22  Q.  I'm on my way up there.

23  A.  Okay.

24         MR. STEPANOVICH:  May I approach, your Honor.

25         THE COURT:  Yes.

170523tartikovT1          Marshall - direct

1  Q.  Mr. Marshall, I've handed you what's been marked as

2  Plaintiff Exhibit 134.  Can you identify that, please.

3  A.  Yes.  They appear to be my comments made on April 29, 2003

4  regarding the Ramapo Comprehensive Plan, DGEIS.

5  Q.  And this is when you were mayor of the village?

6  A.  Yes, it was.  Yes.

7          MR. STEPANOVICH:  Plaintiffs offer 134.

8          MS. NAPP:  No objection.

9          THE COURT:  134 received.

10          (Plaintiffs' Exhibit 134 received in evidence)

11  Q.  These comments, Mr. Marshall, set forth in Exhibit 134,

12  were these comments that you had written yourself, correct?

13  A.  Yes.

14  Q.  And turn to page 2, the second page.

15  A.  Okay.

16  Q.  You write "huge population increases are unacceptable..."

17  A.  Wait a second.  Where?

18  Q.  About five lines --

19  A.  I got it.

20  Q.  In fact, I'll ask you to read that?

21  A.  Huge population increases are unacceptable and simply won't

22  work in Ramapo.  If you want affordable, higher density

23  housing, stabilize the population by increasing opening space

24  and greenways and the outlying areas and centralize density

25  where it already exists.  Develop in along controlled corridors

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

170523tartikovT1          Marshall - cross

1  where major infrastructure improvements can be concentrated to

2  mitigate the negative effects of development.  At the expense

3  of the infrastructure in outer areas where green space can be

4  substituted for infrastructure.

5  Q.  And you write the next line, "Zero population growth should

6  be a major plan objective."

7  A.  Correct.

8  Q.  And you write down about five lines later, "Zero population

9  growth is critical."

10  A.  That's correct.

11  Q.  And you write down about six lines from there, "This is our

12  community, not just theirs, or theirs, or theirs...ours."

13  A.  Correct.

14       MR. STEPANOVICH:  I have nothing further,

15  Mr. Marshall.

16       MS. NAPP:  Just a moment, your Honor.

17       THE COURT:  Take your time.

18  CROSS-EXAMINATION

19  BY MS. NAPP:

20  Q.  Mr. Marshall, you served the village as mayor for a long

21  time, right?

22  A.  Correct.

23  Q.  I believe it was 20 years, am I correct, somewhere in

24  there?

25  A.  I served as deputy mayor and mayor from -- for 21 years.

170523tartikovT1                Marshall - cross

1    Q.  Uh-huh.  And we watched the video tape yesterday, you

2    remember that?

3    A.  I did.

4    Q.  And it appears that you were not -- it wasn't always fun to

5    be the mayor of the Village of Pomona was it?

6    A.  No, it wasn't.

7    Q.  But you did it anyway?

8    A.  Yes.

9    Q.  And you would have done it again had you been elected in

10   2007?

11   A.  Yes.

12   Q.  Why did you first run for office in the Village of Pomona?

13   A.  There was a proposed project contiguous to the Village of

14   Pomona in a sand and gravel pit off of Quaker Road in which a

15   Wal-Mart shopping center was going to be built, excuse me

16   K-Mart shopping center at that time was going to be built and

17   it was felt by the citizens of Pomona that that would have

18   negatively affected the rustic environment that we continue to

19   strive to maintain because it was the reason that we moved to

20   Pomona in the first place.  And our effort in being elected the

21   first time, I say our effort because it wasn't simply myself,

22   it was myself and Melvin Klinger and Alvin Appel, who ran

23   against the incumbents at the time.  And it was principally to

24   cause the village board of trustees to take a more active role

25   in protecting that rustic environment that we so cherish.

170523tartikovT1            Marshall - cross

1   Q.  And during your time as mayor, you and the village

2   continued to take steps to preserve that rustic environment

3   that you all cherish; correct?

4   A.  Constantly.

5   Q.  And one of those steps was you opposed an urban forest

6   corporation mulch plant in the area; do you recall that?

7   A.  Yes.

8   Q.  What town was that in?

9   A.  That was in the Town of Haverstraw.

10  Q.  And the village opposed that development?

11  A.  Yes.  It was contiguous to the village.

12  Q.  And the village also, while you were mayor, opposed a

13  project related to the -- and I'm not going to be able to

14  pronounce this -- Misiongo (ph) Park --

15  A.  Misiongo.

16  Q.  There we go.

17          THE COURT:  Usual spelling?

18          MS. NAPP:  I'll get it for the court reporter

19  afterwards.  I'm sure my notes don't reflect the accurate

20  spelling.

21  A.  It's a nice little creek.

22  Q.  And the village opposed that project?

23  A.  Misiongo --

24  Q.  Yes.

25  A.  Which project was that?

170523tartikovT1            Marshall - cross

1   Q.  Let me ask you, I believe -- did it involve a Wal-Mart?  Is

2   that the right project?

3   A.  No.  Misiongo Creek runs through the village through the

4   Town of Haverstraw and into the -- oh, yes, it does -- it runs

5   into the area where the Wal-Mart shopping center or the K-Mart

6   shopping center, back when we first ran, was proposed to be

7   located.

8   Q.  So, at some point this time there was a K-Mart that was

9   proposed?

10  A.  That's correct.

11  Q.  And the village opposed that?

12  A.  That's correct.

13  Q.  And then subsequent to that there was a Wal-Mart that was

14  proposed?

15  A.  That's correct.

16  Q.  And the village always opposed that development?

17  A.  That's correct.

18  Q.  And we talked about how the village did the village also

19  oppose the down zoning of Patrick Farms?

20  A.  That's correct.

21  Q.  And the village opposed the Ramapo Comprehensive Plan?

22  A.  Yes.

23  Q.  And if you haven't already can you please explain what was

24  the basis of the village's opposition to the comprehensive plan

25  in Ramapo?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1           Marshall - cross

1   A.  We felt that the comprehensive plan allowed for

2   overdevelopment of the area which would have -- our area, as

3   well as the rest of the town, which would have overtaxed, for

4   one, the infrastructure that existed.  We felt that the --

5   Rockland County, its roads, its fire department, its aquifer,

6   which was a big thing, were not capable of handling the

7   increased population, hence my comments at the -- on April 29,

8   2003 where I said zero population.

9           I tried to give -- to provide ways that I thought were

10  reasonable to accommodate people moving in but still maintain

11  zero population which would not have overtaxed that

12  infrastructure.  The Ramapo master plan by its nature would

13  also have caused the change of our -- the rustic environment

14  that we so cherish in our part of Rockland County.

15  Q.  When you say would cause a change to the rustic

16  environment, could you elaborate on that?

17  A.  What?  The change?

18  Q.  Yes.

19  A.  We felt that by increasing the population drastically and

20  if you look at our zoning code, it provides for single-family

21  housing, single-acre, single-family housing throughout the

22  village.

23          In our village, we strove to protect the trees, to

24  protect the wetland, to protect the steep slopes, because they

25  were the aspects of the village that contributed and continue

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1              Marshall - cross

1  to contribute to the very nature of our village, which allows

2  deer to run around and turkey and raccoons and all sorts of

3  very positive fauna, in my mind anyway, to be part of our

4  village.

5  Q.  Okay.  And we heard one of the speakers on the video

6  yesterday, she references she had been fighting for sidewalks

7  for some time.  Do you remember that?

8  A.  Yes.

9  Q.  And she received opposition from the village for the

10 sidewalks, as well, correct?

11 A.  That's correct.

12 Q.  And I take it, Mr. Marshall, that the village's opposition

13 to the sidewalks was based on the same reasons that you just

14 discussed?

15 A.  The opposition to the sidewalks went back to the very

16 beginning of the village when it was thought that it would

17 corrupt, for the most part, corrupt the rustic nature of the

18 village itself.

19 Q.  Mr. Marshall, when was the Village of Pomona formed?

20 A.  1967.

21 Q.  Celebrating its 50th anniversary this year; right?

22 A.  Yes.

23 Q.  Are you familiar with the reasons why the Village of Pomona

24 was formed?

25 A.  To -- for the -- as I recall in the very -- it goes back to

170523tartikovT1          Marshall - cross

1   the very nature of what we're talking -- we were just talking

2   about the overpop -- to prevent the overpopulation of the area

3   and to corrupt the rustic environment that Pomona was at the

4   time.  As I recall, when the village was incorporated, there

5   was a very large project on top of the mountain which involved

6   350, I believe, townhouses that were attempted to be built, and

7   the village was formed, although I wasn't here at the time, the

8   village was formed to prevent that development.

9              MS. NAPP:  May I approach, your Honor.

10             THE COURT:  Yes.

11  Q.  Mr. Marshall, I'm just handing you what's been marked as

12  Defense Exhibit 1082 for identification purposes.  Have you

13  seen that document before?

14  A.  I beg your pardon?

15  Q.  Have you seen that document before?

16  A.  No.  It's pretty fascinating.

17  Q.  You can set that aside, Mr. Marshall.

18  A.  Beg your pardon?

19  Q.  You can set that aside.

20             You spoke a minute ago about Exhibit 134, which you

21  should have in front of you, your comments on the Ramapo

22  Comprehensive Plan.

23  A.  Yes.

24  Q.  And Mr. Stepanovich asked you some questions about zero

25  population growth.  Do you recall that?

170523tartikovT1          Marshall - cross

1  A.  Yes, I do.

2  Q.  And you just explained a few minutes ago your reasons

3  behind those statements.

4  A.  Yes.

5  Q.  Just a few additional questions for you on that.  When you

6  were referring to zero population growth, you weren't referring

7  to any specific segment of the population, were you?

8  A.  No.

9  Q.  You were not referring specifically to Hasidic or Orthodox

10  Jews, were you?

11  A.  No.

12  Q.  And further down you make a statement that involves "this

13  is our community not just theirs, or theirs, or theirs...ours."

14        Can you explain what you meant by that statement?

15  A.  Yes.  Really, it was directed at the Ramapo -- for the most

16  part, at the supervisor and the board of -- board of the -- the

17  town board of -- the town councilman in the Town of Ramapo who

18  were -- who were consistent in taking positions against not the

19  Village of Pomona, but all of the incorporated villages in

20  favor of the unincorporated portion of the Town of Ramapo.

21  Q.  And that statement wasn't referring to any particular

22  segment of the population, was it?

23  A.  No, not at all.  One of the villages was New Square.

24  Q.  It wasn't regarding to Hasidic or Orthodox Jews, was it?

25  A.  No.

170523tartikovT1          Marshall - cross

1   Q.  Sticking with the subject of Ramapo politics, you were also

2   asked about the voting block that exists in Ramapo?

3   A.  The voting...?

4   Q.  The voting block in the Town of Ramapo.

5   A.  Yes.  I was asked about that.

6   Q.  In your opinion is there anything wrong with people voting

7   in a block?

8   A.  Not at all.

9   Q.  Is it their right?

10  A.  It absolutely is.

11  Q.  Do you have Exhibit 110 there in front of you,

12  Mr. Marshall?

13  A.  Which?

14  Q.  It's one of the Village Green newsletters, the one from --

15  A.  I got it.  The pooper-scooper one, right?

16  Q.  Right.  This is the document in which you talked about the

17  good neighbor policy.  Was the good neighbor policy directed

18  towards Hasidic or Orthodox Jews?

19  A.  It was directed at the village, period.  Every village

20  resident, whether they were Orthodox, or whether they were not

21  Orthodox.

22  Q.  Everyone in the village?

23  A.  Everyone, yeah.

24  Q.  Do you have Exhibit 73 in front of you, Mr. Marshall?

25  A.  Which one is that?

170523tartikovT1              Marshall - cross

1   Q.  I believe --

2   A.  Yeah.  I got it.

3   Q.  And that should be the overnight parking law; is that

4   correct?

5   A.  Yes.

6   Q.  Could you turn to the second page of that document.

7   A.  Okay.

8   Q.  Now, if you look at paragraph B at the top, it states the

9   village clerk shall be authorized to issue a written permit for

10  all-night parking upon application therefor in writing by the

11  owner of the motor vehicle for which such parking is sought in

12  accordance with the following conditions and requirements.

13          Did I read that correctly?

14  A.  Yes.

15  Q.  So, the village had a mechanism in this law that would

16  allow individuals who needed to park on the streets overnight

17  to get a permit?

18  A.  That's correct.  It was a major change from this law to the

19  prior laws.  The prior law, as I recall, provided for no

20  parking between 2:00 and 6:00.  In the revision of our Local

21  Laws, there were two things that we tried to maintain

22  consistency with, and that is, one is to maintain the rustic

23  environment that we have spoken about; and the second was to

24  provide in an even-handed manner the application of these laws

25  to all of our residents.

170523tartikovT1          Marshall - cross

1          The overnight parking situation, which was brought to

2   light by the letter that I don't -- didn't recall said that --

3   stated that the overnight parking was a problem.  Well, in

4   order to be even-handed, we felt that it was necessary to

5   provide an option for people who -- and actually, for people

6   who didn't -- couldn't drive on the Sabbath, and that's what

7   this provides for.

8          MS. NAPP:  May I approach, your Honor.

9          THE COURT:  Yes.

10  Q.  Mr. Marshall, I've just handed you what's been marked as

11  Defense Exhibit 1080 for identification purposes.  Have you

12  seen this document before?

13  A.  I recall it; yes.

14  Q.  Could you identify it for the Court, please.

15  A.  Yes.  It was a Local Law which became Local Law 2 of 2007,

16  which was passed -- which was adopted during that meeting that

17  was on the -- that we saw the tape of yesterday.  It -- it is

18  another example of --

19  Q.  One second, Mr. Marshall.

20         MS. NAPP:  Your Honor, defendants would move 1080 into

21  evidence.

22         MR. STEPANOVICH:  My only objection is there's no date

23  on this, when this law was passed.  Mr. Marshall testified -- I

24  see it's written on the top.  I'll retract it.  There it is,

25  your Honor.  I was looking at another spot.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - cross

1          THE COURT:  1080 is received.

2          MS. NAPP:  Thank you, your Honor.

3          (Defendants' Exhibit 1080 received in evidence)

4    BY MS. NAPP:

5    Q.  Mr. Marshall, can you tell the Court about this house of

6    worship law, Exhibit 1080.

7    A.  Yes.  It was a problem we wrestled with over a long period

8    of time and this is another example of us trying to be

9    even-handed for all of our residents.  This Local Law

10   provides -- allows our citizens to have a shtetel (ph) or a

11   regular congregational worship service in their homes as an

12   unrestricted use of their private home, unrestricted, without

13   permit.  It was something that we had -- that was important to

14   our Orthodox community in Ramapo, then the Ramapo part portion

15   of the village.

16          Now, that applies to our residents in Haverstraw, as

17   well, but just to clarify, Pomona is --

18          MR. STEPANOVICH:  Objection.  There's no question.  If

19   he needs to finish his answer, of course he can make a complete

20   answer, but there's no question.

21          MS. NAPP:  That's fine, your Honor.

22   Q.  Mr. Marshall, there's no question pending, unless you need

23   to --

24   A.  Can I clarify my answer?

25          THE COURT:  What do you want to ask him?  Do you want

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Marshall - cross

1   to ask him a question?

2          MS. NAPP:  Sure, your Honor.  I can ask him a

3   question.

4   Q.  Mr. Marshall, do you need to clarify the last answer that

5   you gave me?

6          THE COURT:  So glad you did that.

7   A.  The Village of Pomona is one half of Town of Haverstraw,

8   one half of the Town of Ramapo.

9   Q.  Thank you for that clarification, Mr. Marshall.

10         Now, Mr. Marshall, I think you indicated that with

11  regard to Local Law 2 of 2007 that we were just talking about,

12  you said that was adopted on January 22nd, 2007; is that

13  correct?

14  A.  According to the notes on this, yes.

15  Q.  And that was the same date of the public hearing that we

16  watched yesterday?

17  A.  That's correct.

18  Q.  Was a separate public hearing held that evening on Local

19  Law 2 of 2007?

20  A.  In order for it to have been adopted, yes, that was one of

21  the five Local Laws that I kept saying to the public that we

22  needed to get through.

