170524tartikov1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CONGREGATION RABINNICAL COLLEGE
    of TARTIKOV, INC., et al.,
4
                    Plaintiffs,
5
                    v.                    07 Civ. 6304 (KMK)
6
    VILLAGE of POMONA, NY, et al.,
7
                    Defendants.
8
    ------------------------------x          White Plains Courthouse
9                                            White Plains, N.Y.
                                             May 24, 2017
10                                           9:40 a.m.

11  Before:

12              THE HONORABLE KENNETH M. KARAS,

13                                              District Judge

14                          APPEARANCES

15  JOHN STEPANOVICH
    ROMAN STORZER
16  DONNA SOBEL
    TERRY RICE
17  PAUL SAVAD
            Attorneys for Plaintiffs
18
    JOHN PELOSO
19  ANDREA DONOVAN NAPP
    KARLA CHAFFEE
20          Attorneys for Defendants

21

22

23

24

25

170524tartikov1                    Trial

1            (Case called)

2            THE COURT:  Any issues?

3            MR. PELOSO:  Not for the defendants.

4            MR. STEPANOVICH:  Not for the plaintiffs.

5            THE COURT:  We're going to bring up Ms. Ulman?

6            MR. STEPANOVICH:  Yes.

7            THE COURT:  Come on up, Ms. Ulman.

8            (Witness sworn)

9            MR. STEPANOVICH:  Your Honor, we have the copy of

10   Ms. Ulman's affidavit with the objections.

11           THE COURT:  Okay.  You want to hand that up?

12           Do we want to deal with this now, because you're not

13   offering it, right?  This is a defense exhibit.

14           MR. PELOSO:  I think now is fine.

15           MR. STEPANOVICH:  I think now is probably an

16   appropriate time to do that.  We're ready.

17           THE COURT:  Okay.  So paragraph 15, this is just -- is

18   it just the first sentence?

19           MR. PELOSO:  Yes, your Honor.

20           THE COURT:  I guess legal conclusion is your

21   objection.

22           MR. STEPANOVICH:  Yes.

23           MR. PELOSO:  My understanding is the Court had ruled

24   on that.

25           THE COURT:  But is this permissible for Ms. Ulman to

170524tartikov1                    Trial

1    testify about?

2         MR. PELOSO:  As I indicated to your Honor on Monday,

3    Ms. Ulman obviously drafted most of the local laws, so to some

4    extent, I think for both parties -- it would benefit both

5    parties and the Court for her to be able to explain her legal

6    reasoning.  Also, I think this is something -- I can lay the

7    foundation for this, but I think it's certainly within the

8    confines of her knowledge.

9         THE COURT:  She seems competent to talk about this

10   issue, but what's the -- other than the legal conclusion, any

11   other --

12        MR. STEPANOVICH:  Well, on this one, your Honor, it

13   was just a distinction between her legal opinion and a legal

14   conclusion, and that's probably a fine distinction, but having

15   said that, we'll defer to your ruling.

16        THE COURT:  You're right, there could be that risk,

17   but I think here, to the extent, just from what the Court knows

18   about Ms. Ulman's work, she's clearly competent to give this

19   opinion.  So that objection is overruled.

20        Paragraph 24.

21        MR. STEPANOVICH:  That is a foundation only because,

22   your Honor, I believe Ms. Ulman started as the Village attorney

23   in 2003, and so the issue is the basis of her knowledge of the

24   Local Law of 2001.

25        MR. PELOSO:  I can lay a foundation for that, your

170524tartikov1                    Trial

1   Honor.

2          THE COURT:  Okay.  Are we going to do that before?

3          MR. PELOSO:  I think it makes sense.

4          THE COURT:  All right.

5          So, that covers 24, 25.  30, same issue?

6          MR. PELOSO:  I can cover Yeshiva Spring Valley, yes.

7   Foundation.

8          THE COURT:  31, legal conclusion.

9          MR. PELOSO:  Again, your Honor, Ms. Ulman can testify.

10  I can lay the foundation that she's reviewed the records and so

11  forth.

12         THE COURT:  So, I think Mr. Peloso should be allowed

13  to lay the foundation and we'll see if he does that.

14         MR. STEPANOVICH:  That's fine.

15         THE COURT:  38, again, we're in that sort of zone of

16  her opinion versus --

17         MR. STEPANOVICH:  That's correct.  I defer to your

18  Honor.

19         THE COURT:  I think if you want to lay a foundation,

20  Mr. Peloso.

21         MR. PELOSO:  Okay.

22         THE COURT:  I think 48, she should be allowed to

23  testify to that.

24         MR. STEPANOVICH:  I was going to withdraw that, your

25  Honor.

170524tartikov1                  Trial

1          THE COURT:  Okay.  And 51, the same, because that goes
2   to why she did what she did.
3          MR. STEPANOVICH:  Yes, your Honor.
4          THE COURT:  68, same, it seems to me.
5          I think this goes to thought process.
6          MR. PELOSO:  Correct.
7          THE COURT:  And I think the same is true for 77, but
8   Mr. Stepanovich, tell me why that's wrong.
9          MR. STEPANOVICH:  Your Honor, we had this as a legal
10  conclusion, but we'll certainly abide by your order.
11         THE COURT:  I think this all goes to the process that
12  she used to do what she did that you're going to be inquiring
13  about.
14         88 --
15         MR. STEPANOVICH:  Just that one sentence, your Honor.
16         THE COURT:  But isn't that something that she would
17  know firsthand because she was involved in the process.
18         MR. PELOSO:  Precisely, yes.  I'm not going to say
19  what she's going to testify to, but I think it's self-evident,
20  frankly.
21         THE COURT:  That's a statement of fact.
22         MR. PELOSO:  Yes.
23         THE COURT:  So, I think that's okay.  If you want,
24  Mr. Stepanovich, obviously, you can cross her on that.
25         MR. STEPANOVICH:  Sure.

170524tartikovT1          Ulman - direct

1            THE COURT:  All right.  So --

2            MR. PELOSO:  On the foundation for Yeshiva Spring

3    Valley and Local Law 1 of 2001.

4            THE COURT:  Yes.

5    DORIS ULMAN,

6         called as a witness by the Defendants,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. PELOSO:

10   Q.  Good morning, Ms. Ulman.

11   A.  Good morning.

12   Q.  How long have you been Village Attorney for Pomona?

13   A.  Since 19 -- since 2003.

14   Q.  And as Village Attorney, do you have knowledge of the

15   Village's records?

16   A.  I do.

17   Q.  And do you have knowledge as to the Village's business in

18   general?

19   A.  Yes.

20   Q.  And do you have knowledge of the Village's code?

21   A.  Yes.

22   Q.  And can you explain to the Court how you have that

23   knowledge?

24   A.  There is a code book that contains all of the current laws,

25   local laws of the Village that I have in my possession.  In

170524tartikovT1            Ulman - direct

1   addition, I have all of the files of the previous Village

2   Attorney, Mr. Lautenberg, which includes many of the local laws

3   and other files that he was in charge of.

4   Q.  Thank you.

5        MR. PELOSO:  Your Honor, Mr. Stepanovich pointed out,

6   has the witness been sworn?

7        THE COURT:  Yes.

8        THE WITNESS:  Yes.

9   Q.  I'm sorry.

10       Do you have knowledge of New York State's Municipal

11  Code?

12  A.  Some of them, yes.

13  Q.  Do you have knowledge of the municipal codes of various

14  towns and villages surrounding the Village of Pomona?

15  A.  I have knowledge of the ones that I have worked for.

16  Q.  And what ones are those?

17  A.  Village of Spring Valley, the Village of New Hempstead,

18  South Nyack, Grand View, Wesley Hills, New Square, nine

19  altogether.  I may have left out a couple.

20  Q.  That's okay.  Your affidavit --

21  A.  And Pomona.

22  Q.  Okay.  Regarding Local Law 1 of 2001, have you reviewed

23  that law?

24  A.  I have.

25  Q.  And have you reviewed any documents in the Village's

170524tartikovT1          Ulman - direct

1   records related to that law and its enactment?

2   A.  Yes.

3   Q.  What documents, if you could please tell the Court.

4   A.  In addition to the Local Law itself, I reviewed the minutes

5   of the meetings at which it was adopted, as well as the minutes

6   of the meeting at which it was discussed.  There were three

7   memos from the Village's planning consultant at the time.

8   Q.  Is that Clark?

9   A.  Yes, who actually almost drafted the Local Law, and there

10  were also a couple of prior drafts that I looked at.

11  Q.  And did you review the existing -- or do you have knowledge

12  or have you reviewed the existing laws concerning the subject

13  matter of Local Law 1 of 2001?

14  A.  Yes.

15  Q.  And obviously, am I correct you reviewed them prior to

16  preparing for trial?

17  A.  Oh, yes.

18  Q.  Regarding Yeshiva Spring Valley, are you aware of the

19  informal presentation that it made in 1999?

20  A.  Yes.

21  Q.  Can you inform his Honor how you're aware of that.

22  A.  I read the narrative that was submitted by the engineer for

23  Yeshiva Spring Valley, and I read the minutes of all of the

24  planning board meetings for that period.

25  Q.  And have you read any memos from Frederick Clark &

170524tartikovT1          Ulman - direct

1  Associates --

2  A.  Yes.

3  Q.  -- regarding --

4  A.  I read all the memos of Clark relating to Yeshiva Spring

5  Valley.  They went on for a period of time.  There was also a

6  memo from the Village engineering consultant relating to that

7  project, and I think that was it.

8  Q.  And have you reviewed any laws which were discussed in

9  those memos and were part of the application filed by Yeshiva

10  Spring Valley?

11  A.  Yes.

12      MR. PELOSO:  Your Honor, I move at this time that the

13  affidavit be admitted in full.

14      MR. STEPANOVICH:  Subject to our prior objections, of

15  course, your Honor, but he's handled that, Mr. --

16      THE COURT:  So you're not objecting to the foundation?

17      MR. STEPANOVICH:  I'm not.

18      THE COURT:  What are we marking this affidavit?

19      MR. PELOSO:  This will be I believe 1509 is where

20  we're at.

21      THE COURT:  Plaintiffs' 1509?  I don't think that

22  makes sense.

23      MR. PELOSO:  It doesn't.  I guess it's defendants'.

24      MR. STEPANOVICH:  Correct.

25      THE COURT:  Defendants' what?

170524tartikovT1          Ulman - direct

1          MR. PELOSO:  2000?  2000 is fine.

2          THE COURT:  2000, it is.

3          MR. PELOSO:  Does your Honor need a copy?

4          THE COURT:  Received.  I have a copy.

5          MR. PELOSO:  Can I give the witness a copy?

6          THE COURT:  Yes.

7          (Defendants' Exhibit 2000 received in evidence)

8          THE COURT:  And the exhibits that are referred to --

9          MR. PELOSO:  Yes, I'm going to address those now, your

10   Honor.

11          THE COURT:  Okay.

12          MR. PELOSO:  Most of them have not been objected to so

13   I'd like to enter them at this time.  I have I'll have a list

14   the first is Defendants' 1000.

15          What I'll do, your Honor, if it makes sense to your

16   Honor, is I'll read the list and then make an omnibus motion,

17   so to speak.

18          THE COURT:  Okay.

19          MR. PELOSO:  Defendants' 1000, Plaintiffs' 150,

20   Defendants' 1009, Defendants' 1010, Defendants' 1011,

21   Defendants' 1012, Defendants' 1013, Defendants' 1015,

22   Defendants' 1022, Defendants' 1055, Defendants' 1016,

23   Defendants' 1043, Defendants' 1017.

24          1041 went in yesterday, so that's already in.

25   Defendants' 1066, Plaintiffs' 106, Defendants' 1070,

170524tartikovT1              Ulman - direct

1    Defendants' 1063, Defendants' 1064, Defendants' 1062,

2    Defendants' 1051, Defendants' 1052.  And 1086 came in

3    yesterday.

4              THE COURT:  Okay.

5              MR. PELOSO:  I move the admission of those.

6              THE COURT:  Any objection?

7              MR. STEPANOVICH:  Are these exhibits just related to

8    Ms. Ulman's testimony or --

9              MR. PELOSO:  No.  For all purposes.

10             MR. STEPANOVICH:  I don't know if we're prepared for

11   that, your Honor.  We were prepared to consent to any exhibits

12   relating -- and I'm hopefully not surprising anyone -- relating

13   to Ms. Ulman's testimony, but all of the rest of these

14   exhibits, we're not prepared to consent to that.

15             MR. PELOSO:  Your Honor, they all have two stars as

16   being accepted by the plaintiffs, so they've not been objected

17   to in the pretrial order.  So this is a complete surprise.

18             MR. STEPANOVICH:  I think there's some confusion in

19   terms of the objections, your Honor.  I think there still has

20   to be some basis -- still has to be some basis.

21             THE COURT:  I think the theory is that Ms. Ulman is

22   the witness through which these exhibits come in, and that the

23   two stars indicates there were no other objections.

24             But, look, if you want to double check, that's fine.

25   They can come in subject to objection later on.  That's the

170524tartikovT1          Ulman - direct

 1  beauty of not having a jury here.  And then let me know maybe

 2  at the end of the day or tomorrow if there are any objections.

 3          MR. STEPANOVICH:  That's fine.

 4          THE COURT:  Is that all right?

 5          MR. PELOSO:  Well, I guess your Honor is going to rule

 6  that way, but my understanding of the pretrial order is to

 7  streamline the trial.

 8          THE COURT:  I get it.

 9          MR. PELOSO:  And that was submitted at the end of

10  March.  And to find out now -- the judge's rules say -- your

11  Honor's rules say two stars indicate exhibits to which no

12  parties have objection, every one of those exhibits have two

13  stars.

14          THE COURT:  They're going to have to have a really,

15  really good reason to object.  And I'm going to give them a

16  chance to see if there's a really, really good reason.

17          I get your point.

18          MR. STEPANOVICH:  Yes.

19          THE COURT:  They just didn't focus on this, is the

20  bottom line.  So, they'll get a chance to focus on it.  That's

21  fine.

22          MR. PELOSO:  There are two object exhibits which they

23  objected to.  One is 1018, which is the Chestnut Ridge law

24  regarding dormitories.  I believe your Honor can take judicial

25  notice of that.

170524tartikovT1            Ulman - direct

1            THE COURT:  That seems right.

2            Any reason why that's not right?  Chestnut Ridge law?

3   That's something --

4            MR. STEPANOVICH:  I think it was just an issue of

5   replacing the complete law.  Mr. Peloso did that I think

6   yesterday.  We withdraw that.

7            THE COURT:  1018 is in.

8            MR. PELOSO:  And 1092, we replaced it with the

9   complete New York DEC Wetlands Law.  We move those in also,

10  1092.

11           MR. STEPANOVICH:  Same.

12           THE COURT:  1018 and 1092 are in.  If you can just

13  take a look at the others and let me know if you object,

14  especially in light of the two-star designation, then we'll

15  have that conversation.  But for purposes of this testimony for

16  now, they're in, and if it turns out they shouldn't have been

17  in, we'll deal with that.

18           (Defendants' Exhibits 1018, 1092 received in evidence)

19

20           (Defendants' Exhibits 1000, 1009-1013, 1015-1017

21  received in evidence)

22           (Defendants' Exhibits 1022, 1043, 1051-1052, 1055

23  received in evidence)

24           (Defendant's Exhibits 1062-1064, 1066, 1070 received

25  in evidence)

170524tartikovT1          Ulman - cross

1          (Defendants' Exhibits PX150, PX106 received in

2    evidence)

3          MR. PELOSO:  Thank you, your Honor.

4          THE COURT:  Okay.  Anything else?

5          Are you doing cross, Mr. Stepanovich?

6          MR. STEPANOVICH:  Yes.

7          THE COURT:  The floor is yours.

8    CROSS-EXAMINATION

9    BY MR. STEPANOVICH:

10   Q.  Good morning, Ms. Ulman.

11   A.  Good morning.

12   Q.  Turning your attention to paragraph 5 of your affidavit,

13   you indicate that since its formation -- you can hear me okay?

14   Can you hear me all right?

15   A.  A little bit louder, please.

16   Q.  Since its formation, the Village has always limited land

17   use to single-family residents on one-acre zoned property,

18   zoning commonly known as R40.

19          My question is, but other land uses are permitted in

20   the Village either by right or with a special permit, correct?

21   A.  Yes.

22   Q.  So such as museums?

23   A.  Yes.

24   Q.  And libraries?

25   A.  Yes.

170524tartikovT1            Ulman - cross

1    Q.  Recreational buildings?

2    A.  Yes.

3    Q.  And accredited education institutions with dormitories;

4    correct?

5    A.  And houses are worship.

6    Q.  Are dormitories housing?

7    A.  They -- I consider dormitories to be housing, but strictly

8    related to an educational institution.

9    Q.  Are dormitories single-family residential housing?

10   A.  No, they're not.

11   Q.  So, Ms. Ulman, the Village has not always limited its land

12   use to just single-family residents, isn't that true, based on

13   your testimony just now?

14   A.  There are no museums or libraries in the Village.  There

15   are three houses of worship.  There are no educational

16   institutions.  The vast majority of, I would say, 99 or 44

17   one-hundredth percent of the village is single-family R40.

18   Q.  I hope I didn't confuse you.  The question wasn't whether

19   or not there are any located.  The question was, are museums

20   permitted in the village?

21   A.  Yes, certainly.  Sure.

22   Q.  And, of course, libraries are permitted?

23   A.  Yes.

24   Q.  And recreational buildings?

25   A.  Yes.

170524tartikovT1            Ulman - cross

1   Q.  Okay.

2   A.  But we always think of the Village as being R40, it's just

3   a -- the way we function.

4   Q.  Ms. Ulman, can libraries be consistent with the Village's

5   goal of maintaining its single-family semirural character?

6   A.  I believe the libraries that are referred to in -- that are

7   permitted in the zoning law are what we would consider branches

8   that are used by the -- by the local community.  I can't

9   imagine a major library coming into Pomona because there's no

10  access to it.

