170525tartikovT1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------x

3   CONGREGATION RABINNICAL COLLEGE
    of TARTIKOV, INC., et al.,

4
                    Plaintiffs,

5
                    v.                          07 Civ. 6304 (KMK)

6
    VILLAGE of POMONA, NY, et al.,

7
                    Defendants.

8
    ----------------------------x            White Plains Courthouse
9                                            White Plains, N.Y.
                                             May 25, 2017
10                                           9:39 a.m.

11  Before:

12              THE HONORABLE KENNETH M. KARAS,

13                                              District Judge

14                        APPEARANCES

15  JOHN STEPANOVICH
    ROMAN STORZER
16  DONNA SOBEL
    TERRY RICE
17  PAUL SAVAD
            Attorneys for Plaintiffs
18
    JOHN PELOSO
19  ANDREA DONOVAN NAPP
    KARLA CHAFFEE
20          Attorneys for Defendants

21

22

23

24

25

170525tartikovT1              Ulman - cross

1              (Case called)

2              THE COURT:  Any issues to take up?

3              MS. SOBEL:  Just one.  Good morning.

4              THE COURT:  Good morning.

5              MS. SOBEL:  Yesterday we had a discussion about

6    exhibits to be admitted from defendants.  And I apologize, we

7    were a little confused.  All of the exhibits that are in

8    Ms. Ulman's affidavit we have no objection to.

9              THE COURT:  Okay.

10             MS. SOBEL:  We thought it was a bigger conversation

11   about other exhibits, so they're all good.

12             THE COURT:  No apologies necessary.  I figured as

13   much.  That's why I was saying we should all calm down and sort

14   it out later.

15             MS. SOBEL:  Thank you.

16             THE COURT:  Any other issues?

17             MR. PELOSO:  None for defendants.

18             MR. STEPANOVICH:  Ready to recall Doris Ulman, your

19   Honor.

20             THE COURT:  Okay.  Come on up, Ms. Ulman.  I'll remind

21   you, you are still under oath.

22    DORIS ULMAN,

23   CROSS-EXAMINATION CONTINUED

24   BY MR. STEPANOVICH:

25   Q.  Do you want to take a minute to get organized up there,

                  SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                               (914)390-4053

170525tartikovT1            Ulman - cross

1   Ms. Ulman?

2   A.  No.  I think I recall.

3   Q.  Good morning.

4   A.  Good morning.

5   Q.  Ms. Ulman, are you familiar with any jurisdiction that

6   limits dormitory space to 20 percent?

7   A.  No.  I can't recall any.

8   Q.  Did you write Local Law 6 of 2001 in Chestnut Ridge

9   limiting student housing to define dormitories; did you write

10  that law?

11  A.  If it was 2001, probably, yes, but I don't recall it

12  specifically.

13          Before we go on, Mr. Stepanovich, can I correct a

14  mistake that I made yesterday in reference to a law in the

15  Village code?

16  Q.  I think your counsel will have an opportunity to clear that

17  up.

18  A.  Okay.

19  Q.  Now, Ms. Ulman, I believe you knew, I think probably in

20  your personal capacity -- strike that.  Let me ask this

21  question.  You're testifying here today in your own individual

22  capacity and as the representative for the Village of Pomona;

23  is that right?

24  A.  Yes.  I think we said I would try to distinguish my answers

25  based upon which it was.

170525tartikovT1          Ulman - cross

1  Q.  Right.

2  A.  And I've been trying to do that.

3  Q.  In fairness, I've been trying to pose the questions in such

4  a way that you could --

5  A.  I know that.  Thank you.

6  Q.  So, in your personal capacity, you knew from the time that

7  you learned of the rabbinical college -- of the rabbinical

8  college's purchase that it was going to be used for a

9  rabbinical college; isn't that true?

10 A.  From the name, yes.

11 Q.  Okay.  On February 15, 2005, the Village considered the tax

12 exemption application of the Congregation Rabbinical College of

13 Tartikov; is that true?

14 A.  Yes.  I believe the tax exemption was granted that night.

15 Q.  And that was in 2005?

16 A.  That was 2005.

17 Q.  Now, Ms. Ulman, I want to turn to the January 22, 2007

18 meeting and the minutes related to that meeting.  Does the --

19 the Village does not have a complete set of minutes for that

20 meeting, does it?

21 A.  The Village uses the transcript that was presented to us at

22 my request that was taken by Mr. Savad.  That is what we have

23 adopted as our minutes.

24 Q.  So I think that's Exhibit 137, and that is the minutes that

25 the Village has adopted as their official minutes of --

170525tartikovT1          Ulman - cross

1   A.  In addition -- well, I believe 137 is just a transcript.

2   Q.  Right.

3   A.  Attached to the transcript was the usual summary of what

4   happened at the meeting that is prepared by our record-keeper

5   and so, the minutes are actually the transcript plus I think

6   two or three pages attached to them prepared by the Village.

7   Q.  So for clarity, then, Exhibit 137, which is the transcribed

8   portion that Mr. Savad's office made, the Village has adopted

9   that as part of --

10  A.  As part of its minutes; that's correct.

11       MR. STEPANOVICH:  Your Honor, then, I think 137 was in

12  as an aid.  Based on Ms. Ulman's testimony, we would move 137

13  in as official minutes of the Village based on her testimony.

14       THE COURT:  Any objection?

15       MR. PELOSO:  The only objection, your Honor, would be

16  that, again, the statements that were made by unidentified

17  individuals are hearsay statements.

18       THE COURT:  Right.  So, it would come in obviously

19  along the caveats we've discussed.

20       MR. PELOSO:  Right.

21       THE COURT:  The same thing the video is in for.

22       MR. PELOSO:  Correct.

23       THE COURT:  Okay.  I take it you're okay with that.

24       MR. STEPANOVICH:  I'm fine.

25       THE COURT:  All right.  So 137 is in.

170525tartikovT1            Ulman - cross

1          (Plaintiffs' Exhibit 137 received in evidence)

2   Q.   Ms. Ulman, did there come a time that you became aware that

3   Mayor Marshall removed some comments from the minutes that were

4   being drafted of this meeting?

5   A.   That he would what?  I'm sorry.

6   Q.   He removed comments from this meeting?

7   A.   He didn't remove comments.  He removed the entire document

8   that was prepared by our minute-taker.

9   Q.   And that document -- that document included the comments

10  from the public; isn't that true?

11  A.   Some of it were in, some of it were not.  I don't recall

12  exactly what was in it.  It was -- it was not -- it was written

13  almost as a transcript, but it wasn't a transcript.  And it

14  was -- it had holes in it.  It was not a good presentation of

15  what happened at the meeting.

16  Q.   In fact, I believe the original draft of the minutes was 29

17  pages --

18  A.   Yes.

19  Q.   And then after Mayor Marshall did what he did, it was

20  reduced down to about 13 pages; isn't that accurate?

21  A.   Yes.

22  Q.   And you indicated that that wasn't proper, correct?

23  A.   Mayor Marshall and I sometimes differed as to what we

24  believed was the correct procedure.  He indicated to me when I

25  questioned it that the conference, the New York State

170525tartikovT1            Ulman - cross

1    Conference of Mayors recommends that the only thing you put

2    into minutes are resolutions that are adopted by the board.  I

3    disagreed with that.  And particularly, at a public hearing,

4    it's my belief that you have to list everybody who spoke,

5    that's why we take names and addresses, with a brief summary,

6    not a transcript, but a brief summary of what each person said.

7    So we had a disagreement, and neither one of us won.

8    Q.   Thank you.

9         Now, Ms. Ulman, turning your attention to the SEQRA

10   requirements, and that's SEQRA requirements, in the New York

11   law.

12   A.   Yes.

13   Q.   Could you briefly describe the name of that.  What does the

14   acronym stand for?

15   A.   State Environmental Quality Review Act.

16   Q.   Okay.  And that's a New York state act, correct?

17   A.   It is.

18   Q.   And isn't the adoption of a local law subject to SEQRA?

19   A.   It depends upon the content of the local law.  There are

20   three types of actions that are listed in the SEQRA

21   regulations.  One of those types is called Type II, which is

22   exempt actions, and there are certain types of actions that

23   are, as it states, exempt from SEQRA determinations and

24   therefore, not every local law -- for example, a local law that

25   deals with procedure, administrative procedure or processes

170525tartikovT1            Ulman - cross

 1  would not be subject to a SEQRA review.

 2  Q.  Doesn't SEQRA define an action -- you used the term action.

 3  Doesn't SEQRA define an action as to include adoption of agency

 4  rules, regulations and procedures, including local laws, codes,

 5  ordinances, executive orders and resolutions that may affect

 6  the environment?

 7  A.  As a general rule, yes.

 8  Q.  You say as a general rule.  What I just quoted is contained

 9  in the SEQRA statute; correct?

10  A.  Word for word, I don't recall.

11          MR. STEPANOVICH:  May I approach.

12          THE COURT:  Yes.

13  Q.  Ms. Ulman, I've handed you what has been marked as

14  Plaintiff Exhibit 800 just for identification and ask if you

15  can identify that document.  I mean, does that refresh your

16  recollection as to the definition of action under the SEQRA

17  requirements?

18  A.  Yes.

19  Q.  And could you please testify as to -- has your recollection

20  now been refreshed and do you know whether or not SEQRA

21  regulations define action to include local laws?

22  A.  Oh, they do.  I didn't deny that.

23  Q.  Oh, okay.  I thought you qualified --

24  A.  No.  You had read a very long paragraph.  And what I said

25  was that I -- I didn't know if I agreed with everything in the

170525tartikovT1          Ulman - cross

1    paragraph, but certainly local laws are definitely part of

2    SEQRA, of course.

3    Q.  And on that basis, Ms. Ulman, SEQRA then goes on to provide

4    that no agency involved in any action may undertake, fund or

5    approve the action until it has complied with the provisions of

6    SEQRA; isn't that true?

7    A.  That's correct.

8    Q.  So isn't it true, Ms. Ulman, that the enactment of a local

9    law without adopting a negative declaration or preparing a DEIS

10   and making SEQRA findings is contrary to law?

11   A.  As a general rule, yes.

12   Q.  Thank you.  Regarding -- continuing with SEQRA, Ms. Ulman,

13   isn't one of the purposes of SEQRA to incorporate consideration

14   of environmental factors into the decision-making process?

15   A.  SEQRA is a tool by which local government reviews all

16   actions that are subject to it with the view of diminishing, as

17   much as possible, any adverse environmental impacts that might

18   result from the action.

19   Q.  So I think we agree, but I just want to make sure we're

20   clear and I understand.  SEQRA, the process of SEQRA is to

21   incorporate consideration, then, of these environmental factors

22   into the decision-making process; do you agree with that?

23   A.  Yes.

24   Q.  And isn't it true, Ms. Ulman, that if a proposal may have a

25   significant impact on the environment, an environmental impact

170525tartikovT1              Ulman - cross

1   statement must be required; isn't that true?

2   A.  Generally, but not always.

3   Q.  And is there -- "not always."  Is that an exception in the

4   statute?

5   A.  There are times when you can require the same types of

6   studies that you would do for an environmental impact statement

7   without going through the process and the lengthy period of the

8   environmental impact statement.  That's what I meant to clarify

9   it with, but the study and the review would be the same based

10  upon the impact that you perceive.

11  Q.  So what is it that would be, in your opinion, the

12  substitute for what is required in SEQRA?

13  A.  Well, for example, you may find that a project -- that the

14  only adverse impact that you believe is going to occur would be

15  traffic, and so, you could require the applicant to prepare a

16  full-blown traffic study without making him go through all the

17  other steps of the environmental impact statement.  That's

18  generally a long, drawn-out procedure.

19  Q.  So this impact that you just testified to, I think you said

20  adverse impact and if that wasn't your words, I stand

21  corrected, but this adverse impact would be determined through

22  the decision-making process; correct?

23  A.  Oh, yes.

24  Q.  And through the process set forth in SEQRA, this process

25  must include a description of mitigation measures to cure any

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1            Ulman - cross

1   of these impacts; isn't that true?

2   A.  Yes, if you find there is an adverse impact.

3   Q.  And then if that happens, then DEIS must be prepared, which

4   then addresses the mitigation of those impacts; correct?

5   A.  Yes.

6   Q.  We're going to move on now, Ms. Ulman, to paragraph 68 of

7   your declaration.

8   A.  58?

9   Q.  68.  I'm sorry.

10  A.  5 or 6?

11  Q.  6-8.

12          THE COURT:  6.

13          THE WITNESS:  Sorry.

14  A.  Yes.

15  Q.  The -- this is regarding the wetlands law?

16  A.  Correct.

17  Q.  Now, Ms. Ulman, the wetlands law was enacted to protect the

18  health, safety and welfare of the Village residents, correct?

19  A.  Yes.

20  Q.  And the 100-foot buffer that was part of the Wetland

21  Protection Law was necessary to protect the health, safety and

22  welfare of the Village residents, correct?

23  A.  The 100-foot buffer protects the wetlands, so it's

24  necessary for the health, safety and welfare of the Village;

25  yes.

170525tartikovT1            Ulman - cross

1   Q.  Thank you.  Now, Ms. Ulman, if we could turn to paragraph

2   87 --

3   A.  87?

4   Q.  Yes, ma'am.  87.

5   A.  Yes.

6   Q.  Okay.  I think you testify in paragraph 87 that Village

7   officials do not meet with developers before a formal

8   application is filed?

9   A.  Yes --

10  Q.  And --

11  A.  -- since my tenure.

12  Q.  Since your tenure.  Okay.

13  A.  I don't know what happened before that.

14  Q.  And that's all I'm interested in.

15          Ms. Ulman, if you could turn to Exhibit 150 up there,

16  which is Section 130-39, 130-39.  It's the binder.  Yes.

17  A.  39?

18  Q.  Yes, 130-39.

19  A.  Yes.

20  Q.  Okay.  Turn your attention or direct your attention,

21  Ms. Ulman, to the last sentence of that section, which -- do

22  you have it, the last sentence in that section which I believe

23  reads:  In no case shall this section restrict the right of an

24  applicant to come before the planning board for an informal

25  discussion and review prior to the formal submission.

170525tartikovT1          Ulman - cross

1          Did I read that accurately?

2    A.  Yes.

3    Q.  Okay.  So doesn't that provision allow for a meeting

4    between a developer and the Village prior to a formal

5    application being filed?

6    A.  That doesn't apply to what Mr. Savad was asking for.  What

7    this -- what this applies to is, very often, before submitting

8    an application, when an applicant has a plan in place, they can

9    apply to, as did Yeshiva Spring Valley, they applied to the

10   planning board for a -- an informal discussion with the

11   planning board.  It's part of the planning board meeting

12   process.  It is not a side meeting behind closed doors with one

13   or two officials.

14   Q.  Well.  First of all, Ms. Ulman, what you just described, is

15   it fair to say is your interpretation of what that statute

16   says?

17   A.  That's how we proceed.

18   Q.  So that is, what you've just described, is how the Village

19   proceeds based upon your interpretation of that section?

20   A.  Exactly.  As I just stated, back in 1999, when Yeshiva

21   Spring Valley wanted to discuss their proposal for -- before

22   preparing expensive plans, they applied for an informal

23   discussion with the planning board, and all that they submitted

24   was a narrative from Mr. -- I guess at that time it was

25   Mr. Atzl -- explaining the project and they had an appearance

170525tartikovT1          Ulman - cross

1    with Rabbi Fromowitz at the planning board meeting.  That's how

2    it's always been done.

3    Q.  I understand.  Ms. Ulman, I want to clarify something.

4    It's not your testimony that Mr. Savad was seeking some private

5    meeting between himself and you and a couple of Board of

6    Trustee members; is that your testimony?

7    A.  The March 26 letter asked for a meeting with me and the

8    mayor.  Nobody else.

9    Q.  And the Village received additional correspondence seeking

10   a meeting to explain the project, correct?

11   A.  They never applied or sent a letter to the planning board.

12   They never applied to any board.  The April 25 letter was, as I

13   recall, a letter asking for a discussion with any committee to

14   discuss the environmental impact of a project that we knew was

15   illegal.

16        In April of 2007, we already knew that they wanted a

17   thousand units of housing.  How could you discuss that

18   informally?

19   Q.  And you -- you testified about this thousand units of

20   housing and you knew that how, Ms. Ulman?

21   A.  Through an article in the newspaper --

22   Q.  Right.

23   A.  -- that quoted Mr. Savad.

24        MR. STEPANOVICH:  May I approach, your Honor.

25        THE COURT:  Yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1          Ulman - cross

1  Q.  Ma'am, I've handed you, Ms. Ulman, what has been marked as

2  Plaintiff Exhibit 106.  Do you recognize that document?

3  A.  Oh, I do.

4  Q.  This document?

5        MR. STEPANOVICH:  Your Honor, Plaintiffs move 106 into

6  evidence.

7        MR. PELOSO:  No objection.

8        THE COURT:  106 is received.

9        (Plaintiffs' Exhibit 106 received in evidence)

10 Q.  So Ms. Ulman, Mr. Savad's letter dated April 25, 2007 was

11 addressed to Mr. Sanderson, Ms. Trustee Ulman, Trustee Banks,

12 Trustee Yagel, Trustee Louie --

13        THE COURT:  Hang on a second.

14        Mr. Savad, let's keep a poker face, okay?  All right?

15 You're shaking your head you're doing all kinds of theatrics.

16 Let's let that go, okay?

17        MR. SAVAD:  Yes, sir.

18        THE COURT:  Thank you.

19        Sorry, Mr. Stepanovich.

20        MR. STEPANOVICH:  No.  I'm sorry.

21 Q.  Is that true, Ms. Ulman?

22 A.  Yes.

23 Q.  Now, Ms. Ulman, there came a time -- and this is a question

24 in your personal capacity.  There came a time when you gave a

25 speech at the Rockland Coalition for the Future; isn't that

                    SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

170525tartikovT1          Ulman - cross

1  true?

2  A.  Yes.

3  Q.  And during that speech, you made a statement to the

4  audience, correct?

5  A.  I made a lot of statements.

6  Q.  Well, I'm going to just ask you about one, okay?

7  A.  I think I know which one you're talking about.

8  Q.  Well, I'm sure you were prepared for this.  So you made a

9  statement in response to a question, and you said I think if I

10  put this in context, one of the audience members asked about

11  selling homes; am I correct?

12  A.  Yes.

13  Q.  And your response was you should not cave into them and

14  sell our houses, correct?

15  A.  Yes.  What I -- the question was that people were being --

16  this particular person was approached by a real estate agent

17  and told that because of RLUIPA, her house was going to lose

18  its value and, therefore, she should sell it quickly.  And my

19  response was don't cave into them, the real estate agents,

20  because all they're trying to do is sell your property.

21  Q.  So your response was directed at the real estate agents?

22  A.  Of course.

23  Q.  The real estate agents who represent the Orthodox Hasidic

24  buyers?

25  A.  I don't know who the real estate agent represented.  The

170525tartikovT1          Ulman - cross

1  lady who asked the question did not tell me.

2  Q.  But your quote was don't cave into them, correct?

3  A.  Yes.

4  Q.  Ms. Ulman, under the Village code, could an un- -- strike

5  that.

6          Under the Village code, could an accredited

7  institution, educational institution -- strike that.  Let me

8  start over.

9          Ms. Ulman, under the Village code, could an accredited

10 educational institution with dormitories up to 20 percent of

11 the total square footage be built on the subject property

12 assuming that all regulations were met?

13 A.  Yes.

14 Q.  And those regulations would be the 25 percent impervious

15 surface limitations?

16 A.  Yes.

17 Q.  And the ten percent building coverage limitations?

18 A.  Yes.

19 Q.  And the 20 percent floor area limitations?

20 A.  Yes, and of course the depending also upon the topography

21 of the property.

22 Q.  And with the special permit, could one build a recreational

23 facility with swimming clubs, tennis courts and recreational

24 buildings on that property?

25 A.  I would think so.

170525tartikovT1              Ulman - cross

1   Q.  Ms. Ulman, is it your testimony that no rabbinical college

2   that is not accredited and has student family housing can be

3   built in the Village without creating a grave threat to the

4   Village's public safety, peace or order?

5             MR. PELOSO:  I'm going to object to the form of that

6   because I don't know if Ms. Ulman knows.

7             THE COURT:  Do you understand the question?

8   A.  Could you repeat it.

9   Q.  Yes, ma'am.  Is it your testimony that no rabbinical

10  college that is not accredited which has student family housing

11  can be built in the Village without creating a grave threat to

12  the Village's public safety, peace and order?

13            MR. PELOSO:  I'm going to object to the form.

14            THE COURT:  Overruled.

15  A.  No, I don't agree with that statement.  The Village has not

16  prohibited family housing.  Families can live in housing

17  adjacent to the school, they can live in the dormitory

18  building.

19  Q.  So your testimony is a family could live in a single room

20  dormitory building; is that your testimony?

21  A.  Single or a suite, as they do in some colleges.

22  Q.  And suites are provided for in your code in these

23  dormitories?

24  A.  I believe it says one or two rooms; yeah.  It does not

25  provide for cooking facilities, but I believe you can put rooms

1    together.  I don't think that would be prohibited.

2    Q.  So it's your testimony that a family could move into the

3    dorms as it exists and knock down the walls and create a suite;

4    is that your testimony?

5    A.  I don't know that they'd have to knock down walls, depends

6    on how it's built, but they could live there certainly.

7    Q.  Your code, not your code.  Strike that.  I'm sorry.  The

8    Village's code provides for single dormitory rooms, correct?

9    A.  Yes.

10   Q.  With no cooking facilities, correct?

11   A.  Yes.

12   Q.  No housekeeping facilities?

13   A.  That's correct, except that the definition also states

14   rooms are sleeping quarters for administrative staff, faculty

15   or students.  It doesn't prohibit families.

16   Q.  It doesn't permit it in the statute either, does it?

17   A.  It does not prohibit -- it does not permit apartment-type

18   units.  It does not -- it doesn't address people.  It addresses

19   the building and the property.

20   Q.  So a student -- sorry to debate this with you, but a

21   student is not a person; is that your testimony?

22   A.  The students are going to live in the dormitory.

23   Q.  Okay.  And they can do this with their families; is that

24   your testimony?

