170907congreOA                    Argument

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    CONGREGATION RABBINICAL
3   COLLEGE OF TARTIKOV, et al.,

4                   Plaintiffs,

5            v.                          07 Civ. 6304(KMK)

6   VILLAGE OF POMONA, et al.,

7                   Defendants.
    ------------------------------x        White Plains Courthouse
8                                          White Plains, N.Y.
                                           September 7, 2017
9                                          2:30 p.m.

10  Before:

11                THE HONORABLE KENNETH M. KARAS,

12                                              District Judge
                             APPEARANCES
13
    JOHN G. STEPANOVICH
14  DONNA SOBEL
    PAUL SAVAD
15  ROMAN STORZER
        Representing Plaintiffs Rabbinical Coll. of Tartikov, et al.
16
    MARCI HAMILTON
17  JOHN PELOSO
    THOMAS DONLON
18      Representing Defendants Village of Pomona, et al.

19

20

21

22

23

24

25

            SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
                          (914)390-4053

170907congreOA                    Argument

1            (In open court)

2            THE DEPUTY CLERK:  In the matter of Congregation

3    Rabbinical College of Tartikov versus the Village of Pomona.

4            Counsel, please state your appearances for the record.

5            MR. STEPANOVICH:  John Stepanovich.

6            MS. SOBEL:  Donna Sobel.

7            MR. STORZER:  Roman Storzer.

8            MR. SAVAD:  Paul Savad.

9            THE COURT:  Good afternoon to you all.

10           MS. HAMILTON:  Marci Hamilton.

11           MR. PELOSO:  John Peloso.

12           MR. DONLON:  Thomas Donlon.

13           THE COURT:  Good afternoon to you all.  Please be

14   seated, everybody.

15           We're here for oral argument, closing statements, or

16   how ever you want to phrase it as.  I have read the papers.

17   Just so you don't misinterpret, they were largely downloaded on

18   my iPad, so I'm not in touch with my bookie, if you're

19   wondering what I'm doing with my iPad.

20           So, I don't know who is going to speak on behalf of

21   plaintiffs, but I guess it makes sense for you to go first.

22   And there's no time limit here or anything like that.

23           MR. STEPANOVICH:  Well, I'm assuming, just as you

24   said, your Honor, we'd have some give and take.

25           THE COURT:  Absolutely.

170907congreOA                    Argument

1          MR. STEPANOVICH:  So, we have a short statement to

2     begin with.

3          THE COURT:  Before you do your short statement, do you

4     mind if I have a refreshment?

5          (Laughter)

6          MR. STEPANOVICH:  You just had to do it.

7          THE COURT:  Brandon and I were talking about it.

8          MR. STEPANOVICH:  Is it ginger ale?

9          THE COURT:  It's not.  We realized there was a purity

10    issue there.  Anyway, trying to set the tone here, give or

11    take.

12         So, go ahead with the opening statement, and I do have

13    questions.  And this is going to be how ever long you think it

14    needs to be.

15         Go ahead.

16         MR. STEPANOVICH:  Good afternoon, your Honor.

17         THE COURT:  Good afternoon.

18         MR. STEPANOVICH:  These public servants for the

19    Village of Pomona believe that they have the power to decide

20    who belongs in Pomona and who does not belong in Pomona.  Jacob

21    Hershkowitz, Chaim Rosenberg, Meilech Menczer, and the

22    Rabbinical College of Tartikov, they do not belong in Pomona.

23    That's the message that was sent by these public servants of

24    the Village of Pomona when they passed the laws that we

25    challenge in this lawsuit.

170907congreOA                    Argument

1          They used their power as the decision-makers of Pomona

2     to rig the system, to keep the plaintiffs – these plaintiffs

3     and those like them – out of their village because they wanted

4     to maintain their diversity and keep Pomona Pomona.  They had

5     the power, they knew that, and they used that power to make a

6     conscience decision to take away the freedoms of these

7     plaintiffs.  Because they were a threat to the people of

8     Pomona, so these public servants had to stand up to that threat

9     posed by Jacob Hershkowitz, Chaim Rosenberg, Meilech Meczer,

10    and those that look like them, talk like them, worship like

11    them, because they belong to the burgeoning Hasidic community

12    around Ramapo, and they, along with their families, would

13    attend Tartikov's Rabbinical College.

14          And why do they pose a threat to the people of Pomona?

15    Because they will completely change the make-up of the Village,

16    they will change the character of the Village, they will change

17    the politics of the Village, and they would create a disgusting

18    mini-city in the Village of Pomona.

19          But these public servants of the Village of Pomona

20    want you to believe them and trust them that they were just

21    doing their job, that we have it all wrong, that we twisted

22    their words and mischaracterized the messages delivered to them

23    by their friends and neighbors.

24          They say we're not racist, we're not bigots, but the

25    plaintiffs have never used those ugly words.  We just laid out

170907congreOA                    Argument

1    the evidence that now ends the debate once and for all as to

2    whether or not these laws were passed for any legitimate

3    purpose.  These public servants of the Village of Pomona are

4    the law in Pomona.

5          When Paul Savad showed up to remind them of RLUIPA,

6    they ignored him.  Oh, you mean that fundamentally flawed

7    hammer?  We'll fight you if you try to use that against our

8    village.  These public servants have the power in Pomona, they

9    have the vision, they have the plan, they have the money, and

10   they have the team to fight, to fight Tartikov so that it does

11   not usurp the Village or the Village Board.

12         These public servants were elected by the people of

13   Pomona, their friends and neighbors, to make the laws and to

14   enforce the laws.  And even though they can't say it in public

15   because their lawyer tells them to be careful what you say in

16   public, they will not cave in.

17         These public servants were more afraid of their

18   friends and neighbors than a federal judge, because if we

19   succeed, they'll get a pat on the back from the people of

20   Pomona who will tell them, That's okay, you did your job, you

21   served your public, our money was well spent.  You held off

22   that natural progression of homogeneous individuals for as long

23   as you could.  And they will blame you, your Honor, for doing

24   what they took an oath to do as true public servants, to

25   enforce the law instead ignore it, to uphold the Constitution

170907congreOA                    Argument

1    instead of trample on it.

2            If this Court is supposed to trust them and believe

3    them and believe what they said in this courtroom under the

4    spotlight of this federal courtroom, then it will have to

5    disregard what they said and what they did years ago outside of

6    the spotlight of this courtroom.

7            Be careful what you say in public, Mr. Yagel said.

8            Mr. Marshall, who tells the citizens of the

9    January '07 meeting to give him the benefit of the doubt;

10   Mr. Marshall, before that meeting, as he tells his colleagues,

11   Watch out, the meeting will probably be videotaped and

12   privately transcribed by Savad and Company.

13           Rita Louie says, I'd like to form an offshoot of

14   Preserve Ramapo, but I can't do it because of my position.

15           And why didn't Rita Louie or Brett Yagel sign their

16   name to the letter that claimed that the influx of homogeneous

17   individuals into Pomona was not a natural progression?  Why if

18   they had nothing to hide?

19           If these public servants had nothing to hide, then why

20   did they meet behind closed doors ten times to discuss

21   Tartikov, and, during that time, introduce Local Law No. 1 of

22   2007 and Local Law No. 5 of 2007?

23           The silence to that evidence is deafening.  They have

24   no answer, they have no response.  That alone proves that these

25   public servants had something to hide.

170907congreOA                    Argument

1        So, we're supposed to trust Rita Louie.  We know about

2   Rita Louie and her adverse inference.  We are supposed to trust

3   Brett Yagel, Nick Sanderson, and Rita Louie again, but during

4   their campaign, they all admitted that they told the voters

5   that Tartikov would have environmental and safety issues when

6   they had no information.

7        Let's trust Brett Yagel, who, when the Facebook post

8   was discovered, did he turn it over to his lawyers?  No.  Did

9   he preserve the evidence?  No.  What did he do?  He chastised

10  Rita Louie for making a lapse in judgment.  He was more worried

11  about Tartikov's lawyers discovering the evidence and your

12  Honor than he was about doing the right thing.

13       The evidence is gone.  The text exchange is gone.  His

14  post is gone.  Where could it have gone?  Where is it?  Nobody

15  knows.  But one thing we do know is that Mayor Yagel in those

16  texts told Rita Louie, We don't want to lose this case.  And we

17  know that because he said so himself in those texts away from

18  the spotlight of this courtroom.

19       So, the evidence is in.  Your Honor has heard it.  But

20  in order to defend themselves, these public servants want you

21  to trust them and believe them.

22       They're not worthy of that trust.  They're not worthy

23  of the benefit of the doubt that Mr. Marshall asked for at the

24  January 22, 2007 meeting.  They haven't earned it.

25       If we look -- your Honor, I have a few boards.  Do you

170907congreOA                    Argument

1  mind?

2         THE COURT:  Absolutely.  Help yourself.  Whatever you

3  want to do.

4         MR. STEPANOVICH:  Should I mark these?  They're

5  demonstratives.

6         THE COURT:  They're demonstratives, so it's up to you

7  in terms of what you want the record on appeal to be.

8         MR. STEPANOVICH:  Well, it's okay.  I'd like to mark

9  them.

10         THE COURT:  Okay.

11         MR. STEPANOVICH:  I'm trying to make sure that

12  everybody can see.

13         MR. PELOSO:  I'm going to object.  First of all, we

14  haven't seen them.  I don't know to what extent they're hearsay

15  or they're not hearsay.  Obviously, they're not evidence.

16         THE COURT:  Yes.  They're demonstratives.

17         MR. STEPANOVICH:  And I don't know -- for purposes of

18  this hearing, I don't know where we left off on exhibit

19  numbers.

20         Do you want me to just choose a number?

21         MR. PELOSO:  Well, it's not a trial exhibit.

22         MR. STEPANOVICH:  Yes.  I'm not going to admit them.

23         THE COURT:  Yes, that's why I'm not sure you need to

24  mark them.

25         MR. STEPANOVICH:  Okay.

170907congreOA                    Argument

1          THE COURT:  If you want to mark them, you can give

2     them a whole new series of --

3          MR. STEPANOVICH:  Plaintiffs' A.  Does that work?

4          THE COURT:  Done.

5          MR. PELOSO:  We would object.  In the event of an

6     appeal, these are not exhibits.

7          THE COURT:  They're not exhibits.  They're not being

8     taken as exhibits, they're not being received as exhibits, not

9     being offered as exhibits.  It's a closing statement

10    demonstrative display.

11         MR. STEPANOVICH:  Thank you.

12         As I was saying, your Honor, they want you to trust

13    them and believe them, and these are their own words.  These

14    are words of the public servants of the Village of Pomona.

15         To Deputy Mayor Al Appel:  You failed.  Sorry.  Monsey

16    grew up under your watch.

17         Herb Marshall, 2/22/09:  This thing's going to come

18    in.  They're going to come in and we're going to be caught with

19    our pants down if we don't move.  That's why I want to make

20    sure that we're moving ahead.

21         Herbert Marshall, 12/18/2000:  Zero population growth

22    is critical.  Zero population growth should be a major plan

23    objective for Ramapo, a town that, beginning in the 1990s, has

24    attracted a burgeoning Hasidic Jewish community, which, for the

25    most part, settled around the central hub of Monsey.

170907congreOA                    Argument

1          Now, zero population growth – I mean, who thinks those

2    things today, let alone says it?  Zero population growth.

3          Mr. Marshall had no problem saying that back in 2003.

4    The Tartikov development could completely change the Village

5    and the make-up of the Village.

6          Now, it's not about size, as the defendants want this

7    Court to believe; and, as their representative testified at

8    trial, that most of the statements were statements about size.

9    Could completely change the Village and the make-up of the

10   Village.  Not about size.

11         The Village should maintain its cultural and religious

12   diversity – Nicholas Sanderson.  Not about size.  The prior

13   statement could completely change the Village and the make-up

14   of the Village – Nicholas Sanderson.

15         Commenting on the Village's strong law of governing

16   schools suggested – Nicholas Sanderson – suggested that Yeshiva

17   Spring Valley was advised to go to a friendlier place, such as

18   Ramapo to put up their school – Nicholas Sanderson, 11/4/05.

19   It's not about size.

20         It's pretty disgusting.  They're trying to create this

21   mini-city in our Village – Brett Yagel, January '07.  Not about

22   size.

23         In his campaign material – Brett Yagel – maintaining

24   our diversity, as well as the feeling of community is

25   essential.  Not about size.

170907congreOA                    Argument

1        Regarding an upcoming civic association meeting –

2   Brett Yagel – must be careful about what we say, don't know who

3   is in the audience.  Who knows?  Savad might show up again –

4   Brett Yagel, April 02, '07.  Definitely not about size, but

5   they are being careful about what they are saying, and

6   Mr. Yagel is advising everybody else to be careful.  If it's

7   about size, what do they have to hide?

8        Brett Yagel and Rita Louie, March of '07, take great

9   exception to the statement that Pomona's potential residents at

10  Tartikov would be a natural progression.  To say that this

11  influx of homogeneous individuals is natural in any way is

12  simply not true – Brett Yagel and Rita Louie, March of '07.

13  That is not about size.  That's about the people who were on

14  their way to Pomona and the Orthodox/Hasidic Jews.

15       These are statements, your Honor, the words of Village

16  residents and former officials.  Robert Prol, Village resident,

17  who was then appointed to the Village Planning Board, referred

18  to Tartikov's proposed residents as non-taxpayers; stated that

19  Tartikov would be a slum; posted on a blog about Tartikov, "You

20  seem to forget that the Constitution was written for all of us,

21  not just money-grubbing anti-goyim Semites."

22       He repeatedly referred to the Babad family and Chaim

23  Babad as BaBAD, even though he never met any of the Babad

24  family members; referred to Babad and his ilk; recommended a

25  book to his defeat RLUIPA followers for communities under

170907congreOA                    Argument

1    attack from Hasidic blocs.  And I think Mr. Prol explained, or

2    tried to explain, Oh, that's only about density,

3    overdevelopment.  Your Honor will be the judge of that.

4           Melvin Cook, Village resident and former chairman of

5    the planning board referred to New Square, the area occupied by

6    Orthodox/Hasidic Jewish people as a tribal ghetto and stated

7    that he is opposed to an area becoming a tribal ghetto.  He was

8    opposed to Tartikov and stated that some of us see the

9    Rabbinical college as the beginnings of another restricted

10   religious community similar to New Square.  Because the

11   religious people as we know in New Square are undereducated in

12   a sense because they study the Talmud, so they don't earn as

13   much money, but they have large families, which means a high

14   percentage are on public assistance.  You'll see Medicaid costs

15   skyrocket in communities like New Square and Kiryas Joel.

