N.Y.S.D. Case #
07-cv-6304(KMK)

**18-0869-cv (L)**
*Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

——————————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Dec 20 2019

August Term 2018

(Argued: April 18, 2019 ǀ Decided: December 20, 2019)

Docket Nos. 18-0869-cv(L), 18-1062-cv(XAP)

CONGREGATION RABBINICAL COLLEGE OF TARTIKOV, INC., RABBI
MORDECHAI BABAD, RABBI WOLF BRIEF, RABBI HERMAN KAHANA,
RABBI MEIR MARGULIS, RABBI MEILECH MENCZER, RABBI JACOB
HERSHKOWITZ, RABBI CHAIM ROSENBERG, RABBI DAVID A. MENCZER,

*Plaintiffs-Appellees-Cross-Appellants*,


RABBI GERGELY NEUMAN, RABBI KOLEL BELZ, of Monsey, RABBI ARYEH
ROYDE, RABBI AKIVA POLLACK,

*Plaintiffs*,


-v.-

VILLAGE OF POMONA, NY, BOARD OF TRUSTEES OF THE VILLAGE OF
POMONA, NY, NICHOLAS L. SANDERSON, as Mayor, IAN BANKS, as
Trustee and in his official capacity, ALMA SANDERS-ROMAN, as Trustee and in
her official capacity, RITA LOUIE, as Trustee and in her official capacity, BRETT
YAGEL, as Trustee and in his official capacity,


*Defendants-Appellants-Cross-Appellees.*

——————————

CERTIFIED COPY ISSUED ON 12/20/2019

18-0869-cv (L)                                                                    2
*Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*

Before:

    Wesley and Chin, *Circuit Judges*; and Kaplan, *District Judge.**

    Congregation Rabbinical College of Tartikov, Inc. and future students and faculty sued the Village of Pomona and several village officials, challenging four amendments to the Village of Pomona's zoning law as violations of federal and New York law.  Tartikov argued principally that Pomona adopted the challenged laws based on religious animus against Tartikov.  The United States District Court for the Southern District of New York (Karas, *J.*) dismissed Tartikov's complaint in part and later resolved certain claims in the defendants' favor on a motion for summary judgment.  The remaining claims proceeded to a bench trial, which concluded with a verdict for Tartikov on those claims.  The defendants appeal from the final judgment, while Tartikov cross-appeals to challenge the earlier orders dismissing certain of its claims and granting summary judgment to the defendants on others.

    Tartikov lacks Article III standing to pursue some of its claims.  We **VACATE** the judgment with respect to those claims and **REMAND** with instructions for dismissal.  As to the remaining claims that went to trial, we **REVERSE** the judgment to the extent the claims invoke two of the challenged laws, but we **AFFIRM** insofar as the claims invoke the remaining two.  Finally, we **AFFIRM** with respect to the dismissal and summary judgment orders challenged on cross-appeal.

_____

    Thomas J. Donlon, Robinson & Cole LLP, Stamford, CT (John F. X. Peloso Jr., Robinson & Cole LLP, Stamford, CT; Marci A. Hamilton, Washington Crossing, PA, *on the brief*), *for Defendants-Appellants-Cross-Appellees*.

---

   *

Judge Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

Case 18-869, Document 343, 12/20/2019, 2735446, Page3 of 104

1     ROMAN STORZER, Washington, DC (Joseph A. Churgin, Donna C. Sobel,
2            Savad Churgin, Nanuet, NY; John G. Stepanovich, Stepanovich
3            Law, PLC, Virginia Beach, VA, *on the brief*), *for Plaintiffs-Appellees-*
4            *Cross-Appellants*.

5

6                            _____

7     KAPLAN, *District Judge*:

8            This case poses difficult and in some respects subtle questions.

9     Educational and religious institutions, as owners and users of real estate, are

10    generally subject to local land use regulation.  But they play unique roles in our

11    society.  Hence, our laws afford them some special treatment with respect to such

12    regulation.  Moreover, religious institutions enjoy the protection of the First and

13    Fourteenth Amendments and federal legislation, each of which, in appropriate

14    circumstances, trumps local land use law.

15           Given the importance in our free society of education, religion, and the

16    usually legitimate desires of communities to regulate the manner in which the land

17    within their boundaries is developed and used, conflicts arise when these interests

18    come into tension.  In resolving such conflicts, courts must differentiate among

19    opposition to proposed land uses based on (1) legitimate development concerns like

20    traffic volume, density, and sufficiency of municipal infrastructure, (2) bias against

21    the religious faith or practices of the developer or of likely residents of new

1   development, whether overt or hidden by legitimate-seeming pretext, and (3) mixed

2   motives.  These appeals reflect one such conflict.

3        In 2004, Congregation Rabbinical College of Tartikov, Inc. ("TRC")

4   purchased about 100 acres of land in the Village of Pomona, New York ("Pomona"

5   or the "Village"), a small suburban village of about 3,200 people.  As its name

6   indicates, TRC hoped to use the property to build a school to educate rabbinical

7   judges.  But TRC submitted no concrete development proposals nor sought any

8   zoning or construction approvals in the ensuing years.

9        In January 2007, a local group published an article purporting to reveal

10  that TRC's plan was to build nine large apartment buildings to house 1,000 students

11  and their families – a total of as many as 4,500 people – as well as a school building.

12  This provoked local opposition.  Soon after, the Village board enacted two

13  amendments to its land use laws limiting or outright prohibiting whatever

14  development TRC ultimately might seek to build.

15       TRC and future students and faculty (collectively, "Tartikov") filed this

16  action against the Village and its board of trustees seeking to declare

17  unconstitutional the two amendments enacted after its plans became known.  In

18  addition, it challenged two other amendments that had been passed earlier.  After

Case 18-969, Document 243, 12/20/2019, 2735446/13, Page 5 of 104

3

1    a bench trial, the district court found that all four zoning law amendments were

2    tainted by religious animus, enjoined their enforcement, and entered a broad

3    injunction sweeping away or modifying for these plaintiffs New York State and local

4    laws that otherwise would apply.  The Village challenges the decision below.  Its

5    central contention is that the findings of religious animus were clearly erroneous.

6    Tartikov cross appeals from a number of pretrial rulings that limited the scope of its

7    claims.

8            After careful consideration of the extensive record, we decline to

9    overturn the district court's findings that religious animus motivated the two zoning

10   amendments passed after the plaintiffs' wishes became known and thus affirm the

11   injunction barring their enforcement.  But we respectfully conclude that there was

12   insufficient evidence to support such a finding as to either of the two earlier zoning

13   amendments and therefore reverse that portion of the judgment.  We conclude also

14   that the injunctive relief went further than was appropriate and modify those

15   aspects of the judgment as well.  We affirm as to the cross-appeal.

16

17

18

Case 18-869, Document 343, 12/20/2019, 2735146, Page6 of 104

4

**FACTS**

1

2      The governmental and legal context in which the amendments to the

3  Pomona zoning law ordinance were enacted is important to a full understanding of

4  this case.  We therefore begin by sketching that framework.

5

6  I.    *The Context*

7        A.    *Local Government in New York*

8      New York State is home to over 1,600 local governments.[1]  The entire

9  state is divided among 62 counties, each of which has its own local government.[2]

10  Each of the 57 counties outside New York City is divided into towns and in some

11  instances one or more cities, each of which also has its own local government.[3]

12  There are, in addition, hundreds of villages throughout the state, some coextensive

13  with towns but most within larger towns.  As is now a familiar motif, each has its

---

[1]     *Division of Local Government Services*, N.Y. DEP'T OF STATE,
https://www.dos.ny.gov/lg/localgovs.html.

[2]     *Id.*

[3]     *Id.*

Case 18-869, Document 243, 12/20/2019, 2735446, Page7 of 104

5

1    own government.[4]  Unlike counties, cities, and towns, New York's villages "exist at

2    the discretion of [their] residents"; they "can be created or dissolved by local

3    initiative."[5]  According to New York's Department of State's Division of Local

4    Government Services, one reason town residents might create a village is "a

5    difference in development philosophies of citizens and town officials."[6]

6            Village governments draw their authority to enact and enforce zoning

7    regulations from numerous sources, including the Statute of Local Governments,[7]

8    the Municipal Home Rule Law,[8] and the Village Law.[9]  A village exercises that

9    authority, as well as the authority to enact other legislation, through a board of

---

[4]

      *Id.*

[5]

      *Id.*

[6]

      *Id.*

[7]

      1 Patricia E. Salkin, N.Y. ZONING LAW & PRAC. § 2:04 (hereinafter "Salkin") (citing N.Y. STATUTE OF LOCAL GOVERNMENTS, § 10(6)).

[8]

      *Id.* § 2:05 (citing N.Y. MUNICIPAL HOME RULE LAW § 10).

[9]

      *Id.* §§ 2:05, 2:07, 2:11 (citing N.Y. VILLAGE LAW § 7-700).  Under the Municipal Home Rule Law, villages may amend and supersede the Village Law as it applies to them.  *Id.* (citing N.Y. MUNICIPAL HOME RULE LAW § 10e(3)).

6

1  trustees,[10] which typically consists of an elected mayor and four elected trustees.[11]

2  The Village Law gives a board of trustees the authority to regulate various aspects

3  of land use within its domain.[12]  When a board of trustees regulates land use, it is

4  obliged to follow a "comprehensive plan."[13]  A comprehensive plan identifies the

5  goals, policies, and instruments for the short and long term growth and

6  development of the village.[14]

7

8  **B.**  *Local Zoning Ordinances and Other Land Use Controls*

9  Village and other local governments in New York exercise their land

10  use authority through land use controls, the most common type of which is a zoning

11  ordinance.[15]  Zoning typically entails dividing a municipality's entire territory into

---

10

N.Y. VILLAGE LAW § 4-412.

11

*Id.* § 3-301.  The board of trustees has the power to modify the number of trustee seats.  *Id.*

12

*Id.* § 7-722.

13

*Id.* § 7-704.

14

*Id.* § 7-722(2)(a), (f)-(g).

15

Salkin § 1:10.

Case 18-869, Document 343, 12/20/2018, 2735446/13, Page 9 of 104

7

1   districts and imposing land use restrictions within them.[16]  Zoning ordinances can

2   achieve many goals related to community planning, among the most common of

3   which are prescribing minimum lot and maximum building sizes that control the

4   density of development and permitting or proscribing the use of land in each zoning

5   district for specific purposes such as agricultural, commercial, or residential.[17]

6          Numerous federal and state laws limit the exercise of land use control

7   powers.[18]  One important limitation is the New York State Environmental Quality

8   Review Act ("SEQRA").[19]  SEQRA requires state agencies, including municipalities,

9   "to incorporate the consideration of environmental factors into the . . . planning,

10  review[,] and decision-making processes."[20]  It requires that a municipality

11  considering a significant land use control ordinarily must prepare or request an

---

[16]    *Id.*

[17]    *Id.* §§ 6:04, 6:09, 6:11.

[18]    *See generally* Salkin ch. 3-5.

[19]    6 N.Y. COMP. CODES R. & REGS. § 617.

[20]    *Id.* § 617.1(c).

Case 18-869, Document 243, 12/20/2018, 2735446, Page10 of 104

8

environmental impact statement ("EIS") early in the planning process.[21]  An EIS is

a document that weighs the "social, economic[,] and environmental factors" of a

municipality's proposed decision or regulation, which includes considering

alternative actions and mitigating factors.[22]  After completing an EIS, each agency

involved in the planning process must issue a findings statement that provides a

rationale for its decision in light of the EIS.[23]

C.    *Municipal Regulation of Land Used for Religious and Educational Purposes*

Land use regulation becomes more complicated when affected property

belongs to religious or educational institutions – entities that, as noted previously,

enjoy certain legal rights unavailable to ordinary landowners.  As TRC is a religious

educational institution, the terrain here is particularly rugged.

---

[21]

> *Id.*  A municipality need not prepare a full EIS if it makes or receives a negative declaration.  *See id.* §§ 617.7, 617.12.  A negative declaration is "a written determination by a lead agency that the implementation of the action as proposed will not result in any significant adverse environmental impacts."  *Id.* § 617.2(z). Negative declarations often are used with respect to minor development.

[22]

> *Id.* § 617.2(n).

[23]

> *Id.* § 617(p).

9

1          The New York Court of Appeals thoroughly surveyed this landscape

2    in *Cornell University v. Bagnardi.*[24]  Beginning with a history it deemed essential to

3    understanding the respective positions of religious schools and municipal land use

4    regulators, the court emphasized the "special treatment" that schools and churches

5    often have enjoyed "with respect to residential zoning ordinances."[25] This "favored

6    status," which has included "expan[sion] into neighborhoods where nonconforming

7    uses would otherwise not have been allowed," was unobjectionable in the nation's

8    early years.[26]  But with growing populations and the advent of the automobile,

9    citizens began viewing schools – particularly universities, which were the subject of

10    the *Bagnardi* court's discussion – as disturbances, rather than benefits to the

11    neighborhood.[27]  "With this change in attitude, courts were thrust into the role of

12    protecting [religious and] educational institutions from community hostility."[28]

---

[24]    68 N.Y.2d 583 (1986).

[25]    *Id.* at 592-93.

[26]    *Id.* at 593.

[27]    *Id.*

[28]    *Id.*

1        New York courts did this in several ways.  On occasion, they struck

2    down "[z]oning ordinances that imposed limitations on the construction of public

3    schools" or that interfered with the First Amendment rights of religious schools.[29]

4    On others, they "held that schools, public, parochial[,] and private, by their very

5    nature, singularly serve the public's welfare and morals."[30]  Accordingly, the New

6    York Court of Appeals has concluded that "the total exclusion of such institutions

7    from a residential district serves no end that is reasonably related to the morals,

8    health, welfare[,] and safety of the community."[31]  "[T]otal exclusion is beyond the

9    scope of the localities' zoning authority."[32]

10        This did not mean that schools and religious institutions were exempt

11    from zoning rules – a result that would have "render[ed] municipalities powerless

12    in the face of a religious or educational institution's proposed expansion, no matter

---

[29]        *Id.*

[30]        *Id.*

[31]        *Id.* at 594 (citing *Diocese of Rochester v. Planning Bd. of Town of Brighton*, 1 N.Y.2d 508, 522 (1956)).