23  Q.  And did Mr. Savad speak at that public hearing?

24  A.  I don't recall.  I know Mr. Savad spoke during the -- on

25  the first public hearing and on the second on the Wetland law

170523tartikovT1          Marshall - cross

1  which was helpful, by the way.  On this one, I don't recall.

2  Q.  Now, Mr. Marshall, yesterday we talked -- you and

3  Mr. Stepanovich spoke a little bit about Yeshiva Spring Valley;

4  do you remember that?

5  A.  Yes.

6  Q.  And you talked about a memo that Mark Healey wrote to you

7  and the board of trustees; do you recall that testimony?

8  A.  Yes, I do.  Let me see if I can find it here.

9  Q.  It's Exhibit one 11, if you have that in front of you.

10  A.  I have it somewhere.  Let me check.  Got it.  Okay.

11  Q.  And Mark Healey, he worked for a firm known as Frederick P.

12  Clark and Associates; right?

13  A.  That's correct.

14  Q.  And Frederick P. Clark was the village planner at that

15  time?

16  A.  Correct.

17  Q.  And Frederick P. Clark would employ employees from their

18  firm to service the village; is that correct?

19  A.  Correct.

20  Q.  And they were paid by their employer?

21  A.  Correct.

22  Q.  So, Mr. Healey was not an employee of the Village of

23  Pomona?

24  A.  No.

25  Q.  He was an employee of FP Clark?

170523tartikovT1            Marshall - cross

1  A.  Clark.  Correct.

2  Q.  Did Mr. Healey live in the Village of Pomona?

3  A.  No.

4  Q.  Did you ever meet Mr. Healey?

5  A.  Yes, but I don't -- Dan Weary was our representative for

6  most of the time that Clark Associates worked -- were our

7  planners during the time I was in office.  Healey came towards

8  the end of that.

9  Q.  Okay.  And in fact, Mr. Weary was the vice-president of

10  Frederick P. Clark Associates; is that correct?

11  A.  Yes.  He was promoted after his service to us.  I'd like to

12  think it was so exemplary, that that's why he was promoted.

13  Q.  And Mr. Healey, he was just an associate there, right?

14  A.  Yes.

15  Q.  So, he was lower in the hierarchy of Frederick P. Clark?

16  A.  Yes.

17  Q.  And I think you said you met Mr. Healey before?

18  A.  Yes.

19  Q.  Did Mr. Healey ever give you any reason to believe that he

20  was anti-Hasidic or anti-Orthodox?

21  A.  No.

22  Q.  And you mentioned Mr. Weary.  You met him, as well?

23  A.  Yes.

24  Q.  Did Mr. Weary ever give you any indication that he had any

25  anti-Semitic attitudes?

170523tartikovT1            Marshall - cross

1    A.  Certainty not; and if he had, we probably wouldn't have

2    retained Clark Associates as our planners.

3    Q.  Prior to Yeshiva Spring Valley, had the village ever

4    received an application for a school, to your knowledge?

5    A.  I'm sure that we had, but I don't recall.

6    Q.  Sitting here today, do you recall ever receiving an

7    application?

8    A.  I don't recall.  No.

9    Q.  Mr. Marshall, was -- yesterday we spoke about Local Law 1

10   of 2001; do you recall that?

11   A.  Yes.

12   Q.  Was Local Law 1 of 2001 enacted to prevent Yeshiva Spring

13   Valley from building a school within the Village of Pomona?

14   A.  Not only was it not, I was very much in favor of the

15   Yeshiva Spring Valley when I finally met with them, which was,

16   I think it was after that -- this whole period, it was

17   somewhere like 2002 or '03 and they presented their plan at a

18   meeting with myself and our attorney.  And it was an unofficial

19   meeting, but it included the school that was alluded to in this

20   memo and also 24 houses, which would have really been a plus

21   and fit in with the community.

22        It was, in my view, the best possible use of that

23   property at that point in time, and I was very disturbed when,

24   I think it was 2004, they sort of disappeared or their project

25   disappeared from the -- from what I was trying to cause to

170523tartikovT1            Marshall - cross

1   happen in the village.

2   Q.  Back to Local Law 1 of 2001, Mr. Marshall, you voted on

3   that law; correct?

4   A.  Yes.

5   Q.  And you voted in favor of it?

6   A.  Yes, I think I did.

7   Q.  And when you voted in favor of that law, did you take into

8   account any sort of anti-Semitic anti-Hasidic anti-Orthodox

9   animus?

10  A.  Absolutely not.

11  Q.  Now, yesterday, Mr. Marshall, we spent some time watching

12  the video of the January 22 public hearing from 2007.

13  A.  Yes, we did.

14  Q.  And you recall from watching that video that numerous

15  speakers from both the public and yourself made mention of a

16  newspaper article; do you remember hearing that?

17  A.  Yes.

18          MS. NAPP:  May I approach, your Honor.

19          THE COURT:  Yes.

20          MS. NAPP:  One second, your Honor.

21  Q.  Mr. Marshall, I've handed you what's been marked as

22  Plaintiffs' Exhibit 157 for identification purposes.  Do you

23  know what that document is?

24  A.  Yes.  That's the -- that is the newspaper article which

25  prompted the outcry at the January 22nd meeting.

170523tartikovT1              Marshall - cross

 1          MS. NAPP:  Your Honor, defendants would move

 2   Exhibit 157 into evidence.

 3          THE COURT:  I already have it as being in.

 4          MS. NAPP:  I don't.

 5          THE COURT:  Let's check with the expert.

 6          MS. SOBEL:  Yes, it was entered with Mr. Tauber.

 7          THE COURT:  Okay.  If it's moved in twice, that means

 8   it's out.

 9          (Laughter)

10          MS. NAPP:  I'm just being extra careful.

11          THE COURT:  By the same party, it's out.

12   Q.  Mr. Marshall, I think you just said this is the newspaper

13   article that you were referring to in the January 22nd, 2007

14   meeting; is that correct?

15   A.  Yes, that's correct.

16   Q.  And I know it's a little hard to read on this copy, but it

17   appears that it was dated January 12, 2007?

18   A.  Correct.

19   Q.  And that was just ten days before?

20   A.  Yes.

21   Q.  The meeting on January 22nd; is that correct?

22   A.  Yes.

23   Q.  And if you read this article, there's information in it

24   that's attributed to Mr. Savad; is that correct?

25   A.  Information that is distributed to Mr. Savad?

170523tartikovT1            Marshall - cross

1   Q.  Let me say that again, Mr. Marshall.  If you -- withdrawn.

2          If you review this article, there is information that

3   the author of this article attributes to Mr. Savad?

4   A.  Yes.

5   Q.  And if you look about three-quarters of the way down the

6   first page, looks to be about eight lines up, it says "The

7   attorney said..."

8          Are you with me?

9   A.  Hold on one second.  There's a part that's faded in here.

10  You said that what?

11  Q.  About eight lines from the bottom of the first page,

12  there's a sentence that starts "The attorney said."

13  A.  Oh, yeah.  I got it.

14  Q.  The attorney said the housing would be for 1,000 ordained

15  rabbis and their families.  The rabbis would study there for 15

16  years to be judges in religious courts.

17          Did I read that correctly?

18  A.  Yes.

19  Q.  And if you look at the first -- very first sentence of this

20  article, it says:  Preliminary plans that would transform more

21  than 100 acres of woods, so into a rabbinical college housing

22  almost 5,000 people could be presented to the village in two

23  months.

24          Did I read that right?

25  A.  Yes, you did.

170523tartikovT1          Marshall - cross

1   Q.  And you knew, from being mayor of the Village of Pomona for

2   so long, that the information contained in this article was

3   going to cause excitement amongst the village residents; is

4   that correct?

5   A.  Correct.

6   Q.  And that excitement was based on the sheer number and the

7   size of the development that's being discussed in this article?

8   A.  Yes.

9           MR. STEPANOVICH:  Objection, speculation.

10          THE COURT:  Sustained.  I don't see how he can know

11  that.

12  Q.  Mr. Marshall, when this article was published back in

13  January 2007, did you speak to any village residents about it?

14  A.  I don't recall.  I know that we discussed it -- I discussed

15  it with the board.

16  Q.  Okay.  And what was your discussion with the board about

17  this article?

18  A.  That the meeting would be a difficult meeting.

19  Q.  Why was that?

20  A.  Because the information, while not correct necessarily, was

21  inflammatory.

22  Q.  And what about it was inflammatory?

23  A.  The whole -- the whole gist of the of it -- the text.  I

24  would -- if the political climate were different today I would

25  say this was irresponsible reporting, but I say dare not say

1   that now.

2   Q.  And when you talk about the whole gist of it, you're

3   talking about the numbers that are mentioned in the article; is

4   that correct?

5   A.  Yes.

6   Q.  And ten days later when that meeting came to pass, there

7   were a lot of people in attendance there, right?

8   A.  There were.

9   Q.  There were more people than could fit in the room?

10  A.  There were.

11  Q.  And you presided over that meeting as mayor?

12  A.  I did.

13  Q.  And I think you just said you knew it was going to be a

14  tough meeting?

15  A.  Yes.

16  Q.  And you knew it was going to be a tough meeting because it

17  was coming on the heels of this article that appeared in the

18  newspaper?

19  A.  That's correct.  There was no --

20  Q.  Let me ask a question to you.

21  A.  Good.

22  Q.  And you began that meeting by reminding everybody that the

23  rabbinical college that they read about in the newspaper wasn't

24  on the agenda; is that correct?

25  A.  That's correct.

170523tartikovT1          Marshall - cross

1   Q.  And that there were five public hearings that night?

2   A.  That's correct.

3   Q.  And that the topic of discussion that evening was not going

4   to be about the proposed development that they read about?

5   A.  That's correct.

6   Q.  And Mr. Savad was the first spearer at that meeting, wasn't

7   he?

8   A.  Yes.

9   Q.  In fact, he hired a videographer to tape the meeting; did

10  he not?

11  A.  Yes, he did.

12  Q.  And he hired a court reporter to be there, as well?

13  A.  I don't recall.  I guess he did.

14  Q.  We have a transcript of that meeting.  Do you recall?

15  A.  That would imply that he did.

16  Q.  And we listened to Mr. Savad's remarks yesterday?

17  A.  Yes.

18  Q.  And he made reference to a thousand students on that tape,

19  didn't he?

20  A.  Yes.

21  Q.  And he claimed that the proposed law was discriminatory on

22  its face?

23  A.  Yes.

24  Q.  And he was referring to Local Law 1 of 2007, the dormitory

25  law; correct?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Marshall - cross

1   A.  Correct.

2   Q.  And he said that the law was a deliberate attempt to

3   circumvent state and federal laws; do you recall that?

4   A.  Yes.

5   Q.  And he further stated that the 2004 law related to

6   dormitories Local Law 5 of 2004 was intended to keep Yeshiva

7   Spring Valley out of the village; do you recall that?

8   A.  Yes, I do.

9   Q.  And do you remember what happened after Mr. Savad sat down?

10  A.  Well, I recall later in the meeting as from the -- watching

11  that tape yesterday, that there were -- Mr.-- I -- there were

12  references to Mr. Savad's statement by the attendees of the

13  meeting.

14  Q.  Right.  And as soon as he sat down, there was a lot of

15  noise in the room right; do you remember that from the video?

16  A.  There was a lot of noise throughout.

17  Q.  And you had to bang your gavel?

18  A.  Yes.

19  Q.  In fact you broke your gavel?

20  A.  I think you did.

21  Q.  And yet you threatened to clear the room?

22  A.  Yes.  Often.

23  Q.  Would you agree that the public was inflamed by Mr. Savad's

24  statements at that meeting?

25          MR. STEPANOVICH:  Objection, speculation.

170523tartikovT1              Marshall - cross

1          THE COURT:  Rephrase.

2   Q.  What was your impression of the public's mood after

3   Mr. Savad sat down?

4   A.  That it furthered the inflammatory attitude that existed

5   when the meeting started.

6   Q.  Now, Mr. Stepanovich asked you this morning, he read the

7   statement to you that you made after a gentleman named Mr. Greg

8   Briem spoke.

9          Do you remember that statement?

10  A.  Yes.

11  Q.  And the statement I'm referring to, Mr. Marshall, is the

12  one where you said --

13  A.  What page is that on?  Can you tell me.

14  Q.  We don't need to go there, Mr. Marshall.  Actually, 58 of

15  Exhibit 137.

16  A.  Fifty-eight.  Okay.

17  Q.  And you said:  Ladies and gentlemen, let me say something.

18  We sitting at this table have limitations that are placed on us

19  as to what we can say and what we can't say.

20          Right?

21  A.  Yes.

22  Q.  And you went on from there, but I'm not going to read it

23  into the record again, but what I would like you to do,

24  Mr. Marshall, is if you could go up one paragraph where it says

25  "from the floor," do you see that?

170523tartikovT1            Marshall - cross

1   A.  Where?  Mr. Briem's comments?

2   Q.  Yes.

3   A.  What line is that?

4   Q.  Line four.

5   A.  Oh, line four?

6   Q.  Yes.

7   A.  Okay.  Yeah.

8   Q.  Can you read Mr. Briem's comments?

9   A.  The frustration that we have is that you know of the press

10  that had come out whether it is true or not you knew that it

11  was out there and you -- you were very, very upset.  I think

12  what would have helped -- what would have helped us is that at

13  the beginning of the meeting, you had said this is what is

14  going on, we know that you've read this, we are here to protect

15  your interest and the amendment to this law, this project, this

16  alleged project with the alleged attorney, who is allegedly

17  sitting here produces it, that these amendments will defend

18  it -- will defend us if you had said that in the beginning, I

19  don't think as many people would have been as upset as they are

20  because we don't know where you stand.

21  Q.  Now, Mr. Briem said he was frustrated; right?

22  A.  He sure did.

23  Q.  And he said he was upset?

24  A.  Yes.

25  Q.  And you were trying to calm him down, weren't you?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - cross

1   A.  I was.

2   Q.  In fact, this statement was not dissimilar to many other

3   statements that you made during the course of this meeting, was

4   it?

5   A.  No, it was consistent with them.  And as a matter of fact,

6   really what I was -- what I was saying is summed up in the last

7   paragraph where I say there are limitations under the law that

8   restrict that -- restrict what we can say and what we cannot --

9   what we can't say.

10          What I was trying to express to the audience was that

11  during the public hearing, it was not our -- it would not be

12  proper for us to comment and give our opinions on what was

13  being discussed.

14  Q.  And that was because no application had been received, had

15  it?

16  A.  That's correct.

17  Q.  The only information that you, as the mayor had, was what

18  you read in the newspaper; is that correct?

19  A.  That's right.

20  Q.  You weren't trying to intimate to Mr. Briem or to anyone

21  else in the room that you agreed with his position, were you?

22  A.  Absolutely not.

23  Q.  And you weren't trying to indicate to anyone in the room or

24  to Mr. Briem that you disagreed with him?

25  A.  That's correct.

170523tartikovT1            Marshall - cross

1   Q.  You were simply stating you didn't have enough information

2   to make a determination?

3   A.  Yes.

4   Q.  And you made statements like this throughout the night?

5   A.  I stopped counting at nine.  I don't know how many times I

6   said it.

7   Q.  I actually was counting yesterday, Mr. Marshall.  Would it

8   surprise you if I told you that there were at least 15 instance

9   where's you made similar statements to try to control the

10  meeting?

11  A.  Not at all.

12  Q.  Now, this was the second time that Local Law 1 of 2007 was

13  on the board of trustees' agenda; is that correct?

14  A.  That's correct.

15  Q.  It had been discussed previously at a trusty's meeting in

16  December of 2006; do you recall that?

17  A.  Yes, I do.

18  Q.  And Mr. Savad spoke at that meeting; did he not?

19  A.  I don't recall.

20  Q.  I'll come back to that point, Mr. Marshall.  A lot of

21  people spoke at that January 22nd, 2007 meeting?

22  A.  Yes, they did.

23  Q.  Were all of the speakers from the Village of Pomona?

24  A.  No.

25  Q.  In fact, you identified -- there were people who were not

170523tartikovT1            Marshall – cross

1   from the village?