11  Q.  There are no limitations on the size of libraries, though,

12  is there?

13  A.  The what?  I'm sorry.

14  Q.  There's no limitation on the size of the library, is there?

15  A.  No.

16  Q.  Okay.  And can museums be consistent with the Village's

17  goal of maintaining its single-family semirural character?

18  A.  Again, I think what the founders had in mind when they

19  permitted museums are the type of facilities that you would

20  find, for example, in the Town of Clarkstown, the only museum

21  that I know of in Rockland County is the Blauvelt House in

22  Clarkstown, which is run by the Rockland County Historical

23  Society.  And I'm quite sure that would be the type of thing --

24  again I can't imagine the Museum of Natural History having a

25  branch in the Village of Pomona.

170524tartikovT1          Ulman - cross

1  Q.  I understand, Ms. Ulman.  I just want to be clear.  Let me

2  repeat the question.  Can museums be consistent with the

3  Village's goal of maintaining its single-family semirural

4  character?

5  A.  Yes.

6  Q.  And to come back for a second, can libraries be consistent

7  with the Village's goal of maintaining its single-family

8  semirural character?

9  A.  Yes.

10  Q.  Yes?

11  A.  Yes.

12  Q.  Okay.  Can permitted educational institutions be consistent

13  with the Village's goal of maintaining its single-family

14  semirural character?

15  A.  Yes.

16  Q.  Can houses of worship be consistent with the Village's goal

17  of maintaining its single-family semirural character?

18  A.  Yes, if they're properly constructed, yes.

19  Q.  Can recreational facilities, playgrounds, swimming clubs,

20  tennis courts and recreational buildings not conducted as a

21  business enterprise be consistent with the Village's goal of

22  maintaining its single-family --

23  A.  Yes.  These are all services that would be used by the

24  local community; yes.

25  Q.  Okay.  Can camps be consistent with the Village's goal of

170524tartikovT1          Ulman - cross

1   maintaining its single-family semirural character?

2   A.   Probably not.

3   Q.   Camps are permitted in the zoning code, aren't they?

4   A.   Yes.

5   Q.   And camps are not limited in any way in the zoning code,

6   are they?

7   A.   They're limited in size, and in structure.

8   Q.   Okay.

9           MR. STEPANOVICH:  Your Honor, the plaintiffs move --

10  let's just do it this way.  Can I approach the witness.

11          THE COURT:  Yes.

12          MR. STEPANOVICH:  We have a demonstrative.

13          THE COURT:  Sure.  And what's the demonstrative marked

14  as?

15          MR. STEPANOVICH:  271, your Honor.

16          THE COURT:  Okay.

17          MR. STEPANOVICH:  Is that okay?  Mr. Peloso has a

18  small copy.  I don't know where to stand.  I'm going to point

19  out some --

20          THE COURT:  Well, if you want, you can also have

21  Ms. Ulman step down and do it that way.

22          THE WITNESS:  It would be easier if I could stand,

23  your Honor.

24          THE COURT:  Sure.  I think that makes sense.  Why

25  don't you move it back.

170524tartikovT1          Ulman - cross

1            MR. PELOSO:  Can I approach for the questioning?

2            THE COURT:  Yes.  I think that's easier for everybody.

3            Thank you, Mr. Stepanovich.

4            MR. STEPANOVICH:  For the record, do I have to be near

5   a microphone?

6            THE COURT:  Sabrina says no.  You're good.

7            MR. STEPANOVICH:  For the record, your Honor,

8   plaintiffs have marked Exhibit 271 and we'll offer that into

9   evidence.

10           MR. PELOSO:  No objection.

11           MR. STEPANOVICH:  There's no objection.

12           THE COURT:  Received.

13           (Plaintiffs' Exhibit 271 received in evidence)

14  Q.  Ms. Ulman, can you identify what this 271 is?

15  A.  This looks like a drawing, if you will, of the major roads

16  in and around Pomona.  Most of it, I'd say about half of it, is

17  not within the Village.

18  Q.  Can you identify from 271 --

19           THE COURT:  Is this a drawing or -- it's a Google map.

20           MR. STEPANOVICH:  Google map.

21           THE COURT:  And overhead Google map.

22           THE WITNESS:  Oh, okay.

23           MR. STEPANOVICH:  It's a Google map.

24  Q.  Can you identify from this map, Ms. Ulman, the Tartikov

25  property?

170524tartikovT1          Ulman - cross

1   A.   The Tartikov property would be right here (indicating.)

2   Q.   So, you're identifying (indicating) this area here?

3   A.   Not to the corner, not to 202, from this line downward, I

4   don't know how far it goes to the east.

5   Q.   Okay.  And you indicated in your?

6   A.   There does not seem to be a property delineation on here.

7   Q.   Okay.  And I think you indicated in your affidavit that

8   there is a fairly large commercial area.  Could you identify

9   the large commercial area from Plaintiffs' Exhibit 271?

10  A.   That runs from about Camp Hill Road East.  That is not in

11  the Village of Pomona.

12  Q.   And is there a Super Stop & Shop located in that commercial

13  area?

14  A.   Yes, right there (indicating).

15  Q.   And how about a --

16  A.   Not in the Village of Pomona.

17  Q.   But it's here along 202; isn't that --

18  A.   Yes, but that's in unincorporated Ramapo.

19  Q.   And what about the Mount Ivy All-American Diner?  Can you

20  identify that from this map?

21  A.   That is right here (indicating), and that is in

22  unincorporated Haverstraw, the Town of Haverstraw.

23  Q.   And could you identify the post office?

24  A.   Post office is right about here (indicating.)

25  Q.   Is that within the Village of Pomona?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1            Ulman - cross

1   A.  No.

2   Q.  And what about the Rockland Veterinary, can you identify

3   that?

4   A.  That's a couple doors away from the post office, and that

5   is not in the Village of Pomona.

6   Q.  How about the Sri Ranganatha Temple?  Can you identify

7   that?

8   A.  Yes.  That is on Pomona Road, which appears to be, I don't

9   know -- I can't see it from here, this is marked temple.  That

10  runs parallel -- I don't see Pomona Road on here, but the

11  property's on -- I'm sorry.  The temple I was thinking of, Sri

12  Ranganatha, this temple is on Ladentown Road, yes, right here

13  (indicating.)

14  Q.  So the Sri Ranganatha Temple is right here (indicating) --

15  A.  Is in the Village of Pomona.

16  Q.  -- in the Village, okay.  On 306 and off of 306?

17  A.  Well, it's off of 306.  It's on Ladentown Road.  This is

18  Ladentown Road right here (indicating.)

19  Q.  That's all the questions I have right now from this

20  exhibit.

21          THE COURT:  Okay.

22  Q.  Ms. Ulman, from your identifications on the map, is it fair

23  to say that this commercial area is about a few thousand feet

24  away from the subject property?

25  A.  I would say it's about a quarter to a half a mile, at

170524tartikovT1            Ulman - cross

1   least.

2   Q.   Would development of Patrick Farm impact the community

3   character of the Village of Pomona?

4   A.   Depends on how it's developed.

5   Q.   Do you have any idea how it's zoned now?

6   A.   Right now, a portion of it is zoned R40, and two separate

7   lots within the Patrick Farm are zoned MR8.

8   Q.   And could the development of Patrick Farm affect the

9   community character of Pomona?

10  A.   Yes.

11  Q.   And how is that?

12  A.   The MR8 zones permit -- and Patrick Farm is not within the

13  Village of Pomona.  It's in unincorporated Ramapo, which

14  borders on the Village.  That property is directly across the

15  street from the Village of Pomona.

16          The multifamily housing zones, the MR8 zones, which

17  permit eight units per acre, definitely impact on the community

18  character of the Village of Pomona.

19  Q.   Is it correct that municipal separate storm systems, MS4s

20  that are located within the boundaries of the census bureau,

21  defined urbanized area, are regulated under the EPA's phase II

22  storm-water rule, MS4s?

23  A.   And the New York state Department of Environmental

24  conservation; yes.

25  Q.   So just for clarity, the MS4s are regulated under the EPA's

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

1  phase II storm-water rule; correct?

2  A.  Yes.

3  Q.  And I'll allow you to completely your answer.

4  A.  That was it.

5  Q.  That's it?

6  A.  Yes.

7  Q.  Does the Village have an MS4 system?

8  A.  The Village is an MS4.

9  Q.  And that is regulated under the EPA's Phase II Storm-water

10 Regulations?

11 A.  I don't know what you mean by regulated.  What it is, it's

12 required by the Clean Air, Clean Water Act, the federal act.

13 It's administrated in New York state by the New York State

14 Department of Environmental Conservation.  And the requirement

15 is that MS4s, which is every town and village in our general

16 area - not counties, but towns and villages - are required to

17 implement procedures to reduce as much as possible any

18 pollutants from getting into the water system.  It's a drinking

19 water protection.

20 Q.  Now, Ms. Ulman, turning -- you have your affidavit,

21 correct?

22 A.  I do.

23 Q.  Turning to paragraph 6, you indicate that the Village

24 first adopted its zoning laws which are contained in Chapter

25 130 in 1968?

170524tartikovT1          Ulman - cross

1  A.  Yes.

2  Q.  The purpose of the laws was to -- was and remains to

3  preserve and enhance rural residential character of the

4  Village; did I read that accurately?

5  A.  You did.

6  Q.  I think 150 is admitted, but I don't know if Ms. Ulman has

7  a copy.  Do you have a copy?

8  A.  What is that?

9          THE COURT:  Does she know what it is?

10          MR. STEPANOVICH:  It's not admitted.

11          THE WITNESS:  The only thing I have is my affidavit.

12          THE COURT:  So, 150 is one of the exhibits referred to

13  that's tentatively in.  Yes?

14          MR. STEPANOVICH:  That's right.  We'll clear it up

15  right now.  150.

16          THE COURT:  Okay.

17          MR. STEPANOVICH:  Can I approach.

18          THE COURT:  Yes, of course.

19          MR. STEPANOVICH:  Your Honor, can I approach with the

20  clerk.  This is 150.  I believe you do not have a copy of it.

21          THE COURT:  Okay.  Thank you.

22  Q.  I've handed you what's been marked as trial Exhibit 150,

23  and Ms. Ulman, I'd ask you if you can identify that, police.

24  A.  It looks like it's part or all, I don't know, I would have

25  to look through the whole thing, of the Pomona Village Code.  I

170524tartikovT1          Ulman - cross

1  can't tell what -- it's quite thick.  I really don't know how

2  much of the code --

3          THE COURT:  Did you give her the whole code?

4          MR. STEPANOVICH:  Yes.

5          THE WITNESS:  The whole thing?

6          THE COURT:  That's the whole thing.  We're good.

7          MR. STEPANOVICH:  We move 150 into evidence, your

8  Honor.

9          MR. PELOSO:  No objection, your Honor.

10          THE COURT:  Okay.

11          THE WITNESS:  Is this the most recent version?

12          MR. STEPANOVICH:  If you asked that question -- for

13  the record, that was downloaded from the Village's website.

14          THE WITNESS:  Okay.

15          THE COURT:  How recently?

16          MS. SOBEL:  In the last three weeks.

17          THE COURT:  Okay.  Do you know if there were any

18  changes made in the last three weeks?  You're shaking you're

19  head.

20          Ms. Ulman, were there any changes made to this Village

21  code in the last three weeks?

22          THE WITNESS:  No.

23          THE COURT:  Okay.

24          THE WITNESS:  The only problem might be that some of

25  the more recent local laws may not have been incorporated into

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

 1   the printed version.

 2             THE COURT:  But they don't relate to this.

 3             THE WITNESS:  No, they don't relate to this.

 4             THE COURT:  Did you get that, counsel?  There may be

 5   some other local laws that didn't make it in here, but they

 6   don't relate.

 7             THE WITNESS:  There were a few that recently were

 8   adopted that probably are not in here, but they're not related

 9   to the lawsuit.

10             MR. STEPANOVICH:  That's fine.

11             THE COURT:  Okay.

12             (Plaintiffs' Exhibit 150 received in evidence)

13             MR. STEPANOVICH:  Can I approach, to try to save time.

14             THE COURT:  Yes.

15   Q.  Ms. Ulman, I believe I handed you Plaintiffs' Exhibit 129,

16   and ask if you can identify that, please.

17   A.  That is a copy of the Local Law 1 of 2001 as filed with the

18   secretary of state of the state of New York.

19             MR. STEPANOVICH:  Plaintiffs' 129 in evidence, your

20   Honor.

21             MR. PELOSO:  No objection.

22             THE COURT:  Okay.  Received.

23             (Plaintiffs' Exhibit 129 received in evidence)

24   Q.  I think I handed you Defense Exhibit 1011.  Can you

25   identify that, please.

170524tartikovT1          Ulman - cross

1    A.  That's Local Law 5 of the year 2004, which does not have

2    the page to identify that it was filed, but I will state that I

3    believe it was filed.

4          MR. STEPANOVICH:  Defendants' Exhibit 1011.

5          THE COURT:  That's already in through the affidavit.

6    Q.  And I believe I handed you trial exhibit -- Plaintiffs'

7    Exhibit 151 and asked if you can identify that, please.

8    A.  That's Local Law 1 of 2007 as filed by -- with the

9    secretary of state.

10          MR. STEPANOVICH:  Plaintiffs' 151 into evidence, your

11   Honor.

12          MR. PELOSO:  No objection.

13          THE COURT:  Received.

14          (Plaintiffs' Exhibit 151 received in evidence)

15   Q.  Now, Ms. Ulman, you testified in your affidavit that the --

16   and again coming back to paragraph six, you testified that the

17   purpose of the laws was and remains to preserve and enhance the

18   rural residential character of the Village; is that correct?

19   A.  The purpose, that result refers to the zoning laws, yes.

20   Q.  Yes.  Now, if you can direct your attention to trial

21   exhibit 150, Section 130-2, please.

22   A.  150 --

23   Q.  It would be 130-2?

24   A.  130-2.  Yes.

25   Q.  And doesn't 130-2 set out additional purposes for the

170524tartikovT1          Ulman - cross

1   zoning laws?

2   A.   Yes.

3   Q.   So, the purpose of the zoning laws that you cite in your

4   affidavit at six, to preserve and enhance the rural residential

5   character of the Village, that's not the only purpose of the

6   zoning laws; isn't that correct?

7   A.   We took that primarily from the comprehensive plan, which

8   the most recent one we call I guess the Master Plan Update of

9   1997, and that is the statement that's in the plan.  Yes, these

10  other are accessory to that, certainly.  They really are items

11  that fall within the overall subject of preserve and enhance

12  rural residential.

13  Q.   But those purposes set out in that --

14  A.   Yes.

15  Q.   -- section are purposes of the zoning law?

16  A.   Yes.  Oh, sure.  Yes.

17  Q.   Now, the -- you testified, I believe, in paragraph 7 that

18  the zoning laws reflect the Village's long-time goal of

19  remaining a low-density residential community?

20  A.   Yes.

21  Q.   Does the Village have land uses other than single-family

22  residents?

23  A.   The only ones that I can think of are, as I stated before,

24  the three houses of worship.  And there is one property that

25  is -- received a use variance from the zoning board, and there

170524tartikovT1          Ulman - cross

1   might be some nonconforming two-family residences in the

2   Village that I'm not aware of, but I don't know.

3   Q.   There are institutional land uses in the Village, correct?

4   A.   Houses of worship I would consider institutional; yes.

5   Q.   And what about commercial, business commercial?

6   A.   As I said, there is one property that is partially

7   commercial and partially a nonprofit, and that's the one that

8   received the use variance from the zoning board.

9          MR. STEPANOVICH:  May I approach, your Honor.

10          THE COURT:  Yes.

11  Q.   Now, have you reviewed 226?

12  A.   Yes.

13  Q.   Does that refresh your recollection, Ms. Ulman, as to the

14  land uses that are permitted in the --

15  A.   No.

16  Q.   -- that exist in the Village of Pomona?

17  A.   No.

18  Q.   There's a chart, a legend up there on the left-hand side.

19  A.   Yes.

20  Q.   You see that?

21  A.   Yes.

22  Q.   And after looking at that legend, does that refresh your

23  recollection as to the uses within the Village of Pomona?

24  A.   No.

25  Q.   Now --

170524tartikovT1            Ulman - cross

1    A.  There is no -- to my knowledge, for example, there is no

2    commuter parking facility within the Village of Pomona.

3    Q.  What is the commercial use that is existing in the Village

4    of Pomona?

5    A.  The only commercial use is on the very outskirts of the

6    Village near the Palisades Parkway, and that is a veterinarian

7    hospital that has a -- an adjacent grooming facility for pets,

8    and it is part of what was originally the Hudson Valley Humane

9    Society property, which was a nonconforming use before the

10   adoption -- before the incorporation of the Village in 1969.

11   And the Hudson Valley Humane Society occupies a portion of that

12   property, as well.  And that is the only one I'm aware of.

13   Q.  How about multifamily use?  I think you testified to that

14   can you explain the multifamily use in the Village of Pomona?

15   A.  There is none to my knowledge.

16   Q.  I thought you said there was some nonconforming --

17   A.  I said there might be a nonconforming two-family residence

18   or two in the Village that I'm not aware of.

19          MR. STEPANOVICH:  May I approach.

20          THE COURT:  Yes.

21   Q.  I've handed you what has been marked as trial Exhibit 141.

22   Can you identify that, please.

23   A.  This is the Village of Pomona Master Plan Update of --

24   prepared by Frederick P. Clark Associates for the Village of

25   Pomona in July of 1997.

170524tartikovT1            Ulman – cross

1           MR. STEPANOVICH:  Your Honor, move the admission of

2    141.

3           MR. PELOSO:  No objection.

4           THE COURT:  Received.

5           (Plaintiffs' Exhibit 141 received in evidence)

6    Q.  Ms. Ulman, if you could turn -- there's a color photo

7    there.