25   A.  They can.

170525tartikovT1          Ulman - cross

1   Q.  And they can eat in the one communal dining room with their

2   families, correct?

3   A.  Yes.  I believe that happens now with other facilities,

4   other colleges and universities.

5   Q.  Ms. Ulman, I want to turn your attention now, and I'm

6   almost done, to paragraph 58 of your affidavit.  I'll wait a

7   second until you get there.

8   A.  Yes.

9   Q.  And you say -- again, this relates to the January 22, 2007

10  meeting, and you say in paragraph 58 that most of the public

11  comments were about the issue of high-density housing rather

12  than the proposed law; do you see that?

13  A.  Yes, I do.  That's correct.

14  Q.  All right.  Do you have Exhibit 137 up there, Ms. Ulman?

15  A.  137?

16  Q.  137.  Yes, ma'am.

17  A.  What is it?

18  Q.  I'm going to bring it to you.

19  A.  Yes, this is the transcript.

20  Q.  Okay.  Ms. Ulman, if you could turn to page 56 of that

21  transcript, and I have a few of these comments that I'd like to

22  go over with you?

23  A.  Yes.

24  Q.  I'm sorry, ma'am.  Let me get there.  Starting at line 18.

25  A.  18?  Yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1            Ulman - cross

1   Q.  The comment was made:  You know, in America we have the

2   sense of community.  That's our face.  We're going to be

3   another Kiryas Joel.  That's why we are emotional.  You can get

4   into all that environmental impact and all that.  That's all I

5   have to say.

6            Now, Ms. Ulman, that was a statement about high

7   density?

8   A.  The first part of his statement was.  If you read the first

9   paragraph, it's all about housing density.  The second

10  paragraph, you're correct.  And as I said in my affidavit, most

11  of the statements were only about housing, not all of them.

12  There are one or two that are not.

13  Q.  Let's just go over a few more.  Page ten, line 9 to 11,

14  please:  This would entirely change the character of the

15  Village.  It would entirely change the politics of the Village.

16            That statement's about density?

17  A.  What he's talking about in the prior sentence is the 4500

18  people that were referred to in the newspaper article.

19  Q.  That was published by --

20  A.  And he refers to that as opposed to the existing population

21  of 3200.

22  Q.  In this article that you refer to was --

23  A.  The article in January 12th, whatever the date was.  I

24  forget.

25  Q.  Ms. Ulman, I direct your attention now to page 14, line 10

170525tartikovT1          Ulman - cross

1   to 13.

2   A.  Yes.

3   Q.  My name is Greg Briem.  I'm a resident of Pomona.  This is

4   a disgrace.  It's an absolutely disgrace.  You're in the wrong

5   town and the wrong village.  I work, as many did, for -- I

6   worked as many of my fellow villagers and then I was cut off.

7        That statement's about density?

8   A.  No, but Mr. Briem is -- has a reputation in the Village.

9   Q.  For being what?

10  A.  He doesn't speak for the residents of the Village.

11  Q.  There were plenty of residents there that night that did

12  speak, though, right, Ms. Ulman?

13  A.  They did, and most of them were against the housing

14  density.  I reread this transcript very recently and just for

15  that purpose.  And the vast majority of them were not

16  discriminatory.

17  Q.  Okay.  So the vast majority of these statements, then, to

18  use your words, were about density, right?

19  A.  Yes.

20  Q.  Density means numbers, doesn't it?

21  A.  Density means numbers of houses.

22  Q.  And people live in houses, right?

23  A.  Of course.  Yes.

24  Q.  And you knew, as well as the residents that spoke that

25  evening, that this proposal was going to be for Orthodox

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1          Ulman - cross

1   Hasidic rabbinical students, correct?

2   A.  We knew they were going to be for rabbinical students.  We

3   didn't know what sect they would have, they would belong to.

4   Q.  And their families, correct?

5   A.  And their families.

6   Q.  And this is the high-density housing that the residents

7   were complaining about, correct?

8   A.  All types of high-density housing are subject to complaints

9   from the villages, as well as the board.

10  Q.  So, these complaints were about who was going to be able to

11  live in the Village of Pomona, correct?

12  A.  They were about the environment, they were about the

13  buildings that would take place on a very sensitive piece of

14  property that is zoned for less than 100 units and was going to

15  be proposed for a thousand units.

16  Q.  Dorms are permitted in the Village of Pomona, correct?

17  A.  I beg your pardon?

18  Q.  Dormitories are permitted, is that right?

19  A.  As accessory uses to schools; yes.

20  Q.  So is it your testimony, Ms. Ulman, that that evening,

21  although Mayor Marshall warned the -- strike that.  Warned --

22  advised the crowd many times, he advised them there was no

23  application before the board, correct?

24  A.  That's right.

25  Q.  And he advised them that there was no consideration of

170525tartikovT1          Ulman - redirect

1   environmental concerns at that time, correct?

2   A.  That's right.

3   Q.  So those issues were not being considered that evening,

4   were they?

5   A.  Absolutely not, but it's very hard to convince a room full

6   of people of that fact when they're steamed up because of a

7   newspaper article.

8   Q.  Thank you.  I have nothing further, Ms. Ulman.

9           THE COURT:  Cross.

10  REDIRECT EXAMINATION

11  BY MR. PELOSO:

12  Q.  Ms. Ulman, just to begin, this morning you said you wanted

13  to correct some testimony from yesterday.

14  A.  Yes.  In my discussion with Mr. Stepanovich, we were

15  talking about net lot area, and I agreed with him -- because I

16  was looking at the Chapter 130 of the Village code, I agreed

17  with him that only schools and educational institutions and

18  houses of worship were subject to the net lot area requirement.

19          Last night, when I reviewed the Village code again,

20  and it was because I was unsure that I was correct, I took a

21  look at Chapter 118 and in -- this is, I think, Exhibit 150 --

22  Section 118-25 subdivision C, paragraph four of the Village

23  code states that -- and Chapter 118 is the chapter that deals

24  with the subdivision of land.

25          And that section states that any lot created by

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1              Ulman - redirect

1  subdivision by the planning board of the Village of Pomona

2  would be subject to the net lot area requirement, which is the

3  reduction for steep slopes, percentage reduction for steep

4  slopes, wetlands, flood plains, utility easements, etc., so

5  that single-family lots that are created by subdivision are

6  also subject to net lot area, not only houses of worship and

7  schools.

8  Q.  Mr. Stepanovich showed you Exhibit 106.

9  A.  Which one is that?

10 Q.  It's the April 25, 2007 letter from Mr. Savad.

11 A.  Yes.

12 Q.  And you see the persons to whom it is addressed?

13 A.  I beg your pardon?

14 Q.  To whom is that letter addressed?

15 A.  That's addressed to the -- each member of the Board of

16 Trustees.

17 Q.  Am I correct it's not addressed to any members of the

18 planning board?

19 A.  That's correct.

20 Q.  And to your knowledge, did Mr. Savad ever request to meet

21 with any members of the planning board on behalf of Tartikov?

22 A.  Not to my knowledge.

23 Q.  Now, you may recall from yesterday there were some

24 questions from Mr. Stepanovich regarding the Adult Student

25 Housing Laws in Ramapo?

170525tartikovT1            Ulman - redirect

1   A.  Yes.

2   Q.  And the Village opposed those laws; am I correct?

3   A.  Yes.

4   Q.  And there was some discussion of Patrick Farm in that

5   regard?

6   A.  Yes.  The Adult Student Housing Law as adopted by the Town

7   of Ramapo identified four properties within unincorporated

8   Ramapo that would be eligible for the Adult Student Housing

9   Law.  One of those properties was Patrick Farm, which is across

10  the street and next to the boundary of the Village.  The Adult

11  Student Housing Law permitted high-density housing of 16 units

12  per acre for as many as 12 acres of property, which, next to a

13  single-family residential zone, would just be very detrimental

14  to the surrounding community.

15  Q.  The -- am I correct that the Adult Student Housing Law for

16  schools provided that 90 percent of the property could be used

17  for multifamily housing?

18  A.  Yes.

19  Q.  And the Village was in opposition to this?

20  A.  Yes.

21  Q.  And why was that?

22  A.  Because the law is really a multifamily housing law, not an

23  a law for schools.  The town board -- the town also has a

24  separate law that defines educational institutions and permits

25  them to have dormitories.  The dormitories definition in the

170525tartikovT1          Ulman - redirect

1   town code was not repealed when they adopted adult student

2   housing.

3          So that what they did was to create a specific law for

4   four properties that was a multifamily housing zone and

5   permitted 90 -- as you stated, 90 percent of the property to be

6   used for 16 units per acre and ten percent to be in the nature

7   of a study hall.  They did not -- they could not have

8   anticipated a full-fledged educational institution to operate

9   on ten percent of land.

10  Q.  Was it eight units per acre or 16?

11  A.  Adult student housing is 16.

12  Q.  Okay.

13  A.  The MR8 zone is 8, but the adult student housing is 16.

14  Q.  Now, am I correct that Ramapo is the only municipality in

15  New York state that has this 90 percent provision?

16  A.  To my knowledge, yes.

17  Q.  Now, Mr. Stepanovich showed you yesterday Plaintiffs'

18  Exhibit 156, which was the October 2004 petition in which the

19  Village of Pomona was one of the petitioners.

20  A.  I can't hear you.

21  Q.  Mr. Stepanovich showed you Plaintiffs' 156, which was the

22  October 2004 petition regarding the Adult Student Housing Laws;

23  do you recall that?

24  A.  Yes, the Article 78 proceeding.

25  Q.  Correct.

170525tartikovT1          Ulman - redirect

1  A.  Yes.

2  Q.  Now, that -- that petition was filed after Tartikov

3  purchased the property in August 2004, correct, just in terms

4  of timing?

5  A.  Um --

6  Q.  That was filed in October?

7  A.  I believe so.

8  Q.  Okay.  And the property was purchased, we can agree, in

9  August --

10  A.  We were not aware of it in October --

11  Q.  Has it been established at trial your understanding that

12  the Tartikov purchased the property in August 2004?

13  A.  That's -- yes, we have documents that state that.

14  Q.  And the petition which was Plaintiffs' Exhibit 156 was

15  dated October of 2004?

16  A.  Yes.

17  Q.  And am I correct that the first time anyone at the Village

18  in terms of the Village officials knew that Tartikov had

19  purchased the property was in November of 2004?

20  A.  That was the first time that the Village learned of it,

21  yes.

22  Q.  Now, there was some testimony yesterday by Mr. Stepanovich

23  or actually, I should say, some questions and some testimony by

24  you regarding the accreditation provision in Local Law 5 of

25  2004; do you recall that?

170525tartikovT1            Ulman - redirect

1   A.   Yes.

2   Q.   And you provided some testimony as to the special status

3   and you talked about the case law in that regard?

4   A.   Yes.

5   Q.   Can you explain for the Court why, when you drafted this

6   law, you used the term accreditation?

7   A.   Because Pomona is a community of single-family residences

8   and low-density housing, any use that is -- impacts on that, we

9   tried to minimize.

10       Because we are required by law to permit educational

11  institutions and houses of worship in single-family zoning

12  districts, the intent of the law was to minimize the impact of

13  a nonresidential use on the surrounding community, wherever it

14  may be.

15       To my mind, accreditation would limit the use by

16  colleges and universities to those that are accredited.  I had

17  worked for several years for Rockland Community College.  I

18  knew that they were subject to accreditation by an agency

19  called Middle States.  I checked the Education Law, which I

20  think it's Section 224, which states that you cannot call

21  yourself a college or university unless you issue degrees that

22  are approved by the state or by some other accrediting agency.

23  And to my mind, that word accreditation would limit the type of

24  educational use to those that are governed by the special

25  status requirement.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1            Ulman - redirect

1          I think I've used in my deposition and on many

2    occasions, we were trying to exclude commercial-type training

3    schools, if you will, that are not governed by the *Bagnardi*

4    decision, such as automotive schools, driving schools, those

5    types of things which belong in commercial districts, not in

6    R40 residential districts.

7    Q.  Now, just changing topics to SEQRA, there was some

8    questioning this morning on SEQRA.  Am I correct that SEQRA

9    only permits mitigation of substantial environmental impacts?

10   A.  Yes.

11   Q.  And you had some discussion this morning about Type I and

12   Type II findings and actions?

13   A.  Yes, and Unlisted actions.  There are three types.  Type I,

14   Type II and Unlisted.

15   Q.  And am I correct, the Board of Trustees can't go beyond the

16   standard -- in the context of SEQRA and in the context of

17   before a SEQRA situation, that the board cannot go beyond the

18   standard set forth in its laws?

19   A.  Yes.

20   Q.  Am I correct that while the special permit process can

21   mitigate, it cannot change the impacts in the absence of laws?

22   A.  That's correct.

23   Q.  And the Village cannot control the size of something unless

24   there's a law that addresses the size?

25   A.  Absolutely.  As I said, SEQRA is a tool.  You can't use the

170525tartikovT1            Ulman - redirect

1    tool to change the law.  In order to act, the board or the

2    governing body must comply with the statute.  Whatever is in

3    the law is what we must comply with.

4    Q.  There were some questions yesterday about the Tartikov

5    property and whether it had the ability to be subdivided.  Do

6    you recall those questions?

7    A.  With reference to subdivision?

8    Q.  Yeah.  I think -- am I correct that you testified that the

9    Tartikov property could be subdivided?

10   A.  Oh, yes.

11   Q.  And single-family homes could be built?

12   A.  Yes.

13   Q.  And families could live in those homes, correct?

14   A.  And what?

15   Q.  And families could live in those homes?

16   A.  Sure.

17   Q.  To your knowledge, though, Tartikov has not made any such

18   application for a subdivision?

19   A.  No.

20   Q.  There was some testimony and questions yesterday regarding

21   lack of studies performed by the Village in connection with

22   some of the laws; do you recall that?

23   A.  Yes.

24   Q.  What is the Village's budget or how much of the Village's

25   budget is allocated for studies?

170525tartikovT1          Ulman - redirect

1   A.   None, other than whatever has to be done by our planning

2   consultant in connection with applications that come into the

3   planning board.

4   Q.   Does the Village have the use of its planners, its

5   engineers and its Village counsel in order to determine what is

6   needed when drafting and enacting laws?

7   A.   Yes.

8   Q.   In terms of doing studies about schools, can the Village do

9   a study about schools in the Village if there are no schools in

10  the Village?

11  A.   Doing a study about, for example, Local Law 5 of 2004 would

12  be almost impossible, because the dormitory and the school

13  could be built almost anywhere -- well, not almost -- anywhere

14  within the Village where they had the lot size.  And so to

15  determine -- you can't do a study of every single street in the

16  Village to determine what the traffic impact will be on that

17  street if you don't know the placement, the size and the use.

18          So, it would have been even impossible to do a generic

19  study of that type of use because it could happen anywhere in

20  the Village.

21  Q.   Does --

22  A.   That's why we require applicants, when they apply for a

23  project, they have to do the studies and they have to provide

24  the environmental reviews that are required by SEQRA.

25  Q.   You answered my next question, which was --

170525tartikovT1          Ulman - redirect

1    A.   Sorry.

2    Q.   -- in the application process, does the Village ever

3    receive studies, and I believe you just testified that they do.

4    A.   Yes.   There is -- almost all the time.

5    Q.   And it's when those studies are received that the analysis

6    is performed; am I correct?

7    A.   Yes.

8    Q.   There was some testimony yesterday regarding Local Law 5 of

9    2004.   And you were shown an exhibit and you testified that

10   there was a hearing on that law on September 27 of 2004; do you

11   recall?

12   A.   Yes, I do.

13   Q.   And this hearing obviously was held after Tartikov had

14   bought the property?

15   A.   Yes.

16   Q.   And am I correct that it occurred before either you or any

17   of the Village officials knew that Tartikov had bought the

18   property?

19   A.   Yes.

20   Q.   And am I correct that no one representing Tartikov spoke up

21   at that hearing?

22   A.   My recollection is that -- you're correct, nobody from

23   Tartikov -- I think there was one speaker and she was just a

24   resident.

25   Q.   Am I correct that if Local Law 2005 -- I'm sorry -- if

                   SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                                   (914)390-4053

170525tartikovT1            Ulman - redirect

1   Local Law 5 of 2004 had not been enacted that schools would not

2   have been allowed to have dormitories?

3   A.  That's correct.

4   Q.  It would not have been allowed to house their students?

5   A.  That's correct.

6   Q.  And am I correct that one of the reasons that you had for

7   writing and pushing for the enactment of this law was that you

8   thought that if Yeshiva Spring Valley came back, that you

9   wanted to be able to provide them with dormitories?

10  A.  Yes, because most of the -- many of the yeshivas in the

11  Town of Ramapo did have dormitories.  And so my -- one of my

12  concerns was that if they came back and they did want a

13  dormitory and we had no provision for it, the entire law

14  concerning the educational institutions would have been thrown

15  out by the courts.

16  Q.  So you wanted obviously Yeshiva Spring Valley to have this

17  benefit, correct?

18  A.  Yes.

19  Q.  Am I also correct that you also helped Yeshiva Spring

20  Valley out in that when their application for a 25-lot

21  subdivision or 26 lots, 25 being for single-family homes and

22  one for Yeshiva, when that application kind of stopped moving,

23  you encouraged them to withdraw it so they could have a tax

24  exemption?

25  A.  Yes, because without the school use -- by having the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1          Ulman - redirect

1   subdivision as the primary use of the property, at that point,

2   they had not presented any special permit applications or any

3   site plan with respect to the lot that was to be used for the

4   school, none of that had been proposed; and so it was just a --

5   an application for a 26-lot subdivision, which is not a

6   religious use, and therefore, the tax exempt status was denied.

7   And in order to restore it, I urged them to withdraw that

8   application.

9   Q.   Switching topics, you recall there was a document that

10  Mr. Stepanovich showed you, which was Plaintiffs' 142, in which

11  Mr. Healey from Frederick Clark said that the law, quote,

12  "really stinks;" do you recall?

13  A.   Yes.

14  Q.   Am I correct that the reason was that the existing law was

15  too permissive?

16  A.   Yes.   The existing law did not have provision for adequate

17  setbacks for lot area, minimum lot area requirement; it had no

18  provision for parking on-site, which you really need with an

19  educational institution; and it had no provision, as I recall,

20  for impervious surface.

21  Q.   Can you please -- you may have it with you, Mr. Stepanovich

22  had showed you Plaintiff Exhibit 130.

23  A.   130?

24  Q.   It's a letter from Frederick Clark.

25  A.   A letter from?

170525tartikovT1              Ulman - redirect

1    Q.  Frederick P. Clark.

2    A.  The memo?

3    Q.  The memo.  Yes.

4    A.  Yes.  I had that yesterday.

5    Q.  Just let me know when you have it.

6    A.  Yep.  Got it, way at the bottom of the pile.

7    Q.  Ms. Ulman, I direct your attention to the second-to-last

8    line on the first page.

9    A.  Is it the January 24?

10   Q.  Actually, it's a multipage document, but the first page of

11   text is page 3, and it's a January 14, 2000 memo from Clark.

12   A.  No.  I have January 24.

13   Q.  This is January 14, Exhibit 130.

14   A.  That's one to the planning board, right?

15   Q.  Yes.  Is it not there?  We can get you a copy.

16   A.  I don't see it, but I remember it to a large extent.

17           MR. PELOSO:  Can I approach, your Honor.

18           THE COURT:  Yes.

19   A.  Yes.

20   Q.  Ms. Ulman, if you'd direct your attention to page 3, which

21   is really the first full page of text.  You see the

22   second-to-last line in the memo.  Am I correct that Mr. -- the

23   author of the memo I believe was Mr. Healey, or maybe it was

24   coauthored -- yes -- see, he points out the insufficiency of

25   the current standards?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1            Ulman - redirect

1    A.  I'm sorry?

2    Q.  You see that Mr. Healey, in the bottom of page 1, he points

3    out the insufficiency of the current standards in the laws?

4    Page 1 of the memo, second-to-last line.

5    A.  Yes.  I'm sorry.

6    Q.  And am I correct that on page 2, he points out suggestions

7    that Clark or he was making which you've just testified to

8    earlier?

9    A.  Yes.

10   Q.  Did the Village take serious consideration of Mr. Healey's

11   recommendation?

12   A.  They did.  In fact, they -- he sent a similar memo to the

13   Board of Trustees, and they retained him at a fee to research

14   and prepare a -- recommend a draft local law to the Board of

15   Trustees, and he did that in May of 2000.  And my review of

16   Local Law 1 of 2001 indicates that they adopted just about

17   every recommendation that he made.

18   Q.  So the Village updated its laws based on the

19   recommendations made?

20   A.  They did.

21   Q.  And would you agree that that's something that's

22   appropriate for a village to do?

23   A.  Absolutely.

24   Q.  It doesn't benefit the Village residents to have laws that

25   are outdated?

170525tartikovT1          Ulman - redirect

1   A.  No, it is not a benefit.

2   Q.  It does not benefit applicants to have laws that are

3   outdated?

4   A.  No, it does not.

5   Q.  You were asked some questions by Mr. Stepanovich yesterday

6   about libraries in the Village; do you recall?

7   A.  Yes.

8   Q.  Would you agree with me that libraries normally do not

9   include living facilities?

10  A.  Yes.

11  Q.  They usually do not include dining halls?

12  A.  That's correct.

13  Q.  Do you consider libraries to be a less intense use than

14  schools?

15  A.  That's correct.

16  Q.  And there were some questions and testimony regarding

17  museums; do you recall?

18  A.  Yes.

19  Q.  And am I correct that in your opinion museums normally do

20  not include living facilities?

21  A.  That's correct, and the law does not provide for them.

22  Q.  And they don't include dining facilities?

23  A.  That's correct.

24  Q.  And is it your opinion that museums are a less intense use

25  than schools?

170525tartikovT1              Ulman - redirect

1    A.  Oh, yes.

2    Q.  Now, again, switching topics, there were some questions and

3    answers yesterday regarding zone changes and text amendments

4    and things of that nature; do you recall that?

5    A.  I do.

6    Q.  Am I correct that Tartikov can apply for a zone change for

7    an unaccredited college?

8    A.  Yes.

9    Q.  And did they ever do that?

10   A.  No.

11   Q.  And am I correct that Tartikov could apply for a text

12   amendment to make the accreditation language in the current law

13   more inclusive?