16          Those are the facts according to Mr. Cook.

17          Rockland County and Ramapo have become less diverse

18   because there are more Orthodox, ultra-Orthodox and Hasidic

19   Jews living there and less non-Orthodox Jews, less secular Jews

20   and less non-Jews.  It's hurt the community.

21          Leslie Sanderson, Pomona Village Clerk and Village

22   Administrative Assistant and wife of former Mayor Nicholas

23   Sanderson:  She opposed the sale of the property to the

24   Orthodox for a middle school by saying, That does not sound

25   good and we must all go to the public hearings when they

170907congreOA                    Argument

1   announce them.  The Village objected to the Yeshiva

2   development.  And, finally, she says, Tartikov will usurp the

3   Village, perhaps the Village Board.

4           These are comments, your Honor, some of the comments

5   at the January 22, 2007 meeting, where the defendants argue

6   that those comments were about the size and scale of Tartikov's

7   project.

8           Your Honor heard the video and I'm sure has seen it

9   again, and I beg your indulgence for a few more highlights of

10  the statements that were made at that meeting.

11          And we highlight these because we believe the evidence

12  proves that the statements were about the future beneficiaries

13  of that property and not about the size, and not about the

14  scale of the project that these defendants, these public

15  servants of Pomona, want this Court to believe.

16          "We're going to be another Kiryas Joel, a Hasidic

17  community.  That's why we're emotional.  You can get into all

18  that environmental impact and all of that, that's all I have to

19  say.  It would be nice to hear you all saying, 'Hey, I know how

20  you feel.'"

21          And Mayor Marshall accommodated her.  "Ladies and

22  gentlemen, there isn't anyone sitting up here who doesn't know

23  how you feel," but he could say only what he could say because

24  the mayor and the Board members, the public servants of Pomona,

25  were advised to be careful what they said in public.

170907congreOA                    Argument

1          "I'm a resident of Pomona.  This is a disgrace.  It's

2     an absolutely disgrace.  You're in the wrong town and the wrong

3     Village."  About size?  About scale?  I don't think so.

4          "Tartikov would entirely change the character of the

5     Village, it would entirely change the politics of the Village.

6     And I think there has to be a solution through the zoning laws

7     and through the amendments to the zoning laws that prohibits

8     such a large number of people being within one property and one

9     institution."  And that night, the public servants of Pomona

10    accommodated that request, and they came up with a solution by

11    passing one of the laws challenged in this lawsuit.

12         "I don't look forward to having an increased tax base.

13    I don't look forward to having blights on the landscape and a

14    change in the nature of the community."  Size?  I don't think

15    so.  Scale?  I don't think that statement's about scale.

16         "There's no denying what is going on here tonight, and

17    what's going on here tonight is that there is a group who wants

18    to take over this Village, and we live in this Village and

19    we're saying to you, Where are our rights?"

20         About size?  About scale?  I don't think so.

21         Final comments, your Honor, of the January 22, 2007

22    meeting that these defendants argue were about size and scale:

23    "Why should I be responsible for paying the expenses of

24    somebody else's lifestyle?"  Not about size, not about scale.

25         "These changes are making it very easy for these

1   people to move here, very easy.  How are you going to help us

2   make sure that doesn't happen?"  The response to the people of

3   Pomona by their public servants was passing the laws that are

4   challenged in this lawsuit.

5        "I'm pretty sure that I read in the paper that it said

6   rabbinical students and their families.  That is my concern."

7   About size, scale?  I don't think so.

8        "The frustration that we have is that you knew of the

9   press that had come out, petition whether it be true or not,

10  you knew that it was out there, and you know how we were very,

11  very upset.  I think what would have helped us if, at the

12  beginning of this meeting, you had said, 'This is what's going

13  on.  We know that you've read this, we're here to protect your

14  interests.'"

15       Mayor Marshall responds saying what he can say in

16  public, because he's been advised by their counsel to be

17  careful what you say in public, he responds, "Ladies and

18  gentlemen, let me say something.  We, sitting at this table,

19  have limitations that are placed on us as to what we can say

20  and what we can't say, because our attorney tells us what we

21  can say and what we can't say.  I can't say what I feel.  I

22  can't.  If I agree with you, I don't agree with you.  I don't

23  have that luxury of being able to say all that here.  All that

24  I can say is that every member of this Board works very, very

25  hard to do what is best for this community.  You have your

170907congreOA                    Argument

1   issues.  Don't assume because no one has gotten up and said,

2   'Wow, I agree with you.  Oh, boy.  Don't assume that because we

3   didn't do that, we don't agree.'  We may or we may not, but

4   please give us the benefit of the doubt."

5          They don't deserve the benefit of the doubt, these

6   public servants of Pomona, your Honor.  It is absolutely

7   crystal clear that the Village of Pomona public servants, these

8   defendants, responded to their community, and not only did they

9   respond to the demands of the community, most of them led the

10  fight.  They were out front.

11         And so, your Honor, the point is, was the

12  discrimination, was the animus against the Orthodox/Hasidic

13  Jews a significant factor in the passage of these laws.  Your

14  Honor, I think the evidence is clear there can be no dispute.

15  The evidence is crystal clear, especially in light of the

16  mountains of evidence that we have on that, and in light of the

17  telegraphing of these public servants of Pomona, "Don't worry,

18  we've got your back, we hear you, we've heard you, and we hear

19  you loud and clear."

20         And so, your Honor, I conclude simply by saying that

21  when they came into this courtroom, when these public servants

22  came into this courtroom and they said our claims are

23  repugnant, how dare you accuse us of discrimination, they sat

24  under the spotlight of this federal courtroom and claimed their

25  innocence, but what they said in this courtroom doesn't jive

170907congreOA                    Argument

1  with what they said and what they did years ago outside of the

2  spotlight of this courtroom, and they're not entitled to the

3  benefit of the doubt.

4          THE COURT:  Thank you.

5          Ms. Hamilton.

6          MS. HAMILTON:  Good afternoon.

7          THE COURT:  Good afternoon.

8          MS. HAMILTON:  I didn't bring any props, so I'll just

9  stick with what I've got in front of me.

10         THE COURT:  Fair enough.

11         MS. HAMILTON:  So, I think we ought to go back to what

12 this case is actually about.  There's been an attempt, both in

13 the Plaintiffs' post-trial brief and now with our dramatic

14 reading of certain lines uttered by other people, that there's

15 some kind of cloud, there's some kind of cloud of

16 discrimination, but, of course, that's not how cases work.

17 It's not a cloud that matters; what matters is the facts.

18         So, what I thought I would do is to go through the

19 facts that were proved beyond a preponderance, which is, of

20 course, the standard, and just to set the stage for that, let's

21 remember we're in a facial challenge.  This is the largest

22 non-application land-use project I've ever seen in an RLUIPA

23 case – it's 130 acres and refusal to apply for anything,

24 whether it's a use variance for the 20-percent requirement for

25 the dorms or it's a text amendment or it's a zone change.

170907congreOA                    Argument

1   There was no discrimination proven at trial, there's no

2   substantial burden, and there is certainly no exclusion.

3         In answer to the question Mr. Stepanovich posed, what

4   did they have to hide from Mayor Marshall, who, after all, is

5   Jewish, what he had to hide is that he's not allowed to

6   pre-decide an application before it's been submitted.

7         There was an assumption of good-faith dealing by

8   Tartikov that it would be applying for something.  I don't know

9   how many communities I've said, You may not judge this before

10  anything is on paper, and that's exactly what was being said,

11  and that's exactly what is in the trial transcript.  I don't

12  think ten lines out of 1,310 pages of a trial read by a lawyer

13  on the other side is going to give us the full flavor of what

14  was actually said in those pages.

15        So, what are the facts that have been proved beyond a

16  preponderance in this case?  The main fact, I think, is that

17  the plaintiffs seek to create a rabbinical college

18  extraordinaire.  This is a one-of-a-kind item.  It is so

19  unusual, that it is impossible, at least so far, to find any

20  way to get it accredited.  It is so unusual, that it is

21  extremely difficult to get anybody to sign up to be a student

22  for it.  It's so unusual that it is requiring people to do

23  things - that we have in the record repeatedly - nobody has

24  accomplished in 30 years.

25        I hope they build it.  I hope that they can achieve

170907congreOA                  Argument

1    what is a dream of Chaim Babad.  This is his dream.   This

2    rabbinical college extraordinaire is, according to the trial

3    transcript, it's a dream, it's a vision, it's a hypothetical.

4    It's a conceptual plan, and, at its most concrete, it's a

5    pre-proposal plan.  It is this extraordinary rabbinical college

6    that has never been described in terms of land-use.

7         What do we know about this rabbinical college?  Well,

8    we know a couple of things for sure.  We know that they want to

9    study four books that go beyond the ordinary training for a

10   *beit din* judge.  That's what we know.  We know that it's going

11   to take a very long time, 15 years minimum.  And we know from

12   the facts by a preponderance that the likely enrollment will be

13   extremely small.  According to Chaim Babad, he tried.  Out of

14   140 students, he was only able to persuade 10.  And why does he

15   say that he was only able to do that?  Because it is so hard.

16   This is such a hard path.  It is extremely difficult.   In ten

17   years, they were able to find ten students, and these are

18   students who are being paid, they are receiving a stipend, and

19   they can only gin up ten students.

20        This actually reminds me of a case at the Supreme

21   Court where *Americans United* was arguing that parochial schools

22   should not get computers, because computers could be used to

23   divert toward religious purposes, and that would be a clear

24   violation.  This is *Mitchell v. Helms*.  So, they get to trial,

25   and they get up to the Supreme Court, and there has not been an

170907congreOA                    Argument

1    ounce of evidence of diversion.  And, in the end, what the

2    judges say is you've over ten years to produce some kind of

3    evidence of what you're talking about, and they hadn't produced

4    it.  So, the Court in *Mitchell v. Helms* said that they were not

5    going to assume diversion.  They had ten years here, since

6    2007, to recruit, to find students, to be able to point to

7    students who were interested, and what the record shows is they

8    found ten.

9          What other facts do we know?  We know that Tartikov

10   and its affiliate own 130 acres, 14 homes, and, so far, 10

11   families who would use 14 homes and 130 acres.

12         What else do we know?  And this is the critical part

13   of the RLUIPA claim and the free exercise claim:  We know for a

14   fact that there is no religious belief in this faith that

15   requires that they live in multi-family housing, or that they

16   live in a dorm, or that forbids them from living in a

17   single-family home.  Both Mr. Tauber said that on 128,

18   Mr. Rosenberg said it on 183, but he said it even more

19   strongly.  He said the type of home that you live in at this

20   kind of a college is irrelevant.

21         So, if you take that out of the case, it doesn't

22   matter whether they live in the single-family homes they

23   already own, or a dorm, or multi-family.  They still accomplish

24   their religious ends.  That basically takes the legs out from

25   under their case, and that's just testimony at trial.

170907congreOA                    Argument

1        Now, what they do believe in, clearly, is they believe

2   in sectarian courts for disputes between fellow Jews.  They say

3   they need judges.  You can spend a lot of time going through

4   this trial transcript; you will never find a fact about how

5   many judges exist, how many cases are not being heard, how long

6   are people waiting to have cases heard.  Those statistics are

7   out there, but they weren't introduced in this case.  All that

8   was introduced in this case was an opinion that there aren't

9   enough judges, and because there aren't enough judges, Chaim

10  Babad's dream should be permitted to go forward without

11  application of any sort.

12       We also know beyond a preponderance that the local

13  government and the community are quite united.  They clearly

14  oppose overdevelopment.  They oppose K-Mart, then they oppose

15  Wal-Mart, they oppose multi-family housing.  They accepted

16  group homes in the end, found that that was just fine.  They

17  favor single-family housing in an area where there's

18  multi-family housing aplenty.

19       And one of the most remarkable parts of this case is

20  that the frequent reference by members of this community

21  valuing diversity is supposedly to be interpreted as a belief

22  in discrimination.  That is putting the opposite meeting to the

23  words that are being provided.  I hope in this day and age that

24  everybody values diversity.  This community certainly does.

25       So, if you're going to look at the record, you're

170907congreOA                    Argument

1    going to look at it neutrally, there is evidence of an intent

2    to exclude in the record, but it is not the government that is

3    intending to exclude anybody; it is the plaintiffs, and they

4    have every right to.

5         Their vision is to have a rabbinical college

6    extraordinaire on a mountain where they will never have to be

7    interrupted by people who are outside the faith and they needed

8    to buy 30 acres as a buffer.  It was quite explicit.  Tauber

9    said that was a buffer, to make sure that the rabbinical

10   college would not mix with those outside the rabbinical

11   college.  That's their right.  If there's any analogy to what

12   it is that they're proposing, it's a monastery, except it's a

13   monastery with married members.  But it is deeply ironic for

14   them to be arguing that diversity is wrong when, in this day

15   and age, diversity is what the United States is built on.

16        Now, we also learned, which I found very interesting

17   because there have been statements earlier to the contrary,

18   students will not study at home.  They will be studying

19   together from 5:00 a.m. to 10:30 p.m. every day except for holy

20   days and Shabbat.  And they will be spending all that time

21   together, but they will not be doing that at home.  The

22   studying will be in the study halls.  It will be in the

23   library, it will be in whatever the educational part of it is

24   other than the library, it will be in the courthouse, it will

25   be in the buildings that will be part of the school.  That's in

170907congreOA                    Argument

1  the record.

2          We also learned that there are levels of Torah

3  communities.  While the phrase "Torah community" never appears

4  in the second amended complaint, they have now added it to

5  their list of how to explain what it is, is this rabbinical

6  college extraordinaire.  And according to those who will

7  participate in it – Mr. Rosenberg – you do the best you can to

8  have a Torah community, and it is not a sin if the Torah

9  community is not perfect.  And in fact, there is no sin

10  attached to being part of a rabbinical college where you live

11  off-campus, which is why those who have gone to all of the

12  other rabbinical colleges have been following their beliefs

13  even though they did not live on-campus.

14          So, in the end, what could possibly be going on in

15  this case, because you have a developer, a very savvy

16  developer, who goes on land and agrees to take over and be the

17  owner of 100 acres and does no due diligence.  He doesn't check

18  the zoning?  Well, we know why he didn't.  I would have

19  attributed this to him otherwise, but he said it at the trial.

20  Why would you do that?  He said because federal and state law

21  gives them the right to build this college as of right.  In

22  other words, they are not required to abide by the laws that

23  apply to everybody else.  That's on page 108 of

24  Mr. Tauber's testimony, his deposition testimony.

25          So, in other words, what we had here was a decision to

170907congreOA                    Argument

1   purchase property, which originally was going to be a thousand

2   families, and to use RLUIPA as the hammer to avoid the system.