[32]        *Id.*

1     how offensive, overpowering[,] or unsafe to a residential neighborhood."[33] *Bagnardi*

2     explained how local authorities should balance the competing interests at stake:

> 3     "The controlling consideration in reviewing the request of a school or
> 4     church for permission to expand into a residential area must always be
> 5     the over-all impact on the public's welfare. Although the special
> 6     treatment afforded schools and churches stems from their presumed
> 7     beneficial effect on the community, there are many instances in which
> 8     a particular educational or religious use may actually detract from the
> 9     public's health, safety, welfare[,] or morals. In those instances, the
> 10     institution may be properly denied. There is simply no conclusive
> 11     presumption that any religious or educational use automatically
> 12     outweighs its ill effects. The presumed beneficial effect may be
> 13     rebutted with evidence of a significant impact on traffic congestion,
> 14     property values, municipal services[,] and the like.
>
> 15
> 16     "Thus, educational and religious uses which would unarguably be
> 17     contrary to the public's health, safety[,] or welfare need not be
> 18     permitted at all. . . . Such uses, which are clearly not what the court had
> 19     in mind when it stated that traffic and similar problems are outweighed
> 20     by the benefits a church or school brings, are unquestionably within the
> 21     municipality's police power to exclude altogether. Even religious and
> 22     educational institutions must accommodate to factors directly relevant
> 23     to public health, safety[,] or welfare, inclusive of fire and similar
> 24     emergency risks, and traffic conditions insofar as they involve public
> 25     safety.
>
> 26
> 27     "Less extreme forms of expansion that are nonetheless obnoxious to the
> 28     community's residents, of course, require a more balanced approach
> 29     than total exclusion. In *Matter of Westchester Reform Temple v. Brown*, the
> 30     court recognized that considerations which may wholly justify the
> 31     exclusion of commercial structures from residential areas may be

---

[33]   *Id.*

Case 18-869, Document 243, 12/20/2018, 2735446, Page14 of 104

1   considered for the purpose of minimizing, insofar as practicable, the
2   impairment of surrounding areas or the danger of traffic hazards.  A
3   special permit may be required and reasonable conditions directly
4   related to the public's health, safety[,] and welfare may be imposed to
5   the same extent that they may be imposed on noneducational
6   applicants.  Thus, a zoning ordinance may properly provide that the
7   granting of a special permit to churches or schools may be conditioned
8   on the effect the use would have on traffic congestion, property values,
9   municipal services, the general plan for development of the
10  community, etc.  The requirement of a special permit application,
11  which entails disclosure of site plans, parking facilities, and other
12  features of the institution's proposed use, is beneficial in that it affords
13  zoning boards an opportunity to weigh the proposed use in relation to
14  neighboring land uses and to cushion any adverse effects by the
15  imposition of conditions designed to mitigate them.  These conditions,
16  if reasonably designed to counteract the deleterious effects on the
17  public's welfare of a proposed religious or educational use should be
18  upheld by the courts, provided they do not, by their cost, magnitude[,]
19  or volume, operate indirectly to exclude such uses altogether."[34]

20      The foregoing, of course, was an explication principally of New York

21  law, which is informed with respect to religious land use by constitutional principles

22  applicable to religious institutions.  But to be absolutely clear, the Supremacy Clause

23  of the Constitution demands, as it always has done, that state law yield to the

24  imperatives of more demanding federal law including the First and Fourteenth

25  Amendments.

26

---

[34] *Id.* at 595-96 (citations, brackets, and quotation marks omitted).

1   *II.   Facts*

2        *A.     Pomona and Its Zoning Ordinance*

3             The Village of Pomona was incorporated in Rockland County, New

4   York in 1967.[35]  It is governed by a board of trustees, which consists of the mayor,

5   deputy mayor, and three trustees.[36]  At the times relevant here, the entire Village

6   was designated as an R-40 residential zoning district.[37]  Thus, the entire Village was

7   zoned to permit only single-family residential development on lots of at least 40,000

8   square feet.[38]

9

10

11

12

13

---

[35]

    Joint Pretrial Order Stipulations of Fact ¶¶ 3, 8 [A-732-33].

[36]

    *Id.* ¶ 7 [A-733].

[37]

    Joint Pretrial Order Stipulations of Fact ¶ 5 [A-732].

[38]

    Ulman Affidavit [DX 2000] ¶ 5.

1    *B.    The Subject Property and Pomona's Zoning Ordinance*

2        *1.    Camp Dora and Yeshiva Spring Valley*

3            The 100 acres at issue here are on the southwestern side of Pomona.  For

4    years it had been the site of a summer camp known as Camp Dora.[39]  At some point

5    prior to December 1999 – the record does not indicate when – an entity named

6    Yeshiva Spring Valley ("YSV") acquired the parcel.[40]  Initially, YSV continued

7    operating a summer camp on the site, but its goal was to build a yeshiva[41] on the

8    property.[42]

9

10

11

---

[39]

Joint Pretrial Order Stipulations of Fact ¶¶ 3, 17 [A-732-33].

[40]

Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 34-35 [TE-585-86].

[41]

A yeshiva is a Jewish educational institution that educates students at the elementary, middle, and high school levels.  Some, though not all, are Orthodox institutions. Orthodox Judaism is a branch of Judaism that teaches strict adherence to rabbinical interpretations of holy scripture.

[42]

Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 35-36 [TE-586-87].

Case 18-869, Document 243, 12/29/2018, 2735446, Page17 of 104
Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 17 of 104

15

1       *a.*       *December 1999 Informal Planning Board Meeting*

2              On December 15, 1999, a representative of YSV, Rabbi Fromowitz, met

3       with the Village planning board, the members of which then were Mel Cool, Alan

4       Lamer, Alma Roman, Joy Shulman, and Nik Winter.[43]   Also present was Mark

5       Healey, a representative of Frederick P. Clark Associates, Inc. ("FPC"), then the

6       Village's planning consultant.[44]

7              YSV did not present the planning board with any specific building

8       plans or application.  Rather, it made an informal presentation regarding the yeshiva

9       it hoped to apply to build in the future.[45]   Rabbi Fromowitz explained that YSV

10      wished to build a primary school for children in kindergarten through the eighth

11      grade and a preschool for younger children.[46]   The primary school would be

_____

[43]

        *Id.* at 1 [TE-583].

[44]

        *See id.*; Tr. Ulman Trial Testimony, 753:4-10 [A-1281].

[45]

        This mode of proceeding apparently is frequent in at least some areas in New York
        State.

[46]

        Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 33, 38 [TE-
        584, 589].

1    approximately 100,000 square feet[47] and would accommodate roughly 800

2    students.[48] The preschool building would be approximately 30,000 square feet[49] and

3    include a large synagogue.[50]

4            During the meeting, Roman asked if YSV planned to build dormitories

5    at the schools.  Rabbi Fromowitz answered that it did not.  Roman repeated the

6    question twice more, mentioning a rumor "floating around" that YSV did intend to

7    build dormitories.[51]  Rabbi Fromowitz repeated that YSV had no such intention.  He

8    explain ed that the development would be a primary school and that "[p]rimary

9    school children should be living at home."[52]

---

[47]
    *Id.* at 38 [TE-589].

[48]
    *Id.*

[49]
    *Id.*

[50]
    *Id.* at 40 [TE-591].

[51]
    *Id.* at 37 [TE-588].

[52]
    *Id.*

Case 18-869, Document 243, 12/29/2018, 2735446, Page19 of 104

17

1    Planning board member Lamer asked the Rabbi if YSV had done traffic

2    studies.[53]  Rabbi Fromowitz replied that it had.[54]  Roman then asked if there would

3    be any other structures built on the property.[55]  Rabbi Fromowitz replied that "we

4    have no plans for further development.  There's nothing on the table that we are

5    planning at this moment.  If there would be a future plan we would come before the

6    Planning Board once again for additional, you know, development.  But I can't tell

7    you right now of any other development because there is nothing, that we're

8    planning at this point."[56]

9    Mark Healey, the FPC representative, then interjected the following:

10   "Mr. Chairman, if I could offer some comments to the Board.  I took a
11   look at the zoning for schools in the Village and they really stink, to put
12   it straight.  The[] only requirement is that they have to have five acres
13   of land and the setbacks have to be twice what is ordinarily
14   required.[[57]]  So that leaves an open question of issues that several

---

[53]

Id. at 40 [TE-591].

[54]

Id.

[55]

Id. at 41 [TE-592].

[56]

Id.

[57]

A "setback" is "[t]he minimum amount of space required between a lot line and a building line." *Setback*, Bryan A. Garner, Black's Law Dictionary (11th ed. 2019).

1    members of the Board brought up.  What can happen in the future?  It
2    looks okay now, but look at the property, it's 100 acres and there's a lot
3    of potential out there.   So, I would recommend that perhaps the
4    applicant going back and doing more detailed plans, and doing a traffic
5    study and everything else for the Village to seriously consider looking
6    at it[s] requirements for schools and address such issues as perhaps,
7    more detailed or more tailored lot area requirements.  It's common to
8    have lot area based on the number of students.  So you can have say 5
9    acres, and say you have to have another .1 acre per student.  So you
10   wouldn't restrict them from doing what they want to do but it would
11   assure the Village that they're not going to go down the road and
12   develop a lot more in the future.   Especially considering the
13   constrained nature of the site and also the constrained nature of the
14   surrounding road ways, in terms of traffic."[58]

15   In response to Healey's comments, the board chairman, Mel Cook, asked whether

16   YSV would have the ability to build an additional school in the future or if the

17   Village could "limit that."[59]   Healey replied that the Village could not prohibit

18   building schools but could "put reasonable standards on their development and

19   operations."[60] He added that he thought the Village should consider changes to the

20   Village code for schools "from a planning perspective, in terms of property

---

[58]    Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 41 [TE-592].

[59]    *Id.* at 42 [TE-593].

[60]    *Id.*

1    constraints, traffic and what would be appropriate" for the Camp Dora property and

2    others in the Village.[61]

3            Following the meeting with Rabbi Fromowitz, FPC prepared several

4    memoranda for Mayor Herbert Marshall and the Village board of trustees

5    addressing the YSV proposal and recommending amendments to the Village zoning

6    law.[62]  FPC noted in a January 24, 2000 memorandum that "it quickly became

7    apparent" from a review of "the existing standards for schools in the Village's

8    Zoning Law" that "the current standards for schools . . . are rather scant and would

9    not adequately control the total/future development of a school property."[63]  The

10   memorandum continued:

11               "For example, based on the 10 percent maximum permitted building
12               coverage requirement the subject property[, *i.e.*, YSV property,
13               formerly Camp Dora,] could theoretically be developed with over
14               800,000 square feet of floor space.  While this amount of development
15               is highly unlikely due to the development constraints presented by the

---

[61]

        *Id.*

[62]

        Frederick P. Clark Associates, Inc., Memorandum re Proposed Primary School and
        Pre-School (YSV-Pomona) and the Village's Zoning Regulations Regarding
        Schools, Jan. 24, 2000 [TE-283-85].

[63]

        *Id.* at 1 [TE-283].

1   steep slopes and wetlands on the property, it does point out the
2   inadequacy of the current standards."[64]

3   FPC recommended, among other things, making schools subject to special permit

4   approval by the board of trustees,[65] revising lot area requirements, implementing

5   limits aimed at controlling development intensity, and changing the definition of

6   "school" to include preschools.[66]

7

8               b.      *December 2000 Board of Trustees Meeting*

9               Eleven months later, Pomona trustees Ian Banks and Nick Sanderson,

10  Deputy Mayor Al Appel, and Mayor Herbert Marshall addressed these matters.[67]

---

[64]

   *Id.*

[65]

   A "special permit," or "special-use permit," "is permission to use property in a
   manner expressly permitted by a zoning ordinance although other zoning
   ordinances in effect would otherwise prohibit the use." Salkin § 29:2. It is in effect
   an exception to the ordinance identified within the ordinance itself. It differs from
   a variance, which is an approved development that does not comply with an
   ordinance. *Id.*

[66]

   Frederick P. Clark Associates, Inc., Memorandum re Proposed Primary School and
   Pre-School (YSV-Pomona) and the Village's Zoning Regulations Regarding
   Schools, Jan. 24, 2000 at 1-2 [TE-283-84].

[67]

   One reasonably might infer that there had been discussion involving FPC, the
   Village board, and perhaps the planning board about possible amendments to the
   zoning ordinance in light of FPC's recommendations to the planning board. The
   record, however, is silent on this.

1    On December 18, 2000, they considered whether the definition of "school" in any

2    new law should include both public and private schools, rather than private schools

3    alone, in light of their understanding that state law already regulated public

4    schools.[68]   They discussed also the recommendation to change schools from

5    "permitted uses" "to uses subject to special permit approval."[69] The group indicated

6    that adopting school-related changes to the Village code was a priority that it hoped

7    to accomplish within two months.  Mayor Marshall stated also that the draft changes

8    then before them were "a starting point" that they "want[ed] to work on" because

9    "[t]his thing's going to come in.  They're going to come in and we're going to be

10   caught with our pants down if we don't move.  That's why I want to make sure that

11   we're moving ahead."[70]    At the time of this meeting, and when the changes

12   discussed were enacted into law, there were no schools in the Village.[71]  The only

13   prospective school use was the YSV plan.

---

[68]
      Village of Pomona Board of Trustees Meeting Minutes, Dec. 18, 2000 at 67-69 [TE-296-98].

[69]
      *Id.* at 68 [TE-297].

[70]
      *Id.* at 69 [TE-298].

[71]
      Joint Pretrial Order Stipulations of Fact ¶ 11 [A-733].

Case 18-863, Document 243, 12/20/2018, 2735446, Page34 of 104

1                     *c.*     *Local Law No. 1 of 2001*

2         On January 22, 2001, the board of trustees adopted Local Law No. 1 of

3 2001 (the "2001 Law").[72]  It defined "educational institutions" as kindergartens,

4 primary, and secondary schools that were operated and licensed under New York

5 law.[73] It required also that schools obtain special permits from the board of trustees.

6 In addition, it changed the minimum lot size from 10 gross acres to 10 net acres plus

7 an additional .05 net acres per student.[74]

8

9

10

---

[72]

    *Id.* ¶ 10 [A-733].  At the time, the members of the board were Mayor Herbert Marshall, Deputy Mayor Al Appel, and trustees Nick Sanderson, Ian Banks, and Alma Roman.  *See* Village of Pomona Board of Trustees Meeting Minutes, Oct. 22, 2001 at 1 [TE-273].

[73]

    Local Law No. 1 of 2001, Jan. 22, 2001 [TE-1481-87].

[74]

    *Id.*  "Net lot area" refers to total acreage exclusive of certain types of land.  The concept is a product of overlay zoning, a practice by which a municipality "overlays" its zoning map with a separate map designed to protect an environmental area. *See* Robert J. Blackwell, *Overlay Zoning, Performance Standards, and Environmental Protection After Nollan*, 16 B.C. Envtl. Aff. L. Rev. 615, 615 (1989). As defined in Pomona's 2001 law, net lot area is calculated as acreage less submerged land, most land within utility or drainage easements, and certain land with unexcavated slopes.  Local Law No. 1 of 2001, Jan. 22, 2001 [TE-1481-87].

Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 25 of 104
Case 18-869, Document 243, 12/29/2018, 2735446, Page25 of 104

23

1          *d.*          *June 2001 Planning Board Meeting*

2          In June 2001, YSV returned to the planning board with another informal

3     presentation.  This time, YSV described an additional proposed structure – an

4     educational center for adults.[75]  The Village attorney questioned whether the

5     educational center would qualify as an "educational institution" under the new 2001

6     Law.[76] The planning board and the YSV representative discussed also issues related

7     to wetlands, slopes, and road access.[77]  The YSV representative stated that YSV

8     would address these issues with the Village before submitting a formal application.[78]

9

10          *e.*          *The YSV Subdivision*

11          Under Pomona's subdivision regulations, subdivision of a parcel into

12     two or more lots requires the planning board's approval before the applicant seeks

---

[75]

        Village of Pomona Planning Board Meeting Transcript, June 20, 2001 at 51-52 [TE-
        1609–10].  This aspect of the plan was subsequently removed.  Village of Pomona
        Planning Board Meeting Transcript, Aug. 15, 2001 at 43 [TE-1350].

[76]

        Village of Pomona Planning Board Meeting Transcript, June 20, 2001 at 52-53 [TE-
        1610-11].

[77]

        *Id.* at 54-59 [TE-1612-17].

[78]

        *Id.* at 57-58 [TE-1615-16].

1    approval for a specific development plan on a subdivided lot.[79]  While its informal

2    approach concerning its yeshiva project was underway, YSV made a separate

3    presentation during an August 2001 hearing concerning a proposed subdivision of

4    the 100 acre property into 26 lots – 25 for single-family homes, and one large lot, not

5    a topic of the August 2001 hearing, for the yeshiva.[80]

6            A number of Pomona residents attended the planning board hearing

7    and commented on the YSV proposal.  Two expressed anxiety over the Village's

8    ability to control the large lot.  One asked whether that lot later could be annexed "to

9    any of the other religious areas in the county" and thus prevent the Village from

10   exercising regulatory control over the property.[81]  The other asked whether Pomona

11   had laws stricter than those of the Town of Ramapo that would allow the Village to

12   determine whether and how the Camp Dora property could be developed, or

13   whether there were no such laws and that the school essentially was "a done deal."[82]

---

[79]
    Pomona Code § 118-2 [TE-714].