2   A.   That's correct.  The village --

3   Q.   Mr. Marshall, let me ask you a question and then you can

4   answer.  It will be easier for everyone that way.

5   A.   Sure.

6          MS. NAPP:  May I approach, your Honor

7          THE COURT:  Yes.

8   Q.   Mr. Marshall, I think a few minutes ago you testified that

9   you couldn't recall if Mr. Savad spoke at the December 2006

10  meeting where the dormitory law was discussed; is that correct?

11  A.   Yes, that's correct.

12  Q.   Could you turn to the fourth page of that document and

13  see if that refreshes your recollection.

14  A.   Fourth page.  It appears Mr. Savad did speak.

15  Q.   And that document that I handed you, Mr. Marshall, can you

16  look at the front of it.

17  A.   Okay.

18  Q.   Do you recognize that document?

19  A.   Yes.  It's the -- they're the adopted minutes of the

20  April 18, 2006 meeting.

21         MS. NAPP:  Your Honor, I move Defendants' Exhibit 1041

22  into evidence.

23         MR. STEPANOVICH:  No objection.

24         THE COURT:  1041 received.

25         (Defendants' Exhibit 1041 received in evidence)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - cross

1  Q.  Mr. Marshall, if you can turn back to the fourth page of

2  that document.

3  A.  Okay.

4  Q.  And you see where Mr. Savad is speaking?

5  A.  Yes.

6  Q.  Mr. Savad asked the board of trustees to continue the

7  public hearing on that Local Law, did he not?

8  A.  It appears that way; yes.

9  Q.  And I think he -- his reasoning was that there was

10  insufficient notice; is that correct?

11  A.  Yes.

12  Q.  And the board granted that request; correct?

13  A.  Yes, they did.

14  Q.  And so then, that Local Law, Local Law 1, which ultimately

15  became Local Law 1 of 2007, that next appeared on the agenda at

16  the 1/22/07 meeting?

17  A.  Yes, it did.

18  Q.  Now, Local Law 1 of 2007 was adopted on 1/22/07; is that

19  correct?

20  A.  Correct.

21  Q.  Following that public hearing?

22  A.  Yes.

23  Q.  Did you take any anti-Hasidic or anti-Orthodox comments

24  into account when you voted on that law?

25  A.  Absolutely not.

170523tartikovT1                Marshall - cross

1   Q.  Was that law intended to discriminate against Orthodox or

2   Hasidic Jews?

3   A.  It absolutely wasn't.  It was specific -- it was not

4   property-specific, but an attempt to try and further clarify

5   our Local Laws in general, our Local Law in general.

6   Q.  Now, we talked about how that meeting was videotaped.  Was

7   it usual for Village of Pomona meetings to be videotaped?

8   A.  No.  Over the years, no, not really.  There were occasions

9   when they were videotaped when -- they were taped when there

10  was a court stenographer in the meetings.  Mr. Savad's

11  organization I know attended even our workshop meetings, and I

12  think taped some of those.  It was not uncommon.

13  Q.  Now, Mr. Marshall, when did you cease to be the mayor of

14  the Village of Pomona?

15  A.  In April 2007.

16  Q.  So, you weren't on the law when the wetlands law of 2007

17  was passed, were you?

18  A.  No, I wasn't.

19  Q.  But the board had considered wetlands laws long before

20  2007; is that correct?

21  A.  Absolutely.  It was a major problem for us.  I know it went

22  back certainly into the '90s.

23  Q.  And in fact the former village counsel had drafted a draft

24  wetlands law before; did he not?

25  A.  Yes.  I think in 1998, I think that was.

170523tartikovT1          Marshall – cross

1          MS. NAPP:  May I approach, your Honor.

2          THE COURT:  Yes.

3  Q.  Mr. Marshall, I've just handed you what's been marked as

4  Defense Exhibit 1086 for identification.  Do you recognize that

5  document?

6  A.  Yes.

7  Q.  And what is it, please?

8  A.  It is a copy of the proposed Local Law providing standards

9  and procedures for the regulation and protection of wetlands,

10  water bodies and water courses in the Village of Pomona.

11          MS. NAPP:  Your Honor, defendants would move 1086 into

12  evidence.

13          THE COURT:  Is the date clear from the document?

14          MS. NAPP:  Mr. Marshall, what is date at the top of

15  this cover sheet here, the first page of 1086.

16          THE WITNESS:  The letter on the cover is March 14,

17  1998.

18          THE COURT:  March or May?

19          THE WITNESS:  May.

20          MR. STEPANOVICH:  No objection, your Honor.

21          MS. NAPP:  It's May, your Honor, for the record.

22          THE COURT:  That's what it looked like from your

23  exhibit list.  That's why I asked.

24          That's received.

25          (Defendants' Exhibit 1086 received in evidence)

170523tartikovT1          Marshall - cross

1   Q.  Mr. Marshall, is Exhibit 1086 that you have there in front

2   of you, is that the draft wetlands law that you referenced a

3   minute ago?

4   A.  Yes.

5   Q.  And that's -- the date on that is 1998; right?

6   A.  Correct.

7   Q.  Eleven years before the wetlands law that was enacted in

8   2007?

9   A.  Yes.  There may have been discussion even before that

10  because wetlands were a major problem for us because -- because

11  we were -- we were consistently trying to protect the smaller

12  wetlands and water courses in the village which were not so

13  defined clearly defined by either the DEC or the corps of

14  engineers so we tried to remedy that in the changing of our

15  Local Laws.

16  Q.  And Mr. Marshall, if I can take you back to the

17  January 22nd, 2007 meeting again just for one minute, you

18  answered some questions from Mr. Stepanovich related to the

19  height requirement that's included in Local Law 1 of 2007; do

20  you remember that?

21  A.  Yes.

22  Q.  And I believe you testified that the height requirement was

23  rejected based on comments from citizens; do you remember

24  that testimony?

25  A.  Yes, I remember.

170523tartikovT1              Marshall - cross

1  Q.  When you made that statement, when you testified as such,

2  you were referring to the comments that were related to the

3  height of the building; is that correct?

4  A.  Yes.  Only the height of the buildings.

5  Q.  You weren't referring to any comments made by members of

6  the public that could possibly be construed as anti-Semitic?

7  A.  No, absolutely not.

8  Q.  Because that had nothing to do with how high a building

9  should be?

10  A.  Absolutely not.

11        MS. NAPP:  If I may have one minute to consult with my

12  client.

13        THE COURT:  Yes.

14  Q.  Mr. Marshall, if you don't mind my asking, what religion

15  are you?

16  A.  I'm Jewish.

17        MR. STEPANOVICH:  Objection.  Relevance?

18        THE COURT:  I mean, you know, it's relevant.  How

19  dispositive it is will be argued.

20        Overruled.

21  Q.  You can answer, Mr. Marshall.

22  A.  I'm Jewish.

23  Q.  And you're aware that statements made by you during your

24  tenure as the mayor of the Village of Pomona have been called

25  anti-Semitic?

170523tartikovT1                Marshall - cross

1  A.  Yes.  I find them singularly repugnant.

2  Q.  Why is that, sir?

3  A.  I am Jewish.  I was prior to being elected into public

4  office --

5       MR. STEPANOVICH:  I'll object to this, your Honor.

6  It's one thing to have him say he's an Orthodox -- he's Jewish,

7  but to go on --

8       THE COURT:  It was in response to a follow up question

9  as to his reaction to being accused of making anti-Semitic

10 comments.  It's relevant.

11      Go ahead.

12      THE WITNESS:  Thank you.

13 A.  Prior to being elected mayor of -- or to the board of

14 Pomona, I was the president and late leader of the largest

15 synagogue in Rockland County.  In addition to that, I acted as

16 a canter in three synagogues in various parts of the country

17 over a 15-year period.

18      I consider relative to my Jewishness that there was

19 no -- there's no difference between a chautmer (ph) from Monsey

20 or a reformed Jew from Pomona.  That's my attitude.  I viewed

21 the -- in that same vein, I always viewed any rearing of

22 anti-Semitism, which I perceive to lay beneath the surface in

23 too many areas, I take that as a very personal comment, so that

24 any allegation of anti-Semitism I find repugnant.

25      As a public official, I unfortunately, learned that it

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Marshall - cross

1  is necessary to have a very thick skin.  I accepted that.  It

2  wasn't pleasant, but I draw the line at the question of

3  anti-Semitism because I consider any anti-Semitic acts,

4  wherever they may be, to be very personal to me.

5  Q.  Thank you, Mr. Marshall.

6          Just one other question for you that I found here in

7  my pile of notes.  You testified earlier about residents of the

8  Village of Pomona opposing group homes while you were in

9  office; do you remember that?

10  A.  Yes.

11  Q.  I want to be clear, the residents were opposed to group

12  homes; right?

13  A.  Residents were opposed to group homes as they were to

14  anything that was different in their neighborhood.

15  Q.  And the group home issue came up, I think you said, because

16  applications for group homes were being filed; is that correct?

17  A.  Yes.  There was a one point in time and I forget the year,

18  where the state disbursed the population of disadvantaged --

19  disabled people throughout the group homes throughout the

20  state.  They eliminated the central group homes as part of

21  the -- I believe it was part of the Fair Housing Act.

22  Q.  Thank you, Mr. Marshall.

23          MS. NAPP:  I don't have any further questions, your

24  Honor.

25          THE COURT:  Redirect?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Marshall - redirect

1          MR. STEPANOVICH:  Redirect.

2    REDIRECT EXAMINATION

3    BY MR. STEPANOVICH:

4    Q.  Mr. Marshall, you knew there were wetlands on this

5    property, didn't you?

6    A.  Yes, but I -- however they -- as I recall, they were larger

7    wetlands that were not under question to be protected by our

8    wetlands law.

9    Q.  And you knew that years ago, didn't you?

10   A.  Years ago?  Define that.

11   Q.  Pardon me?

12   A.  What do you --

13   Q.  How about prior to 2007?

14   A.  Yes.

15   Q.  Now, Mr. Marshall, you testified about this exhibit 1086,

16   this wetlands law that was proposed back in 1998, right?

17   A.  Yes.

18   Q.  That law was never passed, was it?

19   A.  I don't recall.  I know we had a wetlands law on the books.

20   I don't know if it was passed or not.

21   Q.  Does it normally take about nine years for the Village of

22   Pomona to pass a law?

23   A.  Depending on the complexity of the law.  The question of

24   the wetlands law was very complex due to the involvement of the

25   DEC and the corps of engineers which changed over the years and

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - redirect

1  required us to revise our law to protect the smaller wetlands

2  that we -- that were not protected under those --

3  Q.  st your testimony, I want to be clear for the record, is

4  it your testimony that prior to wetlands law of 2007, the

5  Village of Pomona had a wetlands law, is that your testimony?

6  A.  To my recollection.

7  Q.  This wetlands law of 2007, that was passed after you were

8  defeated in your election of March of 2007?

9  A.  Correct.

10 Q.  And after this January 22nd, 2007 meeting; isn't that

11 correct?

12 A.  Correct.

13 Q.  Now, Mr. Marshall, I heard the questions by Ms. Napp.  Is

14 it your testimony that Mr. Savad made them all make those

15 statements yesterday, is that your testimony?

16 A.  No.

17        MS. NAPP:  Objection, your Honor.

18        THE COURT:  Overruled.  He answered.

19 Q.  You testified that you couldn't express to the people in

20 the meeting whether or not you could agree or disagree with

21 them.  I think you said something like that; isn't that true?

22 A.  I said -- I said that in that the statement that you're

23 referring to, I believe, that it was my effort to try and calm

24 that -- the hostility that was out there, but more importantly

25 to explain to our residents that it would be improper for board

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall - redirect

1   members to comment, to give their opinions during a public

2   hearing.

3   Q.  But the board voted on January 22nd, 2007 unanimously to

4   pass Local Law 1 of 2007, correct?

5   A.  That's correct, but that was not during the public hearing.

6   That was after the public hearing.

7   Q.  It was the same night?

8   A.  It was the same night.

9   Q.  After the closure of the public hearing?

10  A.  Correct.

11  Q.  After you heard all of these comments?

12  A.  Correct.

13  Q.  Now, you testified, Mr. Marshall, about the overnight

14  parking law?

15  A.  Yes.

16  Q.  And I think that's Exhibit 73.  Do you have that?

17  A.  Yeah, but I have to find it just a second.

18  Q.  Okay.

19  A.  Yep.  Got it.

20  Q.  If you can turn to the first page, Mr. Marshall.

21  A.  Okay.  Have it.

22  Q.  If I'm reading this correctly, this law amended the prior

23  parking law; am I right?

24  A.  It amended the prior parking law, but if I recall, it

25  repealed -- it actually repealed and replaced the prior law.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1              Marshall - recross

1  Q.  And the prior law prohibited overnight parking from

2  November 15 through April first.  Do you see that in the second

3  whereas clause?

4  A.  Yes.

5  Q.  But this new law, Exhibit 73, prohibited overnight parking

6  all year round; isn't that correct?

7  A.  Yes.

8  Q.  And in fact, one could obtain a parking permit in

9  conformance with this overnight parking law; isn't that right?

10  A.  Yes.

11  Q.  And that permit was valid for only seven days from the date

12  of its issuance, and I'm referring to the third page of this

13  document, paragraph four; isn't that correct?

14  A.  Wait.  Let me just check it.

15  Q.  Sure.

16  A.  Yes.

17  Q.  So, a person in order to receive the parking permit would

18  have to go to village hall every seven days to renew the

19  permit?

20  A.  It looks like that.

21        MR. STEPANOVICH:  Thank you.  I have nothing further.

22  RECROSS EXAMINATION

23  BY MS. NAPP:

24  Q.  Mr. Marshall, there are wetlands throughout the Village of

25  Pomona; are there not?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1          Marshall- redirect

A.  I beg your pardon?

Q.  There are wetlands throughout the Village of Pomona; are
there not?

A.  There are.

Q.  And with regard to the subject property, are you aware
whether there are federal wetlands on that property?

A.  I believe there are.  I'm not absolutely certain.  I know
that the wetlands law when it was first considered -- when the
wetlands law was first considered and I go back to 1998, but I
know that it was considered before that, it had nothing to do
with the property in question because there was a question as
to whether that property could in fact be developed because it
was a camp and it was -- it was -- which -- the charter went
back on I think 1903 or something like that.  Of more concern
of the wetlands law was directed at development on the
mountain, which was very heavy at the time.

Q.  And you weren't suggesting earlier, Mr. Marshall, when we
talked about the wetlands law that was first proposed in 1998,
you weren't suggesting that that law had been pending since
1998, were you?

A.  No.

        MS. NAPP:  Nothing further.

        MR. STEPANOVICH:  Okay.

REDIRECT EXAMINATION

BY MR. STEPANOVICH:

170523tartikovT1              Marshall- redirect

1   Q.  The camp that you were referring to was Camp Dora Golding;

2   correct?

3   A.  Yes.

4   Q.  And it goes back a long time, doesn't it?

5   A.  Goes back to around 1900s, somewhere around there.

6   Q.  And that property Camp Dora Golding was used for Jewish --

7   the Jewish children during the summertime; isn't that right?

8   A.  Yes, Jewish fed- -- I think it was a camp charter to the

9   Federation of Jewish Philanthropy.  I think that's what it was

10  chartered to.

11  Q.  And that's the same property that Tartikov owns today;

12  correct?

13  A.  Yes.

14          MR. STEPANOVICH:  Nothing further.

15          MS. NAPP:  Nothing further, your Honor.

16          THE COURT:  Okay.

17          Mr. Marshall, you are excused.

18          THE WITNESS:  I'm done?

19          THE COURT:  You're done.

20          THE WITNESS:  Wow.

21          THE COURT:  If you want to come collect your papers,

22  counsel.

23          (Witness excused)

24          THE COURT:  The quote one of the greatest music albums

25  of all time, "Who's Next"?

170523tartikovT1            Louie - direct

1            MR. STEPANOVICH:  The Plaintiffs call Rita Louie.

2            THE COURT:  Okay.

3            (Witness sworn)

4            THE COURT:  Good morning.

5    RITA LOUIE,

6        called as a witness by the Plaintiffs,

7        having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. STEPANOVICH:

10   Q.  Good morning.

11   A.  Good morning.

12   Q.  Ms. Louie, you were a trustee in the Village of Pomona,

13   correct?