8    A.  Yes.

9    Q.  Do you see that?

10          THE COURT:  For the record, what page is this?

11          MR. STEPANOVICH:  Figure 1.  It's after, it looks like

12   page 3.

13          THE COURT:  Okay.

14   Q.  Do you see that, Ms. Ulman?

15   A.  I do.

16   Q.  And does that figure set forth the existing land use in the

17   Village of Pomona?

18   A.  As well as in the surrounding area, yes.  Not everything on

19   here is within the Village of Pomona.

20   Q.  I understand, but within the jurisdictional boundaries of

21   the Village of Pomona, this figure sets forth the existing land

22   use, correct?

23   A.  Yes.

24   Q.  Now, if you could turn to page 20, please.

25   A.  20?

170524tartikovT1          Ulman - cross

1   Q.  Uh-huh.  Do you see the discussion of Camp Dora Golding?

2   A.  I do.

3   Q.  And I'm going to read from that paragraph related to Camp

4   Dora Golding; do you see that?

5   A.  Yes.

6   Q.  And this master plan -- first of all, this master plan was

7   updated in what year?

8   A.  1997.

9   Q.  Okay.  And I believe this master plan articulated some

10  vision, if you will, for the Camp Dora property; isn't that

11  true?

12  A.  It has some recommendations from the planner but no vision.

13  Q.  And the recommendations for the Camp Dora Golding were what

14  recommendations?

15  A.  Well, one is for the Village -- excuse me -- to acquire the

16  property, which obviously it did not.

17  Q.  It did not.  Right.

18  A.  The other is to suggest a cluster layout to concentrate

19  development in areas previously developed.  I'm reading from it

20  now.

21  Q.  Right.

22  A.  The third would be to encourage a cluster development which

23  incorporates a village community recreational center.

24  Q.  Now, Ms. Ulman, what development would be more consistent

25  with the master plan?  Subdividing the property into 1 acres

170524tartikovT1          Ulman - cross

1   for single-family residential or an educational institution

2   with a cluster layout that would concentrate development in the

3   areas previously developed with camp buildings and maintaining

4   vegetated buffers along Route 202?

5              MR. PELOSO:  I'm not going to object to this, but I am

6   going to point out that Ms. Ulman -- obviously, your Honor is

7   permitting a legal conclusion and so forth, we agreed to that,

8   but she's not an expert witness, so I'm not objecting, I'm

9   just --

10             THE COURT:  You're just letting me know you might

11  object.

12             MR. PELOSO:  No.  I just think there may be a point

13  where the questions venture into the expertise of -- she's not

14  a wetlands expert.

15             THE COURT:  Okay.

16  A.  First, I would point out that what is suggested here is not

17  an educational use with cluster development.  When they talk

18  about cluster development, the other word for it is average

19  density, and it occurs when a property is subdivided into

20  single-family lots.  And in order to preserve some of the

21  features of the property, particularly one like this, which has

22  slope, steep slope and wetlands, you take the number of lots

23  that would be permitted within that property, the number of

24  single-family lots, and cluster them in a way to preserve the

25  environmental features of the property.

170524tartikovT1             Ulman - cross

1            It does not envision a different type of use than a

2     single-family -- the density, the low density of the

3     single-family use.

4     Q.  So, I'm confused, Ms. Ulman.  Is either one of those

5     consistent with the character of the -- of what's set forth in

6     the vision of the master plan, is either one of those?

7     A.  Cluster development is something that's permitted and

8     encouraged by state law.  And it's up to the local planning

9     board to decide if a particular property is, I hate to word use

10     eligible, but if the type of property that wants -- that you

11     want to preserve should be used for the cluster development.

12     Q.  Isn't it true, though, that the property could be

13     subdivided without clustering?

14     A.  Yes, but the density -- the housing density of the property

15     remains the same, whether you're using cluster or single-family

16     lots.  You cannot increase the number of lots or the number of

17     houses in a cluster development situation.

18     Q.  I understand.  But the property could be subdivided without

19     clustering, correct?

20     A.  Oh, yes.

21     Q.  Turning back to the map there on figure 1, you see that?

22     A.  Yes.

23     Q.  And it might be easier if we show you this demonstrative.

24            THE COURT:  What are you marking it as?

25            MR. STEPANOVICH:  We're going to mark this as 141-A

170524tartikovT1            Ulman - cross

1  because it references 141, your Honor.

2          May I approach.

3          THE COURT:  Sure.

4          MR. PELOSO:  May I approach, your Honor.

5          THE COURT:  Yes.

6          MR. STEPANOVICH:  I'm going to ask questions from back

7  there.  I just have a few questions.

8          First of all, the plaintiffs move 141-A into evidence.

9          MR. PELOSO:  No objection.  I'm assuming it's simply a

10  reproduction of figure 1.

11          THE COURT:  It looks like an enlarged reproduction.

12          MR. PELOSO:  No objection.

13          THE COURT:  Received.

14          (Plaintiffs' Exhibit 141-A received in evidence)

15  Q.  Ms. Ulman, from this Exhibit 141-A, can you identify the

16  Tartikov property?

17  A.  Right here (indicating.)

18          THE COURT:  What does it say?

19          THE WITNESS:  Camp Dora Golding.

20          THE COURT:  Okay.  For the record.

21  Q.  And do you see the area to the north end of that property?

22  A.  Yes.

23  Q.  And that area in the north end borders 202; isn't that

24  true?

25  A.  The triangle?  Is that the one you're talking about?

170524tartikovT1          Ulman - cross

1   Q.  Yes.

2   A.  Yes.

3   Q.  Can you tell from this diagram, Exhibit 141-A, whether or

4   not there are any steep slopes on that property?

5   A.  There is an area marked with steep slope.

6   Q.  And what about wetlands?

7   A.  Yes.

8   Q.  Okay.  That's all I have right now.  And from that diagram,

9   the steep slopes are on the north end of the property?

10  A.  Well, they have it listed at the north end as well as at

11  the easterly side of the property.

12  Q.  Okay.  Now, Ms. Ulman, houses of worship have been

13  approved -- you've testified in your affidavit that houses of

14  worship have been approved by the Village as special permit

15  uses after review to minimize the adverse effects of

16  nonresidential uses on the adjacent single-family neighborhoods

17  at paragraph 14.

18          Did I read that accurately?

19  A.  Paragraph 14.

20  Q.  Yes, ma'am.

21  A.  Yes.

22  Q.  Now, only the Board of Trustees can approve a special

23  permit for an educational institution; isn't that true?

24  A.  For an educational institution?

25  Q.  Yes.

170524tartikovT1          Ulman - cross

1   A.  Yes, but would also need site plan approval from the

2   planning board.

3   Q.  Okay, but it's the Board of Trustees that has the authority

4   to approve the special permit; isn't that true?

5   A.  Yes, but a special permit is just another -- a special

6   permit is a -- an additional set of eyes, if you will, on a

7   project of the use of which is approved as an approved use

8   within the Village code.

9   Q.  This additional set of eyes that you mention really is the

10  Board of Trustees' authority to approve the special permit,

11  correct?

12  A.  To approve the special permit, not the entire project.

13  Q.  That's all I asked --

14  A.  Yes.

15  Q.  -- was whether or not the Board of Trustees --

16  A.  Yes, correct.

17  Q.  -- can approve the special permit for an educational

18  institution.  Okay.

19         Now, petitions for text amendments are regulated by

20  the code; isn't that true?

21  A.  By what?  I'm sorry.

22  Q.  By the code, the Village code.

23  A.  Yes.

24  Q.  And I believe that's from Section 130-35 through 130-45?

25  A.  It's towards the end of the code.

170524tartikovT1          Ulman - cross

1    Q.  Okay.  I'm just going to ask you some general questions on

2    that right now.  Ms. Ulman, how many text amendments made by

3    petition by residents have been adopted by the Village Board of

4    Trustees?

5    A.  I'm not aware of any that have been applied for, so none

6    have been adopted.

7    Q.  Okay.  Thank you.

8            Now, isn't it true, Ms. Ulman, according to 130-38 of

9    the code that on making of -- on making the motion for a

10   petition for a text amendment, the Board of Trustees may decide

11   not to formally consider that amendment?

12   A.  Yes.

13   Q.  And there's no requirement that the Board of Trustees

14   decide on a petition for a text amendment within a certain

15   period of time; isn't that true?  And I think if I can

16   reference you to 130-42.

17   A.  I'm looking at that.  No, that -- no, there does not seem

18   to be a time period, a time limit for which the board would be

19   required --

20   Q.  That's my question.  There's nothing in the code --

21   A.  Not that I see; no.

22   Q.  -- that indicates a time period in which the board must

23   act?

24   A.  No.

25   Q.  Ms. Ulman, what is the legal standard of review if the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1   board decides not to adopt a petition for a text amendment?

2   A.   What is the legal what?

3   Q.   Legal standard of review?

4   A.   Of review?

5   Q.   Yes, ma'am.

6   A.   If the board decides not to?

7   Q.   Not to adopt a petition?

8   A.   An Article 78 proceeding or a declaratory judgment action.

9   Q.   So, Ms. Ulman, isn't it true that the town board is not

10  duty-bound to act on a petitioner's application for a text

11  amendment; isn't that true?

12  A.   That's correct.

13  Q.   Ms. Ulman, in the event of a petition for a text amendment,

14  isn't it true that residents can voice their opposition to that

15  text amendment?

16  A.   The procedure for a -- an amendment to the zoning law,

17  which is what I think you're referring to as a text amendment,

18  is set forth in Chapter -- in Article 11 as you indicated; and

19  that provides for a public hearing to be held by the Board of

20  Trustees on the application, and of course, public hearings are

21  open for public comment, and that's the reason that you hold a

22  public hearing, is to get public comment on the particular

23  application.

24  Q.   Ms. Ulman, if I could direct your attention to 130-42,

25  which is procedure upon protest.  Do you see that?

170524tartikovT1          Ulman - cross

1   A.   Yes.

2   Q.   And my question is that there is a procedure for Village

3   residents to protest the petition for a text amendment; isn't

4   that true?

5   A.   Yes.

6   Q.   Okay.  And what is that procedure?

7   A.   The procedure as set forth this seems to be a recitation of

8   the State Section 7-708 of the Village law, the State Village

9   Law, where a petition can be signed by at least 20 percent or

10  more of the area of the land included in such proposed change,

11  or by the owners of 20 percent or more of the land immediately

12  adjacent extending 100 feet from the subject property, or by

13  the owners of 20 percent or more of the land directly opposite

14  thereto extending 100 feet from the street frontage of such

15  opposite land.  I was just reading from the Section 130-42.

16  And what it requires is that the Board of Trustees, instead of

17  having the ability to approve the application by a majority,

18  you need a majority plus one, which is four members of the

19  board instead of three.

20  Q.   And you anticipated my last question.  If that protest

21  would occur by the 20 percent that you just set forth, then the

22  board is required to pass the action by what you would call I

23  think is a supermajority; is that fair?

24  A.   Yes.

25  Q.   So as you stated, instead of three out of five, it would be

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1  four out of five?

2  A.  Right.

3  Q.  Now, Ms. Ulman, I want to ask you a few questions about

4  zone change.  Your affidavit at paragraph 15 mentions zone

5  changes.  And my question, ma'am, is where in the zoning code

6  does it talk about zone changes as you've reflected in your

7  affidavit at paragraph 15?

8  A.  That's authorized by the amendment article.  An

9  amendment -- a zone change is in the nature of an amendment to

10  the zoning law, because what you're doing is changing the

11  zoning map, and you're -- if you were creating a new zone, you

12  would be including that language within the zoning law as an

13  amendment to the -- to the law itself.

14  Q.  So then, if I understand your testimony, then that process

15  would fall under the petition for an amendment; is that true?

16  A.  I believe so, yes.

17  Q.  How many zones are there in the Village?

18  A.  One.

19  Q.  Which zone could Tartikov change its property to in order

20  to be allowed?

21  A.  They would propose a new zone.

22  Q.  So, Tartikov then could not petition for a zone change;

23  isn't that true?

24  A.  Well, we call it a zone change.  It would be very difficult

25  to call it a zone increase.  Zone change covers any -- and this

170524tartikovT1          Ulman - cross

1   is not only in Pomona, I mean, this is all over.  Occasionally,

2   a developer will apply for a new zone that doesn't exist within

3   your current code to accommodate what he wants to do on a

4   particular piece of property.  And in that case, we still call

5   it a zone change because you're changing the existing zone to a

6   different one.

7   Q.  All right.  And that process, then, would fall under your

8   prior testimony and that would be under a petition for

9   amendment?

10  A.  Yes, yes.

11  Q.  And as you indicated, a new zone would have to be created;

12  isn't that true?

13  A.  Yes.  The applicant would propose what it is he wants to

14  do, a zone that encompasses what it is that he wants to do.

15  Q.  Turn your attention, now, Ms. Ulman to paragraph 16?

16  A.  16?

17  Q.  Yes, ma'am.

18  A.  Yes.

19  Q.  Now, I have a few questions.  You talk about the -- I'm

20  going to try to pronounce this right -- Minisceongo Park?

21  A.  Yes.

22  Q.  And when was that park project?

23  A.  The original project was started I think in the early

24  2000s.  It was originally proposed to the Town of Haverstraw.

25  It's not within the Village of Pomona.  It's in the Town of

170524tartikovT1          Ulman - cross

1    Haverstraw.  It was originally proposed as a large multifamily

2    housing project.

3    Q.  To your recollection, Ms. Ulman, what was the most

4    recent --

5    A.  Subsequently, when the town board disapproved the housing

6    project, they submitted a proposal for a commercial strip mall

7    development with the prime tenant being a Wal-Mart.

8    Q.  And when was that?

9    A.  Around 2007, 2008, I think.

10   Q.  Now, you also mention, Ms. Ulman, in paragraph 16, you

11   refer to Ramapo and the multifamily student housing.  I'm going

12   to ask you a few questions about that.

13   A.  Yes.

14   Q.  You refer specifically to Patrick Farm; am I right?

15   A.  Yes.

16   Q.  And Pomona opposed the development of Patrick Farm in 2004;

17   isn't that true?

18   A.  No.

19   Q.  It did not?

20   A.  2004?

21   Q.  Yes, ma'am.

22   A.  No.  There was no development of Patrick Farm proposed in

23   2004.  We opposed the Ramapo Comprehensive Plan in 2004, which

24   was a plan, not a proposal.

25   Q.  The Village of Pomona --

170524tartikovT1          Ulman - cross

 1          MR. STEPANOVICH:  May I approach, your Honor.

 2          THE COURT:  Yes.

 3   Q.  I've handed you -- take a second, a few minutes to identify

 4   that, but I just want for the record to reflect I've handed you

 5   what's been marked as trial exhibit, Plaintiffs' Exhibit 156.

 6   And ask if you can identify that exhibit.

 7   A.  This is the Article 78 proceeding that was -- it's a copy

 8   of the notice of petition and verified petition, which started

 9   the Article 78 proceeding brought by the four villages against

10   the town and three -- four, I'm sorry, four private residences

11   against the Town of Ramapo with reference to the Patrick

12   Farm -- with reference to the town comprehensive plan.

13          MR. STEPANOVICH:  Plaintiffs' offer 156 in evidence.

14          MR. PELOSO:  No objection.

15          THE COURT:  156 received.

16          (Plaintiffs' Exhibit 156 received in evidence)

17   Q.  Now --

18   A.  I'm sorry.  This is -- this is not the comprehensive plan.

19   This is the petition against I guess the adult student housing

20   law, right?

21   Q.  That was going to be my next question.

22   A.  Forgive me.  I stand corrected.

23   Q.  For clarity of the record, this Exhibit 156, this was the

24   challenge against Ramapo for the adult student housing; isn't

25   that true?

170524tartikovT1          Ulman - cross

1    A.  Yes, but there was no -- as I said before, there was no

2    specific development proposed for the property.  You'll note

3    that in -- the respondents included the owners of all four

4    properties that were identified by the town as being eligible

5    for their adult -- the new adult student housing law, but it

6    did not include a specific proposal.

7    Q.  I understand that, but the Village knew at this time that

8    Patrick Farm was meant to accommodate Orthodox Hasidic Jews;

9    isn't that true?

10   A.  Was meant to accommodate the adult student housing law.

11   Q.  And the Village also knew, though, that the adult student

12   housing was meant to accommodate Orthodox Hasidic Jews; isn't

13   that true?

14   A.  There's nothing in the town Local Law that says it's

15   limited to Orthodox Jews --

16   Q.  It includes --

17   A.  -- to my knowledge.

18   Q.  Okay.  But it includes -- the adult student housing

19   includes housing for Orthodox Hasidic Jews; correct?

20   A.  They would be eligible for it; certainly.

21   Q.  Now, if you could turn to page 19, paragraph 98, please.

22   A.  Of?

23   Q.  Of the petition.

24   A.  Page 19?

25   Q.  Yes.

170524tartikovT1          Ulman - cross

1   A.  Paragraph, which?

2   Q.  Paragraph 98?

3   A.  98.

4   Q.  Page 19.

5   A.  Yes.

6   Q.  Okay.  Now, it says that the four sites identified by the

7   consultant are likely to -- that are likely to seek the use are

8   the Patrick farm site, the Nike site, Highview Road, and the

9   Spruce Road site; isn't that true?

10  A.  Yes.

11  Q.  And the Nike site was an Orthodox Jewish development,

12  correct?

13  A.  The Nike site was owned by Orthodox Jews to my knowledge --

14  well, the Village of Pomona didn't know that for a fact.  I

15  personally knew it.

16  Q.  You knew it?

17  A.  Yes.

18  Q.  Then you personally knew that that Nike site involved the

19  adult student housing; isn't that true?

20  A.  Yes.

21  Q.  There was some prior litigation, I believe, by Yeshiva

22  Chofetz Chaim against the Village of New Hempstead in the late

23  90s; isn't that true?