14   A.  Yes.

15   Q.  Did they ever do that?

16   A.  No.

17          MR. PELOSO:  One moment, your Honor.

18          THE COURT:  Sure.

19          MR. PELOSO:  Subject to any further questions by

20   opposing counsel, I have nothing further.

21          THE COURT:  That's your cue.

22          MR. STEPANOVICH:  Yes.

23          THE COURT:  I know.

24          MR. STEPANOVICH:  I understand.  I'm sorry.

25   RECROSS EXAMINATION

170525tartikovT1          Ulman - recross

1   BY MR. STEPANOVICH:

2   Q.  Ms. Ulman, you testified about the action that was filed by

3   the Village of Pomona and some other villages against the Town

4   of Ramapo.  And I think you testified that that action was

5   filed after Tartikov purchased the property sometime in October

6   of 2004; is that correct?

7   A.  Yes.  That was the question that was put to me.  I did not

8   look at the document.

9   Q.  Okay.

10  A.  But that's my recollection.

11  Q.  Okay.

12          MR. STEPANOVICH:  May I approach, your Honor.

13          THE COURT:  Yes.

14  Q.  My question, first, Ms. Ulman, is, do you know when the

15  board authorized the action that was filed in October 2004?

16  A.  I don't remember specifically.  It was sometime I think

17  during the summer.

18  Q.  I've handed you, for purposes of identification, Plaintiff

19  Exhibit 466 for the purpose of refreshing your recollection as

20  to when the board authorized the filing of that lawsuit.  And

21  to save time, if I can direct you to page 7 of that document,

22  that might help.

23  A.  Yes.

24  Q.  Okay.  So now, Ms. Ulman, let me ask you the question

25  again.  Do you now -- is your recollection refreshed as to when

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1          Ulman - recross

1   the board authorized the filing of the lawsuit against Ramapo

2   which was filed in October of 2004?

3   A.   The board retained outside counsel.

4   Q.   When?

5   A.   June 14, 2004 --

6   Q.   Okay.

7   A.   -- for the specific purpose of bringing that lawsuit.

8          MR. STEPANOVICH:  May I approach, your Honor.

9          THE COURT:  Yes.

10  Q.   I've handed you what's been marked for identification as

11  Plaintiffs' 155 and ask if you can identify that document.

12  A.   This is an Article 78 proceeding consisting of a notice of

13  petition and petition in the matter of the Village of Airmont

14  and seven villages against the Town of Ramapo.  This was, I

15  believe, the comprehensive plan against the comprehensive plan.

16         MR. STEPANOVICH:  Your Honor, the Plaintiffs move into

17  evidence 155.

18         MR. PELOSO:  No objection.

19         THE COURT:  155 received.

20         (Plaintiffs' Exhibit 155 received in evidence)

21  A.   Yes.  This was the comprehensive plan.

22  Q.   And this complaint was filed in I believe May of 2004; do

23  you agree with that?

24  A.   I don't know.  It was in 2004.  The verification was

25  May 27, 2004.

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                             (914)390-4053

170525tartikovT1          Ulman - recross

1   Q.  Now, you testified questioning about -- from Mr. Peloso

2   that the board was not aware of Tartikov until what?  Sometime

3   in August of '04 when you received --

4   A.  November.

5   Q.  November of '04, but according --

6          MR. PELOSO:  I'm going to object.  I think

7   the testimony wasn't "wasn't aware that Tartikov had bought the

8   property," not Tartikov as Tartikov --

9          MR. STEPANOVICH:  I stand corrected.  The record will

10  reflect Ms. Ulman's testimony.

11          THE COURT:  Yes.

12  Q.  Ms. Ulman, but in this lawsuit that you have in front of

13  you where the Village of Pomona was a plaintiff against the

14  Town of Ramapo, if I turn your attention to page 6 --

15  A.  Of the petition?

16  Q.  Yes, ma'am.

17  A.  Yes.

18  Q.  Paragraph 31, but the Village was aware, as what is alleged

19  here in 31, beginning in the 1990s, the town has attracted a

20  burgeoning Hasidic community, which has, for the most part,

21  settled around the central hub of Monsey and areas to the east

22  of Monsey, correct?

23  A.  That's what it says.

24  Q.  And this was a complaint that was filed on behalf of the

25  Village of Pomona, along with other villages; isn't that

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                           (914)390-4053

170525tartikovT1              Ulman - recross

1   correct?

2   A.  Yes, but I didn't -- again, I did not draft it.

3   Q.  I understand.  But this -- the Village of Pomona is a

4   plaintiff in this lawsuit?

5   A.  Absolutely correct.

6   Q.  Thank you.  Okay.  You testified on questioning from

7   Mr. Peloso regarding the adult student housing in Ramapo and I

8   think you made a reference, and I'll give you an opportunity to

9   explain about ten percent being used for educational use.

10  A.  Yes.

11  Q.  And you seem to state that that amount was an unusually low

12  amount for educational use.

13  A.  Yes.

14  Q.  Have you ever been in a religious school where students are

15  studying, an Orthodox Hasidic religious school?  Have you ever

16  been in one?

17  A.  No, but my experience has been in dealing with the

18  construction of houses of worship.  Generally -- that type of

19  facility, the so-called study hall where the people study in

20  small groups is generally accessory to a house of worship.  I

21  have never seen it as accessory to a school because, by its

22  nature, an accessory use is subordinate to the major use.  And

23  where you have housing that takes up 90 percent of a lot, it

24  can't possibly be accessory to an educational use that is only

25  taking up ten percent of the lot.  It just doesn't make sense.

170525tartikovT1              Ulman - recross

1   Q.  I understand, but you answered a question that I didn't

2   ask.  The question is this, Ms. Ulman.  It has nothing to do

3   with accessory use, principal use.  The question has to do with

4   the size of the study hall.

5           And so have you ever been in a study hall that has

6   been used for study of the Torah, rabbinical studies?  Have you

7   ever been in one of those facilities?

8   A.  Only with respect to houses of worship.  Not with respect

9   to educational institutions.

10  Q.  So you've never been in, for the lack of a better term, the

11  study hall; is that correct?

12  A.  As it relates to an educational institution, yes.

13  Q.  Okay.

14  A.  But, again, study halls are also used by -- are primarily

15  used, in my opinion, by houses of worship, and they are

16  accessory uses to the house of worship.

17  Q.  Ms. Ulman, you testified I think about Rockland Community

18  College.  You had some knowledge of Rockland Community College?

19  A.  I had worked for the president for a couple of years.

20  Q.  So is Rockland Community College with dorms, is that a use

21  that fits within the Village of Pomona?

22  A.  Rockland Community College would be considered a public

23  institution, and you cannot zone for public ins- -- for public

24  schools.

25  Q.  Besides the nature of it being a public institution, I'm

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1            Ulman - recross

1   really more concerned about the --

2   A.   They don't have a dormitory on site.  I was using Rockland

3   Community College as an explanation for my knowledge of the

4   word accreditation.  It had nothing to do with the dormitories.

5   Q.   But if Rockland County -- hypothetically, if you can answer

6   this, if Rockland County Community College had dormitories,

7   would that institution fit within the Village of Pomona?

8   A.   Yes.

9   Q.   And if Rockland County had housing and those dormitories

10  would be for single-families, if Rockland County Community

11  College had housing that would accommodate families, would that

12  use fit within the Village of Pomona?

13  A.   If they fit within the dormitory -- assuming now it's a

14  private, not a public institution, and if it fit within our --

15  the definition of dormitory, yes.

16  Q.   Okay.  Now, you mentioned Mr. Healey's memo and you have

17  them in front of you.  Mr. Healey worked for F.P. Clark,

18  correct?

19  A.   That's correct.

20  Q.   And the Village of Pomona hired F.P. Clark to help it as a

21  consultant, correct?

22  A.   Yes.

23  Q.   Now, you had been in this business a long time?

24  A.   Yes.

25  Q.   And consultants offer their opinions to the Village, right?

170525tartikovT1              Ulman - recross

1   A.  Yes.

2   Q.  And the Village doesn't always have to take the advice of

3   the consultants, does it?

4   A.  No.

5   Q.  Now, are you aware, Ms. Ulman, in your work with the

6   Village what, if any, consideration has the Village given to

7   the housing needs beyond the Village?

8   A.  The housing --

9            MR. PELOSO:  Beyond the scope.  Objection.

10            THE WITNESS:  I didn't hear the second part of that.

11            THE COURT:  Hang on.  We have an objection.

12            MR. STEPANOVICH:  I believe that Ms. Ulman had

13   testified that the Village had considered this kind of housing,

14   and I thought it was -- the door was opened on Mr. Peloso's

15   questioning.

16            MR. PELOSO:  I don't recall that answer, your Honor.

17            THE COURT:  Why don't you try a different approach.

18            MR. STEPANOVICH:  Okay.

19   Q.  Ms. Ulman, the -- I'll come back to it.  Let me come back

20   to it.

21            Turning to page 77 of your affidavit, Ms. Ulman.

22            THE COURT:  Page or paragraph?

23   Q.  I mean paragraph 77.

24   A.  Yes.

25   Q.  Now, you say that unless there's a zoning provision that

170525tartikovT1            Ulman - recross

1    limits the size of the development such as a dormitory, the

2    Village would have no ability to limit the size of such

3    development in the review process; is that right?

4    A.  Yes.

5    Q.  And if you could please refer to Exhibit 150, Section

6    130-28.

7    A.  Yes.  28?

8    Q.  Yes, ma'am.  And E6, E6.

9    A.  Yes.  I'm sorry.

10   Q.  Okay.  That's fine.  And if you -- if you're there, I have

11   a couple of questions --

12   A.  I'm here.

13   Q.  Okay.  Now, according to 130-28E6, the permitting board has

14   the ability to attach conditions and safeguards to any special

15   permit to ensure that its standards and requirements are met;

16   isn't that correct?

17   A.  Yes.

18   Q.  And that would include the location and size of the special

19   permit use; correct?

20   A.  Generally size and location are not conditions.  When you

21   impose a condition, it would be -- the applicant is proposing

22   the size of the project and the location of the building.  The

23   board would, assuming they're going to approve it, they could

24   approve it with conditions, for example, that the landscaping

25   be maintained in its present condition for the next 100 years,

170525tartikovT1          Ulman - recross

1   that certain drainage swales or detention basins be maintained

2   and located at a certain place.

3           A condition cannot be -- have to be -- again, I'll use

4   the word accessory to the main project.  It's not the project

5   itself.

6   Q.  If we could go, then, Ms. Ulman, directly to the statute

7   6A, and that's on page 1327.

8   A.  Yes, I have it.

9   Q.  You see it?  I don't want to read the statute.  We can all

10  do that, but isn't it -- don't you agree with me that the

11  statute is very clear that the permitting board is able to

12  attach conditions and safeguards in its opinion regarding the

13  location and size of the special permit use; isn't that right

14  there in the statute?

15  A.  That's not a condition.

16  Q.  Okay.

17  A.  These A, B and C, these are for the applicant to propose on

18  his plan.  It is not a condition that's attached to an

19  approval.  You can't approve a special permit in general.  It's

20  got to be for a specific plan that includes these requirements.

21  Q.  Okay, Ms. Ulman, we will move on.  If you could turn to the

22  same Exhibit 150, Section 119-D.

23  A.  119?

24  Q.  D.

25  A.  119 dash --

170525tartikovT1          Ulman - recross

1   Q.  119-D, dash D.  119-5D, 119-5D.  My fault.

2   A.  Yes.

3   Q.  And, again, without reading the statute, wouldn't you agree

4   with me, Ms. Ulman, that in reviewing a site plan, the planning

5   board shall not approve the plan unless it conforms to the

6   requirements of this chapter and the planning board shall set

7   appropriate conditions and safeguards that deal with the

8   height, location and size of the building as set forth in

9   paragraph nine?

10          Isn't that what the code says?

11  A.  I'm sorry.  Would you repeat that.

12  Q.  It would be subsection C of 119 --

13  A.  Yes.  I have it.

14  Q.  Okay.  119D9, my fault.  119D9?

15  A.  9?

16  Q.  Yes, ma'am.

17  A.  Yes.

18  Q.  So wouldn't you agree with me that the code itself sets

19  forth, your code -- not your code, I'm sorry -- Pomona's code

20  sets forth the ability of the planning board to set conditions

21  in building design that deals with the height, location and

22  size of the proposed buildings; you agree with me?

23  A.  Within -- it says within the -- within the requirements of

24  this chapter.  It's referring to the height requirements that

25  are in the zoning law.

170525tartikovT1            Ulman - recross

1              Planning board does not have authority to vary the

2    zoning law.  It has much less authority, for example, than a

3    zoning board.  They -- planning board jurisdiction is very

4    limited, as you can tell by the Chapter 7 of the New York State

5    Village Law.

6    Q.  Now, Ms. Ulman, coming back to SEQRA, SEQRA requires an

7    agency to minimize environmental impacts to the maximum extent

8    possible, correct?

9    A.  That's correct.

10   Q.  And couldn't a board who is entertaining a land use

11   application condition approval on reducing the magnitude of a

12   project in order to minimize environmental impacts?  In other

13   words -- let me ask it a better way.

14              Couldn't a board then entertain a land use application

15   that deals with those environmental impacts?

16   A.  With what environmental impact?  With all environmental

17   impacts.  Yes, when a board entertains an application, it

18   must -- regardless of what the board is, it must, by law,

19   entertain and address any substantial environmental impacts.

20   Q.  And that board can condition approval based on the

21   reduction of magnitude -- of minimizing those impacts, correct?

22   A.  Correct, but a board cannot vary the law.

23   Q.  Ms. Ulman, you testified about subdivision code 118-25, and

24   I think you said that -- you testified --

25   A.  C4.

170525tartikovT1              Ulman - recross

1    Q.  C3 and 4, I think?

2    A.  Not 3, 4.

3    Q.  4.

4    A.  I think 4 is the one that deals with the reduction for

5    steep slopes and wetlands.  I just reviewed it last night.

6    Q.  Does that section apply to libraries?

7    A.  It would apply to any subdivision.

8    Q.  Does it --

9    A.  If you're subdividing a lot, it's not for a specific

10   purpose.  It's a -- just a subdivision of land.  And in Pomona,

11   the only reason for a subdivision is for -- the only thing

12   that's permitted to be subdivided is for single-family lots of

13   a minimum of 40,000 square feet.

14         And what I was trying to say was, in determining that

15   40000-square-foot minimum lot size, you must deduct -- in order

16   to get to 40, you've got to deduct whatever is on the land for

17   wetlands and steep slopes.  The same -- it's basically the same

18   language that's used in the educational institution, I think

19   it's F-2 of Local Law 1 of 2001.

20   Q.  Okay.  But my question is, that section would not apply to

21   putting a library on a specific lot, would it?

22   A.  It only applies to the subdivision of land.  And it only --

23   and as I said, it would primarily apply to single-family

24   residential lots.

25   Q.  When you said -- I'm just -- just confused just a bit.

170525tartikovT1          Ulman - recross

1   "Primarily."  Either it only applies to subdivision lots with

2   residential uses or it primarily applies to it.  I'm trying to

3   be clear.

4   A.  Well, if somebody wants a subdivision, instead of a

5   40000-square-foot lot, if they want 80,000, that's why I said

6   "primarily" because in most cases, people are going to ask for

7   the minimum they can get, which is 40,000; but if they want a

8   larger lot, they might want to subdivision into two 80,000-foot

9   lots.

10  Q.  If they wanted to build a library, would this subdivision

11  code 118-25 apply?

12  A.  It only applies to subdivisions.

13  Q.  Okay.  Subdivisions for residential use?

14  A.  For any use.

15  Q.  Now, Ms. Ulman --

16         MR. STEPANOVICH:  I'm circling back, your Honor.

17         THE COURT:  That was an interesting introduction.

18         MR. STEPANOVICH:  I'm sorry.  I'm circling back as to

19  the housing.  And I believe Ms. Ulman testified about the type

20  of housing that the Village wanted in their jurisdiction.  So,

21  this regards my prior question where the objection was

22  sustained, so I'm rephrasing.

23         THE COURT:  I guess Judge Sand used to have a rule

24  that on 're' anything, you had to identify the question that

25  triggers your question, and so I just don't remember there

170525tartikovT1          Ulman - recross

1   being a question on this from Mr. Peloso.

2            MR. STEPANOVICH:  I'm identifying the answer --

3            THE COURT:  Well, I don't really understand the

4   difference, but go ahead.

5   Q.  You testified about the type of housing that the Village

6   wanted in their jurisdiction, correct?

7   A.  Not the type of housing.  The low residential, low-density

8   nature of the Village.

9   Q.  So in considering the low-density nature of the Village,

10  did the Village consider the regional housing needs in

11  maintaining its exclusive R40 zoning?

12           MR. PELOSO:  Objection on the same basis.

13           THE COURT:  I'll let this one question be asked.

14           Go ahead.

15  A.  The regional nature?

16  Q.  Yes, ma'am.

17  A.  I don't understand the question except -- unless you're

18  asking me if the Village feels its required to comply with the

19  regional requirements; is that what you're getting at?

20           MR. STEPANOVICH:  Can I respond to that question?

21           THE COURT:  Yes.

22  Q.  Ms. Ulman, you, being the Village attorney, are familiar

23  with the *Berenson* requirements for regional housing?

24  A.  That's what I thought you were getting at.

25  Q.  Yes.  That's what I'm referring to.

170525tartikovT1            Ulman - recross

1    A.   Yes.

2    Q.   Okay.  In that regard, did the Village consider these

3    regional housing needs in maintaining its R40 zoning?

4    A.   The Village is surrounded by -- outside of its boundaries,

5    it is surrounded by commercial areas, mobile homes, and various

6    other types.  Within walking distance, there are condominiums

7    and multifamily residences.  So it's always been the Village's

8    position that the region is that area and that we are in

9    compliance with the regional requirements of housing; yes.

10   Q.   So I think your answer to my question, then, was yes based

11   on the explanation that you've just set forth?

12   A.   That's correct.

13   Q.   And that has always been the position of the Village as far

14   as you know; is that correct?

15   A.   Yes, that's why we believe we can maintain the low-density,

16   which I would add also the both regional plans, the county

17   master plan, as well as the Town of Ramapo and Town of

18   Haverstraw Master Comprehensive Plans have within their goals

19   and objectives that the area of -- where Pomona is situated is

20   the low density area.

21        The town comprehensive plan is based upon a

22   centralized commercial and transportation hub along the Route

23   59 area, and as you get out of that center close to where

24   Spring Valley is, the density of housing gets less and less.

25        Pomona is at the very northeast corner of the Town of

170525tartikovT1          Ulman - recross

1   Ramapo, and when you get out to that region, the density of

2   housing, both in the Town of Ramapo and in the Village of

3   Pomona, is R40 for low-density residential use, and that's

4   carried forward, as I said, in the county master plan, I don't

5   think they call it a master plan, I think they call it a

6   residential plan of some kind -- or land use plan, and in the

7   Town of Haverstraw and the Town of Ramapo, as well.

8   Q.  And the final question, your Honor, if I may, final

9   question, and in the Village of Pomona's Master Plan, correct?

10  A.  Yes.

11          MR. STEPANOVICH:  Okay.  That's it.  I have nothing

12  further.

13          Thank you, your Honor, for your indulgence.

14          THE COURT:  No problem.

15          MR. PELOSO:  No questions.

16          THE COURT:  Ms. Ulman, you are excused.

17          THE WITNESS:  Should I take them, leave them?

18          THE COURT:  Counsel, you want to come sort out your

19  stuff?

20          (Witness excused)

21          THE COURT:  We'll let them do it.

22          Who's up next?

23          MS. NAPP:  The defendants call Professor Green back to

24  the stand.

25          THE COURT:  Come on up, Professor.

170525tartikovT1          Green - cross

1          MS. NAPP:  Okay.

2          THE COURT:  Good morning.  Welcome back.  I remind you

3  you're still under oath.

4          THE WITNESS:  Thank you.

5          MS. NAPP:  We received no objections to Professor

6  Green's declaration, so we move to have it in evidence.  No

7  idea what number we're on.

8          MS. SOBEL:  No objection.

9          THE COURT:  Well, it's number -- let's come up with

10  one.

11          MS. NAPP:  I'm sorry?

12          THE COURT:  Let's come up with one.

13          MR. PELOSO:  Defendants' 4000.

14          THE COURT:  You want to do 2001?

15          MR. PELOSO:  We had 2000.

16          MS. NAPP:  So 2001, yes.  Thank you, your Honor.

17          THE COURT:  That's received.

18          (Defendants' Exhibit 2001 received in evidence)

19          MS. SOBEL:  Ms. Napp is about to hand you your --

20          MS. NAPP:  May I approach.

21          THE COURT:  Yes.

22   PRESTON GREEN,

23  CROSS-EXAMINATION CONTINUED

24  BY MS. SOBEL:

25  Q.  Good morning, Professor Green.

170525tartikovT1          Green - cross

1   A.  Good morning.

2   Q.  You state in paragraph 14 of your declaration that you

3   examined the zoning ordinances of the villages and towns in

4   Rockland County except for five villages; correct?

5   A.  That is correct.

6   Q.  And there are five towns in Rockland, correct?

7   A.  I believe so, yes.

8   Q.  And 19 villages?

9   A.  Yes.

10  Q.  So that's 24 jurisdictions?

11  A.  That is 24.

12  Q.  And I count in your Table 1 only two towns and no villages

13  in Rockland County; is that correct?

14  A.  Correct.

15  Q.  And you couldn't find the codes of five villages, correct?

16  A.  I could not find the codes of five villages in my research.

17  Correct.

18  Q.  So is it correct to say that at least 16 jurisdictions in

19  Rockland County do not have accreditation requirements?

20  A.  That I can't say.

21  Q.  Well, you said that --

22  A.  I couldn't find -- what I'm saying is I could not find

23  them.