3          We also hear in the transcript that out of 130 acres,

4   they plan on using only about 30, and it will be the 30 that's

5   farthest away from the community.  Surely that means they'll be

6   in close proximity to their studies, regardless of whether

7   they're in a dorm, a single-family home, or a multi-family home

8   if they subdivide and they get permission.

9          Finally, the accreditation question is one that is, in

10  my view, lacking in fundamental integrity.  Local Law No. 5 of

11  2004 requiring accreditation was adopted on the record when

12  Pomona believed that Yeshiva Spring Valley was the owner of the

13  property.  An accreditation law for that ordinary school was

14  not a problem.  Pomona did not yet know at that point that the

15  purchase had been made, did not know that Chaim Babad had paid

16  $13 million for a piece of property that had been worth

17  1.65 million.  And so, the accreditation requirement was for an

18  ordinary school, and the school regulations were to bring the

19  regulations up to date, and, as Mayor Marshall said, he loved

20  that project, he loved the Yeshiva Spring Valley project in

21  that it was going to be a school of 24 homes.

22         What happened to that project?  It wasn't run out of

23  town.  Two things happened to that project:  They never

24  complete the SEQRA requirements, and they got offered

25  $13 million for a piece of property that had only been worth

170907congreOA                    Argument

1    1.65 million relatively recently.

2           So, in the end, all of the arguments about

3    discrimination do not pan out.  And all they have to rest on

4    is, of course, the message that Mr. Stepanovich delivered,

5    which is all they have to hope on is credibility.  They're

6    trying to challenge the credibility of these public servants.

7    And I'm always shocked by the way in which "public servants"

8    starts to sound like Darth Vader in religious land-use cases,

9    but if they come out of Mr. Stepanovich's mouth, they sound

10   horrific; if you read them in context and you view the people,

11   these are not people discriminating.  And how do we know?  And

12   I'll close with this:  This rabbinical college extraordinaire

13   could be built.  All they would need is to put together a

14   proposal.  And we learned at trial, which is fascinating to me,

15   *shuls* -- there are *shuls* for different parts of the world,

16   different ethnic sources.  So, the *shuls* are permitted, a

17   school is permitted, study halls are permitted, libraries are

18   permitted, courtrooms are permitted, family housing is

19   permitted.  It's already built.  And so, essentially what is

20   the bottom line here, from the perspective of reading the trial

21   transcript, is that there was a hope that they might be able to

22   put multi-family housing in on many, many acres without having

23   to go through the process.

24          The bottom line is in this case is, ten years later,

25   if they had done what the framers of RLUIPA would have assumed

170907congreOA                    Argument

1    they would have done, which is, to ask for use variances, text

2    amendments, or zone changes, and that's in the legislative

3    history, they assume zone changes were part of the process that

4    you would go through, if they had done that, in all likelihood,

5    they would have a college right now, and maybe they'd have more

6    than ten students.  Thank you.

7              THE COURT:  Thank you, Ms. Hamilton.

8              MR. PELOSO:  I just wanted to follow up with some

9    comments which were more specific, your Honor, directed to

10   counsel's statements of this afternoon.

11             THE COURT:  Okay.

12             MR. PELOSO:  Obviously, the charts which have been

13   presented and the arguments by Mr. Stepanovich are designed to

14   be evidence of discriminatory intent.  I was actually quite

15   pleased to see all four of those charts be used today in oral

16   argument because that appears to be all that there is –

17   essentially, a collection of soundbites, most of which your

18   Honor has ruled are not admissible for the truth.

19             I would encourage the Court, as I know the Court will,

20   to look at whatever documents are referenced in those charts,

21   to look at them in their entirety, because looking at something

22   in a soundbite format does not tell the entire story.

23             I would like to address, though, some of the comments

24   that were made this afternoon, just to show what the actual

25   context is when in its completeness.

170907congreOA                    Argument

1       Mr. Stepanovich talked about Mayor Marshall and the
2    video.  We watched the video, your Honor watched the video, and
3    your Honor has read the transcript.  I think your Honor can
4    judge obviously as to what Mr. Marshall's intent was and what
5    his sincerity is.

6       The comment about his pants being caught -- having our
7    pants down, again, the record is very clear - this goes back to
8    Yeshiva Spring Valley - the concern was to have laws in place
9    to prevent schools from being built that would be unlimited in
10   size.  I would encourage your Honor in that regard to look at
11   all the documentation on Yeshiva Spring Valley, meaning the
12   Frederick P. Clark memos, the minutes from the meetings of the
13   Village.  There is not one reference to anything religious.
14   What happened there was, a school came in, Clark realized the
15   school laws were lax and were permissive, something had to be
16   done.  Admittedly, the trigger was Yeshiva Spring Valley, but
17   it could have been any school.  It happened to be a Jewish
18   school.  If it had been a Catholic school, if it had been any
19   other school, the same thing would have happened.  The Clark
20   memos are devoid of anything religious.

21      Mr. Stepanovich also mentions the Rita Louie and Brett
22   Yagel letter, why didn't they offer it.  Well, the testimony at
23   trial was, they didn't offer it is because there was a limit on
24   the number of letters that could be submitted to the press, and
25   they had reached their limit, so someone else submitted it on

170907congreOA                    Argument

1   their behalf.

2           Mr. Stepanovich talks about all the campaign

3   literature and how discriminatory animus is evidenced by that.

4   I would encourage this Court to look at each one of those

5   exhibits and find any reference to religion or, for that

6   matter, to Orthodox or Hasidic folks.  It's just not there.

7           Mr. Stepanovich talks about the texts, and he says --

8   and he quotes, "We don't want to lose this case."  I don't know

9   whether it was Mr. Yagel who said that or Ms. Louie who said

10  that.  I don't think it even matters.

11          Well, I don't want to lose the case.  I don't think

12  they want to lose the case.  What is that evidence of?  It's

13  evidence of concern about losing the case.

14          Then the comment was made about various Village

15  officials saying we need to be very careful of what they say.

16  Well, I think that's just common sense, given the fact that,

17  for the past five to six years, at every single public meeting,

18  there has been a representative of Mr. Savad's office in the

19  audience.  Also, as your Honor knows, at the January 22nd

20  meeting in 2007, they brought a videographer and they brought a

21  stenographer.  They also adjourned that meeting in December.

22  They adjourned the meeting in December, they have the press

23  release or the newspaper article in January, then they

24  conveniently have a videographer for the next meeting.

25              THE COURT:  Let me ask you a question about that.  To

170907congreOA                    Argument

1    the extent that the concern that the town officials had was the

2    scope and the size of the yet-to-be-proposed college, why do

3    you have to be careful about expressing that concern?

4         MR. PELOSO:  The care about expressing any concern

5    about Tartikov throughout the history of this case has been

6    that any statement about, for example, someone says we don't

7    think the Tartikov proposal, the Tartikov development is

8    appropriate for this Village, okay, is interpreted as being

9    anti-Semitic.

10        THE COURT:  So, I remember.  It was, I think, the oral

11   argument on the motion to dismiss, Ms. Hamilton got up and said

12   what we don't want is Wake Forest University in our town.  And

13   I thought that was a very poignant way of describing the

14   concern a community might have about the size and scope of a

15   yet-to-be-proposed institution.  She didn't mince her words.

16   She didn't feel like she had to be careful.  There was no way

17   anybody would interpret that statement as anti-Semitic.

18        So, if a statement like that, which I think was, as I

19   said it was very poignant, it was very powerful, can be made by

20   somebody who, obviously, as a trained lawyer, who does lots of

21   RLUIPA litigation, she didn't hesitate in the slightest to say

22   that, then why would somebody who has that concern be worried

23   about how their words would be misinterpreted?

24        MR. PELOSO:  Because there was always a lawyer from

25   Tartikov at every public heeding.

170907congreOA                    Argument

1          THE COURT:  There were lawyers for Tartikov when
2     Ms. Hamilton said what she said.

3          MR. PELOSO:  Because every statement has been twisted
4     as far as it can be twisted.  I think if I was a Village
5     official, I would have the same concerns, because if I say I'm
6     against the Tartikov development because my village of 3400
7     people would become a Village of 8500 people, I'm labeled as
8     anti-Semitic.  It might be overreaction, but it's overreaction.
9     It's human nature.

10          THE COURT:  Okay.

11          MR. PELOSO:  Mr. Stepanovich mentions Mr. Prol and
12     Mr. Cook.  I would, of course, remind your Honor that Mr. Prol
13     became a planning board member in 2008.  He had nothing to do
14     with any of the laws.  He testified very poignantly as to that
15     fact.

16          Mr. Cook rotated off of the planning board in 2003.
17     He similarly testified he had nothing to do with any of the
18     laws.  And I would say that any statements of Mr. Cook, which
19     could be interpreted as revealing animus, were made in 2014 at
20     his deposition, far beyond the time frame when any of these
21     laws were enacted.

22          The key element, your Honor, that I want to mention,
23     and Ms. Hamilton has touched on this, is that aside from the
24     fact that the majority of these statements were made by
25     anonymous persons, and aside from the fact that, from a legal

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170907congreOA                    Argument

1    point of view, they are not for the truth, let's talk about the

2    connection.  Let's talk about the law here.

3          The law specifies that the plaintiffs must show that

4    the defendants enacted laws because of, and not merely in spite

5    of, the adverse effect on the plaintiffs.  The plaintiffs must

6    show that discriminatory intent was a significant reason for

7    the enactment of the laws.  The plaintiffs must show that the

8    laws were adopted to discriminate against religion.  The

9    plaintiffs must show that comments by the public actually

10   motivated the trustees and were a significant factor.

11         Now, let's look at these facts.  Each trustee at this

12   trial testified that the laws were not enacted because of

13   Tartikov, they were not enacted to prevent Tartikov's

14   development, and they were not enacted at all with Orthodox or

15   Hasidic individuals in mind.

16         Doris Ulman, the Village counsel, testified in her

17   affidavit that she attended every single meeting where a

18   Village law was being discussed, and that in none of the

19   meetings, were any statements made that any of the laws were

20   directed at Tartikov or any of the statements contained animus

21   or any statements were made directed to Orthodox or Hasidic

22   Jews.

23         Now, let's talk about comments from the public, and

24   let's talk about the testimony of the trustees in response to

25   those comments.  Alma Roman testified that discriminatory

170907congreOA                    Argument

1    comments were not considered by the Board of Trustees in

2    enacting the laws.  Ian Banks testified that he sometimes took

3    comments of the public into consideration, but that if he

4    disagreed with the comments, he disagreed with them and would

5    not consider them.  Brett Yagel testified that he doesn't

6    always agree with the comments of his constituents and,

7    moreover, he takes into account heavily the counsel of the

8    Village attorney.

9              As I read the court record, your Honor, the most they

10   have in terms of comments by the Village officials are two:

11   Alan Lamer testified that, quote, "He listened to public

12   opinions."  Nicholas Sanderson said that he considered the

13   public's concerns.  That's it, and that's just not enough.  In

14   fact, that's nothing.

15             Let's talk for a minute, though, about Tartikov.  And

16   since this case is heavily about the concept of sincerity,

17   let's talk about Tartikov for a second.  When Mr. Tauber bought

18   the property in 2004, he told Rabbi Fromowitz, who was at the

19   Yeshiva Spring Valley, that he intended to build townhouses and

20   he intended to sue under RLUIPA.  When Mr. Fromowitz was

21   deposed many years later in connection with this lawsuit, he

22   said that the idea or that the thought that there was going to

23   be a rabbinical college was a, quote, "complete surprise to

24   him."

25             Ms. Hamilton mentioned that Mr. Tauber and no one at

170907congreOA                    Argument

1    Tartikov ever consulted any of the education laws of the

2    Village.  That makes complete sense to me.  Why consult the

3    education laws if you have no intention to build a school?

4    It's kind of interesting that Mr. Tauber has 30-some-odd years

5    of experience as a developer and testified that he always

6    consults all the laws and hires consultants to find out what he

7    can and cannot build, but in this one situation where he spends

8    $13 million, he doesn't bother to do so.  So, I would submit,

9    your Honor, the reason is he knew exactly what he intended to

10   do; he intended to sue.

11          Let's talk a little bit more about Tartikov.  There is

12   no evidence of a curriculum before the lawsuit was filed.

13   After the lawsuit was filed and when this litigation was

14   beginning, there was a one-page curriculum authored by one of

15   the students at the request of Tartikov's lawyers.  There is

16   nothing in Tartikov's Certificate of Incorporation which talks

17   about a rabbinical college.  There is, however, a paragraph in

18   the Certificate of Incorporation which talks about one of its

19   purposes is to provide housing.

20          The Certificate of Incorporation for Tartikov also

21   describes what is a much broader institution than the very

22   narrow rabbinical college that has been proposed.  I find it

23   curious that this certificate was never shown to Bernard

24   Fryshman, who was of AARTS, that is the accrediting agency.  I

25   suspect, and this is speculation on my part, that if that were

170907congreOA                    Argument

1   shown to the director of AARTS, he said this institution might

2   be able to be accredited because it is very broad in what it

3   intends to achieve.  There are no actual plans for the

4   rabbinical college, or none that have been produced in this

5   case.

6         It is also interesting that when Mr. Tauber bought the

7   property in 2004, he was made, shortly thereafter, a trustee of

8   Tartikov for the purposes of litigation.  It's interesting also

9   that Mr. Savad spoke with Ms. Ulman in 2007, May of 2007, and

10  gave her the details of the college, which consisted of simply

11  two things:  It could not be accredited and it would be a

12  college and it would have housing.  Ms. Ulman suggested that

13  Mr. Savad apply for a variance.  None was ever applied for.

14  Instead, suit was filed.

15        I've already discussed the interesting sequence of

16  events where Mr. Savad, in the fall of 2006, adjourned the

17  meeting on, among other things, Local Law 1 of 2007, or it

18  later became that law.  Then, interestingly, in January of

19  2007, an article appeared, authored by Saccardi & Schiff, which

20  was the consultant of Tartikov, saying that there would be

21  1,000 rabbis, 5,000 people, 9 residential apartments -- I'm

22  sorry -- 9 residential buildings, four- to six storeys in

23  height.  And then, of course, shortly after that news article,

24  the adjourned meeting, at the request of Mr. Savad, is held,

25  which the people appear, and Tartikov appears with his

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

170907congreOA                    Argument

1   videographer and his stenographer.

2           I have really just two final thoughts --

3           THE COURT:  Can we pause on that for a second.

4           MR. PELOSO:  Certainly.

5           THE COURT:  Let's play this out.

6           So, Tartikov brings this lawsuit.  He hires officers

7   of the Court to draft up a complaint where they are governed by

8   Rule 11 and alleges that Tartikov wants to build a rabbinical

9   college but can't because of what plaintiffs say is a series of

10  discriminatory law that prevents them from building the

11  college.  The goal of the lawsuit presumably is to win, right,

12  so that they can build what they say they want to build.  And

13  is the theory that, when all is said and done and plaintiffs

14  really do win this lawsuit, they're going to build townhouses

15  and not a college?