[80]
    Village of Pomona Planning Board Meeting Transcript, Aug. 15, 2001 at 29-30 [TE-1336-37].

[81]
    *Id.* at 41 [TE-1348].

[82]
    *Id.* at 46 [TE-1353].

25

Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 27 of 104

1               2.       *TRC Buys the Property and the Village Adopts Local Law No. 5 of*
2                     *2004*
3

4        On August 31, 2004, YSV sold the property to TRC for approximately

5   $13 million.[83]   The parties stipulated below that the Village government did not

6   become aware of this transaction until November 2004.[84]   In the interim, however,

7   the board of trustees considered another amendment to the zoning ordinance.

8        On September 7, 2004, Village Attorney Doris Ulman made the

9   following recommendations to the board of trustees: (1) changing the definition of

10   "educational institution" to allow dormitories as a permitted accessory use, (2)

11   eliminating the requirement of a specific acreage per student, (3) removing

12   restrictions related to the location of schools on certain roads, and (4) limiting

13   dormitories to one such building per lot.[85]   The first recommendation would have

---

[83]

       DX 1057, Deed of Sale, Rockland County, Aug. 31, 2004 [TE-1618]. YSV had paid approximately $1.65 million for the property, though there is no indication in the record of the year in which that occurred. Tr., Deposition of Nathan Fromowitz, 23:11-19 [A-449].

[84]

       Joint Pretrial Order Stipulations of Fact ¶ 15 [A-733].

[85]

       Doris F. Ulman, Memorandum re Proposed Amendment to Zoning Law in Relation to Schools, Sept. 7, 2004 [TE-1513-14]. The board consisted of Mayor Herbert Marshall, Deputy Mayor Nick Sanderson, and trustees Ian Banks, Alan Lamer, and Alma Roman. Village of Pomona Board of Trustees Meeting Minutes, Sept. 7, 2004 at 1 [TE-361].

1   brought Pomona into compliance with state law – specifically, *Bagnardi* – requiring

2   that municipal zoning codes allow dormitories as an educational use of property.[86]

3           On September 27, 2004, the board adopted these recommendations by

4   enactment of  Local Law No. 5 of 2004 (the "2004 Law").[87]  Bound as we are by the

5   parties' stipulation, we, like the court below, necessarily accept that it did so in

6   ignorance of TRC's purchase of the property.

7           The 2004 Law liberalized certain provisions of Village law related to

8   educational institutions – including provisions of the 2001 Law.  It expanded the

9   definition of "educational institution" to include college, graduate, and postgraduate

10  schools in addition to kindergarten, primary, and secondary schools.[88]  It recognized

11  also accreditation of schools "by the New York State Education Department or [a]

12  similar recognized accrediting agency."[89]  Additionally, the 2004 Law defined a

13  "dormitory" as:

---

[86]
        *See Bagnardi*, 68 N.Y.2d 583.

[87]
        Joint Pretrial Order Stipulations of Fact ¶ 24 [A-734]; Village of Pomona Board of
        Trustees Meeting Minutes, Sept. 27, 2004 [TE-374].

[88]
        Local Law No. 5 of 2004, Sept. 27, 2004 [TE-1488-91].

[89]
        *Id.* at 1 [TE-1488].

Case 18-869, Document 243, 12/28/2018, 2735446, Page29 of 104

27

1     "A building that is operated by a school located on the same lot and
2     which contains private or semi-private rooms which open to a common
3     hallway, which rooms are sleeping quarters for administrative staff,
4     faculty[,] or students.  Communal dining, cooking, laundry, lounge[,]
5     and recreation facilities may be provided.  Dormitory rooms shall not
6     contain separate cooking, dining[,] or housekeeping facilities except
7     that one dwelling unit with complete housekeeping facilities may be
8     provided for use of a Superintendent or supervisory staff for every fifty
9     dormitory rooms.  Not more than one communal dining room shall be
10    provided in any building used for dormitory purposes.  Single family,
11    two-family[,] and/or multi-family dwelling units other than as
12    described above shall not be considered to be dormitories or part of
13    dormitories."[90]

14

15    According to Ulman, who drafted the law, this definition was based on laws in

16    Chestnut Ridge and Ramapo.[91]

17          Significantly, none of the changes effected by the 2004 Law would have

18    had any effect on the plans of YSV which, as far as the Board of Trustees knew, still

19    owned the property.

20

21          3.     *The Village's Opposition to the Town of Ramapo's Zoning Changes*

22          Until now, we have focused on events relating to the old Camp Dora

23    that culminated with TRC's acquisition of the property and the Village's

---

[90]     *Id.*

[91]     Affidavit of Doris F. Ulman [07-cv-6304, DI 296] ¶ 47 [TE-1892].

Case 18-863, Document 243, 12/20/2018, 2735116, Page30 of 104

28

1    amendments to its zoning law.  But there were related events going on during part

2    of the same time period that involved the Town of Ramapo's zoning ordinance.  As

3    these events bore also on the district court's findings, we turn to them now.

4            Between 2002 and 2004, the Town of Ramapo, which governs areas

5    adjacent to Pomona, considered and passed a number of laws regulating or relevant

6    to land use.

7            In September 2002, Ramapo came out with a draft comprehensive plan

8    for development.  The draft plan proposed, among other things, to "down zone" a

9    200-acre property called the Patrick Farm Property from 2-acre residential zoning,

10   or RR-80,  to R-40 that would allow for "Planned Residential Development."[92]  The

11   Patrick Farm Property is located on the southwest corner of Routes 202 and 306 –

12   across the road from the TRC property.

13           Rumors circulated that 1,500 to 2,000 units of multi-family housing

14   would be built on the Patrick Farm Property.  To calm the rumors, the town

---

[92]

Office of the Mayor, Letter, Dec. 12, 2002 at 1 [TE-235]. A "planned residential development" is a provision of a zoning ordinance that permits a municipality to exempt certain types of development – frequently large-scale projects – from specified zoning requirements.  *See* Eli Goldston & James H. Scheuer, *Zoning of Planned Residential Developments*, 73 HARV. L. REV. 241, 252-53 (1959).  In some instances, their use may permit higher density as well as building types that otherwise would not be permitted.

Case 18-863, Document 243, 12/29/2018, 2735446, Page31 of 104

1    supervisor,[93] Christopher St. Lawrence, issued a statement to clarify that the draft

2    plan would allow only 220 residential units to be built there.[94]  But some of the

3    neighboring villages, including Pomona, were not reassured and sought to create

4    a new village where the Patrick Farm Property was located in order to remove it

5    from Ramapo's jurisdiction and thus prevent the proposed down zoning.[95]  Mayor

6    Marshall was a proponent of this idea and vocal opponent of the draft

7    comprehensive plan.[96]  He emphasized that "[z]ero population growth should be a

8    major [objective of Ramapo's comprehensive plan]."[97]   Notwithstanding such

---

[93]

    A town supervisor is an elected officer who functions as the town treasurer and presides over town board meetings.  *See* N.Y. TOWN LAW §§ 20, 29, 63.

[94]

    Office of the Mayor, Letter, Dec. 12, 2002 at 1 [TE-235].

[95]

    *Id.* at 2 [TE-236].

    The Town of Ramapo "has no direct jurisdiction over village zoning."  DX 1008, Town of Ramapo Draft Comprehensive Plan (R-2040), Dec. 22, 2003 at 2 [TE-1474].

[96]

    *See* Office of the Mayor, Letter, Dec. 12, 2002 [TE-235-36].

[97]

    Office of the Mayor, Ramapo Comprehensive Plan DGEIS, Apr. 29, 2003 Comments at 2 [TE-379].

1  opposition, the comprehensive plan was adopted on January 28, 2004.[98]  The new

2  village supported by Marshall did not come to pass.

3          In May 2004, the Village of Pomona and five other villages sued

4  Ramapo to set aside its comprehensive plan.[99]  Their petition stated that:

5      "Beginning in the 1990[s], the Town has attracted a burgeoning
6      Hassidic community, which has for the most part settled around the
7      central hub in Monsey and areas to the east of Monsey.
8
9      "This has caused development and political pressures in the Town to
10     increase its housing stock and infrastructure.
11
12     "The essence of the Comprehensive Plan and zoning proposals is to
13     significantly increase the housing densities and infrastructure along the
14     bordering areas of the Town to accommodate the existing and future
15     population increases in this area.
16
17     "It is not a rational development plan, and certainly did not take into
18     consideration the impacts such development would have on the
19     infrastructure and character of the Town's bordering Villages."[100]
20
21  The action sought to set aside the plan on the ground that it had been adopted in

22  violation of SEQRA.

---

[98]

   *In re Application of Village of Airmont*, Verified Petition at 1, May 27, 2004 [TE-848].

[99]

   *Id.*

[100]

   *Id.* ¶¶ 31-34 [TE-853-54].

1          Shortly after the petition was filed, Ramapo adopted Local Law No. 9-

2     2004, which "permits married adult student multi-family high density housing in

3     most single-family residential zones throughout the unincorporated portion of the

4     Town of Ramapo" if that housing is an accessory use to a postsecondary educational

5     institution.[101]   Pomona and other villages again sued Ramapo on the grounds,

6     among others, that the law violated SEQRA and the Establishment Clause of the

7     First Amendment.[102]   And Mayor Marshall separately criticized the Ramapo town

8     board for "pandering to the special interest groups able to deliver the critically

9     important block vote [that] has become so essential to those seeking office in

10    Ramapo."[103]

11

12

13

14

---

[101]
  *Village of Chestnut Ridge v. Town of Ramapo*, Verified Petition and Complaint ¶ 7, Oct. 12, 2004 [TE-889].

[102]
  *Id.* [TE-887-926].

[103]
  Newsletter of the Village of Pomona, THE VILLAGE GREEN (Jul. 2004) [TE-275].

Case 18-869, Document 243, 12/20/2019, 2735416, Page34 of 104

1          4.    *TRC's Plans to Build a Rabbinical College*

2          TRC was formed in August 2004 as a religious corporation.[104] Its stated

3    purpose was, among other things, to "establish, maintain[,] and conduct a school for

4    the [study] of the holy Torah and to maintain classes for the teachings of the

5    customs, traditions[,] and mode of worship of the Jewish Orthodox faith."[105]  It

6    intended to build and operate a rabbinical college in Rockland County to train a new

7    generation of rabbinical judges[106] on the property it purchased from YSV in August

8    2004.[107]

9          According to Tartikov, TRC would be organized as a Torah

10   community,[108] a community designed to isolate students from distractions and

---

[104]

      TRC Certificate of Incorporation, Rockland County, New York, Aug. 5, 2004 (hereinafter "TRC Certificate of Incorporation") [TE-1-2].

[105]

      *Id.* at 1 [TE-2].

[106]

      Trial Declaration of Michael Tauber [07-cv-6304, DI 283] ¶ 11 [TE-1668].

[107]

      TRC Certificate of Incorporation at 3 [TE-4].

[108]

      A Torah community, or Bais Din community, is one in which students training to become rabbinical judges live with their families and study with other students, free from distractions presented by the outside world.  *See* Tr., Tauber Trial Testimony, 69:9-70:8 [A-894-95].

1  surround them only with others engaged in the same study.[109]  Students would

2  follow its planned program of study for approximately fifteen years before

3  becoming rabbinical judges.[110] They would study from 6 a.m. until 10 p.m[111] and live

4  on campus with their spouses and children.[112]  On-campus housing would allow

5  them to meet their religious obligations to their families.[113]  Due to the nature of its

6  program, TRC could not be accredited by the New York State Education Department

7  or the Association for Advanced Rabbinical and Talmudic Schools, the only

8  accrediting agencies relevant to TRC's program of study.[114]

9      There is evidence that Pomona's board of trustees learned a bit about

10  TRC's plans as early as November 2004, when it became aware that TRC had

11  purchased the property.  Most obviously, TRC's name, which includes the phrase

---

[109]  Trial Declaration of Michael Tauber [07-cv-6304, DI 283] ¶ 56 [TE-1672].

[110]  *Id.* ¶ 26 [TE-1669].

[111]  *Id.* ¶ 69 [TE-1673].

[112]  *Id.* ¶ 54 [TE-1672].

[113]  *Id.*

[114]  *Id.* ¶¶ 71-75 [TE-1673-74]; Joint Pretrial Order Stipulations of Fact ¶ 2 [A-732].

1    "Rabbinical College," is not subtle about the purpose of TRC.  Further, from

2    November 2004 until January 2007, the Village approved TRC's tax-exempt status

3    twice,[115] and the board of trustees discussed or planned to discuss TRC in nonpublic

4    meetings on ten separate occasions.[116]  There is evidence also that there were

5    "unsubstantiated rumors"[117] that TRC planned to build a rabbinical college on the

6    property.[118]

7            These facts notwithstanding, there is no evidence that the board knew

8    any details about the planned rabbinical college before January 2007.  In particular,

9    nothing in the record suggests that the board knew about the nature, length, or size

10   of the contemplated rabbinical college program, its anticipated on campus housing,

---

[115]

Joint Pretrial Order Stipulations of Fact ¶ 16 [A-733].

[116]

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 280 F. Supp. 3d 426, 441 (S.D.N.Y. 2017).

Executive sessions, which are nonpublic, may be held to discuss matters of litigation.  *See* Village of Pomona Board of Trustees Meeting Minutes, Feb. 12, 2007 at 6 [TE-247]; Tr., Ulman Trial Testimony, 850:22-851:3 [A-1349-50].

[117]

Defendants' Amended Responses to Certain of Plaintiffs' Second Set of Interrogatories ¶ 20 Response [TE-693].

[118]

Tr., Sanderson Trial Testimony, 463:12-20 [A-1104].

1  the number of people who would reside on the site, or the duration of the planned

2  course of study.

3

4          *5.     Ulman Drafts the 2007 Laws*

5          It was in this context that Ulman in late 2006 drafted what would

6  become Local Law No. 1 of 2007 (the "2007 Dormitory Law") and Local Law No. 5

7  of 2007 (the "2007 Wetlands Law") – the third and fourth challenged laws.[119]

8          The draft 2007 Dormitory Law would have (1) changed the acreage

9  requirement for educational institutions to a net of 10 acres without the prior

10  requirement of .05 additional net acres per student, (2) removed certain slopes from

11  the net lot area calculation, (3) prohibited dormitories from occupying more than 20

12  percent of the total square footage of all the buildings on a lot, and (4) set the

13  maximum height of a dormitory at 25 feet.[120]

14          Among other things, the draft 2007 Wetlands Law would have

15  prohibited "[e]recting any building or structure of any kind," including roads and

---

[119]

See, e.g., December 11, 2006 Memorandum from Doris Ulman to Mayor and
Board of Trustees 1 [TE-341] (sending the board a draft of the Wetlands Law).

[120]

Local Law No. 1 of 2007 [TE-1492-93].

1    driveways, within 100 feet of the boundary of any wetland without a permit issued

2    by the board of trustees or planning board.[121]  A person could apply for a permit

3    only if the prohibitions in the law resulted in the "deprivation of [all] the reasonable

4    use of a property so as to constitute a de facto taking of such property."[122]  The 100-

5    foot buffer, however, would not apply to "lots that are improved with single family

6    residences."[123]  The permit and permit-approval procedures prescribed by the 2007

7    Wetlands Law are different from the special permit requirement and permit process

8    for educational uses under the 2001 Law.

9

10            6.    *December 18, 2006 Public Hearing re 2007 Laws*

11           The board of trustees held a public hearing on what became the 2007

12    Dormitory Law on December 18, 2006.  Paul Savad, the attorney for TRC, asked if

13    the proposed law was being considered due to his client's intended use of its

---

[121]
            Local Law No. 5 of 2007 at 3 [TE-1496].

[122]
            *Id.* at 5 (emphasis omitted, alteration in original) [TE-1498].

[123]
            *Id.* at 3 [TE-1496].