14   A.  Yes.

15   Q.  And for how many years?

16   A.  I believe I was a trustee for five years?  I don't recall

17   exactly how many years.

18   Q.  You ran for election in March of 2007?

19   A.  Yes.

20   Q.  Did you finish your first term?

21   A.  Yes.

22   Q.  Did you run for another term?

23   A.  I believe we ran for re-election; yes.

24   Q.  And did you complete two complete terms -- let me retract

25   that question.  Make it easier.  Did you fulfill two complete

170523tartikovT1          Louie - direct

1  terms?

2  A.  I left -- I resigned early in my second term, not -- I

3  didn't complete the second term, I don't believe.

4  Q.  And when you were a board of trustees member, you received

5  opinions from residents in the community; isn't that true?

6  A.  Yes.

7  Q.  Now, Ms. Louie, you're aware that Orthodox and Hasidic Jews

8  have very large families?

9  A.  Not necessarily.

10  Q.  Are you aware that Orthodox Hasidic Jews have large

11  families?

12  A.  I've heard this; yes.

13          MR. STEPANOVICH:  May I approach, your Honor.

14          THE COURT:  Yes.

15  Q.  Ms. Louie, I've handed you what's been marked as Plaintiff

16  Exhibit 18.  Could you identify that?

17  A.  It looks like an e-mail that was sent to me from Spook Rock

18  gmail.

19  Q.  Does it also contain an e-mail that you sent?

20  A.  It contains an e-mail that I sent to someone named Tina.

21  Q.  And you know who that Tina is?

22  A.  No.  I do not.  I've heard the name, but I don't know

23  who -- I don't know her.

24  Q.  You don't dispute this is your e-mail address?

25  A.  I do not.

170523tartikovT1            Louie - direct

1              MR. STEPANOVICH:  Offer Plaintiffs' 18.

2              MS. NAPP:  Your Honor, no objection as to the portions

3    authored by Ms. Louie, but the other statements from these

4    other individuals are hearsay.

5              MR. STEPANOVICH:  Of course, your Honor.  We make it

6    an exhibit that way because that's the way it was produced.  We

7    obviously concur with that.

8              THE COURT:  So, it's coming in as a statement by a

9    party opponent; the other, what you're saying, is not coming in

10   for the truth of the matter asserted.

11             MR. STEPANOVICH:  That's correct.

12             THE COURT:  Okay.  With those provisos, the exhibit is

13   received.

14             (Plaintiffs' Exhibit 18 received in evidence)

15   Q.  Now, Ms. Louie, you write that the town cannot accept a

16   flawed FBIS based on all data.

17             The "town," you mean the Town of Ramapo; is that

18   correct?

19   A.  Correct.

20   Q.  In addition at the public hearing, the applicant said,

21   quote, religious people would be living there, here and not

22   going to public schools.

23             Did I read that accurately?

24   A.  Yes, you did.

25   Q.  And you write that the town cannot in good conscience

170523tartikovT1            Louie - direct

1  change the comprehensive plan and zoning to accommodate the

2  development of a segregated community.

3              Did I read that accurately?

4  A.  Yes.

5  Q.  And you believe, Ms. Louie, that the town of Ramapo was

6  creating a zone for one religious group?

7  A.  I believed they were ignoring the public comments during

8  the public hearing of that zoning change and one of the public

9  comments was this one applicant who got up and specifically

10 said that property was going to be for religious people, and I

11 felt the town was just ignoring that in their determination.

12 Q.  Did you believe that the town was spot-zoning to create a

13 zone of one religious group?

14 A.  I believed the town was spot-zoning to create a zone for

15 developer.  I don't think they were creating it for a religious

16 group.  I thought they were spot-zoning for a developer and

17 ignoring the religious aspect.

18              MR. STEPANOVICH:  May I approach.

19              THE COURT:  Yes.

20 Q.  You remember you gave a deposition in this case, right,

21 Ms. Louie?

22 A.  Yes.

23 Q.  Turn your attention to page 246 of your deposition.  And

24 I'm going to read line 18.  Are you there?  Let me wait a

25 second.  246, line 18?

170523tartikovT1            Louie - direct

1   A.  Sorry.  I wasn't familiar with the format.  I got it.

2   Q.  Are you there?

3   A.  Yes.

4   Q.  I'm reading:  Why, because the town was catering to a

5   specific religious group?

6           Answer:  Not catering to, but spot-zoning too, yeah,

7   to create a zone of one religious group; yes.

8           Did I read that accurately?

9   A.  Yes, you did.

10  Q.  And you personally have an issue with a segregated

11  community, don't you?

12  A.  Yes.  I don't -- I don't -- I don't like segregated

13  communities in any form way, shape or form.  I'm not a big fan

14  of them; correct.

15  Q.  And you believe that the Orthodox Hasidic Jewish community

16  intentionally segregates itself from assimilating into the

17  general community; isn't that true?

18  A.  That is not my overall belief necessarily.

19  Q.  Turn to page 248 of your deposition, please, line 21:

20          Question:  Do you believe that Orthodox Hasidic

21  community intentionally segregates itself from assimilating

22  into the general community.

23          Answer:  Yes, I do at times, depends on the extremity

24  of the sect.

25          Did I read that correctly?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1              Louie - direct

1   A.  Yes, you did.

2   Q.  Now you know that New Square and Monsey are predominantly

3   occupied by Hasidic Orthodox Jews; isn't that true?

4   A.  Yes.

5   Q.  You can't -- strike that, I'm sorry.  I'll withdraw.

6           You ran on a slate with Nicholas Sanderson and Brett

7   Yagel; isn't that right?

8   A.  Yes, I did.

9   Q.  And your campaign material stated that the single-most

10  important issue facing the village is clearly the Tartikov

11  development, true?

12  A.  It did state that; yes.

13  Q.  And you also said through your campaign materials that we

14  will vigorously defend our land use codes and regulations;

15  isn't that true?

16  A.  Yes.

17  Q.  And your campaign materials also indicated that you, Brett

18  Yagel, and Nick Sanderson have the plan, the experience, the

19  knowledge, the legal counsel and the guts; isn't that true?

20  A.  That is true.

21  Q.  And that you and your running mates will most effectively

22  be able to defeat any developers who plan to take over our

23  village and our area; true?

24  A.  True.

25  Q.  And all of this was campaign speak was it?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Louie - direct

1   A.  Absolutely.  It was really good stuff.

2   Q.  You were trying to get elected, right?

3   A.  Yes.

4   Q.  And you got elected?

5   A.  Yes.

6   Q.  Now, you -- you know Robert Prol?

7   A.  I think I knew Robert Prol.  I was never friends with

8   Robert Prol.  I know the name.  I remember him being around the

9   village, but I am not really familiar with Robert Prol.

10  Q.  Did Mr.-- did Mr. Prol encourage you to fight Tartikov; do

11  you recall that?

12  A.  I don't remember.  No.

13          MR. STEPANOVICH:  May I approach, your Honor.

14          THE COURT:  Yes.

15  Q.  Ms. Louie, did you ever have the -- I just have a couple

16  more questions before I refer to that exhibit.

17          Ms. Louie, did you ever have the occasion to suggest

18  that an offshoot of Preserve Ramapo should be started?

19  A.  I don't remember doing it, but from reading the

20  deposition -- I mean from seeing this document just now, I just

21  read it.  Sorry.  I just glanced down at that.

22  Q.  So, the document that I handed you refreshes your

23  recollection?

24  A.  Yeah.  I don't remember that specifically.

25  Q.  And it was your suggestion that that group be made up of

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1              Louie - direct

1   Orthodox Jews; correct?

2   A.  It was my suggestion that the group be made up of --

3           MS. NAPP:  Objection, your Honor.  I think the witness

4   is testifying from the document that hasn't been admitted into

5   evidence.

6           THE COURT:  Yes.

7           MR. STEPANOVICH:  I'm sorry.

8   Q.  I'm not asking you to testify from the document.  Really,

9   I'm just asking you if that document refreshed your

10  recollection as to this offshoot of Preserve Ramapo.

11  A.  Yes.

12  Q.  And the document does refresh your recollection; isn't that

13  true?

14  A.  Yes, it does.

15  Q.  And so you wanted to form this offshoot of Preserve Ramapo,

16  correct?

17  A.  I guess.  So it says.

18  Q.  But you said that you couldn't do it because of your

19  position; isn't that right?

20  A.  Well, again, if I'm not supposed to refer to the document,

21  I can't answer your question.

22          MS. NAPP:  Your Honor.

23          THE COURT:  All right.

24  Q.  If you remember.

25  A.  I don't remember.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1                Louie - direct

1          MS. NAPP:  The document is sitting in front of her and

2     the witness is continually glancing at it.

3          If she's not going to testify to that --

4          THE COURT:  -- the document.

5          Go ahead.  Ask the question.

6     Q.  Do you remember, Ms. Louie, that you said that you could

7     not be involved in this organization because of your position?

8     A.  I don't remember that.  No.

9     Q.  Is it possible that you said that?

10    A.  It's possible.  Yes.

11    Q.  Now, you wanted to keep Pomona diverse; isn't that true?

12    A.  Correct.  Yes.

13    Q.  And by diverse, you meant maintaining the demographic

14    makeup of the village the way it is; isn't that true?

15    A.  Yes, that's true.

16    Q.  Accepting all people in all areas of the village; isn't

17    that true?

18    A.  That's true.

19    Q.  Because it's worked since the village was formed in 1967,

20    true?

21    A.  True.

22    Q.  And so there's no reason to believe that it wouldn't be

23    maintained, the cultural and economic diversity as it has been

24    maintained; isn't that true?

25    A.  That's true.

170523tartikovT1               Louie - direct

1   Q.  There are no Orthodox Hasidics in the Village of Pomona to

2   your knowledge; isn't that true?

3   A.  That's not true.

4   Q.  And so you -- Hasidic -- strike that.

5           Are there any -- do you have any knowledge whether or

6   not there are Hasidic Jews in the Village of Pomona?

7   A.  Currently?

8   Q.  Yes.

9   A.  I believe there are.  Yes.

10  Q.  And how do you know that?

11  A.  I've talked to my neighbors, I've met some new neighbors,

12  some new religious people that moved into the neighborhood.

13  We're friendly.

14  Q.  With these Orthodox Hasidic Jews?

15  A.  Absolutely.

16  Q.  And these are Orthodox Hasidic Jews that do not segregate

17  themselves into a community?

18  A.  Correct.

19  Q.  Now, you made judgments during your campaign, Ms. Louie,

20  that Rabbinical College of Tartikov had real environmental

21  problems; correct?

22  A.  I probably did.  I don't remember.

23  Q.  And you base those statements on rumors; isn't that right?

24  A.  I don't remember.

25  Q.  Okay.  If you could turn to your deposition at 121, page

170523tartikovT1          Louie - direct

1   121, please.

2          I'm going to start at line 13:  So what did you know

3   about the plan.  Answer:  Rumors like everyone else in the

4   community.

5          Did I read that correctly?

6   A.  Yes.

7   Q.  And you indicated when you were campaigning that the

8   Tartikov project would have environmental concerns, didn't you?

9   A.  Probably, yes.

10  Q.  And you had no facts at all to form that opinion, did you?

11  A.  No.

12  Q.  And you also indicated that the Tartikov program -- I mean

13  project would have safety issues; isn't that true?

14  A.  Possibly.  Yeah.

15  Q.  And you had no facts to form the basis of that statement,

16  did you?

17  A.  None whatsoever.

18  Q.  Now, Ms. Louie, when you were campaigning for election in

19  2007, you drafted a letter to the Journal News editor; isn't

20  that true?

21  A.  Um -- possibly.  I wrote a lot of letters to the Journal

22  News over the years.

23          MR. STEPANOVICH:  May I approach, your Honor.

24          THE COURT:  Yes.

25  Q.  I've handed you what's been marked as Plaintiff Exhibit 17.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1            Louie - direct

1    Can you identify that document, Ms. Louie?

2    A.  It looks like a letter to the Journal News.

3    Q.  From you, correct?

4    A.  Yes.

5            MR. STEPANOVICH:  Move the admission of Plaintiffs'

6    17, your Honor.

7            MS. NAPP:  Your Honor, defendants object to this

8    document as hearsay.  If you look at the bottom it indicates it

9    was signed by Ms. Louie in her capacity as a candidate for

10   public office, not an elected official.  Therefore, it doesn't

11   come under the admission by a party opponent section and it

12   remains hearsay.

13           MR. STEPANOVICH:  We're not offering the document to

14   prove the truth of the matter asserted.

15           THE COURT:  You're offering it for proof of what was

16   said?

17           MR. STEPANOVICH:  What was said; correct.

18           THE COURT:  Why would that not be admissible?

19           MS. NAPP:  Well, your Honor, typically speaking, when

20   we're talking about what was said, or you know --

21           THE COURT:  I know, generally, there's always

22   exceptions to the rule.

23           MS. NAPP:  I guess I'm just not following the logic.

24           THE COURT:  It's not coming in for the truth of the

25   matter asserted; it's coming in for what was said.  The things

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170523tartikovT1              Louie - direct

1   that were said -- they're not trying to use that to prove the

2   truth of what was said in there, but the fact that this witness

3   said it as a reflection of her state of mind, presumably.

4          MR. STEPANOVICH:  That's correct.

5          MS. NAPP:  Yes.  That's right.  Thank you.

6          THE COURT:  With that understanding.

7          (Plaintiffs' Exhibit 17 received in evidence)

8   Q.  You drafted this letter; correct?

9   A.  It appears so, yes.

10  Q.  And you sent this letter on to Brett Yagel; isn't that

11  true?

12  A.  I don't recall.

13  Q.  Turn to page 255 of your deposition, please, line -- I'm

14  sorry.  255.

15  A.  Okay.

16  Q.  Line 15:  I believe I drafted the -- would have drafted the

17  original letter and sent it to Mr. Yagel and he edit it and

18  sent it out.

19          Did I read that accurately?

20  A.  Yes.

21          MR. STEPANOVICH:  May I approach, your Honor.

22          THE COURT:  Yes.

23  Q.  Coming back for just a moment, Ms. Louie, the authors of

24  17 -- Exhibit 17 were Rita Louie and Brett Yagel; isn't that

25  correct?

170523tartikovT1            Louie - direct

1   A.   Yes.

2   Q.   And on 17, coming back to 17, you indicate this letter

3   indicates that the rabbinical college plans for the Village of

4   Pomona was a natural progression and that the character of the

5   village is evolving.

6          You see that in the first paragraph, 17?

7   A.   Yes.  That looks like a quote from a letter that we're

8   responding to.

9   Q.   And the letter also goes on to say that a virtual mini-city

10  within the village that will house thousands of homogeneous

11  individuals is natural in any way is simply not true.

12         Isn't that what it says?

13  A.   Yes.

14  Q.   And by homogeneous individuals, you're referring to

15  Orthodox Hasidic Jews; isn't that correct?

16  A.   Not necessarily.  I was referring to white men, which is

17  what was described in the Journal News article that described

18  the project as men who would be studying there.

19  Q.   And so those white men who would be studying there, you

20  knew were going to be rabbinical students; correct?

21  A.   Yes.

22  Q.   And so those white men who were rabbinical students, they

23  would have been the homogeneous individuals that you're

24  referring to; isn't that correct?

25  A.   Yes.

170523tartikovT1            Louie - direct

1    Q.  Now, if you look at 159, Ms. Louie.  Can you -- I'm sorry.

2    Can you identify 159.

3    A.  It is a letter to the Journal News.

4    Q.  And this letter is not signed by you; isn't that true?

5    A.  That is correct.

6    Q.  Signed by Lynn Yagel?

7    A.  Yes, it is.

8    Q.  The title of the letter, though, indicates Pomona

9    Rabbinical College Not a Natural Progression; isn't that true?

10   A.  That is true.

11   Q.  And going back to 17, the re line of the e-mail says Pomona

12   Rabbinical College Not a Natural Progression; isn't that true?

13   A.  That's true.

14   Q.  Do you have any idea why, Ms. Louie, you didn't sign

15   Exhibit 159?

16   A.  If I remember correctly, like I referred to earlier, I

17   wrote a lot of letters to the Journal Newses.  The Journal News

18   had a restriction that you could not submit a letter within 30

19   days or 60 days, whatever it was at the time of a letter you've

20   already submitted, so I often drafted letters and sometimes

21   other people had to sign them because it was too close

22   together.  That's probably what happened in this case.  When we

23   tried to submit, it was probably rejected by the Journal News

24   because my name was already on another letter for some other

25   purpose.  So, we probably asked Brett's wife to submit it under

170523tartikovT1          Louie - direct

1    her name.  That's the -- that would be the only logical

2    explanation of why she would have submitted a letter that I

3    authored.