24  A.  Yes.

25  Q.  And I believe you were the attorney for New Hempstead

170524tartikovT1          Ulman - cross

1   during that time?

2   A.  I was.

3   Q.  And that case involved allegations of various actions taken

4   by Village officials against the Orthodox Hasidic community;

5   isn't that true?

6   A.  Yes.

7   Q.  In fact, the Village of New Hempstead passed a law

8   requiring a special permit to have two kitchens in a home;

9   isn't that true?

10  A.  I think they did, yes.

11  Q.  And you know that that's a practice of Orthodox Hasidic

12  Jews; isn't that true?

13  A.  Yes.  Did you say they passed a law?

14  Q.  Yes, ma'am.

15  A.  Yes, they did.

16  Q.  Now, I want to come back just for a minute on 156.  If you

17  turn to page 36.

18  A.  36?

19  Q.  The petition alleges that -- strike that.  If you could

20  read paragraph 215, please.

21  A.  Which paragraph?

22  Q.  215, ma'am.  215, page 36, 215.

23  A.  Yes.

24  Q.  And if you could read that, please.

25  A.  The Local Law provides aid and preference to those engaged

170524tartikovT1              Ulman - cross

1    in full-time study consistent with recognized religious

2    practice or belief.

3    Q.   Now, are you on page 36?

4    A.   Yes.

5    Q.   And what paragraph did you just read?

6    A.   216.

7    Q.   Okay.  What about 215?  Can you read that, please.

8    A.   The legislative history shows that the Local Law is drawn

9    to secure for one religious community a unique and significant

10   zoning benefit as it is drafted to benefit four specific

11   properties.

12   Q.   And those four specific properties were the ones that we

13   referenced in paragraph 98; isn't that true?

14   A.   Yes.

15   Q.   And that one religious community referenced in that

16   petition is the Orthodox Hasidic community; isn't that true?

17   A.   I did not write the petition.

18   Q.   Okay.  You were the Village Attorney at this time, correct?

19   A.   Yes.  I was the Village Attorney for Pomona and Chestnut

20   Ridge, which were two of the four --

21   Q.   So, is it your testimony --

22   A.   -- plaintiffs.

23   Q.   Ms. Ulman, that you're not aware of the religious group

24   that that paragraph references?

25   A.   I -- personally or as the Village?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1              Ulman - cross

1   Q.  Either one, ma'am.

2   A.  Personally, I probably knew, yes.

3   Q.  That it was --

4   A.  Yes.

5   Q.  Designated Orthodox Hasidic Jews?

6   A.  Yes.

7   Q.  Okay.  Thank you.

8           Now, you were also the Village Attorney for Chestnut

9   Ridge; isn't that true?

10  A.  At this time, yes.

11  Q.  And just for the record, you were the attorney for Chestnut

12  Ridge during what period of time?

13  A.  I was Assistant Village Attorney from the inception from

14  1980 -- I guess, '85 or '86 until about 1991, at which time I

15  became the Village attorney, until 2012.

16  Q.  And that is in the Village of Chestnut Ridge?

17  A.  Yes.

18  Q.  And did Chestnut Ridge adopt a law saying that no

19  residential uses were permitted for schools of general or

20  religious instruction other than dormitories, which excluded

21  family housing?

22  A.  I don't understand your question.

23  Q.  Did Chestnut Ridge adopt a law indicating that no

24  residential uses were permitted for schools of general or

25  religious instruction other than dormitories?

170524tartikovT1          Ulman - cross

1    A.  It passed a law that defined dormitories as accessory uses

2    to educational uses, very similar to what we have in Pomona.

3    Q.  I understand that, ma'am.  My question, though, has to do

4    with the law as it relates to residential uses, and did

5    Chestnut Ridge adopt a law says that no residential uses were

6    permitted for schools of general or religious instruction other

7    than dormitories?

8    A.  A specific law that said that?  I don't believe so.  By its

9    nature, if dormitories are the only permitted use with an

10   educational institution, all other types of housing are

11   excluded, but I don't think they did anything specifically that

12   I can recall.

13   Q.  Are you family familiar with Local Law 6 of 2001 in

14   Chestnut Ridge?

15   A.  Not off the top of my head; no.

16   Q.  We'll come back to that, Ms. Ulman.

17          What about Wesley Hills?  I believe you were the

18   Village Attorney for Wesley Hills; is that true?

19   A.  No.

20   Q.  Pardon me?

21   A.  No.

22   Q.  You were not?

23   A.  I've never been Village Attorney for Wesley Hills.  I'm

24   deputy Village Attorney, and I work only with the zoning board.

25   I represent the zoning board in Wesley Hills.

170524tartikovT1          Ulman - cross

1    Q.  What about Spring Valley?  Were you the Village Attorney

2    for Spring Valley?

3    A.  I was many, many years ago.

4    Q.  Do you know, Ms. Ulman, whether or not Spring Valley

5    defines dormitories in its code?

6    A.  I do not.  I don't recall.

7    Q.  Now, Ms. Ulman, if we could turn to paragraph 18 of your

8    affidavit.  And it's two paragraphs long, but my specific

9    question is, you write in paragraph 18, "If the board decides

10   it wants to consider the law," I think you're outlining just

11   the general process of the passage of law, and you write, "If

12   the board decides it wants to consider the law," what does that

13   mean?

14   A.  That means if I or some other person suggests the subject

15   of a local law and the board is not interested in it and they

16   don't want to consider it, they will not consider it.

17   Q.  Because that's the board's prerogative; isn't that correct?

18   A.  The Board of Trustees, yes, they are the legislative body

19   of the Village.

20   Q.  All right.  Turning your attention now to paragraph 19.

21   Besides what you set forth in paragraph 19, do you have any

22   other direct knowledge for the reasons for the passage of Local

23   Law 1 of 2001?

24   A.  Any other reason?

25   Q.  Yes, ma'am, other than what you set forth in paragraph 19,

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1  do you have any other --

2  A.  No.

3  Q.  -- knowledge of any reasons beyond that?

4  A.  No.

5  Q.  Okay.  And so, other than reading the minutes, the memos

6  and other documents, you no reason other than that for the why

7  Local Law 1 of 2001 was passed; isn't that true?

8  A.  Yes.

9  Q.  So let me just be a little more specific, Ms. Ulman.  You

10  know the Village laws were being reviewed at that time because

11  of Yeshiva Spring Valley's interest in building a school; true?

12  A.  Not specifically.  I -- from what I have read in the

13  documents and the minutes, the law, Yeshiva Spring Valley

14  raised the issue with our planner, our planning consultant, who

15  then brought it to the attention of the Board of Trustees and

16  the planning board, specifically that the existing Village laws

17  were not adequate to deal with an educational project.

18          MR. STEPANOVICH:  May I approach, your Honor.

19          THE COURT:  Yes.

20  Q.  I've handed you, Ms. Ulman, what is marked as Plaintiff

21  Exhibit 142 and ask if you can identify that.

22  A.  This is the planning board of -- the Village of Pomona

23  Planning Board Agenda for the meeting of December 15, 1999, and

24  the minutes -- a copy of the minutes of that meeting.

25          MR. STEPANOVICH:  Plaintiffs move Exhibit 142 in

170524tartikovT1              Ulman - cross

1    evidence, your Honor.

2              MR. PELOSO:  No objection.

3              THE COURT:  All right.  Received.

4              (Plaintiffs' Exhibit 142 received in evidence)

5              MR. STEPANOVICH:  May I approach.

6              THE COURT:  Yes.

7    Q.  I've just handed you Plaintiffs' Exhibit 130 -- Ms. Ulman,

8    and ask if you can identify that, please.

9    A.  I don't know what the Mel Cook on the face of it is, but

10   the interior is a memorandum dated January 14, 2000 from

11   Frederick P. Clark Associates, Inc., to the Village of Pomona

12   planning board.

13             MR. STEPANOVICH:  Plaintiffs move 130 into evidence.

14             MR. PELOSO:  No objection.

15             THE COURT:  Received.

16             (Plaintiffs' Exhibit 130 received in evidence)

17             MR. STEPANOVICH:  May I approach.

18             THE COURT:  You can just do one trip and bring them

19   all up.

20             MR. STEPANOVICH:  I wish I -- it was that easy, your

21   Honor.

22             THE COURT:  Did he just throw you under the bus?

23             MR. STEPANOVICH:  I did not.  I take all the blame.

24   Q.  Handed you what's been marked as Plaintiffs' Exhibit 111

25   and ask if you can identify that.

                   SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

170524tartikovT1          Ulman - cross

1   A.  This is a memorandum dated January 24, 2000 from Frederick

2   P. Clark Associates to Mayor Herbert Marshall and the Village

3   of Pomona Board of Trustees.

4           MR. STEPANOVICH:  And Plaintiffs move 111 into

5   evidence.

6           THE COURT:  I have it in.  It's already in.

7           MR. STEPANOVICH:  Okay.

8   Q.  Now, if we can come back to 142, Ms. Ulman.

9   A.  Which one?  142?

10  Q.  Page 41 of 142.

11  A.  Page what?  I'm sorry.

12  Q.  I'm sorry.  Page 41 of Exhibit 142.

13  A.  41?  Yes.

14  Q.  And Mr. Healey was employed.  Mr. Healey I believe wrote

15  these -- wrote the memorandum that we just entered, which would

16  be, I think it's 140 -- 111 and 130.  Mr. Healey indicates that

17  the zoning for schools in the Village really stinks, didn't he?

18  A.  Yes.

19  Q.  And so, I think you testified that as a result of Yeshiva

20  Spring Valley's application, the Village started the process of

21  revising its laws regarding schools?

22  A.  No.  I think I said that as a result of Yeshiva Spring

23  Valley's application, Mr. Healey raised the issue with the

24  board that he believed that the village -- the existing Village

25  law was inadequate to deal with the project --

170524tartikovT1          Ulman - cross

1  Q.  And he specifically --

2  A.  -- with educational uses.

3  Q.  Right.  And I think he got even a little more specific when

4  he described that as it really stinks?

5  A.  He was a little better in one of his memos when he said

6  it's scant.

7  Q.  Right.

8  A.  Yes, he did.

9  Q.  Okay.  Now, Ms. Ulman, are you familiar with the effort to

10  bring group homes into the Village of Pomona?

11  A.  I'm familiar with the -- what was going on in all of the --

12  I was not the attorney for Pomona when -- during that period

13  when the state had closed most of their mental health

14  institutions and were encouraging nonprofit organizations to

15  open group homes for the mentally disabled and it was

16  statewide.

17  Q.  Okay.  You don't have any knowledge, either personally or

18  as a representative of the Village, that the Village of Pomona

19  took any action to have the Fair Housing Act reviewed or

20  amended or repealed, do you?

21  A.  No.

22  Q.  Now, are you familiar, Ms. Ulman with the Humane Society's

23  efforts to expand its animal hospital?

24  A.  The Humane Society never had an animal hospital.

25  Q.  Are you familiar at all with the Anaman (ph) property?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1    A.  Yes.

2    Q.  And what is the Anaman property?

3    A.  We call it the old Burgess Meredith property, which is in

4    the Town of Ramapo but across the street from the Village of

5    Pomona.  And it's a -- do you want me to describe it?

6    Q.  Yes, ma'am.  I'm sorry I interrupted you.

7    A.  It's about a 7-acre parcel that has an old beautiful house

8    on it that once belonged to Burgess Meredith and Paulette

9    Goddard, his wife.

10   Q.  And at a certain time, that property was considered to

11   become an assisted living facility; isn't that true?

12   A.  Assisted living?

13   Q.  Yes, ma'am.

14   A.  I don't know.  I'm not aware of it.

15          MR. STEPANOVICH:  May I approach, your Honor.

16          THE COURT:  Yes.

17   Q.  Can you identify 112, Ms. Ulman.

18   A.  This is a copy of the Village Green newsletter issued by

19   the board of -- I guess the Board of Trustees of the Village.

20   The date is February 1999.

21   Q.  I'm just going to ask if you can review that document, just

22   trying to refresh your recollection, ma'am, as to the Anaman

23   property.

24   A.  I was not the Village Attorney at the time, and for the

25   Village, I did not review any documents related to the assisted

170524tartikovT1          Ulman - cross

1   living.  I wasn't aware of it.  I apologize.

2   Q.  No apology needed.  The question, then, is this document

3   doesn't refresh your recollection because you had not; is that

4   what you're saying?

5   A.  I had none.  That's right.

6   Q.  Now, did there come a time, Ms. Ulman, to your knowledge,

7   the Anaman property was proposed to be a yeshiva?

8   A.  Yes, with living facilities on it; yes.

9   Q.  And did the Village of Pomona take any action regarding

10  that proposal?

11  A.  We did.  We issued a letter, I believe, not objecting to

12  the project, but objecting to the development, the way it was

13  being developed.

14  Q.  And how was that?

15  A.  As I stated, it's a 7-acre parcel with wetlands and they

16  were putting in a school.  I think it was about 30-odd-thousand

17  square feet, plus another 30- or 40,000 square feet of housing.

18  And the way it was designed, they had parking areas and

19  driveways running through the whole property.  It was not a

20  well-designed project, and we objected to it on that basis.

21  Q.  Now, Ms. Ulman, you had no knowledge of any opposition to

22  the assisted living facility, I want to come back for a second.

23  A.  I don't --

24  Q.  You had no knowledge whatsoever?

25  A.  No.

170524tartikovT1          Ulman - cross

1   Q.  And Ms. Ulman, do you know what happened with the Anaman

2   property?

3   A.  Ultimately?

4   Q.  Yes, ma'am.

5   A.  It was purchased by the Town of Ramapo, and it is still

6   sitting as it was.  Unfortunately, there were a group of

7   residents in Pomona who wanted to establish a little garden in

8   there and keep up the land since the town was not paying

9   attention to the building itself, and the town discouraged it.

10  Q.  Are you familiar, Ms. Ulman, with the proposal to --

11  regarding an agricultural operation in Wesley Hills in 2004?

12  A.  An agricultural in 2004?

13  Q.  Yes, ma'am.

14  A.  I don't recall.

15  Q.  Okay.

16          MR. STEPANOVICH:  May I approach.

17          THE COURT:  Yes.

18  Q.  I've handed you a document, Ms. Ulman, that -- see if it

19  refreshes your recollection.

20          THE COURT:  For the record, what's it identified as?

21          MR. STEPANOVICH:  Yes, I'm sorry.

22  Q.  Can you identify this exhibit, Ms. Ulman?

23          THE COURT:  What's the number?

24  A.  407.

25          THE COURT:  Plaintiffs' 407.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1          MR. STEPANOVICH:  We're not going to offer it.

2          THE COURT:  Just for identification.

3          You don't have to tell us what the document is.  Is

4     there a portion you want her to read?

5          MR. STEPANOVICH:  I just want to direct her attention

6     to page 2 of 3.

7          THE COURT:  Okay.

8     A.   Yes.

9     Q.   And there's the third paragraph under "old business," and

10    just direct your attention to that paragraph, and see if that

11    refreshes your recollection regarding an agricultural operation

12    in Wesley Hills.

13    A.   This has to do with a local law.

14         THE COURT:  Right.  The question is, does reading that

15    document refresh your recollection --

16    Q.   -- as to an agricultural operation in Wesley Hills?

17    A.   Which project was not an agricultural operation.  It does

18    not refresh my recollection, but I'm familiar with it.

19    Q.   Here's the question:  Did the Village take any action

20    opposing that development?

21    A.   No, because, as stated by then-Trustee Sanderson, it was

22    not on the Village borders.

23    Q.   So, the Village didn't want to get involved; is that

24    correct?

25    A.   Right.  They felt it did not affect the Village, but

170524tartikovT1              Ulman - cross

1   reserved their right to -- to intervene or comment on an

2   application which would affect them.

3   Q.  And are you familiar, Ms. Ulman, with an item in 2003

4   regarding an open space provision in New Hempstead?  Do you

5   have any knowledge of that?

6   A.  I don't recall.

7   Q.  Okay.

8           MR. STEPANOVICH:  Approach, your Honor.

9           THE COURT:  Yes.

10          MR. STEPANOVICH:  For the record, that's 410.  I'm not

11  going to move to admit this, Ms. Ulman, but turn your attention

12  to paragraph 4.

13          MR. PELOSO:  We don't have a 410 on our exhibit list.

14          THE COURT:  Is it being used to try to refresh

15  recollection?

16          MR. STEPANOVICH:  Yes.

17          MR. PELOSO:  I'm just making a note for the record.

18          THE COURT:  You know the deal on that.

19          MR. PELOSO:  Pardon?

20          THE COURT:  They can show her a bowl of spaghetti.

21          MR. PELOSO:  No, I'm just making a note in terms of

22  that it's not listed on --

23          THE COURT:  But the bowl of spaghetti wouldn't be on a

24  pretrial order list, either.

25  A.  Paragraph 4?

170524tartikovT1              Ulman - cross

1    Q.  5 under "old business."

2    A.  Yes.

3    Q.  And does that refresh your recollection, Ms. Ulman,

4    regarding the position of the Village of Pomona on this open

5    space item in New Hempstead?

6    A.  It does not.  I was not at that meeting as you can see from

7    the front.

8           THE COURT:  The document is not in evidence, so

9    don't --

10   Q.  Don't read from it.

11   A.  Sorry.

12          THE COURT:  That's okay.

13   A.  I was not at that meeting.

14   Q.  So, the document does not refresh your recollection?

15   A.  No, it does not.

16   Q.  Okay.  Now, are you familiar with Bar Laboratories,

17   Ms. Ulman?

18   A.  I'm familiar with their location as it affects the Village

19   of Pomona, yes.

20   Q.  And did there come a time where Bar Laboratories purchased

21   property within the Village of Pomona?

22   A.  I don't believe so.

23   Q.  Do you recall at all in your tenure as Village Attorney

24   whether or not there was a meeting with the Board of Trustees

25   and Bar Laboratories?