24  Q.  You could not find the codes?

25  A.  Let me back up.  Could you repeat the question.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1              Green - cross

1    Q.  You said there were 24 jurisdictions in Rockland County?

2    A.  That is correct.

3    Q.  You couldn't find the codes for nine of them?

4    A.  That is correct.

5    Q.  I mean, for five of them.

6    A.  Uh-huh.

7    Q.  So that leaves 19?

8    A.  Right.

9    Q.  And you found two towns and no villages in Rockland County?

10   A.  That is correct.  Okay.

11   Q.  You've listed only two towns and no villages?

12   A.  Right.

13   Q.  So those two towns, plus Pomona, out of the 19

14   jurisdictions means that it would be correct to say that at

15   least 16 jurisdictions in Rockland County do not have

16   accreditation requirements, correct?

17   A.  That would be correct; yes.

18   Q.  And you reviewed 500 jurisdictions in New York, correct?

19   A.  Correct.

20   Q.  And you say there were 26 codes that limit educational use

21   to accredited educational institutions; is that correct?

22   A.  Correct.

23   Q.  And there are really only 25 since you count the Village of

24   Scottsville in both Tables 2 and Table 3, correct?

25   A.  That would be correct.

170525tartikovT1              Green - cross

1   Q.  So that means according to you that 475 out of 500

2   jurisdictions do not have such restrictions, correct?

3   A.  That would be correct.

4   Q.  So that's 95 percent of the jurisdictions in New York that

5   do not limit educational uses to accredited institutions?

6             MS. NAPP:  Objection, your Honor.

7             THE COURT:  What's the objection?

8             MS. NAPP:  The basis of the math behind that.

9             THE COURT:  Well, if it's wrong, you're welcome to

10  cover it on cross.

11            MS. NAPP:  He might want to recalculate it.

12            THE COURT:  He strikes me as somebody who can do math

13  in his head, but I'll defer to the good professor.

14            MS. SOBEL:  I'll take change it to approximately 95

15  percent.

16            THE COURT:  Even I can do this math.  I mean, gee.

17  A.  Correct.

18            THE COURT:  Okay.

19  A.  Yes.

20  Q.  You would agree it's relatively rare for zoning codes to

21  have such provisions, correct?

22  A.  I would agree that -- that it is uncommon.

23  Q.  And you reviewed the codes from the eCode360 website; is

24  that correct?

25  A.  That is correct.

170525tartikovT1          Green – cross

1   Q.  You reviewed the laws of the Town/Village of East

2   Rochester?

3   A.  That is correct.

4   Q.  And you list the Town/Village of East Rochester as one of

5   the jurisdictions that limits educational uses to accredited;

6   is that correct?

7   A.  I found the public or private schools accredited by the New

8   York State Board of Education; correct.

9   Q.  You know that the zoning laws of the Town/Village of East

10  Rochester also permit unaccredited specialized trade,

11  professional or business schools?

12  A.  I did not look that up.

13  Q.  So you don't know?

14  A.  I do not know.

15  Q.  But you reviewed the code?

16  A.  I focused on accredited institutions, and I was looking to

17  see where is that term used.  So I was looking at where the

18  term accredited comes up.

19          MS. SOBEL:  May I approach.

20          THE COURT:  Yes.

21  Q.  Professor Green, I handed you a document marked for

22  identification purposes as Green A.

23  A.  Uh-huh.

24  Q.  This is the code from the Town/Village of East Rochester.

25  If you could please turn to 193-56B3.  Does this refresh your

170525tartikovT1              Green - cross

1   recollection that --

2            MS. NAPP:  Objection -- go ahead.

3   Q.  Does this refresh your recollection that specialized --

4   unaccredited specialized trade, professional or business

5   schools are permitted in the Town/Village of East Rochester?

6            MS. NAPP:  I'm going to object.  He didn't say he

7   didn't remember.  He said he didn't look.

8            MS. SOBEL:  He said that he viewed the codes.

9            THE COURT:  Yeah.  He said I don't know, "I do not

10  know."  So, it's not coming in for refreshing recollection.

11           Do you have another theory in which it comes in?

12           MS. SOBEL:  I'm sorry, your Honor.  I didn't hear.

13           THE COURT:  He didn't say I don't remember.  He said I

14  don't know, which is different.

15           So if you have -- do you have another theory to offer

16  this to have Professor Green look at it?

17           MS. SOBEL:  It's being put in to impeach.  If you look

18  at paragraph 16, he says that the zoning ordinance limit

19  educational use for higher education to accredited colleges and

20  universities.  This is the code which shows that accredited --

21  unaccredited schools are also allowed in.

22           THE COURT:  Okay.  So let's see what Ms. Napp has to

23  say.

24           Ms. Napp.

25           MS. NAPP:  Your Honor, I would disagree that that was

170525tartikovT1            Green - cross

1   an impeachable statement, but your Honor will rule as he sees

2   fit.  I don't --

3          THE COURT:  So the objection -- that objection is

4   overruled.  Whether it's impeaching or how much so is for

5   argument, but in terms of its relevance and the purpose for

6   which Ms. Sobel is offering it, I'll let her use the exhibit.

7          MS. NAPP:  Yes, your Honor.

8          THE COURT:  Go ahead.

9   Q.  Professor Green, the Town/Village of East Rochester permits

10  unaccredited specialized trade, professional or business

11  schools, correct?

12  A.  It doesn't mention accredited, so that would be correct,

13  specialized trade schools.

14  Q.  And turning to the next page under E, it also permits

15  unaccredited school or college?

16  A.  Where am I looking now?

17  Q.  Under E4B.

18  A.  That would be correct.

19  Q.  And turning two pages later, under 197-57CB -- 6CB, excuse

20  me, East Rochester also permits unaccredited schools or

21  college?

22  A.  That would be correct.

23  Q.  And you also reviewed the zoning code of the same

24  jurisdictions, and it defines a school or college without

25  putting in anything about accreditation; is that correct?

170525tartikovT1          Green - cross

1   A.  Well, that is correct there.  Wait.  Before -- could you

2   repeat that question, I apologize, before I answer that.

3   Q.  Yes.  East Rochester defines school or college without

4   defining it as unaccredited or accredited?

5   A.  In those terms that you just -- in the terms that we just

6   went over?

7   Q.  Yes.

8   A.  Let me back up for a second, if I may.  As I look, this is,

9   like, Section 193-56, correct?

10  Q.  Correct.

11  A.  Limited commercial and mixed commercial industrial

12  districts.  Where I've identified is residential districts RI70

13  and RI48.

14  Q.  That wasn't the question.  The question is whether the

15  jurisdiction permits accredited?

16  A.  It permits accredited in those -- in that specific section,

17  but not the one that I listed, which is residential.

18  Q.  So the jurisdiction permits unaccredited?

19  A.  It permits unaccredited, but not for residential.

20  Q.  And you've also reviewed the zoning laws of the Town of

21  Hamburg?

22  A.  Indeed, I -- yes.

23  Q.  And you list the Town of Hamburg as one of the

24  jurisdictions that limits educational uses to accredited uses?

25  A.  Yes.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1              Green - cross

1              MS. SOBEL:  Your Honor, may I approach.

2              THE COURT:  Yes.

3    Q.  The Town of Hamburg permits unaccredited colleges and

4    universities, correct?

5    A.  That is correct.

6    Q.  And the Town of Hamburg permits unaccredited art, dance and

7    music schools?  I'm sorry.  Withdrawn.

8              MS. SOBEL:  May I approach.

9              THE COURT:  Yes.

10   Q.  The Town of Hamburg permits unaccredited art, dance and

11   music schools?

12             THE COURT:  What have you shown the witness?  What are

13   we marking that as?

14             MS. SOBEL:  That is for impeachment purposes and

15   identification purposes as Green D.

16             THE COURT:  Okay.

17   A.  Where am I looking?

18             THE COURT:  Hang on.

19             MS. NAPP:  If we can know what that document is other

20   than "Green D."

21             MS. SOBEL:  I've handed him the zoning code from the

22   Town of Hamburg, specifically Chapter 280.

23             THE COURT:  Okay.

24   Q.  Did you want me to draw your attention?

25   A.  Yes.  Please.

              SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914)390-4053

170525tartikovT1              Green - cross

1    Q.  280-60A6.

2    A.  Yes.

3    Q.  You also reviewed the zoning codes of the Town of

4    Johnstown?

5    A.  I did.

6    Q.  And you listed it as one of the jurisdictions that limits

7    educational uses to accredited uses, correct?

8    A.  I did.

9             MS. SOBEL:  May I approach.

10            THE COURT:  Yes.

11            MS. SOBEL:  I've handed Professor Green for

12   impeachment purposes for identification Green E, which is the

13   zoning code of the Town of Johnstown, Chapter 84.

14            THE COURT:  Okay.

15   Q.  Professor Green, the Town of Johnstown permits unaccredited

16   church or other place of worship or religious education; is

17   that correct?

18   A.  To where am I looking?

19   Q.  84-8B2.  It should be on the second page.

20   A.  That is correct.

21   Q.  And you reviewed the zoning laws - I'm going to apologize

22   for my pronunciation in advance - of the Town of Irondequoit,

23   correct?

24   A.  That is correct.

25   Q.  And you listed it as one of the jurisdictions that limits

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170525tartikovT1            Green - cross

1   educational uses to accredited uses; is that correct?

2   A.   That is correct.

3            MS. SOBEL:  May I approach.

4            THE COURT:  Yes.

5   Q.   I've handed Professor Green for impeachment purposes what's

6   been identified as Green F, which is the zoning code of

7   Irondequoit, Appendix A.

8            THE COURT:  Have you given the spelling to Sabrina?

9   Give the spelling.

10           MS. SOBEL:  I-R-O-N-D-E-Q-U-O-I-T.

11  Q.   Professor Green, the zoning laws of Irondequoit permit

12  unaccredited education learning training centers and/or uses;

13  is that correct?  I direct you to --

14           THE COURT:  Hang on.

15  Q.   If you need to be directed to where it is --

16  A.   And this is for tourism and resort development districts,

17  correct, TRR districts?

18  Q.   Yes.  Does it permit unaccredited uses?

19  A.   For TRR districts, it does permit -- it does permit that.

20  Under the provision that I identified, it does not, which is

21  residential districts R4, R5, R6, sea business districts and

22  manufacturing districts.  There are provisions in Irondequoit

23  where they limit the use of -- where they limit the use of

24  educational institutions to accredited institutions.

25  Q.   But the zoning laws of Irondequoit do also permit

170525tartikovT1              Green - cross

1   unaccredited uses in that jurisdiction, correct?

2   A.   As I look at Table 3 -- okay, okay.  I mean -- okay,

3   correct.

4   Q.   Please answer the question.

5   A.   Under your interpretation, the answer --

6   Q.   Please answer the question.  It's a yes or no question.

7   A.   Okay.  Yes.

8   Q.   And you reviewed the zoning of the Town of Westfield; is

9   that correct?

10  A.   Correct.

11  Q.   And you listed the Town of Westfield as one of the

12  jurisdictions that limits educational uses to accredited uses;

13  is that correct?

14  A.   That is actually incorrect because at Table 2, as I look, I

15  have it as New York Administrative Division for Zoning

16  Ordinance provisions that limit educational use to accredited

17  schools, so that has a provision that is limited to accredited

18  schools.  It has a provision that is actually limited.

19  Q.   Limited to accredited schools?

20  A.   Right.  It has -- it has identified a -- it has identified

21  for one of those zoning or zoning areas permitted use and in

22  that one, it's accredited schools.

23  Q.   So you list it as one of the --

24  A.   I list it as one with a provision limited to accredited

25  schools, and I think that distinction is really important.

170525tartikovT1                Green - cross

1          MS. SOBEL:  May I approach.

2          THE COURT:  Yes.

3          MS. SOBEL:  I've handed Professor Green for

4    impeachment purposes, for identification purposes Green G,

5    which is Chapter 185 of the zoning of Westfield, New York.

6          THE COURT:  Okay.

7    Q.  Professor Green, I direct you to the second page, number

8    19.  The zoning law of the Town of Westfield permits

9    unaccredited use for schools in that jurisdiction; correct?

10   A.  For residential agricultural districts.

11   Q.  For --

12   A.  For residential agricultural.

13   Q.  You answered yes?

14   A.  Yes, but not for residential R12 districts, which is what

15   the revision is.

16         MS. NAPP:  Can we get the citation on the document in

17   front of the witness right now?

18         MS. SOBEL:  I'm sorry.  It's zoning Chapter 185.

19         MS. NAPP:  And the provision, please?

20         MS. SOBEL:  24.  Westfield.

21   Q.  Professor Green, you list the Village of Mastic Beach as

22   one of the jurisdictions that limits educational uses to

23   accredited uses, correct?

24   A.  With a zoning ordinance provision, with one zoning

25   ordinance provision that is limited to accredited use.  There

170525tartikovT1          Green - cross

1  is an zoning ordinance provision in Mastic Beach that states

2  that for that area --

3  Q.  Where does it say that in your declaration?

4  A.  I found 26 zoning ordinance provisions that limit

5  educational use.

6  Q.  Which paragraph are you reading from?

7  A.  This is page 3.

8  Q.  Which paragraph?

9  A.  Paragraph 3:  I have found -- page 3, paragraph 15:  I have

10 found 26 zoning ordinance provisions that limited educational

11 use to accredited educational institutions or seven provisions

12 specifically require that institutions of higher education be

13 accredited; 14 provisions limited educational use to public

14 and/or private accredited schools; five zoning ordinance

15 provisions limit such educational use to accredited elementary

16 and secondary schools.  Tables 1, 2 and 3 list the provisions

17 where I found where the term accreditation is mentioned.

18 Q.  So you didn't see whether unaccredited institutions were

19 also permitted in these jurisdictions, correct?

20 A.  What I did was -- what I did was look where -- what I did

21 was look where they would actually mention they would be

22 accredited.  I did not limit it in that case to where they

23 might be unaccredited.  But there were provisions, there were

24 areas where they actually limited a particular area to

25 accredited provisions.

170525tartikovT1            Green - redirect

1   Q.  Thank you, but if you could please answer the question.

2   You didn't see whether unaccredited institutions were also

3   permitted in these jurisdictions?  Yes or no.

4   A.  That would be a no.

5   Q.  So these jurisdictions could also permit unaccredited

6   institutions?

7   A.  Indeed, they could.

8           MS. SOBEL:  No further questions, your Honor.

9           THE COURT:  Okay.

10           Cross?

11   REDIRECT EXAMINATION

12   BY MS. NAPP:

13   Q.  Professor Green, in your review of the laws of the State of

14   New York Zoning Codes, you were only looking at those portions

15   of the code related to residential zones; is that correct?

16   A.  I was looking for places in the code where the term

17   accreditation came up.

18   Q.  Regardless of the zone?

19   A.  Regardless of the zone.

20   Q.  Are you familiar with -- do you know if the Village of

21   Pomona has a commercial zone?

22   A.  I do not.  I did not look.

23   Q.  Do you know if the Village of Pomona has a industrial zone?

24   A.  I do not.

25   Q.  Do you know if the Village of Pomona has a tourism zone?

170525tartikovT1              Green - recross

1    A.  I do not.

2            MS. NAPP:  No further questions, your Honor.

3            THE COURT:  Okay.

4            Hang on.  We just have a couple more questions.

5            THE WITNESS:  Sorry about that.

6    RECROSS EXAMINATION

7    BY MS. SOBEL:

8    Q.  Professor Green, there's nothing in your declaration that

9    says your findings are about residential zones only, correct?

10   A.  That is correct.

11           MS. SOBEL:  No further questions, your Honor.

12           MS. NAPP:  Nothing further.

13           THE COURT:  All right, Professor.  Have a good day.

14           (Witness excused)

15           THE COURT:  Should we take our midday break?  Who do

16   we have left?  We'll take our 15-minute break.

17           (Recess)

18           (Continued on next page)

19

20

21

22

23

24

25

20175pcongt2

 1                          AFTERNOON SESSION

 2                             12:15 p.m.

 3              THE COURT:  Shall we begin the fight on Ms. Beall.

 4              MR. STORZER:  Plaintiffs would like to call Barbara

 5     Beall.

 6              THE COURT:  Okay.

 7              MR. STORZER:  We will deal with the objections first.

 8              THE COURT:  That's what we're going to deal with,

 9     right.

10              MS. NAPP:  May I approach, your Honor?

11              THE COURT:  Yes.  And what are we marking Ms. Beall's

12     affidavit as?

13              MR. STORZER:  I think we're up to 1510.

14              THE COURT:  Okay.

15              Okay, 5, parenthetical, that doesn't need to stay in,

16     right?

17              MR. STORZER:  Pardon me?

18              THE COURT:  Paragraph 5, the objection to

19     parenthetical.

20              MR. STORZER:  No.  We will concede that.

21              THE COURT:  Okay.

22              MS. NAPP:  I believe the next ones are on page 10,

23     your Honor.

24              THE COURT:  Okay.

25              Mr. Storzer, paragraphs 41 to 45.

20175pcongt2

1          MR. STORZER:  Looks like there are two objections to

2     these five paragraphs, your Honor.

3          THE COURT:  Yes.

4          MR. STORZER:  One is that it's outside of the witness'

5     expertise and the second is that they contain new opinions not

6     previously disclosed in her expert disclosures.

7          Taking the second one first, in her expert report

8     submitted March 12th, 2014, Ms. Beall opined specifically

9     responding to the question are there other locations within the

10    Village of Pomona that would permit an educational institution

11    when reducing that lot area by wetlands of such properties.

12    Her opinions included the sentence, "Based on a review of

13    parcel mapping for the Village and lot sizes, it is my opinion

14    that there are no other vacant lots within the Village of

15    Pomona that could support an educational institution besides

16    the subject parcel."  And it goes on.

17         The issue here -- I'm not sure why paragraphs 41

18    through 44 are identified.  That's clearly within the scope of

19    her disclosures.  Paragraph 45 was an issue raised by the

20    defendants on the summary judgment proceedings.  It deals with

21    one specific property in the Village that also falls within

22    this issue.  Ms. Beall looked at this property, calculated the

23    net lot area, and it confirmed her opinion.  Again, it is just

24    an additional fact that was used to support her initial

25    opinion, which was, obviously, disclosed to the defendants.

20175pcongt2

1           THE COURT:  Okay.

2           MS. NAPP:  Your Honor, defendants' position is that,

3    while some of this information is included in Ms. Beall's

4    report, she never performed these net lot area calculations

5    before, and paragraph 45, which references Trial Exhibit 2008,

6    which defendants object to, as well, as undisclosed prior to

7    the time of trial, is definitively new information.

8           MR. STORZER:  The prohibition is not on disclosing —

9    or looking at new facts or supporting a prior disclosed

10   opinion.  The prohibition is on a new or potentially changed

11   opinion.  The opinion is the same opinion here.  There is

12   simply a refinement of that opinion.

13          MS. NAPP:  I don't have anything further, your Honor.

14   We disagree.

15          THE COURT:  So that's as to 45, right, in terms of the

16   scope of her expertise?

17          MR. STORZER:  Well, I believe the objection is 41

18   through 45.

19          THE COURT:  No, but I'm saying that latter point that

20   we just went back and forth on is focused on 45, right?

21          MR. STORZER:  Yes.

22          THE COURT:  But the scope of expertise relates to 41

23   through 45, and you opted to address the second objection

24   first, hoping I would forget about the first objection.

25          MR. STORZER:  Your Honor, Ms. Beall, as is mentioned

20175pcongt2

1    in her qualifications sections, paragraph 6 through —— her

2    qualifications are extensive.

3              THE COURT:  They're extensive.  I agree.

4              MR. STORZER:  At 29, I believe.  She has worked on

5    feasibility alternatives analysis, which involves evaluating

6    many properties within a geographic area for their ability to

7    support development, taking into account particular size and

8    other limitations, including environmental factors.  She has

9    directed GIS analysis, looking at map data, quiring into

10   geographic areas.  If you take all these factors into account,

11   these are well within her scope of many, many years of

12   expertise.  There are specific examples in paragraph 20 of her

13   declaration that talk about her expertise and her experience in

14   this field.  So it's clearly within the scope of her expertise.

15             MS. NAPP:  Your Honor, there's no disagreement from

16   defendants that Ms. Beall is very experienced in the area of

17   wetlands science.  Her credentials are extensive, as

18   Mr. Storzer just mentioned.  But the fact of the matter is she

19   is not a surveyor.  She has never surveyed this property.  And

20   there's a lot that goes into the net lot area calculations, and

21   that is historically the province of a surveyor, which

22   Ms. Beall is not.

23             MR. STORZER:  That's not exactly true, your Honor.

24   This is an analysis using GIS software.  Surveying doesn't

25   take —— isn't part of this analysis.  She uses and directs the

20175pcongt2

1   use of various data that is input into certain programs to

2   create maps from which she performs analysis.  Whoever goes out

3   there and surveys lot lines or corners is irrelevant.  She uses

4   the underlying parcel data that is provided by various

5   government agencies, which she's certainly entitled to do as an

6   expert.  It comes within the scope of her everyday work.  This

7   is, again, something she does.

8           MS. NAPP:  Your Honor, I would agree that she is

9   permitted, as an expert, to rely on other professionals in

10  forming her opinions, but what she is not entitled to do is be

11  a mouthpiece for those other experts; in this case, a surveyor.

12          THE COURT:  Okay.  Anything else on this?

13          MR. STORZER:  No, your Honor.

14          MS. NAPP:  No, your Honor.

15          (Pause)

16          THE COURT:  All right.  So my view is that 45 is in

17  because of Mr. Storzer's point that this is not any kind of

18  change in the opinion or any new facts.  This is just adding to

19  what she's already opined.

20          41 through 44 are out, though, because I do think it's

21  beyond the scope of her expertise.  It is more akin to what a

22  surveyor does than what she does.  And it may very well be that

23  she's going to be more qualified than most non-surveyors to

24  give this opinion, but, nonetheless, this is something that is

25  beyond the scope of her expertise.