16          MR. PELOSO:  Correct.  Correct.

17          THE COURT:  So, let's play that out some more.

18          As I understood it from the very beginning of the

19  trial, what plaintiffs said was, what they were seeking at this

20  stage in this lawsuit, was the right to apply - I think that's

21  how it was phrased, right - the right to apply to build the

22  rabbinical college.  So, if they win this lawsuit, and you're

23  right, okay, your theory is right, then when they go to apply,

24  when they go to the Village board, they're going to say,

25  actually, we're not going to apply for a college, we're going

170907congreOA                    Argument

1      to do the Tauber Townhouse Development.

2              MR. PELOSO:  No.  I have no doubt they'll apply for a

3      college, but who's going to --

4              THE COURT:  Hang on.  So, let's play it out.

5              Let's say that it's approved, and then they're going

6      to say, oh, never mind, we're not going to build the college

7      you approved, we're going to build townhouses, and somehow

8      that's just going to happen?

9              MR. PELOSO:  I would say, your Honor, that the college

10     that will be built will not be in any way the college that was

11     described in this case.

12             THE COURT:  But they would have to make a proposal to

13     the Village board.  And Ms. Hamilton has been understandably on

14     this theme from day one, we still don't know what it is, but

15     when they go to make a proposal, they're going to have to -- I

16     have no idea what's involved in all of this, but I imagine, you

17     have to show up with more than, like, a drawing on the back of

18     a napkin, right?  Because you have to deal with SEQRA, you have

19     to deal with all kinds of issues, you have to be fairly

20     specific about what you want to build; right?

21             So, they're going to have to say, Here's what our

22     college is going to look like.  Here's an architectural plan.

23     You're going to do an architectural plan?  Experts?  You're

24     shaking your head "yes."  So, here's our architectural plan,

25     and here's how big it's going to be, here's how many square

170907congreOA                  Argument

1   feet it's going to cover, and here's how we're going to deal

2   with environmental issues, and traffic issues, and everything

3   else.  And then, all of that would be a ruse.  Once it's

4   approved, they're going to, like, in the middle of the night,

5   they're going to build townhouses?

6           MR. PELOSO:  One moment, your Honor.

7           THE COURT:  Please.  Of course.

8           (Counsel confer)

9           MR. PELOSO:  In answer to your Honor's question, we

10   believe that they would probably go ahead and propose a

11   college.  They would have to propose plans for a college.

12           THE COURT:  Right.  And let's assume it gets approved.

13           MR. PELOSO:  The college would consist of multi-family

14   housing, assuming that was allowed, the college would likely

15   consist of a synagogue, a study hall, a *mikvah*, all the things

16   that were described.

17           THE COURT:  Yes.

18           MR. PELOSO:  It would probably have about five to ten

19   students, so that the 99.9 percent function of the actual

20   property would be housing.

21           THE COURT:  Right, but -- so, if it had ten students

22   and each student had, you know, a spouse and some number of

23   children, that's why it would be 90-something-percent

24   non-student, but it would still be a college, right?

25           MR. PELOSO:  It would be a college, I would say, in

170907congreOA                    Argument

1   name only.

2          THE COURT:  Right, but it also -- I mean, name only?

3   So, what?  It's really a ruse to get ten families into

4   townhouses?  Is that the idea?  Ten families that would

5   compromise -- let's assume an average family size of one --

6   let's assume ten.  So, you're going to have 100 people in this

7   townhouse complex?

8          Is that really what's stoking this whole thing?

9          MR. PELOSO:  Well, I would say from the Village's

10  point of view, the feeling has always been that Mr. Tauber's

11  intention is to build housing for the Orthodox community, which

12  we think is a noble pursuit, but we do not think it's correct

13  to go through the idea of making it a rabbinical college that's

14  going to have 500 or 1,000 students, and that's borne out by

15  the fact that after ten or so years, he's only got ten

16  students.

17         THE COURT:  I'm struck by that.  Could it be one of

18  the reasons there was only ten students is because of this

19  lawsuit and the uncertainly that it brings?

20         Like, if you're some 20-something-year-old person and

21  somebody comes to you and says, Hey, do you want to go to

22  rabbinical college?  Sure.  You know, it's 15 years of study.

23  Umm, okay, I'll still do it.  Where do I start?  Well, it

24  hasn't been built yet.  Well, actually, it hasn't even been

25  designed yet.  Well, actually, it's in a federal lawsuit.  Oh.

170907congreOA                    Argument

1    When is that going to end?  Well, have you heard about the

2    judge?  It's never going to end.  I'm going to be 50 by the

3    time this case is over with.  Forget it!

4             MR. PELOSO:  I would submit, your Honor, that in order

5    to increase their chances of success, the plaintiffs would

6    likely want to have as many potential students as possible.  I

7    certainly would.

8             THE COURT:  You can argue that they're being honest

9    about the fact that they don't have a thousand students ready

10   to go.  Again, I think the uncertainty created by the lawsuit,

11   to any rational decision-maker, that would be an issue.  It

12   might dissuade some from signing on the dotted line.

13            MR. PELOSO:  I don't think there was evidence to that

14   effect.

15            THE COURT:  Would you go to a law school -- if they

16   say, you can go to law school, but the school isn't built yet,

17   you wouldn't sign onto that.

18            MR. PELOSO:  Certainly, if I knew that there was going

19   to be -- if I wanted to become a rabbinical judge, and if there

20   was an institution that was going to offer me the opportunity

21   to study for 15 years and have my expenses paid, I would sign

22   up in a heartbeat.

23            THE COURT:  Except, you don't know when it's going to

24   happen.

25            MR. PELOSO:  I would get my name on the list.

170907congreOA                    Argument

1          THE COURT:  Maybe you would.  Maybe you wouldn't.
2     You'd be one of the ten, then.
3          MR. PELOSO:  If I were Mr. Tauber, I would want my
4     name on the list, so that when I presented it to your Honor, I
5     would show that I have 200 students waiting.
6          THE COURT:  Right.  So, what does that say about the
7     veracity about the representation of ten?  That's probably a
8     real number.  They're not exaggerating.  It's not really five.
9     So, let's double it.
10          MR. PELOSO:  I think, if there's a low number, it's
11     not necessarily because -- I don't know whether it's because of
12     lack of interest, but it certainly shows that Tartikov or
13     Mr.  Tauber, if you want to look at them as one in the same,
14     has not made any effort to go out and to try to recruit
15     students; and that, in my opinion, suggests that there isn't a
16     concern or there isn't even a desire to actually build a
17     college.
18          THE COURT:  But I don't know how one can recruit for
19     something that doesn't exist, and it may never exist, or it may
20     exist many, many years down the road.
21          MR. PELOSO:  The plaintiffs' prospective students
22     testified that they've signed up because if and when it is
23     built, they intend to attend the college.
24          THE COURT:  Right.  And plenty of other people might
25     have said, Look, I'm not going to wait around, right?

170907congreOA                    Argument

1          MR. PELOSO:  That's entirely possible; yes.

2          THE COURT:  I guess I'm still at a loss to understand

3    how Mr. Tauber gets to the end game of having a townhouse

4    complex, because the ten number is being used to say, Well,

5    really, of the people who would live on the campus, only ten

6    percent of them are actually going to be students.  So, that

7    argument, I suppose, is sort of saying, really what this is

8    about is, the students are being used as the shoehorn to get

9    nine other people into the housing, but if there's only ten

10   students, then you're talking about 100 people, which it's not

11   Wake Forest.

12         MR. PELOSO:  Our belief is that I fully acknowledge

13   that's what's been represented at trial.  What was represented

14   at trial was that only students would be allowed to live on

15   campus - students, obviously, their families, and faculty

16   members.  It's our belief that if this development were built

17   now, that would not be the case.

18         THE COURT:  What would not be the case?

19         MR. PELOSO:  That the only people living on the campus

20   would be students, their families, and faculty.

21         THE COURT:  Right, but how does that make it a

22   townhouse complex?

23         MR. PELOSO:  Well, it's not just a townhouse complex,

24   but if, in our hypothetical - and that word's been used a lot

25   in the past few months - if, in my hypothetical, there are ten

170907congreOA                    Argument

1   students and then there are -- 90 percent of the other

2   residents are not students, I guess it's still a college, but

3   in a *de facto* sense, it's essentially housing.

4            THE COURT:  Okay.

5            MR. PELOSO:  I'd like to close, your Honor, by just

6   simply reading a snippet from a Second Department decision in a

7   case your Honor may very well be aware of, which is the *Village*

8   *of Chestnut Ridge v. Town of Ramapo*.  And the Court said the

9   following:  "A municipality is more than the collection of

10  pavement, pipes and other improvements that make up its

11  infrastructure.  Rather, a village is a local government unit

12  with broad powers, conferred not by legislative grant, but as a

13  matter of constitutional entitlement.  In the furtherance of

14  this authority, municipal officials exercise a broad array of

15  powers with respect to the nature of the community, including

16  the powers to protect and enhance the physical and physical

17  environment.  The power to define the community character is a

18  unique prerogative of a municipality acting in its governmental

19  capacity.  All of the other entities of local government,

20  including its electoral and legislative processes, management

21  policies, and fiscal decisions are ultimately aimed at

22  determining and maintaining the community that its residents

23  desire."

24            Thank you, your Honor.

25            THE COURT:  Thank you very much.

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

170907congreOA                    Argument

1          MR. STORZER:  May I have rebuttal.

2          THE COURT:  Of course.

3          MR. STORZER:  Your Honor, I'm going to address mostly

4    the points that were made by Ms. Hamilton, but with respect to

5    that last issue where there was some back and forth on, this

6    idea that I think it's essentially an attack of the sincerity

7    of the plaintiffs here with respect to what they intend to

8    build.  We don't have to go back to 2007 when plaintiffs filed

9    the lawsuit or go back to 2004 when property was purchased.

10   We're talking about a family and a history that goes back for

11   four centuries.

12          We're going back to the 1600s in Eastern Europe, a

13   family that has this history, this tradition of building, of

14   studying, of praying -- these rabbinical colleges, training

15   rabbinical students to be judges, going through that kind of

16   history, having these kinds of institutions throughout the old

17   countries, going through the Holocaust, having them destroyed,

18   coming to this country, attempting to rebuild, trying to create

19   this institution that once existed and now that they want to

20   have exist again.  If this is a plan to build some townhouses,

21   this really is playing the long game.  It's, I think, beyond

22   reasonable to argue that this is anything but a sincere effort

23   to build a college.  And I think ultimately that was

24   essentially agreed to by opposing counsel.

25          The question of whether that college would be used for

170907congreOA                    Argument

1    people that were not students, people that were not associated

2    with it, that's easily solved.  The evidence showed that the

3    Village can place conditions on permits, can say everybody has

4    to be a student at the college or a family member of a student.

5    That's not an issue.

6            If it becomes something else after approvals were

7    granted, well, the Village has the power to enforce its zoning

8    code.  If something was a college and then became a townhouse

9    development, an apartment building, something else, some other

10   type of land-use, the Village has means of addressing that.

11   That's not a reasonable fear here.

12           THE COURT:  Can I play devil's advocate to that?

13           There are sort of two pieces to that.  There's

14   fear/perception.  To the extent that people in this community

15   were of the view that the school was really going to be, not

16   quite a pretext, but would be -- as I said, it's almost like

17   the shoehorn that would get a facility in Pomona, and let's

18   say, instead ten students, there were a thousand students, and

19   then you have the same multiplier in terms of the families of

20   the students, now you're talking about -- instead 100 people,

21   you're talking about 10,000 people, and then it is Wake Forest

22   University.

23           And whether you want to call it a college or you want

24   to call it a college with adult student housing, to the

25   community, it might look like a townhouse development, right,

170907congreOA                    Argument

1    even though there might be studying and learning going on, the

2    vast, vast majority of the people who are living on the

3    facility are not the students or the teachers.

4         So, if that's a concern that people have, then what's

5    wrong with that?

6         MR. STORZER:  Well, there are many different layers to

7    that question.  The first is, there's an important fact that

8    we're overlooking here in terms of what the Village residents

9    said at that meeting and the laws that were passed.

10        That meeting happened January 22, 2007.  Local Law 1

11   of 2007 was passed on that date, but it was considered and

12   introduced way before that meeting, before the leaked plan was

13   ever published, before there was any concept of a thousand

14   students, before there was any fear of any specific project

15   that may or may not have whatever they consider to be a

16   large-scale, large-size facility.  The ordinance was drawn up.

17        We know that the Village board illegally held meetings

18   where they discussed something that was related to Tartikov, to

19   Camp Dora.  There was no litigation going on.  What were they

20   talking about?  Then this ordinance comes out.  There's a clear

21   inference there.

22        THE COURT:  Your point is that the inference from that

23   chronology is the fear not of Wake Forest, but the fear of

24   Hasidic Jewish people having some kind of an institution,

25   having some ownership of property in Pomona.

170907congreOA                    Argument

1        MR. STORZER:  Absolutely.

2        THE COURT:  Regardless of what the plans are or

3    whether it is to be or perceived to be.

4        MR. STORZER:  Exactly.  The thousand wasn't even a

5    gleam in the Village's eyes at that point or the residents'

6    eyes at that point.

7        Most importantly, --

8        THE COURT:  Yes.

9        MR. STORZER:  -- again, you can have Wake Forest or

10   you can have a smaller version of Wake Forest on this property.

11   Again, this is undisputed.  You can put a traditional college.

12   You can put dormitories.  You can have a thousand students if

13   they fit within the impervious surface coverage restrictions,

14   restrictions that we're not challenging in this suit.  There's

15   a 25 percent limitation.  You can only build up to 25 percent

16   of the property, including driveways, roads, housing,

17   classrooms, athletic facilities, everything, you can put that

18   there.  That's not an issue.  The question is, who it is that

19   they're putting there.

20        In this case, if an application was made for a special

21   permit, let's say the use was permitted, students were allowed

22   to have families and live on campus, and a non-accredited

23   educational institution was permitted, and they couldn't build

24   a facility for a thousand students because it would obviously

25   make up more than the impervious surface limitations, then it's

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170907congreOA                    Argument

1    not going to be permitted.  If Tartikov wants to apply for a

2    variance from that provision, they, like any other applicant,

3    would have the ability to do that, and the Village could deny

4    it if it had the grounds to do it.

5         THE COURT:  Let's play that out, too.  Isn't there a

6    height limit?