Case 18-869, Document 243, 12/20/2019, 2735416, Page39 of 104

1    property and what the law would accomplish for the Village.[124] Marshall responded

2    that the intent was to "refine the existing law."[125]   To give interested parties more

3    time to review the proposed law, the board continued the hearing to the next board

4    meeting on January 22, 2007.[126]   It set the extension hearing on the draft 2007

5    Wetlands Law for the same date.[127]   Before concluding matters on December 18,

6    however, the board held a closed executive session to discuss "matters of

7    litigation."[128]   There is no record of the board's discussion during that session,

8    though the agenda for the meeting indicates that the board planned to discuss the

9    TRC property.[129]

---

[124]

    Village of Pomona Board of Trustees Meeting Minutes, Dec. 18, 2006 at 4 [TE-261].

[125]

    *Id.*

[126]

    *Id.* at 4-5 [TE-261-62].

[127]

    *Id.* at 9 [TE-266].

[128]

    *Id.* at 12 [TE-269].

[129]

    Village of Pomona Board of Trustees Meeting Agenda, Mayor's Edition, Dec. 18, 2006 [TE-318].  Prior to TRC and YSV, the property was owned by Camp Dora. Joint Pretrial Order Stipulations of Fact ¶ 17 [A-733].  Village meeting agenda refer to the property by that name on at least several occasions.  *See, e.g.*, Board of Trustees Meeting Agenda, Tentative Working Edition, Oct. 16, 2006 [TE-226].

Case 18-869, Document 243, 12/20/2018, 2735446, Page40 of 104

38

7.    *Details of TRC's Plans Emerge*

On January 9, 2007, a political action group called Preserve Ramapo published an article detailing plans for the TRC construction.[130] Michael Castellucio circulated the article to a Preserve Ramapo email list along with the following message:

> "This is not our usual update letter.  We have posted an important story that you will not find in other media including the Journal or Channel 12.  Plans are under way to build a 'religious college' in Pomona at the end of Route 306 where it meets Route 202.  On the 100 acres on the right side of the road a developer plans to put up an apartment complex of 4 to 6-story buildings that will house 4,500 adult students and their families.  This campus will have 9 large apartment buildings and a single, much smaller 3-story building that is the sole school building.  The formula used is the 90% apartments 10% school of [Town of Ramapo Supervisor Christopher] St. Lawrence's Adult Student Housing Law. . . .
>
> "Please forward this email, or send a link to the story to your neighbors and friends.  Residents need to know that the Adult Student Housing complex on the old Nike site (Grandview Ave) was just the beginning of a massive urbanization effort whose path was cleared by Supervisor St. Lawrence and his Board."[131]

---

[130]    PX 65, Email and Attachment, Jan. 9, 2007 [TE-163-65].

[131]    *Id.* at 1 [TE-163].

1    The article itself stated that TRC planned to build housing for 1,000 students –

2    together with their families totaling 4,500 residents.[132]  The plan involved parking

3    for 34 vehicles at the school building and 1,036 vehicles at the residence buildings.[133]

4    The article provided also the following background on the adult-student-housing

5    law:

6    "in [the Town of] Ramapo[, the Religious Land Use and
7    Institutionalized Persons Act (RLUIPA)] . . . was used by our town
8    board as the legal justification for its new Adult Student Housing Law
9    (ASH).  Michael Klein, our town attorney, informed the town board
10   that under RLUIPA it could not prevent religious institutions from
11   creating 'Adult Student Housing' connected to schools providing 'post-
12   secondary education.'

14   "Rather than test the fairness and constitutionality of the RLUIPA law
15   in court, Supervisor St. Lawrence and his Board created a number of
16   ASH zones in Ramapo including the project on Grandview Ave. on the
17   old Nike site and numerous others. . . .

19   "By doing so, St. Lawrence and the Board have opened the floodgates
20   to urbanization with high-density, multi-story apartment complexes
21   masquerading as school campuses.

------

132

    *Id.* at 2 [TE-164].

133

    *Id.*

1     "The only way out of this march over the cliff is for voters to clean
2     house this fall in the Ramapo elections, just as they did last fall in the
3     state and national elections."[134]

4     On January 12, 2007, *The Journal News*, a local newspaper, published an

5 article entitled "Pomona to get rabbinical college plan."[135]  It included an overview

6 of the scale of the project similar to the Preserve Ramapo article.  In addition, it

7 quoted Savad as saying that the project was not a "dormitory city" but a rabbinical

8 college "for Orthodox Jews who desperately needed and are mandated by Jewish

9 law to go to the Jewish courts."[136]

10

11     *8.*     *January 22, 2007 Public Hearing on the 2007 Dormitory Law*

12     On January 22, 2007, the board continued the public hearing on the

13 draft 2007 Dormitory Law.  Villagers voiced their opposition to the size and scale of

14 the rabbinical college as had been reported by Preserve Ramapo and *The Journal*

15 *News* despite repeated statements from Marshall that the exclusive purpose of the

---

[134]

    *Id.* at 2-3 [TE-164-65].

[135]

    James Walsh, *Pomona to Get Rabbinical College Plan*, THE JOURNAL NEWS (Jan. 12, 2007) [TE-1129-30].

[136]

    *Id.*

1  hearing was to discuss changes to the law generally rather than to discuss any

2  specific property or project.[137] Nevertheless, some villagers noted that an additional

3  4,500 people added to the Village's population of 3,200 residents would "entirely

4  change the character" and "the politics of the [V]illage."[138] A volunteer firefighter

5  noted that there was no equipment to "handle six story buildings."[139]  One

6  individual mentioned the pressure that the college would put on town

7  infrastructure.[140] A number stressed that the rural character of the community was

8  a feature of Pomona they wished to preserve.[141]  And another described the adult

9  student housing in Ramapo on Grandview Avenue as a "monstrosity."[142]

---

[137]

*See, e.g.*, Tr., Village of Pomona Public Hearings on Local Law Amendment: Dormitories (continued), Local Law Amendment: Wetlands, Jan. 22, 2007, 30:18-25, 54:16-55:11 [TE-409, 433-34].

[138]

*Id.* 10:3-11 [TE-389].

[139]

*Id.* 11:21-12:2 [TE-390-91].

[140]

*Id.* 14:24-15:12 [TE-393-94].

[141]

*See, e.g., id.* 17:8-22 [TE-396].

[142]

*Id.* 21:3-6 [TE-400].

1       Some villagers voiced their opposition to the people who potentially

2 would reside on the property.  One said that "there is a group who wants to take

3 over this village" and that he did not want to be

4       "responsible for paying the expenses of somebody else's lifestyle,
5       whether you cloak it in religion, you cloak it in anything you want to
6       say, it just seems unfair that the burden should be placed on the people
7       who have lived in the village by other people who want to come in and
8       change the whole nature of the village."[143]
9

10 Another stated that "it's really funny how we're talking about law, when you have

11 a group that breaks every law there is."[144]

12       Two potential changes to the draft 2007 Dormitory Law – permission

13 to construct dormitories with two communal dining rooms and a height limit of 35

14 rather than 25 feet on dormitories – were discussed also.  The change from 25 to 35

15 feet would have brought the height limit in line with the limit on all other buildings

16 in the Village.  One villager noted, however, that many single-family homes and

17 other buildings in the Village had pitched, rather than flat roofs, as one would

---

[143]       *Id*. at 18:9-19:14 [TE-397-98].

[144]       *Id*. 47:2-5 [TE-426].

Case 18-863, Document 243, 12/20/2018, 2735446, Page45 of 104

43

expect a dormitory to have.[145]  Applying a different height limit to dormitories

therefore would produce little or no inconsistency in the law.[146]  Another suggested

that the 35-foot limit should be measured from the existing rather than the proposed

grade of a property.[147]

At a certain point in the meeting, an individual stated that "it would be

nice to hear [the board] saying, hey, I know how you all feel."[148]  He continued to

state that "in America, we have the sense of community.  That's our face.  We're

going to be another Kiryas Joel.[[149]] That's why we are emotional."[150]  The next three

---

[145]

Id. 66:1-11 [TE-445].

[146]

Id.

[147]

Id. 68:14-69:10 [TE-447-48].

[148]

Id. 56:11-12 [TE-435].

[149]

Kiryas Joel is a village located within the Town of Monroe in Orange County, New York.  It was incorporated in 1977 to serve as an enclave for followers of the Satmar Hasidic sect of Judaism and is populated almost exclusively by followers of that sect.  See, e.g., Fernanda Santos, Reverberations of a Baby Boom, N.Y. TIMES (Aug. 27, 2006), https://www.nytimes.com/2006/08/27/nyregion/27orange.html.

[150]

Tr., Village of Pomona Public Hearings on Local Law Amendment: Dormitories (continued), Local Law Amendment: Wetlands, Jan. 22, 2007, 56:18-20 [TE-435].

44

1      individuals to speak all commented on the emotion and frustration that villagers felt

2      as a result of the reports detailing TRC's plans.  Specifically, one individual said:

3           "The frustration that we have is that you knew of the press that had
4           come out, whether it be true or not.  You knew that it was out there,
5           and you know we were very, very upset.  I think what would have
6           helped us is if at the beginning of this meeting, you had said, this is
7           what is going on, we know that you've read this, we are here to protect
8           your interests, and the amendments to this law, this project, this
9           alleged project, with the alleged attorney who is allegedly sitting here,
10          produces it, that these amendments will defend us.  If you had said that
11          in the beginning, I don't think as many people would be as upset as
12          they are, because we don't know where you stand."[151]

13

14      Mayor Marshall replied:

15           "We sitting at this table have limitations that are placed on us as to
16           what we can say, and what we can't say, because our attorney tells us
17           what we can say and what we can't say.  I can't say what I feel – I can't
18           – if I agree with you, I don't agree with you, I don't have that luxury of
19           being able to say that here.  All that I can say is that every member of
20           this board works very, very hard to do what is best for this community.
21           You have your issues.  Don't assume because no one has gotten up and
22           said, wow, I agree with you, oh boy; don't assume that because we
23           didn't do that that we don't agree.  We may or we may not, but please
24           give us the benefit of the doubt.  We have all been doing this – we work
25           very hard at what we do.  We try and do what is best for the
26           community, but it's our home.

27

---

[151]

     *Id.* 58:4-18 [TE-437].

Case 18-869, Document 243, 12/20/2018, 2735446, Page47 of 104

45

1    "There are limitations under the law that restrict what we can say and
2    when we can say it."[152]

3            Following the public hearing, the board briefly discussed the proposed

4    changes to the draft law.  Trustee Lamer agreed with the point that dormitories were

5    more likely to have flat roofs and a 25-foot limit expressed the view therefore would

6    be appropriate.[153]  Trustee Banks said he thought that the limit should be consistent

7    with the limit on accessory uses, which was then 20 feet.[154]  Deputy Mayor

8    Sanderson concluded that the limit should be kept at 25 feet as in the draft law

9    proposed on December 18, 2006.[155]  He stated also that the board should keep the

10   provision in the December 18 draft that provided for one, not two, dining rooms.[156]

11   The board then adopted the 2007 Dormitory Law in the form originally prepared by

12   Ulman in 2006.[157]

---

[152]    *Id.* 58:20-59:13 [TE-437-38].

[153]    *Id.* 76:12-18 [TE-455].

[154]    *Id.* 76:23-77:6 [TE-455-56].

[155]    *Id.* 77:8-19 [TE-456].

[156]    *Id.*

[157]    *Id.* 78:18-80:20 [TE-457-59].

9.      *January 22, 2007 Public Hearing on the Wetlands Law*

Following a discussion of two items not subject to public hearing nor transcribed, the board held a public hearing on the proposed 2007 Wetlands Law on January 22.[158]  Savad objected to the law generally and on grounds specific to the TRC property.  He stated that the proposition that the proposed wetlands law was designed to "fill a void created by federal law is incorrect and false . . . because the vast majority of wetlands are under the present, current jurisdiction of the Army Corps of Engineers and the [New York State Department of Environmental Conservation, or] DEC."[159]  Savad argued that the proposed law generally would be "arbitrary and capricious," "subjective,"[160] "insidious," and "not constitutional," at least insofar as it would add an additional 10 acres of the property to the 37 acres already subject to DEC and federal wetlands jurisdiction, thus targeting and preventing certain uses.[161]

---

[158]      *Id.* 80:23-82:12 [TE-459-61].

[159]      *Id.* 84:24-85:7 [TE-463-64].

[160]      *Id.* 85:20-23 [TE-464].

[161]      *Id.* 86:12-87:7 [TE-465-66].

Case 18-869, Document 243, 12/20/2018, 2735446, Page49 of 104

1        A villager who spoke immediately afterward argued that the draft 2007

2    Wetlands Law indeed was needed to fill gaps in federal and state wetlands

3    regulations and provided an example of a developer who had damaged wetlands

4    on a property adjacent to Pomona.  The developer had gone unpunished and the

5    damage unmitigated due to the limited jurisdiction, failings, and resource

6    constraints of the federal and state authorities.[162]   Another villager expressed

7    concern that his property would be affected negatively by the proposed law, which

8    he believed was "made specifically for, let's just say, certain types of institutions

9    which I think is the reason for most of this."[163]   He suggested that large parcels

10    should be treated differently than single-family homes.[164]

11

12

13

14

---

[162]        *Id.* 87:16-88:14 [TE-466-67].

[163]        *Id.* at 93:1-3 [TE-472].

[164]        *Id.* 93:4-6 [TE-472].

Case 18-869, Document 243, 12/29/2018, 2735446, Page50 of 104

48

1        10.      *February 12, 2007 Workshop Meeting*

2        The public hearing on the draft 2007 Wetlands Law was continued to

3   February 26, 2007.[165]  On February 12, 2007, however, the board held a workshop to

4   discuss possible changes to the draft law.  Each member of the board (with the

5   possible exception of Roman) had known for at least six years that there were

6   wetlands on the TRC property.[166]

7        At the workshop, Ulman ran through a list of recommendations from

8   the county.[167]  Subsequently, the board discussed the issue of what would happen

9   under the proposed law if a property owner wanted to extend an existing deck that

10  was within the buffer zone.  Ulman noted that the building inspector in that event

11  would need to go to the property to determine if there were any wetlands that

---

[165]

     *Id.* 97:1-8 [TE-476].

[166]

     Village of Pomona Board of Trustees Meeting Minutes, Oct. 22, 2001 [TE-273-74].

[167]

     Tr., Village of Pomona Planning Board Workshop Meeting, Feb. 12, 2007, 4:8-6:3 [TE-492-94].  New York's General Municipal Law mandates a county-level review for certain municipal land use actions, particularly those that may impact other municipalities or the county more generally.  *See* N.Y. GENERAL MUNICIPAL LAW §§ 239-l, 239-m, and 239-n.

Case 18-869, Document 243, 12/20/2018, 2735446, Page51 of 104

49

1  would trigger the permit procedure in the law.  Sanderson explained to Ulman that

2  the process would not work that way:

3      "[The building inspector] doesn't have the time or the money, budget
4      wise, to go out and look at the site for somebody that wants to rebuild
5      their deck with three extra square feet in it. . . .
6
7      "He has to get a building permit to do it and the guy will look at the
8      site plan or the existing – the existing file and he'll say, have you got a
9      proper – does the deck meet all of our codes?  Yes.  You got a building
10     permit."[168]

11

12  Banks explained that the issue was a "problem of identifying and mapping the

13  existing wetlands or small wetlands all over the village."[169]

14      Marshall noted that the law accomplished such mapping only for new

15  developments.[170]  After further back and forth, the board decided that it would

16  address at the next public hearing the issue of whether to apply the law to "new

17  additions and structures on existing developed property."[171]

18

---

[168]     *Id.* 19:22-20:10 [TE-507-08].

[169]     *Id.* 20:19-22 [TE-508].

[170]     *Id.* 20:23-21:3 [TE-508-09].