4    Q.  Did you receive any rejection letter from the Rockland

5    County Journal News when you submitted this letter?

6    A.  No.  They never sent out rejection letters.  They just

7    wouldn't publish it.

8    Q.  Now, Ms. Louie --

9              THE COURT:  If you're going onto another topic, do you

10   want to break?

11             MS. NAPP:  This would be a perfect break.

12             THE COURT:  Let's do that.  Let's take our mid-day

13   break.

14             We'll see you in 15.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

20175ncongt                    Louie - Direct

1                         **AFTERNOON SESSION**

2                            **12:30 p.m.**

3          **THE COURT:  Mr. Stepanovich, you may continue.**

4          **MR. STEPANOVICH:  Thank you, your Honor.**

5          **May I approach, your Honor?**

6          **THE COURT:  Yes.**

7   **RITA LOUIE resumed the witness stand.**

8   DIRECT EXAMINATION (Resumed)

9   **BY MR. STEPANOVICH:**

10  **Q.  Ms. Louie, I've handed you what has been marked for**

11  **identification as Plaintiffs' Exhibit 72.  Could you identify**

12  **those documents, please.**

13  **A.  It looks like a screen shot of a text message.**

14          **MR. STEPANOVICH:  Your Honor, plaintiffs move into**

15  **admission Plaintiffs' Exhibit 72.**

16          **MS. NAPP:  Your Honor, defendants object to**

17  **Plaintiffs' Exhibit 72.  This text conversation is not relevant**

18  **to anything other than the issue of spoliation, which this**

19  **Court has already ruled on back in the summer of 2015.  It**

20  **doesn't contain any independent evidence of religious animus.**

21  **It's nothing more than a conversation between two former**

22  **colleagues who have a strained relationship and are stuck**

23  **together by virtue of being co-defendants in an action.  As**

24  **such, it's not relevant and defendants' position would be that**

25  **it's more prejudicial than probative.**

20175ncongt                    Louie - Direct

1            THE COURT:  Mr. Stepanovich.

2            MR. STEPANOVICH:  Your Honor, the Court allowed us, in

3    its summary judgment opinion, to pursue the issue of records

4    being lost and, quite frankly, the adverse inference —— a

5    little on unchartered waters here in terms of the adverse

6    inference and what else we need to do in that regard.  And if

7    we have to prove anything, then I think these records are

8    relevant.  And, again, they're not offered for the truth of the

9    matter, they're offered for Ms. Louie's state of mind.

10           MS. NAPP:  Your Honor, I think that they're clearly

11   being offered for the truth of the matter.  Your Honor has

12   already indicated that there is an adverse inference that the

13   defendants have to deal with that the missing Facebook post

14   contained information that was demonstrative of a religious

15   animus.

16           THE COURT:  But doesn't that make —— I'm sorry.

17   Finish your statement.  I didn't mean to interrupt.

18           MS. NAPP:  I was just going to say, your Honor,

19   Exhibit 72 here doesn't further that analysis at all.

20           THE COURT:  Well, doesn't the relevance derive from

21   the adverse inference that the fact finder would get to make so

22   that —— because, otherwise, how do you put the adverse

23   inference into context, A, and, B, if it's not being offered

24   for the truth, but, rather, for state of mind, that's been a

25   consistent theme.  And consistency I guess is not a virtue if

20175ncongt                    Louie - Direct

1   you're consistently wrong, but be that as it may, I think being

2   consistent on this point is right.  So state of mind is

3   something that is an exception to the hearsay rule, and you can

4   cover it on cross and in argument.  So I'm going to overrule

5   the objection.  So 72 is received.

6              MS. NAPP:  Thank you, your Honor.

7              THE COURT:  But, again, for the limited purpose of

8   state of mind and as it might relate to the adverse inference.

9              MR. STEPANOVICH:  Absolutely.  Thank you, your Honor.

10             (Plaintiffs' Exhibit 72 received in evidence)

11             THE COURT:  Okay.  Go ahead.

12  Q.  Now, Ms. Louie, do you understand that this lawsuit was

13  filed in July of 2007?

14  A.  Yes.

15  Q.  And that was about four months after you were elected to

16  the Board of Trustees; isn't that correct?

17  A.  Correct.

18  Q.  And were you informed that you needed to preserve all

19  documents that were in your possession related to this

20  litigation?

21  A.  Yes.

22  Q.  And, in fact, you turned over documents that were in your

23  possession relative to this litigation, correct?

24  A.  Correct.

25  Q.  Now, turning to Exhibit 72, this is a text exchange --

20175ncongt                    Louie - Direct

1  strike that —— a —— yes, a text exchange that you had with

2  Brett Yagel; isn't that true?

3  A.   Yes.

4  Q.   And these documents, Exhibit 72, were not turned over to

5  your counsel, were they?

6          MS. NAPP:  Your Honor, I'm going to object again.  And

7  if you'll hear me out on a slightly different ground.

8          THE COURT:  Sure.

9          MS. NAPP:  I understand your Honor's position that

10 Exhibit 72 is in the record, has been admitted and is received,

11 but now counsel is going down the spoliation road, which I

12 think is even more clear that your Honor has already ruled on.

13         Spoliation is a discovery issue.  Discovery in this

14 case occurred in 2013 with document discovery.  The summer of

15 2014 was taken up by depositions.  They moved on their

16 spoliation claim in 2015.  The ship has already sailed on this

17 issue.  If spoliation was a concern for the defendants, they

18 should have —— as your Honor indicated in his ruling, they

19 should have raised it back in 2013 or 2014, when defendants

20 would have had the opportunity to cure.  At this particular

21 point in time, mid trial, not only is it not relevant, but it's

22 extraordinarily prejudicial.

23         MR. STEPANOVICH:  Your Honor, and I'm reading from

24 your opinion, "and because plaintiffs are free to explore at

25 trial the issue of records being lost without an adverse

20175ncongt                    Louie - Direct

 1   inference charge, certainly during cross-examination for

 2   impeachment purposes," and that's just simply my intent.

 3             MS. NAPP:  Well, your Honor's ruling is your Honor's

 4   ruling.  I don't read that as -- I don't hear that as giving

 5   them carte blanche to retry spoliation.

 6             THE COURT:  Well, no, we're not going to do that.

 7             MR. STEPANOVICH:  That's not my intention, your Honor.

 8             THE COURT:  I was going to say I didn't think that was

 9   counsel's intention.  So I'm going to give Mr. Stepanovich some

10   leeway on this, but be light on your feet ready to object, and

11   I'll take each objection as it's made.

12             MS. NAPP:  Thank you, your Honor.

13             THE COURT:  Okay.

14             Go ahead, Mr. Stepanovich.

15             MR. STEPANOVICH:  Thank you, your Honor.

16   Q.  But, Ms. Louie --

17             MR. STEPANOVICH:  I'm sorry.  Could you read back my

18   last question, please.

19             (Record read)

20   Q.  Did you understand the question, Ms. Louie?

21   A.  Yes.

22   Q.  Were they?

23   A.  This document?  Not that I know of.

24   Q.  And I understand that this text exchange that's reflected

25   in Exhibit 72, this occurred in May of 2013.  Isn't that true?

20175ncongt                 Louie - Direct

1   A.  I don't remember.  It's dated May 10th.

2   Q.  Do you remember the year, Ms. Louie?

3   A.  It was probably 2013, yes.

4   Q.  And that would have been six years after this litigation

5   was filed; isn't that true?

6   A.  Yes.

7   Q.  And you searched your text messages to make sure that there

8   was nothing else like these in your possession; isn't that

9   true?

10          MS. NAPP:  Objection, your Honor.  I think that

11  mischaracterizes the exhibit.

12          THE COURT:  Why don't you rephrase it.

13          MR. STEPANOVICH:  Okay.

14  Q.  You searched your threads, and there was nothing else like

15  these texts in your threads; isn't that true?

16          MS. NAPP:  Objection, your Honor.  I think that still

17  mischaracterizes Exhibit 72.

18          THE COURT:  Do you understand that question?

19          THE WITNESS:  Yes, but the -- it -- the question

20  doesn't make sense, actually.

21          THE COURT:  All right.

22          MR. STEPANOVICH:  I'll try again.

23          THE COURT:  Why don't you rephrase it.

24          MR. STEPANOVICH:  I'll try again.

25          THE COURT:  Yes, okay.

20175ncongt                    Louie - Cross

1   Q.   Ms. Louie, if you could go back three pages from the end.

2   And the white part of these text messages, that is what you

3   wrote; isn't that true?

4   A.   Yes.

5   Q.   And it reads:  "I was not thinking.  Nothing else in my

6   threads has anything like this.  It's gone.  And I will try to

7   stay more focused going forward."

8           Did I read that accurately?

9   A.   Yes.

10  Q.   So you said it's gone.  What was gone?

11  A.   A Facebook comment that the text was referring to.

12  Q.   And it was gone because you deleted it?

13  A.   Yes.

14  Q.   Instead of turning it over to your counsel; isn't that

15  correct?

16  A.   It had nothing to do with this case.

17  Q.   You deleted it, correct, Ms. Louie?

18  A.   Yes; I deleted it.

19          MR. STEPANOVICH:  I have nothing further.

20          THE COURT:  Okay.

21  CROSS-EXAMINATION

22  BY MS. NAPP:

23  Q.   Ms. Louie, you remember receiving what we call a litigation

24  hold notice in this case, don't you?

25  A.   Yes.

20175ncongt                    Louie - Cross

1   Q.  In fact, you probably received more than one of those

2   documents; did you not?

3   A.  Yes, I did.

4   Q.  And that notice informed you that you had an obligation to

5   preserve any documents that you thought might be relevant to

6   this matter, correct?

7   A.  Absolutely, yes.

8   Q.  And you did your best to comply with that document; did you

9   not?

10  A.  Yes.

11  Q.  And you turned over any paper documents that you had in

12  your possession to your lawyers, right?

13  A.  Yes.

14  Q.  And you gave your lawyers access to your e-mails?

15  A.  Yes.

16  Q.  And you gave your lawyers access to your Facebook page?

17  A.  Absolutely.  All the passwords, everything, one-hundred

18  percent.

19  Q.  And you gave us access to any other social media platforms

20  that you might have, right?

21  A.  Yes.

22  Q.  Could you please tell the Court the circumstances

23  surrounding the text message exchange between yourself and

24  Mayor Yagel that's here in Exhibit 72.  What happened?

25  A.  It had to do with a comment that I made on Facebook of

20175ncongt                    Louie - Cross

1   somebody else's post.  Somebody posted something about an event

2   that took place in the Ramapo ballpark, which is a tax-funded

3   facility, that was discriminating against women.  The comment

4   that I made was that the --

5            MR. STEPANOVICH:  Your Honor, I object to the

6   question.  It's outside the scope of my question, your Honor.

7            THE COURT:  Overruled.

8            Go ahead.  You can continue.

9   A.   The comment that I made was that I had an objection to a

10  taxpayer-funded facility housing an event that discriminated

11  against women, because I am a women's advocate, when apparently

12  somebody took a screen shot of my comment and forwarded it to

13  the Mayor, which is what generated this text frenzy from him,

14  because he misconstrued it as something that might possibly

15  affect this case, which I vehemently disagree with.  But in an

16  effort to calm him down, because he wouldn't speak to me, he

17  only wanted to do this by text and was clearly upset, I said,

18  fine, I'll take down the comment, which I did because I

19  didn't -- A, I didn't think it was relevant to this case and,

20  B, I knew that, even if you delete a comment off of Facebook,

21  it's always retrievable.

22            What happened subsequently is when I couldn't retrieve

23  it was because the person who originally made the original post

24  deleted the post; therefore, my comment was also deleted.

25            So that's what -- that's what this entire exchange was

1   about.  It was about the Mayor overreacting to a Facebook

2   comment that had nothing to do with this case and me trying to

3   calm him down because I felt that he was being very

4   over-reactive, and I really literally was concerned for his

5   health at him getting so angry over something so innocuous.

6   Q.  Thank you, Ms. Louie.

7            MS. NAPP:  If I may have a moment, your Honor.

8            THE COURT:  Sure.

9            (Pause)

10  Q.  Ms. Louie, you were also asked about your campaign a few

11  minutes ago.  Do you recall that?

12  A.  Yes.

13  Q.  And what's your position on development within and around

14  the Village of Pomona?

15  A.  I believe in responsible development.  I am a developer.

16  I've been working for builders for over 30 years.  I understand

17  development.  I understand responsible development and I

18  understand irresponsible development.  And I think development

19  could be healthy when done correctly.

20  Q.  And your campaign materials were consistent with that

21  position?

22  A.  I believe so.  And I — actually, in my campaign materials,

23  that was one of my platforms, that I was a developer and I

24  understood development, yes.

25  Q.  You weren't campaigning on an anti-Hasidic or anti-Orthodox

20175ncongt                    Louie - Cross

1  platform, were you?

2  A.   Absolutely not.

3  Q.   You were just concerned about the project as you read about

4  it in the newspaper; isn't that correct?

5  A.   Correct.

6  Q.   And that was all the information you had?

7  A.   That was it, yes.

8  Q.   You knew from the paper that it was going to be big?

9  A.   That's what the article alleged.

10 Q.   And you didn't care who was the proponent of the project,

11 did you?

12 A.   No.

13 Q.   You would have opposed it anyway?

14 A.   Absolutely.

15 Q.   Now, you also spoke earlier about your belief that no one

16 should live in a segregated community.  Do you recall that

17 testimony?

18 A.   Yes, I do.

19 Q.   And that applies to everyone, right?

20 A.   I believe so, yes.

21 Q.   And, in your opinion, it doesn't matter what religion they

22 are?

23 A.   I have no opinion on religion one way or another, any

24 religion.  It's not in my blood.

25 Q.   Doesn't matter what race they are?

20175ncongt                    Louie - Cross

1    A.   No.

2    Q.   Doesn't matter what ethnicity they are?

3    A.   No.   I actually moved to -- from the East Ramapo School

4    District in Nanuet to the East Ramapo School District in Pomona

5    specifically because I wanted my children to grow up in a

6    diverse community, a religious and racially diverse area, like

7    I did in Queens.

8    Q.   Now, Ms. Louie, you were only on the Board of Trustees for

9    one of the local laws that is at issue in this lawsuit; is that

10   correct?

11   A.   Correct.

12   Q.   And that would be the wetlands law?

13   A.   Yes.

14   Q.   Was the wetlands law enacted to prevent Tartikov from

15   developing the property that they own in the Village?

16   A.   Absolutely not, no.

17   Q.   Why was the wetlands law enacted?

18           MS. NAPP:   Withdrawn.

19   Q.   Why did you vote in favor of the wetlands law?

20   A.   I voted in favor of the wetlands law mostly because I had

21   just recently come off being a Planning Board member and I

22   remembered the problems we had on the Planning Board dealing

23   with properties that had wetlands on them when people were

24   building homes, because there wasn't enough information and we

25   didn't have a vehicle to work with in our laws to deal with

20175ncongt                     Louie - Redirect

1   wetlands when making Planning Board decisions.  We really

2   struggled over a couple of applications over that.

3   Q.   Thank you, Ms. Louie.  I don't have anything further.

4   A.   Thank you.

5   REDIRECT EXAMINATION

6   BY MR. STEPANOVICH:

7   Q.   When did you move to Pomona, Ms. Louie?

8   A.   1993.

9   Q.   I've handed you, Ms. Louie, what's been marked for purposes

10  of identification as 135.  Can you identify that, please.