170524tartikovT1          Ulman - cross

1   A.   No.

2   Q.   Now, Ms. Ulman, do you have any knowledge of an application

3   by Bais Yaakov, a yeshiva, for expansion in Ramapo?

4   A.   That was before my tenure.

5          MR. STEPANOVICH:  May I approach, please.

6          THE COURT:  Yes.

7   Q.   I've handed you what's been marked as Plaintiff Exhibit 125

8   and ask if you can identify that, please.

9   A.   The minutes of the Board of Trustees meeting held on

10  May 20, 1996.

11         MR. STEPANOVICH:  Your Honor, plaintiffs move 125 into

12  evidence.

13         MR. PELOSO:  No objection.

14         THE COURT:  125 received.

15         (Plaintiffs' Exhibit 125 received in evidence)

16  Q.   Turn your attention, Ms. Ulman, to page 7 of this document,

17  and there's a reference of Bais Yaakov; isn't that true?

18  A.   I beg your pardon?

19  Q.   There's a reference in paragraph 7 to Bais Yaakov?

20  A.   Yes.

21  Q.   And the Village wrote to the Town of Ramapo opposing this

22  yeshiva, didn't it?

23  A.   The Village wrote stating that too much of the property was

24  being utilized.

25  Q.   Okay.  The Village took a position regarding this yeshiva,

170524tartikovT1          Ulman - cross

1  didn't it?

2  A.  The expansion, the school was already there, this was for

3  an expansion and they took a position that the expansion was

4  too large.

5  Q.  And the Village encouraged opposition to the yeshiva,

6  didn't it?

7  A.  Yes.

8  Q.  Now, Ms. Ulman, are you familiar with the Hebrew Academy

9  for Special Children?

10  A.  Is that the one on 306?

11  Q.  I believe so; yes.  Are you familiar, either personally or

12  as a representative of the Village?

13  A.  If it's -- I'm not sure.  If it's the one I'm thinking of,

14  yes.

15          MR. STEPANOVICH:  May I approach.

16          THE COURT:  Yes.

17  Q.  Ms. Ulman, if -- I've handed you what has been marked as

18  Plaintiff Exhibit 397 just to refresh your recollection, I'm

19  not moving to admit it, if you could turn to page 3.

20  A.  Yes.

21  Q.  Under "new business, item 5."

22  A.  Yes.

23  Q.  And does that refresh your recollection regarding the HASC?

24  A.  Yes.

25  Q.  And what is HASC?

170524tartikovT1            Ulman - cross

1  A.  It's one of three proposals that were before the Town of

2  Ramapo along -- two of which were along Route 306, directly

3  across the street from the Village of Pomona.

4  Q.  And HASC stands for the Hebrew Academy for Special

5  Children, correct?

6  A.  Yes.

7  Q.  And what is Congregation Ki Torah Chaim?  Do you know where

8  that is, first of all?

9  A.  Yes.  That was another -- a separate project that was I

10 believe also a school.

11 Q.  And is that a yeshiva?

12 A.  Yes.

13 Q.  And that's located outside of the Village of Pomona,

14 correct?

15 A.  Across the street from the Village of Pomona.

16 Q.  All right.  And I think you've answered this, but the

17 Hebrew Academy for Special Children, where is it located?

18 Within the Village of Pomona?

19 A.  No.  That's on Mountain Road, which is off 306, I believe.

20 Q.  And what is Mes- --

21 A.  They're all in the Town of Ramapo.

22 Q.  Outside of the Village within the Town?

23 A.  Outside of the Village, but bordering on the Village.

24 Q.  And what is -- are you familiar with Mesifta Beth Shraga?

25 A.  That's the Anaman property.

170524tartikovT1              Ulman - cross

1   Q.  And is that a yeshiva?

2   A.  That's one I discussed before.  That was the proposal for

3   the yeshiva and housing and a huge amount of development.

4   Q.  And to your knowledge, now having your recollection

5   refreshed, does -- are you aware that the town board was

6   seeking to make comment on these projects?

7   A.  Village board.

8   Q.  I mean, the Village board was seeking to make comment on

9   these projects?

10  A.  Yes.

11  Q.  Are you familiar with Bobove Yeshiva?

12  A.  Yes.  That's another one in the same area.

13  Q.  And are you familiar with whether or not the Village of

14  Pomona took any action regarding the Bobove Yeshiva?

15  A.  We didn't take action.  We sent letters.

16  Q.  What were the letters for?

17  A.  Basically, again, we felt that it was an overutilization of

18  the property.  With that one in particular, as I recall, they

19  were coming in for -- they had applied to the Ramapo Zoning

20  Board for a huge number of variances.  And in addition to the

21  property, the subject property, they owned a lot right adjacent

22  to it.  And instead of having the extensive development on the

23  smaller lot, we suggested that they join the two parcels and

24  have the same development, but on a larger piece, which would

25  eliminate many of the environmental problems that we had.

170524tartikovT1           Ulman – cross

1  Q.  And in this project was outside of the Village of Pomona?

2  A.  It is.  By law, we -- when a project is within 500 feet of

3  a municipality outside its borders, the municipality is

4  required to be given notice and a copy of the application and

5  asked to comment on the proposal.  That's how we were aware of

6  it.  We received notice from the Town of Ramapo on each of

7  those projects, because we were within 500 feet of the project.

8  Q.  Ms. Ulman, I'm going to turn your attention now to

9  paragraph 28 of your affidavit.

10  A.  Yes.

11  Q.  Now, in paragraphs 27 and 28, you state that Local Law 1 of

12  2001 added certain requirements for schools or educational

13  institutions; correct?

14  A.  Yes.

15  Q.  And one of these requirements was making them a special

16  permitted use; isn't that true?

17  A.  Yes.

18  Q.  Did the Village at that time or at any time thereafter make

19  libraries and museums special permitted uses?

20  A.  Not to my knowledge; no.

21  Q.  And Local Law 1 of 2001 created a minimum net lot area for

22  schools; isn't that true?

23  A.  Yes.

24  Q.  And the amount of building coverage can't exceed 10 percent

25  of the net lot area; is that true?

170524tartikovT1            Ulman - cross

1    A.  Yes.

2    Q.  And the floor area of the buildings can't exceed 20 percent

3    of the net lot area; isn't that true?

4    A.  Yes, I believe so.

5    Q.  And these restrictions reduce the size of a school that can

6    be built on the property?

7    A.  Yes, they would reduce the size.

8    Q.  And do you know -- strike that.

9         Do you know, Ms. Ulman, that there are major utility

10   lines on this subject property?

11   A.  They're what?  I'm sorry.

12   Q.  Utility, major utility lines on the subject property?

13   A.  No.

14   Q.  You have no knowledge that there's a power transmission

15   lines running through this property?

16   A.  I have never seen a survey of the property.

17   Q.  Now, these net lot area restrictions we talked about only

18   applies to schools; true?

19   A.  That particular section; yes.

20   Q.  No other uses are subject to a minimum net lot area;

21   correct?

22   A.  No.  That's wrong.

23   Q.  That's wrong.  Are libraries -- libraries are not subject

24   to a minimum lot area, are they?

25   A.  Yes.  All uses are subject to a minimum lot area.  Not all

170524tartikovT1          Ulman - cross

1  of them are subject to the net.

2  Q.  I'm sorry.  Minimum net lot area?

3  A.  Yeah.  There are some that are and some that are not.  I

4  can't recall off the top of my head which ones are.  I do know

5  that the educational use is subject to net lot area.

6  Q.  And what about libraries?  I'm just trying to get your

7  knowledge.  Libraries are not subject to a minimum lot area

8  requirement, are they?

9  A.  I'm not sure, but I think not.

10  Q.  What uses are subject to the minimum net lot area,

11  Ms. Ulman?

12  A.  I believe -- I'm not sure.  I would have to look at the

13  zoning law.

14  Q.  Do you want to refer to the code, it's up there, 150?  That

15  might help you?

16  A.  Yes.

17  Q.  I want -- give you every opportunity to get it right.

18  A.  Yes.

19  Q.  Maybe I can make this easier.  I'll try, Ms. Ulman.  My

20  question is, isn't it true that just educational institutions

21  and churches are subject to the net lot area?

22  A.  The older uses do not appear to be subject to net lot area.

23          THE COURT:  Churches or houses of worship?

24  Q.  Houses of worship, churches?

25  A.  Yes, and schools.

170524tartikovT1          Ulman - cross

1   Q.  So, then, for the record, it's just educational institution

2   and houses of worship, they are subject to the minimum net lot

3   area requirement, correct?

4   A.  Yes.

5   Q.  So, libraries are not, correct?

6   A.  Right.

7   Q.  And museums are not, correct?

8   A.  Correct.

9   Q.  So, those two uses, libraries and museums are not limited

10  as to what can be built by the net lot area deductions for

11  wetlands, slopes and utilities uses, correct?

12  A.  They're not subject to reduction for those uses; that's

13  correct.

14  Q.  Now, turning back to paragraph 29 of your affidavit, you

15  indicate that at the time Local Law 1 of 2001 was enacted, no

16  application had been filed by Yeshiva Spring Valley, paragraph

17  29 of your affidavit.

18  A.  Which paragraph?

19  Q.  29.

20  A.  Yes.

21  Q.  At the time Local Law 1 of 2001 was enacted, I think you've

22  testified that the Village was aware of Yeshiva Spring Valley's

23  interest in developing the property; right?

24  A.  Yes.

25  Q.  And at that time, when Local Law 1 of 2001 was enacted,

170524tartikovT1          Ulman - cross

1   there were no schools in the Village of Pomona; isn't that

2   correct?

3   A.   Yes.

4   Q.   Now, turning to paragraph 31, you indicate -- are you

5   there, ma'am?

6   A.   Yes.

7   Q.   You indicate that had YSV or Yeshiva Spring Valley filed an

8   application and had a site plan approved for prior to the

9   enactment of Local Law 2001, the previous law and not Local Law

10  1 of 2001 would have applied to Yeshiva Spring Valley's

11  application?

12  A.   Yes.

13  Q.   And Ms. Ulman, you're familiar with the concept of vested

14  rights?

15  A.   Yes.

16  Q.   You are familiar -- are you familiar, strike that -- with

17  the case of Ellington Construction Corp. v. The Zoning Board of

18  Appeals in New Hempstead?

19  A.   Long time ago.

20  Q.   You're familiar, then?

21  A.   I am.

22         MR. STEPANOVICH:  Can I approach, your Honor, just to

23  hand Ms. Ulman the case.

24         THE COURT:  Yes.

25  Q.   So, I've handed you, Ms. Ulman, the case of the matter of

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1    Ellington Construction Corp. v. The Zoning Board of Appeals of

2    the Incorporated Village of New Hempstead; correct?

3    A.   Yes.

4    Q.   And this case sets out the principle of vested rights,

5    doesn't it?

6    A.   Pretty well, yes.

7    Q.   And isn't it true that the New York rule indicates that

8    only where an owner has undertaken substantial construction and

9    made substantial expenditures prior to the effective date of

10   the amendment, then that owner would be subject to the prior

11   law, isn't that true, when a law is amended?

12   A.   That's the general rule.

13   Q.   Now, is it your testimony, Ms. Ulman, that I believe, and I

14   want to make sure I understand it, is it your testimony that if

15   Yeshiva Spring Valley had filed an application and had site

16   plan approved prior to the enactment of Local Law 1 of 2001,

17   then the previous law and not Local Law 1 would have applied to

18   Yeshiva Spring Valley's application?

19   A.   Yes.

20   Q.   The fact as to whether or not the owner has undertaken any

21   substantial construction wouldn't apply in that instance?

22   A.   I don't believe so.

23   Q.   And that is what we talked about just a minute ago about

24   vested rights; correct?

25   A.   Yeah.  I believe that once you get planning board approval,

170524tartikovT1          Ulman - cross

1   there is no way that a new law could supersede that.

2   Q.   And --

3   A.   I think.

4   Q.   Your basis for that?

5   A.   I think it would be challenged and --

6   Q.   The basis for that is what, Ms. Ulman?  Your opinion?

7   A.   To me, it's an ex post facto law.

8   Q.   So, your conclusion that it's an ex post facto law is

9   contrary to the matter of Ellington Construction case; correct?

10  A.   I would -- I believe that if you were to look at the State

11  Village Law under the Chapter 7 sections that deal with site

12  plan approvals and special permit approvals, there are probably

13  many cases in the annotations that would agree with me.

14  Q.   And do you have any basis for that?

15  A.   I have not researched -- not that I can recollect.

16  Q.   Now, Ms. Ulman, moving on to paragraph 36 of your

17  affidavit --

18  A.   Yes?

19  Q.   Local Law 5 of 2004 was passed in September 2004; isn't

20  that correct?

21  A.   That's correct.

22  Q.   And about six months earlier in March of 2004, the Village

23  promoted its good neighbor policy; didn't it?

24  A.   I don't know if you can call it a promotion.  I heard Mayor

25  Marshall's testimony yesterday which, but I don't recall

170524tartikovT1           Ulman - cross

1   specifically what was in that newsletter.

2   Q.  Okay.  You're familiar with the Village's good neighbor

3   policy, though, correct?

4   A.  Again, I heard it yesterday.

5   Q.  Is that the first time?

6   A.  I beg your pardon?

7   Q.  I'm sorry.  I didn't mean the cut you off.

8   A.  That's all right.

9   Q.  Is that the first time you heard about the Village's good

10  neighbor policy?

11  A.  The first time I've heard it discussed.  I might have read

12  it many years ago, but I really don't recall.

13          MR. STEPANOVICH:  May I approach.

14          THE COURT:  Yes.

15  Q.  I've handed you what has been marked as Plaintiff Exhibit

16  126 and ask if you can identify 126.

17  A.  This is the minutes of the Board of Trustees meeting of

18  January 26, 2004.

19          MR. STEPANOVICH:  Your Honor, plaintiffs move the

20  admission of 126.

21          MR. PELOSO:  No objection.

22          THE COURT:  126 is received.

23          (Plaintiffs' Exhibit 126 received in evidence)

24  Q.  And if you could turn, please, to page 7 of those minutes.

25  Are you there, Ms. Ulman?

170524tartikovT1           Ulman - cross

1   A.  I'm here, yes.

2   Q.  And there's a resolution there in bold.  And isn't it true

3   that the Village, in this resolution, took an official position

4   regarding abdicating their responsibility to placing politics

5   of special interest groups and individual developers ahead of

6   the best interests of the people they're committed to serve;

7   isn't that true?

8   A.  Yes.

9   Q.  And the special interest groups, one of the special

10  interest groups, Ms. Ulman, is the Orthodox Hasidic Jewish

11  block vote; isn't that true?

12  A.  There's nothing in the minutes that indicates what their --

13  what they're referring to.

14  Q.  But my question to you is, do you have knowledge that one

15  of those special interest groups was the Orthodox Hasidic

16  Jewish block vote?

17  A.  No.  It seems to say that developers are the ones that are

18  addressed in this resolution.

19          MR. STEPANOVICH:  May I approach.

20          THE COURT:  Yes.

21  Q.  Ms. Ulman, you recall giving a deposition in this matter;

22  correct?

23  A.  I do.

24  Q.  I turn your attention to page 979 of the deposition that I

25  handed you.  979 at line -- I'll start at line 2.  Are you

170524tartikovT1          Ulman - cross

1   there, 979, line 2?

2   A.  Line 2?

3   Q.  Yes, ma'am.

4   A.  Yes.

5   Q.  Actually, I'll go back a couple lines, 978, line 24:

6          I think it says the politics of special interest

7   groups and individual developers.  So, who is the board

8   referring to when it references the politics of special

9   interest groups?

10         Answer:  I think groups of developers are special

11  interest groups, as well as other types.  There are many

12  different types of special interest groups.

13         Question:  The special interest groups, would that

14  be -- the board is familiar with the term block vote; correct?

15         You answer:  No.

16         Question:  Is the board aware that the special

17  interest group could possibly be the block vote of the Orthodox

18  Hasidic Jews?

19         Answer:  Is that one of those special interest groups?

20         Question:  Yes.

21         Answer:  Yes.

22         Did I read that accurately?

23  A.  Yes.

24         MR. STEPANOVICH:  Your Honor, it might be -- I'm aware

25  of the clock.  It might be a good time --

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1          THE COURT:  Good time for a midday break?

2          Okay.  All right.  So, let's take our midday break.

3    We'll see you in about 15 minutes or so.

4          (Recess)

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

170524tartikovT1          Ulman - cross

1          THE COURT:  Continue, Mr. Stepanovich.

2          MR. STEPANOVICH:

3  Q.  Ms. Ulman, I want to come back to a few points that we made

4  earlier.

5          Are recreational facilities within the Village of

6  Pomona limited to serving the local community?

7  A.  Most of them all of them do serve the local community.

8  Q.  They're not limited to serving the local community; isn't

9  that true?

10  A.  No.

11  Q.  Ms. Ulman, we were looking at the map on the master plan.

12  I think that was Exhibit 141.  The master plan might have

13  been --

14  A.  Oh, the master plan, I'm sorry.

15  Q.  That's okay.

16          Just to have a simple question, I think that master

17  plan that's referenced in that exhibit, that's dated 1997;

18  correct?

19  A.  Yes.

20  Q.  In fact, I think that's called a master plan update; am I

21  right?

22  A.  Yes.

23  Q.  Ms. Ulman, is cluster development authorization only

24  limited to single-family, residential development?

25  A.  Cluster development?

170524tartikovT1          Ulman - cross

1   Q.  Yes, ma'am.

2   A.  It starts with single-family development.  You can have a

3   multifamily development, but it's based upon the number of lots

4   that you could legally divide the property into for -- at

5   40,000 square feet per lot; but the development itself does not

6   have to be single family; that's correct.

7   Q.  I want to move on now to some discussion on the board's

8   consideration of the text amendments.

9          Do you agree, Ms. Ulman, that the determination of the

10  town board not to consider a petitioner's application is a

11  legislative function not subject to review under Article 78?