20175pcongt2

1          All right, 53.  I don't think we need her opinion as
2     to whether or not it was poorly drafted.
3               MR. STORZER:  Your Honor, we should have caught that.
4               THE COURT:  What's the next one, Ms. Napp?
5               MS. NAPP:  On page 28, your Honor, 197, carrying over
6     to page 29.  This same sentence actually appears two other
7     times on page 32.  Perhaps I'm just not understanding it,
8     because when I first objected to it, I had thought that
9     Ms. Beall was offering a legal conclusion on the education
10    institution laws, and then I saw it appear two more times.  So
11    I'm not sure if that's the intent or if I'm misreading that.
12              THE COURT:  Yes.  So it appears again at 226 and 233.
13              MS. NAPP:  Yes, your Honor.
14              THE COURT:  Okay.
15              MR. STORZER:  Your Honor, we don't, frankly,
16    understand the objection here.  It's simply a cross-reference
17    to prior paragraphs.  Ms. Beall is not an educational law
18    expert.  She is simply opining on the efficacy of using such
19    laws to protect wetlands and other ecological resources.
20              MS. NAPP:  Yes, your Honor, as I said, I think I was
21    reading it incorrectly.  I'm willing to withdraw those
22    objections.
23              THE COURT:  Okay.
24              So looks like next up is 264, 265.
25              MS. NAPP:  Yes, your Honor.

20175pcongt2

1              THE COURT:  Mr. Storzer.

2              MR. STORZER:  Ms. Beall provided a rebuttal report on

3      May 13th, 2014, on page 3 of which she talked about the

4      specific physical characteristics of the property and the

5      potential for development, again, the fact that this is the

6      only property in the Village that we are saying can accommodate

7      this use.  She rendered various opinions and statements talking

8      about the potential for a hypothetical rabbinical college,

9      including it would be a clustered design and would be able to

10     avoid the majority of the NYS DEC and Corps wetlands and buffer

11     areas, the steep slopes, the uplands woods located within the

12     buffer areas and on the steep slopes, preserving the woodlands

13     and within the wetlands areas, adjacent buffers and steep

14     slopes, would represent preservation of large wooded habitat

15     area and the sensitive wetlands.

16             This goes back to the issues raised regarding the

17     master plan and the Village's goals for the property.  She's

18     been on the property.  She is well aware of the physical

19     characteristics of it.  So, again, this is within the scope of

20     that report.

21             MS. NAPP:  Your Honor, defendants' position is that

22     these two paragraphs, 264 and 265, look an awful lot like the

23     information that plaintiffs sought to introduce through

24     Mr. Atzl, who was a surveyor, particularly with regard to

25     access.  While Ms. Beall does have some mention of steep slopes

20175pcongt2

1    in her past reports, she never opined on access to the subject

2    property, and, again, I would submit that that's the purview of

3    a surveyor.

4              THE COURT:  Yes.  I think the difference here, though,

5    is that this relates to the topic that she's opining on in this

6    this section and it goes to her analysis of the interplay

7    between the wetlands ordinance and the wetlands on the property

8    and the viability of building on the property.  So I think, in

9    this instance, plaintiffs have the better of the argument, and

10   I accept Mr. Storzer's representation about within the scope of

11   what she's previously opined, and particularly in the rebuttal

12   report.  So those objections are overruled.

13             MR. STORZER:  I think that's it, your Honor.

14             THE COURT:  Okay.  So, then, what we'll do is 1510 is

15   received except for the paragraphs or subsections of the

16   paragraphs already noted.

17             (Plaintiffs' Exhibit 1510 received in evidence)

18             MS. NAPP:  And then there is also the issue, your

19   Honor, of the exhibits ──

20             THE COURT:  Okay.

21             MS. NAPP:  ── in the document itself.  So defendants

22   are objecting to 208, 221, 222, 223, 224, 225, 226, 227, 228,

23   229 and 230.

24             And with regard to 221 to 230, my initial objection is

25   that there is no foundation for these documents.  I'm not even

20175pcongt2

1    sure that I have a substantive objection at this point, but I

2    think that we need a little bit more information about what

3    these documents actually are and how they were created.

4         THE COURT:  Okay.

5         MS. NAPP:  As to 208, your Honor, there's a similar

6    foundational problem, but, also, as this relates to ——

7    primarily related to steep slopes, it's defendants' position

8    that this is outside the scope of Ms. Beall's expertise and

9    that this particular document was not submitted with any of

10   Ms. Beall's prior reports.

11        THE COURT:  Okay.

12        MR. STORZER:  Your Honor, I think your Honor's ruling

13   with respect to paragraph I believe it was 55 deals with

14   Exhibit 208, and that should cover those issues.

15        As to the disclosure, this document I believe was

16   provided in the motions for summary judgment proceedings to the

17   defendants.  There's no surprise here.  And again, for the same

18   reasons as we discussed —— this is the Shapiro property —— it's

19   within her expertise and within the scope of her initial expert

20   report.

21        THE COURT:  I mean, given that representation, I think

22   that's ——

23        MS. NAPP:  Well, your Honor, we could certainly be

24   mistaken, but my colleague here tells me that 208 was not with

25   the summary judgment briefing.  There's been a lot of documents

20175pcongt2

1  in this case.  I could be wrong, but it is not my recollection

2  that it was.

3          THE COURT:  Okay.

4          MR. STORZER:  We have it as Exhibit E to her affidavit

5  referenced in paragraph 19.  It was listed in our trial

6  exhibits as number 208.

7          MS. NAPP:  Your Honor, I have no reason to disagree

8  with Mr. Storzer.  If he says it is and has a reference, I

9  certainly accept that.

10          THE COURT:  Okay.  If it turns out that's wrong, you

11  can look later and we can always pull it back.

12          MS. NAPP:  Certainly, your Honor.

13          THE COURT:  There is no jury to instruct.

14          Foundation on 221 to 230.

15          MR. STORZER:  I'm not sure if the objection was one

16  that was going to be dealt with on cross.  The foundation,

17  frankly, is related to a lot of our prior discussion with

18  respect to her experience.  I'm not sure what the exact

19  objection is here.

20          MS. NAPP:  Well, your Honor, it's just, for any

21  document to come into evidence, there has to be some indicia of

22  reliability for it.  Ms. Beall has not been questioned on any

23  of these documents at her deposition.  I don't know how they

24  were created.  I just —

25          THE COURT:  So why don't you ask her.

20175pcongt2

1              MS. NAPP:  Well, I don't need to ask her, your Honor,

2    but if plaintiffs want to introduce them, I think that they do.

3              When I say I don't need to, your Honor, I don't need

4    to ask her as part of what I intend to cross-examine her on.

5              MR. STORZER:  Your Honor, we've submitted her direct

6    testimony by declaration, which talks about the foundation

7    that's laid for these exhibits.  I can read the paragraphs as a

8    foundation for the record, but I'm not sure that's necessary.

9    And this, again, seems like something that can be dealt with

10   easily on cross.

11             THE COURT:  So, for example, paragraph 62 of

12   Ms. Beall's declaration says, "Trial Exhibit 223 is the NYS DEC

13   streams and wetlands map for Pomona showing the streams and

14   wetlands within the Village that are regulated by the NYS DEC

15   and their location relative to the subject parcel."

16             So Mr. Storzer could ask her to that question.  You

17   know, if he were to call her live and say what is 223, she

18   would give that answer, and given her area of expertise --

19             MS. NAPP:  That's fine, your Honor.  I'm not looking

20   to waste anybody's time here.  My only point was that I

21   understand that there's a lot of information and data that goes

22   into compiling these GIS maps, and it's our position that that

23   should be at least explained before they're admitted into

24   evidence.  But I'm not looking to waste the Court's time or

25   Ms. Beall's time, so if your Honor is inclined to admit them,

20175pcongt2

 1   then that's fine.

 2           THE COURT:  I think there is enough in the

 3   declarations that lays a foundation, but if you want to voir

 4   dire Ms. Beall on any of these that you're suspicions of --

 5           MS. NAPP:  I don't think it's necessary, your Honor.

 6           THE COURT:  Okay.  All right.  So those are in

 7   subject, of course, to any cross-examination that defendants

 8   may want to do on these issues.

 9           MR. STORZER:  Thank you, your Honor.

10           THE COURT:  So, then, the declaration and those

11   exhibits are received, all the exhibits therein.  Have we

12   listed all of them?  I don't think we've done that for

13   Christina's benefit.  Does it stop at 230?

14           MR. STORZER:  I believe it does, your Honor.  I do

15   have a list here.

16           THE COURT:  Why don't you just, for the record, put in

17   the list, read the list.

18           MR. STORZER:  Plaintiffs' Exhibit 190, 191, 192, 193,

19   194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205,

20   206, 207, 208, 209, 210, 211.

21           THE COURT:  Does it go to 230?

22           MR. STORZER:  234.

23           THE COURT:  211 to 230?

24           MR. STORZER:  234, your Honor.

25           THE COURT:  234?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

20175pcongt2

1              We're all about efficiency here.

2              MR. STORZER:  Thank you, your Honor.

3              THE COURT:  I mean, I was tempted to just say in

4    response to Ms. Napp's objection, well, I'll let the odds ones

5    in and exclude the even ones.  But I didn't do that, for the

6    record.

7              All right.  So those are in.

8              (Plaintiffs' Exhibits 190 - 234 received in evidence)

9              MR. STORZER:  At this point, your Honor, we would like

10   to call Barbara Beall.

11             THE COURT:  Okay.

12             Come on up, Ms. Beall.

13             See, you would still be sitting back there if we were

14   reading the exhibits by number.

15    BARBARA BEALL,

16        called as a witness by the Plaintiffs,

17        having been duly sworn, testified as follows:

18             THE DEPUTY CLERK:  Please state and spell your name

19   for the record.

20             THE WITNESS:  May I be seated?

21             THE COURT:  Yes.

22             THE WITNESS:  My name is Barbara Beall, B-E-A-L-L.

23             THE COURT:  Thank you.

24             MR. STORZER:  Your Honor, may I approach?

25             THE COURT:  Yes.

20175pcongt2              Beall - Cross

1              MR. STORZER:  The record can reflect I've handed

2    Ms. Beall Plaintiffs' Exhibit 1510.

3    CROSS-EXAMINATION

4    BY MS. NAPP:

5    Q.  Hi, Ms. Beall.  How are you?

6    A.  I'm fine.  Thank you.

7    Q.  Ms. Beall, as you heard me say a moment ago, you obviously

8    have a great deal of experience with wetlands science, correct?

9    A.  Thank you.

10   Q.  And you worked for the Army Corps of Engineers for about

11   four years; is that right?

12   A.  Four and a half.

13   Q.  Four and a half.  All right.

14              And when you were in that role, you were out in the

15   field delineating wetlands?

16   A.  I did delineate wetlands.  I also validated the wetland

17   delineations that consultants completed.

18   Q.  And after that, you moved over to consulting yourself,

19   right?

20   A.  I spent one year with the Lake George Association.

21   Q.  Okay.  And then after Lake George, you moved over to

22   consulting, right?

23   A.  That is correct.

24   Q.  And you've been doing private consulting since that time;

25   is that right?

20175pcongt2                    Beall - Cross

1   A.   That is correct.

2   Q.   About 30 years, if I'm not mistaken.

3   A.   My total experience has been 30 years.

4   Q.   And private consulting firms mostly work at the state and

5   federal levels, right?

6   A.   That is not correct.  But mostly.  I also work at the -- I

7   also work with municipal firms as well.

8          MS. NAPP:  May I approach, your Honor?

9          THE COURT:  Yes.

10  Q.   Ms. Beall, do you remember being deposed in this matter?

11  A.   Yes, I do.

12  Q.   It was a long time ago, right?

13  A.   It was a long time ago.

14  Q.   If I could direct your attention to page 131 of your

15  deposition, please.

16          Are you with me?

17  A.   Yes.

18  Q.   I'm going to read starting at line 15.

19  A.   Yes.

20  Q.   (Reading)

21  "Q.   Well, when the private consult firms are involved, are

22  they working at the state and federal level?

23  "A.   They are working to map wetlands and delineate wetlands --

24  sorry.  They're working" --

25          MS. NAPP:  I'm going to withdraw that question, your

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

1  Honor.

2              THE COURT:  Okay.

3              MS. NAPP:  Wrong site.

4              THE COURT:  Okay.

5  Q.  So, Ms. Beall, most of your work over the last 30 years has

6  been at the state and federal level.  Would you agree with that

7  statement?

8  A.  A majority of my work has been at the state and federal

9  level.

10  Q.  You have some -- I'm not disagreeing with you.  You do have

11  some municipal experience, correct?

12  A.  I have a bit of municipal experience as well.  Thank you.

13  Q.  Now, Ms. Beall, I think we can probably agree at the outset

14  that wetlands are important.  Are they not?

15  A.  I agree wetlands are important.

16  Q.  You wouldn't have been working in this field for so long if

17  you didn't agree with that statement, right?

18  A.  I agree with that statement.

19  Q.  And they're important to the environment, right?

20  A.  Yes.

21  Q.  And they're important to the people who live in that

22  environment?

23  A.  Yes.

24  Q.  But you take issue with some of the language that the

25  Village uses in its wetlands law; is that not correct?

1    A.  I take issue with a number of -- that is not correct.

2    Q.  Okay.

3    A.  That does not accurately characterize my issues.

4              MS. NAPP:  May I approach, your Honor?

5              THE COURT:  Yes.

6    Q.  Ms. Beall, I just handed you Defendants' Exhibit 1013,

7    which is a copy of the Village of Pomona's Wetland Law.

8              You've seen that document before, right?

9    A.  I have seen this before, yes.

10   Q.  Okay.  And I'm going to ask you to take a look with me at

11   the first page, Section 126-1, Legislative Intent.  And you'll

12   see there that it says, "The protection of all wetlands is

13   vital to the health, safety and welfare of all persons."

14             Do you see that?

15   A.  Yes.

16   Q.  And that's one of the bases that the Village is using to

17   base its law on.  Would you agree with that?

18   A.  I don't know what the intent of the Village is.

19   Q.  Sure.

20             Well, if you look at the heading right on the front

21   page there, it says Section 126-1, Legislative Intent.

22             Did I read that correctly?

23   A.  Yes.

24   Q.  Okay.  And if you could take out your affidavit, please.

25   You have that in front of you, right?

20175pcongt2                Beall - Cross

1  A.  Yes.

2  Q.  And turn to page 11 and look at paragraph 47.

3  A.  Yes.

4  Q.  And you identify in paragraph 47 that the statement that I

5  just read, the protection of all wetlands is vital to the

6  health, safety and welfare of all persons, as what the Village

7  has asserted as one of the bases for adopting its wetlands law,

8  correct?

9  A.  Repeat the question, please.

10  Q.  I'm just -- paragraph 47 of your report, you've identified

11  the Village's statement that the protection of all wetlands is

12  vital to the health, safety and welfare of all persons as one

13  of the bases that they claim for which they adopted Local Law 5

14  of 2007?

15  A.  I agree that that's what they're asserting.

16  Q.  Okay.  And you disagree, though, that that is a valid bases

17  for adopting the local wetland law; is that correct?

18  A.  I disagree with the -- is that correct -- I disagree with

19  this statement.

20  Q.  Okay.  And it's your opinion that that statement is

21  unsupported by general science, right?

22  A.  That is correct.

23  Q.  And that it's not standard language to be included in

24  wetlands laws; is that correct?

25  A.  That is correct.

20175pcongt2                    Beall - Cross

1   Q.  You're aware, are you not, that the Village modeled its

2   wetlands law after the state law, Article 24?

3   A.  They have asserted that.

4           MS. NAPP:  May I approach, your Honor?

5           THE COURT:  Yes.

6   Q.  Ms. Beall, I've just handed you Plaintiffs' Exhibit 194,

7   which I believe is already in evidence.

8           And you're familiar with this document, right?

9   A.  Yes.

10  Q.  This is the kind of document that you work with all the

11  time in your role as a wetlands scientist?

12  A.  Yes.

13  Q.  Let's take a look at 24-0105, please.

14  A.  Say that again, please.

15  Q.  On the second page of the document, the statement of

16  findings section.

17  A.  Yes.

18  Q.  Subsection 1.  It states:  "The freshwater wetlands of the

19  State of New York are invaluable resources for flood

20  protection, wildlife, habitat, open space and water resources."

21          Did I read that correctly?

22  A.  You read that correctly.

23          THE COURT:  By the way, I hate to interrupt.  I don't

24  see 194 as being in, but there's no objection to its coming in;

25  is that right?

20175pcongt2                    Beall - Cross

1              I'm sorry.  Never mind.  Go ahead.

2              MS. NAPP:  Is it in?

3              THE COURT:  I'm a little bit behind the times.

4              MR. STORZER:  No objection.

5              MS. NAPP:  I want to make sure we're all on the same

6   page here, your Honor.  194 is the document.

7              THE COURT:  Yes.  We're all on the same page.  I just

8   hadn't fully implemented everything that Mr. Storzer had read

9   into my list, so I literally am behind the times.

10             Go ahead.  I'm sorry to interrupt.

11             MS. NAPP:  No, no worries, your Honor.  Thank you.

12  Q.  Ms. Beall, do you think that statement is unsupported by

13  general science?

14  A.  I would say that not all freshwater wetlands in the State

15  of New York are invaluable resources for the flood protection,

16  wildlife habitat, open spaces and water resources.

17  Q.  So you would agree with me, then?

18             Withdrawn.

19             You do think that that statement is unsupported by

20  general science, or portions thereof?

21             MR. STORZER:  Objection.  Mischaracterizing

22  Ms. Beall's testimony.

23             THE COURT:  What's that?

24             MR. STORZER:  Objecting to the characterization of

25  Ms. Beall's testimony.

20175pcongt2              Beall - Cross

1        THE COURT:  She can agree or disagree with that

2   statement.

3   A.  I disagree with the statement.

4   Q.  Okay.  So you think that the State of New York has it wrong

5   in this law that we're talking about right here, that section

6   that we both just read?

7   A.  I think that there are -- I think that the State of New

8   York has -- has it -- has over-broadly stated it.  It has

9   not -- it's a very broad statement.

10  Q.  And then if you look at subsection 7 of that same section,

11  it's on the next page, "Any loss of freshwater wetlands

12  deprives the people of the state of some or all of the many and

13  multiple benefits to be derived from wetlands."  And then it

14  lists a bunch of them.

15       Do you find that statement unsupported by general

16  science?

17  A.  Again, I believe that -- yes, I find that this statement is

18  unsupported by general science.

19  Q.  So you disagree with the State of New York on that

20  particular point as well?

21  A.  Yes.

22  Q.  Now, if you could flip back to the local law itself,

23  Ms. Beall, 1013.  And we'll take another look at that first

24  section, legislative intent.

25  A.  Yes.

20175pcongt2                 Beall - Cross

1   Q.  About four lines from the bottom of that section, it

2   states:  "Due to recent court decisions, a void may exist in

3   the protection of wetlands that do not meet the threshold

4   acreage for New York State protection.  The purpose of this

5   chapter is to fill that void and to supplement existing state

6   and federal laws and regulations."

7          You see that there?

8   A.  I do.

9   Q.  Okay.  And you take issue with those two stated purposes as

10  well, don't you?

11  A.  I do.

12  Q.  Now, Ms. Beall, the State of New York generally regulates

13  wetlands that are over 12.4 acres in size or smaller wetlands

14  of local significance, I believe is the language; is that

15  correct?

16  A.  The correct language is unusual local importance.

17  Q.  Okay.  So, with that clarification, you agree with me that

18  that is the jurisdiction of the State of New York over

19  wetlands?

20  A.  Yes.

21  Q.  And your aware that the Federal Government regulates

22  wetlands that have a significant nexus to a traditional

23  navigable body of water, correct?

24  A.  That is correct.

25  Q.  And the Federal Government only regulates the actual fill

20175pcongt2                 Beall - Cross

1   within the wetlands, right?

2   A.  They regulate the discharge of dredge or fill material into

3   the wetlands.

4   Q.  But the Federal Government doesn't regulate adjacent areas,

5   right?

6   A.  That is correct.

7   Q.  Now, the Village of Pomona's law —

8   A.  Can I go back for a second?

9         The Corps of Engineers, while they don't have a

10  regulatory authority to regulate adjacent areas if they're

11  showing a permit and doing a review, it's not uncommon for them

12  to ask for a setback or to ask for areas of buffers around

13  those wetlands in order to provide additional protection.  As

14  part of permitting, they may have for a conservation easement

15  or a deed restriction around wetlands.  It's not uncommon for

16  them to ask for a setback for houses away from wetland areas.

17  Q.  But if I just heard you correctly, Ms. Beall, the Army

18  Corps — and the Army Corps is the federal agency that

19  regulates federal wetlands; is that correct?

20  A.  No.

21  Q.  No?

22        Could you explain.  Just so that we're all on the same

23  page, what is the Army Corps do?

24  A.  The Army Corps regulates wetlands, but the EPA also

25  regulates wetlands.

1   Q.  And if I heard you correctly before, you said, even though

2   the Army Corps does sometimes make requests regarding buffer

3   zones or adjacent areas, they do not actually have regulatory

4   authority over those areas.

5   A.  That is correct.  They have regulatory authority if their

6   jurisdiction is triggered.  So when their jurisdiction is

7   triggered, if they have an impact to a wetland, they then have

8   the ability to look at the upland areas around those wetlands.

9   Q.  Let's focus on the Village of Pomona's law for a minute,

10  Ms. Beall.

11          The Village of Pomona's law covers wetlands that have

12  a contiguous area of at least 2,000 square feet; is that

13  correct?

14          And if you want to look at the law itself, it's in

15  Section 126-2.

16  A.  That is correct.

17  Q.  And you would agree with me that 2,000 square feet is a

18  smaller land area than 12.4 acres, right?

19  A.  I would agree with you.

20  Q.  So the wetlands that are covered by the Village of Pomona

21  law would not be covered by New York State law unless they

22  happen to be those special wetlands of unusual local

23  importance?

24  A.  That is correct.

25  Q.  And wetlands larger than 2,000 square feet wouldn't be

1  covered by the federal law unless they had a significant nexus

2  to a traditional navigable body of water, correct?

3  A.  That is correct.

4  Q.  Now, if I understand your opinion correctly, you don't

5  believe that there's any sort of regulatory void?

6  A.  In this particular law?

7  Q.  Yes.

8         Well, let me ask you a different question, Ms. Beall.

9         If you take out your -- flip back to your declaration,

10  1510.

11  A.  Yes.

12  Q.  And turn to page 12.  At the top of the page, you have a

13  heading there, number 1, no regulatory void.  And I believe --

14  correct me if I'm misstating your opinion -- that you disagree

15  with the Village's statement in the first section of its local

16  law that the local law was enacted to fill a void and to

17  supplement existing state and federal laws and regulations.