7         MR. STORZER:  There's a height limitation.  That is

8    something we are challenging.  There's a height limitation to

9    the housing to the dormitory.

10        THE COURT:  Right.  Part of the argument that you make

11   in terms of strict scrutiny is narrowly tailored or lesser

12   restrictive, right, that there are other things that the

13   Village, in evaluating an actual proposal, can cite in

14   determining whether or not to grant either the proposal or a

15   variance, right?

16        MR. STORZER:  Absolutely.

17        THE COURT:  So, if you play that out, and there are

18   some things where Tartikov says would need a variance and the

19   Village says no, we're not giving you the variance, community

20   character, it's too big, they don't want Wake Forest, does

21   anybody have any doubt as to where you-all are going to be the

22   day after that happens?

23        MR. STORZER:  That depends, your Honor.  If Tartikov

24   tries to build a 15-storey building and it's denied based on

25   the fire engines won't be able to use their equipment to reach

170907congreOA                    Argument

1    the higher floors or it's going to actually have a real impact

2    on the community, it would be, I think, foolhardy to attempt to

3    challenge that, to go through another ten years of litigation

4    and pursue a lawsuit that they know is not going to be

5    successful.  It would be an as-applied challenge.

6            We've seen these kinds of challenges happen in the

7    court.  Sometimes they win, sometimes they lose.  Depends on

8    what it is.  But right now, the height limitation in the

9    Village is 35 feet for single-family homes.  For the housing

10   for a college, it's 25 feet.  That's irrational.  That's

11   unreasonable.  Again, there are the other provisions of RLUIPA

12   and limitations and so on.

13           THE COURT:  I understand.

14           MR. STORZER:  So, if they're allowed to build, and if

15   they built 25 feet, that's allowed under the rules.  If the

16   25-foot limitation is struck down and they're stuck with

17   35 feet, they'll build 35 feet.  If they apply for a variance

18   to 40 feet, you know, under whatever state law standards there

19   are, the Village will approve it or deny it, and then the

20   remedies that might be available for relief would be pursued,

21   but they don't have that choice.  They don't have the chance to

22   apply for it.  They don't have the chance to apply for

23   variances or go through this application process.

24           And on that point, I'd like to address something that

25   Ms. Hamilton started with, which is, again, these words run

170907congreOA                    Argument

1      together, so it's sort of, like, one big word: use variance,

2      text amendment, zone change.  Let's parse that.  There's no use

3      variance.  I'll move on from that.

4              THE COURT:  No.  Go ahead.  Say your piece.  Say your

5      piece.

6              MR. STORZER:  Again, the Village's representatives

7      admitted we could not get a use variance.  The law says we

8      cannot get a use variance; that is, there is no dispute as to

9      that.  Zone change, no such thing.  The words "zone change,"

10     the concept of it does not exist in the Village code.  The only

11     way that theoretically they can come in is through a change in

12     the laws themselves.  And, again, if that is something that the

13     Court would hold is required in order to demonstrate either

14     standing or a substantial burden on a religious exercise, then

15     no RLUIPA case could ever be successful if an ordinance is

16     challenged like this because the laws can always be changed.

17     That is really what is at issue here.

18              But going back to the application question, being

19     treated the same is what Tartikov is looking for here; being

20     able to build as much as an accredited college can build, as a

21     college with normal -- not normal -- but typical dormitories

22     that are permitted under the code.  There was the issue that

23     was raised about why didn't Michael Tauber do his due

24     diligence.  As we argued in our brief, and I think it was

25     absolutely demonstrated at trial, the use was permitted prior

170907congreOA                    Argument

1   to the enactment of Local Law No. 5 of 2004.  The code that --

2   the provisions of the law that were adopted in 2001 did not

3   prohibit housing for colleges, for other educational

4   institutions that were permitted under the code.  They weren't

5   prohibited for, quote, schools, but we did not meet the

6   definition of a school.  We fell under the other part of the

7   definition, which allowed other types of educational

8   facilities.

9        But putting that aside, we're not challenging those

10  laws.  We're challenging the laws that were passed after they

11  purchased the property.  We're challenging Local Law No. 5 of

12  2004, Local Law 1 of 2007, and Local Law 5 of 2007.  The issue

13  of Local Law 1 of 2001 that we are challenging in this suit is

14  somewhat distinct, and that's more of a facial challenge

15  related to the differential treatment of religious assemblies

16  and institutions and non-religious assemblies and institutions,

17  treating the building coverage requirements and the floor area

18  ratios differently between, say, museums, libraries,

19  recreational facilities, and this particular use that's at

20  issue here.

21        THE COURT:  On that point, the stip that went through

22  all of this, this is the stip -- I want to make sure -- the

23  joint stip, paragraph 6 says permitted land-uses as of right

24  within the R40 zoning districts are one-family residences,

25  houses of worship, public utilities, rights-of-way, libraries,

170907congreOA                    Argument

1   and museums, other public parks and playgrounds, and

2   agricultural pursuits.

3           I thought that was not right; I thought houses of

4   worship were not as of right.

5           MR. STORZER:  Houses of worship are a special permit

6   use, which I'm not sure --

7           THE COURT:  Sure.  So, what is one to do with a

8   jointly-stipulated fact that's wrong?

9           MR. PELOSO:  We can certainly amend it, your Honor.

10          THE COURT:  I guess we can amend it right now, right?

11  I thought that was right, but I just want to make sure I

12  didn't --

13          MR. STORZER:  Recreational facilities are also allowed

14  as a special permit use, but not subject to those same building

15  coverages, but they are restrictions.

16          THE COURT:  Okay.  Fair enough.  I'm sorry.  I just

17  wanted to make sure that I didn't lose that thought.

18          MR. STORZER:  All right.  Again, the so-called fear of

19  the size had nothing to do with the introduction and

20  consideration prior to the so-called leak of the plan that the

21  Village was planning to adopt this ordinance.  We know that

22  they met in secret for ten meetings.  We know that it was about

23  Tartikov.  We know that there wasn't any current litigation

24  going on.  It doesn't answer that question.

25          And if there was some concern about size, the Village

170907congreOA                    Argument

1   didn't pass a law saying, okay, some family housing won't be

2   allowed or we will limit it in some way that we think the goals

3   of the Village are met.  They maintained the existing law of

4   2004:  No family housing is permitted.  There is a critical

5   point.  And, again, my co-counsel might disagree with me, but I

6   think the most important fact in this case is what happened at

7   the same time that they passed Local Law No. 5 of 2004, and

8   that was the Village suing the Town of Ramapo to try to get rid

9   of exactly the kind of use that the Village got rid of within

10  its own jurisdiction.

11          They say that this is an unusual use.  They've argued

12  repeatedly, how could we have planned for this.  The township's

13  or the Village's expert witness saying jurisdictions can't plan

14  for every kind of crazy use that comes down the pike.

15          They knew about this use.  They filed the petition in

16  Supreme Court to prevent the Town of Ramapo from doing exactly

17  the same thing.  Ms. Ulman was the Village attorney for the

18  Village of Chestnut Ridge.  We know that she admitted she

19  probably wrote the law that did exactly the same thing within

20  that jurisdiction.  This wasn't a surprise to the Village.

21  They knew exactly what they were doing.  They saw it happening

22  in the Town of Ramapo, and they wanted to make sure that it

23  wasn't going to happen in Pomona.

24          The ten-students issue, again, I think the Court has

25  addressed this completely, but I would say at the end of it,

170907congreOA                    Argument

1    even if it was ten students, so what?  So, there's only ten

2    students on a 100-hundred-acre property.  Surely, that would be

3    consistent with the Village's goal of what they are saying

4    should take place on that property, would leave it mostly open

5    space, have very minimal use of the property.  Obviously,

6    that's not the case.

7          If Tartikov is allowed to apply on equal terms and

8    build this facility, there will be applications coming in.  The

9    issue of whether there are enough judges --

10         THE COURT:  You had the line, right, from "Field of

11   Dreams."  It was there for you.  The alley-oop was there.

12         MR. SAVAD:  "Build it and they will come."

13         THE COURT:  Right?

14         MR. STORZER:  Right.  Absolutely.

15         And we know that this is going on, that there is a

16   burgeoning Hasidic ultra-Orthodox Jewish population happening

17   both here in Rockland County and other places, around Lakewood

18   Township, New Jersey, and so on.  These people exist.  They

19   have children.  Where should they go?  Should the villages be

20   allowed to build a wall, build a wall around Monsey, build a

21   wall around Lakewood, tell them that they're not allowed to

22   come within their jurisdiction, to sequester them?  That's

23   really what's happening here, your Honor.

24         And I think that there are some important policy

25   considerations.  Towns, villages in the northeast are looking

170907congreOA                    Argument

1   at this case.  I know that.  I do a lot of work in this area.

2   I'm asked about this case constantly.  Do we want to give them

3   free rein to pass these kinds of laws to prohibit Arabs as I've

4   seen is the latest thing; to pass laws to prevent real estate

5   agents from being able to market properties to the population

6   because there is this burgeoning need for it; to require

7   property owners to register with the jurisdictions because

8   there is some fear that the owners are actually Hasidic or

9   other types of ultra-Orthodox Jews?  That's what is at issue

10  here.

11          I want to move on to the substantial burden question.

12          THE COURT:  Okay.

13          MR. STORZER:  What you heard here today is, again,

14  what you heard throughout this lawsuit from the defendants:

15  There's no substantial burden on the plaintiffs' religious

16  exercise because this isn't necessary for their religious

17  beliefs, that they wouldn't be sitting if they don't study at

18  this rabbinical college.  That's not the law.  The RLUIPA says

19  so, the Supreme Court has said so.

20          Issues of religious exercise -- this Court in the

21  *Bikur Cholim v. Village of Suffern* litigation, where I

22  represent the plaintiffs as well, said that religious exercise

23  that is aspirational is entitled to just as much protection as

24  religious exercise which is necessary.

25          We believe that this is necessary for our clients, but

170907congreOA                    Argument

1   that's not the standard.  The standard is, is this religious,

2   is it motivated by sincere religious belief, and that's been

3   proven here.

4         The Court heard the testimony of these plaintiffs.

5   This isn't a game for them.  This isn't some ruse to help

6   Michael Tauber out to build townhouses.  They want to study.

7   They are studying.  They want to be able to do it in a way that

8   they believe is the best way for them to reach their goals, to

9   do what their religion, what their God tells them to do.

10  Whether it's a sin or not, that's not the issue.

11        On that point, because we have two different types of

12  plaintiffs here, because we have Tartikov as the plaintiff,

13  which has rights somewhat different than the rights of the

14  individual plaintiffs --

15        THE COURT:  Just so we're all on the same page, there

16  are three individual plaintiffs who are still left, right?

17        MR. STORZER:  I believe there's five.

18        THE COURT:  Who do you count as the five?

19        MS. SOBEL:  The other two students are -- I'm going --

20  we have some of the teachers, Mordechai Babad and Wolf Brief

21  and Hermen Kahana are also teachers and deans who are

22  plaintiffs; and then the students are Meir Margulis, Gergely

23  Neuman -- I'm sorry, Neuman is out -- Meilech Menczer, Jacob

24  Hershkowitz, Chaim Rosenberg, and David Menczer.

25        THE COURT:  Who did you say was out?

170907congreOA                    Argument

1        MS. SOBEL:  Gergely Neuman and Aryeh Royde, they were

2   actually dismissed from the complaint when we started back up

3   after the motion to dismiss when discovery started.  They

4   couldn't wait anymore, and they had to start doing other

5   things.

6        THE COURT:  Okay.  Fine.  Glad I asked.  Thanks.

7        MR. STORZER:  Putting the specific religious interests

8   of the individual plaintiffs aside, which I think was really

9   the focus of defendants' argument here, we have Tartikov.

10  Tartikov has the right -- just as in the *Bikur Cholim* case,

11  Rabbi Lauber certainly had stronger claims according to the

12  Court in that case because of the situation of the other

13  individual plaintiffs that were at issue.

14        If the Court believes that Tartikov has the right to

15  build this religious college, this rabbinical school, and it

16  goes ahead and does so, then the school becomes available, the

17  school becomes available for the individual plaintiffs; and

18  then they actually do have, as the Court has heard, a religious

19  obligation to attend it, to avoid the sin of *bitul* Torah,

20  because there is this facility available for them, and for them

21  not to use it would be a waste of the study of the Torah.

22        So, I don't think this is bootstrapping.  I think that

23  if the college is allowed to exist, then the claims of the

24  individual plaintiffs become that much stronger, but, again, we

25  don't believe that that's what's necessary to prove this case.

170907congreOA                    Argument

1        THE COURT:  I think we're all on the same page as to

2   what the law says.  And I think another way of maybe framing

3   the defendants' position -- and counsel, let me know if I'm

4   wrong -- is maybe challenging the sincerity of the belief that

5   the housing is necessary -- I think necessary -- that the

6   housing is part of the religious exercise of even becoming a

7   rabbinical judge.  And part of their argument is that there are

8   other rabbinical colleges where there is no on-campus housing.

9   I mean, we talked about this even during the course of the

10  trial.  And that even if it's nearby, there are houses that are

11  nearby that could accommodate the ten students, so you're

12  talking about a walk of a short distance.

13        The other point that gets made in their papers is the

14  whole notion of the Torah community they say is something that

15  was – my word, not theirs – sort of ginned up after the

16  lawsuit.  It's not in the complaint.  It's sort of a theory

17  that was adopted post hoc as a way to sort of meet that test.

18        So, if you want to comment on that.

19        MR. STORZER:  It most certainly was in the complaint.

20  The term Torah community might not have existed in the

21  complaint, but the concept of living on campus, to be there, to

22  be in this kind of intense religious learning environment was

23  described in that.  And my co-counsel is looking up the

24  specific paragraphs of the complaint as we speak.  I should

25  have had that ready.  We were talking about that the other day,

170907congreOA                    Argument

1   but it is there.

2            With respect to what other colleges do, I think the

3   evidence was clear that there is, first of all, no other

4   college like this that exists.  One in Israel.

5            The other thing is, again, this is getting back to the

6   necessity question.  The question is not, Can they possibly

7   engage in some other different type of religious exercise

8   because somebody else is doing it?  It is, Do they sincerely

9   believe that this is what they should do according to their

10  religious beliefs?  Should they be in this environment where

11  their peers live beside them, their teachers live beside them,

12  they can study with them day and night.  They are constantly

13  immersed.  They can take care of their families.  During the

14  Sabbath, they don't have the problem of being able to go back

15  and forth to religious services and so on and study without the

16  problem of driving a vehicle.