[171]     *Id.* 21:7-22, 27:4-15 [TE-509, 515].

Case 18-869, Document 243, 12/28/2018, 2735446, Page52 of 104

1      *11. Village Elections*

2           The public hearing scheduled for February 26, 2007 was adjourned until

3    March 26, 2007.[172]  But on March 20, the Village held elections for the board of

4    trustees.  Nick Sanderson, Brett Yagel, and Rita Louie ran as a slate.[173]  They

5    campaigned on a promise to stand up to the threat posed by TRC's "huge

6    development that will include housing for thousands of adult students and their

7    families" that would "have real environmental and safety problems."[174]  They

8    promised to fight TRC's anticipated use of RLUIPA.  They called RLUIPA

9    "fundamentally unfair" and its deployment "a hammer against our village."[175]  And

10   they won: Sanderson became mayor, and Yagel and Louie each became a trustee.[176]

11   At the time they took up consideration of the draft 2007 Wetlands Law, at least

---

[172]  Village of Pomona Board of Trustees Meeting Minutes, Feb. 26, 2007 at 3 [TE-1361].

[173]  PX 41, Sanderson, Louie, Yagel Campaign Flyer [TE-25].  Sanderson at the time was deputy mayor.  *Id.*  Louie and Yagel had no previous experience serving on the board of trustees.  *Id.*

[174]  *Id.*

[175]  *Id.*

[176]  *Id.*; Joint Pretrial Order Stipulations of Fact ¶ 22 [A-734].

Case 18-863, Document 243, 12/20/2018, 2735446, Page53 of 104

1    Sanderson[177] and Yagel[178] were aware of the presence of some wetlands on the TRC

2    property.

3

4              12.    *The Village Adopts the 2007 Wetlands Law*

5              The Village adopted the 2007 Wetlands Law on April 23, 2007.[179]  It

6    exempted existing single-family homes.[180]

7

8    III.    *Procedural History*

9              TRC never applied for a permit to build a rabbinical college on its

10   property.  But Tartikov filed this action on July 10, 2007[181] challenging the four

11   Pomona laws described above.  It argued that the laws, facially and as applied,

---

[177]

    Village of Pomona Board of Trustees Meeting Minutes, Oct. 22, 2001 [TE-273-74].

[178]

    PX 69, Email, Jan. 11, 2007 at 1 [TE-168].

[179]

    Joint Pretrial Order Stipulations of Fact ¶ 26 [A-734].

[180]

    Local Law No. 5 of 2007 at 3 [TE-1496].  The exemption had no practical effect on existing homes, but may or may not have had implications for additions or modifications.

[181]

    Complaint [07-cv-6304, DI 1].

Case 18-868, Document 243, 12/20/2018, 2735446, Page54 of 104

1   violated (1) the First and Fourteenth Amendments and their New York

2   constitutional counterparts, (2) the substantial burden, nondiscrimination, equal

3   terms, and exclusions and limits provisions of RLUIPA, (3) the Fair Housing Act

4   ("FHA"), and (4) New York statutory and common law.[182]

5        Pomona moved to dismiss on the grounds that Tartikov lacked

6   standing, its claims were not ripe, and it failed to state a claim for relief.[183]  The

7   district court granted the motion with respect to the as-applied challenges,

8   concluding that they were not ripe because TRC had not presented formally its

9   actual plans for the proposed rabbinical college nor made any application for a

10  special use permit, use variance, zoning amendment, or zone change.[184]  The court

11  concluded also that Tartikov's claims under New York Civil Rights Law Section 40

12  were unripe.[185]  It denied the motion in all other respects relevant here.[186]

---

[182]   Second Amended Complaint [07-cv-6304, DI 27].

[183]   Def. Mem. Motion to Dismiss [07-cv-6304, DI 37].

[184]   *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 596–607 (S.D.N.Y. 2013).

[185]   *Id.* at 638.

[186]   *Id.*

53

1       Tartikov moved, and Pomona cross-moved, for summary judgment.

2   The district court granted summary judgment in favor of Pomona dismissing the

3   free speech claims.[187]   It otherwise denied the motions in all relevant respects.

4

5       After a ten-day bench trial, the district court ruled in favor of Tartikov

6   on the majority of its claims.[188] Beginning with the Fourteenth Amendment claims,

7   the court found that the Village enacted each of the four challenged laws with a

8   discriminatory purpose against Tartikov based on its religious character and a desire

9   to prevent the growth of a Hasidic community in Pomona.[189]   Among other

10  evidence, the court focused on the timing of the laws, the Village's litigation

11  opposing the Town of Ramapo's comprehensive plan, the comments of villagers and

12  board members during the 2007 hearings, and several statements from Village

13  officials it regarded as indicating their prejudice against Tartikov.[190] The court found

---

[187]   *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015).

[188]   *Tartikov*, 280 F. Supp. 3d 426.

[189]   *Id.* at 449-50.

[190]   *Id.* at 449-53.

Case 18-869, Document 243, 12/20/2018, 2735446, Page56 of 104

54

1    also that the zoning law amendments had a discriminatory effect because they

2    prevented Tartikov from constructing the proposed rabbinical college.[191]   Thus

3    determining that the laws were subject to strict scrutiny, the court held that the

4    Village lacked a compelling state interest in enacting them and, in any case, the laws

5    were not narrowly tailored to serve any such interests.[192]   Based on these findings,

6    the court held also that the Village enacted the laws to discriminate against

7    Tartikov's sincerely held religious beliefs and its associational rights.[193]

8            Treating the RLUIPA nondiscrimination claims as overlapping with the

9    equal protection claims, the court found for Tartikov on these claims, as well.[194]   It

10   found for Tartikov also on the claims under RLUIPA that the zoning law

11   amendments substantially burdened Tartikov's religious exercise.   The court held

12   that Tartikov demonstrated that its desire to build college facilities and multi-family

13   housing was motivated by its religious character, and that the zoning law

---

[191]
          *Id.* at 455.

[192]
          *Id.* at 455, 465.

[193]
          *Id.* at 484-86.

[194]
          *Id.* at 488.

1    amendments would burden its planned construction substantially.[195] However, the

2    court found for Pomona on the RLUIPA exclusions and limits and equal terms

3    claims.   For the former, it found that while the amendments would exclude

4    Tartikov's proposed religious use of its land, they would not, as an exclusions and

5    limits claim requires, totally exclude or unreasonably limit *all* religious assemblies,

6    institutions, or structures within the Village.[196]  As to the equal terms claims, the

7    court found that the zoning law amendments did not, as they must for the claim to

8    succeed, treat religious institutions differently than nonreligious institutions.[197]

9        The court held further that Pomona violated the FHA's prohibition

10   against discriminatory housing policies and New York's constitutional right to

11   freedom of worship largely in the same respects that it violated the U.S. Constitution

---

[195]    *Id.* at 468-82.

[196]    *Id.* at 486-88.

[197]    *Id.* at 488-91.

Case 18-869, Document 243, 12/20/2018, 2735446, Page58 of 104

56

1    and RLUIPA.[198]  The court found for Pomona, however, on the New York common

2    law claims that the Village improperly had excluded multifamily housing.[199]

3              The district court entered judgment and a mandatory injunction on

4    March 1, 2018.  Among other things, the court: (1) declared the four laws facially

5    invalid under the First and Fourteenth Amendments, (2) enjoined Pomona from

6    applying any of the provisions in those laws to the TRC property, (3) ordered

7    Pomona to "process any and all applications" filed by Tartikov without reference

8    to the provisions in the four laws and without "undue delay or religious

9    discrimination," (4) directed Pomona to consider any proposed Tartikov

10   nonaccredited rabbinical college as a permitted use rather than one subject to any

11   special permit requirement, and any proposed Tartikov rabbinical college with

12   student-family-housing as a permitted use in the R-40 zoning district (one acre,

13   single-family residential), and (5) prohibited Pomona from enacting in the future

14   any provisions similar to those in the four challenged laws.[200]

---

[198]    *Id.* at 491-93.

[199]    *Id.* at 493-94.

[200]    Judgment and Mandatory Injunction [07-cv-6304, DI 356].

Case 18-863, Document 243, 12/20/2019, 2735446, Page59 of 104
Case 7:07-cv-06304-KMK Document 386 Filed 12/20/19 Page 59 of 104

57

1  Pomona appealed. Tartikov cross-appealed, asserting that the district

2  court erred in dismissing the as-applied challenges and in ruling for Pomona on the

3  RLUIPA equal terms and exclusions claims.

4

5  **DISCUSSION**

6  *I.    Standing*

7  A federal court's authority to adjudicate depends on whether the

8  plaintiff has standing to pursue its claims.[201] The Supreme Court has construed

9  Article III to mean that a plaintiff must "have (1) suffered an injury in fact, (2) that

10  is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

11  to be redressed by a favorable judicial decision."[202] An injury in fact sufficient to

12  confer standing is "an invasion of a legally protected interest" that is "concrete and

13  particularized" and "actual or imminent, not conjectural or hypothetical."[203] "[A]

---

[201]

*MacDonald v. Safir*, 206 F.3d 183, 188 (2d Cir. 2000); *see also Melito v. Experian Marketing Solutions, Inc.*, 923 F.3d 85, 92 (2d Cir. 2019) ("It is fundamental that we have an independent obligation to satisfy ourselves of the jurisdiction of this court and the court below.") (quotation marks and citation omitted).

[202]

*Melito*, 923 F.3d at 92 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

[203]

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citations omitted).

58

1    plaintiff must demonstrate standing for each claim he seeks to press and for each

2    form of relief that is sought."[204]  Where an action involves multiple plaintiffs, Article

3    III is satisfied so long as at least one plaintiff – and not necessarily the same one –

4    has standing with respect to each claim.[205]

5            Tartikov's claims fall into two distinct groups, each of which asserts a

6    different alleged injury.

7            Tartikov's equal protection claims under the federal and New York

8    constitutions and its nondiscrimination and equal terms claims under RLUIPA all

9    are based on the alleged invasion of Tartikov's right to be free from state

10   discrimination or unequal treatment under the law on the basis of religion.  Its First

11   Amendment free exercise, free speech, and free association claims under the federal

12   and New York constitutions, RLUIPA substantial burden and exclusion and limits

13   claims, FHA claims, and common law claims related to the *Berenson* doctrine[206] all

---

[204]

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

[205]

*Id.* at 1650-51.  We therefore continue to treat TRC and its future students as a single entity for the purpose of our analysis.

[206]

This doctrine requires that "a zoning ordinance . . . [1] provide a properly balanced and well-ordered plan for the community, and . . . [2] adequately consider regional needs and requirements."  *Cont'l Bldg. Co. v. Town of N. Salem*, 625 N.Y.S.2d 700, 703 (1995) (citing *Berenson v. Town of New Castle*, 38 N.Y.2d 102, 110 (1975)).

1  rest on alleged infringement of the free exercise of its religion by regulation of the

2  use of its property.  Whether Tartikov has standing to pursue each group of claims

3  turns on whether the alleged injury is an injury in fact for Article III purposes.[207]

4  The first group of claims is that the Village adopted the four challenged

5  laws at least in part for the purpose of discriminating against Tartikov on the basis

6  of religion and that those laws stigmatized the plaintiffs.  "[S]tigmatizing members

7  of [a] disfavored group as innately inferior and therefore as less worthy participants

8  in the political community" – *i.e.*, discrimination – is an actual and concrete injury

9  sufficient to confer standing.[208]  The "'right invoked is that of equal treatment,' [and]

10  the appropriate remedy is a mandate of *equal* treatment."[209]  Tartikov thus has

11  standing to pursue equal protection claims under the Fourteenth Amendment of the

12  federal and New York constitutions as well as nondiscrimination and equal terms

13  claims under RLUIPA.

---

[207]

Tartikov pled also claims under New York Civil Rights Law Sections 40-c(1) and (2).  The district court dismissed these claims as unripe prior to trial.  *See* Tartikov, 915 F. Supp. 2d at 607.  We therefore do not consider them here.

[208]

*Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (quotation marks omitted).

[209]

*Id.* at 740 (emphasis in original) (quoting *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 247 (1931)).

60

1          But Tartikov's second group of claims is different.  It alleges that the

2     four challenged laws prevent it from building and operating a rabbinical college on

3     the property and thus interfere with its religious freedom.  Tartikov, however, never

4     submitted a formal proposal for the building project, applied for a permit, or

5     engaged in any other conduct that would implicate or invoke the operation of the

6     challenged zoning laws.  Whatever harm may arise from the application of the

7     zoning laws to TRC's property is merely conjectural at this time.  "[C]onjectural"

8     injuries do not suffice under Article III.[210]  We therefore lack jurisdiction over

9     Tartikov's free exercise, free speech, and free association claims under the federal

10    and New York constitutions, RLUIPA substantial burden and exclusion and limits

11    claims, FHA claims, and common law claims related to the *Berenson* doctrine.  We

12    vacate the judgment with respect to these claims and remand with instructions for

13    the district court to dismiss them.

14          We now turn to the remaining claims.

15

16

---

[210]

     *Lujan*, 504 U.S. at 560.

1    *II.    Equal Protection Claims*[211]

2    "This Court has generally recognized three types of equal protection

3    violations: (1) a facially discriminatory law; (2) a facially neutral statute that was

4    adopted with a discriminatory intent and applied with a discriminatory effect . . . ;

5    and (3) a facially neutral law that is enforced in a discriminatory manner."[212]  With

6    respect to each of the challenged laws, Tartikov focused, and the district court based

7    its holding, on the second theory.[213]

8    Discriminatory purpose "implies that the decisionmaker . . . selected or

9    reaffirmed a particular course of action at least in part 'because of,' not merely 'in

---

[211]

The equal protection guarantees under the New York Constitution are coextensive with those under the U.S. Constitution.  *See, e.g., People v. Kern*, 75 N.Y.2d 638, 649 (1990).  Consequently, the analysis that follows applies to Tartikov's equal protection claims under the New York Constitution.

We need not address separately Tartikov's RLUIPA nondiscrimination claim. RLUIPA's nondiscrimination provision codifies the equal protection guarantees of the Fourteenth Amendment.  *Chabad Lubavitch of Litchfield County, Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014).  Thus, our holdings with respect to the equal protection claims apply also to those claims.

[212]

*Chabad Lubavitch*, 768 F.3d at 199.

[213]

*Tartikov*, 280 F. Supp. 3d 426.

Case 18-869, Document 243, 12/20/2019, 2735446, Page64 of 104

1   spite of,' its adverse effects upon an identifiable group."[214] "Determining whether

2   invidious discriminatory purpose was a motivating factor demands a sensitive

3   inquiry into such circumstantial and direct evidence of intent as may be available."[215]

4   This evidence may include "the series of events leading up to a land use decision,

5   the context in which the decision was made, whether the decision or decisionmaking

6   process departed from established norms, statements made by the decisionmaking

7   body and community members, reports issued by the decisionmaking body,

8   whether a discriminatory impact was foreseeable, and whether less discriminatory

9   avenues were available."[216]

10       "In reviewing a district court's decision in a bench trial, we review [its]

11   findings of fact for clear error[,] . . . its conclusions of law *de novo*," and mixed

12   questions of law and fact *de novo*.[217]  Of particular relevance here, "[w]e review a

---

[214]

    *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also, e.g.*, *Hayden v. Paterson*, 594 F.3d 150, 162 (2d Cir. 2010) (same).

[215]

    *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

[216]

    *Chabad Lubavitch*, 768 F.3d at 199.

[217]

    *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178 (2d Cir. 2001).