11  A.   It looks like a memo from the Village of Pomona, from Nick

12  Sanderson, to all current Village officials and employees.

13         MR. STEPANOVICH:  Plaintiffs move the admission of

14  135, your Honor.

15         MS. NAPP:  Your Honor, defendants object to this

16  document, again, on relevance grounds, relevance grounds as

17  well as the fact that the Village of Pomona has undertaken

18  extensive preservation throughout the course of this case going

19  back ten years, and if your Honor is going to admit this single

20  document, it opens the door for a mini-trial on the issue of

21  preservation.

22         THE COURT:  I've ruled on the spoliation motion, so

23  I'm not sure what the purpose of this is.

24         MR. STEPANOVICH:  It's in response to Ms. Napp opening

25  the door asking if she received a letter.  I just wanted to get

20175ncongt                    Louie – Redirect

 1   the letter in evidence and I'm done.

 2          MS. NAPP:  Your Honor, I —

 3          MR. STEPANOVICH:  She asked her — I'm sorry.

 4          MS. NAPP:  Go ahead.  Sorry.

 5          MR. STEPANOVICH:  Ms. Napp asked if Ms. Louie received

 6   a letter, and I was just getting the letter in.

 7          THE COURT:  Is this the letter you were referring to?

 8          MS. NAPP:  It's one of many, your Honor.

 9          THE COURT:  So are we going to put them all in?

10          MR. STEPANOVICH:  It's the only letter I'm offering,

11   your Honor, on this issue.  That's it.

12          THE COURT:  Well, do you want to put the others in for

13   completeness, then?

14          MS. NAPP:  Well, your Honor, I guess that's part of my

15   objection.  All of the other letters are not part of the corpus

16   of evidence that we've been dealing with as we came to trial in

17   this matter.  That's not to say we don't have them.  We do.

18   They're somewhere.  There are many of them over the course of

19   ten years.  And I think that if this is going to come in, then

20   defendants are going to be under an obligation to go back and

21   essentially recreate the discovery process like we would do in

22   a spoliation motion and it's going to be a mini-trial on that

23   issue.  As I stand here before you, your Honor, I can't tell

24   you exactly how many documents that this would be, but, as your

25   Honor certainly can appreciate, there are files and files

20175ncongt                    Louie - Redirect

1    related to the defendants' preservation efforts.

2            THE COURT:  Okay.

3            MR. STEPANOVICH:  Can I respond?

4            THE COURT:  Yes.

5            MR. STEPANOVICH:  That's the only letter that was

6    produced to us.  We don't want any other letters.  We just want

7    to admit the only letter, a letter that was produced to us

8    that's in reference to Ms. Napp's question did you receive a

9    letter.  That's the only one we received.

10           THE COURT:  But we don't even know if this was the

11   letter to which Ms. Napp was referring.

12           MS. NAPP:  Yes, your Honor.

13           THE COURT:  I just don't know what the point is,

14   Mr. Stepanovich.

15           MR. STEPANOVICH:  That's fine.  We'll withdraw it.

16   That's fine.

17           THE COURT:  Okay.

18           MR. STEPANOVICH:  We'll withdraw it.

19           We have nothing further, your Honor ——

20           THE COURT:  Okay.

21           MR. STEPANOVICH:  —— of Ms. Louie.

22           THE COURT:  All right.

23           You're done, right?

24           MS. NAPP:  Nothing further, your Honor.

25           THE COURT:  All right.

20175ncongt                Yagel - Direct

1              You're excused, Ms. Louie.  Thank you.

2              (Witness excused)

3              THE COURT:  So who is next?

4              MR. STEPANOVICH:  Plaintiffs call Brett Yagel.

5              THE COURT:  Okay.

6    BRETT YAGEL,

7        called as a witness by the Plaintiffs,

8        having been duly sworn, testified as follows:

9              THE DEPUTY CLERK:  Please state and spell your name

10   for the record.

11             THE WITNESS:  Brett Louis Yagel.  B-R-E-T-T,

12   L-O-U-I-S, Y-A-G-E-L.

13   DIRECT EXAMINATION

14   BY MR. STEPANOVICH:

15   Q.  Mr. Yagel, good afternoon.

16   A.  Good afternoon.

17   Q.  Are you currently the Mayor of the Village of Pomona?

18   A.  Yes, I am.

19   Q.  When were you first elected to the Board of Trustees in

20   Pomona?

21   A.  The 2007 March elections.

22   Q.  And you were re-elected when?

23   A.  2011 as Mayor.

24   Q.  You're aware that Orthodox Hasidic Jews have large

25   families?

20175ncongt                    Yagel - Direct

1    A.   Yes.

2    Q.   And you've heard -- strike that.

3             Regarding the Tartikov proposal, you saw articles

4    online regarding that proposal, correct?

5    A.   Correct.

6    Q.   And those articles were more negative than positive; is

7    that correct?

8    A.   Some were negative, some were positive.

9    Q.   And when you vote on issues before the Board, do you

10   receive opinions from Village residents before you cast your

11   vote?

12   A.   We take into consideration what the Village residents are

13   saying, but we also weigh what counsel is advising us as a

14   matter of law.

15   Q.   Mr. Yagel, you knew that the subject property of this

16   litigation was going to be used for a rabbinical college; isn't

17   that true?

18   A.   I only found out about that when it was leaked through the

19   Preserve Ramapo website back in January of 2007.

20   Q.   And was that the time you were running for election in

21   Pomona?

22   A.   Yes.

23   Q.   And in your campaign materials, you indicate that this

24   project was going to have environmental issues; isn't that

25   true?

20175ncongt                    Yagel - Direct

1   A.   Those were in the campaign materials, correct.

2   Q.   Those were your campaign materials.   True?

3   A.   For the slate, yes.

4   Q.   And the slate was you, Rita Louie and Nick Sanderson; isn't

5   that true?

6   A.   Yes, that's true.

7   Q.   And those statements –– that was your campaign, correct?

8   You were ––

9   A.   I was running for Trustee.

10  Q.   And you don't disavow those statements, do you?

11  A.   I did not create those statements.   They were part of the

12  campaign literature.

13  Q.   Do you disavow the statement that the Tartikov project was

14  going to have environmental issues?

15  A.   No.

16  Q.   And you had no factual basis to make that statement, did

17  you?

18  A.   Correct.

19  Q.   And you also claimed, through your campaign, that the

20  Tartikov project would have safety issues; isn't that true?

21  A.   That was stated in the campaign materials, yes.

22  Q.   And you do not disavow that statement, do you?

23  A.   I have no knowledge of what safety concerns could be

24  raised.

25  Q.   But you made that statement in your campaign, didn't you?

20175ncongt                    Yagel - Direct

1   A.  I did not make that statement, but it was in the campaign

2   materials.

3   Q.  You do not disavow that statement, do you, Mr. Yagel?

4   A.  I do not disavow that statement was in the materials.

5              MR. STEPANOVICH:  Your Honor, may I approach?

6              THE COURT:  Yes.

7   Q.  I've just handed you, Mr. Yagel, Plaintiffs' Exhibit 41.

8   Could you identify that?

9   A.  This looks like some of the campaign materials that were

10  developed in 2007.

11  Q.  And this would have been your campaign for Board of

12  Trustees in Pomona; isn't that true?

13  A.  Correct.

14             MR. STEPANOVICH:  Plaintiffs move Exhibit 41 into

15  evidence, your Honor.

16             MR. PELOSO:  One moment, your Honor.

17             (Pause)

18             MR. PELOSO:  No objection.

19             THE COURT:  Okay.  41 is received.

20             (Plaintiffs' Exhibit 41 received in evidence)

21  Q.  Now, the Pomona matter was the single-most issue facing the

22  Village -- strike that.

23             The Tartikov issue was the single-most important issue

24  facing Pomona, isn't that correct, in your opinion?

25  A.  That was one of the issues, yes.

1  Q.  And you campaigned that the voters needed to vote for a

2  team that was prepared to stand up to this proposal, isn't that

3  true, Mr. Yagel?

4  A.  Yes.

5  Q.  And you campaigned that the voters needed to vote for a

6  team that is prepared to stand up to this threat of using the

7  fundamentally unfair RLUIPA statute as a hammer against our

8  Village.  Isn't that true?

9  A.  Yes.  That's in the campaign materials.

10        MR. STEPANOVICH:  May I approach, your Honor?

11        THE COURT:  Yes.

12 Q.  Handing you, Mr. -- I've handed you, Mr. Yagel, I'm sorry,

13 what has been marked as Plaintiffs' Exhibit 169 and ask you if

14 you could identify that.

15 A.  It's an article that was written by Peter Applebaum, Our

16 Towns, Where Religion Meets Real Estate Developer in a Town

17 Face-off.

18 Q.  And do you recall being interviewed for that article?

19 A.  Somewhat, yes.

20        MR. STEPANOVICH:  Your Honor, we move the admission of

21 169.

22        MR. PELOSO:  Objection, your Honor.  On the

23 Defendants' Exhibit list, plaintiffs list it as dated as

24 1/20/07.  Mayor Yagel was not a Trustee at the time.  He became

25 a Trustee in April of 2007.  Therefore, it's hearsay.

20175ncongt                    Yagel - Direct

1          MR. STEPANOVICH:  He was campaigning.  I am not

2    offering it for a statement of an opponent.  I'm offering it

3    for his state of mind.  We're not offering it for the truth.

4          THE COURT:  It's only his statements to the reporter,

5    right?

6          MR. STEPANOVICH:  Yes, sir, just his statements.  Not

7    offering it for the truth of the matter, just his state of

8    mind, your Honor.

9          MR. PELOSO:  Well, your Honor, we're getting to the

10   point where the state of mind is becoming the content.  If it's

11   what he said, it's being offered for the truth.

12         I guess I'm a bit confused.  Is it offered for the

13   fact that he made a statement to the reporter?

14         THE COURT:  If he said I've never discriminated

15   against a person in my life, it's morally offensive to me, you

16   would be dying to get this in and you would say it comes in for

17   state of mind.  So let's just call this down the middle.  It

18   goes in for state of mind.  It's the only purpose it's coming

19   in for.  That's it.  It's not coming in for the truth of the

20   matter asserted.

21         And the debate about what people's state of mind is,

22   you're right, we have to get to the truth of that, but that

23   doesn't mean that the hearsay rule applies because it's the

24   exception that's being invoked.

25         MR. PELOSO:  Well, I don't agree with your Honor, but

20175ncongt                 Yagel - Direct

1    your Honor's ruled.

2             THE COURT:  That's fair enough.  What trial involves

3    complete agreement between lawyer and judge?

4    Q.  If you would go to the middle of the article, Mr. Yagel.

5    In the first --

6    A.  First page?  Second page?

7    Q.  First page, yes.  First page, middle of the article.

8    A.  Okay.

9    Q.  There's a quote there.  I'll read the whole thing.  "'The

10   attorney who represents the developer and owner of the property

11   appears ready to file a lawsuit without knowing what the codes

12   for the Village are,' said one resident, Brett Yagel."

13            Did I read that accurately?

14   A.  You did.

15   Q.  The quote continues.  "It's pretty disgusting.  They're

16   trying to create this mini city in our Village and push out

17   people who have put their heart and soul into the community for

18   years."

19            Did I read that accurately?

20   A.  Yes.

21   Q.  You have no reason to disagree with the accuracy of the

22   quotes that you just read, do you, Mr. Yagel?

23   A.  It was a long time ago, but -- no.

24            MR. STEPANOVICH:  May I approach, your Honor?

25            THE COURT:  Yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

20175ncongt                Yagel - Direct

1  Q.  Exhibit 17 I believe has been introduced.  I ask if you can

2  identify that, please.

3  A.  It appears to be a letter to The Journal News editorial

4  page from Rita Louie regarding Pomona College -- Pomona

5  Rabbinical College, Not a Natural Progression.

6  Q.  And at the bottom of the exhibit there is two names; am I

7  correct?

8  A.  That is correct.

9  Q.  Could you read those names, please.

10  A.  Rita Louie, Brett Yagel.

11  Q.  Now, Rita Louie wrote this original draft of this letter;

12  isn't that true?

13  A.  I believe so, yes.

14  Q.  And you edited the draft; isn't that true?

15  A.  Yes.  To the best of my recollection.

16       THE COURT:  Yes.

17       MR. STEPANOVICH:  I'm sorry, your Honor.

18       THE COURT:  It happens at every trial.

19       MR. STEPANOVICH:  First time for me.  I'm sorry.

20       THE COURT:  It's like the lawyer who promises one

21  question and then asks five.

22       MR. STEPANOVICH:  I'm sorry.

23       THE COURT:  No, no.  Please don't apologize.  Please.

24  I'm not trying to bust chops.  One question is like one potato

25  chip.  There is no such thing.

20175ncongt                    Yagel - Direct

1          MR. STEPANOVICH:  Especially if it's Lays.

2          THE COURT:  We don't do product placement already.

3          MR. STEPANOVICH:  Okay.

4    Q.   I've handed you what has been marked, Mr. Yagel, as

5    Plaintiffs' Exhibit 159.  Could you identify that.

6    A.   Pomona Register, Not a Natural Progression.

7          It appears to be an article that was submitted to the

8    LoHud journal newspaper.

9    Q.   And the author of that letter is who?

10   A.   Lynn Yagel.

11   Q.   And the title of the letter is?

12   A.   Pomona Rabbinical College Not a Natural Progression.

13   Q.   Coming back to Exhibit 17, do you know why that wasn't

14   submitted to the Rockland County Journal News with your

15   signature and Ms. Louie's signature?

16   A.   Do I remember why?

17   Q.   Do you know why?

18   A.   I cannot recall why.

19   Q.   Now, you drafted an article I believe regarding the Town of

20   Ramapo and the voting block.  Do you recall that?

21   A.   I may have.  I can't recall specifics.

22   Q.   And you understand what the voting block is in the Town of

23   Ramapo; is that correct?

24   A.   I understand what a voting block is, yes.

25   Q.   And do you understand what the voting block is -- strike

20175ncongt                    Yagel - Direct

1   that.

2              And what do you understand the voting block to be, if

3   any, in the Town of Ramapo?

4   A.   It could be a group of people that want to influence town

5   elections, village elections, county elections.  A voting block

6   could also be a group of individuals who are a part of an

7   engineering union.

8   Q.   And are you aware of a voting block in the Town of Ramapo

9   consisting of the Orthodox Hasidic Jews?

10  A.   Yes.

11             MR. STEPANOVICH:  I'm sorry, your Honor.  Could I just

12  have a moment, please?

13             THE COURT:  Yes, of course.

14             (Pause)

15             MR. STEPANOVICH:  May I approach?

16             THE COURT:  Yes.

17  Q.   I hand you what's been marked as Plaintiffs' Exhibit 50 and

18  ask if you can identify that.

19  A.   It's an e-mail that was created by Peter Katz that was

20  originally distributed to Bob Rhodes of Preserve Ramapo and

21  people who were involved with Preserve Ramapo or other elected

22  officials.

23  Q.   And the date is?

24  A.   November 3rd, 2005.

25  Q.   And you're involved in this e-mail chain?

20175ncongt                    Yagel - Direct

1   A.  I was the recipient of the original e-mail, and I forwarded

2   it on to -- I believe I forwarded it on to Nick Sanderson.

3           MR. STEPANOVICH:  Move the admission of 50, your

4   Honor.

5           MR. PELOSO:  Objection on the grounds of hearsay, your

6   Honor.  Mayor Yagel was not a Trustee or other official in

7   2005.

8           MR. STEPANOVICH:  He was a Village resident at the

9   time, your Honor, and he forwarded this e-mail on to a Village

10  official.  And again, we're not offering it for the truth of

11  the matter.  We're just offering it for Mr. Yagel's state of

12  mind.

13          MR. PELOSO:  Same objection, your Honor.

14          THE COURT:  Well, he's not saying anything here.  He

15  forwarded it.

16          MR. STEPANOVICH:  He is saying something in the

17  e-mail, yes, he is.

18          THE WITNESS:  I said --

19          THE COURT:  Hang on, hang on, hang on.

20          So, in other words, only his statement and the

21  forwarding of the mail comes in.