12          You agree with that?

13  A.  Normally legislative acts are subject to declaratory

14  judgment actions.

15  Q.  So let me ask the question again.

16          So the determination of the town board -- I'm not

17  trying to confuse you.  My question is, the determination of

18  the town board not to consider the petitioner's application is

19  a legislative function not subject to review under Article 78;

20  do you agree with that?

21  A.  It's subject to either an Article 78 or a declaratory

22  judgment action.  If they take no action, it is still subject

23  to court action.

24  Q.  Do you agree, Ms. Ulman, the denial of the application to

25  have property rezoned is a legislative function and, therefore,

170524tartikovT1          Ulman - cross

1    the proper vehicle for that determination on appeal is an

2    action for declaratory judgment, not a 78?

3    A.   Legislative acts are generally declaratory judgments, yes.

4    The reason I'm being a little careful here is because there's a

5    very fine line between a Article 78 and a declaratory judgment

6    action.  And very often, if you bring one and it's wrong, the

7    court will convert it to the other.  But under normal

8    circumstances, declaratory, legislative acts would be subject

9    to declaratory judgments, not to Article 78s.

10   Q.   Thank you.

11         Ms. Ulman, I want to come back to some questions I

12   started to ask you regarding Chestnut Ridge.

13         MR. STEPANOVICH:  May I approach, your Honor?

14         THE COURT:  Yes.

15   Q.   Ms. Ulman, you're familiar with the laws of Chestnut Ridge;

16   isn't that correct?

17   A.   I haven't looked at them for a while, but I was familiar

18   with them, yes.

19   Q.   And, Ms. Ulman, are you familiar with the fact that the

20   Village of Chestnut Ridge adopted a law regulating dormitories?

21   A.   Regulating what?

22   Q.   Regulating dormitories.

23   A.   Yes.

24   Q.   Did you write that law?

25   A.   No.

170524tartikovT1          Ulman - cross

1  Q.  And Ms. Ulman, does that law in Chestnut Ridge, does it

2  restrict student family housing?

3  A.  Yes.

4  Q.  And does it restrict student family housing to limitation

5  to dormitories?

6  A.  It defines dormitories as restricting two-family houses.

7  Q.  Ms. Ulman, I put in front of you a document -- you are not

8  familiar, as you sit here today, with the laws of Chestnut

9  Ridge; are you?

10 A.  No.

11 Q.  The document I gave you, does that refresh your

12 recollection as to the laws of Chestnut Ridge?

13 A.  I recognize it being the use table for the Village of

14 Chestnut Ridge zoning law.  This is what they call the RR-50 --

15 this has all the residential districts, I believe.

16 Q.  And are the -- are dormitories restricted under the village

17 of Chestnut Ridge --

18        MR. PELOSO:  Your Honor, I think reading from a

19 document that's not in evidence and also not on our exhibit

20 list.

21        THE COURT:  You know, again, to the extent somebody

22 can refresh their recollection, you can use it.

23 MR. STEPANOVICH:

24 Q.  Does that refresh your recollection, Ms. Ulman?

25 A.  Yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1              Ulman - cross

1   Q.  Let me ask the question now.

2           So the Village adopted the law regulating dormitories;

3   correct?

4   A.  Again, I don't know what you mean by regulating.

5   Dormitories are permitted as part of the school use.  It's on

6   the use table.

7   Q.  Those dormitories are permitted for whom?

8   A.  In connection with any educational use; private or

9   religious.

10  Q.  And are those dormitories limited to full-time students?

11  A.  I don't think dormitories are specifically limited to

12  full-time students.  I think the definition of school or

13  educational institution -- I don't recall what they use in

14  Chestnut Ridge -- requires that the school provide five-day

15  week, seven months of the year, I believe, is the general

16  phrase that's used in defining a school.

17  Q.  If we referred to this exhibit, schools of general or

18  religious instruction, are permitted provided there shall be no

19  residential --

20          THE COURT:  I thought this wasn't coming in.

21          MR. STEPANOVICH:  Okay.

22  BY MR. STEPANOVICH:

23  Q.  Ms. Ulman, this document does not refresh your

24  recollection.

25  A.  It does.

170524tartikovT1          Ulman - cross

1   Q.  It does.  Okay.

2          Then does it refresh your recollection as to the

3   definition of dormitories?

4   A.  The definition of dormitory is not in this document.

5   Q.  Did you write this law, Ms. Ulman?

6   A.  No.

7   Q.  Were you the deputy attorney at the time this law was

8   passed?

9   A.  I don't think -- the zoning law in Chestnut Ridge was

10  written by a committee of residents.  I believe Mr. Rice and I

11  were -- I think Mr. Rice was the attorney at that time and I

12  was a consultant.  I don't recall whether I had an official

13  title.  It was at the very beginning of the Village back in

14  1985, '86.  But I'm familiar with it because I worked with the

15  law for many years.

16  Q.  So based on your familiarity with the law, does that law

17  prohibit student family housing?

18  A.  The definition of dormitory prohibited multifamily housing,

19  yes.

20  Q.  Okay.

21  A.  And that was taken from the Town of Ramapo law as well.

22  Q.  Ms. Ulman, I turn your attention now to Wesley Hills.

23          Were you the attorney for Wesley Hills at any time?

24  A.  I have been the deputy village attorney; a deputy village

25  attorney in Wesley Hills from 1983 until the present time.

170524tartikovT1          Ulman - cross

1  Q.  Okay.  Are you familiar with the laws in Wesley Hills
2  regarding dormitories?
3  A.  No, I'm not.
4  Q.  Okay.
5          MR. STEPANOVICH:  May I approach?
6          THE COURT:  Yes.
7  BY MR. STEPANOVICH:
8  Q.  Does the Village of Wesley Hills have a definition for
9  dormitory?
10  A.  In this document, yes.
11  Q.  And does the definition of dormitories in Wesley Hills
12  exclude student family housing?
13          MR. PELOSO:  Your Honor, this is not a document.
14  Again, it's not on the exhibit list.
15          THE COURT:  Let's be clear.  She didn't say she
16  doesn't remember.  She doesn't get to read it to refresh her
17  recollection.  She certainly doesn't get to read from it if
18  it's not in.
19          MR. STEPANOVICH:  Okay.  I thought she said she
20  doesn't remember, but I will -- I stand corrected.
21          THE COURT:  You can set up that question, if you want.
22          The last question was, "Are you familiar with the
23  laws?"  And she said, "No, I'm not."
24          MR. STEPANOVICH:  Okay.  Your Honor, I think that this
25  is a zoning law in the Village of Wesley Hills.  I think the

170524tartikovT1            Ulman - cross

1   Court could take judicial notice of this law.

2            THE COURT:  Fair enough.

3            MR. PELOSO:  Is your Honor ruling that can come in as

4   an exhibit?

5            THE COURT:  It's something I can take judicial notice

6   of; right?  So I do think, in fairness to counsel, you should

7   have told them that they were --

8            MR. PELOSO:  We've listed exhibits as to various

9   zoning laws and --

10            THE COURT:  Yes.

11            MR. PELOSO:  -- candidly, we had this discussion with

12   counsel.  What they wanted to do was simply reserve the right

13   to have the Court take judicial notice.  We objected on the

14   grounds they had to be on the exhibit list.  So we would object

15   to any kind of admission to any kind of exhibit not on the

16   list.

17            Again, as I stated this morning, that was the purpose

18   of pretrial order.

19            I will also add regarding the ruling this morning

20   about reconsidering the exhibits on Ms. Ulman's affidavits,

21   when Mr. Tauber first took the stand, and all the plaintiff

22   individuals took the stand, we were prepared and we addressed

23   all the exhibits in their affidavits at that time.

24            MR. STEPANOVICH:  Your Honor, on these exhibits --

25   first of all, Ms. Ulman referenced these Village codes in her

170524tartikovT1          Ulman - cross

1   affidavit.  But we don't think we'll finish today, if, you

2   know, we want to pick this up tomorrow to give Mr. Peloso some

3   time to review these statutes, that's fine.

4          THE COURT:  Okay.

5          MR. PELOSO:  I would object, your Honor.  I'm unclear.

6   If they're trying to make an argument that they're going to be

7   introducing new exhibits, and I need time to look at the new

8   exhibits, I will object.  The time for that has passed.

9          THE COURT:  Yes.  Mr. Stepanovich, I don't understand

10  why not tell them, include these in the exhibit list, that's

11  the point of doing this; right?

12         MR. STEPANOVICH:  Yes, your Honor.  We just got

13  Ms. Ulman's affidavit, and it was after the exhibit list that

14  was submitted.

15         THE COURT:  I mean, she was deposed in this case.  I

16  mean, I'm not sure there's much that's left in terms of the

17  element of surprise.

18         MR. STEPANOVICH:  Well, in her affidavit she did

19  mention the zoning codes, so it came after, after the exhibit

20  list, and it is a bit of a surprise.

21         MR. PELOSO:  All the things that she mentions are

22  Wesley Hills and so forth.  We've attached as exhibits.

23  They're on our exhibit list.

24         To the extent she mentions other laws, I don't think

25  that allows them to now pull up the laws and introduce them as

170524tartikovT1            Ulman - cross

1   exhibits.  Under that theory, you know, I'm just thinking out

2   loud here, but if any of the plaintiffs last week had mentioned

3   certain lawyers and certain religious things, I would have

4   pulled out certain religious things and wanted take put them in

5   as an exhibit, I'm sure there would have been an objection for

6   cause.

7          There's an exhibit list.  I do object to introducing

8   documents I've never seen.

9          THE COURT:  All right.  So let's take it up later.  I

10  do think we were running short on time today, ironically, but

11  if you want to offer them, you should offer them and we can

12  take it up.

13         When she doesn't say I don't remember, they can't come

14  in through that vehicle.

15         MR. STEPANOVICH:  I understand.  We'll save that, your

16  Honor.  Move on.

17         THE COURT:  Okay.

18  BY MR. STEPANOVICH:

19  Q.  Now, Ms. Ulman, if you would turn to paragraph 38 of your

20  affidavit, please.

21  A.  Yes.

22  Q.  I believe you have Local Law 2001 up there; correct?

23  A.  Yes.

24  Q.  Now, I understand that Local Law 2001 added educational

25  institutions as a special permit; is that correct?

170524tartikovT1          Ulman - cross

1    A.   Yes.

2    Q.   And educational institutions are defined on page two of

3    that law; isn't that right?

4    A.   Yes, as is the word school.

5    Q.   And I believe it says that, an educational institution is

6    any school or other organization or institution and/or

7    alternative vocational instruction; isn't that correct?

8    A.   No.

9    Q.   And you want to correct me, please?

10   A.   Educational institution.

11   Q.   Yes, ma'am.

12   A.   It reads, any school or other organization or institution

13   conducting a regularly-scheduled comprehensive curriculum of

14   academic and/or alternate or vocational instruction, similar to

15   that furnished by kindergarten, primary or secondary schools

16   and operating under the Education Law of New York State and

17   duly licensed by the State of New York.

18   Q.   It does also have the definition of schools; doesn't it?

19   A.   Yes, it does.

20   Q.   The definition of schools indicates they do not include

21   institutions with dormitories; correct?

22   A.   That's correct.

23   Q.   But the definition of educational institution, which

24   includes other organizations or institutions, or alternative

25   vocational instruction, does not prohibit dormitories; isn't

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1    that correct?

2    A.   That's correct.  But there's a general law in the code that

3    specifically states that, and I don't recall the exact number,

4    it's in chapter 130 of the code, that specifically states that

5    any use that is not specifically authorized by the code is

6    prohibited.

7    Q.   Let me just make sure I get the answer to the question.

8         The definition of educational, in this Local Law

9    number one of 2001, the definition of educational institution,

10   which also includes other organizations or institution or

11   alternative vocational instruction, does not prohibit

12   dormitories; isn't that correct?

13   A.   In the definition, that is correct.

14   Q.   Under New York Law, Ms. Ulman, dormitories are permitted

15   accessory use to schools; isn't that true?

16   A.   Are permitted what?  I'm sorry.

17   Q.   Permitted accessory uses to all schools.

18   A.   Under case law, yes.

19   Q.   Under the *Bagnardi case*, colleges cannot be prohibited;

20   isn't that true?

21   A.   That's correct.  That's why we adopted Local Law No. 5 of

22   2004.

23   Q.   Turning to paragraph 39 of your affidavit, you indicated

24   that -- I'll give you a second to get there.

25        Paragraph 39, you indicated that you drafted the law

170524tartikovT1          Ulman - cross

1   to permit applicants that want to build a school to be able to

2   have a dormitory; correct?

3   A.   That's correct.

4   Q.   But the way it's drafted, the law forbids single-family,

5   two-family or multifamily dwellings; isn't that correct?

6   A.   Which law, the dormitory definition?

7   Q.   Yes, ma'am.

8   A.   Yes.  Yes, that's correct.

9   Q.   And that housing that I just described, single, two-family

10  or multifamily dwelling, that's the type of housing that's also

11  referred to in Ramapo as adult student housing; isn't that

12  true?

13  A.   In Ramapo's dormitory law?

14  Q.   In the adult student housing law.

15  A.   The adult student housing law is a law that specifically

16  permits multifamily housing in single-family districts.

17  Q.   And you were aware of Ramapo's comprehensive plan and

18  zoning changes when -- you're aware of Ramapo's comprehensive

19  plans and zoning changes; correct?

20  A.   Yes.

21  Q.   And I believe you testified earlier that the Village of

22  Pomona filed suit against the Town of Ramapo challenging their

23  adult student housing; isn't take true?

24  A.   Yes.

25  Q.   Now, Ms. Ulman, turn your attention to paragraph 40 of your

170524tartikovT1          Ulman - cross

1   affidavit.

2   A.   Yes.

3   Q.   You talk about the purposes of Local Law 5 of 2004?

4   A.   Right.

5   Q.   Now, you indicate that purpose number one, is to remove the

6   half acre requirement for each student so that the minimum lot

7   area required for an educational institution was substantially

8   reduced to 10 acres net lot area; correct?

9   A.   That's correct.

10  Q.   Now, Pomona did not have to prohibit family dwelling units

11  to achieve that purpose; did it?

12  A.   No.

13  Q.   And Pomona did not have to prohibit cooking, dining or

14  housekeeping facilities to achieve this purpose; did it?

15  A.   No.

16  Q.   And Pomona did not have to prohibit non-accredited

17  educational institutions the achieve that purpose; did it?

18  A.   No.

19  Q.   And Pomona did not have to limit dormitory buildings to one

20  building to achieve that purpose; correct?

21  A.   Correct.

22  Q.   In fact, this purpose could have been achieved just by

23  removing that provision; correct?

24          MR. PELOSO:  Object to form.  Speculation.

25          THE COURT:  Overruled.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1            Ulman - cross

1   A.  Yes, we could have just adopted a law that removed that

2   provision.

3   Q.  Now, you state purpose number two was, I believe, to allow

4   dormitories, referring again to paragraph 40.

5   A.  Yes.

6   Q.  And I believe that's because the prior prohibition on

7   dormitories for schools was unconstitutional, in your opinion;

8   correct?

9   A.  There was no provision for dormitories -- prior to Local

10  Law 5 of 2004, dormitories were prohibited in the Village of

11  Pomona.

12  Q.  And, in your opinion, that was unconstitutional; correct?

13  A.  Yes.

14  Q.  And Pomona --

15  A.  Unconstitutional -- what precipitated the dormitory law --

16  Q.  I'm sorry.

17  A.  You want me to continue?

18  Q.  No.  The fact that they were not permitted violated

19  *Bagnardi*; didn't it?

20  A.  It violated *Bagnardi* and it violated *Airmont*.

21  Q.  Now, Ms. Ulman, Pomona did not have to prohibit family

22  dwelling units to achieve this purpose; did it?

23  A.  No, it did not.

24  Q.  And Pomona did not have to prohibit cooking, dining or

25  housekeeping facilities to achieve this purpose, did it?

170524tartikovT1          Ulman - cross

1   A.  No, it did not.

2   Q.  And Pomona did not have to prohibit nonaccredited

3   educational institutions to achieve this purpose; did it?

4   A.  No.

5   Q.  Pomona did not have to limit dormitory buildings to one

6   building to achieve this purpose; correct?

7   A.  No.

8   Q.  Now, the purpose could have been achieved by simply

9   eliminating the dormitory prohibition in the definition of

10  schools; correct?

11  A.  We would have had to create a different definition of

12  dormitory and include it in the law.

13  Q.  You didn't have -- strike that.

14           Pomona did not have to prohibit student family

15  housing; isn't that true?

16  A.  No, it did not.

17  Q.  Now you state purpose number three, in your paragraph 40,

18  is to clarify the definition of educational institutions,

19  institution, and removing the definition of school so that

20  there was only one definition relating to the same use.

21  A.  That's correct.

22  Q.  Pomona did not have to prohibit family dwelling units to

23  achieve this purpose; did it?

24  A.  No.

25  Q.  And Pomona did not have to prohibit cooking, dining or

170524tartikovT1          Ulman - cross

1  housekeeping facilities to achieve this purpose; correct?

2  A.   No.

3  Q.   And Pomona did not have to prohibit nonaccredited

4  educational institutions to achieve this purpose; correct?

5  A.   Correct.

6  Q.   Pomona did not have to limit dormitory buildings to one

7  building to achieve this purpose; correct?

8  A.   Correct.

9  Q.   That purpose could have been achieved by Pomona by simply

10 removing the definition of school and the references to school;

11 isn't that true?

12 A.   Yes.  We could have just eliminated the existing provisions

13 and included a new definition.

14 Q.   And, finally, in reference to paragraph 40, you indicate

15 that the purpose for the final paragraph number four is

16 removing the requirement that an educational institution be

17 located on a state or county road; am I right?

18 A.   Yes.

19 Q.   Now, Pomona did not have to prohibit family dwelling units

20 to achieve this purpose?