18  A.  Please clarify the question.

19  Q.  Well, Ms. Beall, why don't we try it this way.  On page 12

20  you have a heading here that says no regulatory void.

21         What do you discuss in that section of your report?

22  A.  I discuss whether or not the wetlands of the Village of

23  Pomona are or are not regulated by the Corps of Engineers and

24  the DEC where there's overlapping regulatory jurisdiction

25  versus places -- where there's overlapping regulatory

20175pcongt2                    Beall - Cross

1  jurisdiction and how the wetlands are regulated in the Village.

2  Q.  So, then, my question to you is is there any gap in

3  regulation in the Village of Pomona?

4          THE COURT:  Well, before adoption.

5          MS. NAPP:  Before, before.

6          THE COURT:  Right.

7  Q.  Before the adoption of Local Law 5 of 2007.

8  A.  What I assert in the document is that there is more

9  regulatory overlap than there is -- than there is a void; that

10 99 percent of the wetlands in the Village of Pomona are

11 regulated already; that 80 percent of the wetlands in the

12 Village of Pomona are regulated by the DEC along with a

13 100-foot adjacent area.

14          I do not see a significant regulatory void in this

15 situation.

16 Q.  So is it your testimony, Ms. Beall, that there are no

17 wetlands -- that prior to -- withdrawn.

18          Is it your testimony, Ms. Beall, that there are no

19 wetlands in the Village of Pomona that are not already covered

20 by the state law and the federal law?

21 A.  It's my testimony that, in my review of the Village, it was

22 very difficult to find any wetlands that were -- I could not

23 find more than maybe one percent that are not regulated by the

24 Corps of Engineers or the DEC -- and then 80 percent are

25 regulated by the DEC.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

20175pcongt2              Beall - Cross

1   Q.  So, other than that one percent, all of the wetlands in the

2   Village of Pomona are either larger than 12.4 acres in size or

3   have a significant nexus to a traditional navigable body of

4   water?  That's your testimony?

5   A.  Based on my analysis, yes.

6   Q.  And you think that, to be sure that there were wetlands

7   that they should be regulating, the Village of Pomona should

8   have gone out and done its own mapping of wetlands; is that

9   correct?

10  A.  Yes.

11  Q.  There's no requirement under state law that a local

12  municipality map local wetlands prior to implementing a local

13  ordinance, is there?

14  A.  No.

15  Q.  And that's not actually something that municipalities do

16  before implementing a local ordinance, is it, Ms. Beall?

17  A.  The Association of Wetland Managers Toolkit discusses the

18  fact that having an inventory of wetlands and understanding the

19  wetlands in your watershed is very important prior to adopting

20  such a law.

21  Q.  So it's a best practice, right?

22  A.  It's an important best practice.

23  Q.  Municipalities don't always have the luxury of following

24  those best practices, do they?

25  A.  I do not know the answer to that question.  I am not an

20175pcongt2              Beall - Cross

1   expert in what municipalities do regarding this area.

2   Q.   Takes a lot of work to map wetlands, doesn't it?

3   A.   Not necessarily.

4   Q.   Is mapping of wetlands something your average municipality

5   could do on its own?

6   A.   Yes.

7   Q.   Do you know if the Village of Pomona has the personnel to

8   undertake mapping of their wetlands?

9   A.   I do not.

10  Q.   Do you know if the Village of Pomona has the financial

11  resources to undertake mapping of their wetlands?

12  A.   I do not.

13  Q.   Now, I believe, in your report, you identify six other

14  municipalities in Rockland County that have wetlands laws; is

15  that correct?

16          Sorry.  I don't have a cite handy for you, Ms. Beall,

17  but if you give me one second, I'll find it.

18  A.   Thank you.

19  Q.   Look at paragraph 128 of your affidavit.

20  A.   Yes.

21  Q.   And those six other municipalities —— so let's be clear.

22  There are actually seven municipalities in Rockland County in

23  total that have a local wetland protection law; is that right?

24  A.   That is correct.

25  Q.   One of those is the Village of Pomona?

20175pcongt2                    Beall - Cross

1   A.  That is correct.

2   Q.  And the others are the Town of Haverstraw, the Town of

3   Stony Point, the Village of Airmont, the Village of Montebello,

4   the Village of Spring Valley and the Village of Wesley Hills,

5   correct?

6   A.  That is correct.

7   Q.  Do you know if any of those six villages mapped their

8   wetlands before -- villages or towns mapped their wetlands

9   before implementing their local wetlands ordinances?

10  A.  I do not.

11  Q.  Now, you would agree with me, Ms. Beall, wouldn't you, that

12  New York State actually requires an applicant to provide a map

13  of wetlands affected by any proposal during the permitting

14  process?

15          And I'll refer you to CRR New York Section 665.6.

16  A.  The DEC, at times, will map wetlands for the applicant.

17  Most of the time a consultant will map wetlands for a project.

18  Q.  I didn't mean to interrupt you, Ms. Beall.  Were you

19  finished?

20  A.  Yes.

21  Q.  When you say a consultant, that consultant is doing that on

22  behalf of the applicant, right?

23  A.  That is correct.

24  Q.  The consultant is hired by the applicant?

25  A.  That is correct.

20175pcongt2                Beall - Cross

1   Q.  You did some mapping in order to prepare your opinions in

2   this matter yourself, is that right, Ms. Beall?

3   A.  I directed mapping to be done.

4   Q.  And you visited the subject property?

5   A.  That is correct.

6   Q.  You looked at some of the wetlands there?

7   A.  That is correct.

8   Q.  Do you know if anyone from the Village has ever been given

9   access to the property to look at the wetlands?

10  A.  I do not know that information.

11  Q.  And you didn't visit any other sites in the Village, did

12  you?

13  A.  I don't believe I did.  Obviously, I drove to the site.

14  Q.  Well, you didn't go on anybody — you didn't go to anyone's

15  yard to see if they had wetlands there, did you?

16  A.  No.  I did drive around the southern part of the town.

17  Q.  But you didn't enter anyone's private property, right?

18  A.  I did not.

19  Q.  You didn't go behind anyone's house?

20  A.  I drove on roads.

21  Q.  So you didn't actually see any other wetlands in the

22  Village of Pomona in person, other than the ones on the subject

23  property?

24  A.  One was able to see wetlands from the roadways that I drove

25  on.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

20175pcongt2              Beall - Cross

Q.   You could see them as you drove your car by?

A.   Yes.

Q.   And did you use that in any of the mapping that you did?

A.   When I drove by, it validated the mapping that I had done using GIS scenario photograph review.  It indicated to me that that's the type of ground trouping that, indeed, the wetlands where I was seeing them were where they were in the Village in the other parts that I drove around.

Q.   In preparing your opinions in this case you didn't actually do any delineation of wetlands, did you?

A.   I did not delineate wetlands.

Q.   And there's a distinction between delineation and mapping, right?

A.   There are — they are different terms.  They mean different things.  Mapping can be both mapping using GIS, but it can also be delineation making a wetland map with flags on it with the actual locations of where wetlands were present on a particular site.

Q.   Delineation usually involves being out in the field, right?

A.   Yes.

Q.   And you didn't do that here?

A.   I observed the — I observed the delineation that was done by others and I saw the wetlands present on the site that were delineated by others.

Q.   But you didn't personally do any delineation here?

20175pcongt2               Beall - Cross

1   A.   No; I did not.   I — I validated rather than delineate.

2   Q.   Sure.   So what you did do was you went online to the

3   National Wetlands Inventory website; is that correct?

4   A.   No; it's not correct.

5   Q.   No?   There's not a website maintained by the U.S. Fish and

6   Wildlife Services that has the National Wetlands Inventory on

7   it?

8   A.   We're discussing methodologies.   To say — so we took data

9   that's — that is maintained by that agency.   We looked at it

10  in two ways.   One is to look at it on the website.   That's a

11  desktop GIS mapper.   The other way to look at it is using GIS

12  data that is integrated through the program of GIS.

13          GIS is a computer program, and you bring in that GIS

14  data, and it layers it for you in a map.   With desktop mapping,

15  you only go to one site and you're looking at the Fish and

16  Wildlife Services website.   So it's not the same — exactly the

17  same thing.   The data is the same.

18  Q.   So my question to you, Ms. Beall, was just did you go on

19  the National Wetlands Inventory website as part of your due

20  diligence here?

21  A.   We utilized National Wetland Inventory data.

22  Q.   And it has a tool called the wetlands mapper, right?

23  A.   There is a wetlands mapper, yes.

24  Q.   And is that the tool that you utilized?

25  A.   No.   We used — we used the data that came off of the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

1  National Fish and Wildlife Service, the wetland —— National

2  Wetland Inventory GIS data, for this mapping.

3  Q.   Okay.  And that data is what the National Wetlands

4  Inventory —— excuse me —— what the U.S. Fish and Wildlife

5  Service refers to as reconnaissance level information on the

6  location, type and size of resources?

7  A.   That is correct.

8  Q.   And the maps are prepared from the analysis of high

9  altitude imagery, right?

10  A.   That is correct.

11  Q.   Okay.  And you would agree with me that there's a certain

12  margin of error inherent in that methodology?

13  A.   There is.

14  Q.   So to be absolutely sure about the location of wetlands,

15  you would have to do a detailed ground inspection, wouldn't

16  you?

17  A.   Not necessarily.

18  Q.   Well ——

19  A.   To be absolutely sure.  That's a big word.

20  Q.   Well, if the National —— if the U.S. Fish and Wildlife

21  Service advised people to do a detailed on-the-ground

22  inspection instead of relying on their data, would you disagree

23  with that statement?

24  A.   For this type of mapping, no, as compared to using it

25  for —— no, I disagree.

20175pcongt2                    Beall - Cross

1   Q.   Okay.  So there are circumstances, then, in which you would

2   be comfortable without actually looking at wetlands on the

3   ground?

4   A.   Yes.

5   Q.   What situations are those?

6   A.   Something like this, where you are generally assessing the

7   wetland characteristics of a particular region.

8   Q.   But if you were going to, you know, assist an applicant in

9   obtaining a permit, you would want to know for sure what was on

10  that property, wouldn't you?

11  A.   I would.

12  Q.   And you would do that by either yourself going out or

13  sending somebody to go look at that property, right?

14  A.   No.  Not necessarily.

15  Q.   No?  Well, how, then, would you be absolutely certain?

16  A.   If you had, for example, a site that was mostly

17  agricultural in nature, if you had a site where you had no

18  hydric soils, those particular situations would not raise to

19  the same level of concern.

20  Q.   So you're referring to an area that would be very dry.  Is

21  that what you're talking about?

22  A.   Yes.

23  Q.   Like a desert, right?

24  A.   Not necessarily a desert.

25  Q.   Now, I was using the term absolutely certain, and that's

1    what I would say as a layman, but let's try a better term.

2           If you wanted to come to, you know, a level of

3    professional certainty that there were no wetlands on a site,

4    you wouldn't feel compelled to go physically visit that site?

5    A.  I believe, in my professional certainty, there would be

6    times where -- there would be times where I would not need to

7    go to the site to be professionally certain that there were not

8    wetlands on a piece of property.

9    Q.  And that's in an instance where, as you testified before,

10   it was a very dry property, right?

11   A.  No.

12   Q.  No?

13          So you would be -- let me ask it this way, Ms. Beall.

14   You would be -- so, in your capacity as a wetlands scientist at

15   a private consulting firm, you help applicants file

16   applications for permits, right?

17   A.  Yes.

18   Q.  With the New York DEC, right?

19   A.  Yes.

20   Q.  That's the entity that regulates wetlands in New York?

21   A.  Yes.

22   Q.  And also with the Federal Government, right?

23   A.  Yes.

24   Q.  So your testimony here today is that -- and during that

25   process, I assume that the applicant has to submit all sorts of

1   data to these regulatory agencies.  Right?

2   A.  Not necessarily.

3   Q.  No?  They don't have to submit any data about wetlands?

4   A.  Not necessarily.

5   Q.  Not to get a permit?

6   A.  If there's no wetlands there, they don't need to talk to

7   the agencies.

8   Q.  So you would be comfortable, then, Ms. Beall, telling one

9   of your clients that there's no wetlands on a property at all

10  without going on that property?

11  A.  Yes.

12  Q.  Okay.  Does the National Wetlands Inventory have any

13  regulatory force?

14  A.  No.

15  Q.  Not a regulation, right?

16  A.  No.

17  Q.  And the U.S. Fish and Wildlife Service, they don't make any

18  determination about who has jurisdiction over wetlands covered

19  by the maps that they're providing on the National Wetlands

20  Inventory, do they?

21  A.  No.

22  Q.  It just shows you all the wetlands that the aerial

23  satellites that they're using can see?

24  A.  With photographic interpretation by human beings.

25  Q.  So the wetlands that are shown, they could be wetlands

1   under federal jurisdiction, right?

2   A.   That is correct.

3   Q.   They could be wetlands that are under state jurisdiction?

4   A.   That is correct.

5   Q.   They could be wetlands that are under local jurisdiction?

6   A.   That is correct.

7   Q.   Now, New York provides maps —

8   A.   Let's say maybe.

9   Q.   Good enough, Ms. Beall.

10          New York provides maps of wetlands, as well, right?

11  A.   That is correct.

12  Q.   And you reviewed these maps, as well, in preparing your

13  opinions in this matter?

14  A.   Yes.

15  Q.   Now, you would agree with me, wouldn't you, that wetlands

16  evolve over time?  Don't they?

17  A.   Explain to me the word evolve.

18  Q.   Well, Ms. Beall, you're the scientist here.  What do you

19  understand evolve to mean?

20  A.   My understanding is that wetlands are relatively — if

21  there's no change in hydrology, wetlands are relatively stable

22  in their area.

23  Q.   So, then, you would disagree if the State of New York said

24  that wetlands change over time?

25  A.   According to — according to Mr. Tiner, wetland — the

20175pcongt2              Beall - Cross

1   wetland area tends to be relatively stable.  They may change in

2   character.  And a lot of that depends on whether or not there's

3   hydrologic changes.

4   Q.  So if the State of New York had published literature saying

5   that wetlands change over time, you would disagree with that

6   assertion?

7   A.  I would need to see the rest of the -- the context of those

8   words.

9   Q.  Well, I'll represent to you, Ms. Beall, that the statement

10  that I'm talking about comes from the New York DEC website.

11           Have you ever been on that website?

12  A.  Yes.

13  Q.  And you've never read those words there before?

14  A.  I would like to see the context in which you're stating

15  them.

16  Q.  Well, my question to you, Ms. Beall -- I wasn't asking you

17  about the -- I'm not asking you to opine on it.  I'm just

18  saying you've never seen those words on that website?

19  A.  I don't recall.

20  Q.  You would agree with me, though, that wetlands maps can

21  be -- of the type that we've been talking about can be

22  inaccurate, right?

23  A.  I would agree with that.

24           MS. NAPP:  May I approach, your Honor?

25           THE COURT:  Yes.

1   Q.   Now, Ms. Beall, I've handed you Plaintiffs' Exhibit 205.

2           You recognize this document, right?

3   A.   Yes.

4   Q.   And this is a document that was prepared by you, correct?

5   A.   Yes.

6   Q.   And it details your methodology for the desktop review of

7   aquatic resources within the Village of Pomona?

8   A.   That is correct.

9   Q.   I would like to ask you a few questions about -- the pages

10  aren't numbered, but if you turn to the sixth page of the

11  document, at the top, it says of the remaining 18 NWI map

12  wetlands.

13  A.   Yes.

14  Q.   I would like to look at Wetland 1.  The section starts

15  Wetland 1.

16  A.   Yes.

17  Q.   Now, Wetland 1 is actually a wetland in the Village of

18  Pomona that's on the subject property, correct?

19  A.   Yes.

20  Q.   Okay.  And you state, it looks like the third sentence of

21  that section:  "The NYS DEC identifies that this wetland is

22  76.7 acres in size and regulated by the NYS DEC under Article

23  24 Freshwater Wetlands Act," correct?

24  A.   Yes.

25  Q.   Okay.  So New York's maps shows that particular wetland as

20175pcongt2                 Beall - Cross

1   76.7 acres in size, right?

2   A.   That is correct.

3   Q.   And then your next sentence says:   "The NWI mapping

4   identifies the wetland as 51 acres."

5          Did I read that correctly?

6   A.   Yes.

7   Q.   And that's a difference of about 25 acres, right?

8   A.   Yes.

9   Q.   Now, New York, when they map their wetlands, they're only

10  mapping New York's wetlands, right?

11  A.   They are mapping wetlands in New York State that are 12.4

12  acres in size or larger or wetlands that are smaller in size

13  and have a local importance.

14  Q.   They're not mapping wetlands that are governed by the Army

15  Corps of Engineers, right?

16  A.   That is correct.

17          Sorry.   That is not correct.   They're -- the wetlands

18  regulated by the Corps of Engineers may also be -- sorry,

19  regulated by the DEC may also be regulated by the Corps of

20  Engineers.   They are not doing the mapping of their wetlands to

21  assert core jurisdiction.   They're two different jurisdictions.

22  Q.   But if there were federal wetlands which did not share

23  overlapping jurisdiction with New York, then New York is not

24  including those wetlands in the maps that they complete.   Would

25  you agree with that?

20175pcongt2                    Beall - Cross

1  A.  Provided they aren't more than — provided they're more

2  than 500 feet away and they don't have a stream connection.

3  The DEC may assert jurisdiction over wetlands that are

4  connected.

5  Q.  And, now, when we discussed before that the National

6  Wetlands Inventory maps, they include any wetland regardless of

7  jurisdiction, right?

8  A.  They can also — yes, they — they — they may include

9  wetlands regardless of jurisdiction.

10  Q.  Okay.

11  A.  That is not a regulatory map.

12  Q.  But in this example here, in Wetland 1, the New York map is

13  actually — which only deals with primarily New York wetlands,

14  shows 25 acres more than the National Inventory map; is that

15  correct?

16  A.  That is correct.

17  Q.  And that would be an example of how maps can be inaccurate,

18  right?

19  A.  That can be an example about how maps can be different

20  based on different jurisdictions.

21  Q.  Well, let's flip over to your affidavit, please, paragraph

22  73.

23          Are you there?

24  A.  Yes.

25  Q.  Okay.  In that first sentence of that section you say, "The

20175pcongt2            Beall - Cross

1   Village has 21 wetlands mapped by the NWI equaling 62.8 acres."

2           Did I read that correctly?

3   A.   Yes.

4   Q.   Okay.  Now, looking back at Exhibit 205, same paragraph,

5   Wetland 1, we previously established, I believe, that New York

6   identified 76.7 acres of wetlands.

7   A.   Yes.

8   Q.   So that's another example of how there can be discrepancies

9   between the maps, correct, if the New York wetlands are larger

10  in size than all of the wetlands identified by the National

11  Wetlands Inventory?

12  A.   Correct.

13  Q.   And it was these maps that we've been talking about, the

14  National Wetlands Inventory and the maps from the State of New

15  York, that you worked with in order to calculate how many

16  wetlands were regulated in the Village of Pomona, correct?

17  A.   Yes.

18  Q.   And from those maps, you came up with the figure of 99

19  percent, right?

20  A.   That is correct.

21  Q.   Ninety-nine percent of all wetlands in the Village of

22  Pomona, in your opinion, are already regulated?

23  A.   Yes.

24  Q.   Just leaves one percent?

25  A.   Yes.

20175pcongt2                    Beall - Cross

1   Q.  And you're confident that that percentage is accurate?

2   A.  I indicated that there could be other — those are the NWI

3   wetlands and DEC wetlands.  I indicated that there could be

4   other wetlands in the Village that weren't regulated by them.

5   Q.  Okay.  And you anticipated my next question, Ms. Beall,

6   because that 99 percent actually only refers to wetlands that

7   have previously been mapped, right?

8   A.  That is correct.

9   Q.  So there could be other wetlands in the Village of Pomona

10  that are not mapped?

11  A.  There could be.

12  Q.  And those wouldn't be accounted for in that 99percent?

13  A.  I'm sorry.  Repeat the question.

14  Q.  Those unmapped wetlands are not accounted for in your 99

15  percent?

16  A.  So you used the word maybe before.

17  Q.  Well, you can restate it, Ms. Beall.  I'm not trying to

18  trick you.  You tell me.

19  A.  This mapping identified those areas that are most likely to

20  have wetlands, including the DEC and the NWI wetlands.  These

21  are the places where there's most likely to be wetlands because

22  it's the places that are the wettest in the Village.  They're

23  linked with hydric soils.  They're linked with stream corridors

24  that you can see.  And so these are the places where the

25  wetlands are most likely to be.  And the mapping that we did

1  and the assessment that we did then placed the 100-foot buffer

2  around these areas.

3  Q.  And I think we've established this, so I apologize if I'm

4  asking you something I've already asked you before, but if I

5  use the word may, you would agree with me that there may be

6  wetlands in the Village of Pomona that are not encompassed by

7  your 99 percent?

8  A.  There may be, yes.

9  Q.  Because the 99 percent only accounts for mapped wetlands,

10  right?

11  A.  That is correct.

12  Q.  Now, Ms. Beall, one of the other opinions contained in your

13  report is that the definition of wetlands that the Village of

14  Pomona uses in its local law is outdated; is that correct?

15  A.  That is correct.

16  Q.  I'll point you to paragraph 97 of your affidavit if you

17  want a point of reference.

18        And you state that it's based on a 1970s understanding

19  of wetlands science?

20  A.  Please repeat the --

21  Q.  Why don't you turn to paragraph 97.

22  A.  Yes.

23  Q.  Just to make sure that the record is clear, you think that

24  the Village of Pomona's definition is based on a 1970s

25  understanding of wetlands science, correct?

1   A.   That is correct.

2   Q.   And you think it should be updated?

3   A.   I wasn't here to discuss what changes ought to be made to

4   the law.  I was here to review the law and its deficiencies.

5   Q.   But you're offering an opinion on the law, are you not,

6   Ms. Beall?

7   A.   Yes.

8   Q.   And your opinion is that it's an outdated definition?

9   A.   That is correct.

10  Q.   Now, if it were a more current definition, and we can talk

11  about what that would be, do you think that would be a step in

12  the right direction?

13  A.   I was here to review the deficiencies in this law, not to

14  decide how to correct it.