17           Is it important to be sequestered from the outside

18  world specifically?  And I think the Court heard

19  this testimony, that this is not simply an issue of

20  convenience.  This is not simply an issue of, You don't have to

21  walk a couple of extra blocks, like was the issue in the

22  Eleventh Circuit's *Midrash Sephardi* case.  Being there itself

23  is an important component of this proposed religious facility.

24           I don't want to stand here and repeat the words of the

25  witnesses that explained why that's important, but the Court

170907congreOA                    Argument

1   heard it, and it's certainly the Court's right and duty to

2   judge the sincerity of those witnesses.  And we don't think

3   that there was any basis to doubt that, but to say that the

4   beliefs are insignificant, to say that they're not central, to

5   say they can do it some other way, again, the text of RLUIPA

6   and the Courts have said that's not a permissible inquiry.

7           THE COURT:  Okay.

8           MR. STORZER:  I'm being pointed to paragraph 64, and I

9   know that there are others as well in the complaint.

10          THE COURT:  Hang on one second.

11          MR. STORZER:  Sorry.  I was looking down.

12          THE COURT:  Go ahead.

13          MR. STORZER:  Thank you, your Honor.

14          We heard that the Village's concern was that they

15  wanted to oppose overdevelopment at the same time they passed a

16  law permitting colleges, permitting dormitories, permitting

17  them to the same extent that we're asking Tartikov to be

18  permitted, too.

19          I don't understand the argument that we wanted to keep

20  out development, so we're going to allow this massive

21  institutional use.  Again, to allow that, but to specifically

22  gerrymander the use to prohibit student family housing, which

23  they know will keep out the Hasidic groups, and we know that

24  because they petitioned the state courts to keep that use out

25  of the Town of Ramapo, we know that because we know that the

170907congreOA                    Argument

1   Village attorney did the same thing in another jurisdiction.

2   That is an unconstitutional gerrymander.  It's a gerrymander

3   that violates RLUIPA, not to mention the other uses that are

4   permitted – libraries, museums, recreational facilities.  It's

5   not just single-family residences that are allowed in the

6   Village.

7           We heard that this RLUIPA was being used as a hammer

8   or that Tartikov is being used as a hammer here.  Again,

9   Tartikov purchased this property before these laws were passed.

10  Were they supposed to have predicted that the Village would

11  take these steps to ban their use?

12          THE COURT:  Well, they knew about the law from 2001.

13          MR. STORZER:  And again, that law is a little bit

14  different.  It's an issue of differential treatment between

15  other -- non-religious assemblies, institutions and the others,

16  and it stands in a little bit different footing.  And I'm not

17  sure we would be here today if that was the only law at issue.

18          THE COURT:  By the way, one of the points that you

19  make on some of the challenged laws is that there was a failure

20  to go through a SEQRA process.

21          Is that something that Pomona has to do every time it

22  adopts a law, a land-use law?

23          MR. STORZER:  There are specific standards that they

24  have to meet.  Standing here today, I think it has something to

25  do with environmental impacts, whether it's a type 1-,

170907congreOA                    Argument

1   type 2-type decision.  Under certain circumstances, they have

2   to do that.  With respect to Local Law 1 of 2001, it was

3   required.  They didn't do it.  There's no dispute as to that.

4          And, again, the importance of that is that it just

5   adds onto this pile of arbitrary, unreasonable and contrary to

6   state law treatment actions that the Village has engaged in,

7   and that's relevant to the substantial burden question as the

8   Second Circuit really has focused on in terms of the

9   *Westchester Day School* and *Fortress Bible Church* decisions.

10         THE COURT:  Well, as to the students of the -- legal

11  challenge to the Ramapo Adult Student Housing Law, one of the

12  arguments was that they didn't go through the SEQRA process.

13         MR. STORZER:  Yes.  That is ironic, your Honor.

14         THE COURT:  Indeed.

15         MR. STORZER:  And, again, this is in our papers.  This

16  challenge to Ramapo's actions was not just about an

17  overdevelopment; it was about the specific community that was

18  explicit in their papers.  They mentioned the Hasidic

19  community, they mentioned the religious needs of this community

20  as the basis for their challenge.

21         With respect to Prol and Cook, one of these sheets

22  that we have, it was argued that they were not on the board

23  that passed these laws, adopted the ordinances.  That's not the

24  point.  The point is that they were clear examples of the

25  Village residents that the board was responsive to.  They lived

170907congreOA                    Argument

1    in the Village, they had the ears of the Village officials.

2    One was even appointed to the planning board after he made

3    these kinds of comments.  Again, that's evidence as to the

4    responsiveness of the board here.

5            It was pointed out, I believe, by Mr. Peloso that the

6    standard here for the discrimination claim was whether the

7    discriminatory motivation was a significant factor, and he was

8    correct on that.  What he didn't mention is that the Second

9    Circuit has had the opportunity to inquire as to what that

10   really means.  And what the Second Circuit said is, it doesn't

11   mean that it's the dominant factor; it just has to be a

12   significant factor.  It doesn't have to be the greatest factor,

13   it doesn't have to be the majority of the reason behind it; it

14   just has to be a significant factor.  And I think, as

15   Mr. Stepanovich argued, that clearly existed here.

16           Another important point we've argued in our briefs,

17   and I wanted to underscore this because it is critical here, to

18   the extent that the Court may not see all of the opposition as

19   based on specific ill-will or animus, again, while that is

20   sufficient to demonstrate discrimination, it's not necessary.

21   What is necessary is that Hasidic/Orthodox Jews were targeted

22   based on their religious beliefs, religious denomination.

23           The *Hassan v. City of New York* case is an excellent

24   example of that.  The Third Circuit there held that you could

25   not target Muslims because you are concerned legitimately about

170907congreOA                    Argument

1   terrorism.  That's not permitted.  Even if the subjective

2   motivations of the police enforcement agencies was legitimate,

3   was concerned about erasing terrorism, you still cannot target

4   Muslim groups.  You can't target black or Hispanic groups for

5   enforcement actions in the City of New York based on the belief

6   that they commit more crimes, as this Court has held.

7          If the concern is about overdevelopment, the Village

8   can't target Hasidic Jews because of it.  Just because they

9   believe that Hasidic Jews are the reason that there are so many

10  Section 8 payments, that that's why the tax base is hurting,

11  that's why the public schools are suffering, that's why condos

12  are being built, they can't target that specific use, even if

13  their subjective motivations were legitimate.  And I think they

14  certainly weren't in this case, but even if they were, it's not

15  permitted.  The only thing that's required is that we show that

16  this group was targeted.

17         There are other claims that we have in this case, and

18  I'm sure the Court will have other questions.  I could spend

19  another three hours here if I had the opportunity.  I'm not

20  going to do that.

21         I do want to point out that we do have a claim under

22  the New York Constitution.  That provision requires a balancing

23  of the interests here.  Even if the Court were to find that we

24  did not meet the level of substantial in terms of the burden on

25  religious exercise, that's not relevant for our claim under the

170907congreOA                    Argument

1  New York Constitution.

2          There is certainly some burden on the plaintiffs here.

3  We think it is a complete burden.  We think it certainly meets

4  the level of substantial, but whatever the extent of that

5  burden is, it's balanced against nothing.  There is no interest

6  here that is served by these challenged laws.  I know that the

7  Court read the defendants' brief.  There's nothing argued in

8  there.  There's no section in there talking about the

9  governmental interest, whether they're compelling, important,

10 or even just legitimate.

11          I don't know if they've given up that argument because

12 of what happened at trial, but there's nothing there.

13          THE COURT:  Come on, Ms. Hamilton.

14          MR. STORZER:  We heard certain things throughout this

15 litigation: community character, traffic, the environmental

16 interests, and then a whole host of more procedural aspects.

17 We wanted to tidy up our laws; that sort of thing.

18          We heard from Ms. Ulman at trial that the purposes

19 that the Village had to adopt these laws, none of them were

20 served by the particular provisions that were at issue here.

21 And all of them could have been achieved by not adopting those

22 provisions or by adopting different provisions.  There's no

23 dispute about that.  There's no evidence that the defendants

24 have introduced at trial regarding traffic.  There's no issue.

25 Our traffic expert certainly demonstrated that this was not an

170907congreOA                    Argument

1   issue.

2          Community character?  The defendants' own planner

3   expert witness admitted that a rabbinical college with student

4   family housing could be built in a way that was sympathetic

5   with the community character of the Village.

6          And the environmental interests?  They get

7   complicated.  We had Ms. Beall testifying about that.  To the

8   extent that the challenged laws had any effect at all on the

9   environment, they were contrary to those interests rather than

10  helping them.

11         So, given the absence of any legitimate interests that

12  are at issue here, we believe that the easiest claim is our

13  claim under the New York Constitution.  I just wanted to point

14  that out before I finished.

15         And my co-counsel, Donna Sobel, has a few words on the

16  discrimination facts, if the Court would permit.

17         THE COURT:  Okay.

18         MS. SOBEL:  Thank you, your Honor.  Good afternoon.

19         THE COURT:  Good afternoon.

20         MS. SOBEL:  Defendants' counsel has argued that we

21  haven't proven that there's a connection between the community

22  comments and the decisions of the public officials.

23         Your Honor, the defendants' counsel said that there

24  were just two statements and they did not seem impressed with

25  what those statements are, but we want to make it clear, that's

170907congreOA                    Argument

1   not all there is.

2        And I specifically want to turn your attention to that

3   January 22, 2007 meeting where, as we saw earlier today, there

4   were many comments that had nothing to do with size and scale,

5   but it was worried about the tax base and people taking over

6   the community and things like that.

7        During that time frame, they were considering changing

8   the proposed law so that dormitories would be 35 feet, which,

9   as was pointed out by Ms. Ulman and Mr. Marshall, is what other

10  buildings are in the Village.

11       In fact, Mr. Marshall said at the beginning of the

12  meeting, he said, "It has to be the same as every other

13  building in the Village.  If every other building is limited to

14  35 feet, you can't say that this should be 25 feet because I

15  don't like it.  You can't do that because the courts will rule

16  against you."  That's how he started the meeting.

17       After he heard all these statements and all the people

18  saying make it in our favor, make it 15 feet, make it better

19  for us, we're concerned about paying the expenses of someone

20  else's lifestyle, we don't want to make it easy for these

21  people to live here, he said that he rejected the 35-foot

22  limitation based on the comments from the citizenry who

23  attended.

24       So, he started the meeting saying what's required of

25  us legally is to treat everyone the same; then he listened to

170907congreOA                    Argument

1   the comments and he said based on what you've said, I'm not

2   doing that.

3          They weren't interested in following the law.  They

4   were interested in making the changes and keeping the laws that

5   the people wanted, making sure that there was no influx of

6   Hasidic and Orthodox Jews into the Village of Pomona as it

7   happened in surrounding towns and villages.

8          But Mr. Marshall wasn't the only one who said

9   something.  Mr. Sanderson specifically said, "Based on the

10  input from this evening, I think it's very clear that there is

11  a great deal of concern about changing it from 25 feet to

12  35 feet," and he voted to leave the laws as they had been

13  proposed before that.

14         Another issue --

15         THE COURT:  So, when Mr. Storzer said there was

16  disagreement about the most important fact, you're a champion

17  for this fact.

18         MS. SOBEL:  I'm a champion for lots of facts, your

19  Honor.

20         THE COURT:  I figured you would say that.

21         MS. SOBEL:  But I do think it is important because it

22  was pointed out that there was no connection, and the

23  connection is there.  The statements were made.  The statements

24  were not about size.

25         Along those lines, defendants' counsel is trying to

170907congreOA                    Argument

1   portray this as these are outliers.  They're not outliers.

2   These are lots and lots of statements.  And as Mr. Storzer

3   pointed out, even if this didn't show ill-will, it's still

4   intentional discrimination.  If you're concerned about the tax

5   base, if you're concerned about the political power, and these

6   are things that you're associating with Hasidic and Orthodox

7   Jews, it's intentional discrimination, and Mr. Storzer cited

8   the cases.  And I'll direct your Honor to our pretrial brief

9   which has those cases on page 27, which really points out how

10  that plays into it.

11          And Mr. Marshall is the one who said it was a hostile

12  meeting.  We're not calling it hostile; he called it hostile.

13          And then another statement was made implying that

14  Mr. Marshall could not possibly be making anti-Semitic or

15  anti-Orthodox or anti-Hasidic statements because he is Jewish.

16  And, unfortunately, that's simply is not true.  There's no card

17  that says just because you share a faith with someone, that

18  you're not making decisions to keep them out, especially when

19  we're talking about different denominations of the same

20  religion.  It's not a free pass to say, Well, I couldn't

21  possibly be because I am -- because I'm of the same religion.

22  It's a different denomination.

23          And Mr. Cook also made it clear that he was Jewish,

24  but he made it clear how he felt about the Orthodox and the

25  Hasidic, and he did not see himself as one of them.  So, we

170907congreOA                    Argument

1    just want to point out that distinction.

2         THE COURT:  You know, there have been studies done

3    about discrimination in urban areas in terms of picking up

4    passengers by taxi drivers.  And it turns out the

5    discrimination by the taxi driver doesn't necessarily depend on

6    the race of the driver.

7         MS. SOBEL:  I understand.

8         And the next thing that we would like to say is the

9    defendants' counsel said that there were no anti-Hasidic or

10   Orthodox statements during the time frame that the laws were

11   discussed, but how do we know that?

12        First of all, every time -- we don't agree with that

13   based on everything we've heard from the meetings that were

14   public, but let's be clear:  They met ten times from July 2006

15   until December 2006.  Before they knew anything about the size

16   of the project, they met ten times about Tartikov in executive

17   session against the New York Public Open Meetings Law, which

18   prohibits you from meeting about something in executive

19   session.  There was no pending litigation.  There was nothing

20   that they could be meeting about.  So, we don't know.  We don't

21   know what was said in those meetings.  We can infer, but we

22   don't know.

23        At the end of those -- during the time frame of those

24   ten secret unauthorized meetings, two of the four challenged

25   laws, which prohibit plaintiffs from having their rabbinical

170907congreOA                    Argument

1   college, were introduced.

2        And then my last point is, defendants' counsel said

3   that -- they talked about the fact that plaintiffs are

4   segregating themselves and they seem to have a problem with

5   that, but, again, you can't keep people out or make laws

6   against them because they're segregating themselves, but then

7   say said, Well, it's a monastery.  But here's the thing:  A

8   monastery would be permitted in Pomona because the residents of

9   a monastery are prohibited from being married or having

10  families.  So, specifically Orthodox and Hasidic Jews, who are

11  required to be married and have families, they're the ones who

12  can't have a religious training institution that they can live

13  at.  They can't have a monastery for Orthodox and Hasidic Jews

14  under Pomona's laws, but other religions, they can have theirs.