Case 18-863, Document 243, 12/20/2019, 2735416, Page65 of 104

1    district court's finding of discrimination after a bench trial for clear error."[218]

2    "[T]here is a strong presumption in favor of a trial court's findings of fact if

3    supported by substantial evidence," and "[w]e will not upset a factual finding unless

4    we are left with the definite and firm conviction that a mistake has been

5    committed."[219]  That said, "we have not hesitated to find clear error 'where the court

6    has failed to synthesize the evidence in a manner that accounts for conflicting

7    evidence or the gaps in a party's evidentiary presentation.'"[220]

8                    We consider the challenged laws in turn.

9

10          A.    *Local Law No. 1 of 2001*

11                   The district court found that the 2001 Law was motivated at least in part

12    by discriminatory animus based on: (1) the timing of the law in relation to YSV's

13    informal proposal to build a yeshiva on the property and the fact that there were no

---

[218]    *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016).

[219]    *White*, 237 F.3d at 178 (quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994)); *see also Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (same).

[220]    *Locurto v. Giuliani*, 447 F.3d 159, 181 (2d Cir. 2006) (quoting *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004)).

Case 18-869  Document 243  12/20/2019  2735416  Page 66 of 104

1   schools in the Village at that time, (2) a comment made by FPC in a memorandum

2   (that specifically referenced YSV) stating that the zoning laws regarding schools

3   were "scant" and FPC's comment at a planning board meeting that those laws

4   "really stink," (3) a comment by Mayor Marshall during the same meeting that the

5   Village would be "caught with [its] pants down," and (4) the Village's supposed

6   reaction to earlier proposed projects – specifically, its opposition to the expansion

7   of an Orthodox Hasidic yeshiva, Bais Yaakov, in Ramapo in 1996 and its support for

8   an assisted-living facility.  Reviewing as we must for clear error, these facts –

9   whether individually or taken together – are insufficient to support an inference that

10  the 2001 Law was enacted to discriminate against YSV in particular or Hasidic Jews

11  in general.

12      We agree with the district court that the timing of the 2001 Law was "in

13  direct response to YSV's desire to build an Orthodox yeshiva on the Subject

14  Property."[221]  But the Village's choice to act in response to YSV's informal proposal

15  says nothing of whether that choice was motivated by a positive, negative, or neutral

16  reaction to YSV, its religious character, or its project.

---

[221] *Tartikov*, 280 F. Supp. 3d at 449.

Case 18-869, Document 243, 12/29/2018, 2735446, Page67 of 104

65

1          YSV first approached the Village in 1999, through the informal

2   presentation described above, about building a yeshiva on the property.  During the

3   meeting, its representative noted, in response to questions from Village

4   representatives, that YSV had conducted a traffic study, did not plan to build any

5   dormitories, and had no further development plans in mind.  Mark Healey, the FPC

6   representative present at the meeting, then made the following comment:

7          "I took a look at the zoning for schools in the Village and they really
8          stink, to put it straight.  The[] only requirement is that they have to
9          have five acres of land and the setbacks have to be twice what is
10         ordinarily required.  So that leaves an open question of issues that
11         several members of the Board brought up.  What can happen in the
12         future?"[222]
13
14   He went on to recommend that the Village "seriously consider looking at it[s]

15   requirements for schools and address such issues as perhaps, more detailed or more

16   tailored lot area requirements."[223]  He stated also that the Village could craft

17   requirements that "*wouldn't restrict* [*YSV*] *from doing what they want to do* but . . .

---

[222]

Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 [TE-592].

[223]

*Id.*

1    would assure the Village that they're not going to go down the road and develop a

2    lot more in the future."[224]

3            The district court relied on the two comments from Healey in finding

4    discriminatory animus. But these comments demonstrate an *acceptance* of YSV and

5    its proposal rather than any religious animus. The only negative implication, if there

6    was any, concerned the possibility of more intensive development in the future,

7    regardless of its nature or the identity of any future developer.

8            Of course, it theoretically is possible that Healy made these comments

9    to cover up discriminatory intent and that the board so understood them. If that

10    were so, the board's receptiveness and responsiveness to Healey's statements would

11    render the 2001 Law a violation of the Fourteenth Amendment. Moreover, if

12    discriminatory intent lurks within the background of a facially neutral decision,

13    courts are obliged to smoke it out.[225] But there is no evidence on this record that

14    Healey harbored any relevant animus or intended the recommendations to serve as

15    cover for discriminatory goals. Nor is there evidence that the board understood his

16    comments to promote a forbidden end. Without evidence of discriminatory intent,

---

[224]

    *Id.* (emphasis added).

[225]

    *Arlington Heights*, 429 U.S. at 267.

1   we must look to the effects of the changes that FPC recommended to the Village to

2   determine how, if at all, they would have affected a formal YSV proposal, which was

3   the impetus for the board's actions in this time period.

4           In its January 24, 2000 memorandum addressed to the Village board of

5   trustees, FPC recommended: (1) adding preschools to the list of authorized uses, (2)

6   subjecting schools to special permit approval, and (3) revising minimum lot size

7   requirements. The Village declined to adopt the first recommendation, as is evident

8   from the definition of "school" and "educational institution" in the 2001 Law. It

9   incorporated the second and third.

10          The record is devoid of evidence that could support an inference of

11  discriminatory intent in the Village's decision not to move forward with the first

12  recommendation. Nothing in record suggests the Village had an invidious purpose

13  behind continuing to exclude preschools from the list of authorized uses.[226] Nor

14  would the recommendation have had a discriminatory effect given that its definition

15  of "educational institution" applied to all schools equally. While YSV was the only

16  school at the time that owned property and intended to build in Pomona, the 2001

---

[226]    See Village of Pomona Board of Trustees Meeting Minutes, Dec. 18, 2000 [TE-290-98].

Case 18-869, Document 243, 12/20/2018, 2735446, Page70 of 104

68

1    Law would not have prevented YSV from applying for a special permit, nor would

2    it have excluded YSV from the Village.  In fact, YSV itself indicated that its proposed

3    preschool was a smaller, subsidiary aspect of the project rather than its focus.[227]

4               The second and third recommendations require more analysis.  To

5    begin, neither recommendation facially evidences discriminatory intent.  In *Bagnardi*,

6    the New York Court of Appeals described the requirement of a special permit

7    application as "beneficial in that it affords zoning boards an opportunity to weigh

8    the proposed use in relation to neighboring land uses and to cushion any adverse

9    effects by the imposition of conditions designed to mitigate them."[228]  An apt

10   example is a minimum lot size requirement, which can control "the effect the use

11   would have on . . . the general plan for development of the community."[229]  The two

12   amendments under discussion thus were addressed to legitimate planning concerns.

13   And that is exactly what the evidence suggests the Village sought to do here.

14   Indeed, the FPC memorandum noted at the outset that "the current standards for

---

[227]

Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 33, 38 [TE-584, 589].

[228]

*Bagnardi*, 68 N.Y.2d at 596.

[229]

*Id*.

1   schools [in the Village code] are rather scant and would not adequately control the

2   total/future development of a school property."[230]

3           We must address also the statement Mayor Marshall made during the

4   December 18, 2000 board meeting.  During that meeting, the Village attorney noted

5   that the draft 2001 Law under discussion was just that – a draft.  Mayor Marshall

6   responded:

7           "Well, it's a starting point, we want to work on it.  This thing's going
8           to come in.  They're going to come in and we're going to be caught with
9           our pants down if we don't move.  That's why I want to make sure that
10          we're moving ahead.  If you miss a meeting, no problem, you're going
11          to be involved in the discussion any way, so.  Okay, next item . . . ."[231]
12
13          From this statement and, in particular, the reference to the Village being

14  caught with its pants down, the district court attributed animus at least to Marshall.

15  But as so often is the case, context is everything.  The starting point is Healy's

16  recommendations and the reasons for them.  He pointed out – and no one disputes

17  – that the Village had virtually no land use standards of any kind applicable to

---

[230]
        Frederick P. Clark Associates, Inc., Memorandum re Proposed Primary School and
        Pre-School (YSV-Pomona) and the Village's Zoning Regulations Regarding
        Schools, Jan. 24, 2000 [TE-283].

[231]
        *Id.* at 69 [TE-298].

Case 18-869, Document 243, 12/29/2018, 2735446, Page72 of 104

1    schools.[232]  It had merely a minimum lot size of 5 acres and required setbacks of only

2    twice those required for a single family house.  But it was confronted with a

3    likelihood of near term development of a small part of a 100 acre parcel perhaps

4    followed in the future by efforts to develop the remainder of the property in

5    possibly more intensive ways.  So the planning consultant recommended preparing

6    more detailed plans, doing a traffic study, and "seriously . . . looking at . . .

7    requirements for schools and address[ing] such issues as perhaps, more detailed or

8    more tailored lot area requirements."[233]  He followed up with recommendations that

9    "wouldn't restrict them [i.e., YSV] from doing what they want to do" but would take

10   appropriate account of possible later development especially in light of "the

11   constrained nature of the site and also the constrained nature of the surrounding

12   road ways, in terms of traffic."[234]

13           Against that background, Marshall's comment that "[t]his thing's

14   [YSV's proposal] is going to come in.  They're going to come in and we're going to

---

[232]

Village of Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 41 [TE-592].

[233]

*Id.*

[234]

*Id.*

be caught with our pants down if we don't move" is not reasonably construed as betraying religious animus. In light of the fact that the recommended legislation before the board at that point, as Healy had pointed out, "wouldn't restrict" YSV "from doing what they want to do," it reflected agreement that action was appropriate to protect against being "caught with our pants down" as respects future development of the portion of the 100 acres that would not be developed under the informal YSV proposal. It did not manifest religious animus toward YSV in particular or Hasidic or others of the Jewish faith.

The district court relied also on the Village's prior opposition to the expansion of the Bais Yaakov yeshiva in 1996. But this evidence does not support its finding either.

According to the minutes of a May 20, 1996 board of trustees meeting discussing the yeshiva expansion:

> "Mayor Klingher[] wrote the Town stating that too much of the property was being utilized, the building was 50' instead of 35'. The approved Negative Declaration was rescinded. They plan to cover 55% of the land instead of 25%. Parking requested was for fifty (50) spaces, 150 are needed. The Plan needs to be revised and changed again."[235]

---

[235] Village of Pomona Board of Trustees Meeting Minutes, May 20, 1996 at 7 [TE-348].

1    Later in the meeting, a member of the public "asked what she can do" about the Bais

2    Yaakov expansion plan.[236]  The mayor at the time responded "to get as many people

3    as she can to come out to the meetings.  Also, they should retain an [a]ttorney to

4    represent them as a group."[237]

5                 This evidence does not support a finding of discriminatory animus.

6    Unlike TRC, the Bais Yaakov yeshiva already existed.  Nothing in the record

7    suggests that the Village opposed its initial construction.  As to the expansion

8    proposal, the evidence of record, according full appropriate deference to the district

9    court's fact finding, does not support a conclusion that the Village was against

10   expanding the yeshiva, either entirely or in part, on religious grounds.  The evidence

11   suggests only that the building was larger than the Village thought it should have

12   been,[238] that the proposed land coverage would have been excessive, and that the

---

[236]    *Id.* at 8 [TE-349].

[237]    *Id.*

[238]    It is unclear exactly what the reference to 50 feet rather than 35 feet actually meant.
One possibility is that at some previous step in the process, Bais Yaakov had
sought or obtained approval for a 35-foot building but that the yeshiva had
switched to 50 feet.  Of course, it is subject to a different interpretation as well –
namely, that the building was simply too large of an expansion.  As the latter is the
view most favorable to plaintiffs, we accept it as fact for purposes of analysis.  But
it is insufficient evidence of prohibited animus.

Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 75 of 104
Case 18-863, Document 243, 12/20/2019, 2735446, Page75 of 104

73

1   proposed parking was insufficient.  These all are permissible factors for municipal

2   regulators to consider.  Likewise, the townsperson's comment coupled with the

3   mayor's response is too vague to permit an inference of animus.

4           The district court premised its animus holding also on the Village's lack

5   of opposition in 1999 to an assisted-living facility to be built on the "Anna Mann"

6   Property.  However, the record contains no evidence as to the size, resident

7   population, or scope of the proposed facility.  Without such evidence, there is no

8   basis for comparing the yeshiva proposal with the assisted living facility.[239]

9           Having concluded that the evidence does not permit a finding of

10  discriminatory intent in the adoption of Local No. 1 of 2001, we must ask whether

11  the zoning law changes brought about by the 2001 Law have discriminatory effect.

12  The record does not support such a conclusion.  The special permit requirement and

13  related conditions apply with equal force to any educational institution, religious or

14  secular, that might seek to build in Pomona.  The fact that YSV was the only school

---

[239]   On cross-examination, Ulman testified that the yeshiva would have included
        "housing and a huge amount of development."  Tr., Ulman Trial Testimony,
        809:25-810:3 [A-1320-21].  This statement is in apparent contradiction to Rabbi
        Fromowitz's assertions that the yeshiva would not include dormitories. Village of
        Pomona Planning Board Meeting Minutes, Dec. 15, 1999 at 37 [TE-588].  Whatever
        the case may be, these scant details provide no basis for comparing the projects.

1    that hoped to build when the 2001 Law was passed does not render the

2    recommendations discriminatory because nothing in the record contradicts the

3    appropriateness of special permit and minimum lot size requirements to protect

4    against "traffic congestion," overburdening "municipal services," or damaging the

5    "general plan for development of the community."[240] Nor is there any evidence that

6    the recommendations, if adopted, would have prevented YSV from applying for a

7    special permit, caused the denial of such an application for any reason other than

8    unwillingness to comply with appropriate and reasonable conditions, or otherwise

9    thwart or exclude YSV from the Village.

10            We give great deference to the district court's findings of fact.  And we

11   are mindful that municipalities of Rockland County have faced significant

12   development pressure from Hasidic people in recent years.  It is easy to see how bias

13   could play a role in influencing a municipality's decision whether to allow a

14   religious institution to undertake a large construction project.  But we must be

15   cognizant also that municipalities may resist development pressures for legitimate

16   reasons unrelated to discriminatory animus.  Without direct evidence of intent, as

17   is the case here, divining a legislature's motive is a difficult task – and one made

---

[240]    *Bagnardi*, 68 N.Y.2d at 596.

1    more difficult by the fact that bias may be implicit and decisions are supported often

2    by multiple rationales.

3

4         B.      *Local Law No. 5 of 2004*

5              The district court relied on the following facts in finding that the 2004

6    Law was motivated by discriminatory animus: (1) the board of trustees passed a

7    resolution in January 2004 opposing any public officials who "abdicate their

8    responsibility of office by placing the politics of special interest groups and

9    individual developers ahead of the best interest of the people," (2) the Village joined

10   others in a lawsuit against the Town of Ramapo in May 2004, which sought to strike

11   down Ramapo's new comprehensive plan for failing to comply with SEQRA, (3)

12   following Ramapo's adoption of an adult-student-housing law in June 2004, the

13   Village joined others in a separate action against Ramapo to strike down that new

14   law, (4) in opposing the Ramapo law, Mayor Marshall stated that Ramapo officials

15   were "pandering to the special interest groups able to deliver the critically important

16   block vote," (5) YSV's tax exempt status was denied for the first time in 2004, and (6)

17   the Village did not oppose an earlier Barr Laboratories project to construct an office

18   building.

Case 7:07-cv-06304-KMK Document 386 Filed 12/20/19 Page 78 of 104
Case 18-863 Document 243 12/20/2019 2735416 Page 78 of 104

76

1          As detailed above, the 2004 Law, which was based on Ulman's

2    recommendations, in fact liberalized several features of the then existing zoning

3    law.[241]  It allowed dormitories, which had not been permitted under the 2001 Law.

4    It loosened accreditation requirements and added college, graduate, and

5    postgraduate schools to the definition of "educational institution[s]" – a change that

6    could have been made as an accommodation or response to YSV's request in June

7    2001 to build an adult-education center on the property.  And it eased some

8    restrictions related to acreage and road access.  The 2004 Law added no new

9    restrictions and did nothing to tighten existing restrictions or requirements.

10          In other words, the 2004 Law would not have prevented YSV from

11    developing the Subject Property.