22          MR. STEPANOVICH:  Yes, your Honor.

23          MR. PELOSO:  But not for the truth.

24          THE COURT:  Not for the truth.  Just state of mind.

25          MR. STEPANOVICH:  That's it, your Honor.

20175ncongt                    Yagel - Direct

1        THE COURT:  All right.  So 50 is in with that caveat.

2        (Plaintiff's Exhibit 50 received in evidence)

3   Q.  Now, Mr. Sanderson -- I mean Mr. Yagel.  I'm sorry.

4   A.  Would you like me to spell it?

5   Q.  Pardon me?  I'm sorry?

6        THE COURT:  That was sarcasm.

7        THE WITNESS:  Sorry, your Honor.

8        THE COURT:  Yeah.  Don't do that, please.  Everybody's

9   doing their best here.  Okay?

10       Go ahead.

11       MR. STEPANOVICH:  May I approach?

12       THE COURT:  Yes.

13  Q.  I've handed you what has been marked as Plaintiffs' Exhibit

14  69 and ask if you can identify that.

15  A.  It's an e-mail to Preserve Ramapo about Camp Dora.

16  Q.  And that's an e-mail from you, correct?

17  A.  It appears to be, yes.

18       MR. STEPANOVICH:  Move the admission of 69, your

19  Honor.

20       MR. PELOSO:  Same objection.  The witness was not a

21  Village official at the time of the e-mail.  Hearsay.

22       THE COURT:  All right.  I understand.  Same ruling.

23       (Plaintiff's Exhibit 69 received in evidence)

24  Q.  And I refer you to the bottom of the first page, Mr. Yagel.

25  And you indicate that "I try to speak with individuals about

1   PR."

2            PR means Preserve Ramapo, correct?

3   A.   Correct.

4   Q.   "Things that are happening in Ramapo, and the Town Board's

5   reluctance to address the needs of all the people and only the

6   wants and whining of a select few."

7            Do you see that?

8   A.   Yes.

9   Q.   The wants and whining of the select few, who are you

10  referring to, Mr. Yagel?

11  A.   The developers in the Town of Ramapo.

12  Q.   Now, Mr. Yagel, you were concerned, were you not, about

13  Mr. Savad showing up at a Board of Trustees meeting; isn't that

14  true?

15  A.   I recall that, yes.  I don't know when it happened, but I

16  recall saying something like that, or writing something.

17  Q.   In fact, you advised Mr. Sanderson that the Board must be

18  careful about what we say.  Don't know who's in the audience.

19  Who knows?  Savad might show up again.  Isn't that true?

20  A.   It could be.

21  Q.   And by being careful about what you say, you meant not to

22  use any discriminatory language at the Board of Trustees

23  meeting, didn't you?

24  A.   No.

25  Q.   What did you mean, Mr. Yagel?

20175ncongt                    Yagel - Direct

1          MR. PELOSO:  Your Honor, is this a document that's in

2    evidence?

3          THE WITNESS:  Yeah.  That's my question.

4    Q.  Pardon me?

5          I'm not asking you about a document.

6          MR. STEPANOVICH:  I was asking a follow-up question to

7    his prior answer.  I'm not referring to a document.

8    A.  What was your question?

9          MR. STEPANOVICH:  If the court reporter could please

10   read it back.

11         (Record read)

12   Q.  Do you understand?

13         MR. STEPANOVICH:  I'll ask another question.

14         MR. PELOSO:  Well, that's my objection, your Honor.

15   What did he mean by that?  I don't know —— that was obviously

16   taken from a document that's not in evidence.

17         MR. STEPANOVICH:  The objection is well taken, your

18   Honor.  I'll rephrase the question.

19         THE COURT:  Okay.  Go ahead.

20   Q.  You recall, Mr. Yagel, telling Mr. Sanderson to be careful

21   what we say, you don't know if Mr. Savad is going to show up at

22   the meeting?  You recall that, correct?

23   A.  I do recall something along those lines, yes.

24   Q.  And my question to you is what do you mean —— or what did

25   you mean about being careful about what we say?

20175ncongt                    Yagel - Direct

1   A.  People's words have a tendency to be twisted and -- for

2   example, in our campaign materials, there might have been

3   something that said fight as opposed to defend the local laws.

4   I didn't want my words being twisted or anybody else's words

5   being twisted.

6   Q.  Okay.  So your campaign materials that you just referenced

7   had the word fight, correct?

8   A.  Correct.

9   Q.  They were your campaign materials, correct?

10  A.  Correct.

11  Q.  You had the opportunity, I'm sure, to remove the word

12  fight.  Is that correct?

13  A.  No.

14  Q.  Okay.  So you allowed your campaign materials to be

15  circulated through the Village of Pomona indicating that you

16  would fight for the Village, correct?

17  A.  Correct.

18  Q.  But that's not really what you meant?

19  A.  I meant to say defend.

20  Q.  But you didn't say --

21  A.  I wasn't the author of all the campaign materials.

22  Q.  But you didn't say defend, did you, Mr. Yagel?

23  A.  The campaign materials did not say that; they said fight.

24  Q.  And that was your intention, correct?

25  A.  My intention was to defend the Village.

20175ncongt                    Yagel - Cross

1              MR. STEPANOVICH:  I have nothing further, your Honor.

2              THE COURT:  Okay.

3              Cross.

4    CROSS-EXAMINATION

5    BY MR. PELOSO:

6    Q.  Mayor, you were asked some questions by Mr. Stepanovich

7    about a constituency and how you vote with constituency.

8              Am I correct that you may not always agree with the

9    what the constituency wants?

10   A.  That is correct.

11   Q.  And you take into account that, but also what you believe

12   is your importance in terms of your term of office?

13   A.  That is correct.

14   Q.  Okay.  And I believe you were asked questions about a

15   voting block.  Am I correct?

16   A.  Yes.

17   Q.  And am I correct that your understanding of what a voting

18   block is are individuals who have similar interests?

19   A.  That's correct.

20   Q.  Now, you were asked some questions about Mr. Savad.  Do you

21   recall those questions?

22   A.  I recall some of them, yes.

23   Q.  Have you ever felt threatened by Mr. Savad?

24   A.  Physically, no.

25              MR. STEPANOVICH:  Objection.

20175ncongt                    Yagel - Cross

1          THE COURT:  Hang on, hang on, hang on.

2          MR. STEPANOVICH:  Objection.

3   A.  Physically, no.

4          THE COURT:  Hang on, hang on.

5          When somebody objects, you have to wait for me to

6   rule.

7          THE WITNESS:  Okay.  Thank you.

8          MR. STEPANOVICH:  I don't see the relevance of that

9   question.

10          THE COURT:  Overruled.

11          Go ahead.  You can answer the question.

12   A.  Physically, no.

13   Q.  In any capacity?

14   A.  Yes.  He has gotten into my personal space.

15   Q.  And isn't it correct that Mr. Savad told you that "this

16   will be the career-ending case for you"?

17   A.  That is correct.

18   Q.  Now, there was some talk about when you first learned of

19   the Tartikov development; am I correct?

20   A.  Yes.

21   Q.  Now, am I also correct that you knew about the -- or I

22   should say you had no knowledge of the Tartikov development at

23   the time you decided to run for office?

24   A.  That is correct.  The article and what was sent out by

25   Preserve Ramapo came out after we had already started to

20175ncongt                Yagel - Cross

1   collect our signatures to run for office in very early January.

2   Q.  That would be January 2nd?

3   A.  January 2nd.

4   Q.  And the article came out on January 9th?

5   A.  It was after we started collecting signatures, correct,

6   about a week later.

7   Q.  What was your reaction when you saw the article?

8   A.  I think the quote was I think it's pretty disgusting.

9   Q.  All right.  Well, was your concern because it was a

10  religious development?

11  A.  Absolutely not.

12  Q.  What was your concern?

13  A.  My concern was the probable overdevelopment that could

14  occur in our Village and to ruin the rural semi-character of

15  the Village that my wife and other families had moved here for.

16  It's a beautiful bucolic area.

17  Q.  Am I correct that any involvement you've had with the

18  Preserve Ramapo is because of those concerns?

19  A.  Yes.

20  Q.  Has any of your involvement with Preserve Ramapo been

21  because of any religious opinions you may have?

22  A.  Absolutely not.

23  Q.  Now, you were shown the New York Times article; am I

24  correct?

25  A.  Yes, I was.

20175ncongt                 Yagel - Cross

1   Q.  Do you consider yourself to be an outgoing person, sir?

2   A.  Yes.

3   Q.  Is it in your nature to speak out about matters about which

4   you care?

5   A.  That I'm passionate for, yes.

6   Q.  Was the future of the property that was owned by Tartikov

7   something you cared about?

8   A.  Most definitely.

9   Q.  And why is that, sir?

10  A.  Because, like I said, it's a beautiful area, and to see the

11  destruction -- the possible destruction that could occur on the

12  property was very upsetting to me.  I had already been involved

13  with a number of meetings and attending at the Town of Ramapo

14  level where, on the Patrick Farm, for example, it was once

15  zoned one home per two acre, was then down-zoned to one home

16  per acre and was then down-zoned even further to I believe now

17  to the point where potentially there could be 497 housing units

18  on top of a sole-source aquifer that -- we all need water.  And

19  on the Patrick Farm, things were getting destroyed.  State and

20  federally protected wetlands were getting destroyed.  And

21  that's when I started getting involved at the Town level in

22  Ramapo, even though I was a Town of Haverstraw residence.

23  Q.  Now, Mr. Stepanovich asked you some questions about RLUIPA.

24  Do you recall that?

25  A.  Yes.

20175ncongt                    Yagel - Cross

1  Q.  And you do agree, sir, that that's an established federal

2  law?

3  A.  Yes, I do.

4  Q.  And in your work as Trustee, do you believe that you've

5  abided by that law at all times?

6  A.  Yes, I have.

7  Q.  And in your work as the Mayor, do you believe that you've

8  abided by that law at all times?

9  A.  Yes.  But I also believe it's a flawed law.

10 Q.  Now, when Mr. Stepanovich was questioning you, he said —

11 or he asked whether you had any factual basis for the

12 environmental issues that you spoke about concerning Tartikov.

13 Do you recall those questions?

14 A.  I recall them, yes.

15 Q.  Am I correct, sir, that, at the time you made those

16 statements, you had already seen the article that had been

17 released about the proposed development?

18 A.  Yes.

19 Q.  And do you recall how many people in the article were

20 mentioned would be occupying that property?

21 A.  I remember it was thousands.  Forty-five-hundred residents.

22         And I know, at the time when we ran, that we only

23 needed 50 signatures for our petitions in order to get on the

24 ballet, so that meant we had less than 3,000 residents in the

25 Village.

20175ncongt                    Yagel - Cross

1  Q.   Now, Mayor, am I correct that you're aware that there are

2  four local laws at issue in this case?

3  A.   Correct.

4  Q.   And am I correct that the only local law that is at issue

5  in this case in which you were a Village official is Local Law

6  5 of 2007, the wetlands law?

7  A.   That's correct.

8  Q.   You were a Trustee at the time?

9  A.   I was a trustee at the time, yes, newly elected.

10  Q.   Did the fact that Tartikov own the subject property play

11  any role in your decision to vote for that law?

12  A.   No.

13  Q.   Did the Tartikov plans that you read about in what's been

14  termed today as the leaked article play any role in your

15  decision to vote for that law?

16  A.   No.

17  Q.   At the time that law was being considered, did you know

18  what kind of wetlands were on the property?

19  A.   No.  I knew that there was -- due to some -- there was some

20  event that had occurred.  It was a very heavy rain that had

21  come through the area.  And I had noticed that there was water

22  coming off at a high velocity from the Tartikov property, which

23  is accessible from Route 306 U.S. -- pardon me -- New York

24  State Route 306 that was coming down and crossing the road and

25  also going into the culvert onto the Patrick Farm property,

20175ncongt                Yagel - Redirect

1   which housed a sole-source aquifer, which fed the headwaters of

2   the Mahwah River, which feeds the Ramapo River, which is where

3   one-third of Rocklanders get their water from.

4   Q.  Was the wetlands law enacted because of the Tartikov

5   development that was posted on Preserve Ramapo?

6   A.  Absolutely not.

7   Q.  Was it enacted in any way to prevent Tartikov from building

8   what it proposed to build?

9   A.  Absolutely not.

10          MR. PELOSO:  No further questions.

11  REDIRECT EXAMINATION

12  BY MR. STEPANOVICH:

13  Q.  Mr. Yagel, you have Exhibit 69 in front of you.

14          The first paragraph -- you were talking about

15  wetlands.  And the first paragraph -- this is an e-mail from

16  you again.  "This process really can't start until plans are

17  officially submitted.  The wetlands have already been

18  delineated and would need to be redelineated again."  Isn't

19  that correct?

20  A.  That's what it says.

21  Q.  And that's an e-mail that came from you; isn't that true?

22  A.  That was an e-mail that I had developed based upon

23  discussions that I had with my mother-in-law, who's head of a

24  planning board up in the Town Wawayanda up in Orange County.

25  Q.  Let me ask the question again, Mr. Yagel.

20175ncongt                    Yagel - Redirect

1          That's in an e-mail that came from you; isn't that

2     correct?

3     A.   Yes, it is.

4     Q.   Now, you know that Patrick Farms is designated as an adult

5     student housing for Orthodox Jews in the Town of Ramapo; isn't

6     that correct?

7     A.   What's your question again?

8     Q.   Do you know that Patrick Farms is designated as an adult

9     student housing location for Orthodox --

10    A.   It was one of four.  I don't know if it was for Orthodox

11    Jews, but it was one of four sites that the Town of Ramapo had

12    designated as adult student housing.  If they had designated

13    specifically for Orthodox Jews, I think that would have been

14    arbitrary and capricious and discriminatory.

15    Q.   Thank you, Mr. Yagel.

16         I'm not --

17    A.   Thank you.

18    Q.   -- quite finished.  I have one or two more questions.

19         You were asked some questions about when you became

20    involved -- when you became aware of the Preserve Ramapo leak,

21    and I think you testified -- and I'm ready to stand

22    corrected -- you testified that you decided to run for office

23    after you were aware of the leak on January the 9th, 2007.

24    Isn't that correct?

25         MR. PELOSO:  Objection.

20175ncongt                    Yagel - Redirect

1   A.  I had decided --

2            THE COURT:  Hang on, hang on, hang on.

3            MR. PELOSO:  I'm just objecting.  That's not what he

4   testified to.

5   Q.  Then I give you the opportunity to correct me, Mr. Yagel.

6            THE COURT:  Go ahead.

7   A.  I decided to run for office around the Christmas time frame

8   when guests had come over to the house, including Rita Louie

9   and Nick Sanderson and some other residents, and this was well

10  before the leaked article.

11  Q.  And this leaked article that we talk about and that you've

12  read indicated that it was for rabbinical students; isn't that

13  true?

14  A.  The Preserve Ramapo leaked article?

15  Q.  Yes, sir.

16  A.  That's not part of one of the exhibits.

17  Q.  I had not handed you an exhibit.  I've asked you just a

18  simple question.

19  A.  It was after I started collecting signatures to run for

20  office.

21  Q.  That wasn't the question.

22            MR. STEPANOVICH:  If the court reporter could please

23  read back my question.

24            (Record read)

25  A.  Yes.  That was a leaked article.

20175ncongt                    Lamer – Direct

1          MR. STEPANOVICH:  I have nothing further.

2          THE COURT:  Okay.

3          Recross?

4          MR. PELOSO:  No further questions.

5          THE COURT:  Okay.  You're excused, Mr. Yagel.

6          (Witness excused)

7          MS. SOBEL:  Your Honor, we call Mr. Lamer.

8          THE COURT:  Okay.

9    ALAN LAMER,

10        called as a witness by the Plaintiffs,

11        having been duly sworn, testified as follows:

12          THE DEPUTY CLERK:  Please state and spell your name

13   for the record.