21 A.   It did not.

22 Q.   And Pomona did not have to prohibit cooking, dining or

23 housekeeping facilities the achieve this purpose; correct?

24 A.   Correct.

25 Q.   And Pomona did not have to prohibit nonaccredited

170524tartikovT1          Ulman - cross

1  educational institutions to achieve this purpose; correct?

2  A.  Correct.

3  Q.  And Pomona did not have to limit dormitory buildings to one

4  building to achieve this purpose; correct?

5  A.  Correct.

6  Q.  That purpose could have simply been achieved by just

7  removing that provision; am I right?

8  A.  You're right.

9  Q.  Now, I think you indicate in your affidavit that another

10  purpose was to prevent the type of housing that Orthodox

11  Jews -- strike that.  Strike that.

12          How many colleges were applying to locate in Pomona?

13  A.  Colleges?

14  Q.  Yes, ma'am.

15  A.  None.

16  Q.  Other than Yeshiva Spring Valley, how many schools had

17  applied to locate in Pomona?

18  A.  None.

19  Q.  How many schools or colleges are currently in Pomona?

20  A.  None.

21  Q.  Now, regarding Local Law No. 5 of 2004, the Village does

22  not have any records to suggest that there was a general

23  municipal law review of that law, Local Law 5 of 2004; isn't

24  that true?

25  A.  I was not able to find one.

170524tartikovT1          Ulman - cross

1          MR. STEPANOVICH:  May I approach, your Honor?

2          THE COURT:  Yes.

3    BY MR. STEPANOVICH:

4    Q.  I handed what's been marked for purpose of identification

5    Defendant's Exhibit 1016, can you identify that document,

6    Ms. Ulman?

7    A.  This is a memorandum I prepared for the mayor and Board of

8    Trustees, Village of Pomona, on September 7, 2004, relating to

9    the proposed local law that we are discussing.

10   Q.  This exhibit has already been admitted in evidence.  So I'm

11   going to ask you a few questions about it, Ms. Ulman.

12          Now, this memo concerns changes in the Village zoning

13   regulations concerning schools and dormitories; correct?

14   A.  It's a change in the existing definitions of school and

15   includes the provision for dormitories.

16   Q.  But this memo that you wrote to the board sets out the

17   changes and the reason for those changes.  And I'm referring to

18   the first full paragraph.  Do you see that?

19   A.  Yes.

20          MR. STEPANOVICH:  Your Honor, we would move in 1016.

21          THE COURT:  It was included in Ms. Ulman's affidavit.

22          MR. PELOSO:  I'm sorry.

23          THE COURT:  Provisionally.

24          MR. PELOSO:  It's my mistake.  I thought it was 1060.

25          THE COURT:  1016, so we're all on the same page?

170524tartikovT1              Ulman - cross

1            MR. PELOSO:  Yes.

2            THE COURT:  All right.

3    BY MR. STEPANOVICH:

4    Q.  Now Ms. Ulman --

5    A.  Yes.

6    Q.  -- turning your attention to paragraph 44 of your

7    affidavit.

8    A.  Paragraph four?

9    Q.  Forty-four, ma'am.

10   A.  Of my affidavit?

11   Q.  Yes.  We're going to move on.

12   A.  Okay.  Yes.

13   Q.  You indicate that on September 27 -- excuse me.

14           September 27, 2004, the Board of Trustees adopted

15   Local Law 5 of 2004; isn't that correct?

16   A.  That's correct.

17   Q.  And you recall, I think we testified earlier -- you

18   testified earlier that the Village of Pomona sued Ramapo over

19   the adult student housing law; correct?

20   A.  Yes.  The adult student housing law is not a dormitory law.

21   Q.  Now, Ms. Ulman, turn your attention to paragraph 48 of your

22   affidavit.

23   A.  Yes.

24   Q.  You indicate that the dormitory portion of Local Law 5 of

25   2004 was the result of research that you performed regarding,

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914)390-4053

170524tartikovT1          Ulman - cross

1   at the time, recent case law developments in the State of New

2   York; correct?

3   A.  Yes.

4   Q.  And you set forth some cases there.  When was *Diocese of*

5   *Rochester versus the Planning Board of the Village of Brighton*

6   decided?

7   A.  A long time before that.  I don't recall the exact date.

8   Q.  Would you --

9   A.  It was before *Bagnardi*.  *Bagnardi* was 1984 -- '86, I think.

10  Q.  You're right.  I'll ask that question in a second.

11          But my question on *Diocese of Rochester*.  Would it

12  surprise you to learn that case was decided in 1956?

13  A.  No, it would not surprise me.

14  Q.  *Cornell University versus Bagnardi*, I think you

15  indicated --

16  A.  '86.

17  Q.  -- 1986.  That's correct.

18  A.  Yes.

19  Q.  Now, neither of those cases, Ms. Ulman, neither of those

20  cases suggest that local governments should prohibit student

21  family housing; correct?

22  A.  No, of course -- correct.  Yes.

23  Q.  Neither of those cases suggest that local governments

24  should prohibit cooking, dining or housekeeping facilities;

25  isn't that true?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1   A.  They don't, they don't prohibit you from making those

2   restrictions in your law, but they do not require you to do it.

3   Q.  So neither of those cases suggest that local governments

4   should prohibit cooking, dining or housekeeping --

5   A.  They do not discuss it, no.

6   Q.  Neither of those cases suggest that local governments

7   should prohibit nonaccredited educational institutions; is that

8   correct?

9   A.  They don't deal with that subject.

10  Q.  Neither of those cases suggest that local governments

11  should limit dormitories to one building; isn't that correct?

12  A.  That's correct.

13  Q.  Ms. Ulman, I'd like to turn your attention to paragraph 51

14  of your affidavit.

15  A.  Yes.

16  Q.  You indicate the reason you added the accreditation

17  provision was to impose a restriction on the use of

18  organizations that might call themselves schools, but which

19  were not subject to the special status outlined in New York

20  case law?

21  A.  That's correct.

22          MR. STEPANOVICH:  May I approach, your Honor?

23          THE COURT:  Yes.

24  BY MR. STEPANOVICH:

25  Q.  Ms. Ulman, my question is, where in the Bagnardi case do

170524tartikovT1           Ulman - cross

1  you find support for the Village's restriction on educational

2  institutions that are not entitled to special status?

3  A.  *Bagnardi* doesn't deal with that issue.

4  Q.  What is the legal basis, Ms. Ulman, for the restriction

5  that you set forth in paragraph 51?

6  A.  The accreditation provision?  The reason -- *Bagnardi*

7  creates the special status for schools and houses of worship

8  and what that is -- I'm sorry.

9  Q.  I'm sorry.  Let me ask.  Isn't the point of *Bagnardi* that

10  local jurisdictions cannot ban educational institutions, but

11  must, rather, allow them special use permits?

12  A.  That's what I call the special status, yes.

13  Q.  So what is it that you call the special status?  I'm

14  confused.

15  A.  The fact that you are required to permit educational

16  institutions and houses of worship in all residential --

17  *Bagnardi* just dealt with residential districts, although that

18  has been expanded to include commercial districts as well, but

19  what *Bagnardi* said is that you cannot prohibit the educational

20  or religious use from any of your residential districts.

21  Q.  In fact, *Bagnardi* indicates that these uses should not be

22  required to apply for variances; isn't that correct?

23  A.  That's correct.  They do not.  That's why we adopted Local

24  Law 5 of 2004, and why Local Law 1 of 2001 was adopted.

25  Q.  Turn your attention now to paragraph 52 of your affidavit,

170524tartikovT1          Ulman - cross

1   Ms. Ulman.

2   A.   Yes.

3   Q.   Now, the Village had no studies to report that there was a

4   need for Local Law 5 of 2004; isn't that correct?

5   A.   I studied case law that required us to adopt Local Law 5 of

6   2004.  The primary reason for adoption of that law --

7   Q.   Let me ask this question, Ms. Ulman.  Not trying to cut you

8   off, I guess maybe my question wasn't clear.

9          The Village had no studies to support that there was a

10  need for the law.

11  A.   No.

12  Q.   And there were no educational institutions in the Village

13  of the passage of the Local Law 2004?

14  A.   That's correct.

15  Q.   And there's still no educational institution in the

16  village; correct?

17  A.   That's correct.

18  Q.   Now, turn your attention, Ms. Ulman, to paragraph 54.

19  A.   Yes.

20  Q.   To be clear, does paragraph 54 contain the reasons for the

21  enactment of Local Law No. 1 of 2007?

22  A.   Yes.

23  Q.   And which of these reasons set forth in local -- paragraph

24  54 apply to the restriction that a dormitory building shall not

25  occupy more than 20 percent of the total square footage of all

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1            Ulman - cross

1   the buildings on the lot?

2   A.   Local Law 1 of 2007 included that provision, yes.

3   Q.   Okay.  And I think I asked that -- I'm asking -- the next

4   question is, apparently, 54 sets out the reasons, correct, for

5   the passage of Local Law 1 of 2007?

6   A.   No, no, 50 -- paragraph 54 specifically says, I believe

7   there were errors as well as inconsistencies and vagueness.

8   These three reasons are only addressing the vagueness and the

9   need for the correction.

10  Q.   If you refer to paragraph 53 above, I'm reading 53 and 54

11  in conjunction, and the last sentence of 53 reads, the reason

12  for that law was to address errors, inconsistencies and

13  vagueness issues in relation to the previously enacted

14  educational institution --

15  A.   That was the main reason for that law, yes.

16  Q.   Okay.  So then moving on to paragraph 54, are you being

17  more specific about those reasons?

18  A.   No, I'm being specific about what's stated in 54, which is

19  just the inaccuracies and the vagueness of the preexisting law.

20  Q.   So then --

21  A.   That's what I considered the most important part of that

22  Local Law 1 of 2007.

23  Q.   So is it your testimony that the reasons that are set forth

24  in 54, A, B, and C, those, in your opinion, are the most

25  important reasons for the passage of Local Law No. 1 of 2007?

170524tartikovT1            Ulman - cross

1   A.   That was to correct the inconsistencies and vagueness, yes.

2   Q.   And of these reasons that were intended to correct the

3   inconsistencies and the vagueness, which of those apply to the

4   restriction that a dormitory building shall not occupy more

5   than 20 percent of the total square footage of all buildings on

6   the lot?

7   A.   None of them.  But that provision is in the local law, but

8   it's not referenced as an inconsistency or vagueness.

9   Q.   Now, Ms. Ulman, moving on to -- move on to paragraph 56.

10  A.   Yes.

11  Q.   You state in paragraph 56 that, Tartikov's attorney, Paul

12  Savad, was at the December 18, 2016, hearing of Local Law 1 of

13  2007.

14  A.   Yes.

15  Q.   Was that the first Village board meeting he spoke at

16  regarding Tartikov?

17  A.   No, it was the first, the first public hearing for that

18  particular local law.

19  Q.   Okay.  And I think somebody may have testified, maybe

20  Mr. Marshall, that the prior month, November 27th of 2007, was

21  Mr. Savad present at that meeting?

22  A.   2006?

23  Q.   November 27, 2006.

24  A.   I believe he or a member of his firm was present at every

25  single meeting from the beginning until Monday night of this

170524tartikovT1          Ulman - cross

1  week.  No, I'm sorry, they didn't attend Monday night.

2  Q.  I'll try to clear that up, Ms. Ulman, because I may have

3  confused you.

4          MR. STEPANOVICH:  May I approach, your Honor?

5          THE COURT:  Yes.

6  BY MR. STEPANOVICH:

7  Q.  I handed you what has been marked, Ms. Ulman, as

8  Plaintiff's Exhibit 115, and ask if you can identify that,

9  please.

10  A.  This is a copy of the minutes of the Village of Pomona

11  Board of Trustees meeting held on November 27, 2006.

12  Q.  And can you determine from those minutes whether or not

13  Mr. Savad was present at the November 27, 2006, meeting?

14  A.  No.

15  Q.  He was not there?

16  A.  I don't know.  He didn't seem to speak.  He may have been

17  there.

18  Q.  But the records -- these minutes do not reflect that

19  Mr. Savad or anybody from his office spoke at that November --

20  A.  It would not be noted in the minutes unless one of them

21  spoke.

22          MR. STEPANOVICH:  May I?

23          THE COURT:  Yes.

24          MR. STEPANOVICH:  I don't know if I moved to admit

25  115, your Honor.  I would move 115 into evidence.

170524tartikovT1            Ulman – cross

 1          MR. PELOSO:  No objection.

 2          THE COURT:  115 received.

 3          (Plaintiffs' Exhibit 115 received in evidence)

 4   A.  This is 119.

 5   Q.  Yes, ma'am.  Can you identify that, please.

 6   A.  This is the agenda for the meeting of the Board of Trustees

 7   of the Village of Pomona on December 18, 2006.

 8          MR. STEPANOVICH:  Plaintiffs move in 119, your Honor.

 9          MR. PELOSO:  No objection.

10          THE COURT:  Received.

11          (Plaintiffs' Exhibit 119 received in evidence)

12   BY MR. STEPANOVICH:

13   Q.  To your knowledge, Ms. Ulman, are agendas prepared prior to

14   the meetings?

15   A.  Usually.  Sometimes they're prepared a day before,

16   sometimes the day of the meeting.  We hope we get them a few

17   days before but not always.

18   Q.  Is it fair to state, say the agendas are actually received

19   by the board before the meeting takes place?

20   A.  They're not distributed to the board until the night of the

21   meeting.

22   Q.  So they would be distributed to the board prior to the

23   beginning of the meeting?

24   A.  At the beginning of the meeting.

25   Q.  Okay.  All right.

170524tartikovT1          Ulman - cross

1           Ms. Ulman turning to Exhibit 119 --

2  A.  Yes.

3  Q.  -- there's a listing on paragraph five, executive session.

4  I mean paragraph 15.

5  A.  Paragraph five?

6  Q.  Fifteen.  I'm sorry, I misspoke.  I meant paragraph 15 on

7  the second page.

8  A.  Oh, yes.

9  Q.  And there's a listing for executive sessions; correct?

10  A.  Yes.

11  Q.  And Camp Dora is listed on the agenda as one of the items

12  discussed in executive session; isn't that correct?

13  A.  Yes.

14  Q.  And this is for the meeting of December 18, 2006; correct?

15  A.  Yes.

16  Q.  That means, according to this agenda, that the board met in

17  executive session to discuss Camp Dora; isn't that correct?

18  A.  Along with other things, yes.

19  Q.  Yes.  Along with the Ramapo Lawsuits, Summit at Pomona,

20  Lynn and hydrants?

21  A.  Yes.

22  Q.  Maybe you can explain, Ms. Ulman, what is the law in

23  New York regarding executive sessions?

24           In other words, what's the basis for going into

25  executive sessions?

170524tartikovT1          Ulman - cross

1   A.  You can go into executive session to discuss limited

2   personnel issues and matters of litigation, current or

3   proposed, or expected.

4           MR. STEPANOVICH:  I think I moved 119 in, correct,

5   your Honor?

6           THE COURT:  You did.

7   BY MR. STEPANOVICH:

8   Q.  If we could be a little more specific, Ms. Ulman, on

9   matters of litigation justifying the need for executive

10  session; could you be more specific on that, please?

11  A.  Litigation would include any matters that we are currently

12  involved in, any litigation that the board was contemplating

13  bringing, or litigation that we had reason to believe would be

14  brought against the Village.

15          MR. STEPANOVICH:  May I approach?

16          THE COURT:  Yes.

17  BY MR. STEPANOVICH:

18  Q.  Handed you what has been marked as Plaintiff's Exhibit 105

19  and ask if you can identify that, Ms. Ulman.

20  A.  This is a copy of the minutes of the Village of Pomona

21  Board of Trustees meeting held on December 18, 2006.

22          MR. STEPANOVICH:  Plaintiffs move the admission of

23  105, your Honor.

24          MR. PELOSO:  One moment, your Honor.

25          No objection.

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                          (914)390-4053

170524tartikovT1          Ulman - cross

1          THE COURT:  Okay.  Received.

2          (Plaintiffs' Exhibit 105 received in evidence)

3    BY MR. STEPANOVICH:

4    Q.  Coming back now, Ms. Ulman, to 119, Camp Dora was listed on

5    executive session.  Camp Dora is what you referred to and the

6    Village refers to as the subject property; isn't that correct?

7    A.  Yes.

8    Q.  And on December the 18th, 2006, it was Tartikov who owned

9    that property; isn't that correct?

10   A.  To the best of my knowledge, yes.

11   Q.  And based on this agenda, Tartikov was discussed in

12   executive session at the December 18, 2006 meeting; isn't that

13   correct?

14         MR. PELOSO:  I'm going to object.  Ms. Ulman can

15   probably answer better than I can, I think executive session is

16   where counsel were present and privileged communication.

17         MR. STEPANOVICH:  I'm not asking for the content of

18   the communications, your Honor.

19         THE COURT:  Just whether or not it was on agenda.

20         MR. STEPANOVICH:  It's on the agenda.

21         THE COURT:  Whether it was discussed.

22         MR. STEPANOVICH:  It was discussed.

23         THE COURT:  Yes, I agree.

24   BY MR. STEPANOVICH:

25   Q.  Do you understand the question?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1   A.   Yes.

2   Q.   And the answer is yes?

3   A.   I believe it was discussed.

4   Q.   Thank you.

5          Earlier in this lawsuit, Ms. Ulman, the Village took

6   the position that it was only in January of 2007, after the

7   Village saw site plans of what Tartikov intended to build, that

8   is when the Village became aware of the potential for

9   litigation; isn't take correct?

10  A.   I believe we became aware of the potential for litigation

11  when Mr. Savad started coming to our meetings.

12  Q.   Which was in December of 2006.

13  A.   I believe he was there before that.

14  Q.   What is your basis for that?

15  A.   My recollection -- I don't remember specific dates, but I

16  believe he was at board meetings before that.

17  Q.   And the minutes would reflect that, Ms. Ulman?

18  A.   No.  As I said, the only, the only time any appearance is

19  reflected in the minutes is when they speak, when a person

20  speaks.