15  Q.   You're aware, are you not, Ms. Beall, that the Village of

16  Pomona's definition of wetlands is the same as the State of New

17  York's definition of wetlands?

18  A.   That is correct.  No, it's not.  There are differences in

19  this definition than the State of New York's definition.

20  Q.   Ms. Beall, do you still have your deposition up there?

21  A.   I need to correct this in my deposition.

22          Which number?

23  Q.   The deposition is the bound.

24  A.   Yes.

25  Q.   Page 121, please.

1   A.   Yes.

2   Q.   I'm going to start reading at line 7:

3   "Q.   How does the Village of Pomona define wetlands?

4   "A.   The Village of Pomona defines wetlands in the same manner

5   as the DEC wetland law."

6           Did I read that correctly?

7   A.   Yeah.   And I made a mistake here.

8           The difference between this and the Village of

9   Pomona's, the Village of Pomona also has in its soils

10  requirement that is not -- I don't believe -- that is not in

11  the DEC definition of wetlands in the law.

12  Q.   So the Village of Pomona definition actually includes more

13  information than the DEC definition.   Is that your testimony

14  today?

15  A.   More information is not always good information.

16  Q.   Well, that wasn't my question, Ms. Beall.   My question was

17  New York law contains additional information beyond that which

18  is -- excuse me.   Withdrawn.

19          My question was the Village of Pomona's law contains

20  additional information beyond that included in the definition

21  promulgated by the State of New York?

22  A.   That is correct.

23  Q.   So I take it, then, that you also think that the New York

24  definition is outdated as well?

25  A.   I do.

20175pcongt2                Beall - Cross

1  Q.  So you disagree with the State of New York again?

2  A.  That's just the way I am.

3          THE WITNESS:  I'm sorry if that was sarcastic.

4          THE COURT:  I think that's how most New Yorkers feel.

5  Q.  But even though the State of New York -- so you disagree

6  with New York and you disagree with Pomona, right?

7  A.  I do.

8  Q.  You think they should both use a different definition to

9  define wetlands?

10  A.  I wasn't here to suggest.  I'm here to identify

11  deficiencies.  I think that these two -- the definition in the

12  Village of Pomona is deficient.

13  Q.  And it's deficient because it relies on a 1970s

14  understanding of science, right?

15  A.  That is correct.

16  Q.  And you think that the Army Corps definition would have

17  been a better definition to use?

18  A.  I wasn't here to identify ways that the things should be

19  improved.  I was just here to identify deficiencies.

20  Q.  You would agree with me, Ms. Beall, that the Army Corps'

21  definition is a more modern definition of wetlands?

22  A.  I would.

23  Q.  And that definition was enacted in 1987; is that correct?

24  A.  That is correct.

25  Q.  And we've already established that the Army Corps and the

20175pcongt2            Beall - Cross

1    State of New York regulate different things, right?

2    A.   Let me go back and say the year that the -- the year that

3    the Corps of Engineers defined wetlands or that the federal law

4    defined wetlands, I don't have an immediate recollection of

5    when that was.  It may have been in the early '80s.  1987 is

6    when the Corps of Engineers wrote their delineation manual.  So

7    I clarify.

8    Q.   Now, the delineation manual, whenever it was written,

9    includes a list of 2,661 plant species; is that correct?

10   A.   No.

11   Q.   No?  What was wrong about that statement?

12   A.   The plant species are actually -- the delineation manual of

13   1987, the plant species was a shorter list.  The manual now has

14   a -- the Corps of Engineers wetland delineation manual of 1987

15   actually is now a procedural manual.  The Corps of Engineers

16   has now adopted regional supplements, and they link into a

17   national database of wetland plants that is more extensive, and

18   that's the number that you're quoting.

19   Q.   And that's the definition that you think is more modern,

20   the one that includes all those plants?

21   A.   That is correct.

22   Q.   Now, the Village of Pomona law includes -- identifies 55

23   plant species, correct?

24   A.   That is correct.

25   Q.   And that's the same as New York, right?

20175pcongt2                    Beall - Cross

1    A.   Yes.   Quite similar.

2    Q.   Now, you also take issue with the Village of Pomona's

3    definition of wetlands I believe because you say it is

4    inconsistent with other definitions that they have in their

5    code as a whole; is that correct?

6    A.   That is correct.

7    Q.   And one of the definitions that you point to in the code is

8    the definition that's contained in their stormwater chapter.

9    Would you agree with that?

10   A.   Yes.

11   Q.   And that definition, in your opinion, more closely aligns

12   with the federal definition?

13   A.   Yes.

14   Q.   Stormwater and wetlands aren't the same thing, are they,

15   Ms. Beall?

16   A.   No; they are not.

17   Q.   And stormwater protection and wetlands protection aren't

18   the same thing, are they?

19   A.   No; they are not.

20   Q.   And turning back to New York law for a second, New York

21   doesn't have a specific requirement for what must be included

22   in a local wetland protection law, does it?

23   A.   Please define specific requirement.

24   Q.   Well, let me back up for a minute.

25           Stormwater protection is regulated by the

1    Environmental Protection Agency, right?

2    A.   Delegated to DEC, correct.

3    Q.   Right.  And stormwater management programs are subject to

4    EPA requirements, right, delegated down through the State of

5    New York?

6    A.   That is correct.

7    Q.   And stormwater management programs have requirements from

8    the EPA that need to be included in them?

9    A.   That is correct.

10   Q.   Are you aware of any federal or state laws that require any

11   provisions or substance in local wetland laws?

12   A.   The DEC's regulations state that if a local municipality is

13   to adopt a regulation, it has to be equal or more protective.

14   Q.   Right.  And it doesn't say anything else, other than that,

15   about what needs to be included in a local wetland protection

16   law, does it?

17   A.   That is correct.

18   Q.   And you also point to the Village's Stormwater Management

19   Code as another area of I believe what you call -- correct me

20   if I'm using the wrong word here, Ms. Beall -- duplicative or

21   overlapping regulation.

22   A.   That is not the way I would have characterized it.

23   Q.   Go ahead.  You tell me.  Say it in your own words, please.

24   A.   I believe that it's another tool available to -- it's

25   another tool available to manage stormwater.  It's another tool

20175pcongt2                    Beall - Cross

1   to manage water quality in the Town -- or in the Village.

2   Q.  Ms. Beall, if I could direct you to paragraph 77 of your

3   affidavit.

4        On page 77 of your affidavit you say, in the first

5   sentence, "Thus, the WPL," which I believe is wetland

6   protection law, "is duplicative of the existing regulations

7   that cover aquatic resources within the Village."

8        Did I read that correctly?

9   A.  Yes.

10  Q.  And were you including stormwater management in that

11  category of duplicative regulations?

12  A.  Not in this paragraph.  I don't believe I was.

13  Q.  Well, is that one of the opinions that you're offering

14  here?

15  A.  Yes.

16  Q.  What else is duplicative?

17  A.  When I meant duplicative in this statement on 77, I was

18  talking about the wetland protection law versus the federal and

19  state wetland regulations that are available in the Village on

20  77.

21  Q.  Well, putting aside paragraph 77, one of the opinions that

22  you're offering is that the stormwater management provision in

23  the Pomona code is duplicative of the wetlands protection laws;

24  is that correct?

25  A.  I believe you're mischaracterizing my --

20175pcongt2                    Beall - Cross

1   Q.  I'm not trying to, Ms. Beall.  I apologize for that.

2   A.  It is another tool available to protect the environment.

3   It's not duplicative with regard to wetlands.  But there are a

4   number of tools in the Village of Pomona's Toolkit for

5   protecting the environment, for protecting water quality, for

6   protecting stormwater, for protecting flood plains, and that

7   includes the federal and state regulatory programs of

8   protecting wetlands, but it also includes stormwater

9   management, flood plain -- flood damage prevention, it includes

10  other tools that are available to it.

11  Q.  Okay.  So, then, the only things that are duplicatory --

12  duplicative -- duplicatory --

13  A.  It's late.

14  Q.  -- take your pick -- are the federal and the state laws.

15  Is that your position?

16  A.  The word duplicative is an interesting word.  How are you

17  using it, please?

18  Q.  Well, Ms. Beall, I'm using it in the same way that you used

19  it in paragraph 77 of your declaration.

20  A.  Paragraph 77 was about the wetland protection law.  And

21  then I discussed other things as being additional tool kits,

22  additional regulatory programs to protect those resources.

23  Q.  Well, so let's just try to boil this down, Ms. Beall.  I'm

24  not trying to be difficult here.

25          Your position is that the Village of Pomona's wetland

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

1   law is unnecessary; is that correct?

2   A.   My position is that the Village of Pomona's -- sorry.

3   Unnecessary isn't the right word.

4   Q.   No?  What would be the right word?

5   A.   The Village of Pomona is -- it's deficient, poorly crafted

6   and bad.  The Village of Pomona's wetland law is just

7   internally inconsistent.  It is -- it is -- it has definitions

8   of wetlands that are not consistent with current science and it

9   has regulatory standards that can't be met and that are not

10  found in any other regulations that I am aware of in New York

11  State.

12  Q.   I'm going to ask you again, Ms. Beall, because I would like

13  an answer to it, do you think that the Village of Pomona's

14  wetlands law is unnecessary?

15  A.   Yes.

16  Q.   Yes.  And that's because all of the wetlands are already

17  regulated by some other organization?

18  A.   I believe at this time, based on the data available that I

19  created and based on the data that the Village of Pomona didn't

20  look at, right now, the document -- the data that we have in

21  front of us would demonstrate that this law is unnecessary.

22  Q.   Do you think that the wetlands law of the Town of

23  Haverstraw is unnecessary?

24  A.   I wasn't asked to look at the Town of Haverstraw's wetland

25  law.

20175pcongt2              Beall - Cross

1   Q.  Well, the Town of Haverstraw would also be subject to New

2   York jurisdiction, right?

3   A.  I wasn't asked to look at the Town of Haverstraw's law.

4   Q.  That wasn't my question, Ms. Beall.  My question is, in

5   your experience as a wetlands scientist, would the Town of

6   Haverstraw be subject to New York State's wetland jurisdiction?

7   A.  If they have state wetlands in the village, it -- or in the

8   town, it would be.

9   Q.  Okay.  And would the Town of Haverstraw be subject to Army

10  Corps of Engineers jurisdiction if they had federal wetlands in

11  the town?

12  A.  Yes.

13  Q.  And the same would be true of Stony Point, right?

14  A.  Yes.

15  Q.  And the same would be true of Airmont?

16  A.  Yes.

17  Q.  And the same would be true of Montebello, right?

18  A.  Yes.

19  Q.  And the same would be true of Spring Valley and Wesley

20  Hills?

21  A.  Yes, yes.

22  Q.  But you're not offering an opinion today that their wetland

23  laws are unnecessary, are you?

24  A.  I wasn't asked to look at their wetland laws.

25  Q.  So I take that as a no.  You're not offering that opinion

20175pcongt2                    Beall - Cross

1  here today?

2  A.   That is correct.

3  Q.   Now, the State of New York expressly gives municipalities

4  the right to implement their own wetlands law, doesn't it?

5  A.   That is correct.

6  Q.   And as we talked about before, the state has said that

7  these local laws can be the same as state law or they can be

8  determined by the local government, right?

9           I prefaced that with we talked about that before.  I

10  don't think we talked about that before, so let me rephrase the

11  question.

12           The State of New York has said that local laws can be

13  synonymous with New York State law or they can be determined as

14  necessary by the local governments, right?

15           And I'll refer you, Ms. Beall, to 240501 subsection 2.

16  A.   Yes.   There are two ways that the local wetland law can

17  be — that local wetland law can occur.   One is to adopt the —

18  adopt the jurisdiction of the DEC.   There's three communities

19  that have done that.   The other way is to pass a local wetland

20  law.

21  Q.   And there's no requirement about what the substance of that

22  law has to be, right?

23  A.   That is not correct.

24  Q.   Well, as long as it's equal or more protective than the law

25  of the State of New York, right?

20175pcongt2               Beall - Cross

1  A.  That is correct.

2  Q.  In fact, New York has actually said that a local government

3  can simply adopt by reference New York's law as its own, right?

4  A.  Yes.

5  Q.  And to encourage local governments to adopt local wetlands

6  law, the state further provides that a local government that

7  has not done so will be deemed to have transferred authority

8  for wetlands to the county, right?

9  A.  My understanding of this is that this has to do with

10  wetland mapping and this has to do with the maintenance of

11  wetland maps, not with wetland laws.  I could be wrong.

12  Q.  Ms. Beall, I'm looking at Article 24 now, Exhibit 194,

13  25-0501, subsection 4, and it says, "If a city, town or a

14  village fails to adopt and implement a freshwater wetland

15  protection law or ordinance in accordance with this Article by

16  the date the applicable freshwater wetlands map is filed by the

17  Department, whichever is later, it shall be deemed to have

18  transferred the function to the county in accordance with

19  Section 24-0503."

20          Did I read that correctly?

21  A.  Yes.

22  Q.  And it talks about, in that very first sentence, how if the

23  town or village fails to adopt and implement a freshwater

24  wetlands protection law, right?

25          THE COURT:  You have to say yes or no.

20175pcongt2                    Beall - Cross

1              THE WITNESS:  Sorry.

2    A.  Yes.

3    Q.  And then the deadline for doing that is by the date the

4    applicable freshwater wetland map is filed or by September 1st,

5    1977, correct?

6    A.  That is correct.

7    Q.  So this section actually does, then, deal with the

8    consequences that a municipality might face if it does not

9    implement a freshwater wetland protection law.  Would you agree

10   with that?

11   A.  No.  There are no penalties.  What are the penalties?  You

12   said there were penalties.

13   Q.  Well, if they don't implement a wetland protection law,

14   Ms. Beall, they fall under the jurisdiction of the county.

15   Would you agree with that?

16              We don't have to call it a penalty, but that's what

17   will happen if they don't implement a local wetland protection

18   law.  They will be deemed to have transferred authority for

19   wetlands to the county.

20   A.  That is correct.

21              It continues on.

22   Q.  That's fine, Ms. Beall.  The law is in evidence.

23   A.  It continues on that if --

24              THE COURT:  You have to wait for a question.

25              THE WITNESS:  Sorry.

20175pcongt2                    Beall - Cross

1   Q.  You also discuss in your affidavit, Ms. Beall, alternate

2   ways of regulating wetlands; is that correct?

3   A.  Yes.

4   Q.  And one of the ways you propose is simply relying on the

5   laws of the State of New York, correct?

6   A.  That mischaracterizes what I had to say.

7   Q.  Well, let's turn to 132 of your affidavit, please.

8   A.  Yes.

9   Q.  And, there, you say, "The asserted governmental interest

10  asserted by the Village of Pomona in its efforts to regulate

11  wetlands can be better achieved through other means.  These

12  include existing federal and state wetland regulations, SEQRA

13  review, site plan and special permit processes, flood plain

14  regulations and stormwater regulations."

15          Did I read that correctly?

16  A.  Yes.

17  Q.  So one of the ways, one of the alternatives that you've

18  identified here, is state and federal wetlands regulations,

19  right?

20  A.  That is correct.

21  Q.  Okay.  And those would be the same New York State

22  regulations that you've disagreed with several times today,

23  right?

24  A.  Yes.

25  Q.  And they could also rely on federal law, right?

20175pcongt2                Beall - Cross

1    A.   Yes.

2    Q.   You would agree with me, Ms. Beall, that the United States

3    of America is different in every way, shape or form from the

4    Village of Pomona; would you not?

5              I'll withdraw the question, Ms. Beall.

6    Q.   The Federal Government is a lot bigger than the Village of

7    Pomona's government, isn't it?

8    A.   Everything's relative.

9    Q.   The Federal Government is bigger than the --

10             THE COURT:   I think we can establish the Federal

11   Government is bigger than the government of Pomona.

12             MS. NAPP:   Thank you, your Honor.

13   A.   They also regulate a larger area.

14   Q.   And we already talked about stormwater, which is another

15   one -- stormwater management, which is another alternative that

16   you've identified, right?

17   A.   Yes.

18   Q.   And stormwater management is different from wetlands

19   protection, right?

20   A.   That is correct.

21   Q.   And another alternative you've identified is flood plain

22   regulation; is that correct?

23   A.   Yes.

24   Q.   And flood plain regulation is different than wetland

25   protection, right?

1   A.  That is correct.

2   Q.  And you've also offered the opinion that site plan and

3   special permit processes alone are sufficient to regulate

4   wetlands; is that correct?

5   A.  Alone is a big word.

6   Q.  Well, you've identified as an alternative to the Village of

7   Pomona's wetland protection law site plan and special permit

8   processes.  You would agree with that, right?

9   A.  That is correct.

10  Q.  And site plan review doesn't happen until after an

11  application has been filed, does it?

12  A.  That is correct.

13  Q.  And it's specific to a given application, or given project?

14  A.  So this is — I'm going to say at this point that this is

15  an area outside of my expertise.

16  Q.  Well, Ms. Beall, you've identified site plan and special

17  permit processes as an alternative to the Village of Pomona's

18  local wetland law; have you not?

19  A.  As it relates to the ability for those things and those

20  regulations to protect wetlands and ecological resources and

21  flood plains and stormwater.  The processes of when does a site

22  plan review get submitted and those sorts of things would be —

23  that's the area that — the process of site plan review is a

24  place where I'm not a land-use attorney.

25  Q.  So you don't actually know, then, how the site plan review

20175pcongt2                Beall - Cross

1   process works; is that correct?

2   A.   I am not a land-use attorney.   I understand the portions of

3   site plan review that protect the language in there that's

4   protective and discusses the protection of water resources and

5   steep slopes.   The process by which an application goes through

6   site plan review is -- I'm not an attorney in this area.

7   Q.   Ms. Beall, I would like a yes or a no answer to that

8   question.

9          You don't know how the site plan review process works,

10  do you?

11  A.   It's a process versus protective measures within site plan

12  review.

13  Q.   Ms. Beall, I'll ask again, do you know how the site plan

14  review process works?

15          MR. STORZER:   Objection.   This is the third time I

16  think --

17          THE COURT:   Yes, but she hasn't gotten a yes or no

18  answer.

19  A.   I have a general knowledge about how the site plan review

20  process works.   It might not be one-hundred percent correct.

21  Q.   But you don't know if a site plan review is specific to a

22  given application, do you?

23          I think that's the question that started this line of

24  questioning.

25  A.   Define -- define what the application is.

1   Q.  Well, Ms. Beall, I'm going to ask you, in the process of

2   site plan, what is an application?  Do you know?

3   A.   There are certain activities.  My understanding is that

4   there are certain activities that don't require site plan

5   review that are automatically authorized in the -- in this --

6   in the Village of Pomona and there are some activities that

7   require site plan review and special use permits, and that's

8   defined within the zoning code of the Village of Pomona.

9   Q.  Do you know how the site plan review process works in the

10  Village of Pomona?

11  A.   I understand how site plan review can protect aquatic

12  resources.

13  Q.  Ms. Beall, do you understand how site plan review works in

14  the Village of Pomona?

15  A.   I'm not a land-use attorney.

16  Q.  Ms. Beall, I'm not trying to beat a dead horse here, but I

17  think I'm entitled to an answer to this question.

18          You've identified site plan review as an alternative

19  to the Village of Pomona's wetland protection law.

20          Do you understand how site plan review works in the

21  Village of Pomona?

22  A.   I understand how site plan review can be used as a way to

23  protect aquatic resources, wetlands, flood plains and

24  stormwater.

25  Q.  Ms. Beall, that's not what I asked.  I'm trying to figure

20175pcongt2                    Beall - Cross

1   out if you understand how site plan review, as you've

2   identified it in your affidavit as an alternative to the

3   Village of Pomona's wetlands law, if you understand how that

4   process works in the Village of Pomona.

5   A.   I understand how some of the process would work in the

6   Village of Pomona.

7   Q.   Some of it.  And what's the basis of that limited -- of

8   your -- of the understanding that you just articulated?

9   A.   I have been through review processes through other

10  communities where I have been asked to assist in site plan

11  reviews for how the regulations of that community can be used

12  to protect wetlands, flood plains, ecological resources and

13  stormwater.  So if a project is in front of a community for

14  site plan review, I assist in evaluating how those regulations

15  can protect those environmental considerations.

16  Q.   And is your answer the same for special permit, the special

17  permit process?

18  A.   Yes.

19  Q.   But you don't have any specific knowledge of how that works

20  in the Village of Pomona, do you?

21  A.   I understand the substantive nature of a site plan review

22  to ensure that environmental issues --

23          THE COURT:  The question is do you understand how it

24  works in Pomona.

25          MS. NAPP:  Thank you.

20175pcongt2                Beall - Cross

1    A.  I understand part of how it would work in Pomona.

2    Q.  Can we agree, Ms. Beall, that site plan and special permit

3    process is outside of your area of expertise?

4    A.  Say the question again.

5    Q.  Can we agree that the site plan review process and the

6    special permit process are outside of your area of expertise?

7    A.  The procedural process is outside of my area of expertise.

8    Q.  Ms. Beall, you've also opined that the Village could use

9    SEQRA as an alternate to the local wetlands law.  Would you

10   agree with that?

11   A.  And this is a place in my deposition where I made one other

12   mistake, and that --

13          THE COURT:  Hang on.  The question was do you agree

14   with that question.

15          THE WITNESS:  I'm sorry.

16   A.  Yes, yes, I agree -- yes, I did say that.

17   Q.  SEQRA also comes into play after an application is filed,

18   doesn't it?

19   A.  That is correct.

20   Q.  And the SEQRA process involves filling out a form, right?

21   A.  That is correct.

22   Q.  SEQRA doesn't apply to all projects, does it?

23   A.  No; it does not.

24   Q.  Projects that are classified as type 2 actions don't

25   require any substantive agency review, do they?

20175pcongt2            Beall - Cross

1    A.  That is correct.  And that's where I made a mistake in my

2    deposition.

3    Q.  And there's actually 37 categories that are considered type

4    2 actions; is that correct?

5    A.  I haven't looked at the type 2 list.  I don't know that by

6    heart, but there are a number of them, yes.