15       Thank you, your Honor.

16       THE COURT:  Thank you very much.

17       MS. HAMILTON:  Okay.  So, we're definitely living in

18  two universes on two sides of the room.

19       What strikes me most about what we just heard is that

20  there seems to have been a fundamental inability to remember

21  this a facial challenge.

22       As your Honor knows, we strongly disagree with the

23  interpretation of this Court on what amounts to a facial

24  challenge, and we have every intention of taking that up in the

25  Second Circuit.

170907congreOA                    Argument

1            THE COURT:  What do you mean?  I thought you were

2    going to win.  You're going to go to the Second Circuit?

3            MS. HAMILTON:  Tell me which side's not appealing.

4    They're appealing.

5            A facial challenge, your Honor, requires them to prove

6    that it's supposed to be unconstitutional in every

7    circumstance.  They haven't been able to show it's

8    unconstitutional in one, except by making things up.

9            At least we had some honesty at the end.  They don't

10   know what happened in executive session; that's true.  There's

11   no evidence in the record about the executive sessions.  And

12   I --

13           THE COURT:  Do you dispute that the executive sessions

14   were contrary to state law?

15           MS. HAMILTON:  We don't agree that they were contrary

16   to state law.

17           THE COURT:  Okay.  And why is that?

18           MS. HAMILTON:  Because executive sessions are

19   permissible for purposes of discussing either litigation or

20   other matters in preparation.

21           THE COURT:  But there was no litigation when these

22   sessions happened.

23           MS. HAMILTON:  With them.

24           THE COURT:  Was there any litigation at all regarding

25   Tartikov back then?

170907congreOA                    Argument

1          MS. HAMILTON:  What was listed as one of the many

2    topics in each session --

3          THE COURT:  Right, but was there any litigation

4    involving Tartikov back in '06?

5          MS. HAMILTON:  There was no -- well, there was a

6    threat of litigation.

7          THE COURT:  But there was no litigation.  And the

8    threat of litigation, what makes you say that?

9          What was the threat of litigation?

10         MS. HAMILTON:  Your Honor, if I can just read what

11   happens in executive session by state law --

12         THE COURT:  Yes.

13         MS. HAMILTON:  -- because it would be unfortunate to

14   have a federal Court imply that executive sessions are illegal

15   when they're not.

16         Section 105 says that executive sessions involve

17   matters which will imperil the public safety if disclosed; any

18   matter which may disclose the identity of a law enforcement

19   agent or informer; information relating to current or future

20   investigation or prosecution; discussions regarding proposed,

21   pending or current litigation; collective negotiations pursuant

22   to Article Fourteen of the Civil Service Law; medical,

23   financial, credit or employment histories of a particular

24   person or corporation; preparation, grading or administration

25   of examinations; proposed acquisition, sale or lease of real

170907congreOA                    Argument

1   property.  So, --

2          THE COURT:  Hang on.  So, which one of those do you

3   think applies?

4          MS. HAMILTON:  Your Honor, --

5          THE COURT:  You just listed them all off.  So, public

6   safety, former investigation, prosecution, medical, financial

7   history, examination.

8          I mean, are you going for the litigation exception?

9          MS. HAMILTON:  Your Honor, the executive sessions are

10  not open to the public for purposes of these kinds of

11  considerations.

12         THE COURT:  I understand that.  Which one of those

13  considerations could have possibly applied to any conversation

14  about Tartikov?

15         MS. HAMILTON:  Tartikov was not necessarily discussed.

16  It was on the list.  Just because it's on the list, doesn't

17  mean it was discussed.  In fact, it wasn't Tartikov --

18         THE COURT:  It would be really unfortunate -- to use

19  your paradigm, it would be really unfortunate if the defendants

20  asserted that the executive sessions were legal and in fact

21  there was no basis for that assertion.

22         So, I want to know what the basis is for you to say

23  that the executive sessions were not contrary to Section 105,

24  which you just listed the things that could justify such a

25  session, and I don't see how any of those would apply.

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

170907congreOA                    Argument

1          MS. HAMILTON:  Your Honor, there was a list of topics

2     for each executive session.  Camp Dora --

3          THE COURT:  Okay.  Let's -- do we have the agenda for

4     these executive sessions?  Let's go through them.

5          MS. SOBEL:  We just need a minute to pull them.

6          (Pause)

7          MR. PELOSO:  Is your Honor looking for the exhibits or

8     the testimony?

9          THE COURT:  Let's just find out the executive sessions

10    where Tartikov is listed as being on the agenda.

11         MR. SAVAD:  She's getting it.

12         MS. SOBEL:  We have July 24, Exhibit 92.

13         MR. PELOSO:  I would ask, is that Camp Dora or

14    Tartikov?

15         MS. SOBEL:  The testimony said that they called it

16    Camp Dora.  The testimony said that when they said Camp Dora,

17    they meant whoever owned the property.

18         The first one is July 10, that's Exhibit 120.  The

19    second one --

20         MS. HAMILTON:  Excuse me.  That's one of a list,

21    right?  Can you read the list of topics?

22         MS. SOBEL:  Your Honor, you asked for the exhibit

23    numbers?

24         THE COURT:  All right.  So, July 10, start with that.

25    July 10, item 7 says executive session, and then the two items

170907congreOA                    Argument

1    on there are Ramapo hydrants and Camp Dora, which is --

2              MR. SAVAD:  Which is this one.

3              THE COURT:  Tartikov, the property.

4              MS. SOBEL:  Yes.

5              THE COURT:  Right, because that's what it used to be.

6              So, Ramapo hydrants, do we have any idea what that is?

7              (No response)

8              THE COURT:  Okay.

9              MS. HAMILTON:  Your Honor, what we do know is that

10   just because something is on the list does not mean it gets

11   discussed.  They do not go through everything on the list.

12             THE COURT:  Fair enough, but there's only two items

13   here on the list, number one; and number two, there are ten

14   instances where Camp Dora is on the list.

15             I guess I'm trying to understand, of the things under

16   105 that would justify an executive session, Ramapo hydrants?

17   I don't know how that could possibly fit under any exception

18   that would justify executive session, and I don't know what

19   about Camp Dora could be, either.

20             MS. HAMILTON:  Your Honor, nobody in this room knows

21   what was going on with the Ramapo hydrants, whether it affected

22   public safety or not, which is the number one thing --

23             THE COURT:  So, how do we know that the executive

24   sessions were legal, lawful under state law?  How do we know

25   that?

170907congreOA                    Argument

1          MS. HAMILTON:  Well, we also don't know that they were

2     illegal.

3          THE COURT:  Okay.

4          MS. HAMILTON:  What I'm saying is that the attempt to

5     cast out and discrimination on local government through

6     innuendo is all they have on this.

7          So, to go back to what this case -- Ramapo hydrants

8     involved litigation.

9          MR. STEPANOVICH:  That's argument and facts.  There's

10    no facts on that.  I know you're inquiring and counsel is

11    trying to answer that --

12         MR. PELOSO:  The judge asked the question.

13         MR. STEPANOVICH:  I understand.

14         THE COURT:  That's fine.

15         MR. STEPANOVICH:  I'm just making a point.

16         THE COURT:  And I think Ms. Ulman is the one that

17    provided the information.

18         MR. PELOSO:  Correct.

19         THE COURT:  I get it.  I understand.

20         What's in the record --

21         MR. STEPANOVICH:  -- is in the record.

22         THE COURT:  I totally understand that.  Because it's

23    interesting, Executive Session 16 in Exhibit 92 lists Ramapo

24    lawsuits as one item, Camp Dora as another item, and then

25    hydrants, but here's the thing:  If the argument is, Oh, well,

170907congreOA                    Argument

1   there were three things on the agenda for executive session and

2   one of those should have been under executive session per

3   Section 105, that doesn't mean the others should have, too.

4            So, to the extent Camp Dora is even on the executive

5   session list, why?  What 105 exception would justify that?

6            MS. HAMILTON:  Your Honor, since we're going outside

7   the record here --

8            THE COURT:  No.  I'm curious.

9            MS. HAMILTON:  Well, I'm going to explain it.

10            THE COURT:  Okay.

11            MS. HAMILTON:  The very first thing that happened in

12   this case before it was ever a case is that Roman Storzer

13   published an op-ed saying that everybody who opposed the

14   process was anti-Semitic.  I then wrote a column in response to

15   that.  That was very early on.

16            THE COURT:  It's on now.

17            MS. HAMILTON:  There was already a fight.

18            THE COURT:  It is on now.

19            When was that?

20            MS. HAMILTON:  There was already a fight going on.

21            MR. STORZER:  I can't recall, your Honor, honestly.  I

22   can probably find out.

23            THE COURT:  Let's find out.

24            MS. HAMILTON:  You can find it, and you can read mine

25   on response.

170907congreOA                    Argument

1          THE COURT:  Let's find out.  See what you can find

2    out.

3          Go ahead.

4          MS. HAMILTON:  So, there was no question that there

5    was already an attempt when Roman Storzer enters the venue.

6          THE COURT:  By the way, you got Mr. Storzer to blush,

7    which is probably not easy.

8          MS. HAMILTON:  So, I'd like to go back to the big

9    picture in this case, because I think that it's helpful in

10   understanding where this case stands in the pantheon of RLUIPA

11   cases which Roman and I have litigated.

12         The *Bensalem Pennsylvania* case just settled, and the

13   *Bensalem Pennsylvania* case involved a mosque.  I represented

14   Bensalem; Roman represented the mosque.

15         THE COURT:  I could have figured that one out.

16         MS. HAMILTON:  I know.

17         The problem in that case was that the applicant argued

18   that they didn't have to abide by the variance standard because

19   of RLUIPA.  This is an increasing problem in these cases in

20   which the argument is that none of the law applies to you, you

21   don't have to do everything that's required by the law, and all

22   you need to say is RLUIPA.  That is so far from where RLUIPA

23   started.

24         I testified on RLUIPA.  It was not intended to

25   displace the system.  And so, this case, in my view, gets the

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

170907congreOA                    Argument

1   attention it gets because it is the largest piece of property,

2   the largest idea for which there was absolutely no application

3   and no attempt.  That's what's problematic about this.

4           THE COURT:  Right, but that's why the case is in the

5   posture it's in, right?

6           So, I granted your motion to dismiss the as-applied

7   challenges because I agreed with you.  And for all I know, the

8   plaintiffs' counsel is just as angry with me as you are about

9   my view about the standard of review on facial challenges, but

10  we're here today because I agreed with you on that point.  So,

11  I understand the argument, and I understand how it feeds into

12  your view about the standard that should be used to evaluate

13  facial challenges.

14          And, look, I'm not stubborn.  I have many limitations,

15  but if I'm wrong, I'm wrong, and I will admit it.  So, I'm

16  going to look at this very carefully.

17          MS. HAMILTON:  Thank you.

18          THE COURT:  So, I understand your arguments in that

19  regard, but just so you know, I can't keep up with RLUIPA cases

20  in Pennsylvania.

21          MS. HAMILTON:  I'm with you.  None of us can.

22          THE COURT:  If we can just get back to this one, that

23  would be great.

24          MS. HAMILTON:  What bothers me most and worries me

25  most about this case is no application whatsoever.

170907congreOA                    Argument

1          THE COURT:  Each of you has firmly planted your foot

2     on the parade of horribles --

3          MS. HAMILTON:  Here we are.

4          I would remind the Court about *Airmont* in which the

5     Court said that RLUIPA does not create an exception for

6     applications for text amendments, zone changes, and area

7     variances.  So, that's part of the law.  It doesn't create

8     exceptions.

9          Mr. Storzer actually misstated what I was saying about

10    multi-family housing and misstated the record.  What I was

11    saying about multi-family housing is that the plaintiffs did

12    not prove that their religious belief requires multi-family

13    housing.

14         To the contrary, their own witnesses stated that

15    multi-family housing is not a religious requirement; that the

16    type of house is irrelevant.  That's their witnesses.  There is

17    nothing in the transcript that shows that they have a belief in

18    the need for either living in dormitories or multi-family

19    housing.  And, as I said before, that takes a lot of the wind

20    out of their sails, because the one thing that is so different

21    from the zone that they bought is multi-family versus

22    single-family, but there's no belief in a requirement -- not

23    that it's necessary, there's just no belief in the type of

24    housing they live in.  What they want to do is live close.

25    They have 100 acres.  They will live close, regardless of the

170907congreOA                    Argument

1   type of building they're living in.

2          THE COURT:  Right.  You know, what do you do with the

3   case law about it being it's not a question of necessity, it's

4   a question of whether it's a sincerely-held belief, and it even

5   includes aspirational notions of what those beliefs are?

6          So, to the extent that there is testimony, both from

7   Tartikov's perspective and the perspective of the would-be

8   students, that the Torah Community is the aspirational notion

9   that it's the combination of the religious obligation to be

10  married and have a family, and then -- because there's no

11  obligation to go to a rabbinical college, so, that's not really

12  the point.  The point is, if you're going to attend a

13  rabbinical college, it's the sincerely-held belief of both the

14  institution that's going to run it and the students that the

15  Torah community is the best way to achieve that.

16         MS. HAMILTON:  Exactly.

17         THE COURT:  Right?

18         MS. HAMILTON:  They say that they don't believe that a

19  Torah community has to be multi-family housing.

20         THE COURT:  But that's the language of necessity.

21  That's not the language of aspiration.

22         MS. HAMILTON:  No.  It's no belief.  If there's no

23  religious belief, then RLUIPA and the First Amendment are not

24  triggered.

25         THE COURT:  It's that they don't believe it's

170907congreOA                    Argument

1    necessary.  It doesn't mean --

2           MS. HAMILTON:  Your Honor, a single-family house is

3    perfectly consistent with their beliefs.

4           THE COURT:  Okay.

5           MS. HAMILTON:  They themselves -- this is their own

6    quote.

7           THE COURT:  Let's assume for the sake of argument that

8    you win that, you still -- for example, if the accreditation

9    law is invalid, you don't even get to the housing question

10   because they can't even build the college.

11          MS. HAMILTON:  As I said before, and I completely

12   disagree with the timeline, the accreditation law was passed

13   before the Village had knowledge of the purchase of the

14   changeover.  The accreditation law was passed in response to

15   the belief that YSV owned it and it was going to be an ordinary

16   religious school that would obviously be accredited.

17          The accreditation requirement was not passed in terms

18   of the timeline in response to knowing anything about Tartikov.

19   But even setting that aside, what if they did know there was

20   going to be a rabbinical college?  They had not yet explained

21   that this was going to be the most unusual rabbinical college

22   in the world.  There's no other rabbinical college like it.

23   That's why they can't get any kind of accreditation under

24   ordinary circumstances.

25          Now, they could set up an accreditation system and

170907congreOA                    Argument

1   actually get it accredited if they wanted to.