12          Nothing in the content or effect of the 2004 Law permits the inference

13    that it was motivated by animus.  The district court found discriminatory animus in

14    the events leading up to the passage of the 2004 Law to support the inference that

15    it was motivated by bias against the Hasidim.  It found that the 2004 Law was

16    intended to shore up the 2001 Law – possibly in danger of invalidation under

---

[241]      Local Law No. 5 of 2004, Sept. 27, 2004 [TE-1488-91].

Case 18-869, Document 243, 12/28/2018, 2735446, Page79 of 104

77

1    *Bagnardi* due to its exclusion of dormitories – in order to "prevent the spread of [the

2    Hasidim] into the Village."[242]

3            As detailed above, in January 2004, the Town of Ramapo – which

4    contains part of the Village of Pomona – adopted a new comprehensive plan.  The

5    Ramapo plan proposed a zoning change that would permit certain residential

6    development on the Patrick Farm Property, which is located across the street from

7    the YSV property.  These changes had been under consideration since September

8    2002.  In the interim, rumors had circulated that the Patrick Farm property would

9    be developed with hundreds if not thousands of units.  Pomona and several other

10   villages petitioned a court to set aside the comprehensive plan as unlawful under

11   SEQRA.  The villages' arguments were based generally on the idea that the plan

12   failed adequately  to consider the environmental and other impacts of the vastly

13   increased  density  of  development  projects  it  would  authorize.    The  petition

14   mentioned the Hasidim only as an explanation of a source of the development

15   pressure: "[b]eginning in the 1990[s], the Town has attracted a burgeoning Hassidic

---

[242]     *Tartikov*, 280 F. Supp. 3d at 450.

1   community . . . [that] has caused development and political pressures in the Town

2   to increase its housing stock and infrastructure."[243]

3          In June of the same year, Ramapo enacted Local Law No. 9-2004, which,

4   subject to issuance of a special permit, authorized adult-married-student housing

5   at postsecondary educational institutions.  In October, before becoming aware that

6   TRC purchased the Subject Property, Pomona, three other villages, and a number

7   of individuals sued Ramapo and others to invalidate the law as a violation of

8   SEQRA  and  municipal  law.[244]   They  argued  also  that  the  law  violated  the

9   Establishment Clauses of the federal and New York constitutions based on certain

10  events  prior  to  the  enactment  of  the  law.[245]   Specifically,  Ramapo  received  a

11  comment from Yeshiva Chofetz Chaim of Radin that asked it to provide adult-

12  student housing for married students and their families while the married students

13  continued their postsecondary education.  This allegedly was the only comment on

---

[243]
      *In re Application of Village of Airmont*, Verified Petition ¶¶ 31-32, May 27, 2004 [TE-853].

[244]
      *Village of Chestnut Ridge v. Town of Ramapo*, Verified Petition and Complaint, Oct. 12, 2004 [TE-887-926].

[245]
      *Id.* at 36 [TE-922].

Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 81 of 104
Case 18-863, Document 243, 12/20/2018, 2735446, Page81 of 104

79

1    this topic.[246]  Ramapo eventually asserted that it would comply with the request.[247]

2    In addition, Ramapo provided in the final legislation a carve-out from a 500-foot

3    buffer requirement for adult-student-housing developments, a carve-out that was

4    uniquely applicable to one parcel in the Town of Ramapo – a parcel owned by

5    Yeshiva Chofetz Chaim.[248]   Consequently, in making their Establishment Clause

6    claims, Pomona and its co-plaintiffs stated that the adult-student-housing law was

7    passed "to secure for one religious community [the Orthodox Jewish community]

8    a unique and significant zoning benefit."[249]

9           We note at the outset that, in order to state an Establishment Clause

10   claim, the Village and its co-plaintiffs had no choice but to reference the religion of

11   the group that stood to benefit from the challenged law.  This and other references

12   to the Hasidim thus contain no suggestion of animus on their face.

---

[246]
          *Id.* ¶ 57 [TE-897].

[247]
          *Id.* ¶ 60 [TE-898].

[248]
          *Id.* ¶¶ 114-16 [TE-907-08]; Affidavit of Jay B. Rosenstein ¶ 39 [TE-953-54].

[249]
          *Village of Chestnut Ridge v. Town of Ramapo*, Verified Petition and Complaint ¶ 215,
          Oct. 12, 2004 [TE-922].

Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 82 of 104
Case 18-869, Document 243, 12/20/2018, 2735446, Page82 of 104

80

1    The issue then is whether the district court clearly erred by inferring

2    religious-based animus toward the Hasidim from the Village's opposition to the

3    proposed Ramapo law that would have benefitted members of the Hasidic

4    community.  Such opposition is related to legitimate land use concerns, free of any

5    religion-based hostility.  Specifically, Tartikov was obliged to show that Pomona's

6    opposition to the Ramapo legislation rested in significant part on religious animus

7    rather than permissible development concerns.   The mere facts that (1) the

8    development was proposed by a Hasidic group and (2) Pomona opposed the

9    development are insufficient to support an inference of discriminatory intent.

10    The same is true for the district court's finding with respect to the

11    January 2004 board resolution.   The resolution expressed opposition toward

12    politicians who favored certain groups or developers.   That those groups or

13    developers might have shared a common religious orientation does not, by itself,

14    suggest that religious animus was a "significant factor" in Pomona's position.  It was

15    clearly erroneous for the district court to conclude otherwise.

16    Mayor Marshall's comment is subject to similar reasoning.  The district

17    court clearly erred in relying on the "block vote" in finding animus because this

18    single instance of rhetoric made by one member of the board, completely divorced

Case 18-863, Document 243, 12/20/2018, 2735446, Page83 of 104

1    from any discussion or proceeding related to the challenged 2004 Law, is insufficient

2    to support a finding that animus was a significant factor that motivated the board's

3    decision to pass the 2004 Law.  We again find insufficient evidence to support the

4    district court's contrary conclusion.

5            That YSV was denied tax exempt status for the first time in 2004 is

6    similarly unconvincing.  There is no indication that YSV lost its tax exempt status

7    because the Village harbored any *religion-based* animus.  Furthermore, after TRC

8    purchased the Subject Property, the Village approved its tax exemption applications

9    in 2005 and 2006.  The district court's finding of discriminatory animus on this fact

10   was therefore clearly erroneous.

11           We turn finally to the evidence that Barr Laboratories, in proposing a

12   purportedly similar building project, received more favorable treatment than YSV.

13   In the years prior to the enactment of the 2004 law, Barr became interested in buying

14   a parcel in Pomona on which to build an office building and parking lot.  The record

15   does not reveal the size of either.  The Village board discussed the matter in May

16   2002.  The minutes show that none of the trustees was "opposed . . . in concept" to

17   the proposal except Sanderson.[250]  But, as with the Anna Mann property, the record

---

[250]    Village of Pomona Board of Trustees Meeting Minutes, May 6, 2002 at 3 [TE-329].

Case 18-863, Document 243, 12/20/2019, 2735446, Page84 of 104

82

1    lacks sufficient information about Barr's proposal for us to compare it to YSV's

2    proposed yeshiva.   Thus, the district court had no record basis for inferring

3    disparate treatment based on religion.

4                                          * * *

5             This Court is entirely mindful of the broader context of this case.

6             On the one hand, we know that residents of suburban, exurban, and

7    urban communities often resist development pressure for a long list of

8    considerations.  Some do not want change, population increases, more traffic, new

9    buildings, elimination of open green space, tall buildings blocking light, and a host

10   of other alterations of the patterns and circumstances of their lives.  And citizens

11   have a perfect right to those views, to express them before boards and legislatures,

12   and to seek through the democratic and judicial processes results that accord with

13   their preferences as long as they do so honestly and without using the mechanisms

14   of government for the purpose of disadvantaging others for religious reasons.

15            The courts' task is to view the evidence and come to a conclusion

16   whether religious bias played a significant role in the adoption of these laws.

17            The district court, which tried the case, has the predominant role in that

18   process.  We have no doubt that it reached its conclusions after a careful and

Case 7:07-cv-06304-KMK Document 386 Filed 12/20/19 Page 85 of 104
Case 18-869, Document 243, 12/20/2018, 2735416, Page85 of 104

83

1    conscientious review of the record.  Insofar as the 2001 and 2004 Local Laws are

2    concerned, however, we have come to the "definite and firm conviction that a

3    mistake has been committed."[251] The record in this case reflects a simple story. YSV

4    explored with Pomona its plan to build a school on the Camp Dora property.  There

5    was virtually no opposition to YSV's plan.  But its emergence, coupled with the

6    advice of the Village's planning consultant, led to the realization that the Village's

7    zoning laws did not adequately address permissible development for educational

8    purposes.  Thus, the Village, after due consideration and before it knew that TRC

9    had purchased the Subject Property, passed the 2001 and 2004 local laws to address

10   that need.  Those measures would not have impeded YSV's planned project.  They

11   looked to the future, to other as yet unknown educational developments, whether

12   on the unused portion of YSV's property or elsewhere in the Village.

13            There simply is not enough evidence to permit a finding by a

14   preponderance of the evidence that the Village acted with discriminatory intent in

15   adopting the 2001 and 2004 local laws.  Instead, the evidence suggests that legitimate

16   land use concerns precipitated the passage of these laws.  We therefore find that the

17   district court clearly erred with respect to the 2001 Law and the 2004 Law.  As will

---

[251]

        *Anderson*, 470 U.S. at 573.

Case 18-863 Document 243 12/20/2019 2735446 Page 86 of 104

1    appear, we reach a different conclusion with respect to the other laws at issue

2    here.[252]

3

4        C.    *Local Laws Nos. 1 and 5 of 2007*

5        By 2007, the situation had changed drastically. There was public outcry

6    over the TRC proposal following news reports in January 2007 noting that the

7    rabbinical college would serve 1,000 students and the construction would include

8    multiple apartment buildings up to six stories high to house 4,500 residents. After

9    board elections in March 2007, Sanderson rose from deputy mayor to mayor and

10    Louie and Yagel, who had not previously served on the board, became trustees. All

11    three ran on a platform opposing the TRC project.

12        It is on this record, with these and still other significant facts not present

13    in 2001 and 2004, that the district court held that the board of trustees enacted the

14    2007 Dormitory and Wetlands Laws with discriminatory purpose.

15

---

[252]    Our conclusion that the district court erroneously found discriminatory effect suffices for reversal. *See Arlington Heights*, 429 U.S. at 265 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). We therefore need not, and do not, address the court's finding that the law had a discriminatory effect on Tartikov.

1    *1.    Discriminatory Purpose*

2    The district court held that the 2007 Dormitory and Wetlands Laws

3    were motivated by discriminatory animus based on the following evidence: (1)

4    villager comments made at a January 22, 2007 public hearing on the draft 2007

5    Dormitory Law, (2) the absence of studies indicating the necessity or utility of the

6    2007 Wetlands Law combined with the Village's knowledge that there were

7    wetlands on the property and the timing of the law's adoption, (3) the exception for

8    single-family homes in the 2007 Wetlands Law, (4) the campaign promise of

9    Sanderson and Yagel and Louie to stop the threat of the TRC development, (5)

10   statements made by Sanderson, Louie, and Yagel "indicative of [Pomona's]

11   prejudice against Tartikov and Orthodox/Hasidic Jews,"[253] (6) statements made by

12   members of the community "express[ing] animus against Orthodox/Hasidic

13   Jews,"[254] (7) the board's rejection of proposals to increase the maximum height of

---

[253]

    *Tartikov*, 280 F. Supp. 3d at 452.

[254]

    *Id.* at 453.

1   dormitories and number of dining facilities allowed in the 2007 Dormitory Law, and

2   (8) the Village's "behavior with respect to other proposed projects."[255]

3           As these facts make plain, the 2007 Dormitory and Wetlands Laws were

4   enacted in a significantly different context than were the 2001 and 2004 Laws.  These

5   differences are highly significant.

6           We begin with the laws themselves.  The 2007 Dormitory Law and the

7   2007 Wetlands Law differ from the 2004 Law in that both 2007 Laws tightened,

8   rather than loosened, restrictions on building schools in the Village.  For example,

9   it prohibited dormitories from occupying more than 20 percent of the total square

10  footage of all buildings on a lot.  And it set a maximum height of 25 feet for any

11  dormitory building.  The Wetlands Law prohibited building any structure within

12  100 feet of the boundary of any wetland without a permit.  And it restricted the

13  persons who could apply for a permit to those who were deprived of *all* reasonable

14  use of their property, a sharp restriction of the trustees' previous special permit

15  authority.

16          It is clear also that the board knew what TRC intended to do with the

17  property when it enacted the 2007 laws.  True, there is scant evidence that the public

---

[255]    *Id.* at 454.

1    or the board knew any significant details about TRC's plans or what its rabbinical

2    college might look like when the draft versions of the Dormitory and Wetlands Laws

3    were discussed at a public hearing on December 18, 2006.   But that ignorance

4    dissolved on January 9, 2007 when Preserve Ramapo published an article describing

5    TRC's plans for a rabbinical college that included housing for 4,500 adult students

6    and their families in buildings up to six stories high.

7            This context is crucial to understanding the board members' thinking

8    when they enacted the laws.  Having learned about the TRC project, many villagers

9    attended the extension of the December 18 hearing that took place on January 22,

10   2007.   The purpose of this hearing, as   Mayor Marshall repeatedly reminded

11   attendees, was to discuss the two proposed amendments to the Village zoning law,

12   and not whether the Village should or should not allow TRC to build the rabbinical

13   college that had not yet been proposed.[256]   But villager after villager spoke out

14   against the TRC project, and the hearing was characterized by "outbursts," "shouts,"

15   and frequent interruptions.[257]   One villager complained that "there is no denying .

---

[256]

    *See, e.g.*, Tr., Village of Pomona Public Hearings on Local Law Amendment:
    Dormitories (continued), Local Law Amendment: Wetlands, Jan. 22, 2007, 13:10-
    14:2 [TE-392].

[257]

    *See, e.g., id.* 20:12-20 [TE-399]; *id.* 21:9-22 [TE-400].

1    . . what is going on here tonight is that there is a group who wants to take over this

2    [V]illage," and that the rabbinical college would "totally change[] the entire concept

3    of the [V]illage," forcing current villagers to "pay[] the expenses of somebody else's

4    lifestyle."[258] Another found it "really funny how we're talking about law, when you

5    have a group [the Hasidic community] that breaks every law there is."[259]  Another

6    proclaimed that "[t]his is a disgrace.  It is an absolute[] disgrace.  You are in the

7    wrong town, and the wrong [V]illage. . . . If you allow this school to be brought to

8    this [V]illage, you're going to destroy everything that everybody here worked for

9    all their life and I will never, ever, let that happen."[260]  And yet another explained

10   that "in America, we have the sense of community.  That's our face.  We're going to

11   be another Kiryas Joel.  That's why we are emotional."[261]

12          The villagers are not the only individuals who understood the

13   connection between TRC and the 2007 Dormitory and Wetlands Laws.  The evidence

---

[258]    *Id.* 18:4-19:14 [TE-397-98].

[259]    *Id.* 47:2-5 [TE-426].

[260]    *Id.* 14:10-15:13 [TE-393-94].

[261]    *Id.* 56:18-20 [TE-435].

Case 7:07-cv-06304-KMK   Document 386   Filed 12/20/19   Page 91 of 104

1    demonstrates that one board member hinted strongly to frustrated villagers that the

2    laws under consideration would prevent the TRC project or at least burden it

3    significantly.  One villager asked Ulman bluntly whether she "feel[s] the new law

4    would make it more difficult for a project like this [*i.e.*, TRC] anywhere in the area

5    to go through, or [whether she] feel[s] it would be less difficult for the project to go

6    through with the new laws."[262]  The villager then asserted: "I think what everybody

7    is trying to say is we would like to make it tougher for these project[s] to go on,

8    rather than easier so if you can tell us how we can vote for that."[263]  Ulman deflected

9    the question, but Trustee Lamer interjected: "You may have heard at the very

10   beginning [of the hearing] that Mr. Savad [TRC's counsel] was complaining that

11   these amendments unfairly restrict some theoretical project that doesn't exist, as far

12   as the [V]illage is concerned."[264]  Lamer then reasserted: "Mr. Savad may believe

13   that these amendments unfairly restrict some theoretical project" before explaining

14   that the proposed amendments were "necessary to promote the public health, safety,

---

[262]    *Id.* 35:10-14 [TE-414].