14          THE WITNESS:  My name is Alan Lamer.  Last name is

15   L-A-M-E-R.  First name is Alan, A-L-A-N.

16   DIRECT EXAMINATION

17   BY MS. SOBEL:

18   Q.  Good morning, Mr. Lamer.

19          THE COURT:  Oh, it's afternoon.  It's morning

20   somewhere, but ––

21          MS. SOBEL:  I stand corrected.

22   Q.  Good morning, Mr. Lamer.

23          THE COURT:  Everybody's tired.

24   Q.  Good afternoon, Mr. Lamer.

25   A.  Good afternoon.

20175ncongt                  Lamer - Direct

1   Q.  Can you just give us a little background.  You were on the

2   Pomona Board of Trustees for how long?

3   A.  Four years.

4   Q.  And what were those years?

5   A.  I believe it was 2003 to 2007.

6   Q.  And you ran for re-election with Herb Marshall in 2007?

7   A.  I did.

8   Q.  And you did not -- you were not re-elected?

9   A.  That's correct.

10  Q.  And before that, you were on the Planning Board?

11  A.  I was.

12  Q.  What years was that?

13  A.  It was for an approximate ten-year period.  I was both a

14  member and then chairman of the Planning Board.

15  Q.  Okay.  Thank you.

16          Mr. Lamer, you're aware that Rockland's Hasidic

17  Orthodox community has increased, correct?

18  A.  Yes.

19  Q.  And you can recognize Orthodox and Hasidic Jews by the

20  manner in which they dress?

21  A.  Sometimes.

22  Q.  And you know that New Square and Monsey are predominantly

23  occupied by Hasidic and Orthodox residents?

24  A.  Yes.

25  Q.  And when you were on the Village Board, you listened to

1    opinions from the public that were stated in Village meetings?

2    A.   Yes.

3    Q.   And you know that Tartikov proposed building a rabbinical

4    college at the property, correct?

5    A.   There was an informal proposal that was presented to the

6    Board, yes.

7    Q.   You knew that they intended to prepare rabbis to sit on

8    rabbinical courts?

9    A.   That was my understanding.

10   Q.   And that it would involve adult student housing?

11   A.   Again, that was my understanding.

12   Q.   And do you recall a meeting on January 22nd, 2007 where the

13   dorm law and the wetlands law were being considered?

14   A.   I have a vague recollection of that meeting, yes.

15   Q.   Do you remember that a large number of residents came out

16   to that meeting?

17   A.   Yes.

18   Q.   And at that meeting, do you remember that you said that the

19   purpose of Local Law No. 1 of 2007 was to tighten up the

20   existing law?

21   A.   I do not have a specific recollection as to those words.

22            MS. SOBEL:  Your Honor, may I approach?

23            THE COURT:  Yes.

24   Q.   I've handed you Plaintiffs' Exhibit 137, which has already

25   been entered.  You can turn to page 31, please.  I'm going to

20175ncongt                    Lamer - Direct

1  read at the end of line 21.  "The purpose of the amendment

2  really is to tighten up the existing law."  And that goes into

3  23.  And if you look up at line 9, it says that you're

4  speaking.

5  A.  Okay.

6  Q.  Did I read that correctly?

7  A.  Yes.

8  Q.  Thank you.

9         Now, Mr. Lamer, in 2004, you had a conversation with

10  somebody from Congressman Engle's office about RLUIPA; isn't

11  that correct?

12  A.  I have a vague recollection of that, yes.

13  Q.  And the Village didn't pass a resolution asking the Federal

14  Government to review or amend RLUIPA at that time, in 2004; is

15  that correct?

16  A.  Again, I have no specific recollection either way.

17  Q.  Do you remember that the Village did pass a resolution?

18  A.  Honestly, I really do not.

19  Q.  No problem.

20         MS. SOBEL:  Your Honor, may I approach?

21         THE COURT:  Yes.

22  Q.  Mr. Lamer, do you remember being deposed in this case?

23  A.  Yes.

24  Q.  Can you please turn to page 83.

25         If you look at line 10, it says that it's the

1   minutes –– or lines 9 through 11 –– the minutes of the Board of

2   Trustees meeting of February 12, 2007.  And then at the bottom

3   it says, starting at line 23, "Reading the minutes," it says,

4   "Trustee Lamer moved the resolution regarding the Religious

5   Land Use and Institutionalized Persons Act, RLUIPA, urging

6   Congress to hold hearings on amendments to the Act and to

7   obtain testimony from towns and villages that are burdened with

8   the improper use of the Act.  Seconded by Deputy Mayor

9   Sanderson.  Carried four to one.  Trustee Banks voted no."

10          Did I read that correctly?

11  A.  Yes, you did.

12  Q.  Does that refresh your recollection to when that vote

13  occurred?

14  A.  The only thing it does is it's a recordation of a meeting

15  that I attended, and I have no doubt that it's correct.

16  Q.  And at the time that the resolution was passed, there were

17  no proposals in the Village which would have been affected by

18  RLUIPA other than the proposal that had been talked about

19  regarding Tartikov; is that correct?

20  A.  I have a problem with the term proposal.  There was an

21  informal discussion regarding the project, but my recollection

22  is that there was no proposal before the Board at that time.

23  Q.  And other than that informal discussion of Tartikov, there

24  were no other proposals in the Village that would be affected

25  by RLUIPA; is that correct?

20175ncongt

1  A.  Yes.

2          MS. SOBEL:  Thank you.

3          No further questions.

4  CROSS-EXAMINATION

5  BY MS. NAPP:

6  Q.  Mr. Lamer, you voted in favor of Local Law 1 of 2007,

7  correct?

8  A.  Yes.

9  Q.  And do you remember what Local Law 1 of 2007 is?

10  A.  My recollection is that it was a law affecting dormitories

11  within the Village.

12  Q.  Was your decision to vote in favor of that local law

13  motivated by any desire to keep Tartikov from building a school

14  within the Village of Pomona?

15  A.  No; it was not.

16          MS. NAPP:  One moment, your Honor.

17          (Pause)

18          MS. NAPP:  Nothing further, Mr. Lamer.

19          MS. SOBEL:  Nothing further, your Honor.

20          THE COURT:  Waited a long time for that.

21          You're excused.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  Have a good day.

24          (Witness excused)

25          THE COURT:  Who's next?

20175ncongt

```
 1              MR. STEPANOVICH:  I'll speak to that, your Honor, if I
 2    might.
 3              THE COURT:  Yes.
 4              MR. STEPANOVICH:  The next witness we have scheduled
 5    will be Ms. Ulman.
 6              THE COURT:  There's no point in putting her on for 12
 7    minutes.
 8              MR. STEPANOVICH:  I agree, I agree.
 9              And I wanted to just maybe circle back on scheduling
10    and let you know where we are.
11              THE COURT:  Who doesn't love the topic of scheduling?
12    Kind of like up there with root canals.
13              MR. STEPANOVICH:  So we have Ms. Ulman tomorrow, and
14    we think that that will take ——
15              THE COURT:  The balance of the day.
16              MR. STEPANOVICH:  —— the balance of the day.
17              THE COURT:  Okay.
18              Have a good night's sleep, Ms. Ulman.
19              MR. STEPANOVICH:  And we have scheduled for Thursday
20    Barbara Beall.  She's our wetlands expert.  And the Village
21    defendants are putting up Professor Green.
22              MS. NAPP:  Yes.
23              THE COURT:  Okay.
24              MR. STEPANOVICH:  And then we had this issue of our
25    experts, and that was Professor Weinstein from Cleveland.
```

20175ncongt

1              THE COURT:  And Fitzpatrick.

2              MR. STEPANOVICH:  Fitzpatrick.

3              THE COURT:  Yes.

4              MR. STEPANOVICH:  And we had had them scheduled --

5              THE COURT:  Is he known as Professor Weinstein from

6      Cleveland?

7              MR. STEPANOVICH:  We'll let you be the judge of that,

8      your Honor.

9              THE COURT:  Okay.

10             MR. STEPANOVICH:  I guess the point I'm making there

11     is that's where we had him scheduled.

12             THE COURT:  They're locked in?

13             MR. STEPANOVICH:  And he's locked in.

14             And so they are scheduled for Tuesday.  And that

15     leaves us, it looks like, Friday being free.

16             THE COURT:  Gasp.

17             MR. STEPANOVICH:  It wasn't the first time that we

18     disclosed it.  And I apologize again, your Honor, but I wanted

19     to -- we both wanted to --

20             MR. PELOSO:  No, we're aware.  Mr. Stepanovich, in all

21     candor, said that Mr. Fitzpatrick has chemotherapy, and we

22     understand that.

23             THE COURT:  Yes, yes, yes.  No.  I mean, look, correct

24     me if I'm wrong.  I think some of this has gone faster than you

25     expected.  So people shouldn't be punished for being efficient.

20175ncongt

1          So in terms of the big picture, then, do you think

2   you're going to rest on Tuesday, then?  Is that your plan?

3          MR. STEPANOVICH:  Yes, sir.

4          THE COURT:  Okay.  And then we're not sitting

5   Wednesday, Thursday, so we're back Friday.  And then we have

6   your expert that has separate scheduling issues, but we're good

7   for the 2nd, right?

8          MR. PELOSO:  Friday the 2nd, yes, your Honor.

9          THE COURT:  All right.  And then after your expert,

10  who's probably not from Cleveland.

11          MR. PELOSO:  No.  He's from Long Island.

12          THE COURT:  Well, you know, the Cleveland of New York.

13          Then what else do you have?

14          MR. PELOSO:  At this time, I don't anticipate any

15  further witnesses.

16          THE COURT:  Oh, you're good.  At this time.  You

17  should go on Meet the Press with that.  At this time, I have no

18  plans of running for office.

19          MR. PELOSO:  So we have deposition designations.  And

20  we'll be moving in the balance of our exhibits.  As I said

21  yesterday, we have exhibits with Ms. Ulman and then we have

22  exhibits that we're just moving in without a witness that have

23  already been objected to or not objected to.

24          THE COURT:  So the taking of testimony may end next

25  Friday, June 2nd.

20175ncongt

1          MR. PELOSO:  That's correct.

2          MR. STEPANOVICH:  That's what we understand, your

3     Honor.

4          THE COURT:  All right.  Well, there's nothing to be

5     done about Friday.  And as I said, I think, for planning

6     purposes, it's very hard to predict these things, and things

7     went a little faster than you expected.  It's awfully

8     convenient that it's the Friday before Memorial Day weekend.

9     So people get a little extra tip of the cap for that.  It is

10    what it is.  I appreciate your candor.

11         And then I think what we should give some thought to,

12    and we can talk about this tomorrow, is how we want to -- what

13    we want to do on the back end.

14         It sounds like the exhibits you're going to put in,

15    Mr. Peloso, they're going to come in on that Friday, June 2nd.

16    Right?  You're just going to make your application and they're

17    either going to come in or they're not going to come in.  There

18    may be objections.  I don't know.

19         MR. PELOSO:  Yes.  At this point -- I have them all

20    listed.  At this point, we have -- the vast majority are not

21    objected to.  I believe there are four that are objected to.

22         THE COURT:  So we'll take those up at the appropriate

23    time.

24         So why don't you give thought to what you want to do

25    by way of post-trial submissions, post-trial argument, when you

20175ncongt

1   want to do that, just because we have to figure out our

2   calendar.  And the reason I was trying to find out from you all

3   about when you're going to finish is Ms. Bordes is eager to

4   find out when you're going to finish so she can start giving

5   away dates to people who have been knocking on our door.

6          MR. PELOSO:  Your Honor, by argument, I assume you

7   mean arguing after the briefs are submitted.

8          THE COURT:  Yes.

9          MR. PELOSO:  Okay.

10          THE COURT:  Because I don't think it makes sense --

11          MR. PELOSO:  You didn't mean closings?

12          THE COURT:  I mean, if you want to do closings, I

13   wouldn't say no, because it's your trial.

14          MR. PELOSO:  No.  I don't think it's necessary.

15          THE COURT:  I assume we're going to have argument

16   after the post-trial submissions anyways, which, in effect,

17   would be closings, but, again, I don't want to make any

18   assumptions if you all had a different view.

19          So why don't you think about that.  And we can talk

20   about it tomorrow or Thursday so at least you have some sense

21   of that, we all have some sense of that, since it looks like

22   we're heading towards a June 2nd finishing of the taking of

23   testimony and the introduction of exhibits, I mean, unless we

24   get like a snowstorm or something.

25          Anything else, then, to take up?

20175ncongt

1          MR. STEPANOVICH:  Nothing on behalf of the plaintiffs,

2     your Honor.

3          THE COURT:  Anything on behalf of defendants?

4          MR. PELOSO:  No, your Honor.  Just one housekeeping

5     matter.

6          THE COURT:  Yes.

7          MR. PELOSO:  Just for my expert, I mean, are we

8     confident that he will not be called on Tuesday?  I want to be

9     able to tell him definitely Friday, that's all.

10         MR. STEPANOVICH:  You mean Mr. Voorhis?

11         MR. PELOSO:  Yes.

12         THE COURT:  Would we finish with him on Tuesday if we

13    did your two experts?  I have no idea how long these two

14    experts will take.

15         MR. PELOSO:  I guess we don't know.

16         (Discussion off the record)

17         MR. PELOSO:  Why don't we keep him on Friday, your

18    Honor.

19         THE COURT:  You don't want to get greedy and see if we

20    can finish this on Tuesday?  I mean, you would get two Fridays

21    in a row off not having to try this case.  That's tempting.

22    Why don't you think about it.

23         MR. STEPANOVICH:  We'll discuss it.

24         THE COURT:  Why don't you think about it and talk

25    about it.

20175ncongt

```
 1              MR. PELOSO:  We'll give it some thought.

 2              THE COURT:  And then we can figure all that out

 3     tomorrow.

 4              If there's nothing, I don't want to keep you all, so I

 5     bid you a pleasant afternoon and evening.  See you all tomorrow

 6     morning.

 7              MR. STEPANOVICH:  Thank you, your Honor.

 8              MS. NAPP:  Thank you, your Honor.

 9              THE COURT:  By the way, to give you a heads up,

10     there's going to be a high school class tomorrow hanging out

11     and watching you all do your magic.

12              (Adjourned to May 24, 2017 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                                Page

 3    HERBERT MARSHALL, (Continued)

 4    Direct By Mr. Stepanovich . . . . . . . . . 608

 5    Cross By Ms. Napp . . . . . . . . . . . . . 635

 6    Redirect By Mr. Stepanovich . . . . . . . . 670

 7    Recross By Ms. Napp . . . . . . . . . . . . 673

 8    Redirect By Mr. Stepanovich . . . . . . . . 674

 9     RITA LOUIE

10    Cross By Ms. Napp . . . . . . . . . . . . . 698

11    Redirect By Mr. Stepanovich . . . . . . . . 704

12    BRETT YAGEL

13    Direct By Mr. Stepanovich. . . . . . . . . . 707

14    Cross By Mr. Peloso . . . . . . . . . . . . 722

15    Redirect By Mr. Stepanovich . . . . . . . . 728

16    ALAN LAMER

17    Direct By Ms. Sobel . . . . . . . . . . . . 731

18    Cross By Ms. Napp . . . . . . . . . . . . . 736

19                         PLAINTIFF EXHIBITS

20    Exhibit No.                                Received

21    94   . . . . . . . . . . . . . . . . . . . 616

22    109  . . . . . . . . . . . . . . . . . . . 618

23    74   . . . . . . . . . . . . . . . . . . . 623

24    73   . . . . . . . . . . . . . . . . . . . 625

25    110  . . . . . . . . . . . . . . . . . . . 626
```

1    103  . . . . . . . . . . . . . . . . 629

2    95   . . . . . . . . . . . . . . . . 631

3    134  . . . . . . . . . . . . . . . . 634

4    18   . . . . . . . . . . . . . . . . 678

5    17   . . . . . . . . . . . . . . . . 688

6    72   . . . . . . . . . . . . . . . . 694

7    41   . . . . . . . . . . . . . . . . 710

8    50   . . . . . . . . . . . . . . . . 718

9    69   . . . . . . . . . . . . . . . . 718

10   72   . . . . . . . . . . . . . . . . 694

11   41   . . . . . . . . . . . . . . . . 710

12   50   . . . . . . . . . . . . . . . . 718

13   69   . . . . . . . . . . . . . . . . 718

14   DEFENDANT EXHIBITS

15   Exhibit No.                         Received

16   1080  . . . . . . . . . . . . . . . 646

17   1041  . . . . . . . . . . . . . . . 662

18   1086  . . . . . . . . . . . . . . . 665

19

20

21

22

23

24

25