21          MR. STEPANOVICH:  May I approach, your Honor?

22          THE COURT:  Yes.

23  BY MR. STEPANOVICH:

24  Q.   Now, I handed you a declaration that you filed in this

25  case, Ms. Ulman, on 7/1/15.

170524tartikovT1            Ulman - cross

1          THE COURT:  Is this marked?

2          MR. STEPANOVICH:  It's not, just attempting to impeach

3    Ms. Ulman.  I think we can mark it.

4          THE COURT:  I think we should mark it.

5          MR. STEPANOVICH:  I'm sorry.  I have a marked copy

6    for Ms. Ulman.

7          THE COURT:  Okay.  That's great.  Thank you.

8    BY MR. STEPANOVICH:

9    Q.  I've handed you now a marked copy of what appears to be

10   your declaration Docket Number 203, filed 7/1/15 in this case.

11   A.  Yes.

12   Q.  And that's your signature on the last page?

13   A.  Yes, it is.

14   Q.  Direct your attention to paragraph 16:  In January of 2007,

15   site plans for the subject property were leaked to the media.

16   These site plans indicated that plaintiffs intended to apply

17   for permission to build a thousand housing units on the subject

18   property.  At or around this time, as Village attorney, I

19   sensed the possibility that the Village may have a dispute with

20   the plaintiffs in the future regarding their stated intentions.

21          Did I read that accurately?

22   A.  You did.

23   Q.  We're going to get these arranged, Ms. Ulman.

24          MR. STEPANOVICH:  But may I approach right now, your

25   Honor, please?

170524tartikovT1          Ulman - cross

1          THE COURT:  Yes.

2     BY MR. STEPANOVICH:

3     Q.  I've handed you, Ms. Ulman, what's been marked as

4     Plaintiffs' Exhibit 80.  Can you identify that, please.

5     A.  This is an agenda of the meeting of the Board of Trustees

6     to be held on November 27, 2006.

7          MR. STEPANOVICH:  Plaintiffs move Exhibit 80 into

8     evidence, your Honor.

9          MR. PELOSO:  No objection.

10         THE COURT:  Received.

11         (Plaintiffs' Exhibit 80 received in evidence)

12    BY MR. STEPANOVICH:

13    Q.  Now, this agenda dated 11/27/06, lists Executive Session,

14    Ramapo Lawsuits, Camp Dora and hydrants; isn't that correct?

15    A.  Yes.

16    Q.  And this agenda indicates that the board discussed Tartikov

17    in executive session on November the 27th, 2006; is that

18    correct?

19    A.  It indicates that they were proposing to discuss it.  I

20    don't recall what was discussed.

21    Q.  I'm not asking you to disclose that, Ms. Ulman.

22    A.  Yes.

23    Q.  But the agenda reflects --

24    A.  Yes, it does.

25    Q.  -- that Camp Dora --

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1  A.  Yes.

2  Q.  Okay.

3        MR. STEPANOVICH:  May I approach, your Honor.  I have

4  a group of them here.

5        THE COURT:  Yes.

6  BY MR. STEPANOVICH:

7  Q.  I've handed you a group of exhibits, Ms. Ulman, and if I

8  could direct your attention to Plaintiffs' Exhibit 83.

9  A.  Yes.

10  Q.  Can you identify that, please.

11  A.  That's the agenda for the Board of Trustees meeting held on

12  November 13, 2006.

13        MR. STEPANOVICH:  Plaintiffs move the admission of 83,

14  your Honor.

15        MR. PELOSO:  No objection.

16        THE COURT:  Okay.  Received.

17        (Plaintiffs' Exhibit 83 received in evidence)

18  BY MR. STEPANOVICH:

19  Q.  Now, the agenda for November 3, 2006, has a section for

20  executive session; correct?

21  A.  Yes.

22  Q.  And Camp Dora is listed under item seven, executive

23  session; isn't that true?

24  A.  Yes.

25  Q.  And this agenda then reflects that Camp Dora was discussed

              SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                         (914)390-4053

170524tartikovT1          Ulman - cross

1   in executive session on November 13, 2006; correct?

2   A.   It was, yes.

3   Q.   The next exhibit should be 85, Ms. Ulman.

4   A.   That's correct.

5   Q.   Ask if you could identify that, please.

6   A.   Agenda for the Board of Trustees meeting held on

7   October 30, 2006.

8          MR. STEPANOVICH:  And plaintiffs move the admission of

9   85.

10          MR. PELOSO:  No objection.

11          THE COURT:  Received.

12          (Plaintiffs' Exhibit 85 received in evidence)

13   BY MR. STEPANOVICH:

14   Q.   It looks like it is two weeks earlier than the prior agenda

15   of Exhibit 83, October 30 of '06.  This agenda reflects that

16   the Board of Trustees discussed Camp Dora in executive session

17   on this date, 10/30/06; correct?

18   A.   Correct.

19   Q.   You should have number 87 there, Ms. Ulman.

20   A.   Yes.

21   Q.   And can you identify -- can you identify that, please.

22   A.   That's the agenda for the Board of Trustees meeting held on

23   October 16, 2006.

24          MR. STEPANOVICH:  Plaintiffs move the admission of 87,

25   your Honor.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1          MR. PELOSO:  No objection.

2          THE COURT:  Received.

3          (Plaintiffs' Exhibit 87 received in evidence)

4    BY MR. STEPANOVICH:

5    Q.  And so now, two weeks earlier than the prior meeting on

6    October 16, 2006, the board met in executive session to discuss

7    Camp Dora; correct?

8    A.  Yes.

9    Q.  The next should be Plaintiffs' Exhibit 89.

10   A.  This is the Board of Trustees agenda for the meeting held

11   on September 25, 2006.

12         MR. STEPANOVICH:  Plaintiffs move the Exhibit No. 89

13   into evidence, your Honor.

14         MR. PELOSO:  No objection.

15         THE COURT:  Received.

16         (Plaintiffs' Exhibit 89 received in evidence)

17   BY MR. STEPANOVICH:

18   Q.  So now, two weeks prior to the last exhibit, 10/16/06, the

19   Board of Trustees met in executive session and discussed Camp

20   Dora; correct?

21   A.  Correct.  It was on the agenda.  We're not discussing

22   whether it was discussed.

23   Q.  No, ma'am.  I'm not asking you the contents of the

24   discussions.

25         Now, the next exhibit, I believe, is Exhibit 90.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1            Ulman - cross

1   A.  This is --

2   Q.  90, nine zero, and ask if you can identify that.

3   A.  This is the Board of Trustees agenda for the meeting held

4   on September 11, 2006.

5          MR. STEPANOVICH:  Plaintiffs move the admission of No.

6   90, your Honor.

7          MR. PELOSO:  No objection.

8          THE COURT:  Received.

9          (Plaintiffs' Exhibit 90 received in evidence)

10  BY MR. STEPANOVICH:

11  Q.  So on September the 11th, 2006, the Board of Trustees of

12  Pomona met in executive session to discuss Camp Dora; correct?

13  A.  That's what's on the agenda, yes.

14  Q.  You should have Exhibit 121.

15  A.  No, I have 91.

16  Q.  Okay.  Then let me give you a 121, Ms. Ulman.

17  A.  Wait.  Let me see.  I don't have --

18  Q.  I'm bringing it to you.

19          Ms. Ulman, I'd like to ask you if you recognize

20  Exhibit 121.

21  A.  This is a copy of the minutes of the Board of Trustees

22  meeting held on September 25, 2006.

23          MR. STEPANOVICH:  Plaintiffs move the admission of

24  121.

25          MR. PELOSO:  No objection.

170524tartikovT1            Ulman - cross

 1            THE COURT:  Received.

 2            (Plaintiffs' Exhibit 121 received in evidence)

 3   BY MR. STEPANOVICH:

 4   Q.  Ms. Ulman, I direct your attention to item nine of the

 5   minutes, page five of the minutes, item nine.

 6   A.  Yes.

 7   Q.  And the minutes reflect that you reported that you're still

 8   working on the local law revision for the wetlands and will try

 9   to have it for the next workshop meeting; is that correct?

10   A.  That's correct.

11   Q.  You should have Exhibit 91, Ms. Ulman.

12   A.  I do.

13   Q.  And ask if you can identify that, please.

14   A.  That's the agenda for the Village board meeting held on

15   August 14, 2006.

16            MR. STEPANOVICH:  Plaintiffs move admission of number

17   91, your Honor.

18            MR. PELOSO:  No objection.

19            THE COURT:  Received.

20            (Plaintiffs' Exhibit 91 received in evidence)

21   BY MR. STEPANOVICH:

22   Q.  And Exhibit 91, the agenda for August 14, 2006, again lists

23   Camp Dora as an item discussed on executive session; correct?

24   A.  That's correct.

25   Q.  The next exhibit, Ms. Ulman, is 92.

                  SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

170524tartikovT1            Ulman - cross

1  A.  Yes.

2  Q.  And ask if you could identify that, please.

3  A.  That is the Board of Trustees agenda for the meeting held

4  on July 24, 2006.

5          MR. STEPANOVICH:  Plaintiffs move the admission of 92,

6  your Honor.

7          MR. PELOSO:  No objection.

8          THE COURT:  Received.

9          (Plaintiffs' Exhibit 92 received in evidence)

10  BY MR. STEPANOVICH:

11  Q.  The meeting agenda, July 24, 2006, indicates that Camp Dora

12  was discussed in executive session on that date, July 24, 2006;

13  correct?

14  A.  That's correct.

15  Q.  Now, I think you should have Exhibit 115 in front of you.

16  A.  Not part of this group.

17  Q.  Okay.  Maybe the first group.  I gave you about six or

18  seven exhibits.

19  A.  115?

20  Q.  Yes, ma'am.

21  A.  Could you tell me what it is?

22  Q.  Yes, ma'am.  It should be the board minutes of November 27,

23  2006; 115.

24          I have another one, Ms. Ulman.

25          MR. STEPANOVICH:  Can I approach?

170524tartikovT1          Ulman – cross

1           THE COURT:  Yes.

2    A.  Thank you.  Found it.

3    Q.  Always happens that way.

4    A.  Sorry.  Yes, I have it.

5    Q.  Ms. Ulman, can you identify 115, please.

6           THE COURT:  This is already in.

7           MR. STEPANOVICH:  Okay.  It's already in.

8    BY MR. STEPANOVICH:

9    Q.  Your Honor -- I mean, Ms. Ulman, at the meeting of

10   November 27, 2006, the Local Law 1 of 2007, the dormitory law

11   was first introduced; isn't that true?  And I'll give you

12   direct reference, item ten, page five.

13   A.  No.

14   Q.  Okay.

15   A.  I have two local laws; one is the dormitory and the other

16   is houses of worship.

17   Q.  Okay.

18   A.  This does not have the wetlands law.

19   Q.  No, maybe I confused you, Ms. Ulman.

20          Under item ten, it appears as if you distributed two

21   proposed laws; one proposed law was in relation to the

22   dormitory buildings, and the other is in relation to the houses

23   of worship.

24   A.  That's correct.

25   Q.  Okay.  All right.  Now, coming back to the agendas,

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

170524tartikovT1          Ulman - cross

1   Ms. Ulman, you should have 120 in front of you.

2   A.  I do.

3   Q.  And could you identify 120, please.

4   A.  That's the agenda for the Board of Trustees meeting held on

5   July 10, 2006.

6          MR. STEPANOVICH:  Plaintiffs move the admission of

7   120, your Honor.

8          MR. PELOSO:  No objection.

9          THE COURT:  Received.

10          (Plaintiffs' Exhibit 120 received in evidence)

11   BY MR. STEPANOVICH:

12   Q.  And this agenda reflects that Camp Dora was discussed by

13   the Board of Trustees in executive session on July 10, 2006;

14   correct?

15   A.  Yes.

16   Q.  The next exhibit is 92.

17   A.  And this is the agenda for the Board of Trustees meeting

18   held on July 24, 2006.

19          MR. STEPANOVICH:  Plaintiffs move the admission of 92,

20   your Honor.

21          THE COURT:  It's already in.

22          MR. PELOSO:  No objection.

23          THE COURT:  It's in.

24          MR. STEPANOVICH:  Oh, all right.

25          Just have a moment, your Honor.  Kind of wrapping this

170524tartikovT1            Ulman - cross

1  up.

2          Can I collect these papers?

3          THE COURT:  Absolutely.

4          MR. STEPANOVICH:  Thank you, your Honor.

5  BY MR. STEPANOVICH:

6  Q.  Now, beginning in July, on July 10 of the year 2006, the

7  Board of Trustees met ten times to discuss Camp Dora; correct?

8  A.  As reflected in the agendas, it appears so.

9  Q.  And that began July 10, 2006, and the last exhibit ended

10 December 18, 2006; correct?

11 A.  Yes.

12 Q.  Okay.

13         MR. STEPANOVICH:  Your Honor.

14         THE COURT:  Yes.

15         MR. STEPANOVICH:  I know we're early, but this might

16 be a good stopping point for me.  I can press forward, but I

17 don't think we have a whole lot left with Ms. Ulman.  I'll stop

18 or I'll do, obviously, whatever you say.

19         If I could just have a few minutes to regroup and then

20 I think that we could wrap it up.  I know I can't wrap it up

21 now.

22         THE COURT:  So you want to break for the day so you

23 can regroup a little bit?

24         MR. STEPANOVICH:  And then condense the rest.  This

25 will give us an opportunity to condense the rest of her

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914)390-4053

170524tartikovT1          Ulman - cross

1   testimony and I think we could get it done in short order

2   tomorrow.

3          THE COURT:  That's fine.

4          Mr. Peloso, is that all right?

5          MR. PELOSO:  That's fine, your Honor.

6          THE COURT:  Are we still on the path to finish this

7   week's witnesses tomorrow, or we going back to sitting Friday?

8   We had sort of moved on, based on what you told me last night.

9   If I need to regroup, you can let me know.

10          MR. STEPANOVICH:  We're still on the schedule we

11   discussed.

12          MR. PELOSO:  As far as I know, yes, your Honor.

13          THE COURT:  That's comforting; as far as I know.

14          MR. PELOSO:  We have --

15          THE COURT:  I'm just making a joke.  Relax.

16          So we're finished with Ms. Ulman.  We have Ms. Beall.

17          MR. PELOSO:  Professor Green.

18          THE COURT:  Professor Green; right.  He's going to be

19   a fairly short witness; right?

20          MR. PELOSO:  I think so.

21          THE COURT:  He's tall, but in terms of testifying.

22          MS. NAPP:  There wasn't much in his affidavit, I would

23   imagine.  And I don't think, for what it's worth, I don't

24   anticipate I will be overly lengthy with Ms. Beall.

25          MR. STORZER:  Your Honor, Professor Green, it's not

170524tartikovT1          Ulman - cross

1    going to be five minutes.  It's not going to take half a day

2    either.

3              THE COURT:  That's what I figured.  All right.  So,

4    look --

5              MR. STEPANOVICH:  I appreciate that.

6              THE COURT:  -- I'm all for efficiency.  Let's break

7              Any housekeeping issues we need to take up?

8              MR. PELOSO:  Not for defendants, your Honor.

9              MR. STEPANOVICH:  And none for the plaintiffs, your

10   Honor.

11             THE COURT:  Okay.  Then we'll break for the day.

12             MR. STEPANOVICH:  Thank you very much.

13             THE COURT:  All right.

14             (Adjourned to May 25, 2017 at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2  Examination of:                              Page

3   DORIS ULMAN

4  Direct By Mr. Peloso . . . . . . . . . . . . 751

5  Cross By Mr. Stepanovich . . . . . . . . . . 759

6                         PLAINTIFF EXHIBITS

7  Exhibit No.                              Received

8   271   . . . . . . . . . . . . . . . . . . 764

9   150   . . . . . . . . . . . . . . . . . . 771

10   129   . . . . . . . . . . . . . . . . . . 771

11   151   . . . . . . . . . . . . . . . . . . 772

12   141   . . . . . . . . . . . . . . . . . . 776

13   141-A   . . . . . . . . . . . . . . . . . 780

14   156   . . . . . . . . . . . . . . . . . . 789

15   142   . . . . . . . . . . . . . . . . . . 798

16   130   . . . . . . . . . . . . . . . . . . 798

17   125   . . . . . . . . . . . . . . . . . . 807

18   126   . . . . . . . . . . . . . . . . . . 818

19

20  115  .  .  .  .  .  .  .  .  .  .  . 849

21  119  .  .  .  .  .  .  .  .  .  .  . 849

22  105  .  .  .  .  .  .  .  .  .  .  . 852

23  80  .  .  .  .  .  .  .  .  .  .  . 855

24  83  .  .  .  .  .  .  .  .  .  .  . 856

25  85  .  .  .  .  .  .  .  .  .  .  . 857

1   87  .  .  .  .  .  .  .  .  .  .  .  . 858

2   89  .  .  .  .  .  .  .  .  .  .  .  . 858

3   90  .  .  .  .  .  .  .  .  .  .  .  . 859

4   121 .  .  .  .  .  .  .  .  .  .  .  . 860

5   91  .  .  .  .  .  .  .  .  .  .  .  . 860

6   92  .  .  .  .  .  .  .  .  .  .  .  . 861

7   120 .  .  .  .  .  .  .  .  .  .  .  . 863

8                      DEFENDANT EXHIBITS

9   Exhibit No.                          Received

10   2000    .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 755

11   1018, 1092 .  .  .  .  .  .  .  .  .  .  .  .  . 758

12   1000, 1009-1013, 1015-1017  .  .  .  .  .  .  .  . 758

13   1022, 1043, 1051-1052, 1055  .  .  .  .  .  .  . 758

14   1062-1064, 1066, 1070  .  .  .  .  .  .  .  .  . 758

15   PX150, PX106 .  .  .  .  .  .  .  .  .  .  .  .  . 759

16

17

18

19

20

21

22

23

24

25