7    Q.  Well, let me give you the SEQRA statute here, Ms. Beall.

8           MS. NAPP:  May I approach, your Honor?

9           THE COURT:  Yes.

10   A.  Thank you.

11   Q.  Ms. Beall, if you could turn to section 617.5.

12   A.  Yes.

13   Q.  That lists 37 categories, right?

14   A.  Yes.

15   Q.  And those are all exempt from SEQRA?

16   A.  That is correct.

17   Q.  And if you look at section C9, one of those categories is

18   construction or expansion of a single-family, a two-family or a

19   three-family residence on an approved lot?

20   A.  That is correct.

21   Q.  And if you look at C7, another one of those exempt

22   categories is construction or expansion of a primary or

23   accessory appurtenant nonresidential structure or facility

24   involving less than 4,000 square feet of gross floor area.

25           Would you agree with that?

20175pcongt2                Beall - Cross

1   A.  And not involving a change in zoning or a use variance and

2   consistent with local land use controls.

3           Yes, I agree with that.

4   Q.  And if you look at -- look at the same section here.

5   That's good.

6           Am I correct that even if a project doesn't require

7   SEQRA review, it would still have to comply with relevant local

8   laws, right?

9   A.  Yes.

10  Q.  Now, I think you mentioned earlier, Ms. Beall, you're aware

11  that the Village of Pomona's wetland law includes a

12  hundred-foot buffer zone.

13  A.  Around what?

14  Q.  If you could turn to the local law itself, Ms. Beall,

15  Exhibit 1013.

16  A.  Yes.

17  Q.  And if you could turn to the third page of that document, I

18  think it is, subsection 126-3, regulated activities.

19  A.  Yes.

20  Q.  Do you see that?

21          Does that provide for a 100-foot boundary around any

22  wetland, water body or water course?

23  A.  No.

24  Q.  No?

25          Well, what is a buffer zone to you?

1              That's a term that's commonly used in your field,
2    isn't it?
3    A.  So it does not include a 100-foot buffer zone around -- in
4    which regulated activities are not to take place shall not
5    apply to lots that are approved with single-family residences.
6    You did not include that.
7              So you said that all wetlands have a one-hundred-foot
8    buffer zone around them.  That's not true in the Village of
9    Pomona.
10   Q.  Ms. Beall, I'm not trying to trick you.  I'm just trying to
11   work through this.  And I'll get to the exemption for
12   single-family homes.
13             The Village of Pomona includes, subject to an
14   exemption that we'll discuss, a hundred-foot buffer zone; is
15   that correct?
16   A.  It does.
17   Q.  Okay.  And that's the same as the State of New York, right?
18   A.  No.  I mean, there's a one-hundred -- both have a
19   one-hundred-foot buffer zone, but it's around different types
20   of areas.
21   Q.  Different types of wetlands.  You would agree?
22   A.  Yes.
23   Q.  And the wetlands law that we've been talking about was
24   enacted in 2007, right?
25   A.  Yes.

20175pcongt2                Beall - Cross

1   Q.   The maps that you were talking about before that you used

2   to do your mapping, were they from 2007?

3   A.   No.   They were more recent.

4   Q.   From probably 2014?  Does that sound about right?

5   A.   That is correct.

6   Q.   And are you aware that the Village of Pomona has existed

7   since 1967?

8   A.   Yes.

9   Q.   And there's a lot of houses in the Village of Pomona,

10  right?

11  A.   That is correct.

12  Q.   And going back to your point earlier, Pomona exempts lots

13  approved with single-family homes from the hundred-foot buffer

14  requirement, right?

15  A.   That is correct.

16  Q.   And it's your opinion that this exemption defeats the

17  entire purpose of the law?

18  A.   This exemption is one of the reasons why the law is

19  inconsistent.

20  Q.   Now, the exemption only applies to what we've identified as

21  the buffer zone, right?

22  A.   That is correct.

23  Q.   Doesn't apply to wetlands in general?

24  A.   That is correct.

25  Q.   Are you familiar with the term pre-existing nonconforming

20175pcongt2              Beall - Cross

1   use?

2   A.  Yes.

3   Q.  Did you look at the Village's zoning code to see how it

4   treats pre-existing nonconforming uses?

5   A.  I did not.

6   Q.  Do you think that homes that existed prior to the adoption

7   of the Village Wetlands Law should get a citation if they were

8   in the hundred-foot buffer zone?

9   A.  No.

10  Q.  Do you think that families that have installed pools within

11  the hundred-foot buffer zone should have to dig them up and

12  take them out?

13  A.  No.

14  Q.  Do you think that playscapes that had been installed prior

15  to the adoption of the wetlands law should have to be torn

16  down?

17  A.  No.

18          MS. NAPP:  Your Honor, I have one -- I'm almost done.

19  I'm aware of the time.

20          THE COURT:  Let's finish, let's finish.

21          I assume there's not going to be too much on redirect,

22  Mr. Storzer.  Is that right?

23          I realize we're not done with the cross, but how much

24  are you expecting to do on redirect?

25          MR. STORZER:  Barring some unexpected flourish at the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

20175pcongt2                    Beall - Cross

1   end of Ms. Napp's questioning, five, ten minutes.

2           THE COURT:  Okay.  I think we can all agree it makes

3   sense to finish.

4           THE WITNESS:  Yes, let's get this done today.

5           THE COURT:  Well, try to listen to the questions

6   carefully and answer the questions.

7           THE WITNESS:  Yes, sir, yes, sir.

8           THE COURT:  Go ahead, Ms. Napp.

9           MS. NAPP:  Thank you, your Honor.

10  Q.  I'm almost done here, Ms. Beall.

11  A.  Yes, ma'am.

12  Q.  If you could turn to paragraph -- take out your

13  declaration, please, and look at paragraph 30.

14          In paragraph 30 you list all the documents that you

15  reviewed --

16  A.  Yes.

17  Q.  -- in preparing your opinions in this case, right?

18  A.  I hope I got them all.

19  Q.  Well, you don't list any site plans there.

20          You haven't reviewed any site plans for the property,

21  have you?

22  A.  No; I have not.

23  Q.  And you haven't reviewed any applications for a site plan

24  approval, have you?

25  A.  I have not.

1   Q.  You haven't reviewed any documents that showed you what

2   buildings might be on the property?

3   A.  I have not.

4          I know what buildings are on the property right now.

5   Q.  Aside from the camp, you haven't reviewed any documents

6   that give you any indication of the buildings that the

7   Rabbinical College of Tartakov wants to build on the property?

8   A.  I have not seen those, no.

9   Q.  So you don't actually know what the Rabbinical College

10  would look like, do you?

11  A.  No; I do not.

12  Q.  And you don't know how many buildings it would include?

13  A.  No; I do not.

14  Q.  And you don't know where those buildings might be located?

15  A.  I do not.

16  Q.  And you don't know how many parking lots it might have?

17  A.  I do not.

18  Q.  And you don't know where those parking lots might be

19  located?

20  A.  I do not.

21  Q.  And you don't know how many acres the college itself would

22  actually take up on the subject property, do you?

23  A.  I do not.

24  Q.  If you could turn to page 34 of your declaration,

25  Ms. Beall.  And on page 34, you have a section Tartikov's

1   proposed use would not result in the asserted harms.  Do you

2   see that?

3   A.   Yes.

4   Q.   And it's your opinion, if you look at paragraph 247 right

5   there, that some form of rabbinical college could be

6   constructed without harming the Village's interests in

7   protecting wetlands and plant/wildlife, avoiding flooding and

8   preserving water and air quality; is that correct?

9   A.   That is correct.

10  Q.   And if you look at paragraph 247, in presence, it describes

11  the form of the rabbinical college development as "which would

12  have a nonaccredited educational institution with greater than

13  20 percent of floor space devoted to student family housing and

14  housekeeping facilities;" is that correct?

15  A.   Yes.

16  Q.   And you think that a college that looks like that, that has

17  greater than 20 percent floor space devoted to student family

18  housing and housekeeping facilities, would not harm any of the

19  Village's asserted environmental interests?

20  A.   That is correct.

21  Q.   How much more than 20 percent of the floor space devoted to

22  student family housing and housekeeping facilities are we

23  talking about here?

24  A.   The -- say that question.

25  Q.   Is it just somewhere north of 20 percent?

20175pcongt2              Beall - Cross

1              You've identified ——

2    A.  Yes, I believe that the building is actually —— there's a

3    limit on building area for the overall building area, and so

4    what's inside the building doesn't matter.

5              I believe that another section talks about the overall

6    size that would be allowed, you know, based on that lot area.

7    Q.  But you think that the rabbinical college, based on what

8    you know, without knowing anything about how many buildings,

9    where they're going to be, how many parking lots, it could

10   actually improve the environmental conditions as it relates to

11   wetlands; is that correct?

12   A.  If there was —— so, right now, the access drive —— so,

13   right, now the access drive coming in and out of the —— so this

14   project would have no impacts on the wetlands but for the

15   access drive.  The access drive would be within a buffer.

16   Currently to the south of that buffer is a sort of filled area

17   with a pool —— an old pool and a bath house.  If those things

18   were torn down and those areas were restored back into wetlands

19   and if there was hydrologic connection between the north and

20   south wetlands, that would be an improvement in the wetlands

21   compared to the existing condition.

22   Q.  Regardless of what they put up on that property, you think

23   the wetlands would be improved?

24   A.  I think that they could be improved by this project, yes.

25   Q.  Based on what you know about it?

20175pcongt2                    Beall - Redirect

1   A.  Based on —— based on if the project were kept within the

2   same footprint as the existing facility on that site, within

3   the same general camp area that's already been developed out

4   there, you keep the development away from the slopes around the

5   edges, yes, I think that you could do it.

6   Q.  But you don't actually know if that's what the rabbinical

7   college intends to do with the property, do you?

8   A.  I was asked to say could this site be developed, and my

9   answer is yes, and I don't believe that it would harm the

10  wetlands.

11  Q.  Right, but you don't —— just try to get this one last

12  point, Ms. Beall.

13          You don't actually know if the development would be in

14  the same footprint that you just described, do you?

15  A.  No, I don't.

16          MS. NAPP:  Thank you.

17          THE COURT:  All right.  Redirect.

18  REDIRECT EXAMINATION

19  BY MR. STORZER:

20  Q.  Ms. Beall, a few more questions, and then we'll be done for

21  the day.

22          The Village's wetlands protection law, is it

23  limited —— is the exemption for single-family uses limited to

24  pre-existing single-family uses?

25          MS. NAPP:  Objection, your Honor.  That calls for a

20175pcongt2              Beall - Redirect

1    conclusion, a legal conclusion.

2              THE COURT:  Yes.  It calls for an interpretation of

3    the ordinance, right?

4              MR. STORZER:  Fair enough.

5              THE COURT:  Go ahead.

6              Don't answer that question.

7              Next question.

8    Q.   I think this question is a little bit different.

9              Does the Village's wetlands protection law apply to

10   past activities?

11   A.   No; it does not.

12   Q.   Does it apply to new activities?

13   A.   It depends where they're occurring.  So it would not apply

14   to the whole issue of what's grandfathered out there.  It would

15   apply to new activities located on properties that are not

16   single — that are not improved with single-family residences.

17   Q.   All right.  And, Ms. Beall, in your opinion, do you believe

18   that a wetlands protection law should apply to new activities

19   on pre-existing single-family home lots?

20   A.   I believe it should.

21   Q.   And why is that?

22   A.   Well, let's start with the statement in the Village of

23   Pomona's code that starts with all wetlands are important to

24   all people.  If all wetlands are important to all people, then

25   apply it to all wetlands and all people.  If all wetlands are

20175pcongt2                 Beall - Redirect

1   important to all people, 2,000 square feet of wetlands should

2   be regulated.

3            But, here, if the main reason why this should be --

4   why it should be regulated is because those areas that aren't

5   already developed with -- you know, the natural areas are a

6   place where functions are still occurring next to wetlands and

7   streams on single-family homes, and so those areas should be

8   protected.

9            The DEC has done such a thing with a general permit

10  around one-hundred-foot adjacent areas where the DEC has a

11  general permit that allows minor activities, but only in areas

12  where there is not natural vegetation, only in lawns.

13  Q.   Can new activities on single-family residential lots harm

14  wetlands?

15  A.   Yes.

16  Q.   And could you give us an example.

17  A.   When you look at the aerial photographs from the Village of

18  Pomona, you can see places where individuals have put up -- put

19  up ponds in and around wetland areas.  There's a tennis court

20  over a stream in the Village of Pomona.  That's one of the

21  exhibits that I have.  There are -- there are places where they

22  have taken down all the trees right up to the edges of streams,

23  and those have resulted in heating and thermal activities in

24  and around those streams.

25           So, yeah, there's examples in the record.

20175pcongt2               Beall - Redirect

Q.   Thank you, Ms. Beall.

          Do you still have Exhibit 194 in front of you?  That's

the Article 24.

A.   Yes, yes.

Q.   And you were asked about Section 24105 on the second page

of that exhibit.

A.   Yes.

Q.   Does that statement of findings, in subparagraph 1, state

that all freshwater wetlands of the State of New York are

invaluable resources?

A.   No; it does not.

Q.   It says, "The freshwater wetlands of the State of New York

are invaluable resources;" is that correct?

A.   That's correct.

Q.   Reading it using that word the, do you agree with the

statement?

A.   Yes, in general as compared to all.  And so that was my

issue there.

Q.   Thank you, Ms. Beall.

          Now, you were asked whether you yourself delineated

wetlands in the Village of Pomona, weren't you, by defense

counsel?

A.   Yes; I was asked that.

Q.   All right.  And delineation, that's a method by which

someone identifies wetlands in general; is that correct?

1    A.  So there's –– there's –– there's a number of steps in the

2    process of identifying wetlands.

3    Q.  Ms. Beall, in the interest of time ––

4    A.  Sorry.

5    Q.  In general, it's a way of identifying wetlands; is that

6    correct?

7    A.  It's a way of identifying the edges of wetlands.

8    Q.  The edges of wetlands.  Thank you.

9          And you answered no, you did not do such delineation?

10   A.  I did not delineate wetlands.

11   Q.  But you said you observed some markings on the property

12   that delineated wetlands?

13   A.  I observed the presence of wetlands on the property based

14   on –– and there may have been some flags, but based on

15   comparing them to a survey map that I had while I was out in

16   the field.  The wetland boundaries were appropriately located

17   given the presence of other items in the field or markers in

18   the field like stone walls, fences, fence lines.  One could see

19   where the wetland was in relationship to those field features,

20   and they lined up very well with the mapping.  The mapping was

21   consistent with what I was seeing in the field versus where the

22   features were.

23   Q.  Thank you, Ms. Beall.

24          And are you reasonably certain that there were

25   wetlands on the property?

20175pcongt2                    Beall - Redirect

1   A.   Yes.

2   Q.   And including directly north of the driveway on the west

3   side of the property?

4   A.   Yes.

5   Q.   Within a hundred feet of that driveway?

6   A.   Yes.

7   Q.   And on the south of the driveway?

8   A.   Yes.

9   Q.   Within a hundred feet of the driveway on the south?

10  A.   Yes.  And that's not just based on the site walkover, but

11  as well from Google Earth mapping will show that.

12  Q.   Thank you, Ms. Beall.

13          You were asked about the different acreages that might

14  be identified with the DEC wetland and NWI mapping; is that

15  correct?

16  A.   Yes.

17  Q.   Is there any reason why there might be a difference other

18  than simply an error?

19  A.   They have two different methodologies of reviewing how to

20  map wetlands.  And the NWI wetlands, you know, are more recent.

21  There may have been changes --

22  Q.   Thank you.

23  A.   -- as a result of human activity.

24  Q.   Ms. Beall, did you have anything to add to that answer?

25  A.   There may have been changes as a result of human activity.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

20175pcongt2                  Beall - Redirect

1   Q.  Thank you.

2          You were asked whether local governments can adopt New

3   York State's wetlands law, correct?

4   A.  Yes.

5   Q.  And does the New York State Wetlands Law use a taking

6   standard for issuing permits?

7   A.  No.

8          MS. NAPP:  Objection, your Honor.  Beyond the scope.

9          THE COURT:  Overruled.  Overruled.

10  Q.  Are there any other differences between the two laws that

11  are relevant to the opinions that you've been expressing today?

12  A.  The two laws?

13  Q.  Between New York State's Wetlands Law and the Village of

14  Pomona's Wetlands Law.

15  A.  Yes.

16  Q.  And could you explain.

17  A.  The DEC's Wetland Law has a very strong regulatory standard

18  that goes through a variety of issues relative to -- and things

19  that need to be demonstrated by the applicant, including, you

20  know, are there off-site alternatives; what are the impacts to

21  the functions and values of this wetland; what are the -- is

22  this having a significant impact on the public health and

23  welfare of, you know, people in the area; will it cause adverse

24  environmental impacts.  And it gives a long list.  And then

25  there's weighing standards that need to be met.  So there's a

20175pcongt2

1    more comprehensive assessment of whether or not -- you know, of

2    permit issuance standards.

3    Q.   Thank you.

4           Ms. Beall, with respect to your preparation for

5    testifying and in the past, have you reviewed the Village of

6    Pomona's zoning codes, at least portions of it?

7    A.   Yes.

8    Q.   And does that include the Village's site plan zoning

9    provisions?

10   A.   Yes.

11   Q.   Would you say that there's anything distinct about the

12   Village's site plan provisions as compared to other

13   jurisdictions where you have reviewed such site plan

14   provisions?

15   A.   No.

16          MR. STORZER:   Thank you, Ms. Beall.   Nothing further.

17          THE COURT:   Hang on.

18          MS. NAPP:   Nothing further, your Honor.

19          THE COURT:   You're excused.   Thank you, Ms. Beall.

20          (Witness excused)

21          THE COURT:   Okay.

22          MR. STORZER:   I think --

23          THE COURT:   No, let's just keep going.

24          I think Ms. Nunwin's(sic) pun of the day when you

25   asked the witness to boil down an issue -- you didn't catch it.

20175pcongt2

1  For sure you're going to object on bad pun grounds.

2          MS. NAPP:  Well, I would like to take credit for that,

3  your Honor.  Completely unintentional.

4          THE COURT:  Well, that's what Freud says, that it's

5  not, right?

6          So we're going to break for the day and for the week,

7  as I understand it, right?

8          MR. STORZER:  Right.

9          THE COURT:  Tuesday we have the two experts.

10          MR. STORZER:  Weinstein and Fitzpatrick.

11          THE COURT:  And then we're not sitting Wednesday.

12  We're not sitting Thursday because of the holidays.  Friday

13  we're going to have Voorhis.  And all those affidavits have

14  obviously been submitted.  Actually, I've done my reading.  I'm

15  ready to go, so if they were here, I would be ready to go.

16          So, on Tuesday, why don't we talk about what you want

17  to do in terms of a post-trial schedule.  And you all can

18  figure it out.  I'm sure it will be reasonable.  And then we

19  can just lock that in.  But no need to do that when everybody's

20  tired.

21          We also need to take up the issue -- I think there was

22  a discrepancy between the exhibits actually in Ms. Beall's

23  declaration and what you read into the record, Mr. Storzer.

24          MR. STORZER:  They may not have been included in the

25  declaration itself.

20175pcongt2

1          THE COURT:  Right.  And it may be that there's no

2     objection to them anyways.  I just want to make sure we're on

3     the same page.

4          MR. STORZER:  Right.  I think we're going to have to

5     go back and make sure.  I know some of those exhibits the

6     defendants have said they have no objection to, and I think we

7     discussed that a little bit yesterday.

8          THE COURT:  You want to figure that out and go over it

9     on Tuesday?

10         MR. STORZER:  We will.

11         MS. NAPP:  And, your Honor, just so you know and so

12    counsel knows -- I don't think we told you -- we're going to

13    ask Mr. Voorhis to be available on standby for Tuesday because

14    I'm not sure that we will take the entire day with

15    Mr. Weinstein and Mr. Fitzpatrick.

16         MR. STORZER:  Well --

17         MR. PELOSO:  I will be defending Mr. Voorhis.  If

18    counsel wants him on Friday, that's fine.

19         MR. STORZER:  It's the Memorial Day weekend, your

20    Honor.  If you want us to start Mr. Voorhis, we will.

21         MS. NAPP:  We didn't mean to burden anyone.  We're

22    just trying to move things along.

23         THE COURT:  Of course I want to move things along, but

24    it's not my weekend that gets crushed.

25         MR. STORZER:  I think it's highly unlikely that we

20175pcongt2

 1   would finish with him on Tuesday, anyway.

 2            MR. PELOSO:  Friday is fine.

 3            THE COURT:  So if we end early, we end early.  That's

 4   fine.  But I appreciate the offer.  Please thank Mr. Voorhis

 5   for that.  But certainly I have no quarrel with the efforts of

 6   counsel.  So there's no reason to crush the holiday weekend any

 7   more than it's already been crushed.

 8            So we will see you Tuesday morning to start at 9:30.

 9   And have a great weekend, everybody.

10            MS. NAPP:  Thank you, your Honor.

11            MR. STEPANOVICH:  Thank you, your Honor.

12            (Adjourned to May 30, 2017 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

20175pcongt2

1                              I N D E X

2

3                              WITNESSES

4    **DORIS ULMAN**

5    **Cross By Mr. Stepanovich . . . . . . . . . . 870**
     **Redirect By Mr. Peloso . . . . . . . . . . . 892**
6    **Recross By Mr. Stepanovich . . . . . . . . . 908**

7    **PRESTON GREEN**

8    **Cross By Ms. Sobel . . . . . . . . . . . . . 924**
     **Redirect By Ms. Napp . . . . . . . . . . . . 938**
9    **Recross By Ms. Sobel . . . . . . . . . . . . 939**

10   **BARBARA BEALL**

11   **Cross By Ms. Napp  . . . . . . . . . . . . . 953**
     **Redirect By Mr. Storzer  . . . . . . . . . .1013**
12

13                             EXHIBITS

14   PLAINTIFFS'

15     **137** . . . . . . . . . . . . . . . . . . **874**

16     **106** . . . . . . . . . . . . . . . . . . **883**

17     **155** . . . . . . . . . . . . . . . . . . **909**

18     **1510** . . . . . . . . . . . . . . . . . . **947**

19     **190 − 234** . . . . . . . . . . . . . . . . **952**

20     **2001** . . . . . . . . . . . . . . . . . . **924**

21

22

23

24

25