2           THE COURT:  Well, in order to be accredited, they have

3   to exist, and they can't exist if they can't get it accredited.

4           I know what you're going to say because I read the

5   line in your brief that is suspiciously missing a cite, which

6   is, Oh, people get provisional accreditation all the time.

7           There's nothing in the record about that.

8           MS. HAMILTON:  It's called a use variance.

9           THE COURT:  No, no, no --

10          MS. HAMILTON:  Not a use variance.  A text amendment.

11  All they had to do was to come in and ask.

12          THE COURT:  Ask what?  Ask to change the law?

13          MS. HAMILTON:  Right.

14          THE COURT:  Okay.  So, if Congress passed a law

15  tomorrow saying it is a crime to employ Greek Americans, no big

16  deal.  Greek Americans just go ask Congress to change the law.

17          If the law is invalid, it's invalid.  Your out is,

18  Well, no, they can ask us to change it.

19          MS. HAMILTON:  Your Honor, no one had ever imagined a

20  rabbinical college like this, least of all any local government

21  in the State of New York.

22          It can't be the obligation of a local government to

23  imagine what they do not know when they pass an ordinance.

24  They did not know about Tartikov at the time, but even if they

25  had, they did not know of the special qualities that this

170907congreOA                    Argument

1    rabbinical college would have.

2           THE COURT:  The accreditation department does evolve

3    over time, but that's a different argument than text amendment.

4    Text amendment, I'm surprised you keep beating that drum.  I

5    just don't really see how that helps.

6           MS. HAMILTON:  Because it's land-use.  That's the way

7    land-use operates.

8           THE COURT:  So, what if it's land-use?  The law

9    doesn't allow them to even seek a variance, so all you're

10   saying is what they can do is ask them to change the law.

11   That's what your argument is.  And if that's the argument, then

12   there really can't be any way for a court to strike down any

13   unconstitutional law because.  Shame on the plaintiffs for not

14   asking the people who they say passed the bad law, to ask them,

15   please, can you change it.

16          MS. HAMILTON:  *Airmont* actually says the opposite.  It

17   says text amendments are part of the exceptions that can be and

18   should be asked for under RLUIPA.

19          THE COURT:  Okay.

20          MS. HAMILTON:  And that is exactly the process that

21   Congress was imagining; that people would go through ordinary

22   development practices, and there wouldn't be special reasons

23   why you didn't have to do what a secular applicant would have

24   to do; except, if you didn't win, if you didn't get what you

25   asked for, then you got a special privilege under RLUIPA.  It's

170907congreOA                    Argument

1   not that you get to leapfrog the process.  And that's exactly

2   what saying -- applying for a text amendment is obviously not

3   acceptable, that's what that means.

4         Before 2001, there were no dorms.  They weren't

5   permitted.  State law required them to pass a law to permit

6   dorms.  In 2001, they expanded dorm use.  They didn't reduce

7   it.  And the suggestion that having school regulations means

8   that obviously Pomona wants intense use is nonsensical.

9   Schools are permitted.  In other jurisdictions, they're

10  permitted, they're expected; it's just, there weren't any at

11  the time.  YSV comes in and they pass laws that make YSV very

12  possible.  YSV walks away.  That's what's in the record.

13        THE COURT:  And there's also some testimony as to why

14  YSV walks away.  I know your view as to why YSV walks away, but

15  there is testimony on that.

16        MS. HAMILTON:  There are facts that show that they

17  walked away from the process and entered into the deal with

18  Tartikov.

19        THE COURT:  Okay.

20        MS. HAMILTON:  Finally, I want to reemphasize that it

21  would be very unfair to say that the Village had to regulate

22  and include a use that was inconceivable.  This is a facial

23  challenge, and so the remedy, if any of the laws were to be

24  stricken, is to remove the law; that's the whole remedy.  And

25  that would mean they would have to apply it, and then we can go

170907congreOA                    Argument

1   back to where we should have been from the beginning.

2           Finally, there's a real problem with respect to the

3   narrowing of this case on particular facts having to do with

4   just this particular non-applicant.  The laws that are at stake

5   here are in other communities, as the record shows.  So,

6   holding these laws facially illegal or unconstitutional will

7   have effects well beyond Pomona.

8           Thank you.

9           THE COURT:  Thank you.

10          MR. STORZER:  A few points.

11          MR. STEPANOVICH:  I yield my time.  As much as I'd

12   like to respond, I yield my time to my colleagues.

13          THE COURT:  Fair enough.

14          MS. SOBEL:  I just want to talk about one thing, and

15   then Mr. Storzer can follow.

16          Your Honor, I just want to talk a little bit more

17   about the executive sessions, because I think there were some

18   things that were said that are not correct.

19          The Executive Session Law, New York Public Officers

20   Official Law 105 says that "In an open meeting, pursuant to a

21   motion identifying the general area or areas of the subject or

22   subjects to be considered..."

23          So, to be clear, during the regular meeting, they had

24   to say which reason they were going for.  They can't now say

25   which one they think it is.  And in two of the minutes, which

170907congreOA                    Argument

1    we have in the record for the regular meeting, Exhibit 105,

2    which is from December 18, 2006, it says that they adjourned to

3    executive session to discuss matters of litigation.

4          On 11/27/06, Exhibit 115, which is in the record, it

5    was produced by defendants but without the last page, so we

6    don't know what reason was stated, but on 9/25/06, which is

7    Exhibit 121, on page 6, it says, Adjourned to executive session

8    to discuss matter of litigation.  So, the only one that they

9    were going for was litigation.

10         And to say that, well, there was litigation that was

11   threatened then -- we can't find when the exchange happened

12   between Mr. Storzer and Ms. Hamilton, but to be clear, during

13   the spoliation motion in this case, we said in our brief that

14   defendants should have had knowledge of the litigation in

15   December 2006, and that's at docket 196, page 6, that was our

16   motion of law in support of our spoliation sanctions.  They

17   directly denied this.

18         In docket 200, page 4, they cite to the January 2007

19   dissemination of Tartikov's plans as when they became aware for

20   the potential for a dispute in the future.

21         Similarly, at docket 200, pages 4-5, they said,

22   Village trustees never discussed litigation in January 2007.

23         And in the Village representative Attorney Doris

24   Ulman's affidavit, docket 203, paragraph 16, she said that

25   around the time that the plans were leaked to the media in

170907congreOA                    Argument

1    January 2007, she sensed the possibility that the Village might

2    have a dispute with Tartikov in the future and that she does

3    not know of any individual defendants who discussed the topic

4    in January of 2007.

5            So, defendants have taken the position to this Court

6    that there was no threat of litigation prior to January of

7    2007.  And so, there's no question that when they were having

8    the discussions ten times between July and December of 2006,

9    there was no litigation.

10           They also can't use the attorney/client privilege as

11   both a sword and a shield.  They cannot say trust us, we didn't

12   say anything discriminatory during those meetings, but we can't

13   tell you what happened during those meetings because

14   attorney/client privilege.  If you're relying on what you said

15   in those meetings, you have to say what you said.  You can't

16   just say that we should trust you.  It's not a sword and a

17   shield.

18           It's their privilege.  They could have waived it.

19   They did not put in any evidence to say anything about what

20   happened in those meetings, and they can't be allowed to put in

21   conjecture today.

22           THE COURT:  Thank you.

23           MR. PELOSO:  One moment, your Honor.

24           THE COURT:  Sure.

25           MR. PELOSO:  Just one comment.  Two seconds.

170907congreOA                    Argument

1          Counsel was just saying that we use the

2     sword-and-the-shield argument, that I mentioned that Ms. Ulman

3     in her affidavit testified that in none of the meetings or the

4     laws did she ever hear any discriminatory comments being made.

5     I'd just like to point out that those meetings did not occur in

6     executive session.  Those meetings occurred outside of

7     executive session, so it's not a sword and a shield.  We're not

8     hiding behind anything.

9          THE COURT:  Okay.  Thank you.

10         MR. STORZER:  A few final points.

11         THE COURT:  Sure, and then I have one final question,

12    which I'll let you-all decide who answers it for the plaintiff.

13         Go ahead.

14         MR. STORZER:  Ms. Hamilton, again, describes the use

15    as inconceivable.  This is the use that they sued the Town of

16    Ramapo for, authorized the lawsuit against Ramapo just a few

17    months prior obviously was not inconceivable; it was well in

18    their minds.

19         Ms. Hamilton also raised the issue of multi-family

20    housing not being specifically required for the students'

21    religious beliefs.  And, again, putting aside the necessity

22    question, this is not about multi-family housing.  That's one

23    specific type of housing use.

24         All family housing is prohibited as part of an

25    educational institution in the Village of Pomona.  You can't

170907congreOA                    Argument

1    have single-family homes, you can't have townhouses, you can't

2    have duplexes, you can't have apartment buildings.  You can't

3    have any type of housing that houses families on an educational

4    institution campus.  The multi-family housing which translates

5    to apartment buildings is just a red herring.

6          With respect to the facial challenge issue, again, I

7    think *Planned Parenthood v. Casey* answers that question

8    completely.  Did the Village's position here, if argued in that

9    case, would simply be, well, why don't those wives tell their

10   husbands, then there would be no problem.  It's not a good

11   response, not in the First Amendment constitutional rights-type

12   case.  It is the class for which the regulation creates the

13   problem that is at issue, and not for colleges that are

14   accredited, not for colleges that only need dormitories for

15   single students, and so on.

16         And the final point, the *Bensalem* matter was

17   mentioned.  I recommend the Court reading the decision in

18   *Bensalem Masjid v. Bensalem Township* where the Court held that

19   plaintiffs there did not need to apply for a use variance in

20   order to proceed with the lawsuit on an as-applied and facial

21   challenge.

22         If the Court has questions, perhaps I should --

23         THE COURT:  Ms. Hamilton raised something that

24   triggered a question.  She said that -- you know, she was sort

25   of suggesting that if the relief that you're seeking is, since

170907congreOA                    Argument

1    we're in a posture only on facial challenge, the relief you

2    would get would be invalidation of the law.

3            Is there anything else you think you'd be entitled to?

4            MR. STORZER:  We're asking the Court to appoint a

5    monitor to oversee an application process.  We think leaving

6    the henhouse in the charge of the foxes here is not a good

7    idea.  And, certainly, we heard what the Village will do.  They

8    will delay us for years and years through the SEQRA process.

9            THE COURT:  I guess, I'm not sure.  What would a

10   monitor do?  Say hurry up?

11           MR. STORZER:  In essence, they can oversee the

12   process.  It is a complicated process.  There are various

13   things, procedural aspects that have to happen in this kind of

14   application.  We'd have to apply for a special permit.  We'd

15   have to apply for cite plan approval.  We'd have to do SEQRA

16   reviews.  There are questions as to who becomes the lead agency

17   there, which body would it be, and under New York law, that can

18   be various types of bodies that can constitute the lead agency.

19           THE COURT:  So, we would have a federal monitor tell a

20   municipality how to apply its own land-use procedures?

21           MR. STORZER:  These are land-use procedures that are

22   generally governed by state law.

23           THE COURT:  Exactly.

24           MR. STORZER:  Where the plaintiffs have proved

25   intentional discrimination, if the plaintiffs prove that, then

170907congreOA                    Argument

1   I think it's clearly warranted here.  It's garden-variety

2   stuff.  Absent the discriminatory aspect of this, our setbacks

3   match, is the storm water management plan capable of being

4   approved and so on?  At the very least, there are time frames

5   that can be set so this does not drag out, as a Village trustee

6   said, for four or five years until they save enough to fight

7   another RLUIPA lawsuit at the end of it.

8           THE COURT:  Anything else that you were contemplating?

9           MR. STEPANOVICH:  I think that will conclude our

10   presentation.

11           MS. HAMILTON:  One word in response to Mr. Storzer's

12   suggestion of a monitor.  Federalism.  And we have written

13   about it throughout the case, so I'm not going to belabor.

14           THE COURT:  I figured that's what you were going to

15   say, and that's why I figured I was going to ask the question

16   you would want asked.

17           MS. HAMILTON:  Thank you.

18           MR. STEPANOVICH:  Mr. Savad.

19           THE COURT:  Yes.

20           MR. SAVAD:  If I may say something.

21           THE COURT:  Yes.

22           MR. SAVAD:  I've had situations where monitors have

23   been appointed by the federal court.  There was a project just

24   down the road from this, there was a substantial housing

25   development.  An attorney was appointed as the monitor.  And

170907congreOA                    Argument

1   ultimately, I asked for a hearing before the court and the

2   monitor recommended sanctions against the Town of Haverstraw in

3   which this village is partially located.  And that resulted --

4   that application for sanction resulted in the judge saying this

5   case ought to be settled; otherwise, you're going to be paying

6   Mr. Savad's legal fees.  We went outside and we settled the

7   case.  The monitor was very important in that case, and the

8   Court took note of it, and it resulted in a settlement.

9        The monitor shows up, he senses the crowd, he senses

10  the people, and, if necessary, we make application to the

11  Court.

12       Thanks.

13       THE COURT:  That's quite a powerful person, senses the

14  crowd.

15       MR. SAVAD:  No, but the judge has the ultimate

16  decision.

17       THE COURT:  I know, but that's quite a skill set.

18       MR. SAVAD:  Yes.

19       THE COURT:  Or the monitor could be a way to keep you

20  all coming back here every week, not that I don't love each and

21  every one of you.

22       MR. SAVAD:  I don't think the Village would want to

23  come back at that point.

24       THE COURT:  Depends.  Maybe they'd be the ones asking

25  for a monitor.

170907congreOA                    Argument

1        MR. SAVAD:  We enjoyed ourselves.

2        THE COURT:  Anything?

3        MR. STEPANOVICH:  Nothing further on behalf of

4   plaintiffs, your Honor.

5        THE COURT:  Anything else?

6        MS. HAMILTON:  Nothing further.

7        THE COURT:  I have to say, I wasn't the least bit

8   surprised of the quality of the briefing here, given the

9   quality of the advocacy up to this point, but truly, it is a

10  lot of material to marshal.  And I thought you all did a heck

11  of a job.

12       So, you can imagine, you write a lot of briefs, we

13  read a lot of briefs, and this was really excellent advocacy by

14  all of you.  I really appreciate it.  I wish you litigated more

15  cases in front of us because it would make life a lot easier.

16       I will do my best.  I promise you, this won't be

17  delayed very long.  I'm working really hard on this.  I'll give

18  you an answer as soon as I can.

19       With that, I will bid you a pleasant afternoon.

20            - - -

21  Certified to be a true and correct

22  transcript of the stenographic record

23  to the best of my ability.

24  _____

    U.S. District Court
25  Official Court Reporter

          SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                    (914)390-4053