[263]    *Id.* 35:18-21 [TE-414].

[264]    *Id.* 36:18-22 [TE-415].

Case 18-869, Document 243, 12/20/2018, 2735446, Page92 of 104

90

1   and welfare of the [V]illage . . . [a]nd that's the reason why this proposal is before

2   us today."[265]  It is reasonable to conclude that Trustee Lamer's reminder that TRC

3   opposed the amendments permitted an inference, supported by the other evidence

4   we have cited, that the board was using facially neutral laws to discriminate against

5   the one entity it knew was hoping to build a school in Pomona

6          The board members were present for the hearing and heard the

7   villagers' comments.  And their private discussion following the conclusion of the

8   hearing demonstrates that those comments were on their minds.  When discussing

9   the 2007 Dormitory Law, Trustee Lamer reasoned that the height restriction should

10  not be increased due to the differences between buildings with flat roofs such as

11  dormitories and buildings with pitched roofs such as single-family homes.  He

12  stated also that one communal dining room "would be sufficient."[266]  Trustee Banks

13  suggested reducing the maximum height to 20 feet to "be consistent with our law,

14  accessory use height is twenty feet."[267]  Deputy Mayor Sanderson then said:

---

[265]       *Id.* 37:5-14 [TE-416].

[266]       *Id.* 76:18-22 [TE-455].

[267]       *Id.* 76:23-77:6 [TE-455-56].

Case 18-863, Document 243, 12/20/2018, 2735446, Page93 of 104

"Well, I think that based on the input from the public this evening, I think it's very clear that there is a great deal of concern about the additional changes from the amendments that were first proposed on December 18th.  It's my opinion that we should go back to the December 18th amendments. We should cut out the two dining rooms and go back to one.  We should go back from 35 feet to 25 feet, which is clearly more acceptable, and if we're going to do that, we should probably go back to 20 percent coverage instead of 25 percent, and keep it the way it was at the first public hearing."[268]

The board then voted to reject the proposed changes and adopted the 2007 Dormitory Law as it had been proposed at the December 18, 2006 meeting.

It is impossible for us to glean precisely how the board weighed the villagers' comments.  But that is not our task on appeal.  It is clear from Sanderson's statement that the comments influenced at least his decisionmaking process.  Some of those comments were susceptible to an inference of religious animus and hostility toward the group that would be affected negatively by the 2007 Dormitory Law.  Viewing the record as a whole, including "the series of events" leading up to the adoption of the 2007 Dormitory Law, the "context in which the decision[s]" regarding the law were made, and "statements made by the decisionmaking body and community members,"[269]  we cannot say that the district court clearly erred in

---

[268]

       *Id.* 77:8-19 [TE-456].

[269]

       *Chabad Lubavitch*, 768 F.3d at 199.

1    finding that religious animus was a "significant factor in the position taken by . . .

2    those to whom the decision-makers were knowingly responsive."[270]  And this is so

3    notwithstanding that a proposal to add 4,500 new residents and multiple apartment

4    buildings to a small village of single family houses with a population of 3,200 almost

5    certainly would have provoked opposition regardless of any religious element.

6          We reach the same conclusion with respect to the 2007 Wetlands Law.

7    In finding discriminatory purpose, the district court relied on facts related to the

8    board's decisionmaking process.  These facts included the absence of any studies

9    conducted to determine the need for or most appropriate means of enacting

10   wetlands protection.  The court relied also on comments made by villagers at the

11   January 22, 2007 hearing.  We have concluded already that the board members, who

12   were present for that hearing and discussed the comments afterwards, were

13   responsive to those comments and the animus they embodied.

14          To be sure, there is little or no direct evidence of any personal religious

15   bias on the part of the trustees who passed these laws.  But viewing the evidence in

---

[270]   *Tartikov*, 280 F. Supp. 3d at 453 (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)).

Case 18-863, Document 243, 12/29/2018, 2735446, Page95 of 104

1    the holistic manner counseled by our precedent,[271] we see no clear error in the

2    district court's findings with respect to the 2007 Dormitory and Wetlands Laws.

3

4         *2.*    *Discriminatory Effect*

5         The next and final question with regard to the 2007 Dormitory and

6    Wetlands laws is whether the district court clearly erred in holding that the laws had

7    a discriminatory effect on Tartikov.

8         For the 2007 Dormitory Law, the court based its discriminatory effect

9    finding on a finding that three provisions of the law would burden TRC's planned

10    construction of dormitories unlawfully. The first two provisions were the exclusion

11    of multifamily dwelling units from the definition of "dormitory" and the prohibition

12    on separate cooking and dining areas. The court found that both restrictions

13    prohibited the types of residences TRC intended to build, which included "kitchens

14    in each residence so that students can diligently study . . . while also meeting their

15    religious obligations to their families."[272] The other offending provision was the 20

16    percent floor space restriction, which would limit dormitories to just 20,000 square

---

[271]         *See Chabad Lubavitch*, 768 F.3d at 199.

[272]         *Tartikov*, 280 F. Supp. 3d at 456.

1    feet based on TRC's planned 100,000 square feet of construction.[273]  Dormitories of

2    that size, the court calculated, could accommodate roughly 30 students and their

3    families – a number far short of what TRC had planned.[274]

4              Pomona appears to concede that Tartikov would face these burdens

5    because it advances no argument challenging the district court's findings.[275] It does,

6    however, fleetingly argue that the court erred by finding the 2007 Dormitory Law

7    would have had an effect sufficient for Tartikov to prevail on its RLUIPA

8    "substantial burden" claim.[276]  In that portion of its brief, it argues that the burdens

9    identified by the district court are insubstantial because students could live off

10   campus, TRC could buy more land, and living on campus was not essential to TRC's

11   proposed Torah community.

---

[273]

   *Id.*

[274]

   *Id.*

[275]

   Pomona Br. 52 n.18.

[276]

   *Id.* ("As [Tartikov] failed to [show discriminatory purpose], evidence on . . . discriminatory effect[] does not matter.  Further, [Tartikov] failed to prove a substantial effect.").  We decline to draw any lines here for how much discriminatory effect suffices for an equal protection claim because that question is not close with respect to the 2007 Dormitory and Wetlands Laws.

1    Even if we were to credit these arguments, they would not persuade us

2    that the finding of discriminatory effect was clearly erroneous.  There is sufficient

3    basis in the record to conclude, as the district court did, that on campus housing of

4    the nature Tartikov sought was important to the exercise of Tartikov's faith because

5    it would allow students to be near their families while maintaining a diligent study

6    schedule.  Further, Pomona has presented no evidence suggesting that the Village

7    and surrounding community had sufficient housing for 1,000 students and 3,500

8    additional family members to live within walking or even driving distance of the

9    TRC site without additional construction.

10    With regard to the 2007 Wetlands Law, the district court found that two

11    provisions working in tandem prevented construction of a TRC-like project

12    anywhere in Pomona.  The 10 net acre minimum lot size for educational institutions

13    ensured that TRC's lot was the only site in Pomona large enough for the proposed

14    college.[277]  And the required 100-foot buffer between constructed features and

15    wetlands guaranteed TRC could not build on the property, because the only suitable

---

[277]    *Id.* at 456-57.

1    location for a driveway fell within 100 feet of wetlands.[278]  While the 2007 Wetlands

2    Law allowed landowners who were deprived of all reasonable use of their property

3    to apply for a permit, the parties' stipulated to the district court that TRC did not

4    qualify for a permit because its property could be put to reasonable use – though not

5    the use it desired.[279]

6            We find no error in the district court's reasoning.  Again in the context

7    of challenging the RLUIPA substantial burden finding, Pomona faults the district

8    court for not determining whether TRC could have regraded the property to comply

9    with the wetlands law without facing a substantial burden.  Pomona points to no

10   facts suggesting that TRC could have constructed a driveway consistent with the

11   2007 Wetlands Law with or without regrading.  Nor does it point to any evidence

12   that TRC could have constructed its proposed rabbinical college elsewhere in the

13   Village.  Moreover, forcing TRC to regrade the property or buy new land – even if

14   doing so could have brought it into compliance with the 2007 Wetlands Law –

15   would have been a discriminatory effect of the law.

---

[278]

        *Id.* at 457.

[279]

        *Id.*

1    While the burden of showing discriminatory effect was on Tartikov

2    below, the burden of showing clear error here is on Pomona.  It has not met this

3    burden.  We find no error in the district court's conclusion that the 2007 Dormitory

4    and Wetlands Laws had a discriminatory effect on Tartikov.

5

6        D.    *Remedy*

7    The district court enjoined the Village from enforcing the offending

8    provisions of the four challenged laws against Tartikov.  But its injunction went

9    much further than this.  The court below prescribed how the Village must process

10   and review a possible application from TRC concerning its proposed rabbinical

11   college.[280]  Among other things, the injunction required the Village to exempt TRC

12   from any special permit or variance requirements, process its application

13   expeditiously, and perform "segmented review"[281] of the application because "such

_____

[280]

  Special App. at 2-5.

[281]

  "Segmentation means the division of the environmental review of an action such
that various activities or stages are addressed under [state regulatory law] as
though they were independent, unrelated activities, needing individual
determinations of significance." 6 N.Y. COMP. CODES R. & REGS. § 617.2(ah).

Case 18-863, Document 343, 12/26/2018, 2735446, Page100 of 104

1    a review will be more protective of the environment."[282]  The court also prohibited

2    the Village from enacting laws similar to the four challenged laws and retained

3    jurisdiction over "any and all additional remedies sought by [Tartikov] consistent

4    with" the judgment and injunctions.[283]  This relief goes too far.

5           Parts of the injunction conflict with state law.  The requirement that the

6    agency tasked with reviewing any TRC application engage in segmented review

7    takes away authority that New York delegates to the reviewing agency.[284]   In

8    addition, the court's requirement that the Village hold a public hearing within 62

9    days of receiving an application conflicts with the statutory time limit that, the

10   parties agree and we assume to be true, initiates the 62-day clock once an application

11   is complete.[285]

---

[282]

    Special App. at 4.

[283]

    *Id.* at 5-6.

[284]

    *See* 6 N.Y. COMP. CODES R. & REGS. § 617.6(b); *see also* Arthur Ientilucci, *Seqra: Down the Garden Path or Detour for Development*, 6 ALB. L. ENVTL. OUTLOOK J. 102, 119-20 (2002) (noting an agency charged with reviewing an application determines whether segmented review is appropriate).

[285]

    *See* Pomona Br. 52-53.

1    Moreover, much of the injunctive relief is speculative.  TRC has not

2    submitted an application for its rabbinical college, and the Village has not taken any

3    action suggesting it would fail to follow the law in processing its application.[286] The

4    injunction goes much further than is needed to remedy the injuries that Tartikov

5    actually suffered and that are the subject of this lawsuit.

6    We affirm insofar as the district court enjoined Tartikov from enforcing

7    the 2007 Wetlands and Dormitory Laws,[287] but we vacate the majority of the

8    additional relief.[288]

9

10

---

[286]

*Cf., e.g., Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 750 (2d Cir. 1994) (finding it unnecessary to "fence in" a defendant with "a broad injunction" in light of its past activities when there was "no reason to believe" the defendant would fail to follow its legal obligations going forward); *Galella v. Onassis*, 487 F.2d 986, 993, 998 (2d Cir. 1973) (modifying, among other things, a portion of an injunction prohibiting the plaintiff from coming within 50 yards of the defendant by reducing the distance to 25 feet, because the original injunction was "broader than is required to protect the defendant").

[287]

The district court's injunction focused on two specific provisions of the 2007 Dormitory Law.  *See* Special App. 3.  Our holding enjoins the Village from enforcing the entire law.

[288]

Specifically, we vacate decretal paragraphs 3-6, 7A-7I, 8-16, and 18-20.  Special App. 1-6.

1 III.    *Tartikov's Cross-Appeal*

2          Tartikov challenges on cross-appeal the district court's order dismissing

3 the as-applied challenges as unripe for consideration and the summary judgment

4 order in favor of Pomona on the RLUIPA equal terms and total exclusion provisions.

5 We address each in turn.

6

7          A.    *As-Applied Challenges*

8          Having ruled on the scope of Tartikov's standing to sue and affirmed

9 the judgment of the district court with respect to the 2007 Dormitory and Wetlands

10 Laws, the only question that remains is whether the court erred in holding that

11 Tartikov could not assert as-applied challenges to the 2001 and 2004 Laws under the

12 Equal Protection Clause or RLUIPA's nondiscrimination or equal terms provisions.

13 To prove any as-applied claims under the Equal Protection Clause or RLUIPA's

14 nondiscrimination and equal terms provisions, Tartikov would need to rely on the

15 same evidence of animus that purportedly supports its facial challenges.  This

16 evidence, we have held, is insufficient with respect to the 2001 and 2004 Laws.  The

17 as-applied claims therefore fail here for the same reason as the facial challenges.[289]

---

[289]          One additional issue is lurking in the background.  TRC purchased the property

1    B.    RLUIPA Equal Terms and Exclusion Claims

2            To prevail on an equal terms claim, a plaintiff must show that the

3    challenged law – by its terms or operation – actually differentiates between religious

4    and secular groups, not merely that it was enacted with the intent to adversely affect

5    the religious group.[290]   Here, the challenged laws are facially neutral and treat

6    religious and secular institutions equally.  Tartikov has failed to make the necessary

7    showing.

8            The exclusion provision of RLUIPA forbids the *total* exclusion of

9    religious assemblies from a jurisdiction.[291]   The challenged laws do not totally

10   exclude all religious assemblies from Pomona.  The district court correctly dismissed

11   these claims.

12

13

---

years after the 2001 Law was enacted.  And while its purchase predates the 2004
Law, that law is effectively a more permissive version of the 2001 Law.  Under
these circumstances, buying into an injury in fact does not suffice for Article III
standing.  As we rest our holding on evidentiary grounds, however, we need not
and do not rest our holding on this ground.

[290]

*Chabad Lubavitch*, 768 F.3d at 196-97.

[291]

42 U.S.C. § 2000cc(b)(3)(A); *see also Vision Church v. Village of Long Grove*, 468 F.3d
975, 989-90 (7th Cir. 2006).

Case 18-863, Document 343, 12/20/2019, 2735446, Page104 of 104

1    **CONCLUSION**

2    We **AFFIRM** the judgment insofar as it enjoins the Village from

3    enforcing the unconstitutional 2007 Dormitory and Wetlands Laws, but we

4    **REVERSE** with respect to 2001 and 2004 Laws and **VACATE** the relief that goes

5    beyond enjoining enforcement of the two unconstitutional laws.[292]  In addition, we

6    **VACATE** the portions of the judgment premised on claims for which Tartikov lacks

7    standing and **REMAND** for the district court to dismiss those claims.[293]  Lastly, we

8    **AFFIRM** the portions of the judgment challenged on cross-appeal.[294]

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[292]

    *See* note 288, *supra.*

[293]

    Specifically, we refer here to the First Amendment free exercise, free speech, and free association claims under the federal and New York constitutions, RLUIPA substantial burden and exclusion and limits claims, FHA claims, and common law claims related to the *Berenson* doctrine.

[294]

    Specifically, we refer here to the as-applied challenges dismissed at the pleading stage and the RLUIPA equal terms and total exclusion claims resolved in the summary judgment order.